1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LEWIS and ROCA LLP
Robert M. Charles, Jr.
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169-5996
Telephone: 702.949.8320
Facsimile:   702.949.8321
E-mail:      rcharles@LRLaw.com

&

MORRISON & FOERSTER LLP
G. Larry Engel (*pro hac vice* pending)
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile:   415.268.7522
E-mail:      lengel@mofo.com

&

MORRISON & FOERSTER LLP
James E. Hough (*pro hac vice* pending)
Norman S. Rosenbaum (*pro hac vice* pending)
Jordan A. Wishnew (*pro hac vice* pending)
1290 Avenue of the Americas
New York, New York 10104
Telephone: 212.468.8000
Facsimile:   212.468.7900
E-mail:      jhough@mofo.com
E-mail:      nrosenbaum@mofo.com
E-mail:      jwishnew@mofo.com

Attorneys for JPMorgan Chase Bank, N.A.,
for itself and as Administrative Agent

**REDACTED**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>SOUTH EDGE, LLC,<br><br>                Involuntary Debtor. | Case No.: 10-32968<br><br>Chapter 11<br><br>**Notice of Motion and Motion to Appoint an Interim and Permanent Chapter 11 Trustee for South Edge, LLC During (i) the "Gap" Period and (ii) On A Permanent Basis; Memorandum of Points and Authorities**<br><br>**Hearing Information**<br>Date:      TBD<br>Time:      TBD<br>Courtroom:  [___] |

2296130.1

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................................ 1

II.  FACTS ................................................................................................................. 5

    A.   Background and Current Situation ..................................................... 5

    B.   "Inspirada: its history and purpose" ................................................. 7

    C.   The Petitioning Creditors ................................................................... 8

    D.   South Edge: the Operating Agreement and the Credit Agreement ...... 10

        (i)   Operating Agreement ............................................................ 10

        (ii)  Credit Agreement ................................................................. 12

    E.   The Lenders' Rights ......................................................................... 13

        (i)   Guaranties ............................................................................ 13

        (ii)  Collateral Documents .......................................................... 14

    F.   Members' Failure to Pay and South Edge's Defaults ........................ 14

        (i)   South Edge's Management Committee Freezes Further Development of Inspirada and Other Events of Default Caused By Builder-Defendants ..................................... 16

        (ii)  Members' Unilateral Extension of Takedown Schedule ........... 17

    G.   Forbearance Agreement .................................................................... 18

    H.   Commencement of Litigation and Arbitration ................................... 19

        (i)   Litigation Commenced by Lenders ...................................... 19

        (ii)  Focus' Arbitration Proceeding ............................................. 19

    I.   South Edge's Current Management Is Hopelessly Conflicted and Is De-Valuing the Project ......................................................................... 21

        (i)   The Majority of the Members of the Management Committee Have Breached Their Contractual Obligations and Frozen Development at Inspirada ................................. 23

        (ii)  South Edge Is Not Maximizing Potential Recoveries on LID Bonds ....... 24

    J.   South Edge Has Valuable Assets That Must Be Preserved ................. 25

        (i)   The Plans and Specifications for Inspirada Must Be Updated ............... 25

        (ii)  Local Improvement District ("LID") Funds ........................ 26

        (iii) Causes of Action ................................................................. 26

III. LEGAL ARGUMENT ....................................................................................... 27

    A.   A Trustee Must Be Appointed During The "Gap Period" Of This Involuntary Chapter 11 Case ............................................................ 27

    B.   It Is Necessary and Appropriate To Appoint a Permanent Chapter 11 Trustee ............................................................................................ 28

        (i)   The Facts Before The Court Provide Overwhelming Support For The Appointment of a Chapter 11 Trustee ............................ 29

i

# TABLE OF CONTENTS
## (continued)

Page

(ii)    Even if the Court Determines That "Cause" Does Not Exist,
Appointing a Chapter 11 Trustee is in the Best Interests of South
Edge's Creditors Under Section 1104(a)(2) of the Bankruptcy Code ...... 30

**TABLE OF AUTHORITIES**

Page

CASES

*In re Bellevue Place Assocs.,*
   171 B.R. 615 (Bankr. N.D. Ill.), *aff'd, Bellevue Place Assocs. v. Caisse Centrale Des
   Banques Populaires*, No. 94-C-5089, 1004 U.S. Dist. LEXIS 17409 (N.D. Ill.
   December 6, 1994) ................................................................................................. 29,30

*In re Clinton Centrifuge, Inc.,*
   85 B.R. 980 (Bankr. E.D. Pa. 1988)........................................................................ 29

*Comm. of Dalkon Shield Claimants v. A.H. Robins Co. Inc.,*
   828 F.2d 239 (4th Cir. 1987)................................................................................... 29

*In re E-Z Pay Servcs., Inc.*, Case No. BK-S-06-50567 (Bankr. D. Nev. Aug. 23, 2006) ............ 28

*Hirsch v. Pa. Textile Corp. (In re Centennial Textiles, Inc.),*
   227 B.R. 606 (S.D.N.Y. 1998) ................................................................................ 28

*In re Intercat, Inc.,*
   247 B.R. 911 (Bankr. S.D. Ga. 2000) ..................................................................... 28

*In re Ionosphere Clubs, Inc.,*
   113 B.R. 164 (Bankr. S.D.N.Y. 1990) .................................................................... 31

*In re Kimball Hill, Inc.*, Case No. 08-10095 (SPS) (Bankr. N.D. Ill. Apr. 23, 2008)................... 15

*Lowenschuss v. Selnick (In re Lowenschuss),*
   171 F.3d 673 (9th Cir. 1999).................................................................................. 30

*In re Madison Mgmt. Group, Inc.,*
   137 B.R. 275 (Bankr. N.D. Ill. 1992)...................................................................... 31

*In re McCall*, 34 B.R. 68 (Bankr. E.D. Pa. 1983) ............................................................. 30

*In re Nat'l R.V. Holdings, Inc.,*
   390 B.R. 690 (Bankr. C.D. Cal. 2008) .................................................................... 28

*Okla. Refining Co. v. Blair (In re Okla. Refining Co.),*
   838 F.2d 1133 (10th Cir. 1988)............................................................................... 29

*In re Petralex Stainless, Ltd.*, 78 B.R. 738 (Bankr. E.D. Pa. 1987) ................................... 31

*In re Prof'l Accountants Referral Servs., Inc.*, 142 B.R. 424 (Bankr. D. Colo. 1992) ............. 27

*In re Rivermeadows Assocs. Ltd.,*
   185 B.R. 615 (Bankr. D. Wyo. 1995) ................................................................. 29,30

*In re V. Savino Oil & Heating Co.,*
   99 B.R. 518 (Bankr. E.D.N.Y. 1988)....................................................................... 30

*In re Woodside Group LLC*, Case No. 08-20682 (PC) (Bankr. C.D. Cal. Aug. 20, 2008).......... 16

*Variable-Parameter Fixture Dev. Corp. v. Comerica Bank-Cal. (In re Morpheus Lights,
   Inc.),*
   228 B.R. 449 (Bankr. N.D. Cal. 1998) .................................................................... 28

iii

**TABLE OF AUTHORITIES**
(continued)

Page

**STATUTES**

11 U.S.C. § 101(5)(A) .................................................................................................. 8

11 U.S.C. § 101(10)(A) ................................................................................................ 8

11 U.S.C. § 303(b)(1) .............................................................................................. 8,9

11 U.S.C. § 1104(a) ............................................................................................... 27,28

11 U.S.C. § 1104(a)(1) ............................................................................................. 27

11 U.S.C. § 1104(a)(2) ............................................................................................. 30

**OTHER AUTHORITIES**

5 Bankr. Service, L. Ed. § 41.30 at 49-50 (1987) ..................................................... 30

*Collier on Bankruptcy* ¶303.29 (15th ed. 2010) ....................................................... 27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF EXHIBITS

A    Form 10-Q, pp. 12-13, Beazer Homes USA, Inc. (August 5, 2010)....................16

B    Order Granting Alternative Debt Portfolios' Motion to Appoint Trustee Pursuant
To 11 U.S.C. § 1104(a) and (b) (*In re E-Z Pay Services, Inc.*, Bankr. D. Nev.
August 23, 2006, Docket No. 18 (Case No: 06-50567 (GWZ)))..........................28

JPMorgan Chase Bank, N.A., as a petitioning creditor, Agent and Lender under the Credit Agreement ("JPMorgan" or "Movant"), submits this Motion to Appoint an Interim and Permanent Chapter 11 Trustee for South Edge, LLC, a Nevada limited liability company ("South Edge" or "Debtor") during (i) the "Gap" Period and (ii) on a Permanent Basis (the "Motion"), together with the supporting declarations (collectively the "Declarations") of John P. McDonagh (the "McDonagh Decl."), Michael D. Ross (the "Ross Decl."), and James E. Hough (the "Hough Decl.").

## I.
## PRELIMINARY STATEMENT

On December 9, 2010, JPMorgan (in its capacity as a Lender to South Edge), together with Credit Agricole Corporate and Investment Bank ("Credit Agricole") and Wells Fargo Bank, N.A. ("Wells Fargo") (also Lenders to South Edge) filed an involuntary Chapter 11 petition against South Edge under section 303 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court, District of Nevada (the "Court").

This involuntary Chapter 11 case, in combination with the appointment of a Chapter 11 trustee, is the last hope of rescuing South Edge and its "Inspirada" project (the "Project") from the waste and precipitous decline that has been caused, and will continue to be caused, by Debtor's controlling insiders. These insiders are sacrificing the Project and repudiating Debtor's obligations in a quest for greater profits at the expense of not only approximately 39 lenders to whom the insiders seek to shift their losses, but also the City of Henderson, Debtor's other creditors and other parties in interest. The Project can endure neither the insiders' persistent neglect, self-dealing and abuse nor the drawn out litigation favored by the insiders and their affiliates.

The appointment of a trustee under section 1104(a) of the Bankruptcy Code is mandatory where, as here, there is overwhelming "cause" for the appointment of a trustee under section 1104(a)(1) of the Bankruptcy Code. In addition, appointment of a trustee under section 1104(a)(2) is appropriate because having an independent fiduciary replace the incompetent, self-

1  dealing insiders that currently control South Edge is clearly in the best interests of South Edge's

2  creditors and the community at large.

3         Movant seeks the appointment of both (i) an interim trustee to serve pending the entry of

4  an order for relief, and (ii) a permanent Chapter 11 trustee to be appointed immediately upon the

5  entry of an order for relief.  Such relief is warranted under section 1104(a) of the Bankruptcy

6  Code because:

7          • In the spring of 2008, the Debtor's controlling insiders intentionally shut down the

8            Project by refusing to seek further capital contributions from themselves and South

9            Edge's other members;

10          • The Debtor's management committee has squandered opportunities to enhance the

11            value of the Project and obtain significant monetary recoveries for South Edge,

12            including realizing millions of dollars of municipal financing.  Unless promptly

13            remedied, the intentional failure to capitalize on this opportunity, places those

14            funds in jeopardy;

15          • The Debtor's controlling insiders have failed to arrange for essential health, safety

16            and maintenance work at the Project and their continued neglect will most

17            certainly result in the loss or impairment of essential City permits and entitlements.

18          • The Debtor's controlling insiders have breached their fiduciary and contractual

19            obligations to South Edge, while at the same time using their considerable

20            financial resources to wage a litigation campaign against the Lenders in

21            furtherance of their own objectives at the expense of South Edge and its estate;

22          • The Debtor's controlling insiders have breached their contractual obligations to the

23            Debtor with impunity, as adjudicated by an Arbitration Panel consisting of two

24            former Justices of the Nevada Supreme Court and one former United States

25            District Judge for the District of Nevada; and

26          • Since at least January 22, 2008, South Edge has been in default under its Credit

27            Agreement with the Lenders; not as a direct consequence of South Edge's

28            financial condition, but rather, as the direct result of its controlling insiders'

2

strategic and self-interested decision to breach their contractual commitments to South Edge.

An operating trustee will be charged with managing South Edge in furtherance of the interests of its estate and creditors. As an independent fiduciary, the trustee will be able to promptly take the steps necessary to address these issues and to focus on the immediate and longer term needs of the Project. Given the challenging economic environment, the focus must be on constructive solutions, and collaboration with local government officials and other parties in interest. A Chapter 11 trustee, in stark contrast to Debtor's conflicted management, can fulfill this much needed role.

This bankruptcy proceeding is the last and best opportunity to salvage the Project and extract value for Debtor's creditors. Appointing a Chapter 11 trustee, who will function as an independent fiduciary, will ameliorate the damages created by the Builder-Defendants' ongoing waste and mismanagement. There are significant value-creating LID project opportunities for South Edge to pursue, but Debtor's conflicted insider management is not taking any affirmative steps to realize such value. A Chapter 11 trustee will provide South Edge with the much-needed independent, objective and value-driven leadership that its creditors deserve, thereby providing a meaningful opportunity for the Project to survive through a plan of reorganization that either provides a liquidating trust or a reorganized South Edge solution. There are at least four steps a Chapter 11 trustee can immediately take:

1. **Enforce Takedowns.** A trustee will have standing to enforce the defaulting Members' obligation to complete their "Takedowns," or to compensate South Edge for the defaulting Members' failures to complete the Takedowns. Only a trustee can fill this role, because the South Edge Operating Agreement, as construed by the arbitrators in the recent Arbitration Award, requires the defaulting Members' consent to Debtor's collection actions against them.

2. **Recover LID Proceeds.** A trustee can collect over $89 million of LID proceeds and protect the LID bond process from being defeased by the City of Henderson ("COH" or the "City") and LID bondholders. Those parties are concerned that the Project may be abandoned by

3

Debtor as a consequence of the controlling Builder-Defendants' insiders' sabotage and wrongful shut down of the Project. A small amount of additional work to be arranged by a trustee can result in significant LID recoveries that can be used, in turn, to complete more LID projects and obtain additional LID proceeds, on a rolling basis. *See* Ross Decl. at ¶8 (describing scope of LID recoveries). Moreover, a Chapter 11 trustee can renegotiate and update the Project entitlements (*i.e.*, the process by which South Edge obtains approvals from the COH to develop the Project), plans, specifications and budgets with COH in order to develop a more viable and valuable Project, consistent with the post-bubble realities.

3.    **Efficient Management of the Project.** A trustee can work with COH and other constructive parties (*e.g.*, Focus) to protect and salvage the Project from the continuing waste, neglect and abuse it now suffers. A trustee could preserve the value of the Project by allocating funds to address essential maintenance and cost-effective and affordable work, much of which is required to preserve COH permits and entitlements or for smart business practices. A trustee can also provide an independent assessment of the Project to the Lenders and COH and determine what changes to make in design and specifications for this Project in order to make it viable and feasible in the current economic environment.

4.    **Develop Reorganization Plan.** Finally, a trustee can facilitate a timely and cost-effective exit strategy for South Edge and other parties in interest, including the Lenders. Because the Loan Documents have voting requirements different from (and more stringent than) those contained in the Bankruptcy Code, a consensual, out of court restructuring would be difficult, if not impossible, without the benefit of a Chapter 11 proceeding.

By empowering a trustee to recover for the estate from these Builder-Defendant insiders what they refuse to pay to the Debtor, the value of this Project and its LID proceeds can be salvaged before it's too late. That is important not only to the Lenders and Focus, the innocent Member, but also to the holders of $102 million in LID bonds, the City of Henderson, Inspirada homeowners, and other parties in interest. Unlike the Builder-Defendants, the Lenders have not given up on South Edge, and hope to have the opportunity to pursue collaborative arrangements with a Chapter 11 trustee in order to preserve and create value for this estate. The Lenders

4

support this involuntary case in order to try to maintain and increase the value of the Project, Takedown claims, and the LID financing and to ameliorate the damages created by the Builder-Defendants' ongoing waste, self-dealing and mismanagement; thereby increasing the prospect of recovery for all creditors including the petitioners.

## II.
## FACTS

### A.    Background and Current Situation

South Edge is a special-purpose, limited liability company-joint venture that owns Inspirada, a nearly 2,000-acre real estate project that was begun by some of the nation's most successful homebuilders shortly before the real estate bubble burst. This "new urbanism" development in Henderson, Nevada, is the sole business of this "single-asset real estate" debtor (*see* §101(51B) of the Bankruptcy Code). The Project was designed by eight builders, who are South Edge's members (collectively the "<u>Members</u>" and each a "<u>Member</u>"), as a joint venture for pooling their resources to build common infrastructure on a cost-effective basis with (1) $585 million in Loans (defined below) from a large group of Lenders (defined below)[1] for whom JPMorgan acts as "Administrative Agent" and collateral agent, (2) $102 million in public bonds known as "LID" bonds, and (3) Member capital contributions. The Project was designed to ensure timely repayment of the Loans through the Member's periodic purchase from the Debtor of their allocated portion of the Project's real property, a process referred to as a "Takedown," the precise mechanics of which are described below.

Out of eight Members, two Members currently are being liquidated by trusts created under confirmed Chapter 11 plans and as a consequence, have defaulted on their obligations. One Member (Focus South Group, LLC ("<u>Focus</u>")) has honored its Takedown obligations in accordance with the applicable agreements. The remaining five "Builder-Defendants",[2]

---

[1] At present, there are approximately 39 Lenders, some original lenders and some successors or assignees.

[2] Movant collectively refers to those confirmed defaulting Members and their guarantor-Parent corporations as the "Builder-Defendants," because they are defendants in both (i) the Completion Guaranty Actions (defined herein) and the UCC Actions (defined herein) commenced by JPMorgan that are referenced in Hough Decl. as Exhibits A and B (together, the "<u>Nevada Actions</u>"), and (ii) the Debtor-Members' arbitration resulting in an
(Footnote continues on next page.)

1    representing a supermajority of equity interests of the Members, have elected wrongfully to shut

2    down the Project and hold it hostage. These insiders' ransom demands include relief of sufficient

3    liabilities in order to assure that they can acquire their allocated interests in the Project at an

4    unfairly large discount, and thereby realize huge future profits. The insiders' hostage-ransom

5    strategy purposely ignores their contractual obligations to Debtor and to the Lenders, as well as

6    their fiduciary duties to Debtor's creditors generally.

7         Since January 22, 2008, South Edge has been in default under its Credit Agreement with

8    the Lenders as a result of numerous willful breaches before and after the maturity of the Loans.

9    For example, South Edge has failed to make the requisite principal and interest repayments to the

10   Lenders because the Builder-Defendants have failed to pay their agreed Takedowns to South

11   Edge. Moreover, in the spring of 2008, certain Members of South Edge chose to cease making

12   any further capital contributions to South Edge, intentionally shutting down the Project and

13   leaving it dormant for the past two and a half years. In addition, instead of authorizing the

14   requisite funding to complete ongoing projects supported by the LID bonds, or other essential

15   work necessary to maintain improvements and equipment and avoid waste, the Builder-

16   Defendants chose to pay their respective lawyers to wage a litigation campaign in an attempt to

17   intimidate the Lenders and coerce undeserved concessions in favor of those insiders.

18        The Debtor's management committee is mired in perpetual deadlock and dysfunction,

19   refuses to undertake further development of the Project, and even fails to arrange for essential

20   health, safety and maintenance work at the Project that would, if completed, result in millions of

21   dollars of cash payments to the Debtor funded by LID bond proceeds. The wrongful actions of

22   the controlling Builder-Defendants (led by KBHN with an approximate 49% interest, plus a veto

23   on any material decision), threaten essential City permits and entitlements and Debtor's access to

24   vital LID bond proceeds.

25   (Footnote continued from previous page.)

26   arbitration award (discussed in greater detail herein and in the Hough Decl.). The Builder-Defendants include the
     following members of South Edge: Meritage Homes of NV ("Meritage"), Coleman-Toll Limited Partnership

27   ("Toll"), Beazer Homes Holding Corp. ("Beazer"), KB Home Nevada, Inc. ("KBHN") and Pardee Homes of Nevada,
     Inc. ("Pardee"), together with their respective Parent entities.

28

In May 2009, Focus[3] (the only non-defaulting Member as to Takedowns) commenced an arbitration against the controlling alliance of Builder-Defendants, in which Focus sought to (i) compel those Members' specific performance of certain contractual obligations, such as to pay the Takedowns, and (ii) recover monetary damages from the controlling Members for the loss of value to South Edge resulting from the Builder-Defendants' ongoing pattern of putting their own self-interests ahead of the best interests of South Edge and its creditors. On July 6, 2010, the arbitration panel issued its arbitration award (the "Arbitration Award"), finding that the controlling Builder-Defendants wrongfully shut down the Project and wrongfully extended the maturity of the Builder-Defendants' liability to pay the Takedowns to Debtor (and Lenders as secured creditor-assignees) in violation of their contractual obligations. *See* Hough Decl. at ¶¶ 33, 34, 37, 38. The Arbitration Award[4] also highlights the managerial deadlock at South Edge. Pursuant to the terms of the Arbitration Award, neither Focus nor any other Member is able to act derivatively to enforce Debtor's rights and claims for recovery of Takedown or other liabilities from the Builder-Defendants. Moreover, the Builder-Defendants retain their voting rights (but only on matters not related to their own defaults) until they are formally voted out of South Edge pursuant to the terms of South Edge's operating agreement. *See* Hough Decl. at ¶ 40.

**B.    "Inspirada: its history and purpose"**

In 2003, preliminary discussions began among some of the nation's largest homebuilders for the creation of "Inspirada" — a large-scale "new urbanism" development[5] project in the City of Henderson, Nevada. Inspirada was to include 8,500 residences spread over nearly 2,000 acres of land in seven "Villages," and was expected to cost at least $1.25 billion.[6] In addition, a

---

[3] There is a separate Focus entity that is the manager of South Edge – Holdings Manager, LLC. Another Focus general affiliate, called Landtek, is the construction manager of the Project. These Focus-related creditors have substantial claims, although the more than $8 million management fee owing to Holdings has been delayed, because the Builder-Defendants wrongfully stopped the key related work just short of completion.

[4] The Arbitration Award was entered by the Nevada District Court on November 2, 2010, and on November 9, 2010, the Builder-Defendants filed a notice of appeal of the Arbitration Award. Hough Decl. at ¶ 41.

[5] The urbanism concept for Inspirada is the largest ever undertaken in Las Vegas for this style of development.

[6] That budget has increased to more than $1.55 billion due to cost overruns and delays.

1  centrally-located, 300-acre Town Center was supposed to be an urban destination for retail,

2  residential, commercial, gaming, office, civic and municipal uses, and was to include an

3  additional approximately 3,000 residences.  The Villages and Town Center were supposed to

4  include two middle schools, three elementary schools, a fire station, a police station, three

5  community parks, six neighborhood parks and miles of trail systems.  The Project was organized

6  in units, the smallest of which (20-60 acres each) were called "Pods," and the Pods were designed

7  for mandatory acquisition by individual Members of the Debtor, in what are called "Takedown"

8  purchases for the construction of the individual Builder-Defendants' housing projects.  The Pods

9  are grouped into seven residential "Villages" of 200-250 acres each, and a "Town Center."  *See*

10  McDonagh Decl. at ¶3.  Of the original 1,953 acres in the Project, Members have acquired only

11  773.82 acres, resulting in 1,179 acres remaining with South Edge.

12    In May 2004, these homebuilders, through their subsidiary members, formed South Edge,

13  a single-purpose entity whose sole purpose was to purchase the land for the Project from the

14  Federal Bureau of Land Management ("BLM") at a cost of $557 million,[7] and then to develop it

15  with basic infrastructure in accordance with specific Takedown contracts that are a part of the

16  Lenders' collateral.  *See* McDonagh Decl. at ¶4.  The Members would then acquire the land,

17  complete the onsite and offsite work and build houses for sale.  *See id.*  Unfortunately, they

18  misjudged the market and made their deals near the top of the real estate bubble.  Nevertheless,

19  this Chapter 11 case is not occurring because of a bubble, but rather on account of how the

20  Builder-Defendants reacted to the bursting bubble and sabotaged the Project for their own benefit.

21    **C.    The Petitioning Creditors**

22    Section 303(b)(1) of the Bankruptcy Code requires each petitioning entity to be a "holder

23  of a claim . . . that is not contingent as to liability or the subject of a bona fide dispute as to

24  liability or amount."  *See* 11 U.S.C. § 303(b)(1).  Section 101(5)(A) of the Bankruptcy Code

25  defines "claim" as a "right to payment," *see* 11 U.S.C. § 101(5)(A), and section 101(10)(A) of the

26

27    [7] At the boom time, the land purchase price for Inspirada was a record purchase price for land in the Las
    Vegas Valley.

28

1    Bankruptcy Code defines "creditor" as an ". . . entity that has a claim against the debtor that arose

2    at the time of or before the order for relief concerning the debtor." *See* 11 U.S.C. § 101(10)(A).

3            The three petitioning creditors are JPMorgan, Credit Agricole and Wells Fargo

4    (collectively, the "Petitioners"). Each of the Petitioners is a creditor of South Edge, because each

5    holds a claim against South Edge in the form of a note that was issued pursuant to the terms of the

6    Credit Agreement (each, a "Note"). Under the Credit Agreement, each Lender makes it own

7    several – not joint – loan to the Debtor, and each Note is made payable to the order of the

8    noteholder for the sum of the Borrower's obligation to such noteholder. *See* McDonagh Decl. at

9    ¶6. Therefore, each noteholder is an individual creditor with the right to exercise its own rights,

10   subject to the Agent's exercise of collateral remedies for the Lenders collectively.

11           Section 303(b)(1) of the Bankruptcy Code also requires that the claim not be contingent as

12   to liability or subject to a bona fide dispute. *See* 11 U.S.C. § 303(b)(1). It is undisputed that

13   South Edge is in default under the terms of the Credit Agreement, *see* Hough Decl. at ¶¶12, 13,

14   38 (describing (i) the Debtor's affirmation of defaults under the Credit Agreement including in

15   the Forbearance Agreement, as well as (ii) the arbitration panel's recognition of numerous

16   defaults under the terms of the Credit Agreement and related loan documents). Moreover, there is

17   no bona fide factual or legal dispute as to the validity of the debt owing to the Lenders and

18   noteholders under the Credit Agreement and the Notes. *See* McDonagh Decl. at ¶36. South Edge

19   has a definite payment obligation to both the Lenders and the noteholders to satisfy the

20   obligations provided for under the Credit Agreement and the Notes. *Id.* Accordingly, the

21   Petitioners' claims are not contingent as to liability, and their claims are not subject to a bona fide

22   dispute.

23           Section 303(b)(1) of the Bankruptcy Code further requires that the petitioners hold

24   unsecured claims in the aggregate amount of at least $14,425. *See* 11 U.S.C. § 303(b)(1).

25   Notwithstanding that South Edge pledged certain collateral to JPMorgan and the Lenders to

26   secure repayment of its obligations under the Notes and the Credit Agreement, the Petitioners'

27   claims are under-secured, and the aggregate, undisputed amount of these unsecured claims are not

28   less than $14,425. *See* McDonagh Decl. at ¶17.

9

1      Finally, in addition to the numerous payment defaults under the Credit Agreement, South

2   Edge is months behind on payments to certain of its creditors. *See* McDonagh Decl. at ¶39.

3   Therefore, it is beyond question that South Edge is not paying its debts as they become due.

4      For these reasons, the involuntary petition filed on December 9, 2010 by the Petitioners is

5   proper pursuant to section 303 of the Bankruptcy Code, and an order for relief under Chapter 11

6   of the Bankruptcy Code should be granted by the Court.

7       **D.      South Edge: the Operating Agreement and the Credit Agreement**

8      South Edge is governed by the Amended and Restated Operating Agreement of South

9   Edge, LLC, dated as of May 3, 2004 (the "<u>Operating Agreement</u>," a copy of which is attached to

10  the McDonagh Decl. as Ex. D).

11          (i)     *Operating Agreement*

12     The Operating Agreement addresses the governance of South Edge, as well as the

13  purchase, sale and development obligations of its Members,[8] consistent with the Credit

14  Agreement and related Loan Documents.

15     South Edge consists of eight Members, and as noted in the following chart, each

16  Member's ownership share of South Edge is based on the amount of land it is to develop in the

17  Project. In addition, each Member has a Parent Guarantor.[9]

18

19

| Member | Parent Guarantor | Acreage | Units | Percentage Interest |
|--------|-----------------|---------|-------|---------------------|
| Focus South Group, LLC | John A. Ritter | 304.52 | 15.59 | 15.59 |
| Meritage Homes of NV | Meritage Corporation | 68.96 | 3.53 | 3.53 |
| Alameda Investments, LLC* | Woodside Group, LLC | 159.0 | 8.14 | 8.14 |
| Coleman-Toll Limited Partnership | Toll Brothers, Inc. | 205.49 | 10.52 | 10.52 |

20

21

22

23

24

25      [8] Although the Operating Agreement predates the Credit Agreement, it contemplates the general structure of

26  the loan arrangement as finally agreed to in the Credit Agreement and defers in advance that the Credit Agreement
    shall control (Operating Agreement at § 2.3.3.) and that the Credit Agreement Events of Default create Events of
    Default under the Operating Agreement.

27      [9] *See* Section II.E *infra* describing the scope of the Parents' guarantees to JPMorgan and the Lenders.

28

10

| Member | Parent Guarantor | Acreage | Units | Percentage Interest |
|---|---|---|---|---|
| Beazer Homes Holding Corp. | Beazer Homes USA, Inc. | 50.4 | 2.58 | 2.58 |
| KB Home Nevada, Inc. ("KBHN") | KB Home | 946.38 | 48.45 | 48.45 |
| Kimball Hill Homes Nevada, Inc.* | Kimball Hill, Inc. | 122.86 | 6.29 | 6.29 |
| Pardee Homes of Nevada, Inc. | Weyerhaeuser Real Estate Company | 95.71 | 4.9 | 4.9 |
| **TOTAL** | | **1,953.32** | **100.0** | **100.0** |

**\*Note:** Both Kimball Hill and Alameda filed for bankruptcy protection, and each rejected the Operating Agreement in their respective bankruptcy proceedings. Each is now represented by a Liquidating Trustee under a confirmed plan of reorganization. They are not "Builder-Defendants" herein.

The terms and amount of South Edge's payments to the Lenders under the Credit Agreement and applicable Notes mirror the Members' obligations in the Operating Agreement and their Takedown and other obligations under their respective "Acquisition Agreements" (titled the "Purchase and Sale Agreement and Joint Escrow Instructions"), which are also assigned to the Lenders. *See* McDonagh Decl. at ¶8. Every Member has its own Acquisition Agreement with South Edge, which is an integrated part of, and incorporated by reference in, the Operating Agreement, and the terms of each Acquisition Agreement are substantially identical. *See id.*

The management of South Edge's affairs is exclusively vested in a Management Committee, which includes one representative per Member (each, a "Manager"). *See* Operating Agreement, Section 5.1.1.

One of the most significant responsibilities of the Management Committee, as provided for in the Operating Agreement, is to determine the appropriate amount of Capital Contributions to be made by the Members to South Edge to cover its' expenses. These expenses include on-going development costs, interest payments, principal payments for the land financing, maintaining interest reserves (Operating Agreement, §2.3.3), funding Management Fees (§2.3.7), as well as ongoing payments for post-auction planning, engineering, legal and other incidental expenses (§2.3.1).

1    Except as to certain matters, the Operating Agreement provides that the Management

2    Committee shall act by an affirmative vote of the Managers representing a majority of the

3    membership percentage interests. *See* Operating Agreement at §5.1.1. All actions taken by South

4    Edge must be by quorum, which includes at least three Members and a 60% majority of the

5    membership interests. *See Id.* at §5.2.4. Therefore, as a result of KBHN's 49% share, a quorum

6    can not be achieved without KBHN, and its proportionate share in South Edge provides it with a

7    veto and an enormous amount of control over South Edge's actions.

8              (ii)    *Credit Agreement*

9              South Edge completed the purchase from BLM, in part, with funds loaned by Lenders

10   pursuant to a Credit Agreement dated November 1, 2004, among South Edge, as "Borrower,"

11   JPMorgan, as "Administrative Agent" and as a "Lender," together with the other "Lenders" from

12   time to time party thereto (the "Lenders"), which was amended by the Amended and Restated

13   Credit Agreement, dated March 9, 2007 (the "Credit Agreement").[10] *See* McDonagh Decl. at ¶5.

14             In addition to funding the purchase of the BLM land, the Credit Agreement also provided

15   funding for the construction of the major infrastructure on the Project. *Id.* at ¶12.

16             The Operating Agreement required each Member to enter into an Acquisition Agreement

17   with South Edge. *See* Acquisition Agreement, Recital A ("Builder is currently a Member of

18   Developer. Pursuant to the Operating Agreement of Developer, Builder is to enter into this

19   Agreement with respect to the 'Property' Builder shall ultimately acquire from Developer"). *See*

20   *also* Operating Agreement §§ 2.3.4 and 6.11.3, as amended, incorporating the Acquisition

21   Agreements. *See* McDonagh Decl. at ¶12.

22             In order to facilitate the construction of the Project, the Members agreed to purchase

23   through their Takedowns, on a set schedule at the specified price with formula escalators to

24   recover all of Debtor's infrastructure costs, specific parcels of the Project from South Edge. *See*

25   ───────────────
          [10] A copy of the Credit Agreement is attached to the McDonagh Decl. as Exhibit A. The Credit Agreement
26   has four "facilities." Facility A is a construction loan that is drawn down by South Edge as needed, Facilities B and
     C are term loans that were fully funded at the closing of the Credit Agreement, and Facility D provides for letters of
27   credit available to South Edge. The original 2004 Credit Agreement is substantially the same as the Credit
     Agreement, and has been omitted for brevity.

28

                                                            12

1    McDonagh Decl. at ¶12. As explained in the Arbitration Award, KBHN and its allied Builder-

2    Defendants compelled Focus to acquire all of its land with timely Takedowns just weeks before

3    KBHN and its allies forced South Edge to wrongfully shut down the Project and refused to make

4    their own further Takedown payments owing to South Edge. Therefore, Focus is the only non-

5    defaulting Member under the Operating Agreement as to the Takedowns.

6         The schedule for the land purchases from South Edge (*i.e.*, the "Takedowns") was

7    specifically set up to align South Edge's periodic needs with the maturity of the Loans provided

8    by JPMorgan and the Lenders. The Acquisition Agreements and the Takedown schedules

9    provided therein were essential to the Credit Agreement, because they provided the means by

10   which the Loans would be repaid to JPMorgan and the Lenders. *See* McDonagh Decl. at ¶13.

11   The payments from the Members to South Edge in connection with land purchases were intended

12   to provide South Edge with funds that it would use, as Borrower, to repay its liabilities and

13   obligations to Lenders under the Credit Agreement and other Loan Documents, as well as other

14   creditors thereafter and by which the LID project work could be funded. *See id.* The Builder-

15   Defendants' past-due Takedown obligations owing to South Edge exceed $270 million, but the

16   Builder-Defendants' claim they never have to repay those debts, unless and until they choose to

17   do so, because (absent a Chapter 11 trustee) the Builder-Defendants can veto any collection

18   action Debtor may attempt. *See* Award at 15, a copy of which is annexed as Ex. D to the Hough

19   Decl.

20        **E.**        **The Lenders' Rights**

21             (i)      *Guaranties*

22        When South Edge entered into the Credit Agreement with JPMorgan and the Lenders,

23   each Member and its respective parent also executed the following guaranties (collectively, the

24   "Guaranties") in favor of JPMorgan, as Administrative Agent under the Credit Agreement: (1) a

25   Completion Guaranty, which guaranties the completion of certain improvements on the Project

26   and the payment of certain development costs (discussed below), (2) a Limited Guaranty (also

27   known as a "bad boy guaranty") under which the Member and parent guaranty payment for

28   damages related to certain fraudulent and/or unlawful acts, and (3) a Repayment Guaranty, which

13

1    is triggered in the event of an involuntary or voluntary bankruptcy of South Edge.  *See*

2    McDonagh Decl. at ¶20.

3            Under each Guaranty, the Member and its Parent are jointly and severally liable for their

4    share of the guarantied obligations.

5                    (ii)    *Collateral Documents*

6            The Lenders were willing to make these substantial Loans only if they were adequately

7    secured.  As security for the Loans underlying Inspirada, the Lenders required—and obtained—

8    both liens on the land and related Collateral, including on South Edge's rights to payment vis-à-

9    vis the Members and their Parents and LID bond proceeds.  *See* McDonagh Decl. at ¶15

10   (describing in greater detail the collateral documents pledged to JPMorgan and the scope of the

11   security interests in various forms of collateral).  South Edge, as the purchaser of the land, holds

12   title to it (subject to JPMorgan's lien and the Deed of Trust of JPMorgan).  In addition, the

13   security agreements among the Loan Documents create security interests in all of Debtor's

14   personal property, including the assigned Acquisition Agreements and the Operating Agreement

15   rights to payment owing to Debtor, as well as LID proceeds and certain MI Deposits.[11]  *Id.*  The

16   Lenders relied not only on the land, but also, among other things, on the (i) guarantors'

17   Completion Guaranties to improve that Project, (ii) assignment of the Takedown payments and

18   MI Deposits owing to Debtor, and (iii) the LID proceeds from the $102 million LID bond

19   issuance.

20   **F.    Members' Failure to Pay and South Edge's Defaults**

21           The Project commenced after the Credit Agreement, Loan Documents and Collateral

22   Documents were executed.  The Lenders honored all draw requests until approximately March

23   2008, when the Builder-Defendants wrongfully shut down the Project and repudiated their

24   obligations to South Edge and Lenders, as described in the Arbitration Award.  *See* Hough Decl.

25   at ¶38.

26           [11] An "MI Deposit," as defined in §2.3.6 of the Operating Agreement, is the sum equal to thirty percent

27   (30%) of the projected total Member Costs (defined in the Operating Agreement) that is deposited by a Member at the closing of the conveyance of the Pods.

28

1    In mid-2006, less than two years after the signing of the Credit Agreement, South Edge,

2    through its Members (including KBHN), reached out to JPMorgan to seek an extension of the

3    Takedown schedule. *See* McDonagh Decl. at ¶22. Pursuant to the Loan Documents, South Edge

4    could not modify the Takedowns or schedules without JPMorgan's consent. *See Id.*

5    With some concessions from South Edge, and because certain changes beneficial to the

6    Lenders occurred (such as a higher appraisal value and higher density for the Project, which both

7    increased the value of the collateral), JPMorgan agreed to extend the Takedown schedules. The

8    Takedown schedule extensions did not change the maturity date of the Loan. At the time

9    JPMorgan consented to the extension of the Takedown schedule, South Edge and JPMorgan also

10   began to discuss amending the Credit Agreement to increase the aggregate loan amount to South

11   Edge. *See* McDonagh Decl. at ¶23. On March 9, 2007, JPMorgan and South Edge entered into

12   the Amended and Restated Credit Agreement, which included a $50 million increase in Facility A

13   (the construction loan facility) and incorporated the modified Takedown schedule. *Id.* at ¶24.

14   Just prior to the closing of the Credit Agreement in March of 2007, South Edge paid off

15   Facility B. *Id.*

16   In early 2008, less than one year after entering into the amended Credit Agreement,

17   certain Members began experiencing financial problems. Two of the Members, Alameda

18   Investments LLC (Woodside Group Inc. was its Parent Guarantor, together "<u>Woodside</u>") and

19   Kimball Hill Homes Nevada (Kimball Hill Inc. was its Parent Guarantor, together "<u>Kimball</u>

20   <u>Hill</u>") defaulted on certain covenants in their corporate credit revolvers, and those defaults caused

21   a cross-default under the Credit Agreement. *See* McDonagh Decl. at ¶26.

22   Kimball Hill filed for bankruptcy protection on April 23, 2008,[12] causing another default

23   under the Credit Agreement. Woodside continued to have financial issues as well, and it was not

24   clear if it would be able to meet its obligations to South Edge and JPMorgan. An involuntary

25   petition was filed against Woodside by its lender creditors in August 2008 (that was later

26

27   [12] *See* Case No. 08-10095 (SPS) (Jointly Administered) pending in the U.S. Bankruptcy Court, Northern
     District of Illinois.

28

15

consensually converted to a voluntary chapter 11 case),[13] and its wholly-owned subsidiary, Alameda Investments LLC (and Member of South Edge), sought bankruptcy protection on January 20, 2009. Both Members (and their respective parents) confirmed liquidating plans of reorganization, and Liquidating Trustees now represent the Members. *See* McDonagh Decl. at ¶27.

        (i)     *South Edge's Management Committee Freezes Further Development of Inspirada and Other Events of Default Caused By Builder-Defendants*

Even before the cross-defaults triggered by the bankruptcy filings, the Builder-Defendants caused significant South Edge defaults under the Credit Agreement and other Loan Documents by (A) wrongfully failing to (1) cause South Edge to make interest payments, (2) cure defaults of certain Members, and (3) make their scheduled Takedowns, and (B) voting to extend the agreed-upon Takedown schedule without obtaining JPMorgan's consent in contra distinction to the request made to JPMorgan in March of 2007. *See* McDonagh Decl. at ¶28; Hough Decl. at ¶32 (discussing Judge Pro's decision granting JPMorgan leave to amend its complaint). *See also* the Arbitration Award at pp. 57-58, generally confirming the Lenders' position on these disputes, annexed to the Hough Decl. as Ex. D.

In early March 2008, South Edge's Management Committee determined that it would not remit the February 2008 interest payment on the Credit Agreement. *See* McDonagh Decl. at ¶29. Soon thereafter, a controlling majority of the Management Committee (i) refused to issue capital calls to either maintain interest reserves, (ii) refused to pay financing interest, and (iii) voted to cease work on Inspirada. *See id.*

South Edge has not made any payments to either fund credit reserves or interest payments in more than two (2) years, and no further development of the Project (beyond the initial Takedown parcels) has materialized. According to a recent SEC filing by one of the Parent Guarantors, "certain of the joint venture Members have curtailed the funding of their allocable joint venture obligations." *See* Form 10-Q, pp. 12-13, Beazer Homes USA, Inc. (August 5, 2010),

---

    .[13] *See* Case No. 08-20682 (PC) (Jointly Administered) pending in the U.S. Bankruptcy Court, Central District of California.

1    a copy of which is attached hereto as **Exhibit A**. The Arbitration Award determined that the

2    Builder-Defendants' refusal to fund interest payments, failure to complete Takedowns, and

3    decision to cease work on the Project constituted breaches of their obligations to South Edge.

4                    (ii)    *Members' Unilateral Extension of Takedown Schedule*

5            On March 9, 2007, with the Lenders' express consent, each Member signed a Second

6    Amendment to Purchase and Sale Agreement and Joint Escrow Instructions, which extended the

7    Takedown schedules.  The amended Takedown schedule provided for the following:

8                    i.        295.59 acres to be taken down on April 15, 2007;

9                    ii.       483.35 acres to be taken down on October 15, 2007;

10                   iii.      324.07 acres to be taken down on April 15, 2008;

11                   iv.      50.4 acres to be taken down on July 15, 2008;

12                   v.       232.51 acres to be taken down on October 15, 2008;

13                   vi.      445.52 acres to be taken down on April 15, 2009; and

14                   vii.     121.88 acres to be taken down on October 15, 2009.

15    *See* McDonagh Decl. at ¶25.

16           The Members completed their respective Takedowns scheduled for April 15, 2007 and

17    October 15, 2007; however, there was a significant Takedown scheduled for April 15, 2008, and

18    in advance of that date, some of the Members indicated that they were unsure if they would

19    perform their respective obligated Takedowns. *See* McDonagh Decl. at ¶30.

20           With these Takedowns looming and uncertainty about whether they would be completed,

21    JPMorgan, South Edge, the Members, and their Parent Guarantors, began discussions regarding

22    curing the existing and pending defaults under the Credit Agreement and restructuring the terms

23    of the Credit Agreement. *See* McDonagh Decl. at ¶31.

24           However, unbeknownst to the Agent, the South Edge Members orchestrated secret votes

25    of the South Edge Management Committee wrongfully to extend the Takedown schedules,

26    including those scheduled for April 15, 2008, so that their obligations to South Edge purportedly

27    would not come due at the time agreed upon by JPMorgan in the Loan Documents.  Specifically,

28    on April 10, 2008, the Members (except for Meritage and Focus) voted to extend their Takedown

schedules without the Agent's knowledge or consent, even though they were aware that such consent was required. *See* McDonagh Decl. at ¶32. Ordinarily, for such modifications, both South Edge and the Members in their own capacity (in addition and separate from their capacity as Members) had to formally and in writing extend their Takedown schedules. The Arbitration Award confirms this as a breach of the Acquisition Agreements by the Builder-Defendants. *See* Hough Decl. at ¶38.

### G.    Forbearance Agreement

On May 27, 2008, JPMorgan, South Edge, and the Members and the Parent Guarantors, entered into a Forbearance Agreement in order to "provide [South Edge] with sufficient time to propose, negotiate and close a potential restructuring of Loans advanced under the Credit Agreement." The Forbearance Agreement reaffirmed all obligations owing to the Lenders and all rights and liens of the Lenders. The Debtor and other Credit Parties (including the Builder-Defendants) provided comprehensive releases to JPMorgan and the Lenders as well as various other benefits. *See* Hough Decl. at ¶¶10-13.

Neither South Edge, nor any of the Members or Parent Guarantors, informed JPMorgan of the secretly extended Takedown schedules at the time the Forbearance Agreement was signed. In fact, South Edge specifically warranted that only limited and enumerated defaults had occurred, and the Members, including KBHN, ratified such misstatements and omissions by failing to apprise JPMorgan of their falsity. *See* Hough Decl. at ¶14.

Following the signing of the Forbearance Agreement, JPMorgan, South Edge, the Members, and the Parents sought to restructure the Loans under the Credit Agreement, but those efforts were unsuccessful, and the Forbearance Agreement terminated, by its own terms, on June 30, 2008. After South Edge, the Members, and the Parent Guarantors refused to cure the numerous defaults, make the balancing payments, or assure any performance under the Credit Agreement, Loan Documents, or Collateral Documents, JPMorgan commenced two sets of actions (i.e., the Nevada Actions) against each of the Builder-Defendant Members and Parent Guarantors.

18

1    More recently, Lenders have sent South Edge an updated notice of defaults, dated

2    November 23, 2010, as well as a related demand for information and documents, as provided for

3    under the Credit Agreement. *See* McDonagh Decl. at Ex. J and Ex. K. These chronic problems

4    illustrate why a Chapter 11 trustee is essential to speak and act for South Edge, because otherwise

5    no credible party has the right and power to do so.

6    **H.    Commencement of Litigation and Arbitration**

7        (i)    *Litigation Commenced by Lenders*

8    The first set of actions, filed in the Southern District of New York on December 5, 2008,

9    against the Builder-Defendant Members of South Edge and Parent Guarantors, were based on the

10   Completion Guaranties executed by each of the defendants (the "Completion Guaranty Actions").

11       On that same day, JPMorgan also filed a second set of actions against the Builder-

12   Defendant Members of South Edge and their Parent Guarantors (the "UCC Actions") in the

13   District of Nevada. The UCC Actions seek to enforce the collateral pledged to JPMorgan

14   pursuant to the Credit Agreement and Loan Documents, including the Takedowns owing in

15   excess of $270 million, and also seek damages for certain torts committed by KBHN, KB Home

16   and other Builder-Defendants. [14]

17       The litigation is not likely to result in tangible benefit for the Lenders or South Edge

18   within the time frame necessary to save the expiring entitlements, access the LID bond proceeds

19   and preserve important Project value.

20       (ii)    *Focus' Arbitration Proceeding*

21   In May of 2009, Focus, as a Member of South Edge, filed a demand for arbitration against

22   the other Members of South Edge, including KBHN, on behalf of itself *and South Edge*, and it

23   sought relief in the arbitration both for itself and for South Edge. Focus was the only Member of

24

25

26   ───────────────
     [14] On May 26, 2009, an order was entered, pursuant to the motion of KBHN, KB Home, and the other
     Builder-Defendant Members and Parent Guarantors, transferring the Completion Guaranty Actions to the District of

27   Nevada where the UCC Actions were pending. The Completion Guaranty Actions were eventually consolidated with
     the UCC Actions in front of the Honorable Philip M. Pro in case number 2:08-cv-01711.

28

1    South Edge that (i) did not default on its Takedown obligations under the Operating Agreement

2    and (ii) performed all of its Takedowns under its Acquisition Agreement.

3            Focus sought, among other things, to require KBHN and the other Members to honor and

4    specifically perform their contractual obligations to South Edge, including satisfying the

5    Takedowns past due and owing to South Edge. By operation of the Credit Agreement and other

6    Loan Documents, any such recovery by South Edge would result in substantial payments to

7    JPMorgan to pay down the Loan and salvage the collateral.

8            The Arbitration proceeding was involved and comprehensive. The arbitral panel was

9    made up of two retired Chief Justices of the Nevada Supreme Court and a retired United States

10   District Judge for the District of Nevada. The Arbitration hearing was conducted over a two

11   week period, beginning on February 22, 2010. In the course of the Arbitration, more than 1,300

12   exhibits were submitted to the Arbitration panel and at least thirteen witnesses testified. The

13   Arbitration's closing arguments were heard on March 11, 2010.

14           In the Arbitration Award, the arbitration panel determined that the defaulting Builder-

15   Defendants breached their agreements by (i) failing to fund interest payments, (ii) voting to cease

16   construction on the Project, (iii) refusing to make their Takedowns, and (iv) purporting to extend

17   the Takedown schedule. In the end, the only cash award was to Focus to compensate for the

18   Builder Defendants' direct and immediate breach of contract, in the sum of $36,815,354. The

19   Panel determined this amount was equivalent to the diminution in value of Focus' investment in

20   the Project resulting from the breaches by the other Builder Members. *See* Hough Decl. at ¶¶38-

21   39.

22           However, the panel's decision fosters managerial deadlock and does not rectify South

23   Edge's governance, because, under the panel's interpretation of the Operating Agreement, no

24   Member is able to compel KBHN and the other defaulting Members to perform their past-due

25   Takedowns to South Edge—*i.e.*, pay down a significant portion of the money owed to JPMorgan

26   and the Lenders under the Credit Agreement. The panel concluded that Focus could only

27   commence arbitration on its own behalf and could not assert claims on behalf of South Edge,

28   because Focus, as the only non-defaulting Member, is not permitted to singularly form a quorum

1   under the Operating Agreement.  Rather, the panel found that the Management Committee, duly

2   constituted, is the only entity with the authority to bring an arbitration on behalf of South Edge.

3   In this regard, the panel concluded that the Members retain their right to vote until they are

4   formally voted out under the Operating Agreement.  *See* Hough Decl. at ¶40.

5        Despite its multiple findings of wrongdoing on the part of the Builder-Defendants, the

6   Arbitration Award created a quagmire allowing KBHN and the other Builder-Defendants to

7   continue to stall payment to the Debtor on their respective Takedowns, because there can never

8   be a quorum of the Management Committee sufficient to authorize enforcement actions against

9   them absent KBHN's consent.  Moreover, there is no recourse if Builder-Defendants choose to

10  not capitalize any of the necessary infrastructure projects required by the City, because the

11  arbitration panel concluded that the Members retain their right to vote on matters unrelated to

12  their defaults until they are formally voted out under the Operating Agreement. *See* Hough Decl.

13  at ¶40.

14       By supplanting Debtor's managers and maintaining sole control over Debtor's affairs, a

15  Chapter 11 trustee could quickly enforce the obligations owed by Builder-Defendants, relying in

16  part on the doctrine of collateral estoppel to show the Builder-Defendants are in default.  Absent

17  this Court approving the appointment of a Chapter 11 trustee who can step in and make rational

18  and objective fiduciary decisions for South Edge, the breaching Builder-Defendants will continue

19  to hold the Debtor and Project hostage with their confirmed wrongs against South Edge until such

20  day -- likely to be more than 18 months to two years from now -- when JPMorgan obtains a final

21  judgment in the Nevada Actions.  Until then, South Edge and the Project will continue to suffer

22  irreversible damage as a result of the Builder-Defendants' abusive hostage strategy, including

23  access to significant LID bond proceeds.

24  **I.    South Edge's Current Management Is Hopelessly Conflicted and Is De-**
        **Valuing the Project**

25       The Builder-Defendants, who compromise a majority of the Management Committee, are

26  all a party to the Nevada Actions in which JPMorgan is seeking to enforce the guarantees

27  provided by the Builder-Defendants and their parent guarantors in connection with the Credit

28

1  Agreement. The Builder-Defendants have chosen to abandon their managerial duties, because

2  their primary motivation is to minimize their individual exposures in the Nevada Actions and

3  ultimately settle for less than what is being sought by JPMorgan, thereby acquiring the Project

4  "on the cheap."

*See* Ross Decl. at ¶19.

16        One way to advance the Builder-Defendants' hostage strategy is for the Builder-

17  Defendants to de-value the Project, which serves as JPMorgan's collateral, and inhibit the

18  development and maintenance of the Project. As majority Members of the Management

19  Committee, the Builder-Defendants have utilized their power to do exactly that. Over the

20  approximate past two and a half years, the Builder-Defendants have intentionally made the

21  Project less valuable by (i) refusing to make their respective Takedowns and (ii) failing to fund

22  critical infrastructure projects, while blocking LID recoveries and refusing the City's willingness

23  to improve and preserve the expiring or threatened entitlements and permits.

24        KBHN and Toll are a part of a larger venture that is bound by a set of rules, as set forth in

25  the Credit Agreement and related Loan Documents, including the Operating Agreement. These

26  parties have chosen to disregard those rules and only concern themselves with their bottom lines.

27  In fact, KBHN and Toll are stalling all work on the Project in order to give their competing units

28

1   an unfair advantage.  Their self-interested actions have severe negative repercussions for the

2   entire joint venture.

3          The Project and LID recoveries must be managed in a more effective manner, and an

4   independent third party who does not have an equity interest in the Project would be better suited

5   to undertake and execute such responsibilities and collect the Takedowns.

6          (i)    *The Majority of the Members of the Management Committee Have*

7                 *Breached Their Contractual Obligations and Frozen Development at*
                  *Inspirada*

8          The Builder-Defendants can not be trusted to equitably regulate and manage South Edge

9   and ensure that their actions do not harm Debtor's interests and those of its creditors.

10         The Builder-Defendants have wielded control over the Project to the detriment of third

11  parties by failing to fulfill their obligation to make the Takedowns required by the Operating

12  Agreement and related Acquisition Agreements.  By making a Takedown, the builder pays South

13  Edge for the land (against which JPMorgan holds a lien), and in exchange, the builder obtains

14  title to the land.  South Edge can then use those Takedown proceeds to repay the sums due and

15  owing to JPMorgan or with the Lenders' consent, use those funds for other beneficial tasks on the

16  Project.  Once it obtains title to the land, the builder can then develop the land, ideally in an

17  improved and higher-value plan in collaboration with COH.  Beginning in 2008 and continuing

18  ever since then, the Builder-Defendants chose to not make the requisite Takedowns.  As was

19  recently confirmed by the Arbitration Award, there is no legal justification for the Builder-

20  Defendants' failure to fulfill their Takedown obligations to South Edge.

21         At the time of the March 2008 default when the Management Committee voted to cease

22  any further development efforts at Inspirada, Focus was the only Member to (i) have completed

23  all of its Takedown obligations and (ii) fully advanced its MI deposits and its portion of the

24  financing interest required under the Credit Agreement.  Almost all of Focus's land was located

25  in "Town Center," a mixed residential-commercial part of Inspirada, as opposed to other purely

26  residential villages.  The fundamental problem for Focus was that before the Town Center could

27  be developed, major infrastructure improvements had to be installed, but the ███████████

28  ████████████████████████████████████████████████████████████████

1   [REDACTED]

2   [REDACTED] . *See* Ross Decl. at ¶20. In fact, COH may declare

3   Inspirada to be "abandoned," which would result in loss of a valuable source of financing for

4   South Edge. *See* Ross Decl. at ¶17.

5   The Management Committee has wrongfully quashed further development efforts. [REDACTED]

6   [REDACTED]

7   [REDACTED]

8   [REDACTED] . *See* Ross Decl. at ¶21. This effectively blocked additional

9   competition for KBHN and Toll from the other Members, who would otherwise be competing to

10   sell homes to consumers interested in purchasing a home in Inspirada.

11         (ii)    *South Edge Is Not Maximizing Potential Recoveries on LID Bonds*

12   Construction on the LID improvements at Inspirada commenced in the summer of 2006.

13   One hundred fifty four (154) projects are contemplated, some of which have been substantially

14   completed or advanced with Loan funds before the Project shutdown. *See* Ross Decl. at ¶6. To

15   date, three (3) projects have been completed and turned over to COH, and South Edge received

16   approximately $1.3 million of reimbursements in November 2007 and January 2008 from COH.

17   *See Id.* at ¶7. The Builder-Defendants have inexplicably chosen to cease funding significant work

18   on the Project that would provide South Edge with tens of millions of dollars in LID recoveries.

19   [REDACTED]

20   [REDACTED]

21   [REDACTED]

22   [REDACTED] . *See Id.* at ¶13.

23   Moreover, to the extent that South Edge has completed specific improvements within

24   Inspirada, it is failing to diligently recover reimbursements that COH is holding to distribute to

25   South Edge. *See* Ross Decl. at ¶10. For example, approximately $1.035 million of LID bond

26   proceeds is pending distribution for completed work that was initiated well over two years ago.

27   The final step necessary to obtain the release of those funds is for South Edge to deliver a formal

28   letter to COH requesting that COH accept the underlying improvements. This letter could have

24

1   been sent in May 2010.  However, Holdings Manager, LLC still has not signed this document,

2   and South Edge still has not received the approximate $1.035 million of LID funds. *See Id.*

3          There can be no justification why South Edge's insider defendant management would

4   want to wait more than two years to recover funds rightfully due and owing to it, unless South

5   Edge's management's hostage goal is to starve South Edge of resources, and make the Project

6   and its Lenders suffer.  An independent and objective fiduciary is needed to ensure that South

7   Edge timely completes its improvement projects and once completed, immediately recovers all

8   sums it is rightfully owed.

9          **J.      South Edge Has Valuable Assets That Must Be Preserved**

10         If development of the Project is allowed to proceed and LID recoveries or other funds are

11  timely allocated to address certain pressing needs, as discussed in greater detail below, value can

12  be created that will benefit South Edge and all of its creditors.  A Chapter 11 trustee could

13  immediately start working with the City to adjust and improve the Project entitlements and Plans

14  and Specifications to the post-bubble economic realities, creating significant value that the

15  Builder-Defendants wish to stall until it is believed after they can buy the Project at distressed

16  prices.

17              (i)      *The Plans and Specifications for Inspirada Must Be Updated*

18         According to the offering statement for the LID Bonds (the "Offering Statement"), in

19  April 2006, it was anticipated that the Takedowns would be completed by April 15, 2009.  In

20  addition, it was anticipated that Inspirada's infrastructure would be fully constructed by the end of

21  calendar year 2009.  The Offering Statement also provided for estimated buildout dates by the

22  Members of their respective parcels.  In April 2006, it was contemplated that the buildouts of

23  residential product by Alameda, Kimball Hill Homes Nevada, Pardee, Meritage and Beazer in the

24  seven Villages would be completed by Spring 2012. *See* Ross Decl. at ¶28.

25         Only Villages 1 and 2 have been constructed, and the development of Village 3 has

26  stalled. *See* Ross Decl. at ¶29.

27

28

                                              25

1
       (ii)     *Local Improvement District ("LID") Funds*

2
      In April 2006, the City of Henderson raised more than $100 million by issuing T-18 Local

3
Improvement District (Inspirada) Limited bonds ("LID Bonds")[15] to buy certain roads and other

4
potential public infrastructure after it was built by South Edge. *See* Ross Decl. at ¶5. However,

5
the Builder-Defendants wrongfully shut down the Project and blocked these recoveries, including

6
work desired by COH that was nearly completed. A Chapter 11 trustee working with JPMorgan

7
could complete some of that remaining work and recover significant funds for the estate.

8
      To date, South Edge has spent approximately $43,343,618 on LID improvements. Should

9
South Edge be able to complete these improvements and satisfy other requirements, it will be

10
entitled eventually to recover at a minimum $91,956,686 (less a 2.5% fee payable to the COH

11
Engineer and the cost of the work and financing). *See* Ross Decl. at ¶8.

12
      South Edge needs that attractive financing, and the Lenders would like those recoveries,

13
even if some of them are reinvested in the Project collateral. This is a "win/win" for everyone

14
except, apparently, the Builder-Defendants who are trying to stall the development and claim

15
these value enhancement opportunities later for themselves. A Chapter 11 trustee can prevent this

16
inexcusable waste and self-dealing that Builder-Defendants are imposing upon South Edge and its

17
creditors.

18
       (iii)    *Causes of Action*

19
      The Chapter 11 trustee can be exceptionally cost efficient in recovering the claims of

20
Debtor against the Builder-Defendants. For example, the doctrine of collateral estoppel should

21
permit the trustee to enforce the Takedown obligations owed by those Builder-Defendants,

22
because the arbitration panel already decided that the Builder-Defendants are in breach of those

23
obligations. The Arbitration Award also contains other findings that support claims the trustee

24
may consider bringing against the Builder-Defendants, such as claims for breach of fiduciary

25
duty, fraudulent transfers and equitable subordination of any sums allegedly due from South Edge

26
to the Builder-Defendants.

27
---
   [15] The LID Bonds are paid like property taxes on the applicable land.

28

# III.
# LEGAL ARGUMENT

**A.    A Trustee Must Be Appointed During The "Gap Period" Of This Involuntary Chapter 11 Case**

Section 1104(a) of the Bankruptcy Code authorizes the Court to appoint a trustee in Chapter 11 cases for "cause" at "any time after the commencement of the case but before confirmation of a plan...." 11 U.S.C. § 1104(a). Under the statute, "cause" specifically includes "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management...." 11 U.S.C. § 1104(a)(1).

In the context of involuntary Chapter 11 bankruptcy cases, a trustee may be appointed for cause at any time after the filing of the involuntary petition—including during the "gap period" between the filing of the involuntary petition and the court's entry of an order for relief. The filing of the involuntary petition commences the case and therefore triggers the application of Section 1104. *See In re Prof'l Accountants Referral Servs., Inc.*, 142 B.R. 424 (Bankr. D. Colo. 1992) (recognizing statutory authority to appoint a Chapter 11 trustee during the gap period pursuant to 11 U.S.C. § 1104); *see also Collier on Bankruptcy* ¶303.29 (15th ed. 2010) (same). Section 105 of the Bankruptcy Code provides additional support for appointing a Chapter 11 trustee during the gap period. *Prof'l Accountants Referral Servs., Inc.*, 142 B.R. at 430 (asserting that "if necessary, the exercise of [the Bankruptcy Court's] equitable powers under 11 U.S.C. § 105 allows for the appointment of a trustee during the gap period.").

Courts have appointed Chapter 11 trustees during the gap period in order to prevent or stop gross mismanagement or suspected fraudulent activity. For example, in *In re Prof'l Accountants Referral Servs., Inc.*, the Court appointed a trustee to prevent further harm to the debtor's estate and its creditors where the debtor's current management seemed to be working at odds with the success of the corporate entity. That is, the court found that, "as opposed to fulfilling his fiduciary duties, [the company's chief officer] had been engaged in a substantially similar and competing business..." *Id.* at 429. The Honorable Gregg W. Zive of this district granted a motion to appoint a Chapter 11 trustee in an involuntary case during the gap period where the petitioning creditors asserted gross mismanagement and fraud on the part of the

1  company's CEO. *In re E-Z Pay Servcs., Inc.*, Case No. BK-S-06-50567 (Bankr. D. Nev. Aug.

2  23, 2006). *See* **Exhibit B**. In that case, despite significant unresolved legal issues (including the

3  question of whether venue was proper in Nevada), within days of the filing of the involuntary

4  petition, the court heard the motion to appoint a "gap period" trustee on shortened notice, and

5  ruled that "the Office of the United States Trustee should appoint a Chapter 11 trustee as soon as

6  possible." *Id.* As discussed throughout this Motion, similar circumstances exist in this case, and

7  it is imperative that a Chapter 11 trustee be appointed in order to stem the current gross

8  mismanagement, preserve South Edge's assets and protect its creditors from further harm.

9     **B.     It Is Necessary and Appropriate To Appoint a Permanent Chapter 11 Trustee**

10     Section 1104(a) of the Bankruptcy Code provides, in part, that the Court shall appoint a

11  Chapter 11 trustee if one of the following standards is satisfied: (1) appointment "for cause,

12  including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor

13  by current management, either before or after the commencement of the case . . ."; or

14  (2) appointment because it is "in the interest of creditors, any equity security holders, and other

15  interests of the estate . . . ." 11 U.S.C. § 1104(a).

16     A Chapter 11 debtor and its managers owe fiduciary duties to the debtor's estate and its

17  creditors. *Hirsch v. Pa. Textile Corp. (In re Centennial Textiles, Inc.)*, 227 B.R. 606, 612

18  (S.D.N.Y. 1998). "As fiduciaries, the debtor in possession and its managers are obligated to treat

19  all parties to the case fairly, maximize the value of the estate, and protect and conserve the

20  debtor's property." (internal citations omitted) *In re Nat'l R.V. Holdings, Inc.*, 390 B.R. 690

21  (Bankr. C.D. Cal. 2008), quoting *Centennial Textiles*, 227 B.R. at 612. "In the appropriate case,

22  the appointment of a trustee is a power which is crucial for the Court to exercise in order to

23  preserve the integrity of the bankruptcy process and to insure that the interest of creditors are

24  served." *In re Intercat, Inc.*, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000). Where there is doubt

25  about management's ability to carry out its fiduciary duties, appointment of a trustee is the

26  appropriate remedy. *See, e.g., Variable-Parameter Fixture Dev. Corp. v. Comerica Bank-Cal. (In*

27  *re Morpheus Lights, Inc.)*, 228 B.R. 449, 454 (Bankr. N.D. Cal. 1998) (citations omitted).

28

1    The Builder-Defendants, as controlling Members of Debtor's management committee,

2    have a duty to protect the best interests of Debtor's creditors by maximizing the value of the

3    Project. They have patently and deliberately failed to do so. Over the past two and a half years,

4    the Builder-Defendants have chosen to pursue a path that serves only their interests and severely

5    damages the development of the Project while diminishing Debtor's value. This inherent conflict

6    provides overwhelming "cause" to appoint a Chapter 11 trustee to collect needed recoveries from

7    the Builder-Defendants, to restore order to Debtor's affairs and to get the Project back on track. It

8    is clearly in the creditors' best interests to have an independent fiduciary carry out management of

9    South Edge's affairs.

10           (i)    *The Facts Before The Court Provide Overwhelming Support For The
                     Appointment of a Chapter 11 Trustee.*

11    A determination of "cause" under section 1104(a)(1) of the Bankruptcy Code "is within

12    the discretion of the court [based on] various interests involved in the bankruptcy proceeding." *In*

13    *re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill.), *aff'd, Bellevue Place Assocs. v.*

14    *Caisse Centrale Des Banques Populaires*, No. 94-C-5089, 1004 U.S. Dist. LEXIS 17409 (N.D.

15    Ill. December 6, 1994); *see also Comm. of Dalkon Shield Claimants v. A.H. Robins Co. Inc.*, 828

16    F.2d 239, 242 (4th Cir. 1987). For example, the Court may consider pre-petition activity as part

17    of its section 1104 determination. *See Okla. Refining Co. v. Blaik (In re Okla. Refining Co.)*, 838

18    F.2d 1133, 1136 (10th Cir. 1988); *see also In re Rivermeadows Assocs. Ltd.*, 185 B.R. 615, 619

19    (Bankr. D. Wyo. 1995) ("the [Bankruptcy] Code is clear that the prepetition conduct of the

20    debtor's management may be the sole deciding factor").

21    Courts also consider the existence of other factors, including, but not limited to:

22    (a) conflicts of interest, including inappropriate relations between corporate parents and

23    subsidiaries; (b) misuse of assets and funds; (c) inaccurate and inadequate record keeping and

24    reporting; (d) non-filing of required documents, including lack of adequate disclosure; (e) various

25    instances of conduct found to establish fraud or dishonesty; (f) failure to make required payments;

26    (g) lack of credibility and creditor confidence; and (h) extreme acrimony and deep-seated

27    animosity among the debtors and their creditors. *In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 985

28

1  (Bankr. E.D. Pa. 1988), citing 5 Bankr. Service, L. Ed. § 41.30 at 49–50 (1987); *see, e.g.,*

2  *Lowenschuss v. Selnick (In re Lowenschuss)*, 171 F.3d 673, 685 (9th Cir. 1999) (debtor's

3  prepetition transfer of assets from his pension plan out of Pennsylvania in order to avoid the

4  jurisdiction of the Pennsylvania courts was "cause" for appointing a Chapter 11 trustee); *In re*

5  *McCall*, 34 B.R. 68, 69 (Bankr. E.D. Pa. 1983) (granting request for Chapter 11 trustee because

6  of debtor's incompetence and gross mismanagement of its affairs, coupled with the ongoing

7  failure to pay monthly mortgage that diminished the sole valuable estate asset).

8      Once "cause" is found by a court, the appointment of a trustee under section 1104(a)(1) of

9  the Bankruptcy Code is mandatory. *See Rivermeadows Assocs.*, 185 B.R. at 617.

10      Here the scores of conflicts, mismanagement and incompetence of Debtor's current self-

11  dealing managers could not be more striking. *See* Sections 2.F, 2.H(ii) and 2.I *supra*. Value will

12  not be maximized if such self-dealing behavior by controlling insiders is allowed to continue. A

13  disinterested party must be put in place to ensure that the value of the *entire* Project is being

14  maximized. By turning over decision-making authority to a Chapter 11 trustee, further

15  construction delays could be averted, LID collections could occur more quickly, and the Project

16  could be salvaged for the benefit of Debtor's creditors, thus restoring justice to the case.

(ii)  *Even if the Court Determines That "Cause" Does Not Exist, Appointing a*
17        *Chapter 11 Trustee is in the Best Interests of South Edge's Creditors*
18        *Under Section 1104(a)(2) of the Bankruptcy Code*

19      Section 1104(a)(2) provides a "flexible standard for appointment of a trustee even when

20  no cause exists." *See Bellevue Place Assocs.*, 171 B.R. at 623; *see also In re V. Savino Oil &*

21  *Heating Co.*, 99 B.R. 518, 527 n.11 (Bankr. E.D.N.Y. 1988) ("factors constituting a basis for

22  appointing a trustee under § 1104(a)(2) are amorphous, diverse, and necessarily involve a great

23  deal of judicial discretion."). The standard affords the Bankruptcy Court "particularly wide

24  discretion" to look to the practical realities and necessities involved in appointing a trustee. *See*

25  *Bellevue Place Assocs.*, 171 B.R. at 623. Factors often used to determine whether appointment of

26  a Chapter 11 trustee is in the creditors' best interests include: (1) the debtor's trustworthiness;

27  (2) the debtor's past and present performance and prospects for the debtor's rehabilitation; (3) the

28  confidence, or lack thereof, of the business community and creditors in present management; and

1   (4) the benefits derived by the trustee's appointment, balanced against the cost of appointment.

2   *See In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990); *In re Madison*

3   *Mgmt. Group, Inc.*, 137 B.R. 275, 282 (Bankr. N.D. Ill. 1992). For example, in *Petralex*, a trustee

4   was appointed under section 1104(a)(2), because the court found that the debtor could not

5   continue its operations. The debtor's inability to operate was a result of the board being

6   deadlocked, being unable to resolve financing problems, and not being able to operate profitably.

7   *See In re Petralex Stainless, Ltd.*, 78 B.R. 738, 744 (Bankr. E.D. Pa. 1987). As the *Petralex* court

8   aptly noted, "[u]nder such chaotic circumstances, a disinterested trustee can impartially assess

9   [Debtor's] conditions and work with the warring factions, thus facilitating the decision making

10  process." *Id.* at 745.

11       As confirmed in the Arbitration Award, for well over the past two years, South Edge's

12  Management Committee has demonstrated that it is fraught with conflicts, because the majority

13  of its Members regularly put their own economic interests ahead of the best interests of the

14  Project. In addition to failing to make the Takedowns required by the Loan Documents, the

15  Management Committee continues to obstruct any effort to move forward with the development

16  of the Project, and it squanders those few opportunities it has to bring funds into South Edge on

17  account of the limited public improvement work that has been accomplished to date.

18       Both Focus and the Lenders have pursued alternate courses of action (either through the

19  Nevada Actions or the Arbitration) in an effort to wrest control of South Edge away from the

20  Builder-Defendants and hold them responsible for their selfish and disruptive actions to the

21  Project. Those courses of action have not provided Focus or the Lenders with the desired results.

22  Efforts by the Lenders and Focus to advance the completion of the Project through negotiations

23  with the defaulting Members did not provide even a modicum of success. The parties have also

24  tried to pursue substantive settlement discussions, but those have not produced a mutually

25  acceptable agreement. In short, over the last two and one-half years, the Builder-Defendants have

26  had more than an adequate opportunity to engage with the Lenders, but they have chosen not to

27  do so. Accordingly, this involuntary Chapter 11 proceeding is the best and last way to preserve

28

1  Inspirada and minimize any further degradation of the Project and risk of loss on the LID bond

2  proceeds and City entitlements.

3          The dismal waste and lack of progress at Inspirada is not lost on outsiders, including both

4  COH and the holders of the LID Bonds, both of which are losing patience with the stagnation at

5  Inspirada, and action must be taken to foster development before it is too late.

6          Inspirada will enormously benefit from the appointment of a Chapter 11 trustee, because

7  an independent third party who is not a party to the Nevada Actions can make objective and

8  rational business decisions that are not influenced by a desire to minimize their contractual

9  obligations or hold the Project hostage for their own gain.  A Chapter 11 trustee will have control

10  over management of the Project and allocation of funds, as well as the power to enforce the

11  Takedowns and other obligations.  Moreover, a Chapter 11 trustee with homebuilding and

12  development experience will restore confidence in the Project, because that individual will be

13  able to deal effectively with COH, the LID bondholders, the Lenders and other creditors, as well

14  as the honest Member, Focus.  Finally, a Chapter 11 trustee will be able to forge ahead with the

15  Lenders to develop and confirm a plan of reorganization or liquidation that will maximize the

16  value of the Inspirada estate, to the benefit of its creditors and to the community-at-large.

17

18

19

20

21

22

23

24

25

26

27

28

1  Dated: December 9, 2010

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS and ROCA LLP
Robert M. Charles, Jr.
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169-5996
Telephone: 702.949.8320
Facsimile: 702.949.8321
E-mail:    rcharles@LRLaw.com

&

MORRISON & FOERSTER LLP
G. Larry Engel (*pro hac vice* pending)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522
E-mail:    lengel@mofo.com

&

MORRISON & FOERSTER LLP
James E. Hough (*pro hac vice* pending)
Norman S. Rosenbaum (*pro hac vice* pending)
Jordan A. Wishnew (*pro hac vice* pending)
1290 Avenue of the Americas
New York, New York 10104
Telephone: 212.468.8000
Facsimile: 212.468.7900
E-mail:    jhough@mofo.com
E-mail:    nrosenbaum@mofo.com
E-mail:    jwishnew@mofo.com

Attorneys for J.P. Morgan Chase Bank, N.A.,
for itself and as Administrative Agent

By:    /s/ROBERT M. CHARLES, JR.(NV #6593)
      Robert M. Charles, Jr.