LEWIS and ROCA LLP
Robert M. Charles, Jr.
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169-5996
Telephone: 702.949.8320
Facsimile: 702.949.8321
E-mail: rcharles@LRLaw.com

&

MORRISON & FOERSTER LLP
G. Larry Engel (*pro hac vice* pending)
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522
E-mail: lengel@mofo.com

&

MORRISON & FOERSTER LLP
James E. Hough (*pro hac vice* pending)
Norman S. Rosenbaum (*pro hac vice* pending)
Jordan A. Wishnew (*pro hac vice* pending)
1290 Avenue of the Americas
New York, New York 10104
Telephone: 212.468.8000
Facsimile: 212.468.7900
E-mail: jhough@mofo.com
E-mail: nrosenbaum@mofo.com
E-mail: jwishnew@mofo.com

Attorneys for JPMorgan Chase Bank, N.A.,
for itself and as Administrative Agent

REDACTED

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| In re:<br><br>SOUTH EDGE, LLC,<br><br>                    Involuntary Debtor. | Case No.:   10-32968<br><br>Chapter 11<br><br>**Declaration of John P. McDonagh In Support of JPMorgan Chase Bank N.A.'s Motion to Appoint an Interim and Permanent Chapter 11 Trustee for South Edge, LLC During (i) the "Gap" Period and (ii) On A Permanent Basis**<br><br>**Hearing Information**<br>Date: _____, 2010<br>Time:        [ ]<br>Courtroom:   [ ] |
|---|---|

DECLARATION OF JOHN P. McDONAGH

sf-2929928

I, John P. McDonagh, declare pursuant to 28 U.S.C. § 1746, as follows:

1. I am a Managing Director at JPMorgan Chase Bank, N.A. (hereinafter, "JPMorgan"). I have held this position at JPMorgan for over 15 years and have been employed by JPMorgan and its predecessor for 35 years. The facts in this affidavit are based on my personal knowledge, the documents maintained in JPMorgan's files relating to this matter, and my discussions with various JPMorgan employees.[1]

2. In my role as Managing Director, I am one of the individuals at JPMorgan responsible for dealing with defaulted loans. I have management responsibility for the South Edge loans described in this declaration.

## "INSPIRADA"

3. Around late 2003, a consortium of developers and homebuilders began preliminary talks for the creation of a large-scale development in Henderson, Nevada, to be known as "Inspirada," which was to include roughly 8,500 residences as well as shopping areas, parks, trails, cultural centers, and other amenities, spread over nearly 2,000 acres of land in seven "Villages." In addition to the Villages, a centrally-located, 300-acre "Town Center" was to be an urban destination for retail, residential, commercial, gaming, office, civic and municipal uses, and was to include an additional approximately 3,000 residences. Inspirada was intended to be a large-scale "new urbanism" development project (the "Project")—the largest such project ever undertaken in Las Vegas. The anticipated cost of Inspirada was approximately $1.25 billion.[2] The Villages and Town Center were intended to include two middle schools, three elementary schools, a fire station, a police station, three community parks, six neighborhood parks and miles of trail systems. The Project was organized in units, the smallest of which (20-60 acres each) were called "Pods." The Pods were grouped into seven residential "Villages" of 200-250 acres each, and a "Town Center."

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion to Appoint an Interim and Permanent Chapter 11 Trustee for South Edge, LLC During (i) the "Gap" Period and (ii) On A Permanent Basis.

[2] The budget later increased to more than $1.55 billion due to cost overruns and delays.

4. In May 2004, in order to finance the acquisition of the underlying land as well as development of portions of the Project, the developers created a single purpose entity called South Edge LLC ("South Edge"), the involuntary debtor herein (the "Debtor"). The sole purpose of South Edge was to purchase the land for the Project from the Federal Bureau of Land Management ("BLM")[3] and then to develop it by completing onsite and offsite work and building houses for sale.

5. Following the formation of South Edge, and after much negotiation, JPMorgan, along with a group of other lenders (together with JPMorgan, the "Lenders"), agreed to finance a significant part of the costs of the Inspirada project. To that end, South Edge and the Lenders entered into a credit agreement, dated November 1, 2004, which was replaced by an Amended and Restated Credit Agreement, dated March 9, 2007 (collectively, the "Credit Agreement").[4] JPMorgan, as Administrative Agent under the Credit Agreement, acts as the agent for the Lenders with respect to the loans ("Agent"). In addition to the Credit Agreement, as explained below, South Edge also entered into several other loan documents (collectively, the "Loan Documents") with JPMorgan that assigned certain collateral to JPMorgan, as Agent (collectively, the "Collateral Documents").[5]

6. Under Section 2.10 (e) of the Credit Agreement, each Lender that made its own several – not joint - loan (each, a "Loan") to South Edge was entitled to receive a note (each a "Note") made payable to the order of that Lender (a "Noteholder") for the sum of South Edge's obligation to such Noteholder.

7. South Edge is a Nevada limited liability company that is governed by the Amended and Restated Operating Agreement of South Edge, LLC, dated as of May 3, 2004 (the

---

[3] The purchase price of the land for Inspirada was $557 million, which, at the time, was a record purchase price for land in the Las Vegas Valley.

[4] A true and correct copy of the Credit Agreement is attached hereto as **Exhibit A**. The Credit Agreement has four "facilities." Facility A is a construction loan that is drawn down by South Edge as needed, Facilities B and C are term loans that were fully funded at the closing of the Credit Agreement, and Facility D provides for letters of credit available to South Edge. The original 2004 Credit Agreement is substantially the same as the Credit Agreement, and has been omitted for brevity.

[5] True and correct copies of certain of the Collateral Documents are attached as exhibits hereto, including (i) the Assignment of Contracts, Permits and Plans and Specifications dated as of November 1, 2004 (attached as **Exhibit B**), and (ii) the Assignment of and Agreement with Respect to Acquisition Agreements dated November 1, 2004 (attached as **Exhibit C**).

"Operating Agreement").[6] The Operating Agreement addresses both the governance of South Edge as well as certain specified purchase, sale and development obligations of the members. As set forth in the Operating Agreement, South Edge consists of eight members (each a "Member," and collectively, the "Members"), all of which are subsidiaries of major developers or homebuilders (each a "Parent," and collectively, the "Parents"). Each Member's ownership share of South Edge is based on the amount of land it is to develop in the Project. One Member, KB Home Nevada, Inc. ("KBHN"), possesses an ownership share in South Edge that is significantly larger than that of the other Members. KBHN's ownership share is 48.45 percent. The remaining 51.55 percent is divided among the other seven Members, with the second largest ownership share at 15.59 percent, as set forth in the table below.

| Member | Guarantor Parent | Acreage | Units | Percentage Interest |
|---|---|---|---|---|
| Focus South Group, LLC | John A. Ritter | 304.52 | 15.59 | 15.59 |
| Meritage Homes of NV | Meritage Corporation | 68.96 | 3.53 | 3.53 |
| Alameda Investments, LLC* | Woodside Group, LLC | 159.0 | 8.14 | 8.14 |
| Coleman-Toll Limited Partnership | Toll Brothers, Inc. | 205.49 | 10.52 | 10.52 |
| Beazer Homes Holding Corp. | Beazer Homes USA, Inc. | 50.4 | 2.58 | 2.58 |
| KB Home Nevada, Inc. | KB Home | 946.38 | 48.45 | 48.45 |
| Kimball Hill Homes Nevada, Inc.* | Kimball Hill, Inc. | 122.86 | 6.29 | 6.29 |
| Pardee Homes of Nevada, Inc. | Weyerhauser Real Estate Company | 95.71 | 4.9 | 4.9 |
| **TOTAL** | | 1,953.32 | 100.0 | 100.0 |

*<u>Note</u>: Both Kimball Hill and Alameda filed for bankruptcy protection, and each rejected the Operating Agreement in their respective bankruptcy proceedings. Each is now represented by a Liquidating Trustee under a confirmed plan of reorganization. They are not "Builder-Defendants" herein.

8. South Edge's payments to the Lenders under the Credit Agreement and applicable Notes mirror the Members' obligations in the Operating Agreement and their obligations under their respective "Acquisition Agreements" (titled the "Purchase and Sale Agreement and Joint Escrow Instructions"), which are also assigned to Lenders, as discussed *infra*. Every Member has

---

[6] A true and correct copy of the Operating Agreement is attached hereto as **Exhibit D**.

its own Acquisition Agreement with South Edge, which is an integrated part of, and incorporated by reference in, the Operating Agreement, and the terms of each Acquisition Agreement are substantially identical.[7] As discussed in greater detail herein, the Acquisition Agreements are all assigned to JPMorgan as collateral pursuant to the Assignment of Acquisition Agreements signed by Debtor and each of the Members.

9. Pursuant to Section 5 of the Operating Agreement, South Edge is managed by a committee (the "Management Committee"), which includes one representative per Member (each, a "Manager"). The Management Committee is charged with a number of tasks, including determining the appropriate amount of capital contributions each Member must make in order to cover South Edge's expenses (see Operating Agreement at Section 2.3). Such expenses include on-going development costs, interest payments, principal payments for the land financing, maintaining interest reserves, funding management fees, as well as ongoing payments for post-auction planning, engineering, legal and other incidental expenses.

10. Under the Operating Agreement, all actions taken by South Edge require authorization by a quorum of Managers, as well as by sixty percent of the membership interests.[8] As a result of this structure, KBHN, the Member with the largest ownership percentage in South Edge, possesses considerable power over the management of South Edge.

11. As security for the loan facilities under the Credit Agreement, the Lenders obtained liens on both the land and related collateral, including on South Edge's rights to payment vis-à-vis the Members and their Parents.

12. In addition to funding the purchase of the BLM land, the Credit Agreement also provided funding for the construction of the major infrastructure on the Project. In order to facilitate the construction of the Project, the Members each entered into an "Acquisition Agreement" with South Edge whereby the Member agreed to purchase, on a set schedule at the specified price, specific parcels of the Project from South Edge. South Edge, as the purchaser of the land, held title to the land, subject to the Lenders' lien. The schedule for the land purchases

---

[7] A true and correct copy of the Acquisition Agreement between South Edge and KB Home Nevada Inc. is attached hereto as **Exhibit E**.
[8] *See* Operating Agreement at section 5.2.4.

5
DECLARATION OF JOHN P. McDONAGH

sf-2929928

from South Edge (known as "Takedowns") was specifically set up to align periodic needs with the maturity of the loans provided by the Lenders.

13. The Acquisition Agreements have all been assigned to JPMorgan as collateral. Such assignments make all of the Members' "rights, options, remedies, interests, privileges and other benefits arising out of, under or relating to the Acquisition Agreements . . . subject and subordinate to all rights, interests, security interests, and liens in favor of" JPMorgan under the other Loan Documents.[9] From the perspective of JPMorgan, the Acquisition Agreements, and the Takedown schedules provided therein, were essential to the Credit Agreement because they provided the means by which the loan would be repaid to the Lenders. The payments from the Members to South Edge in connection with land purchases were intended to provide South Edge with funds that it would use to repay its obligations under the Credit Agreement. In essence, South Edge served as the conduit by which JPMorgan was to be repaid by the Members for the loans, and by which the Members took title to the land they intended to develop. For example, Section 2.3.4 of the Operating Agreement provides that "[u]pon conveyance to each Member of its respective Pod[10] or Pods within the Subject Property to be conveyed to such Member in accordance with the terms of this Agreement and the applicable Acquisition Agreement, such Member shall pay to the Company the amount of its Member BLM Price less the sum of the Interim Payment and the Bid Payment previously paid to the Company by such Member ("Conveyance Payment")."

14. As they would with any loan, and especially a loan of this size to a single-asset real estate entity with virtually no assets aside from the Project land and related assets, the Lenders sought assurance of payment under the loans, as well as protections in the event that payments are not made. Here, the protection sought—and received—by the Lenders was based in significant part on the underlying agreements between and among the Members and Debtor. In addition to the Credit Agreement, South Edge also entered into several other Loan Documents

---

[9] See **Exhibit B** at paragraph 4.
[10] Section 5.1.2(c) of the Operating Agreement defines a "Pod" as a developable builder parcel.

6
DECLARATION OF JOHN P. McDONAGH

sf-2929928

with JPMorgan that assigned certain collateral to JPMorgan, as Agent. These documents are known as the "Collateral Documents" and are as follows:

    i.    The Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents and Leases dated as of October 29, 2004, and recorded as Instrument No. 20041101-0006330 with the Clark County Recorder on November 1, 2004, as amended by the First Amendment to Deed of Trust, Security Agreement and Fixture Filing and Assignment of Rents and Leases dated as of March 9, 2007, and recorded with the Clark County Recorder on March 9, 2007, (the "Deed of Trust")[11];

    ii.    The Assignment of Contracts, Permits and Plans and Specifications dated as of November 1, 2004 (the "Assignment of Contracts") (attached hereto as **Exhibit B**); and

    iii.    The Assignment of and Agreement with Respect to Acquisition Agreements dated as of November 1, 2004 (the "Assignment of Acquisition Agreements") (attached hereto as **Exhibit C**).

15. The Collateral Documents provide JPMorgan, as Administrative Agent, with security interests in, without limitation: (1) the Acquisition Agreements as amended; (2) the Operating Agreement; (3) the MI Deposits and Letters of Credit; (4) the LID proceeds and related rights; (5) to the extent that they constitute personal property subject to the UCC, all other contract rights, accounts, general intangibles, actions and rights in actions relating to the "Real Property" or "Personal Property" referenced in the Deed of Trust or the Project, as well as all contracts relating to the development, design or construction of the Improvements, together with all proceeds thereof or proceeds of the Acquisition Agreement or of the sale of all or any part of that Real Property or other Trust Property (described in the Deed of Trust as "Sale Proceeds") and including the sale of interests in the Project; and (6) all other revenues, profits, proceeds, principal, interest, fees, or other sums or amounts constituting personal property under the UCC and derived or generated from the ownership, operation, occupancy, leasing, licensing, development, sale or other disposition of the Project or other Collateral by South Edge or due or payable to South Edge under the Acquisition Agreement, as well as all other similar contracts of

---

[11] A true and correct copy of the Deed of Trust is attached hereto as **Exhibit F**.

any other nature concerning the design, construction, or development of any portion of or all of the Project, and all personal property proceeds thereof subject to the UCC.

16. Under the Assignment of Acquisition Agreement, the Deed of Trust and other Collateral Documents, and the Credit Agreement, South Edge assigned all of its rights under all of its agreements with each Member and each Member's parent to the Lenders as collateral for the $585 million of Loans (see **Exhibit C** at paragraphs 2 and 3, and **Exhibit F** at page 4).

17. Notwithstanding that South Edge pledged certain collateral to JPMorgan and the Lenders to secure repayment of its obligations under the Credit Agreement, the petitioning creditors' claims are under-secured because the amount outstanding under the principal and interest owing to these parties under the Credit Agreement exceeds the estimated value of the collateral securing their claims by an amount not less than $14,425.

18. South Edge also executed in favor of JPMorgan the Assignment of Contracts assigning all "Permits" and "Governmental Approvals," all "Construction Agreements," "Contracts" and all "Assigned Plans" as each is so defined in the Assignment of Contracts. This overlaps with the Deed of Trust and Assignment of Acquisition Agreements, but provides further rights and benefits for Lenders as to those unique assets.

19. Each of the Members and Parents also expressly consented to each of the Loan Documents in the consent and agreement (the "Consent and Agreement"), dated March 9, 2007 entered into by each of the Members and their Parents and by and in favor of JPMorgan as Agent for the Lenders, creating obligations of good faith and fair dealing by each of the Members in favor of the Lenders.[12]

20. Additionally, as a condition precedent to the execution of the Credit Agreement in 2004, each South Edge Member and its respective Parent signed certain guaranties. Specifically, the parties entered into (i) completion guaranties ("Completion Guaranties"), which guaranty the completion of certain improvements on the Project and the payment of certain development costs; (ii) limited guaranties ("Limited Guaranties"); and (iii) repayment guaranties ("Repayment Guaranties", together with Completion Guaranties and Limited Guaranties, the "Guaranties") in

---

[12] A true and correct copy of the Consent and Agreement is attached hereto as **Exhibit G**.

8
DECLARATION OF JOHN P. McDONAGH

sf-2929928

1  favor of JPMorgan, as Agent under the Credit Agreement. Under the Limited Guaranties, (also
2  known as a "bad boy" guaranties) the Members and Parents (the "Parent Guarantors") guaranty
3  payment for damages related to certain fraudulent and/or unlawful acts. Under the Repayment
4  Guaranties, the Members and Parents are responsible for repayment of South Edge's obligations
5  in the event of an involuntary or voluntary bankruptcy of South Edge. Under each Guaranty, the
6  Member and Parent are jointly and severally liable for their share of the guarantied obligations.

7  21. Execution of the Guaranties was a condition precedent to JPMorgan's funding
8  under the Credit Agreement. From the perspective of the Lenders, in order to ensure repayment
9  of the funds loaned pursuant to the Credit Agreement, it was necessary to rely not only on the
10 land, but also on the protection of the Guaranties, including the assurance provided by the
11 Completion Guaranties to improve the Project, as well as on the assignment of the Takedown
12 payments owing to South Edge from its creditworthy Members.

13 22. After the Credit Agreement, Loan Documents, and Collateral Documents were
14 executed, the Project commenced. In mid-2006, less than two years after the signing of the Credit
15 Agreement, South Edge, through its Members (including KBHN), reached out to JPMorgan to
16 seek an extension in the Takedown schedule. Pursuant to the Loan Documents, South Edge could
17 not modify the Takedown schedules without JPMorgan's consent.

18 23. With some concessions from South Edge, and because of an increase in the value
19 of the underlying collateral, JPMorgan agreed to extend the Takedown schedules. However, the
20 Takedown schedule extensions did not change the maturity date of the Loan. At the time
21 JPMorgan consented to the extension of the Takedown schedule, South Edge and JPMorgan also
22 began to discuss amending the Credit Agreement to increase the aggregate loan amount to South
23 Edge.

24 24. On March 9, 2007, JPMorgan, as Agent and Lender, South Edge and the other
25 Lenders entered into the Amended and Restated Credit Agreement, which included a $50 million
26 increase in Facility A (the construction loan facility) and incorporated the modified Takedown
27 schedule. Just prior to the closing of the amended Credit Agreement in March of 2007, South
28 Edge paid off Facility B.

9
DECLARATION OF JOHN P. McDONAGH

25. On March 9, 2007, each South Edge Member also signed a Second Amendment to Purchase and Sale Agreement and Joint Escrow Instructions (a "Second Amended Acquisition Agreement")[13] that extended the Takedown schedules with the Lenders' consent. The amended takedown schedule provided for the following: (i) 295.59 acres to be taken down on April 15, 2007; (ii) 483.35 acres to be taken down on October 15, 2007; (iii) 324.07 acres to be taken down on April 15, 2008; (iv) 50.4 acres to be taken down on July 15, 2008; (v) 232.51 acres to be taken down on October 15, 2008; (vi) 445.52 acres to be taken down on April 15, 2009; and (vii) 121.88 acres to be taken down on October 15, 2009.

26. Less than one year after entering into the amended Credit Agreement in 2007, certain Members of South Edge began to have financial problems. Two of the Members, Alameda Investments LLC (together with its Parent, Woodside Group Inc., "Woodside") and Kimball Hill Homes Nevada (together with its Parent, Kimball Hill Inc., "Kimball Hill") defaulted on certain covenants in their corporate credit revolvers. Those defaults caused a cross-default under the Credit Agreement.

27. Throughout the beginning of 2008, JPMorgan and South Edge worked together in an effort to cure the defaults and allow funding of the Project to go forward. However, Kimball Hill filed for bankruptcy protection on April 23, 2008, causing another default under the Credit Agreement. Woodside continued to have financial troubles as well, and it was not clear if it would be able to meet its obligations to South Edge and JPMorgan. An involuntary petition was commenced against Woodside by its creditors in August 2008 (that was later consensually converted to a voluntary chapter 11 proceeding), and its wholly-owned subsidiary (and Member of South Edge) Alameda Investments LLC sought bankruptcy protection on January 20, 2009. Both Members (and their respective Parents) confirmed liquidating plans of reorganization, and Liquidating Trustees now represent those Members.

28. Even before the cross-defaults triggered by the bankruptcy filings, the Members caused significant defaults under the Credit Agreement and other Loan Documents by (A) failing to (1) make interest payments, (2) cure defaults of certain Members, and (3) make their scheduled

---

[13] A true and correct copy of the Second Amended Acquisition Agreement is attached hereto as **Exhibit H**.

10
DECLARATION OF JOHN P. McDONAGH

sf-2929928

Takedowns, and (B) voting to unilaterally extend the agreed-upon Takedown schedule. First, Kimball Hill and Woodside advised South Edge of their inability to make their respective Takedowns. This caused the entire credit facility to be in default. As a result, JPMorgan advised South Edge that it would not agree to fund an upcoming loan draw.

29. ███████████████████████████████████████████████████████████ In addition, in March 2008, a controlling majority of the Management Committee (i) refused to issue capital calls to maintain interest reserves, (ii) refused to pay financing interest, and (iii) voted to cease work on Inspirada. In fact, South Edge has not made any payments to either fund credit reserves or interest payments in more than two years, and any further development of the Project (beyond the initial Takedown parcels) has not materialized. ███████████████████████████████

30. The Members completed their respective Takedowns scheduled for April 15, 2007 and October 15, 2007; however, there was a significant Takedown scheduled for April 15, 2008, and the impression was given to me that some of the Members indicated that they were unsure if they would perform their obligated Takedown.

31. With these Takedowns looming and uncertainty about whether they would be completed, JPMorgan, South Edge, the Members, and their Parent Guarantors, began discussions regarding curing the existing and pending defaults under the Credit Agreement and restructuring the loans.

32. However, unbeknownst to JPMorgan, the Members orchestrated secret votes of the Management Committee to extend the Takedown schedules, including those scheduled for April 15, 2008, so that their obligations to South Edge would not come due at the time agreed upon by JPMorgan in the Loan Documents. Specifically, on April 10, 2008, the Members (except for Meritage and Focus) voted to extend their Takedown schedules without JPMorgan's knowledge or consent even though they were aware that such consent was required. Ordinarily, for such

modifications, both South Edge and its Members in their own capacity (in addition and separate from their capacity as Members) had to extend their Takedown schedules in writing.[14]

33. On May 27, 2008, JPMorgan, South Edge, and the Members and the Parent Guarantors, entered into a forbearance agreement (the "Forbearance Agreement") in order to afford South Edge the opportunity to negotiate a potential restructuring of the loans under the Credit Agreement. Neither South Edge, nor any of the Members or Parent Guarantors, informed JPMorgan of the secretly extended Takedown schedules at the time the Forbearance Agreement was signed. In fact, South Edge specifically warranted that only limited and enumerated defaults had occurred, and the Members, including KBHN, ratified such misstatements and omissions.

34. After the signing of the Forbearance Agreement, JPMorgan, South Edge, the Members, and the Parents sought to restructure the loan, but those efforts were unsuccessful, and the Forbearance Agreement terminated, by its own terms, on June 30, 2008. JPMorgan formally notified South Edge and the Members and their Parent Guarantors of the Forbearance Agreement's termination and apprised them of some of the continuing defaults by letter dated July 1, 2008. On July 2, 2008, JPMorgan sent a notice of default to South Edge and KBHN (similar letters were sent to the other Members), regarding the defaults associated with KBHN's failure to make its Takedowns as required under its Acquisition Agreement.

35. Following notices of default and demands for adequate assurance from JPMorgan, and after South Edge, its Members, and the Parent Guarantors refused to cure the numerous defaults, make the balancing payments required under the Credit Agreement, or assure any performance under the Credit Agreement, Loan Documents, or Collateral Documents, JPMorgan commenced litigation proceedings against certain of the Members and Parent Guarantors, as set forth more fully in the accompanying Declaration of James E. Hough, Esq.

36. To the best of my knowledge, there is no bona fide factual or legal dispute as to the validity of the debt owing to the Lenders and Noteholders under the Credit Agreement and the Notes. South Edge has a definite payment obligation to both the Lenders and the Noteholders to satisfy the obligations provided for under the Credit Agreement and the Notes. However, South

---

[14] See **Exhibit A** of the accompanying Declaration of James E. Hough, Esq.

Edge has not complied with these obligations despite numerous notices of default and demands for adequate assurance from JPMorgan.

37. As recently as November 23, 2010, Lenders have sent South Edge an updated notice of defaults as well as a related demand for information and documents, as provided for under the Credit Agreement.[15] However, South Edge, its Members, and the Parent Guarantors continue to refuse to cure the numerous defaults, make the Balancing Payments, or assure any performance under the Credit Agreement, Loan Documents, or Collateral Documents.

38. In addition, on November 23, 2010, pursuant to the terms of the Assignment of Acquisition Agreement by and between South Edge, LLC and JPMorgan Chase Bank, N.A., in its capacity as Administrative Agent for the Lenders party to the Credit Agreement, dated as of April 27, 2006 (the "Assignment of Acquisition Agreement"),[16] the Agent sent a letter to the City of Henderson requesting that the Trustee pay to the Administrative Agent from the Acquisition Fund the Purchase Price from time to time payable under the Acquisition Agreement.[17]

39. Finally, in addition to the numerous payment defaults under the Credit Agreement, South Edge is months behind on payments to certain of its creditors.

---

[15] True and correct copies of such notices are attached hereto as **Exhibits J** and **K**.
[16] A true and correct copy of the Assignment of Acquisition Agreement is attached hereto as **Exhibit L**.
[17] A true and correct copy of the Agent's letter is attached hereto as **Exhibit M**.

|   |   |
|---|---|
| 1 | I declare under penalty of perjury under the laws of the State of New York and the United |
| 2 | States of America that the above is true and correct. Executed this ___ day of December, 2010 at |
| 3 | New York, New York. |

*[signature]*

John P. McDonagh

14
DECLARATION OF JOHN P. McDONAGH

ny-943236