# EXHIBIT A

EXECUTION VERSION



AMENDED AND RESTATED CREDIT AGREEMENT

Dated as of

March 9, 2007

Among

SOUTH EDGE, LLC

The Lenders Party Hereto

And

JPMORGAN CHASE BANK, N.A.
as Administrative Agent

and

THE ROYAL BANK OF SCOTLAND PLC
as Syndication Agent

J.P. MORGAN SECURITIES INC.,
as Sole Bookrunner and Sole Lead Arranger

CHI 3741503v.7

TABLE OF CONTENTS

## ARTICLE I

### Definitions

SECTION 1.01. Defined Terms ...........................................................................................1
SECTION 1.02. Classification of Loans and Borrowings.....................................................27
SECTION 1.03. Terms Generally ........................................................................................27
SECTION 1.04. Accounting Terms; GAAP .........................................................................28

## ARTICLE II

### The Credits

SECTION 2.01. Commitments..............................................................................................28
SECTION 2.02. Loans and Borrowings. ..............................................................................29
SECTION 2.03. Requests for Borrowings ...........................................................................30
SECTION 2.04. Intentionally Omitted. ................................................................................31
SECTION 2.05. Intentionally Omitted.................................................................................31
SECTION 2.06. Letters of Credit.........................................................................................31
SECTION 2.07. Funding of Borrowings. .............................................................................35
SECTION 2.08. Interest Elections. ......................................................................................35
SECTION 2.09. Termination of Commitments; Reduction of Facility D Commitments............37
SECTION 2.10. Repayment of Loans; Evidence of Debt.....................................................37
SECTION 2.11. Prepayment of Loans. ................................................................................38
SECTION 2.12. Fees.............................................................................................................39
SECTION 2.13. Interest. ......................................................................................................41
SECTION 2.14. Alternate Rate of Interest ..........................................................................42
SECTION 2.15. Increased Costs. .........................................................................................42
SECTION 2.16. Break Funding Payments ...........................................................................43
SECTION 2.17. Taxes...........................................................................................................44
SECTION 2.18. Payments Generally; Pro Rata Treatment; Sharing of Set-offs. .......................45
SECTION 2.19. Mitigation Obligations; Replacement of Lenders...........................................47

## ARTICLE III

### Representations and Warranties

SECTION 3.01. Organization; Powers..................................................................................48
SECTION 3.02. Authorization; Enforceability .....................................................................48
SECTION 3.03. Governmental Approvals; No Conflicts ......................................................48
SECTION 3.04. No Material Adverse Change ......................................................................48
SECTION 3.05. Properties. ..................................................................................................48
SECTION 3.06. Litigation.....................................................................................................49

Table of Contents
(continued)

|  |  | Page |
|---|---|---|
| SECTION 3.07. | Compliance with Laws and Agreements | 49 |
| SECTION 3.08. | Investment Company Act | 49 |
| SECTION 3.09. | Taxes | 49 |
| SECTION 3.10. | ERISA | 49 |
| SECTION 3.11. | Disclosure | 50 |
| SECTION 3.12. | Environmental Matters | 50 |
| SECTION 3.13. | Permits, Zoning, Governmental Approvals, Etc. | 50 |
| SECTION 3.14. | Collateral | 51 |
| SECTION 3.15. | Project Agreements | 51 |
| SECTION 3.16. | Solvency | 51 |
| SECTION 3.17. | Advances under Original Credit Agreement | 51 |
| SECTION 3.18. | Operating Agreement | 51 |

ARTICLE IV

Conditions and Limitations

| SECTION 4.01. | Closing Date | 52 |
|---|---|---|
| SECTION 4.02. | Each Credit Event | 53 |
| SECTION 4.03. | Conditions to First Loan | 54 |
| SECTION 4.04. | Additional Conditions to Loans | 56 |
| SECTION 4.05. | Intentionally Omitted | 57 |
| SECTION 4.06. | Limitations | 57 |

ARTICLE V

Construction and Related Provisions

| SECTION 5.01. | Performance and Completion of Project | 59 |
|---|---|---|
| SECTION 5.02. | Entitlements | 60 |
| SECTION 5.03. | LID Bonds. | 60 |
| SECTION 5.04. | Construction Delays | 60 |
| SECTION 5.05. | Construction Responsibilities | 60 |
| SECTION 5.06. | Correction of Defects | 61 |
| SECTION 5.07. | Compliance with Agreements | 61 |
| SECTION 5.08. | No Changes or Amendments | 61 |
| SECTION 5.09. | Loan Balancing | 61 |
| SECTION 5.10. | Proceedings to Enjoin or Prevent Construction | 62 |
| SECTION 5.11. | The Administrative Agent's and the Lenders' Actions for Their Own Protection Only | 62 |
| SECTION 5.12. | Inspections; Construction Consultant | 63 |
| SECTION 5.13. | Contractor Construction Information | 63 |
| SECTION 5.14. | Prohibited Contracts | 63 |

ii

Table of Contents
(continued)

Page

SECTION 5.15. Hold Disbursements of Loans in Trust................................................63
SECTION 5.16. The Administrative Agent's Verification of Subcontracts ...................64
SECTION 5.17. Limited Nature of Waivers of Requirements......................................64

## ARTICLE VI

### Affirmative Covenants

SECTION 6.01. Financial Statements and Other Information ......................................64
SECTION 6.02. Notices of Material Events ................................................................65
SECTION 6.03. Existence; Conduct of Business.........................................................66
SECTION 6.04. Payment of Obligations ....................................................................66
SECTION 6.05. Maintenance of Properties; Insurance ..............................................66
SECTION 6.06. Books and Records; Inspection Rights ..............................................66
SECTION 6.07. Compliance with Laws .....................................................................66
SECTION 6.08. Use of Proceeds and Letters of Credit ..............................................66
SECTION 6.09. Taxes and Fees on Loan Documents .................................................67
SECTION 6.10. Environmental Notices .....................................................................67
SECTION 6.11. Insurance with Respect to Project.....................................................67
SECTION 6.12. Environmental Audits .......................................................................68
SECTION 6.13. Insurance and Condemnation Proceeds. ...........................................69
SECTION 6.14. Appraisals ........................................................................................69
SECTION 6.15. Collateral..........................................................................................69
SECTION 6.16. Subdivision Maps; Other Encumbrances...........................................70
SECTION 6.17. Further Assurances ...........................................................................71
SECTION 6.18. Interest Reserve. ..............................................................................71

## ARTICLE VII

### Negative Covenants

SECTION 7.01. Indebtedness .....................................................................................71
SECTION 7.02. Liens. ...............................................................................................71
SECTION 7.03. Fundamental Changes; Sales; Releases; and Release Price. ...............71
SECTION 7.04. Investments, Loans, Advances, Guarantees and Acquisitions ...........75
SECTION 7.05. Swap Agreements .............................................................................75
SECTION 7.06. Restricted Payments..........................................................................75
SECTION 7.07. Transactions with Affiliates...............................................................76
SECTION 7.08. Restrictive Agreements......................................................................76
SECTION 7.09. Organizational Documents ................................................................76
SECTION 7.10. General Manager ..............................................................................76
SECTION 7.11. Construction Manager .......................................................................76
SECTION 7.12. Principal Project Engineer .................................................................76

iii

<u>Table of Contents</u>
(continued)

<u>Page</u>

### ARTICLE VIII

#### Special Entity Provisions

SECTION 8.01. SPE Covenants.................................................................................................77

### ARTICLE IX

#### Events of Default; Remedies

SECTION 9.01. Events of Default .............................................................................................79
SECTION 9.02. All Remedies ...................................................................................................82
SECTION 9.03. Construction.....................................................................................................82
SECTION 9.04. Enforcement.....................................................................................................83
SECTION 9.05. Cash Collateral Account..................................................................................83
SECTION 9.06. Qualified Letters of Credit ..............................................................................84
SECTION 9.07. Cure of Member Defaults.................................................................................85
SECTION 9.08. Application of Payments..................................................................................86

### ARTICLE X

#### The Administrative Agent

SECTION 10.01. Appointment of Administrative Agent .............................................................87
SECTION 10.02. Administrative Agent's Rights as a Lender......................................................87
SECTION 10.03. Administrative Agent's Duties ........................................................................88
SECTION 10.04. Reliance ...........................................................................................................88
SECTION 10.05. Sub-Agents ......................................................................................................88
SECTION 10.06. Resignation ......................................................................................................89
SECTION 10.07. Credit Analysis and Decision by Lenders ......................................................89
SECTION 10.08. Collateral..........................................................................................................89

### ARTICLE XI

#### Miscellaneous

SECTION 11.01. Notices. ............................................................................................................90
SECTION 11.02. Waivers; Amendments.....................................................................................91
SECTION 11.03. Expenses; Indemnity; Damage Waiver. ..........................................................93
SECTION 11.04. Successors and Assigns ...................................................................................94
SECTION 11.05. Survival ...........................................................................................................98
SECTION 11.06. Counterparts; Integration; Effectiveness ........................................................98
SECTION 11.07. Severability .....................................................................................................98
SECTION 11.08. Right of Setoff ................................................................................................98

iv

Table of Contents
(continued)

Page

SECTION 11.09.  Governing Law; Jurisdiction; Consent to Service of Process. ........................99
SECTION 11.10.  WAIVER OF JURY TRIAL ...........................................................................99
SECTION 11.11.  Headings ...................................................................................................100
SECTION 11.12.  Confidentiality ..........................................................................................100
SECTION 11.13.  USA PATRIOT ACT ...................................................................................100
SECTION 11.14.  Ratification .................................................................................................100
SECTION 11.15.  Lenders .......................................................................................................100

v

# TABLE OF CONTENTS

SCHEDULES AND EXHIBITS

| | |
|---|---|
| Schedule 1 | Facility A and D Lenders and Commitments |
| Schedule 2 | Members, Parent Guarantors and Related Information |
| Schedule 3 | Disclosed Matters |
| Schedule 4 | Intentionally Omitted |
| Schedule 5 | Parent Guarantor Financial Covenants |
| Schedule 6 | Legal Description of Project |
| Schedule 7 | Scope of Work |
| Schedule 8 | Project Agreements |
| Schedule 9 | Required Insurance |
| Exhibit A | Assignment and Assumption |
| Exhibit B | Intentionally Omitted |
| Exhibit C | Intentionally Omitted |
| Exhibit D | Project Budget |
| Exhibit E | Consent and Agreement |
| Exhibit F | Deed of Trust Amendment |
| Exhibit G | Draw Request Form |

AMENDED AND RESTATED CREDIT AGREEMENT dated as of March 9, 2007, among SOUTH EDGE, LLC, a Nevada limited-liability company, the Lenders party hereto, and JPMORGAN CHASE BANK, N.A. as Administrative Agent.

## RECITALS

A.    The Borrower, Administrative Agent and certain lenders have entered into a Credit Agreement dated November 1, 2004 (the "Original Credit Agreement").

B.    Pursuant to the Original Credit Agreement, the Borrower has requested (1) the Facility A Increase (as defined therein) increasing Facility A by $50,000,000 to $160,000,000 and (2) a one-year extension of the maturity of Facility A, and by their execution hereof the Facility A Lenders (as herein defined) have agreed thereto.

C.    The Borrower and the Required Lenders (as defined in the Original Credit Agreement) have also agreed to certain other changes to the Original Credit Agreement set forth herein.

NOW, THEREFORE, the Borrower, the Administrative Agent and Lenders signatory hereto (including all of the Facility A Lenders) constituting Required Lenders hereby amend and restate the Original Credit Agreement as follows:

## ARTICLE I

### Definitions

SECTION 1.01.  Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acquisition Agreement" means, with respect to any Member, that certain Purchase and Sale Agreement and Joint Escrow Instructions dated October 29, 2004 between the Borrower and such Member, and co-signed by such Member's Parent Guarantor, as amended by a First Amendment thereto dated November 28, 2006 and a Second Amendment thereto dated the date hereof, providing for the purchase by such Member of the Phases designated in such agreement for the applicable Takedown Price, as such agreement may be further supplemented, amended or modified from time to time in accordance with the provisions of this Agreement.

"Adjusted Gross Acreage" means, with respect to any Phase, the "Adjusted Gross Acreage" of such Phase as determined from time to time pursuant to the Acquisition Agreement that governs the purchase and sale of such Phase.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of

1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Adjusted Pro Rata Share" means, with respect to any Member, a percentage equal to the Original Pro Rata Share of such Member, (a) plus or minus adjustments thereto in connection with changes to the Adjusted Gross Acreage of a Member in accordance with its Acquisition Agreement as a result of the finalization of the Planning Area Parcel Map and (b) plus the Original Pro Rata Share (or portion thereof) of any Defaulting Member (as adjusted pursuant to clause (a) above) acquired by such Member pursuant to a Key Member Acquisition. The Adjusted Pro Rata Share shall never be less than the Original Pro Rata Share (as adjusted pursuant to clause (a) above).

"Administrative Agent" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent for the Lenders hereunder.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Aggregate Facility A Commitment" means the Facility A Commitments of all of the Facility A Lenders in the aggregate amount of $160,000,000, as such amount may be reduced or increased pursuant to the terms of this Agreement.

"Aggregate Facility D Commitment" means the Facility D Commitments of all of the Facility D Lenders in the aggregate amount of $25,000,000, as such amount may be reduced from time to time pursuant to the terms of this Agreement.

"Aggregate Facility D Outstanding Credit Exposure" means, at any time, the aggregate of the Facility D Outstanding Credit Exposure of all Facility D Lenders.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Base CD Rate in effect on such day plus 1% and (c) the Federal Funds Effective Rate in effect on such day plus ½ of 1%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Base CD Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate, the Base CD Rate or the Federal Funds Effective Rate, respectively.

"Applicable Percentage" means at any time (a) (subject to the next succeeding sentence) with respect to any Facility A Lender, the percentage of the Aggregate Facility A Commitment then represented by such Lender's Facility A Commitment, (b) with respect to any Facility B Lender, the percentage of all outstanding Facility B Loans then represented by such Lender's outstanding Facility B Loans, (c) with respect to any Facility C Lender, the percentage of all outstanding Facility C Loans then represented by such Lender's outstanding Facility C Loans, (d) (subject to the next succeeding sentence) with respect to any Facility D Lender, the percentage of the Aggregate Facility D Commitment then represented by such Lender's Facility

D Commitment and (e) (subject to the next succeeding sentence) with respect to a Lender and all Facilities, the percentage of (i) the sum of the Aggregate Facility A Commitment, all outstanding Facility B Loans and Facility C Loans and the Aggregate Facility D Commitment then represented by (ii) the sum of such Lender's Facility A Commitment, outstanding Facility B Loans and Facility C Loans and Facility D Commitment.  If the Aggregate Facility A Commitment or Aggregate Facility D Commitment has terminated, the Applicable Percentage shall be determined in each case based upon the outstanding Facility A Loans (in the case of termination of the Aggregate Facility A Commitment) or Facility D Outstanding Credit Exposure (in the case of termination of the Aggregate Facility D Commitment).

"Applicable Rate" means, for any day, with respect to any ABR Loan, Eurodollar Loan or Letter of Credit, as the case may be, under a Facility, the applicable rate per annum set forth below under the caption "ABR Spread," or "Eurodollar Spread" or "Applicable Rate for Letters of Credit" with respect to such Facility, as the case may be:

| Facility : | ABR Spread | Eurodollar Spread | Applicable Rate for Letters of Credit |
|---|---|---|---|
| Facility A | 0% | 1.75% | Not Applicable |
| Facility B | 0% | 1.75% | Not Applicable |
| Facility C | 0.25% | 2.00% | Not Applicable |
| Facility D | 0.25% | 2.00% | 2.00% |

"Application for Payment and Sworn Statement" means the certificate and application for payment and sworn statement to be executed by the Project Contractor in connection with progress payment applications under the Project Contract or by the Construction Manager in connection with payments under the Construction Management Agreement, in each case in a form reasonably satisfactory to the Administrative Agent, which certificate and application shall include certifications as to the following matters: (A) the aggregate Hard Costs incurred to date for the Project and the estimated remaining Hard Costs to be paid for the Project, in each case pursuant to the Project Contract or Construction Management Agreement (as applicable), (B) all retainage amounts, (C) the percentage completion of the construction of the Project and the conformance of such construction substantially in accordance with the Approved Plans and Specifications, (D) that the sum requested in the current Application for Payment and Sworn Statement represents costs payable pursuant to the Project Contract and actually incurred by the Project Contractor or pursuant to the Construction Management Agreement and actually incurred by the Construction Manager, and (E) that the work and materials for which payment is requested have been performed and incorporated into the Project substantially in accordance with the Approved Plans and Specifications.

"Appraisal" means a written appraisal of the Project, which appraisal is satisfactory to, and prepared by an independent appraiser engaged directly by, the Administrative Agent, and satisfies the requirements of the Financial Institutions Reform, Recovery and Enforcement Act, as amended, and the regulations promulgated thereunder, if applicable (which

3

appraisal may be an updated version of a prior Appraisal), together with evidence of compliance with applicable federal regulations governing loans in areas having special flood hazards.

"Approved Development Costs" means the Development Costs identified by line item category and dollar amount in the Approved Project Budget.

"Approved Fund" has the meaning assigned to such term in Section 11.04.

"Approved Plans and Specifications" is defined in Section 4.03(a).

"Approved Project Budget" means the budget for the Project attached hereto as Exhibit D and any Modifications thereto that are either Permitted Modifications or approved in writing by the Administrative Agent, which approval shall not be unreasonably withheld or delayed.

"Approved Project Schedule" means the schedule for the Project approved by the Administrative Agent and any Modifications thereto that are either Permitted Modifications or approved in writing by the Administrative Agent, which approval shall not be unreasonably withheld or delayed.

"Approved Swap Agreement" is defined in Section 7.05.

"Assessment Rate" means, for any day, the annual assessment rate in effect on such day that is payable by a member of the Bank Insurance Fund classified as "well-capitalized" and within supervisory subgroup "B" (or a comparable successor risk classification) within the meaning of 12 C.F.R. Part 327 (or any successor provision) to the Federal Deposit Insurance Corporation for insurance by such Corporation of time deposits made in dollars at the offices of such member in the United States; provided that if, as a result of any change in any law, rule or regulation, it is no longer possible to determine the Assessment Rate as aforesaid, then the Assessment Rate shall be such annual rate as shall be determined by the Administrative Agent to be representative of the cost of such insurance to the Lenders.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 11.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"Assignment of Acquisition Agreements" means that certain Assignment of and Agreement with Respect to Acquisition Agreements dated November 1, 2004 executed by the Borrower, the Members, the Parent Guarantors and the Administrative Agent, as supplemented by the Consent and Agreement.

"Assignment of Contracts" means that certain Assignment of Contracts, Permits and Plans and Specifications dated November 1, 2004 executed by the Borrower.

"Balancing Notice" is defined in Section 5.09.

"Balancing Payment" is defined in Section 5.09.

4

"Base CD Rate" means the sum of (a) the Three-Month Secondary CD Rate multiplied by the Statutory Reserve Rate plus (b) the Assessment Rate.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means South Edge, LLC, a Nevada limited-liability company.

"Borrower's Application for Payment" means the certificate and application for payment to be executed by the Borrower in connection with each request for a disbursement of Loans, in a form reasonably satisfactory to the Administrative Agent, which application shall include certifications as to the following matters: (A) the aggregate Approved Development Costs incurred to date and the estimated remaining Approved Development Costs to be paid, (B) all retainage amounts, and (C) that the sum requested in the current Draw Request Form represents Approved Development Costs included in the Approved Project Budget and actually incurred by the Borrower.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date under the same Facility and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash Collateral Account" means an account maintained with the Administrative Agent pursuant to this Agreement and over which the Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal.

"Change in Control" means the occurrence of any one or more of the following events:

(a)    With respect to any Member, that such Member shall cease to own its Adjusted Pro Rata Share of the membership interests in the Borrower (other than by reason of a Key Member Acquisition), free and clear of any Liens other than Permitted

Encumbrances or Liens in favor of another Member pursuant to the Operating Agreement; or

(b)    In the case of any Member (other than Focus), that such Member shall cease to be wholly owned, directly or indirectly, by its Parent Guarantor; or

(c)    In the case of Focus, that (i) John A. Ritter, lineal descendants of John A. Ritter and trusts controlled by John A. Ritter or his lineal descendants shall, in the aggregate, cease to own, directly or indirectly, beneficially at least twenty-five percent (25%) of the equity interests in Focus or (ii) other than by reason of death or disability, John A. Ritter shall cease to exercise primary management responsibilities with respect to the operations of Focus.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or Issuing Bank (or, for purposes of Section 2.15(b), by any lending office of such Lender or by such Lender's or Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"City" means the City of Henderson, Nevada.

"Closing Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means, at any time, any assets that are subject to a security interest or other Lien in favor of the Administrative Agent for the benefit of the Holders of Secured Obligations.

"Collateral Documents" means the Deed of Trust, the Assignments of Contracts, the Assignment of Acquisition Agreements and any other documents from time to time executed by Borrower, granting the Administrative Agent, for the benefit of Holders of Secured Obligations, a Lien securing the Secured Obligations.

"Commitment" means the Facility A Commitment, Facility B Commitment, Facility C Commitment or Facility D Commitment (as the case may be).

"Common Areas" means private streets, sidewalks, access ways, drainage and retention areas or other private common areas, infrastructure or improvements intended to be conveyed to and owned by a Development Association for the benefit of all or any portion of the Project.

"Completion Guaranty" means, with respect to each Member and its Parent Guarantor, that certain Completion Guaranty dated November 1, 2004 executed and delivered by such Member and its Parent Guarantor, as supplemented by the Consent and Agreement.

6

"Consent and Agreement" means the Consent and Agreement executed by the Guarantors and Administrative Agent substantially in the form attached hereto as Exhibit E.

"Construction Agreements" is defined in Section 4.03(h).

"Construction Consultant" means, collectively, the architect(s), engineer(s) and any other consultant(s) engaged by the Administrative Agent from time to time to review plans and specifications, construction and other matters relating to the Project.

"Construction Management Agreement" is defined in Section 4.03(e).

"Construction Manager" means Landtek, LLC, a Nevada limited-liability company and Affiliate of the General Manager, or any Person that shall succeed it, as construction manager with respect to the construction of the Improvements, in accordance with the provisions of this Agreement.

"Contingent Obligation" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Contingent Obligation shall not include endorsements for collection or deposit in the ordinary course of business.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Corporate Guarantor" means each of the Parent Guarantors, except John A. Ritter.

"Credit Parties" means the Borrower and the Guarantors; "Credit Party" means any of the Credit Parties.

"Customary Real Estate Encumbrances" means declarations, covenants, restrictions, easements, zoning restrictions, rights-of-way, and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not materially detract from the value of the affected portion of the Project or interfere with the development or improvement of the Project or the ordinary conduct of business of the Borrower.

7

"Date Down Endorsement" is defined in Section 4.04(f).

"Deed of Trust" means the deed of trust executed by the Borrower dated November 1, 2004 and recorded November 1, 2004 in Book 20041101 as Document No. 0006330 in Clark County, Nevada, granting to the trustee thereunder, and in favor of the Administrative Agent (as beneficiary), for the benefit of the Holders of Secured Obligations, a first Lien on the Project as security for the Secured Obligations, subject only to Permitted Encumbrances, as amended by the Deed of Trust Amendment.

"Deed of Trust Amendment" means the First Amendment to Deed of Trust executed by the Borrower and the Administrative Agent substantially in the form of Exhibit F attached hereto.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Member" means a Member with respect to which a Member Default has occurred and is continuing or with respect to whose Parent Guarantor a Member Default has occurred and is continuing.

"Defaulting Member's Remaining Obligations" means, at any time, an amount (as reasonably determined by the Administrative Agent) equal to the sum of (i) such Defaulting Member's Adjusted Pro Rata Share of Approved Development Costs not yet paid (less its Adjusted Pro Rata Share of the sum of the amounts of (i) the undisbursed portion of the Aggregate Facility A Commitment and (ii) the Facility D Loan Availability), plus (ii) without duplication, an amount equal to the Takedown Prices of the Phases not yet acquired by such Defaulting Member pursuant to its Acquisition Agreement.

"Development Agreement" means, collectively, one or more development agreements between the Borrower and the City providing for development of the Project as a master plan community and approved by the Administrative Agent, as amended or modified from time to time with the written approval of the Administrative Agent, which approval shall not be unreasonably withheld or delayed.

"Development Association" means any homeowner's association, development association or other similar entity formed for the benefit of the Project or any portion thereof.

"Development Costs" means all costs incurred by the Borrower in connection with the construction of the Improvements, including (a) the cost of labor and materials (collectively, the "Hard Costs") and (b) all so-called "soft costs" (collectively, the "Soft Costs"), including (i) fees and charges of the Construction Manager, Project Engineer and all other engineers and other consultants engaged by the Borrower, and the costs and fees incurred in connection with the procurement of all Permits necessary to complete the Project, (ii) all interest payments on the Loans and LC Disbursements, all fees payable under this Agreement and any periodic payments under any Approved Swap Agreement (but not payments due upon default, termination or breakage) and (iii) real estate taxes, insurance premiums and other carrying costs for the Project; provided, that under no circumstances shall Development Costs include (A) any

8

principal or interest payments on Indebtedness other than as specified in clause (ii) above, (B) any Restricted Payments or other payments to Members of Borrower or any Affiliate of Borrower or of any such Member (except Permitted Affiliate Fees).

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.

"dollars" or "$" refers to lawful money of the United States of America.

"Draw Request Form" means the form of Request for Loan Advance attached hereto as Exhibit G, as the same may be revised from time to time with the consent of the Borrower and the Administrative Agent.

"Entitlement Proceeding" is defined in Section 3.13(b).

"Environmental, Health or Safety Requirements of Law" means all Requirements of Law derived from or relating to foreign, federal, state and local laws or regulations or common law theories relating to or addressing pollution or protection of the environment, or protection of worker health or safety, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq., and the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq., in each case including any amendments thereto, any successor statutes, and any regulations or guidance promulgated thereunder, and any state or local equivalent thereof.

"Environmental Indemnity Agreement" means that certain Environmental Indemnity Agreement dated November 1, 2004 executed by Borrower.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower directly or indirectly resulting from or based upon (a) violation of any Environmental, Health or Safety Requirements of Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Report" means a "Phase I" environmental assessment, or equivalent report as approved by the Administrative Agent, and, if required by the Administrative Agent, a "Phase II" environmental site assessment, in each case prepared by an environmental engineering consultant, and in form and substance, satisfactory to the Administrative Agent in its reasonable judgment.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

9

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Section 9.01.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, any Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) its net income by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.19(b)), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Lender's failure to comply with Section 2.17(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.17(a).

"Facilities" means Facility A, Facility B, Facility C and Facility D; provided, however, that, if the context indicates that reference to less than all of Facility A, Facility B, Facility C and Facility D is intended, "Facilities" shall mean only such of Facility A, Facility B, Facility C and Facility D as is so intended.

"Facility A" means the loan facility described in Section 2.01(a).

"Facility A Commitment" means, for each of the Facility A Lenders, the obligation of such Facility A Lender to make Loans under Facility A in the aggregate not exceeding the amount set forth in Schedule 1 hereto as its "Facility A Commitment" or the amount set forth in any Assignment and Assumption Agreement by which such Facility A Lender acquires an interest in Facility A, as such applicable amount may be increased or decreased from time to time pursuant to the terms hereof.

"Facility A Lender" means, at any time, each of the Lenders holding an interest in Facility A.

"Facility A Maturity Date" means October 31, 2008 or such earlier date upon which the outstanding principal amount of the Facility A Loans, all accrued and unpaid interest thereon, and all other Facility A Obligations become or are declared due and payable pursuant to the terms of this Agreement.

"Facility A Obligations" means all unpaid principal of and accrued and unpaid interest on the Facility A Loans, all accrued and unpaid fees with respect to Facility A and all expenses, reimbursements, indemnities and other obligations of the Credit Parties to the Facility A Lenders or to any Facility A Lender, the Administrative Agent or any indemnified party with respect to Facility A under the Loan Documents.

"Facility B" means the term loan facility described in Section 2.01(b).

"Facility B Commitment" means, for each of the Facility B Lenders as of the Closing Date, the amount of the Facility B Loan held by such Facility B Lender on the Closing Date. Notwithstanding the reference to the "Commitment" of the Facility B Lenders, the Facility B Loans were fully disbursed under the Original Credit Agreement, and no Facility B Lender has any obligation to make any advances under Facility B.

"Facility B Lender" means, at any time, each of the Lenders holding an interest in Facility B.

"Facility B Maturity Date" means October 31, 2007 or such earlier date upon which the outstanding principal amount of the Facility B Loans, all accrued and unpaid interest thereon, and all other Facility B Obligations become or are declared due and payable pursuant to the terms of this Agreement.

"Facility B Obligations" means all unpaid principal of and accrued and unpaid interest on the Facility B Loans, all accrued and unpaid fees with respect to Facility B and all expenses, reimbursements, indemnities and other obligations of the Credit Parties to the Facility

B Lenders or to any Facility B Lender, the Administrative Agent or any indemnified party with respect to Facility B arising under the Loan Documents.

"Facility C" means the term loan facility described in Section 2.01(c).

"Facility C Commitment" means, for each of the Facility C Lenders as of the Closing Date, the amount of the Facility C Loan held by such Facility C Lender on the Closing Date. Notwithstanding the reference to the "Commitment" of the Facility C Lenders, the Facility C Loans were fully disbursed under the Original Credit Agreement, and no Facility C Lender has any obligation to make any advances under Facility C.

"Facility C Lender" means, at any time, each of the Lenders holding an interest in Facility C.

"Facility C Maturity Date" means October 31, 2009 or such earlier date upon which the outstanding principal amount of the Facility C Loans, all accrued and unpaid interest thereon, and all other Facility C Obligations become or are declared due and payable pursuant to the terms of this Agreement.

"Facility C Obligations" means all unpaid principal of and accrued and unpaid interest on the Facility C Loans, all accrued and unpaid fees with respect to Facility C and all expenses, reimbursements, indemnities and other obligations of the Credit Parties to the Facility C Lenders or to any Facility C Lender, the Administrative Agent or any indemnified party with respect to Facility C arising under the Loan Documents.

"Facility D" means the revolving credit (including letter of credit) facility described in Section 2.01(d).

"Facility D Commitment" means, for each of the Facility D Lenders, the obligation of such Facility D Lender to participate in Letters of Credit issued under Facility D, and to make loans pursuant to Facility D, not exceeding in the aggregate the amount set forth in Schedule 1 hereto as its "Facility D Commitment" or the amount set forth in any Assignment and Assumption Agreement by which such Facility D Lender acquires an interest in Facility D, as such applicable amount may be increased or decreased from time to time pursuant to the terms hereof.

"Facility D Lender" means, at any time, each of the Lenders holding an interest in Facility D.

"Facility D Loan Availability" means the amount by which the Aggregate Facility D Commitment exceeds the Aggregate Facility D Outstanding Credit Exposure.

"Facility D Maturity Date" means October 31, 2009 or such earlier date upon which the outstanding principal amount of the Facility D Loans, all accrued and unpaid interest thereon, and all other Facility D Obligations become or are declared due and payable pursuant to the terms of any of this Agreement.

12

"Facility D Obligations" means all unpaid principal of and accrued and unpaid interest on the Facility D Loans, all LC Disbursements, all accrued and unpaid fees with respect to Facility D and all expenses, reimbursements, indemnities and other obligations of the Credit Parties to the Facility D Lenders or to any Facility D Lender, the Administrative Agent or any indemnified party with respect to Facility D arising under the Loan Documents.

"Facility D Outstanding Credit Exposure" means, as to any Facility D Lender at any time, the sum of (i) an amount equal to its LC Exposure at such time, plus (ii) the aggregate principal amount of its Facility D Loans outstanding at such time.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financial Officer" means, at any time, the chief financial officer, principal accounting officer, treasurer or controller of (a) the Borrower if at such time a Person holds any such position and, if not, (b) the General Manager.

"Focus" means Focus South Group, LLC, a Nevada limited-liability company.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located.  For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"GAAP" means generally accepted accounting principles in the United States of America.

"General Manager" means Holdings Manager, LLC, a Nevada limited-liability company, or any Person that shall succeed it as general manager of the Borrower in accordance with the provisions of this Agreement.

"Governmental Approval" means all right, title and interest in any existing or future certificates, licenses, permits, variances, authorizations and approvals issued with respect to the Project by any Governmental Authority having jurisdiction with respect to the Project.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

13

"Guaranties" means the Repayment Guaranties executed by each of the Members and their respective Parent Guarantors, the Completion Guaranties executed by each of the Members and their respective Parent Guarantors, and the Limited Guaranties executed by each of the Members and their respective Parent Guarantors; "Guaranty" means one of the Guaranties.

"Guarantor" means any Credit Party that executed or executes a Guaranty pursuant to the Original Credit Agreement or this Agreement and includes both the Members and the Parent Guarantors.

"Hard Costs" is defined in the definition of "Development Costs."

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental, Health or Safety Requirements or Law.

"Holders of Secured Obligations" means the holders of the Secured Obligations from time to time and shall include (i) each Lender in respect of its Loans, (ii) each Issuing Bank in respect of LC Disbursements owed to it, (iii) the Administrative Agent, the Lenders and the Issuing Banks in respect of all other present and future obligations and liabilities of any Credit Party of every type and description arising under or in connection with this Agreement or any other Loan Document, (iv) each Indemnitee in respect of the obligations and liabilities of any Credit Party to such Person hereunder or under the other Loan Documents, (v) each Lender (or Affiliate thereof), in respect of all Secured Swap Obligations of Borrower to such Lender (or Affiliate), and (vi) their respective successors, transferees and assigns.

"Improvements" means infrastructure improvements constructed and installed or to be constructed or installed on the Project, as described in the Scope of Work and more specifically provided for in the Approved Plans and Specifications.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Contingent Obligations of such Person, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest

14

in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitees" is defined in Section 11.03(b).

"Information Memorandum" means the Confidential Information Memorandum dated February 15, 2007 relating to the Borrower and the Transactions.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.08.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each March, June, September and December and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months thereafter, as the Borrower may elect; provided, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless, in the case of a Eurodollar Borrowing only, such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period pertaining to a Eurodollar Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Issuing Bank" means JPMorgan Chase Bank, N.A. and any Facility D Lender that, at the request of the Borrower and with the approval of the Administrative Agent in its reasonable judgment, agrees to issue Letters of Credit hereunder, each in its capacity as the issuer of Letters of Credit hereunder, and any successors in such capacity as provided in Section 2.06(i). An Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by its Affiliates, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"Key Member" means KB Nevada Home, Inc., Coleman-Toll Limited Partnership and any other Member that is approved as a "Key Member" by the Required Lenders.

"Key Member Acquisition" is defined in Section 9.07(c).

15

"LC Disbursement" means a payment made by an Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time. The LC Exposure of any Facility D Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"Lenders" means the Persons listed on Schedule 1 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Letter of Credit" means any letter of credit issued pursuant to this Agreement.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, the rate appearing on Page 3750 of the Dow Jones Market Service (or on any successor or substitute page of such Service, or any successor to or substitute for such Service, providing rate quotations comparable to those currently provided on such page of such Service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period. In the event that such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such Eurodollar Borrowing for such Interest Period shall be the rate at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"LID Bond Account" means an account established with the LID Bond trustee or another Person pursuant to the LID Bond Documents, into which account the Net LID Proceeds shall be disbursed to or as directed by the Borrower from time to time for payment of certain Approved Development Costs in accordance with the LID Bond Documents.

"LID Bond Documents" means each indenture and other document or instrument that evidences the issuance of or is executed and delivered in connection with or that secures the LID Bonds.

"LID Bonds" means any Local Improvement District Bonds issued with respect to the Project.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

16

"<u>Limited Guaranty</u>" means, with respect to each Member and its Parent Guarantor, that certain Limited Guaranty dated November 1, 2004 executed and delivered by such Member and its Parent Guarantor, as supplemented by the Consent and Agreement.

"<u>Loan Documents</u>" means (a) this Agreement, any Notes delivered pursuant hereto or the Original Credit Agreement, the Guaranties, the Environmental Indemnity Agreement and the Collateral Documents and (b) any and all other instruments or documents delivered or to be delivered by the Credit Parties pursuant hereto or pursuant to any of the other documents described in clause (a) above.

"<u>Loan Title Insurance Policy</u>" means the American Land Title Association loan policy (1992 Form), issued by the Title Insurer to Administrative Agent on or about the Original Closing Date, and the related reinsurance agreements, as revised and updated (including by the endorsement provided for in Section 4.01(e)) from time to time with the Administrative Agent's consent.

"<u>Loans</u>" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"<u>Major Project Contract</u>" means one or more Project Contracts under which the aggregate amount payable to the same Project Contractor exceeds $5,000,000.

"<u>Major Subcontract</u>" means one or more subcontracts for the furnishing of labor and materials under which the aggregate amount payable to the same subcontractor exceeds $5,000,000.

"<u>Major Subcontractor</u>" means a subcontractor under a Major Subcontract.

"<u>Master Plan</u>" means the West Henderson and Section 34 Land Use and Transportation Plan (CPA-02-520035).

"<u>Material Adverse Effect</u>" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Borrower, (b) the ability of the Borrower to perform any of its obligations under this Agreement or any Loan Document or (c) the rights of or benefits available to the Administrative Agent or the Lenders under this Agreement or any of the other Loan Documents. Without limitation of the foregoing, an adverse effect of $5,000,000 or more on the Borrower or the Project shall be deemed material.

"<u>Material Default</u>" means any Event of Default under Section 9.01(a) or (b) hereof or (with respect to the Borrower) under Section 9.01(h), (i) or (j) hereof.

"<u>Material Indebtedness</u>" means, at any time in the case of each Parent Guarantor, Recourse Indebtedness in an amount in excess of 5% of its total Recourse Indebtedness.

"<u>Maturity Date</u>" means (i) with respect to Facility A, the Facility A Maturity Date, (ii) with respect to Facility B, the Facility B Maturity Date, (iii) with respect to Facility C, the Facility C Maturity Date, and (iv) with respect to Facility D, the Facility D Maturity Date.

"<u>Maximum Indebtedness Limitation</u>" means that at no time shall the outstanding principal amounts of the Loans under the Facilities exceed the sum of the Release Prices of those Phases not theretofore released from the Deed of Trust.

"<u>Member</u>" means each of the members of the Borrower identified in <u>Schedule 2</u> hereto, and any successor or assign of such Member permitted under this Agreement.

"<u>Member Default</u>" means any Default with respect to a Member or its Parent Guarantor under Section 9.01 that is not yet an Event of Default.

"<u>Modification</u>" is defined in the definition of "Permitted Modifications."

"<u>Moody's</u>" means Moody's Investors Service, Inc.

"<u>Multiemployer Plan</u>" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Net LID Proceeds</u>" means, with respect to the issuance of any LID Bonds, the proceeds of such LID Bonds, net of expenses of the issuer, the bond trustee and the underwriter and of reserves required to be established pursuant to the terms of the LID Bond Documents.

"<u>Net Mark-to-Market Exposure</u>" means, as of any date of determination, the excess (if any) of all unrealized losses over all unrealized profits of the Borrower arising from Approved Swap Agreements. "Unrealized losses" means the fair market value of the cost to the Borrower of replacing such Approved Swap Agreements as of the date of determination (assuming the Approved Swap Agreements were to be terminated as of that date), and "unrealized profits" means the fair market value of the gain to the Borrower of replacing such Approved Swap Agreements as of the date of determination (assuming such Approved Swap Agreements were to be terminated as of that date).

"<u>Note</u>" is defined in Section 2.10(e).

"<u>Obligations</u>" means all Loans, LC Disbursements, advances, debts, liabilities, obligations, covenants and duties owing by any Credit Party to the Administrative Agent, any Lender, any Issuing Bank, the Arranger, any Affiliate of the Administrative Agent or any Lender or Issuing Bank or any Person entitled to indemnification by any Credit Party under this Agreement or any other Loan Document, of any kind or nature, present or future, arising under this Agreement or any other Loan Documents, whether or not evidenced by any note, guaranty or other instrument, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification, or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired. The term "Obligations" includes, without limitation, all Facility A Obligations, Facility B Obligations, Facility C Obligations and Facility D Obligations, all interest, charges, expenses, fees, reasonable attorneys' fees and disbursements, reasonable paralegals' fees and any other sum chargeable to any Credit Party under this Agreement or any other Loan Document.

18

"Operating Agreement" means the Amended and Restated Operating Agreement of South Edge, LLC dated as of May 3, 2004, as amended by First Amendment thereto dated October 29, 2004 and Second Amendment thereto dated March 8, 2007 and as the same may be further amended from time to time in accordance with the provisions of this Agreement.

"Organizational Documents" means, with respect to any corporation, limited liability company or partnership (i) the articles/certificate of incorporation or formation (or the equivalent organizational documents) of such corporation or limited liability company, (ii) the partnership agreement of the partnership and the certificate of limited partnership, (iii) the bylaws or operating agreement (or the equivalent governing documents) of the corporation, limited liability company or partnership and (iv) any document setting forth the designation, amount and/or relative rights, limitations and preferences of any class or series of such corporation's limited liability company's or partnership's Equity Interests.

"Original Closing Date" means November 1, 2004, which was the "Closing Date" under the Original Credit Agreement.

"Original Credit Agreement" is defined in Recital A.

"Original Pro Rata Share" means, with respect to any Member, a percentage equal to its percentage interest in the Borrower as of the Closing Date as designated in Schedule 2 hereto.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement.

"Out-of-Balance Condition" is defined in Section 5.09.

"Parent Guarantor" means each of those Persons designated as a Parent Guarantor in Schedule 2 hereto.  The Parent Guarantor of or with respect to a Member shall be the Person so designated in the adjoining column in Schedule 2.

"Parent Guarantor Financial Covenants" means:

(a)  At any time in the case of each Corporate Guarantor, each of the following financial covenants to the extent, and only to the extent, then contained in the Primary Credit Facility of such Corporate Guarantor: (i) each of the leverage covenants (i.e., a covenant that imposes a maximum limit on the ratio of debt to net worth or debt to total assets); (ii) each of the interest coverage covenants (i.e., a covenant that imposes a minimum limit on the ratio of EBITDA (i.e., earnings before interest, taxes, depreciation and amortization) to interest incurred, and (iii) each of the net worth covenants (i.e., a minimum limit on net worth or tangible net worth), which covenants as in effect as of the Closing Date are identified in Schedule 5 hereto, provided, however, that (A) in the event that a Primary Credit Facility that contains any leverage, interest coverage or net worth covenant is amended to delete, or is replaced by a Primary Credit Facility that does not have, such financial covenant, the financial covenant in effect prior to such deletion or

19

replacement shall continue to be a Parent Guarantor Financial Covenant; and (B) in the event that a Primary Credit Facility is terminated and not replaced by a new Primary Credit Facility containing leverage, interest coverage and net worth covenants to the extent the same were contained in the Primary Credit Facility it replaced, the leverage, interest coverage or net worth covenant or covenants (as applicable) contained in the terminated Primary Credit Facility shall continue to be Parent Guarantor Financial Covenants;

(b) In the case of John A. Ritter, the covenants identified in Schedule 5.

"Participant" is defined in Section 11.04.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Performance Letter of Credit" means any letter of credit issued: (a) on behalf of a Person in favor of a Governmental Authority, including, without limitation, any utility, water, or sewer authority, or other similar entity, for the purpose of assuring such Governmental Authority that such Person will properly complete work it has agreed to perform for the benefit of such Governmental Authority; (b) in lieu of cash deposits to obtain a license or in place of a utility deposit; (c) in connection with bid and performance bonds and surety bonds; or (d) otherwise to assure completion of the Improvements.

"Permit" means any permit, consent, approval, authorization, license, variance, or permission with respect to the Project required from any Governmental Authority.

"Permitted Affiliate Fees" means (a) the management fee and any expenses payable to the General Manager pursuant to the Operating Agreement, (b) the fees and expenses payable to the Construction Manager pursuant to the Construction Management Agreement, (c) any fees and expenses payable to any Member or its Affiliate for goods or services provided to the Borrower on terms and conditions not less favorable to the Borrower than could be obtained on an arms-length basis from a Person that is not an Affiliate of the Borrower or any Member and (d) payments made to the Development Association for maintenance and other similar costs related to the Common Areas.

"Permitted Encumbrances" means:

(a) Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 6.04;

(b) carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 6.04;

(c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)  Liens to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)  judgment liens in respect of judgments that do not constitute an Event of Default under Section 9.01(k);

(f)  the Collateral Documents;

(g)  the Planning Area Parcel Map;

(h)  any Subdivision Maps approved by the Administrative Agent pursuant to Section 6.16(a);

(i)  the Development Agreement;

(j)  the Master Plan;

(k)  the LID Bond Documents; and

(l)  Customary Real Estate Encumbrances.

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Investments" means:

(a)  direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any instrumentality thereof) in each case maturing within one year from the date of acquisition thereof;

(b)  investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)  investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)  fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(e)  money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii)

21

are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000; and

(f)  equity interests in any Development Association.

"Permitted Modification" means (i) any revision to the Approved Project Budget (including reallocation of amounts between line items), (ii) any change order or other amendment to any Construction Agreement, (iii) any amendment, addition or other change to the Approved Plans and Specifications or (iv) any amendment or other change to the Approved Project Schedule (any of items (i), (ii), (iii) and (iv) being hereinafter referred to as a "Modification"), which Modification satisfies all of the following conditions:

(a)    Such Modification has been approved in writing by (1) the Borrower and (x) in the case of a Modification (including any change order) to any agreement, the parties thereto and (y) in the case of any Modification to the Approved Plans and Specifications, the Project Engineer, and in any case copies of such Modification and approvals have been promptly furnished to the Administrative Agent and (2) unless the Borrower certifies to the Administrative Agent that all of the conditions set forth in subparagraphs (b) through (f) below are satisfied, the Administrative Agent, which approval shall not be unreasonably withheld or delayed; provided, however, that there shall be no reallocation with respect to the interest reserve line item without the Administrative Agent's written approval in its sole discretion;

(b)    Such Modification is consistent with the Scope of Work and complies with all applicable Requirements of Law;

(c)    Such Modification does not impair the ability of the Borrower to perform its obligations hereunder in accordance with the Approved Project Schedule;

(d)    If (i) such Modification (together with any related Modifications) results in a change in the Development Costs of more than $2,000,000 and (ii) such Modification, together with all Modifications made after the Closing Date, results in total changes to the Development Costs that exceed in the aggregate $5,000,000, then such Modification has been approved in writing by the Administrative Agent, which approval shall not be unreasonably withheld or delayed.  For purposes of the foregoing, each increase in an individual line item of Development Costs in the Approved Project Budget resulting from a Modification shall constitute a "change," each decrease in an individual line item of Development Costs in the Approved Project Budget resulting from a Modification shall constitute a "change," and in determining the amount of any "change" decreases shall not be netted against increases;

(e)    Such Modification will not have a Material Adverse Effect; and

(f)    Such Modification is not otherwise prohibited by this Agreement.

22

"Permitted Restricted Payment" is defined in Section 7.06(a).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Phase" means, with respect to a Member, each phase of the Project to be acquired by such Member pursuant to its Acquisition Agreement.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Planning Area Parcel Map" means the final map approved by the City designating the planning area parcels that make up the Phases to be acquired by the Members pursuant to the Acquisition Agreements and in compliance with the requirements of the Acquisition Agreements, as the same may be modified or amended from time to time with the approval of the Administrative Agent, which approval shall not be unreasonably withheld or delayed.

"Primary Credit Facility" means, with respect to any Corporate Guarantor, the primary credit facility under which such Corporate Guarantor obtains financing for its general corporate purposes. The Primary Credit Facility for each of the Corporate Guarantors as of the Closing Date is identified in Schedule 5.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Principal Project Engineer" means VTN Nevada, and any other Person that shall succeed it, as the principal engineer with respect to the Improvements, in accordance with the provisions of this Agreement.

"Project" means the real property described in Schedule 6 hereto.

"Project Agreements" means the Acquisition Agreements, the Construction Agreements and the Development Agreement.

"Project Contract" is defined in Section 4.03(g).

"Project Contractor" is defined in Section 4.03(g).

"Project Engineer" is defined in Section 4.03(f).

"Project Engineer's Agreement" is defined in Section 4.03(f).

23

"Property" of a Person means any and all property, whether real, personal, tangible, intangible, or mixed, of such Person, or other assets owned, leased or operated by such Person.

"Property Award Event" is defined in Section 6.13(a).

"Property Awards" means all compensation, awards, damages, refunds, claims, rights of action and proceeds (including cash, equivalents readily convertible into cash, and such proceeds of any notes received in lieu of cash) payable under policies of property damage, boiler and machinery, rental loss, rental value and business interruption insurance or with respect to any condemnation or eminent domain claim or award relating to the Project or any part thereof.

"Public Land" is defined in Section 7.03(c).

"Qualified Letter of Credit" means, in the case of any letter of credit delivered to the Administrative Agent hereunder in satisfaction of a condition or requirement hereunder, a letter of credit that (a) is issued by a commercial bank approved by the Administrative Agent and having a deposit rating of A- or better from S&P or an equivalent rating from Moody's, (b) designates the Administrative Agent as the sole beneficiary thereof, (c) may be drawn upon in New York City or Chicago, Illinois, (d) may be drawn upon by presentation by the Administrative Agent of a sight draft, (e) has an expiry date that is not earlier than six months after the issuance thereof (unless otherwise agreed to by the Administrative Agent), (f) is, individually or together with one or more other Qualified Letters of Credit delivered to the Administrative Agent at the same time and for the same purpose, in the amount required under the applicable provisions of this Agreement and (g) is otherwise reasonably satisfactory to the Administrative Agent.

"Real Estate" means land, rights in land and interests therein (including, without limitation, leasehold interests), and equipment, structures, improvements, furnishings, fixtures and buildings (including a mobile home of the type usually installed on a developed site) located on or used in connection with land, rights in land or interests therein (including leasehold interests), but shall not include mortgages or other Liens or interests therein.

"Recourse Indebtedness" means, in the case of each Parent Guarantor, all of its Indebtedness except such Indebtedness for which it has no personal liability for repayment thereof.

"Register" is defined in Section 11.04.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, trustees, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" means any release, spill, emission, leaking, pumping, pouring, dumping, injection, deposit, disposal, abandonment, or discarding of barrels, containers or other receptacles, discharge, emptying, escape, dispersal, leaching or migration into the indoor or outdoor environment or into or out of any Property of any Hazardous Materials, including the

24

movement of Hazardous Materials through or in the air, soil, surface water, groundwater or Property.

"Release Price" means, with respect to a Phase to be acquired by such Member pursuant to its Acquisition Agreement, the amount designated in Schedule 2 hereto; provided, however, that (i) if the release of a Phase upon payment of the Release Price would result in a violation of the Maximum Indebtedness Limitation, such Release Price shall be increased by an amount such that, upon payment thereof and release of such Phase, the Maximum Indebtedness Limitation shall not be violated and (ii) subject to clause (i), if in connection with the planning for the Improvements for the Project, the Borrower desires to make non-material adjustments of the Adjusted Gross Acreage of one or more Phases, the Administrative Agent may, it its reasonable discretion, approve such adjustments and corresponding non-material adjustments of the Release Prices.

"Remedial Action" means any remedial actions as may be prudent or required from time to time to comply with Environmental, Health or Safety Requirements of Laws.

"Repayment Guaranty" means, with respect to each Member and its Parent Guarantor, that certain Repayment Guaranty dated November 1, 2004 executed by such Member and its Parent Guarantor, as supplemented by the Consent and Agreement.

"Required Lenders" means, at any time, Lenders whose Applicable Percentages with respect to all Facilities, in the aggregate, are 66-2/3% or greater.

"Required Lien Waivers" means written waivers of Lien from (i) the Project Contractor under any Major Project Contract, (ii) the Construction Manager (iii) the Major Subcontractors and (iv) if reasonably requested by Administrative Agent, any other Project Contractor and any other subcontractor that has entered into a contract or subcontract for the furnishing of labor or materials in connection with the Project, all of which lien waivers shall be in customary form, duly executed, acknowledged and delivered, and sufficient in all respects to cause the Title Insurer to issue the Loan Title Insurance Policy and Date Down Endorsements thereto from time to time provided for in this Agreement.

"Requirements of Law" means, as to any Person, the articles and regulations or other Organizational Documents of such Person, and any law, rule or regulation, or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject, including, without limitation, the Securities Act, the Securities Exchange Act, Regulations T, U and X of the Board, ERISA, the Fair Labor Standards Act, the Worker Adjustment and Retraining Notification Act, the Americans with Disabilities Act of 1990, and any certificate of occupancy, zoning ordinance, building, environmental or land use requirement or permit or environmental, labor, employment, occupational safety or health law, rule or regulation, including Environmental, Health or Safety Requirements of Law.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on

account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in the Borrower or any option, warrant or other right to acquire any such Equity Interests in the Borrower; provided that, in no event shall the difference between the value of any portion of the Project to be acquired by a Member pursuant to its Acquisition Agreement and the purchase price therefor be considered a "Restricted Payment."

"S&P" means Standard & Poor's.

"Scope of Work" means the description of the Improvements set forth in Schedule 7 hereto.

"Secured Obligations" means, collectively, (i) the Obligations and (ii) the Secured Swap Obligations.

"Secured Swap Obligations" means obligations of the Borrower to a Lender (or an Affiliate thereof) as exchange party or counterparty under any Approved Swap Agreement.

"Soft Costs" is defined in the definition of "Development Costs."

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject (a) with respect to the Base CD Rate, for new negotiable nonpersonal time deposits in dollars of over $100,000 with maturities approximately equal to three months and (b) with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subdivision Map" is defined in Section 6.16.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"Takedown" means, with respect to a Member, the closing of its acquisition of a Phase pursuant to its Acquisition Agreement.

"Takedown Price" means, with respect to any Phase, the cash amount required to be paid by the Member at the time of the Takedown of such Phase pursuant to its Acquisition Agreement, after taking into account all credits and offsets to which such Member is entitled.

"Takedown Schedule" means, with respect to a Member, the schedule for each of its Takedowns provided for in its Acquisition Agreement.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Title Insurer" means Chicago Title Insurance Company.

"Three-Month Secondary CD Rate" means, for any day, the secondary market rate for three-month certificates of deposit reported as being in effect on such day (or, if such day is not a Business Day, the next preceding Business Day) by the Board through the public information telephone line of the Federal Reserve Bank of New York (which rate will, under the current practices of the Board, be published in Federal Reserve Statistical Release H.15(519) during the week following such day) or, if such rate is not so reported on such day or such next preceding Business Day, the average of the secondary market quotations for three-month certificates of deposit of major money center banks in New York City received at approximately 10:00 a.m., New York City time, on such day (or, if such day is not a Business Day, on the next preceding Business Day) by the Administrative Agent from three negotiable certificate of deposit dealers of recognized standing selected by it.

"Transactions" means the execution, delivery and performance by the Borrower of this Agreement, the borrowing of Loans, the use of the proceeds thereof and the issuance of Letters of Credit hereunder.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02.  Classification of Loans and Borrowings.  For purposes of this Agreement, Loans may be classified and referred to by Facility (e.g., a "Facility B Loan") or by Type (e.g., a "Eurodollar Loan") or by Facility and Type (e.g., a "Facility B Eurodollar Loan"). Borrowings also may be classified and referred to by Facility (e.g., a "Facility B Borrowing") or by Type (e.g., a "Eurodollar Borrowing") or by Facility and Type (e.g., a "Facility B Eurodollar Borrowing").

SECTION 1.03.  Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or

27

Administrative Agent intended to be created by the Loan Documents, or which calls into question the validity or priority of such Liens which would not be paid off by the proceeds of the then requested Borrowing, (iv) any litigation or proceeding is commenced to enjoin the construction at the Project or any portion thereof, to alter the zoning or land use classification of the Project or any portion thereof or to enjoin or prohibit the Borrower, the Administrative Agent or the Lenders from performing their respective material obligations under this Agreement, (v) any deviation exists in the construction of the Improvements on the Project from the Approved Plans and Specifications without the prior written approval of the Administrative Agent, or it appears to the Administrative Agent in its reasonable judgment that there are defects in the workmanship or materials, or (vi) the construction of the Improvements is not being diligently pursued in accordance with the Approved Project Schedule;

(h)  disburse any Loan if any Construction Agreement (excluding any Project Contract that is not a Major Project Contract), Major Subcontract or Acquisition Agreement is amended, modified or terminated in violation of this Agreement or there shall occur and shall continue either (i) a material default by the Borrower thereunder that will not be cured by the use of the proceeds of such Loan or (ii) a material default by any other Person thereunder that could reasonably be expected to have a Material Adverse Effect;

(i)  disburse any Loan (i) after the Administrative Agent's delivery of a Balancing Notice under Section 5.09 unless and until the Administrative Agent determines that an Out-of-Balance Condition no longer exists, or (ii) in the event and to the extent the Administrative Agent determines that such disbursement would result in an Out-of-Balance Condition; or

(j)  disburse any Loan if the same would result in a violation of the Maximum Indebtedness Limitation.

## ARTICLE V

### Construction and Related Provisions

SECTION 5.01.  Performance and Completion of Project.  The Borrower shall perform and complete the construction of the Improvements on the Project in a good and workmanlike manner with materials of good quality, free of Liens (other than Permitted Encumbrances) and free of material defects, all substantially in accordance with the Approved Plans and Specifications therefor, all Requirements of Law, including all requirements and conditions set forth in all Permits, to the extent material, which have been obtained or are required to be obtained for the construction of the Improvements, the Approved Project Schedule and the terms and provisions of the Development Agreement and the Acquisition Agreements. Once commenced, the Borrower shall diligently continue and complete construction of the Improvements on the Project in a commercially reasonable manner and in accordance with this Agreement.

59

SECTION 5.02.  Entitlements.  The Borrower has advised the Administrative Agent that the Borrower is in discussions with the City regarding specific entitlements for the "Town Center" portion of the Project, and the Borrower agrees that, upon request by the Administrative Agent from time to time, the Borrower will advise the Administrative Agent of the status of such discussions.

SECTION 5.03.  LID Bonds.  (a)  There have heretofore been issued LID Bonds in the principal amount of approximately $102,000,000, the Net LID Proceeds of which in the amount of approximately $82,700,000 were deposited with the bond trustee to pay certain Approved Development Costs, and the Borrower's right to receive such Net LID Proceeds has been collectively assigned to Administrative Agent for the benefit of the Lenders pursuant to that certain Assignment of Acquisition Agreement dated as of April 27, 2006 between the Borrower and the Administrative Agent.  As of the Closing Date, the Borrower anticipates additional LID Bonds in the amount of approximately $40,000,000 to be issued prior to December 31, 2007, of which the Net LID Proceeds anticipated to be available to pay certain Approved Development Costs are approximately $32,400,000.  The Borrower hereby agrees that the Borrower will not cause or permit the issuance of any LID Bonds without (i) delivering copies of the LID Bond Documents to the Administrative Agent (which the Administrative Agent shall furnish to the Lenders) and (ii) the Administrative Agent's prior written approval of the terms of the LID Bonds and the form and substance of the LID Bond Documents, which approval shall not be unreasonably withheld or delayed.  To the extent permitted by the LID Bond Documents, the Borrower shall assign as Collateral to the Administrative Agent the Borrower's right to receive proceeds disbursed from the LID Bond Account until all Obligations have been paid in full, all Commitments have terminated and all Letters of Credit have been terminated or have expired.

(b)     The Net LID Proceeds of the LID Bonds heretofore or hereafter issued will be used solely to pay (or to reimburse the Borrower for payment of) Approved Development Costs.

SECTION 5.04.  Construction Delays.  The Borrower shall promptly notify the Administrative Agent in writing of any event causing delay or interruption of construction, or the timely completion of construction, of the Improvements as set forth in the Approved Project Schedule of more than thirty (30) days.  The notice shall specify the particular work delayed, and the cause and period of each delay.

SECTION 5.05.  Construction Responsibilities.  The Borrower shall be solely responsible for all aspects of the Borrower's business and conduct in connection with the Project and Improvements, including, without limitation, for the quality and suitability of the plans and specifications and their compliance with all Requirements of Law, the supervision of the work of construction, the qualifications, financial condition and performance of all architects, engineers, contractors, subcontractors, material suppliers and consultants, and the accuracy of all applications for payment and the proper application of all disbursements.  Neither the Administrative Agent nor any Lender is obligated to supervise, inspect or inform the Borrower or any third party of any aspect of the construction of the Improvements or any other matter referred to above.

SECTION 5.06. <u>Correction of Defects</u>. The Borrower shall proceed with diligence to investigate and correct all material defects in the construction of the Improvements and any material departures from the Approved Plans and Specifications. The disbursement of any Loans shall not constitute a waiver of the Administrative Agent's right to require compliance with this covenant with respect to any such defect or departure from the Approved Plans and Specifications or any other requirements of this Agreement.

SECTION 5.07. <u>Compliance with Agreements</u>. The Borrower shall comply in all material respects with its obligations under: (a) all Project Agreements; (b) all underlying covenants, conditions and restrictions of record with respect to the Project; and (c) all other material contractual obligations relating to the ownership and development of the Project which are not described in the foregoing clauses (a) and (b) above, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. In addition to the foregoing the Borrower shall enforce in a commercially reasonable manner its material rights and remedies under the agreements described in the foregoing clauses (a) through (c), above except where the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.08. <u>No Changes or Amendments</u>. Except for Permitted Modifications, the Borrower shall not (i) make any changes or Modifications to or otherwise amend the Approved Plans and Specifications, the Approved Project Schedule or the Approved Project Budget or (ii) cause or permit any Modification or other amendment, or the termination, of the Construction Management Agreement, the Project Engineer's Agreement or any of the Major Project Contracts or Major Subcontracts without the prior written approval of the Administrative Agent in each instance, which approval shall not be unreasonably withheld or delayed. The Borrower shall not, in the absence of the Administrative Agent's prior written approval, which approval shall not be unreasonably withheld or delayed, consent to any assignment of the obligations of the Project Engineer under the Project Engineer's Agreement, the Project Contractor under any Major Project Contract or the Construction Manager under the Construction Management Agreement.

SECTION 5.09. <u>Loan Balancing</u>. In the event the Administrative Agent determines in its reasonable judgment that the Development Costs to be incurred through the completion of construction of the Improvements, sale of all of the Phases and repayment of all Secured Obligations, will at any time exceed by $2,500,000 (or more) the amount provided therefor in the Approved Project Budget, an "<u>Out-of-Balance Condition</u>" (hereby so defined) shall be deemed to exist. Within ten (10) Business Days after the Borrower has received written notice from the Administrative Agent of such Out-of-Balance Condition (a "<u>Balancing Notice</u>"), the Borrower shall either pay to the Administrative Agent for deposit into a Cash Collateral Account the amount specified by the Administrative Agent in the Balancing Notice (each such deposit being herein referred to as a "<u>Balancing Payment</u>"), or in lieu thereof deliver to the Administrative Agent a Qualified Letter of Credit in such amount. If and as long as such Out-of-Balance Condition continues to exist, the Lenders shall have no obligation to make any further Loans, and all Approved Development Costs shall be funded by the Borrower from funds of the Borrower until such time as an Out-of-Balance Condition no longer exists, when the obligation of the applicable Facility A Lenders (or, if applicable, Facility D Lenders) to make Loans shall resume. Unless an Event of Default has occurred that is continuing, the Balancing Payments

61

deposited in the Cash Collateral Account pursuant to this Section 5.09 shall be available for disbursement by the Administrative Agent for payment of the Approved Development Costs in the same manner and subject to the same terms and conditions as Loan disbursements are made hereunder, and the Administrative Agent shall have disbursed all Balancing Payments in the Cash Collateral Account prior to any further Loan disbursements. The Qualified Letters of Credit delivered under this Section 5.09 may be drawn upon (A) to pay any such Approved Development Costs that the Borrower fails to pay or (B) as provided in Section 9.06. When an Out-of-Balance Condition no longer exists, and provided no Event of Default has occurred that is continuing, Balancing Payments and Qualified Letters of Credit then held by the Administrative Agent pursuant to this Section 5.09 shall be returned to the Borrower.

SECTION 5.10.  <u>Proceedings to Enjoin or Prevent Construction</u>.  If any proceedings are filed seeking to enjoin or otherwise prevent or declare unlawful the construction of the Improvements or any part thereof or the use or development of the Project or any portion thereof, the Borrower shall at its sole expense (i) cause such proceedings to be vigorously contested in good faith and in a commercially reasonable manner and (ii) in the event of an adverse ruling or decision, prosecute all allowable appeals therefrom.  Without limiting the generality of the foregoing, the Borrower shall resist the entry or seek the stay of any temporary or permanent injunction that may be entered and use commercially reasonable efforts to bring about a favorable and speedy disposition of all such proceedings.

SECTION 5.11.  <u>The Administrative Agent's and the Lenders' Actions for Their Own Protection Only</u>.  The Borrower acknowledges and agrees that the authority herein conferred upon the Administrative Agent and the Lenders, and any actions taken by the Administrative Agent and the Lenders with respect to the Project, to procure waivers or sworn statements, to approve contracts, subcontracts and purchase orders, to approve plans and specifications, or otherwise, will be exercised and taken by the Administrative Agent and the Lenders for their own protection only and may not be relied upon by the Borrower or any third party for any purposes whatever; and none of the Administrative Agent, the Lenders, or the Construction Consultant shall be deemed to have assumed any responsibility to the Borrower or any third party with respect to any such action herein authorized or taken by the Administrative Agent, the Lenders or the Construction Consultant, or with respect to the proper construction of Improvements on the Project, performance of contracts, subcontracts or purchase orders by any contractor or material supplier, or prevention of mechanics' liens from being claimed or asserted against the Project or any portion thereof.  Any review, investigation or inspection conducted by the Administrative Agent, the Lenders or the Construction Consultant or any other consultants retained by the Administrative Agent or the Lenders, or any agent or representative of the Administrative Agent or the Lenders in order to verify independently the Borrower's satisfaction of any conditions precedent to disbursements under this Agreement, the Borrower's performance of any of the covenants, agreements and obligations of the Borrower under this Agreement or the other Loan Documents, or the validity of any representations and warranties made by the Borrower hereunder (regardless of whether or not the party conducting such review, investigation or inspection should have discovered that any of such conditions precedent were not satisfied or that any such covenants, agreements or obligations were not performed or that any such representations or warranties were not true), shall not affect (or constitute a waiver by the Administrative Agent or the Lenders of) (i) any of the Borrower's or any other Credit Party's agreements, covenants, representations and warranties under this Agreement or the other Loan

Documents or the Administrative Agent's and the Lenders' reliance thereon or (ii) the Administrative Agent's and Lenders' reliance upon any certifications of the Borrower or any Person required under this Agreement or any of the other Loan Documents, or any other facts, information or reports furnished to the Administrative Agent or the Lenders by or on behalf of the Borrower.

SECTION 5.12. <u>Inspections; Construction Consultant</u>. The Administrative Agent and the Construction Consultant shall have the right to enter upon the Project at all reasonable times upon reasonable notice to the Borrower to inspect the Improvements and the construction work to verify information disclosed or required pursuant to this Agreement. The Borrower shall provide to the Construction Consultant in a timely manner all information reasonably requested by the Construction Consultant and fully cooperate with the Construction Consultant in the performance of its services to the Administrative Agent. The Administrative Agent may reasonably request from time to time from the Construction Consultant such reports with respect to the plans and specifications and the performance of the construction as the Administrative Agent may reasonably determine to be appropriate, but the receipt of periodic inspection reports shall not be a condition under Section 4.04(c) with respect to more than one Borrowing in any calendar quarter.

SECTION 5.13. <u>Contractor Construction Information</u>. Within ten (10) days of the Administrative Agent's written request, the Borrower shall deliver to the Administrative Agent from time to time in a form acceptable to the Administrative Agent: (a) a list detailing the name, address and phone number of each contractor, subcontractor and material supplier to be employed or used for construction of the Improvements together with the dollar amount, including changes, if any, of each contract and subcontract, and the portion thereof, if any, paid through the date of such list; (b) to the extent requested by the Administrative Agent, copies of each contract and subcontract identified in such list, including any changes thereto; (c) a cost breakdown of the projected total cost of constructing the Improvements, and that portion, if any, of each cost item which has been incurred; and (d) a construction progress schedule detailing the progress of construction and the projected scheduling and completion time for uncompleted work, all as of the date of such schedule.

SECTION 5.14. <u>Prohibited Contracts</u>. Without the Administrative Agent's prior written consent, the Borrower shall not contract for any materials, furnishings, equipment, fixtures or other parts or components of the Improvements, if any third party shall retain any ownership interest (other than lien rights created by operation of law) in such items after their delivery to the Project. The Borrower shall have five (5) days to effect the removal of any such retained interest, after the Borrower obtains actual knowledge thereof.

SECTION 5.15. <u>Hold Disbursements of Loans in Trust</u>. Until utilized in accordance with the provisions of this Agreement, the Borrower shall receive and hold in trust for the sole benefit of the Administrative Agent and the Lenders (and not for the benefit of any other Person, including any contractors or subcontractors) all disbursements of Loans made hereunder directly to the Borrower, for the purpose of paying Approved Development Costs in accordance with the applicable Draw Request Form and Approved Project Budget. The Borrower shall use the proceeds of the Loans solely for the payment or reimbursement of Approved Development Costs as specified in each applicable Draw Request Form. Neither the

63

Administrative Agent nor the Lenders shall have any obligation to monitor or determine the Borrower's use or application of proceeds of Loans.

SECTION 5.16. The Administrative Agent's Verification of Subcontracts. The Administrative Agent may from time to time forward to contractors, subcontractors, material suppliers, architects, engineers and other parties listed on any sworn statement, a contract verification to ascertain the correctness of the amount of the contract for each contractor, subcontractor, material supplier, architect, engineer and any other party as contained on the statement. In the event of any discrepancy between the amounts as shown by the executed copies of the contracts, the sworn statement, and the verification of contract forms, the Administrative Agent shall have the right to require that such discrepancies be eliminated to its reasonable satisfaction.

SECTION 5.17. Limited Nature of Waivers of Requirements. It is expressly understood and agreed that if the Administrative Agent shall intentionally or unintentionally waive or fail to require satisfaction of any condition precedent or other provision or requirement set forth in this Agreement for the first or any subsequent Loan, the Administrative Agent shall be deemed to have reserved the right to require compliance with such condition precedent or other provision or requirement prior to any subsequent Loan, notwithstanding any previous continuing or intermittent pattern of such waivers or failures to require such satisfaction thereof.


ARTICLE VI

Affirmative Covenants

Until all of the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full and all Letters of Credit shall have expired or terminated and all LC Disbursements shall have been reimbursed, the Borrower covenants and agrees with the Lenders that:

SECTION 6.01. Financial Statements and Other Information. The Borrower will furnish or cause to be furnished to the Administrative Agent (and the Administrative Agent shall furnish to the Lenders following its receipt thereof):

(a) within 120 days after the end of each fiscal year of the Borrower beginning with fiscal year 2006, its audited consolidated balance sheet and related statements of operations, members' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year (if applicable), all reported on by independent public accountants approved by the Administrative Agent in its reasonable discretion (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such financial statements present fairly in all material respects the financial condition and results of operations of the Borrower in accordance with GAAP consistently applied;

(b) within 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, its balance sheet and related statements of operations,

64

ARTICLE IX

Events of Default; Remedies

SECTION 9.01.  Events of Default.  If any of the following events ("Events of Default") shall occur:

(a)  the Borrower shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)  the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or the other Loan Documents, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)  any representation or warranty made or deemed made by or on behalf of the Borrower in or in connection with this Agreement or any other Loan Document, any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Documents or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)  the Borrower shall fail to observe or perform any covenant, condition or agreement contained, or make any payment or deliver any Qualified Letter of Credit provided for, in Sections 5.01, 5.03, 5.08, 5.09, 6.03 (with respect to the Borrower's existence), 6.08 or 6.15 or in Article VII;

(e)  the Borrower shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to the Borrower; provided, however, that, if such failure is one that the Borrower cannot with reasonable diligence cure within such 30-day period but can with reasonable diligence cure within 90 days after such notice, the cure period provided for herein shall be extended to the 90th day after such notice as long as the Borrower promptly commences and diligently pursues to completion the cure of such failure and provided, further that the Administrative Agent may in its discretion extend such period for cure by up to an additional 90 days (in the aggregate);

(f)  Intentionally Omitted.

(g)  any Material Indebtedness of any Parent Guarantor (excluding Indebtedness that is not Recourse Indebtedness) shall become or be declared due prior to its scheduled maturity; provided, however, that, if any such event under this paragraph (g) occurs, the same shall not constitute an Event of Default if cured as provided in Section 9.07;

79

(h)  either (i) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (A) liquidation, reorganization or other relief in respect of the Borrower or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (B) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or for a substantial part of its assets or a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered; or (ii) any event described in clause (i) above shall occur in respect of any Member or its Parent Guarantor but only if such Member has not theretofore acquired all Phases to be acquired by it pursuant to its Acquisition Agreement; provided, however, that, if any such event under clause (ii) occurs, the same shall not constitute an Event of Default if cured as provided in Section 9.07;

(i)  either (i) the Borrower shall (A) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (B) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (C) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or for a substantial part of its assets, (D) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (E) make a general assignment for the benefit of creditors or (F) take any action for the purpose of effecting any of the foregoing; or (ii) any event described in clause (i) above shall occur in respect of any Member or its Parent Guarantor but only if such Member has not theretofore acquired all Phases to be acquired by it pursuant to its Acquisition Agreement; provided, however, that, if any such event under clause (ii) occurs, the same shall not constitute an Event of Default if cured as provided in Section 9.07;

(j)  either (i) the Borrower shall become unable, admit in writing its inability or fail generally to pay its debts as they become due or (ii) any Member or its Parent Guarantor shall become unable, admit in writing its inability or fail generally to pay its debts as they become due but only if such Member has not theretofore acquired all Phases to be acquired by it pursuant to its Acquisition Agreement; provided, however, that, if any such event under clause (ii) occurs, the same shall not constitute an Event of Default if cured as provided in Section 9.07;

(k)  (i) one or more judgments for the payment of money (excluding any such judgments which are covered by insurance, subject to any customary deductible) in an aggregate amount in excess of $3,000,000 shall be rendered against the Borrower and the same shall remain undischarged for a period of sixty (60) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower to enforce any such judgment or (ii) any action shall be legally taken by a judgment creditor to attach or levy upon the Project or any portion thereof or any other material assets of the Borrower to enforce any judgment (in any amount) and the same is not discharged at least twenty (20) days prior to the scheduled sale of the asset affected thereby;

80

(l)  any Member shall fail to acquire a Phase within 15 days after the outside date provided therefor in its Takedown Schedule; provided, that the same shall not constitute an Event of Default if cured as provided in Section 9.07;

(m)  there occurs a breach in the performance of any Parent Guarantor Financial Covenant of a Parent Guarantor but only if the Member of such Parent Guarantor has not theretofore acquired all Phases to be acquired by it pursuant to its Acquisition Agreement; provided, however, that the same shall not constitute an Event of Default if cured in accordance with the provisions of Section 9.07;

(n)  a Change in Control shall occur; provided, however, that the same shall not constitute an Event of Default if cured as provided in Section 9.07;

(o)  (i) there is any material deviation in the work of construction from the Approved Plans and Specifications or Requirements of Law or use of materially defective workmanship or materials in constructing the Improvements, and the Borrower fails to remedy the same to the Administrative Agent's reasonable satisfaction within thirty (30) days of the Administrative Agent's written demand to do so; or (ii) there is a cessation of construction of the Improvements for a continuous period of more than thirty (30) days or, in the case of force majeure, ninety (90) days; or (iii) the construction of the Improvements or sale of all or any portion of the Project in accordance with the Acquisition Agreements and Loan Documents is prohibited, enjoined or delayed for a continuous period of more than thirty (30) days;

(p)  (i) the recording of any claim of Lien in an amount in excess of $1,000,000 against the Project or the service on the Administrative Agent or any Lender of any bonded stop notice relating to the Loans and the continuance of such claim of Lien or bonded stop notice for sixty (60) days without discharge, satisfaction or provision for payment being made by the Borrower in a manner satisfactory to the Administrative Agent in its reasonable judgment; or (ii) the recording of any claim of Lien in any amount against the Project or the service on and Administrative Agent or any Lender of any bonded stop notice relating to the Loans and the continuance of such claim of Lien or bonded stop notice without discharge, satisfaction or provision for payment being made by the Borrower in a manner satisfactory to the Administrative Agent in its reasonable judgment at least twenty (20) days prior to the sale of the Project or any portion thereof; or (iii) the condemnation, seizure or appropriation of, or occurrence of an uninsured casualty with respect to any material portion of the Project and which has a Material Adverse Effect; or (iv) the sequestration or attachment of, or any levy or execution upon any of the Project, any other Collateral provided by the Borrower under any of the Loan Documents, or any substantial portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not released, expunged or dismissed at least twenty (20) days prior to the scheduled sale of the assets affected thereby;

(q)  the occurrence of a default by the Borrower under any Approved Swap Agreement that is not cured within any applicable cure period thereunder;

81

(r)  (i) any Collateral Document shall for any reason fail to create a valid and perfected first priority Lien or security interest (subject to the Permitted Encumbrances) in any Collateral (except for Collateral (other than the Project) whose value is not significant) purported to be covered thereby and is not corrected or cured within twenty (20) days of notice thereof, except as permitted by the terms of any Collateral Document, or (ii) any Collateral Document or Guaranty shall fail to be or remain in full force and effect or any action shall be taken by or on behalf of the Borrower or any other Credit Party to discontinue or to assert the invalidity or unenforceability of any Collateral Document or Guaranty;

(s)  the occurrence of an "Event of Default" described in Section 9.07;

(t)  the occurrence of any "Event of Default" under any Loan Document; or

(u)  an ERISA Event shall have occurred that, in the reasonable opinion of the Administrative Agent or the Required Lenders, could reasonably be expected to result in a Material Adverse Effect;

then, and in every such event (other than an event described in subclause (i) of clause (h) of this Section 9.01 or subclause (i) of clause (i) of this Section 9.01), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times:  (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event described in subclause (i) of clause (h) of this Section 9.01 or subclause (i) of clause (i) of this Section 9.01, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

SECTION 9.02.  <u>All Remedies</u>.  Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and the Lenders shall also have all rights and remedies set forth herein, in the Loan Documents, at law and in equity, and the Administrative Agent and the Lenders shall have the right (but not the obligation) to pursue one or more of such rights and remedies concurrently or successively, it being the intent hereof that all such rights and remedies shall be cumulative, and that no remedy shall be to the exclusion of any other.

SECTION 9.03.  <u>Construction</u>.  In addition to and without limiting any of its rights and remedies available hereunder, under the other Loan Documents, at law or in equity, and without constituting an election of remedies, upon the occurrence and continuance of any Event of Default, the Administrative Agent and the Lenders may, subject to applicable

82

Requirements of Law (i) take possession of the Project and complete the construction of the Improvements or any part thereof and take any other action whatever which, in the Administrative Agent's and the Lenders' sole judgment, is necessary to fulfill the covenants, agreements and obligations of the Borrower under this Agreement and the other Loan Documents, including the right to avail themselves of and procure performance of existing Construction Agreements and other Project Agreements and (ii) let any contracts with the same contractors and subcontractors or others and to employ watchmen to protect the Project or any part thereof from injury. Without restricting the generality of the foregoing, and for the purpose aforesaid, the Borrower hereby appoints and constitutes the Administrative Agent its lawful attorney in fact with full power of substitution and agrees that the Administrative Agent and the Lenders shall be entitled, subject to applicable Requirements of Law, to (A) complete the construction of the Project or any part thereof; (B) use any Balancing Payments, funds held in any Cash Collateral Account (subject to the provisions of Section 9.06) or undisbursed portion of the Aggregate Facility A Commitment and (if applicable) Aggregate Facility D Loan Commitment or which may be reserved, escrowed or set aside for any purpose whatever at any time, to complete the construction of the Project or any part thereof or (subject to the provisions of Section 9.06) draw upon any Qualified Letter of Credit held by the Administrative Agent; (C) advance funds in excess of the amount of any or all the Loans to complete the construction of the Project; (D) make changes in the Approved Plans and Specifications which shall be necessary or desirable to complete the construction of the Project; (E) retain or employ such new general contractors, contractors, subcontractors, architects, engineers and inspectors as may be required for said purposes; (F) pay, settle or compromise all existing bills and claims, the nonpayment of which might result in Liens on the Project or any part thereof, or prevent such bills and claims from resulting in Liens against the Project or any part thereof or against fixtures, furnishing, furniture or equipment or other Property, or as may be necessary or desirable for the completion of the construction and equipping and furnishing of the Project or any part thereof or for the clearance of title; (G) execute all applications and certificates which may be required by any of the Loan Documents; (H) prosecute and defend all actions or proceedings connected with or relating to the Project or any part thereof; (I) take such action and require such performance as the Administrative Agent deems necessary under any payment and performance bonds, and make settlements and compromises with the surety or sureties thereunder, and, in connection therewith, execute instruments of release and satisfaction; (J) take possession of and operate the Project or any part thereof; and (K) do any and every act which the Borrower might do in its own behalf, it being understood and agreed that the foregoing power of attorney shall be a power coupled with an interest and cannot be revoked.

       SECTION 9.04. Enforcement. The Borrower acknowledges that in the event the Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement or any other Loan Document, any remedy of law may prove to be inadequate relief to the Administrative Agent and the Lenders; therefore, the Borrower agrees that the Administrative Agent and the Lenders shall (subject to applicable Requirements of Law) be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

       SECTION 9.05. Cash Collateral Account.

(a) The Borrower hereby pledges, assigns and grants to the Administrative Agent, on behalf of and for the benefit of the Lenders and other Holders of Secured Obligations, to secure the prompt and complete payment and performance of the Secured Obligations, a security interest in all of the Borrower's right, title and interest in and to (i) each Cash Collateral Account established pursuant to this Agreement; (ii) all cash, instruments, securities, investments and other property from time to time transferred or credited to, contained in or comprising any Cash Collateral Account; (iii) all statements, certificates and instruments representing any Cash Collateral Account; (iv) any and all substitutions or additions of or with respect to any of the foregoing; and (v) any and all proceeds and products of any of the foregoing, including, without limitation (A) interest, principal, dividends and other amounts or distributions received with respect to any of the foregoing and (B) property received from the sale, exchange or other disposition of any of the foregoing.

(b) Other than any interest earned on the investment of deposits in any Cash Collateral Account, which investments shall be made at the request of the Borrower (subject to the provisions hereof) and at the Borrower's risk and expense, such deposits shall not bear interest, and interest or profits, if any, on such investments shall accumulate in such Cash Collateral Account. Provided no Event of Default has occurred that is continuing, the Administrative Agent shall, at the written request of the Borrower, invest funds in any Cash Collateral Account in investments of the type then customarily permitted by Administrative Agent in similar cash collateral accounts held by it for comparable borrowers.

(c) As long as no Event of Default has occurred that is continuing, funds in any Cash Collateral Account may be used solely for the purpose provided for in the section of this Agreement pursuant to which such funds were deposited in such Cash Collateral Account.

(d) Except as otherwise provided in Section 2.06(j), from and after the occurrence and during the continuance of an Event of Default, funds in any Cash Collateral Account may be used to pay any Secured Obligations, provided, however, that funds deposited in a Cash Collateral Account by or on behalf of a Member pursuant to Section 7.03(b) may only be used to pay such Member's Adjusted Pro Rata Share of such Secured Obligations.

SECTION 9.06. Qualified Letters of Credit.

(a) Except as otherwise provided in paragraph (c) below, as long as no Event of Default has occurred that is continuing, any Qualified Letter of Credit delivered to the Administrative Agent pursuant to Section 5.09, 7.03(b) or 9.07 shall be drawn upon by the Administrative Agent only to pay amounts for the same purpose for which funds deposited in a Cash Collateral Account pursuant to such Sections may be used.

(b) From and after the occurrence and during the continuance of an Event of Default, the Administrative Agent may draw upon any Qualified Letter of Credit in the

84

full amount thereof and apply the amount drawn as provided in, and subject to the provisions of, Section 9.05(d).

(c)  Notwithstanding anything to the contrary contained herein, if less than 60 days remain until the expiration of a Qualified Letter of Credit, and, if requested by the Administration Agent, the Borrower fails to cause to be delivered to the Administrative Agent within fifteen (15) days of such request an amendment extending such Qualified Letter of Credit for an additional period of six months (or such lesser period to which the Administrative Agent may agree) or a replacement Qualified Letter of Credit meeting the terms hereof, the Administrative Agent may draw upon such Qualified Letter of Credit and deposit the amount drawn in a Cash Collateral Account established for the same purpose for which such Qualified Letter of Credit was delivered or (if and as applicable) as provided in Section 9.05(d).

SECTION 9.07.  Cure of Member Defaults.

(a)  The occurrence of a Member Default shall not constitute an Event of Default if within thirty (30) days after notice from the Administrative Agent to the Borrower (which 30-day period may, in the Administrative Agent's sole discretion, be extended by an additional 30 days, provided that the Administrative Agent is furnished satisfactory evidence that such Member Default will be cured within such additional 30 days), either (i) the Borrower deposits or causes to be deposited funds in a Cash Collateral Account, or delivers or causes to be delivered a Qualified Letter of Credit, in the amount provided for in and otherwise in accordance with the provisions of paragraph (b) below or (ii) the entire right, title, interest of the Defaulting Member in and to the Borrower and such Defaulting Member's right, title, interest and obligations in, to and under the Operating Agreement, such Defaulting Member's Acquisition Agreement and any Loan Document to which such Defaulting Member is a party are transferred to and assumed and acquired by one or more Key Members, and the obligations of the Defaulting Member's Parent Guarantor under the Loan Document to which it is a party are assumed by such Key Members' Parent Guarantor, all in accordance with the terms and conditions set forth in paragraph (c) below.

(b)  The occurrence of a Member Default shall not constitute an Event of Default if, within the time period provided for in paragraph (a) above, the Borrower shall deposit in a Cash Collateral Account funds in the amount of the Defaulting Member's Remaining Obligations (as reasonably determined by the Administrative Agent) (net of any cash collateral or letter of credit provided by or on behalf of such Member pursuant to Section 7.03(b) hereof) and/or deliver to the Administrative Agent a Qualified Letter of Credit in the amount of the Defaulting Member's Remaining Obligations.  Provided no Event of Default has occurred that is continuing, funds deposited in the Cash Collateral Account pursuant to the immediately preceding sentence shall be advanced by the Administrative Agent from time to time to pay such Defaulting Member's Adjusted Pro Rata Share of Approved Development Costs not funded from Loans or Net LID Proceeds and to pay Release Prices with respect to such Phases at the time at which such Phases would be required to be purchased by such Defaulting Member pursuant to its Acquisition Agreement (whether or not actually purchased and without regard to whether such

85

Acquisition Agreement remains in force or effect). If at any time the Administrative Agent determines in its reasonable judgment that the amount in such Cash Collateral Account or the amount of such Qualified Letter of Credit held by the Administrative Agent is less than such Defaulting Member's Remaining Obligations as then reasonably determined by the Administrative Agent, it shall constitute an Event of Default if, within thirty days of demand by the Administrative Agent therefor, the Borrower fails to deposit in the Cash Collateral Account, and/or deliver a Qualified Letter of Credit in, an aggregate amount equal to such deficiency as so determined by Administrative Agent. Any Qualified Letter of Credit delivered to the Administrative Agent pursuant to this paragraph (b) may be reduced from time to time to an amount not less than the Defaulting Member's Remaining Obligations and the Administrative Agent shall, upon reasonable notice, so consent to any such reduction.

(c)  The occurrence of a Member Default shall not constitute an Event of Default if, within the time period provided for in paragraph (a) above, one or more Key Members shall take all of the following actions (herein collectively referred to as a "Key Member Acquisition"):

(i)  The assumption by such Key Members of, or their agreement to be liable for, all of the obligations (whether theretofore accrued or thereafter accruing) of such Defaulting Member under the Operating Agreement and such Defaulting Member's Acquisition Agreement, all pursuant to documents satisfactory to the Administrative Agent in its reasonable discretion;

(ii)  The assumption by such Key Members of, or their agreement to be liable for, all of the obligations (whether theretofore accrued or thereafter accruing) of such Defaulting Member under the Loan Documents to which such Defaulting Member is a party, all pursuant to documents satisfactory to the Administrative Agent;

(iii)  The assumption by the Parent Guarantors of such Key Members of, or such Parent Guarantors' agreement to be liable for, all of the obligations (whether theretofore accrued or thereafter accruing) of the Defaulting Member's Parent Guarantor under such Defaulting Member's Acquisition Agreement and all Loan Documents to which the Parent Guarantor of such Defaulting Member is a party, all pursuant to documents satisfactory to the Administrative Agent;

(iv)  The delivery to the Administrative Agent of such Organizational Documents, certificates of good standing, opinions of counsel and other documents in respect of such Key Members and their Parent Guarantors as the Administrative Agent may reasonably require.

(d)  Upon the cure of a Member Default pursuant to the provisions of this Section 9.07, the Administrative Agent shall notify the Borrower and the Lenders thereof.

SECTION 9.08.  Application of Payments.  On and after the occurrence of an Event of Default, but subject to the provisions of Section 2.11, the Administrative Agent shall

86

apply all payments and prepayments in respect of any Obligations and all proceeds of the Collateral in the following order (except as hereinafter provided):

>  (i)  first, to pay Obligations in respect of any fees, expenses, reimbursements or indemnities then due to the Administrative Agent;

>  (ii)  second, to pay Obligations in respect of any fees (other than commitment fees and Letter of Credit fees), expenses, reimbursements or indemnities then due to the Lenders and Issuing Banks;

>  (iii)  third, to pay commitment fees, Letter of Credit fees and interest due in respect of Loans and LC Disbursements;

>  (iv)  fourth, to the ratable payment or prepayment of principal outstanding on Loans and LC Disbursements and Secured Swap Obligations;

>  (v)  fifth, to the Cash Collateral Account provided for, and to the extent required under, Section 2.06(j); and

>  (vi)  sixth, to the ratable payment of all other Obligations.

Unless otherwise designated (which designation shall only be applicable prior to the occurrence of an Event of Default) by the Borrower, all principal payments in respect of Loans under a Facility shall be applied, first, to repay outstanding ABR Loans under such Facility and then to repay outstanding Eurodollar Loans under such Facility, with those that have the earlier expiring Interest Period being repaid prior to those that have later expiring Interest Periods. The order of priority set forth in this paragraph and the related provisions of this Agreement are set forth solely to determine the rights and priorities of the Administrative Agent, the Lenders, and the Issuing Banks as among themselves. The order of priority set forth in clauses (i) and (ii) may be changed only with the prior written consent of the Administrative Agent and the order of priority of payments in respect of LC Disbursements may be changed only with the prior written consent of the Issuing Banks.

## ARTICLE X

### The Administrative Agent

SECTION 10.01. Appointment of Administrative Agent. Each of the Lenders and the Issuing Banks hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.

SECTION 10.02. Administrative Agent's Rights as a Lender. The bank serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally

87

engage in any kind of business with the Borrower or any Affiliate thereof as if it were not the Administrative Agent hereunder.

SECTION 10.03. <u>Administrative Agent's Duties</u>. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or that the Administrative Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 11.02), and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 11.02) or in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, (ii) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document or the perfection or priority of any Lien, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

SECTION 10.04. <u>Reliance</u>. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 10.05. <u>Sub-Agents</u>. The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall

apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

SECTION 10.06. <u>Resignation</u>. Subject to the appointment and acceptance of a successor Administrative Agent as provided in this paragraph, the Administrative Agent may resign at any time by notifying the Lenders, the Issuing Banks and the Borrower. Upon any such resignation, the Required Lenders shall have the right to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders and the Issuing Banks, appoint a successor Administrative Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. Notwithstanding the foregoing, as long as no Event of Default has occurred that is continuing, the appointment of any successor Administrative Agent hereunder shall be subject to the prior written approval of the Borrower, which approval shall not be unreasonably withheld or delayed. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 11.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

SECTION 10.07. <u>Credit Analysis and Decision by Lenders</u>. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.

SECTION 10.08. <u>Collateral</u>.

(a)  Each Lender authorizes the Administrative Agent to enter into each of the Loan Documents to which it is a party (including, without limitation, the Consent and Agreement and Deed of Trust Amendment) and to take all action contemplated by such Loan Documents. Each Lender agrees that no Holder of Secured Obligations, other than the Administrative Agent acting on behalf of all Holders of Secured Obligations, shall have the right individually to seek to realize upon the security granted by any Loan Document, it being understood and agreed that such rights and remedies may be exercised solely by the Administrative Agent for the benefit of the Holders of Secured Obligations, upon the terms of the Loan Documents.

89

(b)  In the event that any Collateral is pledged by any Person as collateral security of the Secured Obligations, the Administrative Agent is hereby authorized to execute and deliver on behalf of the Holders of Secured Obligations any Loan Documents necessary or appropriate to grant and perfect a Lien on such Collateral in favor of the Administrative Agent on behalf of the Holders of Secured Obligations.

(c)  The Lenders hereby authorize the Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by the Administrative Agent upon any Collateral (i) upon termination of the Commitments and payment and satisfaction of all of the Obligations and expiration or termination of all Letters of Credit, (ii) as permitted by, but only in accordance with, the terms of the applicable Loan Documents or (iii) if provided, authorized or ratified in writing by the Required Lenders, unless such release is required to be approved by all of the Lenders hereunder.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority to release particular types or items of Collateral pursuant to this paragraph.

(d)  Upon any sale or transfer constituting Collateral which is expressly permitted pursuant to the terms of any Loan Document, or consented to in writing by all of the Lenders, and upon at least ten (10) Business Days' prior written request by the Borrower (or such shorter period to which the Administrative Agent may agree), the Administrative Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Administrative Agent for the benefit of the Holders of Secured Obligations, upon the Collateral that was sold or transferred; provided, however, that (i) the Administrative Agent shall not be required to execute any such document on terms which, in the Administrative Agent's opinion, would expose the Administrative Agent to liability or create any obligation or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Secured Obligations or any Liens upon (or obligations of the Borrower or any other Credit Party in respect of) all interests retained by the Borrower or any other Credit Party, including (without limitation) the proceeds of the sale, all of which shall continue to constitute part of the Collateral.

ARTICLE XI

Miscellaneous

SECTION 11.01.  Notices.

(a)  Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such Obligations may be unmatured, provided, however, that no Lender or any Affiliate shall exercise any right of setoff without the prior written approval of the Administrative Agent. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 11.09.  Governing Law; Jurisdiction; Consent to Service of Process.

(a)  This Agreement and every other Loan Document shall be construed in accordance with and governed by the law of the State of New York (except to the extent that such other Loan Document specifically states that it shall be construed in accordance with the laws of another jurisdiction).

(b)  The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent, any Issuing Bank or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against the Borrower or its properties in the courts of any jurisdiction.

(c)  The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 11.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 11.10.  WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON

99

CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 11.11. Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 11.12. Confidentiality. Each of the Administrative Agent, the Issuing Banks and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee or pledgee (under Section 11.04(d)) of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective, direct or indirect, counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, any Issuing Bank or any Lender on a nonconfidential basis from a source other than the Borrower. For the purposes of this Section, "Information" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to the Administrative Agent, any Issuing Bank or any Lender on a nonconfidential basis prior to disclosure by the Borrower. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 11.13. USA PATRIOT ACT. Each Lender that is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") hereby notifies the Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.

SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AGREEMENT WITH
SOUTH EDGE, LLC

JPMORGAN CHASE BANK, N.A., as Lender
and Administrative Agent

By: _____

Name: ___Kent Kaiser_____

Title: ___Executive Director_____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

SOUTH EDGE, LLC, a Nevada limited-liability company

By:  Holdings Manager, LLC, a Nevada limited-liability company, its general manager

By _____

John A. Ritter
General Manager

SCHEDULE 1

Facility A and D Lenders and Commitments

FACILITY A

| Facility A Lender | Commitment |
|---|---|
| JPMorgan Chase Bank, N.A. | $25,000,000 |
| The Royal Bank of Scotland plc | $30,000,000 |
| Comerica Bank | $20,000,000 |
| Wachovia Bank National Association | $20,000,000 |
| Calyon New York Branch | $20,000,000 |
| LaSalle Bank National Association | $20,000,000 |
| PNC Bank, National Association | $15,000,000 |
| California Bank & Trust | $10,000,000 |
| TOTAL | $160,000,000 |

FACILITY D

| Facility D Lender | Commitment |
|---|---|
| JPMorgan Chase Bank, N.A. | $15,000,000 |
| Wachovia Bank National Association | $5,000,000 |
| Comerica Bank | $5,000,000 |
| TOTAL | $25,000,000 |

SCHEDULE 2

Members, Parent Guarantors and Related Information

| Member | Takedown Date | Ownership Percentage | Gross Acres | Release Price |
|---|---|---|---|---|
| KB Home Nevada, Inc. | April 15, 2007 | 6.61% | 129.20 | $38,668,500 |
| KB Home Nevada, Inc. | October 15, 2007 | 8.34% | 162.92 | 48,789,000 |
| KB Home Nevada, Inc. | April 15, 2008 | 5.12% | 99.94 | 29,952,000 |
| KB Home Nevada, Inc. | October 15, 2008 | 4.15% | 81.06 | 24,277,500 |
| KB Home Nevada, Inc. | April 15, 2009 | 19.10% | 373.11 | 111,735,000 |
| KB Home Nevada, Inc. | October 15, 2009 | 5.13% | 100.15 | 30,010,500 |
| **KB Home Nevada, Inc. Total** | | **48.45%** | **946.38** | **$283,432,500** |
| | | | | |
| Focus South Group, LLC | October 15, 2007 | 15.59% | 304.52 | $91,201,500 |
| **Focus South Group, LLC Total** | | **15.59%** | **304.52** | **$91,201,500** |
| | | | | |
| Coleman-Toll Limited Partnership | April 15, 2007 | 1.59% | 31.14 | $9,301,500 |
| Coleman-Toll Limited Partnership | April 15, 2008 | 1.54% | 30.12 | 9,009,000 |
| Coleman-Toll Limited Partnership | October 15, 2008 | 2.56% | 50.09 | 14,976,000 |
| Coleman-Toll Limited Partnership | April 15, 2009 | 3.72% | 72.41 | 21,762,000 |
| Coleman-Toll Limited Partnership | October 15, 2009 | 1.11% | 21.73 | 6,493,500 |
| **Coleman-Toll Limited Partnership Total** | | **10.52%** | **205.49** | **$61,542,000** |
| | | | | |
| Alameda Investments, LLC | April 15, 2007 | 3.15% | 61.47 | $18,427,500 |
| Alameda Investments, LLC | April 15, 2008 | 2.12% | 41.40 | 12,402,000 |
| Alameda Investments, LLC | October 15, 2008 | 2.87% | 56.13 | 16,789,500 |
| **Alameda Investments, LLC Total** | | **8.14%** | **159.00** | **$47,619,000** |
| | | | | |
| Kimball Hill Homes Nevada, Inc. | April 15, 2007 | 2.36% | 46.12 | $13,806,000 |
| Kimball Hill Homes Nevada, Inc. | October 15, 2007 | 0.81% | 15.91 | 4,738,500 |
| Kimball Hill Homes Nevada, Inc. | April 15, 2008 | 3.11% | 60.83 | 18,252,000 |
| **Kimball Hill Homes Nevada, Inc. Total** | | **6.29%** | **122.86** | **$36,796,500** |
| | | | | |
| Pardee Homes of Nevada | April 15, 2008 | 2.58% | 50.48 | $15,093,000 |
| Pardee Homes of Nevada | October 15, 2008 | 2.32% | 45.23 | 13,572,000 |
| **Pardee Homes of Nevada Total** | | **4.90%** | **95.71** | **$28,665,000** |
| | | | | |
| Meritage Homes of Nevada, Inc.* | April 15, 2007 | 1.42% | 27.66 | $8,307,000 |
| Meritage Homes of Nevada, Inc. | April 15, 2008 | 2.11% | 41.30 | 12,343,500 |
| **Meritage Homes of Nevada, Inc. Total** | | **3.53%** | **68.96** | **$20,650,500** |
| | | | | |
| Beazer Homes Holdings Corp. | July 15, 2008 | 2.58% | 50.40 | $15,093,000 |
| **Beazer Homes Holdings Corp. Total** | | **2.58%** | **50.40** | **$15,093,000** |
| | | | | |
| **Totals** | | **100.00%** | **1,953.32** | **$585,000,000** |

*Formerly known as MTH Homes, Nevada, Inc.

EXHIBIT D

APPROVED PROJECT BUDGET

# South Edge, LLC
## Approved Project Budget

| | |
|---|---:|
| Land Cost | 557,000,000 |
| Management Fee | 38,990,000 |
| Pre-development Costs | 968,868 |
| Improvement Costs | 448,586,775  * |
| Less: Reimbursement | (23,899,269) |
| **Net Improvement Costs** | **424,687,506** |
| Taxes & Insurance Costs | 30,922,071 |
| LID Cost | 24,644,627 |
| Loan Fees (incl. Closing, Arranger, Unused, & L/C Fees) | 9,246,785 |
| Loan Interest Expense | 115,810,248 |
| **Total** | **1,202,270,106** |

\* detail attached

3/8/2007  6:50 PM

## SUMMARY - ESTIMATE OF IMPROVEMENT COSTS

**DIRECT COSTS**

| | | |
|---|---|---|
| Roadways | $ | 68,713,076.20 |
| Water | $ | 49,404,845.94 |
| Sewer | $ | 19,264,178.10 |
| Major Drainage Facilities | $ | 73,183,598.41 |
| Dry Utilities (Excludes Substation) | $ | 26,890,356.74 |
| Project Entry, Landscaping (wiithin Roadway Improvements), School/Park Grading, Parks/Open | $ | 75,267,788.00 |
| | | |
| **Sub Total** | $ | 312,723,843.38 |
| | | |
| **10% Contingency** | $ | 23,528,077.12 |
| | | |
| ***Total Direct Costs*** | $ | 336,251,920.95 |

**Design and Fees**

| | | |
|---|---|---|
| Engineering /Professional Services | $ | 24,384,688.90 |
| CM Fee: | $ | 24,513,022.02 |
| Permits and Fees | $ | 24,558,102.80 |
| Public Facilities: | $ | 16,570,269.00 |
| Impact Fees/Bonding | $ | 14,808,771.13 |
| ROW Acquistion | $ | 2,500,000.00 |
| Power Substation | $ | 5,000,000.00 |
| | | |
| **Total Fees and Related Costs** | $ | 112,334,853.85 |
| | | |
| **Total All Costs** | $ | 448,586,774.80 |