# EXHIBIT D

# PART 2

Transferor or the Management Committee in obtaining, any such consent, approval, waiver or authorization and shall cooperate and use diligent efforts to respond as promptly as practicable to all inquiries received by it, by the Transferor or by the Management Committee from any governmental authority for initial or additional information or documentation in connection therewith.

### 10.7. TRANSFERS AFTER CONVEYANCE OF PODS

10.7.1. Without approval of the Management Committee (excluding the Manager who represents the Transferor), no Units may be transferred after the conveyance of Pods to the Members except in connection with the contemporaneous transfer by the Transferor to the same transferee of Pods or portions thereof proportional to the transferred Units.

10.7.2. If any Member proposes to transfer (a) Pods or any portion thereof after conveyance of Pods to the Members but prior to dissolution of the Company or (b) the right to acquire Pods pursuant to its Acquisition Agreements, then the Member must comply with this Section 10.7.2. The Members may transfer Pods or rights to acquire Pods pursuant to their Acquisition Agreements provided that prior notice of such proposed transfer is given to the Management Committee (except that no notice is required for transfers of Pods to homebuyers or homeowners associations in the ordinary course of a business), the transferring Member has fully complied with all of its payment and other obligations through the date of the proposed transfer, and the transferring Member has paid any brokerage commissions required pursuant to Section 14.5. Notwithstanding any agreements between the transferring Member and its transferee(s), the transferring Member shall remain primarily liable for all obligations of the transferring Member under this Agreement, and, with respect to any assignment of rights to acquire Pods pursuant to its Acquisition Agreement, such assigning Member shall be the sole representative before the Company to act for and on behalf of the assignee.

## 11. DEFAULT

### 11.1. EVENTS OF DEFAULT

Upon an Event of Default on the part of the General Manager or any Member, the Company, acting by or through the General Manager or any Member, but in either case, only after authorization by the Management Committee (by affirmative vote of the Managers representing a majority of the Percentage Interests held by Members other than the Defaulting Party or by its Affiliate), may provide written notice of the Event of Default (the "Default Notice") to the defaulting General Manager, Member or the defaulting unadmitted assignee of Units or Interests (either a "Defaulting Party"), and to the Company and the non-defaulting Members and the Company may exercise any remedies available to the Company on account of such Event of Default provided in this Agreement or by law or in equity. For the purposes of this Agreement, an "Event of Default" shall mean any of the following:

11.1.1. Deficiency. A failure of such Defaulting Party to make any Capital Contribution required pursuant to any provision of this Agreement and such failure within any applicable cure period provided for in this Agreement;

11.1.2.    Breach.    Except as covered in Section 11.1.1, the Defaulting Party has committed a material breach of any material covenant or any representation (or any such representation of Defaulting Party would be materially inaccurate if restated at any time subsequent to the date of this Agreement) contained in this Agreement or materially defaulted on any material obligation provided for in this Agreement and such breach or default continues for ten (10) days after the date written notice thereof has been given to such Defaulting Party by any non-defaulting Member, provided that, if such breach or default is not a failure to pay money and is of such a nature that it cannot reasonably be cured within such ten (10) day period, but is curable and such Defaulting Party in good faith begins efforts to cure it within such ten (10) day period and continues diligently to do so, such Defaulting Party shall have a reasonable additional period thereafter to effect the cure (not to exceed thirty (30) days unless extended by the Management Committee (excluding any Manager who has been appointed by the Defaulting Party or by its Affiliate);

11.1.3.    Retirement, Resignation or Withdrawal.    The retirement, resignation or withdrawal, or attempted retirement, resignation or withdrawal, by a Defaulting Party from the Company in violation of this Agreement without the prior written consent of the non-defaulting Members;

11.1.4.    Dissolution or Liquidation.    Any dissolution or liquidation of a Defaulting Party or the taking of any action by its directors, majority stockholder, or Parent looking to the dissolution or liquidation of such Defaulting Party, unless either (i) the business of such Defaulting Party is carried on without termination, or (ii) substantially all assets of the Defaulting Party are transferred or are to be transferred to a person directly or indirectly controlling, controlled by or under common control with such Defaulting Party;

11.1.5.    Voluntary Bankruptcy.    The bankruptcy of a Defaulting Party, which means: (a) the inability of the Defaulting Party generally to pay its debts as such debts become due, or an admission in writing by the Defaulting Party of the Defaulting Party's inability to pay the Defaulting Party's debts generally or a general assignment by the Defaulting Party for the benefit of creditors; (b) the filing of any petition or answer by the Defaulting Party seeking to adjudicate the Defaulting Party as bankrupt or insolvent, or seeking for the Defaulting Party any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of the Defaulting Party or the Defaulting Party's debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for the Defaulting Party or for any substantial part of the Defaulting Party's property; or (c) any action taken by the Defaulting Party to authorize any of the actions set forth above.

11.1.6.    Involuntary Bankruptcy.    The involuntary bankruptcy of a Defaulting Party, which means, without the consent or acquiescence of the Defaulting Party, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation, or the filing of any such petition against such person, which petition shall not be dismissed within ninety (90) days, or without the consent or acquiescence of the Defaulting Party, the entering of an order appointing a trustee, custodian, receiver or liquidator of the

Defaulting Party or of all or any substantial part of the property of the Defaulting Party, which order shall not be dismissed within ninety (90) days.

11.1.7.    Appointment.    The appointment of a receiver, trustee, custodian or other similar official for any substantial part of the Defaulting Party's property;

11.1.8.    Investment Company.    Any transfer that would result in subjecting the Company to the Investment Company Act of 1940, as amended; or

11.1.9.    Prohibited Transfer.    A transfer of all or any portion of such Defaulting Party's Interests except as expressly permitted or required by this Agreement.

11.1.10.    Ineligibility.    BLM, the City of Henderson, or any other governmental authority determines that the Defaulting Party is ineligible, unqualified, unsuitable or otherwise prohibited from investing or participating in the Subject Property, the Community, or other related matters or its investment or participation is the subject of any restriction not applicable to other Members.

11.1.11.    Focus Member.    With respect to Focus Member or the General Manager, (i) any Event of Default by the General Manager or Focus Member, respectively, under this Agreement or (ii) any default (after the expiration of any applicable cure period) by any Affiliate of Focus Member or General Manager under any agreement with the Company.

**11.2.    AVAILABILITY OF REMEDIES**

To the extent applicable the Company shall have the rights and remedies provided under Section 2.4 in addition to those under this Section 11. The resort to any remedy pursuant to this Section 11 or Section 2.4 shall not, for any purpose, be deemed to be a waiver of any remedy not described in this Section 11 or Section 2.4 and otherwise available hereunder or under applicable law. Further, notwithstanding the election of the Company or a non-defaulting Member to pursue any rights under this Section 11 or Section 2.4, the Company or the non-defaulting Members may seek action to enjoin the Defaulting Party, seek to obtain specific performance of the Defaulting Party's obligations, seek to obtain any and all damages, losses and expenses (including, without limitation, reasonable attorneys' fees and disbursements) suffered or incurred by the Company as a result of such Event of Default (collectively, the "Damages") against the Defaulting Party or resort to any of the other remedies then available to the Company or any of the non-defaulting Members.

Without limitation of the foregoing, upon any Event of Default and continuing until cure pursuant to the terms of this Agreement, neither the Defaulting Party nor the Manager appointed by the Defaulting Party shall have any voting rights hereunder and, not withstanding anything in this Agreement to the contrary, such Defaulting Party and its Member shall not be considered for purposes of satisfying any quorum, voting, or approval requirements, including, without limitation, any requirement for unanimous approval.

## 12.   DISSOLUTION AND WINDING UP

### 12.1.   DISSOLUTION EVENTS

The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each a "Dissolution Event"):

12.1.1.   The affirmative vote of Members holding at least a Supermajority to dissolve, wind up, and liquidate the Company; or

12.1.2.   After turnover of control of the master homeowners association to the homeowners; or

12.1.3.   A judicial determination that an event has occurred that makes it unlawful, impossible or impractical to carry on the Company's business; or

12.1.4.   A Person other than the Company purchases the Subject Property at the Auction.

### 12.2.   WINDING UP

Upon the occurrence of either a Dissolution Event or the determination by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Dissolution Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members, and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business; provided, however, that all covenants and obligations provided for in this Agreement shall continue to be fully binding upon the Members until such time as the Property has been distributed pursuant to this Section 12.2 and the Company has been dissolved pursuant to the NRS. The General Manager shall be responsible for overseeing the winding up and dissolution of the Company with the approval and at the direction of the Management Committee, which winding up and dissolution shall be completed within ninety (90) days of the occurrence of the Dissolution Event. The Management Committee shall take full account of the Company's liabilities and Property and shall cause the Property or the proceeds from the sale thereof, to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

a.   First, to creditors (including the General Manager, Members and Managers who are creditors) in satisfaction of all of the Company's debts, obligations and other liabilities, including, without limitation, any claims and obligations as required by NRS 86.521 (whether by payment or the making of reasonable provision for payment thereof), other than liabilities for which reasonable provision for payment has been made and liabilities for interim distributions to the Members or distributions to resigning Members; and then

b.   The balance, if any, to the Members in accordance with their Percentage Interests, after giving effect to all contributions, distributions and allocations for all periods.

### 12.3.   COMPLIANCE WITH CERTAIN REQUIREMENTS OF REGULATIONS; DEFICIT CAPITAL ACCOUNTS

In the event the Company is "liquidated" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), distributions shall be made pursuant to this Section 12 to the Members who have positive Capital Accounts in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2). If any Member has a deficit balance in his Capital Account (after giving effect to all contributions, distributions and allocations for all Allocation Years, including, without limitation, the Allocation Year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other person for any purpose whatsoever. In the discretion of the Management Committee, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to this Section 12 may be:

a.    Distributed to a trust established for the benefit of the Members for the purposes of liquidating the Company's assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company. The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Management Committee, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to Section 12.2 of this Agreement; or

b.    Withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company; provided, however, that such withheld amounts shall be distributed to the Members as soon as practicable.

### 12.4.   DEEMED CONTRIBUTION AND DISTRIBUTION

Notwithstanding any other provision of this Section 12, in the event the Company is liquidated within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g) but no Dissolution Event has occurred, Property shall not be liquidated, the Company's debts, obligations and other liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up. Instead, solely for federal income tax purposes, the Company shall be deemed to have contributed all of its Property and liabilities to a new limited-liability company in exchange for an interest in such new company and, immediately thereafter, the Company will be deemed to liquidate by distributing interests in the new limited-liability company to the Members.

### 12.5.   RIGHTS OF MEMBERS

Except as otherwise provided in this Agreement, each Member shall look solely to Property for the return of such Member's Capital Contribution and shall have no right or power to demand or receive Property other than cash from the Company. If the assets of the Company remaining after payment or discharge of the debts, obligations or other liabilities of the Company are insufficient to return such Capital Contributions, the Members shall have no recourse against the Company, any Manager or any Member.

### 12.6. NOTICE OF DISSOLUTION

In the event a Dissolution Event occurs or an event occurs that would, but for provisions of Section 12.1 of this Agreement, result in a dissolution of the Company, the Management Committee shall, within thirty (30) days thereafter, provide written notice thereof to each Member and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Management Committee) and shall publish notice thereof in a newspaper of general circulation in each place in which the Company regularly conducts business (as determined in the discretion of the Management Committee).

### 12.7. TERMINATION

Upon completion of the distributions as provided in this Section 12, the Company shall be terminated, and the Management Committee shall cause the filing of the articles of dissolution pursuant to NRS 86.541 and shall take all such other actions as may be necessary to terminate the Company.

### 12.8. ALLOCATIONS DURING PERIOD OF LIQUIDATION

During the period commencing on the first day of the Allocation Year during which a Dissolution Event occurs and ending on the date on which all of the Property has been distributed to the Members pursuant to Section 12.2 of this Agreement (the "Liquidation Period"), the Members shall continue to share Profits, Losses and other items of the Company's income, gain, loss or deduction in the manner provided in Section 3 of this Agreement.

### 12.9. CHARACTER OF LIQUIDATING DISTRIBUTIONS

All payments made in liquidation of the interest of a Member in the Company shall be made in exchange for the interest of such Member in Property pursuant to Section 736(b)(1) of the Code, including, without limitation, the interest of such Member in Company goodwill.

### 12.10. FORM OF LIQUIDATING DISTRIBUTIONS

For purposes of making distributions required by Section 12.2 of this Agreement, the Management Committee may determine whether to distribute all or any portion of the Property in-kind or to sell all or any portion of the Property and distribute the proceeds therefrom.

### 13. INDEMNIFICATION

The Company shall indemnify and advance expenses to the General Manager, any Manager, any Member, any person formerly in any such position, and any other person, to the extent that such current or former General Manager, Manager, Member or any other person at any time acted on behalf of the Company, to the fullest extent permitted under the Articles or the NRS on and subject to the following limitations. In addition to and without limitation of the foregoing, to the extent that an indemnified party is entitled to indemnification but the Company is unable for any reason to indemnify the General Manager, its officers, directors, members employees, agents, Affiliates and other persons acting on its behalf or at its direction (collectively, "indemnified parties") fully against any and all liabilities and expenses incurred or

threatened to be incurred and all costs of defense (and if such liabilities and expenses are not otherwise insured against by the Company), then the Members shall jointly and severally each so indemnify the indemnified parties to the extent of each such Member's proportionate share (determined in proportion to their respective Percentage Interests). Said indemnity shall not be applicable to any act or omission by the indemnified party or any Affiliate of the indemnified party which constitutes intentional misconduct, fraud, gross negligence or a knowing violation of the law, or material breach of this Agreement or any other agreement with the Company by such indemnified party or Affiliate, and was material to the matter which is the subject of the claim for indemnification. Without limitation of the foregoing, the Management Committee may cause the Company to purchase insurance covering such persons.

## 14.    FEES OF GENERAL MANAGER AND ITS AFFILIATES

The General Manager and its Affiliates shall be entitled to the following fees and expenses for their services which the Members agree are fair and reasonable.

### 14.1.    MANAGEMENT FEE

If the Company submits the successful bid at the Auction, the General Manager shall receive a fee from the Company for the General Manager's services hereunder equal to seven percent (7%) of the total cost of the Subject Property (the "Management Fee"). The amount of the Management Fee shall be funded by the contributions of the Members under Sections 2.2 and 2.3. If the Company's bid at the Auction is not successful, then the General Manager shall not receive the Management Fee. If the General Manager is removed pursuant to Section 5.7.1, then it shall be entitled to the portion of the Management Fee payable through the date of removal but to no further portions of the Management Fee which become payable after such date. Nothing herein shall prejudice the General Manager's right to dispute and contest any alleged cause for removal and to pursue its right to receive the entire Management Fee.

### 14.2.    INTENTIONALLY DELETED

### 14.3.    PAYMENT SCHEDULE

The Management Fee shall be paid to the General Manager in the manner described in Section 2.3.7.

### 14.4.    LANDTEK FEES

For so long as an Affiliate of Focus Member is a General Manager and Focus Member is a Member of the Company, Landtek shall receive a fee equal to seven percent (7%) of the total pre-development and construction costs as compensation for the performance of its services contemplated under Section 5.6.2 of this Agreement. The fee payable to Landtek is in addition to the Management Fee. The fee shall be earned and payable in accordance with terms and conditions of the construction management agreement described in Section 5.6.2.

### 14.5. BROKERAGE COMMISSIONS

If any Member transfers all or any portion of any Pods (other than to a homebuyer, in connection with any dedications of Public Sites or transfers to homeowner associations, to a joint venture or other entity which is a Qualifying Successor Entity, or pursuant to a bona fide land banking arrangement) within one year after conveyance of the Pods to the Member, such Member shall pay a 3% brokerage commission to Focus Commercial Group, Inc., an Affiliate of the General Manager, on the excess of the gross sale price over the purchase price paid for the property by the Member to the Company. The purchase price paid by the Member for the portion of its Pods being transferred shall be equal to the Member Consideration times a fraction, the numerator of which shall be the number of acres being sold by the Member, and the denominator of which shall be the total acres of the Pods acquired by the Member.

## 15.   MISCELLANEOUS

### 15.1.  NOTICES

Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be hand delivered, sent via facsimile, electronic mail, overnight delivery or registered or certified mail, return receipt requested. Notice shall be effective: (a) if hand delivered, when delivered; (b) if sent via facsimile or electronic mail, on the day of transmission thereof on a proper facsimile machine or computer, as applicable, with confirmation provided that a duplicate notice is sent simultaneously by another approved method; (c) if sent via overnight delivery, on the day of delivery thereof by a reputable overnight courier service, delivery charges prepaid; and (d) if mailed, on the third business day after the deposit of such item in the mail, postage prepaid, provided that a duplicate notice is sent via facsimile on the date of deposit in the mail. Notices shall be addressed or sent as follows: (x) if to the Company, to the address or facsimile number provided in Section 1.3 of this Agreement; (y) if to the Managers, to the address or facsimile number set forth in Section 5.1.3 of this Agreement; or (z) if to a Member, to the address or facsimile number set forth on Schedule II to this Agreement.

### 15.2.  BINDING EFFECT

Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members, the General Manager, and their respective successors, transferees, assigns, heirs and personal representatives.

### 15.3.  CONSTRUCTION

The terms of this Agreement were negotiated at arm's length by the parties hereto. The covenants, terms and provisions contained herein shall not be construed in favor of or against any party because that party or its counsel drafted this Agreement, but shall be construed simply according to its fair meaning as if all parties prepared this Agreement, and any rules of construction to the contrary are hereby specifically waived.

### 15.4. TIME

In computing any period of time pursuant to this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day. All references to any period of days in this Agreement shall mean calendar days unless the reference is specifically to business days. References to business days shall mean days other than Saturdays, Sundays, and legal holidays as observed in the State of Nevada.

### 15.5. HEADINGS

Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

### 15.6. SEVERABILITY

Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the legality or validity of the remainder of this Agreement. The preceding sentence of this Section 15.6 shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause any Member to lose the material benefit of its economic bargain.

### 15.7. ENTIRE AGREEMENT; INCORPORATION BY REFERENCE

This Agreement and the Articles (including all exhibits, schedules and other documents referred to in this Agreement, all of which are hereby incorporated by reference) constitute the entire agreement by and among the Members and by and among the parties hereto, and supersede all prior discussions, negotiations, agreements and understandings, both written and oral, by and among the parties hereto with respect to the subject matter of this Agreement.

### 15.8. VARIATION OF TERMS

All terms and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the person or persons may require.

### 15.9. GOVERNING LAW; VENUE

The laws of the State of Nevada (without giving effect to the conflicts of laws principles thereof) shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties arising hereunder. All rights and remedies of each person under this Agreement shall be cumulative and in addition to all other rights and remedies which may be available to the person from time to time, whether under this Agreement, at law, in equity or otherwise. Each Member agrees that the arbitration provisions contained in Section 15.10 are valid and binding and provide the exclusive dispute resolution mechanism. Notwithstanding the foregoing, to the extent consistent with Section 15.10 or Section 15.12, if it

is necessary that any matter become the subject of court proceedings, each Member: (a) agrees that any legal suit, action or proceeding arising out of or relating to this Agreement shall be instituted exclusively in Nevada State Court, County of Clark, or in the United States District Court for the District of Nevada; (b) waives any objection to the venue of any such suit, action or proceeding and the right to assert that such forum is not a convenient forum; and (c) irrevocably consents to the jurisdiction of the Nevada State Court, County of Clark, and the United States District Court for the District of Nevada in any such suit, action or proceeding. Each Member further agrees to accept and acknowledge service of any and all process that may be served in any such suit, action or proceeding in the Nevada State Court, County of Clark, or in the United States District Court for the District of Nevada and agrees that service of process upon it mailed by certified mail to its address shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding.

### 15.10. ARBITRATION

Any dispute, claim or controversy arising out or relating to this Agreement or any transaction contemplated hereby which cannot be resolved by the parties shall be resolved by binding arbitration in accordance with the Nevada Uniform Arbitration Act of 2000, Nevada Revised Statutes 38.206, et seq. The arbitration proceedings shall be held in Clark County, Nevada before a panel of three arbitrators (the "Arbitrator") who is expert in the subject of real estate development and well versed in the subject of limited liability companies and is a practicing or retired Nevada lawyer or retired judge or magistrate. The Arbitrator shall be selected jointly by the General Manager and a majority of the Units held by the Members directly affected or failing such agreement within ten days after the any party makes a written demand for arbitration then the Arbitrator shall be selected by the State of Nevada district court pursuant to NRS 38.226. The Arbitrator shall follow the laws of the State of Nevada (without giving effect to the conflicts of laws principles thereof). Any award or other determination (including interim orders or awards) rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in any court provided for in Section 15.9 and such judgment may be enforced by any court with jurisdiction. Pending the final resolution of an arbitration, the Arbitrator shall have the power, at the request of any party, to take interim measures and make interim orders or awards (including for the purpose of maintaining the status quo or otherwise preserving the rights of a party). The costs of the arbitration, and any subsequent court proceedings (including but not limited to all reporter costs) shall be shall be borne as determined by the Arbitrator, in his/her discretion. Unless the Arbitrator so awards attorneys' fees, each party shall be responsible for its own attorneys' fees. The arbitration proceedings shall be expedited to the maximum extent practicable. To the extent possible, the arbitration hearings shall be conducted on consecutive days, excluding Saturdays, Sundays, and holidays, until the hearings are completed. All discovery and hearings shall be completed within 30 days from the day the Arbitrator is selected or appointed. The Arbitrator shall render her/his decision(s) concerning the substantive issue(s) in dispute in writing. The Arbitrator shall have the authority to impose sanctions on any party that fails to comply with above time periods, including the sanction of summarily dismissing any dispute or defense with prejudice. The doctrines of compulsory counterclaim, res judicata, and collateral estoppel shall apply to any arbitration proceeding hereunder so that a party must state as a counterclaim in the arbitration proceeding any claim or controversy which arises out of the transaction or occurrence that is the subject matter of the dispute. The Arbitrator must: (1) consolidate in a single arbitration proceeding any

other claim or controversy involving another party that is substantially related to the dispute; and (2) consolidate in a single arbitration proceeding any other claim or controversy that is substantially similar to the dispute. The Arbitrator may award to the prevailing party recovery of all costs and fees (including attorneys' fees and costs, arbitration administration fees and costs, and arbitrator(s)' fees), but shall have no authority to award punitive or consequential damages. The Arbitrator, either during the pendency of the arbitration proceeding or as part of the arbitration award, also may grant an award of injunctive relief. When prepared to issue a ruling, the Arbitrator shall first so inform the parties, who will have ten (10) days to resolve the dispute by a binding agreement between them. If the parties resolve the dispute prior to the close of business on the tenth (10th) day, the Arbitrator will not make any award. If the parties do not resolve the dispute in such ten (10) day period, the Arbitrator shall issue a written ruling on the eleventh (11th) day following the notification to the parties that the Arbitrator was prepared to issue a ruling. The arbitration proceeding shall be completed and the written decision shall be delivered to the parties no later than the earlier to occur of (i) 60 days after the last hearing date, or (ii) 120 days after the delivery of notice of the dispute to the opposing party. If any of the provisions relating to arbitration are not adhered to or complied with, either party may petition any court provided for in Section 15.9 for appropriate relief.

### 15.11. COUNTERPART EXECUTION

This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document. All counterparts shall be construed together and shall constitute one agreement.

### 15.12. SPECIFIC PERFORMANCE

Each Member agrees with the other Members that the other Members would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such event. Accordingly, it is agreed that, in addition to any other remedy to which the nonbreaching Members may be entitled, at law or in equity, the nonbreaching Members and the General Manager shall be entitled to injunctive and other equitable relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court under Section 15.9.

### 15.13. ATTORNEYS' FEES

The prevailing party in any dispute arising from the terms or subject matter of this Agreement shall be entitled to payment by the other party of the prevailing party's costs and expenses, including, without limitation, such party's attorneys' fees, incurred in connection with resolving such dispute.

### 15.14. NON-WAIVER

No failure by any party to insist upon strict compliance with any term or provision of this Agreement, to enforce any right, or to seek any remedy upon any default of any other party shall affect, or constitute a waiver of, the first party's right to insist upon such strict compliance, enforce that right, or seek that remedy with respect to that default or any prior, contemporaneous

or subsequent default. No custom or practice of the parties at variance with any provisions of this Agreement shall affect or constitute a waiver of any party's right to demand strict compliance with all provisions of this Agreement.

### 15.15. CREDITORS

None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company, any Manager or any Member.

IN WITNESS WHEREOF, the parties have executed and entered into this Amended and Restated Operating Agreement of the Company as of the day first above set forth.

**GENERAL MANAGER:**

**Holdings Manager, LLC, a**
    Nevada limited-liability company

By: _____

Its: Manager
    John A. Ritter

**MEMBERS:**

**FOCUS SOUTH GROUP, LLC, a**
    Nevada limited-liability company

By: _____

Its: Manager
    John A. Ritter

**MTH HOMES NEVADA, INC., an**
    Arizona corporation

By: _____
    Robert Beville

Its: Chief Operating Officer

or subsequent default.  No custom or practice of the parties at variance with any provisions of this Agreement shall affect or constitute a waiver of any party's right to demand strict compliance with all provisions of this Agreement.

### 15.15. CREDITORS

None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company, any Manager or any Member.

IN WITNESS WHEREOF, the parties have executed and entered into this Amended and Restated Operating Agreement of the Company as of the day first above set forth.

**GENERAL MANAGER:**

**Holdings Manager, LLC, a**
    Nevada limited-liability company

By: _____
        John A. Ritter
Its:    Manager

**MEMBERS:**

**FOCUS SOUTH GROUP, LLC, a**
    Nevada limited-liability company

By: _____
        John A. Ritter
Its:    Manager

**MTH HOMES NEVADA, INC., an**
    Arizona corporation

By: _____
        Robert Beville
Its:    Chief Operating Officer

ALEMEDA INVESTMENTS, LLC

By:
_____
Gene Morrison
Its:    Manager

KIMBALL HILL HOMES NEVADA

By:    _____
Stan Gutshall
Its:    Vice President

PARDEE HOMES OF NEVADA, a
    Nevada corporation

By:    _____
Klif Andrews
Its:    Vice President

COLEMAN-TOLL LIMITED PARTNERSHIP, LLC,
    a Nevada limited-partnership

By:    Toll NV GP Corp., its General Partner

By:    _____
Gary M. Mayo
Its:    Vice President

BEAZER HOMES HOLDINGS CORP

By:
_____
W.A. June
Its:    Division President – Nevada Division

ALEMEDA INVESTMENTS, LLC

By: _____
Gene Morrison
Its:    Manager


KIMBALL HILL HOMES NEVADA

By: _____
Stan Gutshall
Its:    Vice President


PARDEE HOMES OF NEVADA, a
Nevada corporation

By: _____
Klif Andrews
Its:    Vice President


COLEMAN-TOLL LIMITED PARTNERSHIP, LLC,
a Nevada limited-partnership

By:    Toll NV GP Corp., its General Partner

By: _____
Gary M. Mayo
Its:    Vice President


BEAZER HOMES HOLDINGS CORP

By: _____
W.A. June
Its:    Division President – Nevada Division

ALEMEDA INVESTMENTS, LLC

By: _____
    Gene Morrison
Its:    Manager


KIMBALL HILL HOMES NEVADA

By: _____
    Stan Gutshall
Its:    Vice President


PARDEE HOMES OF NEVADA, a
    Nevada corporation

By: _____
    Jon E. Lash
Its:    Senior Vice President


COLEMAN-TOLL LIMITED PARTNERSHIP, LLC,
    a Nevada limited-partnership

By:    Toll NV GP Corp., its General Partner

By: _____
    Gary M. Mayo
Its:    Vice President


BEAZER HOMES HOLDINGS CORP

By: _____
    W.A. June
Its:    Division President – Nevada Division

·ALEMEDA INVESTMENTS, LLC

By:    _____
       Gene Morrison
Its:   Manager


KIMBALL HILL HOMES NEVADA

By:    _____
       ·Stan Gutshall
Its:   Vice President


PARDEE HOMES OF NEVADA, a
    Nevada corporation

By:    _____
       Klif Andrews
Its:   Vice President


COLEMAN-TOLL LIMITED PARTNERSHIP, LLC,
    a Nevada limited-partnership

By:    Toll NV GP Corp., its General Partner

By:    _____
       Gary M. Mayo
Its:   Vice President


BEAZER HOMES HOLDINGS CORP

By:    _____
       W.A. June
Its:   Division President – Nevada Division

**KB HOME NEVADA INC.,**
a Nevada corporation

By: _____
Jim Widner

Its: Division President

08571.00030

### SCHEDULE I—DESCRIPTION OF SUBJECT PROPERTY

BLM SERIAL NO. N-75200

Township 23, South Range 61 East

SECTION 11
S1/2 S1/2 NW1/4 SE1/4
SW1/4 SE1/4
W1/2 W1/2 SE1/4 SE1/4
E1/2 SE1/4 SW1/4
S1/2 SE1/4 NE1/4 SW1/4

SECTION 14
E1/2 E1/2 NW1/4
W1/2 NE1/4
W1/2 W1/2 NE1/4 NE1/4
SE1/4 SW1/4 NE1/4 NE1/4
W1/2 SE1/4 NE1/4
W1/2 E1/2 SE1/4 NE1/4
SE1/4
E1/2 NE1/4 SW1/4
SE1/4 SW1/4
S1/2 SW1/4 SW1/4
NE1/4 SW1/4 NE1/4 SW1/4
S1/2 SW1/4 NE1/4 SW1/4
NE1/4 NE1/4 SW1/4 SW1/4
S1/2 NE1/4 SW1/4 SW1/4
SW1/4 NW1/4 SW1/4 SW1/4

SECTION 15
S1/2 SE1/4
S1/2 NW1/4 SE1/4
SW1/4 NE1/4 SE1/4
SW1/4 SE1/4 NE1/4 SE1/4
SW1/4 NW1/4 NE1/4 SE1/4
S1/2 NE1/4 NW1/4 SE1/4
NE1/4 NE1/4 NW1/4 SE1/4

SECTION 22
E1/2
SW1/4

SECTION 23
ALL

SECTION 24
SW1/4 NW1/4 NW1/4 NW1/4
SW1/4 NW1/4 NW1/4
SW1/4 SE1/4 NW1/4 NW1/4
W1/2 SW1/4 NW1/4
W1/2 E1/2 SW1/4 NW1/4
E1/2 SE1/4 SW1/4 NW1/4
SE1/4 NE1/4 SW1/4 NW1/4
W1/2 SW1/4 SE1/4 NW1/4
W1/2 SW1/4
W1/2 E1/2 SW1/4
W1/2 NE1/4 SE1/4 SW1/4
SE1/4 SE1/4 SW1/4

## SCHEDULE II– MEMBERS

The name, initial Member Acreage Allotment, Units and Percentage Interest of each Member are set forth as follows:

| Names and Address | Member Acreage Allotment | Units | Percentage Interest |
|---|---|---|---|
| Focus South Group, LLC | 302 Acres | 15.50 Units | 15.50% |
| MTH Homes Nevada, Inc. | 69 Acres | 3.60 Units | 3.60% |
| Alameda Investments, LLC | 158 Acres | 8.10 Units | 8.10% |
| Coleman-Toll Lim. Part. | 204 Acres | 10.50 Units | 10.50% |
| Beazer Homes Hold. Corp. | 50 Acres | 2.60 Units | 2.60% |
| KB HOME Nevada, Inc. | 940 Acres | 48.50 Units | 48.50% |
| Kimball Hill Homes Nev., Inc. | 122 Acres | 6.30 Units | 6.30% |
| Pardee Homes of Nevada | 95 Acres | 4.90 Units | 4.90% |
| | 1,940 Acres | 100.00 Units | 100.00% |

## SCHEDULE III—FORM OF ACQUISITION AGREEMENTS

To be completed within 30 days after the Auction in a form approved by the Management Committee.

# APPENDIX A – INDEX OF DEFINED WORDS AND PHRASES

Acquisition Agreement ...............................39
Adjusted Capital Account Deficit ...............13
Affiliate ...................................................3
Agreement ..............................................1
Allocation Year .........................................3
an Affiliate of a holding company .............43
Arbitrator ..............................................61
Articles ....................................................2
Auction ....................................................1
Bid Payment.............................................6
BLM .......................................................1
BLM Deposit ............................................6
BLM Purchase Price ..................................3
Book Adjustments .....................................3
Business Plan ............................................3
Capital Account .......................................12
Capital Contributions ................................3
Closing Payment .......................................7
Code .......................................................3
Commercial Deficiency ..............................8
Commercial Land .......................................8
Community ...............................................1
Company ..................................................1
Company Minimum Gain ...........................14
confidential or proprietary information..........36
control ......................................................3
Conveyance Payment..................................8
Damages.................................................54
Default Notice ..........................................52
Defaulting Party ...............................27, 52
Deficiency ...............................................10
Disbursement Agent ...................................9
Dissolution Event .....................................55
Effective Date ...........................................2
Event of Default .......................................52
Fiscal Quarter ...........................................3
Fiscal Year ...............................................3
Focus Member ...........................................4
General Manager...................................1, 27
Gross Asset Value ......................................4
holding company .....................................43
indemnified parties...................................58
Initial Payment .........................................6
Initial Payment Period................................9
Interests .................................................47
Interim Payment ........................................6
investment company ...........................43, 50
Land Financing ..........................................4
Landtek .................................................26

LID .......................................................39
Liquidation Period ...................................57
Losses .....................................................5
Major Infrastructure ..................................1
Major Infrastructure Costs .........................8
Majority ...................................................4
Management Committee........................4, 19
Management Fee......................................58
Manager ...................................................4
Managers ...............................................19
matching services ...................................41
Maximum Bid .........................................19
MCD Account ...........................................9
Member Acreage Allotment .........................5
Member BLM Price....................................4
Member Consideration ...............................4
Member Cost Deposit .................................8
Member Costs ...........................................8
Member Nonrecourse Debt........................14
Member Nonrecourse Debt Minimum Gain....14
Member Nonrecourse Deductions ...............14
Members ...................................................1
Net Cash Flow .........................................14
Non-Contributing Member ........................10
Nonrecourse Deductions ...........................14
Nonrecourse Liability ...............................14
NRS .......................................................2
Parent .....................................................4
Parent Final Map .......................................4
partnership .............................................46
Penalty Rate ...........................................12
Percentage Interest.....................................5
Permitted Transfer ...................................47
Person .....................................................5
Pod Related Transaction ...........................37
Pods ......................................................19
Profits .....................................................5
Property ...................................................2
Public Sites .............................................38
Qualifying Successor Entity .......................48
Regulations ...............................................5
Regulatory Allocations .............................17
Remaining Members.................................31
Revaluation ...............................................5
Securities Act...........................................40
Subject Property .........................................1
subsidiary of a holding company ................43
Supermajority ...........................................5
Tax Matters Manager................................46

Tax Year ................................................... 3
Terminated Member ................................... 31
Termination Refund ................................... 31
Threshold Amount .................................... 30

transfer .................................................... 2
Transferor ............................................... 47
Units ....................................................... 2

SOUTH EDGE, LLC

FIRST AMENDMENT
TO AMENDED AND RESTATED OPERATING AGREEMENT

REFERENCE IS MADE to that certain Amended and Restated Operating Agreement of South Edge, LLC, a Nevada limited liability company, dated as of May 3, 2004 (the "Operating Agreement"). Capitalized terms used herein and not otherwise defined herein are used with the meanings given them in the Operating Agreement.

WHEREAS, the Members of the Company have agreed that certain amendment to the Operating Agreement are necessary;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned Members hereby agree as follows:

1.      Amendment to Conform to Credit Agreement.  In order to conform to the requirements of Section 8.01 of the Credit Agreement dated as of October _____, 2004, by and among the Company, the Lenders party thereto, and JPMorgan Chase Bank, as Administrative Agent (the "Credit Agreement"), the following provisions are hereby made a part of the Operating Agreement.

Capitalized terms used in this Section and not otherwise defined in this Section shall be used with the meanings given them in the Credit Agreement.

(a)  The Company was organized solely for the purpose of acquiring, owning, developing and selling the Subject Property;

(b)  The Company has not engaged and will not engage in any business activities unrelated to the acquisition, ownership, development or sale of the Subject Property;

(c)  The Company does not have and will not have any assets other than the Subject Property (and personal property incidental to the ownership of the Subject Property, including contributions from its Members and proceeds of the LID Bonds);

(d)  The Company has not and, to the full extent permitted by law, will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation or merger;

(e)  The Company has no Indebtedness (and will have no Indebtedness) other than (i) the Obligations, (ii) Approved Swap Obligations, and (iii) unsecured trade debt which is not evidenced by a note and is incurred in the ordinary course of its business in connection with the Subject Property and is paid within ninety (90) days from the date incurred or, if later, within thirty (30) days of the date when due;

(f)  The Company has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(g)  The Company has maintained and will maintain its accounts, books and records separate from those of any other Person;

(h)  The Company has maintained and will maintain its books, records, resolutions and agreements as official records;

(i)  The Company (i) has not commingled and will not commingle its funds or assets with those of any other entity; and (ii) has held and will hold its assets in its own name;

(j)  The Company has conducted and will conduct its business in its own name;

(k)  The Company has maintained and will maintain its accounting records and other entity documents separate from those of any other Person;

(l)  The Company will prepare separate financial statements and will file its own tax returns, if any, as may be required by applicable Requirements of Law;

(m)  The Company has paid and will pay its own liabilities and expenses out of its own funds and assets (including Loans advanced hereunder);

(n)  The Company has observed and will observe all limited liability company formalities and record keeping, as applicable;

(o)  The Company has not assumed, guaranteed or become obligated for, and will not assume or guarantee or become obligated for, the obligations of any other entity or hold out its credit as being available to satisfy the obligations of any other entity;

(p)  The Company has not acquired and will not acquire obligations or Equity Interests of any of its Members, the General Manager or any other Person other than Permitted Investments;

(q)  The Company has allocated and will allocate fairly and reasonably the costs associated with common employees (if any) and any overhead for shared office space (if any) and has used and will use separate stationery, invoices and checks;

(r)  except for the Collateral Documents, The Company has not pledged and will not pledge its assets for the benefit of any other Person;

(s)  The Company has held and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(t)  The Company has not made and will not make loans to any Person;

(u)  The Company has not identified and will not identify any of its Members, the General Manager or any Affiliates of any of its Members or the General Manager as a division or part of it;

(v)   The Company has not entered into, is not a party to, and will not enter into or be a party to, any transaction with any of its Members, the General Manager or any Affiliates of any of its Members or the General Manager (except as permitted under Section 7.07 of the Credit Agreement);

(w)   The Company has paid and will pay the salaries of its own employees, if any, and has maintained and will maintain a sufficient number of employees (which may be zero) in light of its contemplated business operations;

(x)   The Company has maintained and will maintain adequate capital in light of its contemplated business operations; and

(y)   The Company shall conduct its business and operations in strict compliance with the terms contained in the Operating Agreement.

In the event of any conflict between any of the foregoing provisions and any other terms of the Operating Agreement, the foregoing provisions shall prevail.

2.    Additional Amendments to the Operating Agreement.  The Operating Agreement is hereby further amended as follows:

a)    "Initial Funding" when used in Sections 2.2.1 and 2.2.3 of the Operating Agreement shall refer to "Initial Payment".

b)    Section 1.6 is hereby replaced in its entirety with the following:

At all times after the Effective Date, any and all real and personal property acquired by the Company, including, without limitation, cash, improvements to property and tangible or intangible property ("Property"), shall be held, and owned by and conveyed in the name of the Company as an entity, and not in the name of any Member, provided, however, that if the Company's bid at the Auction is successful then the Subject Property shall be allocated among the Members and conveyed to the Members in accordance with the terms of this Agreement and the Acquisition Agreement (as hereinafter defined), net of Public Sites and Community Facilities (as defined in the Acquisition Agreement).  Each Unit shall be personal property for all purposes.  No Property shall be transferred for, or in payment of, any obligation of any Member.

c)    Section 2.1 is hereby amended to add the following definitions:

"Additional Capital Contribution" means all Capital Contributions required under Section 2.3.

"Loan Documents" means all documents evidencing and securing the MI Financing (as defined in the Acquisition Agreement).

d)    The definition of "Land Financing" set forth in Section 2.1.11 is hereby replaced in its entirety with the following:

"Land Financing" means any borrowings by the Company to finance a portion of the BLM Purchase Price and/or the development and improvement of the Subject Property subject to the approval of the Management Committee pursuant to Sections 5.1.1 and 5.1.2(f), that will be secured by the Subject Property, and will be outstanding from the closing of the purchase of the Subject Property from BLM until the conveyance of the Pods to the Members when the Members' Conveyance Payments will be applied in part to pay off such borrowings and the Pods will be released from the Land Financing lien at release prices equal to par. The Members hereby acknowledge and agree that the Term Sheet attached to this Amendment as Exhibit "A" sets forth the current terms approved by the Management Committee with respect to the Land Financing and each such Member approves of such terms and conditions. The amount of the BLM Purchase Price not funded by capital contributions pursuant to Section 2.2 or by the Land Financing shall be funded by further Member capital contributions pursuant to Section 2.3.

e)     The definition of "Parent Final Map" set forth in Section 2.1.18 is hereby replaced in its entirety with the following:

"Parent Final Map" means the final map as approved by the applicable governmental authorities and recorded in the real estate records of Clark County, Nevada by which the Subject Property is divided into large lots in accordance with NRS Chapter 278, and in conformity with the terms of this Agreement, such map to be substantially consistent with the allocation of the Pods pursuant to the Preliminary Pod Allocation Map last approved pursuant to this Agreement prior to the recordation of the Parent Final Map.

f)     The initial two paragraphs of Section 2.2 are hereby replaced in their entirety with the following:

Each Unit shall be issued to the Members in consideration for the Capital Contributions provided for in this Agreement. Each Member shall be issued Units (and accordingly shall hold its Percentage Interest in the Company) in direct proportion to the "Adjusted Gross Acreage" (as defined in the Acquisition Agreement) of the Subject Property which has been allotted to the Member to acquire ("Member Acreage Allotment") as set forth in the Preliminary Pod Allocation Map (attached hereto as Appendix B), which is incorporated herein and subject to adjustment pursuant to Section 6.11.2. The total of all of the Member Acreage Allotments equals the total Adjusted Gross Acreage of the Subject Property. All payments by a Member pursuant to Sections 2.2 and 2.3 shall be deemed applied on account of the Purchase Price (as defined in the Acquisition Agreement) for Pods that it acquires under this Agreement and its respective Acquisition Agreement.

The name, address, initial Capital Contribution, initial Units and initial Percentage Interest of each Member are set forth in Schedule II. The Management Committee shall amend Schedule II from time to time (including,

without limitation, to adjust the relative Units and Percentage Interests of the Members set forth thereon) to reflect the admission of additional Members, transfers among Members or changes in the relative Member Acreage Allotments pursuant to this Agreement. Except for the letter of credit which a Member may deliver pursuant to its Acquisition Agreement and which shall be treated as a Capital Contribution by such Member, the initial or additional Capital Contribution of a Member shall consist of cash. The amount of the initial capital contribution to be made by each Member and the payment schedule are as follows:

g)       Section 2.3.2 is hereby replaced in its entirety with the following:

Closing Payment. Each Member shall pay to the Company the sum of the Member's Percentage Interest of the following amounts:  (a) the BLM Purchase Price less the amount paid by the Company for the BLM Deposit and less the net proceeds of the Land Financing; and (b) aggregate payments payable pursuant to the Land Financing for the six month period following the closing of the purchase of the Subject Property from BLM as projected in the Business Plan (collectively, the "Closing Payment").  The Closing Payment is due and payable no later than the date which is one (1) business day prior to the date scheduled by the Management Committee for the closing on the Subject Property.  It is anticipated that the closing shall occur on or about November 1, 2004.  The General Manager shall deliver written notice to each Member of the date upon which the Closing Payment shall be due and the amount of said Member's Closing Payment no less than five (5) business days prior to said due date.  Thereafter, throughout the term of the Land Financing, the Member shall make such capital contributions to the Company as may be necessary so that the Company shall at all times be holding in reserve a sum equal to a no less than three (3) months of aggregate interest payments payable under the Land Financing.

h)       Section 2.3.4 is hereby replaced in its entirety with the following:

Conveyance Payment. Upon the conveyance to each Member of its respective Pod or Pods (as hereinafter defined) within the Subject Property to be conveyed to such Member in accordance with the terms of this Agreement and the applicable Acquisition Agreement, such Member shall pay to the Company the "Purchase Price" due under such Acquisition Agreement ("Conveyance Payment").  Each Member shall have made all capital contributions required to date under this Agreement as of each Takedown as a condition of such Member acquiring its respective Pods in that Takedown.  All Capital Contributions of a Member that are credited against the Purchase Price (i.e. paid to the Company on account of such Purchase Price) to be paid pursuant to the applicable Acquisition Agreement, then shall, upon closing of the acquisition of a Pod pursuant to the Acquisition Agreement, be deemed to have been distributed to such member as a return of such capital contributions equal in amount to such credit, provided, however, that if pursuant to the Acquisition Agreement such member receives a credit against the Purchase Price for future progress payments due pursuant to Section 3.c of the

Acquisition Agreement, such Member shall not be credited with a Capital Contribution or be deemed to have received a return of such Capital Contribution until such time as such progress payment is actually made under the Acquisition Agreement. In addition to the foregoing, the Members acknowledge that the net cash portion of any Conveyance Payment paid by a Member under its Acquisition Agreement (i.e. after application of the credits applied to such Conveyance Payment under the Acquisition Agreement) shall for purposes of this Agreement be allocated by the Company as follows: (i) first, to pay the release price due under the Land Financing, (ii) second, to satisfy any obligations to fund the MCD Account, (iii) third, to distribute the 10% Markup in accordance with Section 4.1, and (iv) fourth, any amounts left over shall be applied to and credited against the future Capital Contribution obligations of such Member hereunder (the "Future Capital Contribution Credit"). However, with respect to clause (iv), such Future Capital Contribution Credit shall only be applied as follows: (A) only to those Capital Contribution obligations of such Member ("Current Budgeted Contribution Obligations") which are necessary to pay its share of the total "Master Planned Community Costs" provided in the current approved "Master Planned Community Budget" (as those quoted terms are defined in the Acquisition Agreement) (and which budget is also intended to be part of the current Business Plan for purposes of this Agreement) as of the date of the Conveyance Payment and of which such Conveyance Payment was calculated pursuant to the Acquisition Agreement, (B) it shall not be applied to any additional costs of the Company which were not contemplated in the Master Planned Community Budget which the Members are required to fund hereunder through Additional Capital Contributions and (C) if there are additional Takedowns that such Member must acquire pursuant to the Acquisition Agreement, then such Future Capital Contribution Credit shall be spread across such Member's Current Budgeted Contribution Obligations prorata in the same proportion that the Adjusted Gross Acreage in the Takedown for which such credit is being granted to such Member hereunder bears to the total Adjusted Gross Acreage that such Member must acquire under its Acquisition Agreement.

i)       Section 2.3.5 is hereby replaced in its entirety with the following:

Commercial Deficiency Payment.  As a portion of the real property it shall acquire from the Company, the Focus Member or another Member shall acquire the land designated for commercial uses (the "Commercial Land"). The Members acknowledge that the price per acre paid for the Subject Property at the Auction may exceed the then per acre value of the Commercial Land. The Members agree that such a deficiency in per acre value of the Commercial Land should not be borne by the Focus Member or such other Member. In order to determine whether such a deficiency exists and the amount thereof, the Members agree that if the Company is the successful bidder at the Auction, then the Company shall engage two (2) MAI appraisers selected by the Management Committee to appraise the Commercial Land. The value of the Commercial Land shall be the average of the two (2) appraisals. If the value of the Commercial Land is less than its proportion (based on acreage) of the BLM Purchase Price paid by the

Company for the Subject Property, then the amount of said difference (the "Commercial Deficiency") shall be quantified and shall be paid by each Member (other than the Focus Member or the other Member purchasing the Commercial Land) to the Company based on its Percentage Interest. The Commercial Deficiency (if any) shall be determined once the land plan for the Town Center portion of the Project has been approved by the Management Committee. Within ten (10) business days after the amount of the Commercial Deficiency is determined and approved by the Management Committee, each Member other than the Member purchasing the Commercial Land shall pay its share of the Commercial Deficiency to the Member purchasing the Commercial Land.

j)    Section 2.3.6 is hereby replaced in its entirety with the following:

Major Infrastructure Payments. Each Member shall be responsible for the payment of that portion (the "Member Costs") of the "Major Infrastructure Cost" (as defined in the Acquisition Agreement) as is set forth in Section 3 of the Acquisition Agreement, which obligation to contribute the Member Costs shall survive any Phase Close of Escrow (as defined in the Acquisition Agreement) and continue for each Member notwithstanding the termination of the Acquisition Agreement of such Member or the rights of such Member thereunder. Each Member shall also be responsible under its Acquisition Agreement to establish any required "Builder MI Deposit" (referred to herein as the "Member Cost Deposit") at the time and in the manner provided in such Acquisition Agreement into a third-party construction control account (the "MCD Account") to be established and administered by an agent selected by the Management Committee (the "Disbursement Agent"). No material expenditures for Major Infrastructure Costs shall be made except pursuant to the Business Plan or as approved by the Management Committee. From and immediately upon the first incurrence of Major Infrastructure Costs, until the expiration of the "Initial Payment Period" (as defined in each Member's Acquisition Agreement), each Member shall, in accordance with its Acquisition Agreement, deposit into the MCD Account on a monthly basis, in cash or immediately available funds, the portion of the Member Costs required for the payment of Major Infrastructure Costs. Such funding of Member Costs shall be treated as Capital Contributions hereunder. As a Member acquires a Pod pursuant to the Acquisition Agreement, it shall be deemed to have received a return of its Capital Contributions equal in an amount to the Member Costs funded by such Member as of the date of such acquisition. In addition, if a Member is required to fund Member Costs with respect to a Pod after conveyance of such Pod pursuant to the Acquisition Agreement, such Member Costs will be treated as a Capital Contribution by such Member, a concurrent return of such Capital Contribution to such Member, and an additional payment on account of the Purchase Price as contemplated by Section 2.2.

k)    The heading and first paragraph of Section 2.4 are hereby replaced in their entirety with the following:

2.4.    FAILURE TO MAKE CAPITAL CONTRIBUTIONS

A Member that fails to make any portion of such Member's Capital Contribution as required by Section 2.2 or Section 2.3 shall be considered a "Defaulting Party" hereunder and shall also sometimes be referred to herein as a "Non-Contributing Member". Any Member which has made all of its required payments ("Contributing Member") shall have the right to give written notice of any such failure to the Defaulting Party. The Defaulting Party shall have five (5) business days from the date of such written notice to cure such default (the "Cure Period") by providing payment in full of all amounts which are due and payable (the "Deficiency"). Further, if a Member commits an Event of Default (defined below) under Section 11.1.12, such Member shall also be considered a Defaulting Party hereunder. The Members acknowledge and agree that in light of the purposes of the Company, the funding deadlines imposed on the Company inherent in the process of the Auction, the Company's obligation to close the purchase of the Subject Property from the BLM, and the necessity of the Members acquiring their Pods in accordance with their respective Acquisition Agreements so as to permit the Company to satisfy its obligations under the MI Financing, that the remedies provided by Sections 2.4.1 and 2.4.2 are necessary and reasonable to allow the other Members to have a reasonable opportunity to satisfy the foregoing obligations of the Company. Monetary damages would be impractical to calculate and unlikely recoverable from the Defaulting Party in light of the potential magnitude of such damages and the remedies provided herein are reasonable in light of the cost of the remedy to the Defaulting Party balanced against the potential damages to the other Members and the Company.

l)    Section 2.4.2 is hereby replaced in its entirety with the following:

2.4.2. Mandatory Sale. Without limiting the remedies available to the Company and the Members but in addition thereto and whether or not other remedies have been invoked, if the Defaulting Party does either of the following: (i) has made all payments required pursuant to Section 2.2 and has made its full Closing Payment pursuant to Section 2.3.2, but thereafter has failed to make any Capital Contribution required to be made pursuant to Section 2.3 of this Agreement after notice and expiration of the Cure Period or (ii) commits an Event of Default under Section 11.1.12, then the Defaulting Party shall be required to sell all of its Units and any other interests in the Company for a sale price equal to 80% of the amount of the Defaulting Party's Capital Account (not including the Deficiency) less the amount of all legal, accounting, and other fees and expenses of the Company relating to the default or the buy-out transaction. The Units of such Defaulting Party shall be offered and sold to the Contributing Members in accordance with and on the terms and conditions determined by the Management Committee by affirmative vote of the Managers representing 75% of the Percentage Interests held by the Contributing Members. If the Management Committee fails to so determine the terms and conditions, the Units shall be offered to the Contributing Members in proportion to their Percentage Interests. If less than all of the Units of such Defaulting Party are acquired by the Contributing Members, then such remaining Units shall be disposed of as determined by the Management Committee by affirmative vote of the Managers

representing 75% of the Percentage Interests held by the Contributing Members. Each Contributing Member or other Persons purchasing Units under this Section shall contribute to the Company the portion of the Deficiency which is proportional to the portion of the Units so purchased. The Percentage Interests and Member Acreage Allotments shall be adjusted accordingly. Any Contributing Member or Person purchasing Units under this Section shall assume all of the obligations of the Defaulting Party in connection with such purchased Units under this Agreement and under the Acquisition Agreement arising from and after the closing of the purchase of such Units.

     m)    Section 3.2 is hereby replaced in its entirety with the following:

## 3.2 PROFITS

After giving effect to the special allocations set forth in Sections 3.4 and 3.5 of this Agreement, Profits for any Allocation Year shall be allocated to and among the Members as follows:

3.2.1. First, proportionately to each Member to the extent that (a) the cumulative Losses allocated to such Member pursuant to Section 3.3.3 of this Agreement exceeds (b) the cumulative Profits allocated to such Member pursuant to this Section 3.2.1;

3.2.2 Second, proportionately to each Member to the extent that (a) the cumulative Losses allocated to such Member pursuant to Section 3.3.2 of this Agreement exceeds (b) the cumulative Profits allocated to such Member pursuant to this Section 3.2.2; and

3.2.3 Third, to and among all the Members in accordance with their respective Percentage Interests.

Notwithstanding the foregoing, with each acquisition of a Pod by a Member pursuant to its Acquisition Agreement, such Member shall be specially allocated items of the Company's gross income and gain in the amount of the "10% Markup" (as defined in the Acquisition Agreement) with respect to such Pod.

     n)    Section 3.3.1 is hereby replaced in its entirety with the following:

First, proportionately to each Member to the extent that (a) the cumulative Profits allocated to such Member pursuant to Section 3.2.3 of this Agreement exceeds (b) the cumulative Losses allocated to such Member pursuant to this Section 3.3.1;

     o)    Section 4.1 is hereby amended to add the following paragraph to the end of the Section:

Notwithstanding the foregoing, with each acquisition of a Pod by a Member pursuant to its Acquisition Agreement, such Member shall be specially distributed the 10% Markup received by the Company with respect to such Pod.

p)    Section 5.6.2 is hereby amended to add the following as the last two sentences thereof:

In addition, in the event that any act or omission of Landtek causes a default under the Loan Documents and Landtek fails to cure such default within any applicable cure period provided in the Loan Documents or its contract, if shorter, Landtek's engagement and its right to receive any further compensation for such engagement as described hereunder shall terminate. Upon any such termination, the Management Committee may engage a replacement consultant to perform some or all of the duties performed by Landtek on such terms and conditions as the Management Committee deems appropriate.

q)    Section 5.7.1 is hereby amended to add the following clause (iv) to the first sentence of such Section:

(iv) in the event that any act or omission of the General Manager, Landtek, or any Affiliate of either the General Manager or Landtek causes a default under the Loan Documents and such party fails to cure such default within any applicable cure period provided in the Loan Documents.

r)    Section 6.11.2 is hereby replaced in its entirety with the following:

Conveyance. The Company will purchase the Subject Property from BLM and convey the Pods to the Members pursuant to the allocation provided for in Section 6.11.1. The Member BLM Price shall be based on the Member's Percentage Interest of the Adjusted Gross Acreage of the Subject Property but the Pods will be conveyed net of "Public Sites" and "Community Facilities". The total acreage in the Community to be granted, reserved, or dedicated for Public Sites or Community Facilities shall be allocated equitably over the entire Community so that the total acreage of the Pods allocated to each Member shall reflect as nearly as practicable a reduction from the Member Acreage Allotment which equals the Member's Percentage Interest multiplied by total Public Site and Community Facility acreage in the Community. Any issues on such allocation not resolved by the final conceptual plan shall be resolved by the Management Committee. To the extent that the Pods acquired by one or more Members suffer a reduction from their Member Acreage Allotment which is materially greater than contemplated by the allocation described above, the Member BLM Price payable by each such Member shall be reduced and the Member BLM Price payable by the Members which suffered a reduction less than contemplated by this Section shall be increased, in each case in accordance with the amounts which would have been paid by the Members if their payments had been allocated based on their receipt of acreage net of Public Sites and Community Facilities.

s)    Section 6.11.3 is hereby replaced in its entirety with the following:

Acquisition Agreements. After the Pods are allocated but before conveyance, each of the Members shall enter into an acquisition agreement (each an

"Acquisition Agreement") in the form attached hereto as Schedule III with the Company which shall evidence the unconditional obligation of the Member to acquire its allocated Pods. The final form of each Acquisition Agreement executed by the Company and each Member shall be uniform (excepting the identification of the acquirer, the identification of the lands to be acquired, and such other terms as shall reasonably require distinction due to the unique circumstances of each such transaction) and each respective Acquisition Agreement shall be prepared and approved by the Management Committee in advance of the execution thereof by any of the Members and shall be substantially in the form of Schedule III hereto. Any material modifications to the Acquisition Agreement form or to any executed Acquisition Agreement shall be subject to approval by the Management Committee. The Acquisition Agreements shall not prohibit or restrict a Member from conveying any Pod or portion thereof acquired by such Member to another merchant builder provided that such Member complies with Section 10.7.2.

t)    Section 6.11.5 is hereby replaced in its entirety with the following:

Closing. The closing of all of the conveyances to the Members shall occur either in a single "Takedown" or in multiple "Takedowns" pursuant to the "Takedown Schedule" as defined in and in accordance with the Acquisition Agreement. It shall be a condition of closing for the benefit of the Company with respect to each Member that such Member shall have made all payments required under this Agreement and is in compliance with all other obligations under this Agreement and no default or Event of Default shall exist with respect to such Member or would exist with notice and/or the passage of time.

u)    The Section heading of Section 10.7 is hereby replaced in its entirety with the following:

**TRANSFERS IN CONNECTION WITH CONVEYANCE OF PODS**

v)    Section 10 is hereby amended to add Section 10.8 as follows:

**10.8  DEFAULT UNDER LOAN DOCUMENTS AND RESTRICTION ON TRANSFER**

Notwithstanding any other provision of this Agreement, a Transferor shall not transfer all or any part of its Member's Units if such transfer would constitute or cause a default under the Loan Documents.

w)    Section 11 is hereby amended to add Section 11.1.12 as follows:

Default under the Loan Documents or Acquisition Agreement. A default by such Defaulting Party under its respective Acquisition Agreement or an act or omission which causes the Company to be in default under any Loan Documents, and the failure to cure such default within the applicable cure period, if any, under either the Acquisition Agreement or the Loan Documents, respectively.

x)    The introductory sentence of Section 12.1 is hereby replaced in its entirety as follows:

Subject to Section 1 of that certain First Amended and Restated Operating Agreement of South Edge, LLC, by and among the General Manager and the Members, dated May 3, 2004, the Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each a "Dissolution Event"):

y)    Section 12.2.b is hereby replaced in its entirety with the following:

b.    Subject to the requirement to distribute the 10% Markup upon conveyance and subject to the requirement to distribute cash receipts upon conveyance of Pods pursuant to each Acquisition Agreement as provided in Section 4.1, above, the balance, if any, to the Members in accordance with their Percentage Interests, after giving effect to all contributions, distributions and allocations for all periods.

z)    The approved form of the Acquisition Agreement to be attached to the Operating Agreement as Schedule III is attached to this Amendment as Exhibit "B".

3.    Effect on Agreement. The Operating Agreement shall remain unmodified and in full force and effect except as expressly amended hereby.

4.    Entire Agreement. The Operating Agreement as amended by this Amendment, and the Articles (including all exhibits, schedules and other documents referred to in the Operating Agreement as amended by this Amendment) constitute the entire agreement by and among the parties and supersede all prior discussions, negotiations, agreements and understandings, both written and oral, by and among the parties with respect to the subject matter of the Operating Agreement as amended by this Amendment.

5.    Counterparts. This Amendment may be executed in any number of counterparts with the same effect as if all of the parties had signed the same document. All counterparts shall be construed together and shall constitute one agreement.

IN WITNESS WHEREOF, the parties have executed this First Amendment as of the
29 day of October, 2004.

GENERAL MANAGER:

Holdings Manager, LLC, a
Nevada limited-liability company

By: _____
    John A. Ritter
Its: Manager

MEMBERS:

FOCUS SOUTH GROUP, LLC, a
Nevada limited-liability company

By: _____
    John A. Ritter
Its: Manager

MTH HOMES NEVADA, INC.,
an Arizona corporation

By: _____
    Robert Beville
Its: Chief Operating Officer

ALEMEDA INVESTMENTS, LLC

By: _____
    Gene Morrison
Its: Manager

IN WITNESS WHEREOF, the parties have executed this First Amendment as of the _____ day of October, 2004.

GENERAL MANAGER:

Holdings Manager, LLC, a
Nevada limited-liability company

By:_____
    John A. Ritter
Its: Manager

MEMBERS:

FOCUS SOUTH GROUP, LLC, a
Nevada limited-liability company

By:_____
    John A. Ritter
Its: Manager

MTH HOMES NEVADA, INC.,
an Arizona corporation

By:_____
    Robert Beville
Its: Chief Operating Officer

ALEMEDA INVESTMENTS, LLC

By:_____
    Gene Morrison
Its: Manager

IN WITNESS WHEREOF, the parties have executed this First Amendment as of the ____ day of October, 2004.

**GENERAL MANAGER:**

**Holdings Manager, LLC,** a
Nevada limited-liability company

By:_____
     John A. Ritter
Its: Manager

**MEMBERS:**

**FOCUS SOUTH GROUP, LLC,** a
Nevada limited-liability company

By:_____
     John A. Ritter
Its: Manager

**MTH HOMES NEVADA, INC.,**
an Arizona corporation

By:_____
     Robert Beville
Its: Chief Operating Officer

**ALEMEDA INVESTMENTS, LLC**

By:_____
     Gene Morrison
Its: ~~Manager~~  Authorized Agent

KIMBALL HILL HOMES NEVADA

By: _____
      David K. Hill
Its: Chairman and CEO

**PARDEE HOMES OF NEVADA**
a Nevada corporation


By: _____
      Klif Andrews
Its: Vice President

**COLEMAN-TOLL LIMITED PARTNERSHIP, LLC,**
a Nevada limited-partnership

By:    Toll NV GP Corp., its General Partner


By: _____
      Gary M. Mayo
Its: Vice President

**BEAZER HOMES HOLDINGS CORP**


By: _____
      W.A. June
Its: Division President – Nevada Division

**KB HOME NEVADA INC.,**
a Nevada corporation


By: _____
      Jim Widner
Its: Division President

**KIMBALL HILL HOMES NEVADA**

By:_____
    Stan Gutshall
Its: Vice President

**PARDEE HOMES OF NEVADA**
a Nevada corporation

By: _W. A. Bryan_ (signature)
    William A. Bryan
Its: Senior Vice President

**COLEMAN-TOLL LIMITED PARTNERSHIP, LLC,**
a Nevada limited partnership

By:    Toll NV GP Corp., its General Partner

By:_____
    Gary M. Mayo
Its: Vice President

**BEAZER HOMES HOLDINGS CORP**

By:_____
    W.A. June
Its: Division President – Nevada Division

**KB HOME NEVADA INC.,**
a Nevada corporation

By:_____
    Jim Widner
Its: Division President

KIMBALL HILL HOMES NEVADA

By: _____
    Stan Gutshall
Its: Vice President

**PARDEE HOMES OF NEVADA**
a Nevada corporation

By: _____
    Klif Andrews
Its: Vice President

**COLEMAN-TOLL LIMITED PARTNERSHIP, LLC,**
a Nevada limited partnership

By:    Toll NV GP Corp., its General Partner

By: _____
    Gary M. Mayo
Its: Vice President

**BEAZER HOMES HOLDINGS CORP**

By: _____
    W.A. June
Its: Division President -- Nevada Division

**KB HOME NEVADA INC.,**
a Nevada corporation

By: _____
    Jim Widner
Its: Division President

**KIMBALL HILL HOMES NEVADA**

By:_____
    Stan Gutshall
Its: Vice President

**PARDEE HOMES OF NEVADA**
a Nevada corporation

By:_____
    Klif Andrews
Its: Vice President

**COLEMAN-TOLL LIMITED PARTNERSHIP, LLC,**
a Nevada limited-partnership

By:    Toll NV GP Corp., its General Partner

By:_____
    Gary M. Mayo
Its: Vice President

**BEAZER HOMES HOLDINGS CORP**

By:_____
    W.A. June
Its: Division President — Nevada Division

**KB HOME NEVADA INC.,**
a Nevada corporation

By:_____
    Jim Widner
Its: Division President

**KIMBALL HILL HOMES NEVADA**

By:_____
   Stan Gutshall
Its: Vice President

**PARDEE HOMES OF NEVADA**
a Nevada corporation

By:_____
   Klif Andrews
Its: Vice President

**COLEMAN-TOLL LIMITED PARTNERSHIP, LLC,**
a Nevada limited-partnership

By:    Toll NV GP Corp., its General Partner

By:_____
   Gary M. Mayo
Its: Vice President

**BEAZER HOMES HOLDINGS CORP**

By:_____
   W.A. June
Its: Division President – Nevada Division

**KB HOME NEVADA INC.,**
a Nevada corporation

By:_____
   Jim Widner
Its: Division President

EXHIBIT C

**SOUTH EDGE, LLC**

Unanimous Written Consent of Management Committee

Dated as of November __1__, 2004

The undersigned, being all of the members of the management committee of South Edge, LLC, a Nevada limited-liability company (the "Company"), do hereby consent in writing to the adoption of the following resolutions without the necessity of convening a meeting therefore:

WHEREAS, the undersigned have reviewed the Credit Agreement dated as of November __1__, 2004, by and among the Company, as Borrower, JPMorgan Chase Bank, as Administrative Agent, and the other parties thereto (the "Credit Agreement") together with the forms of agreements, instruments, and documents attached to the Credit Agreement as Schedules or Exhibits (the Credit Agreement, together with such agreements and instruments, and any and all further agreements, instruments, and documents contemplated by any of the foregoing, are herein referred to collectively as the "Financing Documents") and have determined that the terms and provisions of the Financing Documents are necessary and desirable and in the best interests of the Company;

NOW, THEREFORE, BE IT RESOLVED, that the Company enter into each of the Financing Documents to which is a party, borrow pursuant to the facilities provided thereby, grant and record such liens in such collateral of the Company as are required thereby, and perform its obligations under the Financing Documents.

FURTHER RESOLVED, that the General Manager of the Company, be, and hereby is, authorized and empowered, in the name and on behalf of the Company, to take to execute, deliver, and perform any such agreements, instruments, filings, recordings, and documents, including, but not limited to, each of the Financing Documents to which the Company is a party, with such changes therein as the General Manager may approve as necessary or desirable (such approval to be conclusively evidenced by the General Manager's execution thereof).

FURTHER RESOLVED, that the General Manager is hereby authorized and empowered to take or cause to be taken, in the Company's name, all such further action as may be deemed necessary or advisable to enable the Company to carry out fully and accomplish the purposes of the foregoing resolutions.

FURTHER RESOLVED, that any and all actions heretofore or hereafter taken and expenses incurred by the General Manager or other persons at the direction of the General Manager on behalf of the Company within the terms of the foregoing resolutions are hereby ratified, confirmed, adopted and approved as the acts and deeds of the Company.

PHL_A 81932475 v4

FURTHER RESOLVED, that this Unanimous Written Consent of Management Committee may be executed in counterparts, each of which shall be deemed an original, and any director may execute any such counterpart, all of which, when taken together, shall constitute one and the same instrument.

FURTHER RESOLVED, that this Unanimous Written Consent of Management Committee be filed with the records of the Company.

_____
John A. Ritter
Focus South Group, LLC

_____
Robert Beville
MTH Homes Nevada, Inc.

_____
Gene Morrison
Alameda Investments, LLC

_____
Joe Caddel
Coleman-Toll Limited Partnership

_____
Bill June
Beazer Homes Holdings Corp.

_____
Bruce Tripp
KB HOME Nevada, Inc.

_____
Stan Gutshall
Kimball Hill Homes

_____
Kliff Andrews
Pardee Homes of Nevada

FURTHER RESOLVED, that this Unanimous Written Consent of Management Committee may be executed in counterparts, each of which shall be deemed an original, and any director may execute any such counterpart, all of which, when taken together, shall constitute one and the same instrument.

FURTHER RESOLVED, that this Unanimous Written Consent of Management Committee be filed with the records of the Company.

 

| |
|---|
| John A. Ritter |
| Focus South Group, LLC |

| |
|---|
| Robert Beville |
| MTH Homes Nevada, Inc. |

| |
|---|
| Gene Morrison |
| Alameda Investments, LLC |

| |
|---|
| Joe Caddel |
| Coleman-Toll Limited Partnership |

| |
|---|
| Bill June |
| Beazer Homes Holdings Corp. |

| |
|---|
| Bruce Tripp |
| KB HOME Nevada, Inc. |

| |
|---|
| Stan Gutshall |
| Kimball Hill Homes |

| |
|---|
| Klif Andrews |
| Pardee Homes of Nevada |

FURTHER RESOLVED, that this Unanimous Written Consent of Management Committee may be executed in counterparts, each of which shall be deemed an original, and any director may execute any such counterpart, all of which, when taken together, shall constitute one and the same instrument.

FURTHER RESOLVED, that this Unanimous Written Consent of Management Committee be filed with the records of the Company.

_____
John A. Ritter
Focus South Group, LLC

_____
Robert Beville
MTH/Homes Nevada, Inc.

_____
Gene Morrison
Alameda Investments, LLC

_____
Joe Caddel
Coleman-Toll Limited Partnership

_____
Bill June
Beazer Homes Holdings Corp.

_____
Bruce Tripp
KB HOME Nevada, Inc.

_____
Stan Gutshall
Kimball Hill Homes

_____
Klif Andrews
Pardee Homes of Nevada

FURTHER RESOLVED, that this Unanimous Written Consent of Management Committee may be executed in counterparts, each of which shall be deemed an original, and any director may execute any such counterpart, all of which, when taken together, shall constitute one and the same instrument.

FURTHER RESOLVED, that this Unanimous Written Consent of Management Committee be filed with the records of the Company.

_____
John A. Ritter
Focus South Group, LLC

_____
Robert Beville
MTH Homes Nevada, Inc.

_____
Gene Morrison
Alameda Investments, LLC

_____
Joe Gaddel
Coleman-Toll Limited Partnership

_____
Bill June
Beazer Homes Holdings Corp.

_____
Bruce Tripp
KB HOME Nevada, Inc.

_____
Stan Gutshall
Kimball Hill Homes

_____
Klif Andrews
Pardee Homes of Nevada

FURTHER RESOLVED, that this Unanimous Written Consent of Management Committee may be executed in counterparts, each of which shall be deemed an original, and any director may execute any such counterpart, all of which, when taken together, shall constitute one and the same instrument.

FURTHER RESOLVED, that this Unanimous Written Consent of Management Committee be filed with the records of the Company.

_____
John A. Ritter
Focus South Group, LLC

_____
Robert Beville
MTH Homes Nevada, Inc.

_____
Gene Morrison
Alameda Investments, LLC

_____
Joe Caddel
Coleman-Toll Limited Partnership

_____  10/28/04
Bill June
Beazer Homes Holdings Corp.

_____
Bruce Tripp
KB HOME Nevada, Inc.

_____
Stan Gutshall
Kimball Hill Homes

_____
Klif Andrews
Pardee Homes of Nevada

FURTHER RESOLVED, that this Unanimous Written Consent of Management Committee may be executed in counterparts, each of which shall be deemed an original, and any director may execute any such counterpart, all of which, when taken together, shall constitute one and the same instrument.

FURTHER RESOLVED, that this Unanimous Written Consent of Management Committee be filed with the records of the Company.

_____
John A. Ritter
Focus South Group, LLC

_____
Robert Beville
MTH Homes Nevada, Inc.

_____
Gene Morrison
Alameda Investments, LLC

_____
Joe Caddel
Coleman-Toll Limited Partnership

_____
Bill June
Beazer Homes Holdings Corp.

_____
Bruce Tripp
KB HOME Nevada, Inc.

_____
Stan Gutshall
Kimball Hill Homes

_____
Klif Andrews
Pardee Homes of Nevada

FURTHER RESOLVED, that this Unanimous Written Consent of Management Committee may be executed in counterparts, each of which shall be deemed an original, and any director may execute any such counterpart, all of which, when taken together, shall constitute one and the same instrument.

FURTHER RESOLVED, that this Unanimous Written Consent of Management Committee be filed with the records of the Company.

_____
John A. Ritter
Focus South Group, LLC


_____
Robert Beville
MTH Homes Nevada, Inc.


_____
Gene Morrison
Alameda Investments, LLC


_____
Joe Caddel
Coleman-Toll Limited Partnership


_____
Bill June
Beazer Homes Holdings Corp.


_____
Bruce Tripp
KB HOME Nevada, Inc.


_____
Stan Gutshall
Kimball Hill Homes


_____
Klif Andrews
Pardee Homes of Nevada

FURTHER RESOLVED, that this Unanimous Written Consent of Management Committee may be executed in counterparts, each of which shall be deemed an original, and any director may execute any such counterpart, all of which, when taken together, shall constitute one and the same instrument.

FURTHER RESOLVED, that this Unanimous Written Consent of Management Committee be filed with the records of the Company.

_____
John A. Ritter
Focus South Group, LLC

_____
Robert Beville
MTH Homes Nevada, Inc.

_____
Gene Morrison
Alameda Investments, LLC

_____
Joe Caddel
Coleman-Toll Limited Partnership

_____
Bill June
Beazer Homes Holdings Corp.

_____
Bruce Tripp
KB HOME Nevada, Inc.

_____
Stan Gutshall
Kimball Hill Homes

_____
Klif Andrews
Pardee Homes of Nevada



# CERTIFICATE OF EXISTENCE
# WITH STATUS IN GOOD STANDING

I, DEAN HELLER, the duly elected and qualified Nevada Secretary of State, do hereby certify that I am, by the laws of said State, the custodian of the records relating to filings by corporations, non-profit corporations, corporation soles, limited-liability companies, limited partnerships, limited-liability limited partnerships, limited-liability partnerships and business trusts pursuant to Title 7 of the Nevada Revised Statutes which are either presently in a status of good standing or were in good standing for a time period subsequent of 1976 and am the proper officer to execute this certificate.

I further certify that the records of the Nevada Secretary of State, at the date of this certificate, evidence, SOUTH EDGE, LLC, as a limited-liability company duly organized under the laws of Nevada and existing under and by virtue of the laws of the State of Nevada since July 10, 2003, and is in good standing in this state.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office, in Carson City, Nevada, on October 20, 2004.

DEAN HELLER
Secretary of State

By

Certification Clerk