# EXHIBIT E

## CERTIFICATION OF
## <u>ACQUISITION AGREEMENT</u>

Each of the undersigned hereby certifies that attached hereto as <u>Exhibit A</u> is a true, correct and complete copy of the Purchase and Sale Agreement and Joint Escrow Instructions by and between South Edge, LLC and KB Home Nevada Inc. and the same has not been revoked, modified, amended or rescinded and is in full force and effect as of the date hereof.

This Certification of Acquisition Agreement may be executed in one or more counterparts (by facsimile or otherwise), each of which shall be deemed an original but all of which together shall constitute one and the same certificate.

HOLDINGS MANAGER, LLC, as General
Manager of South Edge, LLC

Dated: October 29, 2004

By: _____
    John Ritter
    General Manager

KB HOME NEVADA INC., a Nevada
corporation

Dated: October ___, 2004

By: _____
    Jim Widner
    President

KB HOME, a Delaware corporation

Dated: October ___, 2004

By: _____
    Kelly M. Allred
    Vice President, Treasury and Risk
    Management

## CERTIFICATION OF
## ACQUISITION AGREEMENT

Each of the undersigned hereby certifies that attached hereto as <u>Exhibit A</u> is a true, correct and complete copy of the Purchase and Sale Agreement and Joint Escrow Instructions by and between South Edge, LLC and KB Home Nevada Inc. and the same has not been revoked, modified, amended or rescinded and is in full force and effect as of the date hereof.

This Certification of Acquisition Agreement may be executed in one or more counterparts (by facsimile or otherwise), each of which shall be deemed an original but all of which together shall constitute one and the same certificate.

HOLDINGS MANAGER, LLC, as General Manager of South Edge, LLC

Dated: October ___, 2004

By: _____
    John Ritter
    General Manager

KB HOME NEVADA INC., a Nevada corporation

Dated: October 29, 2004

By: _____
    Jim Widner
    President

KB HOME, a Delaware corporation

Dated: October ___, 2004

By: _____
    Kelly M. Allred
    Vice President, Treasury and Risk
    Management

## CERTIFICATION OF
## <u>ACQUISITION AGREEMENT</u>

Each of the undersigned hereby certifies that attached hereto as <u>Exhibit A</u> is a true, correct and complete copy of the Purchase and Sale Agreement and Joint Escrow Instructions by and between South Edge, LLC and KB Home Nevada Inc. and the same has not been revoked, modified, amended or rescinded and is in full force and effect as of the date hereof.

This Certification of Acquisition Agreement may be executed in one or more counterparts (by facsimile or otherwise), each of which shall be deemed an original but all of which together shall constitute one and the same certificate.

HOLDINGS MANAGER, LLC, as General
Manager of South Edge, LLC

Dated:  October ___, 2004

By: _____
John Ritter
General Manager

KB HOME NEVADA INC., a Nevada
corporation

Dated:  October ___, 2004

By: _____
Jim Widner
President

KB HOME, a Delaware corporation

Dated:  October 29, 2004

By: _____
Kelly M. Allred
Vice President, Treasury and Risk
Management

## PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS

THIS PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (this "**Agreement**") is made as of the 29th day of October, 2004 (the "**Effective Date**"), by and between SOUTH EDGE LLC, a Nevada limited liability company ("**Developer**"), and KB HOME NEVADA INC., a Nevada corporation ("**Builder**"). Builder and Developer are each sometimes referred to herein as a "**Party**," and, collectively, as the "**Parties**."

### RECITALS

A.    Builder is currently a Member of Developer.  Pursuant to the Operating Agreement for Developer (the "**Operating Agreement**"), Builder is to enter into this Agreement with respect to the "Property" (defined below) Builder shall ultimately acquire from Developer. Unless otherwise defined herein, capitalized terms shall be used with the meanings given them in the Operating Agreement.   This Agreement shall further evidence and govern Builder's acquisition of the Property from Developer and the Parties' obligations with respect thereto. Builder's obligations under the Operating Agreement and this Agreement shall survive the conveyance of the Property to Builder.

B.    Developer was the successful bidder at the public auction held June 2, 2004 (the "**Auction**") to acquire from the United States Department of the Interior, Bureau of Land Management ("**BLM**"), fee title to approximately 1,940 acres of unimproved land in the City of Henderson (the "**City**"), Nevada (the "**BLM Land**").  The date Developer closes escrow for its purchase of the BLM Land (which date shall be the date upon which Escrow Holder is in a position to insure conveyances of the BLM Land by Developer to third-parties) is referred to herein as the "**BLM Closing Date**". The BLM Land is depicted on the map attached hereto as Exhibit "**A**".

C.    Upon the acquisition of the BLM Land, Developer intends to develop the BLM Land as a master planned community (herein, the "**Planned Community**").  The Planned Community will be subject to a development agreement between the City and Developer in accordance with the provisions of NRS 278.0201 (as the same may be in effect from time to time, the "**Development Agreement**").  In addition to residential uses, and subject to the terms of the Development Agreement, the Planned Community may include within its boundaries any or all of the following: (i) commercial or other non residential uses; (ii) master community facilities (i.e. facilities maintained by the "Master Association" (defined below)), such as landscaped entry amenities and landscaped Paseos (the "**Community Facilities**") and (iii) open spaces, schools, parks and other public or quasi public facility sites including public roads and rights of way (collectively, "**Public Sites**").

D.    Builder is obligated to purchase from Developer and Developer is obligated to sell to Builder the Property which is located in the Planned Community, for the consideration and in accordance with the terms and conditions set forth herein.  The current intended location of the Property is depicted on Exhibit "**B**" attached hereto (the "**Pod Allocation Map**").  The Parties intend that the Property will be developed by Builder to consist of a project of single and/or

1

multi-family residences (the "**Project**") on the Property in conformance with the terms and conditions of (i) this Agreement, and (ii) a plan for development (the "**Project Plan**") to be prepared by Builder and approved by Developer as set forth in the "Development Declaration" (hereinafter defined). The construction work required by the Project Plan is hereinafter referred to as the "**Project Plan Work.**" The individual subdivision lots to be mapped on the Property by Builder shall be referred to herein as the "**Lots.**" The individual dwelling units within the Project, to be constructed by the Builder in accordance with the Project Plan, shall be referred to herein individually as a "**Residence**" and collectively as the "**Residences.**" The type and number of Residences that Builder will construct on the Property shall be limited to the type and number to be more fully described in the Project Plan.

      E.     Builder desires to acquire the Property in phases (each a "**Phase**"). Upon the approval by the City and the recordation of that certain parent final map for the overall Planned Community (the "**Parent Final Map**"), the Planned Community will consist of planning area parcels. Planning areas parcels making up the Property (referred to herein as a "**Parcel**" and collectively, as the **Parcels**") are shown on the Pod Allocation Map. The Phases shall be made up of one or more Parcels making up the Property. The Parties acknowledge that the Parcels are subject to further reconfiguration and/or parcelization as may be required to carry out the intent of the Operating Agreement and the development of the Planned Community ("**Future Reconfigurations**").

      F.     By this Agreement, Developer and Builder hereby desire to set forth the terms according to which Developer will sell and Builder will acquire the Property in Phases and certain additional matters related thereto, all as more fully set forth herein.

AGREEMENT

    NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

    1.    **Agreement of Purchase and Sale.**

        a.    Property.    Subject to the terms and conditions hereinafter set forth, Developer agrees to sell and convey and Builder agrees to purchase the following in Phases (collectively, the "**Property**"):

        i.    that portion of the BLM Land, more particularly shown on the Pod Allocation Map, subject to Future Reconfiguration as provided in the Operating Agreement and this Agreement (the "**Land**"), including, without limitation, all easements and other rights arising from or appertaining to the Land;

        ii.    the improvements on the Land, if any (the "**Improvements**") (the Land and Improvements being referred herein collectively as the "**Real Property**");

        iii.    all of Developer's right, title and interest in and to the intangible property (collectively, the "**Intangible Property**") now or hereafter owned by Developer and used in connection with the Real Property, including, without limitation, transferable licenses,

2

permits, surveys, plans, engineering information, applications, agreements that benefit the Land, approvals, authorizations and other entitlements, all assignable existing warranties and guaranties (expressed or implied) issued to Developer, reports, test results, environmental assessments, and other similar documents and materials relating to the ownership or development of the Property; provided, however that to the extent any Intangible Property relates to other property within the Planned Community, such conveyance by Developer shall be non-exclusive and shall only be transferred by Developer to the extent related to the Real Property.

      b.    Phase Takedown.  The Parties acknowledge and agree that Builder's obligation to acquire the Property shall be broken into separate closings (each a "**Takedown**"), one (1) applicable to each Phase.  The schedule for each such Takedown and the applicable Phase is attached hereto as Exhibit "C" (the "**Takedown Schedule**").  The first Takedown shall not occur prior to thirty (30) days after Builder receives notice of the recordation of the Parent Final Map.  Builder shall have the right, but not the obligation, to accelerate any such Takedown, provided that "Developer's Conditions" (defined below) to the particular Takedown, as set forth in Section 13.c.ii, are satisfied or waived.  Builder may also seek Developer's approval, which shall not be unreasonably withheld, to modify the order of the Takedowns set forth on the Takedown Schedule; provided, however that any such modification shall also be subject to any required approvals under any financing arrangements obtained by Developer to finance "Major Infrastructure Costs" (defined below) (the "**MI Financing**").  In the event that Builder fails to acquire a Phase in accordance with this Agreement and the Takedown Schedule (as modified from time to time pursuant to this Section 1.b, then, in addition to all other rights and remedies of Developer hereunder, Developer shall have the right to terminate Builder's right to acquire any Phases not previously acquired by Builder hereunder.

      2.    Purchase Price.  The purchase price for the entire Property (i.e., for all Phases) (the "**Purchase Price**") shall be calculated as the amount equal to the "Per Acre FMV" (defined below), multiplied by the total acreage of the Real Property exclusive of the acreage for Community Facilities and Public Sites as determined from time to time in accordance with this Agreement ("**Adjusted Gross Acreage**").  The current estimated total Adjusted Gross Acreage making up the entire Property is Nine Hundred Forty (940) acres and the current estimated Per Acre FMV is $535,927.30, which results in an estimated Purchase Price for the entire Property of Five Hundred Three Million Seven Hundred Seventy-One Thousand Six Hundred Sixty Dollars ($503,771,660) (the "**Estimated Purchase Price**").  Because the size and location of the Community Facilities and Public Sites have not been determined as of the date of this Agreement, the Parties acknowledge that currently the estimated Adjusted Gross Acreage substantially equals, and the Estimated Purchase Price is substantially based upon, the gross acreage of the Real Property.  The Purchase Price shall be allocated among the Phases (each a "**Phase Purchase Price**") in proportion to the Adjusted Gross Acreage for each such Phase in relation to the total Adjusted Gross Acreage for the Property.  Based on the Estimated Total Purchase Price, the estimated Phase Purchase Price for each Phase is shown on the Takedown Schedule.  The Estimated Purchase Price and corresponding estimated Phase Purchase Prices shall be increased or decreased to arrive at the actual Purchase Price and Phase Purchase Prices based on the actual Adjusted Gross Acreage and actual Per Acre FMV making up the Property determined in accordance with this Section 2.  The Parties shall endeavor to finalize the amounts set forth in this Section 2, and all other amounts set forth in this Agreement as projections or estimates, no less than ninety (90) days prior to the first Phase Close of Escrow (defined below);

3

provided, however, failure to finalize such amounts shall not delay or be a condition to any Phase Close of Escrow.

a.    Determination of Final Adjusted Gross Acreage.  The Parties acknowledge that pursuant to the Operating Agreement, Builder was allocated certain Pods to acquire and that such allocation is subject to change in accordance therewith.  Accordingly, the description of the Property on the Pod Allocation Map is preliminary and subject to change based upon the final determination of the allocation of such Pods in accordance with the Operating Agreement (such final determination being referred to herein as the "**Final Conceptual Plan**").  The Parent Final Map shall substantially conform to the Final Conceptual Plan.  At such time as the Parent Final Map is recorded and not later than ten (10) days prior to the first Takedown, the surveyor of record, who shall be licensed by the State of Nevada (the "**Surveyor**"), shall be instructed to determine the Adjusted Gross Acreage of the Property, based upon such Parent Final Map and allocation of Pods pursuant to the Operating Agreement, and each Parcel comprising the same, and to certify such determination in writing to each of Builder, Developer and "Escrow Holder" (defined below).  Thereafter, in the event of a Future Reconfiguration, if the number, location or nature of Community Facilities and/or Public Sites materially changes subsequent to the recordation of the Parent Final Map, then either Builder or Developer may notify Surveyor and the other Party of such changes and Surveyor, upon receipt of such notice, shall promptly make the appropriate revisions to the Adjusted Gross Acreage.  Absent manifest error, Surveyor's determination of the Adjusted Gross Acreage (and any subsequent modifications thereto) of the Property and of each Parcel shall be conclusive for the purpose of calculating each "Phase Purchase Price" (defined below).  Developer shall pay the Surveyor's costs, fees and expenses.

b.    Determination of Per Acre FMV.  The Parties acknowledge that the current estimate of the Per Acre FMV is determined as follows: the quotient of (1) the sum of (A) all fees, costs and expenses, including, without limitation, the Management Fee (as defined in the Operating Agreement) and all total hard and soft costs incurred by Developer (the "**Master Planned Community Costs**") (i) to acquire the Planned Community, the actual amount of which is shown in the "Master Planned Community Budget" (defined below), and (ii) to own, finance, develop, improve and ultimately dispose of the Planned Community, an estimate of which is shown in the Master Planned Community Budget and which is subject to adjustment in accordance with this Section 2.b plus (B) 10% of the Master Planned Community Costs (the "**10% Markup**") divided by (2) the total Adjusted Gross Acres making up the Planned Community.  For purposes of determining the Per Acre FMV, Major Infrastructure Costs shall be included in the calculation of the Master Planned Community Costs.  Accordingly, any "Builder MI Costs" (defined below) advanced by Builder under Section 3.a shall be credited toward Builder's Purchase Price at the time and in the manner specified in Section 3.f.  Developer's current estimate of the Master Planned Community Costs is set forth on Exhibit "D", which budget shall be amended from time to time in accordance with the Operating Agreement (as so amended, the "**Master Planned Community Cost Budget**").  The Parties intend that the Purchase Price paid by Builder (i.e., the sum of the Per Acre FMV for the total Property) shall equal such Builder's (or such Builder's predecessor's) Percentage Interest, as a Member of the Developer, of the total Master Planned Community Costs actually incurred upon completion of the Planned Community by Developer.  It being further acknowledged and agreed that each Member's Percentage Interest in Developer is equal in all material respects to the percentage that the Adjusted Gross Acreage of the Property bears to the total Adjusted Gross Acreage within the

4

Planned Community being acquired by all the Members or Developer (the "**Total Adjusted Gross Acreage**"). Accordingly, pursuant to the Operating Agreement, such Percentage Interests shall be adjusted from time to time as necessary to reflect any adjustments to the Adjusted Acreage of the Property in comparison to such Total Adjusted Gross Acreage. Accordingly, Developer shall have the right from time to time both prior to, on and after each Takedown to adjust the Per Acre FMV upward or downward based upon Developer's most recent reasonable estimate of the Master Planned Community Costs. Builder and Developer shall pay or reimburse to the other (whichever is applicable) amounts based on any adjustment to the Per Acre FMV for any Phase already acquired by Builder hereunder promptly following such adjustments, and such obligation shall survive such acquisition.

3.    **Major Infrastructure Progress Payments and Assumption of LID**

a.    **Builder MI Costs**.  Builder shall be responsible for the payment of a portion of all costs (the "**Major Infrastructure Costs**") of the "Major Infrastructure" (defined below).  As used herein, the term Major Infrastructure Costs includes all "soft" costs and "hard" costs incurred by Developer in connection with the design, engineering, entitlement and construction of the Major Infrastructure and all construction management fees incurred in connection therewith other than those costs which are covered by the Management Fee paid pursuant to the Operating Agreement.  Major Infrastructure Costs are intended to include, without limitation, all "Development Costs" (as such term is defined in the "Loan Documents" (defined below).  The portion of the Major Infrastructure Costs for which each Builder shall be responsible (the "**Builder MI Costs**") shall equal the proportion by which the Adjusted Gross Acreage of the Property bears to the Total Adjusted Gross Acreage (i.e., Builder's (or its predecessor's) Percentage Interest in Developer) as the same be adjusted from time to time pursuant to this Agreement and the Operating Agreement (the "**AGA Ratio**").

b.    **Builder MI Deposit**.  On each Takedown, Builder shall deposit (the "**Builder MI Deposit**") the greater of the (i) sum equal to the AGA Phase Fraction (defined below) times thirty percent (30%) of the projected total Builder MI Costs, as determined by the Management Committee of Developer based on the Master Planned Community Cost Budget for such costs contained in the Business Plan of Developer (the "**Projected Total Builder MI Costs**") which remain to be paid by the Developer for such Takedown or (ii) the sum required by the MI Financing.  Unless otherwise required by the "MI Financing", the Builder MI Deposit may be in the form of a commercial letter of credit for such amount and in form and substance satisfactory to the Management Committee of Developer.  To the extent that it can be determined by the Management Committee of Developer with reasonable certainty, the amount of the net proceeds of any LID described in the Operating Agreement applicable to Major Infrastructure Costs shall be applied toward the calculation of projected total Builder MI Costs to reduce the amount of the Builder MI Deposit, as appropriate.  Unless otherwise required by the MI Financing, the Builder MI Deposit shall be deposited at each Takedown into a third-party construction control account (the "**MCD Account**") to be administered by an agent selected by the Management Committee of Developer or otherwise in accordance with the Operating Agreement (the "**Disbursement Agent**").  The MCD Account shall be governed by a disbursement agreement, the form of which shall be approved by the Management Committee of Developer, which agreement shall provide for, inter alia: (i) disbursement to Developer only upon the presentation of invoices work completed and/or materials supplied (as confirmed by

inspections to be performed by the Disbursement Agent); and (ii) the provision by each subcontractor of all necessary lien releases and insurance and tax certificates as a condition of payment; provided, however, that such disbursement agreement shall be subject to such additional modifications as are required by the MI Financing. Unless otherwise required by the MI Financing or as otherwise provided herein with respect to the Builder MI Deposit, funds in the MCD Account shall be released from the MCD Account to Developer for the purpose of paying the Builder MI Costs on a progress of construction basis. Unless otherwise required by the MI Financing, the MCD Account shall be an interest bearing account, with all interest earned thereon to be added to the account. Except in the case where the Builder MI Deposit represents one hundred percent (100%) of the Builder MI Costs for the applicable Takedown, and unless otherwise required by the MI Financing, the Builder MI Deposit for such Takedown shall be utilized by the Developer to pay the last of the Major Infrastructure Costs to become due for such Takedown; provided, however, that if, upon completion of the Major Infrastructure for a phase ("**MI Phase**") and payment of all Builder MI Costs for such MI Phase, Developer reasonably determines that there will be sufficient funds available to complete the remaining Major Infrastructure for such Takedown, Developer may release funds from the MCD Account for such completed MI Phase to Builder in an amount not to exceed the product of the Builder MI Deposit multiplied by a fraction the numerator of which is the Builder MI Costs for such MI Phase and the denominator of which is the Developer's most recent determination of the Projected Total Builder MI Costs for such Takedown. No material expenditures for Major Infrastructure Costs shall be made except pursuant to the Business Plan of Developer or as approved by the Management Committee of Developer.

      c.      <u>Progress Payment</u>. From and immediately upon the first incurrence of Major Infrastructure Costs, until the expiration of the "Initial Payment Period" (as defined below), Builder shall deposit into the MCD Account on a monthly basis, in cash or immediately available funds, the portion of the Builder MI Costs required for the payment of Major Infrastructure Costs to be expended during the following month, as reasonably determined by the Management Committee of Developer, such deposit to be made within ten (10) business days following Builder's receipt of notice thereof from Developer ("**Progress Payment Notice**"). On a periodic basis, but at no more than quarterly intervals or such other intervals as determined by the Management Committee of Developer, the Management Committee of Developer shall approve updated detailed budgets for the Major Infrastructure Costs as well as an updated projection of the Builder MI Costs to become due over the upcoming 180 days. Such update shall take into account any adjustment in the AGA Ratio. Unless otherwise required by the MI Financing, as used herein, the "**Initial Payment Period**" will expire as of the date the Management Committee of Developer reasonably determines that the total of the then remaining Major Infrastructure Costs is equal to or less than the sum of: (i) the total then on deposit in the MCD Account including the available amount of letters of credit delivered as Member Cost Deposits, and (ii) funds immediately available to Developer from other sources (i.e., excluding proceeds from the MI Financing) to pay Major Infrastructure Costs. The "Development Declaration" (defined below) to be recorded on each Parcel in accordance with this Agreement shall contain provisions which shall create a lien on each Builder's Parcel securing payment only of such Builder's Builder MI Costs, which lien shall be extinguished with respect to any Lot upon the conveyance of the Lot to a homeowner and in any event upon payment in full of such Builder's Builder MI Costs.

      d.    <u>LID</u>.  On each Takedown, Builder shall accept the applicable Parcel subject to the lien of the "LID" (defined below) and shall assume and be obligated thereby as more fully described below in <u>Section 11.g</u>. The total amount of the Impositions (defined below) represented by the lien of the LID on each Parcel purchased by Builder shall be applied against the Purchase Price for said Parcel as set forth in <u>Section 3.f</u>.

      e.    <u>Non-Refundable</u> .  The amounts deposited by Builder in the MCD Account (together with the interest earned thereon while held in account) shall be non-refundable.

      f.    <u>Credits to Be Applied Against the Purchase Price</u>.  The following amounts shall be credited against the applicable Phase Purchase Price for each Takedown:

      i.    <u>**Capital Contribution Credits**</u>.

      (1)    A portion of the "Deposit" (as defined in <u>Section 4.a</u>) in amount equal to the Deposit times a fraction (the "<u>**AGA Phase Fraction**</u>") the numerator of which shall equal the Adjusted Gross Acreage of the Phase being acquired in such Takedown and the denominator of which shall equal the Adjusted Gross Acreage of the entire Real Property being acquired by Builder hereunder;  . . .

      (2)    The "MCD Account Builder Credit" (defined below) applicable to such Takedown.  As used herein, the "<u>**MCD Account Builder Credit**</u>" shall mean (i) the amount of the Builder MI Deposit for such Takedown required at the time of such Takedown pursuant to <u>Section 3.b</u> hereof, and (ii) if such deposit is less than one hundred percent (100%) of the Projected Total Builder MI Costs for such Takedown, the progress payments required in the future to be paid by such Builder pursuant to <u>Section 3.c</u> for such Takedown.  Builder's receipt of any MCD Account Builder Credit for progress payments projected under <u>Section 3.c</u> shall not diminish or modify in any way Builder's obligation to deposit such progress payments as and when due under <u>Section 3.c</u>;  and

      (3)    If and to the extent not already applied as part of the Deposit or MCD Builder Account Credit pursuant to clauses (1) and (2) of <u>Section 3.f.i</u>. above, all other Capital Contributions ("<u>**Remaining Capital Contributions**</u>") made by Builder as a Member of Developer to the date of the applicable Takedown times the AGA Phase Fraction.

In connection with the foregoing, it is the intent of the Parties that the total of all Capital Contributions made by Builder for the entire Project be credited proportionately over the Phase Purchase Price for each of the Takedowns based upon the Adjusted Gross Acreage of each such Takedown. Accordingly, such credits may need to be reconciled by Developer from time to time to take into account any change in the total Capital Contributions which Developer projects will be required from Builder for the Project.  Within thirty (30) days following the completion of each MI Phase and otherwise from time to time as determined by Developer or required by the MI Financing, Developer shall promptly reconcile (i) the sum of the Purchase Price actually paid by Builder, and (ii) the amount of any additional Purchase Price due from Builder hereunder in the future, against (x) the total Capital Contributions which have been applied hereunder (i.e., by way of the credit of the Deposit, the MCD Account Builder Credit and the Remaining Capital

Contributions) and (y) the Capital Contributions (including Builder's deposits to the MCD Account) which Developer projects will be required from Builder in the future. Unless otherwise required by the MI Financing, if following such reconciliation Developer determines that after application of the credits due Builder hereunder (and taking into account any adjustments to such credits as a result of any change in the required Capital Contributions of Builder) either (A) Builder has overpaid for the Phases acquired to date by Builder, then any such overpayment by Builder shall be promptly reimbursed by Developer, provided that Builder has acquired all of the Property up to that point in accordance with this Agreement and is otherwise in compliance with the Operating Agreement, or (B) Builder has underpaid for the Phases acquired to date by Builder, then any such underpayment by Builder shall be promptly paid by Builder to Developer.

        ii.    **LID Impositions Credits**. The total amount of the "Impositions" (defined below) represented by the lien of the LID on the applicable Phase being purchased by Builder in such Takedown. To the extent that such Impositions have not been finally determined at the time of any particular Takedown, then to the extent permitted by the MI Financing, Builder shall receive a credit against the Phase Purchase Price for the applicable Phase in an amount equal to the Developer's estimate of the amount of such Impositions for that Phase (the "**Estimated Phase Impositions**"). Within thirty (30) following the date on which the amount of such Impositions for such Phase have been finalized, the Parties shall reconcile such actual amount of Impositions against the Estimated Phase Impositions. If such actual amount exceeds the Estimated Phase Impositions, then, to the extent permitted by the MI Financing, Developer shall promptly pay such difference to Builder, provided that Builder has acquired all of the Property up to that point in accordance with this Agreement. If such Estimated Phase Impositions exceed such actual amount of Impositions, then Builder shall promptly pay such difference to Developer.

        g.    <u>Survival</u>. The obligation of Builder under this <u>Section 3</u> to pay Builder MI Costs and to make deposits to the MCD Account shall survive each Takedown and the termination of this Agreement.

    4.    **Deposit Payments**.

        a.    <u>Deposit</u>. Concurrently herewith, Builder shall deposit into an escrow (the "**Escrow**") with Chicago Title Agency of Nevada, Inc., Attention: Lorraine Hill, 1700 W. Horizon Ridge Pkwy., Suite 203, Henderson, NV 89012 ("**Escrow Holder**") by cash, wire transfer, or other immediately available funds, the amount of Ninety-Nine Million One Hundred Eighty-Six Thousand Two Hundred Eighty-Four Dollars ($99,186,284) (the "**Deposit**"). In determining the amount of the Deposit which Builder is actually required to fund pursuant to this Agreement, Builder shall receive a dollar for dollar credit equal to (1) the amount contributed to date by Builder to Developer to pay its share of the Initial Payment, BLM Deposit and any other Additional Capital Contributions and (2) the amount contributed or to be contributed by Builder to Developer to pay its share of the Closing Payment, in each case, pursuant to the Operating Agreement.

        b.    <u>Deposits Nonrefundable and Released</u>. The Deposit shall be released from Escrow to Developer and shall thereafter be deemed non-refundable.

8

5.      **Failure to Acquire a Phase**.  The right of Builder to acquire a Phase on the applicable Takedown shall be subject to Builder's timely acquisition of all previous Phases in accordance with this Agreement and the Takedown Schedule.  If Builder fails to timely acquire a Phase in accordance with this Agreement and the Takedown Schedule, then Builder shall be deemed in default of this Agreement and Developer shall have the rights provided in Section 21 hereof.

6.      **Escrow**.

a.      Opening of Escrow.  No later than one (1) Business Day after the Effective Date, a fully-executed copy of this Agreement shall be delivered to Escrow Holder (the "**Opening of Escrow**").

b.      Joint Escrow Instructions and General Conditions.  This Agreement shall constitute joint escrow instructions to Escrow Holder.  The Parties shall also execute the Escrow Holder's general conditions (the "**General Conditions**"); provided, however, if there is any inconsistency between the provisions of the General Conditions and this Agreement, the provisions of this Agreement shall control.

c.      Phase Close of Escrow.  Unless the Parties agree upon an earlier closing date for any particular Takedown and except as permitted under Section 1.b, subject to the satisfaction (or waiver by the appropriate Party) of the conditions to such Takedown, the Takedown for each Phase of the Property from Developer to Builder shall occur through Escrow (each a "**Phase Close of Escrow**") on the date specified for such Phase on the Takedown Schedule.

7.      **Builder's Feasibility Review**.

a.      General.  Builder has had the opportunity to complete a feasibility study for its proposed development of the Property (the "**Feasibility Review**"), including, without limitation, review of market reports, soils reports, water, sewer, and other infrastructure availability and costs, and engineering estimates for the Property, zoning matters and all other physical and non-physical issues all at Builder's sole cost and expense.  Builder hereby approves of its Feasibility Review and acknowledges that any such approval shall no longer be a condition precedent to any Phase Close of Escrow.

b.      Access.  So long as this Agreement has not been terminated, Developer authorizes Builder, its agents, employees, licensees, and contractors, to enter upon the Property for the purposes of making a physical inspection of the Property, including, without limitation, soils, hydrology and seismic tests, provided that in exercising such privilege Builder undertakes and agrees that it will not suffer or permit any lien for work done on or in respect of any applicable portion of the Property for the account or upon the authority of Builder to remain undischarged in the event Builder does not complete the purchase of such portions of the Property.  The license granted hereby to enter the Property shall not constitute a license,

9

following any applicable Phase Close of Escrow, to utilize any portion of the Property not yet acquired by Builder for any purpose not expressly provided for herein (unless Developer otherwise consents to such use, in writing), nor shall Builder have the right to import soils from, or export soils to, any portion of the Property not yet acquired by Builder, without Developer's consent, which will not be unreasonably withheld or delayed; provided, however, Developer will reasonably accommodate Builder's needs to access any such other portions of the Property to facilitate entitlement and development activities such as grading and in tract infrastructure construction with respect to any portion of the Property previously acquired by Builder (as more fully described herein).

c.    Indemnity.  Builder hereby agrees to indemnify, defend and hold harmless Developer, Developer's agents, employees, partners, members, officers, directors, contractors, consultants, successors and assigns, and the Property, from and against any and all liabilities and claims, including, without limitation, future liabilities and claims by purchasers of all or any portion of the Property, for mechanic's liens, demands, suits, actions, liabilities, losses, damages, injuries, judgments, costs and expenses, including reasonable attorneys' fees and costs (collectively, "Claims"), directly arising from or related to the entry onto the Property by Builder or its agents, employees, licensees or contractors; provided, however, Builder shall have no liability for (i) pre-existing conditions, except to the extent known about and exacerbated by Builder or (ii) the results or findings of any tests, studies or reports which result from such entry. The foregoing indemnification shall not apply to Claims to the extent caused by Developer's negligence or willful misconduct.  The provisions of this subsection (c) shall survive termination.

d.    Restoration.  In the event that Builder, for any reason, shall not complete the purchase of the entire Property, Builder shall (unless otherwise directed by Developer) restore the portions of the Property so not acquired (by means of recompaction or otherwise as necessary) substantially to its condition existing prior to Builder conducting any such tests, and any soils reports, except that Builder shall not be obligated to repair or restore any change in the condition of the Property caused by Developer.  The provisions of this subsection (d) shall survive termination.

e.    Insurance.  Notwithstanding any provisions of this Agreement to the contrary, prior to any entry by Builder or any of its agents, employees or contractors onto the Property, Builder shall provide to Developer evidence satisfactory to Developer that Builder has in force adequate commercial general liability insurance with coverage of not less than Two Million Dollars ($2,000,000) per occurrence and annual aggregate, naming Developer as an additional insured to protect Developer against any and all Claims (including, without limitation, attorneys' fees and other litigation expenses) which may occur as a result of any activity of Builder or its agents, employees or contractors on the Property.  All such insurance required hereby shall be issued by companies with ratings and financial strength of A/VIII or better as shown in Best's Insurance Guide.  Alternatively, Builder may satisfy the foregoing insurance requirements through use of a captive insurance company issuing insurance which otherwise meets the general requirements of this Section other than the Best's Insurance Guide rating (which is not provided for such captive insurance companies).

8.    Developer Deliveries.  Developer has delivered or will deliver to Builder copies of each of those agreements, studies, plans and reports pertaining to the Property (collectively,

the "Feasibility Documents"). Builder understands and agrees that Developer has not made and does not hereby make any representations or warranties regarding, and shall have no liability whatsoever with respect to, the accuracy, correctness, or suitability of any of the Feasibility Documents, except that Developer represents and warrants that, to Developer's actual knowledge, the copies delivered to Builder are complete copies thereof. Should any Phase Close of Escrow fail to occur for any reason, all of the Feasibility Documents for any Phase not already closed provided by Developer to Builder shall be returned to Developer. This Section 8 shall survive termination.

9.    **AS-IS Transaction; Builder Acknowledgments and Agreements**.  Builder hereby acknowledges and agrees as follows:

a.    Property to be Delivered AS-IS. Except as expressly set forth herein, Builder is acquiring the Property (or any portion thereof comprising a particular Phase) "AS IS, WHERE IS" AND "WITH ALL FAULTS, LIABILITIES, AND DEFECTS, LATENT OR OTHERWISE, KNOWN OR UNKNOWN," in its present state and condition as of the date of conveyance thereof to Builder, with no rights of recourse against Developer (or any related or affiliated party) for same.

b.    No Representations or Warranties by Developer. Except as expressly provided herein, neither Developer nor any of Developer's agents, contractors, consultants, attorneys, or representatives have made, do make, and Developer specifically negates and disclaims, and Builder is not relying on, any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning, or with respect to the Property. Nothing herein shall limit or restrict, or in any way be deemed a waiver of, any representations, warranties covenants, rights or remedies of the Members as set forth in the Operating Agreement.

10.   **Title Matters**.

a.    Title Report. Attached hereto as Exhibit "B" is a current preliminary title report covering the Planned Community (the "Overall PTR") issued by Chicago Title Agency of Nevada, Inc. (the "Title Company"). Within ten (10) days following the recordation of the Parent Final Map, Developer shall cause the Title Company to issue a preliminary title report and the Surveyor to prepare an ALTA survey (the "Survey"), in each case, covering the Property and based upon such Parent Final Map (collectively, the "Initial PTR"). Builder has reviewed the Overall PTR and copies of all documents described therein. The Property shall be conveyed to Builder at the applicable Phase Close of Escrow subject only to the following conditions of title (the "Permitted Conditions of Title"):

i.    A lien to secure payment of real estate taxes and/or assessments not delinquent.

ii.   The LID.

iii.  Matters affecting title created by, or with the consent of, Builder; provided, however, Builder acknowledges and agrees that the foregoing shall not permit Builder

11

and Builder shall not have the right to impose any such liens, encumbrances or other matters prior to any applicable Phase Close of Escrow without Developer's prior written consent, which consent may be withheld in Developer's sole and absolute discretion.

        iv.    The printed standard exceptions of the Title Company.

        v.    Those certain covenants, conditions, restrictions, and reservations of easements (the "**Development Declaration**") and a declaration of special land use restrictions (the "**Declaration of SLURs**"), in each case, in customary form and reasonably approved by the parties hereto and which will be recorded by Developer against each Phase on the applicable Phase Close of Escrow. Notwithstanding the foregoing, in the event that Developer deems it necessary or appropriate to modify the Development Declaration or Declaration of SLURs (collectively, the "**Declarations**") to address changes in requirements, standards, timelines, or the like being imposed by any applicable governmental or quasi-governmental authority or agency (each a "**Governmental Agency**") or utility, Builder agrees to reasonably cooperate with Developer in completing and recording such modification, including, without limitation, by providing any necessary consents or approvals required to record such modification (copies of which shall be timely delivered to Builder); provided, however, Developer shall not have the right to modify the Declarations in a way that has a detrimental effect on Builder or Builder's ability to develop, market and sell the applicable portion of the Property.

        vi.    A master "declaration" (as defined in NRS Chapter 116) for some or all of the Planned Community (the "**Master CCRs**") or a document annexing the Property thereunder (an "**Annexation**"), which will be recorded prior to the GBS Deed (defined below) and subject each parcel thereto and to the authority of the "association" (as defined in NRS Chapter 116) (the "**Master Association**") described therein. The form of the Master CCRs and all Annexations thereto shall comply with NRS Chapter 116.

        vii.    The Development Agreement.

        viii.    The Parent Final Map.

        ix.    Those matters which are necessary to obtain the appropriate entitlements for the development of the Planned Community in accordance with the Development Agreement, Operating Agreement and Business Plan of Developer.

        x.    Those rights, interests and easements reserved by Developer in the grant, bargain sale deed conveying any portion of the Property from Developer to Builder in customary form for the County (the "**GBS Deed**").

        xi.    Subject to Section 10.c, any other matters disclosed by the Overall PTR and any "Supplemental Report" (as defined below) other than monetary liens ("**Pre-Disapproved Monetary Liens**") which do not constitute non-delinquent taxes or assessments (including, without limitation, non-delinquent assessments resulting from the LID or the Master Association). Developer shall be responsible for removing the Pre-Disapproved Monetary Liens from each Phase on or prior to the Takedown for such Phase.

b.    Review of Title and Survey.  Other than the Pre-Disapproved Monetary Liens, Builder shall approve of the matters contained in the Initial PTRs and the Survey on and subject to the terms of Section 10(c).

c.    Additional Title Exceptions.  No additional title exceptions ("**Additional Exceptions**") beyond those shown on the Overall PTR after the Effective Date or that are not otherwise expressly required, anticipated, or contemplated by this Agreement or the Operating Agreement shall be recorded against any portion of the Property not yet acquired by Builder and no changes shall be made to the size or configurations of the Parcels comprising the Property after the date hereof and before the applicable Phase Close of Escrow for that portion of the Property, except in accordance with this Agreement or the Operating Agreement.  In connection therewith, Additional Exceptions which are expressly required, anticipated, or contemplated by this Agreement or the Operating Agreement (the "**Pre-Approved Additional Exceptions**") shall include, without limitation, the following: (i) Additional Exceptions caused by changes to the size or configuration of any Parcels in accordance with the Operating Agreement, or (ii) Additional Exceptions which are required as result of easements, rights, and rights-of-way or other matters that are required by any applicable Governmental Agency, quasi governmental agency or utility company in connection with the Major Infrastructure or to obtain the entitlements required to develop the Property as contemplated hereby unless such Additional Exceptions would materially interfere with Builder's ability to develop the Property as planned and cannot be adequately addressed by Developer by bond, indemnity or endorsement to Builder's reasonable satisfaction.  Builder shall not have the right to disapprove any Pre-Approved Additional Exceptions.  Also, notwithstanding the foregoing, nothing herein shall prevent Developer from securing any financing with a deed of trust or similar instrument encumbering all or any portion of the Property prior to the applicable Phase Close of Escrow for that portion of the Property, provided that if any lender providing such financing requests that Builder subordinate its rights relating to the Property to the lien of the new financing, then Builder shall agree to such subordination, provided that such lender shall be required, as a condition to Builder's subordination, to recognize Builder's purchase rights and give non-disturbance protection to Builder with respect to such purchase rights.  In the event that any unauthorized Additional Exceptions are recorded against the Property, which Additional Exceptions Developer fails to have removed, bonded around, indemnified around, or endorsed around to Builder's reasonable satisfaction, Builder shall have the right to either (i) terminate this Agreement as it applies to the portion of the Property encumbered by the Additional Exception and receive a refund of any then-unapplied portion of the Deposit, or (ii) acquire the applicable portion of the Property which is the subject of the Additional Exception and pursue a post-closing claim for damages.  With respect to any Additional Exceptions not constituting Pre-Approved Additional Exceptions, upon notice to Builder by delivery of a supplemental title report including without limitation the Initial PTR or the Survey (the "**Supplemental Report**") disclosing the same, Builder shall have the right to object thereto by delivering written notice to Developer and Escrow Holder (the "**Supplemental Title Objection Notice**") no later than fifteen (15) days (with respect to the first Takedown) after receipt thereof and then five (5) Business Days with respect to subsequent Supplemental Reports after receipt thereof.  Failure to timely deliver such Supplemental Title Objection Notice shall be construed as Builder's disapproval of the Supplemental Report.  If Builder disapproves or is deemed to have disapproved an item, then Developer shall have five (5) Business Days after receipt of any Supplemental Title Objection Notice ("**Developer Notice Deadline**") to notify Builder either

that (i) Developer shall take no steps to rectify the disapproved items, or (ii) that Developer intends to take certain specified steps to rectify the disapproved items and the time such steps will require ("**Developer's Notice**"). In no event shall any provision of Developer's Notice be construed as a covenant by Developer that it will spend any money to rectify, or that it will rectify, any disapproved items unless expressly so stated in Developer's Notice. Failure by Developer to deliver Developer's Notice shall be deemed an election by Developer not to cure any of the matters disapproved of by Builder. If Builder is not satisfied with Developer's Notice, or Developer's election not to deliver such Developer's Notice, Builder shall have five (5) Business Days after the Developer Notice Deadline (the "**Title Cancellation Deadline**") to make its election of remedies as provided hereinabove.

　　　　d.　　　**Policy of Title Insurance.** Title to the Property shall be insured by an owner's ALTA Extended Coverage Policy of Title Insurance, as and when portions of the Property are acquired by Builder, in the amount of the Phase Purchase Price attributable to the Phase being acquired, for the benefit of Builder, insuring fee title to the Property, free and clear of all liens and encumbrances other than the Permitted Conditions of Title ("**Title Policy**"). Each Title Policy shall include Title Company's 101.4 Endorsement or equivalent, modified to include design professionals' liens. Receipt by Builder of such Title Policy for the applicable Phase shall be deemed a condition concurrent to the Phase Close of Escrow for such Phase.

　　　　e.　　　**Developer's Title Policy.** Developer shall, at its option and its own expense have the right to cause the Title Company to issue an ALTA Extended Coverage Policy of Title Insurance with an aggregate liability limit in the amount of the Phase Purchase Price attributable to the Phase being acquired by Builder in any applicable Phase Close of Escrow insuring the priority of the Declarations free and clear of any liens, encumbrances and interests except the Permitted Conditions of Title ("**Developer's Title Policy**").

　　　11.　　　**Developer and Builder Entitlements and Improvements.**

　　　　a.　　　**Developer Entitlements and Improvements.** In connection with the development of the overall Planned Community, Developer shall be responsible to construct all major infrastructure improvements for the Planned Community (the "**Major Infrastructure**") and pay all "Developer Fees and Charges" (defined below). As used herein, the Major Infrastructure shall include, without limitation, (i) master sewer, water and storm drains from the points of connection to the Property, (ii) the master drainage facility, (iii) backbone curb, gutter, sidewalk, streets and landscaping on off site streets and (iv) master dry utilities to the Property, but excluding such wet and dry utilities, streets, and other customary "in-tract" improvements which are to be located within the Property which shall be Builder's responsibility to construct and/or install. The Major Infrastructure shall also include, without limitation, those improvements generally described or depicted on Exhibit "F" hereto. Attached hereto as part of Exhibit "F" is the anticipated schedule for completion of the Major Infrastructure (the "**MI Schedule**"). Developer shall pay all fees and charges required in connection with the design and construction of the Major Infrastructure, the recordation of the Parent Final Map and such other

14

fees and costs related to offsite mitigation measures imposed by any Governmental Agency pursuant to entitlements which exist as of the date of this Agreement or obtained in the future by Developer in accordance with the Operating Agreement and Business Plan ("**Developer Fees and Charges**").

        i.        Post-Closing Major Infrastructure.  Builder agrees to and does hereby grant to Developer and any agent, employee, licensee, contractor, or subcontractor of Developer, a non-exclusive license to enter any portion of the Property after Builder acquires title to same, for purposes of completing construction of any Major Infrastructure. Builder shall also grant to Developer and its agents, as reasonably requested by Developer, nonexclusive easements necessary to construct, operate and maintain any Major Infrastructure for the Planned Community upon the Property (or applicable portions thereof) (e.g., utilities, etc.). Developer shall utilize all such licenses and easements in such manner as to not unreasonably interfere with Builder's construction and development activities upon the Property. Notwithstanding anything else herein to the contrary, any loss or damage to the Major Infrastructure (either after completion or during construction) caused by Builder or Builder's agents, contractors, employees, invitees, or licensees shall be solely Builder's responsibility and Builder shall be responsible to repair any damage thereto, and any loss or damage to any improvements then made on or to the Property by Builder which is caused by Developer or Developer's agents, contractors, employees, invitees or licensees shall be solely Developer's responsibility and Developer shall be responsible to repair any damage thereto. This provision shall survive each applicable Phase Close of Escrow. In connection with any such entry onto the Property by Developer or its agents, employees, licensees, contractors, or subcontractors, Developer shall indemnify, defend and hold harmless Builder and Builder's agents, employees, partners, members, officers, directors, contractors, consultants, successors and assigns, and the Property, from and against any and all Claims arising from or related to such entry or activities by Developer or its agents, employees, licensees or contractors on the Property or otherwise related to the performance of such activities on the Property (other than for Claims to the extent caused by Builder's affirmative acts or omissions or the affirmative acts or omissions of any of its agents, employees, contractors, consultants, invitees or licensees (other than Developer or its agents, employees, licensees, contractors, or subcontractors)). Prior to such entry onto the Property, Developer shall provide to Builder evidence reasonably satisfactory to Builder that Developer has in force commercial general liability insurance with coverage not less than Five Million Dollars ($5,000,000) per occurrence and annual aggregate, naming Builder as an additional insured to protect Builder against any and all Claims (including, without limitation, attorneys' fees and other litigation expenses) which may occur as a result of any activity of Developer or its agents, employees or contractors on the Property. All such insurance required hereby shall be issued by companies with ratings and financial strength of A/VIII or better as shown in Best's Insurance Guide.

        ii.       Failure to Construct Major Infrastructure.

        (1)     In the event that any Major Infrastructure construction is not progressing in accordance with the MI Schedule, subject to Unavoidable Delay, then, after delivering to Developer written notice and providing Developer thirty (30) days from receipt thereof to cure such delay, Builder shall have the right, but not the obligation, to enter upon the Property and/or adjacent Planned Community property to complete any of the Major

Infrastructure (and Developer shall be deemed to have granted to Builder a license in, on, over, along, and across the Planned Community for such purpose); provided that Builder acknowledges that it will still be required to acquire the Property in accordance with the Takedown Schedule and Developer's failure to comply with the MI Schedule shall not be a condition to such obligation of Builder or otherwise an excuse to delay any particular Phase Close of Escrow.

(2)     Any such work by Builder shall be at competitive rates and prices.

(3)     Prior to performing any such work, Builder shall provide to Developer evidence reasonably satisfactory to Developer that Builder has in force commercial general liability insurance with coverage not less than Five Million Dollars ($5,000,000) per occurrence and annual aggregate, naming Developer as an additional insured to protect Developer against any and all Claims (including, without limitation, attorneys' fees and other litigation expenses) which may occur as a result of any activity of Builder or its agents, employees or contractors on the Property. All such insurance required hereby shall be issued by companies with ratings and financial strength of A/VIII or better as shown in Best's Insurance Guide. Alternatively, Builder may satisfy the foregoing insurance requirements through use of a captive insurance company issuing insurance which otherwise meets the general requirements of this Section other than the Best's Insurance Guide rating (which is not provided for such captive insurance companies).

(4)     Builder shall not be liable to Developer, Developer's agents, employees, partners, members, officers, directors, contractors, consultants, successors and assigns, or the Planned Community, for any Claims arising from or related to any such entry on the Planned Community by Builder or its agents, employees, licensees or contractors as long as Builder acts in a commercially reasonable manner.

(5)     If Builder elects to perform such Major Infrastructure, Builder shall recoup costs of performing such work plus an overhead fee of 5% of such costs and interest on such costs of 10% per annum in the form of either (i) a credit against the portion of the Purchase Price payable upon any subsequent Phase Close of Escrow for any remaining Phase, if costs were incurred by Builder prior to such closings or (ii) a reimbursement, if incurred after the final Phase Close of Escrow for the Property. Unless otherwise required by the MI Financing, any such reimbursement shall be paid no later than thirty (30) days following the date that such costs are finally determined. The amount of the foregoing credit or reimbursement, as applicable, shall be equal to such costs incurred by Builder plus such overhead fee and interest; provided, however, such credit against the Purchase Price or reimbursement shall not be granted or made unless and until Developer or, in the case of any reimbursement, its construction lender receives evidence reasonably satisfactory to Developer or such construction lender of all such expenses incurred by Builder to complete the applicable Major Infrastructure. Notwithstanding any other provision herein, in the event that Builder elects to exercise its rights to complete any of the Major Infrastructure, any Purchase Price credit or reimbursement for the costs thereof shall not be deemed damages, and shall not be subject to the damage recovery limitations set forth in this Agreement.

16

(6)    In the event that Developer fails to timely pay any Developer Fees and Charges, following notice by Builder to Developer and Developer's opportunity to cure on the same terms as for failure to timely construct the Major Infrastructure as set forth above in this Section 11.a.ii, Builder shall have the right to pay such fees on Developer's behalf, and, if Builder so elects to pay such fees, Builder shall recoup such fees plus an overhead fee of 5% of such Developer Fees and Charges and interest on such Developer Fees and Charges of 10% per annum, in the form of either (i) a credit against the portion of the Purchase Price payable upon any subsequent Phase Close of Escrow for any remaining Phase, if the fees were paid by Builder prior to such closings or (ii) a reimbursement, if incurred after the final Phase Close of Escrow for the Property. Any such reimbursement shall be paid no later than thirty (30) days following the date that such fees are paid by Builder. Notwithstanding the foregoing, such credit against the Purchase Price or reimbursement shall not be granted or made unless and until Developer receives evidence of clearances of such fee obligations by the appropriate Governmental Agency to which such fees are owing. Notwithstanding any other provision herein, in the event that Builder elects to exercise its rights to pay any such fees, any Purchase Price credit or reimbursement for the costs thereof shall not be deemed damages, and shall not be subject to the damage recovery limitations set forth in this Agreement.

iii.    Approval of Development Agreement and Recordation of Parent Final Map. Commencing on the Effective Date and continuing thereafter until the Development Agreement has been approved and Parent Final Map has been recorded in the official records of Clark County, Nevada (the "**Official Records**"), Developer shall continuously and diligently use commercially reasonable efforts to cause the Development Agreement to be approved and the Parent Final Map to be recorded. In all events, subject to Unavoidable Delays, Developer shall cause the Development Agreement to be approved and the Parent Final Map to be recorded in the Official Records not later than thirty (30) days prior to the first Takedown.

b.    Unavoidable Delay. As used herein, "**Unavoidable Delay**" shall mean any prevention, delay or stoppage in the performance and/or completion of either Party's obligations hereunder, including, without limitation, Developer's completion of Major Infrastructure under this Section, which prevention, delay or stoppage is caused by (a) the other Party's material interference, (b) acts of God, war, terrorism, inability to obtain labor or materials or reasonable substitutes therefor, (c) moratoria, regulations, or controls imposed, or lack of action taken by Government Agencies, (d) the inability, through no fault of such Party, to obtain permits or other necessary governmental, quasi-governmental or utility company approvals, (e) inclement weather, or (f) other similar matters or causes beyond such Party's reasonable control. Lack of financing shall not constitute an Unavoidable Delay. The occurrence of an Unavoidable Delay shall extend the time within which the affected Party is required to perform any acts required under this Agreement, for a period or periods equal to any period of such Unavoidable Delay; provided, however, the date for any applicable Phase Close of Escrow shall not be subject to extension for Unavoidable Delay. The affected Party shall give written notice to the other Party within thirty (30) days after the occurrence of an Unavoidable Delay specifying the nature of the Unavoidable Delay and the term of such Unavoidable Delay.

c.    Additional Approvals. Other than with respect to the Major Infrastructure, Developer Fees and Charges, the Development Agreement and the Parent Final Map, Builder shall be solely responsible to obtain, at its sole cost, all additional governmental approvals,

17

permits, entitlements, subdivision maps, and subdivision improvement agreements and associated bonds, which may from time to time be required for the future development of the Property. Builder acknowledges and agrees that Developer shall have no liability, obligation, or responsibility for any costs, fees, or expenses of any kind whatsoever related to, or associated with any entitlement of any portion of the Property (other than in connection with approval and recordation of the Parent Final Map, the approval of the Development Agreement, payment of the Developer Fees and Charges and construction of the Major Infrastructure). Except for its obligations to deposit the Builder MI Costs in the MCD Account, Builder shall have no liability, obligation, or responsibility for any costs, fees, or expenses of any kind whatsoever related to, or associated with approval and recordation of the Parent Final Map, the approval of the Development Agreement, installation of the Major Infrastructure and payment of the Developer Fees and Charges. Nothing herein shall limit or restrict, or in any way be deemed a waiver of, any obligations, rights or remedies of any Member of Developer set forth in the Operating Agreement.

        d.      <u>Builder Entitlements and Improvements</u>.

                i.      Builder shall be responsible for the construction and installation of all Residences and other improvements on the Property not included within Major Infrastructure, including, without limitation, all grading, interior streets, interior landscaping, and utilities serving the individual Lots (collectively, "**Builder's Improvements**").

                ii.      Notwithstanding anything else herein to the contrary, any loss or damage to Builder's Improvements (either after completion or during construction) caused by Developer or Developer's agents, contractors, employees, invitees, or licensees (other than Builder) shall be solely Developer's responsibility and Developer shall be responsible to repair any damage thereto. This provision shall survive each applicable Phase Close of Escrow.

                iii.      Except for the Developer Fee and Charges, Builder shall be responsible for the payment of all fees, charges, levies, deposits, assessments, bonds or other costs levied by any Governmental Agency or otherwise in connection with the development of the Property with Residences or the occupancy and use thereof (collectively called "**Builder's Fees and Charges**").

        e.      <u>Cooperation</u>. The Parties agree to cooperate with each other in the completion of their respective improvement obligations under this Agreement, including, without limitation, executing, acknowledging and delivering any and all applications, modifications, agreements, easements, maps, instruments or other documents which the other Party reasonably requests with respect to development approvals pertaining to their respective properties at no material cost to the other Party.

        f.      <u>Reimbursement</u>. If, either prior to or subsequent to any Phase Close of Escrow, Builder receives any credit, rebate, reimbursement or reduction in amounts otherwise payable by Builder as a result of any fees, deposits or charges previously paid by Developer or as a result of any work performed or obligation assumed by Developer on or for benefit of the Property, Builder will pay such amounts to Developer within thirty (30) days after receipt of such amounts by Builder. Builder shall pay to Developer, within thirty (30) days after receipt of

such amounts by Builder, any credits, offsets or reductions that Builder receives as a result of the installation by Developer of any utility improvements on the Property including, but not limited to, telephone, gas or electrical lines. If any such amounts due under this Section are not paid to Builder, Builder will cooperate with Developer and complete any applications and an assignment of rights to receive credits required in order for Developer to obtain reimbursement of such amounts. All credits, rebates, reimbursements, fees or other amounts described in this Section 11.f are referred to collectively as the "**Reimbursable Fees**."

g.    Local Improvement Districts.    Builder acknowledges that, either prior to or subsequent to the first Phase Close of Escrow, Developer intends to establish, participate in, and/or authorize formation of one or more Local Improvement Districts or similar districts now or hereafter permitted to be created (collectively the "**LID**"), which will (i) encumber the Property with the annual levy of special taxes, assessments, exactions, fees or charges (collectively, "**Impositions**"), and (ii) pledge the Property as security for a borrowing, for the issuance of municipal bonds, or for the payment of Impositions. Provided that the following conditions are satisfied, Builder agrees to take title to the Property upon each Phase Close of Escrow subject to any LID and non-delinquent Impositions in existence, and subsequent to the Phase Close of Escrow to have any of the LID or non-delinquent Impositions formed or imposed upon the Property.

i.    Builder agrees to cooperate with Developer as necessary in Developer's efforts to execute any necessary documents and agreements required by Developer or the Governmental Agencies forming the LID signifying Builder's consent to, or in connection with, the formation of the LID.

ii.    Builder agrees to use commercially reasonable efforts to provide, at the request of Developer, the Governmental Agency forming the LID, or any of the agents of either Developer or such Governmental Agency, certificates or other documents executed by any lender(s) with respect to Builder's development of the Property signifying such lender's acknowledgment and consent to the Impositions on the Property and the issuance of bonds secured by such Impositions.

iii.    Builder agrees that if any or all of the LID are formed, Builder shall subject the Property to any Impositions made in connection therewith in accordance with the terms of this Section and as provided by law.

iv.    Builder agrees not to contest, protest or otherwise challenge the formation of any LID, the authorization and levy of the Impositions on the Property or the issuance of any bonds secured by such Impositions. Builder shall not take any action that would in any way interfere with the operation of the LID or decisions made or actions taken by Developer with respect to the LID's formation or the bond financing relating thereto, including, without limitation, the timing of commencement of Impositions, the amount of Impositions, the apportionment of Impositions and the use of the Impositions so collected by the LID. The subsequent ownership of the Property by Builder will not give Builder the right to protest or contest the formation of the LID, the right to levy or the amount of any Impositions and/or the type of facilities to be financed under any LID.

19

v.    Builder agrees not to interfere with or impede the issuance of any series of bonds issued by or in connection with any of the LID and agrees to provide information in connection with each series of bonds as reasonably requested by (i) Developer, (ii) the Governmental Agency issuing the bonds, (iii) any of the agents of either Developer or such Governmental Agency, including bond counsel and disclosure counsel, (iv) any appraiser utilized in connection with the valuation of the Property, (v) any market absorption consultant, (vi) any underwriter and its counsel, (vii) any financial advisor associated with the bonds or the LID, and (viii) any credit enhancer for the bonds or the LID (the parties in (i) – (viii), inclusive, shall be referred to as the "**Financing Participants**").    Such information may not include proprietary financial information with respect to Builder, any development pro forma or any other confidential or proprietary information of Builder or its parent or affiliates.

vi.    Subject to the limitations contained in <u>Section 11.k.v</u>, Builder also agrees to execute and perform under any continuing disclosure agreement as may be requested by any of the Financing Participants (including the provision of financial statements).

vii.    In addition to the foregoing covenants and agreements, Builder further agrees to disclose the requirements of this Section to any prospective buyers of all or any portion of the Property (other than individual home buyers) and require each such buyer to enter into an agreement with Builder assuming Builder's obligations under this Section with respect to the bonds and respective LID.

viii.    Any reimbursements from the proceeds of any bonds or directly from any Impositions shall be the property of Developer, regardless of the time of the original payment or the identity of the party that made the payment.    Should Builder receive any such reimbursements, or should Builder receive the return or reimbursement of any deposits with any Governmental Agency or utility, Builder shall promptly pay the same over to Developer.

ix.    The obligation to pay the total LID assessments allocable to a certain Parcel purchased by Builder shall be assumed by Builder and said assumed assessments shall be applied as a credit against the Phase Purchase Price for the Phase in which such Parcel is located as provided in <u>Section 3.f.</u>

x.    The covenants and provisions contained in this Section will survive each applicable Phase Close of Escrow.

h.    <u>Builder Compliance With Loan Documents</u>.  Builder shall be responsible for satisfying those conditions required under the documents evidencing and securing the MI Financing to the Phase Close of Escrow for each Phase subject to this Agreement (the "**Loan Documents**"), except to the extent any such condition is the obligation of Developer hereunder.

12.    **Representations and Warranties.**

a.    Developer's Representations and Warranties.  Developer represents and warrants to Builder as of the date hereof, and shall reaffirm as of the date of each applicable Phase Close of Escrow, that:

i.    Entity Matters.  Developer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada and is duly authorized and qualified to do all things required of it under this Agreement.

ii.    Approvals.  The execution and delivery of this Agreement have been duly authorized and approved by all requisite action of Developer, and the consummation of the transactions contemplated hereby will be duly authorized and approved by all requisite action of Developer, and no other authorizations or approvals will be necessary in order to enable Developer to enter into or to comply with the terms of this Agreement.  This Agreement and all documents required hereby to be executed by Developer are and shall be valid and enforceable against Developer.  Execution, delivery and performance of this Agreement and conveyance of the Property to Builder do not and will not violate any agreement to which Developer is a party or by which Developer or, to Developer's actual knowledge, the Property is bound or affected.

iii.    Compliance with Laws; Hazardous Materials.  Except as may be disclosed in any of the Feasibility Documents, to Developer's actual knowledge, the Property is not in violation of any applicable laws, rules and regulations including but not limited to laws, rules and regulations applicable to Hazardous Materials and, except for use of Hazardous Materials in connection with grading and other activities related to the development and improvement of the Property, to Developer's actual knowledge, neither Developer nor any other person has used, generated, stored, placed or disposed of Hazardous Materials on the Property.  As used herein, the term "**Hazardous Materials**" shall mean any hazardous or toxic materials, substances or wastes, such as (a) substances defined as "hazardous substances," "hazardous materials" or "toxic substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 USC Section 9601, et seq.) and/or the Hazardous Materials Transportation Act (49 USC Section 1801, et seq.), as either of such acts are amended from time to time; (b) any materials, substances or wastes which are hazardous, toxic, ignitable, corrosive or reactive and which are regulated by any local governmental authority, any agency of the State of Nevada or any agency of the United States of America or any law, restriction, rule or ordinance of any of the foregoing jurisdictions; (c) asbestos, petroleum and petroleum based products, urea formaldehyde foam insulation, polychlorinated biphenyls (PCBs), and freon and other chlorofluorocarbons; and (d) those substances defined as any of the foregoing in the regulations adopted and publications promulgated pursuant to each of the aforesaid laws.

iv.    Condemnation.  To Developer's actual knowledge, no condemnation or eminent domain proceeding is pending or overtly threatened in writing against any portion of the Property which would prohibit the development, construction, use, sale or occupancy of the Property as contemplated by this Agreement.

v.    Lawsuits.  To Developer's actual knowledge, there are no pending lawsuits or legal proceedings affecting all or any portion of the Property, or the ability of Developer to carry out its obligations hereunder.

As used herein, the phrase "to Developer's actual knowledge" shall mean the current, actual knowledge of John A. Ritter, without any inquiry or duty of inquiry.

b.    Builder's Representations and Warranties.    Builder represents and warrants to Developer as of the date hereof, and shall reaffirm as of the date of each applicable Phase Close of Escrow, that:

i.    Entity Matters.  Builder is a corporation, duly organized, validly existing and in good standing under the laws of the State of Nevada, is and duly authorized and qualified to do all things required of it under this Agreement.

ii.    Approvals.  The execution and delivery of this Agreement have been duly authorized and approved by all requisite action of Builder, and the consummation of the transactions contemplated hereby will be duly authorized and approved by all requisite action of Builder, and no other authorizations or approvals will be necessary in order to enable Builder to enter into or to comply with the terms of this Agreement.  This Agreement and all documents required hereby to be executed by Builder are and shall be valid and enforceable against Builder. Execution, delivery and performance of this Agreement and acquisition of the Property by Builder do not and will not violate any agreement to which Builder is a party or by which Builder is bound or affected.

13.    **Phase Close of Escrow.**

a.    Deliveries by Developer.  Developer shall deliver the following fully executed and, where necessary, acknowledged documents to Escrow Holder no later than two (2) Business Days prior to each Phase Close of Escrow:

i.    A certificate reaffirming Developer's representations and warranties set forth in Section 12 above (which reaffirmation shall be in customary form);

ii.    A GBS Deed for such Phase;

iii.    Declarations encumbering such Phase;

iv.    An Omnibus Assignment for such Phase in customary form (the "**Omnibus Assignment**");

v.    An Assignment of the Development Agreement for such Phase in customary form (the "**Development Agreement Assignment**"), which shall contain an indemnity for the benefit of the Builder covering Developer's obligations thereunder for which Builder is not responsible all in form reasonably satisfactory to Builder and Developer;

vi.    The "Non-Foreign Affidavits" (as defined below); and

22

vii.    Such other documents and instruments as are reasonably necessary to accomplish the conveyance of such Phase in accordance with this Agreement.

b.    <u>Deliveries by Builder</u>.  Builder shall deliver the following funds (by cash, wire transfer, or other immediately available funds) and fully executed and, where necessary, acknowledged documents to Escrow Holder no later than one (1) Business Day prior to such Phase Close of Escrow:

i.    A certificate reaffirming Builder's representations and warranties set forth in <u>Section 12</u> above (which reaffirmation shall be in customary form);

ii.    The unpaid balance of such Phase's Purchase Price (i.e. after applying the credits set forth in <u>Section 3.f</u>), together with Builder's share of closing costs and prorations;

iii.    The Development Agreement Assignment for such Phase;

iv.    The Declarations encumbering such Phase; and

v.    Such other documents and instruments as are reasonably necessary to accomplish the conveyance of such Phase in accordance with this Agreement; and

vi.    To the extent required by <u>Section 3.b</u> of this Agreement, Builder shall deliver the MI Deposit.

c.    <u>Conditions to the First Phase Close of Escrow</u>.

i.    <u>Builder's Conditions</u>.  The satisfaction, or waiver by Builder, of the following shall be the exclusive conditions precedent to Builder's obligation to proceed with the first Phase Close of Escrow ("**<u>Builder's Conditions</u>**"):

(1)    The Parent Final Map shall have been recorded so as to permit the conveyance to Builder of the applicable parcel in each Phase;

(2)    All of Developer's representations and warranties herein shall be and remain true and correct; and

(3)    The Title Company shall be irrevocably committed to issue the Title Policy related to the first Phase.

If any of Builder's Conditions are not satisfied or Builder has not waived the same by the first Phase Close of Escrow, then Builder may elect either: (i) extend the first Phase Close of Escrow for up to ninety (90) days, in which case, Developer shall be obligated to diligently pursue the satisfaction of Builder's Conditions or (ii) to cancel Escrow and terminate this Agreement by delivery of written notice to Developer and Escrow Holder; provided, however, before such termination is deemed effective, Developer shall have thirty (30) days (from the date of Builder's election) to cure any failure of a condition to occur unless such condition cannot be reasonably cured within such period, then Developer shall have such time as is reasonably

23

necessary to effectuate such cure so long as it is diligently and continuously pursuing such cure. If Developer causes the complete satisfaction of such failed condition within such period of time (and all other conditions precedent to Builder's obligations have been satisfied or waived by Builder), then the first Phase Close of Escrow shall proceed on and subject to the terms of this Agreement not later than the first Business Day that is at least ten (10) days following notice to Builder of such cure.  In the event that any conditions precedent to the first Phase Close of Escrow for Builder's benefit are not satisfied or waived by Builder as provided herein, Builder shall have the right to terminate this Agreement and this Agreement shall be of no further force or effect except for those provisions which expressly survive termination.  The foregoing shall not limit Builder's remedies provided in <u>Section 21.b</u> in the event of Developer's default and failure to cure the same within any applicable cure period.

   ii. <u>Developer's Conditions</u>.  The satisfaction, or waiver by Developer, of each of the following shall be a condition precedent to Developer's obligation to proceed with the first Phase Close of Escrow ("<u>**Developer's Conditions**</u>"):

    (1) All of Builder's representations and warranties herein shall be and remain true and correct;

    (2)  ·· Builder shall have performed all of its obligations to be performed on or prior to the first Phase Close of Escrow in accordance with this Agreement and the Operating Agreement.

  If any of Developer's Conditions are not satisfied or Developer has not waived the same by the first Phase Close of Escrow, then Developer may elect to cancel Escrow and terminate this Agreement by delivery of written notice to Builder and Escrow Holder specifying such failed conditions; provided, however, before such termination is deemed effective, Builder shall have (i) three (3) business days (from the date of Developer's election) to cure any failure to meet any monetary obligations, including, but not limited to, payment of the Purchase Price, the Builder MI Deposit, or Builder MI Costs and (ii) thirty (30) days (from the date of Developer's election) to cure any failure of any non-monetary defaults. If Builder causes the complete satisfaction of such failed condition within such period of time (and all other conditions precedent to Developer's obligations have been satisfied or waived by Developer), then the first Phase Close of Escrow shall proceed on and subject to the terms of this Agreement not later than the first Business Day that is at least ten (10) days following notice to Developer of such cure.

   d. <u>Concurrent Deliveries</u>.  All requirements with respect to the first Phase Close of Escrow shall be considered as having taken place simultaneously, and no delivery or payment shall be considered as having been made until all deliveries, payments and closing transactions have been accomplished.

   e. <u>Prorations</u>.  Escrow Holder shall prorate all non-delinquent real property taxes, assessments and other charges applicable to the applicable Phase as of each Phase Close of Escrow, in the customary manner for real estate transactions in the County.  Upon receipt of any tax bill by either Party which relates to any property owned in part by the other Party, such receiving Party shall provide a copy of such bill to the other Party, and the Parties shall meet and confer in a timely fashion so as to determine the appropriate allocation of such taxes and assure

that same are paid no later than ten (10) days prior to the date of delinquency. If at any Phase Close of Escrow any tax assessor's parcel does not match the legal description for the Phase being conveyed, the Parties will prorate all taxes and assessments based on the square footage of such Phase in relation to the assessor parcel or parcels in which such Phase is located. Builder and Developer shall promptly reconcile such proration as soon as the assessor parcel or parcels are revised to align with such Phase, which obligation shall survive closing.

14.    **Closing Costs.**  Builder shall pay the escrow fees and charges, all costs of its lender's title policy, all premiums for the Title Policy with respect to any portion of the Property then being acquired by Builder, the costs of any endorsements to the Title Policy with respect to any portion of the Property then being acquired by Builder, the recording fees for the applicable GBS Deed, and transfer taxes. Developer shall pay for any Developer's Title Policy with respect to any portion of the Property then being acquired by Builder. Escrow Holder shall notify the Parties in writing of their estimated respective shares of such costs not less than three (3) Business Days before the first Phase Close of Escrow and the Parties shall deposit or otherwise provide Escrow Holder with amounts sufficient to cover such costs by noon on the date which is one (1) Business Day before the first Phase Close of Escrow.

15.    **Recordation and Delivery of Documents.**

a.    **Recordation.**  Provided that all of the terms and conditions set forth in this Agreement have been satisfied, Escrow Holder shall, at the first Phase Close of Escrow, and, as applicable, each additional Phase Close of Escrow with respect to each subsequent Phase, cause all documents deposited into Escrow for recordation to be recorded in the Official Records of the County. The following documents shall be recorded in the following order:

i.    First, the Master CCRs or Annexation, as appropriate;

ii.    Second, the GBS Deed;

iii.    Third; the Development Declaration; and

iv.    Fourth, the Declaration of SLURs.

b.    **Delivery of Documents.**  Upon the first Phase Close of Escrow and each applicable later Phase Close of Escrow, Escrow Holder shall deliver to Builder and Developer the Escrow closing statements and all funds and documents to which each is entitled.

16.    **Non-Foreign Affidavits.**  Developer warrants and represents to Builder that Developer is not a foreign individual, foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Internal Revenue Code and the Federal Tax Regulations). Developer shall execute and deliver to Builder at the first Phase Close of Escrow (and with respect to later phases, any later phase closings) an affidavit in substantially the same form as Exhibit "G" attached hereto, certifying the representations and warranties made pursuant to this Section (collectively, the "**Non-Foreign Affidavits**").

17.    **Subsequent Phase Closes of Escrow.**  The conveyance of Phases subsequent to the first Phase shall be accomplished on the same terms and conditions as set forth in the

foregoing Sections 13, 14, 15 and 16 with respect to the first Phase including, without limitation, the execution, delivery, and as applicable, recordation, of the documents described in such Sections with respect to each such Phase, and the allocation and/or proration of taxes, assessments and closing costs with respect to such subsequent Phases.

18.    **Termination of Escrow.**

      a.    Cancellation Instructions.  If Builder or Developer desires to terminate this Agreement and cancel Escrow pursuant to any Section herein which expressly provides for such right to terminate this Agreement, then such terminating Party may do so and subject to the terms of such Section by delivering written cancellation instructions (the "**Cancellation Instructions**") to Escrow Holder and the other Party provided such instructions are delivered before the applicable deadlines as set forth in such Sections and the canceling Party has otherwise complied with any of the provisions of such Sections.

      b.    No Further Obligations.  Upon receipt of any Cancellation Instructions delivered in accordance with the foregoing, Escrow Holder and Developer shall return all funds required by this Agreement to be so returned, less applicable Escrow cancellation charges allocated to the Parties, and all documents to the Parties who deposited them.  Thereafter, neither Party shall have any further obligation or responsibility hereunder or liability of any kind, other than obligations which expressly survive termination as provided herein.

      c.    Escrow Cancellation Charges.  If any Phase Close of Escrow fails to occur due to Developer's default, Developer shall pay all "Escrow Cancellation Charges" (as defined below).  If any Phase Close of Escrow fails to occur due to Builder's default, Builder shall pay all Escrow Cancellation Charges.  If any Phase Close of Escrow fails to occur for any reason other than the foregoing, Builder and Developer shall each pay one-half (1/2) of any Escrow Cancellation Charges.  As used herein, "**Escrow Cancellation Charges**" shall mean all fees, charges and expenses incurred by Escrow Holder and Title Company, including all expenses incurred in connection with issuance of the Title Report, but expressly does not include any charges or fees incurred by Builder in connection with its review of the Title Report, the preparation of any Survey or proforma title policies or endorsements.

19.    **Development of Adjacent Properties.**  After acquiring any portion of the Property, Builder shall develop such portions of the Property in accordance with the Declarations.  Builder acknowledges that Developer may sell other parcels of property in the Planned Community to other merchant builders (the "**Other Builders**") and may provide such Other Builders with the right, or obligation, to develop such properties with the type and style of residences similar to those to be built by Builder.

20.    **Obligation to Maintain Property During Escrow.**  Prior to the applicable Phase Close of Escrow for any Phase, Developer agrees to and shall maintain any Phase not yet acquired by Builder, in substantially the same condition as it currently exists, ordinary wear and tear excluded, and subject to ongoing development activities contemplated by this Agreement (including, without limitation, any grading activity which may be performed by Builder prior to any applicable Phase Close of Escrow).  Developer shall not commit waste with respect to the Property.

21. <u>Remedies</u>. Each of the covenants of the Parties under this Agreement is a material consideration for this Agreement, the breach of which shall be deemed a default hereunder. Each of the Party's rights and remedies under this Agreement shall be cumulative and no one of them shall be exclusive of the others.

a. <u>REMEDIES FOR DEVELOPER.</u>

i. NOTWITHSTANDING THE FOREGOING, IF A PHASE CLOSE OF ESCROW FAILS TO OCCUR DUE TO BUILDER'S DEFAULT UNDER THIS AGREEMENT, OR ANY OTHER BUILDER DEFAULT NOT SET FORTH IN <u>SECTION 21.a.ii</u> DEVELOPER SHALL RETAIN THE "LIQUIDATED SUM" (DEFINED BELOW) AS LIQUIDATED DAMAGES. IN CONNECTION THEREWITH, THE PARTIES ACKNOWLEDGE THAT IF SUCH A DEFAULT OCCURS, DEVELOPER WILL BE DAMAGED AND WILL BE ENTITLED TO COMPENSATION FOR THOSE DAMAGES. SUCH DAMAGES MAY, HOWEVER, BE EXTREMELY DIFFICULT AND IMPRACTICAL TO ASCERTAIN FOR THE FOLLOWING REASONS: (1) THE DAMAGES TO WHICH DEVELOPER WOULD BE ENTITLED WILL BE BASED IN PART ON THE DIFFERENCE BETWEEN THE ACTUAL VALUE OF THE PROPERTY AT THE TIME SET FOR THE APPLICABLE PHASE CLOSE OF ESCROW AND THE PURCHASE PRICE FOR THE PROPERTY AS SET FORTH IN THIS AGREEMENT; (2) PROOF OF THE AMOUNT OF SUCH DAMAGES WILL BE BASED ON OPINIONS OF VALUE OF THE PROPERTY, WHICH MAY VARY IN SIGNIFICANT AMOUNTS; AND (3) IT IS IMPOSSIBLE TO PREDICT AS OF THE DATE ON WHICH THIS AGREEMENT IS MADE WHETHER THE VALUE OF THE PROPERTY WILL INCREASE OR DECREASE AS OF THE DATE SET FOR EACH APPLICABLE PHASE CLOSE OF ESCROW. DEVELOPER AND BUILDER WISH TO AVOID THE COSTS AND LENGTHY DELAYS WHICH WOULD RESULT FROM A LEGAL PROCEEDING BY DEVELOPER TO COLLECT ITS DAMAGES FOR FAILURE OF BUILDER TO CLOSE ESCROW ON ANY SUCH PHASE IN BREACH OF THIS AGREEMENT. THEREFORE, IF ANY PHASE CLOSE OF ESCROW FAILS TO OCCUR DUE TO BUILDER'S DEFAULT UNDER THIS AGREEMENT, THEN DEVELOPER SHALL TREAT THE SUM (THE "<u>LIQUIDATED SUM</u>") REPRESENTED BY (1) THE DEPOSIT TO THE EXTENT NOT APPLIED TO THE PURCHASE PRICE AND (2) ALL AMOUNTS DEPOSITED TO THE MCD ACCOUNT BY BUILDER AS A REASONABLE ESTIMATE OF DEVELOPER'S DAMAGES. AS SUCH, DEVELOPER'S SOLE AND EXCLUSIVE REMEDY IN THE EVENT OF THE FAILURE TO CLOSE ESCROW ON ANY PHASE RESULTING FROM BUILDER'S DEFAULT SHALL BE TO TERMINATE THIS AGREEMENT AND RETAIN THE LIQUIDATED SUM.

ii. <u>NO LIMITATION FOR OTHER DEFAULTS.</u> THE FOREGOING REMEDY SHALL NOT LIMIT DEVELOPER'S RIGHTS OR REMEDIES (WHETHER ARISING AT LAW OR IN EQUITY) FOR ANY BUILDER DEFAULT OF AN INDEMNITY OBLIGATION WHICH EXPRESSLY SURVIVES THE TERMINATION OF THIS AGREEMENT, NOR SHALL IT LIMIT DEVELOPER'S RIGHTS OR REMEDIES (A) FOR BUILDER'S OBLIGATIONS HEREUNDER OR UNDER ANY DOCUMENT ATTACHED HERETO OR REFERENCED HEREIN WHICH EXPRESSLY SURVIVES THE CLOSE OF ESCROW OR (B) TO RECOVER ITS ATTORNEYS' FEES AND COSTS IN ACCORDANCE WITH THIS AGREEMENT.

iii.   NO WAIVER OR LIMITATION OF RIGHTS OR REMEDIES UNDER OPERATING AGREEMENT. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NOTHING HEREIN SHALL LIMIT OR RESTRICT, OR IN ANY WAY BE DEEMED A WAIVER OF, ANY OBLIGATIONS, RIGHTS OR REMEDIES OF DEVELOPER OR ANY MEMBER OF DEVELOPER SET FORTH IN THE OPERATING AGREEMENT. DEVELOPER AND ITS MEMBERS MAY PURSUE ANY AND ALL OF THEIR RESPECTIVE RIGHTS AND REMEDIES UNDER THE OPERATING AGREEMENT WITHOUT REGARD TO WHETHER ANY RIGHTS OR REMEDIES HAVE BEEN PURSUED OR EXHAUSTED HEREUNDER.

BUILDER'S INITIALS ⟨signature⟩ 10/29 DEVELOPER'S INITIALS _____

b.   REMEDIES FOR DEVELOPER DEFAULT. IN THE EVENT THAT DEVELOPER DEFAULTS HEREUNDER (WHICH DEFAULT IS NOT TIMELY CURED AS PROVIDED HEREIN), BUILDER'S SHALL HAVE ALL RIGHTS AND REMEDIES AVAILABLE AT LAW OR EQUITY.

BUILDER'S INITIALS ⟨signature⟩ 10/29 DEVELOPER'S INITIALS _____

c.   Defaults; Cure Periods; Mitigation. IN THE EVENT THAT EITHER PARTY DEFAULTS IN ANY OF ITS OBLIGATIONS HEREUNDER, THEN, UPON NOTICE TO SUCH PARTY FROM THE OTHER PARTY OF SUCH DEFAULT, THE DEFAULTING PARTY SHALL HAVE THIRTY (30) DAYS IN WHICH TO CURE THAT DEFAULT PRIOR TO ANY ACTION BEING TAKEN BY THE NON-DEFAULTING PARTY; PROVIDED, HOWEVER, BUILDER SHALL ONLY HAVE THREE (3) BUSINESS DAYS TO CURE ANY MONETARY DEFAULT. IF EITHER PARTY LEARNS OF ANY FACT OR ISSUE WHICH CONSTITUTES OR IS LIKELY TO CONSTITUTE A DEFAULT BY THE OTHER PARTY HEREUNDER, THE NON-DEFAULTING PARTY (i) SHALL BE OBLIGATED TO NOTIFY THE DEFAULTING PARTY OF SUCH DEFAULT OR EVENTS LIKELY TO GIVE RISE TO A DEFAULT, (ii) SHALL GIVE THE DEFAULTING PARTY THE REASONABLE OPPORTUNITY TO CURE SUCH DEFAULT OR EVENTS LIKELY TO GIVE RISE TO A DEFAULT AS SET FORTH ABOVE, AND (iii) SHALL TAKE REASONABLE STEPS TO ATTEMPT TO MITIGATE ANY DAMAGES RELATED THERETO.

22.   Condemnation. In the event that prior to any applicable Phase Close of Escrow all or a substantial portion of the Property not previously acquired by Builder is taken or appropriated by any public or quasi-public authority under the power of eminent domain (a "Taking") so as to render the remainder of the Property substantially unsuitable for Builder's development thereof, then Builder may terminate this Agreement without further liability hereunder. If Builder elects to terminate this Agreement in accordance with the foregoing, then, notwithstanding anything to the contrary contained in this Agreement, the Deposits, to the extent not then applied to Builder's purchase of any portion of the Property then acquired by Builder, shall be returned to Builder, and neither Party shall have any further liability or obligation under this Agreement (except under the provisions of this Agreement which specifically state that they survive termination). In the event of a partial Taking of some of the Property which does not render the Property substantially unsuitable for Builder's development, then Builder may elect to

(a) have the Purchase Price applicable to the Phase which is the subject of the Taking reduced by the amount of any compensation awarded for such Taking and any such award shall belong solely to Developer, or (b) purchase the applicable portion of the Property which is the subject of the Taking at the full amount of the Purchase Price applicable to that Phase, in which case Builder shall be entitled to retain any compensation awarded for such Taking.

23.    **Casualty.**  Except as otherwise set forth herein, Builder shall have no right to terminate this Agreement in the event of any loss that is not a "Material Loss" (as defined below), provided that Developer shall make commercially reasonable efforts to cure, if possible, any damage, loss or destruction prior to the applicable Phase Close of Escrow that is not in excess of a Material Loss.  A "**Material Loss**" shall be any damage, loss or destruction in excess of Five Hundred Thousand Dollars ($500,000).  If, prior to any applicable Phase Close of Escrow any portion of the Property not yet acquired by Builder suffers a Material Loss, Builder shall have the right, as its sole and exclusive remedy, to either  (a) terminate this Agreement with respect to the portions of the Property not yet acquired, or (b) purchase the portion of the Property which is the subject of the Material Loss as provided in this Agreement and receive an assignment of any insurance proceeds received by Developer with respect to such loss upon Developer's receipt of such proceeds.  The parties acknowledge and agree in no event shall the date for any Phase Close of Escrow be extended due to a Material Loss.  Notwithstanding the foregoing, the assignment of insurance proceeds as provided herein shall not include any proceeds received for items not related to the physical condition of the Property, such as proceeds from Developer's business interruption insurance, if any.  Builder shall be entitled to be present at the negotiation of any insurance settlement relating to a Material Loss; provided, however, Builder shall not be entitled to approve any such settlement.

24.    **Assignments; Successors and Assigns.**

a.    **Generally.**  Except as otherwise provided in this Section, neither Party shall voluntarily or by operation of law assign or transfer any right, interest or obligation hereunder without the other Party's express prior written consent, which consent may be given or withheld in such Party's sole discretion for any reason whatsoever; provided, however, (i) Developer shall be free to assign this Agreement to accomplish the MI Financing and (ii) following Developer's completion of all of the Major Infrastructure, the foregoing restriction on assignment and/or transfer shall not apply to or bind Developer (which may thereafter freely assign or transfer any right, interest or obligation hereunder without Builder's consent, and upon such an assignment and the assumption of Developer's obligations hereunder by the assignee, Developer shall be fully and forever released from any and all such obligations).

b.    **Controlling Interest Transfers.**  With respect to Builder, notwithstanding any other provisions herein, the term "transfer" and "assign" shall also include any transfer or assignment of any controlling interest in such Party making the transfer or assignment.  For the purposes of this Agreement, the term "controlling interest" shall mean an ownership interest or interests in an entity which, in the aggregate, gives the owner(s) thereof the right to control any aspect of the management and policies of that entity.  In any event, ownership of more than fifty percent (50%) of the ownership interests in an entity shall be considered a controlling interest hereunder.

      c.     <u>Permitted Transfer Without Consent.</u>

      i.     Either Party may assign its interest in this Agreement without the other Party's consent (i) to a partnership, limited liability company, corporation, or joint venture in which the assigning Party (directly or indirectly through a wholly owned subsidiary (a "**Wholly Owned Subsidiary**")) is a general partner, or member or shareholder owning more than a fifty percent (50%) interest, (ii) to a partnership, limited liability company, or corporation, resulting from the merger or consolidation with the assigning Party and in which the assigning Party directly or indirectly (through a Wholly Owned Subsidiary) has continued to maintain more than a fifty percent (50%) interest, or (iii) to a project-specific limited liability company in which the assigning Party (directly or indirectly through a Wholly Owned Subsidiary) is the operating member or partner, and the assigning Party (directly or indirectly through a Wholly Owned Subsidiary) owns at least a fifty percent (50%) interest, provided that the assignee pursuant to (i), (ii) or (iii) above assumes all obligations of the assigning Party under this Agreement. In the event of such an assignment under this subparagraph, the assigning Party shall, at least ten (10) days prior to such assignment, deliver written notice to the other Party of such assignment and satisfactory evidence that the assignee shall assume the obligations of this Agreement. Any such assignment shall not in any way affect or limit the liability of the Parties under the terms of this Agreement, even if after such assignment, the terms of the Agreement are materially changed or altered without the consent of such assigning Party, the consent of which shall not be necessary.

      ii.     If Builder is a Member, Builder may assign or transfer its interest in this Agreement directly or indirectly to any party to which such Member may transfer or assign, directly or indirectly, its interest in Developer pursuant to a "Permitted Transfer" as defined in the Operating Agreement.

      iii.     Builder may assign or partially assign its rights to purchase any Phase in accordance with this Agreement without obtaining the prior written consent of Developer provided that Builder shall not be released from its obligations hereunder without the consent of Developer which consent shall not be unreasonably withheld or delayed.

      d.     <u>Successors and Assigns.</u>  Subject to the foregoing, all of the terms and conditions of this Agreement shall inure to the benefit and shall be binding upon the successors of Builder and Developer. As used in this Section, "successors" shall refer to the successors to all or substantially all of a Party's assets and to a Party's successors by merger or consolidation.

      e.     <u>Subsequent Transfers.</u>  In no event shall a Party's consent to any one assignment of this Agreement constitute consent to any subsequent assignment.

25.    **Miscellaneous.**

a.    Notices.  All notices, requests and demands to be made hereunder to the parties hereto shall be in writing and shall be deemed received upon personal delivery to the party to whom the notice is directed or, if sent by reputable overnight delivery service, upon one (1) Business Day after delivery to the delivery service, or if sent by telecopy, upon electronic verification of receipt by the sending machine and provided that such notice, request or demand is concurrently transmitted by another authorized method, or if sent by mail, upon receipt or refusal to accept delivery following its deposit in the United States mail, postage prepaid, certified or registered mail, return receipt requested, addressed to the applicable party at the addresses set forth below:

| | |
|---|---|
| If to Builder: | KB HOME Nevada Inc.<br>750 Pilot Road, Suite G<br>Las Vegas, Nevada 89119<br>Attention: Jim Widner, Division President |
| With a Copy to: | KB HOME Nevada Inc.<br>750 Pilot Road, Suite G<br>Las Vegas, Nevada 89119<br>Attention: Christopher Stephens, Counsel |
| If to Developer: | SOUTH EDGE, LLC<br>C/o Holdings Manager, LLC<br>3455 Cliff Shadows Parkway, Suite 220<br>Las Vegas, Nevada 89129<br>Attention: John A. Ritter, Manager |

Notice of change of address shall be given by written notice in the manner detailed in this Section.  Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to constitute receipt of the notice, demand, request or communication sent.

b.    No Modifications.  No addition to or modification of any term or provision of this Agreement shall be effective unless set forth in writing and signed by both Parties.

c.    Construction of Agreement.  The agreements contained herein shall not be construed in favor of or against either Party based on any presumption against the drafting Party, but shall be construed as if both Parties prepared this Agreement.

d.    Headings.  The Section headings herein are used only for the purpose of convenience and shall not be deemed to limit the subject of such Sections or to be considered in their construction.

e.    <u>Governing Law</u>.  The laws of the State of Nevada shall govern this Agreement.

f.    <u>Attorneys' Fees</u>.  In case of dispute arising out of or related to this Agreement, the Parties agree that the prevailing Party shall be entitled to its actual attorneys' fees, and all fees, costs, and expenses incurred in connection with such suit.  Such attorneys' fees, fees, costs and expenses shall include post-judgment attorneys' fees, fees, costs and expenses incurred on appeal or in collection of any judgment.  This provision is separate and several and shall survive the merger of this Agreement into any judgment on this Agreement.

g.    <u>Time of the Essence</u>.  Subject to the following sentence, time is of the essence in the performance of each provision of this Agreement.  Whenever action must be taken (including the giving of notice or the delivery of documents) under this Agreement during a certain period of time or by a particular date that ends or occurs on a non-Business Day, then such period or date shall be extended until the immediately following Business Day.  As used herein, "**Business Day**" means any day other than Saturday, Sunday or a federal or Nevada holiday.  In all events, each Phase Close of Escrow shall occur on only a Wednesday or Thursday.

h.    <u>Further Assurances</u>.  Each of the Parties shall execute and deliver all additional papers, documents and other assurances, and shall do all acts and things reasonably necessary in connection with the performance of their obligations hereunder to carry out the intent of this Agreement.

i.    <u>No Waiver</u>.  A Party's waiver of a breach of any of the terms, covenants, or conditions of this Agreement by the other Party shall not be construed or held to be a waiver of any succeeding or preceding breach of the same or any other term, covenant or condition contained herein.  No waiver of any default by a Party hereunder shall be implied from any omission by the other Party to take any action on account of such default if such default persists or is repeated and no express waiver shall affect a default other than as specified in such waiver.  The consent or approval by either Party to or of any act by the other requiring the first Party's consent or approval shall not be deemed to waive or render unnecessary the consenting Party's consent or approval to or of any subsequent similar acts by the other Party.

j.    <u>Severability</u>.  If any portion of this Agreement becomes illegal, null, void or against public policy, for any reason, or is held by any court of competent jurisdiction to be illegal, null, void or against public policy, the remaining portions of this Agreement shall not be affected thereby and shall remain in effect to the fullest extent permitted by law.

k.    <u>Gender and Number</u>.  In this Agreement (unless the context requires otherwise), the masculine, feminine and neuter genders and the singular and the plural include one another.

l.    <u>Entire Agreement</u>.  This Agreement and the exhibits attached hereto constitute the entire agreement between the Parties hereto pertaining to the subject matter hereof and all prior and contemporaneous agreements, representations, negotiations and understandings

32

of the Parties, oral or written, are hereby superseded and merged herein. The preceding sentence shall not affect the validity of any exhibits attached hereto nor the Operating Agreement.

        m.    <u>Survival of Covenants</u>. All covenants, representations, warranties, obligations, indemnities and agreements contained in this Agreement shall survive each applicable Phase Close of Escrow, and the delivery and recordation of all documents or instruments in connection therewith. Notwithstanding the foregoing, however, a Party's obligation to perform a certain act or take a certain action as required hereunder shall cease upon that Party's timely and proper performance thereof.

        n.    <u>No Warranties</u>. Except as is otherwise specifically provided herein, neither Builder nor Developer has made any representations, warranties or agreements by or on behalf of either Party to the other Party as to any matters concerning the Property. Each Party expressly waives any rights of rescission and all claims for damages by reason of any statement, representation, warranty, promise or agreement, if any, not contained in this Agreement.

        o.    <u>Time References</u>. Any reference in this Agreement to time for performance of obligations or to elapsed time shall mean consecutive calendar days, months, or years, as applicable, unless otherwise explicitly indicated herein.

        p.    <u>No Partnership or Agency Relationship</u>. Nothing in this Agreement shall be construed as making Developer a partner, venturer, shareholder or other principal or agent of Builder, and, except as otherwise expressly provided herein, Developer has no liability or responsibility whatsoever resulting from or arising out of Builder's ownership and development of, construction upon, or resale of the Property.

        q.    <u>Brokers</u>. Developer and Builder each represent that, no brokers or finders have been involved in this transaction, and no brokerage commission or finders fee is owing to any person as a result of the conduct of any of the Parties incident to this transaction and that they have entered into no written agreement with any real estate broker or finder with respect to same. Developer hereby agrees to indemnify, defend and hold Builder harmless from any real estate brokerage commissions or finders fees payable in connection with this transaction by reason of the conduct of Developer. Builder hereby agrees to indemnify, defend and hold Developer harmless from any real estate brokerage commissions or finders fees payable in connection with this transaction by reason of the conduct of Builder.

        r.    <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

        26.    <u>Co-Signing by Parent Guarantor</u>. The Builder's corresponding Parent Guarantor is co-signing this Agreement solely for the purpose of acknowledging Builder's rights and obligations hereunder.

<b>[Signatures on Following Page]</b>

33

IN WITNESS WHEREOF, Builder and Developer have executed this Agreement as of the day and year first written above.

"**Developer**"

**SOUTH EDGE, LLC**, a
Nevada limited liability company

By:    Holdings Manager, LLC, its Manager

By:    _____
       John A. Ritter, Manager

Date of Signature:  10/29/04

"**Builder**"

**KB HOME NEVADA INC.**, a Nevada corporation

By:    _____
       Jim Widner
Its:   Division President

Date of Signature:  10/29/04

"**Builder Parent Co-Signer**"

**KB HOME**, a Delaware corporation

By:     _____

Print:  _____

Its:    _____

Date of Signature: _____

34

IN WITNESS WHEREOF, Builder and Developer have executed this Agreement as of the day and year first written above.

"Developer"

SOUTH EDGE, LLC, a
Nevada limited liability company

By:    Holdings Manager, LLC, its Manager

By:    _____
       John A. Ritter, Manager

Date of Signature: _____

"Builder"

KB HOME NEVADA INC., a Nevada corporation

By:    _____
       Jim Widner
Its:   Division President

Date of Signature: _____

"Builder Parent Co-Signer"

KB HOME, a Delaware corporation

By:    _~~~~~~~~~~~~~~~~~~_

Print: _Kelly M. Allred_

Its:   _VP, Treasury & Risk Mgmt_

Date of Signature: _10/29/04_

34

## JOINDER

By executing this Agreement where provided below, the undersigned hereby undertakes to act as Escrow Holder in this transaction pursuant to the terms of the instructions set forth above, and pursuant to any other supplemental instructions signed by the parties.

Date:   November _1_, 2004

Chicago Title Agency of Nevada, Inc.

By:   _____

Name:  _Frances Butler_

Its:   _Asst. Escrow Mgr._



Exhibit "A"
BLM Land



Exhibit "B"
Pod Allocation Map
(KB)

KB

## EXHIBIT "C"

## TAKEDOWN SCHEDULE

| DATE | ACRES | PURCHASE PRICE |
|---|---|---|
| October 15, 2006 | 329 | $176,320,081 |
| October 15, 2007 | 131 | $70,206,476 |
| October 15, 2008 | 241 | $129,158,479 |
| April 15, 2009 | 239 | $128,086,624 |

Exhibit "D"

## South Edge, LLC
### Master Plan Community Cost Budget

| | | |
|---|---:|---:|
| Land cost | | $    557,000,000 |
| Holdings Manager developer fee | | 38,990,000 |
| Predevelopment costs | | 1,164,000 |
| Improvement costs* | | 255,777,481 |
| Reimbursements* | | (26,067,260) |
| Loan costs: | | |
|    Loan origination fee | 3,745,000 | |
|    Letter of credit fees | 2,370,000 | |
|    Commitment fee | 372,000 | |
|    Administrative fees | 745,000 | |
|    Legal, appraisal, title, etc. | 1,000,000 | |
| | | 8,232,000 |
| Property taxes | | 2,500,000 |
| Insurance premiums | | 7,500,000 |
| LID interest, underwriting fee, administrative | | |
|    costs, offering expenses, reserves, etc. | | 20,160,000 |
| Loan interest | | 79,924,650 |
| Total | | $    945,180,871 |

*detail attached

Page 1 of 3

| South Edge | | |
|---|---|---|
| **Estimated Improvement Cost Detail** | | |
| Engineer's Preliminary Opinion of Probable Costs – Prepared by VTN-Nevada | | |
| **Costs:** | | |
| | | |
| Roadways | 48,421,156 | |
| Water | 47,904,797 | |
| Sewer | 8,052,992 | |
| Drainage Facilities | 25,184,387 | |
| Dry Utilities (excludes Substation) | 23,920,564 | |
| Paseo Costs (Drainage excluded)  * | - | |
| Project Entry | 3,500,000 | |
| SubTotal | 156,983,895 | |
| 10% Contingency | 15,698,390 | |
| TOTAL DIRECT COSTS | | 172,682,285 |
| | | |
| 8% Engineering Design | 12,558,713 | |
| 3% Professional Services | 5,180,469 | |
| 3% Permits & Fees | 5,180,469 | |
| TOTAL DESIGN & PERMITS | | 22,919,650 |
| | | |
| Public Facilities | 31,100,000 | |
| Impact Fees | 8,571,000 | |
| ROW Acquisition | 2,500,000 | |
| Power Substation | 5,000,000 | |
| | | 47,171,000 |
| | | |
| CM Fee: | | |
| 7% of Direct Costs | 12,087,760 | |
| 4% A&E Services | 916,786 | |
| TOTAL CM FEE | | 13,004,546 |
| | | |
| Total Costs | | 255,777,481 |
| | | |

| Cost reimbursements: | | |
|---|---|---|
| | | |
| Offsite Water (50% P&R / Transmission Mains) | 11,834,350 | |
| Offsite Sewer 15% ** | 649,150 | |
| Power Feeders | 2,792,960 | |
| Power Substation | 5,000,000 | |
| Park Credit ($775/du) | 5,790,800 | |
| Total Cost reimbursements | | 26,067,260 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| * To be funded by adjacent Builders | | |
| | | |
| ** Assumed reimbursement is 15% of total construction cost (per COH, reimbursement will only | | |
| be paid from connection fees for water and sewer) | | |

Exhibit "E"
Title Report

# Chicago Title Insurance Company

## Commitment for Title Insurance

File No. 04143250 (3rd Amended)

### SCHEDULE A

Escrow Officer: Lorraine M. Hill
1700 W. Horizon Ridge Pky #203
Henderson, NV 89012

Title Officer: Bonnie L. Blackburn
3980 Howard Hughes Parkway #100
Las Vegas, Nevada 89109
Phone Number (702) 836-8000

Phone Number: (702) 492-6117

1. Effective Date: August 20th, 2004

2. Policy of Policies to be issued:                                    Amount of Insurance

   (a) C.L.T.A. Owner's                                                $557,000,000.00
       Proposed Insured:   South Edge, LLC

   (b) A.L.T.A. Loan Policy 1992                                       $To Be Determined
       Proposed Insured:   JPMorgan Chase Bank, as agent for

   (c) Endorsements:                                                   $To Be Determined
       list any endorsements

3. The estate or interest in the land described or referred to in this Commitment and covered herein is:

   Fee Simple

4. Title to the estate or interest in said land is at the effect date hereof vested in:

   United States of America

5. The land referred to in this Commitment is described as follows:

   See Exhibit A attached hereto and made a part hereof.

This Commitment valid only if Schedules BI and BII are attached

# Chicago Title Insurance Company

### Commitment for Title Insurance

File No: 04143250 (3rd Amended)

### SCHEDULE B - PART 1

The following requirements must be met and completed to the satisfaction of the Company before its policy of title insurance will be issued:

1. Show that restrictions or restrictive covenants have not been violated.

2. Payment to or for the account of the grantors or mortgagors of the full consideration for the estate or interest, mortgage or lien to be issued.

3. Furnish proof of payment of all bills for labor and material furnished or to be furnished in connection with improvements erected or to be erected.

4. Pay all general and special taxes now due and payable.

5. Record instrument conveying or encumbering the estate or interest to be insured.

6. It is required that the original patent or certified copy thereof be recorded before any insurance is issued.
   Patent No.  :N-75200 / 2700 SNPL (NV-055)

7. We will require the following items from South Edge, LLC, a Limited Liability Company:

   A.  A copy of the Articles of Organization.
   B.  A copy of the company's operating agreement.
   C.  A current list of the names of the company members, if said company is member managed.

8. We have communicated with the Nevada Secretary of State and determined that the entity known as South Edge, LLC, a Nevada limited liability company is in good standing as of the date of this report. The list of Officers are: Resident Agent    : Devore & Associates, Ltd
                                                                        Manager/Member  : Holdings Manager, LLC

9. Rights and claims of parties in possession by reason of unrecorded leases, if any, that would be disclosed by an inquiry of the parties, or by an inspection of said land.

10. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

11. Lack of a right of access to and from the land.  The Company requires satisfactory evidence of a right of access.  The Company may then make additional requirements or exceptions.

This Commitment valid only if Schedules BI and BII are attached

# Chicago Title Insurance Company

**Commitment for Title Insurance**

File No. 04143250 (3rd Amended)

### Schedule B I - Continued

12. An inspection will be required prior to close of escrow. Additional exceptions may be added due to any facts, rights, interests or claims which are not shown by the public records, but which may be ascertained by the inspection of said premises or by making inquiry of persons in possession thereof.

Should the inspection of the real property disclose any work of improvement in progress, Mechanic's Lien Insurance will be deleted from coverage in our policy when issued, unless prior approval to commence work has been obtained from this company.

This Commitment valid only if Schedules BI and BII are attached

# Chicago Title Insurance Company

### Commitment for Title Insurance

File No: 04143250 (3rd Amended)

### SCHEDULE B – PART II

The following matters will be excepted in Schedule B of the policy to be issued:

Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records, or attaching subsequent to the effective date hereof but prior to the date the proposed Insured acquires for value of record the estate or interest or mortgage therein covered by this commitment.

1. Taxes for the fiscal year 2004-2005 are exempt.
   Parcel No. 191-11-101-001
   Affects: Parcel 1
   (With Other Property)

2. Taxes for the fiscal year 2004-2005 are exempt.
   Parcel No. 191-14-101-001
   Affects: Parcel 2
   (With Other Property)

3. Taxes for the fiscal year 2004-2005 are exempt.
   Parcel No. 191-15-000-001
   Affects: Parcel 3
   (With Other Property)

4. Taxes for the fiscal year 2004-2005 are exempt.
   Parcel No. 191-22-000-001
   Affects: Parcel 4
   (With Other Property)

5. Taxes for the fiscal year 2004-2005 are exempt.
   Parcel No. 191-23-000-001
   Affects: Parcel 5

6. Taxes for the fiscal year 2004-2005 are exempt.
   Parcel No. 191-24-401-001
   Affects: Parcel 6

7. Any taxes that may be due, but not assessed, for new construction which can be assessed on the unsecured property rolls, in the Office of the Clark County Assessor, per Nevada Statute 361.260.

8. Water rights, claims or title to water, whether or not shown by the public record.

This Commitment valid only if Schedules BI and BII are attached

# Chicago Title Insurance Company

**Commitment for Title Insurance**

File No. 04143250 (3rd Amended)

Schedule B II - Continued

9.  A Notice of Right of Way Grant affecting a portion of said land for the purpose stated herein, and
    incidental purposes
    In Favor of    : Nevada Power Company
    For            : Federal land for electric transmission line
    Recorded       : August 26, 1996 in Book 960826
    Document No.   : 00713, Official Records.

    Said right of way was amended for the purpose of re-locating said transmission line by instrument
    recorded April 27, 1998 in Book 980427 as Document No. 01163, Official Records.

10. Any rights, interest, or claims which may exist or arise by reason of a Record of Survey
    File          : 99, of Surveys, Page 89
    Recorded      : January 20, 1999 in Book 990120
    Document No.  : 02395, Official Records.

11. A Notice of Right of Way Grant affecting a portion of said land for the purpose stated herein, and
    incidental purposes
    In Favor of   : City of Henderson
    For           : Federal land for flood control detention basin
    Recorded      : August 3, 1999 in Book 990803
    Document No.  : 01069, Official Records.

12. The terms, covenants, conditions and provisions as contained in an instrument, entitled "Ordinance
    No. 2010; An Ordinance of the City Council of the City of Henderson, Nevada, Extending the City
    Limits"
    Recorded      : August 03, 2000 in Book 20000803
    Document No.  : 00742, Official Records.

13. A Notice of Right of Way Grant affecting a portion of said land for the purpose stated herein, and
    incidental purposes
    In Favor of   : Del Webb Conservation Holding Corp.
    For           : Federal land for roadway and utilities
    Recorded      : May 03, 2001 in Book 20010503
    Document No.  : 01011, Official Records.

14. The terms, provisions and easements as contained in an instrument, entitled "Notice of Intent to
    Occupy and Use"
    By            : The Las Vegas Valley Water District
    Recorded      : April 26, 2002 in Book 20020426
    Document No.  : 00888, Official Records.
    Affects: Government Patent Reservations/Easements and dedicated streets and roads in Parcels 3 and
    4.

This Commitment valid only if Schedules BI and BII are attached

# Chicago Title Insurance Company

**Commitment for Title Insurance**

File No. 04143250 (3rd Amended)

Schedule B II - Continued

15. A Notice of Right of Way Grant affecting a portion of said land for the purpose stated herein, and incidental purposes

| | |
|---|---|
| In Favor of | : City of Henderson |
| For | : Federal land for waterline maintenance area |
| Recorded | : May 20, 2003 in Book 20030520 |
| Document No. | : 01978, Official Records. |

16. A Notice of Right of Way Grant affecting a portion of said land for the purpose stated herein, and incidental purposes

| | |
|---|---|
| In Favor of | : Nevada Power Company |
| For | : Federal land for electric transmission line and access road |
| Recorded | : December 04, 2003 in Book 20031204 |
| Document No. | : 01553, Official Records. |

17. Any unrecorded easements and rights of way over said land on file with The Bureau of Land Management.

18. Any rights, interest, or claims which may exist or arise by reason of the following facts as disclosed on the Survey

| | |
|---|---|
| Prepared by | : Jason Paul Higgins, PLS. No. 13601 |
| Dated | : May 21, 2004 |
| Job No. | : Henderson West-Pulte Homes |

   A. Unrecorded powerline under the Bureau of Land Management Right of Way NEV 055893, 50 feet in width in favor of Nevada Power Company located along the South Section line of Section 11, Township 23 South, Range 61 East, in Parcel 1.

   B. Unrecorded rain gauge site under the Bureau of Land Management Grant N56450 located in the Southwest Quarter (SW ¼) of the Northeast Quarter (NE ¼) of Section 14, Township 23 South, Range 61 East, in Parcel 2.

   C. An encroachment of fence from adjacent land over the North line of the Southwest Quarter (SW ¼) of Section 22, Township 23 South, Range 61 East, in Parcel 4.

19. Lack of right of access to and from the land. The insuring provision as to access is hereby deleted.

This Commitment valid only if Schedules BI and BII are attached

Exhibit A

All that land situated in the County of Clark, State of Nevada, more particularly described as follows:

PARCEL 1:

The South Half (S ½) of the South Half (S ½) of the Northwest Quarter (NW ¼) of the Southeast Quarter (SE ¼); and the Southwest Quarter (SW ¼) of the Southeast Quarter (SE ¼); and the West Half (W ½) of the West Half (W ½) of the Southeast Quarter (SE ¼) of the Southeast Quarter (SE ¼); and the East Half (E ½) of the Southeast Quarter (SE ¼) of the Southwest Quarter (SW ¼); and the South Half (S ½) of the Southeast Quarter (SE ¼) of the Northeast Quarter (NE ¼) of the Southwest Quarter (SW ¼) of Section 11, Township 23 South, Range 61 East, M.D.M., Clark County, Nevada.

PARCEL 2:

The East Half (E ½) of the East Half (E ½) of the Northwest Quarter (NW ¼); and the West Half (W ½) of the Northeast Quarter (NE ¼); and the West Half (W ½) of the West Half (W ½) of the Northeast Quarter (NE ¼) of the Northeast Quarter (NE ¼); and the Southeast Quarter (SE ¼) of the Southwest Quarter (SW ¼) of the Northeast Quarter (NE ¼) of the Northeast Quarter (NE ¼); and the West Half (W ½) of the Southeast Quarter (SE ¼) of the Northeast Quarter (NE ¼); and the West Half (W ½) of the East Half (E ½) of the Southeast Quarter (SE ¼) of the Northeast Quarter (NE ¼); and the Southeast Quarter (SE ¼); and the East Half (E ½) of the Northeast Quarter (NE ¼) of the Southwest Quarter (SW ¼); and the Southeast Quarter (SE ¼) of the Southwest Quarter (SW ¼); and the South Half (S ½) of the Southwest Quarter (SW ¼) of the Southwest Quarter (SW ¼); and the Northeast Quarter (NE ¼) of the Southwest Quarter (SW ¼) of the Northeast Quarter (NE ¼) of the Southwest Quarter (SW ¼); and the South Half (S ½) of the Southwest Quarter (SW ¼) of the Northeast Quarter (NE ¼) of the Southwest Quarter (SW ¼); and the Northeast Quarter (NE ¼) of the Northeast Quarter (NE ¼) of the Southwest Quarter (SW ¼) of the Southwest Quarter (SW ¼); and the South Half (S ½) of the Northeast Quarter (NE ¼) of the Southwest Quarter (SW ¼) of the Southwest Quarter (SW ¼); and the Southwest Quarter (SW ¼) of the Northwest Quarter (NW ¼) of the Southwest Quarter (SW ¼) of the Southwest Quarter (SW ¼) of Section 14, Township 23 South, Range 61 East, M.D.M., Clark County, Nevada.

PARCEL 3:

The South Half (S ½) of the Southeast Quarter (SE ¼); and the South Half (S ½) of the Northwest Quarter (NW ¼) of the Southeast Quarter (SE ¼); and the Southwest Quarter (SW ¼) of the Northeast Quarter (NE ¼) of the Southeast Quarter (SE ¼); and the Southwest Quarter (SW ¼) of the Southeast Quarter (SE ¼) of the Northeast Quarter (NE ¼) of the Southeast Quarter (SE ¼); and the Southwest Quarter (SW ¼) of the Northwest Quarter (NW ¼) of the Northeast Quarter (NE ¼) of the Southeast Quarter (SE ¼); and the South Half (S ½) of the Northeast Quarter (NE ¼) of the Northwest Quarter (NW ¼) of the Southeast Quarter (SE ¼); and the Northeast Quarter (NE ¼) of the Northeast Quarter (NE ¼) of the Northwest Quarter (NW ¼) of the Southeast Quarter (SE ¼) of Section 15, Township 23 South, Range 61 East, M.D.M., Clark County, Nevada.

PARCEL 4:

The East Half (E ½); and the Southwest Quarter (SW ¼) of Section 22, Township 23 South, Range 61 East, M.D.M., Clark County, Nevada.

PARCEL 5:

All of Section 23, Township 23 South, Range 61 East, M.D.M., Clark County, Nevada.

PARCEL 6:

The Southwest Quarter (SW ¼) of the Northwest Quarter (NW ¼) of the Northwest Quarter (NW ¼) of the Northwest Quarter (NW ¼); and the Southwest Quarter (SW ¼) of the Northwest Quarter (NW ¼) of the Northwest Quarter (NW ¼); and the Southwest Quarter (SW ¼) of the Southeast Quarter (SE ¼) of the Northwest Quarter (NW ¼) of the Northwest Quarter (NW ¼); and the West Half (W ½) of the Southwest Quarter (SW ¼) of the Northwest Quarter (NW ¼); and the West Half (W ½) of the East Half (E ½) of the Southwest Quarter (SW ¼) of the Northwest Quarter (NW ¼); and the East Half (E ½) of the Southeast Quarter (SE ¼) of the Southwest Quarter (SW ¼) of the Northwest Quarter (NW ¼); and the Southeast Quarter (SE ¼) of the Northeast Quarter (NE ¼) of the Southwest Quarter (SW ¼) of the Northwest Quarter (NW ¼); and the West Half (W ½) of the Southwest Quarter (SW ¼) of the Southeast Quarter (SE ¼) of the Northwest Quarter (NW ¼); and the West Half (W ½) of the Southwest Quarter (SW ¼); and the West Half (W ½) of the East Half (E ½) of the Southwest Quarter (SW ¼); and the West Half (W ½) of the Northeast Quarter (NE ¼) of the Southeast Quarter (SE ¼) of the Southwest Quarter (SW ¼); and the Southeast Quarter (SE ¼) of the Southeast Quarter (SE ¼) of the Southwest Quarter (SW ¼) of Section 24, Township 23 South, Range 61 East, M.D.M., Clark County, Nevada.

EXHIBIT "F"
MAJOR INFRASTRUCTURE
SCHEDULE    PG. 1

EXHIBIT "F"
MAJOR INFRASTRUCTURE
SCHEDULE    PG. 2

South Edge Preliminary Master Schedule
(Phase 1)

Exhibit "G"
Form of Non-Foreign Affidavit

### Non-Foreign Affidavit

1.        _____ ("Seller") is not a foreign individual, foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Federal Tax Regulations);

2.        The U.S. employer identification number of Seller is _____;

3.        The address of Seller is _____; and

4.        The undersigned understands and acknowledges that this affidavit may be disclosed to the Internal Revenue Service by _____ ("Buyer") in connection with the certain Purchase Agreement and Escrow Instructions by and between Seller and Buyer, as evidence of Buyer's compliance with Section 1445 of the Internal Revenue Code. The undersigned understands that any false statements contained herein could be punished by fine or imprisonment or both.

The undersigned certifies under penalty of perjury that the foregoing is true and correct.

Dated as of this ___ day of _____, 200__.

                                        [SIGNATURE BLOCK OF SELLER]