**LEWIS AND ROCA LLP**
Robert M. Charles, Jr., NV 006593
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169-5996
Telephone:   702.949.8320
Facsimile:   702.949.8321
E-mail:   rcharles@LRLaw.com

**MORRISON & FOERSTER LLP**
G. Larry Engel (*pro hac vice* pending)
425 Market Street
San Francisco, California 94105-2482
Telephone:   415.268.7000
Facsimile:   415.268.7522
E-mail:   lengel@mofo.com

*Attorneys for JPMorgan Chase Bank, N.A.*
*for itself and as Administrative Agent*

**MORRISON & FOERSTER LLP**
James E. Hough (*pro hac vice* pending)
Norman S. Rosenbaum (*pro hac vice* pending)
Jordan A. Wishnew (*pro hac vicce* pending)
1290 Avenue of the Americas
New York, New York 10104
Telephone:   212.468.8000
Facsimile:   212.468.7900
E-mail:   jhough@mofo.com
E-mail:   nrosenbaum@mofo.com
E-mail:   jwishnew@mofo.com

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF NEVADA

| In re: | Case No.: 10-32968 |
|---|---|
| SOUTH EDGE, LLC, | Chapter 11 |
| Involuntary Debtor. | **Declaration of James E. Hough, Esq. In Support of JPMorgan Chase Bank N.A.'s Motion to Appoint an Interim and Permanent Chapter 11 Trustee for South Edge, LLC During (i) the "Gap" Period and (ii) On A Permanent Basis**<br><br>**Hearing Information**<br>Date: _____, 2010<br>Time:   [ ]<br>Courtroom:   [ ] |

I, James E. Hough, Esq., declare pursuant to 28 U.S.C. § 1746, as follows:

## INTRODUCTION

1. I am a member of Morrison & Foerster LLP, counsel for JPMorgan Chase Bank, N.A. ("JPMorgan"). I submit this Declaration In Support of JPMorgan's Motion to Appoint an Interim and Permanent Chapter 11 Trustee for South Edge, LLC During (i) the "Gap" Period and (ii) On A Permanent Basis, to provide the Court with the background of JPMorgan's claims against certain members of South Edge, LLC and their corporate parents (the "Builder-Defendants")[1] which have been asserted in several related cases pending against the Builder-Defendants in the United States District Court for the District of Nevada. JPMorgan's claims against the Builder-Defendants stem from a $585 million syndicated loan provided to South Edge, LLC ("South Edge" or "Debtor"), under which JPMorgan acts as Administrative Agent. These related cases are captioned as *JPMorgan Chase Bank, N.A. v. KB Home et al.*, and are consolidated for pre-trial purposes under case number 2:08-cv-01711.[2] The complaints against KBHN, and its corporate parent, KB Home, are attached as **Exhibits A** and **B** as examples of all the claims asserted by JPMorgan against the Builder-Defendants.

## BACKGROUND

2. In 2003, preliminary discussions began among some of the nation's largest homebuilders for the creation of "Inspirada"—a large-scale "new urbanism" development project in the City of Henderson, Nevada ("Inspirada" or "the Project"). In May 2004, eight corporate parent homebuilders, through their subsidiaries, formed South Edge, a single-purpose entity whose sole purpose was to purchase the land for the Project from the Federal Bureau of Land Management

---

[1] The Builder-Defendants are: Meritage Homes of Nevada ("Meritage"), Coleman-Toll Limited Partnership ("Coleman-Toll"), Beazer Homes Holding Corp. ("Beazer"), KB Home Nevada, Inc. ("KBHN"), and Pardee Homes of Nevada ("Pardee"), and their respective defendant Parent entities.

[2] The additional case numbers referencing these related cases pending against the Builder-Defendants are: 2:08-cv-01709, 2:08-cv-01713, 2:08-cv-01714, 2:08-cv-01715, 2:08-cv-01716, 2:08-cv-01717, 2:09-cv-01154, 2:09-cv-01547, 2:09-cv-01548, 2:09-cv-01549, 2:09-cv-011550, 2:09-cv-01551, and 2:09-cv-01552.

("BLM") at a cost of $557 million, and then to develop it in accordance with specific contracts that are a part of the Lenders' collateral.

3. The eight Members of South Edge (each a "Member") include the Builder-Defendants, as well as Focus South Group, LLC ("Focus"), Alameda Investments, LLC ("Alameda"), and Kimball Hill Homes Nevada, Inc. ("Kimball Hill").

4. Focus is the only Member of South Edge that has not defaulted on its Takedown obligations under the Operating Agreement and is also the only Member that has performed all of its takedowns under its Acquisition Agreement.

5. Kimball Hill and Alameda and their respective parent homebuilders all sought protection under Chapter 11 of the United States Bankruptcy Code and therefore they are not named as defendants in any of the related suits filed by JPMorgan as Agent.

6. The corporate parent homebuilders (each a "Parent Guarantor") are some of the largest developers and homebuilders in the United States. The Parent Guarantors include: KB Home, Beazer Homes USA, Inc., Toll Brothers, Inc., Weyerhaueser Real Estate Company, Meritage Homes Corp., Woodside Group, Inc., Kimball Hill Inc., and John A. Ritter.

7. The funds for the Project came from three sources: (1) a $585 million loan ("Loan") from a syndicate of lenders, with JPMorgan acting as Administrative Agent and collateral agent for the loan; (2) $102 million in Local Improvement District ("LID") bonds issued by the City of Henderson; and (3) Member capital contributions. At present, there are approximately 39 Lenders, including some of the original lenders, and some successors or assignees.

8. The Loan was funded pursuant to a Credit Agreement dated November 1, 2004, among South Edge, as "Borrower," JPMorgan, as "Administrative Agent" and as a "Lender," together with the other "Lenders" from time to time party thereto (the "Lenders"), which was replaced by an Amended and Restated Credit Agreement, dated March 9, 2007 (the "Credit

1  Agreement").[3] South Edge is governed by the Amended and Restated Operating Agreement of South
2  Edge, LLC, dated as of May 3, 2004 (the "Operating Agreement").[4]

3  9.  South Edge entered into certain other Loan Documents that assign collateral to
4  JPMorgan, including: the Deed of Trust, Security Agreement, Fixture Filing and Assignment of
5  Rents and Leases dated as of October 29, 2004 (the "Deed of Trust");[5] the Assignment of Contracts,
6  Permits and Plans and Specifications dated as of November 1, 2004 (the "Assignment of
7  Contracts");[6] the Assignment of and Agreement with Respect to Acquisition Agreements dated as of
8  November 1, 2004 (the "Assignment of Acquisition Agreements");[7] and, in addition, a UCC
9  Financing Statement was duly filed (collectively, the "Collateral Documents").

**INITIAL DEFAULT AND THE FORBEARANCE AGREEMENT**

10.  On May 27, 2008, following numerous defaults, JPMorgan, South Edge, and the Members and the Parent Guarantors, entered into a Forbearance Agreement in order to "provide [South Edge] with sufficient time to propose, negotiate and close a potential restructuring of Loans advanced under the Credit Agreement."[8]

11.  South Edge, the Members, and the Parent Guarantors provided comprehensive releases to JPMorgan and the Lenders as well as various other benefits in the Forbearance Agreement.

---

[3] The Credit Agreement is attached to the Declaration of John P. McDonagh, dated November 30, 2010 ("McDonagh Decl.") as **Exhibit A**. The original 2004 Credit Agreement is substantially the same as the 2007 Credit Agreement, and has been omitted for brevity.

[4] The Operating Agreement is attached to the McDonagh Decl. as **Exhibit D**.

[5] The Deed of Trust is attached to the McDonagh Decl. as **Exhibit F**.

[6] The Assignment of Contracts is attached to the McDonagh Decl. as **Exhibit B**.

[7] The Assignment of Acquisition Agreements is attached to the McDonagh Decl. as **Exhibit C**.

[8] Forbearance Agreement Introductory Statement. The Forbearance Agreement is attached hereto as **Exhibit C**.

12. In the Forbearance Agreement, South Edge, the Members, and the Parent Guarantors specifically warranted that only limited and enumerated defaults had occurred. Specifically, the following specified Defaults and Events of Default were listed in the Forbearance Agreement:

> (i) the Event of Default existing under Section 9.01(b) of the Credit Agreement with respect to Borrower's failure to pay the interest payment due on the Loans on February 29, 2008; (ii) the Event of Default existing under Section 9.01(b) of the Credit Agreement with respect to Borrower's failure to pay the interest payment due on the Loans on March 31, 2008; (iii) the Event of Default existing under Section 9.01(b) of the Credit Agreement with respect to Borrower's failure to pay the interest payment due on the Loans on April 30, 2008; (iv) subject to Section 3(d) of this Forbearance Agreement, any Default or Event of Default arising solely with respect to the failure by a Member to complete its scheduled Takedown on April 15, 2008; (v) the Event of Default existing under Section 6.18 of the Credit Agreement on account of Borrower's failure to maintain the interest reserve provided for in the Operating Agreement; (vi) the Event of Default existing under Section 9.01(i) of the Credit Agreement with respect to the voluntary commencement by Kimball Hill, Inc. and Kimball Hill Homes Nevada, Inc. of a petition seeking reorganization under Federal bankruptcy law; and (vii) any other Defaults or Events of Default existing as of the date hereof or which may arise during the Forbearance Period [the Effective Date to the Forbearance Termination Date], other than any New Material Defaults.[9]

13. The Forbearance Agreement also provided for reaffirmation of the specific obligations South Edge, the Members, and the Parent Guarantors owed to the Lenders. Specifically, the following obligations owing to the Lenders were reaffirmed as part of the Forbearance Agreement: (1) the obligation of South Edge to make interest payments due on the Loans under § 9.01(b) of the Credit Agreement; (2) the obligation of Members to complete their scheduled Takedowns; (3) the obligation of South Edge to maintain the interest reserve provided for in the Operating Agreement under § 6.18 of the Credit Agreement; (4) the obligation of the Members and Parent Guarantors to not file a voluntary petition seeking reorganization under Federal bankruptcy law, which would result in an Event of Default under § 9.01(i) of the Credit Agreement; (5) the obligation to keep the Collateral from becoming encumbered by one or more liens or bonded stop notices exceeding $5 million; and (6) the obligation to pay money due in order to keep from materially and adversely

---

[9] Forbearance Agreement, Ex. C, at § 2.

1  affecting the value of the collateral, the ability of JPMorgan or the Lenders to exercise remedies with
2  respect to the collateral or guaranties, or the timing of any remedies.

3  14.     Neither South Edge, nor any of the Members or Parent Guarantors, informed
4  JPMorgan of the secretly extended Takedown schedules at the time the Forbearance Agreement was
5  signed. In fact, South Edge specifically warranted that only limited and enumerated defaults had
6  occurred, and the Members, including KBHN, ratified such misstatements and omissions by failing to
7  apprise JPMorgan of their falsity.

8  15.     After signing the Forbearance Agreement, JPMorgan, South Edge, the Members, and
9  the Parents sought to restructure the Loan, but those efforts were unsuccessful, and the Forbearance
10 Agreement terminated, by its own terms, on June 30, 2008.

## CONTINUING DEFAULTS

12 16.     On July 1, 2008, JPMorgan formally notified South Edge and the Members and their
13 Parent Guarantors of the Forbearance Agreement's termination and apprised them of some of the
14 continuing defaults.

15 17.     On July 2, 2008, JPMorgan sent a Notice of Default to South Edge and KBHN
16 (similar letters were sent to the other Members), regarding the defaults associated with KBHN's
17 failure to make its Takedowns as required under its Acquisition Agreement.

18 18.     On November 13, 2008, JPMorgan sent South Edge a Balancing Notice. Pursuant to
19 the terms of the Credit Agreement, a Balancing Payment is due when the projected costs to complete
20 the Project exceed the Approved Project Budget. At such time, an "Out of Balance Condition" exists
21 and, upon demand, South Edge must make a Balancing Payment to JPMorgan in the amount of the
22 Out of Balance Condition. JPMorgan calculated the Out of Balance Condition to be $325,389,667 at
23 the time it sent the Balancing Notice.

24 19.     By operation of § 2 of the Completion Guaranty, executed by each Member and its
25 Parent, if South Edge fails to make a Balancing Payment (which they have failed to do), the Members
26 and the Parents must jointly and severally pay their pro rata shares of the Balancing Payment to
27 JPMorgan.

28

20.     On December 1, 2008, JPMorgan sent South Edge (and all the Members and Parent Guarantors) two Notices of Default for multiple defaults under the Credit Agreement and Collateral Documents.

21.     Also on December 1, 2008, JPMorgan sent South Edge, all of the Members, and all of the Parent Guarantors, a Demand for Adequate Assurance of Due and Future Performance.

## LITIGATION COMMENCED

22.     After South Edge, the Members, and the Parent Guarantors refused to cure numerous defaults; make certain "Balancing Payments," which are required under the Credit Agreement and the Completion Guaranties signed by each Member and Parent Guarantor; or assure any performance under the Credit Agreement, Loan Documents, or Collateral Documents, JPMorgan commenced two sets of actions against each of the non-bankrupt Members and their respective Parent Guarantors (but not directly against South Edge) in order to enforce (i) the guarantees given by the Members (and their Parents) to Lenders in connection with the Credit Agreement and applicable Notes, (ii) South Edge's rights under the operable documents (*e.g.*, the Operating Agreement and Acquisition Agreements) against the Members, and (iii) other claims for breaches of fiduciary duty and other torts by the Builder-Defendants.

23.     Under Section 11.02 of the Credit Agreement, unanimous consent of the Lenders is required in order to compromise the fundamental rights, guaranties, and collateral granted to the Lenders under the Loan Documents.

### Completion Guaranty Actions

24.     The first set of actions, filed in the United States District Court for the Southern District of New York on December 5, 2008 against the non-bankrupt Members and Parent Guarantors, were based on the Completion Guaranties executed by each of the Builder-Defendants (the "Completion Guaranty Actions"). The Completion Guaranty Actions seek from the Members and Parent Guarantors (1) their share of the payment of the outstanding Guaranteed Development Costs, which is estimated to be more than $600 million, (2) their share of the Balancing Payment owed by South Edge, and (3) their share of all costs and expenses incurred by JPMorgan relating to performance and enforcement of the Completion Guaranties, including attorney's fees.

ny-946647

7

DECLARATION OF JAMES E. HOUGH, ESQ.

25. On May 26, 2009, on motion by the Members and Parent Guarantors, the Completion Guaranty Actions were transferred to the United States District Court for the District of Nevada where the UCC Actions (discussed below) were pending. The Completion Guaranty Actions were consolidated, along with the UCC Actions, before the Honorable Philip M. Pro.

### UCC Actions

26. Also on December 5, 2008, JPMorgan filed a second set of actions against the Members of South Edge and their Parent Guarantors, known as the "UCC Actions," in the United States District Court for the District of Nevada. The UCC Actions seek to enforce the collateral pledged to JPMorgan pursuant to the Credit Agreement and Loan Documents, including the Takedowns owing in excess of $275 million, and also seek damages for certain torts committed by KBHN, KB Home, and the other Builder-Defendants.

27. The UCC Actions, filed against the non-bankrupt Members and their respective Parent Guarantors, seek damages for (1) the Members' breach of contract, including breach of the Operating Agreement, Acquisition Agreement, and Assignment of Acquisition Agreement; (2) the Parents' breach of the same contracts; (3) the Members' and Parents' breach of their fiduciary duty to South Edge (which had assigned its rights to JPMorgan) and to JPMorgan (as a creditor of an insolvent LLC); (4) the Parents' intentional interference with contractual relations between each Member and South Edge; and (5) the action seeks a resulting trust.

28. The basis of many of JPMorgan's claims was the assignment of all of South Edge's contract rights to it by (1) the Deed of Trust, (2) the Assignment of Acquisition Agreements, and (3) the Assignment of Contracts. In essence, JPMorgan sought to enforce certain of South Edge's rights against the Members and Parent Guarantors of South Edge, by "standing in the shoes" of South Edge and enforcing its rights as a secured creditor under the Uniform Commercial Code Section 9607. In addition, JPMorgan brought some of the causes of action (notably, those in tort), in its own name against the Builder-Defendants.

29. On January 30, 2009, KBHN, KB Home, and the other Members and Parent Guarantors moved to dismiss the UCC Actions. JPMorgan opposed the motion, and the court issued its decision on July 15, 2009. In the Court's Order, it denied the motion to dismiss in large part,

leaving intact (1) all of JPMorgan's claims for breach of contract against KBHN and the other Members, (2) JPMorgan's breach of contract claim against KB Home and the other Parent Guarantors under the Acquisition Agreement and Assignment of Acquisition Agreement, (3) JPMorgan's claim for breach of fiduciary duty as a creditor to an insolvent LLC against both the Members and the Parent Guarantors, and (4) all of JPMorgan's claims against KBHN, KB Home, and the other Members and Parent Guarantors for intentional interference with contract.

### Recent Litigation Decisions

30.  On September 27, 2010, Judge Pro in the District of Nevada denied KBHN, KB Home, and the other Members and Parent Guarantors' motion for leave to file a counterclaim and third-party complaint arising from a Cooperation Agreement entered into by JPMorgan and Focus. JPMorgan, Focus, and Focus's Parent Guarantor, John A. Ritter, opposed the motion. The court rejected all of the Builder-Defendants' proposed claims. The rejected claims alleged (1) tortuous interference with contract, (2) breach of the implied covenant of good faith and fair dealing, (3) champerty, and (4) declaratory relief. The court also rejected the Builder-Defendants' attempt to add Lender Steering Committee members as parties to the claims. The court held that any counterclaim arising under the Guaranties was waived by the Builder-Defendants. This included the proposed counterclaim for breach of good faith and fair dealing under the court's interpretation of the New York Uniform Commercial Code, and counterclaims relating to Nevada's one action rule, unclean hands, and *in pari delicto*.

31.  On September 27, 2010, the court also denied KBHN and KB Home's motion for a preliminary injunction (joined by the other Members and Parent Guarantors) to enjoin JPMorgan from drawing down on the Major Infrastructure Deposits ("MI Deposits"). The MI Deposits were deposited when the home builders made their Takedowns in order to cover major Project costs in the event a Member did not make payments when they came due. In the court's Order, it agreed with JPMorgan's position that irreparable harm did not exist because the dispute could be remedied by money damages, and because the MI Deposits were not intended for immediate use. Additionally, the court found that the Builder-Defendants' motion did not weigh in their favor in equity because the Project was threatened because *South Edge* stopped performing and ceased further development on

the project, not because JPMorgan drew down the MI Deposits. The court permitted JPMorgan to continue drawing down the deposits, and said it could do so disproportionally to the home builders' pro rata shares of the Project because the entire amount of deposits made by the respective home builders still did not equal their pro rata secured obligations. In so ruling the court also denied the Builder-Defendants' request to add related claims for conversion and declaratory judgment stemming from JPMorgan's use of these funds.

32. Finally, on September 27, 2010, the court granted JPMorgan's motion to amend its UCC Actions. The amended complaints added claims for damages arising from (1) fraudulently inducing JPMorgan into a Forbearance Agreement, (2) tortiously interfering with the Credit Agreement between South Edge and the Lenders (the court ordered that this claim only proceed against the Members), (3) breaching the Limited Guaranty executed by each of the Members and Parent Guarantors, and (4) seeking a declaration that certain purported extensions of the Takedown Schedule are null and void. These claims are largely based on certain Members' and Parent Guarantors' efforts to unlawfully extend the dates on which each Member was required to perform its Takedowns and the subsequent efforts to conceal these actions from JPMorgan, including representations made in the Forbearance Agreement.

### FOCUS'S ARBITRATION WITH THE OTHER MEMBERS

33. In May 2009, Focus filed a demand for arbitration against the other Members of South Edge, including KBHN, on behalf of itself and South Edge, and sought relief in the Arbitration both for itself and for South Edge (the "Arbitration"). Focus brought its demand as the only Member of South Edge that did not default on its Takedown obligations under the Operating Agreement and performed all of its Takedowns under its Acquisition Agreement.[10]

34. Through the Arbitration, Focus sought to require KBHN and the other Members to honor and specifically perform their contractual obligations to South Edge, including (1) satisfying the Takedowns past due and owing to South Edge and (2) recover monetary damages from the

---

[10] There is a separate Focus entity that is the manager of South Edge—Holdings Manager, LLC ("Holdings"). Another Focus general affiliate, called Landtek, LLC, is the construction manager. These Focus-related creditors also have substantial claims.

controlling Members for the loss of value to South Edge resulting from the Builder-Defendants' ongoing pattern of putting their own self-interests ahead of the best interests of South Edge and its creditors. By operation of the Credit Agreement and other Loan Documents, any recovery by Focus or South Edge would have resulted in substantial payments to JPMorgan to pay down the loan.

35. KBHN and the other Members did not succeed in either enjoining the arbitration or staying the UCC Actions. As a result, the arbitration and the litigations continued simultaneously.

36. The arbitral panel included two retired Chief Justices of the Nevada Supreme Court and a retired United States District Judge for the District of Nevada. On August 11, 2009, the Arbitration panel was given discretion, from Judge Philip M. Pro who presides over the civil litigation in the district court, to permit up to 120 days for pretrial discovery, 30 days for dispositive motions, motions in limine, and trial briefing. A scheduling order was issued by the parties to the arbitration on September 1, 2009. Thereafter, the parties conducted a significant amount of discovery prior to the arbitration, and the panel issued orders on numerous related discovery motions on five separate occasions. The Arbitration was conducted over a two week period, beginning on February 22, 2010 and concluding on March 4, 2010, in Las Vegas, Nevada. More than 1,300 exhibits were submitted to the arbitration panel. During the arbitration proceeding, at least thirteen witnesses testified. The Arbitration's closing arguments were heard on March 11, 2010.

### Arbitration Award

37. The arbitration was completed in March 2010, and the panel issued its written Arbitration Award (the "Arbitration Award") on Tuesday, July 6, 2010.

38. In the panel's decision, they found that the Builder-Defendants had wrongfully shut down the Project and wrongfully extended the maturity of the Builder-Defendants' liability to pay the Takedowns to Debtor (and the Lenders as secured creditor-assignees) in accordance with their contract. In its Arbitration Award, the arbitration panel concluded that the defaulting Builder-Defendants breached their agreements by (i) failing to fund interest payments and interest reserves, (ii) voting to cease construction on the Project, (iii) refusing to make their Takedowns, and (iv) purporting to extend the Takedown schedule in breach of the Acquisition Agreements. (Award at 57-58.) The Arbitration Award is attached hereto as **Exhibit D**.

39.	The only cash award was to Focus to compensate it for the Builder Defendants' direct and immediate breach of contract, in the sum of $36,815,354. The Panel determined this amount was equivalent to the diminution in value of Focus' investment in the Project resulting from the breaches of the other Builder Members.

40.	The panel's decision fosters managerial deadlock and does not rectify South Edge's governance issue for a number of reasons. First, pursuant to the Arbitration Award, Focus is unable to compel KBHN and the other Members to perform their past-due Takedowns to South Edge—*i.e.*, pay down a significant portion of the money owed to JPMorgan and the Lenders under the Credit Agreement. (Award at 55.) Second, the Arbitration Award does not permit Focus to act derivatively for South Edge to enforce its rights and claims for recovery from the Builder-Defendants. (Award at 46.) The decision found that "the commission of an act constituting an Event of Default would immediately disable the defaulting party from participating in forming a quorum of the Management Committee." (Award at 42.) The Award then went on to find that the Operating Agreement's quorum and default provisions were not harmonious, creating a "latent ambiguity" because, if all the Members have defaulted, it is impossible for South Edge to form a quorum. (*Id.*) Therefore, the panel decision did not permit Focus to singularly form a quorum under the Operating Agreement as the only non-defaulting Member. (Award at 44.) Rather, the panel found that the Management Committee, duly constituted, is the only entity with the authority to bring an arbitration on behalf of South Edge. (Award at 46.) In this regard, the panel concluded that the Members retain their right to vote until they are formally voted out under the Operating Agreement. (Award at 47.) The panel therefore concluded that Focus could only commence arbitration on its own behalf, and could not assert claims on behalf of South Edge. (Award at 46.)

41.	The Arbitration Award was confirmed by the United States District Court for the District of Nevada on November 2, 2010, and on November 9, 2010, the Builder-Defendants filed a notice of appeal of judgment of the Arbitration Award.

1  I declare under penalty of perjury that the foregoing is true and correct.  Executed this 30th of
2  November, 2010 at New York, New York.

_____
James E. Hough, Esq.