# EXHIBIT A

1    SYLVESTER & POLEDNAK, LTD.
     JEFFREY R. SYLVESTER, ESQ. (Nevada Bar No. 4396)
2    ALLYSON R. NOTO, ESQ. (Nevada Bar No. 8286)
     7371 Prairie Falcon Road, Suite 120
3    Las Vegas, Nevada  89128
     Tel.: (702) 952-5200
4    Fax: (702) 952-5205
     jeff@sylvesterpolednak.com
5    allyson@sylvesterpolednak.com

6    MORRISON & FOERSTER LLP
     JAMES E. HOUGH, ESQ. (Admitted pro hac vice)
7    1290 Avenue of the Americas
     New York, New York  10104-0050
8    Tel.: (212) 468-8000
     Fax: (212) 468-7900
9    jhough@mofo.com

10   Attorneys for Plaintiff/Counterdefendant
     JPMORGAN CHASE BANK, N.A.

11

12                  IN THE UNITED STATES DISTRICT COURT

13                        DISTRICT OF NEVADA

14   JPMORGAN CHASE BANK, N.A.,              2:08-CV-01711-PMP-RJJ **BASE FILE**

15                    Plaintiff,
                                             **AMENDED COMPLAINT**
16          v.
                                             **JURY DEMAND**
17   KB HOME, *et al.*,
                                             **Related Cases:**
18                    Defendants.            2:08-CV-01709-PMP-RJJ
                                             2:08-CV-01713-PMP-RJJ
19                                           2:08-CV-01714-PMP-RJJ
                                             2:08-CV-01715-PMP-RJJ
20                                           2:08-CV-01716-PMP-RJJ
                                             2:08-CV-01717-PMP-RJJ
21   This Document Relates To:
                                             2:09-CV-01154-PMP-RJJ
22   2:08-CV-01711-PMP-RJJ                   2:09-CV-01547-PMP-RJJ
                                             2:09-CV-01548-PMP-RJJ
23                                           2:09-CV-01549-PMP-RJJ
                                             2:09-CV-01550-PMP-RJJ
24                                           2:09-CV-01551-PMP-RJJ
                                             2:09-CV-01552-PMP-RJJ
25

26   / / /
     / / /
27   / / /

28
                                     1

JPMorgan Chase Bank, N.A. ("JPMorgan" or "Plaintiff"), for itself and as Administrative

Agent, by its undersigned counsel, Sylvester & Polednak, Ltd., for its complaint against

defendants KB Home ("Defendant Parent") and KB Home Nevada, Inc. ("Defendant Member"

and, generally with Defendant Parent, each a "Defendant"), alleges, on knowledge with respect to

its own acts, and on information and belief with respect to all other matters as follows:[1]

## JURISDICTION AND VENUE

1.      The Plaintiff is a nationally chartered bank with its main office in Columbus, Ohio.

Defendant Parent is a corporation incorporated under the laws of Delaware with its principal

place of business in California.  Defendant Member is a corporation incorporated under the laws

of Nevada with its principal place of business in Nevada.  The amount in controversy, without

interest and costs, exceeds the sum or value specified by 28 U.S.C. §1332.

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

3.      Defendants have consented to personal jurisdiction in this Court.

## PARTIES AND RELEVANT NON-PARTIES

4.      Plaintiff is a nationally chartered bank with its main office in Columbus, Ohio.

Pursuant to 28 U.S.C. § 1348, Plaintiff is a citizen of the State of Ohio.  Plaintiff brings this

action on its own behalf, and as Administrative Agent under the Credit Agreement and other

Loan Documents defined below.

5.      Defendant Parent is a Delaware corporation with a principal place of business at

10990 Wilshire Boulevard, Los Angeles, California, and is a citizen of the states of Delaware and

California.

6.      Defendant Member is a Nevada corporation with its principal place of business

located at 5655 Badura Ave., Las Vegas, Nevada, and is a citizen of the state of Nevada.

---

[1] This Amended Complaint is filed pursuant to the Court's September 27, 2010 Order.
(ECF# 344.)  The claims contained herein, which were subject to the parties' respective motions
to dismiss and amend, are subject to the Court's opinions and orders on those motions.  *See* Order
dated July 15, 2009 (ECF# 85); Order dated September 27, 2010 (ECF# 344).  In filing this
Amended Complaint, JPMorgan does not intend to reassert claims dismissed by the Court in
those earlier opinions.

AMENDED COMPLAINT

1  Defendant Member is a controlling Member of the "Borrower," South Edge, LLC ("South
2  Edge").
3         7.    Non-party South Edge is a Nevada limited liability company with its principal
4  place of business at 3455 Cliff Shadows Parkway, Suite 220, Las Vegas, Nevada.
5         8.    Non-party South Edge is comprised of the eight members (each a "Member"), of
6  which Defendant Member is one.  The other Members of South Edge are Focus South Group,
7  LLC, Coleman-Toll Limited Partnership, Meritage Home of Nevada, Inc., Beazer Homes
8  Holding Corp., Pardee Homes of Nevada, Alameda Investments, LLC, and Kimball Hill Homes
9  Nevada, Inc.
10        9.    Each Member has a parent (each a "Parent"), and Defendant Parent is the Parent of
11 Defendant Member.  The Parents of the Members listed in paragraph 12 are John A. Ritter, Toll
12 Brothers, Inc., Meritage Homes Corp., Beazer Homes USA, Inc., Weyerhaeuser Real Estate
13 Company, Woodside Group, Inc., and Kimball Hill Inc., respectively.

## SUMMARY OF THE ACTION

15        10.   This is a diversity action arising from multiple breaches of several contracts that
16 relate to a real estate development project called "Inspirada" (the "Project") located in Henderson,
17 Nevada that encompasses nearly two thousand acres of land purchased at auction from the federal
18 government.  Development of Inspirada was initially projected to cost more than $1.25 billion,
19 and is now projected to cost at least $1.55 billion.  A significant portion of the financing for
20 Inspirada was provided by a syndicate of banks, for which Plaintiff acts as Administrative Agent,
21 in the form of loans to South Edge, an entity that was formed solely for the purpose of developing
22 the Project.

23        11.   South Edge is controlled by its eight Members, each of which is affiliated with a
24 large real estate developer.  Defendant Member is one of the Members, and is a wholly owned
25 subsidiary of Defendant Parent.  Separate, parallel actions or claims have been filed against the
26 other Members and their Parents.[2]

27 _____
        [2] Six similar suits have been filed by Plaintiff against 1) Focus South Group, LLC and
28 John A. Ritter, 2) Beazer Homes Holding Corp. and Beazer Homes USA, Inc., 3) Coleman-Toll

AMENDED COMPLAINT

12.     As a result of the breaches of the Credit Agreement (defined below) and other Loan Documents alleged herein, Plaintiff is entitled to enforce rights to the collateral pledged as security for the loans to South Edge.  Among the collateral pledged by South Edge is the right to enforce certain contracts that require the Members to make payments to South Edge, so that South Edge will have funds to repay the lenders.  By this action, Plaintiff seeks to enforce those rights against Defendant Member.  The full amount owed by Defendant Member will be determined at the trial of this action.

13.     This action also seeks to hold Defendant Parent responsible for causing Defendant Member to breach its payment obligations to South Edge, for its wrongful interference with the contracts between Defendant Member and South Edge, and for its failure to honor its contractual obligations to South Edge and to the lenders.

## BACKGROUND ALLEGATIONS

14.     In 2003, preliminary discussions began for the creation of "Inspirada" - a large-scale "new urbanism" development project in the City of Henderson, Nevada.  Inspirada was to include 11,500 residences spread over nearly 2,000 acres of land, and was expected to cost approximately $1.25 billion.  The Development Costs (as defined in the Credit Agreement) have increased by at least another $325,000,000 as a result of delays and other problems caused by Defendants, among other causes.

15.     The Members formed South Edge in May 2004 to purchase the land for the Project from the Federal Bureau of Land Management at a cost of $557 million.  South Edge completed that purchase, in part, with funds loaned by Lenders pursuant to a Credit Agreement dated November 1, 2004, among South Edge, as "Borrower," JPMorgan, as "Administrative Agent" and as a "Lender," together with the other "Lenders" from time to time party thereto (the

Limited Partnership and Toll Brothers, Inc., 4) Pardee Homes of Nevada and Weyerhaueser Real Estate Company, 5) Meritage Homes Nevada, Inc. and Meritage Homes Corp., and 6) Alameda Investments, LLC.  Woodside Group, Inc. (the Parent of Alameda Investments, LLC, a South Edge Member), Kimball Hill Homes Nevada, Inc., and Kimball Hill Inc. (the Parents of Kimball Hill Homes Nevada, Inc., a South Edge Member) have filed as debtors under Chapter 11 of the United States Bankruptcy Code and have, therefore, not been named as defendants in any of these related suits.

"Lenders"), which was replaced by an Amended and Restated Credit Agreement, dated March 9, 2007 (the "Credit Agreement").  A copy of the Credit Agreement is attached hereto as Exhibit "A"[3] and is incorporated herein by reference.[4]  Except as otherwise specified herein, the capitalized terms in this Complaint are used as they are defined in the Credit Agreement.

16.    Defendant Member (as well as the other Members) agreed to purchase specified parcels of land from South Edge.  The payments from the Members to South Edge in connection with land purchases were intended to provide funds South Edge would use, as Borrower, to repay its liabilities and obligations to Lenders under the Credit Agreement and other Loan Documents.

17.    Each Member has the right *and the obligation* to acquire specified parcels of land, from South Edge in successive Phases.  Each parcel of the land so purchased must be developed in accordance with the Project's Master Plan.

18.    Defendant Member also agreed to make periodic payments to Borrower in amounts and under conditions specified in the agreements identified below.  Borrower's rights to enforce such payment and related obligations are among the collateral pledged to Lenders under the Loan Documents.

19.    Defendant Member has, among other things, failed and refused to purchase land from Borrower in accordance with its agreements, and make other payments and perform other obligations to Borrower as required by its agreements.

20.    Borrower is dependent on Defendants (together with the other similarly situated Members and Parents) to be able timely to perform its obligations to Lenders.  Borrower requires, and was promised, timely cooperation, funding and support from Defendants, as well as other Members and Parents.

21.    Defendants were and are unconditionally obligated to timely perform and to pay all of their relevant liabilities and obligations.

---

[3] Exhibits A-H were attached to the original Complaint and are incorporated herein by reference.

[4] Certain non-substantive portions (such as exhibits and non-party signature pages) have been omitted from Exhibit A due to the substantial volume of the document.

**AMENDED COMPLAINT**

22.     Defendants have undermined Borrower's ability to repay Lenders through their actions and failures to act.

23.     On May 3, 2004, the Members, including Defendant Member, entered into the Amended and Restated Operating Agreement of South Edge, LLC, dated as of May 3, 2004 (as amended, the "LLC Agreement"), attached hereto as Exhibit "B", and incorporated herein by reference.

24.     On October 24, 2004, the Members, including Defendant Member, entered into an "Acquisition Agreement" with Borrower (Acquisition Agreement is defined in the Credit Agreement as the "Purchase and Sale Agreement and Joint Escrow Instructions"), attached hereto as Exhibit "C" and incorporated herein by reference.

## THE COLLATERAL DOCUMENTS

25.     Pursuant to the Credit Agreement and to provide security for the repayment of the loans made thereunder, Borrower executed, in favor of Plaintiff (on behalf of Lenders), the following "Collateral Documents," in which Plaintiff and Lenders acquired as "Collateral" both a Lien on the Project and related real property rights and interests as "Trust Property," as well as certain personal property security interests pursuant to the applicable Uniform Commercial Code ("UCC"):

    (a)     The Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents and Leases dated as of October 29, 2004, and recorded as Instrument No. 20041101-0006330 with the Clark County Recorder on November 1, 2004, as amended by the First Amendment to Deed of Trust, Security Agreement and Fixture Filing and Assignment of Rents and Leases dated as of March 9, 2007, and recorded with the Clark County Recorder on March 9, 2007, (the "Deed of Trust"), a copy of which is attached hereto as Exhibit "D" and incorporated herein by reference;

    (b)     The Assignment of Contracts, Permits and Plans and Specifications dated as of November 1, 2004 (the "Assignment of Contracts"), a copy of which is attached as Exhibit "E" and incorporated herein by reference;

6

(c)   The Assignment of and Agreement with Respect to Acquisition Agreements dated as of November 1, 2004 (the "Assignment of Acquisition Agreements"), a copy of which is attached hereto as Exhibit "F" and incorporated herein by reference; and

(d)   A UCC financing statement duly filed in the Nevada Secretary of State's office to perfect such UCC security interest.

26.   Among such UCC Collateral (as described below) constituting personal property subject to the UCC are liabilities and obligations of each Defendant to Borrower in connection with each of their contracts (herein collectively referred to as the "Defendants' Contract Collateral"), including without limitation:

(a)   the Acquisition Agreement, as amended;

(b)   the LLC Agreement;

(c)   to the extent that they constitute personal property subject to the UCC, all other contract rights, accounts, general intangibles, actions and rights in actions relating to the "Real Property" or "Personal Property" referenced in the Deed of Trust or the Project, as well as all contracts relating to the development, design or construction of the Improvements, together with all proceeds thereof or proceeds of the Acquisition Agreement or of the sale of all or any part of that Real Property or other Trust Property (described in the Deed of Trust as "Sale Proceeds") and including the sale of interests in the Project; and

(d)   all other revenues, profits, proceeds, principal, interest, fees, or other sums or amounts constituting personal property under the UCC and derived or generated from the ownership, operation, occupancy, leasing, licensing, development, sale or other disposition of the Project or other Collateral by Borrower or due or payable to Borrower under the Acquisition Agreement, as well as all other similar contracts of any other nature concerning the design, construction, or development of any portion of or all of the Project, and all personal property proceeds thereof subject to the UCC.

**PLAINTIFF'S AUTHORITY TO ENFORCE BORROWER'S RIGHTS**

27. Plaintiff is entitled under the Credit Agreement, Collateral Documents and applicable law (including UCC 9607) to enforce each and every right, remedy and claim of Borrower against Defendants in connection with Defendants' Contract Collateral, including, without limitation, each of the rights, remedies and claims asserted in this Complaint, including injunctive relief.

28. Plaintiff is entitled to act in the name and place of Borrower in order to enforce Borrower's rights against Defendants and to perform Borrower's obligations to Lenders, including pursuant to § 9.03 of the Credit Agreement, which provides, in pertinent part; "the Borrower hereby appoints and constitutes the Administrative Agent its lawful attorney in fact with full power of substitution and agrees that the Administrative Agent and the Lenders shall be entitled, subject to applicable Requirements of Law, to . . . (K) do any and every act which the Borrower might do in its own behalf, it being understood and agreed that the foregoing power of attorney shall be a power coupled with an interest and cannot be revoked."

29. Pursuant to the Deed of Trust, Plaintiff is entitled by its terms and applicable law to, among other things, execute and enforce this Complaint, including, without limitation, by:

(a) Collecting as "Sale Proceeds" of such "Sale Contracts" the relevant amounts owing to Borrower collected by Plaintiff hereunder from each Defendant, as UCC Collateral. Borrower (as Trustor) has authorized Plaintiff on account of the continuing Events of Default to recover all such amounts from Defendants, either as attorney in fact for Borrower or as a secured creditor, in either case "with full power to bring suit for collection thereof," as provided in the Deed of Trust;

(b) Pursuant to § 7, performing any of Borrower's obligations, exercising any of Borrower's rights and remedies; and

(c) Exercising other rights thereunder or under the Credit Agreement incorporated by § 10 of the Deed of Trust, which authorizes the remedies enforced herein.

1   30.   Pursuant to the Assignment of Acquisition Agreements, Plaintiff is also now

2   entitled by its terms and applicable law to, among other things, execute and enforce this

3   Complaint, including, without limitation, by:

4   (a)   Collecting all "Proceeds" as defined therein in accordance with §§ 3 and 7 of the

5   Assignment of Acquisition Agreements, including all amounts claimed hereunder

6   as UCC Collateral; and

7   (b)   Enforcing Plaintiff's rights under § 3(a)(i) of the Assignment of Acquisition

8   Agreements "to enforce, for its own benefit, the rights and benefits of the

9   Borrower in the Acquisition Agreements"; under § 3(a)(ii) of the Assignment of

10   Acquisition Agreements "to institute, appear in and defend any action or

11   proceeding purporting to affect, enforce, adjudicate or determine the rights,

12   powers, duties or obligations of the Borrower under the Acquisition Agreements";

13   and under § 3(a)(iv) of the Assignment of Acquisition Agreements "to incur and

14   pay reasonable costs and expenses, employ counsel, and incur and pay reasonable

15   attorney's fees" as "additional Secured Obligations. . . ."

16   31.   Defendants have subordinated their respective rights, claims and interests as to

17   Borrower in favor of Plaintiff's and other Lenders' rights, claims and interests pursuant to § 4 of

18   the Assignment of Acquisition Agreements.

19   **DEFAULTS AND BREACHES**

20   32.   Events of Default exist under the Credit Agreement and Collateral Documents and

21   other Loan Documents.  Defaults also continue to exist on Defendants' Collateral obligations to

22   Borrower under Defendants' Contract Collateral.

23   33.   Borrower is currently in default under the Credit Agreement, Collateral

24   Documents, and other Loan Documents, for, among other reasons, its failure to timely pay

25   millions of dollars in interest and fees, and to make principal payments as and when due.

26   34.   Borrower is also in default for, among other reasons, its failure to diligently

27   continue and complete the construction of the Improvements on the Project without material

28   interruption or cessation in the manner required in the Credit Agreement, and for failing to pay

1   Development Costs and make Balancing Payments as required under the Credit Agreement, the

2   Other Loan Documents, and the Balancing Notice.

3       35.   Defendant Member has failed and refused to purchase parcels of land as required

4   under the Acquisition Agreement and LLC Agreement.

5       36.   Defendant Parent has interfered with Borrower's and Plaintiff's rights with respect

6   to the Acquisition Agreement and the LLC Agreement, and has deprived Borrower and Plaintiff

7   of the benefits thereof, by failing and refusing to permit and enable Defendant Member to honor

8   its obligations to complete land purchases as set forth therein.

9       37.   Members and Parents, including Defendants, have intentionally and wrongfully

10  failed to provide funds and other support owed to Borrower and necessary for Borrower to

11  perform its obligations to Lenders.

12      38.   Each of these defaults and Events of Default is continuing, notwithstanding notice

13  of such defaults having been provided to Borrower and Defendants.  Plaintiff also has made a

14  demand for assurances of future performance on Borrower and Defendants.

15      **ANTICIPATORY REPUDIATION BY FAILURE TO REASSURE**

16      39.   Plaintiff has requested Borrower and Defendants' assurance of future performance

17  of its obligations, and cure of Events of Default and other defaults under the Loan Documents

18  including, without limitation, by the notices attached as Exhibit "G".  Each Defendant (as well as

19  Borrower) has failed to cure any defaults or to provide any assurances, and Plaintiff is informed

20  and believes that Defendants are unable and unwilling to do so.

21      40.   Plaintiff has requested assurances of performance and of cure of the defaults and

22  Events of Default under Defendants' Contract Collateral, including, without limitation, by

23  Plaintiff's notices of default and demands for adequate assurances of future performance on

24  behalf of Borrower and itself, a copy of which is attached hereto as Exhibit "H".  Defendants

25  have failed to cure such defaults under Defendants' Contract Collateral or to provide adequate

26  assurances of future performance thereunder, thereby anticipatorily repudiating and breaching all

27  of those obligations.

28

**MODIFICATION OF TAKEDOWN DATES**

41.     Pursuant to each Member's Acquisition Agreement, each Member is obligated to make its "Takedowns" pursuant to a set schedule (the "Takedown Schedule").

42.     Exhibit C to each Member's Acquisition Agreement includes a Takedown Schedule indicating the scheduled date of each such Takedown.

43.     Each Takedown Schedule is also incorporated into the Credit Agreement and the Operating Agreement.

44.     Section 3.2.3(t) of the First Amendment to the Amended and Restated Operating Agreement states that Takedowns shall occur "pursuant to the 'Takedown Schedule' as defined in accordance with the Acquisition Agreement."

45.     Section 1(b) of the Acquisition Agreement states that all modifications to "the order of the Takedowns set forth on the Takedown Schedule . . . . shall also be subject to any required approvals under any financing arrangements obtained by Developer . . . . "

46.     Section 7.03(a) of the Credit Agreement states that "The Borrower shall not amend, modify or terminate any Acquisition Agreement without the prior written approval of the Administrative Agent . . . . "

47.     Section 8 of the Assignment of Acquisition Agreements, signed by South Edge, each Member, and each Parent states that "Each Member [] agrees not to amend, modify, supplement or, except in accordance with the terms of its Acquisition Agreement, terminate its Acquisition Agreement without the Administrative Agent's prior written approval . . . . "

48.     Section 25(b) of the Acquisition Agreement requires that all modifications to the Acquisition Agreement, including modifications to the Takedown Schedule, be set forth in writing and signed by South Edge and the Member.

49.     In its capacity as Administrative Agent, JPMorgan's written approval was required to amend the Takedown Schedule.

50.     The required approvals by JPMorgan for changes in the Acquisition Agreements were critical to the overall structure of the loan because the Takedown Schedules were set up to coincide with the payment schedule under the Credit Agreement.

**AMENDED COMPLAINT**

1     51.    Indeed, the entire mechanism for having the loan repaid to the Lenders relied on

2 the timing of the scheduled Takedowns and any change in the timing of the Takedowns materially

3 affected the bargain struck by the parties.

4     52.    The Defendants knew that they were required to seek JPMorgan's approval for

5 changes to the Takedown Schedule.

6     53.    On information and belief, in or around August 2006, South Edge, the Members,

7 and the Parents requested JPMorgan's written consent to extend the Takedown dates to conform

8 to a revised project schedule.

9     54.    On or around November 28, 2006, JPMorgan provided written consent to modify

10 the Takedown Schedule.

11     55.    In return for consenting to the Takedown Schedule modification in November

12 2006, JPMorgan received important concessions from South Edge, including the elimination of

13 the 90-day grace period (provided for in the Credit Agreement) for the Takedowns that JPMorgan

14 agreed to modify.

15     56.    Other than the modification of the Takedown Schedule it approved in November

16 of 2006, JPMorgan has never consented to any modification of the Acquisition Agreements, and

17 neither South Edge nor any of the Members or Parents have ever told JPMorgan about any

18 purported modifications to the Takedown Schedules and/or Acquisition Agreements.

19     57.    On April 10, 2008, all of the Members, except Meritage Homes of Nevada, Inc.

20 and Focus South Group, LLC, purported to extend all Takedowns scheduled for April 15, 2008

21 until April 30, 2008. The Members voted on the extension by e-mail, and Joe Caddel of Toll

22 Brothers, Inc., confirmed by e-mail that the motion to extend Takedown dates had passed.

23 Hereinafter, KB Home Nevada, Inc., Coleman-Toll Limited Partnership, Beazer Homes Holding

24 Corp., and Pardee Homes of Nevada shall be referred to as the "Takedown Fraud Defendants."

25     58.    At the time the Takedown Fraud Defendants purported to extend the Takedown

26 Schedules, they knew that such action was in violation of various Loan Documents because, in

27 addition to the clear and unambiguous language in the Loan Documents and their request and

28 receipt of approval for the previous extension, at the April 9, 2008 Management Committee

1   meeting at which the extension was discussed, Scott Bogatz, of Focus South Group, explicitly

2   told them so.

3        59.    By e-mail dated April 15, 2008, Scott Bogatz reiterated that changing the

4   Takedown Schedule could not occur without JPMorgan's consent.

5        60.    The initial proposal for the extension of the Takedown Schedule was made by

6   Takedown Fraud Defendants KB Home Nevada, Inc. and Coleman-Toll Limited Partnership by

7   memorandum dated April 8, 2008 to the other Members of South Edge.

8        61.    Neither South Edge nor any of the Takedown Fraud Defendants sought or received

9   JPMorgan's approval for such a change in the Takedown Schedule even though they knew they

10  were required to do so.

11       62.    Additional Takedowns were scheduled for July 15, 2008, October 15, 2008, April

12  15, 2009, and October 15, 2009.

13       63.    By purporting to exercise the power to extend the Takedown Schedules without

14  JPMorgan's consent, the Takedown Fraud Defendants eviscerated the entire structure of the

15  South Edge loan: that the Takedowns would occur on a prescribed schedule that coincided with

16  payment obligations under the Credit Agreement.

17       64.    Such an unauthorized change in the Takedown Schedules undermined the ability

18  of the Lenders to be repaid for the hundreds of millions of dollars loaned to South Edge because it

19  would allow Defendants to perpetually and unilaterally change the loan's repayment schedule,

20  permit the Defendants to dictate the terms of repaying the loan, and essentially decide whether the

21  Loan would be repaid at all.

22       65.    The Takedown Fraud Defendants' effort to change the Takedown Schedules

23  without JPMorgan's consent changed the entire nature of the bargain struck not only for the

24  Takedowns scheduled for April 15, 2008, but for all of the subsequent Takedowns because it

25  further encouraged Takedown Fraud Defendants to breach their obligations to JPMorgan and

26  South Edge with impunity.

27       66.    After the Takedowns originally scheduled for April 15, 2008 were purportedly

28  extended until April 30, 2008, KB Home Nevada, Inc. and Coleman-Toll Limited Partnership

1   again proposed, by memorandum dated April 30, 2008, an unauthorized extension of Takedowns

2   from April 30, 2008 until May 15, 2008.

3          67.    By written agreement, the Takedown Fraud Defendants again purported to extend

4   the Takedowns originally scheduled for April 15, 2008 (and subsequently changed to April 30,

5   2008) until May 15, 2008, as proposed by KB Home Nevada, Inc. and Coleman-Toll Limited

6   Partnership.

7          68.    By e-mail dated May 5, 2008, Scott Bogatz, of Focus South Group, explicitly

8   reiterated to the Members that the Takedown Fraud Defendants' actions attempting to change the

9   Takedown Schedule violated provisions of the Credit Agreement and the Operating Agreement.

10         69.    Neither South Edge nor any of the Takedown Fraud Defendants sought or received

11  JPMorgan's approval for such a change in the Takedown Schedule even though they knew they

12  were required to do so.

13         70.    After the Takedowns originally scheduled for April 15, 2008 were purportedly

14  extended until May 15, 2008, KB Home Nevada, Inc. and Coleman-Toll Limited Partnership

15  again proposed, by memorandum dated May 15, 2008, an unauthorized extension of Takedowns

16  from May 15, 2008 until May 30, 2008.

17         71.    By written agreement, the Takedown Fraud Defendants again purported to extend

18  the Takedowns originally scheduled for April 15, 2008 (and previously changed to May 15, 2008)

19  until May 30, 2008, as proposed by KB Home Nevada, Inc.  and Coleman-Toll Limited

20  Partnership.

21         72.    By e-mail dated May 15, 2008, Scott Bogatz, of Focus South Group, explicitly

22  reiterated to the Takedown Fraud Defendants that their attempts to change the Takedown

23  Schedules were invalid without JPMorgan's approval.

24         73.    Neither South Edge nor any of the Takedown Fraud Defendants sought or received

25  JPMorgan's approval for such a change in the Takedown Schedule even though they knew they

26  were required to do so.

27

28

AMENDED COMPLAINT

74.     As more fully described below, JPMorgan entered into a "Forbearance Agreement" with all of the Members, Parents, and South Edge on May 27, 2008, relying, in part, on the fact that the Takedown Schedules had not been modified.

75.     After the Takedowns originally scheduled for April 15, 2008 were purportedly extended until May 30, 2008, KB Home Nevada, Inc. and Coleman-Toll Limited Partnership again proposed, by memorandum dated June 4, 2008, to extend the Takedowns originally scheduled for April 15, 2008 until June 30, 2008.

76.     By written agreement, the Takedown Fraud Defendants, and this time, Meritage Homes of Nevada, Inc., purported to again extend the Takedowns originally scheduled for April 15, 2008 (and subsequently changed to May 30, 2008) until June 30, 2008, as proposed by KB Home Nevada, Inc. and Coleman-Toll Limited Partnership.

77.     South Edge, the Takedown Fraud Defendants, and Meritage Homes of Nevada, Inc. did not seek or receive JPMorgan's approval for such a change in the Takedown Schedule even though each of them knew they were required to do so.

78.     After the Takedowns originally scheduled for April 15, 2008 were purportedly extended until June 30, 2008, a "Restructuring Committee of South Edge, LLC," led by KB Home Nevada, Inc. and Coleman-Toll Limited Partnership, proposed, by memorandum dated July 29, 2008, to extend the Takedowns originally scheduled to occur on April 15, 2008 (and subsequently changed to June 30, 2008) until September 30, 2008.

79.     By written agreement, the Takedown Fraud Defendants and Meritage Homes of Nevada, Inc. again purported to extend the Takedowns originally scheduled to occur on April 15, 2008 (and subsequently changed to June 30, 2008) until September 30, 2008, as proposed by the Restructuring Committee of South Edge, LLC.

80.     South Edge, the Takedown Fraud Defendants, and Meritage Homes of Nevada, Inc. did not seek or receive JPMorgan's approval for such a change in the Takedown Schedule even though each of them knew they were required to do so.

81.     After the Takedowns originally scheduled for April 15, 2008 were purportedly extended until September 30, 2008, the Restructuring Committee of South Edge, LLC proposed,

1   by memorandum dated December 15, 2008, an unauthorized extension of <u>nearly all of the</u>

2   <u>remaining Takedowns</u>.  The proposal sought to modify the Takedowns scheduled for April 15,

3   2008 (and subsequently changed to September 30, 2008), July 15, 2008, and October 15, 2008

4   until January 31, 2009.

5        82.    By written agreement, the Takedown Fraud Defendants and Meritage Homes of

6   Nevada, Inc. purported to extend the Takedowns originally scheduled to occur on April 15, 2008

7   (and subsequently changed to September 30, 2008), July 15, 2008, and October 15, 2008 until

8   January 31, 2009, as proposed by the Restructuring Committee of South Edge, LLC.

9        83.    South Edge, the Takedown Fraud Defendants, and Meritage Homes of Nevada,

10   Inc. did not seek or receive JPMorgan's approval for such a change in the Takedown Schedule

11   even though each of them knew they were required to do so.

12        84.    After the Takedowns originally scheduled for April 15, 2008, July 15, 2008, and

13   October 15, 2008 were purportedly extended until January 31, 2009, the Restructuring Committee

14   of South Edge, LLC again proposed, by memorandum dated April 15, 2009, to retroactively

15   extend all of those Takedowns, as well as the Takedown scheduled for April 15, 2009, until July

16   15, 2009.

17        85.    By written agreement, the Takedown Fraud Defendants and Meritage Homes of

18   Nevada, Inc. again purported to extend the Takedowns originally scheduled for April 15, 2008,

19   July 15, 2008, October 15, 2008 (and subsequently changed to January 31, 2009), and April 15,

20   2009 until July 15, 2009, as proposed by the Restructuring Committee of South Edge, LLC.

21        86.    South Edge, the Takedown Fraud Defendants, and Meritage Homes of Nevada,

22   Inc. did not seek or receive JPMorgan's approval for such a change in the Takedown Schedule

23   even though each of them knew they were required to do so.

24        87.    After the Takedowns originally scheduled for April 15, 2008, July 15, 2008,

25   October 15, 2008, and April 15, 2009 were purportedly extended until July 15, 2009, the

26   Restructuring Committee of South Edge, LLC again proposed, by memorandum dated June 29,

27   2009, to extend all of those Takedowns until December 15, 2009.

28

88.     By written agreement, the Takedown Fraud Defendants and Meritage Homes of Nevada, Inc. again purported to extend the Takedowns originally scheduled for April 15, 2008, July 15, 2008, October 15, 2008, and April 15, 2009 (and subsequently changed to July 15, 2009), until December 15, 2009, as proposed by the Restructuring Committee of South Edge, LLC.

89.     South Edge, the Takedown Fraud Defendants, and Meritage Homes of Nevada, Inc. did not seek or receive JPMorgan's approval for such a change in the Takedown Schedule even though each of them knew they were required to do so.

90.     On information and belief, the Takedown Fraud Defendants and Meritage Homes of Nevada, Inc., through South Edge, have purported to continue extending all Takedowns indefinitely.

91.     South Edge, the Takedown Fraud Defendants, and Meritage Homes of Nevada, Inc. have not sought or received JPMorgan's approval for such a changes in the Takedown Schedules even though each of them know they are required to do so.

92.     The Takedown Fraud Defendants and Meritage Homes of Nevada, Inc.'s purported extension of Takedown Schedules without JPMorgan's consent is a fraudulent act or omission under the Loan Documents.

93.     Defendants' failure to inform JPMorgan of the purported extension of the Takedown Schedules is a fraudulent omission.

94.     The Takedown Fraud Defendants and Meritage Homes of Nevada, Inc.'s unauthorized extensions of the Takedown Schedule are unlawful acts.

95.     The Takedown Fraud Defendants and Meritage Homes of Nevada, Inc.'s unauthorized extensions of the Takedown Schedule without informing or seeking consent from JPMorgan resulted in willful and/or fraudulent misrepresentations.

96.     On information and belief, the Takedown Fraud Defendants and Meritage Homes of Nevada, Inc., all of which voted to extend the Takedown Schedules without first seeking or obtaining JPMorgan's consent, have done so with the knowledge that JPMorgan's consent was required.

17

97.     On information and belief, the Takedown Fraud Defendants and Meritage Homes of Nevada, Inc., all of which voted to extend the Takedown Schedules without first seeking or obtaining JPMorgan's consent, did so at times when they were in default of their obligations under the Operating Agreement.

98.     On information and belief, the Takedown Fraud Defendants and Meritage Homes of Nevada, Inc., all of which voted to extend the Takedown Schedules without first seeking or obtaining JPMorgan's consent, did not have the authority to act on behalf of South Edge, either individually or collectively, and therefore their efforts to extend the Takedown Schedules are null and void.

99.     JPMorgan would not have entered into the Credit Agreement, the Forbearance Agreement, or the other Loan Documents if it knew that South Edge and/or the Members thought that they could unilaterally modify the Takedown Schedules.

## FORBEARANCE AGREEMENT

100.     After certain Events of Default under the Loan Documents had occurred, South Edge, the Members, and the Parents entered into negotiations with JPMorgan in an effort to resolve those defaults.

101.     As those negotiations continued, and defaults continued to accrue, South Edge, each Member and each Parent entered into a Forbearance Agreement with JPMorgan on May 27, 2008.  The Forbearance Agreement is attached hereto as Exhibit "I".

102.     The purpose of the Forbearance Agreement was to "provide [South Edge] with sufficient time to propose, negotiate and close a potential restructuring of Loans advanced under the Credit Agreement."

103.     Section 15(a) of the Forbearance Agreement states "as of the date hereof [May 27, 2008], there are no defaults or Events of Default (and no events which with the giving of notice or the lapse of time or both would constitute a default o[r] Event of Default) under the Loan Documents other than the Specified Defaults."

104.     "Specified Defaults" are listed in Section 2 of the Forbearance Agreement.

18

1      105.    The defaults triggered by the unauthorized purported extension of the Takedown

2    Schedules are not listed in the Forbearance Agreement as Specified Defaults.

3      106.    In Section 15(b) of the Forbearance Agreement, Defendants represented that "[t]he

4    Loan Documents and the provisions thereof . . . have not been modified, supplemented or

5    waived . . . ."

6      107.    Section 3(d) of the Forbearance Agreement states, in part, that there were

7    Takedowns "currently scheduled for April 15, 2008."

8      108.    When it entered the Forbearance Agreement, JPMorgan was not aware that the

9    Takedown Fraud Defendants, Meritage Homes of Nevada, Inc., and South Edge had purported to

10    modify the Takedown Schedules.

11      109.    On information and belief, Defendants knew that the Takedown Schedules had

12    been modified and that such modification caused a default under the Loan Documents at the time

13    they entered into the Forbearance Agreement because, among other reasons, the Takedown Fraud

14    Defendants voted for such modifications and the other Members were aware of such votes.

15      110.    On information and belief, Defendants knew that their representations and

16    warranties regarding the existence of other defaults, the modification of Loan Documents, and the

17    scheduled April 15, 2008 Takedowns were false.

18      111.    JPMorgan was fraudulently induced into entering the Forbearance Agreement by

19    relying on South Edge's, the Members', and the Parents' promise that no defaults other than the

20    Specified Defaults had occurred, that the April 15, 2008 Takedowns were not changed, and that

21    none of the Loan Documents had been modified.

22      112.    JPMorgan would not have entered into the Forbearance Agreement had it known

23    about the purported unauthorized Takedown Schedule extensions.

24                    **LIMITED GUARANTY**

25      113.    On November 1, 2004, each Member and each Parent entered into a "Limited

26    Guaranty" for the benefit of JPMorgan.  The Limited Guaranty entered into by Defendants, dated

27    November 1, 2004, is attached hereto as Exhibit "J".

28      114.    The Limited Guaranty provides, in relevant part:

1
2

> The Guarantor does hereby absolutely, irrevocably and
> unconditionally . . . as primary obligor . . . guarantee and agree to
> pay, upon demand by the Administrative Agent, . . .

3

> * * *

4
5
6
7
8

> (a) any and all actual losses, costs, damages and expenses incurred
> by the Administrative Agent [or] any Lender  . . . as a direct or
> indirect result of (i) any willful or fraudulent misrepresentation by
> the Parent Guarantor or the Member Guarantor under any Loan
> Documents; (ii) any fraudulent or unlawful act or omission of the
> Parent Guarantor or the Member Guarantor in respect of the Loans
> or the Obligations or any of the Loan Documents to which such
> Parent Guarantor or Member Guarantor is a party

> * * *

9
10
11
12
13

> and (b) an amount equal to the Member Guarantor's Adjusted Pro
> Rata Share of any and all actual losses, costs, damages and
> expenses incurred by the Administrative Agent [or] any Lender . . .
> as a direct or indirect result of (i) any willful or fraudulent
> misrepresentation by Borrower under the Credit Agreement or any
> other Loan Document; (ii) any fraudulent or unlawful act or
> omission of the Borrower in respect of the Loans or other
> Obligations . . . .

14   115.   Loan Documents are defined in the Credit Agreement to include "any and all other

15   instruments or documents delivered or to be delivered by the Credit Parties pursuant hereto or

16   pursuant to any of the other documents . . . . "

17   116.   Because the Members and Parents fraudulently induced JPMorgan to enter the

18   Forbearance Agreement, they have triggered the Limited Guaranty.

19   117.   Because the Members and Parents fraudulently modified the Takedown Schedules

20   without seeking or obtaining approval from or even providing notice to JPMorgan, they have

21   triggered the Limited Guaranty.

22   118.   Because Members and Parents purported to act through South Edge in fraudulently

23   modifying the Takedown Schedules without seeking or obtaining approval or even providing

24   notice to JPMorgan, the Limited Guaranty has been triggered.

25   119.   By letter dated February 11, 2010, JPMorgan made demand for payment under the

26   Limited Guaranty.

27   120.   By this Complaint, JPMorgan demands payment and seeks judgment against

28   Defendants based on their obligations under the Limited Guaranties.

**ATTORNEYS' FEES**

121.   Plaintiff is entitled to recover attorneys' fees and all other fees, costs and expenses for enforcing Borrower's rights and claims against Defendant Member under Defendants' Contract Collateral and against Defendant Parent, including, without limitation, pursuant to § 25.f of the Acquisition Agreement, § 17 of the Assignment of Acquisition Agreements, and § 15.13 of the LLC Agreement.

## COUNT I – BREACH OF CONTRACT – DAMAGES
## KB HOME NEVADA, INC.

122.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 121 above as if fully set forth herein.

123.   By reason of the foregoing, Defendant Member has breached its contractual obligations to Borrower and to Plaintiff.

124.   By reason of the foregoing, Defendant Member has injured Plaintiff and is liable to Plaintiff for damages to be proven in this action.

## COUNT II – BREACH OF CONTRACT – DAMAGES
## KB HOME

125.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 124 above as if fully set forth herein.

126.   Defendant Parent's obligations include the implied covenant of good faith and fair dealing.

127.   By comprehensive and continuous use of its management control and vetoes over Borrower's performance and enforcement of its obligations for the self-interested benefit of Defendants, Defendant Parent has breached its fiduciary duties, as well as its contractual and other legal duties, to Lenders under the Loan Documents, as well as to Borrower under Defendants' Contract Collateral.

128.   By reason of the foregoing, Defendant Parent has breached its contractual obligations to Borrower and to Plaintiff, including the implied covenant of good faith and fair dealing.

1    129.    By reason of the foregoing, Defendant Parent has injured Plaintiff and is liable to

2    Plaintiff for damages to be proven in this action.

3                    **COUNT III – BREACH OF FIDUCIARY DUTY**

4                      **KB HOME AND KB HOME NEVADA, INC.**

5        130.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

6    through 129 above as if fully set forth herein.

7        131.    Defendants, as members and/or managers or controlling persons of Borrower, owe

8    fiduciary duties of loyalty to Borrower under applicable law.

9        132.    Because Borrower is insolvent, and therefore has fiduciary duties to creditors,

10    Defendants, as controllers and managers of the insolvent Borrower, also owe fiduciary duties to

11    such creditors, including in this case, Plaintiff and other Lenders.

12        133.    By comprehensive and continuous use of their management control and vetoes

13    over Borrower's performance and enforcement of Borrower's obligations for the self-interested

14    benefit of Defendants, Defendants have breached their respective fiduciary duties, as well as their

15    contractual and other legal duties to Lenders under the Loan Documents as well as to Borrower

16    under Defendants' Contract Collateral.

17        134.    By acting in a manner disloyal to Borrower, Defendants have breached their

18    fiduciary duties.

19        135.    By reason of the foregoing, Defendants have injured Plaintiff and are liable to

20    Plaintiff for damages to be proven in this action.

21    **COUNT IV – INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

22                                  **KB HOME**

23        136.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

24    through 135 above as if fully set forth herein.

25        137.    Defendant Parent has knowingly and intentionally interfered with the contracts

26    between Defendant Member and Borrower.

27

28

**AMENDED COMPLAINT**

1    138.    Defendant Parent's knowing and intentional interference with the contracts

2 between Defendant Member and Borrower was intended to disrupt the contractual relationship

3 between Defendant Member and Borrower and has resulted in a disruption of that relationship.

4    139.    By reason of the foregoing, Defendant Parent has injured Plaintiff and is liable to

5 Plaintiff for damages to be proven in this action.

6              **COUNT V – CONSTRUCTIVE AND/OR RESULTING TRUST**

7                    **KB HOME AND KB HOME NEVADA, INC.**

8    140.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

9 through 139 above as if fully set forth herein.

10    141.    Defendants have failed to pay all "credit, rebate, reimbursement or reductions in

11 amounts otherwise payable by [Defendant Member]" as "Reimbursable Fees" as required by

12 Acquisition Agreement § 11.f.  Plaintiff also demands performance by Defendants of their

13 covenants in Acquisition Agreement § 11.g and that Defendants "cooperate with [Borrower] and

14 complete any applications and an assignment of rights to receive credits required in order for

15 Developer to obtain reimbursement of such amounts" as required by Acquisition Agreement §

16 11.f.

17    142.    By reason of the foregoing, Defendants have breached their contractual obligations

18 set forth in the Acquisition Agreement and Plaintiff requests that the court impose a constructive

19 and/or resulting trust on Defendants for such fees.

20    **COUNT VI – INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

21                    **KB HOME AND KB HOME NEVADA, INC.**

22    143.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

23 through 142 as if fully set forth herein.

24    144.    Defendants have knowingly and intentionally interfered with the contracts,

25 including but not limited to the Credit Agreement between Plaintiff and Borrower.

26    145.    Defendants' knowing and intentional interference with the contracts between

27 Plaintiff and Borrower was intended to disrupt the contractual relationship between Plaintiff and

28 Borrower and has resulted in a disruption of that relationship.

**AMENDED COMPLAINT**

1   146.   By reason of the foregoing, Defendants have injured Plaintiff and are liable to

2   Plaintiff for damages to be proven in this action.

3   ## COUNT VII FRAUD IN THE INDUCEMENT – FORBEARANCE AGREEMENT

4   ## KB HOME AND KB HOME NEVADA, INC.

5   147.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

6   through 146 as if fully set forth herein.

7   148.   In the Forbearance Agreement, Defendants falsely represented to Plaintiff that no

8   Defaults or Events of Default other than the Specified Defaults existed under the Loan

9   Documents and that none of the Loan Documents had been modified.

10   149.   Defendants knew that other defaults had occurred, including but not limited to the

11   defaults triggered by the unauthorized change in Takedown dates under the Acquisition

12   Agreements.

13   150.   Defendants withheld this information with the intention of inducing Plaintiff to

14   enter into the Forbearance Agreement and to forbear from exercising remedies under the Credit

15   Agreement and Collateral Documents.

16   151.   Plaintiff justifiably relied on Defendants' material misrepresentation and but for

17   that misrepresentation would not have entered into the Forbearance Agreement.

18   152.   Defendants fraudulently induced JPMorgan to enter into the Forbearance

19   Agreement and JPMorgan.

20   153.   By reason of the foregoing, Defendants have injured Plaintiff and are liable to

21   Plaintiff for damages to be proven in this action.

22   ## COUNT VIII – PAYMENT DUE UNDER LIMITED GUARANTY

23   ## KB HOME AND KB HOME NEVADA, INC.

24   154.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

25   through 153 as if fully set forth herein.

26   155.   Pursuant to the Limited Guaranty, which, by its terms, is absolute, irrevocable, and

27   unconditional, Defendants jointly and severally guaranteed, any and all actual losses, costs,

28

24

1    damages, and expenses incurred by Plaintiff as a result of, among other things, their fraudulent

2    misrepresentations and/or omissions.

3        156.    Defendants have triggered the Limited Guaranty by fraudulently inducing

4    Plaintiffs to enter the Forbearance Agreement.

5        157.    Takedown Fraud Defendants have triggered the Limited Guaranty by extending

6    the Takedown schedules without the consent of JPMorgan and without informing JPMorgan of

7    such actions, and have therefore committed a fraud under the Loan Documents.

8        158.    By reason of the foregoing, Defendants have injured Plaintiff and are liable to

9    Plaintiff for damages to be proven in this action.

10                     **COUNT IX – DECLARATORY RELIEF**

11                     **KB HOME AND KB HOME NEVADA, INC.**

12        159.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

13    through 158 as if fully set forth herein.

14        160.    Defendants purported changes in the Takedown schedules, made in concert with

15    South Edge LLC are null and void and of no effect because they did not receive the required

16    approvals from JPMorgan, were in default under various Loan Documents, did not follow the

17    proper formalities for such modifications, among other reasons.

18        161.    A justiciable controversy exists between the Defendants and JPMorgan with

19    respect to the purported modifications of the Takedown Schedules.

20        162.    The controversy is between JPMorgan and Defendants, whose interests are

21    adverse.

22        163.    JPMorgan has a legally protectable interest in the controversy by virtue of the

23    Loan Documents.

24        164.    This matter is ripe for judicial determination.

25        165.    By reason of the foregoing, JPMorgan seeks a declaration from the court that the

26    Takedown schedules have not been changed by Defendants and/or South Edge.

27                     **PRAYER FOR RELIEF**

28        **WHEREFORE,** Plaintiff respectfully requests that the following relief be awarded:

**AMENDED COMPLAINT**

(a)     Entry of judgment against Defendants, in amounts to be proven in this action, calculated by Plaintiff to be no less than $164,723,251 (Defendants' pro-rata share of the outstanding amounts owed to Plaintiff), together with applicable pre- and post-judgment interest;

(b)     Entry of an order imposing a constructive and/or resulting trust on Defendants;

(c)     Entry of an order awarding Plaintiff its attorneys' fees and other costs of collection associated with enforcing Plaintiff's rights and claims under the Loan Documents and Defendants' Contract Collateral and under applicable law;

(d)     Entry of an award for punitive damages against Defendants in amounts that this court deems just and proper;

(e)     A declaration that the Takedown Schedules have not been modified by the Defendants and/or South Edge and that the Takedown Schedules as last approved by JPMorgan remain in full force and effect; and

(f)     Such other and further relief as this Court deems just and proper.

Dated:  October 8, 2010                              Respectfully submitted,

                                                     Jeffrey R. Sylvester
                                                     SYLVESTER & POLEDNAK, LTD.
                                                     7371 Prairie Falcon Road, Suite 120
                                                     Las Vegas, Nevada 89128
                                                     Tel.:  702-952-5200
                                                     Fax:  702-952-5205
                                                     jeff@sylvesterpolednak.com


                                     By:  /s/ James E. Hough
                                                     James E. Hough (admitted *pro hac vice*)
                                                     Jamie A. Levitt (admitted *pro hac vice*)
                                                     MORRISON & FOERSTER LLP
                                                     1290 Avenue of the Americas
                                                     New York, NY  10104-0050
                                                     Tel.:  212.468.8000
                                                     Fax:  212.468.7900
                                                     jhough@mofo.com

                                                     *Attorneys for JPMorgan Chase Bank, N.A.*

AMENDED COMPLAINT

# EXHIBIT "I"

# FORBEARANCE AGREEMENT

This **FORBEARANCE AGREEMENT** is dated as of May 27, 2008 by and among: (i) South Edge, LLC ("Borrower"), a Nevada limited liability company, (ii) Beazer Homes USA, Inc., a Delaware corporation, Beazer Homes Holding Corp., a Delaware corporation, Meritage Homes Corporation, a Maryland corporation, Meritage Homes of Nevada, Inc., an Arizona Corporation, Weyerhaeuser Real Estate Company, a Washington corporation, Pardee Homes of Nevada, a Nevada Corporation, Toll Brothers, Inc., a Delaware corporation, Coleman-Toll Limited Partnership, a Nevada limited liability company, John A. Ritter, an individual, Focus Group South, LLC, a Nevada limited liability company, KB Home, a Delaware corporation and KB Home Nevada, Inc., a Nevada corporation, Kimball Hill Inc., an Illinois corporation, Kimball Hill Homes Nevada, Inc., a Nevada corporation, Woodside Group, Inc., a Nevada corporation, Alameda Investments, LLC, a Delaware limited liability company, and (iii) JPMorgan Chase Bank, N.A., a national banking association, as administrative agent ("Agent") under that certain Amended and Restated Credit Agreement (as in effect on the date hereof, the "Credit Agreement") dated as of March 9, 2007, among Borrower, Agent, the Royal Bank of Scotland PLC, as syndication agent, J.P. Morgan Securities Inc., as sole book runner and sole lead arranger, and the Lenders party thereto.

Borrower has requested Agent temporarily to forbear from exercising its rights and remedies under the Loan Documents with respect to certain existing and anticipated Events of Default (as defined in the Credit Agreement) in order to provide Borrower with sufficient time to propose, negotiate and close a potential restructuring of Loans advanced under the Credit Agreement. Agent is willing to grant such forbearance on the terms and subject to the conditions provided below. Accordingly, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1.    <u>Loan Documents; Defined Terms</u>.

(a)    The parties hereto acknowledge and agree that:

(i)    Borrower is indebted to the Lenders under the Loan Documents in the amounts specified in <u>Schedule I</u>; and

(ii)    <u>Schedule II</u> contains a true, correct and complete listing of the principal Loan Documents.

(b)    Unless otherwise defined herein, terms defined in the Credit Agreement are used herein as therein defined. As used herein, "<u>Forbearing Credit Party</u>" means each of the Credit Parties (other than Borrower) which shall have executed this Forbearance Agreement as of the Effective Date, and "<u>Non-Forbearing Credit Party</u>" means each of the Credit Parties which have not executed this Forbearance Agreement as of the Effective Date.

Section 2.    <u>Specified Defaults</u>.  As used herein, "<u>Specified Defaults</u>" shall mean the following Defaults and Events of Default: (i) the Event of Default existing under

Section 9.01(b) of the Credit Agreement with respect to Borrower's failure to pay the interest payment due on the Loans on February 29, 2008; (ii) the Event of Default existing under Section 9.01(b) of the Credit Agreement with respect to Borrower's failure to pay the interest payment due on the Loans on March 31, 2008; (iii) the Event of Default existing under Section 9.01(b) of the Credit Agreement with respect to Borrower's failure to pay the interest payment due on the Loans on April 30, 2008; (iv) subject to Section 3(d) of this Forbearance Agreement, any Default or Event of Default arising solely with respect to the failure by a Member to complete its scheduled Takedown on April 15, 2008; (v) the Event of Default existing under Section 6.18 of the Credit Agreement on account of Borrower's failure to maintain the interest reserve provided for in the Operating Agreement; (vi) the Event of Default existing under Section 9.01(i) of the Credit Agreement with respect to the voluntary commencement by Kimball Hill, Inc. and Kimball Hill Homes Nevada, Inc. of a petition seeking reorganization under Federal bankruptcy law; and (vii) any other Defaults or Events of Default existing as of the date hereof or which may arise during the Forbearance Period (as defined below), other than any New Material Default. "New Material Default" means any of (A) the occurrence of any of the events described in Section 5(d); (B) the occurrence of any of the events described in Section 5(e) which would result in termination of the Forbearance Period; (C) any of the Collateral shall become encumbered by one or more Liens, claims of Liens or bonded stop notices (other than Permitted Encumbrances, Liens that are bonded by Borrower in a manner reasonably satisfactory to Agent, and carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law which have not been recorded against the Property) exceeding, in the aggregate, $5,000,000; and (D) the occurrence of any other Defaults or Events of Default (other than those described in clauses (i), (ii), (iii), (iv), (v) and (vi) of the preceding sentence) involving the failure to pay money or that, individually or in the aggregate, would materially and adversely affect (1) the value of the Collateral, (2) the ability of the Agent or the Lenders to exercise remedies with respect to any Collateral or Guaranties or (3) the timing of such remedies; provided, however, that a New Material Default shall not include any event with respect to a Member or Parent Guarantor which does not give rise to termination of this Forbearance Agreement under Section 5(e).

Section 3.    Forbearance; Extension of the Takedown Schedule.

(a)    Agent agrees, on the terms and subject to the conditions contained herein, to forbear during the period (the "Forbearance Period") from and after the Effective Date (as defined in Section 4(b)) until (but excluding) the Forbearance Termination Date (as defined in Section 5), from taking any of the following actions against Borrower and the Forbearing Credit Parties based solely on any Specified Default:

Instituting any suit or proceeding in any court, or taking any other formal action, seeking to enforce the repayment of the Loans, or to realize upon any collateral security therefor (including any collateral in the Cash Collateral Accounts), or to exercise any of its rights and remedies solely with respect to the Specified Defaults under any of the Loan Documents (all such actions being referred to herein as "Enforcement Actions"), excluding Enforcement Actions brought against the Non-Forbearing Credit Parties and/or in connection with any collateral security provided

by or relating directly to the Non-Forbearing Credit Parties and/or any Guarantee executed by any such Non-Forbearing Credit Party.

(b)      Notwithstanding such forbearance, it is understood by Borrower and the Forbearing Credit Parties that Agent has not waived the Specified Defaults or any other Defaults or Event of Defaults or any rights or remedies in respect thereof under the Loan Documents, at equity, in law or otherwise, and that Agent's consent to this Forbearance Agreement shall not in any way be considered to be a cure of the Specified Defaults or any other Default or Event of Default, or a discharge or compromise with respect to the Loans or Notes. Moreover, and without limiting the provisions of Section 13, neither this Forbearance Agreement, nor the terms contemplated hereby, nor the receipt and application of sums during the Forbearance Period pursuant to the terms hereof shall, except for the forbearance from the exercise of Enforcement Actions by Agent expressly provided above: (i) constitute a waiver by Agent or the Lenders of their rights or remedies under the Loan Documents, at equity, in law or otherwise, (ii) result in Agent or the Lenders being estopped from exercising any such rights or remedies from and after the Forbearance Termination Date, or (iii) be construed as an agreement by Agent not to respond to (including to defend and to assert counterclaims in) any litigation or other proceeding commenced against it by Borrower or any other Credit Party. During the Forbearance Period, Borrower shall not be entitled to any rights provided to it in the Loan Documents that are conditioned on there being no Default or Event of Default in existence, unless expressly permitted or provided for in this Forbearance Agreement.

(c)      During the Forbearance Period (as defined below), the Loans will bear interest at the pre-default rate, provided that if the Secured Obligations are not repaid in full or restructured pursuant to definitive final documentation duly executed and delivered by all appropriate parties prior to the Forbearance Termination Date (as defined below), Borrower from and thereafter shall be liable in accordance with the Loan Documents for any and all sums and charges due pursuant thereto, including, without limitation, all default rate interest accruing in accordance with the Loan Documents on the unpaid principal balance of and interest on the Loans as of and after the Effective Date.

(d)      To the extent permitted under the Credit Agreement, Agent hereby agrees to (a) extend the outside date of the Takedown of the Phases currently scheduled for April 15, 2008 until the later of (i) the Forbearance Termination Date (as defined below), and (ii) five (5) Business Days following the end of the Forbearance Period, if the Forbearance Period is terminated prior to the Expiration Date (as defined below), and (b) make conforming modifications of the "Takedown Schedules" attached to certain of the Acquisition Agreements, as Borrower and the Members may determine. No Takedown shall be permitted during the Forbearance Period.

Section 4.      Conditions.

(a)      As conditions to the effectiveness of this Forbearance Agreement:

(i)     Borrower shall have paid directly to Agent on account of the Lenders the interest payments due on February 29, 2008, March 31, 2008 and April 30, 2008, at the contract (i.e., pre-default) rate of interest assuming the Loans did not convert to ABR Borrowings, as a result of the Specified Defaults, it being understood and agreed that Agent is not waiving its right to collect any interest at the converted or default rate but simply forbearing from exercising its remedies with respect thereto under Section 3;

(ii)    The case (the "Litigation") encaptioned, Focus South Group, LLC v. JP Morgan Chase Bank, N.A., et al. (Case No. A559988-B, Dept. No. XIII), pending in the District Court of Clark County, Nevada (the "Nevada State Court"), shall be dismissed by all plaintiffs without prejudice pursuant to the Litigation Stipulation (as defined below). The Temporary Restraining Order entered in the Litigation on March 31, 2008 and continued until May 27, 2008, shall be dissolved and of no further force and effect upon the Effective Date pursuant to an order of dismissal (which shall be in form and substance satisfactory to plaintiffs and defendants), and neither Focus Group South, LLC nor any other plaintiff (the "Focus Member") shall seek to extend or amend such Order, unless the Effective Date does not occur on or before May 27, 2008, in which case the Focus Member shall not be prohibited from seeking to extend such temporary restraining order through the Effective Date. Other than the Litigation Stipulation, the Focus Member shall not submit a proposed preliminary injunction order or any other proposed order regarding the Litigation to the Nevada State Court prior to the Effective Date or during the Forbearance Period. The Focus Member shall not refile or otherwise recommence the Litigation or other litigation regarding the Loan Documents or the Project during the Forbearance Period but fully reserves the right to do so upon the expiration thereof. The Agent, the Lenders and the Focus Member expressly acknowledge that the dismissal of the Litigation pursuant to this Section 4(a)(ii) is without prejudice and that nothing in this Forbearance Agreement, including, without limitation, the releases provided for in Section 9, is intended to or shall modify, waive, impair or in any way affect any of the claims, rights and defenses of Focus Member, on the one hand, and the Agent and the Lenders on the other, asserted or assertable in the Litigation. For purposes of this Agreement, the term "Litigation Stipulation" shall mean a stipulation between the defendants and the plaintiffs in form and substance satisfactory to the plaintiffs and defendants and approved by the Nevada State Court providing for: (a) the dismissal of the Litigation without prejudice and (b) an agreement by the defendants that the plaintiffs shall be entitled to reinstate the Litigation as if the Litigation had never been dismissed at their sole discretion in the event that the Forbearance Period terminates without a consensual comprehensive restructuring of the Secured Obligations;

(iii)   All fees, expenses and disbursements of Agent (including, without limitation, legal expenses) relating to the Credit Agreement, the Litigation, this Forbearance Agreement and/or the transactions contemplated hereby, for which statements have been submitted to Borrower on or before the Effective Date, shall have been paid by Borrower;

(iv)    Agent shall have received evidence in form, scope and substance satisfactory to it that the amounts to be paid under Section 4(a)(i) and (iii) shall have been paid in full; and

(v)    Agent, Borrower and each of the Forbearing Credit Parties shall have executed and delivered this Forbearance Agreement to the other parties hereto.

(b)    Provided that the conditions contained in clause (a) above have been satisfied, this Forbearance Agreement shall become effective on the date the last such condition shall have been satisfied (the "Effective Date").  In the event that Agent executes this Forbearance Agreement prior to the satisfaction of each of the other conditions contained clause (a) and such conditions do not occur within three (3) Business Day thereafter, Agent's execution of this Forbearance Agreement shall be deemed null and void.  Upon the Effective Date, the Agent shall release from the Cash Collateral Account maintained under Section 7.03(b)(iii) of the Credit Agreement for the Focus Member an amount equal to such Member's Adjusted Pro Rata Share (which is 15.59%) of the interest payment to be made under Section 4(a)(i) (but not any other amount to be paid in this Section 4) and shall apply such amount to such interest payment on the Effective Date.  In addition, the Agent shall release from the Focus Cash Collateral Account  an amount equal to the Focus Member's Adjusted Pro Rata Share of each interest payment to be made during the Forbearance Period on the date that such payment is due and shall apply such amounts to such interest payment on such date, provided that the Forbearance Termination Date has not occurred prior to such time, and, provided further, that the remainder of the interest payments then due under the Loan Documents have been paid.

Section 5.    Termination.  The Forbearance Period shall terminate and be of no further force or effect at 10:00 a.m. (New York time) on the date (the "Forbearance Termination Date"), which is the earliest of:

(a)    June 30, 2008, or such later date as may be agreed upon by Agent (with the consent of the Required Lenders) and Borrower in writing (the "Expiration Date");

(b)    The commencement of any litigation or other proceeding against Agent or any of the other Lenders by any Credit Party relating to the Loans, the Loan Documents, the Collateral, the Project or this Forbearance Agreement;

(c)    Two (2) Business Days following the date on which Agent gives notice to Borrower of the occurrence of a breach by Borrower of any of the representations, warranties or covenants contained in this Forbearance Agreement, or in any document or agreement now or hereafter delivered in connection with or pursuant to the terms of this Forbearance Agreement;

(d)    The date on which either (i) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (A) liquidation, reorganization or other relief in respect of Borrower or its debts, or of a substantial part of

its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (B) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Borrower or for a substantial part of its assets or a substantial part of its assets, and such involuntary proceeding or petition shall not be dismissed within thirty (30) days of filing; or (ii) Borrower shall (A) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (B) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (ii) above, (C) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Borrower or for a substantial part of its assets, (D) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (E) make a general assignment for the benefit of creditors or (F) take any action for the purpose of effecting any of the foregoing;

(e)    The date on which any event described in Section 5(d) shall occur with respect to any Credit Party (other than the Borrower or the Non-Forbearing Credit Parties); provided, however, that the occurrence of such an event with respect to a Member or Parent Guarantor shall not terminate the Forbearance Period so long as such Member or Parent Guarantor is not a Key Member or Parent Guarantor of a Key Member and such event shall not have occurred with respect to more than three Members or Parent Guarantors; and

(f)    The date on which Agent (on its own determination or pursuant to the direction of the Required Lenders) elects to terminate the Forbearance Period after any event, which alone or with the giving of notice or lapse of time or both would constitute an Event of Default (other than a Specified Default) occurs.

Upon termination of the Forbearance Period, Agent and the Lenders shall immediately be fully restored to the position they would have held if this Forbearance Agreement had never been executed; provided, however, that notwithstanding anything else in this Forbearance Agreement, if the Forbearance Period terminates pursuant to Section 5(a), 5(b), 5(c), 5(d), 5(e) or 5(f) of this Forbearance Agreement (other than a termination pursuant to Section 5(c), 5(d), 5(e) or 5(f) as a result of acts or omissions by the Focus Member or John A. Ritter), the Agent and the Lenders shall not take any action or commence any proceeding to apply any funds in the Cash Collateral Account initially funded by the Focus Member to the Secured Obligations until the expiration of the fifth (5th) Business Day following the termination of the Forbearance Period.

Section 6.    Extension; Amendments.    The terms of this Forbearance Agreement may be modified, waived, supplemented or amended, and the Forbearance Period may be extended, only by a writing or writings executed by Agent (with the consent of the Required Lenders), Borrower and the Forbearing Credit Parties. It is understood and agreed that neither Agent nor any Lender is nor shall it be under any obligation, express or implied, to consent to any modification, waiver, supplement or amendment hereof, or to any proposed extension of the Forbearance Period.

Section 7.   <u>Continuing Effect</u>.  Except as expressly provided herein each Loan Document shall continue unchanged and in full force and effect, and all rights, powers, privileges and remedies of the Agent and Lenders thereunder are hereby expressly reserved. Without in any way limiting the generality of the foregoing, and subject to <u>Section 3(c)</u>, Borrower shall be liable in accordance with the Loan Documents for any and all sums and charges due pursuant thereto, including, without limitation, default interest and late charges, if any.

Section 8.   <u>Covenants</u>.  In addition to the covenants and agreements made by Borrower in the Loan Documents, Borrower and, where set forth below, each of the Forbearing Credit Parties covenant and agree that:

(a)   In addition to any information or other material that it is required to deliver to the Agent under the Loan Documents, Borrower shall from time to time also provide or cause to be provided to Agent, promptly upon request, reports of accounts payable covering such time periods as may be requested by Agent and setting forth with respect to each account payable, among other things, the amount of the payable, the identity of the account creditor, the aging thereof and any known disputes relating to the payable and the status thereof.  Borrower shall also use reasonable efforts to provide Agent with such information as Agent may reasonably request from time to time relating to the completion and sale of housing units constructed or to be constructed on Phases acquired to date by the Members.

(b)   Without limiting Borrower's obligations under the Credit Agreement, Borrower shall (and each Forbearing Credit Party shall use reasonable efforts to cause Borrower to) cooperate with Agent and its agents in the conduct of any appraisal which Agent may desire to have undertaken and any other studies or evaluations of the Project (it being acknowledged by the Credit Parties that, notwithstanding any provisions of the Credit Agreement to the contrary, the Credit Parties shall not be entitled to obtain copies of any such appraisals, studies of evaluations (provided, however, that nothing herein shall preclude the Credit Parties from seeking discovery, disclosure, or production or such appraisals, studies or evaluations after the termination of the Forbearance Period, as may be permitted by law)).

(c)   Borrower shall use reasonable efforts to enforce Borrower's claims and rights (and any such claims and rights pledged to Agent) in any insolvency proceeding involving another Credit Party.

(d)   Subject to the provisions of Section 6.04 of the Credit Agreement, Borrower shall pay all obligations of Borrower under Section 6.04 of the Credit Agreement, and all other accounts payable in respect of the Project (including without limitation, all amounts due and owing to contractors, subcontractors, suppliers, material men and other third parties), whether such obligations and accounts payable arose prior to the Effective Date or during the Forbearance Period, and shall provide evidence in form, scope and substance satisfactory to Agent upon request thereof.  Each Forbearing Credit Party agrees that if Borrower fails to pay such amounts arising prior to the Effective Dave and during the Forbearance Period, it shall pay its Adjusted Pro Rata Share of such

amounts, together with such Forbearing Credit Party's pro rata share of any such amounts not paid by any other Credit Party (such that the amount is paid in full). Nothing in this Section 8(d) shall require any Forbearing Credit Party to pay any obligations due to the Agent and the Lenders under the Loan Documents or to pay any obligations or accounts payable to any Member or any affiliate of a Member.

(e)   Without limiting any of Agent's rights or remedies under the Loan Documents, Borrower shall pay to Agent within two (2) Business Days following written demand (i) all costs and expenses of Agent (including, without limitation, the fees and disbursements of its legal counsel) incurred in connection with the negotiation, preparation, execution, delivery and performance of this Forbearance Agreement, or any waiver or amendment of or supplement or other modification to, this Forbearance Agreement, and (ii) all costs and expenses (including, without limitation, the fees and disbursements of legal counsel to Agent) of collection or incident to the enforcement, protection or preservation of any right or claim of Agent under this Forbearance Agreement. All payments are to be made by Borrower under this clause (d) notwithstanding the availability of cash collateral or letters of credit held by Agent. Notwithstanding anything in Section 8(d) to the contrary, each Forbearing Credit Party agrees that if Borrower fails to pay such amounts, it shall pay its Adjusted Pro Rata Share of such amounts, together with such Forbearing Credit Party's pro rata share of any such amounts not paid by any other Credit Party (such that the amount is paid in full).

(f)   Borrower shall give immediate notice by telecopy to Agent of any event or condition described in Section 5 (other than Section 5(a)). Each Forbearing Credit Party shall give immediate notice by telecopy to Agent of any event or condition described in Section 5 (other than Section 5(a)) caused or taken by such Forbearing Credit Party of which such Forbearing Credit Party has knowledge.

Section 9.   Release.   Borrower and each Forbearing Credit Party does hereby release, acquit and forever discharge Agent, the Syndication Agent and the Lenders and all past, present and future participating lenders, subsidiaries, affiliates, officers, director, shareholders, agents, employees, servants, attorneys and representatives of Agent, the Syndication Agent and the Lenders, as well as the respective heirs, executors, administrators, personal representatives, successors and assigns of any and all of them (hereinafter collectively being referred to as the "Released Parties") of and from any and all claims, demands, debts, losses, costs, expenses, proceedings, judgments, damages, actions, causes of action, suits, contracts, agreements, obligations, accounts, offsets against the Loans and liabilities of any kind of character whatsoever, known or unknown, suspected or unsuspected, in contract or in tort, at law or in equity, including, without limitation, such claims as fraud, mistake, duress and usury, which any of Borrower and/or each Forbearing Credit Party ever had, now has or might hereafter have against the Released Parties, or any of them, jointly or severally, for or by reason of any matter, cause or thing whatsoever arising on or before the date hereof, which relates to, is based on, or arises out of, by reason of or in connection with, in whole or in part, directly or indirectly: (a) the Loan Documents, (b) the Loans, the Collateral or the administration of either of the foregoing, or (c) the entering into this Forbearance Agreement, or any other documents or agreements contemplated hereby or entered into in connection herewith.  In addition, Borrower and each Forbearing Credit Party agrees not to (i) commence, join in, prosecute or participate in any suit

or other proceeding in a position which is adverse to any of the Released Parties arising directly or indirectly from any of the foregoing matters arising on or before the date hereof, or (ii) assert or seek to assert any claim, offset, demand, action, counterclaim or crossclaim of any kind or nature whatsoever arising directly or indirectly from any of the foregoing matters arising on or before the date hereof.

Section 10.     Counterparts.  This Forbearance Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Forbearance Agreement by signing any such counterpart.

Section 11.     Benefit of Agreement.  This Forbearance Agreement is solely for the benefit of, is binding upon and is personal to the signatories hereto and their respective successors and assigns (provided that neither Borrower nor any Forbearing Credit Party shall assign this Forbearance Agreement or its rights and/or obligations hereunder without the prior written consent of Agent) and no other person or entity (including, without limitation, any other creditor of or claimant of or against Borrower or any Forbearing Credit Party) shall have any rights under, or because of the existence of, this Forbearance Agreement.

Section 12.     GOVERNING LAW.   THIS FORBEARANCE AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

Section 13.     No Commitment or Waiver.  Neither this Forbearance Agreement, nor the terms contemplated hereby, nor the receipt and application of sums during the Forbearance Period pursuant to the terms hereof, nor any action or inaction on the part of Agent or Lenders shall be construed to constitute or represent (a) a commitment or agreement by Agent or the Lenders to make any new loans or grant or extend any financial accommodations to Borrower or any other persons or entities, (b) a commitment or agreement by Agent or the Lenders to modify, extend or restructure the Loans or any other indebtedness of Borrower, or to grant or extend any financial accommodations (other than as expressly provided for herein) with respect to the Loans or any other indebtedness of any Credit Party, or (c) an intention by Agent or the Lenders to waive, modify or, except as expressly provided in Section 3, forbear from exercising any of its rights, powers, privileges or remedies under the Loan Documents, at law, in equity or otherwise, and Borrower and Forbearing Credit Parties acknowledge, agree and confirm that no such commitment, waiver, modification or, except as expressly provided in Section 3, forbearance has been offered, granted, extended or agreed to by Agent or the Lenders.

Section 14.     Due Authorization.  Each party executing and delivering this Forbearance Agreement represents and warrants to all other parties that, as to itself:

(a)     Such party has the full authority and legal right and power to do so and to perform the terms hereof and the transactions contemplated hereby;

(b)     All necessary corporate, partnership or other action on the part of such party to be taken in connection with the execution, delivery and performance of this

Forbearance Agreement and the transactions contemplated hereby have been duly and effectively taken; and

(c)     The execution, delivery and performance by such party does not constitute a violation or breach of such party's articles of incorporation, by-laws, partnership agreement, operating agreement or certificate of partnership, or any other agreement or law by which such party is bound.

Section 15.     Other Representations of Borrower.     Borrower represents and warrants to Agent and the Lenders that:

(a)     As of the date hereof, there are no defaults or Events of Defaults (and no events which with the giving of notice or the lapse of time or both would constitute a default of Event of Default) under the Loan Documents other than the Specified Defaults; and

(b)     The Loan Documents and the provisions thereof are and remain legal, valid and binding obligations of the Credit Parties enforceable in accordance with their terms (subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity), have not been modified, supplemented or waived, and remain in full force and effect.

Section 16.     Other Representations by Agent.     Agent represents and warrants to Borrower that Agent has sought and obtained the approval of the Required Lenders to enter into this Forbearance Agreement on behalf of the Lenders.

Section 17.     Indemnity.     Borrower agrees to indemnify, defend and hold Agent and the Lenders harmless from and against any and all liabilities, claims, demands, losses, damages, costs and expenses (including, without limitation, legal fees and disbursements, and litigation expenses), actions and causes of action, arising out of or relating to Borrower's or any other Credit Party's breach of any covenant or agreement contained in this Forbearance Agreement, or the incorrectness or inaccuracy of any representation and warranty of Borrower or any other Forbearing Credit Party contained in this Forbearance Agreement. Each Forbearing Credit Party agrees to indemnify, defend and hold Agent and the Lenders harmless from and against any and all liabilities, claims, demands, losses, damages, costs and expenses (including, without limitation, legal fees and disbursements, and litigation expenses), actions and causes of action, arising out of or relating to such Forbearing Credit Party's breach of any covenant or agreement contained in this Forbearance Agreement, or the incorrectness or inaccuracy of any representation and warranty of such Forbearing Credit Party contained in this Forbearance Agreement.

Section 18.     Entire Agreement.     This Forbearance Agreement constitutes the entire and final agreement among the parties hereto with respect to the subject matter hereof and there are no other agreements, understandings, undertakings, representations or warranties among the parties hereto with respect to the subject matter hereof except as set forth herein.

Section 19.     Remedies.     No failure on the part of Agent or the Lenders or any of their agents to exercise, and no course of dealing with respect to,  and no delay in exercising, any

right, power, privilege or remedy hereunder or under the Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise by Agent or the Lenders or any of their agents or any right, power, privilege or remedy hereunder or under the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy.

Section 20.    Headings, Etc.    Section or other headings contained in this Forbearance Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Forbearance Agreement. This Agreement attaches Schedule I and II. Numbers, letters or roman numerals preceded by the words "Section" or "Schedule" are referenced to Sections and Schedules of and to this Forbearance Agreement.

Section 21.    VOLUNTARY AGREEMENT.    BORROWER AND EACH OF THE UNDERSIGNED CREDIT PARTIES REPRESENTS AND WARRANTS THAT IT IS REPRESENTED BY LEGAL COUNSEL OF ITS CHOICE, IS FULLY AWARE OF THE TERMS CONTAINED IN THIS FORBEARANCE AGREEMENT AND HAS VOLUNATRILY AND WITHOUT COERCION OR DURESS OF ANY KIND ENTERED INTO THIS FORBEARANCE AGREEMENT, AND THE DOCUMENTS AND AGREEMENTS EXECUTED AND TO BE EXECUTED IN CONNECTION WITH THIS FORBEARANCE AGREEMENT.

Section 22.    Notices.    Any notices, consents or requests which are required or may be given hereunder shall be given to the parties at the addresses and in the manner provided in the Credit Agreement, except that copies of any notices to Agent shall also be sent to:

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104-0050
Attn.: Mark S. Edelstein, Esq.

In addition, all notices given to the Agent under the Credit Agreement should also be sent to:

John P. McDonagh
Managing Director
JPMorgan Chase
277 Park Avenue – 8th Floor
New York, NY 10172

Section 23.    Further Assurances.    Borrower and each Forbearing Credit Party shall execute all additional documents and do all acts and things not specifically referred to herein which are reasonably necessary to fully effectuate the intent of this Forbearance Agreement which may from time to time be requested by Agent in connection herewith.

Section 24.    Time of Essence.    Time is strictly of the essence of this Forbearance Agreement and full and complete performance of each and every provision hereof.

Section 25. <u>Negation of Partnership, Etc.</u>  The relationship between Borrower, on the one hand, and Agent and the Lenders, on the other hand, is that of debtor and creditor. Nothing contained in this Forbearance Agreement shall be deemed to create a partnership, joint venture, agency relationship or any other relationship between Agent and the Lenders, on one hand, and any Credit Party, on the other hand, or between Agent and the Lenders, on one hand, and any other person or entity, on the other hand, or to cause Agent or the Lenders to be liable or responsible in any way for the actions, liabilities, debts or obligations of any Credit Party or any other person or entity.

Section 26. <u>Remedies.</u>  If Borrower or any Forbearing Credit Party should breach this Forbearance Agreement, or any of the terms, covenants, conditions, representations or warranties contained herein, Agent shall be entitled, among other things, to (a) enforce any and all remedies expressly provided for herein, (b) exercise its rights, remedies, powers and privileges under the Loan Documents, and/or (c) seek specific performance or damages by reason of such breach.

Section 27. <u>Guaranties.</u>  The undersigned Credit Parties reaffirm the Guaranties, in accordance with their terms, executed by each of the Members and their respective Parent Guarantors in connection with the Loans under the Credit Agreement, and the Credit Parties, the Agent and the Lenders agree that nothing herein shall modify, amend or waive any of the provisions of the Guaranties or give rise to any defense to the obligations of the Members and the Parent Guarantors under the Guaranties.

Section 28. <u>Miscellaneous.</u>  Borrower and each of the Forbearing Credit Parties hereby agree and confirm that to the extent that any payments under or as described in this Forbearance Agreement are made by a Forbearing Credit Party to cover the Adjusted Pro Rata Share of any Non-Forbearing Credit Parties, such payments shall not reduce or otherwise alter the Adjusted Pro Rata Share of the Forbearing Credit Party with respect to any amounts covered by the Loan Documents or otherwise.

[Signatures begin on next page.]

WHEREOF, the undersigned have caused this Forbearance agreement to be duly executed as of the day and year first above written.

**ADMINISTRATIVE AGENT:**

JPMORGAN CHASE BANK, N.A., as Lender and Administrative Agent

By: _____

Name: JOHN P. McDONAGH

Title: MANAGING DIRECTOR

**BORROWER:**

SOUTH EDGE, LLC a Nevada limited- liability company

By:   Holdings Manager, LLC, a Nevada limited-liability company, its general manager

By:   _____
      John A. Ritter
      General Manager

[Signatures continued on next page.]

la-975558

IN WITNESS WHEREOF, the undersigned have caused this Forbearance agreement to be duly executed as of the day and year first above written.

ADMINISTRATIVE AGENT:

JPMORGAN CHASE BANK, N.A., as Lender and Administrative Agent

By: _____
    Name: _____
    Title: _____

BORROWER:

SOUTH EDGE, LLC a Nevada limited- liability company

By:    Holdings Manager, LLC, a Nevada limited-
    liability company, its general manager

    By: _____
        John A. Ritter
        General Manager

[Signatures continued on next page.]

**CREDIT PARTIES:**

KB HOME NEVADA, INC., a Nevada corporation

By: _[signature]_
Name: Ronald J. DelGiorno
Title: PRESIDENT

KB HOME, a Delaware corporation

By: _____
Name: _____
Title: _____

FOCUS SOUTH GROUP, LLC, a Nevada
limited-liability company

By: _____
Name: _____
Title: _____


_____
John A. Ritter


COLEMAN-TOLL LIMITED PARTNERSHIP, a
Nevada limited partnership

By:   Toll NV GP Corp., a Nevada corporation,
      its general partner

      By: _____
      Name: _____
      Title: _____

TOLL BROTHERS, INC., a Delaware Corporation

By: _____
Name: _____
Title: _____

[Signatures continued on next page.]

la-975558                                    14

**CREDIT PARTIES:**

KB HOME NEVADA, INC., a Nevada corporation

By: _____

    Name: _____

    Title: _____

KB HOME, a Delaware corporation

By: _____

    Name: KELLY MASUDA

    Title: SVP, TREASURER

FOCUS SOUTH GROUP, LLC, a Nevada
limited-liability company

By: _____

    Name: _____

    Title: _____


_____

John A. Ritter


COLEMAN-TOLL LIMITED PARTNERSHIP, a
Nevada limited partnership

By:    Toll NV GP Corp., a Nevada corporation,
    its general partner

      By: _____

        Name: _____

        Title: _____

TOLL BROTHERS, INC., a Delaware Corporation

By: _____

    Name: _____

    Title: _____

[Signatures continued on next page.]

**CREDIT PARTIES:**

KB HOME NEVADA, INC., a Nevada corporation

By: _____
    Name: _____
    Title: _____

KB HOME, a Delaware corporation

By: _____
    Name: _____
    Title: _____

FOCUS SOUTH GROUP, LLC, a Nevada
limited-liability company
by Focus Investment Manager, LLC, its Manager

By: _____
    Name: John A. Ritter
    Title: Manager

John A. Ritter

COLEMAN-TOLL LIMITED PARTNERSHIP, a
Nevada limited partnership

By:    Toll NV GP Corp., a Nevada corporation,
    its general partner

    By: _____
        Name: _____
        Title: _____

TOLL BROTHERS, INC., a Delaware Corporation

By: _____
    Name: _____
    Title: _____

[Signatures continued on next page.]

la-975558

14

**CREDIT PARTIES:**

KB HOME NEVADA, INC., a Nevada corporation

By: _____
     Name: _____
     Title: _____

KB HOME, a Delaware corporation

By: _____
     Name: _____
     Title: _____

FOCUS SOUTH GROUP, LLC, a Nevada
limited-liability company

By: _____
     Name: _____
     Title: _____


_____
John A. Ritter


COLEMAN-TOLL LIMITED PARTNERSHIP, a
Nevada limited partnership

By:    Toll NV GP Corp., a Nevada corporation,
       its general partner

       By: _____
       Name: Mark Kessler
       Title: SVP, General Counsel

TOLL BROTHERS, INC., a Delaware Corporation

By: _____
     Name: Mark Kessler
     Title: SVP, General Counsel

[Signatures continued on next page.]

PARDEE HOMES OF NEVADA, a Nevada
corporation

By: _____
    Name: JON E. LASH
    Title: EXEC VP & COO

WEYERHAEUSER REAL ESTATE COMPANY,
a Washington corporation

By: _____
    Name: _____
    Title: _____

MERITAGE HOMES OF NEVADA, INC.
(formerly known as MTH Homes Nevada, Inc.), an
Arizona corporation

By: _____
    Name: _____
    Title: _____

MERITAGE HOMES CORPORATION, a
Maryland corporation

By: _____
    Name: _____
    Title: _____

BEAZER HOMES HOLDING CORP., a Delaware
corporation

By: _____
    Name: _____
    Title: _____

[Signatures continued on next page.]

PARDEE HOMES OF NEVADA, a Nevada
corporation

By: _____
     Name: _____
     Title: _____

WEYERHAEUSER REAL ESTATE COMPANY,
a Washington corporation

By: _____
     Name: ___Thomas R. Stocks_____
     Title: ___Vice President and Treasurer___

MERITAGE HOMES OF NEVADA, INC.
(formerly known as MTH Homes Nevada, Inc.), an
Arizona corporation

By: _____
     Name: _____
     Title: _____

MERITAGE HOMES CORPORATION, a
Maryland corporation

By: _____
     Name: _____
     Title: _____

BEAZER HOMES HOLDING CORP., a Delaware
corporation

By: _____
     Name: _____
     Title: _____

**[Signatures continued on next page.]**

PARDEE HOMES OF NEVADA, a Nevada
corporation

By: _____
    Name: _____
    Title: _____

WEYERHAEUSER REAL ESTATE COMPANY,
a Washington corporation

By: _____
    Name: _____
    Title: _____

MERITAGE HOMES OF NEVADA, INC.
(formerly known as MTH Homes Nevada, Inc.), an
Arizona corporation

By: _____
    Name: ROBERT M. BEUTLER
    Title: DIVISION PRESIDENT

MERITAGE HOMES CORPORATION, a
Maryland corporation

By: _____
    Name: _____
    Title: _____

BEAZER HOMES HOLDING CORP., a Delaware
corporation

By: _____
    Name: _____
    Title: _____

[Signatures continued on next page.]

la-975558            15

PARDEE HOMES OF NEVADA, a Nevada
corporation

By: _____
    Name: _____
    Title: _____

WEYERHAEUSER REAL ESTATE COMPANY,
a Washington corporation

By: _____
    Name: _____
    Title: _____

MERITAGE HOMES OF NEVADA, INC.
(formerly known as MTH Homes Nevada, Inc.), an
Arizona corporation

By: _____
    Name: _____
    Title: _____

MERITAGE HOMES CORPORATION, a
Maryland corporation

By: _____
    Name: HARRY W. SHY
    Title: EVP / CFO

BEAZER HOMES HOLDING CORP., a Delaware
corporation

By: _____
    Name: _____
    Title: _____

[Signatures continued on next page.]

la-975558                        15

PARDEE HOMES OF NEVADA, a Nevada
corporation

By: _____
     Name: _____
     Title: _____

WEYERHAEUSER REAL ESTATE COMPANY,
a Washington corporation

By: _____
     Name: _____
     Title: _____

MERITAGE HOMES OF NEVADA, INC.
(formerly known as MTH Homes Nevada, Inc.), an
Arizona corporation

By: _____
     Name: _____
     Title: _____

MERITAGE HOMES CORPORATION, a
Maryland corporation

By: _____
     Name: _____
     Title: _____

BEAZER HOMES HOLDING CORP., a Delaware
corporation

By: _____*Troy Radelat*_____
     Name: _____
     Title: _____Troy Radelat_____
              Regional CFO
              Phoenix RAC
        Mt. West & Central Region

[Signatures continued on next page.]

la-975558                    15

BEAZER HOMES USA, INC., a Delaware
Corporation

By: _____
Name: _____Allan P. Merrill_____
Title: _____EVP and CFO_____

KIMBALL HILL INC., an Illinois corporation

By: _____
Name: _____
Title: _____

KIMBALL HILL HOMES NEVADA, INC., an
Arizona corporation

By: _____
Name: _____
Title: _____

WOODSIDE GROUP, INC., a Nevada corporation

By: _____
Name: _____
Title: _____

ALAMEDA INVESTMENTS, LLC, a Delaware
limited-liability company

By: _____
Name: _____
Title: _____

## Schedule I

### Outstanding Indebtedness

| | |
|---|---|
| Facility A | $101,760,500.00 |
| Facility C | $225,000,000.00 |
| Facility D | $1,095,000.00 |

Schedule II

Principal Loan Documents

(All documents dated as of November 1, 2004,
except those designated by (*), which are dated March 9, 2007)

---

1.   Amended and Restated Credit Agreement among South Edge, LLC ("Borrower"),
     JPMorgan Chase Bank, N.A., as Administrative Agent ("Administrative Agent") and the
     Lenders party thereto.*

2.   Amended and Restated Notes - Facility A Loans.*

     A.   $30,000,000 Note - Royal Bank of Scotland plc.

     B.   $20,000,000 Note - Calyon New York Branch.

     C.   $20,000,000 Note - LaSalle Bank National Association.

3.   Notes - Facility B Loans.

4.   Note - Facility C Loans.

5.   Amended and Restated Notes - Facility D Loans.*

     A.   $15,000,000 Note - JPMorgan Chase Bank, N.A.

     B.   $5,000,000 Note - Wachovia Bank National Association.

     C.   $5,000,000 Note - Comerica Bank.

6.   Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents and Leases,
     by Borrower as Trustee to Chicago Title Agency of Nevada as Trustee for the benefit of
     Administrative Agent recorded November 1, 2004 in Book 20041101 as Document No.
     0006330 in Clark County, Nevada.

7.   First Amendment to Deed of Trust, Security Agreement, Fixture Filing and Assignment
     of Leases and Rents.*

8.   Assignment of and Agreement with Respect to Acquisition Agreements among
     Borrower, Members and Parent Guarantors in favor of Administrative Agent.

9.   Assignment of Contracts, Permits and Plans and Specifications by Borrower in favor of
     Administrative Agent.

la-975558

10.      Environmental Indemnity by Borrower in favor of Administrative Agent.

11.      Consent and Agreement among KB Home Nevada, Inc. ("KB Home Nevada"), Focus South Group, LLC ("Focus"), Coleman-Toll Limited Partnership ("Coleman-Toll"), Alameda Investments, LLC ("Alameda"), Kimball Hill Homes Nevada, Inc. ("Kimball Hill Nevada"), Pardee Homes of Nevada ("Pardee"), Meritage Homes of Nevada, Inc. ("Meritage Nevada"), Beazer Homes Holding Corp. ("BHHC"), KB Home ("KB Home"), John A. Ritter ("Ritter"), Toll Brothers, Inc. ("Toll"), Woodside Group, Inc. ("Woodside"), Kimball Hill, Inc. ("Kimball Hill"), Weyerhaeuser Real Estate Company ("WRECO"), Meritage Homes Corporation ("Meritage"), Beazer Homes USA, Inc. ("Beazer") and Administrative Agent.*

12.      Repayment Guaranty by KB Nevada and KB Home in favor of Administrative Agent for the benefit of the Lenders.

13.      Completion Guaranty by KB Nevada and KB Home in favor of Administrative Agent for the benefit of the Lenders.

14.      Limited Guaranty by KB Nevada and KB Home in favor of Administrative Agent for the benefit of the Lenders.

15.      Repayment Guaranty by Focus and Ritter in favor of Administrative Agent for the benefit of the Lenders.

16.      Completion Guaranty by Focus and Ritter in favor of Administrative Agent for the benefit of the Lenders.

17.      Limited Guaranty by Focus and Ritter in favor of Administrative Agent for the benefit of the Lenders.

18.      Repayment Guaranty by Coleman-Toll and Toll in favor of Administrative Agent for the benefit of the Lenders.

19.      Completion Guaranty by Coleman-Toll and Toll in favor of Administrative Agent for the benefit of the Lenders.

20.      Limited Guaranty by Coleman-Toll and Toll in favor of Administrative Agent for the benefit of the Lenders.

21.      Repayment Guaranty by Alameda and Woodside in favor of Administrative Agent for the benefit of the Lenders.

22.      Completion Guaranty by Alameda and Woodside in favor of Administrative Agent for the benefit of the Lenders.

23.      Limited Guaranty by Alameda and Woodside in favor of Administrative Agent for the benefit of the Lenders.

24.  Repayment Guaranty by Kimball Hill Nevada and Kimball Hill in favor of Administrative Agent for the benefit of the Lenders.

25.  Completion Guaranty by Kimball Hill Nevada and Kimball Hill in favor of Administrative Agent for the benefit of the Lenders.

26.  Limited Guaranty by Kimball Hill Nevada and Kimball Hill in favor of Administrative Agent for the benefit of the Lenders.

27.  Repayment Guaranty by Pardee and WRECO in favor of Administrative Agent for the benefit of the Lenders.

28.  Completion Guaranty by Pardee and WRECO in favor of Administrative Agent for the benefit of the Lenders.

29.  Limited Guaranty by Pardee and WRECO in favor of Administrative Agent for the benefit of the Lenders.

30.  Repayment Guaranty by MTH and Meritage in favor of Administrative Agent for the benefit of the Lenders.

31.  Completion Guaranty by MTH and Meritage in favor of Administrative Agent for the benefit of the Lenders.

32.  Limited Guaranty by MTH and Meritage in favor of Administrative Agent for the benefit of the Lenders.

33.  Repayment Guaranty by BHHC and Beazer in favor of Administrative Agent for the benefit of the Lenders.

34.  Completion Guaranty by BHHC and Beazer in favor of Administrative Agent for the benefit of the Lenders.

35.  Limited Guaranty by BHHC and Beazer in favor of Administrative Agent for the benefit of the Lenders.

36.  UCC-1 Financing Statement identifying Borrower as debtor and Administrative Agent as secured party filed November 3, 2004 as Document No. 2004033410-8 with the Nevada Secretary of State.

37.  Certification of Acquisition Agreement among Borrower, KB Home and KB Home Nevada.

38.  Certification of Acquisition Agreement among Borrower, Focus and Ritter.

39.  Certification of Acquisition Agreement among Borrower, Coleman-Toll and Toll.

40.  Certification of Acquisition Agreement among Borrower, Alameda and Woodside.

41.  Certification of Acquisition Agreement among Borrower, Kimball Hill Nevada and Kimball Hill.

42.  Certification of Acquisition Agreement among Borrower, Pardee and WRECO.

43.  Certification of Acquisition Agreement among Borrower, Meritage Nevada and Meritage.

44.  Certification of Acquisition Agreement among Borrower, BHHC and Beazer.

45.  Certified copy of Purchase and Sale Agreement and Joint Escrow Instructions dated October 29, 2004 between Borrower and KB Nevada.

46.  Certified copy of Purchase and Sale Agreement and Joint Escrow Instructions dated October 29, 2004 between Borrower and Focus.

47.  Certified copy of Purchase and Sale Agreement and Joint Escrow Instructions dated October 29, 2004 between Borrower and Coleman-Toll.

48.  Certified copy of Purchase and Sale Agreement and Joint Escrow Instructions dated October 29, 2004 between Borrower and Alameda.

49.  Certified copy of Purchase and Sale Agreement and Joint Escrow Instructions dated October 29, 2004 between Borrower and Kimball Hill Nevada.

50.  Certified copy of Purchase and Sale Agreement and Joint Escrow Instructions dated October 29, 2004 between Borrower and Pardee.

51.  Certified copy of Purchase and Sale Agreement and Joint Escrow Instructions dated October 29, 2004 between Borrower and MTH.

52.  Certified copy of Purchase and Sale Agreement and Joint Escrow Instructions dated October 29, 2004 between Borrower and BHHC.

53.  General Manager's Certificate by Holdings, as general manager of Borrower, with respect to (a) Borrower's articles of organization, (b) Borrower's operating agreement, (c) the resolutions of Borrower's management committee (copies of which (a), (b) and (c) are attached to such certificate) and (d) the incumbency of the general manager of Holdings, together with a certificate of good standing of Borrower issued by the Nevada Secretary of State.*

# EXHIBIT "J"

## LIMITED GUARANTY

**THIS LIMITED GUARANTY** (this "**Guaranty**") is made as of November 1, 2004, by KB HOME NEVADA, INC., a Nevada corporation ("**Member Guarantor**"), and KB HOME, a Delaware corporation ("**Parent Guarantor**") (collectively, jointly and severally, the "**Guarantor**") in favor of JPMorgan Chase Bank, as Administrative Agent (the "**Administrative Agent**"), for the benefit of the Lenders under the Credit Agreement referred to below and the other Holders of Secured Obligations.

### WITNESSETH:

**WHEREAS**, South Edge, LLC, a Nevada limited liability company (the "**Borrower**"), the Administrative Agent, and certain other Lenders from time to time party thereto have entered into a certain Credit Agreement of even date herewith (as same may be amended, modified, supplemented or restated from time to time, the "**Credit Agreement**"), providing for credit extensions or financial accommodation to the Borrower, including, but not limited to, the making of loans and the issuance of letters of credit to Borrower and Borrower may from time to time enter into Approved Swap Agreements with one or more Lenders or Affiliates of Lenders (all of the foregoing agreements or arrangements being the "**Facilities**" and any writing evidencing, supporting or securing a Facility, including but not limited to this Guaranty, as such writing may be amended, modified or supplemented from time to time, a "**Facility Document**");

**WHEREAS**, it is a condition precedent to the execution of the Credit Agreement by the Administrative Agent and the Lenders that the Guarantor execute and deliver this Guaranty whereby the Guarantor shall guarantee, or otherwise agree to pay and perform, certain liabilities and obligations as herein provided;

**WHEREAS**, Member Guarantor is the wholly-owned Subsidiary of Parent Guarantor, and Member Guarantor owns 48.45% of the membership interests of Borrower, and in order to induce the Lenders and the Administrative Agent to enter into the Credit Agreement, and because the Guarantor has determined that executing this Guaranty is in its interest and to its financial benefit, the Guarantor is willing to execute and deliver this Guaranty; and

**WHEREAS**, capitalized terms used herein, but not defined herein, shall have the meanings ascribed to such terms in the Credit Agreement.

**NOW THEREFORE**, in order to induce the Administrative Agent to extend credit or give financial accommodation under the Facilities, the Guarantor agrees as follows:

SECTION 1.  **Guaranty**.  The Guarantor does hereby absolutely, irrevocably and unconditionally, jointly and severally, as primary obligor and not as surety, guarantee and agree to pay, upon demand by the Administrative Agent, for the benefit of the Lenders and the other Holders of Secured Obligations, (a) any and all actual losses, costs, damages and expenses

incurred by the Administrative Agent, any Lender or any Holder of Secured Obligations as a direct or indirect result of (i) any willful or fraudulent misrepresentation by the Parent Guarantor or the Member Guarantor under any Loan Documents; (ii) any fraudulent or unlawful act or omission of the Parent Guarantor or the Member Guarantor in respect of the Loans or the Obligations or any of the Loan Documents to which such Parent Guarantor or Member Guarantor is a party, or (iii) the receipt by the Member Guarantor, the Parent Guarantor or any of their Affiliates of any Restricted Payment that is not a Permitted Restricted Payment; and (b) an amount equal to the Member Guarantor's Adjusted Pro Rata Share of any and all actual losses, costs, damages and expenses incurred by the Administrative Agent, any Lender or any Holder of Secured Obligations as a direct or indirect result of (i) any willful or fraudulent misrepresentation by Borrower under the Credit Agreement or any other Loan Document; (ii) any fraudulent or unlawful act or omission of the Borrower in respect of the Loans or other Obligations; (iii) the misappropriation of funds by the Borrower, including without limitation the application of any Property Award or other proceeds of Collateral in a manner not permitted under the Loan Documents; (iv) any action, claim, litigation, investigation or proceeding (each, an "Action") commenced, instituted or brought by any Person (other than the Administrative Agent or any Lender or other Holder of Secured Obligations or any Affiliate of the foregoing) including any counterclaim or cross-claim by such Person in any Action initially commenced, instituted or brought by the Administrative Agent or any Lender or other Holder of Secured Obligations or any Affiliate of the foregoing, whether based on contract, tort or other remedy, arising out of the Transactions or the acquisition, ownership, development, improvement or sale of the Project, except to the extent that such losses, claims, damages, liabilities or related expenses under this clause (iv) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence, criminal acts or willful misconduct of the party or parties seeking indemnification; (v) any actual or alleged presence or Release of Hazardous Materials on or from the Project or any other Property owned or operated by Borrower; or (vi) the breach by Borrower of any representations, warranties or covenants relating to Hazardous Materials or Environmental, Health or Safety Requirements of Law contained in any of the Loan Documents, including the Environmental Indemnity. The obligations that the Guarantor guarantees or otherwise agrees to pay or perform under this Section 1 are herein referred to as the "Guaranteed Obligations." The obligations of the Guarantor hereunder shall not be reduced by amounts paid by any other guarantor. This Guaranty is a guaranty of payment and not of collection only. The Administrative Agent shall not be required to exhaust any right or remedy or take any action against the Borrower, any other Guarantor or any other Person obligated for all or any part of the Guaranteed Obligations or other Obligations or otherwise to enforce its payment against any Collateral securing all or any part of the Guaranteed Obligations or other Obligations. The Guarantor agrees that, as between the Guarantor and the Administrative Agent, the Lenders and any other Holders of Secured Obligations, the Guaranteed Obligations may be declared to be due and payable for the purposes of this Guaranty notwithstanding any stay, injunction or other prohibition which may prevent, delay or vitiate any declaration as regards the Borrower and that in the event of any such declaration or attempted declaration, the Guaranteed Obligations shall immediately become due and payable by the Guarantor for the purposes of this Guaranty. The provisions of this Section 1 shall survive repayment of the Secured Obligations.

SECTION 2. **Guaranty Absolute**. The liability of the Guarantor under this Guaranty is absolute, irrevocable and unconditional irrespective of: (a) any change in the time, manner or

place of payment of, or in any other term of, all or any of the Facility Documents or Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any of the terms of any Facility Document or Guaranteed Obligations, including any increase or decrease in the rate of interest thereon; (b) any release or amendment or waiver of, or consent to departure from, any other guaranty or support document, or any exchange, release or non-perfection of any Collateral, for all or any of the Facility Documents or Guaranteed Obligations; (c) any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of any Facility Document or Guaranteed Obligations; (d) without being limited by the foregoing, any lack of validity or enforceability of any Facility Document or Guaranteed Obligations; and (e) any other setoff, defense or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) with respect to the Facility Documents or the transactions contemplated thereby which might constitute a legal or equitable defense available to, or discharge of, the Borrower or a guarantor.

SECTION 3.  **Guaranty Irrevocable**.  This Guaranty is a continuing guaranty of all Guaranteed Obligations now or hereafter existing under the Facilities and the obligations of Guarantor hereunder shall remain in full force and effect until all Secured Obligations (including any that survive repayment of the Loans) have been indefeasibly paid and performed in full, all Letters of Credit have terminated or expired, and all Commitments and Facilities have terminated or expired.

SECTION 4.  **Reinstatement**.  This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Administrative Agent on the insolvency, bankruptcy or reorganization of the Borrower or otherwise, all as though the payment had not been made.

SECTION 5.  **Subrogation**.  The Guarantor shall not exercise any rights which it may acquire by way of subrogation, by any payment made under this Guaranty or otherwise, until all the Guaranteed Obligations have been paid in full and the Facilities are no longer in effect.  If any amount is paid to the Guarantor on account of subrogation rights under this Guaranty at any time when all the Guaranteed Obligations have not been paid in full, the amount shall be held in trust for the benefit of the Administrative Agent and shall be promptly paid to the Administrative Agent to be credited and applied to the Guaranteed Obligations, whether matured or unmatured or absolute or contingent, in accordance with the terms of the Facilities.  If the Guarantor makes payment to the Administrative Agent of all or any part of the Guaranteed Obligations and all the Guaranteed Obligations are paid in full and all requirements for discharge of this Guaranty under Section 4 above have been met, the Administrative Agent shall, at the Guarantor's request, execute and deliver to the Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to the Guarantor of an interest in the Guaranteed Obligations resulting from the payment.

SECTION 6.  **Subordination**.  Without limiting the rights of the Administrative Agent, the Lenders or any other Holders of Secured Obligations under any other agreement, any Indebtedness of the Borrower to the Guarantor, including but not limited to interest accruing at

the agreed contract rate after the commencement of a bankruptcy or similar proceeding, is hereby subordinated to the Guaranteed Obligations.

SECTION 7. **Payments Generally**. All payments by the Guarantor shall be paid in U.S. Dollars and made in the manner and at the place required by the Credit Agreement.

SECTION 8. **Certain Taxes**. The Guarantor further agrees that all payments to be made hereunder shall be made without setoff or counterclaim and free and clear of, and without deduction for, any taxes, levies, imposts, duties, charges, fees, deductions, withholdings or restrictions or conditions of any nature whatsoever now or hereafter imposed, levied, collected, withheld or assessed by any country or by any political subdivision or taxing authority thereof or therein ("Taxes") other than Excluded Taxes. If any Taxes (other than Excluded Taxes) are required to be withheld from any amounts payable to the Administrative Agent for the benefit of the Lenders or any other Holders of Secured Obligations, the amounts so payable to the Administrative Agent shall be increased to the extent necessary to yield to the Lenders or any other Holders of Secured Obligations (after payment of all Taxes (other than Excluded Taxes)) the amounts payable hereunder in the full amounts so to be paid. Whenever any Tax (other than Excluded Taxes) is paid by the Guarantor, as promptly as possible thereafter, the Guarantor shall send the Administrative Agent an official receipt showing payment thereof, together with such additional documentary evidence as may be required from time to time by the Administrative Agent or any Lender or other Holder of Secured Obligations.

SECTION 9. **Representations and Warranties**. The Guarantor represents and warrants that: (a) this Guaranty (i) has been authorized by all necessary action on the part of the Guarantor; (ii) does not violate any agreement, instrument, law, regulation or order applicable to the Guarantor; (iii) does not require the consent or approval of any person or entity, including but not limited to any governmental authority, or any filing or registration of any kind; and (iv) is the legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms, except to the extent that enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally and general principles of equity; and (b) in executing and delivering this Guaranty, the Guarantor has (i) without reliance on the Administrative Agent or any Lender or other Holder of Secured Obligations or any information received from the Administrative Agent or any Lender or other Holder of Secured Obligations and based upon such documents and information it deems appropriate, made an independent investigation of the transactions contemplated hereby and the Borrower, the Borrower's business, assets, operations, prospects and condition, financial or otherwise, and any circumstances which may bear upon such transactions, the Borrower or the obligations and risks undertaken herein with respect to the Guaranteed Obligations; (ii) adequate means to obtain from the Borrower on a continuing basis information concerning the Borrower; (iii) full and complete access to the Facility Documents and any other documents executed in connection with the Facility Documents; and (iv) not relied and will not rely upon any representations or warranties of the Administrative Agent or any Lender or other Holder of Secured Obligations not embodied herein or any acts heretofore or hereafter taken by the Administrative Agent or any Lender or other Holder of Secured Obligations (including but not limited to any review by the Administrative Agent or any Lender or other Holder of Secured Obligations of the affairs of the Borrower).

SECTION 10. **Remedies Generally**.   The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law.  The Guarantor waives any right or claims of right to cause a marshalling of the Borrower's assets or to proceed against the Guarantor, the Borrower or any other guarantor of any of the Borrower's obligations in any particular order, including, but not limited to, any right arising out of NRS 40.430.

SECTION 11. **Setoff**.   The Guarantor agrees that, in addition to (and without limitation of) any right of setoff, banker's lien or counterclaim the Administrative Agent or any Lender or other Holder of Secured Obligations may otherwise have, the Administrative Agent and any Lender or other Holder of Secured Obligations shall be entitled, at its option, to offset balances (general or special, time or demand, provisional or final) held by it for the account of the Guarantor at any of the offices of the Administrative Agent or any Lenders or Holders of Secured Obligations, in U.S. Dollars or in any other currency, against any amount payable by such Guarantor under this Guaranty which is not paid when due (regardless of whether such balances are then due to such Guarantor), in which case it shall promptly notify the Guarantor thereof; <u>provided</u> that the failure of Administrative Agent or any Lender or any other Holder of Secured Obligations to give such notice shall not affect the validity thereof.

SECTION 12. **Formalities**.   The Guarantor waives presentment, notice of dishonor, protest, notice of acceptance of this Guaranty or incurrence of any Liability and any other formality with respect to any of the Guaranteed Obligations or this Guaranty.

SECTION 13. **Amendments and Waivers**.  No amendment or waiver of any provision of this Guaranty, nor consent to any departure by the Guarantor therefrom, shall be effective unless it is in writing and signed by the Administrative Agent, and then the waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No failure on the part of the Administrative Agent to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver or preclude any other or further exercise thereof or the exercise of any other right.

SECTION 14. **Expenses**.   The Guarantor shall reimburse the Administrative Agent on demand for all costs, expenses and charges (including without limitation fees and charges of external legal counsel for the Administrative Agent and costs allocated by its internal legal department) incurred by the Administrative Agent in connection with the performance or enforcement of this Guaranty.  The obligations of the Guarantor under this Section shall survive the termination of this Guaranty.

SECTION 15. **Assignment**.  This Guaranty shall be binding on, and shall inure to the benefit of the Guarantor, the Administrative Agent, the Lenders and the other Holders of Secured Obligations and their respective successors and assigns; <u>provided</u> that the Guarantor may not assign or transfer its rights or obligations under this Guaranty.  Without limiting the generality of the foregoing, any Lender may assign, sell participations in or otherwise transfer its rights under the Facilities to any other person or entity on and subject to the terms set forth in the Credit Agreement, and the other person or entity shall then become vested with all the rights and benefits granted to the Lenders in this Guaranty or otherwise.

SECTION 16. **Captions**.   The headings and captions in this Guaranty are for convenience only and shall not affect the interpretation or construction of this Guaranty.

SECTION 17. **Governing Law, Etc.**  **THIS GUARANTY SHALL BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.  THE GUARANTOR CONSENTS TO THE NONEXCLUSIVE JURISDICTION AND VENUE OF THE STATE OR FEDERAL COURTS LOCATED IN THE CITY OF NEW YORK.  SERVICE OF PROCESS BY THE ADMINISTRATIVE AGENT IN CONNECTION WITH ANY SUCH DISPUTE SHALL BE BINDING ON THE GUARANTOR IF SENT TO ANY GUARANTOR BY REGISTERED MAIL AT THE ADDRESS SPECIFIED BELOW OR AS OTHERWISE SPECIFIED BY THE GUARANTOR FROM TIME TO TIME.  THE GUARANTOR WAIVES ANY RIGHT THE GUARANTOR MAY HAVE TO JURY TRIAL IN ANY ACTION RELATED TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND FURTHER WAIVES ANY RIGHT TO INTERPOSE ANY COUNTERCLAIM RELATED TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY IN ANY SUCH ACTION.  TO THE EXTENT THAT THE GUARANTOR HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER FROM SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OF A JUDGMENT, EXECUTION OR OTHERWISE), THE GUARANTOR HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS GUARANTY.**

SECTION 18. **Integration; Effectiveness; Counterparts**. This Guaranty alone sets forth the entire understanding of the Guarantor and the Administrative Agent relating to the guarantee of the Guaranteed Obligations and constitutes the entire contract between the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Guaranty shall become effective when it shall have been executed and delivered by the Guarantor to the Administrative Agent. Delivery of an executed signature page of this Guaranty by telecopy shall be effective as delivery of a manually executed signature page of this Guaranty.  This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same Guaranty.

SECTION 19. **Notices**.  All notices, requests, demands and other communications to any party hereunder shall be given or made in accordance with the provisions of Section 11.01 of the Credit Agreement.  The notice address for Administrative Agent shall be as provided in the Credit Agreement, and the notice address for each Guarantor shall be as set forth below its respective signature to this Guaranty.  Any party may change its notice address by notice to the other parties.

**[Signatures to follow]**

## SIGNATURE PAGE TO LIMITED GUARANTY

**IN WITNESS WHEREOF**, each Guarantor has caused this Guaranty to be duly executed and delivered by its duly authorized officer as of the date first above written.

MEMBER GUARANTOR:

KB HOME NEVADA INC., a Nevada corporation

By: _____
James Widner, President

By: _____
Donald J. DelGiorno, Executive Vice
President

Address:

KB Home Nevada, Inc.
750 Pilot Road, Suite F
Las Vegas, NV 89119
Attention: James Widner
Telecopy Number: (702) 614-2645

with a copy to:

KB Home Nevada, Inc.
750 Pilot Road, Suite F
Las Vegas, NV 89119
Attention: Chris Stephens
Telecopy Number: (702) 614-2645

and

KB Home
10990 Wilshire Blvd.
Los Angeles, CA 90024
Attention: Kelly M. Allred
Telecopy Number: (310 ) 231-4140

## SIGNATURE PAGE TO LIMITED GUARANTY

PARENT GUARANTOR:

KB HOME, a Delaware corporation

By: _____

William R. Hollinger, Senior Vice President
and Controller

By: _____

Kelly M. Allred, Vice President, Treasury
and Risk Management

Address:

KB Home
10990 Wilshire Blvd.
Los Angeles, CA  90024
Attention:  Kelly M. Allred
Telecopy Number:  (310 ) 231-4140

with a copy to:

KB Home Nevada, Inc.
750 Pilot Road, Suite F
Las Vegas, NV  89119
Attention:  James Widner
Telecopy Number:  (702) 614-2645

and

KB Home Nevada, Inc.
750 Pilot Road, Suite F
Las Vegas, NV  89119
Attention:  Chris Stephens
Telecopy Number:  (702) 614-2645