# EXHIBIT B

# PART I

US CIV 10572

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JPMORGAN CHASE BANK, N.A.,

              Plaintiff,

-against-

KB HOME and KB HOME NEVADA, INC.,

              Defendants.

Civil No. _____

**COMPLAINT**



JPMorgan Chase Bank, N.A. ("JPMorgan" or "Plaintiff"), as Administrative Agent,

by its undersigned counsel, Morrison & Foerster LLP, for its complaint against defendants KB

Home and KB Home Nevada, Inc. (together, the "Defendants"), alleges as follows:

## SUMMARY OF THIS ACTION

1.      On or about November 1, 2004, JPMorgan and other lenders (collectively, the

"Lenders") entered into a credit agreement with South Edge, LLC ("South Edge" or

"Borrower"), which was replaced by an Amended and Restated Credit Agreement, dated

March 9, 2007 (the "Credit Agreement"). JPMorgan serves as the Administrative Agent for the

Lenders and brings this action in its capacity as Administrative Agent. An excerpted copy of the

Credit Agreement is attached hereto as Exhibit A and is incorporated herein by reference.

2.      South Edge is an entity that was formed for the purpose of developing a planned

community called "Inspirada," a project with total costs of over $1 billion to be built in

Henderson, Nevada (the "Project"). South Edge consists of eight members (each, a "Member"),

all of which are subsidiaries of some of the largest developers and homebuilders in the United

ny-845432

States.  Defendant KB Home Nevada, Inc. is a Member.[1]  All of the Members are subsidiaries (in most cases wholly owned) of parent guarantors (each parent guarantor, a "Parent").[2]  Defendant KB Homes is the Parent of Defendant KB Home Nevada, Inc. and together they are a Guarantor.

3.      Pursuant to the Credit Agreement, the Lenders committed to lend up to approximately $535 million to South Edge to help finance the Project.  As a condition precedent to the execution of the Credit Agreement, each Member and its affiliated Parent were required to execute a completion guaranty in favor of JPMorgan for the benefit of the Lenders, which was supplemented by a Consent and Agreement, dated March 9, 2007, entered into by each Member and its affiliated Parent (the "Consent and Agreement").  A Copy of the Completion Guaranty entered into by the Defendants, dated November 1, 2004 (the "Completion Guaranty"), is attached hereto as Exhibit B and a copy of the Consent and Agreement is attached hereto as Exhibit C, both of which are incorporated herein by reference.  The Defendants guaranteed the liabilities and obligations set forth in the Completion Guaranty and are jointly and severally liable thereunder for such liabilities and obligations.

4.      Pursuant to the Guaranty, the Defendants are liable for certain payment and completion obligations as a result of the Borrower's failure to perform such obligations in accordance with the Credit Agreement.

5.      This action seeks judgment against Defendants based on their obligations under the Completion Guaranty.  JPMorgan seeks to enforce Defendants' obligations under the Completion Guaranty and to recover damages due to Defendants' breach thereof.

---

[1] The other members of South Edge are Beazer Homes Holdings Corp.; Coleman-Toll Limited Partnership; Focus South Group, LLC; Meritage Homes Nevada, Inc. (f/k/a MTH-Homes Nevada, Inc.; Alameda Investments, LLC; Pardee Homes of Nevada; Kimball Hill Homes Nevada, Inc.

[2] The Parents are Beazer Homes USA, Inc.; Toll Brothers, Inc.; John A. Ritter; KB Home; Meritage Homes Corporation; Woodside Group, Inc.; Kimball Hill Inc.; and Weyerhaeuser Real Estate Company.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C.

§ 1332, based upon the diversity of the citizenship of the parties.  The amount in dispute is

greater than $75,000.

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and the parties

have consented to "Nonexclusive jurisdiction and venue of the state or federal courts located in

the city of New York."  Completion Guaranty, § 17.

## THE PARTIES

8.     Plaintiff is a nationally chartered bank with its main office in Columbus, Ohio.

Pursuant to 28 U.S.C. § 1348, plaintiff is a citizen of the State of Ohio.

9.     Upon information and belief, Defendant KB Home is a Delaware corporation with

its principal place of business at 10990 Wilshire Boulevard, Los Angeles, California.

10.     Upon information and belief, Defendant KB Home Nevada, Inc. is a Nevada

corporation with its principal place of business at 5655 Badura Avenue, Las Vegas, Nevada.

## STATEMENT OF FACTS

### I.     The Formation of South Edge

11.     In or about late 2003, the Members began preliminary talks for the creation of

"Inspirada" – a large-scale "new urbanism" development project in Henderson, Nevada.

Inspirada was to include 11,500 residences spread over nearly 2,000 acres of land and was

expected to cost approximately $1.25 billion.

12.     To begin the Project, the Members formed South Edge in May 2004 to purchase

1,940 acres of land in Henderson (the "Land") from the Federal Bureau of Land Management at

a cost of $557 million.

13.     Under South Edge's limited liability company agreement (as well as other agreements between each Member and South Edge), each Member has the right and the obligation to acquire specified parcels of the Land in order to develop its own unique housing and commercial products. Each Member is permitted to develop its parcels itself in accordance with the Inspirada Master Plan, or a Member can resell all or a portion of its allotted parcels to third parties for such development. Each Member's interest in South Edge is approximately equal to the percentage of the Land allotted to it in Inspirada.

14.     Each Member agreed to purchase its respective parcels of land from South Edge, with such purchases timed to coincide with South Edge's loan payment obligations to the Lenders, discussed *infra*. The payments from the Members to South Edge for these purchases provide the funds necessary for South Edge, as Borrower, to repay its obligation to the Lenders under the Credit Agreement.

## II.     The Credit Agreement

15.     Pursuant to the Credit Agreement, JPMorgan, along with the other Lenders, agreed to help finance the Land acquisition and the infrastructure development for Inspirada by providing a substantial loan to South Edge. Pursuant to the Credit Agreement, the Lenders committed to lend up to approximately $535 million to South Edge for such purposes.

16.     Loans made pursuant to the Credit Agreement are secured by, *inter alia,* a Deed of Trust and other documents on the Project itself, as well as certain cash and letters of credit.

17.     Each Member's obligation to purchase land from South Edge is divided into Phases or Pods and each purchase of a Phase is sometimes referred to as a "Takedown". These Takedowns are divided into phases. The Credit Agreement requires that each time a Member acquires (or "takes down") a phase, South Edge must pay the Lenders a portion of the purchase

price paid by the Member for that Takedown (the "Release Price").  Upon receipt of full payment of the Release Price, the Administrative Agent (on behalf of the Lenders) agrees to release the lien of the Deed of Trust on such parcel.

18.     The Credit Agreement, at various points, makes reference to each Member's "Adjusted Pro Rata Share," which, essentially, is equivalent to, and can never be less than, the Member's percentage interest in South Edge.

19.     KB Home Nevada Inc.'s Adjusted Pro Rata Share is 48.45%.

20.     Section 5.01 of the Credit Agreement obligates the Borrower to complete certain Improvements to the Land, which are defined as "infrastructure improvements constructed and installed or to be constructed or installed on the Project, as described in the Scope of Work and more specifically provided for in the Approved Plans and Specifications."

21.     Pursuant to Section 5.01 of the Credit Agreement, Borrower must "perform and complete the construction of the Improvements on the Project in a good and workmanlike manner with materials of good quality, free of Liens (other than Permitted Encumbrances) and free of material defects, all substantially in accordance with the Approved Plans and Specifications therefor, all Requirements of Law, including all requirements and conditions set forth in all Permits, to the extent material, which have been obtained or are required to be obtained for the construction of the Improvements, the Approved Project Schedule and the terms and provisions of the Development Agreement and the Acquisition Agreements.  Once commenced, the Borrower shall diligently continue and complete construction of the Improvements on the Project in a commercially reasonable manner and in accordance with this Agreement."

## III.    The Completion Guaranty

22.    As a condition precedent to the execution of the Credit Agreement, the Defendants (as well as the other Members and Parents) executed and delivered a Completion Guaranty.  In the Completion Guaranty, each Member and its Parent (in this case, the Defendants) are together referred to as a "Guarantor."

23.    The Completion Guaranty requires the Defendants to, *inter alia*, pay and perform certain Completion Obligations in the event that the Borrower, South Edge, fails to do so, including the obligation to develop the Project and complete the construction of the Improvements required under the Credit Agreement, to pay the Guaranteed Development Costs, and to make Balancing Payments.

24.    Section 2 of the Completion Guaranty provides, *inter alia*:

(a)  The Guarantor does hereby absolutely, irrevocably and unconditionally, jointly and severally, as primary obligor and not as surety, guarantee and agree to pay and to perform, upon demand by the Administrative Agent, for the benefit of the Lenders and the other Holders of Secured Obligations, but without duplication of the Guarantor's Obligations under any other Guaranty, the Member[]'s Adjusted Pro Rata Share of any and all Completion Obligations not paid or performed by the Borrower, which payment shall be due and payable by the Guarantor, notwithstanding whether allowed or allowable during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding.  The obligations of the Guarantor hereunder shall not be reduced by amounts paid by other guarantors.  This Guaranty is a guaranty of payment and not of collection only.  The Administrative Agent shall not be required to exhaust any right or remedy or take any action against the Borrower, any other guarantor or any other Person obligated for all or any part of the Completion Obligations or other Obligations, or otherwise to enforce its payment against any Collateral securing all or any part of the Completion Obligations or other Obligations.  The Guarantor agrees that, as between the Guarantor and the Administrative Agent, the Lenders and any other Holders of Secured Obligations, the Completion Obligations may be declared to be due and payable for the purposes of this Guaranty notwithstanding any stay, injunction or other prohibition which may prevent, delay or vitiate any declaration as regards the Borrower and that in the event of any such declaration or attempted declaration, the Completion Obligations shall immediately become due and payable by the Guarantor for the purposes of this Guaranty.

\*        \*        \*

(c) In furtherance, but without duplication, of the provisions of paragraph (a) above, Guarantor hereby further agrees on demand to pay to and to reimburse the Administrative Agent, Lenders and Holders of Secured Obligations, for the Member Guarantor's Adjusted Pro Rata Share of any and all Guaranteed Development Costs incurred by the Administrative Agent or any Lender or Holder of Secured Obligations.

25.    "Completion Obligations" are defined in Section 1(a) of the Completion

Guaranty as:

(i) Borrower's obligation to diligently commence, continue and complete, and to pay the Guaranteed Development Costs incurred with respect to, the construction of the Improvements on the Project without material interruption or cessation of work in a good and workmanlike manner with materials of good quality, free of Liens (other than Permitted Encumbrances) and free of material defects, all in accordance with the Approved Plans and Specifications therefor, all Requirements of Law, including all requirements and conditions set forth in all Permits which have been obtained or are required to be obtained for the construction of the Improvements, the Approved Project Schedule and the terms and provisions of the Acquisition Agreements and the Development Agreement, (ii) Borrower's obligation to make Balancing Payments pursuant to the Credit Agreement and (iii) Borrower's obligation to pay any and all LC Disbursements, provided, however, the Completion Obligations shall not include any obligation to pay Guaranteed Development Costs incurred subsequent to the completion of the Improvements except for Guaranteed Development Costs incurred or accruing through the date of such completion (whether or not payable thereafter).

26.    "Guaranteed Development Costs," as defined in Section 4(c) of the Consent and

Agreement, means:

all Development Costs (other than Excluded Costs) not paid or performed by Borrower, to the extent such Development Costs at any time exceed an amount equal to (i) the undisbursed amount of the Aggregate Facility A Commitment whether or not such Aggregate Facility A Commitment has been terminated plus (ii) the amount by which the undisbursed amount of the Aggregate Facility D Commitment (whether or not such Aggregate Facility D Commitment has been terminated) exceeds the aggregate LC Exposure of all Facility D Lenders, less the amounts of the Aggregate Facility A Commitment and Aggregate Facility D Commitment budgeted for payment of Excluded Costs.

27.    "Development Costs," as defined in Section 1.01 of the Credit Agreement, means:

all costs incurred by the Borrower in connection with the construction of the Improvements, including (a) the cost of labor and materials (collectively, the "Hard Costs") and (b) all so-called "soft costs" (collectively, the "Soft Costs"), including (i) fees and charges of the Construction Manager, Project Engineer and all other engineers and other consultants engaged by the Borrower, and the costs and fees incurred in connection with the procurement of all Permits necessary to complete the Project, (ii) all interest payments on the Loans and LC Disbursements, all fees payable under this Agreement and any periodic payments under any Approved Swap Agreement (but not payments due upon default, termination or breakage) and (iii) real estate taxes, insurance premiums and other carrying costs for the Project; provided, that under no circumstances shall Development Costs include (A) any principal or interest payments on Indebtedness other than as specified in clause (ii) above, (B) any Restricted Payments or other payments to Members of Borrower or any Affiliate of Borrower or of any such Member (except Permitted Affiliate Fees).

28.    "Balancing Payments" are defined in Section 5.09 of the Credit Agreement,

which provides:

In the event the Administrative Agent determines in its reasonable judgment that the Development Costs to be incurred through the completion of construction of the Improvements, sale of all of the Phases and repayment of all Secured Obligations, will at any time exceed by $2,500,000 (or more) the amount provided therefore in the Approved Project Budget, an "Out-of-Balance Condition" (hereby so defined) shall be deemed to exist. Within ten (10) Business Days after the Borrower has received written notice from the Administrative Agent of such Out-of-Balance Condition (a "Balancing Notice"), the Borrower shall either pay to the Administrative Agent for deposit into a Cash Collateral Account the amount specified by the Administrative Agent in the Balancing Notice (each such deposit being herein referred to as a "Balancing Payment"), or in lieu thereof deliver to the Administrative Agent a Qualified Letter of Credit in such amount. If and as long as such Out-of-Balance Condition continues to exist, the Lenders shall have no obligation to make any further Loans, and all Approved Development Costs shall be funded by the Borrower from funds of the Borrower until such time as an Out-of-Balance Condition no longer exists, when the obligation of the applicable Facility A Lenders (or, if applicable, Facility D Lenders) to make Loans shall resume. Unless an Event of Default has occurred that is continuing, the Balancing Payments deposited in the Cash Collateral Account pursuant to this Section 5.09 shall be available for disbursement by the Administrative Agent for payment of the Approved Development Costs in the same manner and subject to the same terms and conditions as Loan disbursements are made hereunder, and the Administrative Agent shall have disbursed all Balancing Payments in the Cash Collateral Account prior to any further Loan disbursements. The Qualified Letters of Credit delivered under this Section 5.09 may be drawn upon (A) to pay any such Approved Development Costs that the Borrower fails to pay or (B) as provided in

Section 9.06. When an Out-of-Balance Condition no longer exists, and provided no Event of Default has occurred that is continuing, Balancing Payments and Qualified Letters of Credit then held by the Administrative Agent pursuant to this Section 5.09 shall be returned to the Borrower.

29.    LC Disbursements are defined in Section 1.01 of the Credit Agreement to mean "a payment made by an Issuing Bank pursuant to a Letter of Credit."

30.    The Defendants' obligations under the Completion Guaranty are triggered in at least three situations.

31.    First, in the event that the Borrower has not paid or performed its Completion Obligations in connection with any past or future infrastructure improvements at Inspirada, each Guarantor (in this case the Defendants) must pay or reimburse the Lenders the amount of the Member's Adjusted Pro Rata Share of the Guaranteed Development Costs.

32.    Second, in the event that the Project is in an Out-of-Balance Condition and South Edge fails to make the Balancing Payments necessary to cure such condition, each Guarantor must make a Balancing Payment up to an amount equal to the Member's Adjusted Pro Rata Share to cover such a condition.  As discussed, *supra*, an Out-of-Balance Condition exists if JPMorgan determines that the costs incurred or required to be incurred by South Edge in connection with any past or future infrastructure Improvements at Inspirada will at any time exceed the Approved Project Budget (attached to the Credit Agreement as Exhibit D and included in Exhibit A to this complaint) by $2,500,000 or more.

33.    Third, in the event South Edge fails to pay any and all disbursements made pursuant to letters of credit issued pursuant to the Credit Agreement, JPMorgan may demand that the Guarantor make those payments up to an amount equal to the Member's Adjusted Pro Rata Share.

34.    Additionally, pursuant to Section 2(c) of the Completion Guaranty, should JPMorgan itself or any of the Lenders incur any costs in connection with any required past or future infrastructure Improvements at Inspirada beyond the total amount of available funds under Facility A of the Credit Agreement, JPMorgan may demand that the Guarantor pay those costs in excess of the available funds up to each Member's Adjusted Pro Rata Share.

35.    Furthermore, Section 14 of the Completion Guaranty provides that the Guarantor shall reimburse the Administrative Agent on demand "for all costs, expenses and charges (including without limitation fees and charges of external legal counsel for the Administrative Agent and costs allocated by its internal legal department) incurred by the Administrative Agent in connection with the performance or enforcement of this Guaranty."

36.    Section 17 of the Completion Guaranty provides that it is governed by New York law.  Section 17 further provides that the Guarantor consents to the nonexclusive jurisdiction and venue of the state or federal courts located in the city of New York.

**IV.    Borrower's Default and Guarantor's Failure to Perform**

37.    South Edge is currently in default under the Credit Agreement for, *inter alia*, its failure to timely pay interest and fees accruing under the Credit Agreement, and failure to make principal payments as and when due.

38.    South Edge is also in default for, among other reasons, its failure to diligently continue and complete the construction of the Improvements on the Project without material interruption or cessation in the manner required in the Credit Agreement, and for failing to pay Development Costs and make Balancing Payments as required under the Credit Agreement.

39.    Work on the Project has substantially stalled, if not ceased completely.

40.    Each of these defaults is continuing, notwithstanding notice of such defaults having been provided to the Borrower and the Guarantors.

41.    Due in part, *inter alia*, to the stoppage or near stoppage of work on the Project, the failure of South Edge to pay interest due under the Credit Agreement, and the failure of certain Members to perform their Takedown obligations, there currently exists a substantial Out-of-Balance Condition because the costs of completing the infrastructure Improvements far exceed the Approved Project Budget.

42.    Despite demand having been made to South Edge and Defendants[3] (as well as the other Guarantors) for funding their Adjusted Pro Rata Share of all outstanding Balancing Payments by letters dated November 13, 2008, the Defendants have not made any payments to satisfy their Adjusted Pro Rata Share of the outstanding Balancing Payment. A copy of the November 13, 2008 letter is attached hereto as Exhibit D.

43.    Pursuant to the terms of the Completion Guaranty, the Defendants are liable for the payment and performance of the Completion Obligations, including, *inter alia*, the payment of their Adjusted Pro Rata Share of all unpaid Guaranteed Completion Costs and the funding of the Member's Adjusted Pro Rata Share of all outstanding Balancing Payments.

44.    Defendants are also liable for payment of JPMorgan's costs incurred in connection with enforcing the Completion Guaranty, including reasonable attorneys' fees, which costs continue to be incurred.

---

[3] The letters notifying Defendants of the Balancing Payment owed were sent via facsimile and UPS Overnight delivery to both Defendants. Defendant KB Home's notice sent by UPS Overnight delivery was refused by them despite it being sent to the address provided in the Completion Guaranty and listed as their corporate headquarters on various documents available in the public domain. There were no apparent problems with the facsimile delivery of the letter (or UPS Overnight delivery to Defendant KB Home Nevada, Inc.) and as such, both Defendants are fully on notice regarding the outstanding Balancing Payments owed.

## COUNT I

45.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 44 above as if fully set forth herein.

46.    Because South Edge has defaulted under the Credit Agreement and has failed to cause the Improvements to be completed in accordance with the Credit Agreement, Defendants are obligated to cause the completion of the Improvements in accordance with Section 2(a) of the Completion Guaranty.

47.    Defendants have failed to diligently continue and complete the construction of the Improvements on the Project without material interruption or cessation of work in a good and workmanlike manner with materials of good quality, free of Liens (other than Permitted Encumbrances) and free of material defects, all in accordance with the Approved Plans and Specifications therefor, all Requirements of Law, including all requirements and conditions set forth in all Permits which have been obtained or are required to be obtained for the construction of the Improvements, the Approved Project Schedule and the terms and provisions of the Acquisition Agreements and the Development Agreement.

48.    Further, because South Edge has failed to diligently continue and complete the construction of Improvements and pay all Development Costs, Defendants are obligated to pay and perform their Adjusted Pro Rata Share (48.45%) of the Guaranteed Development Costs.  The total Guaranteed Development Costs to be paid by all of the members are now estimated to exceed $600 million.

49.    By reason of the foregoing, Defendants have breached their contractual obligations set forth in the Completion Guaranty.

## COUNT II

50.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 49 above as if fully set forth herein.

51.    Because there currently exists an Out-of-Balance Condition, and South Edge has failed to make Balancing Payments in accordance with the Credit Agreement, Defendants are obligated to deposit with the Administrative Agent their Adjusted Pro Rata Share (48.45%) of such Balancing Payments.  The current total Balancing Payments owed by all of the Guarantors is at least $325,389,667 and subject to increase.

52.    Defendants have failed to deposit with the Administrative Agent their Adjusted Pro Rata Share of the Balancing Payments despite due notice and demand from JPMorgan.

53.    By reason of the foregoing, Defendants have breached their contractual obligations set forth in the Completion Guaranty.

## COUNT III

54.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 53 above as if fully set forth herein.

55.    The Completion Guaranty provides that:

> "The Guarantor shall reimburse the Administrative Agent on demand for all costs, expenses and charges (including without limitation fees and charges of external legal counsel for the Administrative Agent and costs allocated by its internal legal department) incurred by the Administrative Agent in connection with the performance or enforcement of this Guaranty.  The obligations of the Guarantor under this Section shall survive termination of this Guaranty."

56.    By virtue of the foregoing, the Defendants are jointly and severally liable for all costs and expenses incurred by Plaintiff relating to the performance and enforcement of the Completion Guaranty, including, but not limited to, Plaintiff's attorneys' fees, Plaintiff's costs

related to enforcement of Defendants' Completion Guaranty, and the costs and disbursements of this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the following relief be awarded:

(a)  Entry of judgment in amounts to be proven in this action against each of the Defendants;

(b)  Pre- and post-judgment interest;

(c)  Attorneys' fees and other costs of collection associated with enforcing JPMorgan's rights under the Completion Guaranty;  and

(d)  Such other and further relief as this Court deems just and proper.

Dated:  December 4, 2008

Respectfully submitted,

MORRISON & FOERSTER LLP

By: _____
        Jamie A. Levitt
        Leah A. Ramos
1290 Avenue of the Americas
New York, NY  10104-0050
Tel.:  212.468.8000
Fax:  212.468.7900
jlevitt@mofo.com
lramos@mofo.com

*Attorneys for Plaintiff JPMorgan Chase Bank, N.A.*

# Exhibit A

EXECUTION VERSION



AMENDED AND RESTATED CREDIT AGREEMENT

Dated as of

March 9, 2007

Among

SOUTH EDGE, LLC

The Lenders Party Hereto

And

JPMORGAN CHASE BANK, N.A.
as Administrative Agent

and

THE ROYAL BANK OF SCOTLAND PLC
as Syndication Agent

J.P. MORGAN SECURITIES INC.,
as Sole Bookrunner and Sole Lead Arranger

CH1 3741503v.7

## TABLE OF CONTENTS

### ARTICLE I

### Definitions

SECTION 1.01. Defined Terms ........................................................................................1
SECTION 1.02. Classification of Loans and Borrowings.................................................27
SECTION 1.03. Terms Generally .....................................................................................27
SECTION 1.04. Accounting Terms; GAAP .....................................................................28

### ARTICLE II

### The Credits

SECTION 2.01. Commitments............................................................................................28
SECTION 2.02. Loans and Borrowings.............................................................................29
SECTION 2.03. Requests for Borrowings .........................................................................30
SECTION 2.04. Intentionally Omitted...............................................................................31
SECTION 2.05. Intentionally Omitted...............................................................................31
SECTION 2.06. Letters of Credit.......................................................................................31
SECTION 2.07. Funding of Borrowings............................................................................35
SECTION 2.08. Interest Elections.....................................................................................35
SECTION 2.09. Termination of Commitments; Reduction of Facility D Commitments............37
SECTION 2.10. Repayment of Loans; Evidence of Debt..................................................37
SECTION 2.11. Prepayment of Loans...............................................................................38
SECTION 2.12. Fees...........................................................................................................39
SECTION 2.13. Interest. ....................................................................................................41
SECTION 2.14. Alternate Rate of Interest.........................................................................42
SECTION 2.15. Increased Costs........................................................................................42
SECTION 2.16. Break Funding Payments.........................................................................43
SECTION 2.17. Taxes.........................................................................................................44
SECTION 2.18. Payments Generally; Pro Rata Treatment; Sharing of Set-offs. ...........45
SECTION 2.19. Mitigation Obligations; Replacement of Lenders....................................47

### ARTICLE III

### Representations and Warranties

SECTION 3.01. Organization; Powers...............................................................................48
SECTION 3.02. Authorization; Enforceability ..................................................................48
SECTION 3.03. Governmental Approvals; No Conflicts ..................................................48
SECTION 3.04. No Material Adverse Change ..................................................................48
SECTION 3.05. Properties..................................................................................................48
SECTION 3.06. Litigation..................................................................................................49

Table of Contents
(continued)

|  |  | Page |
|---|---|---|
| SECTION 3.07. | Compliance with Laws and Agreements | 49 |
| SECTION 3.08. | Investment Company Act | 49 |
| SECTION 3.09. | Taxes | 49 |
| SECTION 3.10. | ERISA | 49 |
| SECTION 3.11. | Disclosure | 50 |
| SECTION 3.12. | Environmental Matters | 50 |
| SECTION 3.13. | Permits, Zoning, Governmental Approvals, Etc. | 50 |
| SECTION 3.14. | Collateral | 51 |
| SECTION 3.15. | Project Agreements | 51 |
| SECTION 3.16. | Solvency | 51 |
| SECTION 3.17. | Advances under Original Credit Agreement | 51 |
| SECTION 3.18. | Operating Agreement | 51 |

## ARTICLE IV

### Conditions and Limitations

| SECTION 4.01. | Closing Date | 52 |
|---|---|---|
| SECTION 4.02. | Each Credit Event | 53 |
| SECTION 4.03. | Conditions to First Loan | 54 |
| SECTION 4.04. | Additional Conditions to Loans | 56 |
| SECTION 4.05. | Intentionally Omitted | 57 |
| SECTION 4.06. | Limitations | 57 |

## ARTICLE V

### Construction and Related Provisions

| SECTION 5.01. | Performance and Completion of Project | 59 |
|---|---|---|
| SECTION 5.02. | Entitlements | 60 |
| SECTION 5.03. | LID Bonds | 60 |
| SECTION 5.04. | Construction Delays | 60 |
| SECTION 5.05. | Construction Responsibilities | 60 |
| SECTION 5.06. | Correction of Defects | 61 |
| SECTION 5.07. | Compliance with Agreements | 61 |
| SECTION 5.08. | No Changes or Amendments | 61 |
| SECTION 5.09. | Loan Balancing | 61 |
| SECTION 5.10. | Proceedings to Enjoin or Prevent Construction | 62 |
| SECTION 5.11. | The Administrative Agent's and the Lenders' Actions for Their Own Protection Only | 62 |
| SECTION 5.12. | Inspections; Construction Consultant | 63 |
| SECTION 5.13. | Contractor Construction Information | 63 |
| SECTION 5.14. | Prohibited Contracts | 63 |

Table of Contents
(continued)

Page

SECTION 5.15. Hold Disbursements of Loans in Trust .......................................................... 63
SECTION 5.16. The Administrative Agent's Verification of Subcontracts ................................ 64
SECTION 5.17. Limited Nature of Waivers of Requirements .................................................. 64

## ARTICLE VI

Affirmative Covenants

SECTION 6.01. Financial Statements and Other Information ................................................ 64
SECTION 6.02. Notices of Material Events ........................................................................... 65
SECTION 6.03. Existence; Conduct of Business ..................................................................... 66
SECTION 6.04. Payment of Obligations ................................................................................ 66
SECTION 6.05. Maintenance of Properties; Insurance .......................................................... 66
SECTION 6.06. Books and Records; Inspection Rights .......................................................... 66
SECTION 6.07. Compliance with Laws .................................................................................. 66
SECTION 6.08. Use of Proceeds and Letters of Credit .......................................................... 66
SECTION 6.09. Taxes and Fees on Loan Documents ............................................................. 67
SECTION 6.10. Environmental Notices ................................................................................. 67
SECTION 6.11. Insurance with Respect to Project ................................................................. 67
SECTION 6.12. Environmental Audits .................................................................................. 68
SECTION 6.13. Insurance and Condemnation Proceeds ........................................................ 69
SECTION 6.14. Appraisals .................................................................................................... 69
SECTION 6.15. Collateral ..................................................................................................... 69
SECTION 6.16. Subdivision Maps; Other Encumbrances ...................................................... 70
SECTION 6.17. Further Assurances ....................................................................................... 71
SECTION 6.18. Interest Reserve ........................................................................................... 71

## ARTICLE VII

Negative Covenants

SECTION 7.01. Indebtedness ................................................................................................ 71
SECTION 7.02. Liens ............................................................................................................ 71
SECTION 7.03. Fundamental Changes; Sales; Releases; and Release Price ............................ 71
SECTION 7.04. Investments, Loans, Advances, Guarantees and Acquisitions ....................... 75
SECTION 7.05. Swap Agreements ........................................................................................ 75
SECTION 7.06. Restricted Payments ..................................................................................... 75
SECTION 7.07. Transactions with Affiliates .......................................................................... 76
SECTION 7.08. Restrictive Agreements ................................................................................ 76
SECTION 7.09. Organizational Documents ........................................................................... 76
SECTION 7.10. General Manager .......................................................................................... 76
SECTION 7.11. Construction Manager .................................................................................. 76
SECTION 7.12. Principal Project Engineer ............................................................................ 76

iii

Table of Contents
(continued)

Page

ARTICLE VIII

Special Entity Provisions

SECTION 8.01. SPE Covenants..................................................................................77

ARTICLE IX

Events of Default; Remedies

SECTION 9.01. Events of Default.............................................................................79
SECTION 9.02. All Remedies....................................................................................82
SECTION 9.03. Construction.....................................................................................82
SECTION 9.04. Enforcement.....................................................................................83
SECTION 9.05. Cash Collateral Account..................................................................83
SECTION 9.06. Qualified Letters of Credit..............................................................84
SECTION 9.07. Cure of Member Defaults................................................................85
SECTION 9.08. Application of Payments..................................................................86

ARTICLE X

The Administrative Agent

SECTION 10.01. Appointment of Administrative Agent ...........................................87
SECTION 10.02. Administrative Agent's Rights as a Lender.....................................87
SECTION 10.03. Administrative Agent's Duties .......................................................88
SECTION 10.04. Reliance ..........................................................................................88
SECTION 10.05. Sub-Agents .....................................................................................88
SECTION 10.06. Resignation .....................................................................................89
SECTION 10.07. Credit Analysis and Decision by Lenders ......................................89
SECTION 10.08. Collateral.........................................................................................89

ARTICLE XI

Miscellaneous

SECTION 11.01. Notices.............................................................................................90
SECTION 11.02. Waivers; Amendments.....................................................................91
SECTION 11.03. Expenses; Indemnity; Damage Waiver. ..........................................93
SECTION 11.04. Successors and Assigns ...................................................................94
SECTION 11.05. Survival............................................................................................98
SECTION 11.06. Counterparts; Integration; Effectiveness ........................................98
SECTION 11.07. Severability.......................................................................................98
SECTION 11.08. Right of Setoff..................................................................................98

iv

Table of Contents
(continued)

Page

SECTION 11.09.  Governing Law; Jurisdiction; Consent to Service of Process. ........................99
SECTION 11.10.  WAIVER OF JURY TRIAL ...............................................................................99
SECTION 11.11.  Headings ............................................................................................................100
SECTION 11.12.  Confidentiality ...................................................................................................100
SECTION 11.13.  USA PATRIOT ACT ..........................................................................................100
SECTION 11.14.  Ratification .........................................................................................................100
SECTION 11.15.  Lenders ...............................................................................................................100

# TABLE OF CONTENTS

## SCHEDULES AND EXHIBITS

| | |
|---|---|
| Schedule 1 | Facility A and D Lenders and Commitments |
| Schedule 2 | Members, Parent Guarantors and Related Information |
| Schedule 3 | Disclosed Matters |
| Schedule 4 | Intentionally Omitted |
| Schedule 5 | Parent Guarantor Financial Covenants |
| Schedule 6 | Legal Description of Project |
| Schedule 7 | Scope of Work |
| Schedule 8 | Project Agreements |
| Schedule 9 | Required Insurance |
| Exhibit A | Assignment and Assumption |
| Exhibit B | Intentionally Omitted |
| Exhibit C | Intentionally Omitted |
| Exhibit D | Project Budget |
| Exhibit E | Consent and Agreement |
| Exhibit F | Deed of Trust Amendment |
| Exhibit G | Draw Request Form |

AMENDED AND RESTATED CREDIT AGREEMENT dated as of March 9, 2007, among SOUTH EDGE, LLC, a Nevada limited-liability company, the Lenders party hereto, and JPMORGAN CHASE BANK, N.A. as Administrative Agent.

## RECITALS

A.    The Borrower, Administrative Agent and certain lenders have entered into a Credit Agreement dated November 1, 2004 (the "Original Credit Agreement").

B.    Pursuant to the Original Credit Agreement, the Borrower has requested (1) the Facility A Increase (as defined therein) increasing Facility A by $50,000,000 to $160,000,000 and (2) a one-year extension of the maturity of Facility A, and by their execution hereof the Facility A Lenders (as herein defined) have agreed thereto.

C.    The Borrower and the Required Lenders (as defined in the Original Credit Agreement) have also agreed to certain other changes to the Original Credit Agreement set forth herein.

NOW, THEREFORE, the Borrower, the Administrative Agent and Lenders signatory hereto (including all of the Facility A Lenders) constituting Required Lenders hereby amend and restate the Original Credit Agreement as follows:

## ARTICLE I

### Definitions

SECTION 1.01.  Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acquisition Agreement" means, with respect to any Member, that certain Purchase and Sale Agreement and Joint Escrow Instructions dated October 29, 2004 between the Borrower and such Member, and co-signed by such Member's Parent Guarantor, as amended by a First Amendment thereto dated November 28, 2006 and a Second Amendment thereto dated the date hereof, providing for the purchase by such Member of the Phases designated in such agreement for the applicable Takedown Price, as such agreement may be further supplemented, amended or modified from time to time in accordance with the provisions of this Agreement.

"Adjusted Gross Acreage" means, with respect to any Phase, the "Adjusted Gross Acreage" of such Phase as determined from time to time pursuant to the Acquisition Agreement that governs the purchase and sale of such Phase.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of

1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Adjusted Pro Rata Share" means, with respect to any Member, a percentage equal to the Original Pro Rata Share of such Member, (a) plus or minus adjustments thereto in connection with changes to the Adjusted Gross Acreage of a Member in accordance with its Acquisition Agreement as a result of the finalization of the Planning Area Parcel Map and (b) plus the Original Pro Rata Share (or portion thereof) of any Defaulting Member (as adjusted pursuant to clause (a) above) acquired by such Member pursuant to a Key Member Acquisition. The Adjusted Pro Rata Share shall never be less than the Original Pro Rata Share (as adjusted pursuant to clause (a) above).

"Administrative Agent" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent for the Lenders hereunder.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Aggregate Facility A Commitment" means the Facility A Commitments of all of the Facility A Lenders in the aggregate amount of $160,000,000, as such amount may be reduced or increased pursuant to the terms of this Agreement.

"Aggregate Facility D Commitment" means the Facility D Commitments of all of the Facility D Lenders in the aggregate amount of $25,000,000, as such amount may be reduced from time to time pursuant to the terms of this Agreement.

"Aggregate Facility D Outstanding Credit Exposure" means, at any time, the aggregate of the Facility D Outstanding Credit Exposure of all Facility D Lenders.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Base CD Rate in effect on such day plus 1% and (c) the Federal Funds Effective Rate in effect on such day plus ½ of 1%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Base CD Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate, the Base CD Rate or the Federal Funds Effective Rate, respectively.

"Applicable Percentage" means at any time (a) (subject to the next succeeding sentence) with respect to any Facility A Lender, the percentage of the Aggregate Facility A Commitment then represented by such Lender's Facility A Commitment, (b) with respect to any Facility B Lender, the percentage of all outstanding Facility B Loans then represented by such Lender's outstanding Facility B Loans, (c) with respect to any Facility C Lender, the percentage of all outstanding Facility C Loans then represented by such Lender's outstanding Facility C Loans, (d) (subject to the next succeeding sentence) with respect to any Facility D Lender, the percentage of the Aggregate Facility D Commitment then represented by such Lender's Facility

2

D Commitment and (e) (subject to the next succeeding sentence) with respect to a Lender and all Facilities, the percentage of (i) the sum of the Aggregate Facility A Commitment, all outstanding Facility B Loans and Facility C Loans and the Aggregate Facility D Commitment then represented by (ii) the sum of such Lender's Facility A Commitment, outstanding Facility B Loans and Facility C Loans and Facility D Commitment.  If the Aggregate Facility A Commitment or Aggregate Facility D Commitment has terminated, the Applicable Percentage shall be determined in each case based upon the outstanding Facility A Loans (in the case of termination of the Aggregate Facility A Commitment) or Facility D Outstanding Credit Exposure (in the case of termination of the Aggregate Facility D Commitment).

"Applicable Rate" means, for any day, with respect to any ABR Loan, Eurodollar Loan or Letter of Credit, as the case may be, under a Facility, the applicable rate per annum set forth below under the caption "ABR Spread," or "Eurodollar Spread" or "Applicable Rate for Letters of Credit" with respect to such Facility, as the case may be:

| Facility : | ABR Spread | Eurodollar Spread | Applicable Rate for Letters of Credit |
|---|---|---|---|
| Facility A | 0% | 1.75% | Not Applicable |
| Facility B | 0% | 1.75% | Not Applicable |
| Facility C | 0.25% | 2.00% | Not Applicable |
| Facility D | 0.25% | 2.00% | 2.00% |

"Application for Payment and Sworn Statement" means the certificate and application for payment and sworn statement to be executed by the Project Contractor in connection with progress payment applications under the Project Contract or by the Construction Manager in connection with payments under the Construction Management Agreement, in each case in a form reasonably satisfactory to the Administrative Agent, which certificate and application shall include certifications as to the following matters:  (A) the aggregate Hard Costs incurred to date for the Project and the estimated remaining Hard Costs to be paid for the Project, in each case pursuant to the Project Contract or Construction Management Agreement (as applicable), (B) all retainage amounts, (C) the percentage completion of the construction of the Project and the conformance of such construction substantially in accordance with the Approved Plans and Specifications, (D) that the sum requested in the current Application for Payment and Sworn Statement represents costs payable pursuant to the Project Contract and actually incurred by the Project Contractor or pursuant to the Construction Management Agreement and actually incurred by the Construction Manager, and (E) that the work and materials for which payment is requested have been performed and incorporated into the Project substantially in accordance with the Approved Plans and Specifications.

"Appraisal" means a written appraisal of the Project, which appraisal is satisfactory to, and prepared by an independent appraiser engaged directly by, the Administrative Agent, and satisfies the requirements of the Financial Institutions Reform, Recovery and Enforcement Act, as amended, and the regulations promulgated thereunder, if applicable (which

3

appraisal may be an updated version of a prior Appraisal), together with evidence of compliance with applicable federal regulations governing loans in areas having special flood hazards.

"Approved Development Costs" means the Development Costs identified by line item category and dollar amount in the Approved Project Budget.

"Approved Fund" has the meaning assigned to such term in Section 11.04.

"Approved Plans and Specifications" is defined in Section 4.03(a).

"Approved Project Budget" means the budget for the Project attached hereto as Exhibit D and any Modifications thereto that are either Permitted Modifications or approved in writing by the Administrative Agent, which approval shall not be unreasonably withheld or delayed.

"Approved Project Schedule" means the schedule for the Project approved by the Administrative Agent and any Modifications thereto that are either Permitted Modifications or approved in writing by the Administrative Agent, which approval shall not be unreasonably withheld or delayed.

"Approved Swap Agreement" is defined in Section 7.05.

"Assessment Rate" means, for any day, the annual assessment rate in effect on such day that is payable by a member of the Bank Insurance Fund classified as "well-capitalized" and within supervisory subgroup "B" (or a comparable successor risk classification) within the meaning of 12 C.F.R. Part 327 (or any successor provision) to the Federal Deposit Insurance Corporation for insurance by such Corporation of time deposits made in dollars at the offices of such member in the United States; provided that if, as a result of any change in any law, rule or regulation, it is no longer possible to determine the Assessment Rate as aforesaid, then the Assessment Rate shall be such annual rate as shall be determined by the Administrative Agent to be representative of the cost of such insurance to the Lenders.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 11.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"Assignment of Acquisition Agreements" means that certain Assignment of and Agreement with Respect to Acquisition Agreements dated November 1, 2004 executed by the Borrower, the Members, the Parent Guarantors and the Administrative Agent, as supplemented by the Consent and Agreement.

"Assignment of Contracts" means that certain Assignment of Contracts, Permits and Plans and Specifications dated November 1, 2004 executed by the Borrower.

"Balancing Notice" is defined in Section 5.09.

"Balancing Payment" is defined in Section 5.09.

4

"Base CD Rate" means the sum of (a) the Three-Month Secondary CD Rate multiplied by the Statutory Reserve Rate plus (b) the Assessment Rate.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means South Edge, LLC, a Nevada limited-liability company.

"Borrower's Application for Payment" means the certificate and application for payment to be executed by the Borrower in connection with each request for a disbursement of Loans, in a form reasonably satisfactory to the Administrative Agent, which application shall include certifications as to the following matters: (A) the aggregate Approved Development Costs incurred to date and the estimated remaining Approved Development Costs to be paid, (B) all retainage amounts, and (C) that the sum requested in the current Draw Request Form represents Approved Development Costs included in the Approved Project Budget and actually incurred by the Borrower.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date under the same Facility and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash Collateral Account" means an account maintained with the Administrative Agent pursuant to this Agreement and over which the Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal.

"Change in Control" means the occurrence of any one or more of the following events:

(a)     With respect to any Member, that such Member shall cease to own its Adjusted Pro Rata Share of the membership interests in the Borrower (other than by reason of a Key Member Acquisition), free and clear of any Liens other than Permitted

Encumbrances or Liens in favor of another Member pursuant to the Operating Agreement; or

(b)    In the case of any Member (other than Focus), that such Member shall cease to be wholly owned, directly or indirectly, by its Parent Guarantor; or

(c)    In the case of Focus, that (i) John A. Ritter, lineal descendants of John A. Ritter and trusts controlled by John A. Ritter or his lineal descendants shall, in the aggregate, cease to own, directly or indirectly, beneficially at least twenty-five percent (25%) of the equity interests in Focus or (ii) other than by reason of death or disability, John A. Ritter shall cease to exercise primary management responsibilities with respect to the operations of Focus.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or Issuing Bank (or, for purposes of Section 2.15(b), by any lending office of such Lender or by such Lender's or Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"City" means the City of Henderson, Nevada.

"Closing Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means, at any time, any assets that are subject to a security interest or other Lien in favor of the Administrative Agent for the benefit of the Holders of Secured Obligations.

"Collateral Documents" means the Deed of Trust, the Assignments of Contracts, the Assignment of Acquisition Agreements and any other documents from time to time executed by Borrower, granting the Administrative Agent, for the benefit of Holders of Secured Obligations, a Lien securing the Secured Obligations.

"Commitment" means the Facility A Commitment, Facility B Commitment, Facility C Commitment or Facility D Commitment (as the case may be).

"Common Areas" means private streets, sidewalks, access ways, drainage and retention areas or other private common areas, infrastructure or improvements intended to be conveyed to and owned by a Development Association for the benefit of all or any portion of the Project.

"Completion Guaranty" means, with respect to each Member and its Parent Guarantor, that certain Completion Guaranty dated November 1, 2004 executed and delivered by such Member and its Parent Guarantor, as supplemented by the Consent and Agreement.

6

"Consent and Agreement" means the Consent and Agreement executed by the Guarantors and Administrative Agent substantially in the form attached hereto as Exhibit E.

"Construction Agreements" is defined in Section 4.03(h).

"Construction Consultant" means, collectively, the architect(s), engineer(s) and any other consultant(s) engaged by the Administrative Agent from time to time to review plans and specifications, construction and other matters relating to the Project.

"Construction Management Agreement" is defined in Section 4.03(e).

"Construction Manager" means Landtek, LLC, a Nevada limited-liability company and Affiliate of the General Manager, or any Person that shall succeed it, as construction manager with respect to the construction of the Improvements, in accordance with the provisions of this Agreement.

"Contingent Obligation" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Contingent Obligation shall not include endorsements for collection or deposit in the ordinary course of business.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Corporate Guarantor" means each of the Parent Guarantors, except John A. Ritter.

"Credit Parties" means the Borrower and the Guarantors; "Credit Party" means any of the Credit Parties.

"Customary Real Estate Encumbrances" means declarations, covenants, restrictions, easements, zoning restrictions, rights-of-way, and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not materially detract from the value of the affected portion of the Project or interfere with the development or improvement of the Project or the ordinary conduct of business of the Borrower.

7

"Date Down Endorsement" is defined in Section 4.04(f).

"Deed of Trust" means the deed of trust executed by the Borrower dated November 1, 2004 and recorded November 1, 2004 in Book 20041101 as Document No. 0006330 in Clark County, Nevada, granting to the trustee thereunder, and in favor of the Administrative Agent (as beneficiary), for the benefit of the Holders of Secured Obligations, a first Lien on the Project as security for the Secured Obligations, subject only to Permitted Encumbrances, as amended by the Deed of Trust Amendment.

"Deed of Trust Amendment" means the First Amendment to Deed of Trust executed by the Borrower and the Administrative Agent substantially in the form of Exhibit F attached hereto.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Member" means a Member with respect to which a Member Default has occurred and is continuing or with respect to whose Parent Guarantor a Member Default has occurred and is continuing.

"Defaulting Member's Remaining Obligations" means, at any time, an amount (as reasonably determined by the Administrative Agent) equal to the sum of (i) such Defaulting Member's Adjusted Pro Rata Share of Approved Development Costs not yet paid (less its Adjusted Pro Rata Share of the sum of the amounts of (i) the undisbursed portion of the Aggregate Facility A Commitment and (ii) the Facility D Loan Availability), plus (ii) without duplication, an amount equal to the Takedown Prices of the Phases not yet acquired by such Defaulting Member pursuant to its Acquisition Agreement.

"Development Agreement" means, collectively, one or more development agreements between the Borrower and the City providing for development of the Project as a master plan community and approved by the Administrative Agent, as amended or modified from time to time with the written approval of the Administrative Agent, which approval shall not be unreasonably withheld or delayed.

"Development Association" means any homeowner's association, development association or other similar entity formed for the benefit of the Project or any portion thereof.

"Development Costs" means all costs incurred by the Borrower in connection with the construction of the Improvements, including (a) the cost of labor and materials (collectively, the "Hard Costs") and (b) all so-called "soft costs" (collectively, the "Soft Costs"), including (i) fees and charges of the Construction Manager, Project Engineer and all other engineers and other consultants engaged by the Borrower, and the costs and fees incurred in connection with the procurement of all Permits necessary to complete the Project, (ii) all interest payments on the Loans and LC Disbursements, all fees payable under this Agreement and any periodic payments under any Approved Swap Agreement (but not payments due upon default, termination or breakage) and (iii) real estate taxes, insurance premiums and other carrying costs for the Project; provided, that under no circumstances shall Development Costs include (A) any

8

principal or interest payments on Indebtedness other than as specified in clause (ii) above, (B) any Restricted Payments or other payments to Members of Borrower or any Affiliate of Borrower or of any such Member (except Permitted Affiliate Fees).

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.

"dollars" or "$" refers to lawful money of the United States of America.

"Draw Request Form" means the form of Request for Loan Advance attached hereto as Exhibit G, as the same may be revised from time to time with the consent of the Borrower and the Administrative Agent.

"Entitlement Proceeding" is defined in Section 3.13(b).

"Environmental, Health or Safety Requirements of Law" means all Requirements of Law derived from or relating to foreign, federal, state and local laws or regulations or common law theories relating to or addressing pollution or protection of the environment, or protection of worker health or safety, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq., and the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq., in each case including any amendments thereto, any successor statutes, and any regulations or guidance promulgated thereunder, and any state or local equivalent thereof.

"Environmental Indemnity Agreement" means that certain Environmental Indemnity Agreement dated November 1, 2004 executed by Borrower.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower directly or indirectly resulting from or based upon (a) violation of any Environmental, Health or Safety Requirements of Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Report" means a "Phase I" environmental assessment, or equivalent report as approved by the Administrative Agent, and, if required by the Administrative Agent, a "Phase II" environmental site assessment, in each case prepared by an environmental engineering consultant, and in form and substance, satisfactory to the Administrative Agent in its reasonable judgment.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

9

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Section 9.01.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, any Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) its net income by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.19(b)), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Lender's failure to comply with Section 2.17(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.17(a).

10

"Facilities" means Facility A, Facility B, Facility C and Facility D; provided, however, that, if the context indicates that reference to less than all of Facility A, Facility B, Facility C and Facility D is intended, "Facilities" shall mean only such of Facility A, Facility B, Facility C and Facility D as is so intended.

"Facility A" means the loan facility described in Section 2.01(a).

"Facility A Commitment" means, for each of the Facility A Lenders, the obligation of such Facility A Lender to make Loans under Facility A in the aggregate not exceeding the amount set forth in Schedule I hereto as its "Facility A Commitment" or the amount set forth in any Assignment and Assumption Agreement by which such Facility A Lender acquires an interest in Facility A, as such applicable amount may be increased or decreased from time to time pursuant to the terms hereof.

"Facility A Lender" means, at any time, each of the Lenders holding an interest in Facility A.

"Facility A Maturity Date" means October 31, 2008 or such earlier date upon which the outstanding principal amount of the Facility A Loans, all accrued and unpaid interest thereon, and all other Facility A Obligations become or are declared due and payable pursuant to the terms of this Agreement.

"Facility A Obligations" means all unpaid principal of and accrued and unpaid interest on the Facility A Loans, all accrued and unpaid fees with respect to Facility A and all expenses, reimbursements, indemnities and other obligations of the Credit Parties to the Facility A Lenders or to any Facility A Lender, the Administrative Agent or any indemnified party with respect to Facility A under the Loan Documents.

"Facility B" means the term loan facility described in Section 2.01(b).

"Facility B Commitment" means, for each of the Facility B Lenders as of the Closing Date, the amount of the Facility B Loan held by such Facility B Lender on the Closing Date. Notwithstanding the reference to the "Commitment" of the Facility B Lenders, the Facility B Loans were fully disbursed under the Original Credit Agreement, and no Facility B Lender has any obligation to make any advances under Facility B.

"Facility B Lender" means, at any time, each of the Lenders holding an interest in Facility B.

"Facility B Maturity Date" means October 31, 2007 or such earlier date upon which the outstanding principal amount of the Facility B Loans, all accrued and unpaid interest thereon, and all other Facility B Obligations become or are declared due and payable pursuant to the terms of this Agreement.

"Facility B Obligations" means all unpaid principal of and accrued and unpaid interest on the Facility B Loans, all accrued and unpaid fees with respect to Facility B and all expenses, reimbursements, indemnities and other obligations of the Credit Parties to the Facility

11

B Lenders or to any Facility B Lender, the Administrative Agent or any indemnified party with respect to Facility B arising under the Loan Documents.

"Facility C" means the term loan facility described in Section 2.01(c).

"Facility C Commitment" means, for each of the Facility C Lenders as of the Closing Date, the amount of the Facility C Loan held by such Facility C Lender on the Closing Date. Notwithstanding the reference to the "Commitment" of the Facility C Lenders, the Facility C Loans were fully disbursed under the Original Credit Agreement, and no Facility C Lender has any obligation to make any advances under Facility C.

"Facility C Lender" means, at any time, each of the Lenders holding an interest in Facility C.

"Facility C Maturity Date" means October 31, 2009 or such earlier date upon which the outstanding principal amount of the Facility C Loans, all accrued and unpaid interest thereon, and all other Facility C Obligations become or are declared due and payable pursuant to the terms of this Agreement.

"Facility C Obligations" means all unpaid principal of and accrued and unpaid interest on the Facility C Loans, all accrued and unpaid fees with respect to Facility C and all expenses, reimbursements, indemnities and other obligations of the Credit Parties to the Facility C Lenders or to any Facility C Lender, the Administrative Agent or any indemnified party with respect to Facility C arising under the Loan Documents.

"Facility D" means the revolving credit (including letter of credit) facility described in Section 2.01(d).

"Facility D Commitment" means, for each of the Facility D Lenders, the obligation of such Facility D Lender to participate in Letters of Credit issued under Facility D, and to make loans pursuant to Facility D, not exceeding in the aggregate the amount set forth in Schedule 1 hereto as its "Facility D Commitment" or the amount set forth in any Assignment and Assumption Agreement by which such Facility D Lender acquires an interest in Facility D, as such applicable amount may be increased or decreased from time to time pursuant to the terms hereof.

"Facility D Lender" means, at any time, each of the Lenders holding an interest in Facility D.

"Facility D Loan Availability" means the amount by which the Aggregate Facility D Commitment exceeds the Aggregate Facility D Outstanding Credit Exposure.

"Facility D Maturity Date" means October 31, 2009 or such earlier date upon which the outstanding principal amount of the Facility D Loans, all accrued and unpaid interest thereon, and all other Facility D Obligations become or are declared due and payable pursuant to the terms of any of this Agreement.

12

"Facility D Obligations" means all unpaid principal of and accrued and unpaid interest on the Facility D Loans, all LC Disbursements, all accrued and unpaid fees with respect to Facility D and all expenses, reimbursements, indemnities and other obligations of the Credit Parties to the Facility D Lenders or to any Facility D Lender, the Administrative Agent or any indemnified party with respect to Facility D arising under the Loan Documents.

"Facility D Outstanding Credit Exposure" means, as to any Facility D Lender at any time, the sum of (i) an amount equal to its LC Exposure at such time, plus (ii) the aggregate principal amount of its Facility D Loans outstanding at such time.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financial Officer" means, at any time, the chief financial officer, principal accounting officer, treasurer or controller of (a) the Borrower if at such time a Person holds any such position and, if not, (b) the General Manager.

"Focus" means Focus South Group, LLC, a Nevada limited-liability company.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"GAAP" means generally accepted accounting principles in the United States of America.

"General Manager" means Holdings Manager, LLC, a Nevada limited-liability company, or any Person that shall succeed it as general manager of the Borrower in accordance with the provisions of this Agreement.

"Governmental Approval" means all right, title and interest in any existing or future certificates, licenses, permits, variances, authorizations and approvals issued with respect to the Project by any Governmental Authority having jurisdiction with respect to the Project.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

13

"Guaranties" means the Repayment Guaranties executed by each of the Members and their respective Parent Guarantors, the Completion Guaranties executed by each of the Members and their respective Parent Guarantors, and the Limited Guaranties executed by each of the Members and their respective Parent Guarantors; "Guaranty" means one of the Guaranties.

"Guarantor" means any Credit Party that executed or executes a Guaranty pursuant to the Original Credit Agreement or this Agreement and includes both the Members and the Parent Guarantors.

"Hard Costs" is defined in the definition of "Development Costs."

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental, Health or Safety Requirements or Law.

"Holders of Secured Obligations" means the holders of the Secured Obligations from time to time and shall include (i) each Lender in respect of its Loans, (ii) each Issuing Bank in respect of LC Disbursements owed to it, (iii) the Administrative Agent, the Lenders and the Issuing Banks in respect of all other present and future obligations and liabilities of any Credit Party of every type and description arising under or in connection with this Agreement or any other Loan Document, (iv) each Indemnitee in respect of the obligations and liabilities of any Credit Party to such Person hereunder or under the other Loan Documents, (v) each Lender (or Affiliate thereof), in respect of all Secured Swap Obligations of Borrower to such Lender (or Affiliate), and (vi) their respective successors, transferees and assigns.

"Improvements" means infrastructure improvements constructed and installed or to be constructed or installed on the Project, as described in the Scope of Work and more specifically provided for in the Approved Plans and Specifications.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Contingent Obligations of such Person, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest

14

in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitees" is defined in Section 11.03(b).

"Information Memorandum" means the Confidential Information Memorandum dated February 15, 2007 relating to the Borrower and the Transactions.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.08.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each March, June, September and December and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months thereafter, as the Borrower may elect; provided, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless, in the case of a Eurodollar Borrowing only, such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period pertaining to a Eurodollar Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Issuing Bank" means JPMorgan Chase Bank, N.A. and any Facility D Lender that, at the request of the Borrower and with the approval of the Administrative Agent in its reasonable judgment, agrees to issue Letters of Credit hereunder, each in its capacity as the issuer of Letters of Credit hereunder, and any successors in such capacity as provided in Section 2.06(i). An Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by its Affiliates, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"Key Member" means KB Nevada Home, Inc., Coleman-Toll Limited Partnership and any other Member that is approved as a "Key Member" by the Required Lenders.

"Key Member Acquisition" is defined in Section 9.07(c).

15

"LC Disbursement" means a payment made by an Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time. The LC Exposure of any Facility D Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"Lenders" means the Persons listed on Schedule 1 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Letter of Credit" means any letter of credit issued pursuant to this Agreement.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, the rate appearing on Page 3750 of the Dow Jones Market Service (or on any successor or substitute page of such Service, or any successor to or substitute for such Service, providing rate quotations comparable to those currently provided on such page of such Service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period. In the event that such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such Eurodollar Borrowing for such Interest Period shall be the rate at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"LID Bond Account" means an account established with the LID Bond trustee or another Person pursuant to the LID Bond Documents, into which account the Net LID Proceeds shall be disbursed to or as directed by the Borrower from time to time for payment of certain Approved Development Costs in accordance with the LID Bond Documents.

"LID Bond Documents" means each indenture and other document or instrument that evidences the issuance of or is executed and delivered in connection with or that secures the LID Bonds.

"LID Bonds" means any Local Improvement District Bonds issued with respect to the Project.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

16

"Limited Guaranty" means, with respect to each Member and its Parent Guarantor, that certain Limited Guaranty dated November 1, 2004 executed and delivered by such Member and its Parent Guarantor, as supplemented by the Consent and Agreement.

"Loan Documents" means (a) this Agreement, any Notes delivered pursuant hereto or the Original Credit Agreement, the Guaranties, the Environmental Indemnity Agreement and the Collateral Documents and (b) any and all other instruments or documents delivered or to be delivered by the Credit Parties pursuant hereto or pursuant to any of the other documents described in clause (a) above.

"Loan Title Insurance Policy" means the American Land Title Association loan policy (1992 Form), issued by the Title Insurer to Administrative Agent on or about the Original Closing Date, and the related reinsurance agreements, as revised and updated (including by the endorsement provided for in Section 4.01(e)) from time to time with the Administrative Agent's consent.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"Major Project Contract" means one or more Project Contracts under which the aggregate amount payable to the same Project Contractor exceeds $5,000,000.

"Major Subcontract" means one or more subcontracts for the furnishing of labor and materials under which the aggregate amount payable to the same subcontractor exceeds $5,000,000.

"Major Subcontractor" means a subcontractor under a Major Subcontract.

"Master Plan" means the West Henderson and Section 34 Land Use and Transportation Plan (CPA-02-520035).

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Borrower, (b) the ability of the Borrower to perform any of its obligations under this Agreement or any Loan Document or (c) the rights of or benefits available to the Administrative Agent or the Lenders under this Agreement or any of the other Loan Documents. Without limitation of the foregoing, an adverse effect of $5,000,000 or more on the Borrower or the Project shall be deemed material.

"Material Default" means any Event of Default under Section 9.01(a) or (b) hereof or (with respect to the Borrower) under Section 9.01(h), (i) or (j) hereof.

"Material Indebtedness" means, at any time in the case of each Parent Guarantor, Recourse Indebtedness in an amount in excess of 5% of its total Recourse Indebtedness.

"Maturity Date" means (i) with respect to Facility A, the Facility A Maturity Date, (ii) with respect to Facility B, the Facility B Maturity Date, (iii) with respect to Facility C, the Facility C Maturity Date, and (iv) with respect to Facility D, the Facility D Maturity Date.

17

"Maximum Indebtedness Limitation" means that at no time shall the outstanding principal amounts of the Loans under the Facilities exceed the sum of the Release Prices of those Phases not theretofore released from the Deed of Trust.

"Member" means each of the members of the Borrower identified in Schedule 2 hereto, and any successor or assign of such Member permitted under this Agreement.

"Member Default" means any Default with respect to a Member or its Parent Guarantor under Section 9.01 that is not yet an Event of Default.

"Modification" is defined in the definition of "Permitted Modifications."

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net LID Proceeds" means, with respect to the issuance of any LID Bonds, the proceeds of such LID Bonds, net of expenses of the issuer, the bond trustee and the underwriter and of reserves required to be established pursuant to the terms of the LID Bond Documents.

"Net Mark-to-Market Exposure" means, as of any date of determination, the excess (if any) of all unrealized losses over all unrealized profits of the Borrower arising from Approved Swap Agreements. "Unrealized losses" means the fair market value of the cost to the Borrower of replacing such Approved Swap Agreements as of the date of determination (assuming the Approved Swap Agreements were to be terminated as of that date), and "unrealized profits" means the fair market value of the gain to the Borrower of replacing such Approved Swap Agreements as of the date of determination (assuming such Approved Swap Agreements were to be terminated as of that date).

"Note" is defined in Section 2.10(e).

"Obligations" means all Loans, LC Disbursements, advances, debts, liabilities, obligations, covenants and duties owing by any Credit Party to the Administrative Agent, any Lender, any Issuing Bank, the Arranger, any Affiliate of the Administrative Agent or any Lender or Issuing Bank or any Person entitled to indemnification by any Credit Party under this Agreement or any other Loan Document, of any kind or nature, present or future, arising under this Agreement or any other Loan Documents, whether or not evidenced by any note, guaranty or other instrument, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification, or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired. The term "Obligations" includes, without limitation, all Facility A Obligations, Facility B Obligations, Facility C Obligations and Facility D Obligations, all interest, charges, expenses, fees, reasonable attorneys' fees and disbursements, reasonable paralegals' fees and any other sum chargeable to any Credit Party under this Agreement or any other Loan Document.

18

"Operating Agreement" means the Amended and Restated Operating Agreement of South Edge, LLC dated as of May 3, 2004, as amended by First Amendment thereto dated October 29, 2004 and Second Amendment thereto dated March 8, 2007 and as the same may be further amended from time to time in accordance with the provisions of this Agreement.

"Organizational Documents" means, with respect to any corporation, limited liability company or partnership (i) the articles/certificate of incorporation or formation (or the equivalent organizational documents) of such corporation or limited liability company, (ii) the partnership agreement of the partnership and the certificate of limited partnership, (iii) the bylaws or operating agreement (or the equivalent governing documents) of the corporation, limited liability company or partnership and (iv) any document setting forth the designation, amount and/or relative rights, limitations and preferences of any class or series of such corporation's limited liability company's or partnership's Equity Interests.

"Original Closing Date" means November 1, 2004, which was the "Closing Date" under the Original Credit Agreement.

"Original Credit Agreement" is defined in Recital A.

"Original Pro Rata Share" means, with respect to any Member, a percentage equal to its percentage interest in the Borrower as of the Closing Date as designated in Schedule 2 hereto.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement.

"Out-of-Balance Condition" is defined in Section 5.09.

"Parent Guarantor" means each of those Persons designated as a Parent Guarantor in Schedule 2 hereto. The Parent Guarantor of or with respect to a Member shall be the Person so designated in the adjoining column in Schedule 2.

"Parent Guarantor Financial Covenants" means:

(a) At any time in the case of each Corporate Guarantor, each of the following financial covenants to the extent, and only to the extent, then contained in the Primary Credit Facility of such Corporate Guarantor: (i) each of the leverage covenants (i.e., a covenant that imposes a maximum limit on the ratio of debt to net worth or debt to total assets); (ii) each of the interest coverage covenants (i.e., a covenant that imposes a minimum limit on the ratio of EBITDA (i.e., earnings before interest, taxes, depreciation and amortization) to interest incurred, and (iii) each of the net worth covenants (i.e., a minimum limit on net worth or tangible net worth), which covenants as in effect as of the Closing Date are identified in Schedule 5 hereto, provided, however, that (A) in the event that a Primary Credit Facility that contains any leverage, interest coverage or net worth covenant is amended to delete, or is replaced by a Primary Credit Facility that does not have, such financial covenant, the financial covenant in effect prior to such deletion or

19

replacement shall continue to be a Parent Guarantor Financial Covenant; and (B) in the event that a Primary Credit Facility is terminated and not replaced by a new Primary Credit Facility containing leverage, interest coverage and net worth covenants to the extent the same were contained in the Primary Credit Facility it replaced, the leverage, interest coverage or net worth covenant or covenants (as applicable) contained in the terminated Primary Credit Facility shall continue to be Parent Guarantor Financial Covenants;

(b)  In the case of John A. Ritter, the covenants identified in Schedule 5.

"Participant" is defined in Section 11.04.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Performance Letter of Credit" means any letter of credit issued: (a) on behalf of a Person in favor of a Governmental Authority, including, without limitation, any utility, water, or sewer authority, or other similar entity, for the purpose of assuring such Governmental Authority that such Person will properly complete work it has agreed to perform for the benefit of such Governmental Authority; (b) in lieu of cash deposits to obtain a license or in place of a utility deposit; (c) in connection with bid and performance bonds and surety bonds; or (d) otherwise to assure completion of the Improvements.

"Permit" means any permit, consent, approval, authorization, license, variance, or permission with respect to the Project required from any Governmental Authority.

"Permitted Affiliate Fees" means (a) the management fee and any expenses payable to the General Manager pursuant to the Operating Agreement, (b) the fees and expenses payable to the Construction Manager pursuant to the Construction Management Agreement, (c) any fees and expenses payable to any Member or its Affiliate for goods or services provided to the Borrower on terms and conditions not less favorable to the Borrower than could be obtained on an arms-length basis from a Person that is not an Affiliate of the Borrower or any Member and (d) payments made to the Development Association for maintenance and other similar costs related to the Common Areas.

"Permitted Encumbrances" means:

(a)  Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 6.04;

(b)  carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 6.04;

(c)  pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

20

(d) Liens to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e) judgment liens in respect of judgments that do not constitute an Event of Default under Section 9.01(k);

(f) the Collateral Documents;

(g) the Planning Area Parcel Map;

(h) any Subdivision Maps approved by the Administrative Agent pursuant to Section 6.16(a);

(i) the Development Agreement;

(j) the Master Plan;

(k) the LID Bond Documents; and

(l) Customary Real Estate Encumbrances.

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Investments" means:

(a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any instrumentality thereof) in each case maturing within one year from the date of acquisition thereof;

(b) investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c) investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d) fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(e) money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii)

21

are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000; and

(f) equity interests in any Development Association.

"Permitted Modification" means (i) any revision to the Approved Project Budget (including reallocation of amounts between line items), (ii) any change order or other amendment to any Construction Agreement, (iii) any amendment, addition or other change to the Approved Plans and Specifications or (iv) any amendment or other change to the Approved Project Schedule (any of items (i), (ii), (iii) and (iv) being hereinafter referred to as a "Modification"), which Modification satisfies all of the following conditions:

(a) Such Modification has been approved in writing by (1) the Borrower and (x) in the case of a Modification (including any change order) to any agreement, the parties thereto and (y) in the case of any Modification to the Approved Plans and Specifications, the Project Engineer, and in any case copies of such Modification and approvals have been promptly furnished to the Administrative Agent and (2) unless the Borrower certifies to the Administrative Agent that all of the conditions set forth in subparagraphs (b) through (f) below are satisfied, the Administrative Agent, which approval shall not be unreasonably withheld or delayed; provided, however, that there shall be no reallocation with respect to the interest reserve line item without the Administrative Agent's written approval in its sole discretion;

(b) Such Modification is consistent with the Scope of Work and complies with all applicable Requirements of Law;

(c) Such Modification does not impair the ability of the Borrower to perform its obligations hereunder in accordance with the Approved Project Schedule;

(d) If (i) such Modification (together with any related Modifications) results in a change in the Development Costs of more than $2,000,000 and (ii) such Modification, together with all Modifications made after the Closing Date, results in total changes to the Development Costs that exceed in the aggregate $5,000,000, then such Modification has been approved in writing by the Administrative Agent, which approval shall not be unreasonably withheld or delayed. For purposes of the foregoing, each increase in an individual line item of Development Costs in the Approved Project Budget resulting from a Modification shall constitute a "change," each decrease in an individual line item of Development Costs in the Approved Project Budget resulting from a Modification shall constitute a "change," and in determining the amount of any "change" decreases shall not be netted against increases;

(e) Such Modification will not have a Material Adverse Effect; and

(f) Such Modification is not otherwise prohibited by this Agreement.

22

"Permitted Restricted Payment" is defined in Section 7.06(a).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Phase" means, with respect to a Member, each phase of the Project to be acquired by such Member pursuant to its Acquisition Agreement.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Planning Area Parcel Map" means the final map approved by the City designating the planning area parcels that make up the Phases to be acquired by the Members pursuant to the Acquisition Agreements and in compliance with the requirements of the Acquisition Agreements, as the same may be modified or amended from time to time with the approval of the Administrative Agent, which approval shall not be unreasonably withheld or delayed.

"Primary Credit Facility" means, with respect to any Corporate Guarantor, the primary credit facility under which such Corporate Guarantor obtains financing for its general corporate purposes. The Primary Credit Facility for each of the Corporate Guarantors as of the Closing Date is identified in Schedule 5.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Principal Project Engineer" means VTN Nevada, and any other Person that shall succeed it, as the principal engineer with respect to the Improvements, in accordance with the provisions of this Agreement.

"Project" means the real property described in Schedule 6 hereto.

"Project Agreements" means the Acquisition Agreements, the Construction Agreements and the Development Agreement.

"Project Contract" is defined in Section 4.03(g).

"Project Contractor" is defined in Section 4.03(g).

"Project Engineer" is defined in Section 4.03(f).

"Project Engineer's Agreement" is defined in Section 4.03(f).

23

"Property" of a Person means any and all property, whether real, personal, tangible, intangible, or mixed, of such Person, or other assets owned, leased or operated by such Person.

"Property Award Event" is defined in Section 6.13(a).

"Property Awards" means all compensation, awards, damages, refunds, claims, rights of action and proceeds (including cash, equivalents readily convertible into cash, and such proceeds of any notes received in lieu of cash) payable under policies of property damage, boiler and machinery, rental loss, rental value and business interruption insurance or with respect to any condemnation or eminent domain claim or award relating to the Project or any part thereof.

"Public Land" is defined in Section 7.03(c).

"Qualified Letter of Credit" means, in the case of any letter of credit delivered to the Administrative Agent hereunder in satisfaction of a condition or requirement hereunder, a letter of credit that (a) is issued by a commercial bank approved by the Administrative Agent and having a deposit rating of A- or better from S&P or an equivalent rating from Moody's, (b) designates the Administrative Agent as the sole beneficiary thereof, (c) may be drawn upon in New York City or Chicago, Illinois, (d) may be drawn upon by presentation by the Administrative Agent of a sight draft, (e) has an expiry date that is not earlier than six months after the issuance thereof (unless otherwise agreed to by the Administrative Agent), (f) is, individually or together with one or more other Qualified Letters of Credit delivered to the Administrative Agent at the same time and for the same purpose, in the amount required under the applicable provisions of this Agreement and (g) is otherwise reasonably satisfactory to the Administrative Agent.

"Real Estate" means land, rights in land and interests therein (including, without limitation, leasehold interests), and equipment, structures, improvements, furnishings, fixtures and buildings (including a mobile home of the type usually installed on a developed site) located on or used in connection with land, rights in land or interests therein (including leasehold interests), but shall not include mortgages or other Liens or interests therein.

"Recourse Indebtedness" means, in the case of each Parent Guarantor, all of its Indebtedness except such Indebtedness for which it has no personal liability for repayment thereof.

"Register" is defined in Section 11.04.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, trustees, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" means any release, spill, emission, leaking, pumping, pouring, dumping, injection, deposit, disposal, abandonment, or discarding of barrels, containers or other receptacles, discharge, emptying, escape, dispersal, leaching or migration into the indoor or outdoor environment or into or out of any Property of any Hazardous Materials, including the

24

movement of Hazardous Materials through or in the air, soil, surface water, groundwater or Property.

"Release Price" means, with respect to a Phase to be acquired by such Member pursuant to its Acquisition Agreement, the amount designated in Schedule 2 hereto; provided, however, that (i) if the release of a Phase upon payment of the Release Price would result in a violation of the Maximum Indebtedness Limitation, such Release Price shall be increased by an amount such that, upon payment thereof and release of such Phase, the Maximum Indebtedness Limitation shall not be violated and (ii) subject to clause (i), if in connection with the planning for the Improvements for the Project, the Borrower desires to make non-material adjustments of the Adjusted Gross Acreage of one or more Phases, the Administrative Agent may, it its reasonable discretion, approve such adjustments and corresponding non-material adjustments of the Release Prices.

"Remedial Action" means any remedial actions as may be prudent or required from time to time to comply with Environmental, Health or Safety Requirements of Laws.

"Repayment Guaranty" means, with respect to each Member and its Parent Guarantor, that certain Repayment Guaranty dated November 1, 2004 executed by such Member and its Parent Guarantor, as supplemented by the Consent and Agreement.

"Required Lenders" means, at any time, Lenders whose Applicable Percentages with respect to all Facilities, in the aggregate, are 66-2/3% or greater.

"Required Lien Waivers" means written waivers of Lien from (i) the Project Contractor under any Major Project Contract, (ii) the Construction Manager (iii) the Major Subcontractors and (iv) if reasonably requested by Administrative Agent, any other Project Contractor and any other subcontractor that has entered into a contract or subcontract for the furnishing of labor or materials in connection with the Project, all of which lien waivers shall be in customary form, duly executed, acknowledged and delivered, and sufficient in all respects to cause the Title Insurer to issue the Loan Title Insurance Policy and Date Down Endorsements thereto from time to time provided for in this Agreement.

"Requirements of Law" means, as to any Person, the articles and regulations or other Organizational Documents of such Person, and any law, rule or regulation, or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject, including, without limitation, the Securities Act, the Securities Exchange Act, Regulations T, U and X of the Board, ERISA, the Fair Labor Standards Act, the Worker Adjustment and Retraining Notification Act, the Americans with Disabilities Act of 1990, and any certificate of occupancy, zoning ordinance, building, environmental or land use requirement or permit or environmental, labor, employment, occupational safety or health law, rule or regulation, including Environmental, Health or Safety Requirements of Law.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on

25

account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in the Borrower or any option, warrant or other right to acquire any such Equity Interests in the Borrower; provided that, in no event shall the difference between the value of any portion of the Project to be acquired by a Member pursuant to its Acquisition Agreement and the purchase price therefor be considered a "Restricted Payment."

"S&P" means Standard & Poor's.

"Scope of Work" means the description of the Improvements set forth in Schedule 7 hereto.

"Secured Obligations" means, collectively, (i) the Obligations and (ii) the Secured Swap Obligations.

"Secured Swap Obligations" means obligations of the Borrower to a Lender (or an Affiliate thereof) as exchange party or counterparty under any Approved Swap Agreement.

"Soft Costs" is defined in the definition of "Development Costs."

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject (a) with respect to the Base CD Rate, for new negotiable nonpersonal time deposits in dollars of over $100,000 with maturities approximately equal to three months and (b) with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subdivision Map" is defined in Section 6.16.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"Takedown" means, with respect to a Member, the closing of its acquisition of a Phase pursuant to its Acquisition Agreement.

"Takedown Price" means, with respect to any Phase, the cash amount required to be paid by the Member at the time of the Takedown of such Phase pursuant to its Acquisition Agreement, after taking into account all credits and offsets to which such Member is entitled.

26

"Takedown Schedule" means, with respect to a Member, the schedule for each of its Takedowns provided for in its Acquisition Agreement.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Title Insurer" means Chicago Title Insurance Company.

"Three-Month Secondary CD Rate" means, for any day, the secondary market rate for three-month certificates of deposit reported as being in effect on such day (or, if such day is not a Business Day, the next preceding Business Day) by the Board through the public information telephone line of the Federal Reserve Bank of New York (which rate will, under the current practices of the Board, be published in Federal Reserve Statistical Release H.15(519) during the week following such day) or, if such rate is not so reported on such day or such next preceding Business Day, the average of the secondary market quotations for three-month certificates of deposit of major money center banks in New York City received at approximately 10:00 a.m., New York City time, on such day (or, if such day is not a Business Day, on the next preceding Business Day) by the Administrative Agent from three negotiable certificate of deposit dealers of recognized standing selected by it.

"Transactions" means the execution, delivery and performance by the Borrower of this Agreement, the borrowing of Loans, the use of the proceeds thereof and the issuance of Letters of Credit hereunder.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02.  Classification of Loans and Borrowings.  For purposes of this Agreement, Loans may be classified and referred to by Facility (e.g., a "Facility B Loan") or by Type (e.g., a "Eurodollar Loan") or by Facility and Type (e.g., a "Facility B Eurodollar Loan"). Borrowings also may be classified and referred to by Facility (e.g., a "Facility B Borrowing") or by Type (e.g., a "Eurodollar Borrowing") or by Facility and Type (e.g., a "Facility B Eurodollar Borrowing").

SECTION 1.03.  Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or

27

Administrative Agent intended to be created by the Loan Documents, or which calls into question the validity or priority of such Liens which would not be paid off by the proceeds of the then requested Borrowing, (iv) any litigation or proceeding is commenced to enjoin the construction at the Project or any portion thereof, to alter the zoning or land use classification of the Project or any portion thereof or to enjoin or prohibit the Borrower, the Administrative Agent or the Lenders from performing their respective material obligations under this Agreement, (v) any deviation exists in the construction of the Improvements on the Project from the Approved Plans and Specifications without the prior written approval of the Administrative Agent, or it appears to the Administrative Agent in its reasonable judgment that there are defects in the workmanship or materials, or (vi) the construction of the Improvements is not being diligently pursued in accordance with the Approved Project Schedule;

(h)  disburse any Loan if any Construction Agreement (excluding any Project Contract that is not a Major Project Contract), Major Subcontract or Acquisition Agreement is amended, modified or terminated in violation of this Agreement or there shall occur and shall continue either (i) a material default by the Borrower thereunder that will not be cured by the use of the proceeds of such Loan or (ii) a material default by any other Person thereunder that could reasonably be expected to have a Material Adverse Effect;

(i)  disburse any Loan (i) after the Administrative Agent's delivery of a Balancing Notice under Section 5.09 unless and until the Administrative Agent determines that an Out-of-Balance Condition no longer exists, or (ii) in the event and to the extent the Administrative Agent determines that such disbursement would result in an Out-of-Balance Condition; or

(j)  disburse any Loan if the same would result in a violation of the Maximum Indebtedness Limitation.


## ARTICLE V

### Construction and Related Provisions

SECTION 5.01.  Performance and Completion of Project.  The Borrower shall perform and complete the construction of the Improvements on the Project in a good and workmanlike manner with materials of good quality, free of Liens (other than Permitted Encumbrances) and free of material defects, all substantially in accordance with the Approved Plans and Specifications therefor, all Requirements of Law, including all requirements and conditions set forth in all Permits, to the extent material, which have been obtained or are required to be obtained for the construction of the Improvements, the Approved Project Schedule and the terms and provisions of the Development Agreement and the Acquisition Agreements. Once commenced, the Borrower shall diligently continue and complete construction of the Improvements on the Project in a commercially reasonable manner and in accordance with this Agreement.

59

SECTION 5.02. Entitlements. The Borrower has advised the Administrative Agent that the Borrower is in discussions with the City regarding specific entitlements for the "Town Center" portion of the Project, and the Borrower agrees that, upon request by the Administrative Agent from time to time, the Borrower will advise the Administrative Agent of the status of such discussions.

SECTION 5.03. LID Bonds. (a) There have heretofore been issued LID Bonds in the principal amount of approximately $102,000,000, the Net LID Proceeds of which in the amount of approximately $82,700,000 were deposited with the bond trustee to pay certain Approved Development Costs, and the Borrower's right to receive such Net LID Proceeds has been collectively assigned to Administrative Agent for the benefit of the Lenders pursuant to that certain Assignment of Acquisition Agreement dated as of April 27, 2006 between the Borrower and the Administrative Agent. As of the Closing Date, the Borrower anticipates additional LID Bonds in the amount of approximately $40,000,000 to be issued prior to December 31, 2007, of which the Net LID Proceeds anticipated to be available to pay certain Approved Development Costs are approximately $32,400,000. The Borrower hereby agrees that the Borrower will not cause or permit the issuance of any LID Bonds without (i) delivering copies of the LID Bond Documents to the Administrative Agent (which the Administrative Agent shall furnish to the Lenders) and (ii) the Administrative Agent's prior written approval of the terms of the LID Bonds and the form and substance of the LID Bond Documents, which approval shall not be unreasonably withheld or delayed. To the extent permitted by the LID Bond Documents, the Borrower shall assign as Collateral to the Administrative Agent the Borrower's right to receive proceeds disbursed from the LID Bond Account until all Obligations have been paid in full, all Commitments have terminated and all Letters of Credit have been terminated or have expired.

(b)    The Net LID Proceeds of the LID Bonds heretofore or hereafter issued will be used solely to pay (or to reimburse the Borrower for payment of) Approved Development Costs.

SECTION 5.04. Construction Delays. The Borrower shall promptly notify the Administrative Agent in writing of any event causing delay or interruption of construction, or the timely completion of construction, of the Improvements as set forth in the Approved Project Schedule of more than thirty (30) days. The notice shall specify the particular work delayed, and the cause and period of each delay.

SECTION 5.05. Construction Responsibilities. The Borrower shall be solely responsible for all aspects of the Borrower's business and conduct in connection with the Project and Improvements, including, without limitation, for the quality and suitability of the plans and specifications and their compliance with all Requirements of Law, the supervision of the work of construction, the qualifications, financial condition and performance of all architects, engineers, contractors, subcontractors, material suppliers and consultants, and the accuracy of all applications for payment and the proper application of all disbursements. Neither the Administrative Agent nor any Lender is obligated to supervise, inspect or inform the Borrower or any third party of any aspect of the construction of the Improvements or any other matter referred to above.

SECTION 5.06. Correction of Defects. The Borrower shall proceed with diligence to investigate and correct all material defects in the construction of the Improvements and any material departures from the Approved Plans and Specifications. The disbursement of any Loans shall not constitute a waiver of the Administrative Agent's right to require compliance with this covenant with respect to any such defect or departure from the Approved Plans and Specifications or any other requirements of this Agreement.

SECTION 5.07. Compliance with Agreements. The Borrower shall comply in all material respects with its obligations under: (a) all Project Agreements; (b) all underlying covenants, conditions and restrictions of record with respect to the Project; and (c) all other material contractual obligations relating to the ownership and development of the Project which are not described in the foregoing clauses (a) and (b) above, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. In addition to the foregoing the Borrower shall enforce in a commercially reasonable manner its material rights and remedies under the agreements described in the foregoing clauses (a) through (c), above except where the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.08. No Changes or Amendments. Except for Permitted Modifications, the Borrower shall not (i) make any changes or Modifications to or otherwise amend the Approved Plans and Specifications, the Approved Project Schedule or the Approved Project Budget or (ii) cause or permit any Modification or other amendment, or the termination, of the Construction Management Agreement, the Project Engineer's Agreement or any of the Major Project Contracts or Major Subcontracts without the prior written approval of the Administrative Agent in each instance, which approval shall not be unreasonably withheld or delayed. The Borrower shall not, in the absence of the Administrative Agent's prior written approval, which approval shall not be unreasonably withheld or delayed, consent to any assignment of the obligations of the Project Engineer under the Project Engineer's Agreement, the Project Contractor under any Major Project Contract or the Construction Manager under the Construction Management Agreement.

SECTION 5.09. Loan Balancing. In the event the Administrative Agent determines in its reasonable judgment that the Development Costs to be incurred through the completion of construction of the Improvements, sale of all of the Phases and repayment of all Secured Obligations, will at any time exceed $2,500,000 (or more) the amount provided therefor in the Approved Project Budget, an "Out-of-Balance Condition" (hereby so defined) shall be deemed to exist. Within ten (10) Business Days after the Borrower has received written notice from the Administrative Agent of such Out-of-Balance Condition (a "Balancing Notice"), the Borrower shall either pay to the Administrative Agent for deposit into a Cash Collateral Account the amount specified by the Administrative Agent in the Balancing Notice (each such deposit being herein referred to as a "Balancing Payment"), or in lieu thereof deliver to the Administrative Agent a Qualified Letter of Credit in such amount. If and as long as such Out-of-Balance Condition continues to exist, the Lenders shall have no obligation to make any further Loans, and all Approved Development Costs shall be funded by the Borrower from funds of the Borrower until such time as an Out-of-Balance Condition no longer exists, when the obligation of the applicable Facility A Lenders (or, if applicable, Facility D Lenders) to make Loans shall resume. Unless an Event of Default has occurred that is continuing, the Balancing Payments

61

deposited in the Cash Collateral Account pursuant to this Section 5.09 shall be available for disbursement by the Administrative Agent for payment of the Approved Development Costs in the same manner and subject to the same terms and conditions as Loan disbursements are made hereunder, and the Administrative Agent shall have disbursed all Balancing Payments in the Cash Collateral Account prior to any further Loan disbursements. The Qualified Letters of Credit delivered under this Section 5.09 may be drawn upon (A) to pay any such Approved Development Costs that the Borrower fails to pay or (B) as provided in Section 9.06. When an Out-of-Balance Condition no longer exists, and provided no Event of Default has occurred that is continuing, Balancing Payments and Qualified Letters of Credit then held by the Administrative Agent pursuant to this Section 5.09 shall be returned to the Borrower.

SECTION 5.10. <u>Proceedings to Enjoin or Prevent Construction.</u> If any proceedings are filed seeking to enjoin or otherwise prevent or declare unlawful the construction of the Improvements or any part thereof or the use or development of the Project or any portion thereof, the Borrower shall at its sole expense (i) cause such proceedings to be vigorously contested in good faith and in a commercially reasonable manner and (ii) in the event of an adverse ruling or decision, prosecute all allowable appeals therefrom. Without limiting the generality of the foregoing, the Borrower shall resist the entry or seek the stay of any temporary or permanent injunction that may be entered and use commercially reasonable efforts to bring about a favorable and speedy disposition of all such proceedings.

SECTION 5.11. <u>The Administrative Agent's and the Lenders' Actions for Their Own Protection Only.</u> The Borrower acknowledges and agrees that the authority herein conferred upon the Administrative Agent and the Lenders, and any actions taken by the Administrative Agent and the Lenders with respect to the Project, to procure waivers or sworn statements, to approve contracts, subcontracts and purchase orders, to approve plans and specifications, or otherwise, will be exercised and taken by the Administrative Agent and the Lenders for their own protection only and may not be relied upon by the Borrower or any third party for any purposes whatever; and none of the Administrative Agent, the Lenders, or the Construction Consultant shall be deemed to have assumed any responsibility to the Borrower or any third party with respect to any such action herein authorized or taken by the Administrative Agent, the Lenders or the Construction Consultant, or with respect to the proper construction of Improvements on the Project, performance of contracts, subcontracts or purchase orders by any contractor or material supplier, or prevention of mechanics' liens from being claimed or asserted against the Project or any portion thereof. Any review, investigation or inspection conducted by the Administrative Agent, the Lenders or the Construction Consultant or any other consultants retained by the Administrative Agent or the Lenders, or any agent or representative of the Administrative Agent or the Lenders in order to verify independently the Borrower's satisfaction of any conditions precedent to disbursements under this Agreement, the Borrower's performance of any of the covenants, agreements and obligations of the Borrower under this Agreement or the other Loan Documents, or the validity of any representations and warranties made by the Borrower hereunder (regardless of whether or not the party conducting such review, investigation or inspection should have discovered that any of such conditions precedent were not satisfied or that any such covenants, agreements or obligations were not performed or that any such representations or warranties were not true), shall not affect (or constitute a waiver by the Administrative Agent or the Lenders of) (i) any of the Borrower's or any other Credit Party's agreements, covenants, representations and warranties under this Agreement or the other Loan

Documents or the Administrative Agent's and the Lenders' reliance thereon or (ii) the Administrative Agent's and Lenders' reliance upon any certifications of the Borrower or any Person required under this Agreement or any of the other Loan Documents, or any other facts, information or reports furnished to the Administrative Agent or the Lenders by or on behalf of the Borrower.

SECTION 5.12. <u>Inspections; Construction Consultant</u>. The Administrative Agent and the Construction Consultant shall have the right to enter upon the Project at all reasonable times upon reasonable notice to the Borrower to inspect the Improvements and the construction work to verify information disclosed or required pursuant to this Agreement. The Borrower shall provide to the Construction Consultant in a timely manner all information reasonably requested by the Construction Consultant and fully cooperate with the Construction Consultant in the performance of its services to the Administrative Agent. The Administrative Agent may reasonably request from time to time from the Construction Consultant such reports with respect to the plans and specifications and the performance of the construction as the Administrative Agent may reasonably determine to be appropriate, but the receipt of periodic inspection reports shall not be a condition under Section 4.04(c) with respect to more than one Borrowing in any calendar quarter.

SECTION 5.13. <u>Contractor Construction Information</u>. Within ten (10) days of the Administrative Agent's written request, the Borrower shall deliver to the Administrative Agent from time to time in a form acceptable to the Administrative Agent: (a) a list detailing the name, address and phone number of each contractor, subcontractor and material supplier to be employed or used for construction of the Improvements together with the dollar amount, including changes, if any, of each contract and subcontract, and the portion thereof, if any, paid through the date of such list; (b) to the extent requested by the Administrative Agent, copies of each contract and subcontract identified in such list, including any changes thereto; (c) a cost breakdown of the projected total cost of constructing the Improvements, and that portion, if any, of each cost item which has been incurred; and (d) a construction progress schedule detailing the progress of construction and the projected scheduling and completion time for uncompleted work, all as of the date of such schedule.

SECTION 5.14. <u>Prohibited Contracts</u>. Without the Administrative Agent's prior written consent, the Borrower shall not contract for any materials, furnishings, equipment, fixtures or other parts or components of the Improvements, if any third party shall retain any ownership interest (other than lien rights created by operation of law) in such items after their delivery to the Project. The Borrower shall have five (5) days to effect the removal of any such retained interest, after the Borrower obtains actual knowledge thereof.

SECTION 5.15. <u>Hold Disbursements of Loans in Trust</u>. Until utilized in accordance with the provisions of this Agreement, the Borrower shall receive and hold in trust for the sole benefit of the Administrative Agent and the Lenders (and not for the benefit of any other Person, including any contractors or subcontractors) all disbursements of Loans made hereunder directly to the Borrower, for the purpose of paying Approved Development Costs in accordance with the applicable Draw Request Form and Approved Project Budget. The Borrower shall use the proceeds of the Loans solely for the payment or reimbursement of Approved Development Costs as specified in each applicable Draw Request Form. Neither the

63

Administrative Agent nor the Lenders shall have any obligation to monitor or determine the Borrower's use or application of proceeds of Loans.

SECTION 5.16.  The Administrative Agent's Verification of Subcontracts.  The Administrative Agent may from time to time forward to contractors, subcontractors, material suppliers, architects, engineers and other parties listed on any sworn statement, a contract verification to ascertain the correctness of the amount of the contract for each contractor, subcontractor, material supplier, architect, engineer and any other party as contained on the statement.  In the event of any discrepancy between the amounts as shown by the executed copies of the contracts, the sworn statement, and the verification of contract forms, the Administrative Agent shall have the right to require that such discrepancies be eliminated to its reasonable satisfaction.

SECTION 5.17.  Limited Nature of Waivers of Requirements.  It is expressly understood and agreed that if the Administrative Agent shall intentionally or unintentionally waive or fail to require satisfaction of any condition precedent or other provision or requirement set forth in this Agreement for the first or any subsequent Loan, the Administrative Agent shall be deemed to have reserved the right to require compliance with such condition precedent or other provision or requirement prior to any subsequent Loan, notwithstanding any previous continuing or intermittent pattern of such waivers or failures to require such satisfaction thereof.

## ARTICLE VI

### Affirmative Covenants

Until all of the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full and all Letters of Credit shall have expired or terminated and all LC Disbursements shall have been reimbursed, the Borrower covenants and agrees with the Lenders that:

SECTION 6.01.  Financial Statements and Other Information.  The Borrower will furnish or cause to be furnished to the Administrative Agent (and the Administrative Agent shall furnish to the Lenders following its receipt thereof):

(a)  within 120 days after the end of each fiscal year of the Borrower beginning with fiscal year 2006, its audited consolidated balance sheet and related statements of operations, members' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year (if applicable), all reported on by independent public accountants approved by the Administrative Agent in its reasonable discretion (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such financial statements present fairly in all material respects the financial condition and results of operations of the Borrower in accordance with GAAP consistently applied;

(b)  within 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, its balance sheet and related statements of operations,

## ARTICLE IX

### Events of Default; Remedies

SECTION 9.01.  Events of Default.  If any of the following events ("Events of Default") shall occur:

(a)  the Borrower shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)  the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or the other Loan Documents, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)  any representation or warranty made or deemed made by or on behalf of the Borrower in or in connection with this Agreement or any other Loan Document, any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Documents or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)  the Borrower shall fail to observe or perform any covenant, condition or agreement contained, or make any payment or deliver any Qualified Letter of Credit provided for, in Sections 5.01, 5.03, 5.08, 5.09, 6.03 (with respect to the Borrower's existence), 6.08 or 6.15 or in Article VII;

(e)  the Borrower shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to the Borrower; provided, however, that, if such failure is one that the Borrower cannot with reasonable diligence cure within such 30-day period but can with reasonable diligence cure within 90 days after such notice, the cure period provided for herein shall be extended to the 90th day after such notice as long as the Borrower promptly commences and diligently pursues to completion the cure of such failure and provided, further that the Administrative Agent may in its discretion extend such period for cure by up to an additional 90 days (in the aggregate);

(f)  Intentionally Omitted.

(g)  any Material Indebtedness of any Parent Guarantor (excluding Indebtedness that is not Recourse Indebtedness) shall become or be declared due prior to its scheduled maturity; provided, however, that, if any such event under this paragraph (g) occurs, the same shall not constitute an Event of Default if cured as provided in Section 9.07;

79