# EXHIBIT B

# PART II

(h) either (i) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (A) liquidation, reorganization or other relief in respect of the Borrower or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (B) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or for a substantial part of its assets or a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered; or (ii) any event described in clause (i) above shall occur in respect of any Member or its Parent Guarantor but only if such Member has not theretofore acquired all Phases to be acquired by it pursuant to its Acquisition Agreement; provided, however, that, if any such event under clause (ii) occurs, the same shall not constitute an Event of Default if cured as provided in Section 9.07;

(i) either (i) the Borrower shall (A) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (B) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (C) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or for a substantial part of its assets, (D) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (E) make a general assignment for the benefit of creditors or (F) take any action for the purpose of effecting any of the foregoing; or (ii) any event described in clause (i) above shall occur in respect of any Member or its Parent Guarantor but only if such Member has not theretofore acquired all Phases to be acquired by it pursuant to its Acquisition Agreement; provided, however, that, if any such event under clause (ii) occurs, the same shall not constitute an Event of Default if cured as provided in Section 9.07;

(j) either (i) the Borrower shall become unable, admit in writing its inability or fail generally to pay its debts as they become due or (ii) any Member or its Parent Guarantor shall become unable, admit in writing its inability or fail generally to pay its debts as they become due but only if such Member has not theretofore acquired all Phases to be acquired by it pursuant to its Acquisition Agreement; provided, however, that, if any such event under clause (ii) occurs, the same shall not constitute an Event of Default if cured as provided in Section 9.07;

(k) (i) one or more judgments for the payment of money (excluding any such judgments which are covered by insurance, subject to any customary deductible) in an aggregate amount in excess of $3,000,000 shall be rendered against the Borrower and the same shall remain undischarged for a period of sixty (60) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower to enforce any such judgment or (ii) any action shall be legally taken by a judgment creditor to attach or levy upon the Project or any portion thereof or any other material assets of the Borrower to enforce any judgment (in any amount) and the same is not discharged at least twenty (20) days prior to the scheduled sale of the asset affected thereby;

(l) any Member shall fail to acquire a Phase within 15 days after the outside date provided therefor in its Takedown Schedule; provided, that the same shall not constitute an Event of Default if cured as provided in Section 9.07;

(m) there occurs a breach in the performance of any Parent Guarantor Financial Covenant of a Parent Guarantor but only if the Member of such Parent Guarantor has not theretofore acquired all Phases to be acquired by it pursuant to its Acquisition Agreement; provided, however, that the same shall not constitute an Event of Default if cured in accordance with the provisions of Section 9.07;

(n) a Change in Control shall occur; provided, however, that the same shall not constitute an Event of Default if cured as provided in Section 9.07;

(o) (i) there is any material deviation in the work of construction from the Approved Plans and Specifications or Requirements of Law or use of materially defective workmanship or materials in constructing the Improvements, and the Borrower fails to remedy the same to the Administrative Agent's reasonable satisfaction within thirty (30) days of the Administrative Agent's written demand to do so; or (ii) there is a cessation of construction of the Improvements for a continuous period of more than thirty (30) days or, in the case of force majeure, ninety (90) days; or (iii) the construction of the Improvements or sale of all or any portion of the Project in accordance with the Acquisition Agreements and Loan Documents is prohibited, enjoined or delayed for a continuous period of more than thirty (30) days;

(p) (i) the recording of any claim of Lien in an amount in excess of $1,000,000 against the Project or the service on the Administrative Agent or any Lender of any bonded stop notice relating to the Loans and the continuance of such claim of Lien or bonded stop notice for sixty (60) days without discharge, satisfaction or provision for payment being made by the Borrower in a manner satisfactory to the Administrative Agent in its reasonable judgment; or (ii) the recording of any claim of Lien in any amount against the Project or the service on and Administrative Agent or any Lender of any bonded stop notice relating to the Loans and the continuance of such claim of Lien or bonded stop notice without discharge, satisfaction or provision for payment being made by the Borrower in a manner satisfactory to the Administrative Agent in its reasonable judgment at least twenty (20) days prior to the sale of the Project or any portion thereof; or (iii) the condemnation, seizure or appropriation of, or occurrence of an uninsured casualty with respect to any material portion of the Project and which has a Material Adverse Effect; or (iv) the sequestration or attachment of, or any levy or execution upon any of the Project, any other Collateral provided by the Borrower under any of the Loan Documents, or any substantial portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not released, expunged or dismissed at least twenty (20) days prior to the scheduled sale of the assets affected thereby;

(q) the occurrence of a default by the Borrower under any Approved Swap Agreement that is not cured within any applicable cure period thereunder;

81

(r) (i) any Collateral Document shall for any reason fail to create a valid and perfected first priority Lien or security interest (subject to the Permitted Encumbrances) in any Collateral (except for Collateral (other than the Project) whose value is not significant) purported to be covered thereby and is not corrected or cured within twenty (20) days of notice thereof, except as permitted by the terms of any Collateral Document, or (ii) any Collateral Document or Guaranty shall fail to be or remain in full force and effect or any action shall be taken by or on behalf of the Borrower or any other Credit Party to discontinue or to assert the invalidity or unenforceability of any Collateral Document or Guaranty;

(s) the occurrence of an "Event of Default" described in Section 9.07;

(t) the occurrence of any "Event of Default" under any Loan Document; or

(u) an ERISA Event shall have occurred that, in the reasonable opinion of the Administrative Agent or the Required Lenders, could reasonably be expected to result in a Material Adverse Effect;

then, and in every such event (other than an event described in subclause (i) of clause (h) of this Section 9.01 or subclause (i) of clause (i) of this Section 9.01), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times:  (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event described in subclause (i) of clause (h) of this Section 9.01 or subclause (i) of clause (i) of this Section 9.01, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

SECTION 9.02.  All Remedies.  Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and the Lenders shall also have all rights and remedies set forth herein, in the Loan Documents, at law and in equity, and the Administrative Agent and the Lenders shall have the right (but not the obligation) to pursue one or more of such rights and remedies concurrently or successively, it being the intent hereof that all such rights and remedies shall be cumulative, and that no remedy shall be to the exclusion of any other.

SECTION 9.03.  Construction.  In addition to and without limiting any of its rights and remedies available hereunder, under the other Loan Documents, at law or in equity, and without constituting an election of remedies, upon the occurrence and continuance of any Event of Default, the Administrative Agent and the Lenders may, subject to applicable

Requirements of Law (i) take possession of the Project and complete the construction of the Improvements or any part thereof and take any other action whatever which, in the Administrative Agent's and the Lenders' sole judgment, is necessary to fulfill the covenants, agreements and obligations of the Borrower under this Agreement and the other Loan Documents, including the right to avail themselves of and procure performance of existing Construction Agreements and other Project Agreements and (ii) let any contracts with the same contractors and subcontractors or others and to employ watchmen to protect the Project or any part thereof from injury. Without restricting the generality of the foregoing, and for the purpose aforesaid, the Borrower hereby appoints and constitutes the Administrative Agent its lawful attorney in fact with full power of substitution and agrees that the Administrative Agent and the Lenders shall be entitled, subject to applicable Requirements of Law, to (A) complete the construction of the Project or any part thereof; (B) use any Balancing Payments, funds held in any Cash Collateral Account (subject to the provisions of Section 9.06) or undisbursed portion of the Aggregate Facility A Commitment and (if applicable) Aggregate Facility D Loan Commitment or which may be reserved, escrowed or set aside for any purpose whatever at any time, to complete the construction of the Project or any part thereof or (subject to the provisions of Section 9.06) draw upon any Qualified Letter of Credit held by the Administrative Agent; (C) advance funds in excess of the amount of any or all the Loans to complete the construction of the Project; (D) make changes in the Approved Plans and Specifications which shall be necessary or desirable to complete the construction of the Project; (E) retain or employ such new general contractors, contractors, subcontractors, architects, engineers and inspectors as may be required for said purposes; (F) pay, settle or compromise all existing bills and claims, the nonpayment of which might result in Liens on the Project or any part thereof, or prevent such bills and claims from resulting in Liens against the Project or any part thereof or against fixtures, furnishing, furniture or equipment or other Property, or as may be necessary or desirable for the completion of the construction and equipping and furnishing of the Project or any part thereof or for the clearance of title; (G) execute all applications and certificates which may be required by any of the Loan Documents; (H) prosecute and defend all actions or proceedings connected with or relating to the Project or any part thereof; (I) take such action and require such performance as the Administrative Agent deems necessary under any payment and performance bonds, and make settlements and compromises with the surety or sureties thereunder, and, in connection therewith, execute instruments of release and satisfaction; (J) take possession of and operate the Project or any part thereof; and (K) do any and every act which the Borrower might do in its own behalf, it being understood and agreed that the foregoing power of attorney shall be a power coupled with an interest and cannot be revoked.

SECTION 9.04. <u>Enforcement</u>. The Borrower acknowledges that in the event the Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement or any other Loan Document, any remedy of law may prove to be inadequate relief to the Administrative Agent and the Lenders; therefore, the Borrower agrees that the Administrative Agent and the Lenders shall (subject to applicable Requirements of Law) be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

SECTION 9.05. <u>Cash Collateral Account</u>.

(a) The Borrower hereby pledges, assigns and grants to the Administrative Agent, on behalf of and for the benefit of the Lenders and other Holders of Secured Obligations, to secure the prompt and complete payment and performance of the Secured Obligations, a security interest in all of the Borrower's right, title and interest in and to (i) each Cash Collateral Account established pursuant to this Agreement; (ii) all cash, instruments, securities, investments and other property from time to time transferred or credited to, contained in or comprising any Cash Collateral Account; (iii) all statements, certificates and instruments representing any Cash Collateral Account; (iv) any and all substitutions or additions of or with respect to any of the foregoing; and (v) any and all proceeds and products of any of the foregoing, including, without limitation (A) interest, principal, dividends and other amounts or distributions received with respect to any of the foregoing and (B) property received from the sale, exchange or other disposition of any of the foregoing.

(b) Other than any interest earned on the investment of deposits in any Cash Collateral Account, which investments shall be made at the request of the Borrower (subject to the provisions hereof) and at the Borrower's risk and expense, such deposits shall not bear interest, and interest or profits, if any, on such investments shall accumulate in such Cash Collateral Account. Provided no Event of Default has occurred that is continuing, the Administrative Agent shall, at the written request of the Borrower, invest funds in any Cash Collateral Account in investments of the type then customarily permitted by Administrative Agent in similar cash collateral accounts held by it for comparable borrowers.

(c) As long as no Event of Default has occurred that is continuing, funds in any Cash Collateral Account may be used solely for the purpose provided for in the section of this Agreement pursuant to which such funds were deposited in such Cash Collateral Account.

(d) Except as otherwise provided in Section 2.06(j), from and after the occurrence and during the continuance of an Event of Default, funds in any Cash Collateral Account may be used to pay any Secured Obligations, provided, however, that funds deposited in a Cash Collateral Account by or on behalf of a Member pursuant to Section 7.03(b) may only be used to pay such Member's Adjusted Pro Rata Share of such Secured Obligations.

SECTION 9.06. Qualified Letters of Credit.

(a) Except as otherwise provided in paragraph (c) below, as long as no Event of Default has occurred that is continuing, any Qualified Letter of Credit delivered to the Administrative Agent pursuant to Section 5.09, 7.03(b) or 9.07 shall be drawn upon by the Administrative Agent only to pay amounts for the same purpose for which funds deposited in a Cash Collateral Account pursuant to such Sections may be used.

(b) From and after the occurrence and during the continuance of an Event of Default, the Administrative Agent may draw upon any Qualified Letter of Credit in the

full amount thereof and apply the amount drawn as provided in, and subject to the provisions of, Section 9.05(d).

(c) Notwithstanding anything to the contrary contained herein, if less than 60 days remain until the expiration of a Qualified Letter of Credit, and, if requested by the Administration Agent, the Borrower fails to cause to be delivered to the Administrative Agent within fifteen (15) days of such request an amendment extending such Qualified Letter of Credit for an additional period of six months (or such lesser period to which the Administrative Agent may agree) or a replacement Qualified Letter of Credit meeting the terms hereof, the Administrative Agent may draw upon such Qualified Letter of Credit and deposit the amount drawn in a Cash Collateral Account established for the same purpose for which such Qualified Letter of Credit was delivered or (if and as applicable) as provided in Section 9.05(d).

SECTION 9.07. Cure of Member Defaults.

(a) The occurrence of a Member Default shall not constitute an Event of Default if within thirty (30) days after notice from the Administrative Agent to the Borrower (which 30-day period may, in the Administrative Agent's sole discretion, be extended by an additional 30 days, provided that the Administrative Agent is furnished satisfactory evidence that such Member Default will be cured within such additional 30 days), either (i) the Borrower deposits or causes to be deposited funds in a Cash Collateral Account, or delivers or causes to be delivered a Qualified Letter of Credit, in the amount provided for in and otherwise in accordance with the provisions of paragraph (b) below or (ii) the entire right, title, interest of the Defaulting Member in and to the Borrower and such Defaulting Member's right, title, interest and obligations in, to and under the Operating Agreement, such Defaulting Member's Acquisition Agreement and any Loan Document to which such Defaulting Member is a party are transferred to and assumed and acquired by one or more Key Members, and the obligations of the Defaulting Member's Parent Guarantor under the Loan Document to which it is a party are assumed by such Key Members' Parent Guarantor, all in accordance with the terms and conditions set forth in paragraph (c) below.

(b) The occurrence of a Member Default shall not constitute an Event of Default if, within the time period provided for in paragraph (a) above, the Borrower shall deposit in a Cash Collateral Account funds in the amount of the Defaulting Member's Remaining Obligations (as reasonably determined by the Administrative Agent) (net of any cash collateral or letter of credit provided by or on behalf of such Member pursuant to Section 7.03(b) hereof) and/or deliver to the Administrative Agent a Qualified Letter of Credit in the amount of the Defaulting Member's Remaining Obligations. Provided no Event of Default has occurred that is continuing, funds deposited in the Cash Collateral Account pursuant to the immediately preceding sentence shall be advanced by the Administrative Agent from time to time to pay such Defaulting Member's Adjusted Pro Rata Share of Approved Development Costs not funded from Loans or Net LID Proceeds and to pay Release Prices with respect to such Phases at the time at which such Phases would be required to be purchased by such Defaulting Member pursuant to its Acquisition Agreement (whether or not actually purchased and without regard to whether such

85

Acquisition Agreement remains in force or effect). If at any time the Administrative Agent determines in its reasonable judgment that the amount in such Cash Collateral Account or the amount of such Qualified Letter of Credit held by the Administrative Agent is less than such Defaulting Member's Remaining Obligations as then reasonably determined by the Administrative Agent, it shall constitute an Event of Default if, within thirty days of demand by the Administrative Agent therefor, the Borrower fails to deposit in the Cash Collateral Account, and/or deliver a Qualified Letter of Credit in, an aggregate amount equal to such deficiency as so determined by Administrative Agent. Any Qualified Letter of Credit delivered to the Administrative Agent pursuant to this paragraph (b) may be reduced from time to time to an amount not less than the Defaulting Member's Remaining Obligations and the Administrative Agent shall, upon reasonable notice, so consent to any such reduction.

(c) The occurrence of a Member Default shall not constitute an Event of Default if, within the time period provided for in paragraph (a) above, one or more Key Members shall take all of the following actions (herein collectively referred to as a "Key Member Acquisition"):

(i) The assumption by such Key Members of, or their agreement to be liable for, all of the obligations (whether theretofore accrued or thereafter accruing) of such Defaulting Member under the Operating Agreement and such Defaulting Member's Acquisition Agreement, all pursuant to documents satisfactory to the Administrative Agent in its reasonable discretion;

(ii) The assumption by such Key Members of, or their agreement to be liable for, all of the obligations (whether theretofore accrued or thereafter accruing) of such Defaulting Member under the Loan Documents to which such Defaulting Member is a party, all pursuant to documents satisfactory to the Administrative Agent;

(iii) The assumption by the Parent Guarantors of such Key Members of, or such Parent Guarantors' agreement to be liable for, all of the obligations (whether theretofore accrued or thereafter accruing) of the Defaulting Member's Parent Guarantor under such Defaulting Member's Acquisition Agreement and all Loan Documents to which the Parent Guarantor of such Defaulting Member is a party, all pursuant to documents satisfactory to the Administrative Agent;

(iv) The delivery to the Administrative Agent of such Organizational Documents, certificates of good standing, opinions of counsel and other documents in respect of such Key Members and their Parent Guarantors as the Administrative Agent may reasonably require.

(d) Upon the cure of a Member Default pursuant to the provisions of this Section 9.07, the Administrative Agent shall notify the Borrower and the Lenders thereof.

SECTION 9.08.  Application of Payments.  On and after the occurrence of an Event of Default, but subject to the provisions of Section 2.11, the Administrative Agent shall

apply all payments and prepayments in respect of any Obligations and all proceeds of the Collateral in the following order (except as hereinafter provided):

> (i) first, to pay Obligations in respect of any fees, expenses, reimbursements or indemnities then due to the Administrative Agent;

> (ii) second, to pay Obligations in respect of any fees (other than commitment fees and Letter of Credit fees), expenses, reimbursements or indemnities then due to the Lenders and Issuing Banks;

> (iii) third, to pay commitment fees, Letter of Credit fees and interest due in respect of Loans and LC Disbursements;

> (iv) fourth, to the ratable payment or prepayment of principal outstanding on Loans and LC Disbursements and Secured Swap Obligations;

> (v) fifth, to the Cash Collateral Account provided for, and to the extent required under, Section 2.06(j); and

> (vi) sixth, to the ratable payment of all other Obligations.

Unless otherwise designated (which designation shall only be applicable prior to the occurrence of an Event of Default) by the Borrower, all principal payments in respect of Loans under a Facility shall be applied, first, to repay outstanding ABR Loans under such Facility and then to repay outstanding Eurodollar Loans under such Facility, with those that have the earlier expiring Interest Period being repaid prior to those that have later expiring Interest Periods. The order of priority set forth in this paragraph and the related provisions of this Agreement are set forth solely to determine the rights and priorities of the Administrative Agent, the Lenders, and the Issuing Banks as among themselves. The order of priority set forth in clauses (i) and (ii) may be changed only with the prior written consent of the Administrative Agent and the order of priority of payments in respect of LC Disbursements may be changed only with the prior written consent of the Issuing Banks.

## ARTICLE X

### The Administrative Agent

SECTION 10.01. Appointment of Administrative Agent. Each of the Lenders and the Issuing Banks hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.

SECTION 10.02. Administrative Agent's Rights as a Lender. The bank serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally

engage in any kind of business with the Borrower or any Affiliate thereof as if it were not the Administrative Agent hereunder.

SECTION 10.03. Administrative Agent's Duties. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or that the Administrative Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 11.02), and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 11.02) or in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, (ii) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document or the perfection or priority of any Lien, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

SECTION 10.04. Reliance. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 10.05. Sub-Agents. The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall

apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

SECTION 10.06. Resignation. Subject to the appointment and acceptance of a successor Administrative Agent as provided in this paragraph, the Administrative Agent may resign at any time by notifying the Lenders, the Issuing Banks and the Borrower. Upon any such resignation, the Required Lenders shall have the right to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders and the Issuing Banks, appoint a successor Administrative Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. Notwithstanding the foregoing, as long as no Event of Default has occurred that is continuing, the appointment of any successor Administrative Agent hereunder shall be subject to the prior written approval of the Borrower, which approval shall not be unreasonably withheld or delayed. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 11.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

SECTION 10.07. Credit Analysis and Decision by Lenders. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.

SECTION 10.08. Collateral.

(a) Each Lender authorizes the Administrative Agent to enter into each of the Loan Documents to which it is a party (including, without limitation, the Consent and Agreement and Deed of Trust Amendment) and to take all action contemplated by such Loan Documents. Each Lender agrees that no Holder of Secured Obligations, other than the Administrative Agent acting on behalf of all Holders of Secured Obligations, shall have the right individually to seek to realize upon the security granted by any Loan Document, it being understood and agreed that such rights and remedies may be exercised solely by the Administrative Agent for the benefit of the Holders of Secured Obligations, upon the terms of the Loan Documents.

89

(b) In the event that any Collateral is pledged by any Person as collateral security of the Secured Obligations, the Administrative Agent is hereby authorized to execute and deliver on behalf of the Holders of Secured Obligations any Loan Documents necessary or appropriate to grant and perfect a Lien on such Collateral in favor of the Administrative Agent on behalf of the Holders of Secured Obligations.

(c) The Lenders hereby authorize the Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by the Administrative Agent upon any Collateral (i) upon termination of the Commitments and payment and satisfaction of all of the Obligations and expiration or termination of all Letters of Credit, (ii) as permitted by, but only in accordance with, the terms of the applicable Loan Documents or (iii) if provided, authorized or ratified in writing by the Required Lenders, unless such release is required to be approved by all of the Lenders hereunder. Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority to release particular types or items of Collateral pursuant to this paragraph.

(d) Upon any sale or transfer constituting Collateral which is expressly permitted pursuant to the terms of any Loan Document, or consented to in writing by all of the Lenders, and upon at least ten (10) Business Days' prior written request by the Borrower (or such shorter period to which the Administrative Agent may agree), the Administrative Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Administrative Agent for the benefit of the Holders of Secured Obligations, upon the Collateral that was sold or transferred; provided, however, that (i) the Administrative Agent shall not be required to execute any such document on terms which, in the Administrative Agent's opinion, would expose the Administrative Agent to liability or create any obligation or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Secured Obligations or any Liens upon (or obligations of the Borrower or any other Credit Party in respect of) all interests retained by the Borrower or any other Credit Party, including (without limitation) the proceeds of the sale, all of which shall continue to constitute part of the Collateral.

## ARTICLE XI

### Miscellaneous

SECTION 11.01. Notices.

(a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such Obligations may be unmatured, provided, however, that no Lender or any Affiliate shall exercise any right of setoff without the prior written approval of the Administrative Agent. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 11.09. Governing Law; Jurisdiction; Consent to Service of Process.

(a) This Agreement and every other Loan Document shall be construed in accordance with and governed by the law of the State of New York (except to the extent that such other Loan Document specifically states that it shall be construed in accordance with the laws of another jurisdiction).

(b) The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent, any Issuing Bank or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against the Borrower or its properties in the courts of any jurisdiction.

(c) The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 11.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 11.10. WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON

99

CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 11.11. Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 11.12. Confidentiality. Each of the Administrative Agent, the Issuing Banks and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee or pledgee (under Section 11.04(d)) of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective, direct or indirect, counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, any Issuing Bank or any Lender on a nonconfidential basis from a source other than the Borrower. For the purposes of this Section, "Information" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to the Administrative Agent, any Issuing Bank or any Lender on a nonconfidential basis prior to disclosure by the Borrower. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 11.13. USA PATRIOT ACT. Each Lender that is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") hereby notifies the Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.

SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AGREEMENT WITH
SOUTH EDGE, LLC

JPMORGAN CHASE BANK, N.A., as Lender
and Administrative Agent

By: _____

Name: _____Kent Kaiser_____

Title: _____Executive Director_____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

SOUTH EDGE, LLC, a Nevada limited-liability company

By:  Holdings Manager, LLC, a Nevada limited-liability company, its general manager

By _____

John A. Ritter
General Manager

## SCHEDULE 1

### Facility A and D Lenders and Commitments

#### FACILITY A

| Facility A Lender | Commitment |
|---|---|
| JPMorgan Chase Bank, N.A. | $25,000,000 |
| The Royal Bank of Scotland plc | $30,000,000 |
| Comerica Bank | $20,000,000 |
| Wachovia Bank National Association | $20,000,000 |
| Calyon New York Branch | $20,000,000 |
| LaSalle Bank National Association | $20,000,000 |
| PNC Bank, National Association | $15,000,000 |
| California Bank & Trust | $10,000,000 |
| **TOTAL** | **$160,000,000** |

#### FACILITY D

| Facility D Lender | Commitment |
|---|---|
| JPMorgan Chase Bank, N.A. | $15,000,000 |
| Wachovia Bank National Association | $5,000,000 |
| Comerica Bank | $5,000,000 |
| **TOTAL** | **$25,000,000** |

## SCHEDULE 2

### Members, Parent Guarantors and Related Information

| Member | Takedown Date | Ownership Percentage | Gross Acres | Release Price |
|---|---|---|---|---|
| KB Home Nevada, Inc. | April 15, 2007 | 6.61% | 129.20 | $38,668,500 |
| KB Home Nevada, Inc. | October 15, 2007 | 8.34% | 162.92 | 48,789,000 |
| KB Home Nevada, Inc. | April 15, 2008 | 5.12% | 99.94 | 29,952,000 |
| KB Home Nevada, Inc. | October 15, 2008 | 4.15% | 81.06 | 24,277,500 |
| KB Home Nevada, Inc. | April 15, 2009 | 19.10% | 373.11 | 111,735,000 |
| KB Home Nevada, Inc. | October 15, 2009 | 5.13% | 100.15 | 30,010,500 |
| **KB Home Nevada, Inc. Total** | | **48.45%** | **946.38** | **$283,432,500** |
| | | | | |
| Focus South Group, LLC | October 15, 2007 | 15.59% | 304.52 | $91,201,500 |
| **Focus South Group, LLC Total** | | **15.59%** | **304.52** | **$91,201,500** |
| | | | | |
| Coleman-Toll Limited Partnership | April 15, 2007 | 1.59% | 31.14 | $9,301,500 |
| Coleman-Toll Limited Partnership | April 15, 2008 | 1.54% | 30.12 | 9,009,000 |
| Coleman-Toll Limited Partnership | October 15, 2008 | 2.56% | 50.09 | 14,976,000 |
| Coleman-Toll Limited Partnership | April 15, 2009 | 3.72% | 72.41 | 21,762,000 |
| Coleman-Toll Limited Partnership | October 15, 2009 | 1.11% | 21.73 | 6,493,500 |
| **Coleman-Toll Limited Partnership Total** | | **10.52%** | **205.49** | **$61,542,000** |
| | | | | |
| Alameda Investments, LLC | April 15, 2007 | 3.15% | 61.47 | $18,427,500 |
| Alameda Investments, LLC | April 15, 2008 | 2.12% | 41.40 | 12,402,000 |
| Alameda Investments, LLC | October 15, 2008 | 2.87% | 56.13 | 16,789,500 |
| **Alameda Investments, LLC Total** | | **8.14%** | **159.00** | **$47,619,000** |
| | | | | |
| Kimball Hill Homes Nevada, Inc. | April 15, 2007 | 2.36% | 46.12 | $13,806,000 |
| Kimball Hill Homes Nevada, Inc. | October 15, 2007 | 0.81% | 15.91 | 4,738,500 |
| Kimball Hill Homes Nevada, Inc. | April 15, 2008 | 3.11% | 60.83 | 18,252,000 |
| **Kimball Hill Homes Nevada, Inc. Total** | | **6.29%** | **122.86** | **$36,796,500** |
| | | | | |
| Pardee Homes of Nevada | April 15, 2008 | 2.58% | 50.48 | $15,093,000 |
| Pardee Homes of Nevada | October 15, 2008 | 2.32% | 45.23 | 13,572,000 |
| **Pardee Homes of Nevada Total** | | **4.90%** | **95.71** | **$28,665,000** |
| | | | | |
| Meritage Homes of Nevada, Inc.* | April 15, 2007 | 1.42% | 27.66 | $8,307,000 |
| Meritage Homes of Nevada, Inc. | April 15, 2008 | 2.11% | 41.30 | 12,343,500 |
| **Meritage Homes of Nevada, Inc. Total** | | **3.53%** | **68.96** | **$20,650,500** |
| | | | | |
| Beazer Homes Holdings Corp. | July 15, 2008 | 2.58% | 50.40 | $15,093,000 |
| **Beazer Homes Holdings Corp. Total** | | **2.58%** | **50.40** | **$15,093,000** |
| | | | | |
| **Totals** | | **100.00%** | **1,953.32** | **$585,000,000** |

*Formerly known as MTH Homes, Nevada, Inc.

# EXHIBIT D

## APPROVED PROJECT BUDGET

## South Edge, LLC
### Approved Project Budget

| | |
|---|---|
| Land Cost | 557,000,000 |
| Management Fee | 38,990,000 |
| Pre-development Costs | 968,868 |
| Improvement Costs | 448,586,775 * |
| Less: Reimbursement | (23,899,269) |
| Net Improvement Costs | 424,687,506 |
| Taxes & Insurance Costs | 30,922,071 |
| LID Cost | 24,644,627 |
| Loan Fees (incl. Closing, Arranger, Unused, & L/C Fees) | 9,246,785 |
| Loan Interest Expense | 115,810,248 |
| **Total** | **1,202,270,106** |

\* detail attached

3/8/2007  6:50 PM

## SUMMARY - ESTIMATE OF IMPROVEMENT COSTS

**DIRECT COSTS**

| | | |
|---|---|---:|
| Roadways | $ | 68,713,076.20 |
| Water | $ | 49,404,845.94 |
| Sewer | $ | 19,264,178.10 |
| Major Drainage Facilities | $ | 73,183,598.41 |
| Dry Utilities (Excludes Substation) | $ | 26,890,356.74 |
| Project Entry, Landscaping (within Roadway Improvements), School/Park Grading, Parks/Open | $ | 75,267,788.00 |
| **Sub Total** | $ | **312,723,843.38** |
| **10% Contingency** | $ | **23,528,077.12** |
| ***Total Direct Costs*** | $ | ***336,251,920.96*** |

**Design and Fees**

| | | |
|---|---|---:|
| Engineering /Professional Services | $ | 24,384,888.90 |
| CM Fee: | $ | 24,513,022.02 |
| Permits and Fees | $ | 24,558,102.80 |
| Public Facilities: | $ | 16,570,269.00 |
| Impact Fees/Bonding | $ | 14,808,771.13 |
| ROW Acquisition | $ | 2,500,000.00 |
| Power Substation | $ | 5,000,000.00 |
| **Total Fees and Related Costs** | $ | **112,334,853.85** |
| **Total All Costs** | $ | **448,586,774.80** |

# EXHIBIT B

## COMPLETION GUARANTY

THIS COMPLETION GUARANTY (this "**Guaranty**") is made as of November 1, 2004, by KB HOME NEVADA, INC., a Nevada corporation ("**Member Guarantor**"), and KB HOME, a Delaware corporation ("**Parent Guarantor**") (collectively, jointly and severally, the "**Guarantor**") in favor of JPMorgan Chase Bank, as Administrative Agent (the "**Administrative Agent**"), for the benefit of the Lenders under the Credit Agreement referred to below and the other Holders of Secured Obligations.

### WITNESSETH:

WHEREAS, South Edge, LLC, a Nevada limited liability company (the "**Borrower**"), the Administrative Agent, and certain other Lenders from time to time party thereto have entered into a certain Credit Agreement of even date herewith (as same may be amended, modified, supplemented or restated from time to time, the "**Credit Agreement**"), providing for credit extensions or financial accommodation to the Borrower, including, but not limited to, the making of loans and the issuance of letters of credit to Borrower and Borrower may from time to time enter into Approved Swap Agreements with one or more Lenders or Affiliates of Lenders (all of the foregoing agreements or arrangements being the "**Facilities**" and any writing evidencing, supporting or securing a Facility, including but not limited to this Guaranty, as such writing may be amended, modified or supplemented from time to time, a "**Facility Document**");

WHEREAS, it is a condition precedent to the execution of the Credit Agreement by the Administrative Agent and the Lenders that the Guarantor execute and deliver this Guaranty whereby the Guarantor shall guarantee, or otherwise agree to pay and perform, certain liabilities and obligations as herein provided; and

WHEREAS, Member Guarantor is the wholly-owned Subsidiary of Parent Guarantor, and Member Guarantor owns 48.45% of the membership interests of Borrower, and in order to induce the Lenders and the Administrative Agent to enter into the Credit Agreement, and because the Guarantor has determined that executing this Guaranty is in its interest and to its financial benefit, the Guarantor is willing to execute and deliver this Guaranty.

NOW THEREFORE, in order to induce the Administrative Agent to extend credit or give financial accommodation under the Facilities, the Guarantor agrees as follows:

SECTION 1. **Defined Terms.**

(a) "Completion Obligations" means, without duplication, (i) Borrower's obligation to diligently commence, continue and complete, and to pay the Guaranteed Development Costs incurred with respect to, the construction of the Improvements on the Project without material interruption or cessation of work in a good and workmanlike manner with materials of good quality, free of Liens (other than Permitted Encumbrances) and free of material defects, all in accordance with the Approved Plans and Specifications therefor, all Requirements of Law,

including all requirements and conditions set forth in all Permits which have been obtained or are required to be obtained for the construction of the Improvements, the Approved Project Schedule and the terms and provisions of the Acquisition Agreements and the Development Agreement, (ii) Borrower's obligation to make Balancing Payments pursuant to the Credit Agreement and (iii) Borrower's obligation to pay any and all LC Disbursements, provided, however, the Completion Obligations shall not include any obligation to pay Guaranteed Development Costs incurred subsequent to the completion of the Improvements except for Guaranteed Development Costs incurred or accruing through the date of such completion (whether or not payable thereafter).

(b)    "Excluded Costs" means principal and interest payments on the Loans and fees payable to the Administrative Agent, Lenders and other Holders of Secured Obligations under the Loan Documents and amounts payable by the Borrower under any Approved Swap Agreement with one or more Lenders or Affiliates of Lenders.

(c)    "Guaranteed Development Costs" means all Development Costs (other than Excluded Costs), to the extent such Development Costs at any time exceed the undisbursed amount of the Aggregate Facility A Commitment whether or not such Aggregate Facility A Commitment has been terminated (excluding amounts thereof budgeted for the payment of Excluded Costs).

(d)    "Guarantor Group" means the Guarantor and all other "Guarantors" (as that term is defined in the Credit Agreement).

(e)    Other capitalized terms used herein but not defined herein shall have the meaning set forth in the Credit Agreement.

SECTION 2.  **Guaranty**.  (a)  The Guarantor does hereby absolutely, irrevocably and unconditionally, jointly and severally, as primary obligor and not as surety, guarantee and agree to pay and to perform, upon demand by the Administrative Agent, for the benefit of the Lenders and the other Holders of Secured Obligations, but without duplication of the Guarantor's Obligations under any other Guaranty, the Member Guarantor's Adjusted Pro Rata Share of any and all Completion Obligations not paid or performed by the Borrower, which payment shall be due and payable by the Guarantor, notwithstanding whether allowed or allowable during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding.    The obligations of the Guarantor hereunder shall not be reduced by amounts paid by other guarantors. This Guaranty is a guaranty of payment and not of collection only.  The Administrative Agent shall not be required to exhaust any right or remedy or take any action against the Borrower, any other guarantor or any other Person obligated for all or any part of the Completion Obligations or other Obligations, or otherwise to enforce its payment against any Collateral securing all or any part of the Completion Obligations or other Obligations.  The Guarantor agrees that, as between the Guarantor and the Administrative Agent, the Lenders and any other Holders of Secured Obligations, the Completion Obligations may be declared to be due and payable for the purposes of this Guaranty notwithstanding any stay, injunction or other prohibition which may prevent, delay or vitiate any declaration as regards the Borrower and that in the event of any such declaration or attempted declaration, the Completion Obligations shall immediately become due and payable by the Guarantor for the purposes of this Guaranty.

2

(b)     In furtherance, and without limitation, of the provisions of paragraph (a) above, if there shall occur an Event of Default under the Credit Agreement in respect of the Borrower's performance of the Completion Obligations in accordance with the terms of the Credit Agreement and, following such Event of Default all or part of the Guarantor Group, which, at a minimum shall include all of the Key Members and their Parent Guarantors at such time (collectively, the "Completion Group"), shall deliver to the Administrative Agent a notice undertaking the performance of the Completion Obligations in accordance with their respective Completion Guaranties, then the applicable Lenders shall, at the written direction of the Borrower and subject to the conditions set forth in the Credit Agreement, make available to the Completion Group (acting for and on behalf of the Borrower) Facility A Loans and Letters of Credit and, after the Facility D Conversion, Facility D Loans, from time to time as construction of the Improvements on the Project progresses, for payment of Approved Development Costs, so long as: (i) such Loans and Letters of Credit are fully secured by the Deed of Trust and other Loan Documents, (ii) the Completion Obligations and all other obligations of the Borrower under the Credit Agreement are being performed in accordance with the terms of the Credit Agreement, (iii) no Event of Default shall have occurred and be continuing, other than an Event of Default that is or results from the same event or events which gave rise to the Borrower's failure to perform the Completion Obligations (other than under subclause (i) of Section 9.01(h) or subclause (i) of Section 9.01(i) of the Credit Agreement) that is personal to and relates solely to the Borrower and which is not capable of cure by the Completion Group using commercially reasonable efforts and (iv) each Member of the Completion Group complies with and performs all of its obligations under its Guaranties, all in the same manner and the same amounts as would have been disbursed directly to or, in the case of a Letter of Credit, issued on behalf of the Borrower for such Approved Development Costs; it being expressly acknowledged that the Lenders shall have no obligation under this Section 2(b) to make a Loan or issue a Letter of Credit unless all interest, fees and other amounts (other than principal) due under the Credit Agreement have been paid at such time.

(c)     In furtherance, but without duplication, of the provisions of paragraph (a) above, Guarantor hereby further agrees on demand to pay to and to reimburse the Administrative Agent, Lenders and Holders of Secured Obligations, for the Member Guarantor's Adjusted Pro Rata Share of any and all Guaranteed Development Costs incurred by the Administrative Agent or any Lender or Holder of Secured Obligations.

(d)     In the event that at any time Guarantor shall be obligated hereunder to pay or to reimburse Administrative Agent for Guarantor's Adjusted Pro Rata Share of Guaranteed Development Costs, Guarantor's liability hereunder with respect to the Guaranteed Development Costs accrued to that point in time shall be limited to its Adjusted Pro Rata Share thereof, it being the intent hereof that, Guarantor shall have no liability hereunder with respect to any portion of such accrued Guaranteed Development Costs in excess of its Adjusted Pro Rata Share thereof. To the extent that additional Guaranteed Development Costs accrue after such point in time, Guarantor shall be obligated hereunder only for its Adjusted Pro Rata Share of such additional Guaranteed Development Costs and shall never be obligated with respect to any other guarantors' Adjusted Pro Rata Share of any Guaranteed Development Costs that are not paid by such other guarantors.

(e)     If, at any time at which Guarantor shall be obligated hereunder to pay or to reimburse Administrative Agent for Guarantor's Adjusted Pro Rata Share of Guaranteed Development Costs, Administrative Agent is holding funds deposited by Guarantor in a Cash Collateral Account pursuant to Section 7.03(b) of the Credit Agreement, or is holding a Qualified Letter of Credit delivered by Guarantor pursuant to Section 7.03(b) of the Credit Agreement, the funds held in such Cash Collateral Account or drawn on such Qualified Letter of Credit shall be applied to such obligation of Guarantor hereunder.

SECTION 3.  **Guaranty Absolute**.  The liability of the Guarantor under this Guaranty is absolute, irrevocable and unconditional irrespective of: (a) any change in the time, manner or place of payment of, or in any other term of, all or any of the Facility Documents or Completion Obligations, or any other amendment or waiver of or any consent to departure from any of the terms of any Facility Document or Completion Obligations, including any increase or decrease in the rate of interest thereon; (b) any release or amendment or waiver of, or consent to departure from, any other guaranty or support document, or any exchange, release or non-perfection of any Collateral, for all or any of the Facility Documents or Completion Obligations; (c) any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of any Facility Document or Completion Obligations; (d) without being limited by the foregoing, any lack of validity or enforceability of any Facility Document or Completion Obligations; and (e) any other setoff, defense or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) with respect to the Facility Documents or the transactions contemplated thereby which might constitute a legal or equitable defense available to, or discharge of, the Borrower or a guarantor.

SECTION 4.  **Guaranty Irrevocable**.  This Guaranty is a continuing guaranty of all Completion Obligations now or hereafter existing under the Facilities and the obligations of Guarantor hereunder shall remain in full force and effect until (a) all Secured Obligations (including any that survive repayment of the Loans) have been indefeasibly paid and performed in full, all Letters of Credit have terminated or expired, and all Commitments and Facilities have terminated or expired or (b) all Improvements have been completed in accordance with the terms of the Credit Agreement and all Guaranteed Development Costs accruing or incurred through the date of such completion (whether or not payable thereafter) have been paid in full (whichever (a) or (b) shall first occur).

SECTION 5.  **Subrogation**.  The Guarantor shall not exercise any rights which it may acquire by way of subrogation, by any payment made under this Guaranty or otherwise, until all the Completion Obligations have been paid in full and the Facilities are no longer in effect.  If any amount is paid to the Guarantor on account of subrogation rights under this Guaranty at any time when all the Completion Obligations have not been paid in full, the amount shall be held in trust for the benefit of the Administrative Agent and shall be promptly paid to the Administrative Agent to be credited and applied to the Completion Obligations, whether matured or unmatured or absolute or contingent, in accordance with the terms of the Facilities.  If the Guarantor makes payment to the Administrative Agent of all or any part of the Completion Obligations and all the Completion Obligations are paid in full and all requirements for discharge of this Guaranty under Section 4 above have been met, the Administrative Agent shall, at the Guarantor's request, execute and deliver to the Guarantor appropriate documents, without recourse and without

4

representation or warranty, necessary to evidence the transfer by subrogation to the Guarantor of an interest in the Completion Obligations resulting from the payment.

SECTION 6.  **Subordination**.  Without limiting the rights of the Administrative Agent, the Lenders or any other Holders of Secured Obligations under any other agreement, any Indebtedness of the Borrower to the Guarantor, including but not limited to interest accruing at the agreed contract rate after the commencement of a bankruptcy or similar proceeding, is hereby subordinated to the Completion Obligations.

SECTION 7.  **Payments Generally**.  All payments by the Guarantor shall be paid in U.S. Dollars and made in the manner and at the place required by the Facility Documents.

SECTION 8.  **Certain Taxes**.  The Guarantor further agrees that all payments to be made hereunder shall be made without setoff or counterclaim and free and clear of, and without deduction for, any taxes, levies, imposts, duties, charges, fees, deductions, withholdings or restrictions or conditions of any nature whatsoever now or hereafter imposed, levied, collected, withheld or assessed by any country or by any political subdivision or taxing authority thereof or therein ("Taxes") other than Excluded Taxes.  If any Taxes (other than Excluded Taxes) are required to be withheld from any amounts payable to the Administrative Agent for the benefit of the Lenders or any other Holders of Secured Obligations, the amounts so payable to the Administrative Agent shall be increased to the extent necessary to yield to the Lenders or any other Holders of Secured Obligations (after payment of all Taxes (other than Excluded Taxes)) the amounts payable hereunder in the full amounts so to be paid.  Whenever any Tax (other than Excluded Taxes) is paid by the Guarantor, as promptly as possible thereafter, the Guarantor shall send the Administrative Agent an official receipt showing payment thereof, together with such additional documentary evidence as may be required from time to time by the Administrative Agent or any Lender or other Holder of Secured Obligations.

SECTION 9.  **Representations and Warranties**.   The Guarantor represents and warrants that:  (a) this Guaranty (i) has been authorized by all necessary action on the part of the Guarantor; (ii) does not violate any agreement, instrument, law, regulation or order applicable to the Guarantor; (iii) does not require the consent or approval of any person or entity, including but not limited to any governmental authority, or any filing or registration of any kind; and (iv) is the legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms, except to the extent that enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally and general principles of equity; and (b) in executing and delivering this Guaranty, the Guarantor has (i) without reliance on the Administrative Agent or any Lender or other Holder of Secured Obligations or any information received from the Administrative Agent or any Lender or other Holder of Secured Obligations and based upon such documents and information it deems appropriate, made an independent investigation of the transactions contemplated hereby and the Borrower, the Borrower's business, assets, operations, prospects and condition, financial or otherwise, and any circumstances which may bear upon such transactions, the Borrower or the obligations and risks undertaken herein with respect to the Completion Obligations; (ii) adequate means to obtain from the Borrower on a continuing basis information concerning the Borrower; (iii) full and complete access to the Facility Documents and any other documents executed in connection with the Facility Documents; and (iv) not relied and will not rely upon any

5

representations or warranties of the Administrative Agent or any Lender or other Holder of Secured Obligations not embodied herein or any acts heretofore or hereafter taken by the Administrative Agent or any Lender or other Holder of Secured Obligations (including but not limited to any review by the Administrative Agent or any Lender or other Holder of Secured Obligations of the affairs of the Borrower).

SECTION 10. **Remedies Generally**.    The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law. The Guarantor waives any right or claims of right to cause a marshalling of the Borrower's assets or to proceed against the Guarantor, the Borrower or any other guarantor of any of the Borrower's obligations in any particular order, including, but not limited to, any right arising out of NRS 40.430.

SECTION 11. **Setoff**. The Guarantor agrees that, in addition to (and without limitation of) any right of setoff, banker's lien or counterclaim the Administrative Agent or any Lender or other Holder of Secured Obligations may otherwise have, the Administrative Agent and any Lender or other Holder of Secured Obligations shall be entitled, at its option, to offset balances (general or special, time or demand, provisional or final) held by it for the account of the Guarantor at any of the offices of the Administrative Agent or any Lenders or Holders of Secured Obligations, in U.S. Dollars or in any other currency, against any amount payable by such Guarantor under this Guaranty which is not paid when due (regardless of whether such balances are then due to such Guarantor), in which case it shall promptly notify the Guarantor thereof; provided that the failure of Administrative Agent or any Lender or any other Holder of Secured Obligations to give such notice shall not affect the validity thereof.

SECTION 12. **Formalities**.    The Guarantor waives presentment, notice of dishonor, protest, notice of acceptance of this Guaranty or incurence of any Liability and any other formality with respect to any of the Completion Obligations or this Guaranty.

SECTION 13. **Amendments and Waivers**.  No amendment or waiver of any provision of this Guaranty, nor consent to any departure by the Guarantor therefrom, shall be effective unless it is in writing and signed by the Administrative Agent, and then the waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No failure on the part of the Administrative Agent to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver or preclude any other or further exercise thereof or the exercise of any other right.

SECTION 14. **Expenses**.  The Guarantor shall reimburse the Administrative Agent on demand for all costs, expenses and charges (including without limitation fees and charges of external legal counsel for the Administrative Agent and costs allocated by its internal legal department) incurred by the Administrative Agent in connection with the performance or enforcement of this Guaranty. The obligations of the Guarantor under this Section shall survive the termination of this Guaranty.

SECTION 15. **Assignment**. This Guaranty shall be binding on, and shall inure to the benefit of the Guarantor, the Administrative Agent, the Lenders and the other Holders of Secured Obligations and their respective successors and assigns; provided that the Guarantor may not assign or transfer its rights or obligations under this Guaranty. Without limiting the generality of

6

the foregoing, any Lender may assign, sell participations in or otherwise transfer its rights under the Facilities to any other person or entity on and subject to the terms set forth in the Credit Agreement, and the other person or entity shall then become vested with all the rights and benefits granted to the Lenders in this Guaranty or otherwise.

SECTION 16. **Captions.**    The headings and captions in this Guaranty are for convenience only and shall not affect the interpretation or construction of this Guaranty.

SECTION 17. **Governing Law, Etc.** THIS GUARANTY SHALL BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK. THE GUARANTOR CONSENTS TO THE NONEXCLUSIVE JURISDICTION AND VENUE OF THE STATE OR FEDERAL COURTS LOCATED IN THE CITY OF NEW YORK. SERVICE OF PROCESS BY THE ADMINISTRATIVE AGENT IN CONNECTION WITH ANY SUCH DISPUTE SHALL BE BINDING ON THE GUARANTOR IF SENT TO ANY GUARANTOR BY REGISTERED MAIL AT THE ADDRESS SPECIFIED BELOW OR AS OTHERWISE SPECIFIED BY THE GUARANTOR FROM TIME TO TIME. THE GUARANTOR WAIVES ANY RIGHT THE GUARANTOR MAY HAVE TO JURY TRIAL IN ANY ACTION RELATED TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND FURTHER WAIVES ANY RIGHT TO INTERPOSE ANY COUNTERCLAIM RELATED TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY IN ANY SUCH ACTION. TO THE EXTENT THAT THE GUARANTOR HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER FROM SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OF A JUDGMENT, EXECUTION OR OTHERWISE), THE GUARANTOR HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS GUARANTY.

SECTION 18. **Integration; Effectiveness; Counterparts.** This Guaranty alone sets forth the entire understanding of the Guarantor and the Administrative Agent relating to the guarantee of the Completion Obligations and constitutes the entire contract between the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Guaranty shall become effective when it shall have been executed and delivered by the Guarantor to the Administrative Agent. Delivery of an executed signature page of this Guaranty by telecopy shall be effective as delivery of a manually executed signature page of this Guaranty. This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same Guaranty.

SECTION 19. **Notices.** All notices, requests, demands and other communications to any party hereunder shall be given or made in accordance with the provisions of Section 11.01 of the Credit Agreement. The notice address for Administrative Agent shall be as provided in the Credit Agreement, and the notice address for each Guarantor shall be as set forth below its respective signature to this Guaranty. Any party may change its notice address by notice to the other parties.

[Signatures Follow]

7

## SIGNATURE PAGE TO COMPLETION GUARANTY

**IN WITNESS WHEREOF,** each Guarantor has caused this Guaranty to be duly executed and delivered by its duly authorized officer as of the date first above written.

MEMBER GUARANTOR:

KB HOME NEVADA INC., a Nevada corporation

By: _____
James Widner, President

By: _____
Donald J. DelGiorno, Executive Vice
President

Address:

KB Home Nevada, Inc.
750 Pilot Road, Suite F
Las Vegas, NV 89119
Attention: James Widner
Telecopy Number: (702) 614-2645

with a copy to:

KB Home Nevada, Inc.
750 Pilot Road, Suite F
Las Vegas, NV 89119
Attention: Chris Stephens
Telecopy Number: (702) 614-2645

and

KB Home
10990 Wilshire Blvd.
Los Angeles, CA 90024
Attention: Kelly M. Allred
Telecopy Number: (310) 231-4140

SIGNATURE PAGE TO COMPLETION GUARANTY

PARENT GUARANTOR:

KB HOME, a Delaware corporation

By: _____
William R. Hollinger, Senior Vice President
and Controller

By: _____
Kelly M. Allred, Vice President, Treasury
and Risk Management

Address:

KB Home
10990 Wilshire Blvd.
Los Angeles, CA  90024
Attention:  Kelly M. Allred
Telecopy Number:  (310 ) 231-4140

with a copy to:

KB Home Nevada, Inc.
750 Pilot Road, Suite F
Las Vegas, NV  89119
Attention:  James Widner
Telecopy Number:  (702) 614-2645

and

KB Home Nevada, Inc.
750 Pilot Road, Suite F
Las Vegas, NV  89119
Attention:  Chris Stephens
Telecopy Number:  (702) 614-2645

# EXHIBIT C

## CONSENT AND AGREEMENT

This **CONSENT AND AGREEMENT** (this "Consent and Agreement") dated as of March 9, 2007, is entered into by each of the Member Guarantors (the "Member Guarantors") and Parent Guarantors (the "Parent Guarantors") identified on the signature pages hereto (collectively, the "Guarantors") and by and in favor of JPMorgan Chase Bank, N.A. in its capacity as Administrative Agent (the "Administrative Agent") for the Lenders party to the Credit Agreement referred to below, for the benefit of the Holders of Secured Obligations.

### WITNESSETH:

**WHEREAS,** South Edge LLC, a Nevada limited-liability company (the "Borrower"), the Administrative Agent and the lenders party thereto have entered into a Credit Agreement dated November 1, 2004 (the "Original Credit Agreement");

**WHEREAS,** pursuant to the Original Credit Agreement, each Member Guarantor and its affiliated Parent Guarantor have executed and delivered a Limited Guaranty dated November 1, 2004 (each a "Limited Guaranty"), a Completion Guaranty dated November 1, 2004 (each a "Completion Guaranty") and a Repayment Guaranty dated November 1, 2004 (each a "Repayment Guaranty") and, collectively with the Limited Guaranty and Completion Guaranty by such Member Guarantor and its affiliated Parent Guarantor, the "Guaranties");

**WHEREAS,** pursuant to the Original Credit Agreement, the Borrower, the Member Guarantors and the Parent Guarantors have also executed and delivered a certain Assignment of and Agreement with respect to Acquisition Agreements dated November 1, 2004 (the "Assignment");

**WHEREAS,** the Original Credit Agreement has been amended and restated by an Amended and Restated Credit Agreement of even date herewith (the "Credit Agreement"), which Credit Agreement provides for, among other things, the increase of the maximum principal amount of Facility A to $160,000,000.00 and the extension of the Facility A Maturity Date to October 31, 2008; and

**WHEREAS,** the execution of this Consent and Agreement is a condition precedent to the Lenders' obligations under the Credit Agreement.

NOW, THEREFORE, in consideration of the recitals set forth above and incorporated herein, and for other good and valuable consideration, the receipt and sufficiency whereof are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Capitalized Terms. Capitalized terms not defined herein shall have the meaning ascribed thereto in the Credit Agreement.

2.      Consent. Each of the Guarantors hereby acknowledges and consents to the Credit Agreement and the amendment of the Loan Documents provided for therein and agrees that the Guaranties to which it is a party apply to the Facilities as amended under the Credit Agreement



and that the Assignment applies to the Acquisition Agreement to which such Guarantor is a party, as amended as provided in the Second Amendment to Purchase and Sale Agreement and Joint Escrow Instructions dated as of the date hereof.

3.      Percentage Interests. Each Member Guarantor and its affiliated Parent Guarantor acknowledge that as of the date hereof the percentage interests in the Borrower owned by such Member Guarantor is the percentage set forth in Schedule 2 to the Credit Agreement.

4.      Amendments to Completion Guaranty. (a) The definition of "Guaranteed Development Costs" in each Completion Guaranty is hereby amended and restated in its entirety as follows:

(c)      "Guaranteed Development Costs" means all Development Costs (other than Excluded Costs) not paid or performed by Borrower, to the extent such Development Costs at any time exceed an amount equal to (i) the undisbursed amount of the Aggregate Facility A Commitment whether or not such Aggregate Facility A Commitment has been terminated plus (ii) the amount by which the undisbursed amount of the Aggregate Facility D Commitment (whether or not such Aggregate Facility D Commitment has been terminated) exceeds the aggregate LC Exposure of all Facility D Lenders, less the amounts of the Aggregate Facility A Commitment and Aggregate Facility D Commitment budgeted for payment of Excluded Costs.

(b)      Section 2(b) of the Completion Guaranty is hereby amended by deleting the phrase ",after the Facility D Conversion,".

5.      Ratification. Each Member Guarantor and its affiliated Parent Guarantor hereby ratify the Guaranties to which each is a party and the Assignment, which (as modified hereby) remain in full force and effect.

6.      Guarantors Representations and Warranties. Each Guarantor represents and warrants as of the date hereof that all approvals and consents required for the execution and delivery of this Consent and Agreement have been obtained and this Consent and Agreement constitutes the valid and binding agreement of such Guarantor, enforceable in accordance with its terms.

7.      Governing Law, Etc. THIS CONSENT AND AGREEMENT SHALL BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

8.      Successors and Assigns. This Consent and Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns and each Holder of Secured Obligations.

9.      Section Headings. The section headings used in this Consent and Agreement are for convenience of reference only and do not constitute a part of this Consent and Agreement for any purpose.

2

10.    <u>Counterparts</u>.  This Consent and Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Consent and Agreement by signing any such counterpart.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF,** the Member Guarantors, Parent Guarantors and Administrative Agent have executed and delivered this Consent and Agreement under seal as of the day and year first written above.

MEMBER GUARANTORS:

KB HOME NEVADA, INC., a Nevada corporation

By: _____
Name: William R. Hollinger
Title:  Vice President, CFO and Assistant Secretary


FOCUS SOUTH GROUP, LLC, a Nevada
limited-liability company

By: _____
Name: _____
Title: _____


COLEMAN-TOLL LIMITED PARTNERSHIP, a
Nevada limited partnership

By:    Toll NV GP Corp., a Nevada corporation,
       its general partner

By: _____
Name: _____
Title: _____


ALAMEDA INVESTMENTS, LLC, a Delaware
limited liability company

By: _____
Name: _____
Title: _____


KIMBALL HILL HOMES NEVADA, INC., a
Nevada corporation

By: _____
Name: _____
Title: _____


4

**IN WITNESS WHEREOF,** the Member Guarantors, Parent Guarantors and Administrative Agent have executed and delivered this Consent and Agreement under seal as of the day and year first written above.

**MEMBER GUARANTORS:**

KB HOME NEVADA, INC., a Nevada corporation

By: _____

Name: _____

Title: _____

FOCUS SOUTH GROUP, LLC, a Nevada limited-liability company

By: _____

Name: John A. Ritter, Manager of

Title: Focus Investment Manager, LLC
       Manager of Focus South Group, LLC

COLEMAN-TOLL LIMITED PARTNERSHIP, a Nevada limited partnership

By:     Toll NV GP Corp., a Nevada corporation,
        its general partner

By: _____

Name: _____

Title: _____

ALAMEDA INVESTMENTS, LLC, a Delaware limited liability company

By: _____

Name: _____

Title: _____

KIMBALL HILL HOMES NEVADA, INC., a Nevada corporation

By: _____

Name: _____

Title: _____

4

**IN WITNESS WHEREOF,** the Member Guarantors, Parent Guarantors and Administrative Agent have executed and delivered this Consent and Agreement under seal as of the day and year first written above.

### MEMBER GUARANTORS:

KB HOME NEVADA, INC., a Nevada corporation

By: _____
Name: _____
Title: _____

FOCUS SOUTH GROUP, LLC, a Nevada limited-liability company

By: _____
Name: _____
Title: _____

COLEMAN-TOLL LIMITED PARTNERSHIP, a Nevada limited partnership

By:    Toll NV GP Corp., a Nevada corporation, its general partner

By: _____
Name: _L I N d A_ _H A R T_
Title: _V P_ _F i N A N c e_

ALAMEDA INVESTMENTS, LLC, a Delaware limited liability company

By: _____
Name: _____
Title: _____

KIMBALL HILL HOMES NEVADA, INC., a Nevada corporation

By: _____
Name: _____
Title: _____

4

**IN WITNESS WHEREOF,** the Member Guarantors, Parent Guarantors and Administrative Agent have executed and delivered this Consent and Agreement under seal as of the day and year first written above.

**MEMBER GUARANTORS:**

KB HOME NEVADA, INC., a Nevada corporation

By: _____
Name: _____
Title: _____

FOCUS SOUTH GROUP, LLC, a Nevada limited-liability company

By: _____
Name: _____
Title: _____

COLEMAN-TOLL LIMITED PARTNERSHIP, a Nevada limited partnership

By:    Toll NV GP Corp., a Nevada corporation, its general partner

By: _____
Name: _____
Title: _____

ALAMEDA INVESTMENTS, LLC, a Delaware limited liability company

By: _____
Name: Chad Gardner
Title: Authorized Agent

KIMBALL HILL HOMES NEVADA, INC., a Nevada corporation

By: _____
Name: _____
Title: _____

4

**IN WITNESS WHEREOF,** the Member Guarantors, Parent Guarantors and Administrative Agent have executed and delivered this Consent and Agreement under seal as of the day and year first written above.

**MEMBER GUARANTORS:**

KB HOME NEVADA, INC., a Nevada corporation

By: _____
Name: _____
Title: _____

FOCUS SOUTH GROUP, LLC, a Nevada limited-liability company

By: _____
Name: _____
Title: _____

COLEMAN-TOLL LIMITED PARTNERSHIP, a Nevada limited partnership

By:    Toll NV GP Corp., a Nevada corporation, its general partner

By: _____
Name: _____
Title: _____

ALAMEDA INVESTMENTS, LLC, a Delaware limited liability company

By: _____
Name: _____
Title: _____

KIMBALL HILL HOMES NEVADA, INC., a Nevada corporation

By: _____
Name:  Hal H. Barber
Title:  Vice President

4

PARDEE HOMES OF NEVADA, a Nevada
corporation

By: _W. A. Bryan_
Name: _____
Title: W. A. Bryan, Sr. Vice President


MERITAGE HOMES OF NEVADA, INC.
(formerly known as MTH Homes Nevada, Inc.), an
Arizona corporation

By: _____
Name: _____
Title: _____


BEAZER HOMES HOLDING CORP., a
Delaware corporation

By: _____
Name: _____
Title: _____


**PARENT GUARANTORS:**

KB HOME, a Delaware corporation

By: _____
Name: _____
Title: _____


_____
JOHN A. RITTER


TOLL BROTHERS, INC., a Delaware
corporation

By: _____
Name: _____
Title: _____


5

PARDEE HOMES OF NEVADA, a Nevada
corporation

By: _____
Name: _____
Title: _____


MERITAGE HOMES OF NEVADA, INC.
(formerly known as MTH Homes Nevada, Inc.), an
Arizona corporation

By: _____
Name: _____
Title: _____


BEAZER HOMES HOLDING CORP., a
Delaware corporation

By: _____
Name: _____
Title: _____


**PARENT GUARANTORS:**

KB HOME, a Delaware corporation

By: _____
Name: _____
Title: _____


_____
JOHN A. RITTER


TOLL BROTHERS, INC., a Delaware
corporation

By: _____
Name: _____
Title: _____


5

PARDEE HOMES OF NEVADA, a Nevada
corporation

By: _____
Name: _____
Title: _____


MERITAGE HOMES OF NEVADA, INC.
(formerly known as MTH Homes Nevada, Inc.), an
Arizona corporation

By: _____
Name: _____
Title: _____


BEAZER HOMES HOLDING CORP., a
Delaware corporation

By: _CBoyd_____
Name: Cory J. Boydston
Title:  Senior Vice President


**PARENT GUARANTORS:**

KB HOME, a Delaware corporation

By: _____
Name: _____
Title: _____


_____
JOHN A. RITTER


TOLL BROTHERS, INC., a Delaware
corporation

By: _____
Name: _____
Title: _____


5

PARDEE HOMES OF NEVADA, a Nevada
corporation

By: _____
Name: _____
Title: _____


MERITAGE HOMES OF NEVADA, INC.
(formerly known as MTH Homes Nevada, Inc.), an
Arizona corporation

By: _____
Name: _____
Title: _____


BEAZER HOMES HOLDING CORP., a
Delaware corporation

By: _____
Name: _____
Title: _____

**PARENT GUARANTORS:**

KB HOME, a Delaware corporation

By: _____
Name: Kelly M. Allred
Title:   Vice President, Treasury


_____
JOHN A. RITTER


TOLL BROTHERS, INC., a Delaware
corporation

By: _____
Name: _____
Title: _____

5

PARDEE HOMES OF NEVADA, a Nevada
corporation

By: _____
Name: _____
Title: _____


MERITAGE HOMES OF NEVADA, INC.
(formerly known as MTH Homes Nevada, Inc.), an
Arizona corporation

By: _____
Name: _____
Title: _____


BEAZER HOMES HOLDING CORP., a
Delaware corporation

By: _____
Name: _____
Title: _____


**PARENT GUARANTORS:**

KB HOME, a Delaware corporation

By: _____
Name: _____
Title: _____

JOHN A. RITTER

TOLL BROTHERS, INC., a Delaware
corporation

By: _____
Name: _____
Title: _____


5

PARDEE HOMES OF NEVADA, a Nevada
corporation

By: _____
Name: _____
Title: _____


MERITAGE HOMES OF NEVADA, INC.
(formerly known as MTH Homes Nevada, Inc.), an
Arizona corporation

By: _____
Name: _____
Title: _____


BEAZER HOMES HOLDING CORP., a
Delaware corporation

By: _____
Name: _____
Title: _____


**PARENT GUARANTORS:**

KB HOME, a Delaware corporation

By: _____
Name: _____
Title: _____


_____
JOHN A. RITTER


TOLL BROTHERS, INC., a Delaware
corporation

By: *Linda Hart*
Name: *LINDA HART*
Title: *VP FINANCE*


5

WOODSIDE GROUP, INC., a Nevada
corporation

By: _____
Name: Chad Gardner
Title:   Treasurer


KIMBALL HILL, INC., an Illinois
corporation

By: _____
Name: _____
Title: _____


WEYERHAEUSER REAL ESTATE COMPANY,
a Washington corporation

By: _____
Name: _____
Title: _____


MERITAGE HOMES CORPORATION,
a Maryland corporation

By: _____
Name: _____
Title: _____


BEAZER HOMES USA, INC., a Delaware
corporation

By: _____
Name: _____
Title: _____


6

WOODSIDE GROUP, INC., a Nevada
corporation

By: _____
Name: _____
Title: _____


KIMBALL HILL, INC., an Illinois
corporation

By: _____
Name: _____Hal H. Barber_____
Title: _____Senior Vice President___


WEYERHAEUSER REAL ESTATE COMPANY,
a Washington corporation

By: _____
Name: _____
Title: _____


MERITAGE HOMES CORPORATION,
a Maryland corporation

By: _____
Name: _____
Title: _____


BEAZER HOMES USA, INC., a Delaware
corporation

By: _____
Name: _____
Title: _____


6

WOODSIDE GROUP, INC., a Nevada
corporation

By: _____
Name: _____
Title: _____


KIMBALL HILL, INC., an Illinois
corporation

By: _____
Name: _____
Title: _____


WEYERHAEUSER REAL ESTATE COMPANY,
a Washington corporation

By: _____
Name: _____
Title: _____
          JEFFREY W. NITTA
          Vice President/Treasurer


MERITAGE HOMES CORPORATION,
a Maryland corporation

By: _____
Name: _____
Title: _____


BEAZER HOMES USA, INC., a Delaware
corporation

By: _____
Name: _____
Title: _____

6

WOODSIDE GROUP, INC., a Nevada
corporation

By: _____
Name: _____
Title: _____


KIMBALL HILL, INC., an Illinois
corporation

By: _____
Name: _____
Title: _____


WEYERHAEUSER REAL ESTATE COMPANY,
a Washington corporation

By: _____
Name: _____
Title: _____


MERITAGE HOMES CORPORATION,
a Maryland corporation

By: _____
Name: ROBERT M. SEUSSLE
Title: DIVISION PRESIDENT


BEAZER HOMES USA, INC., a Delaware
corporation

By: _____
Name: _____
Title: _____


6

WOODSIDE GROUP, INC., a Nevada
corporation

By: _____
Name: _____
Title: _____


KIMBALL HILL, INC., an Illinois
corporation

By: _____
Name: _____
Title: _____


WEYERHAEUSER REAL ESTATE COMPANY,
a Washington corporation

By: _____
Name: _____
Title: _____


MERITAGE HOMES CORPORATION,
a Maryland corporation

By: _____
Name: _____
Title: _____


BEAZER HOMES USA, INC., a Delaware
corporation

By: _____
Name: Cory J. Boydston
Title:   Senior Vice President


6

ADMINISTRATIVE AGENT:

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent

By: _____

Name: ___Kent Kaiser_____

Title: ___Executive Director_____

CHI 3741794v.3

# EXHIBIT D

## JPMORGAN CHASE BANK, N.A.
277 Park Avenue
8th Floor
New York, New York 10172
Telephone: (212) 622-4529/Telecopy: (212) 622-4557

## ***IMPORTANT NOTICE REQUIRING IMMEDIATE ATTENTION***

November 13, 2008

**Via telecopy with copy to follow**
**to follow via UPS Next Day Air**

South Edge, LLC
c/o Focus South Group LLC
3455 Cliff Shadows Parkway, Suite 220
Las Vegas, NV 89189
Attention: John A. Ritter

-and-

Each of the Addressees Set Forth on Schedule 1 Attached Hereto

Re:   Amended and Restated Credit Agreement dated as of March 9, 2007, among South
      Edge, LLC, a Nevada limited-liability company, the Lenders party thereto, and
      JPMorganChase Bank, N.A. as Administrative Agent (as in effect on the date hereof,
      the "Credit Agreement")

Dear Mr. Ritter:

Reference is made to the Credit Agreement. Terms defined in the Credit Agreement and
used but not otherwise defined herein have the meanings ascribed to such terms in the Credit
Agreement.

This letter constitutes a Balancing Notice pursuant to Section 5.09 of the Credit Agreement.
The Administrative Agent has determined that an Out-of-Balance Condition exists and
hereby demands that, within ten (10) Business Days of receipt of this letter, the Borrower
make a Balancing Payment of $325,389,667, or in lieu thereof, deliver to the Administrative
Agent a Qualified Letter of Credit in such amount. You are advised that if Borrower fails to
deposit with the Administrative Agent the hereinabove described Balancing Payment within
ten (10) Business Days of receipt hereof, a further Event of Default shall have occurred
under the Credit Agreement.

la-1003618

South Edge, LLC
Page Two

**Further to the forgoing, this letter shall also serve as a demand to each Member and its Parent Guarantor (other than Kimball Hill Homes Nevada, Inc., Kimball Hill Inc., Alameda Investments, LLC, and Woodside Group, Inc.) pursuant to their respective Completion Guaranty to deposit with the Administrative Agent such Member's Adjusted Pro Rata Share of the Balancing Payment in the event that the Borrower fails to timely do so in accordance with this letter.**

**Due to the automatic stay in effect pursuant to 11 U.S.C. §362(a) with respect to Kimball Hill Homes Nevada, Inc., Kimball Hill Inc., Alameda Investments, LLC, and Woodside Group, Inc., the Administrative Agent is sending a copy of this letter to such parties for information purposes only.**

The Administrative Agent's determination of the amount of the Balancing Payment was made on the basis of information available to the Administrative Agent at this time to the extent that such information is deemed by Administrative Agent to be sufficient for such purpose. The Administrative Agent and/or its consultants have made several requests of the Borrower to provide current estimates of Development Costs and related information, but the Borrower has declined or failed to provide this information in contravention of its obligations under the Credit Agreement. The Administrative Agent reserves the right to make adjustments to the amount of the Balancing Payment from time to time, including without limitation as it acquires additional information or analysis, and nothing herein shall be construed as limiting the Administrative Agent's right to require additional Balancing Payments in accordance with the Credit Agreement.

This Balancing Notice and demand shall be without prejudice to all of the rights and remedies of the Administrative Agent under the Credit Agreement and related Loan Documents, at law and in equity, all of which are expressly reserved.

Administrative Agent refers to and incorporates all of its prior default or Event of Default notices and other information requests pursuant to the Credit Agreement and other Loan Documents. Administrative Agent repeats its demand for the cure of such defaults and Events of Default, for all requested information, and for assurances of future performance of all of Borrower's obligations under the Loan Documents.

Please direct any questions concerning this matter to the undersigned at the address and telephone number set forth above.

[Remainder of page intentionally left blank.]

Ja-1003618

South Edge, LLC
Page Three

Nothing contained in this letter is intended to create or constitute a waiver, modification, relinquishment or forbearance by Lender of any of its rights and remedies under the Loan Documents, including without limitation, any and all rights or remedies in connection with any other Defaults or Events of Default that may now or hereafter exist under the Loan Documents, all of which rights and remedies are hereby expressly reserved.

Sincerely,

John P. McDonagh
Managing Director

South Edge, LLC
Page Four

cc:

I. Scott Bogatz
Senior Vice President & General Counsel
c/o Focus South Group LLC
3455 Cliff Shadows Parkway, Suite 220
Las Vegas, NV 89189
Telecopy No. (702) 216-2067

Kummer Kaempfer Bonner & Renshaw
Seventh Floor
3800 Howard Hughes Parkway
Las Vegas, NA 89109
Attention: John C. Jeppsen
Telecopy No.: (702) 796-7181

Ballard Spahr Andrews & Ingersoll LLP
1735 Market Street
Philadelphia, PA 19103-7599
Attention: Richard Perelman
Telecopy No. (215) 864-9973

la-1003618

## Schedule 1

### Additional Addressees

KB Home Nevada, Inc.
750 Pilot Road, Suite F
Las Vegas, NV 89119
Attention: James Widner
Telecopy Number: (702) 614-2645

KB Home Nevada, Inc.
750 Pilot Road, Suite F
Las Vegas, NV 89119
Attention: Chris Stephens
Telecopy Number: (702) 614-2645

KB Home
10990 Wilshire Blvd.
Los Angeles, CA 90024
Attention: Kelly M. Allred
Telecopy Number: (310 ) 231-4140

Beazer Homes USA, Inc.
1000 Abernathy Road
Suite 1200
Atlanta, GA 30328
Attention: Cory J. Boydston, Senior Vice President
Telecopy Number: (404) 847-4903

Beazer Homes USA, Inc.
4670 South Fort Apache Road
Suite 200
Las Vegas, NV 89147
Attention: Division President
Telecopy Number: (702) 837-2101

Beazer Homes Holdings Corp.
1000 Abernathy Road
Suite 1200
Atlanta, GA 30328
Attention: Cory J. Boydston
Senior Vice President
Telecopy Number: (404) 847-4903

Beazer Homes Holdings Corp.
4670 South Fort Apache Road
Suite 200
Las Vegas, NV 89147
Attention: Division President
Telecopy Number: (702) 837-2101

Kimball Hill Homes Nevada, Inc.
8 Sunset Way
Suite 101
Henderson, NV 89014
Attention: Stan Gutshall
Telecopy Number: (702) 436-9491

Rice Silbey Reuther & Sullivan, LLP
3960 Howard Hughes Parkway
Suite 700
Las Vegas, NV 89109
Attention: Stephen M. Sullivan, Esq.
Telecopy Number: (702) 732-7110

Kimball Hill, Inc.
5999 New Wilke Road
Suite 504
Rolling Meadows, IL 60008
Attention: Hal H. Barber
Telecopy Number: (847) 439-0875

Holland & Knight, LLP
131 S. Dearborn Street
30th Floor
Chicago, IL 60603
Attention: John R. Nyweide, Esq.
Telecopy Number: (312) 715-5740

MTH-Homes Nevada, Inc.
555 West Badura Avenue, Suite 120
Las Vegas, NV 89118
Attention: Robert M. Beville
Telecopy Number: (702) 896-9191

la-1003618

Meritage Homes Corporation
8501 East Princess Drive, Suite 290
Scottsdale, AZ 85255
Attention: Larry Seay
Telecopy Number: (480) 998-9178

Pardee Homes of Nevada
10880 Wilshire Boulevard, Suite 1900
Los Angeles, CA 90024
Attention: William A. Bryan
Telecopy Number: (310) 446-1294

Sandler and Rosen, LLP
1801 Avenue of the Stars, Suite 510
Los Angeles, CA 90067
Attention: Steven E. Levy
Telecopy Number: (310) 277-5954

Weyerhaeuser Real Estate Co..
33663 Weyerhaeuser Way South
Federal Way, WA 98003
Attention: Treasurer
Telecopy Number: (253) 924-3870

Focus South Group LLC
3455 Cliff Shadows Parkway, Suite 220
Las Vegas, NV 89129
Attention: John A. Ritter
Telecopy Number: (702) 216-2067

Focus Property Group
3455 Cliff Shadows Parkway, Suite 220
Las Vegas, NV 89129
Attention: John A. Ritter
Telecopy Number: (702) 216-2067

Coleman-Toll Limited Partnership
1140 Town Center Drive, Suite 350
Las Vegas, NV 89144
Attention: Gary Mayo, Vice President
Telecopy Number: (702) 243-9610

Toll Brothers, Inc.
3103 Philmont Avenue
Huntingdon Valley, PA 19006
Attention: Joel H. Rassman, Chief Financial Officer,
            Executive Vice President
            and Treasurer
Telecopy Number: (215) 938-8010

Toll Brothers, Inc.
3103 Philmont Avenue
Huntingdon Valley, PA 19006
Attention: Frederick Cooper, Sr. Vice President,
            Finance
Telecopy Number: (215) 938-8010

Toll Brothers, Inc.
3103 Philmont Avenue
Huntingdon Valley, PA 19006
Attention: Kenneth J. Gary, Sr. Vice President
            and General Counsel
Telecopy Number: (215) 938-8255

Alameda Investments, LLC
 and Woodside Group, Inc.
39 East Eagleridge Drive, Suite 102
North Salt Lake, UT 84054
Attention: Leonard K. Arave
Telecopy Number: (801) 299-0550

Alameda Investments, LLC
 and Woodside Group, Inc.
39 East Eagleridge Drive, Suite 102
North Salt Lake, UT 84054
Attention: Wayne Farnsworth
Telecopy Number: (801)813-8003

la-1003618