Hon. David Warner Hagen (Ret.)
Hon. Robert R. Rose (Ret.)
JAMS
2300 W. Sahara, Suite 900
Las Vegas, Nevada 89102
Telephone: (702) 457-5267
Fax: (702) 437-5267

Hon. A. William Maupin (Ret.)

# JAMS ARBITRATION PROCEEDING

| | |
|---|---|
| SOUTH EDGE, LLC and FOCUS SOUTH GROUP, LLC<br><br>Claimants,<br><br>v.<br><br>KB HOME NEVADA, INC., COLEMAN-TOLL LIMITED PARTNERSHIP, PARDEE HOMES OF NEVADA, BEAZER HOMES HOLDINGS CORP., and MERITAGE HOMES OF NEVADA, INC.<br><br>Respondents.<br><br>KB HOME NEVADA, INC., COLEMAN-TOLL LIMITED PARTNERSHIP, PARDEE HOMES OF NEVADA, BEAZER HOMES HOLDING CORP., and MERITAGE HOMES OF NEVADA, INC.<br><br>Counterclaimants,<br><br>v.<br><br>SOUTH EDGE, LLC and HOLDINGS MANAGER, LLC.<br><br>Counter Respondents. | **Case Reference No.**  1260001162<br><br>Justice Robert E. Rose (Ret.)<br>Justice A. William Maupin (Ret.)<br>Judge David Warner Hagen (Ret.)<br><br><br>**FINAL AWARD** |

1

# I. INTRODUCTION

Focus South Group, LLC, on its own behalf and on behalf of South Edge, LLC, as claimants, brought this arbitration against KB Home Nevada, Inc., Coleman-Toll Limited Partnership, Pardee Homes of Nevada, Beazer Homes Holdings Corp., and Meritage Homes of Nevada, Inc. f/k/a MTH Homes of Nevada, Inc, an Arizona Corporation, as respondents.  All respondents have lodged counterclaims.  The general subject matter of the arbitration is a series of disputes concerning a master planned real estate project developed by South Edge.  The matter was tried for nine (9) days of the ten (10) scheduled during the period February 22, 2010 to March 5, 2010, before an arbitral panel consisting of A. William Maupin and Robert R. Rose, retired Chief Justices of the Nevada Supreme Court, and David Warner Hagen, retired United States District Judge for the District of Nevada, panel chair.

Appearing as counsel for claimants were Anthony Sgro, Esq., Bryan A. Merryman, Esq., Thomas J. Benedict, Esq., and Roberto J. Kampfner, Esq.  Appearing as counsel for respondents were Bruce Van Dalsem, Esq., Michael T. Lifrak, Esq., Mark T. Drooks, Esq., Benjamin D. Lichtman, Esq., Donald A. Lattin, Esq., Andrew Detherage, Esq., Karoline E. Jackson, Esq., Fredric C. Nelson, Esq., John R. Foote, Esq., Pat Lundvall, Esq., Douglas C. Northup, Esq., and Craig S. Newman, Esq.

By their claims "pursuant to Sections 11.1 and 11.2 of the Operating Agreement, South Edge and Focus each seek an order demanding specific performance of the obligations of each

2

Defaulting Party under the Operating Agreement and Acquisition Agreements,"[1] or "In the alternative, and only [if] the Arbitration Panel finds that specific performance cannot be awarded, each of South Edge and Focus seeks damages (including attorney fees and costs) to be paid by respondents to South Edge in the amount of their obligations to South Edge for the other members' failure to satisfy their respective takedown commitments, fund appropriate interest reserves and MI deposits, and complete the Inspirada project as contemplated by the Operating Agreement and other related documents.  Focus also seeks damages to be paid to Focus by respondents for their aforementioned breaches, including attorney fees and costs, and/or restitution for unjust enrichment based on the benefit respondents have reaped from Focus's performance and respondents' non-performance under the Operating Agreement."[2]

Respondents opposed these amended claims on October 14, incorporating by reference their earlier opposition which alleged "Focus's claims have no merit, and Focus [has no] standing to pursue them."  Respondents further requested "(a) that the panel dismiss Focus's Demand for Arbitration in its entirety; (b) in the alternative, that the panel deny Focus's request for an order demanding specific performance and deny Focus's request for damages; (c) an award of all attorneys' fees and costs incurred by respondents in connection with Focus's Demand for Arbitration; and (d) an award in their favor on their Counterclaims being filed herewith."[3]

Respondents separately counterclaimed against Focus for breach of the Operating Agreement by initiation of these proceedings without proper Management Committee

---

[1] Amended Demand for Arbitration, September 30, 2009, p. 10.
[2] *Id.*
[3] Resps. Joint Answer, August 25, 2009, p. 38.

3

authorization, its improper disclosure of confidential and/or proprietary information relating to South Edge and its business in various public forums, and for entering into a litigation cooperation agreement with the administrative agent for the lenders on the project. [4]

Respondent Meritage, as counter-claimant, seeks declaratory relief "that (1) it has fully performed all obligations under [its] Acquisition Agreement and the Operating Agreement; and (2) its full performance and South Edge's inability to deliver clear title as required discharged Meritage from any additional obligations or performance under the Acquisition Agreement or the Operating Agreement.

    . . . .

Meritage further requests the panel award it the attorneys' fees incurred in bringing this counterclaim as allowed by the contracts between the parties." [5]

## II.  THE ARBITRATION AGREEMENT

Section 15.10 of the Amended and Restated Operating Agreement at issue provides:

15.10. ARBITRATION

Any dispute, claim or controversy arising out or relating to this Agreement or any transaction contemplated hereby which cannot be resolved by the parties shall be resolved by binding arbitration in accordance with the Nevada Uniform Arbitration Act of 2000, Nevada Revised Statutes 38.206, *et seq. The* arbitration proceedings shall be held in Clark County, Nevada before a panel of three arbitrators (the "Arbitrator") who is expert in the subject of real estate development and well versed in the subject of limited liability companies and is a practicing or retired Nevada lawyer or retired judge or magistrate. The Arbitrator shall be selected jointly by the General Manager and a majority of the Units held by the Members directly affected or failing such agreement within ten days after the any party makes a written demand for arbitration then the Arbitrator shall be

---

[4] Resps. Counterclaims, August 25. 2009, p. 7, 13, and amended counterclaim, _____.
[5] Resp. Meritage Homes of Nevada, Inc.'s Counterclaims, August 28, 2009, pp. 3,4.

CONFIDENTIAL

selected by the State of Nevada district court pursuant to NRS 38.226. The Arbitrator shall follow the laws of the State of Nevada (without giving effect to the conflicts of laws principles thereof). Any award or other determination (including interim orders or awards) rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in any court provided for in Section 15.9 and such judgment may be enforced by any court with jurisdiction. Pending the final resolution of an arbitration, the Arbitrator shall have the power, at the request of any party, to take interim measures and make interim orders or awards (including for the purpose of maintaining the status quo or otherwise preserving, the rights of a party). The costs of the arbitration, and any subsequent court proceedings (including but not limited to all reporter costs) shall be shall be borne as determined by the Arbitrator, in his/her discretion. Unless the Arbitrator so awards attorneys' fees, each party shall be responsible for its own attorneys' fees. The arbitration proceedings shall be expedited to the maximum extent practicable. To the extent possible, the arbitration hearings shall be conducted on consecutive days, excluding Saturdays, Sundays, and holidays, until the hearings are completed. All discovery and hearings shall be completed within 30 days from the day the Arbitrator is selected or appointed. The Arbitrator shall render her/his decision(s) concerning the substantive issue(s) in dispute in writing. The Arbitrator shall have the authority to impose sanctions on any party that fails to comply with above time periods, including the sanction of summarily dismissing any dispute or defense with prejudice. The doctrines of compulsory counterclaim, res judicata, and collateral estoppel shall apply to any arbitration proceeding hereunder so that a party must state as a counterclaim in the arbitration proceeding any claim or controversy which arises out of the transaction or occurrence that is the subject matter of the dispute. The Arbitrator must: (1) consolidate in a single arbitration proceeding any other claim or controversy involving another party that is substantially related to the dispute; and

(2) consolidate in a single arbitration proceeding any other claim or controversy that is substantially similar to the dispute. The Arbitrator may award to the prevailing party recovery of all costs and fees (including attorneys' fees and costs; arbitration administration fees and costs, and arbitrator(s)' fees), but shall have no authority to award punitive or consequential damages.

The Arbitrator, either during the pendency of the arbitration proceeding or as part of the arbitration award, also may grant an award of injunctive relief. When prepared to issue a ruling, the Arbitrator shall first so inform the parties, who will have ten (10) days to resolve the dispute by a binding agreement between them. If

5

the parties resolve the dispute prior to the close of business on the tenth (10th) day, the Arbitrator will not make any award. If the parties do not resolve the dispute in such ten (10) day period, the Arbitrator shall issue a written ruling on the eleventh (11th) day following the notification to the parties that the Arbitrator was prepared to issue a ruling. The arbitration proceeding shall be completed and the written decision shall be delivered to the parties no later than the earlier to occur of (i) 60 days after the last hearing date, or (ii) 120 days after the delivery of notice of the dispute to the opposing party. If any of the provisions relating to arbitration are not adhered to or complied with, either party may petition any court provided for in Section 15.9 for appropriate relief.

*See* Exhibit 14, pp. 60, 61.

### III.  PRE-ARBITRATION PROCEDURAL HISTORY

On July 30, 2009, in *JPMorgan Chase, N.A. v. KB Home, et al,* BASE FILE 2:08 cv-01711-PMP-RJJ, pending in the United States District Court for the District of Nevada, Presiding Judge Philip M. Pro, having earlier granted a motion made by Focus South Group, LLC to compel arbitration and appoint arbitrators, appointed this panel to conduct this arbitration in accordance with § 15.10, above, and ordered the parties to report back to him by August 13 with an agreed-upon arbitration schedule.  The arbitrators conferred with the parties and then recommended on August 11, that, while they would proceed under whatever schedule was selected by the parties or ordered by the court, they invited the court to exercise its NRS 38.236 authority to suspend § 15.10's 120 day deadline for completion of the arbitration to allow sufficient time for the parties' pretrial preparation and post-trial preparation of the award.  On August 19 the court agreed, suspended the time periods referenced in the arbitration clause to the extent they were inconsistent with his order, and permitted "the arbitration panel to allow, in its discretion, up to 120 days for pretrial discovery, with another 30 days for dispositive motions, motions in limine,

6

and trial briefs." Order Re Arbitration, p. 2. In addition, the court extended the time for rendering the award to 90 days after the last arbitration hearing date. *Id.*

## IV. ARBITRATION PROCEDURAL HISTORY

The scheduling order was issued September 1 by agreement of the parties after preliminary conference with them. It scheduled the arbitral hearing for the weeks of February 22 and March 1, 2010. At the parties' requests, the scheduling order was amended three times, but never to extend the dates of the arbitral hearing. In accordance with the U.S. District Court's order, the award is due no later than June 2, 2010.


Other Pretrial Motions and Orders

There were multiple pretrial orders.

- November 6. The panel corrected a clerical error on the application of JAMS Rule 31 on fee sharing and allocated equally per-side the fees and expenses. On February 8 the panel denied reconsideration of that order.

- November 9 and 30. The panel ruled on objections to respondents taking the deposition of John C. Jeppson.

- December 10, 14, and 21. The panel scheduled various discovery motions for briefing.

- December 29. The discovery motions were heard telephonically.

- December 30. The discovery motions were decided.

- January 7 and 8. Further orders were issued on the discovery matters heard December 29.

7

- January 14.  Parties agree to continued participation of arbitrator A. William Maupin after disclosure in late December of 2009 of his plans to join the Nevada law firm of Lionel Sawyer & Collins.  Parties agreement was based upon creation by the firm of an "ethical wall" per an internal office memorandum to the firm from the firm's managing partner noting Justice Maupin's involvement in the instant arbitration prior to joinder, specifying an approximate date of joinder of March 15 (while it was originally contemplated that employment be deferred pending the arbitration, a starting date of mid-March was proposed in the memo), listing the parties to the arbitration, and listing the names of additional persons who might have an interest in the outcome of the arbitration.  The memo stated as follows:

"I am pleased to announce that former Nevada Supreme Court Justice William Maupin will be joining the firm around March 15. Before joining the Firm, Justice Maupin will be involved in an arbitration proceeding arising from the Inspirada project.  Parties to that arbitration are:

South Edge, LLC
Focus South Group, LLC
KB Home Nevada, Inc.
Coleman-Toll Limited Partnership, LLC
Pardee Homes of Nevada
Beazer Homes Holding Corp.
MTH Homes Nevada, Inc.

Additional persons who might have an interest in the outcome of that arbitration include:
John Ritter
Darrin Badger
JP Morgan Chase Bank
Inspirada
Meritage Homes of Nevada

8

From now until the conclusion of the arbitration proceedings, it is necessary that Justice Maupin be screened from any involvement with any of the parties identified in this memo. Accordingly, everyone is required to ensure that Justice Maupin is not party to any communication of any kind involving any of the persons or entities mentioned in this memo."

After a telephonic conference, the parties agreed per e-mail transmission as follows:

"Further to our conference call with the panel this morning, KB Home Nevada agrees that the ethical wall established pursuant to the memo attached to the e-mail below is acceptable and that it is appropriate for your honor to hear this arbitration notwithstanding your plan to join Lionel, Sawyer & Collins."

All counsel confirmed via e-mail response.

The panel then determined that Justice Maupin could proceed with employment starting after March 15.

- January 15. An order was issued scheduling briefing and a hearing (January 26) about a recently discovered Cooperation Agreement between JPMorgan and claimants.

- January 25. An order was issued about a 30(b)(6) witness for Focus.

- January 27. An order was issued on multiple discovery issues.

- January 29 and February 5. An order was issued allowing respondents to file under seal in the U.S. District Court action the JPMorgan/Focus Cooperation Agreement.

9

- February 9.  An order was issued granting respondents' 26(b)(5)(B) "claw-back" motion for the return of a privileged document inadvertently disclosed.  JAMS Rule 29 sanctions were requested.  They were reserved for post-trial ruling.

- February 16.  An order was issued denying all motions for summary disposition.

Trial started on February 22 in special hearing rooms provided by the parties at the Venitian Pallazzo Hotel and Casino in Las Vegas.  It ended a day early, on March 4.  At the close of the evidence the panel denied all sanctions associated with the need for the 26(B)(5)(b) "claw back" motion.  Closing arguments were heard March 11 at JAMS's offices in Las Vegas, following which the matter was submitted for decision.


## V.  FACTUAL PRESENTATION

General Background

This case singularly demonstrates the catastrophic effects of adverse national economic trends upon America's most respected real estate financiers and developers.  These include the parties to these proceedings and their lenders—all of whom optimistically placed their faith in a traditionally sound local real estate market in Southern Nevada.

In early 2004, KB Home Nevada, Inc., Focus South Group, LLC, Coleman-Toll Limited partnership, Alameda Investments (Woodside), LLC, Kimball Hill Homes Nevada, Inc., Pardee Homes of Nevada, Meritage Homes of Nevada, Inc., and Beazer Homes Holdings Corp. formed South Edge, LLC, to purchase 1940[6] acres of vacant real estate in the City of Henderson, Nevada, from the Bureau of Land Management (BLM).  Their purpose was to develop the

---

[6] Subsequent surveys confirmed that the property actually consisted of 1953.32 acres.

10

property into a major master planned community that became known as "Inspirada." The BLM accepted South Edge's bid in the amount of $557 million.[7]

South Edge Acquired the Property from the BLM on November 1, 2004, pursuant to an "Operating Agreement" originally dated in May of 2004. As discussed below, the Operating Agreement, which also provided for development and contemplated financing arrangements, is but a part of a construct of agreements designed to memorialize the scope of the development, the relative roles, interests and obligations of the investors, and the interrelationships and obligations of South Edge, its Members and the lenders.

Years into the project, it became apparent that two of the Members, Kimball Hill Homes Nevada and Woodside, could not fulfill their obligations to participate. After other of the Members came to conclude that the ultimate strategic goals of South Edge could not be met, the parties to this arbitration and the lenders took various measures that stimulated a series of litigations designed to resolve their respective rights in connection with Inspirada.

Operating Agreement:

The Operating agreement governed the bid process for the BLM property and its development in the event of a successful bid. The Percentage Interests of the Members of South Edge are as follows:

KB Home Nevada                 48.45%

Coleman-Toll                   10.52%

Pardee Homes                   4.9%

---

[7] South Edge LLC is a "single purpose" limited liability company "organized solely for the purpose of acquiring, owning, developing and selling the Subject Property." See Section 1(a) of the second amendment to the Operating Agreement concerning the project.

CONFIDENTIAL

MTH Homes                      3.53%

Beazer Homes                   2.58%

Focus                          15.59%

Kimball (bankrupt)             6.29%

Woodside (bankrupt)            8.14%

The Operating Agreement further provided that the Members would purchase, or "take down," their individual portions of the project in scheduled phases under separate "Acquisition Agreements." The individual portions or parcels are referred to as "PODS," allocated in proportion to the Members' respective Percentage Interests in the bid purchase.[8] The original Takedown Schedules appended to the individual Acquisition Agreements were as follows:

| Member | Takedown date(s) | Acres | Purchase price |
|--------|------------------|-------|----------------|
| KB     | 10/15/06         | 329   | $176,320,081   |
|        | 10/15/07         | 131   | $70,206,476    |
|        | 10/15/08         | 241   | $129,158,479   |
|        | 4/15/09          | 239   | $128,086,624   |
| Toll   | 10/15/06         | 97    | $51,984,948    |
|        | 10/15/07         | 107   | $57,344,221    |
| Beazer | 10/15/06         | 50    | $26,796,365    |

---

[8] The POD purchases were to occur in single or multiple "Takedowns" per schedules in the individual Acquisition Agreements.

12

| | | | |
|---|---|---|---|
| Woodside | 10/15/06 | 158 | $84,676,513 |
| Meritage | 10/15/06 | 69 | $36,978,884 |
| Pardee | 10/15/07 | 95 | $50,913,093 |
| Focus | 10/15/06 | 302 | $161,850,044 |
| Kimball Hill | 10/15/06 | 122 | $65,383,130[9] |

Finally, the Operating Agreement sought to provide for the engineering, design and construction of major on-site infrastructures and the preparation and recordation of appropriate architectural guidelines for the overall development.

In summary, the South Edge concept involved the general purchase of the BLM property through the Land Financing arrangements, that the individual Members would incrementally purchase their PODS or "super pads" for re-sale or individual residential and commercial development, and that Major Infrastructure costs were apportioned among the Members as Takedowns progressed.

Financing Arrangements

To partially finance the purchase and development of the property, South Edge took out loans through a "Credit Agreement" totaling $585,000,000. A syndicate of lenders provided the funds and JPMorgan Chase Bank, N.A., served as administrative agent for the credit facility.

South Edge, not its Members, is the borrower under the Credit Agreement. As a result, the Operating Agreement contains various provisions obligating the Members to contribute capital for South Edge to satisfy its obligations to the lenders. Section 11.1.12 of the Operating Agreement makes it an Event of Default for a Member to breach its Acquisition Agreement or

---

[9] Schedules are set forth in Exhibits 065, 066, 067, 068, 070, 071, 071A, 074, and 076 respectively.

13

cause South Edge to default under its obligations to the Lenders under the Credit Agreement and the other loan documents.  Accordingly, Section 2.3.2 of the Operating Agreement requires the Members to make capital contributions to South Edge as necessary for South Edge to hold a three month interest reserve, Section 2.3.3 requires Members to pay their respective shares of all amounts due under the Credit Agreement, including principal, fees and interest, and Section 6.11.5 requires Members to comply with their respective takedown schedules.  The mechanics of this process are discussed below.

To repay the land financing loan principal, the basic Credit Agreement as revised provides that each time a Member makes a Takedown, South Edge must pay the Lenders a portion of the purchase price paid by the Member to South Edge for that takedown, a sum which is referred to as the "Release Price."  Upon receipt of payment of the Release Price, JPMorgan must release the lien created by a Deed of Trust on that parcel.  To provide security for repayment of the loans under the Credit Agreement, South Edge executed in favor of JP Morgan:

A.  A Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents and Leases dated as of October 29, 2004;

B.  An assignment of Contracts, Permits and Plans and Specifications dates as of November 1, 2004;

C.  An Assignment with Respect to the Acquisition Agreements dated as of November 1, 2004;

D.  A UCC Financing Statement.

<u>Management Committee</u>

14

CONFIDENTIAL

Managers appointed per NRS 86.291(3) by the Members of South Edge serve as a Management Committee to govern the conduct of project development. The Operating Agreement requires attendance by Managers representing at least three Members holding in the aggregate at least 60% of the Percentage Interests to constitute a quorum. (Operating Agreement, section 5.2.4). The Management Committee must act by the affirmative vote of the Managers representing a majority of the Percentage Interests (Operating Agreement, section 5.1.1), except in certain circumstances requiring affirmative action by a "supermajority" [75% of the Percentage Interests] (Operating Agreement, sections 5.1.1, 2.4.3.2).

The Operating Agreement also provides that the Management Committee shall determine the amounts of Capital Contributions required of each Member for the payment of the expenses of the Company authorized from time to time by . . . the Management Committee. (Operating Agreement, section 2.3.1). The Operating Agreement thus provides for the Committee to make "capital calls" for various purposes such as on-going development costs, payments of interest or principal in connection with the Land Financing, maintaining interest reserves, payments to fund Management Fees, as well as payments of ongoing post-auction planning, engineering, legal and other incidental expenses. The respondents in this case contend that these expense and loan obligations are not self-executing to the Members as asserted by claimants, but are conditioned upon the issuance of capital calls by the Committee. Thus, if a Member fails to make a capital call contribution, a "contributing member" shall have the right to give written notice of default and provide a notice to cure. Failure to cure can result in a divestiture or forced sale to the other Members. Whether capital calls are required as a condition to declaring a Member in default is vigorously contested in this case. Claimants contend that, with or without a formal call for

15

capital, Managers are required under the Operating Agreement to take whatever action is necessary to prevent defaults under the various financing arrangements entered into on behalf of South Edge. Failure to do so, they reason, is an act of default by the Member that appointed the Manager.

As noted, Takedown payments to South Edge were to be made per individual schedules—some of the Members were required to participate in only a single takedown event and others, based upon the scope and timing of their individual developments, were allowed multiple takedown events. Under section 2.3.6 of the Operating Agreement and Section 7.03(b)(iii) of the Credit Agreement, each member is required as part of individual initial Takedowns to pre-fund South Edge development costs, including interest due under the Credit Agreement, by either obtaining a letter of credit in favor of or depositing cash collateral with the Administrative Agent, depending upon the existence or level of a "rating" under either Moody's or Standard and Poors. These payments included funding for "major infrastructure costs and "were paid into a third party account called an "MCD Account," via "MI (Major Infrastructure) deposits." Major infrastructure costs included such things as sewer and utilities.

<u>Inspriada history—claimed defaults and litigation</u>

As indicated, the first Takedowns for all of the Members except Pardee were scheduled for October 15, 2006. Its initial Takedown was set for October 15, 2007. For reasons not relevant to this dispute, on or about November 28, 2006, the Lenders, South Edge and its Members agreed to extend the first Takedowns for all Members, except Meritage, Beazer and Pardee, to April 15, 2007. This arrangement re-set the Meritage and Beazer Takedowns for October 15, 2007, and re-set the Pardee Takedown for April 15, 2008. In order to accomplish

16

CONFIDENTIAL

these changes, the parties executed individual First Amendments to Purchase and Sale Agreements and Joint Escrow Instructions (the First Amended Acquisition Agreements).[10] Including the April 15, 2007, transactions, the first amendment of the Takedown schedules created an entirely new set of Takedown dates as follows:

| Member | Takedown date(s) | Acres |
|--------|------------------|-------|
| KB | 4/15/07 | 331 |
| | 4/15/08 | 131.83 |
| | 4/15/09 | 483.16 |
| Toll | 4/15/07 | 97.65 |
| | 4/15/08 | 107.81 |
| Beazer | 10/15/07 | 50.39 |
| Woodside | 4/15/07 | 158.97 |
| Meritage | 10/15/07 | 69.92 |
| Pardee | 4/15/08 | 95 |
| Focus | 4/15/07 | 303.5 |
| Kimball Hill | 4/15/07 | 122.84[11] |

On March 9, 2007, each member signed a Second Amendment to Purchase and Sale Agreement and Joint Escrow Instructions (Second Amended Acquisition Agreement) that further amended

---

[10] Section 8 of the Assignment Agreement with the Lenders requires Members to seek approval of JP Morgan before undertaking to amend, modify, supplement or terminate Acquisition Agreements—this encompasses changes in the Takedown Schedules.

[11] Consent to amend and amended schedules are set forth in Exhibits 241-249.

17

CONFIDENTIAL

the Takedown schedules with the consent of the Lenders acting through their Administrative Agent, JP Morgan.  The new schedules were established as follows:

| Member | Takedown date(s) | Acres |
|---|---|---|
| KB | 4/15/07 | 129.2 |
| | 10/15/07 | 162.92 |
| | 4/15/08 | 99.94 |
| | 10/15/08 | 81.06 |
| | 4/15/09 | 373.11 |
| | 10/15/09 | 100.15 |
| Toll | 4/15/07 | 31.14 |
| | 4/15/08 | 30.12 |
| | 10/15/08 | 50.09 |
| | 4/15/09 | 72.41 |
| | 10/15/09 | 21.73 |
| Beazer | 7/15/08 | 50.4 |
| Woodside | 4/15/07 | 61.47 |
| | 4/15/08 | 41.4 |
| | 10/15/08 | 56.13 |
| Meritage | 4/15/07 | 27.66 |
| | 4/15/08 | 41.3 |
| Pardee | 4/15/08 | 50.48 |
| | 10/15/08 | 45.23 |

18

CONFIDENTIAL

| | | |
|---|---|---|
| Focus | 10/15/07 | 304.52 |
| Kimball Hill | 4/15/07 | 46.12 |
| | 10/15/07 | 15.91 |
| | 4/15/08 | 60.83[12] |

In accord with the amended schedules, on April 15, 2007, KB "took down" 129.2 acres; Toll, 31.14 acres; Woodside, 61.47 acres; Kimball Hill, 46.12 acres; and Meritage, 27.66 acres. In exchange, these members ultimately obtained clear title from JP Morgan. Delays in closing occurred related to documentation concerning closing and MI deposits, and transfer taxes inappropriately assessed by the Clark County Recorder, but were unrelated to the ability of the Members to deposit the necessary funds into escrow which occurred within the applicable deadlines.

KB and Kimball Hill completed their October 15, 2007, Takedowns on schedule, KB acquiring an additional 162.92 acres and Kimball Hill acquiring an additional 15.91 acres.

During this process, Focus negotiated an extension of its sole Takedown to October 15, 2007. Over time prior to the amended Takedown date, numerous discussions took place concerning the constriction of the credit market during the summer of 2007 and Focus's ability to perform. It was eventually compelled to assemble a financing package with multiple lenders under fairly onerous terms to proceed with its Takedown (purchase price and MI deposit). Although Focus has argued that it was prepared to close on the scheduled date, it sought relief from the Management Committee by way of a 15 day delay per Section 9.01(1) of the Credit Agreement (the "grace period"). In response to Focus's failure to close on the specific closure

---

[12] Schedules are set forth in Exhibits 298, 299, 301, and 310-315.

CONFIDENTIAL

date, the Management Committee sent Focus a notice, dated October 22, 2007, claiming failure to close was an "immediate Event of Default" under the Operating Agreement and gave Focus five business days to cure by completing the Takedown. Focus complied and completed its Takedown on October 25, 2007, at a cost, via a mixture of cash and financing, of $122 million (purchase price of about $91.2 million and $30.7 million in MI funds). It has made other capital contributions totaling $49,477,642.00.

Respondents contend that the Management Committee insisted upon strict compliance with the Acquisition Agreement because an October 31 deadline on the current Credit Facility "B" was looming; and because Focus was realizing substantial financial advantages from fees paid to its affiliates, the Holdings Manager and the Construction Manager, without having purchased its parcel. It turns out that a return on the investment occurred very shortly thereafter on October 30, when Focus sold a portion of its Takedown parcel to Stations Casinos for approximately $71 million. Focus claims that the intransigence of respondents caused it to unnecessarily expend about $1.3 million in "bridge" loan costs that could have been avoided by use of the Credit Agreement grace period at least up and until the Station's sale. Focus also contends that respondents' intransigence was in part based upon a scheme to oust Focus from Inspirada, revealed later when Focus discovered that KB and Toll had made a proposal to JP Morgan to take over Focus's position in the event of default. According to evidence submitted at the hearing, these respondents projected a profit from the takeover of some 72 million dollars. Focus finally contends that respondents forced the Takedowns knowing that in short order they would discontinue South Edge for purely individual economic reasons. In any case, the

20

purported takeover never occurred and, as stated, Focus successfully closed escrow on the Takedown on October 25, 2007.

As of December 31, 2007, all of the Members required to purchase parcels under the Acquisition Takedown schedules had done so. In the wake of precipitous decline in the national and local real estate markets, Kimball Hill and Woodside ultimately defaulted and could no longer participate in the development. This placed the entire Credit Facility in default and, in March of 2008, JP Morgan indicated that it would not fund an impending loan draw. On March 10, the Management Committee determined that it would not pay the February 2008 interest payment on the Credit Facility, which caused JP Morgan to issue a formal notice of default of that same date. At or about the same time, a controlling majority of the Management Committee refused to issue capital calls to either maintain interest reserves or pay financing interest, and voted to cease work on the Inspirada project. The decisions to suspend payments and work on the project stemmed from the evaporating commercial viability of the project and, the respondents posit, Members of the Committee felt it irresponsible to continue incurring expenses without providing funds to pay the vendors.

Respondents urge that Woodside's notice that it would not consummate its April 2008 Takedowns and Kimball Hill's refusal to fund ongoing operations, along with the declining cash position of the project, created an untenable situation. Thus, the Management Committee voted a series of Takedown extensions without seeking approval of JP Morgan. At this point, however, Focus was the only Member to have fully completed all of its Takedown obligations and was the only Member that had fully advanced MI funds and its portion of the financing interest.

21

CONFIDENTIAL

In April of 2008, Meritage attempted to consummate its Takedown but, given that the entire project was in default, JP Morgan refused to release its lien against the Meritage parcel. Accordingly, Meritage withdrew the Takedown escrow deposit. Upon failures to make the March and April interest payments, the Members undertook an effort to re-structure the entire loan arrangement. In aid of this effort, South Edge and its Members entered into a May 27, 2008, "Forbearance Agreement," under which the interest and reserves were brought current and the Takedowns postponed to June 30, 2008, the so-called "forbearance period." Although the parties had to concede the default status of the loans, this measure temporarily postponed any breaches stemming from financing defaults. The negotiations failed and South Edge has made no payments to either fund credit reserves or interest payments and has not resumed development of the project. Additionally, none of the April 2008 Takedowns have gone forward and all of the subsequently scheduled Takedown dates have been extended by joint resolution of the Management Committee, Focus and Meritage being the only dissenters. None of the extensions beyond June 30, 2008 have been approved by JP Morgan.[13]

Focus initially notified respondents of their alleged defaults in financing and development of the project by correspondence dated March 28, 2008.

It is important to note that the actual development of South Edge has gone forward with regard to the initial Takedown parcels. But the development is staged in increments for portions of the development called "Villages." Two of the villages have been developed with major

---

[13] The Meritage withdrawal of the Takedown deposits, according to Focus, was related to the delays afforded under the forbearance agreement. Meritage has always asserted its rights to effect the April Takedown, regardless of that arrangement. After the expiration of the forbearance period, Meritage has indicated a willingness to close its Takedowns, has received less than an enthusiastic response, if any, and has not taken any formal steps since June 30, 2008 to effect its April 2008 Takedown.

22

CONFIDENTIAL

infrastructure improvements.  Almost all of the land allotted to Focus is located in "Town Center," where no major infrastructure exists although the same was scheduled and planned.  As Focus is in the business of developing real estate, there is no realistic ability to pursue that business purpose unless the major infrastructures are installed.

On December 5, 2008, JP Morgan filed 14 legal actions related to the project, seven in the Southern District of New York and seven in the District of Nevada.  Venue of the New York actions was transferred to Nevada.  The presiding federal judge in the District of Nevada granted in part and denied in part respondents' motion to dismiss the actions.

In April of 2009, Focus, Mr. John A. Ritter (CEO of Focus) and JP Morgan entered into a Cooperation and Settlement Agreement (Exhibit 1143), as follows:

> 1.  Focus and Ritter agreed to commence and diligently prosecute to completion an arbitration against the other "Members" of South Edge in consideration for several payments and promises from JP Morgan;

> 2.  Focus and Ritter agreed to seek specified "Minimum Arbitration Relief,' including specific performance of the Takedowns;

> 3.  Focus and Ritter agreed to consult with JP Morgan regarding the arbitration;

> 4.  JP Morgan agreed to "support" Focus and Ritter in the arbitration, including subordination demands against the Members and testimony on behalf of Focus;

> 5.  JP Morgan agreed to pay Focus $1,000,000.00 for prosecution of this arbitration, and to pay $2,000,000 for development costs to be used at Focus's and Ritter's discretion;

> 6.  JP Morgan agreed to pay Focus and Ritter up to $8,000,000.00 upon successful completion of the arbitration;

> 7.  JP Morgan agreed to forbear from using Focus's portion of South Edge's Cash Collateral to pay Secured Obligations under the Credit Agreement so long as Focus continued to prosecute this arbitration;

23

CONFIDENTIAL

8.  Focus, Ritter and Holdings Manager agreed to assign a portion of the South Edge Management Fee to JP Morgan;[14]

9.  Focus and Ritter agreed that JP Morgan had the sole discretion to accept or reject settlement offers made in the arbitration.  Should either Focus or Ritter accept an unapproved settlement, it would be required to return monies received under the Cooperation Agreement and Mr. Ritter would lose the benefit of the release of certain liabilities made thereunder.  *Id.*

On May 12, 2009, Focus sent second notices of default to each respondent.  And, on May 26, 2009, it convened a Management Committee Meeting as the sole attending Member of South Edge at which it unilaterally declared a quorum and voted to commence this arbitration.

Pertinent excepts from the various agreements.

OPERATING AGREEMENT PROVISIONS

### 1.2  PURPOSE; POWERS

The primary purposes and objectives of the Company shall be to:  (a) provide a vehicle and a process for the Members to make a joint bid at the . . . [BLM] auction to be held in June 2004 . . . (b) if the Company's bid at the Auction is successful, to formulate a conceptual plan for the development of the Subject Property, obtain necessary approvals and authorizations for the subdivision of the Subject Property into the Pods (as hereinafter defined), to design and install certain infrastructure improvements, and allocate and convey the Subject Property to the Members in proportion to their respective Percentage Interests and the terms of this agreement . . . .

### 1.6  TITLE TO PROPERTY

At all times after the Effective Date, any and all real and personal property acquired by the Company, including, without limitation, cash, improvements to property and tangible or intangible property ("Property"), shall be held, and owned by and conveyed in the name of the Company as an entity, and not in the

---

[14] Paragraph 4(d), Cooperation and Settlement Agreement, Exhibit 1143, notwithstanding Holdings Manager is not a party to the agreement.

24

name of any Member, provided, however, that if the Company's bid at the Auction is successful then the Subject Property shall be allocated among the Members and conveyed to the Members in accordance with the terms of this Agreement and the Acquisition Agreements . . . .

SECTION 2.1.11 [DEFINITION OF LAND FINANCING]
"Land Financing" means any borrowing by the Company to finance a portion of the BLM Purchase Price and/or the development and improvement of the Subject Property . . . that will be secured by the Subject Property, and will be outstanding from the closing of the purchase of the Subject Property from BLM until the conveyance of the Pods to the Members when the Members' Conveyance Payments will be applied in part to pay off such borrowings and he Pods will be released from the Land Financing lien at release prices equal to par.  (As amended)

## 2.2  INITIAL CAPITAL CONTRIBUTIONS [As amended ]

Each Unit shall be issued to the Members in consideration for the Capital Contributions provided for in this Agreement.  Each Member shall be issued Units (and accordingly shall hold its Percentage Interest in the Company) in direct proportion to the "Adjusted Gross Acreage" (as defined in the Acquisition Agreement) of the Subject Property which has been allotted to the Member to acquire ("Member Acreage Allotment") as set forth in the Preliminary Pod Allocation Map (attached hereto as Appendix B), which incorporated herein and subject to adjustment pursuant to Section 6.11.2.  The total of all of the Member Acreage Allotments equals the total Adjusted Gross Acreage of the Subject Property.  All payments by a Member pursuant to Sections 2.2 and 2.3 shall be deemed applied on account of the Purchase Price (as defined in the Acquisition Agreement) for Pods that it acquires under this Agreement and its respective Acquisition Agreement.

The name, address, initial Capital Contribution, initial Units and initial Percentage Interest of each Member are set forth in Schedule II.   The Management Committee shall amend Schedule II from time to time (including without limitation, to adjust the relative Units and Percentage Interests of the Members set forth thereon) to reflect the admission of additional Members, transfers among Members or changes to the relative Member Acreage Allotment pursuant to this Agreement.  Except for the letter of credit which a Member may deliver pursuant to its Acquisition Agreement and which shall be treated as a Capital Contribution by such Member, the initial or additional Capital Contributions of a Member shall consist of cash.  The amount of the initial capital contribution to be made by each Member and the payment schedule are as follows:

25

2.2.1   Initial Funding.   Each Member has contributed, Six Hundred Dollars ($600.00) for each acre (pro-rated for any fractional acre) in the Member Acreage Allotment ("Initial Payment").

2.2.2   Interim Payment.   Five Thousand Dollars ($5,000.00) for each acre . . . due and payable by each Member to the Company no later than May 1, 2004.

2.2.3   Bid Payment.   The bid payment (the "Bid Payment") for each Member shall be due and payable no later than the later to occur of May 15, 2004 or the date the Maximum Bid is determined in accordance with this Agreement. The amount of the Bid Payment for each Member shall be determined pursuant to Section 5.10. . . .

2.3   In addition to the initial Capital Contributions of the Members, if the Company is the successful bidder at the Auction, the Management Committee shall determine the amounts of additional Capital Contributions required of each Member for the payment of the expenses of the Company authorized from time to time by the Business Plan or by the Management Committee, which shall be payable as follows:

2.3.1   Post-Auction Capital Calls For Expenses.
The Management Committee shall provide in the Business Plan or by vote of the Management Committee the amounts necessary from time to time to fund post-Auction planning, mapping, engineering, legal, and other costs and expenses authorized to be incurred by the Company.   The General Manager shall issue notices to each Member calling for Additional Capital Contributions in the amounts determined by multiplying the post-Auction costs by each Member's Percentage Interest.   Each Member shall pay the full amount of each capital call under this Section 2.3.1 no later than (10) days after the date of the notice.

2.3.2   Closing Payment.   [As amended]
Each Member shall pay to the Company the sum of the Member's Percentage Interest of the following amounts:   (a) the BLM Purchase Price less the amount paid by the Company for the BLM Deposit and less the net proceeds of the Land Financing; and (b) aggregate payments payable pursuant to the Land Financing for the six month period following the closing of the purchase of the Subject Property from BLM as projected in the Business Plan (collectively, the "Closing Payment").   [The amendatory language added is as follows] *The Closing Payment is due and payable no later than the date which is one (1) business day prior to the date scheduled by the Management Committee for the closing on the Subject Property.   It is anticipated that the closing shall occur on or about*

26

CONFIDENTIAL

*November 1, 2004. The General Manager shall deliver written notice to each Member of the date upon which the Closing Payment shall be due and the amount of said Member's Closing Payment no less than five (5) business days prior to said due date. Thereafter, throughout the term of the Land Financing, the Member shall make such capital contributions to the company as may be necessary so that the Company shall at all times be holding in reserve a sum equal to a no less than three (3) months of aggregate interest payments payable under the Land Financing.* (Emphasis added.)[15]

2.3.3  <u>Financing Payments; Guarantees</u>.  In the event the Company shall obtain the Land Financing and/or any other loans or financings from time to time as such is approved by the Management Committee, each Member shall pay to the Company the Member's Percentage Interest multiplied by the sum of all principal, interest, points, advisory fees, and other charges, fees, costs, and expenses coming due thereunder or in connection therewith from time to time to the extent not otherwise covered by the proceeds of refinancing or other revenues directed by the Management Committee for the payment thereof in accordance with the Business Plan unless otherwise approved by the Management Committee by affirmative vote of Managers representing a Supermajority.  <u>Each Member shall pay the full amount of each capital call under this section 2.3.3 no later than ten (10) days after the date of the notice thereof issued to the Members by the General Manager unless otherwise directed by the Management committee.</u>  To the extent required by any lender of the Land Financing as such is approved by the Management Committee pursuant to sections 5.1.1 and 5.1.2 (f), each Member and any Affiliate of such Member (other than such Affiliate who is a natural person) shall guaranty to the lender or lenders of the Land Financing, payment of such Member's Percentage Interest of all obligations of the Company to such lender or lenders; provided, however, that the amount payable by a Member shall not exceed (and shall be limited by the terms of any such guaranty to) such Members Percentage Interest of the Land Financing and other charges, fees, costs, and expenses referred to above, and that such guaranty shall be several, and not joint and several with the other Members and shall be based on a declining outstanding loan balance.  Notwithstanding the foregoing, in lieu of providing such guaranty, any Member may provide an alternate form of credit enhancement so long as it is acceptable to the lender or lenders of the Land Financing.  The Land Financing shall provide for the Pods to be released from the Land Financing lien at release prices equal to par and the guarantees of the Members to be released upon payment of such release prices.  Notwithstanding anything herein to the contrary, the Company will not obtain any financing that would require the personal guaranty of any natural person. (Emphasis added.)

---

[15] The point of contention here is the member's obligation to pay in the absence of a capital call by the Mangement Committee.

27

CONFIDENTIAL

2.3.4 <u>Conveyance Payment</u>. [As amended]  Upon the conveyance to each Member of its respective Pod or Pods within the Subject Property to be conveyed to such Member in accordance with the terms of this Agreement and the applicable Acquisition Agreement, such Member shall pay to the Company the "Purchase Price" due under such Acquisition Agreement ("Conveyance Payment").  Each Member shall have made all capital contributions required to date under this Agreement as of each Takedown as a condition of such Member acquiring its respective Pods in that Takedown.  All Capital Contributions of a Member that are credited against the Purchase Price (i.e. paid to the Company on account of such Purchase Price) to be paid pursuant to the applicable Acquisition Agreement, then shall, upon closing of the acquisition of a Pod pursuant to the Acquisition Agreement, be deemed to have been distributed to such member as a return of such capital contributions equal in amount to such credit, <u>provided, however</u>, that if pursuant to the Acquisition Agreement such member receives a credit against the Purchase Price for future progress payments due pursuant to Section 3.c of the Acquisition Agreement, such Member shall not be credited with a Capital Contribution or be deemed to have received a return of such Capital Contribution until such time as such progress payment is actually made under the Acquisition Agreement.  In addition to the foregoing, the Members acknowledge that the net cash portion of any conveyance Payment paid by a Member under its Acquisition Agreement (i.e., after application of the credits applied to such Conveyance Payment under the Acquisition Agreement) shall for purposes of this Agreement be allocated by the Company as follows: (i) first, to pay the release price due under the Land Financing, (ii) second, to satisfy any obligations to fund the MCD Account, . . .

2.3.6 <u>Major Infrastructure Payments</u>. [As amended]  Each Member shall be responsible for the payment of that portion (the "Member Costs") of the "Major Infrastructure Cost" (as defined in the Acquisition Agreement) as is set forth in Section 3 of the Acquisition Agreement, which obligation to contribute the Member Costs shall survive any Phase Close of Escrow (as defined in the Acquisition Agreement) and continue for each Member notwithstanding the termination of the Acquisition Agreement of such Member or the rights of such Member thereunder.  Each Member shall also be responsible under its Acquisition Agreement to establish any required "Builder MI Deposit" (referred to herein as the Member Cost Deposit") at the time and in the manner provided in such Acquisition Agreement . . . .  No material expenditures for Major Infrastructure Costs shall be made except pursuant to the Business Plan or as approved by the Management Committee.  From and immediately upon the first incurrence of Major Infrastructure Costs, until the expiration of the "Initial Payment Period" (as defined in each Member's Acquisition Agreement), each member shall, in

28

accordance with its Acquisition Agreement, deposit into the MCD Account on a monthly basis, in cash or immediately available funds, the portion of the Member Costs required for the payment of Major Infrastructure Costs. . . .

### 2.4 FAILURE TO MAKE CAPITAL CONTRIBUTIONS [As amended]

A Member that fails to make any portion of such Member's Capital Contribution as required by Section 2.2 or Section 2.3 shall be considered a "Defaulting Party" hereunder and shall also sometimes be referred to herein as a "Non-Contributing Member".  Any Member which has made all of its required payments ("Contributing Member") shall have the right to give written notice of any such failure to the Defaulting Party.  The Defaulting Party shall have five (5) business days from the date of such written notice to cure such default (the "Cure Period") by providing payment in full of all amounts which are due and payable (the "Deficiency").  Further, if a Member commits an event of Default (defined below) under Section 11.1.12, such Member shall also be considered a Defaulting Party hereunder.  The Members acknowledge and agree that in light of the purposes of the Company, the funding deadlines imposed on the Company inherent in the process of the Auction, the Company's obligation to close the purchase of the Subject Property from the BLM, and the necessity of the Members acquiring their Pods in accordance with their respective Acquisition Agreements so as to permit the Company to satisfy its obligations under the MI Financing, that the remedies provide by Sections 2.4.1 and 2.4.2 are necessary and reasonable to allow the other Members to have a reasonable opportunity to satisfy the foregoing obligations of the Company.  Monetary damages would be impractical to calculate and unlikely recoverable from the Defaulting Party in light of the potential magnitude of such damages and the remedies provided herein are reasonable in light of the cost of the remedy to the Defaulting Party balanced against the potential damages to the other Members and the Company.

2.4.3.2 <u>Additional Remedies</u>.  The foregoing remedies are not intended to be exclusive, and the Company may pursue such other remedies, including, without limitation, the initiation of legal proceedings, that the Management Committee determines by affirmative vote of the Managers representing 75% of the Percentage Interests held by Members other than the Non-Contributing Member.

### 5.1. MANAGERS; MANAGEMENT COMMITTEE

5.1.1. <u>Management Committee; Voting</u>.  Except as otherwise provided in this Agreement, the Members agree that the management of the Company shall be exclusively vested in a management committee (the "Management Committee").  Each Member (including the Focus Member) shall **have** the exclusive right to

29

appoint one member of the Management Committee. The Members of the Management Committee are referred to herein as the "Managers." Each Manager shall have a vote equal to the Percentage Interest of the Member which appointed such Manager. . . . Except as otherwise provided in the Agreement, the Management Committee shall act by the affirmative vote of Managers representing a Majority. With respect to the matters set forth in Sections 5.1.2 (a), (c) (d) (e) (f) (i) and (j), the Management Committee shall act by affirmative vote of the Managers representing a Supermajority. The General Manager shall not be a member of the Management Committee. (Emphasis added.)

5.1.2 Powers [of the Management Committee] Without limiting the general power and authority of the Management Committee as set forth in Section 5.1.1 of this Agreement, the Management Committee shall: . . .

f. If the Company submits the successful bid at the Auction, approve the terms and conditions of the Land Financing and any amendments thereto. . . .

h. Approve actions authorized under Section 2.4 [relating to failures to make capital contributions].

5.1.6 <u>Authority of Managers</u>. Each Manage shall have the decision making authority on behalf of the Member which appointed such Manager and without limitation of the foregoing, each Manager shall have the authority to cast the vote of such Member in any vote of the Members.

5.2.4 <u>Quorum</u>. Managers representing at least three Members which hold at least 60% of the Percentage Interests, acting either in person or represented by proxy, shall constitute a quorum for the transaction of business by the Management Committee.

**6.1** [Members] **RIGHTS OR POWERS**

The Members shall not have any right or power to take part in the management or control of the Company or to act for or to bind the Company in any way. Notwithstanding the foregoing, the Members shall have all of the rights and powers specifically set forth in this Agreement and, to the extent not inconsistent with this Agreement, in Chapter 86 of the NRS.

6.3.3 <u>Quorum</u>. Members holding at least 60% of the Percentage Interests shall constitute a quorum for the transaction of business by the Members. Each Member shall be entitled, acting either in person or represented by proxy, to vote in proportion to each Member's Percentage Interest.

**6.4 WITHDRAWAL; RESIGNATION**

30

Except as otherwise provided in this Agreement, no Member shall demand or receive a return on or of any Capital Contribution or withdraw from the Company without the consent of all Members. No Member shall have the right to retire, withdraw or resign except as specifically permitted by the terms of this Agreement. The retirement, resignation or withdrawal of a Member shall not relieve the Member from any obligations which survive termination of its status as a Member or which relate to any periods prior to its retirement, resignation or withdrawal.

### 6.11. ALLOCATION AND CONVEYANCE OF THE SUBJECT PROPERTY

6.11.1 Allocation. If the Company's bid at the Auction is successful, the Pods will be allocated among the Members in accordance with the Preliminary POD Allocation Map attached hereto as **Appendix B**, which map shall be subject to modification from time to time by the Management Committee of the Members in the manner provided in Section 9, it being understood by the Members that the allocations contemplated by the Preliminary POD Allocation Map are subject to modification based on changes required by the City of Henderson and other variables and contingencies as determined by the Management Committee. Such reallocation shall not result in a change in a Member's allocation that is material and adverse to such member, taking into account all Members' allocations, without such Member's consent which shall not be unreasonably withheld or delayed. The Member Acreage Allotment, Units, Percentage Interests, and Capital Contributions and other payments by the Members shall be adjusted accordingly from time to time in proportion to actual Pod allocations.

6.11.2 Conveyance. [As amended] The Company will purchase the Subject Property from BLM and convey the Pods to the Members pursuant to the allocation provided for in Section 6.11.1. . . .

6.11.3 Acquisition Agreements. [As amended] After the Pods are allocated but before conveyance, each of the Members shall enter into an acquisition agreement (each an "Acquisition Agreement") with the Company which shall evidence the unconditional obligation of the Member to acquire its allocated Pods. The final form of each Acquisition Agreement executed by the Company and each Member shall be uniform (excepting the identification of the acquirer, the identification of the lands to be acquired, and such other terms as shall reasonably require distinction due to the unique circumstances of each such transaction) and each respective Acquisition Agreement shall be prepared and approved by the Management Committee in advance of the execution thereof by any of the Members and shall be substantially in the form of Schedule III hereto. Any material modifications to the Acquisition Agreement form or to any executed Acquisition Agreement shall be subject to approval by the Management

31

Committee. The Acquisition Agreements shall not prohibit or restrict a Member from conveying any Pod or portion thereof acquired by such Member to another merchant builder provided that such Member complies with Section 10.7.2. (Emphasis added.)

Section 6.11.5 [As amended]

Closing. The closing of all of the conveyances to the Members shall occur either in a single "Takedown" or in Multiple "Takedowns" pursuant to the "Takedown Schedule" as defined in and in accordance with the Acquisition Agreement. It shall be a condition of closing for the benefit of the Company with respect to each Member that such Member shall have made all payments required under this Agreement and is in compliance with all other obligations under this Agreement and no default or Event of Default shall exist with respect to such Member or would exist with notice and/or the passage of time.

## 11. DEFAULT

### 11.1. EVENTS OF DEFAULT

Upon an Event of Default on the part of the General Manager or any Member, the Company, acting by and through the General Manager or any Member, but in either case, only after authorization by the Management Committee (by affirmative vote of the Managers representing a majority of the Percentage Interests held by Members other than the Defaulting Party or by its Affiliate), may provide written notice of the Event of Default (the "Default Notice") to the defaulting General Manager, [or] Member . . . and to the Company and the non-defaulting Members and the Company may exercise any remedies available to the Company on account of such Event of Default provided in this Agreement or by law or in equity. For the purposes of this Agreement, an "Event of Default" shall mean any of the following:

11.1.1  Deficiency.  A failure of such Defaulting Party to make any Capital Contribution required pursuant to any provision of this Agreement and such failure within any applicable cure period provided for in this Agreement.

11.1.12 [Added by amendment]

[An "Event of Default" shall mean any of the following:]  Default under the Loan Documents or Acquisition Agreement. A default by such Defaulting Party under its respective Acquisition Agreement or an act or omission which causes the Company to be in default under any Loan Documents, and the failure to cure such default within the applicable  cure period if any, under either the Acquisition Agreement or the Loan  Documents, respectively.

32

## 11.2 AVAILABILITY OF REMEDIES

To the extent applicable the Company shall have the rights and remedies provided under Section 2.4 in addition to those under this Section 11. . . . [N]otwithstanding the election of the Company or a non-defaulting Member to pursue any rights under this Section 11 or section 2.4, the Company or the non-defaulting Members may seek action to enjoin the Defaulting Party, seek to obtain specific performance of the Defaulting Party's obligations, seek to obtain any and all damages, losses and expenses (including without limitation, reasonable attorneys' fees and disbursements) suffered or incurred by the Company as a result of such Event of Default (collectively, the "Damages") against the Defaulting Party or resort to any  of the other remedies then available to the Company or any of the non-defaulting Members.

Without limitation of the foregoing, upon any Event of Default and continuing until cure pursuant to the terms of this Agreement, neither the Defaulting Party nor the Manager appointed by the Defaulting Party shall have any voting rights hereunder and, not withstanding anything in the Agreement to the contrary, such Defaulting Party and its Member shall not be considered for purposes of satisfying any quorum, voting, or approval requirements, including, without limitation, any requirement for unanimous approval.

## 15.12 SPECIFIC PERFORMANCE

Each Member agrees with the other Members that the other Members would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy such event.  Accordingly, it is agreed that, in addition to any other remedy to which the nonbreaching Members may be entitled, at law or in equity, the nonbreaching Members and the General Manager shall be entitled to injunctive and other equitable relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court under Section 15.9.

## 15.15 CREDITORS

None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company, any Manager or any Member.

CONFIDENTIAL

ACQUISITION AGREEMENT PROVISIONS

21. <u>Remedies.</u>Each of the covenants of the Parties under this Agreement is a material consideration for this Agreement, the breach of which shall be deemed a default hereunder. <u>Each of the Party's rights and remedies under this Agreement shall be cumulative and no one of them shall be exclusive of the others</u>. (Emphasis Added.)

a. <u>REMEDIES FOR DEVELOPER.</u>

i. NOTWITHSTANDING THE FOREGOING, IF A PHASE CLOSE OF ESCROW FAILS TO OCCUR DUE TO BUILDER'S DEFAULT UNDER THIS 21 <u>a.ii</u> DEVELOPER SHALL RETAIN THE "LIQUIDATED SUM" (DEFINED BELOW) AS LIQUIDATED DAMAGES. IN CONNECTION THEREWITH, THE PARTIES ACKNOWLEDGE THAT IF SUCH A DEFAULT OCCURS, DEVELOPER WILL BE DAMAGED AND WILL BE ENTITLED TO COMPENSATION FOR THOSE DAMAGES. SUCH DAMAGES MAY, HOWEVER, BE EXTREMELY DIFFICULT AND IMPRACTICAL TO ASCERTAIN FOR THE FOLLOWING REASONS: (1) THE DAMAGES TO WHICH DEVELOPER WOULD BE ENTITLED WILL BE BASED IN PART ON THE DIFFERENCE BETWEEN THE ACTUAL VALUE OF THE PROPERTY AT THE TIME SET FOR THE APPLICABLE PHASE CLOSE OF ESCROW AND THE PURCHASE PRICE FOR THE PROPERTY AS SET FORTH IN THIS AGREEMENT; (2) PROOF OF THE AMOUNT OF SUCH DAMAGES WILL BE BASED ON OPINIONS OF VALUE OF THE PROPERTY, WHICH MAY VARY IN SIGNIFICANT AMOUNTS; AND (3) IT IS IMPOSSIBLE TO PREDICT AS OF THE DATE ON WHICH THIS AGREEMENT IS MADE WHETHER THE VALUE OF THE PORPERTY WILL INCREASE OR DECREASE AS OF THE DATE SET FOR EACH APPLICABLE PHASE CLOSE OF ESCROW. DEVELOPER AND BUILDER WISH TO AVOID THE COSTS AND LENGTHY DELAYS WHICH WOULD RESULT FROM A LEGAL PROCEEDING BY DEVELOPER TO COLLECT ITS DAMAGES FOR THIS AGREEMENT. THEREFORE, IF ANY PHASE CLOSE OF ESCROW FAILS TO OCCUR DUE TO BUILDER'S DEFAULT UNDER THIS AGREEMENT, THEN DEVELOPER SHALL TREAT THE SUM (THE "**LIQUIDATED SUM**" REPRESENTED BY (1) THE DEPOSIT TO THE EXTENT NOT APPLIED TO THE PURCHASE PRICE AND (2) ALL AMOUNTS DEPOSITED TO THE MCD ACCOUNT BY BUILDER AS A REASONABLE ESTIMATE OF DEVELOPER'S DAMAGES. <u>AS SUCH, DEVELOPER'S SOLE AND EXCLUSIVE REMEDY IN THE EVENT OF THE FAILURE TO CLOSE ESCROW ON ANY PHASE RESULTING FROM BUILDER'S DEFAULT SHALL BE TO TERMINATE THIS AGREEMENT AND RETAIN THE LIQUIDATED SUM</u>. (Underlined emphasis added.)

34

Section 21 (a) iii.   <u>NO WAIVER OR LIMITATION OF RIGHTS OR REMEDIES UNDER OPERATING AGREEMENT</u>.   NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NOTHING HEREIN SHALL LIMIT OR RESTRICT, OR IN ANY WAY BE DEEMED A WAIVER OF, ANY OBLIGATIONS, RIGHTS OR REMEDIES OF DEVELOPER OR ANY MEMBER OF DEVELOPER SET FORTH IN THE OPERATING AGREEMENT.   DEVELOPER AND ITS MEMBERS MAY PURSUE ANY AND ALL OF THEIR RESPECTIVE RIGHTS AND REMEDIES UNDER THE OPERATING AGREEMENT WITHOUT REGARD TO WHETHER ANY RIGHTS OR REMEDIES HAVE BEEN PURSUED OR EXHAUSTED HEREUNDER.

Assignment Agreement provisions:

2.   <u>Assignment</u>.   As security for the payment and performance of the Secured obligations, now existing or hereafter arising, the Borrower hereby assigns, transfers, sets over and pledges to the Administrative Agent, and hereby grants to the Administrative Agent a security interest and Lien in, to and against, all of the Borrower's right, title and interest, powers, remedies, privileges and other benefits, whether now owned or hereafter acquired, in, to, and under the Acquisition Agreements.

3.   <u>Exercise of Assigned Rights</u>.   (a) Upon the occurrence and during the continuance of an Event of Default, The Administrative Agent shall have the right . . . (i) to enforce, for its own benefit, the rights and benefits of the Borrower in the Acquisition Agreements, (ii) to institute, appear in and defend any action or proceeding purporting to affect, enforce, adjudicate or determine the rights, powers, duties or obligations of the Borrower under the Acquisition Agreements . . . .

(b)   Each Member Party, upon written notice from the Administrative Agent of the occurrence of an Event of Default and during the continuance thereof, shall be and is hereby authorized by the Borrower to perform its obligations under its Acquisition Agreement for the benefit of the Administrative Agent in accordance with the terms and conditions thereof without any obligation to determine whether or not such an Event of Default has in fact occurred.

(c)   Subject to the limitations set forth in this Assignment Agreement and the other Loan Documents, for as long as no Event of Default shall have occurred and be continuing, the Borrower may exercise all of its rights and privileges under the Acquisition Agreement.

35

8.   Amendment to Acquisition Agreement:   Each Member Party agrees not to amend, modify, supplement or, except in accordance with the terms of its Acquisition Agreement, terminate its Acquisition Agreement without the Administrative Agent's prior written approval, which approval shall not be unreasonably withheld in the case of any amendment, modification or supplement but may be withheld in the Administrative Agent's sole discretion in the case of termination.

CREDIT AGREEMENT PROVISIONS

SECTION 7.03.   Fundamental Changes; Sales; Releases; and Release Price.
(a)   . . . The Borrower shall not amend, modify or terminate any Acquisition Agreement without the prior written approval of the Administrative Agent which (in the case of any amendment or modification, but not any termination) shall not be unreasonably withheld or delayed. . . .

SECTION 9.01   Events of Default.   If any of the following events ("Events of Default") shall occur: . . .
        (l) any Member shall fail to acquire a Phase within 15 days after the outside date provided therefor in its Takedown Schedule; provided, that the same shall not constitute an Event of Default if cured as provided in Section 9.07; . . .
        (o) . . . (ii) there is a cessation of construction of the Improvements for a continuous period of more than thirty (30) days . . . or (iii) the construction of the Improvements or sale of all or any portion of the Project in accordance with the Acquisition Agreements and Loan Document is prohibited, enjoined or delayed for a continuous period of more than thirty (30) days; . . .
        then . . . the Administrative Agent may . . . by by notice to the Borrower, . . . (ii) declare the Loans then outstanding to be due and payable . . . .

## VI.  CLAIMS OF THE PARTIES

It is fair to say that this dispute's *causa causans* was a decision made by the Management Committee of South Edge, LLC, in February-March, 2008, while staring into the maw of a real estate market collapse, to not make a capital contribution call on the "Members" of the South Edge development for debt service and to put the development of South Edge's master planned community project on hold by stopping development and by extending the time for the "Takedowns" of land - events that would also have triggered payment for the land taken down -

36

by those "Members." In play, materially although not exclusively, are the meaningful applications to be made of § 2.3 and its subparts, and §§ 11.1 and 11.2, of the development's Operating Agreement, as amended from time to time, and the authority of the Management Committee under that agreement. There are other provisions and other agreements – the parties' Acquisition Agreements, South Edge's Credit Agreement, and, on the sidelines, the Mass Grading Agreement – to name some but not all. There are e-mail chains or streams by the dozens, declarations, and the products of discovery, including deposition excerpts. There are mixed questions of fact and law, the collision of law and equity on contract performance, the common law of contracts and a variety of rules of contract construction   Most telling is the fact that there is virtually no dispute over the language of the various agreements invoked by the parties as dispositive of the issues raised in the case—and that all of the combatants in this matter have claimed victory as a matter of law based upon "the plain meaning" of the agreements as worded.

We therefore undertake the resolution of the factual disputes presented, including without limitation what the relevant provisions of the documents actually manage to say, how their provisions interrelate, and how the parties' history in applying them in the course of the development reflect their contractual intent.

Claimants' contentions

Claimants maintain that respondents, including Meritage, breached the Operating Agreement as a matter of law by defaulting on their obligations to continue development of the project, failing to fully fund their share of South Edge's interest obligations to its lenders and mandated interest reserves, and for failing to make their respective takedowns when required by their Acquisition

37

CONFIDENTIAL

Agreement takedown schedules. Claimants also assert the right to specific performance and damages.

<u>Respondents' contentions</u>

1. The Management Committee properly decided to stop calling for capital.

2. Focus may not obtain specific performance under either the terms of the agreements or the law of specific performance.

3. Focus has not received proper Management Committee approval to bring claims on behalf of South Edge under Section 11 of the Operating Agreement.

4. Focus's claims under the Acquisition Agreements fail because the rights to bring a South Edge claim were expressly assigned to JPMorgan.

5. The claims brought on behalf of South Edge will not benefit South Edge and would be contrary to the non-recourse nature of the deal in its entirety.

6. Focus's claims are a disguised challenge to the legitimate actions of the Management Committee so as to avoid the pitfalls of a proper "derivative" action.

7. Focus's and Holdings Manager's direct claims against respondents are meritless.

8. Focus has breached the Operating Agreement.

<u>Meritage claims</u>

Meritage claims that it was legally discharged from any further obligation under either the Operating Agreement or the Acquisition Agreement because: first, South Edge breached both agreements by failing to deliver the Meritage takedown property in April 2008 upon its tender of performance of its takedown obligations; second, Meritage caused no Events of Default broadly attributed to respondents, including the alleged failure to pay into the interest reserve account

38

prior to its takedown attempt in April of 2008; and third, Focus and South Edge failed to perfect claims against Meritage under the cure provisions of the agreements.

## VII. CONCLUSIONS ON CLAIMANT' CLAIMS

Preface

To the extent that this award makes findings of fact that are actually conclusions of law, the findings will be considered conclusions of law. And, to the extent that this award articulates as conclusions of law items that are actually findings of fact, the conclusions will be considered findings of fact.

Standing

One of the threshold issues in this case involves whether, on May 28, 2009, Focus could properly declare itself the only non-defaulting Member of South Edge, singularly conduct the business of the Company itself as a duly constituted "quorum" of the Management Committee, and therefore vote to commence this Arbitration under Section 15.10 of the Operating agreement.[16]

Respondents attack Focus's claim of standing based upon the lack of a quorum under Section 5.2.4 of the Operating Agreement, requiring the presence of "Managers [plural] representing at least three Members which hold at least 60% of the Percentage Interests"[17] for the Managers to conduct business; and under Sections 5.1.1 and 2.4.3.2, which prevents the Management Committee from commencing legal proceedings such as this Arbitration without a "supermajority" of Managers. Respondents argue that the 5.1.1 vesting of exclusive

---

[16] Our preliminary resolution of Focus's standing to bring the Arbitration on behalf of South Edge under the terms of the Operating Agreement *assumes* that the respondent Members *have* committed actions constituting Events of Default.

[17] Emphasis added.

39

management responsibility to the Management Committee gives it the sole authority to commence litigation.

Focus for itself and on behalf of South Edge asserts that all of the other Members were in default as early as March of 2008, for failures to fund Land Financing Interest Expenses under the Credit Agreement, maintain interest reserves per amended Section 2.3.2 of the Operating Agreement, and for stopping development of the project;[18] and that the other Members were certainly in default after the lapse of the forbearance period on June 30, 2008, for failure to effect their April 2008 Takedowns under the Schedules set forth in their respective Acquisition Agreements.[19]    Focus argues under Section 11.2 of the Operating Agreement that the acts and omissions of respondents were self-executing Events of Default that immediately stripped the non-Focus Members' voting rights in any Company matters as of March of 2008, and that defaulting Members could not be counted in forming a quorum of the Management Committee.

Focus thus maintains that, as the only non-defaulting Member, it could call a Management Committee meeting and singularly vote as a duly constituted quorum on May 26, 2009.    Such a vote, it reasons, satisfies any majority or super-majority requirements. Respondents claim that, assuming the alleged defaults did occur, the Operating Agreement only affected Member rights to vote on matters related to individual Events of Default.  Thus, until a member is "voted out of the company," Focus, as a distinct minority Member, could not call a

---

[18] See White and Case correspondence dated March 7, 2008 (Exhibit 769).

[19] See, Notice of Default letters dated May 12, 2009 (Exhibits 1155-1159).

One of Claimants main substantive claims is that breaches of the acquisition schedules in turn constituted violations of the Operating Agreement per Section 11.1.12, that the purported Takedown extensions granted by resolution to non-Focus Members without seeking consent of the Lenders violated the Section 8 of the Assignment Agreement, and that such action caused South Edge to breach Section 7.03 of the Credit Agreement.

40

CONFIDENTIAL

meeting with a duly constituted quorum without KB and Toll or at least participation of Members whose Percentage Interests amount to 60%. Respondents note that Mr. Bogatz of Focus at one point apparently agreed with that proposition (See Exhibit 983, p.5, Management Committee Minutes of 8/25/08).

Notwithstanding Focus's claims of default on the part of respondents, the record demonstrates that Focus [evidently] consented to votes by respondents related and unrelated to the claimed Events of Default after March of 2008, until May 26, 2009, when Focus held the meeting in which it determined to commence this Arbitration. In this, Claimants vigorously assert that subsequent votes by the respondent Members after occurrence of the Events of Default did not divest Focus of the right to declare a "quorum of one" in late May of 2009.

While respondents rely upon the express language of Section 5.2.4 concerning the formation of a quorum to do business, Focus relies heavily on the default provisions in the second paragraph of Section 11.2.[20] The Quorum and forfeiture of voting rights provisions provide, in pertinent parts:

> OPERATING AGREEMENT 5.2.4 Quorum. Managers representing at least three Members which hold at least 60% of the Percentage Interests, acting either in person or represented by proxy, shall constitute a quorum for the transaction of business by the Management Committee.

### 11.2 AVAILABILITY OF REMEDIES

---

[20] Focus also relies upon section 11.1 in making its argument; we have concluded that Section 11.2 provides Focus's strongest argument that the alleged Events of Default were self-executing and that non-defaulting members were not required to seek some sort of "adjudication" of default by the Management Committee under section 11.1. Again, for the purpose of resolving the general "standing" issue, we assume that all of the Members but Focus had committed self-executing Events of Default as of May 2009.

CONFIDENTIAL

> . . . [U]pon any Event of Default and continuing until cure pursuant to the terms of this Agreement, neither the Defaulting Party nor the Manager appointed by the Defaulting Party shall have any voting rights hereunder and, not withstanding anything in the Agreement to the contrary, such Defaulting Party and its Member shall not be considered for purposes of satisfying any quorum, voting, or approval requirements, including, without limitation, any requirement for unanimous approval.

Reading these provisions together is of itself problematic. First, Section 5.2.4 defining a quorum unequivocally requires the presence of at least three Managers representing at least 60% of the ownership interests, defining who must be present in the plural sense. Second, Section 11.2 strips defaulting members of voting rights and ostensibly prevents the formation of a quorum if a sufficient number of Members are in default--expressly purporting to immediately disable all of the Managers representing Defaulting Members upon the Event of Default. In this, we conclude that the plain terms of the second paragraph of Section 11.2 required no "adjudication" of default under Section 11.1 for the quorum prohibitions to apply—the commission of an act constituting an Event of Default would immediately disable the defaulting party from participating in forming a quorum of the Management Committee. Thus, assuming Focus was the only non-defaulting Member, it was the only member that could convene a quorum on May 26, 2009, but it is only one member, here representing only 15.59% of the Company.

We conclude that the Management Committee quorum provisions cannot operate in harmony with the default provisions, thus at minimum creating a latent ambiguity under the Operating Agreement as to whether Focus could itself convene a Management Committee meeting and singularly form a quorum. Accordingly, we must resort to rules of interpretation to resolve the ambiguity; in this, we must construe the agreement so as to both acquit the intent of the parties and to avoid absurd results. *Royal Indem. Co. v. Special Serv.,* 82 Nev. 148, 152, 413

42

P.2d 500, 503 (1966) ("'If one interpretation would lead to an absurd conclusion, then such interpretation should be abandoned and the one adopted which would be in accord with reason and probability.'" (citations omitted)); *Compare* Cal. Civ. Code § 1638: "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."

Having determined that these provisions cannot be read together, we must then resolve which provision controls the formation of a quorum in this instance.  We conclude that the requirement that multiple Managers attend representing at least 60% ownership takes precedence over the default provisions related to that subject.  This is the only construction that avoids the potentially absurd result that the second paragraph of Section 11.2 could entirely incapacitate the Company from doing business.

To explain, taking the Focus argument to its logical conclusion, the Company would be rendered impotent to do business of any kind in the event that all of the Members were guilty of Events of Default at the time of any Management Committee meeting.  This is a distinct possibility in this matter given the respective claims of default by these parties.  It would certainly create an absurdity if the Company would be entirely incapacitated from doing business based upon mutual claims of Default among Members.  The intent of the parties that such an eventuality be avoided is clearly demonstrated by the fact that Focus "allowed" the non-Focus Members votes on matters unrelated (and some related) to the claimed defaults until May of 2009,[21] and respondents "allowed" Focus to vote during periods of claimed defaults against it.[22]

---

[21]There was, as of May of 2009, a total breakdown in the working relationship between Focus and the Respondents.

43

Accordingly, Focus's attempt to create a quorum on May 26, 2009, was void.  This, however, does not end the analysis of whether Focus has individual standing to prosecute this Arbitration.

Respondents contend that Focus was also without authority to individually commence either formal legal action in federal or state court, and had no authority to commence Arbitration under Section 15.10 of the Operating Agreement.  The starting point of an analysis of this argument begins with the terms of Operating Agreement Sections 5.1.1, 5.1.2, and 2.4.3.2, which provide in pertinent part:

> 5.1 MANAGERS; MANAGEMENT COMMITTEE
>
> 5.1.1. <u>Management Committee; Voting</u>.  <u>Except as otherwise provided in this Agreement, the Members agree that the management of the Company shall be exclusively vested in a management committee (the "Management Committee").</u>  Each Member (including the Focus Member) shall **have** the exclusive right to appoint one member of the Management Committee.  The Members of the Management Committee are referred to herein as the "Managers."  Each Manager shall have a vote equal to the Percentage Interest of the Member which appointed such Manager.  . . .   Except as otherwise provided in the Agreement, the Management Committee shall act by the affirmative vote of Managers representing a Majority.   <u>With respect to the matters set forth in Sections 5.1.2 (a), (c) (d) (e) (f) (i) and (j), the Management Committee shall act by affirmative vote of the Managers representing a Supermajority.</u>  The General Manager shall not be a member of the Management Committee.  (Emphasis added.)
>
> 5.1.2  **Powers** [of the Management Committee]   Without limiting the general power and authority of the Management Committee as set forth in Section 5.1.1 of this Agreement, the Management Committee shall:  . . .

---

[22] Respondents contend that Sections 5.3.4 and 11.2 can be read in harmony if Events of Default are not self-executing under Section 11.1 *and* if the restrictions in Section 11.2 on forming a quorum only disable individual Members with regard to forming a quorum to resolve their individual Events of Default.  As, stated, we conclude that the second paragraph of Section 11.2 of the Operating Agreement clearly purports to render a breach an immediate Event of Default under Section 11.1 without any declarations by the Management Committee.  Because we conclude that events of default *are* self-executing when Sections 11.1 and 11.2 are appropriately read together, but also conclude that Section 11.2 cannot be read to disable the functionality of a limited liability company, we decline to resolve the standing issue as primarily suggested by respondents.

CONFIDENTIAL

h.   Approve actions authorized under Section 2.4 [relating to failures to make capital contributions and remedies in that connection]. (Emphasis added.)

2.4.3.2 <u>Additional Remedies</u>.  The foregoing remedies are not intended to be exclusive, and the <u>Company</u> may pursue such other remedies, including, without limitation, the initiation of legal proceedings, that the Management Committee determines by affirmative vote of the Managers representing 75% of the Percentage Interests held by Members other than the Non-Contributing Member. (Emphasis added.)

Respondents argue that these provisions, read together, clearly require a supermajority of Managers to commence any sort of litigation between or among parties to the Operating Agreement. We disagree.  In particular, the first paragraph of Section 11.2 stipulates:

**11.2 AVAILABILITY OF REMEDIES**

To the extent applicable the Company shall have the rights and remedies provided under Section 2.4 in addition to those under this Section 11.  . . . [N]otwithstanding the election of the Company or a non-defaulting Member to pursue any rights under this Section 11 or section 2.4, the Company or the non-defaulting Members may seek action to enjoin the Defaulting Party, seek to obtain specific performance of the Defaulting Party's obligations, seek to obtain any and all damages, losses and expenses (including without limitation, reasonable attorneys' fees and disbursements) suffered or incurred by the Company as a result of such Event of Default (collectively, the "Damages") against the Defaulting Party or resort to any  of the other remedies then available to the Company or any of the non-defaulting Members.  (Emphasis added.)

And, Section 15.2 of the Operating Agreement also provides:

**15.12. SPECIFIC PERFORMANCE**

Each Member agrees with the other Members that the other Members would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that the monetary damages would not provide an adequate remedy in such event.  Accordingly, it is agreed that, in addition to any other remedy to which the non-breaching Members may be entitled, at law or in equity, the non-breaching Members and the General Manager shall be entitled to injunctive and other equitable relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court under Section 15.9.

45

Certainly, these provisions generally allow individual members standing to seek specific performance, to some degree, to enforce obligations under the Operating Agreement, assuming Events of Default have occurred.[23]   Reading these provisions together, Sections 2.4.3.2 and 5.1.2, have to do with the Company itself determining to take legal action, and Sections 11.2 and 15.12 deal in part with individual rights to effect remedies under the agreement.  Nothing in this agreement expressly forbids initiation of legal action, legal or equitable, by individual members.  And, of course, Section 15.10 requires that "[a]ny dispute, claim or controversy arising out of or relating to this Agreement or any transaction contemplated hereby which cannot be resolved by the parties shall be resolved by binding arbitration in accordance with the Nevada Uniform Arbitration Act of 2000, Nevada Revised Statutes 38.206, *et seq.* . . .   The Arbitrator . . . shall have no authority to award punitive or consequential damages. . . ."[24]

   We therefore conclude that, while Focus could not seize control of the company by individually attempting to form a quorum on May 26, 2009, it has standing under the agreement to commence this Arbitration on its own behalf.  This ruling, however, precludes its standing to bring any suit on behalf of South Edge, as the Management Committee duly constituted has the sole authority in that regard.  Also, so that the Company could function with potential Events of Default having consequences as the parties intended, we read Section 11.2 of the Operating

---

[23] We reach neither the scope these specific performance remedies or the merits of the specific performance claims in this section of the Arbitration Order.  The scope of these claims and their merits are resolved below.

[24] As the panel discusses *infra*, the damages we award to Focus, patently not punitive, are also not consequential.

46

Agreement as immediately divesting defaulting members on a limited basis of their rights to vote on matters relating to their Events of Default. [25]

The second paragraph of Section 11.2 of the Operating Agreement renders a breach an immediate Event of Default under Section 11.1 without any declarations by the Management Committee. These breaches therefore gave Focus the immediate right to seek legal redress as they were immediate self-executing Events of Default.

In short, no Member of South Edge entirely loses the right to vote on Company business upon an Event of Default until and unless that Member has been voted out of the company in compliance with the South Edge Operating Agreement; and the provisions of Section 11.2 relating to the constitution of a quorum only apply with respect to gathering a quorum to vote on the matters related to the particular Event of Default. Thus, votes by defaulting members to extend takedowns constitute breaches of the Operating Agreement along with, as discussed below, the unilateral extensions of and failures to consummate the takedowns.

---

[25] Section 11.1 of the Operating Agreement provides that, "[u]pon an Event of Default" and "after authorization by the Management Committee," the Company acting through a Member may "provide written notice of the Event of Default to the defaulting . . . Member . . . and the Company may exercise any remedies available to the Company on account of such Event of Default." This language, Focus contends, requires Management Committee authorization for a Member to exercise remedies on behalf of South Edge, but it does not require the Management Committee to declare Events of Default or determine that a defaulting Member is a "Defaulting Party." In other words, a Member can only seek Management Committee approval to exercise [Company] remedies "upon" the occurrence of an Event of Default by a Defaulting Party. Under this view, the breach of the Acquisition Agreements without cure is an immediate Event of Default under the Operating Agreement that strips the breaching Member of its Operating Agreement voting rights on a self-executing basis per the second paragraph of Operating Agreement Section 11.2. The Management Committee (made up of non-defaulting Members) is then vested with the power to pursue the remedies against the defaulting Member or Members. None of this obtains where, as here, the claims of the limited liability company against defaulting members are moot. The remedies of individual Members are not subject to the provisions of Section 11.1.

47

Moreover, complete incapacitation of an LLC cannot occur by way of quorum provisions in an agreement because an LLC has continuing life under Nevada law and must have provisions for management, notwithstanding defaults by Members of the company. *See* NRS 86.291:

> 1. Except as otherwise provided in this section or the articles of organization, management of a limited-liability company is vested in its members in proportion to their contribution to its capital, as adjusted from time to time to reflect properly any additional contributions or withdrawals by the members.

In light of this ruling, the claims brought on behalf of South Edge are dismissed.

Rights of Specific Performance under the agreements

Our determination that Focus lacks standing to assert claims for South Edge in this arbitration moots the question of whether South Edge enjoys rights of specific performance to enforce the Takedowns under the construct of these agreements. However, in order to resolve Focus's individual action for specific performance, the following discussion reaches of the scope of this remedy as to both South Edge and its individual Members.

As noted, the Operating and Acquisition Agreements, along with the Credit and Assignment Agreements, govern the South Edge project and, thus, its Members, the Holdings Manager, and the Lenders. Focus claims that these agreements, read together as the parties intended, require that respondents specifically perform the April 2008 Pod Takedowns. Focus points to the October 22, 2007 default notice it received from the respondents shortly before its single takedown:

> . . . Pursuant to the terms of Section 11.1.12 of the [Operating] Agreement, a default by a Member under its respective Acquisition Agreement, and the failure to cure such default within the applicable cure period set forth in such Acquisition

48

CONFIDENTIAL

> Agreement, <u>shall constitute an immediate "Event of Default"</u> under the [Operating] Agreement. . . . If Focus fails to cure . . . all non-defaulting Members shall have the right to exercise and pursue any or all of their respective rights and remedies [under Section 11.1] against Focus . . . whether arising at law and/or in equity, including, without limitation, such rights and remedies specifically set forth in the [Operating] Agreement. (Emphasis added.)

Focus urges that the respondents' interpretation of the default provisions in 2007 applies equally to the respondents in this instance: that the failure to effect the takedowns per the schedules last in place before expiration of the [forbearance agreement] and the failure to cure under the Acquisition Agreements (by performing the takedowns) constituted immediate Events of Default under the Operating Agreement.[26]   As stated, Focus in turn contends that these defaults implicated the remedy of specific performance of the Takedowns.  Focus finds support in two provisions of the Operating agreement.  First, Section 11.2 (availability of remedies):

> To the extent applicable the Company shall have the rights and remedies provided under Section 2.4 in addition to those under this Section 11.  . . . [N]otwithstanding the election of the Company or a non-defaulting Member to pursue any rights under this Section 11 or section 2.4, the Company or the non-defaulting Members may seek action to enjoin the Defaulting Party, seek to obtain specific performance of the Defaulting Party's obligations . . .

Second, Section 15.12 (specific performance):

> Each Member agrees with the other Members that the other Members would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy such event.  Accordingly, it is agreed that, in addition to any other remedy to which the nonbreaching Members may be

---

[26]Operating Agreement, section 11.1.12 (added to the agreement to accommodate the Land Financing Arrangement), includes uncured defaults under the Acquisition Agreements as Events of Default under the Operating Agreement.  However, because of our ruling that Focus has no standing to assert claims of behalf of South Edge, the question of whether an Event of Default is self-executing upon its occurrence, with or without Management Committee action, is not determinative of the case—the remaining issues having to do with Focus's claims of breach that do not implicate the procedures of Section 11.1 of the Operating Agreement.

CONFIDENTIAL

entitled, at law or in equity, the nonbreaching Members and the General Manager shall be entitled to injunctive and other equitable relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court under Section 15.9.

Respondents counter that no breaches have occurred and that, in any case, Section 21(a) (i) of the Acquisition Agreements limits liability for breach of Takedown obligations to liquidated damages [awardable only to South Edge itself]. In this, respondents caused Section 21(a) (i) to be added to the Acquisition Agreements in place of a specific performance clause from a prior draft during negotiations with the Lenders. Section 21 (a) (i) states all in capital letters:

21. Remedies. Each of the covenants of the Parties under this Agreement is a material consideration for this Agreement, the breach of which shall be deemed a default hereunder. Each of the Party's rights and remedies under this Agreement shall be cumulative and no one of them shall be exclusive of the others. (Emphasis Added.)

a. REMEDIES FOR DEVELOPER.

i. NOTWITHSTANDING THE FOREGOING, IF A PHASE CLOSE OF ESCROW FAILS TO OCCUR DUE TO BUILDER'S DEFAULT UNDER THIS 21 a.ii DEVELOPER SHALL RETAIN THE "LIQUIDATED SUM" (DEFINED BELOW) AS LIQUIDATED DAMAGES. IN CONNECTION THEREWITH, THE PARTIES ACKNOWLEDGE THAT IF SUCH A DEFAULT OCCURS, DEVELOPER WILL BE DAMAGED AND WILL BE ENTITLED TO COMPENSATION FOR THOSE DAMAGES. SUCH DAMAGES MAY, HOWEVER, BE EXTREMELY DIFFICULT AND IMPRACTICAL TO ASCERTAIN FOR THE FOLLOWING REASONS: (1) THE DAMAGES TO WHICH DEVELOPER WOULD BE ENTITLED WILL BE BASED IN PART ON THE DIFFERENCE BETWEEN THE ACTUAL VALUE OF THE PROPERTY AT THE TIME SET FOR THE APPLICABLE PHASE CLOSE OF ESCROW AND THE PURCHASE PRICE FOR THE PROPERTY AS SET FORTH IN THIS AGREEMENT; (2) PROOF OF THE AMOUNT OF SUCH DAMAGES WILL BE BASED ON OPINIONS OF VALUE OF THE PROPERTY, WHICH MAY VARY IN SIGNIFICANT AMOUNTS; AND (3) IT IS IMPOSSIBLE TO PREDICT AS OF THE DATE ON WHICH THIS AGREEMENT IS MADE WHETHER THE VALUE OF THE PORPERTY WILL INCREASE OR DECREASE AS OF THE DATE SET FOR

50

CONFIDENTIAL

EACH APPLICABLE PHASE CLOSE OF ESCROW. DEVELOPER AND BUILDER WISH TO AVOID THE COSTS AND LENGTHY DELAYS WHICH WOULD RESULT FROM A LEGAL PROCEEDING BY DEVELOPER TO COLLECT ITS DAMAGES FOR THIS AGREEMENT. THEREFORE, IF ANY PHASE CLOSE OF ESCROW FAILS TO OCCUR DUE TO BUILDER'S DEFAULT UNDER THIS AGREEMENT, THEN DEVELOPER SHALL TREAT THE SUM (THE "**LIQUIDATED SUM**" REPRESENTED BY (1) THE DEPOSIT TO THE EXTENT NOT APPLIED TO THE PURCHASE PRICE AND (2) ALL AMOUNTS DEPOSITED TO THE MCD ACCOUNT BY BUILDER AS A REASONABLE ESTIMATE OF DEVELOPER'S DAMAGES. <u>AS SUCH, DEVELOPER'S SOLE AND EXCLUSIVE REMEDY IN THE EVENT OF THE FAILURE TO CLOSE ESCROW ON ANY PHASE RESULTING FROM BUILDER'S DEFAULT SHALL BE TO TERMINATE THIS AGREEMENT AND RETAIN THE LIQUIDATED SUM.</u> (Underlined emphasis added.)

RESTATEMENT (SECOND) CONTRACTS §361 (1981) provides "Specific Performance . . . may be granted to enforce a duty even though there is a provision for liquidated damages for breach of that duty." However, as cmt. b points out, "Although parties who merely provide for liquidated damages are not taken to have fixed a price for the privilege not to perform, there is no reason why parties may not fix such a price if they so choose." As the last sentence of § 21. (a) (i) makes plain, that is what the parties have done here. Even if the South Edge claims were properly a part of this arbitration, South Edge would be barred by promissory estoppel to seek specific performance to enforce the Takedowns.

Respondents contend that the removal of the specific performance language and the insertion of the liquidated damage provision created an absolute restriction on remedies that precludes specific performance of the Takedowns. At the Arbitration hearing, they introduced considerable evidence suggesting that none of the respondents would have agreed to go forward with the JP Morgan financing arrangements if specific performance of the Takedown obligations

51

under the Acquisition Agreements could be compelled. Respondents' witnesses remained adamant that this remedy would have had the effect of converting the financing arrangements from limited-recourse to recourse obligations against the Members (diluting their immunity to creditors under Nevada LLC statutory protection, NRS 86.371), that the value of the property sufficiently secured the Lenders, that respondents were willing to pay higher interest on non-recourse financing to limit the amount of risk attendant to this project, and that at least KB and Toll would have resorted to their own financing resources if they had wanted to proceed with less expensive "recourse" financing. Other evidence suggested that JP Morgan originally insisted on South Edge having the remedy of specific performance, relented for a time, then insisted on the remedy again at the "last minute" before closing the Land Financing, but finally relented so that the Credit Facility arrangements would proceed.

Because South Edge was the debtor under the Credit Facility, and because payment of Takedown release prices to South Edge would automatically revert to the lenders to reduce Land Financing principal, we find that an order of specific performance of Takedowns in the event of breach would indirectly convert the limited-recourse financing into full-recourse financing. We therefore agree that Section 21 (a) (i), limiting South Edge to liquidated damages in the event of a Takedown default, was designed to maintain the "limited recourse" nature of the loan arrangements.[27] However, while the agreements manifest this intent as to claims of specific performance by South Edge, this intent was not so clear with respect to specific performance claims between Members.

---

[27] See, also, NRS 86.371, immunizing LLC members from liability to creditors absent agreement to the contrary.

CONFIDENTIAL

Focus argues that the lenders insisted during loan negotiations that the Acquisition Agreements include the right to specifically perform the takedowns to provide greater security to their investors.   Conceding that the remedy was removed from the Acquisition Agreements before final execution by the parties, they contend that the removal was simply an accounting matter, i.e., KB and Coleman Toll disclosure concerns over compliance with federal "Financial Accounting Standards Board" ("FIN") requirements.  Most tellingly, Focus argues that a separate provision, Section 21(a) (iii), inserted into the "remedy" section of the Acquisition Agreements at the same time as Section 21(a)(i), preserves specific performance as a "cumulative" remedy available to the Members under the Operating Agreement for Takedown defaults.   Certainly, Sub-section iii of section 21(a) of the Acquisition Agreements provides, also entirely in capital letters:

> iii. <u>NO WAIVER OR LIMITATION OF RIGHTS OR REMEDIES UNDER OPERATING AGREEMENT</u>.  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NOTHING HEREIN SHALL LIMIT OR RESTRICT, OR IN ANY WAY BE DEEMED A WAIVER OF, ANY OBLIGATIONS, RIGHTS OR REMEDIES OF DEVELOPER OR ANY MEMBER OF DEVELOPER SET FORTH IN THE OPERATING AGREEMENT. DEVELOPER AND ITS MEMBERS MAY PURSUE ANY AND ALL OF THEIR RESPECTIVE RIGHTS AND REMEDIES UNDER THE OPERATING AGREEMENT WITHOUT REGARD TO WHETHER ANY RIGHTS OR REMEDIES HAVE BEEN PURSUED OR EXHAUSTED HEREUNDER.

Notwithstanding the language of Acquisition Agreement Section 21 (a) (i), Focus therefore contends that the insertion of Section 21 (a) (iii) into the Acquisition Agreements preserves the right to specific performance of Takedowns under Sections 11.2 and 15.12 of the Operating Agreement.

53

CONFIDENTIAL

Respondents counter that the presence of Section 21 (a) (i) in the Acquisition agreement, coupled with the absence of any explicitly stated remedy in connection with Takedowns in the Operating Agreement, effectively limits specific performance preserved under Section 21 (a) (iii) to other rights upon default; i.e., rights under the Operating Agreement to specifically perform such things as divestitures under Section 2.4.1 and mandatory sales under Section 2.4.2. Otherwise, the right to specifically perform takedowns would again compromise the limited recourse nature of these interrelationships.[28]    In this, they contend that the FIN requirements were material to whether they would agree to a construct that included this equitable remedy.

The parties to this arbitration therefore urge diametrically opposed views as to the meaning of the undisputed language of these agreements; in particular, Sub-sections 21 (a) (i) and (iii) of the Acquisition Agreement and Sections 11.2 and 15.12 of the Operating Agreement. In short, Focus claims that the remedy was clearly preserved for South Edge and its Members, and respondents claim that the remedy was clearly written out of the arrangement.  While both sides point to individual provisions and both have resorted to interpretive arguments based to some degree upon parol evidence to urge their relative positions, neither can point to unequivocal language that would foreclose any controversy.  Since we find both interpretations to have reasonable persuasive force, the agreements are ambiguous in this regard.  This would ordinarily stimulate resort to rules of construction to resolve the ambiguity and, assuming construction of the agreements preserved specific performance as a remedy, we would then assess the actual merits of the claim.  The panel, however, has determined to forego this analytic

---

[28] In this, all of the parties to these proceedings concede that the Acquisition and Operating Agreements must be read together, and that breach of the Acquisition agreement in turn breaches the Operating Agreement.

54

CONFIDENTIAL

process because it has further determined to deny specific performance based upon substantive principles of equity.

Under Nevada law, "[s]pecific performance is available only when: (1) the terms of the contract are definite and certain; (2) the remedy at law is inadequate; (3) the [plaintiff] has tendered performance; and (4) the court is willing to order it." *Serpa v. Darling*, 107 Nev 299, at 305, 810 P.2d 778, at 782 (1991), citing *Carcione v. Clark*, 96 Nev. 808, 618 P.2d 346 (1980). A corollary of the third leg of the rule is that the party seeking specific performance be ready, willing and able to perform on its own behalf. *Serpa*, at 107 Nev. 304 (noting that, "[t]o be awarded specific performance, a purchaser [of realty] who has not tendered the purchase price must demonstrate that [he] is ready, willing, and able to perform[;] citing *Cohen v. Rasner*, 97 Nev. 118, 624 P.2d 1006 (1981)). The rule applies equally to sellers as well as purchasers: "[s]pecific performance [may be] granted in favor of a vendor of land as freely as in favor of a vendee. (Pomeroy's Eq. Jur., vol. 6, sec. 747.)." *See Southern Pacific Co v. Miller*, 39 Nev. 169, 170, 154 Pac. 929 (1916). And, with respect to the specific performance of an agreement to purchase real property free and clear of encumbrances, it seems axiomatic that the party seeking performance by the purchaser must demonstrate the ability to deliver marketable title. *See* 71 AM. JUR. 2D *Specific Performance*, § 156 (2009).

Applying these principles, we decline to award specific performance for the following reasons. First, as discussed later in this award, the remedy at law, an award of damages, is adequate to resolve Focus's individual claim. Second, assuming that the Town Center major infrastructures were installed, it would be virtually impossible for a court or this panel to police and supervise continuing performance, such as maintenance, security, etc. Third, we find that

55

Focus is not in a position to perform because it does not itself have the power or authority to convey clear title to the Takedown parcels—that must come from a unanimous vote of the syndicate of lenders.[29]    Fourth, specific performance would require all of the respondents to "take a bath" in what is currently a stalled or largely failed enterprise.  Accordingly, rather than simply force all of the respondents into such a result, an individual award to Focus based upon breaches of the Operating Agreement would be more just.  In this, we find that the respondents breached the agreement when they voted to stop build out of the project, failed to fund interest reserves and land financing interest payments, failed to perform on the Takedowns and unilaterally extended takedowns (as noted, these actions regarding the Takedowns were the result of defaulting members improperly voting in connection with events of default).  We also find that the latter three breaches became actionable under the arbitration clause of the Operating Agreement upon expiration of the so-called "Forbearance Agreement."

---

[29] Also, given that the pre-existing defaults of Kimbal Hill and Woodside still remain uncured, and given the default status of respondents' Takedowns, JP Morgan would have to obtain unanimous consent of the lender syndicate before any Takedown could occur.  Thus, as a specific performance plaintiff, Focus cannot prove actual tender of performance.  We further find that the October 22, 2009, letter sent to Focus on behalf of JP Morgan indicating a willingness to provide waivers of encumbrances in exchange for individual Member payments of Takedown release prices and MI deposits does not sufficiently prove the ability of Focus or South Edge to perform by conveyance of free and clear title.  Referring again to  the court's observation in *Serpa:*

> To be awarded specific performance, a purchaser who has not tendered the purchase price must demonstrate that she is ready, willing, and able to perform. *Cohen v. Rasner*, 97 Nev. 118, 624 P.2d 1006 (1981). Appellant was not ready and willing to perform because tender of the option monies was never effectuated. We find appellant's argument that a valid tender was made by placing checks at the title company unpersuasive since respondent had to satisfy conditions in order to secure release of the money and these checks were not placed in escrow.  107 Nev. 299, 305 (1991)

This selection from *Serpa* seems to apply by analogy here.  While the JP Morgan witness at trial, John McDonagh, strongly speculated that unanimous approval could be obtained as of the date of the arbitration hearing, he had to concede the need to get that approval before encumbrances could be waived (the entire project is in default on the credit facility and consent to waive as to individual Takedowns is still required).   Certainly, prior to the October 2009 letter, neither South Edge nor Focus were in a position to convey clear title as required under the Acquisition Agreements.

56

CONFIDENTIAL

The above considerations and the unyielding divergence or deadlock over whether specific performance as a remedy is preserved militate against its use in this instance. Moreover, the very fact of this frank ambiguity undercuts the willingness of the panel to order specific performance of the April 2008 Takedowns. Accordingly, in the exercise of our legal discretion to grant or deny specific performance, we are "unwilling" to make such an award.[30]

Focus Claims of Breach of Contract

We find that respondent Members, except Meritage, breached the Operation Agreement in connection with their duties to fund financing interest and interest reserves when the Members, voting their interests as Managers of South Edge, either refused to propose or approve capital calls for such expenditures. Meritage breached these duties under the Operating Agreement by failure to seek tender of financing interest and interest reserves payments into the appropriate account. Accordingly, we agree with Focus that individual Members of South Edge could not approve the Land Financing arrangements and avoid liability by the simple expedient of ordering their respective Managers to disapprove formal calls for capital. The use of Managers does not insulate the Members from their liabilities under these agreements. Conversely, Managers, voting the interests of their Members, could elect to take actions that exposed their respective Members to individual liability.

---

[30] As stated above, the intensity of the deadlock over whether Takedowns may be the subject of specific performance of itself creates a degree of reluctance to make such an award. In Serpa, the court also noted as follows:

   . . . "[T]he decision to either grant or refuse specific performance is addressed to the sound discretion of the trial court and will not be disturbed on appeal unless an abuse of discretion is shown." *McCann v. Paul*, 90 Nev. 102, 103-104, 520 P.2d 610, 611 (1974). See also *Carcione v. Clark*, 96 Nev. 808, 618 P.2d 346 (1980). 107 Nev. 299, 305.

CONFIDENTIAL

Likewise, the respondent Members, except Meritage, breached their obligations under the Operating Agreement to effect their April 2008 Takedowns as scheduled, or during and following expiration of the Forbearance Agreement on June 31, 2008, by unilaterally extending Takedown dates without approval of the Lenders' Administrative Agent, here JP Morgan. We conclude that breaches of the acquisition schedules in turn constituted violations of the Operating Agreement per Section 11.1.12, that the purported extensions by certain of the non-Focus Members without seeking consent of the Lenders violated the Section 8 of the Assignment Agreement, and that such action caused South Edge to breach Section 7.03 of the Credit Agreement. In this, on prior occasions up to and including the forbearance period, respondents had sought and obtained permission to extend the Takedown dates. Thus, they were fully aware of the obligation to seek Lender approval to extend Takedowns and were fully aware of the process for doing so.

We also find that failures to fund interest reserves and land financing interest payments, and the failures to perform the Takedowns, became actionable under the arbitration clause of the Operating Agreement upon expiration of the so-called "Forbearance Agreement."

The respondents also breached Section 7.03 (o) of the Credit Agreement, which prohibits cessation of construction of improvements for a continuous period. Such in turn constituted an "Event of Default" under Operation Agreement Section 11.1.12. This breach became effective upon the Management Committee vote to terminate work taken on March 10, 2008.[31]

Focus's claims of bad faith against respondents under the Operating Agreement

---

[31] In light of our rulings on the ability of Focus to press its individual claims, we need not reach the standing question of Focus's rights to pursue rights assigned to JPMorgan as security for the Land Financing.

58

Focus claims that respondents breached implied covenants of good faith and faith and fair dealing under these agreements in four different ways. First, after making use of grace periods under the credit agreement in connection with April 2007 takedowns, respondents denied Focus a similar use of the same grace period provision in October of 2007. This, Focus argues, caused it to unnecessarily expend some $1.3 million dollars in interest and/or loan fees it would not have had to pay on its takedown financing if the takedown could have been briefly delayed from the October 15 scheduled date for a simultaneous closing with the Stations Casino transaction on October 30, 2007. Under this claim, Focus could have avoided using some $35 million of the $70 million dollars in back up financing to effect the October 15, 2007 takedown. Second, KB and Toll attempted to co-opt Focus's position in the project leading up to the takedown in order to realize a $73 million profit. Third, respondents ultimately failed to perform under the operating and acquisition agreements in 2008 shortly after forcing the October 2007 takedown by Focus. Fourth, respondents compromised Focus's ability to achieve a return on its investment by stopping work on the project, excluding Focus from participating in restructuring negotiations with the Lenders, extending takedowns for lengthy periods, and by perpetuating defaults under the credit facility by refusing to negotiate in good faith with the Lender's Administrative Agent in connection with attempts to restructure the loan arrangement.

We reject these claims based upon the following findings of fact.

Findings of fact:

### Refusal to allow Focus use of Credit Agreement grace periods

Focus argues that respondents' insistence on closure on October 17, 2007, after using grace periods in April of 2007, demonstrates a breach of the implied covenant of good faith and

59

fair dealing. We disagree and find that the circumstances in October of 2007 were entirely different from those extant the previous April.

While at least three of the respondents availed themselves of grace periods under the credit agreement in connection with April 2007 takedowns, we find that those delays in closing were not the result of an inability to pay, or a need to finance, their respective purchase prices into escrow—they were the result of errors by the Clark County Recorder in charging transfer taxes on the transactions, and external delays in completing paper work on letters of credit to secure MI deposits. Also, no deadlines on the payment of credit facilities compelled those Takedown completions as was the case with credit facility "B" on October 31, 2007.

Moreover, we find that no harm was inflicted upon Focus as a result—Focus was able to acquire back-up financing to fully effect its Takedown. In this, we reject the claim that timely performance on the October Takedown caused unnecessary financing costs because the forced closing was not contemporaneous with the Stations Casino Purchase. We further find that those expenses were contemplated notwithstanding the actions of respondents. More particularly, Exhibit 580, p. 582, the closing statement for the Pacific Western portion of the Focus Takedown financing, includes "consultant fees" that were committed with reference to the claimed "Stations bridge loan" on October 11, 2007 (*Id.* at p. 585), well before the default notice of October 22, 2007. This indicates that the need for the bridge financing to get to Stations Closing on October 31 was not related to the posture taken by respondents on October 22.

We further find that the Acquisition Agreements contain no "grace periods" for performance—rather the grace periods upon which Focus sought to rely were set forth in the Credit Agreements. Here, however, the maturity of the Credit Facility "B" on October 31, 2007,

60

CONFIDENTIAL

provided justification for the actions taken by the respondents in providing a Notice of Default to Focus on October 22, 2007.

### Claim that respondents attempted to co-opt Focus's position in Inspirada

Focus argues that respondents' insistence on closure on October 17, 2007, was motivated by the prospect of a $73 million profit that could be realized upon a take-over of Focus's position in the company. Although some of respondent's witnesses had to concede that a potential profit would be a consideration for insisting on enforcing the fixed Takedown date, and while we find that respondents were clearly motivated to act in their own individual interests, we find that their maneuverings did not violate any express terms under either the Operating or Acquisition Agreements.[32] And, despite the aggressive nature of the actions taken by respondents near to Focus's Takedown date, we cannot conclude that any separate breach of the implied covenant of good faith and fair dealing has occurred.

As a result of a meeting between Larry Bross of Focus and Don Del Giorno of KB, KB knew Focus had pre-sold the Stations Casino Property before October 17 2007, and therefore before the October 22 Notice of Default to Focus regarding its October 2007 Takedown. This is confirmed by the fact that the casino sale was included in the separate proposal of KB and Toll to JP Morgan to assume the Focus position in South Edge in the event Focus could not make the Takedown. A fair inference is that KB and Toll were motivated to maneuver Focus out of South Edge if Focus could not perform. However, we find that, given the absence of fiduciary duties between and among the Members of South Edge, and the fact that preparations to "take out"

---

[32] We recognize that breaches of the implied covenant of good faith and fair dealing can create liabilities beyond those attended to breaches of express contractual provisions. *See Hilton Hotels v. Butch Lewis Productions,* 107 Nev. 226, 232-33, 808 P.2d 919 (1991).

CONFIDENTIAL

Focus in the event of a default on its October Takedown obligation were not unreasonable and never came to fruition in any event, we find that such does not compel a determination that KB and Toll violated the implied covenant of good faith and fair dealing under the Operating Agreement.

In summary, we find that any actions based upon motivations to gain from Focus's potential problems with closing do not constitute an act of bad faith. We further find that respondents Meritage, Beazer and Pardee were not implicated in many of the actions alleged by Focus as violating covenants of good faith and fair dealing.

### Failures to perform under the Operating and Acquisition Agreements

Having concluded that direct breaches have occurred with regard to completion of the project, failures to fund interest reserves and interest payments, and failures to effect Takedowns, we find no separate violations of the implied covenants here. In any case, any such damage would be duplicative.

### Other defaults

Likewise, we find that Focus has sustained no damages beyond those directly caused by breaches consisting of actions taken by some or all of the respondents to defer Takedowns under the Acquisition Agreements.

## VIII.  RESPONDENTS' COUNTERCLAIMS

Respondents bring the following counterclaims:

A. Counterclaims against Focus.

62

1.  That Focus is in breach of its obligations to South Edge to fund capital calls in the sum of at least $256,687.70 (*See* Exhibit 1175).

2.  That Focus is in breach of its obligations under the Mass Grading Agreement (Exhibit 268) in the sum of $654,832.86 (*cf.* Exhibit 649, $653,125.70; Exhibit 712, $651,031.00).

3.  That Focus wrongfully disclosed to the media confidential and/or proprietary information of South Edge.  (*See* Exhibit 743).

4.  That Focus is in breach of the Operating Agreement's management provisions.

5.  That Focus is in breach of the Operating Agreement by having entered into the Cooperation Agreement (Exhibit 1143) with JPMorgan.


B.  Counterclaims against Holdings Manager.

1.  To recover damages, fees and expenses they have incurred because of Holdings Managers improper actions in not complying with the Operating Agreement.

2.  To recover such damages South Edge has suffered from such improper actions.

3.  That Holdings Manager is in breach of the Operating Agreement by reason of the Cooperation Agreement.

C.  Meritage's counterclaims for declaratory relief against South Edge and Holdings Manager.

1.  That Meritage has fully performed all obligations under its Acquisition Agreement and the Operating Agreement.

CONFIDENTIAL

2. That upon such performance South Edge was unable to deliver clear title to its Takedown.

3. That as a result Meritage is discharged from any further obligation under its Acquisition Agreement and the Operating Agreement.

4. That Meritage be awarded its attorney fees and costs in bring the counterclaim.

## IX.    CONCLUSIONS ON RESPONDENTS' COUNTERCLAIMS

Breach of Focus in its obligations to South Edge

As noted elsewhere, a Nevada LLC member has no standing to assert a claim belonging to the LLC. *See* NRS 86.281.1. All claims asserted herein on behalf of South Edge by its members will be dismissed without prejudice.

Breach of Focus in its obligations under the Mass Grading Agreement

Because Art. VIII of the Mass Grading Agreement requires mediation and binding arbitration in another ADR forum, breach of that agreement cannot be raised here, and this counterclaim will be dismissed without prejudice. Moreover, respondents waived any claim for damages under this counterclaim at closing argument. Tr. 3/11/10, p. 119. ("Respondents are not seeking damages under the mass grading agreement in this case.")

Breach of Focus in disclosing confidential/proprietary information of South Edge

As noted above, all claims by members asserted on behalf of South Edge will be dismissed without prejudice. In addition, respondent at closing argument waived any claim for damages under this counterclaim. *Id.* ("The Wall Street Journal and the mass grading agreement are only relevant to the defaults that were sent to Focus and stripping Focus of its voting rights.")

Breach by Focus of the Operating Agreement's management provisions

64

CONFIDENTIAL

The General Manager under the Operating Agreement is Holdings Manager, whose powers and duties are set out in sections 5.7 and 5.8 of that agreement. Save for being a Member, Focus was not a Manager. Focus's Manager was Ritter, who represented Focus's interests on the Management Committee. *See* Section 5.1.3. The alleged breaches by Holdings Manager are discussed below.

By this counterclaim against Focus, respondents seek to recover damages for "the improper commencement of [these] arbitration proceedings, including legal fees and expenses." Resp. Counterclaim at 10.[33] No proof of such damages was made at the hearing. This counterclaim will be dismissed.

Breach of Fiduciary Duty by Holdings Manager

Respondents claim that Holdings Manager, as the Manager of the project, must respond in damages for its breach of fiduciary duties. In this, they claim that Holdings Manager improperly refused to sign off on legitimate extensions of the Takedown Schedules, and aided in a major breach of the Operating Agreement through involvement in the negotiation and creation of the Cooperation Agreement between Focus and JP Morgan acting for the Lenders.

Takedown Extensions

With regard to the claim that Holdings Manager wrongfully refused to sign off on the amendments to the Takedown schedules, respondents invite our attention to Section 5.8.1 of the Operating Agreement:

---

[33] They also counterclaim on behalf of South Edge for damages caused by the initiation of these proceeding. As discussed above, all claims brought by members on behalf of South Edge will be dismissed without prejudice.

CONFIDENTIAL

> 5.8.1  <u>Specific Powers and Duties.</u>  The General Manager shall, subject to the terms and conditions of this Agreement . . . and to the determinations of the Management Committee . . . have the following duties and the authority to:
>> a.  Execute any and all agreements, contracts documents certifications, and instruments that, in the Management Committee's discretion, are necessary or convenient in connection with the management, maintenance, and operation of the Company . . . .
>> j.  Subject to the directions and determinations of the Management Committee, institute, prosecute, defend, settle, compromise, and dismiss lawsuits . . . brought by, on behalf of, or against the company, the Members, the General Manager, or any Manager . . . .

We reject respondents' claim that Holdings Manager's refusal to sign off on the extensions violated its fiduciary obligations to the Members and to South Edge.  First, we conclude that the extensions violated Section 8 of the Assignment Agreement and thus created an Event of Default under the Operating Agreement, Section 11.1.12, as well as under Section 7.03 of the Credit Agreement.  Thus, Holdings Manager's refusal to sign was justified as an action governed by Operating Agreement Section 5.8.1., which requires the Holdings Manager to act within the terms and conditions of the Operating Agreement.   Second, Holdings Manager is immune from this type claim under Operating Agreement Section 5.7:

> . . . The General Manager, its officers, directors, members employees, agents, Affiliates [the section acknowledges that such includes Focus] and other persons acting on its behalf or at its direction shall not be liable, responsible or accountable in damages or otherwise to the Company or to the Members for any act or omission, unless such act or omission constituted a material breach of fiduciary duty involving intentional misconduct, fraud, a knowing violation of law, gross negligence, or a material breach of this Agreement; provided, however, that the General Manager shall have no liability for material breach unless it has received    notice    and    reasonable    opportunity    to    cure.

Cooperation Agreement

Respondents vigorously maintain that the Cooperation Agreement between JP Morgan and Focus constituted a material breach of Operating Agreement, Section 15.15, which provides

66

CONFIDENTIAL

that "[n]one of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company, any Manager or any Member." As an extension of this argument, respondents assert that the Holdings Manager's authority to commence and settle litigation under 5.8.1 (j) did not include the Cooperation Agreement with JP Morgan because that action is calculated to benefit of the Company's creditors, not the Company. The Cooperation Agreement, they reason, caused Holdings Manager to improperly divert MI Deposits for the individual use of Focus, improperly delegate to JPMorgan the Holdings Manager's litigation responsibilities, moved forward with this arbitration, all in concert with Focus, and all in derogation of its fiduciary duties under Section 5.7 of the Operating Agreement to the Management Committee. Accordingly, respondents claim that Holdings Manager has committed Events of Default under Section 11.1.2 and 11.1.11 of the Operating Agreement.

We find that the Holdings Manager has not violated any fiduciary duties to the Members in connection with the Cooperation Agreement. First, Holdings Manager is not a party to the JP Morgan Cooperation Agreement. Second, while an affiliate of Focus, the Operating Agreement waives any conflicts that might arise between and among Members, and as between Members and South Edge, because of that affiliation. See Operating Agreement, § 5.6.1. Third, while it improperly attempted to form a quorum to press the claims on behalf of South Edge, the defensive actions taken by Focus on its own behalf (in particular, the Cooperation Agreement with JP Morgan), were reasonable given the adversarial stance that developed between Focus and respondents.

67

Meritage's counterclaim for declaratory relief

Larry Seay, chief financial office and executive vice-president of Mertiage testified that he was "involved in the discussion from Meritage to temporarily halt construction." Tr. 3/2/10 p. 10. He said his company did not think "it was appropriate to continue to incur costs on the project [where] there was no source of repayment because the bank was not funding draws at that point. . . . [T]he company didn't want to be a party to asking people to do work where there was no source of payment." *Id.*

Nevertheless, he testified, "we had every intention of doing [our second and final takedown on April 15, 2008]" *Id.,* pp. 10, 11. "We opened escrow. We deposited all money for the purchase, including depositing additional funds for the MI Deposit that would have been required. We signed all the documents that would be required. . . . *Id.,* p.13. One week after the end of the Forbearance Period, on July 8, 2008, Meritage reiterated its Takedown position, "assuming the property can be delivered free and clear of all Pre-Disapproved Monetary Liens[34], including the bank lien." Exhibit 943.

As discussed in the factual presentation, **V.**, above, the decision by the Management Committee to suspend work on the project was contemporaneous with its (majority vote) refusal to issue capital calls to either maintain interest reserves or pay financing interest. Although Meritage voted against the latter, it voted for the former. By this it committed an event of default. Thus, it cannot be said to have performed all of its obligations under the Operating

---

[34] A defined term in the Acquisition Agreement form (*see e.g.*, Exhibit 5) meaning "monetary liens which do not constitute non-delinquent taxes or assessments (including, without limitation, non-delinquent assessments resulting from LID or the Master Association)."

CONFIDENTIAL

Agreement.  Accordingly, its counterclaim for declaratory relief that it has so performed will be denied.


## IX. DAMAGES

Focus Damages

Claiming that the actions of breach by respondents rendered the Inspirada land "useless to Focus," Focus seeks a complete return of its out-of-pocket investment.  The claim is itemized as follows:

| | |
|---|---|
| Takedown Payments | $122,150,397 |
| Other Capital contributions | $49,544,906 |
| Financing and Closing Costs | $12,200,037 |
| | |
| LID Payments | $483,414 |
| Other Costs (Legal, design, construction | |
| Marketing, Interest, Property taxes) | $2,198,089 |
| Interest and Fees after Interest Reserve Depletion | $13,636,883 |
| Total Gross Costs to Focus as of trial | $200,782,939 |
| Total Net Costs (less Stations Casino Sale | _____ |
| of $71,119,071) | $129,094,655 |

69

CONFIDENTIAL

We agree with respondents that Focus cannot receive a total return on its investment and remain in any way connected with the project. We therefore must reject this formula for compensation for the various breaches we have found in this matter.

We also reject the notion that Focus's damages must be calculated on its view of the value of the purchased Inspirada parcel. That Focus now finds the land useless for its own commercial use is not determinative of damages here; rather, we conclude that the damages sustained must be based upon its net out-of-pocket expenses less the current value of the property.

Apparently relying on its theory that the property in its current state has no value, Focus failed to provide any concrete appraisals as to the current market value. But the property certainly does have a remaining market value and we conclude that at least some degree of competent testimony has been produced on that subject. In this, Mr. Devore testified in confirmation of his deposition testimony that the property purchased is worth at least what Focus currently owes on the property after a deduction for the foreclosure recoveries. We find that Mr. Devore's testimony to be the most reliable evidence of the current fair market value of the Focus Takedown parcel. That figure is $92,279,301. Subtracting that figure from the out-of-pocket costs, $129,094,655, we conclude that Focus has sustained direct and immediate breach of contract damages in the amount of $36,815,354.[35] *See Johnson v. Utile*, 86 Nev. 593, 599, 472 P.2d 335 (1970) (observing that "one who breaches a duty to another is liable for all damages

---

[35] We reject respondents' argument, apparently under Operating Agreement 2.3.7, that Focus must also return its portion of the Management Fee previously paid to Holdings Manager, a Focus Affiliate, which Focus could pay under 2.3.7 via "book entry or other means determined by . . . Focus." Respondents have failed to prove to a preponderance of the evidence any entitlement to this recovery.

CONFIDENTIAL

naturally flowing from the wrongful breach.")  Such contract damages are within the authority of the panel to award because they are not consequential.  See CORBIN ON CONTRACTS, § 56.6 (Rev. ed. 2005):

> The term "consequential damages" has often been used with respect to harm suffered as a "consequence" of the breach or duty, but not as a direct and immediate and foreseeable consequence. The use of this expression is continued in the Uniform Commercial Code.  It may be that "consequential damages" is a term used loosely as a synonym for "special" as opposed to "general' damages.  If such damages are not recoverable, it is for reasons that are stated herein regarding foreseeability and remoteness. Sometimes a contract contains a provision against liability for consequential damages.  The interpretation given to the term usually seems to be that suggested herein. *Id.*

*See also* BLACK'S LAW DICTIONARY (7th ed. 1999), p. 394: "***consequential damages.***  Losses that do not flow directly and immediately from an injurious act, but that result indirectly from the act."

We find that these damages have been proven by a preponderance of the evidence.

Focus's claim for lost profits

Focus claims that it is entitled to recover its projected loss of profits that would have been realized from the eventual marketing of its parcels had respondents not cancelled the project in March of 2008.    Respondents argue that the profits claimed in this instance are "consequential damages" and are therefore non-recoverable under Section 15.10 of the Operating Agreement. Section 15.10, the Arbitration clause, explicitly provides that the Arbitrator in a dispute such as this has "no authority to award punitive or consequential damages."

The primary Focus witnesses in support of this claim were John Ritter and Thomas Devore.  Both agreed that they based this claim on a projection provided by at least two of the

71

respondents to the Lenders shortly before the Focus Takedown in October of 2007, a projection Focus claims was used in an attempt to secretly co-opt Focus's investment in South Edge. Aside from respondents' motives, which are dealt with in our resolution of Focus's claims of breach of the implied covenant of good faith and fair dealing, respondents did make such a presentation to the Lenders in which respondents projected potential marketing profits at $72 million. See Exhibit 520. In short, Focus theorizes that respondent's own marketing projections provide a competent starting point for proof of this damage claim. Refining those projections, Mr. Ritter testified, that Focus's profit losses, "flowing from the breach," totaled $52 million.

Certainly, Focus bore the burden of proving its lost profits. We note, however, that Mr. Devore, the designated Focus NRCP 30(b)(6) witness during discovery, denied having conducted a market analysis of the prior projections and had no opinion on the extent of the lost profits claim other than to opine that it was understated. Rather, he deferred to Mr. Ritter with regard to refinements of respondents' projections and to provide support for this damage component. Unfortunately, Mr. Ritter did not offer much in the way of refinements and had to concede that respondents' original $72 million dollar projection in October of 2007 assumed a sale from the Focus Takedown parcel to Stations Casinos in the amount of $100 million, when the ultimate sale was consummated for $71 million, and that the ability to realize a return on the investment in comparison to what the respondents could have realized was in part affected by the fact that Focus was neither a Standard and Poors nor Moody's rated company (such ratings allowed certain Members to submit letters of credit to satisfy MI deposits rather than cash as was required for the Focus Takedown). Evidence also demonstrated that respondents' projections

72

assumed that Focus would have defaulted and that the respondents could have acquired the Focus parcel at 80% of its value under Section 2.4.2 of the Operating Agreement.

In summary, Mr. Ritter was only able to generalize concerning the extent of these losses, adding little in the way of substantive analysis of the lost profits claim. While at least one Nevada case, *Eaton v. J.H. Inc.*, 94 Nev. 446, 581 P.2d 14 (1978), sustained a claim of lost profits under a theory of contractual breach, the claim in that case was allowed based upon a clear history of profit accumulation, profits that could no longer be realized as a proximate result of the breach. "To recover lost profits it must be shown to a reasonable certainty that those damages would have been sustained." *Id.* at 94 Nev. 450, 581 P.2d 17. No such proofs were elicited here. Accordingly, we conclude that this claim fails for a lack of proof to a reasonable certainty. [36]

## Holdings Manager Damages

Focus, on behalf of Holdings Manager, seeks $6.824 million, the alleged unpaid balance of the Holdings Manager Management Fee under Section 2.3.7 of the Operating Agreement:[37]

> 2.3.7   Payment to Fund Management Fee.   Each Member shall pay to the Company [its proportionate share of the Management Fee] . . . as provided herein. Fifty percent (50%) of the portion of the Management Fee payable by the Member shall be due and payable at the time TE Closing Payment is due and payable, 25% shall be due and payable on the date that the Parent Final Map is recorded, and the remaining 25% shall be due and payable at the time of completion of the Major Infrastructure to the extent necessary for Members to obtain building permits for Phase 2 improvements area, i.e., the upper water zone).

---

[36] In making this determination, we have given no weight to the testimony of Respondent witnesses that the projections they submitted to JP Morgan in October of 2007 was "pure speculation," although we so conclude.
[37] This figure is net based upon the amounts owed by Focus and defaulting Members Kimball Hill and Woodside.

CONFIDENTIAL

Mr. Ritter testified that the final installment was due and owing because the water facility was "substantially complete" or otherwise "almost complete."  We conclude that the evidence that the facility was "substantially complete," fails to prove that the final 25% per cent installment is now due and owing.  Moreover, Focus conceded during discovery that the condition precedent to the final payment had not been met.

Prevailing Party

The panel having found that both sides have prevailed on major issues, it now finds that neither side has truly prevailed in the arbitration *per se*.  Therefore we exercise our discretion in not awarding prevailing party fees or costs.

/

/

/

/

/

/

/

/

/

/

/

74

CONFIDENTIAL

## X.  FINAL AWARD

ACCORDINGLY, the panel awards as follows:

- Claimants take nothing by reason of their specific performance claims herein.

- Counterclaimants take nothing by virtue of their counterclaims herein.

- Focus is awarded direct and immediate damages for breach of contract in the sum of $36,815,354 as set forth above.

- Focus takes nothing by virtue of its lost profits claim herein.

- There being no prevailing party in this arbitration, no prevailing party fees or costs will be awarded.

Dated: ~~May~~ JULY 6, 2010


DAVID WARNER HAGEN, Chair

A.  WILLIAM MAUPIN

ROBERT R. ROSE

75

CONFIDENTIAL