1 I. SCOTT BOGATZ (NSBN 3367)                     **E-FILED ON DECEMBER 22, 2010**
  CHARLES M. VLASIC III (NSBN 11308)
2 BOGATZ & ASSOCIATES, P.C.
  3455 Cliff Shadows Parkway, Suite 110
3 Las Vegas, Nevada 89129
  Telephone: (702) 776-7000
4 Facsimile: (702) 776-7900

5 ROBERTO J. KAMPFNER (*pro hac vice* pending)
  JOSHUA M. KEESAN (*pro hac vice* pending)
6 WHITE & CASE LLP
  633 West Fifth Street, Suite 1900
7 Los Angeles, CA 90071
  Telephone: 213-620-7700
8 Facsimile:  213-452-2329

9 Attorneys for
  FOCUS SOUTH GROUP, LLC and
10 HOLDINGS MANAGER, LLC

11                      UNITED STATES BANKRUPTCY COURT

12                        DISTRICT OF NEVADA (LAS VEGAS)

13

14

15  In re:                                    Case No. 10-32968

16  SOUTH EDGE, LLC,                          Chapter 11

17                 Involuntary Debtor.        **DECLARATION OF THOMAS J. DEVORE IN
                                              SUPPORT OF MOTION (I) TO PREVENT
18                                            KLEE, TUCHIN, BOGDANOFF & STERN
                                              LLP FROM REPRESENTING SOUTH EDGE,
19                                            LLC AND (II) TO APPOINT A RESPONSIBLE
                                              OFFICER TO HIRE COUNSEL AND
20                                            DETERMINE WHETHER THE PETITION
                                              SHOULD BE CONTROVERTED;
21                                            MEMORANDUM OF POINTS AND
                                              AUTHORITIES**

22                                            <u>**Hearing Date**</u>

23                                            Date:  TBA
                                              Time: TBA
24

25

26

27

28

                    DEVORE DECLARATION IN SUPPORT OF MOTION TO PRECLUDE KTB&S AND
                              TO APPOINT RESPONSIBLE OFFICER

# DECLARATION OF THOMAS J. DEVORE

I, Thomas J. DeVore, declare, as follows:

1.  I am an individual over eighteen years of age.  Unless otherwise indicated, I have personal knowledge of the following facts and, if called up on to testify, I could testify competently thereto.

2.  I am the Manager of Focus Investment Manager, LLC, manager of Focus South Group, LLC ("Focus").  Holdings Manager, LLC ("Holdings Manager") is an affiliate of Focus and serves as the General Manager for South Edge.  In my capacity as manager of Focus, and through my affiliation with South Edge's General Manager, I am one of the persons responsible for maintaining Focus's business records, including the various documents and agreements referenced in this declaration.

3.  On or about May 3, 2004, the Members entered into the Amended and Restated Operating Agreement of South Edge, LLC (the "Operating Agreement").  Attached hereto as Exhibit A is a true and correct copy of the Operating Agreement.

4.  The First Amendment to Amended and Restated Operating Agreement was executed on or about October 29, 2004 (the "First Amendment").  Attached hereto as Exhibit B is a true and correct copy of the First Amendment.

5.  On or about March 8, 2007, the Members entered into a Second Amended and Restated Operating Agreement (the "Second Amendment").  Attached hereto as Exhibit C is true and correct copy of the Second Amendment.

6.  After the completion of a two-week arbitration hearing, the arbitral panel issued its award (the "Award"), which granted Focus $36,815,354 in damages as compensation for the Builders' failure to meet its obligations under the Operating Agreement.  Attached hereto as Exhibit D is a true and correct copy of the Award.

7.  Focus's repayment guaranties were released by the Lenders when Focus made all of its takedowns in October 2007.

8.  On December 16, 2010, KTB&S filed its Notice of Appearance and Request for

- 2 -

1   Papers (the "Notice of Appearance").  The Notice of Appearance alleges that South Edge will

2   appear in this proceeding by and through KTB&S.  Focus, a Member of South Edge, was not

3   consulted with respect to and did not vote on the retention of KTB&S.

4         9.      On December 16, 2010, the Builders also circulated a so-called "Action by

5   Written Consent of the Management Committee of South Edge, LLC" (the "Action").  Attached

6   hereto as Exhibit E is a true and correct copy of the Action.

7         10.     At the time that the Builders began causing defaults under the Credit Agreement,

8   the General Manager recommended to the Management Committee that South Edge retain

9   independent counsel.  I attended Management Committee meetings where such recommendation

10  was made on March 24, 2008, March 31, 2008, April 14, 2008, April 28, 2008, and May 27,

11  2008.

12      //

13      //

14      //

15      //

16      //

17      //

18      //

19      //

20      //

21      //

22      //

23      //

24      //

25      //

26      //

27      //

28

- 3 -

1    I declare under penalty of perjury under the laws of the State of Nevada and the United

2    States of America that the foregoing is true and correct.

3        Executed on December 20, 2010, at Las Vegas, Nevada

4

5

6

7        Thomas J. DeVore

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -

DEVORE DECLARATION IN SUPPORT OF MOTION TO PRECLUDE KTB&S AND TO

# EXHIBIT A

AMENDED AND RESTATED

OPERATING AGREEMENT

OF

SOUTH EDGE, LLC

A Nevada limited-liability company

08571.00030

AMENDED AND RESTATED

OPERATING AGREEMENT
OF
SOUTH EDGE, LLC

**Table of Contents**

|  |  |  | PAGE |
|---|---|---|---|
| 1. | **THE COMPANY** | | 1 |
|  |  |  | 1 |
|  | 1.1. | DEFINITIONS | 1 |
|  | 1.2. | PURPOSE; POWERS | 2 |
|  | 1.3. | PRINCIPAL PLACE OF BUSINESS | 2 |
|  | 1.4. | TERM | 2 |
|  | 1.5. | AUTHORIZED MEMBERSHIP UNITS | 2 |
|  | 1.6. | TITLE TO PROPERTY | 2 |
| 2. | **MEMBERS' CAPITAL CONTRIBUTIONS** | | 3 |
|  |  |  | 3 |
|  | 2.1. | DEFINITIONS | 5 |
|  | 2.2. | INITIAL CAPITAL CONTRIBUTIONS | 6 |
|  | 2.3. | ADDITIONAL CAPITAL CONTRIBUTIONS AND OTHER PAYMENTS IF COMPANY WINS AUCTION | 10 |
|  | 2.4. | FAILURE TO MAKE CAPITAL CONTRIBUTIONS | 12 |
|  | 2.5. | CAPITAL ACCOUNTS | 13 |
|  | 2.6. | NO CERTIFICATION OF UNITS | 13 |
| 3. | **ALLOCATIONS** | | 13 |
|  |  |  | 13 |
|  | 3.1. | DEFINITIONS | 14 |
|  | 3.2. | PROFITS | 14 |
|  | 3.3. | LOSSES | 15 |
|  | 3.4. | SPECIAL ALLOCATIONS | 16 |
|  | 3.5. | CURATIVE ALLOCATIONS | 17 |
|  | 3.6. | LOSS LIMITATION | 17 |
|  | 3.7. | OTHER ALLOCATION RULES | 17 |
|  | 3.8. | TAX ALLOCATIONS: CODE SECTION 704(C) | 18 |
| 4. | **DISTRIBUTIONS** | | 18 |
|  |  |  | 18 |
|  | 4.1. | NET CASH FLOW | 18 |
|  | 4.2. | AMOUNT WITHHELD | 18 |
|  | 4.3. | LIMITATIONS ON DISTRIBUTIONS | 18 |
| 5. | **MANAGEMENT** | | 18 |
|  | 5.1. | MANAGERS; MANAGEMENT COMMITTEE | 22 |
|  | 5.2. | MEETINGS OF THE MANAGEMENT COMMITTEE | 23 |
|  | 5.3. | MANAGEMENT COMMITTEE DUTIES | 23 |
|  | 5.4. | REIMBURSEMENTS | 24 |
|  | 5.5. | INDEPENDENT ACTIVITIES; NONCOMPETITION | 25 |
|  | 5.6. | TRANSACTIONS WITH AFFILIATES | 25 |
|  | 5.7. | GENERAL MANAGER; DUTIES, POWERS | 25 |

| | | |
|---|---|---|
| 5.8. | GENERAL MANAGER; SPECIFIC POWERS | 27 |
| 5.9. | INTENTIONALLY OMITTED | 29 |
| 5.10. | DETERMINATION OF THE MAXIMUM BID | 29 |
| 5.11. | LIMITATIONS | 31 |
| 5.12. | PROCEDURAL FORMALITIES | 31 |
| 5.13. | BUSINESS PLAN | 32 |
| **6.** | **MEMBERS** | **32** |
| 6.1. | RIGHTS OR POWERS | 32 |
| 6.2. | VOTING RIGHTS | 33 |
| 6.3. | MEETINGS OF THE MEMBERS | 34 |
| 6.4. | WITHDRAWAL; RESIGNATION | 34 |
| 6.5. | MEMBER COMPENSATION | 35 |
| 6.6. | MEMBER LIABILITY; NO FIDUCIARY DUTIES | 35 |
| 6.7. | PARTITION | 35 |
| 6.8. | CONFIDENTIALITY | 36 |
| 6.9. | TRANSACTIONS BETWEEN A MEMBER AND THE COMPANY | 37 |
| 6.10. | OTHER INSTRUMENTS | 37 |
| 6.11. | ALLOCATION AND CONVEYANCE OF THE SUBJECT PROPERTY | 39 |
| 6.12. | PROCEDURAL FORMALITIES | 39 |
| **7.** | **REPRESENTATIONS, WARRANTIES AND COVENANTS** | **39** |
| 7.1. | IN GENERAL | 39 |
| 7.2. | REPRESENTATIONS, WARRANTIES AND COVENANTS | 39 |
| **8.** | **ACCOUNTING, BOOKS AND RECORDS** | **42** |
| 8.1. | ACCOUNTING, BOOKS AND RECORDS | 44 |
| 8.2. | TAX MATTERS | 45 |
| 8.3. | CLASSIFICATION | 45 |
| **9.** | **AMENDMENTS** | **45** |
| 9.1. | PROPOSAL OF AMENDMENTS | 45 |
| 9.2. | APPROVAL OF AMENDMENTS | 45 |
| 9.3. | LIMITATIONS ON AMENDMENTS | 46 |
| **10.** | **WITHDRAWAL AND TRANSFERS** | **46** |
| 10.1. | RESTRICTIONS ON WITHDRAWALS | 46 |
| 10.2. | RESTRICTIONS ON TRANSFERS; PERMITTED TRANSFERS | 48 |
| 10.3. | INTENTIONALLY DELETED | 48 |
| 10.4. | ADMISSION OF ADDITIONAL AND SUBSTITUTED MEMBERS | 50 |
| 10.5. | DISTRIBUTIONS AND ALLOCATIONS WITH RESPECT TO TRANSFERRED UNITS | 50 |
| 10.6. | EXTENSION OF TIME | 51 |
| 10.7. | TRANSFERS AFTER CONVEYANCE OF PODS | 51 |
| **11.** | **DEFAULT** | **51** |
| 11.1. | EVENTS OF DEFAULT | 53 |
| 11.2. | AVAILABILITY OF REMEDIES | 54 |
| **12.** | **DISSOLUTION AND WINDING UP** | **54** |
| 12.1. | DISSOLUTION EVENTS | 54 |
| 12.2. | WINDING UP | |
| 12.3. | COMPLIANCE WITH CERTAIN REQUIREMENTS OF REGULATIONS; DEFICIT CAPITAL ACCOUNTS | 55 |

08571.00030

| | | |
|---|---|---|
| 12.4. | DEEMED CONTRIBUTION AND DISTRIBUTION | 55 |
| 12.5. | RIGHTS OF MEMBERS | 55 |
| 12.6. | NOTICE OF DISSOLUTION | 56 |
| 12.7. | TERMINATION | 56 |
| 12.8. | ALLOCATIONS DURING PERIOD OF LIQUIDATION | 56 |
| 12.9. | CHARACTER OF LIQUIDATING DISTRIBUTIONS | 56 |
| 12.10. | FORM OF LIQUIDATING DISTRIBUTIONS | 56 |

**13. INDEMNIFICATION** ........................................................................... **56**

**14. FEES OF GENERAL MANAGER AND ITS AFFILIATES** ............... **57**

| | | |
|---|---|---|
| | | 57 |
| 14.1. | MANAGEMENT FEE | 57 |
| 14.2. | INTENTIONALLY DELETED | 57 |
| 14.3. | PAYMENT SCHEDULE | 57 |
| 14.4. | LANDTEK FEES | 58 |
| 14.5. | BROKERAGE COMMISSIONS | 58 |

**15. MISCELLANEOUS** ............................................................................... **58**

| | | |
|---|---|---|
| 15.1. | NOTICES | 58 |
| 15.2. | BINDING EFFECT | 58 |
| 15.3. | CONSTRUCTION | 59 |
| 15.4. | TIME | 59 |
| 15.5. | HEADINGS | 59 |
| 15.6. | SEVERABILITY | 59 |
| 15.7. | ENTIRE AGREEMENT; INCORPORATION BY REFERENCE | 59 |
| 15.8. | VARIATION OF TERMS | 59 |
| 15.9. | GOVERNING LAW; VENUE | 60 |
| 15.10. | ARBITRATION | 61 |
| 15.11. | COUNTERPART EXECUTION | 61 |
| 15.12. | SPECIFIC PERFORMANCE | 61 |
| 15.13. | ATTORNEYS' FEES | 61 |
| 15.14. | NON-WAIVER | 62 |
| 15.15. | CREDITORS | 65 |

**SCHEDULE I—DESCRIPTION OF SUBJECT PROPERTY** ..................... **65**

**SCHEDULE II– MEMBERS** .......................................................................... **67**

**SCHEDULE III—FORM OF ACQUISITION AGREEMENTS** ................... **68**

**APPENDIX A – INDEX OF DEFINED WORDS AND PHRASES** ............ **A-1**

# AMENDED AND RESTATED

## OPERATING AGREEMENT
## OF
## SOUTH EDGE, LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") of South Edge, LLC, a Nevada limited-liability company (the "Company"), is made and entered into and shall be effective as of the 3rd day of May, 2004, by and among Holdings Manager, LLC, a Nevada limited-liability company (the "General Manager") and the other undersigned persons who comprise all of the members of the Company (such other undersigned persons are herein referred to as the "Members"). This Amended and Restated Operating Agreement amends and restates in its entirety that certain operating agreement executed by the undersigned dated as of May 3, 2004.

## 1.     THE COMPANY

### 1.1.   DEFINITIONS

Capitalized words and phrases used in this Agreement have the meanings provided for in this Agreement. Although **Appendix A** to this Agreement contains a summary index of the key capitalized words and phrases used in this Agreement, **Appendix A** is not an exhaustive list of all of such capitalized words and phrases.

### 1.2.   PURPOSE; POWERS

The primary purposes and objectives of the Company shall be to: (a) provide a vehicle and a process for the Members to make a joint bid at the Bureau of Land Management ("BLM") auction to be held in June 2004 (the "Auction") of real property consisting of approximately 1,940 gross acres located in the City of Henderson, Nevada as such is described in **Schedule I** to this Agreement (the "Subject Property") on which will be developed a master planned community (the "Community"); (b) if the Company's bid at the Auction is successful, to formulate a conceptual plan for the development of the Subject Property, obtain necessary approvals and authorizations for the subdivision of the Subject Property into the Pods (as hereinafter defined), to design and install certain infrastructure improvements, and allocate and convey the Subject Property to the Members in proportion to their respective Percentage Interests and the terms of this Agreement; (c) provide a mechanism for sharing among the Members of the pre-Auction investigation and due diligence costs and expenses and the costs and expenses associated with the conceptual planning and the mapping of the Subject Property, to acquire of necessary approvals and authorizations for the development of the Subject Property, and the engineering, design and construction of the major on-site and offsite infrastructure improvements necessary to serve the Community and to obtain and record the Parent Final Map, including, without limitation, wet and dry utilities, drainage, roadway and master plan

08571.00030

landscaping improvements (the "Major Infrastructure"); (d) prepare and record appropriate design and architectural guidelines and CC&R documents which shall govern the Community and the Members' development thereof; and (e) conduct any other lawful business activity permitted by Nevada law and to perform all acts in furtherance thereof. The Company has the power to do any and all acts that are necessary, appropriate, proper, advisable, incidental or convenient to carry out the purposes of the Company.

### 1.3.    PRINCIPAL PLACE OF BUSINESS

The Company's principal place of business shall be 3455 Cliff Shadows Parkway, Suite 220, Las Vegas, Nevada 89129. In its sole discretion, the Management Committee (as defined in Section 5.1 of this Agreement) may change the Company's principal place of business to any other place within the State of Nevada upon written notice to the Members.

### 1.4.    TERM

The term of the Company shall commence on the date the Company's articles of organization (the "Articles") are filed in the office of the Nevada Secretary of State in accordance with Chapter 86 of the Nevada Revised Statutes, governing limited liability companies, as amended from time to time (the "NRS"), or such later date to the extent specified in the Articles (the "Effective Date"), and shall continue until the dissolution and winding up of the Company is completed pursuant to Section 12 of this Agreement.

### 1.5.    AUTHORIZED MEMBERSHIP UNITS

The Company shall be authorized to issue one thousand, nine hundred forty (1,940) ("Units"). Each Unit shall represent an ownership interest in the Company, including any and all benefits to which the holder of such Units may be entitled as provided in this Agreement, together with all obligations of such person to comply with the terms and provisions of this Agreement. The number of authorized Units may be increased in the sole discretion of the Management Committee without the affirmative vote or written consent of the Members, subject to Section 2.2.4, below. The Company may issue fractional Units. The transfer of Units is restricted and must be made in accordance with the terms and conditions of this Agreement and the Acquisition Agreements (as defined herein), where, for the purposes of this Agreement, "transfer" means, as a noun, any voluntary or involuntary transfer, sale, pledge, hypothecation, encumbrance or other disposition and, as a verb, to voluntarily or involuntarily transfer, sell, pledge, hypothecate, encumber or otherwise dispose of.

### 1.6.    TITLE TO PROPERTY

At all times after the Effective Date, any and all real and personal property acquired by the Company, including, without limitation, cash, improvements to property and tangible or intangible property ("Property"), shall be held, and owned by and conveyed in the name of the Company as an entity, and not in the name of any Member, provided, however, that if the Company's bid at the Auction is successful then the Subject Property shall be allocated among the Members and conveyed to the Members in accordance with the terms of this Agreement and the Acquisition Agreements (as hereinafter defined), net of Public Sites (as hereinafter defined).

Each Unit shall be personal property for all purposes. No Property shall be transferred for, or in payment of, any obligation of any Member.

## 2. MEMBERS' CAPITAL CONTRIBUTIONS

### 2.1. DEFINITIONS

2.1.1.    "Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.  For purposes of this Agreement, "control" (including the terms "controlled by" and "under common control with") with respect to the relationship between or among two or more Persons, means either (i) the possession, directly or indirectly or as a trustee or executor, of the power to direct or cause the direction of the management and policies of a Person whether through the ownership of voting securities, as trustee or executor, by contract or otherwise, including the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the management and policies of such Person or (ii) direct or indirect, record or beneficial, ownership of at least 50% of the outstanding equity, capital, or right to profits of such Person.  Notwithstanding the foregoing: (a) a Person's position as officer, employee, or director of a corporation or limited liability company shall not in an of itself be deemed to be control of such corporation or limited liability company by such Person and (b) a Person shall not be deemed an Affiliate of another Person solely as a result of ownership of securities of a company which has a class of securities registered under Section 12 of the Securities Exchange Act of 1934.

2.1.2.    "Allocation Year" or "Tax Year" means the calendar year.

2.1.3.    "BLM Purchase Price" means the aggregate cost of acquisition of the Subject Property from the BLM if the Company wins the Auction.

2.1.4.    "Book Adjustments"  shall mean adjustments with respect to the Gross Asset Value of the Company's assets for depreciation, depletion, amortization, and gain or loss, as computed in accordance with Section 1.704-1(b)(2)(iv)(g) of the Regulations.

2.1.5.    "Business Plan" means the business plan and operating budget as approved by the Members, and as amended from time to time with the approval of the Members, pursuant to Section 5.13 hereof.

2.1.6.    "Capital Contributions" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any Property (other than money) contributed to the Company with respect to such Member's Units.

2.1.7.    "Code" means the Internal Revenue Code of 1986, as amended from time to time.

2.1.8.    "Fiscal Year" means the fiscal year of the Company as established by the Business Plan, and if not so established shall mean the calendar year. "Fiscal Quarter" means

each three-month quarterly segment of the Fiscal Year, the first such quarter commencing with the first day of the Fiscal Year.

2.1.9.    "Focus Member" means Focus South Group, LLC, a Nevada limited liability company, which is a Member and is an Affiliate of the General Manager.

2.1.10.    "Gross Asset Value" means, with respect to any Property, the fair market value of such Property at the time of its contribution to the Company (as adjusted by Book Adjustment) without respect to the assets of the Company that have been revalued, the fair market value of such assets as adjusted pursuant to Code Section 732(d) or 734, 743 and 754 whenever it is determined by the Management Committee, in the Management Committee's business judgment, that such adjustment is appropriate and advantageous to the Company.

2.1.11.    "Land Financing" means, if the Company wins the Auction, any borrowings by the Company to finance a portion of the BLM Purchase Price, it being the intent of the Members that such borrowings will finance 50% of the BLM Purchase Price or such other percentage thereof as may be authorized by the Management Committee pursuant to Sections 5.1.1 and 5.1.2(f), will be secured by the Subject Property, and will be outstanding from the closing of the purchase of the Subject Property from BLM until the conveyance of the Pods to the Members when the Members' Conveyance Payments will be applied in part to pay off such borrowings and the Pods will be released from the Land Financing lien at release prices equal to par. In no event will the Land Financing cover the portion of the BLM Purchase Price payable as the BLM Deposit as herein defined. The BLM Deposit shall be funded by Member capital contributions pursuant to Section 2.2. The amount of the BLM Purchase Price not funded by capital contributions pursuant to Section 2.2 or by the Land Financing shall be funded by further Member capital contributions pursuant to Section 2.3.

2.1.12.    "Majority" means the Members holding a majority of the Percentage Interests (as defined in Section 2.1.18 of this Agreement).

2.1.13.    "Management Committee" shall have the meaning ascribed in Section 5.1.1.

2.1.14.    "Manager" shall have the meaning ascribed in Section 5.1.1.

2.1.15.    "Member BLM Price" means, if the Company wins the Auction, with respect to each Member, such Member's Percentage Interest of the BLM Purchase Price.

2.1.16.    "Member Consideration" means the total consideration paid by a Member for Pods including, without limitation, all Capital Contributions under Sections 2.2 and 2.3.

2.1.17.    "Parent" means any person who holds, directly or indirectly, a majority of the outstanding equity securities of or comparable interests in a Member.

2.1.18.    "Parent Final Map" means the final map as approved by the applicable governmental authorities and recorded in the real estate records of Clark County, Nevada by which the Subject Property is divided into large lots in accordance with NRS Chapter 278, and in conformity with the terms of this Agreement.

08571 00030

2.1.19.    "Percentage Interest" of each Member means, as of any date, the ratio (expressed as a percentage) of the number of Units held by such Member on such date to the aggregate Units held by all Members on such date.

2.1.20.    "Person" means any partnership, joint venture, association, corporation, limited liability company, trust or other entity and, where the context so permits or requires, a natural person.

2.1.21.    "Profits" and "Losses" mean, for each Allocation Year, the income gain, loss, deductions, and credits, as the case may be, of the Company (including items not subject to federal income tax or deductible for federal income tax purposes and shall include adjustments due to Revaluations such that increases to the Gross Asset Value of any asset shall be treated as an item of gain and decreases to the Gross Asset Value of any asset shall be treated as an item of loss), whether in the aggregate or separately stated, as appropriate, determined under federal income tax principles.

2.1.22.    "Regulations" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations are amended from time to time.

2.1.23.    "Revaluation" shall mean an adjustment to the Gross Asset Value of any asset of the Company pursuant to Regulations Section 1.704-1(b)(2)(iv)(f) or, if applicable, Regulations Section 1.704-1(b)(2)(iv)(q), subject to Book Adjustments.

2.1.24.    "Supermajority" shall mean the Members holding at least 75% of the Percentage Interests.

## 2.2.    INITIAL CAPITAL CONTRIBUTIONS

Each Unit shall be issued to the Members in consideration for the Capital Contributions provided for in this Agreement. Each Member shall be issued Units in direct proportion to the number of gross acres of the Subject Property which has been allotted to the Member to acquire ("Member Acreage Allotment") as set forth in the attached **Schedule II**, which is incorporated herein and subject to adjustment pursuant to Section 6.11.2. The total of all of the Member Acreage Allotments equals the total gross acreage of the Subject Property. All payments by a Member pursuant to Sections 2.2 and 2.3 shall be deemed consideration for Pods that it acquires under this Agreement.

The name, address, initial Capital Contribution, initial Units and initial Percentage Interest of each Member are set forth in **Schedule II**. The Management Committee shall amend **Schedule II** from time to time to reflect the admission of additional Members or transfers among Members. The initial or additional Capital Contribution of a Member shall consist of cash. The amount of the initial capital contribution to be made by each Member and the payment schedule are as follows:

2.2.1.    Initial Funding. Each Member has contributed, Six Hundred Dollars ($600.00) for each acre (pro rated for any fractional acre) in the Member Acreage Allotment ("Initial Payment").

2.2.2.  **Interim Payment.** Five Thousand Dollars ($5,000.00) for each acre (pro rated for any fractional acre) in the Member Acreage Allotment shall be due and payable by each Member to the Company no later than May 1, 2004 ("Interim Payment").

2.2.3.  **Bid Payment.** The bid payment (the "Bid Payment") for each Member shall be due and payable no later than the later to occur of May 15, 2004 or the date the Maximum Bid is determined in accordance with this Agreement. The amount of the Bid Payment for each Member shall be determined pursuant to Section 5.10.

The Initial Payment shall be applied by the General Manager for the Company's pre-Auction costs including costs associated with investigation, conceptual planning, mapping, engineering, legal, accounting and other expenses authorized by the Business Plan or vote of the Management Committee. Except for third party fees and expenses, the General Manager shall not be reimbursed for any costs unless authorized by the Business Plan or the Management Committee. The Interim Payment and Bid Payment shall be used to pay the required deposit (the "BLM Deposit") in the event that the Company's bid at the Auction is successful. In the event that the Company's bid at the Auction is not successful, then unexpended amounts remaining from the Initial Funding, after payment or satisfaction of all fees, costs, or expenses of the Company, together with the Interim Payment and the Bid Payment, will be refunded to the Members in accordance with their respective Percentage Interests pursuant to Article 12. Except as provided in the preceding sentence or in Section 5.10, none of the payments under Sections 2.2 and Section 2.3 are refundable for any reason.

2.2.4.  **Changes in Member Acreage Allotments, Etc.** After the Members make the Interim Payments, the Member Acreage Allotments, the Members' respective Units and the Percentage Interests shall not change except as the result of transfers between existing Members, upon default of a Member, pursuant to Section 2.4.1, pursuant to Section 5.10, pursuant to Section 6.11.1, pursuant to Section 6.11.2, or otherwise in accordance with the terms of this Agreement, unless otherwise approved by the Management Committee by affirmative vote of the Managers representing a Supermajority provided, however, that if a particular Member is being materially, adversely and disproportionately impacted by such change, such change also shall require approval of such Member.

2.3.  **ADDITIONAL CAPITAL CONTRIBUTIONS AND OTHER PAYMENTS IF COMPANY WINS AUCTION**

In addition to the initial Capital Contributions of the Members, if the Company is the successful bidder at the Auction, then the Management Committee shall determine the amounts of additional Capital Contributions required of each Member for the payment of the expenses of the Company authorized from time to time by the Business Plan or by the Management Committee, which shall be payable as follows:

2.3.1.  **Post-Auction Capital Calls For Expenses.** The Management Committee shall provide in the Business Plan or by vote of the Management Committee the amounts necessary from time to time to fund post-Auction planning, mapping, engineering, legal, and other costs and expenses authorized to be incurred by the Company. The General Manager shall issue notices to each Member calling for Additional Capital Contributions in the amounts determined

by multiplying the post-Auction costs by each Member's Percentage Interest. Each Member shall pay the full amount of each capital call under this Section 2.3.1 no later than ten (10) days after the date of the notice.

2.3.2.    Closing Payment. Each Member shall pay to the Company the sum of the Member's Percentage Interest of the following amounts: (a) the BLM Purchase Price less the amount paid by the Company for the BLM Deposit and less the net proceeds of the Land Financing; and (b) aggregate payments payable pursuant to the Land Financing for the six month period following the closing of the purchase of the Subject Property from BLM as projected in the Business Plan (collectively, the "Closing Payment"). The Closing Payment is due and payable no later than October 1, 2004.

2.3.3.    Financing Payments; Guarantees. In the event the Company shall obtain the Land Financing and/or any other loans or financings from time to time as such is approved by the Management Committee, each Member shall pay to the Company the Member's Percentage Interest multiplied by the sum of all principal, interest, points, advisory fees, and other charges, fees, costs, and expenses coming due thereunder or in connection therewith from time to time to the extent not otherwise covered by the proceeds of refinancings or other revenues directed by the Management Committee for the payment thereof in accordance with the Business Plan unless otherwise approved by the Management Committee by affirmative vote of Managers representing a Supermajority. Each Member shall pay the full amount of each capital call under this Section 2.3.3 no later than ten (10) days after the date of the notice thereof issued to the Members by the General Manager unless otherwise directed by the Management Committee. To the extent required by any lender of the Land Financing as such is approved by the Management Committee pursuant to Sections 5.1.1 and 5.1.2(f), each Member and any Affiliate of such Member (other than such an Affiliate who is a natural person) shall guaranty to the lender or lenders of the Land Financing, payment of such Member's Percentage Interest of all obligations of the Company to such lender or lenders; provided, however that the amount payable by a Member shall not exceed (and shall be limited by the terms of any such guaranty to) such Member's Percentage Interest of the Land Financing and other charges, fees, costs, and expenses referred to above, and that such guaranty shall be several, and not joint and several with the other Members and shall be based on a declining outstanding loan balance. Notwithstanding the foregoing, in lieu of providing such guaranty, any Member may provide an alternate form of credit enhancement so long as it is acceptable to the lender or lenders of the Land Financing. The Land Financing shall provide for the Pods to be released from the Land Financing lien at release prices equal to par and the guarantees of the Members to be released upon payment of such release prices. Notwithstanding anything herein to the contrary, the Company will not obtain any financing that would require the personal guaranty of any natural person.

2.3.4.    Conveyance Payment. Upon the conveyance to each Member of its respective Pod or Pods (as hereinafter defined) within the Subject Property to be conveyed to such Member in accordance with the terms of this Agreement and the applicable Acquisition Agreement (as hereinafter defined), such Member shall pay to the Company the amount of its Member BLM Price less the sum of the Interim Payment and the Bid Payment previously paid to the Company by such Member ("Conveyance Payment"). The Conveyance Payment shall be due and payable upon conveyance of the Member's respective Pods (as defined in Section 5.1.2) to the Member by the Company. Neither the Initial Funding payments nor any other contributions made by a

Member for Company costs or expenses shall be applied toward the Conveyance Payment. The Members shall be required to make all capital contributions under this Agreement notwithstanding that various of such Capital Contributions will fund costs and expenses of the Company and not be applied toward the Member BLM Price and all such capital contributions must be fully paid as a condition of the Member acquiring its respective Pods.

    2.3.5.   Commercial Deficiency Payment. As a portion of the real property it shall acquire from the Company, the Focus Member shall acquire the land designated for commercial uses (the "Commercial Land"). The Members acknowledge that the price per acre paid for the Subject Property at the Auction may exceed the then per acre value of the Commercial Land. The Members agree that such a deficiency in per acre value of the Commercial Land should not be borne by the Focus Member. In order to determine whether such a deficiency exists and the amount thereof, the Members agree that if the Company is the successful bidder at the Auction, then the Company shall engage two (2) MAI appraisers selected by the Management Committee to appraise the Commercial Land. The value of the Commercial Land shall be the average of the two (2) appraisals. If the value of the Commercial Land is less than its proportion (based on acreage) of the BLM Purchase Price paid by the Company for the Subject Property, then the amount of said difference (the "Commercial Deficiency") shall be quantified and shall be paid by each Member (other than the Focus Member) to the Company based on its Percentage Interest. Each other Member's share of the Commercial Deficiency shall be paid at the time it makes its Closing Payment, in addition thereto. The amount of the Commercial Deficiency paid by the Members other than the Focus Member shall be applied as a credit against the Closing Payment otherwise due from the Focus Member for the Commercial Land.

    2.3.6.   Major Infrastructure Payments. Each Member shall be responsible for the payment of a portion of all costs of the Major Infrastructure (the "Major Infrastructure Costs"). As used herein, the term Major Infrastructure Costs includes all "soft" costs and "hard" costs incurred by the Company in connection with the design, engineering, entitlement and construction of the Major Infrastructure and all construction management fees incurred in connection therewith other than those costs which are covered by the Management Fee. The portion of the Major Infrastructure Costs for which each Member shall be responsible (the "Member Costs") shall equal the proportion by which the gross acreage of the Pods to be conveyed to the Member bears to the total gross acreage of the Subject Property. The Member's obligation to pay the Member Costs shall survive the conveyance of the Pods. Each Member shall accept the Pods subject to the lien of the LID (as defined in Section 6.11.4) and shall be obligated thereby. Each Member at the closing of the conveyance of the Pods must deposit the sum equal to thirty percent (30%) of the projected total Member Costs (the "Member Cost Deposit"), as determined by the Management Committee based on the then latest budget(s) for such costs contained in the Business Plan. The Member Cost Deposit may be in the form of a commercial letter of credit for such amount and in form and substance satisfactory to the Management Committee. To the extent they can be determined by the Management Committee with reasonable certainty, the amount of the net proceeds of the LID shall be applied toward the calculation of projected total Member Costs in determining the amount of the Member Cost Deposit. The Member Cost Deposit shall be deposited at Closing (as described in Section 6.11.5) into a third-party construction control account (the "MCD Account") to be administered by an agent selected by the Management Committee (the "Disbursement Agent"). The MCD Account shall be governed by a disbursement agreement, the form of which shall be approved by

the Management Committee, which agreement shall provide for, inter alia: (i) disbursement to the Company only upon the presentation of invoices work completed and/or materials supplied (as confirmed by inspections to be performed by the Disbursement Agent); and (ii) the provision by each subcontractor of all necessary lien releases and insurance and tax certificates as a condition of payment. The MCD Account shall be an interest bearing account, with all interest earned thereon to be added to the account. The Member Cost Deposit and all other funds in the MCD Account shall be utilized by the Company to pay the last of the Major Infrastructure Costs to become due. Such funds shall be released from the MCD Account to the Company for such purpose on a progress of construction basis. If directed by the Management Committee, the General Manager or Landtek shall administer the MCD Account in lieu of a Disbursement Agent. No material expenditures for Major Infrastructure Costs shall be made except pursuant to the Business Plan or as approved by the Management Committee.

From and immediately upon the first incurrence of Major Infrastructure costs, until the expiration of the Initial Payment Period (as defined below), each Member shall deposit into the MCD Account on a monthly basis, in cash or immediately available funds, the portion of the Member Costs required for the payment of Major Infrastructure Costs to be expended during the following month, as reasonably determined by the Management Committee. On a periodic basis, but at no more than quarterly intervals or such other intervals as determined by the Management Committee, the Management Committee shall approve updated detailed budgets for the Major Infrastructure Costs as well as a projection of the Member Costs to become due over the upcoming 180 days. As used herein, the "Initial Payment Period" will expire as of the date the Management Committee reasonably determines that the total of the then remaining Major Infrastructure Costs is equal to or less than the sum of: (i) the total then on deposit in the MCD Account including the available amount of letters of credit delivered as Member Cost Deposits, (ii) the remaining net LID proceeds, and (iii) funds immediately available to the Company from other sources to pay Major Infrastructure Costs. The declaration of development covenants and restrictions to be recorded on each Pod shall contain provisions which shall create a lien on each Member's Pods securing payment only of such Member's Member Costs, which lien shall be extinguished with respect to any lot within the Pods upon the conveyance of the lot to a homeowner and in any event upon payment of such Member's Member Costs.

2.3.7.    Payments to Fund Management Fee. Each Member shall pay to the Company the amount of the Member's Percentage Interest multiplied by the Management Fee (as defined in Section 14) or any installment thereof, as and when such Management Fee or such installment thereof is due and payable to the General Manager as provided herein. Fifty percent (50%) of the portion of the Management Fee payable by the Member shall be due and payable at the time the Closing Payment is due and payable, 25% shall be due and payable on the date that the Parent Final Map is recorded, and the remaining 25% shall be due and payable at the time of completion of the Major Infrastructure to the extent necessary for Members to obtain building permits for the phase 2 improvements area, i.e., the upper water zone). Notwithstanding the foregoing, the Focus Member may, provided that it is an Affiliate of the General Manager, pay its share of the Management Fee to the General Manager by intercompany book entry or other means determined by the Focus Member and General Manager which shall be deemed full payment by the Focus Member of its obligation under this Section 2.3.7 for all purposes of this Agreement.

2.3.8.    <u>Adjustments to Capital Payments.</u>  The amount of the payments under Sections 2.2 and 2.3 shall be adjusted with the approval of the Management Committee to reflect changes resulting in modifications to Pod allocations pursuant to Section 6.11.1.  Such adjustments shall be effected as determined by the Management Committee through credits against future payment obligations, additional capital calls, adjustments to Capital Accounts, transfers among Members or such other means as determined by the Management Committee.

### 2.4.    FAILURE TO MAKE CAPITAL CONTRIBUTIONS

If a Member fails to make any portion of such Member's Capital Contribution as required by Section 2.2 or Section 2.3 (the "Non-Contributing Member"), any Member which has made all of its required payments ("Contributing Member") shall have the right to give written notice of such failure to the Non-Contributing Member, who shall have five (5) business days from the date of such written notice to cure such default (the "Cure Period") by providing payment in full of all amounts which are due and payable (the "Deficiency").  The Members acknowledge and agree that in light of the purposes of the Company and the funding deadlines inherent in the process of the Auction and closing of the purchase of the Subject Property from the BLM, that the remedies provided by Sections 2.4.1 and 2.4.2 are necessary and reasonable to allow the other Members to have a reasonable opportunity to satisfy the purposes of the Company. Monetary damages would be impractical to calculate and unlikely recoverable from the Non-Contributing Party in light of the potential magnitude of such damages and the remedies provided herein are reasonable in light of the cost of the remedy to the Non-Contributing Member balanced against the potential damages to the other Members and the Company.

2.4.1.    <u>Divestiture.</u>  Without limiting the remedies available to the Company and the Contributing Members but in addition thereto, if the Non-Contributing Member has failed to make any Capital Contribution required to be made pursuant to Section 2.2 or Section 2.3.2 of this Agreement after notice and expiration of the Cure Period, the Non-Contributing Member shall be divested of all of its Units and any other interests in the Company, and the Company shall retain all of the Capital Contributions received from the Non-Contributing Member.  The divested Units of such Non-Contributing Member shall be offered to the other Contributing Members in accordance with and on the terms and conditions determined by the Management Committee by affirmative vote of the Managers representing 75% of the Percentage Interests held by the Contributing Members.  If the Management Committee fails to so determine the terms and conditions, the Units shall be offered to the Contributing Members in proportion to their Percentage Interests at a price per Unit equal to the sum of the Non-Contributing Members' total Capital Contributions plus the Deficiency, divided by the total number of Units of the Non-Contributing Member.  If less than all of the Units of such Non-Contributing Member are acquired by the Contributing Members, then such remaining Units shall be disposed of as determined by the Management Committee by affirmative vote of the Managers representing 75% of the Percentage Interests held by the Contributing Members.  The Percentage Interests and Member Acreage Allotments shall be adjusted accordingly.

2.4.2.    <u>Mandatory Sale.</u>  Without limiting the remedies available to the Company and the Members but in addition thereto and whether or not other remedies have been invoked, if the Non-Contributing Member has made all payments required pursuant to Section 2.2 and has made its full Closing Payment pursuant to Section 2.3.2, but thereafter has failed to make any Capital

Contribution required to be made pursuant to Section 2.3 of this Agreement after notice and expiration of the Cure Period, then at the election of the Management Committee in its sole discretion, the Non-Contributing Member shall be required to sell all of its Units and any other interests in the Company for a sale price equal to 80% of the amount of the Non-Contributing Member's Capital Account (not including the Deficiency) less the amount of all legal, accounting, and other fees and expenses of the Company relating to the default or the buy-out transaction. The Units of such Non-Contributing Member shall be offered and sold to the Contributing Members in accordance with and on the terms and conditions determined by the Management Committee by affirmative vote of the Managers representing 75% of the Percentage Interests held by the Contributing Members. If the Management Committee fails to so determine the terms and conditions, the Units shall be offered to the Contributing Members in proportion to their Percentage Interests. If less than all of the Units of such Non-Contributing Member are acquired by the Contributing Members, then such remaining Units shall be disposed of as determined by the Management Committee by affirmative vote of the Managers representing 75% of the Percentage Interests held by the Contributing Members. Each Contributing Member or other Persons purchasing Units under this Section shall contribute to the Company the portion of the Deficiency which is proportional to the portion of the Units so purchased. The Percentage Interests and Member Acreage Allotments shall be adjusted accordingly. In the event that Pods were conveyed to a Member before it became a Non-Contributing Member, then such Non-Contributing Member's Capital Account shall be deemed reduced in the proportion that the gross acreage of such conveyed Pod(s) bears to the sum of the gross acreage of such conveyed Pods plus the gross acreage of all of the additional Pods which would have been conveyed to such Non-Contributing Member but for its failure to make any required payments.

2.4.3.    _Other Remedies_. If the Non-Contributing Member has failed to make any Capital Contribution required to be made pursuant to Section 2.3 of this Agreement, other than Section 2.3.2 and provided that the remedy in Section 2.4.2 in not invoked, then the following other remedies shall be available:

2.4.3.1.    _Advance_. Without limiting the remedies available to the Company and the Members but in addition thereto, the Management Committee may, but is not required to, elect to proceed under this Section 2.4.3.1, by permitting the Contributing Members to advance such funds to the Company on behalf of the Non-Contributing Member as a "Contribution Loan" from such Contributing Members to the Non-Contributing Member. Each Contributing Member shall have the right to participate in such Contribution Loan in proportion to its Percentage Interest. Each Contribution Loan shall bear simple interest at the greater of six percent (6%) above the prime rate (as published in The Wall Street Journal (or similar publication if The Wall Street Journal has then ceased to be published)) or eighteen percent (18%) (the "Penalty Rate"). The Contribution Loan shall be (i) treated as a Capital Contribution by the Non-Contributing Member, (ii) shall be secured by all of the Non-Contributing Member's Units, and (iii) shall be repayable on demand by the Non-Contributing Members as to their respective portions. Without limiting the foregoing, any right of the Non-Contributing Member to purchase Pods shall be conditioned upon the repayment of all outstanding amounts under the Contribution Loan. The Non-Contributing Member hereby authorizes the recordation

and filing of the appropriate financing statements to perfect the foregoing security interest.

2.4.3.2.  Additional Remedies.  The foregoing remedies are not intended to be exclusive, and the Company may pursue such other remedies, including, without limitation, the initiation of legal proceedings, that the Management Committee determines by affirmative vote of the Managers representing 75% of the Percentage Interests held by Members other than the Non-Contributing Member.

2.4.4.  Continuing Obligation.  Unless a remedy under Sections 2.4.1 or 2.4.2 has been successfully enforced, a Non-Contributing Member shall remain liable to the Company for such Deficiency and/or the Contribution Loan, as the case may be, together with simple interest at the Penalty Rate from the date of the Deficiency, until the payment thereof.

## 2.5.  CAPITAL ACCOUNTS

2.5.1.  Definition.  The term, "Capital Account," shall mean, with respect to any Member, the Capital Account maintained for such Member in accordance with the following provisions:

1.    Each Member's Capital Account shall be increased by:  (i) such Member's Capital Contributions; (ii) such Member's distributive share of Profits and any items in the nature of income or gain that are specially allocated pursuant to Section 3 of this Agreement; and (iii) the amount of any Company liabilities assumed by such Member or that are secured by any Property distributed to such Member; provided, however, the principal amount of a promissory note that is not readily traded on an established securities market and that is contributed to the Company by the maker of the note (or a Member related to the maker of the note within the meaning of Regulations Section 1.704-1(b)(2)(ii)(c)) shall not be included in the Capital Account of any Member until the Company makes a taxable disposition of the note or until (and to the extent that) principal payments are made on the note, all in accordance with Regulations Section 1.704-1(b)(2)(iv)(d)(2);

2.    Each Member's Capital Account shall be decreased by:  (i) the amount of money and the Gross Asset Value of any Property distributed to such Member pursuant to any provision of this Agreement; (ii) such Member's distributive share of Losses and any items in the nature of expenses or losses that are specially allocated pursuant to Section 3 of this Agreement; and (iii) the amount of any liabilities of such Member assumed by the Company or that are secured by any Property contributed by such Member to the Company;

3.    In the event Units are transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent such Capital Account relates to the transferred Units; and

4.    In determining the amount of any liability for purposes of subparagraphs (1) and (2) of this Section 2.5.1, Code Section 752(c) and any other applicable provisions of the Code and Regulations shall be taken into account.

08571.00030

2.5.2.    Intent.  The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the Management Committee shall determine that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases thereto (including, without limitation, the increases or decreases relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Members), are computed in order to comply with such Regulations, the Management Committee may make such modification, provided that such modification is not likely to have a material effect on the amounts distributed to any person pursuant to Section 12 of this Agreement upon the dissolution of the Company.    The Management Committee shall also make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q), and shall make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

### 2.6.    NO CERTIFICATION OF UNITS

The Units issued to each Member shall be uncertificated.

## 3.    ALLOCATIONS

### 3.1.    DEFINITIONS

3.1.1.    "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Allocation Year, after giving effect to the following adjustments:

Increase to such Capital Account of any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

Decrease to such Capital Account of the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

3.1.2.    "Company Minimum Gain" has the meaning given the term "partnership minimum gain" in Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

3.1.3.    "Member Nonrecourse Debt" has the same meaning as the term "Partner nonrecourse debt" in Regulations Section 1.704-2(b)(4).

3.1.4.    "Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such

Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

3.1.5.    "Member Nonrecourse Deductions" has the same meaning as the term "Partner nonrecourse deductions" in Section 1.704-2(i) of the Regulations.

3.1.6.    "Net Cash Flow" means the gross cash proceeds of the Company less the portion thereof used to pay or establish reserves for all Company expenses, debt payments, capital improvements, replacements and contingencies, all as determined by the Management Committee. "Net Cash Flow" shall not be reduced by depreciation, amortization, cost recovery deductions or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition.

3.1.7.    "Nonrecourse Deductions" has the meaning set forth in Regulations Section 1.704-2(b)(1).

3.1.8.    "Nonrecourse Liability" has the meaning set forth in Regulations Section 1.704-2(b)(3).

**3.2.    PROFITS**

After giving effect to the special allocations set forth in Sections 3.4 and 3.5 of this Agreement, Profits for any Allocation Year shall be allocated to and among the Members as follows:

3.2.1.    First, proportionately to each Member to the extent that (a) the cumulative Losses allocated to such Member pursuant to Section 3.3.3 of this Agreement exceeds (b) the Profits allocated to such Member pursuant to this Section 3.2.1;

3.2.2.    Second, proportionately to each Member to the extent that (a) the cumulative Losses allocated to such Member pursuant to Section 3.3.2 of this Agreement exceeds (b) the Profits allocated to such Member pursuant to this Section 3.2.2; and

3.2.3.    Third, to and among all the Members in accordance with their respective Percentage Interests.

**3.3.    LOSSES**

After giving effect to the special allocations set forth in Sections 3.4 and 3.5 of this Agreement, and subject to Section 3.6 of this Agreement, Losses for any Allocation Year shall be allocated to and among the Members as follows:

3.3.1.    First, proportionately to each Member to the extent that (a) the cumulative profits allocated to such Member pursuant to Section 3.2.3 of this Agreement exceeds (b) the cumulative Losses allocated to such Member pursuant to this Section 3.3.1;

3.3.2.    Second, proportionately to each Member to the extent that such Member's positive Capital Account balance exceeds zero; and then

3.3.3.    Third, to and among all the Members in accordance with their respective Percentage Interests.

**3.4.    SPECIAL ALLOCATIONS**

The following special allocations shall be made in the following order:

3.4.1.    Minimum Gain Chargeback.    Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding any other provision of this Section 3, if there is a net decrease in Company Minimum Gain during any Allocation Year, each Member shall be specially allocated items of the Company's income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 3.4.1 is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

3.4.2.    Member Minimum Gain Chargeback.    Except as otherwise provided in Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Section 3, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Allocation Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(5), shall be specially allocated items of the Company's income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 3.4.2 is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

3.4.3.    Qualified Income Offset.    In the event any Member unexpectedly receives any adjustment, allocation, or distribution described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), items of the Company's income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible; provided, however, that an allocation pursuant to this Section 3.4.3 shall be made only if, and to the extent that, the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 3 have been tentatively made as if this Section 3.4.3 were not in this Agreement.

3.4.4.    Gross Income Allocation.    In the event any Member, at the end of any Allocation Year, has a deficit Capital Account that is in excess of the amount such Member is obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1)

and 1.7042(i)(5), each such Member shall be specially allocated items of the Company's income and gain in the amount of such excess as quickly as possible; provided, however, that an allocation pursuant to this Section 3.4.4 shall be made only if, and to the extent that, such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 3 have been made as if Section 3.4.3 and this Section 3.4.4 were not in this Agreement.

3.4.5.    Nonrecourse Deductions.  Nonrecourse Deductions for any Allocation Year shall be specially allocated to the Members in proportion to their respective Percentage Interests.

3.4.6.    Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any Allocation Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deduction is attributable in accordance with Regulations Section 1.704-2(i)(1).

3.4.7.    Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any Property is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

3.4.8.    Allocations Relating to Taxable Issuance of Units.  Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of Units by the Company to a Member shall be allocated among the Members so that, to the extent possible, the net amount of such income, gain, loss or deduction, together with all other allocations under this Agreement to each Member shall be equal to the net amount that would have been allocated to each such Member if such income, gain, loss or deduction had not been realized.

### 3.5.    CURATIVE ALLOCATIONS

The allocations set forth in Sections 3.4.1 through 3.4.8, inclusive, and 3.6 of this Agreement (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of the Company's income, gain, loss or deduction pursuant to this Section 3.5. Therefore, notwithstanding any other provision of this Section 3 (other than the Regulatory Allocations), the Management Committee shall make such offsetting special allocations of the Company's income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Sections 3.2 and 3.3 of this Agreement.

### 3.6. LOSS LIMITATION

Losses allocated pursuant to Section 3.3 of this Agreement shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Allocation Year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 3.3, the limitation set forth in this Section 3.6 shall be applied on a Member-by-Member basis and Losses not allocable to any Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses to each Member under Regulations Section 1.704-1(b)(2)(ii)(d).

### 3.7. OTHER ALLOCATION RULES

3.7.1.    Determination of Period.  For purposes of determining Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Management Committee using any permissible method under Code Section 706 and the Regulations thereunder.

3.7.2.    Acknowledgement of the Income Tax Consequences.  The Members are aware of the income tax consequences of the allocations made by this Section 3 and hereby agree to be bound by the provisions of this Section 3 in reporting their shares of the Company's income and loss for income tax purposes.

3.7.3.    Excess Nonrecourse Liabilities.  Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1.752-3(a)(3), the Members' interests in Profits are in proportion to their Percentage Interests.

### 3.8. TAX ALLOCATIONS: CODE SECTION 704(C)

In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any Property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such Property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with the definition of Gross Asset Value shall be determined in accordance with Code Section 704(c) and the Regulations thereunder or with the principles of such provisions).

In the event the Gross Asset Value of any Property is adjusted pursuant to Section 2.1.10 of this Agreement, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take into account any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

Any election or other decision relating to such allocations shall be made by the Management Committee in any manner that reasonably reflects the purpose and intention of this Agreement.  Allocations pursuant to this Section 3.8 are solely for purposes of federal, state, and

local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

4.    **DISTRIBUTIONS**

    **4.1.    NET CASH FLOW**

Except as otherwise provided in Section 12 of this Agreement and unless otherwise determined by the Management Committee, Net Cash Flow, if any, shall not be distributed but shall be retained by the Company and applied for the purposes of the Company.

    **4.2.    AMOUNT WITHHELD**

At the discretion of the Management Committee, the Management Committee may withhold amounts from the distributions to any Non-Contributing Member for the payment of any Deficiency owed to the Company by such Non-Contributing Member or Contribution Loan owing to any Contributing Members. The Members hereby acknowledge and agree that any amounts withheld by the Management Committee from such distributions shall be deemed to have been made to the specific Member and that the specific Member shall be responsible for all of the tax-related obligations associated with such amounts that are deemed to have been distributed to such Member.

    **4.3.    LIMITATIONS ON DISTRIBUTIONS**

The Company shall make no distributions to the Members except (a) as provided in this Agreement, (b) to correct errors, (c) to reflect changes in capital contributions resulting from changes in Pod allocations, or (d) as authorized by the Management Committee by affirmative vote of the Managers representing a Supermajority, so long as such distribution does not have the impact of treating any Member represented by a Manager not voting for such distribution in a manner which is materially disproportionate to the manner the other Members are treated based on the relative Percentage Interests of the Members. No Member may receive a distribution from the Company to the extent such distribution would violate applicable law.

5.    **MANAGEMENT**

    **5.1.    MANAGERS; MANAGEMENT COMMITTEE**

        5.1.1.    <u>Management Committee; Voting</u>.    Except as otherwise provided in this Agreement, the Members agree that the management of the Company shall be exclusively vested in a management committee (the "Management Committee"). Each Member (including the Focus Member) shall have the exclusive right to appoint one member of the Management Committee. The members of the Management Committee are referred to herein as the "Managers.") Each Manager shall have a vote equal to the Percentage Interest of the Member which appointed such Manager. For purposes of voting rights only, no adjustments shall be made to the Percentage Interests of any Member as a result of modifications to Pod allocations under Section 6.11.1, unless such modifications under Section 6.11.1 would result in a change to the Percentage Interests of any Member which constitutes at least 3% of the total Percentage

Interests of the Company. If such change would constitute at least 3% of the total Percentage Interests of the Company, then, subject to Section 2.2.4, an adjustment to the voting rights of the Member shall be made which fully reflects the Section 6.11.1 modifications. Except as otherwise provided in this Agreement, the Management Committee shall act by the affirmative vote of Managers representing a Majority. With respect to the matters set forth in Sections 5.1.2(a), (c), (d), (e), (f), (i) and (j), the Management Committee shall act by affirmative vote of the Managers representing a Supermajority. The General Manager shall not be a member of the Management Committee.

5.1.2.    Powers. Without limiting the general power and authority of the Management Committee as set forth in Section 5.1.1 of this Agreement, the Management Committee shall:

a.    Establish the initial Business Plan of the Company as provided in Section 5.13 of this Agreement, and approve any amendments thereto from time to time.

b.    Determine the maximum bid to be made by the Company at the Auction ("Maximum Bid") in accordance with the procedure set forth in Section 5.10.

c.    Approve the final conceptual plan for the Subject Property dividing the Subject Property into developable builder parcels ("Pods") and areas for schools, parks, and public facilities and any amendments thereto, including any material or adverse changes to a proposed general plan amendment, final maps, or any amendments thereto.

d.    Approve any modifications to the allocations contemplated by the Preliminary Pod Allocation Map pursuant to Section 6.11.1.

e.    Approve the terms of the Development Agreement to be negotiated by the Company with the City of Henderson and any amendments thereto.

f.    If the Company submits the successful bid at the Auction, approve the terms and conditions of the Land Financing and any amendments thereto.

g.    Approve all contracts and other undertakings between the Company and any Member, Manager or the General Manager, or any Affiliates thereof (subject to the authority of the Company expressed in this Agreement, and of the General Manager on behalf of the Company, to enter into any contract or other arrangement expressly approved herein or therein).

h.    Approve actions authorized under Section 2.4.

i.    Approve the master plan documents comprehensively governing the overall development of the Subject Property, including all design and architectural guidelines and CC&R documents which shall govern the Community and the Members' development thereof and any amendments thereto.

j.    Approve all contracts which obligate the Company to payments of $100,000 or more in the aggregate.

06571.00030

k.    Approve all other material contracts to which the Company is a party.

5.1.3.    Number of Managers.  The number of Managers shall be equal to the number of Members.  The names and addresses of the initial Managers are:

| Name | Address |
|---|---|
| John A. Ritter<br>Focus South Group, LLC | 3455 Cliff Shadows Parkway, Suite 220<br>Las Vegas, Nevada  89129<br><br>Tel:    (702) 242-4949<br>Fax:    (702) 216-2015<br>Email:   JR@fcglv.com |
| Robert Beville<br>MTH Homes Nevada, Inc. | 7150 Pollock Drive, Suite 104<br>Las Vegas, Nevada  89119<br><br>Tel:    (702) 896-9100<br>Fax:    (702) 896-9191<br>Email:  Robb@permabilthomes.com |
| Gene Morrison<br>Alameda Investments, LLC | 3855 S. Jones Boulevard, Suite 102<br>Las Vegas, Nevada  89103<br><br>Tel:    (702) 889-7800<br>Fax:    (702) 889-0801<br>Email:   genem@woodsidegroupinc.com |
| Joe Caddel<br>Coleman-Toll Limited Partnership | 1635 Village Center Circle, Suite 100<br>Las Vegas, Nevada  89134<br><br>Tel:    (702) 243-9800<br>Fax:    (702) 243-9610<br>Email:  jcaddel@tollbrothersinc.com |
| Bill June<br>Beazer Homes Holdings Corp. | 4670 South Fort Apache Road<br>Las Vegas, Nevada  89147<br><br>Tel:    (702) 837-2100<br>Fax:    (702) 837-2113<br>Email:  bjune@beazer.com |
| Bruce Tripp<br>KB HOME Nevada Inc. | 750 Pilot Road, Suite G<br>Las Vegas, Nevada  89119<br><br>Tel:    (702) 614-2500<br>Fax:    (702) 614-2645<br>Email:  btripp@kbhome.com |

08571.00030

| Name | Address |
|------|---------|
| Stan Gutshall<br>Kimball Hill Homes | 8 Sunset Way, Suite 101<br>Henderson, Nevada 89014<br><br>Tel:    (702) 436-4582/x102<br>Fax:    (702) 436-9491<br>Email: sgutshall@khhcorp.com |
| Klif Andrews<br>Pardee Homes of Nevada | 650 White Drive, Suite 100<br>Las Vegas, Nevada 89119<br><br>Tel:    (702) 614-1400<br>Fax:    (702) 873-6881<br>Email: klif.andrews@pardeehomes.com |

The Members, by signing this Agreement, hereby designate the persons identified above as the Managers until their successors are elected and qualified.

5.1.4.  <u>Election of Managers, Removal and Vacancies</u>.  Each Manager shall remain in office until such Manager resigns, is removed by the Member which appointed such Manager, is disqualified to serve, or the Manager's successor is elected by the Member which appointed him. Each Manager may be removed at any time, with or without cause, by the Member which appointed such Manager.  In the event any Manager dies or is unwilling or unable to serve or is removed from office, the Member which appointed him shall appoint a successor to such Manager.  Each Member shall have the exclusive right to appoint, remove, and replace the Manager which it appointed.  Upon any such removal or replacement, the Member shall give all other Members prompt written notice thereof.  Upon termination of the status of any Member as a Member for any reason, the Manager appointed by such Member shall immediately and automatically cease to be a Manager without any action required to be taken by the Company, such Manager, or such former Member.

5.1.5.  <u>Delegation</u>.  The Management Committee shall have the power to delegate authority to such committees of Managers, officers, employees, agents or representatives of the Company as it may from time to time deem appropriate.  Any delegation of authority to take any action must be approved in the same manner as would be required for the Management Committee to approve such action directly.

5.1.6.  <u>Authority of Managers.</u>  Each Manager shall have the decision making authority on behalf of the Member which appointed such Manager and without limitation of the foregoing, each Manager shall have the authority to cast the vote of such Member in any vote of the Members.

## 5.2.   MEETINGS OF THE MANAGEMENT COMMITTEE

5.2.1.   Regular Meetings.  The Management Committee shall hold regular meetings once every month (or at such other interval determined by the General Manager or the Management Committee) and shall establish meeting times, dates and places and requisite notice requirements and adopt rules or procedures consistent with the terms of this Agreement. Notice for regular meetings of the Management Committee shall be given in the manner provided for in Section 5.2.3 of this Agreement.

5.2.2.   Special Meetings.  Special meetings of the Management Committee, for any purpose or purposes whatsoever, may be called at any time by the General Manager or by any Manager. Except in special cases where other express provisions are made by the NRS, notice of such special meetings shall be given in the same manner as for regular meetings of the Management Committee.

5.2.3.   Notice.  Written notice of any meeting of the Management Committee shall be given to each Manager entitled to vote at the meeting and addressed to the Manager's address appearing on the books of the Company and to the General Manager. All such notices shall be sent to each Manager entitled thereto and to the General Manager by facsimile, electronic mail or similar method (in each case, notice shall be given at least three (3) business days before the time of the meeting unless the General Manager determines that due to the exigencies of the subject matter such notice period is not possible in which case the notice period shall be as determined by the General Manager) or by first-class mail (in which case, notice shall be deposited in the mail, postage prepaid, at least five (5) business days before the meeting).  Each such notice shall state:  (a) the time, date, place (which shall be at the principal office of the Company unless otherwise determined by the Management Committee) or other means of conducting such meeting; and (b) the purpose(s) of the meeting.  If a Manager gives no address, notice shall be deemed to have been given to the Manager if sent by mail or other means of written communication addressed to the Manager at the last known address of the Member entitled to appoint such Manager.

5.2.4.   Quorum.  Managers representing at least three Members which hold at least 60% of the Percentage Interests, acting either in person or represented by proxy, shall constitute a quorum for the transaction of business by the Management Committee.

5.2.5.   Waiver of Notice.  The transactions carried out at any meeting of the Management Committee, however called and noticed or wherever held, shall be as valid as though had at a meeting regularly called and noticed, if:  (a) all of the Managers are present at the meeting; or (b) a quorum of the Management Committee is present, and if, either before or after the meeting, each of the Managers not present signs (i) a waiver of notice or a consent to holding such meeting and (ii) an approval of the minutes thereof, which waiver or consent and approval shall be filed by the General Manager with the other records of the Company or made a part of the minutes of such meeting.

5.2.6.   Manner of Meeting.  Unless otherwise approved by the Management Committee, each meeting of the Management Committee may be held telephonically, electronically or physically at the Company's principal place of business or other location set by

the Management Committee. The participation of a Manager at a meeting telephonically or electronically shall constitute presence in person at such meeting and waiver of notice for such meeting. At such meetings, the Management Committee shall transact such business as may properly be brought before the meeting.

5.2.7.    Written Consent.    Notwithstanding anything in this Section 5.2, the Management Committee may take any action that may be taken by the Management Committee without a meeting if such action is approved by the written consent of Managers representing at least three Members holding at least 60% of the Percentage Interests; or such greater vote as may be otherwise expressly required under this Agreement for the action to be taken. The written consent may be executed in one or more counterparts and by facsimile and each such consent so executed shall be deemed an original. Each counterpart of the written consent must be filed with the General Manager promptly upon execution. Whenever action is taken by written consent, a meeting of the Management Committee need not be called or noticed. Absent compliance with Section 5.2.5, however, notice of the purpose of the written consent or the form of written consent shall be delivered to all Managers and to General Manager before it becomes effective. If the written consent is not executed by all Managers, a copy of each written consent shall be sent to each Member by the General Manager within five (5) business days following receipt by the General Manager of a written consent executed by Managers representing the requisite Percentage Interests and shall be filed by the General Manager with the other records of the Company.

### 5.3.    MANAGEMENT COMMITTEE DUTIES

Performance of Duties; Individual Liability.  Each Manager shall represent the Member which appointed such Manager in all business and matters of the Company, and may act in the interest of such Member, and such representation shall not itself be deemed a violation of the Manager's duties. Each Manager who so performs such Manager's duties shall not have any liability solely by reason of being or having been a Manager. A Manager shall not be liable, responsible or accountable in damages or otherwise to the Company or to the Members for any act or omission, unless it is determined by a final nonappealable decision on the merits that such act or omission constituted intentional misconduct, fraud, or a knowing violation of law. Nothing herein shall affect any separate contractual or other legal relationship between a Manager and the Member which appointed such Manager.

### 5.4.    REIMBURSEMENTS

Only if and to the extent authorized under the Business Plan or by the Management Committee: the Company shall reimburse any Member, Manager, the General Manager, or Affiliate thereof for all fees and expenses incurred and paid by any of them in the organization of the Company and, as authorized by the Management Committee, in the conduct of its business, including, without limitation, expenses of maintaining an office, telephones, travel, office equipment and secretarial and other personnel as may reasonably be attributable to the Company. Such expenses shall not include any expenses incurred in connection with the exercise of the General Manager's or a Manager's or Member's rights as a Manager or Member apart from the ordinary course of business. Such reimbursement shall be treated as an expense of the Company and shall not be deemed to constitute a distribution to any Member pursuant to Section 4 of this

Agreement. Excepting only the expenses reimbursable in accordance with the Business Plan and subject to the indemnity provisions expressly contained in this Agreement, each Member, Manager and the General Manager shall bear, without reimbursement from the Company, all costs and expenses (including without limitation attorney's fees and other legal expenses) of this transaction and their services hereunder. Notwithstanding the foregoing, under no circumstances shall the General Manager be entitled to any reimbursement for performing services under this Agreement over and above the fees payable to the General Manager hereunder and reimbursement authorized by the Business Plan or by the Management Committee.

### 5.5. INDEPENDENT ACTIVITIES; NONCOMPETITION

5.5.1.    Independent Activities. Each Manager shall be required to devote such time to the affairs of the Company as he determines in his discretion (provided that each Manager shall use its best efforts to attend all meetings if its absence would cause the absence of a quorum), and shall be free to serve any other person or enterprise in any capacity that such Manager may deem appropriate in such Manager's sole and absolute discretion. Insofar as permitted by applicable law and except as provided in this Section 5.5, neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Member, Manager, the General Manager, or Affiliate thereof from engaging in whatever activities the Member, Manager, the General Manager, or Affiliate thereof chooses, whether the same are competitive with the Company or otherwise, and any such activities may be undertaken without having or incurring any obligation to offer any interest in such activities to the Company or any Member, or require any Member, Manager, the General Manager, or Affiliate thereof to permit the Company or any other Member, Manager, the General Manager, or Affiliate thereof to participate in any such activities. As a material part of the consideration for the execution of this Agreement by each Member, each Member hereby waives, relinquishes and renounces any such right or claim of participation.

5.5.2.    Noncompetition. Notwithstanding the foregoing, each Member and Manager and the General Manager agrees that neither they nor their Affiliates shall engage, participate, invest, or otherwise assist or have any interest, directly or indirectly, in its own name or through or in concert with any other Person other than from or through the Company pursuant to this Agreement, in (i) any bid for the Subject Property or any portion thereof at the Auction (or, if the Subject Property is not sold pursuant to the Auction, any subsequent auction within three years from the date of the Auction, so long as Persons or their Affiliates who constitute all of the Members as of the date hereof continue to then hold at least 60% of the Percentage Interests) or (ii) until the earlier of (A) the completion of the BLM auctions for the large parcels in Las Vegas and North Las Vegas currently scheduled for November 2004 (or any adjournment, continuation, or subsequent auctions if the offered property is not sold pursuant to the scheduled auctions) and (B) February 1, 2005, any acquisition, offer to acquire, attempt or negotiation to acquire (or preparation for any of the foregoing); any interest in or any option or other right to acquire the Subject Property or any portion thereof from the successful bidder in the Auction (other than the Company) or any Affiliate or successor or assignee of the successful bidder (other than the Company). This Section 5.5.2 shall remain in effect notwithstanding any termination of such status as Member, Manager, or General Manager, as the case may be, for any reason including, without limitation, dissolution of the Company. Without limiting the general applicability of Section 15.12, breach of this Section 5.5.2 would cause irreparable harm such that injunctive and other equitable relief would be required pursuant to Section 15.12.

08571.00030

## 5.6.    TRANSACTIONS WITH AFFILIATES

5.6.1.    <u>Generally</u>.  The General Manager may cause the Company to deal with its Affiliates as expressly contemplated by this Agreement and on such terms consistent with this Agreement. upon terms authorized by the Business Plan, or as authorized by the Management Committee (by vote of a majority of Managers representing a majority of the Percentage Interests held by Members other than the Focus Member).  The Members acknowledge that the General Manager is an Affiliate of the Focus Member and the other Members agree that such affiliation with the Focus Member shall not in and of itself constitute a conflict of interest or otherwise violate the duties of the General Manager, the Focus Member or the Manager appointed by the Focus Member.

5.6.2.    <u>Engagement of Landtek</u>.  If the Company submits the successful bid at the Auction, the Company shall engage Landtek, LLC, an Affiliate of the General Manager ("Landtek"), to supervise engineering, mapping, geotechnical, and other consultants and contractors as required for the preparation of analyses, construction drawings, and mapping and the construction of the Major Infrastructure.  The compensation payable to Landtek is described in Section 14.4. The other terms and conditions of the engagement shall be governed by an industry standard form of project or construction management agreement to be entered into between the Company and Landtek acceptable to the Management Committee.   Such construction management agreement shall include a cross default provision providing for default by Landtek under that agreement in the event of an uncured default by Focus Member or the General Manager hereunder.

5.6.3.    <u>Approval</u>.  With respect to the approval of any contract or other dealings (including, without limitation, any dispute) between the Company and any Affiliate of the General Manager and the enforcement of any remedies or rights against such Person by the Company; any Manager or any Member Affiliated with such Affiliate shall not participate in any vote for the approval of such contract or dealing or exercise of any remedy or right by the Company, but such vote shall be determined without regard to the Percentage Interest or other interest of such interested Manager or Member.

## 5.7.    GENERAL MANAGER; DUTIES, POWERS

<u>General Powers and Duties</u>.  The General Manager shall be responsible for conducting, in the name of, and on behalf of, the Company, the day-to-day business and affairs of the Company, and shall conduct and discharge such activities and duties of the Company as are assigned to the General Manager under this Agreement or the Business Plan with the consent of the General Manager, and such further activities and duties as shall be assigned to the General Manager by the Management Committee from time to time with the consent of the General Manager.  The Members acknowledge that the General Manager is an Affiliate of the Focus Member and of certain service providers to the Company and that neither such affiliations nor retention of such Affiliates by the General Manager to provide services to the Company on terms provided for in this Agreement, or if not so provided, on such terms as approved by the Management Committee (as provided in Section 5.6.1, above), shall be deemed a violation of the General Manager's duties.  The General Manager, its officers, directors, members employees, agents, Affiliates and other persons acting on its behalf or at its direction shall not be liable, responsible or accountable

08571.00030

in damages or otherwise to the Company or to the Members for any act or omission, unless such act or omission constituted a material breach of fiduciary duty involving intentional misconduct, fraud, a knowing violation of law, gross negligence, or a material breach of this Agreement; provided, however, that the General Manager shall have no liability for material breach unless it has received notice and reasonable opportunity to cure. The General Manager shall attend the meetings of the Management Committee and shall inform the Management Committee of the status of the Company and its activities at each regular meeting.

5.7.1.    The General Manager may not resign and is not subject to removal by the Members or the Management Committee except by affirmative vote of the Managers representing Members holding at least seventy-five percent (75%) of the Percentage Interests, other than the Focus Member (whose Percentage Interests shall be excluded in making such calculation), and only in the following circumstances: (i) the Focus Member or any of its Affiliates shall be a Non-Contributing Member or a Defaulting Party (as hereinafter defined), (ii) the General Manager shall be the subject of any of the proceedings or conditions specified in Section 11.1.5 or 11.1.6 of this Agreement (for which purpose, the term "General Manager" shall be substituted for "Defaulting Party" in construing such Sections), or (iii) the Management Committee (by the same vote as shall be required for the removal of General Manager under this sentence) shall first have determined that the General Manager has been guilty of gross recklessness, material breach of its duties under this Agreement, bad faith or criminal conduct in the execution of its duties as General Manager under this Agreement or that Landtek or another Affiliate of the General Manager is in material default of its contractual obligations to the Company provided that in the case of a material breach by General Manager or its Affiliates under this Agreement or other contractual obligations of its Affiliates contemplated by this Agreement (but not in the case of any of the other foregoing causes for removal of the General Manager) the vote shall not occur until after (A) notice to the General Manager authorized by the Management Committee (by the same vote as shall be required for the removal of the General Manager) and setting forth in reasonable detail the basis for the proposed termination and (B) reasonable opportunity for the General Manager, or its Affiliate, as the case may be, to cure and to dispute the matters set forth in the notice; provided, however, that such cure period for monetary defaults shall not exceed five (5) business days and for non-monetary defaults shall not exceed thirty (30) days (unless such cure cannot reasonably be cured within such thirty (30) day period, then for an additional period not to exceed sixty (60) days so long as such cure is commenced within ten (10) days of General Manager's receipt of notice of the default and diligently pursued to completion during such additional period); and such removal shall not prejudice the General Manager's claim for the payment and/or reimbursement of all costs and expenses incurred by the General Manager and its Affiliates and the payment of all fees, if any, which would otherwise have been payable to the General Manager and its Affiliates as of the date of such removal less any damages incurred by the Company as a result of the breach by the General Manager or its Affiliates. Nothing herein shall prejudice the right of the General Manager or its Affiliates to dispute and contest any alleged cause for removal or claim against it. In any case in which the office General Manager is vacant (by removal, resignation or otherwise) a replacement General Manager shall be elected by affirmative vote of the Members holding at least seventy-five percent (75%) of the Percentage Interests including the Focus Member.

5.7.2.    Delegation. The General Manager shall devote such personnel and resources as are reasonably necessary to carry out its duties hereunder. To the extent allowed by Nevada law,

the General Manager, subject to the approval of the Management Committee shall have the power and authority to delegate its functions to one or more officers or managers of the General Manager or any other Person associated with any Affiliate of the General Manager or any Member. To the extent allowed by Nevada Law, the General Manager, subject to the approval of the Management Committee, may appoint such persons as officers of the Company with any titles designated by the General Manager including without limitation, President, Vice President, Secretary, Treasurer, Assistant Secretary, and Assistant Treasurer with such powers as normally associated with such offices or as otherwise designated by the General Manager provided that the General Manager shall not delegate any matter not within its power and authority under this Agreement. Without limiting the foregoing, the General Manager agrees that (a) John A. Ritter, and (b) Thomas DeVore, Larry Bross, Andy Flaherty or such other individuals having similar skills and competency, shall devote reasonable time to the operations of the General Manager subject to unavailability due to death, disability, or illness. Except pursuant to Article 14, the General Manager will not be compensated for the time of its officers or managers, provided that nothing herein limits the General Manager to be reimbursed for costs, and expenses, including without limitation the fees, costs, and expenses of outside service providers and full onsite staff, to the extent provided for in the Business Plan or approved by the Management Committee.

**5.8.    GENERAL MANAGER; SPECIFIC POWERS**

5.8.1.    <u>Specific Powers and Duties</u>. The General Manager shall, subject to the terms and conditions of this Agreement and in conformity with the Business Plan, and to the determinations of the Management Committee (and the Members with respect to matters reserved to the determination of the Members hereunder), have the following duties and the authority to:

a.    Execute any and all agreements, contracts, documents, certifications, and instruments that, in the Management Committee's discretion, are necessary or convenient in connection with the management, maintenance, and operation of the Company, or in connection with managing the affairs of the Company including without limitation the preparation, execution and submission of all bid documents for the Auction and any other agreements, contracts, documents, certifications, or instruments relating to the BLM, the Subject Property, the Land Financing, the City of Henderson, or otherwise;

b.    In accordance with the Business Plan or as determined by the Management Committee, conduct or cause to be conducted pre-Auction and post-Auction activities of the Company including, without limitation, investigation, conceptual planning, planning, mapping, and engineering;

c.    In accordance with the Business Plan or as determined by the Management Committee from time to time, conduct and prosecute all applications and proceedings to obtain and modify all the approvals required for the subdivision of the Subject Property and for the development thereof consistent with the plans therefor approved by the Management Committee, including without limitation the conduct of negotiations with the City of Henderson concerning planning and entitlement matters (subject to the ultimate approval thereof by the Management Committee);

d.  Establish and maintain bank accounts and other accounts for the maintenance and investment of the funds of the Company, and to draw upon such accounts from time to time for the payment of the costs associated with the prosecution of the purposes of the Company and for distributions under this Agreement;

e.  Conduct and carry out the day-to-day administration of the Company and its business affairs, and otherwise exercise the day-to-day administrative discretion for the prosecution of the purposes of the Company consistent with the Business Plan or as directed by the Management Committee ;

f.  Formulate for review and consideration by the Management Committee a conceptual plan for the subdivision and development of the Subject Property, including appropriate land use categories and a layout of appropriate locations therefor, and to interpret and conform such plan to the City of Henderson's draft Development Agreement and all applicable governmental requirements;

g.  Assist the Management Committee to develop, and upon approval thereof by the Management Committee process and record, a comprehensive plan amendment (if necessary) and a Parent Final Map (or other accepted method of legally dividing the Subject Property) dividing the Community into developable parcels and providing for the development thereof (including the Major Infrastructure and suitable supplies of required utility services);

h.  Execute, in furtherance of any or all of the purposes of the Company and to the extent approved by the terms of this Agreement or as approved by the Management Committee, any deed, lease, bill of sale, contract, or other instrument purporting to convey or encumber any or all of the Subject Property;

i.  Care for and invest funds pending application, all in accordance with the provisions of this Agreement and Business Plan;

j.  Subject to the directions and determinations of the Management Committee, institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought by, on behalf of, or against the Company, the Members, the General Manager, or any Manager in connection with any activity arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith;

k.  Subject to the directions and determinations of the Management Committee, purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, dispose of or otherwise use and deal in or with any interest in or any obligation of any domestic or foreign entity, any individual or the United States or any government, state, territory, government district or municipality or of any instrumentality of any of them;

l.  Execute and deliver, on behalf of the Company, all notes, bonds, mortgages, deeds and other financing documents required to be made, executed or entered into in connection with the Land Financing, if any, and any other financing

arrangements of the Company authorized under the Business Plan, approved by the terms of this Agreement or the Business Plan, or otherwise approved by the Management Committee;

m.    Assist the Management Committee to develop and draft the master plan documents comprehensively governing the overall development of the Subject Property, including all design and architectural guidelines and CC&R documents which shall govern the Community and the Members' development thereof;

n.    Assist the Management Committee in the selection and engagement of independent contractors, such as engineers, lawyers and accountants, and supervise the activities of such contractors;

o.    Supervise and direct third-party consultants and contractors engaged by the Company from time to time; and

p.    Subject to the directions and determinations of the Management Committee, do and perform all other acts as may be necessary or appropriate to carry on the Company's operations, to fulfill the purposes of the Company, or to comply with the terms of this Agreement and the Business Plan.

## 5.9.    INTENTIONALLY OMITTED

## 5.10.    DETERMINATION OF THE MAXIMUM BID

5.10.1.    The amount of the Maximum Bid shall be determined pursuant to the procedure set forth in this Section 5.10. The Managers representing those Members which have fully paid their respective Interim Payments shall hold discussions regarding the amount of the Maximum Bid. At the conclusion of such discussions, each Manager (other than the Manager representing the Focus Member) shall submit to the General Manager the maximum bid price per gross acre up to which its Member shall be irrevocably bound to purchase its Member Acreage Allotment (referred to herein as the Member's "Threshold Amount") pursuant to the terms of this Agreement. The Threshold Amounts of each Member shall be disclosed to all of the Members. Subject to the terms of this Section 5.10, the Threshold Amount of the Focus Member shall be equal to the Maximum Bid as determined below. The Maximum Bid shall equal the highest of the Members' Threshold Amounts at which at least 50% of the total Member Acreage Allotments, not including the Member Acreage Allotment of the Focus Member, would be bound to purchase its Acreage Allotment. Each Member's Bid Payment shall equal 20% of such Member's Threshold Amount multiplied by its Member Acreage Allotment, minus such Member's Interim Payment. In addition to its Bid Payment, the Focus Member shall advance to the Company the amount necessary, when added to the sum of the Members' Interim Payments and Bid Payments then held by the Company, to equal the required BLM Deposit.

5.10.2.    The General Manager, by and through John A. Ritter, shall place the bids on behalf of the Company at the Auction. Such bidding shall be done in Mr. Ritter's sole discretion so long as it is done in accordance with this Section 5.10. Mr. Ritter will cause the Company to bid in increments up to the Maximum Bid (or in excess thereof in accordance with Section 5.10.3 below). If the Company is the successful bidder at the Auction, then on the day of the Auction

the Company shall pay to the BLM the necessary BLM Deposit. Notwithstanding the foregoing, the Focus Member, in its sole discretion, may cause the bidding to exceed the Maximum Bid and all of the Members with Threshold Amounts greater than or equal to the actual successful bid amount shall remain obligated to purchase their Member Acreage Allotments at the actual bid price. In such event, if the Company is ultimately the successful bidder, the Focus Member shall advance to the Company the amount necessary, when added to the sum of the Members' Interim Payments and Bid Payments previously made to the Company and any advance by the Focus Member pursuant to Section 5.10.1, to equal the required BLM Deposit.

5.10.3.    If the Company makes a bid at the Auction (including any bid authorized by the Focus Member which exceeds the Maximum Bid) in excess of any of the Members' Threshold Amounts and the Company is ultimately the successful bidder at the Auction, then the Member(s) whose Threshold Amounts were exceeded shall automatically be terminated as a Member; provided, however, that if the Company's successful bid amount was no more than five percent (5%) higher than a Member's Threshold Amount then such Member shall not be terminated and shall continue without interruption as a Member if on or prior to the tenth (10th) day after the Company makes the successful bid at the Auction (the "Member Termination Date"), such Member (a) delivers written notice to the other Members and to the General Manager that it has agreed to increase its Threshold Amount to the amount of the successful bid made by the Company and to purchase its Member Acreage Allotment at the successful bid price and (b) pays to the Company the difference between its previously paid Bid Payment and the amount of its Bid Payment calculated at its revised Threshold Amount, which amount shall be immediately paid to the Focus Member and applied to repayment of the advances for the BLM Deposit made by the Focus Member pursuant to Sections 5.10.1 and, if applicable, 5.10.2. If the Company's bid at the Auction exceeded the Maximum Bid then the foregoing five percent limitation shall not apply and all Members shall have the right to maintain their Member status pursuant to the foregoing provision. Each such Member which is terminated because it fails to maintain its Member status pursuant to the preceding sentence ("Terminated Member") shall have no further rights in the Company, except with respect to the return of its Interim and Bid Payments as expressly provided in Section 5.10.4 below.

5.10.4.    Within thirty (30) days following the Company's successful bid at the Auction, the Company shall return to any Terminated Member(s) their respective Interim Payment and Bid Payment and, if the successful bid exceeds the Maximum Bid, also the Initial Payment (the "Termination Refund"). Each Member other than the Terminated Member(s) (the "Remaining Members") shall have ten (10) days following the Member Termination Date to notify the General Manager in writing of such Remaining Member's election to purchase all or a portion of its proportion (based on the gross acreage allotted to all of the Members other than the Terminated Member(s)) of the Units of the Terminated Member(s). If a Remaining Member elects to purchase any of the Units of the Terminated Member(s) then, no later than twenty-five (25) days after the date of the Auction, it shall deliver to the Company: (a) such Remaining Member's proportion of the Termination Refund; and (b) except for the Focus Member, such Remaining Member's proportion of the BLM Deposit advance made by the Focus Member pursuant to Sections 5.10.1 and, if applicable, 5.10.2, which amount shall be immediately paid to the Focus Member and applied to repayment of the advances for the BLM Deposit made by the Focus Member. To the extent that the Remaining Members elect not to purchase all of the Units of the Terminated Member(s), or fail to timely deliver the notice and/or payments required

pursuant to the preceding sentence, then the Focus Member shall purchase any unpurchased Units of the Terminated Member(s) by paying the Termination Refund associated with such Units. Each Terminated Member shall execute and deliver such instruments of transfer as reasonably required by the Management Committee, but the purchases contemplated by this Section shall be effective notwithstanding the failure to deliver any such instruments.

5.10.5. After the ten (10) day election period described in Section 5.10.4, the Pods allocated to the Terminated Member(s) shall be reallocated to the Remaining Members purchasing Units of the Terminated Member(s) pursuant to Section 5.10.4 by agreement among of such purchasing Members. If the purchasing Members fail to reach such agreement within forty-five (45) days after the Auction, then the Pods shall be allocated by a majority vote of the Units so purchased with each purchasing Member voting the Units purchased by it pursuant to Section 5.10.4.

### 5.11. LIMITATIONS

The General Manager and the Management Committee shall cause the Company to conduct its business separate and apart from that of any Member, Manager or Affiliate thereof, including, without limitation: (a) segregating Property and not allowing funds or other Property to be commingled with the funds or other assets of, held by, or registered in the name of any Member, Manager or Affiliate thereof; (b) maintaining books and financial records of the Company separate from the books and financial records of any Member, Manager or Affiliate thereof; (c) observing all Company procedures and formalities, including, without limitation, maintaining minutes of Company meetings and acting on behalf of the Company only pursuant to due authorization of the Members; and (d) causing the Company to conduct its dealings with third parties in its own name and as a separate and independent entity.

Notwithstanding anything in this Article 5 or other provision of this Agreement, the Members shall each be responsible for the planning, engineering, and construction costs for the on-site improvements of their own Pods (i.e. improvements which do not constitute Major Infrastructure).

### 5.12. PROCEDURAL FORMALITIES

The procedures set forth in Section 5.2 of this Agreement are for the benefit of the Company and are to provide an orderly process by which the General Manager and the Management Committee may take any action or inaction that is reserved to them. As such, no court, creditor of the Company, creditor of a Member, creditor of a Manager, creditor of the General Manager, creditor of any Affiliate, any Member, any Manager, the General Manager or any third party may use the failure of the General Manager or any Manager to comply with the provisions contained in Section 5.2 of this Agreement in determining the validity of the Company's status as a limited-liability company or the personal liability protection that the Company, as a limited-liability company, provides to its Members and Managers.

### 5.13. BUSINESS PLAN

Prior to submitting its bid at the Auction, the Management Committee shall establish (by vote as set forth in this Section 5.13) an initial business plan and operating budget for the

08571.00030

Company, and a plan for the implementation of the purposes of the Company (the "Business Plan"). The Business Plan shall set forth, among other matters, contemplated capital requirements of the Company, cash flow projections, the financing plan, budgets and time lines for Company operations. The initial Business Plan shall specifically consider and provide details concerning the specific matters identified in this Agreement as the subject matter thereof, and such other matters as the Management Committee, in consultation with the General Manager, shall determine. At least once each Fiscal Quarter, the Managers shall confer and shall make such amendments, additions, deletions, supplements and other changes to such Business Plan as the Management Committee, in consultation with the General Manager, shall determine to be necessary or desirable. Subject to the determinations and directions of the Members and the Management Committee, the General Manager shall conduct the business of the Company in accordance with the Business Plan then-in effect. The initial Business Plan, and all amendments thereto, shall be approved by the Management Committee by affirmative vote of the Managers representing a Supermajority. To the extent any matter provided for in this Agreement refers to provisions of the Business Plan but the Business Plan fails to address such matter, then such matter shall be determined by the Management Committee (by vote as set forth in this Section 5.13).

## 6. MEMBERS

### 6.1. RIGHTS OR POWERS

The Members shall not have any right or power to take part in the management or control of the Company or to act for or to bind the Company in any way. Notwithstanding the foregoing, the Members shall have all the rights and powers specifically set forth in this Agreement and, to the extent not inconsistent with this Agreement, in Chapter 86 of the NRS.

### 6.2. VOTING RIGHTS

6.2.1. General. No Member has any voting rights except with respect to those matters specifically reserved for a Member vote that are set forth in this Agreement and as required in Chapter 86 of the NRS. The Members may approve of a matter or take any action by the vote of the Members at a meeting, in person or by proxy, or by the written consent of the Members. Except as otherwise required by this Agreement, the vote of a Majority, either at a meeting or by written consent, shall constitute a valid and binding action of the Members.

6.2.2. Matters Requiring Member Vote. Notwithstanding any other provision of this Agreement, and in addition to any other matters requiring any vote or other action on the part of the Members as set forth herein or in the Business Plan, the Company shall not take any action (whether by the General Manager, the Management Committee, or otherwise) in connection with any of the following matters without the affirmative vote of a Majority (or such other vote as is specifically provided for):

    a.    Any transaction to liquidate or dissolve the Company; and

    b.    Any transaction by the Company to merge or consolidate with another person.

6.2.3.    Appointment of Managers.  As provided in Article 5, each Member shall have the exclusive right to appoint, remove, and replace its Manager.

## 6.3.    MEETINGS OF THE MEMBERS

6.3.1.    Annual Meetings; Notice.  The annual meeting of the Members shall be held on or about the annual anniversary date of the Effective Date beginning with the year 2004, or on such other date and time as the Management Committee may determine.  Written notice of each annual meeting, signed by the Management Committee or by such other person as the Management Committee shall designate, shall be given (a) to each Member entitled to vote at the meeting and addressed to such Member at the address for such Member appearing on the books of the Company or given by such Member to the Company for the purpose of notice, and (b) the General Manager.  All such notices shall be sent to each Member entitled thereto and the General Manager by facsimile, electronic mail or similar method (in each case, notice shall be given at least three (3) business days before the time of the meeting unless the General Manager determines that due to exigencies of the subject matter such notice period is not possible in which the notice period shall be as determined by the General Manager) or by first-class mail (in which case, notice shall be deposited in the mail, postage prepaid, at least five (5) days before the meeting).  Each such notice shall state: (a) the time, date, place (which shall be at the principal office of the Company unless otherwise determined by the Management Committee) or other means of conducting such meeting; and (b) the purpose(s) of the meeting.  If a Member gives no address, notice shall be deemed to have been given to the Member if sent by mail or other means of written communication addressed to the Member at the last known address of the Member.

6.3.2.    Special Meetings; Notice.  Special meetings of the Members, for any purpose or purposes whatsoever, may be called at any time by the General Manager or by any Member.  Except in special cases where other express provision is made by the NRS, notice of such special meetings shall be given in the same manner as for annual meetings of Members.

6.3.3.    Quorum.  Members holding at least 60% of the Percentage Interests shall constitute a quorum for the transaction of business by the Members.  Each Member shall be entitled, acting either in person or represented by proxy, to vote in proportion to such Member's Percentage Interest.

6.3.4.    Waiver of Notice.  The transactions carried out at any meeting of the Members, however called and noticed or wherever held, shall be as valid as though had at a meeting regularly called and noticed, if:  (a) all of the Members are present at the meeting; or (b) a quorum of the Members is present, and if, either before or after the meeting, each Member not present signs (i) a waiver of notice or consent to holding such meeting and (ii) an approval of the minutes thereof, which waiver, consent and approval shall be filed with the other records of the Company or made a part of the minutes of such meeting.

6.3.5.    Record Date.  For the purpose of determining the Members entitled to vote on, or to vote at, any meeting of the Members or any adjournment thereof, the Management Committee or the Member requesting such meeting may fix, in advance, a date as the record date for any such determination.  Such date shall be the date that notice is first sent to the Members.

6.3.6.    <u>Voting; Proxy</u>. Members may vote in person, by proxy or by telephone at any meeting and may waive advance notice of any meeting. Each Member may authorize any person or persons to act on such Member's behalf by proxy on all matters in which a Member is entitled to participate, including, without limitation, waiving notice of any meeting or voting or participating at a meeting. Every proxy must be signed by the Member or such Member's attorney-in-fact. No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the Member executing such proxy.

6.3.7.    <u>Manner of Meeting</u>. Unless otherwise approved by the Management Committee, each meeting of the Members may be held telephonically, electronically or physically at the Company's principal place of business or other location set by the Management Committee. The participation of a Member at a meeting telephonically or electronically shall constitute presence in person at such meeting and waiver of notice for such meeting. At such meetings, the Members shall transact such business as may properly be brought before the meeting.

6.3.8.    <u>Written Consent</u>. Notwithstanding this Section 6.3, the Members may take any action that may be taken by the Members without a meeting if such action is approved by the written consent of at least three Members holding at least 60% of the Percentage Interests; or such greater vote as may be otherwise expressly required under this Agreement for the action to be taken. The written consent may be executed in one or more counterparts and by facsimile and each such consent so executed shall be deemed an original. Whenever action is taken by written consent, a meeting of the Members need not be called or noticed. Each counterpart of the written consent must be filed with the General Manager promptly upon execution. Absent compliance with Section 6.3.4, however, notice of the purpose of the written consent or the form of written consent shall be delivered to all Managers and the General Manager before it becomes effective if the written consent is not executed by all Members, a copy of each written consent shall be sent to each Member by the General Manager within five (5) business days following receipt by the General Manager of a written consent executed by Members representing the requisite Percentage Interests and shall be filed by the General Manager with the other records of the Company.

**6.4.    WITHDRAWAL; RESIGNATION**

Except as otherwise provided in this Agreement, no Member shall demand or receive a return on or of any Capital Contribution or withdraw from the Company without the consent of all Members. No Member shall have the right to retire, withdraw, or resign except as specifically permitted by the terms of this Agreement. The retirement, resignation or withdrawal of a Member shall not relieve the Member from any obligations which survive termination of its status as a Member or which relate to any periods prior to its retirement, resignation or withdrawal.

**6.5.    MEMBER COMPENSATION**

No Member shall receive any interest, salary, drawing or other form of compensation with respect to such Member's Capital Contribution or Capital Account or for services rendered

on behalf of the Company, or otherwise, in such Member's capacity as a Member except as otherwise provided in this Agreement.

### 6.6. MEMBER LIABILITY; NO FIDUCIARY DUTIES

Each Member's liability shall be limited as set forth in the NRS, the Articles, this Agreement and other applicable law. Without limiting the obligations of the Members under this Agreement or any agreement or document contemplated by this Agreement, neither the Members nor their respective Managers shall have any fiduciary duties to any other Member or Managers or the Company or the General Manager.

### 6.7. PARTITION

While the Company remains in existence, each Member hereby waives such Member's right to cause any Property to be partitioned or to file a complaint or institute any suit, action or proceeding at law or in equity to have any Property partitioned, and each Member, on behalf of such Member, and such Member's successors and assigns, hereby waives any such right.

### 6.8. CONFIDENTIALITY

6.8.1.   General. Except as contemplated hereby or required by a court of competent authority, each Member shall keep confidential and shall not disclose to others and shall use reasonable efforts at its own cost and expense to prevent any of such Member's Affiliates and any present or former employee, agent and representative of such Member, or such Member's Affiliates, from disclosing to others without the prior written consent of the Management Committee any information that pertains to: (a) this Agreement, any previous letters of intent, any negotiations pertaining to this Agreement or any letter of intent, any of the transactions contemplated hereby, or the Company's business; (b) the confidential or proprietary information of any Member or the Company or that any Member has labeled in writing as confidential or proprietary; (c) all information heretofore or hereafter provided by the General Manager regarding the Subject Property, the Community, or the Auction or its Affiliates, provided, however, that any Member may disclose to such Member's employees, agents, and representatives any information made available to such Member but only to the extent required for such persons to perform services necessary to such Member's performance as contemplated by this Agreement and only after such Member has informed such persons of the confidentiality requirements and instructed such persons to comply with them. The term "confidential or proprietary information" is used in this Section 6.8 to describe information that is confidential, non-public or proprietary in nature, was provided to such Member or its representatives by the Company, any other Member, or such persons' agents, representatives and employees, and relates either directly or indirectly to the Company or its business.

6.8.2.   Limitations. Information that: (a) is available, or becomes available, to the public through no fault or action by such Member, or such Member's agents, representatives or employees; (b) is now known or that becomes available on a non-confidential basis from any source other than the Company, any other Member, or such persons' agents, representatives or employees where such source is not prohibited from disclosing such information; (c) is independently developed, discovered or arrived at by such Member without using any of the

confidential information; (d) is in the possession of such Member without confidentiality restrictions at the time of disclosure and without a breach of this Agreement; (e) was rightfully received by such Member from a third party without a breach of this Agreement or breach of duty by such third party to the Company or other Member; or (f) concerns the environmental condition of the Subject Property or any property in the vicinity of the Subject Property, or any other matter required by law to be disclosed to any purchaser of or lender secured by a building lot on or other part of the Subject Property or which, in the conduct of prudent business practices, would or should be disclosed to such lender or purchaser shall not be deemed confidential or proprietary information. A Member may disclose the confidential information in order to comply with any applicable law, order, regulation or ruling, or in any legal proceeding concerning the interpretation or enforcement of this Agreement or any action between or among the Members or any Member(s) and the General Manager. Additionally, each Member and any Manager or other representative of the Company or a Member (and each employee, representative or other agent thereof) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated hereby and of the Company, and all materials of any kind (including without limitation opinions or other tax analyses) that are provided to the Company or any Member relating to such tax treatment and tax structure. Following the completion of the Auction, the term "confidential and proprietary information" shall not include with respect to any Member, information relating specifically to such Member's own Pods or information disclosed by such Member in connection with any transaction ("Pod Related Transaction") by a Member involving the conveyance of its own Pods to a third party or the formation of a joint venture with a third party relating to its own Pods; provided, however, that prior to the Auction no Member shall either (i) discuss a Pod Related Transaction with any third party that such Member either knows, or has information indicating it reasonably likely, will be a competing bidder at the Auction or (ii) reveal as part of such information the amount which the Company or any of its Members intends to bid for the Property or any matter which would reveal the Company's strategy or approach for bidding at the Auction.

    6.8.3.   <u>Survival</u>.  This Section 6.8 shall remain in effect notwithstanding any termination of such status as Member, Manager, or General Manager, as the case may be, for any reason including, without limitation, dissolution of the Company for a period of three years following dissolution of the Company. Without limiting the general applicability of Section 15.12, breach of this Section 6.8 would cause irreparable harm such that injunctive and other equitable relief would be required pursuant to Section 15.12.

### 6.9.   TRANSACTIONS BETWEEN A MEMBER AND THE COMPANY

    Except as otherwise provided by this Agreement or any agreement or document contemplated by this Agreement or applicable law, and subject to approval of the Management Committee, any Member may, but shall not be obligated to, lend money to the Company, act as surety for the Company and transact other business with the Company. Subject to the terms of this Agreement or any agreement or document contemplated by this Agreement, any such Member shall have the same rights and obligations when transacting business with the Company as any other person or entity who is not a Member. A Member or an Affiliate employee, stockholder, agent, director or officer of a Member, or any Affiliate thereof, may also be an employee or be retained as an agent of the Company. The existence of these relationships and

acting in such capacities will not result in the Member being deemed to be participating in the control of the business of the Company or otherwise affect the limited liability of the Member. In addition, any compensation paid to such Member or Affiliate shall be treated as a salary and not a guaranteed payment under Code Section 707(c), unless otherwise required by law.

### 6.10.  OTHER INSTRUMENTS

Each Member hereby agrees to execute and deliver to the Company, within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, and other instruments and to take such other action as the General Manager reasonably determines to be necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Agreement.

### 6.11.  ALLOCATION AND CONVEYANCE OF THE SUBJECT PROPERTY

6.11.1.  <u>Allocation</u>.  If the Company's bid at the Auction is successful, the Pods will be allocated among the Members in accordance with the Preliminary POD Allocation Map attached hereto as **Appendix B**, which map shall be subject to modification from time to time by the Management Committee or the Members in the manner provided in Section 9, it being understood by the Members that the allocations contemplated by the Preliminary POD Allocation Map are subject to modification based on changes required by City of Henderson and other variables and contingencies as determined by the Management Committee. Such reallocation shall not result in a change in a Member's allocation that is material and adverse to such Member, taking into account all Members' allocations, without such Member's consent which shall not be unreasonably withheld or delayed. The Member Acreage Allotment, Units, Percentage Interests, and Capital Contributions and other payments by the Members shall be adjusted accordingly from time to time in proportion to actual Pod allocations.

6.11.2.  <u>Conveyance</u>.  The Company will purchase the Subject Property from BLM and convey the Pods to the Members pursuant to the allocation provided for in Section 6.11.1. The Member BLM Price shall be based on the Member's Percentage Interest of the gross acreage of the Subject Property but the Pods will be conveyed net of school, park and public facility sites (collectively, "Public Sites"), to the extent such Public Sites have not previously been dedicated (subject, as applicable, to the obligation to dedicate any of the same required to be dedicated pursuant to the approved plan of development). The total acreage in the Community to be granted, reserved, or dedicated for Public Sites shall be allocated equitably over the entire Community so that the total acreage of the Pods allocated to each Member shall reflect as nearly as practicable a reduction from the Member Acreage Allotment which equals the Member's Percentage Interest multiplied by total Public Site acreage in the Community. Any issues on such allocation not resolved by the final conceptual plan shall be resolved by the Management Committee. To the extent that the Pods acquired by one or more Members suffer a reduction from their Member Acreage Allotment which is materially greater than contemplated by the allocation described above, the Member BLM Price payable by each such Member shall be reduced and the Member BLM Price payable by the Members which suffered a reduction less than contemplated by this Section shall be increased, in each case in accordance with the

amounts which would have been paid by the Members if their payments had been allocated based on their receipt of acreage net of Public Sites.

6.11.3. <u>Acquisition Agreements</u>. After the Pods are allocated but before conveyance, each of the Members shall enter into an acquisition agreement (each an "Acquisition Agreement") with the Company which shall evidence the unconditional obligation of the Member to acquire its allocated Pods. The form of each Acquisition Agreement shall be uniform (excepting the identification of the acquirer, the identification of the lands to be acquired, and such other terms as shall reasonably require distinction due to the unique circumstances of each such transaction) and each respective Acquisition Agreement shall be prepared and approved by the Management Committee in advance of the execution thereof by any of the Members and shall be substantially in the form of Schedule III hereto Any material modifications to the Acquisition Agreement form or to any executed Acquisition Agreement shall be subject to approval by the Management Committee. The Acquisition Agreements shall not prohibit or restrict a Member from conveying any Pod or portion thereof acquired by such Member to another merchant builder provided that such Member complies with Section 10.7.2.

6.11.4. <u>Planning and Construction of Major Infrastructure</u>. Pursuant to the terms of each Acquisition Agreement and the agreements contemplated thereby, after the conveyances to the Members, the Company shall continue in the role of master developer for the design, development, engineering, construction and utilization of the Major Infrastructure, and for seeking the financing thereof, including construction financing. The Members presently contemplate that, to permanently finance the costs of constructing portions of the Major Infrastructure, the Company will form and the Members shall subject their respective Pods to, a Local Improvement District ("LID") to finance such major infrastructure improvements and shall subject each of their Pods to any liens and encumbrances in connection with the LID. Each Member acknowledges that the Company will be unable to finance some or all of the costs of constructing the Major Infrastructure, and that each Member shall be obligated to make the Capital Contributions to the Company in accordance with Section 2.3.6 for such Major Infrastructure to the extent not financed by the Company from other sources.

6.11.5. <u>Closing</u>. The closing of all of the conveyances to the Members shall occur as soon as practicable after the Subject Property is legally divided as determined by the Management Committee. It shall be a condition of closing for the benefit of the Company with respect to each Member that such Member shall have made all payments required under this Agreement and is in compliance with all other obligations under this Agreement and no default or Event of Default shall exist with respect to such Member or would exist with notice and/or the passage of time. At the closing, the Company shall deliver to the Member a Grant, Bargain, Sale deed for the Pods purchased by such Member against delivery by the Member of (i) its Conveyance Payment, amounts payable by such Member pursuant to Section 2.3.7, and such Member's Percentage Interest of the Commercial Deficiency (except for the Focus Member which shall receive a credit in the full amount of the Commercial Deficiency) by wire transfer or bank check of immediately available funds, (ii) its Member Cost Deposit, (iii) such other instruments and documents reasonably required by the Company.

### 6.12.  PROCEDURAL FORMALITIES

The procedures set forth in Section 5.2 or Section 6.3 of this Agreement are for the benefit of the General Manager and the Members and are to provide an orderly process by which the General Manager and  Members may take any action or omission to act that is reserved to them.  As such, no court, creditor of the Company, creditor of a Member, creditor of a Manager, creditor of any Affiliate, any Member, any Manager or any other third party whatsoever, may use the failure of the Members, General Manager, or Managers to comply with the provisions contained in Section 6.3 of this Agreement in determining the validity of the Company's status as a limited-liability company or the personal liability protection that the Company, as a limited-liability company, provides to its Members and Managers.

## 7.  REPRESENTATIONS, WARRANTIES AND COVENANTS

### 7.1.  IN GENERAL

As of the date hereof, each Member hereby makes each of the representations, warranties and covenants applicable to such Member as set forth in this section, and such representations, warranties and covenants shall survive the execution of this Agreement.

### 7.2.  REPRESENTATIONS, WARRANTIES AND COVENANTS

Each Member, and solely with respect to Section 7.2.7, Section 7.2.8, Section 7.2.10 and Section 7.2.13, the General Manager hereby represents, warrants and covenants that:

7.2.1.   Disclaimer.  This Agreement was drafted by counsel for the General Manager and the Focus Member and said counsel has in no way undertaken to represent the Company or any other Member.  Each Member has been represented by competent counsel of its own selection in connection with the negotiation of the terms and conditions of this Agreement, and that such Member has had adequate opportunity to do so and has done so.

7.2.2.   Securities Laws.  The Units and other interests represented by this Agreement have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or registered with or qualified under the securities laws of any state and have been issued in reliance upon one or more exemptions from the registration requirements of the Securities Act and the securities laws of the relevant states.  No transfer, sale, assignment, pledge, hypothecation or other disposition of Units may be made:  (a) except pursuant to an effective registration statement under the Securities Act; or (b) unless the Company has been furnished with a satisfactory opinion of counsel for the holder of such Units that such transfer, sale, assignment, pledge, hypothecation or other disposition is exempt from the registration requirements of the Securities Act and the securities laws of the relevant states.

7.2.3.   Sophistication; Investigation.  Each Member is familiar with the proposed activities of the Company and has the sophistication, knowledge and experience necessary to evaluate the benefits and risks associated with this particular investment.  Each Member is acquiring such Member's Units based upon such Member's own investigation, and the exercise of rights by such Member and the performance of such Member's obligations under this Agreement will be based upon such Member's own investigation, analysis, and expertise.

7.2.4.   <u>Purchase For Own Account</u>.  Each Member hereby covenants and agrees with the Company, for the benefit of the Company and all Members, that:  (a) such Member's acquisition of Units hereunder is made as principal for such Member's own account and not for resale or distribution of such Units; (b) such Member is not currently making a market in Units and will not in the future make a market in such Units; (c) each Member will not transfer such Member's Units on an established securities market, a secondary market (or the substantial equivalent thereof) within the meaning of Code Section 7704(b) (and any Regulations, proposed Regulations, revenue rulings, or other official pronouncements of the Internal Revenue Service or Treasury Department that may be promulgated or published thereunder); and (d) in the event such Regulations, revenue rulings, or other pronouncements treat any or all arrangements that facilitate the selling of Units and that are commonly referred to as "matching services" as being a secondary market or substantial equivalent thereof, it will not transfer any Units through a matching service that is not approved in advance by the Company.

7.2.5.   <u>Restrictions on Transfer</u>.  Each Member further agrees that such Member will not transfer any Units to any person unless such person agrees to be bound by the representations and warranties contained in this Section and to transfer such Units only to persons who agree to be similarly bound.  Any transfer in violation of this Agreement shall be void.

7.2.6.   <u>Code Section 754 Elections and Obligations</u>.  Each Member receiving the benefits of any election under Code Section 754, 743(b) or 734(b) shall be responsible to pay the costs of or reimburse the Company for any cost directly or indirectly associated with such election in an amount equal to the portion of such costs that corresponds to the ratio of the positive Capital Account balance of such Member prior to such election compared to the positive Capital Account balances of all such Members prior to such election.

7.2.7.   <u>Due Incorporation or Formation; Authorization of Agreement</u>.  If an entity, such Member or General Manager, as applicable, is a corporation duly organized or a partnership or limited-liability company duly formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the corporate, partnership, or company power and authority to own its property and carry on its business as owned and carried on at the date hereof and as contemplated hereby.  Such Member or General Manager, as applicable, is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its financial condition or its ability to perform its obligations hereunder.  Such Member or General Manager, as applicable, has the corporate, partnership or company power and authority to execute and deliver this Agreement and to perform its obligations hereunder and the execution, delivery, and performance of this Agreement have been duly authorized by all necessary corporate, partnership, or company action.  In addition, all internal committee approvals or other internal requirements have been obtained and all internal procedures have been completed whether or not required by law.  This Agreement constitutes the legal, valid, and binding obligation of such Member or General Manager, as applicable, and such Member or General Manager, as applicable, is ready, willing, and able to perform all of its obligations under this Agreement unconditionally except for the conditions set forth in this Agreement.

7.2.8.   <u>No Conflict With Restrictions; No Default</u>.  Neither the execution, delivery, nor performance of this Agreement nor the consummation by such Member or General Manager, as

applicable, of the transactions contemplated hereby: (i) will conflict with, violate or result in a breach of any of the terms, conditions or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency or instrumentality, domestic or foreign, or any arbitrator, applicable to such Member or General Manager, as applicable, its Parent or any of its wholly-owned Affiliates; (ii) will conflict with, violate, result in a breach of or constitute a default under any of the terms, conditions or provisions of the articles of incorporation or organization, bylaws, partnership agreement or operating agreement of such Member or General Manager, as applicable, its Parent, or any of its wholly-owned Affiliates or of any material agreement or instrument to which such Member or General Manager, as applicable, its Parent or any of its wholly-owned Affiliates is a party or by which such Member or General Manager, as applicable, its Parent or any of its wholly-owned Affiliates is or may be bound or to which any of its material properties or assets is subject; (iii) will conflict with, violate, result in a breach of, constitute a default under (whether with notice or lapse of time or both), accelerate or permit the acceleration of the performance required by, give to others any material interests or rights, or require any consent, authorization or approval under any indenture, mortgage, lease agreement or instrument to which such Member or General Manager, as applicable, its Parent or any, of its wholly-owned Affiliates is a party or by which such Member or General Manager, as applicable, its Parent or any of its wholly-owned Affiliates is or may be bound; or (iv) will result in the creation or imposition of any lien upon any of the material properties or assets of such Member or General Manager, as applicable, its Parent or any of its wholly-owned Affiliates.

7.2.9.  <u>Governmental Authorizations</u>.  Any registration, declaration or filing with, or consent, approval, license, permit, or other authorization or order by, any governmental or regulatory authority, domestic or foreign, that is required in connection with the valid execution, delivery, acceptance and performance by such Member under this Agreement or the consummation by such Member of any transaction contemplated hereby has been completed, made or obtained on or before the Effective Date.

7.2.10.  <u>Litigation</u>.  There are no actions, suits, proceedings or investigations pending or, to the knowledge of each Member or General Manager, as applicable, or any of such Member's or General Manager's wholly-owned Affiliates, threatened against or affecting such Member or General Manager, any of such Member's or General Manager's wholly-owned Affiliates or any of their respective properties, assets, or businesses in any court or before or by any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator which, if adversely determined (or, in the case of an investigation could lead to any action, suit or proceeding, which if adversely determined could), may reasonably be expected to materially impair the ability of such Member or General Manager, as applicable, to perform such Member's or General Manager's obligations under this Agreement or to have a material adverse effect on the consolidated financial condition of such Member or General Manager; and such Member or General Manager or any of such Member's or General Manager's wholly-owned Affiliates has not received any currently effective notice of any default, and such Member or General Manager or any of such Member's or General Manager's wholly owned Affiliates is not in default, under any applicable order, writ, injunction, decree, permit, determination or award of any court, any governmental department, board, agency or instrumentality, domestic or foreign, or any arbitrator which could reasonably be expected to materially impair the ability to perform

such Member's or General Manager's obligations under this Agreement or to have a material adverse effect on the consolidated financial condition of such Member or General Manager.

7.2.11.  Investment Company Act.  Neither such Member nor any of such Member's Affiliates is, nor will the Company as a result of such Member holding an interest therein be, an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended. Each Member hereby covenants and agrees with the Company, for the benefit of the Company and all Members, that such Member and its Affiliates will not take any action or authorize to take any action that would result in subjecting the Company to the Investment Company Act of 1940, as amended.

7.2.12.  Public Utility Holding Company Act.  Neither such Member nor any of such Member's Affiliates is, nor will the Company as a result of such Member holding an interest therein be, a "holding company," "an Affiliate of a holding company," or a "subsidiary of a holding company" as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935.

7.2.13.  Licensing.  Such Member or General Manager has all required licenses and qualifications to engage in the business and activities contemplated by this Agreement.

## 8.    ACCOUNTING, BOOKS AND RECORDS

### 8.1.    ACCOUNTING, BOOKS AND RECORDS

8.1.1.  General.  The General Manager, or such other person as the General Manager may designate, from time to time, shall be responsible for causing the preparation of financial reports of the Company and the coordination of financial matters of the Company with the Company's accountants.

8.1.2.  Books and Records Inspection.  Any Member or such Member's designated representative has the right to have reasonable access to and inspect and copy the contents of the Company's books or records and the books and records of the General Manager pertaining to the Company and the operations and affairs of the Company, and shall also have reasonable access during normal business hours to additional financial information, documents, books and records. The rights granted to a Member pursuant to this Section 8.1 are expressly subject to compliance by such Member with Section 6.8 and the safety, security and confidentiality procedures and guidelines of the Company, as such reasonable procedures and guidelines may be established by the Management Committee from time to time.  The Company shall keep on site at its principal place of business each of the following records pursuant to Section 86.241 of the NRS (or any successor statute thereof): (a) a current list of the full name and last known business, residence or mailing address of each Member and Manager, both past and present; (b) a copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed; and (c) a copy of this Agreement and all amendments hereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed.

8.1.3.   Accounting Method.   The Company shall use the method of accounting required by the Code in preparation of its financial reports and for tax purposes and shall keep its books and records accordingly.

8.1.4.   Maintenance of Books and Records.   The Company shall maintain the following books and records in addition to any books and records required by law or generally accepted accounting principles.

a.   Separate books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the conduct of the Company and the operation of the Business in accordance with this Agreement.

b.   Copies of the Company's federal, state and local income tax returns and reports, if any, for the six (6) most recent years;

c.   Copies of any writings regarding the obligation of a Member to perform any enforceable promise to contribute cash or property or to perform services as consideration for such Member's Capital Contribution;

d.   Unless contained in this Agreement, a statement prepared and certified as accurate by the General Manager that describes:

(i)   The amount of cash and a description and statement of the agreed value of the other property or services contributed by each Member and that each Member has agreed to contribute in the future;

(ii)   The times at which, or events that on the happening of which, any additional Capital Contributions agreed to be made by each Member are to be made;

(iii)   If agreed upon, the time at which, or the events that on the happening of which, a Member may terminate his Units in the Company and the amount of, or the method of determining, the distribution to which he may be entitled respecting his Units and the terms and conditions of the termination and distribution; and

(iv)   Any right of a Member to receive distributions, which include a return of all or any part of a Member's contribution;

e.   Any written consents obtained from Members regarding action taken by Members without a meeting; and

f.   Any written consents obtained from Managers regarding action taken by Managers without a meeting.

8.1.5.   Financial Statements.   The Company (and the General Manager on its behalf) shall cause to be delivered to each Member the financial statements listed in clauses (a) and (b) below, prepared, in each case (other than with respect to Member's Capital Accounts, which shall be prepared in accordance with this Agreement) in accordance with generally accepted

accounting principles consistently applied, and shall be prepared in accordance with the method of accounting selected by the Management Committee and on the basis of the fiscal year, and such other reports as any Member may reasonably request from time to time; provided, however, that if the Management Committee so determines within thirty (30) days thereof, such other reports shall be provided at such requesting Member's sole cost and expense. The monthly and quarterly financial statements referred to in clause (b) below may be subject to normal year-end unaudited adjustments.

a.    As soon as practicable following the end of each Fiscal Year (and in any event not later than ninety (90) days after the end of such Fiscal Year), and at such time as distributions are made to the Members pursuant to Section 12 of this Agreement following the occurrence of a Dissolution Event, an unaudited statement prepared by the Company setting forth a balance sheet of the Company as of the end of such Fiscal Year and the related statements of operations, Members' Capital Accounts and changes therein, and cash flows for such Fiscal Year.

b.    As soon as practicable following the end of each of the first three Fiscal Quarters of each Fiscal Year (and in any event not later than sixty (60) days after the end of each such Fiscal Quarter), an unaudited statement prepared by the Company setting forth a balance sheet of the Company as of the end of such Fiscal Quarter and the related statements of operations and cash flows for such Fiscal Quarter and for the Fiscal Year to date, in each case, to the extent the Company was in existence, setting forth in comparative form the corresponding figures for the prior Fiscal Year's Fiscal Quarter and the interim period corresponding to the Fiscal Quarter and the interim period just completed.

The quarterly or monthly statements described above shall be accompanied by a written report of the outside accountants for the Company to the extent required by the source of the Land Financing or otherwise.

## 8.2.    TAX MATTERS

8.2.1.    <u>Tax Elections</u>.  The General Manager shall, subject to the consent of the Members being required herein, make any and all elections, and revocations thereof, for federal, state, local and foreign tax purposes including, without limitation, any election, if permitted by applicable law, to:  (a) with the consent of the Management Committee adjust the basis of Property pursuant to Code Sections 754, 734(b) and 743(b), or comparable provisions of state, local or foreign law, in connection with transfers of Units and Company distributions; (b) with the consent of all of the Members, extend the statute of limitations for assessment of tax deficiencies against the Members with respect to adjustments to the Company's federal, state, local or foreign tax returns; (c) with the consent and at the direction of the Management Committee, to the extent provided in Code Sections 6221 through 6231 and similar provisions of federal, state, local, or foreign law, represent the Company and the Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company or the Members in their capacities as Members; and (d) with the consent and at the direction of the Management Committee file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including, without limitation, agreements or other

documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company and the Members.

8.2.2. <u>Tax Matters Member</u>. On and subject to the terms and conditions of this Agreement, the Focus Member is specifically authorized to act as the "Tax Matters Member" under the Code and in any similar capacity under state, local or foreign law.

8.2.3. <u>Tax Information</u>. Necessary tax information shall be delivered to each Member as soon as practicable after the end of each Allocation Year but not later than three (3) months after the end of each Allocation Year.

### 8.3. CLASSIFICATION

The General Manager shall take such action as may be required under the Code and the Regulations to cause the Company to be taxable as a partnership for Federal income tax purposes. To the extent that the Company is not taxable as a partnership for Federal income tax purposes, the General Manager shall take such action as may be required under any state or local law applicable to the Company to cause the Company to be taxable as, and in a manner consistent with, a partnership (or the functional equivalent thereof under applicable law) for state or local income tax purposes. In addition, it is the express intent of the Company, the Management Committee and the Members that the Company not be classified as a "partnership," as defined by Section 303 of the Bankruptcy Code of 1978, as amended.

## 9. AMENDMENTS

### 9.1. PROPOSAL OF AMENDMENTS

Amendments to this Agreement or the Articles may be proposed by the Management Committee or by a Majority. Following such proposal, the Management Committee shall submit to the Members a verbatim statement of any proposed amendment and the Management Committee shall include in any such submission a recommendation as to the proposed amendment to this Agreement or the Articles.

### 9.2. APPROVAL OF AMENDMENTS

The Management Committee shall seek the written consent of the Members on the proposed amendment or shall call a meeting to vote thereon and to transact any other business that the Management Committee may deem appropriate. A proposed amendment shall be adopted and be effective as an amendment hereto only if it receives the affirmative vote of a Supermajority, or with respect to modifications to the Preliminary POD Allocation Map, by the Management Committee by affirmative vote of the Managers representing a Supermajority. Amendment of the content of Schedules in the manner contemplated by other provisions of this Agreement shall not be subject to this Article 9.

### 9.3. LIMITATIONS ON AMENDMENTS

Notwithstanding this Section 9 and except as provided in Section 1.5 hereof for the addition of Units or amendment of the content of Schedules in the manner contemplated by other

provisions of this Agreement, neither this Agreement nor the Articles shall be amended without the consent of each Member adversely affected if such amendment would (a) modify the limited liability of a Member, (b) materially adversely affect the interest of a Member in Profits, Losses or any Company distributions in a manner disproportionate to the other Members or (c) the rights of such Member to receive the allocation and conveyance of its proportionate interest in the Subject Property would be materially adversely affected, including any of the density, salability, timing of the release, or developability of the Subject Property in a manner materially disproportionate to other Members; and neither this Agreement nor the Articles shall be amended without the consent of the General Manager if such amendment would change in any manner the rights, powers, authority, duties, liabilities, fees, reimbursement, or indemnification of the General Manager. The percentage or other proportion of votes (by Percentage Interest or otherwise) required for the taking of any action (or to refrain from any action) by the Members or by the Management Committee, as expressly set forth in this Agreement, shall not be altered except with unanimous approval of the Members. The provisions of Section 5.7.1 hereof, concerning the removal and replacement of the General Manager shall not be amended except with the unanimous approval of the Members and the General Manager.

## 10. WITHDRAWAL AND TRANSFERS

### 10.1. RESTRICTIONS ON WITHDRAWALS

No Member shall have any right to retire, resign or withdraw from the Company except pursuant to the terms of Section 6.11 or in the event of the transfer of all of its Units and admission of a substituted Member with respect to all of such Units in compliance with Section 10.4, or to commit an act that constitutes an Event of Default (defined below). Any act of a Member that constitutes a retiring, resignation, withdrawal (other than pursuant to the terms of Section 6.11 or in the event of the transfer of all of its Units and admission of a substituted Member with respect to all of such Units in compliance with Section 10.4) or Event of Default by the Member from the Company shall constitute a material breach of this Agreement, and the Company and the other Members shall be entitled to collect damages for such breach, including attorneys fees and costs. Such damages shall offset any cash or other property that would otherwise be distributable to such Member by the Company.

### 10.2. RESTRICTIONS ON TRANSFERS; PERMITTED TRANSFERS

10.2.1. <u>Restrictions on Transfer; Permitted Transfers</u>. Except as provided in this Section 10.2, any transfer or purported transfer of all or any portion of a Member's Units or an unadmitted assignee's rights to receive allocations and distributions with respect to transferred Units (where such Units or rights shall be referred to as "Interests") shall be null and void; provided; however, a Member or an unadmitted assignee of transferred Units or Interests (either a "Transferor") may transfer all or any portion of such Member's or unadmitted assignee's Interests only to the extent that such transfer is a "Permitted Transfer," for which purpose a Permitted Transfer shall mean a transfer to:

a. Any non-Member in which a Member holds at least a thirty percent interest (30%) in the capital of such transferee and retains day to day management responsibilities with respect to such transferee and shall be solely responsible for

interfacing with the Company and the General Manager on behalf of such transferee (a "Qualifying Successor Entity");

    b.    Any other Member;

    c.    The Transferor's successor by merger or similar combination; or

    d.    Any non-Member if such transfer is approved by the Management Committee by affirmative vote of the Managers representing at least seventy-five percent (75%) of the Percentage Interests held by Members other than the Transferor and its Affiliates; provided that no transfers pursuant to this clause (d) shall occur after the date the Interim Payment is due unless such transfer is approved by all of the Members and the Transferor guarantees all obligations of the transferee.

Notwithstanding the foregoing, unless otherwise approved by all of the Members or as the result of purchases from Terminated Member(s) pursuant to Section 5.10.4 or acquisitions pursuant to Section 2.4.1 or Section 2.4.2, no Member nor any group composed of any Member and its Affiliates, shall own or control more than forty-nine percent (49%) of the Percentage Interests in the Company at any time, and no transfer shall be permitted (notwithstanding that such transfer may otherwise qualify as a Permitted Transfer) that would result in any Member or any group composed of any Member and its Affiliates, owning or controlling more than forty-nine percent (49%) of the Percentage Interests in the Company.

    10.2.2.    <u>Effect of Unauthorized Transfer; Restrictions After Transfer</u>.  Any transfer that is not a Permitted Transfer shall be in violation of this Agreement and shall be null and void and of no force or effect whatsoever.  To the extent that the Company is required to recognize a transfer that is not a Permitted Transfer (or if the Management Committee, in its sole discretion, elects to recognize a transfer that is not a Permitted Transfer), the unadmitted transferee of such transferred Units shall have no rights under this Agreement except for the right to receive allocations and distributions as provided by this Agreement with respect to the transferred Units, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations or liabilities for damages that the transferor or transferee of such Units may have to the Company and the other Members.  Each transferee and any subsequent transferee of all or any portion of any Interests, regardless of whether or not such Person signs this Agreement, or such transfer is approved by the Management Committee and the Members, shall, unless this Agreement expressly provides otherwise, hold such Interests subject to all of the provisions of this Agreement and make no further transfer.

    10.2.3.    <u>Indemnification</u>. In the case of a transfer or attempted transfer of Units that is not a Permitted Transfer, the parties engaging or attempting to engage in such transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability and damage that any of such indemnified Members may incur (including, without limitation, incremental tax liabilities, lawyers' fees and expenses) as a result of such transfer or attempted transfer and efforts to enforce the indemnity granted hereby.

10.2.4. <u>No Transfer Permitted Under Certain Circumstances</u>. Notwithstanding any other provision of this Agreement other than transfers that result from purchases from Terminated Member(s) pursuant to Section 5.10.4 or acquisitions pursuant to Section 2.4.1 or Section 2.4.2, a Transferor shall not transfer all or any part of its Interests if such transfer would violate any applicable federal or state securities laws, federal or state antitrust laws or any other applicable laws, and any such attempted transfer shall be null and void.

10.2.5. <u>Taxpayer Information</u>. Notwithstanding anything to the contrary contained in this Section 10, the Transferor and the transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Interests that are to be transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any Interests to be transferred pursuant to this Section 10 until it has received such information.

10.2.6. <u>Intentionally Omitted</u>.

10.2.7. <u>Adjustment of Schedule II</u>. Upon satisfaction of the conditions to a transfer among existing Members, or any re-allocation expressly permitted pursuant to this Agreement, the General Manager shall revise Schedule II as to Units, Percentage Interests, and Members Acreage Allotments, accordingly, subject to Management Committee review for accuracy.

**10.3. INTENTIONALLY DELETED**

**10.4. ADMISSION OF ADDITIONAL AND SUBSTITUTED MEMBERS**

10.4.1. <u>Unadmitted Transferees</u>. A person who acquires an Interest but who is not admitted as an additional or substitute Member pursuant to this Section 10.4 shall be entitled only to allocations and distributions with respect to such Interest in accordance with this Agreement, and shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the NRS, the Articles or this Agreement.

10.4.2. <u>Admission</u>. Subject to the other provisions of this Section 10, a transferee of Interests shall be admitted to the Company as a substituted Member upon satisfaction of all of the conditions set forth in this Section 10.4.2, but not otherwise:

a. The consent of the at least seventy-five percent (75%) of the Percentage Interests held by Members other than the Transferor and its Affiliates; provided, however, this condition is not applicable to Permitted Transfers;

b. The Interests with respect to which the transferee is being admitted were acquired by means of a Permitted Transfer;

c. The transferee of Interests (other than a transferee that was a Member prior to the transfer) shall, by written instrument in form and substance reasonably

satisfactory to the General Manager: (i) make representations and warranties to the Company and each non-transferring Member equivalent to those set forth in Article 7 of this Agreement; (ii) accept and adopt, effective as of the effective date of such transfer, the terms and provisions of this Agreement, including this Section 10; (iii) assume the obligations of the transferor Member under this Agreement with respect to the transferred Interests arising on and after the effective date of such transfer; and (iv) execute and deliver such other instruments as the Management Committee reasonably deems necessary or appropriate to effect, and as a condition to, such transfer, including, without limitation, amendments to the Articles or any other instrument filed with the State of Nevada or any other state or governmental authority;

> d.    The transferee pays or reimburses the Company for all reasonable legal, filing and publication costs that the Company incurs in connection with the admission of the transferee as a substituted Member with respect to the transferred Interests;

> e.    The transfer shall be confirmed by presentation to the Company of legal evidence of such transfer, in form and substance reasonably satisfactory to counsel to the Company; and

> f.    The Transferor and transferee shall execute and deliver to the Company such reasonable documents and instruments of conveyance as may be necessary or appropriate in the reasonable opinion of counsel to the Company to effect such transfer, including, without limitation: (i) evidence of the registration of the transferred Interests under the Securities Act and any applicable state securities laws or an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Management Committee, to the effect that such transfer is exempt from all applicable registration requirements and that such transfer will not violate any applicable laws regulating the transfer of securities; and (ii) if required by the General Manager, an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Management Committee, to the effect that such transfer will not cause the Company to be deemed to be an "investment company" under the Investment Company Act of 1940.

Upon satisfaction of the conditions contained in this Section 10.4.2, the General Manager, with the consent of the Management Committee, shall revise **Schedule II** of this Agreement to reflect the name, address, Units and Percentage Interest of the substituted Member and the records of the Company shall reflect the Capital Contribution of the substituted Member. Upon any such revision the General Manager shall promptly send a copy of the revised Schedule II to all Members.

10.4.3.    Adjustment of Member Acreage Allotments.    Upon satisfaction of the conditions contained in Section 10.4.2, and if the Pods have not yet been conveyed to the Members, then the Member Acreage Allotments shall be adjusted to deduct from the Transferor the number of gross acres which is proportional to the number of Units transferred and to add such gross acres to the substituted Member and the General Manager shall revise **Schedule II** of this Agreement accordingly.

10.4.4.    Obligations of Transferor.  Except as otherwise provided in this Agreement or as otherwise approved by the Management Committee, any Transferor shall remain primarily liable for all of the obligations and liabilities of the Transferor under this Agreement as if such transfer had not occurred, including, without limitation:  (a) those obligations or liabilities of the Transferor arising out of a breach of this Agreement; (b) those obligations or liabilities of the Transferor based on events occurring, arising or maturing prior to the date of transfer; and (c) any Capital Contribution or other financing obligation of the Transferor under this Agreement.  Notwithstanding the foregoing, a Terminated Member pursuant to Section 5.10 or a Non-Contributing Member as to which the remedies under Section 2.4.1 or Section 2.4.2 are enforced shall be released from all such obligations except all obligations which otherwise would survive termination of status as a Member shall remain in effect, including, without limitation, Sections 5.5 and 6.8.

10.5.    DISTRIBUTIONS AND ALLOCATIONS WITH RESPECT TO TRANSFERRED UNITS

If any Interests are transferred during any Allocation Year in compliance with the provisions of this Section 10, Profits, Losses and each item thereof, and all other items attributable to the transferred Interests for such Allocation Year shall be divided and allocated between the transferor and the transferee by taking into account their varying Percentage Interests during the Allocation Year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Management Committee.  All distributions on or before the date of such transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee.  Solely for purposes of making such allocations and distributions, the Company shall recognize such transfer not later than the end of the calendar month during which it is given notice of such transfer; provided, however, that, if the Company is given notice of a transfer at least ten (10) days prior to the transfer, the Company shall recognize such transfer as of the date of such transfer, and provided further that if the Company does not receive a notice that states the date such Interests were transferred and such other information as the Management Committee may reasonably require within thirty (30) days after the end of the Allocation Year during which the transfer occurs, then all such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Company, was the owner of the Interests on the last day of such Allocation Year.  Neither the Company nor any Member shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 10.5, whether or not any Manager or the Company has knowledge of any transfer of any Interests.

10.6.    EXTENSION OF TIME

If any transfer of a Transferor's Interests in accordance with Section 10 of this Agreement requires the consent, approval, waiver, or authorization of any governmental authority or of the equity holders of a Transferor or any of such Transferor's Affiliates as a condition to the lawful and valid transfer of such Transferor's Interests to the proposed transferee thereof, then each of the time periods provided in Section 10 of this Agreement for the closing of such transfer shall be suspended for the period of time during which any such consent, approval, waiver, or authorization is being diligently pursued; provided, however, that in no event shall the suspension of any time period pursuant to this Section 10.6 extend for more than one hundred eighty (180) days.  Each Member agrees to use diligent efforts to obtain, or to assist the

Transferor or the Management Committee in obtaining, any such consent, approval, waiver or authorization and shall cooperate and use diligent efforts to respond as promptly as practicable to all inquiries received by it, by the Transferor or by the Management Committee from any governmental authority for initial or additional information or documentation in connection therewith.

### 10.7. TRANSFERS AFTER CONVEYANCE OF PODS

10.7.1. Without approval of the Management Committee (excluding the Manager who represents the Transferor), no Units may be transferred after the conveyance of Pods to the Members except in connection with the contemporaneous transfer by the Transferor to the same transferee of Pods or portions thereof proportional to the transferred Units.

10.7.2. If any Member proposes to transfer (a) Pods or any portion thereof after conveyance of Pods to the Members but prior to dissolution of the Company or (b) the right to acquire Pods pursuant to its Acquisition Agreements, then the Member must comply with this Section 10.7.2. The Members may transfer Pods or rights to acquire Pods pursuant to their Acquisition Agreements provided that prior notice of such proposed transfer is given to the Management Committee (except that no notice is required for transfers of Pods to homebuyers or homeowners associations in the ordinary course of a business), the transferring Member has fully complied with all of its payment and other obligations through the date of the proposed transfer, and the transferring Member has paid any brokerage commissions required pursuant to Section 14.5. Notwithstanding any agreements between the transferring Member and its transferee(s), the transferring Member shall remain primarily liable for all obligations of the transferring Member under this Agreement, and, with respect to any assignment of rights to acquire Pods pursuant to its Acquisition Agreement, such assigning Member shall be the sole representative before the Company to act for and on behalf of the assignee.

## 11. DEFAULT

### 11.1. EVENTS OF DEFAULT

Upon an Event of Default on the part of the General Manager or any Member, the Company, acting by or through the General Manager or any Member, but in either case, only after authorization by the Management Committee (by affirmative vote of the Managers representing a majority of the Percentage Interests held by Members other than the Defaulting Party or by its Affiliate), may provide written notice of the Event of Default (the "Default Notice") to the defaulting General Manager, Member or the defaulting unadmitted assignee of Units or Interests (either a "Defaulting Party"), and to the Company and the non-defaulting Members and the Company may exercise any remedies available to the Company on account of such Event of Default provided in this Agreement or by law or in equity. For the purposes of this Agreement, an "Event of Default" shall mean any of the following:

11.1.1. Deficiency. A failure of such Defaulting Party to make any Capital Contribution required pursuant to any provision of this Agreement and such failure within any applicable cure period provided for in this Agreement;

11.1.2.   Breach.   Except as covered in Section 11.1.1, the Defaulting Party has committed a material breach of any material covenant or any representation (or any such representation of Defaulting Party would be materially inaccurate if restated at any time subsequent to the date of this Agreement) contained in this Agreement or materially defaulted on any material obligation provided for in this Agreement and such breach or default continues for ten (10) days after the date written notice thereof has been given to such Defaulting Party by any non-defaulting Member, provided that, if such breach or default is not a failure to pay money and is of such a nature that it cannot reasonably be cured within such ten (10) day period, but is curable and such Defaulting Party in good faith begins efforts to cure it within such ten (10) day period and continues diligently to do so, such Defaulting Party shall have a reasonable additional period thereafter to effect the cure (not to exceed thirty (30) days unless extended by the Management Committee (excluding any Manager who has been appointed by the Defaulting Party or by its Affiliate);

11.1.3.   Retirement, Resignation or Withdrawal.   The retirement, resignation or withdrawal, or attempted retirement, resignation or withdrawal, by a Defaulting Party from the Company in violation of this Agreement without the prior written consent of the non-defaulting Members;

11.1.4.   Dissolution or Liquidation.   Any dissolution or liquidation of a Defaulting Party or the taking of any action by its directors, majority stockholder, or Parent looking to the dissolution or liquidation of such Defaulting Party, unless either (i) the business of such Defaulting Party is carried on without termination, or (ii) substantially all assets of the Defaulting Party are transferred or are to be transferred to a person directly or indirectly controlling, controlled by or under common control with such Defaulting Party;

11.1.5.   Voluntary Bankruptcy.   The bankruptcy of a Defaulting Party, which means: (a) the inability of the Defaulting Party generally to pay its debts as such debts become due, or an admission in writing by the Defaulting Party of the Defaulting Party's inability to pay the Defaulting Party's debts generally or a general assignment by the Defaulting Party for the benefit of creditors; (b) the filing of any petition or answer by the Defaulting Party seeking to adjudicate the Defaulting Party as bankrupt or insolvent, or seeking for the Defaulting Party any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of the Defaulting Party or the Defaulting Party's debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for the Defaulting Party or for any substantial part of the Defaulting Party's property; or (c) any action taken by the Defaulting Party to authorize any of the actions set forth above.

11.1.6.   Involuntary Bankruptcy.   The involuntary bankruptcy of a Defaulting Party, which means, without the consent or acquiescence of the Defaulting Party, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation, or the filing of any such petition against such person, which petition shall not be dismissed within ninety (90) days, or without the consent or acquiescence of the Defaulting Party, the entering of an order appointing a trustee, custodian, receiver or liquidator of the

Defaulting Party or of all or any substantial part of the property of the Defaulting Party, which order shall not be dismissed within ninety (90) days.

11.1.7.    Appointment.  The appointment of a receiver, trustee, custodian or other similar official for any substantial part of the Defaulting Party's property;

11.1.8.    Investment Company.  Any transfer that would result in subjecting the Company to the Investment Company Act of 1940, as amended; or

11.1.9.    Prohibited Transfer.  A transfer of all or any portion of such Defaulting Party's Interests except as expressly permitted or required by this Agreement.

11.1.10.    Ineligibility.  BLM, the City of Henderson, or any other governmental authority determines that the Defaulting Party is ineligible, unqualified, unsuitable or otherwise prohibited from investing or participating in the Subject Property, the Community, or other related matters or its investment or participation is the subject of any restriction not applicable to other Members.

11.1.11.    Focus Member.  With respect to Focus Member or the General Manager, (i) any Event of Default by the General Manager or Focus Member, respectively, under this Agreement or (ii) any default (after the expiration of any applicable cure period) by any Affiliate of Focus Member or General Manager under any agreement with the Company.

**11.2.  AVAILABILITY OF REMEDIES**

To the extent applicable the Company shall have the rights and remedies provided under Section 2.4 in addition to those under this Section 11.  The resort to any remedy pursuant to this Section 11 or Section 2.4 shall not, for any purpose, be deemed to be a waiver of any remedy not described in this Section 11 or Section 2.4 and otherwise available hereunder or under applicable law.  Further, notwithstanding the election of the Company or a non-defaulting Member to pursue any rights under this Section 11 or Section 2.4, the Company or the non-defaulting Members may seek action to enjoin the Defaulting Party, seek to obtain specific performance of the Defaulting Party's obligations, seek to obtain any and all damages, losses and expenses (including, without limitation, reasonable attorneys' fees and disbursements) suffered or incurred by the Company as a result of such Event of Default (collectively, the "Damages") against the Defaulting Party or resort to any of the other remedies then available to the Company or any of the non-defaulting Members.

Without limitation of the foregoing, upon any Event of Default and continuing until cure pursuant to the terms of this Agreement, neither the Defaulting Party nor the Manager appointed by the Defaulting Party shall have any voting rights hereunder and, not withstanding anything in this Agreement to the contrary, such Defaulting Party and its Member shall not be considered for purposes of satisfying any quorum, voting, or approval requirements, including, without limitation, any requirement for unanimous approval.

## 12.  DISSOLUTION AND WINDING UP

### 12.1.  DISSOLUTION EVENTS

The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each a "Dissolution Event"):

12.1.1.    The affirmative vote of Members holding at least a Supermajority to dissolve, wind up, and liquidate the Company; or

12.1.2.    After turnover of control of the master homeowners association to the homeowners; or

12.1.3.    A judicial determination that an event has occurred that makes it unlawful, impossible or impractical to carry on the Company's business; or

12.1.4.    A Person other than the Company purchases the Subject Property at the Auction.

### 12.2.  WINDING UP

Upon the occurrence of either a Dissolution Event or the determination by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Dissolution Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members, and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business; provided, however, that all covenants and obligations provided for in this Agreement shall continue to be fully binding upon the Members until such time as the Property has been distributed pursuant to this Section 12.2 and the Company has been dissolved pursuant to the NRS. The General Manager shall be responsible for overseeing the winding up and dissolution of the Company with the approval and at the direction of the Management Committee, which winding up and dissolution shall be completed within ninety (90) days of the occurrence of the Dissolution Event. The Management Committee shall take full account of the Company's liabilities and Property and shall cause the Property or the proceeds from the sale thereof, to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

a.    First, to creditors (including the General Manager, Members and Managers who are creditors) in satisfaction of all of the Company's debts, obligations and other liabilities, including, without limitation, any claims and obligations as required by NRS 86.521 (whether by payment or the making of reasonable provision for payment thereof), other than liabilities for which reasonable provision for payment has been made and liabilities for interim distributions to the Members or distributions to resigning Members; and then

b.    The balance, if any, to the Members in accordance with their Percentage Interests, after giving effect to all contributions, distributions and allocations for all periods.

## 12.3. COMPLIANCE WITH CERTAIN REQUIREMENTS OF REGULATIONS; DEFICIT CAPITAL ACCOUNTS

In the event the Company is "liquidated" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), distributions shall be made pursuant to this Section 12 to the Members who have positive Capital Accounts in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2). If any Member has a deficit balance in his Capital Account (after giving effect to all contributions, distributions and allocations for all Allocation Years, including, without limitation, the Allocation Year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other person for any purpose whatsoever. In the discretion of the Management Committee, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to this Section 12 may be:

a.    Distributed to a trust established for the benefit of the Members for the purposes of liquidating the Company's assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company. The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Management Committee, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to Section 12.2 of this Agreement; or

b.    Withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company; provided, however, that such withheld amounts shall be distributed to the Members as soon as practicable.

## 12.4. DEEMED CONTRIBUTION AND DISTRIBUTION

Notwithstanding any other provision of this Section 12, in the event the Company is liquidated within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g) but no Dissolution Event has occurred, Property shall not be liquidated, the Company's debts, obligations and other liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up. Instead, solely for federal income tax purposes, the Company shall be deemed to have contributed all of its Property and liabilities to a new limited-liability company in exchange for an interest in such new company and, immediately thereafter, the Company will be deemed to liquidate by distributing interests in the new limited-liability company to the Members.

## 12.5. RIGHTS OF MEMBERS

Except as otherwise provided in this Agreement, each Member shall look solely to Property for the return of such Member's Capital Contribution and shall have no right or power to demand or receive Property other than cash from the Company. If the assets of the Company remaining after payment or discharge of the debts, obligations or other liabilities of the Company are insufficient to return such Capital Contributions, the Members shall have no recourse against the Company, any Manager or any Member.

### 12.6.  NOTICE OF DISSOLUTION

In the event a Dissolution Event occurs or an event occurs that would, but for provisions of Section 12.1 of this Agreement, result in a dissolution of the Company, the Management Committee shall, within thirty (30) days thereafter, provide written notice thereof to each Member and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Management Committee) and shall publish notice thereof in a newspaper of general circulation in each place in which the Company regularly conducts business (as determined in the discretion of the Management Committee).

### 12.7.  TERMINATION

Upon completion of the distributions as provided in this Section 12, the Company shall be terminated, and the Management Committee shall cause the filing of the articles of dissolution pursuant to NRS 86.541 and shall take all such other actions as may be necessary to terminate the Company.

### 12.8.  ALLOCATIONS DURING PERIOD OF LIQUIDATION

During the period commencing on the first day of the Allocation Year during which a Dissolution Event occurs and ending on the date on which all of the Property has been distributed to the Members pursuant to Section 12.2 of this Agreement (the "Liquidation Period"), the Members shall continue to share Profits, Losses and other items of the Company's income, gain, loss or deduction in the manner provided in Section 3 of this Agreement.

### 12.9.  CHARACTER OF LIQUIDATING DISTRIBUTIONS

All payments made in liquidation of the interest of a Member in the Company shall be made in exchange for the interest of such Member in Property pursuant to Section 736(b)(1) of the Code, including, without limitation, the interest of such Member in Company goodwill.

### 12.10.  FORM OF LIQUIDATING DISTRIBUTIONS

For purposes of making distributions required by Section 12.2 of this Agreement, the Management Committee may determine whether to distribute all or any portion of the Property in-kind or to sell all or any portion of the Property and distribute the proceeds therefrom.

## 13.  INDEMNIFICATION

The Company shall indemnify and advance expenses to the General Manager, any Manager, any Member, any person formerly in any such position, and any other person, to the extent that such current or former General Manager, Manager, Member or any other person at any time acted on behalf of the Company, to the fullest extent permitted under the Articles or the NRS on and subject to the following limitations. In addition to and without limitation of the foregoing, to the extent that an indemnified party is entitled to indemnification but the Company is unable for any reason to indemnify the General Manager, its officers, directors, members employees, agents, Affiliates and other persons acting on its behalf or at its direction (collectively, "indemnified parties") fully against any and all liabilities and expenses incurred or

threatened to be incurred and all costs of defense (and if such liabilities and expenses are not otherwise insured against by the Company), then the Members shall jointly and severally each so indemnify the indemnified parties to the extent of each such Member's proportionate share (determined in proportion to their respective Percentage Interests). Said indemnity shall not be applicable to any act or omission by the indemnified party or any Affiliate of the indemnified party which constitutes intentional misconduct, fraud, gross negligence or a knowing violation of the law, or material breach of this Agreement or any other agreement with the Company by such indemnified party or Affiliate, and was material to the matter which is the subject of the claim for indemnification. Without limitation of the foregoing, the Management Committee may cause the Company to purchase insurance covering such persons.

## 14. FEES OF GENERAL MANAGER AND ITS AFFILIATES

The General Manager and its Affiliates shall be entitled to the following fees and expenses for their services which the Members agree are fair and reasonable.

### 14.1. MANAGEMENT FEE

If the Company submits the successful bid at the Auction, the General Manager shall receive a fee from the Company for the General Manager's services hereunder equal to seven percent (7%) of the total cost of the Subject Property (the "Management Fee"). The amount of the Management Fee shall be funded by the contributions of the Members under Sections 2.2 and 2.3. If the Company's bid at the Auction is not successful, then the General Manager shall not receive the Management Fee. If the General Manager is removed pursuant to Section 5.7.1, then it shall be entitled to the portion of the Management Fee payable through the date of removal but to no further portions of the Management Fee which become payable after such date. Nothing herein shall prejudice the General Manager's right to dispute and contest any alleged cause for removal and to pursue its right to receive the entire Management Fee.

### 14.2. INTENTIONALLY DELETED

### 14.3. PAYMENT SCHEDULE

The Management Fee shall be paid to the General Manager in the manner described in Section 2.3.7.

### 14.4. LANDTEK FEES

For so long as an Affiliate of Focus Member is a General Manager and Focus Member is a Member of the Company, Landtek shall receive a fee equal to seven percent (7%) of the total pre-development and construction costs as compensation for the performance of its services contemplated under Section 5.6.2 of this Agreement. The fee payable to Landtek is in addition to the Management Fee. The fee shall be earned and payable in accordance with terms and conditions of the construction management agreement described in Section 5.6.2.

### 14.5. BROKERAGE COMMISSIONS

If any Member transfers all or any portion of any Pods (other than to a homebuyer, in connection with any dedications of Public Sites or transfers to homeowner associations, to a joint venture or other entity which is a Qualifying Successor Entity, or pursuant to a bona fide land banking arrangement) within one year after conveyance of the Pods to the Member, such Member shall pay a 3% brokerage commission to Focus Commercial Group, Inc., an Affiliate of the General Manager, on the excess of the gross sale price over the purchase price paid for the property by the Member to the Company. The purchase price paid by the Member for the portion of its Pods being transferred shall be equal to the Member Consideration times a fraction, the numerator of which shall be the number of acres being sold by the Member, and the denominator of which shall be the total acres of the Pods acquired by the Member.

## 15. MISCELLANEOUS

### 15.1. NOTICES

Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be hand delivered, sent via facsimile, electronic mail, overnight delivery or registered or certified mail, return receipt requested. Notice shall be effective: (a) if hand delivered, when delivered; (b) if sent via facsimile or electronic mail, on the day of transmission thereof on a proper facsimile machine or computer, as applicable, with confirmation provided that a duplicate notice is sent simultaneously by another approved method; (c) if sent via overnight delivery, on the day of delivery thereof by a reputable overnight courier service, delivery charges prepaid; and (d) if mailed, on the third business day after the deposit of such item in the mail, postage prepaid, provided that a duplicate notice is sent via facsimile on the date of deposit in the mail. Notices shall be addressed or sent as follows: (x) if to the Company, to the address or facsimile number provided in Section 1.3 of this Agreement; (y) if to the Managers, to the address or facsimile number set forth in Section 5.1.3 of this Agreement; or (z) if to a Member, to the address or facsimile number set forth on Schedule II to this Agreement.

### 15.2. BINDING EFFECT

Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members, the General Manager, and their respective successors, transferees, assigns, heirs and personal representatives.

### 15.3. CONSTRUCTION

The terms of this Agreement were negotiated at arm's length by the parties hereto. The covenants, terms and provisions contained herein shall not be construed in favor of or against any party because that party or its counsel drafted this Agreement, but shall be construed simply according to its fair meaning as if all parties prepared this Agreement, and any rules of construction to the contrary are hereby specifically waived.