1   I. SCOTT BOGATZ (NSBN 3367)                     **E-FILED ON DECEMBER 22, 2010**
    CHARLES M. VLASIC III (NSBN 11308)
2   BOGATZ & ASSOCIATES, P.C.
    3455 Cliff Shadows Parkway, Suite 110
3   Las Vegas, Nevada 89129
    Telephone: (702) 776-7000
4   Facsimile: (702) 776-7900

5   ROBERTO J. KAMPFNER (*pro hac vice* pending)
    JOSHUA M. KEESAN (*pro hac vice* pending)
6   WHITE & CASE LLP
    633 West Fifth Street, Suite 1900
7   Los Angeles, CA 90071
    Telephone: 213-620-7700
8   Facsimile:  213-452-2329

9   Attorneys for
    FOCUS SOUTH GROUP, LLC and
10  HOLDINGS MANAGER, LLC

11                    UNITED STATES BANKRUPTCY COURT

12                      DISTRICT OF NEVADA (LAS VEGAS)

13

14
    In re:                                 |  Case No. 10-32968
15                                         |
    SOUTH EDGE, LLC,                       |  Chapter 11
16                                         |
                                           |  **DECLARATION OF ROBERTO J.**
17           Involuntary Debtor.           |  **KAMPFNER IN SUPPORT OF EX PARTE**
                                           |  **APPLICATION FOR AN ORDER**
18                                         |  **SHORTENING TIME TO SET HEARING**
                                           |  **ON: MOTION (I) TO PREVENT KLEE,**
19                                         |  **TUCHIN, BOGDANOFF & STERN LLP**
                                           |  **FROM REPRESENTING SOUTH EDGE,**
20                                         |  **LLC AND (II) TO APPOINT A**
                                           |  **RESPONSIBLE OFFICER TO HIRE**
21                                         |  **COUNSEL AND DETERMINE WHETHER**
                                           |  **THE PETITION SHOULD BE**
22                                         |  **CONTROVERTED**
                                           |
23                                         |  **Hearing Date**
                                           |
24                                         |  Date:  [OST REQUESTED]
                                           |  Time:  [OST REQUESTED]
25

26

27

28

                                 - 1 -

LOSANGELES 890768 (2K)

### DECLARATION OF ROBERTO J. KAMPFNER

I, ROBERTO J. KAMPFNER, declare as follows:

1.      I am an attorney duly admitted to practice law in the State of California.  My *pro hac vice* application to appear in this proceeding is pending.

2.      I am a partner at White & Case, LLP, counsel for Focus South Group, LLC ("Focus") and Holdings Manager, LLC ("Holdings Manager").

3.      Pursuant to this Court's December 16, 2010 Scheduling Order, this Court will conduct an evidentiary hearing on Wednesday, January 19, 2011 on the Petitioners' Motion to Appoint an Interim and Permanent Chapter 11 Trustee for South Edge, LLC.  This Court will also conduct an evidentiary hearing, to begin on Monday, January 24, 2011, on the underlying involuntary petition.

4.      Concurrently herewith, Focus and Holdings Manager have filed a Motion (i) to Prevent Klee, Tuchin, Bogdanoff & Stern LLP from Representing South Edge, LLC and (ii) to Appoint a Responsible Officer to Hire Counsel and Determine Whether the Petition Should Be Controverted (the "Focus Motion"), and have requested that the Focus Motion be heard on shortened time.  Attached hereto as Exhibit A, pursuant to Local Rule 9006, is a true and correct copy of the Focus Motion.

5.      As set forth with more particularity in the Focus Motion, Focus contends that KB Home Nevada, Inc. ("KB"), Coleman-Toll Limited Partnership, LLC ("Toll"), Pardee Homes of Nevada ("Pardee"), Beazer Homes Holding Corp. ("Beazer"), and MTH Homes Nevada, Inc. ("Meritage") (collectively, and excluding Focus, the "Builders") did not have the corporate authority to purportedly hire Klee, Tuchin, Bogdanoff & Stern LLP ("KTB&S") to represent South Edge in connection with these proceedings.

6.      Among other things, KTB&S's services will cost more than $100,000 and, therefore, the Builders do not have the supermajority (75% of the percentage interests in South Edge) required by the South Edge operating agreement to hire KTB&S.  Focus also contends that the Builders cannot vote to retain counsel for South Edge in connection with the involuntary petition because these proceedings were caused by the Builders' defaults under the South Edge

LOS ANGELES 890768 (2K)

operating agreement, and the Builders cannot vote on matters related to their defaults. In any event, the Builders (to the extent they have authority to hire counsel, which they do not) are hopelessly conflicted and cannot adequately represent South Edge's interests in these proceedings. Accordingly, an independent and neutral responsible officer should be appointed to hire counsel for South Edge and determine whether or not controvert the petition.

7.    Given the deadlines set forth in the Scheduling Order and South Edge's need for representation, I believe it is critical that the issues raised by the Focus Motion be resolved on shortened time. Among other things, South Edge cannot be properly represented while the authority of its legal counsel is unclear.

8.    On Monday, December 20, 2010, and Tuesday, December 21, 2010, I communicated with Matt Heyn of KTB&S, purported counsel for South Edge, and attempted to reach an agreement with respect to when the Focus Motion should be heard and oppositions and replies should be filed. No agreement was reached.


I declare under penalty of perjury that the foregoing is true and correct and was executed on December 22, 2010 at Los Angeles, California.

Roberto J. Kampfner

LOSANGELES 890768 (2K)

# EXHIBIT A

| | |
|---|---|
| 1 | I. SCOTT BOGATZ (NSBN 3367)       **E-FILED ON DECEMBER 22, 2010** |
| 2 | CHARLES M. VLASIC III (NSBN 11308)<br>BOGATZ & ASSOCIATES, P.C. |
| 3 | 3455 Cliff Shadows Parkway, Suite 110<br>Las Vegas, Nevada 89129 |
| 4 | Telephone: (702) 776-7000<br>Facsimile: (702) 776-7900 |

ROBERTO J. KAMPFNER (*pro hac vice* pending)
JOSHUA M. KEESAN (*pro hac vice* pending)
WHITE & CASE LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone:  213-620-7700
Facsimile:   213-452-2329

Attorneys for
FOCUS SOUTH GROUP, LLC and
HOLDINGS MANAGER, LLC

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA (LAS VEGAS)

| | |
|---|---|
| In re: | Case No. 10-32968 |
| SOUTH EDGE, LLC, | Chapter 11 |
| Involuntary Debtor. | **NOTICE OF MOTION AND MOTION (I) TO PREVENT KLEE, TUCHIN, BOGDANOFF & STERN LLP FROM REPRESENTING SOUTH EDGE, LLC AND (II) TO APPOINT A RESPONSIBLE OFFICER FOR THE LIMITED PURPOSE OF HIRING COUNSEL AND DETERMINING WHETHER THE PETITION SHOULD BE CONTROVERTED; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**Hearing Date**<br><br>Date:  [OST Requested]<br>Time: [OST Requested] |

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ...........................................................................1

II.   SUMMARY .......................................................................................................2

III.  STATEMENT OF FACTS ..................................................................................6

   A.  Formation of Inspirada .................................................................................6

   B.  The Operating Agreement ............................................................................6

   C.  The Financing Arrangements .......................................................................8

   D.  The Builders' Defaults Forced Focus to Demand Arbitration...................10

   E.  The Award ..................................................................................................11

   F.  The Petition.................................................................................................13

IV.   ARGUMENT ...................................................................................................14

   A.  KTB&S Cannot Represent South Edge Because the Builders' Vote to
       Retain KTB&S is Null and Void ................................................................14

   B.  The Court Should Exercise Its Authority to Appoint a Responsible
       Officer to Hire Counsel and Determine Whether the Petition Should Be
       Controverted ..............................................................................................17

       1.  The Builders Are Hopelessly Conflicted And Cannot Meaningfully
           Represent South Edge's Interests.........................................................18

       2.  A Responsible Officer is Necessary to Break Deadlock Among South
           Edge's Members ..................................................................................19

V.    CONCLUSION ................................................................................................21

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### FEDERAL CASES

4

5
*In re Bergdog Prods. of Hawaii, Inc.,*
    7 B.R. 890 (Bankr. D. Haw. 1980) ........................................................................ 15

6
*In re Colorado-Ute Elec. Ass'n, Inc.,*
    120 B.R. 164 (Bankr. D. Colo. 1990) ................................................................... 21

7

8
*In re Hathaway Ranch P'ship,*
    116 B.R. 208 (Bankr. C.D. Cal. 1990) ................................................................. 15

9
*JPMorgan Chase Bank, N.A. v. KB Home* et al.,
    632 F. Supp. 2d 1013 (D. Nev. 2009) ................................................................... 19

10

11
*In re Marvel Entertainment Group, Inc.,*
    140 F.3d 463 (3d Cir. 1998) ................................................................................. 20

12
*Matter of Gaslight Club, Inc.,*
    782 F.2d 767 (7th Cir. 1986) ................................................................................ 17

13

14
*In re New Orleans Paddlewheels, Inc.,*
    350 B.R. 667 (Bankr. E.D. La. 2006) ................................................................... 20

15
*In re New Towne Development, LLC,*
    404 B.R. 140 (Bankr. M.D. La. 2009) ............................................................. 19, 20

16

17
*In re Ortiz,*
    400 B.R. 755 (Bankr. C.D. Cal. 2009) ................................................................. 14

18
*In re Property Co. of Am. Joint Venture,*
    110 B.R. 244 (Bankr. N.D. Tex. 1990) ................................................................. 17

19

20
*In re Texas Rangers Baseball Partners,*
    435 B.R. 706 (Bankr. N.D. Tex. 2010) ................................................................. 17

21
*In re United Energy Corp.,*
    944 F.2d 589 (9th Cir. 1991) ................................................................................ 15

22

23

### FEDERAL STATUTES

24
11 U.S.C. § 105(a) ....................................................................................................... 4, 16

25
11 U.S.C. § 303(f) ......................................................................................................... 4, 17

26

27

### MISCELLANEOUS

Judge D. Michael Lynn, *The Toolbox: Trustees & Examiners,*
    4 Bloomberg Law Reports: Bankruptcy Law No. 40, Oct. 4, 2010 ........................ 18

28

1    Focus South Group, LLC ("<u>Focus</u>"), a member of South Edge, LLC ("<u>South Edge</u>" or the

2    "<u>Debtor</u>") and Holdings Manager, LLC ("<u>Holdings Manager</u>"), the general manager of the

3    Debtor, submit this Motion (i) to Prevent Klee, Tuchin, Bogdanoff & Stern LLP from

4    Representing South Edge, LLC and (ii) to Appoint a Responsible Officer for the Limited Purpose

5    of Hiring Counsel and Determining Whether the Petition Should Be Controverted.

6

7    **I.**

8    **PRELIMINARY STATEMENT**

9    Focus is one of Southern Nevada's most prominent developers.  It has developed some of

10   the most successful master planned communities in the state and has a substantial stake in the

11   success of Southern Nevada.  Focus is also a member of the Debtor.  Affiliates of Focus serve as

12   the General Manager of the Debtor and the construction manager of the Inspirada project.  In

13   addition, Focus is the only member to have taken down all of its land and fully pre-funded its pro

14   rata share of major infrastructure costs.  It has invested approximately $172 million into South

15   Edge, the second most funds of any member, and just slightly less than KB Home Nevada, Inc.,

16   which is obligated for 48.5% of the project.

17   It is undisputed that the other members of South Edge, referenced below as the

18   "Builders," have not made all of their takedowns when due.  Nor have they fully funded their

19   share of development costs.  Instead, as found by an arbitration panel made up of three prominent

20   retired judges appointed by the Honorable Philip Pro — Justices A. William Maupin and Robert

21   R. Rose, and Judge David W. Hagen, the Builders have failed to live up to their financial

22   commitments to South Edge and have damaged Focus and South Edge in the process.

23   Nevertheless, the Builders have and will likely continue to cast aspersions on Focus in this

24   proceeding, claiming that Focus is acting for, or at the behest, of the Petitioners.  Not true.  Since

25   the Builders first defaulted on their obligations to South Edge in early 2008, Focus has

26   continuously fought for one goal — to force the Builders to live up to their contractual

27   commitments to both Focus and South Edge and build Inspirada for the benefit of all parties'

28   interests.  The Builders have no such intentions, acting only in their own self-interest.  This point

has been proven yet again as the Builders have purported to retain counsel for South Edge to do their bidding, without complying with the requirements of the South Edge Operating Agreement, and with the sole intention of continuing to avoid their obligations to South Edge, as opposed to acting in South Edge's best interests.  This Motion is being filed to assure that South Edge retains independent counsel and that its interests, not the interests of the Builders, are properly represented in these proceedings.

**II.**

**SUMMARY**

In 2004, Focus, along with KB Home Nevada, Inc. ("KB"), Coleman-Toll Limited Partnership, LLC ("Toll"), Pardee Homes of Nevada ("Pardee"), Beazer Homes Holding Corp. ("Beazer"), and MTH Homes Nevada, Inc. ("Meritage") (collectively, and excluding Focus, the "Builders"), and two companies that have filed chapter 11 proceedings, Kimball Hill Homes Nev., Inc. ("Kimball Hill") and Alameda Investments, LLC ("Woodside"), formed South Edge, a limited liability company, for the purpose of purchasing approximately 1,940 acres of real property (the "Property") in Henderson, Nevada.  Later, the members of South Edge (collectively, the "Members" and each a Member") agreed that, through South Edge, they would also develop a project (the "Project") on the Property to be known as "Inspirada."  On or about May 3, 2004, the Members entered into the Amended and Restated Operating Agreement of South Edge, LLC (as amended by the First Amendment thereto as of October 29, 2004, and the Second Amendment thereto as of March 8, 2007, the "Operating Agreement"), and various other related agreements, including certain "Acquisition Agreements," requiring Members to "take down" or purchase land from South Edge.

After Focus fully performed its obligations in October 2007 and made approximately $122 million in payments to South Edge, beginning in February 2008, the Builders began defaulting on their obligations under the various agreements governing South Edge.  Among other things, the Builders failed to fully fund their pro rata share of South Edge's obligations to its lenders, failed to make their "takedowns," when due (takedowns are the primary mechanism for funding repayments of loans to South Edge's lenders), and halted work on the development of

MOTION TO PREVENT KTB&S AND TO APPOINT RESPONSIBLE OFFICER

1   Inspirada.  As explained in more detail below, an arbitration panel found that each of these

2   actions constituted a default under the Operating Agreement.  Due to these failures, the Builders

3   owe hundreds of millions of dollars to South Edge.

4        As a consequence of these breaches, Focus, in compliance with the Operating Agreement,

5   served the Builders with a demand for arbitration.  Although the Operating Agreement requires

6   disputes to be resolved on an expedited basis, the road to arbitration was long and hard.  The

7   Builders refused to arbitrate and attempted to prevent Focus from exercising its rights under the

8   Operating Agreement.  They failed, and the United States District Court for the District of

9   Nevada (the "District Court") ordered arbitration on July 15, 2009.  After extensive discovery and

10  the completion of a two-week arbitration hearing, the arbitral panel (the "Panel") issued its award

11  (the "Award"), which granted Focus $36,815,354 in damages as compensation for the Builders'

12  failure to meet their obligations under the Operating Agreement, including as a result of their

13  failure to fund their pro rata shares of amounts due from South Edge to the lenders and make their

14  take downs when due, and refusal to continue to build the Inspirada project.  True to form, the

15  Builders filed a flurry of motions to reduce and/or vacate the Award, none of which was

16  successful.  The District Court confirmed the Award on November 2, 2010 and entered judgment.

17  The Builders have appealed.

18       On December 9, 2010, certain lenders to South Edge filed an involuntary chapter 11

19  petition (the "Petition") against South Edge pursuant to section 303 ("Section 303") of title 11 of

20  the United States Code (the "Bankruptcy Code") in this Court.

21       The Builders have now purported to cause South Edge to retain the services of Klee,

22  Tuchin, Bogdanoff & Stern LLP ("KTB&S") to represent South Edge with respect to this

23  proceeding.  The Builders' engagement of KTB&S is impermissible and is the latest in a long line

24  of maneuvers employed by the Builders to avoid their contractual obligations to South Edge.[1]  As

---

25  [1] The Builders' abuse of their purported "majority" on the Management Committee has already begun.  Despite the
    fact that Holdings Manager continues to serve as the General Manager of South Edge, and that Focus is the only
26  Member of South Edge to make all of its takedowns and fully fund its development obligations to South Edge,
    KTB&S has served numerous burdensome subpoenas on Holdings Manager and Focus and has sought extensive
27  depositions during the week between Christmas and New Year's Day, which were scheduled without any
    consultation with Focus of Holdings Manager.  Conversely, KTB&S, South Edge's purported counsel has not
28  noticed any depositions of the Builders, which jointly owe hundreds of millions of dollars to South Edge.  Focus and

1   an initial matter, the Operating Agreement requires a 75% "supermajority" vote before South

2   Edge can enter into a contract that obligates it to payments of more than $100,000.  Without

3   Focus's participation in the vote, such supermajority was not and cannot be reached.  The

4   Builders have attempted to circumvent the "supermajority" requirement by agreeing to pay

5   KTB&S's legal fees directly themselves and without obligating South Edge to do so.  This is

6   simply form over substance.  Indeed, the purported resolution hiring KTB&S expressly states that

7   all payments made by the Builders to KTB&S will be counted as capital contributions to South

8   Edge.  Further, any firm being compensated directly by the Builders, and not South Edge, will

9   have, at best, two masters and be hopelessly conflicted.  Importantly, the resolution purporting to

10  authorize South Edge to employ KTB&S does not require KTB&S to independently assess the

11  facts or the law and act in the best interests of South Edge; rather, it requires KTB&S to oppose

12  the Petition and the trustee motions filed by the Petitioners without regard to the facts or the law.

13  The Builders are attempting to hire KTB&S to do their bidding, not act in the best interests of

14  South Edge, and protect the Builders from having to pay the hundreds of millions of dollars the

15  Builders owe South Edge.  As such, KTB&S should not have been engaged, and has no right or

16  authority to represent South Edge.

17          Further, the Award makes clear that the Operating Agreement strips members of South

18  Edge of the right to vote on matters related to their own defaults.  Here, these proceedings are the

19  direct result of the Builders' unwillingness to perform their obligations under the Operating

20  Agreement, and determining who South Edge should hire as counsel and on what terms are both

21  matters related to the Builders' defaults upon which the Builders have no right to vote.

22          The Operating Agreement also makes clear that South Edge cannot institute legal

23  proceedings related to the failure of a Member to make a capital contribution without the

24  affirmative vote of 75% of the Management Committee, not including non-contributing

25  Members.  As determined by the Panel, the Builders are clearly non-contributing Members.

26  Finally, the Operating Agreement expressly authorizes Holdings Manager, as the General

27

28  Holdings Manager will file a motion to quash those subpoenas, but it is already quite clear that KTB&S represents
    the interests of the Builders, not the interests of South Edge.

- 4 -

1  Manager of South Edge, subject to the direction of the Management Committee, to hire counsel

2  for South Edge and to defend, compromise and settle litigation.  The Builders completely ignored

3  these provisions and hired KTB&S without consulting or including Holdings Manager or Focus

4  in any manner whatsoever.

5        In addition to determining that the Builders cannot hire counsel on behalf of South Edge,

6  the Court should exercise its authority under section 105(a) and 303(f) of the Bankruptcy Code to

7  appoint a "responsible officer" for the purpose of (i) selecting counsel to represent South Edge;

8  and (ii) determining whether or not the Petition should be controverted.  The Court's appointment

9  of a responsible officer will guarantee that South Edge's interests (not the interests of the

10  Builders) are properly represented throughout these proceedings.

11        The Court can and should appoint such an officer.  The Builders and Focus do not agree

12  on the question of who has authority to hire and direct South Edge counsel.  Nor do they agree on

13  the instructions that should be given to South Edge's counsel.  Further, even if the Builders could

14  unilaterally hire and direct counsel (which they cannot do), they simply have too many conflicts

15  to defend the interests of South Edge, as opposed to their own.  The Builders (as the Panel found)

16  breached their contractual duties under the Operating Agreement by stopping the development of

17  the Project, failing fund their share of the financing payments owed by South Edge to its lenders,

18  and failing to make their takedowns when due.  If and when relief is entered, South Edge will

19  have the tools with which to pursue such claims on its own behalf, should it choose to do so.

20  And, if this proceeding is not dismissed within 60 days, the Builders will owe direct obligations

21  to repay the loans made by JPMorgan and the other lenders.  Thus, the Builders have every

22  incentive to controvert the Petition, whether or not doing so is in the best interests of South Edge.

23  Under these circumstances, the appointment of a neutral third party to hire and direct counsel is

24  essential and critical, and sidesteps any disagreements concerning corporate governance.  Focus

25  and South Edge's general manager, Holdings Manager, respectfully request that the Motion be

26  granted.

27

28

MOTION TO PREVENT KTB&S AND TO APPOINT RESPONSIBLE OFFICER

**III.**

**STATEMENT OF FACTS**

**A.      Formation of Inspirada**

South Edge was created for the purpose of acquiring and then later developing the
Property for a project known as "Inspirada."  The Inspirada development is essentially a small
city, comprised of seven residential villages of approximately 200 acres each, and an almost 400-
acre Town Center.  The total projected cost of the master planned development, including land
acquisition, development and financing costs, is approximately $1.2 billion.

On or about May 3, 2004, the Members entered into the Operating Agreement, and
various other related agreements, including the Acquisition Agreements, which require Members
to "take down" or purchase land from South Edge.  The funds generated by the takedowns are
used to pay the loans made by the Petitioners and the other lenders to South Edge.  Pursuant to
the Operating Agreement, Holdings Manager was designated "General Manager" of South Edge
and charged with running its day-to-day operations.  *See* Declaration of Thomas J. DeVore
("DeVore Decl."), Ex. A (Operating Agreement), p. 1, and §§ 5.7, 5.8.  South Edge and the
Members also entered into various "Loan Documents" with a syndicate of lenders for which
JPMorgan Chase, N.A. ("JPMorgan") serves as agent.  The Property was auctioned by the Bureau
of Land Management in May of 2004.  South Edge was the prevailing bidder at the auction and
closed the sale of the Property on November 1, 2004.

**B.      The Operating Agreement**

The Members subsequently amended the Operating Agreement on two separate occasions.
On or about October 29, 2004, the Members entered into the First Amendment to Amended and
Restated Operating Agreement (the "First Amendment") as a requirement for obtaining financing.
The First Amendment added various provisions to the Operating Agreement, which make it clear
that the Members are required to contribute capital as necessary for South Edge to meet its
obligations to its lenders.  DeVore Decl., Ex. B (First Amendment).  Among other things, the
First Amendment added Section 11.1.12 to the Operating Agreement, which, as discussed more
fully below, makes it an "Event of Default" under the Operating Agreement for a Member to act

- 6 -

or fail to act in any manner that causes South Edge to be in default under any of its loan documents with its lenders (subject to any applicable cure periods). *Id.* The Members also entered into a Second Amendment to the Amended and Restated Operating Agreement on or about March 8, 2007. *See* DeVore Decl., Ex. C (Second Amendment).

Generally, pursuant to the Operating Agreement, the Members agreed to: (a) make a joint bid for the Property; (b) upon a successful bid, to (i) formulate a conceptual plan for the development of the Property, (ii) obtain necessary approvals and authorizations for the subdivision of the Property into "Pods," (iii) design and install certain infrastructure improvements, (iv) allocate and convey the Property to the Members in proportion to their respective percentage interests in South Edge, and (v) obligate each Member to purchase or "take down" its Pods from South Edge pursuant to a pre-determined schedule; (c) provide a mechanism for sharing the costs of developing Inspirada among the Members; and (d) prepare and record appropriate design and architectural guidelines and CC&R documents to govern the Inspirada development. DeVore Decl., Ex. A (Operating Agreement). Section 5.1.1 of the Operating Agreement also establishes a "Management Committee," which is comprised of a representative of each Member voting by "Percentage Interest." *Id.*

The Ownership Interests of the Members of South Edge are as follows:

| Member | Percentage Interest | Acreage | Units in Inspirada |
|---|---|---|---|
| Focus | 15.59% | 304.52 Acres | 15.59 Units |
| Meritage | 3.53% | 68.96 Acres | 3.53 Units |
| Toll | 10.52% | 205.49 Acres | 10.52 Units |
| Beazer | 2.58% | 50.40 Acres | 2.58 Units |
| KB | 48.45% | 946.38 Acres | 48.45 Units |
| Pardee | 4.90% | 95.71 Acres | 4.90 Units |
| Woodside (now bankrupt) | 8.14% | 159.00 Acres | 8.14 Units |
| Kimball Hill (now bankrupt) | 6.29% | 122.86 Acres | 6.29 Units |
| | 100.00% | 1,953.32 Acres | 100.00 units |

MOTION TO PREVENT KTB&S AND TO APPOINT RESPONSIBLE OFFICER

1    The Management Committee generally governs the affairs of South Edge.  The Operating

2    Agreement requires attendance by Managers representing at least three Members that hold at least

3    60% of the Percentage Interests to constitute a quorum.  DeVore Decl., Ex. A (Operating

4    Agreement), § 5.2.4.  Importantly, the Operating Agreement also states that the "General

5    Manager shall attend the meetings of the Management Committee . . . ."  *Id.* at § 5.7.  The

6    Management Committee must act by the affirmative vote of the Managers representing a majority

7    of the Percentage Interests.  *Id.* at § 5.1.1.  However, certain circumstances require affirmative

8    action by a "supermajority," which requires a vote by Members representing 75% of the

9    Percentage Interests.  Of particular relevance here, an affirmative vote by a supermajority is

10   required to approve "all contracts which obligate [South Edge] to payments of $100,000 or more

11   in the aggregate" and for "the initiation of legal proceedings" related to unpaid capital

12   contributions to South Edge.   *Id.* at §§ 5.1.2(j), 2.4.3.2.

13       The Operating Agreement also spells out the specific powers and duties of the General

14   Manager, which include:

15   Subject to the directions and determinations of the Management Committee,
     institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other
16   judicial or administrative proceedings brought by, on behalf of, or against the
     Company.

17                                          *  *  *  *

18   Assist the Management Committee in the selection and engagement of
19   independent contractors, such as … lawyers … and supervise the activities of
     such contractors.
20

21   *Id.* at §§ 5.8.1(j), (n).

22   **C.    The Financing Arrangements**

23       In order to finance part of the purchase and development of the Property, South Edge

24   obtained loans (the "Loans") in the amount of $535 million from a syndicate of lenders (the

25   "Lenders") for which JPMorgan acts as administrative agent (the "Administrative Agent").  The

26   Loans were obtained under the terms of a Credit Agreement (the "Original Credit Agreement")

27   dated November 1, 2004, and certain other loan documents, which include conditional repayment

28   guaranties (the "Repayment Guaranties") by each Member and its respective parent.

LOSANGELES 890260 (2K)          MOTION TO PREVENT KTB&S AND TO APPOINT RESPONSIBLE OFFICER

1    Subsequently, South Edge entered into an Amended and Restated Credit Agreement dated as of

2    March 9, 2007, increasing the principal amount of the Loans to $585 million (the "Amended and

3    Restated Credit Agreement and, together with the Original Credit Agreement, the "Credit

4    Agreement").  *See* Decl. of John P. McDonagh In Support of JPMorgan's Motion to Appoint an

5    Interim and Permanent Chapter 11 Trustee for South Edge, LLC During (i) the "Gap" Period and

6    (ii) On a Permanent Basis ("McDonagh Decl."), Ex. A (Credit Agreement).

7           South Edge, not its Members, is the borrower under the Credit Agreement.  As a result,

8    the Operating Agreement contains various provisions that obligate the Members to contribute the

9    capital required for South Edge to satisfy its obligations to the Lenders under the Credit

10   Agreement and makes it an Event of Default for a member not to do so.  Most importantly,

11   Section 11.1.12 of the Operating Agreement makes it an Event of Default for a Member to breach

12   its Acquisition Agreement (e.g., by not making its takedowns) or cause South Edge to default

13   under its obligations to the Lenders under the Credit Agreement and the other loan documents.[2]

14   In addition, Section 2.3.2 of the Operating Agreement requires the Members to make capital

15   contributions to South Edge as necessary for South Edge to hold at all times a three-month

16   interest reserve; Section 2.3.3 expressly provides that each Member "shall pay to the Company"

17   its share of all amounts due under Credit Agreement, including principal, fees and interest; and

18   Section 6.11.5 of the Operating Agreement requires Members to comply with their respective

19   takedown schedules.  DeVore Decl., Ex. A (Operating Agreement).  After extensive litigation, the

20   Panel found that the Builders violated these provisions of the Operating Agreement by (much as

21

22   ———————————————

23   [2] Section 11.1.12 provides, in relevant part:

24          For purposes of this Agreement, an "Event of Default" shall mean any of the
            following:

25          11.1.12  Default under the Loan Documents or Acquisition Agreement.  A

26          default by such Defaulting Party under its respective Acquisition Agreement or
            an act or omission which causes the Company to be in default under any Loan
            Documents, and the failure to cure such default within the applicable cure period,

27          if any, under either the Acquisition Agreement or the Loan Documents,
            respectively.

28

LOSANGELES 890260 (2K)      MOTION TO PREVENT KTB&S AND TO APPOINT RESPONSIBLE OFFICER

1  they attempt to do here) improperly using the Management Committee to extend takedown dates

2  and failing to contribute capital as required by the Operating Agreement.

3       Under the terms of the Repayment Guaranties, the occurrence of a "Bankruptcy Event,"

4  defined to include an involuntary petition filed against South Edge that is "undismissed for 60

5  days," triggers an automatic "springing guaranty" under which each Builder owes a liquidated

6  sum to the Lenders.  *See, e.g.,* McDonagh Decl., ¶ 20.

7

8  **D.**     **The Builders' Defaults Forced Focus to Demand Arbitration**

9       After Focus fully performed its obligations in October 2007, beginning in February 2008,

10  the Builders began defaulting on their obligations under the Operating Agreement, the

11  Acquisition Agreements and other related documents, which, in turn, caused South Edge to

12  default under the terms of its loan documents with the Lenders.  Among other things, the Builders

13  failed to (a) continue development of the Project, (b) make the capital contributions required for

14  South Edge to make interest payments to its lenders and fund a three-month interest reserve, and

15  (c) make takedowns scheduled from April 15, 2008, through today.

16       Notably, at the time that the Builders began causing defaults under the Credit Agreement,

17  the General Manager recommended to the Management Committee that South Edge retain

18  independent counsel.  The General Manager renewed such recommendation on several occasions.

19  *See* DeVore Decl., ¶ 10.  The Builders refused to hire counsel until the Petition was filed.

20       Instead of either complying with their obligations or, at a minimum, obtaining counsel to

21  advise South Edge as to its rights and obligations, the Builders attempted, from time to time, in an

22  attempt to excuse their defaults, to extend their takedown dates by purportedly amending the

23  takedown schedule attached to their respective Acquisition Agreements through actions by

24  written consent of the Members or votes.  Focus objected to each of these resolutions.  The Panel

25  found that those actions were ineffective and constituted defaults under Section 11.1.12 of the

26  Operating Agreement.  DeVore Decl., Ex D (Award), p. 58.

27       Faced with the Builders' intransigence and failure to honor their respective obligations to

28  South Edge and Focus, Focus commenced an arbitration proceeding on behalf of itself and South

     MOTION TO PREVENT KTB&S AND TO APPOINT RESPONSIBLE OFFICER

1   Edge seeking specific performance of the Builders' obligations under the Operating Agreement

2   or, in the alternative, damages.  The Builders contested Focus's right to any form of arbitration.

3   The District Court, however, ordered the parties to arbitration on July 15, 2009.  The arbitration

4   involved significant discovery, numerous motions for summary disposition, all of which were

5   denied, and a lengthy evidentiary hearing that lasted approximately two weeks.  At the conclusion

6   of the process, the Panel issued a 75-page award.

7

8   **E.      The Award**

9         The Award granted Focus $36,815,354 in direct damages on account of the Builders'

10  numerous breaches of the Operating Agreement.  Among other things, the Panel found:

11              [The Builders], except Meritage, breached the Operating
                Agreement in connection with their duties to fund financing interest
12              and interest reserves when the Members, voting their interests as
                Managers of South Edge, either refused to propose or approve
13              capital calls for such expenditures.  Meritage breached these duties
                under the Operating Agreement by failure to seek tender of
14              financing interest and interest reserves into the appropriate account.

15  DeVore Decl., Ex. D. (Award), p. 57.  The Panel also found:

16              Likewise, [the Builders], except Meritage, breached their
                obligations under the Operating Agreement to effect their April
17              2008 Takedowns as scheduled, or during and following expiration
                of the Forbearance Agreement on June 31, 2008, by unilaterally
18              extending Takedown dates without the approval of . . . JPMorgan. .
                . . The [Builders] also breached Section 7.03(o) of the Credit
19              Agreement, which prohibits cessation of construction of
                improvements for a continuous period.  Such in turn constituted an
20              "Event of Default" under [Operating] Agreement Section 11.1.12.
                This breach became effective upon the Management Committee
21              vote to terminate work taken on March 10, 2008.

22

23  *Id.* at 58.  In sum, the "[Builders] breached the agreement when they voted to stop build out of

24  the project, failed to fund interest reserves and land financing interest payments, failed to

25  perform on the Takedowns and unilaterally extended takedowns."  *Id.* at 56.

26        The Panel also went to great lengths to analyze the ability of the Members to participate in

27  Management Committee votes relating to South Edge, particularly in a situation where a Member

28  has committed an Event of Default under the Operating Agreement.  The Panel determined that

Section 11.2 "immediately divest[s] defaulting [M]embers on a limited basis of their rights to vote on matters relating to their Events of Default." *Id.* at 46-47.  The Panel concluded:

> "[N]o Member of South Edge entirely loses the right to vote on Company business upon an Event of Default until and unless that Member has been voted out of the company in compliance with the [Operating Agreement]; and the provisions of Section 11.2 relating to the constitution of a quorum only apply with respect to gathering a vote on **the matters related to the particular Event of Default**. Thus, votes by defaulting [M]embers to extend takedowns constitute breaches of the Operating Agreement along with . . . the unilateral extensions of and failures to consummate the takedowns."

*Id.* at 47 (emphasis added).

Under the terms of Focus's Acquisition Agreement, Focus was required to take down all of its Pods and fund its M.I. Deposit on October 15, 2007.  The Panel found that Focus took down all of its land on October 25, 2007, and deposited approximately $30.7 million as an M.I. Deposit. *Id.* at 20.  The total cost to Focus to do so was approximately $122 million.  *Id.*  By doing so, and by paying in other capital of almost $50 million, Focus fully complied with all of its obligations under the Operating Agreement and the Acquisition Agreement to fully fund South Edge and the development of the Project.[3]  *See* DeVore Decl., Ex. D (Award), p. 20.

The District Court entered an order confirming the Award on November 2, 2010, and entered judgment for Focus in the amount of $36,815,354, plus post-judgment interest.

While the Panel ruled that the Builders had breached the Operating Agreement, it did not require that the Builders specifically perform their obligations to South Edge, as requested by Focus.  The Panel did not reach the question of whether specific performance was precluded by the Operating Agreement and/or Acquisition Agreements with respect to Focus, finding instead that it would not use its discretion to order such relief under the particular circumstances of the case and in light of its damage award to Focus.  *Id.* at 55-56.

Further, the Panel found that Focus did not have standing to enforce *South Edge's* rights under the Operating Agreement against the Builders.  Focus only had standing to enforce its own rights.  *Id.* at 48.  As explained below, this decision has created an insurmountable conflict for the

---

[3] Importantly, Focus's repayment guaranties were released by the Lenders when Focus made all of its takedowns in October 2007.  DeVore Decl., ¶ 7.

1    Builders in connection with this proceeding.  In short, a bankruptcy proceeding could provide

2    South Edge with the ability to collect its sizable claims against the Builders, and the Builders

3    have every incentive to prevent this from happening regardless of what is best for South Edge or

4    the Project.

5

6    **F.    The Petition**

7         On December 9, 2010, JPMorgan, in its capacity as Lender to South Edge, together with

8    Credit Agricole Corporate and Investment Bank and Wells Fargo Bank, N.A. (collectively, the

9    "Petitioners"), filed the Petition.

10        On December 16, 2010, KTB&S filed its Notice of Appearance and Request for Papers

11   (the "Notice of Appearance").  The Notice of Appearance alleges that South Edge will appear in

12   this proceeding by and through KTB&S.  Neither Focus nor Holdings Manager was consulted

13   with respect to the retention of KTB&S.  DeVore Decl., ¶ 8.  In addition, the General Manager

14   was not advised of any meetings relating to the retention of KTB&S, did not negotiate the terms

15   of the engagement, and is being prohibited from fulfilling its function of supervising such

16   counsel.

17        On December 16, 2010, the Builders circulated a so-called "Action by Written Consent of

18   the Management Committee of South Edge, LLC" (the "Action").  DeVore Decl., Ex. E.  The

19   Action claims that "by this Written Consent, the Management Committee determines that [South

20   Edge] should engage [KTB&S] to oppose the Involuntary Petition, seek dismissal of and/or

21   abstention with respect to the Involuntary Bankruptcy Case, oppose the appointment of an interim

22   trustee pending adjudication of the Involuntary Petition, and address any related disputes

23   [regarding] the Involuntary Petition."  *Id.* at 1.  The Action purports to proceed without Focus's

24   participation because "[Focus] and [Holdings Manager] are cooperating with [the Petitioners] and

25   are adverse to [South Edge] in respect of the Involuntary Petition."[4]  *Id.* at 2.  Further, in an

26   attempt to circumvent the Operating Agreement's requirement of a supermajority for such a

---

[4] Focus is in no way adverse to South Edge in these proceedings and the fact that Focus may not agree with the
Builders does not make it so.  Indeed, it is the Builders that are adverse to South Edge and are attempting to insulate
themselves from their defaults under the Operating Agreement.

- 13 -

1   decision, the Action states that "[a]ny engagement agreement between [South Edge] and

2   [KTB&S] shall provide that the [Builders] are liable for the attorneys' fees, costs and expenses

3   charged by [KTB&S] and shall not obligate [South Edge] for such liabilities," but, importantly,

4   the Action also states that "payments to [KTB&S] shall constitute capital contributions to [South

5   Edge] by the [Builders]." *Id.* at 3. The Action was signed by all the Builders. *Id.* at 4-8.

6                                        **IV.**

7                                     **ARGUMENT**

8   **A.      KTB&S Cannot Represent South Edge Because the Builders' Vote to Retain**

9   **        KTB&S is Null and Void**

10          The Builders have no authority to retain KTB&S. The Operating Agreement requires that

11  contracts which will "obligate [South Edge] to payments of $100,000 or more in the aggregate"

12  be approved by a supermajority of managers on the Management Committee. DeVore Decl., Ex.

13  A (Operating Agreement), § 5.1.2. There is little doubt that KTB&S will incur fees in excess of

14  the $100,000 threshold. Nevertheless, Focus was not invited to and did not participate in or

15  consent to the retention of KTB&S. Without Focus's consent, the remaining Builders constitute

16  only a 69.98% interest in South Edge and have no authority to retain KTB&S.[5] Further, in spite

17  of the baseless allegations in the Action, Focus is not in default under the Operating Agreement,

18  and, as the Panel found, in any event, has the continued right to vote "until and unless [it] has

19  been voted out of the company in compliance with the [Operating Agreement]." DeVore Decl.,

20  Ex. D (Award), p. 47. That is especially true in a case such as this where the Petition is not and

21  cannot be related to Focus's actions or purported defaults. Indeed, Focus is the sole Member that

22  has made all its takedowns and fully funded its development obligations to South Edge.

---

23  [5] Although Kimball Hill and Woodside defaulted under the terms of the Operating Agreement by filing chapter 11
24  petitions, the Panel expressly ruled that a Member does not lose the right to vote on matters not related to their
    defaults until it is removed as a Member of South Edge pursuant to the terms of the Operating Agreement. That has
25  never occurred with respect to Kimball Hill or Woodside. Moreover, the Builders do not own or hold Kimball Hill or
    Woodside's interests in South Edge. As a result, the Builders only hold 69.98% of the Percentage Interests in South
26  Edge and cannot retain counsel without the consent of Focus in situations where counsel will bill more than
    $100,000. Finally, although the Builders are sure to argue that Kimball Hill and Woodside are not entitled to vote
27  because they each rejected the Operating Agreement, such argument is without merit. Indeed, it is axiomatic that
    "[a]lthough rejection also serves to relieve a debtor from certain financial obligations, the breach created by rejection
28  under the Bankruptcy Code does not terminate rights and obligations under the contract." *In re Ortiz*, 400 B.R. 755,
    765 (Bankr. C.D. Cal. 2009).

1    The Builders will argue that they are entitled to circumvent the supermajority requirement

2    set forth in the Operating Agreement because it is they and not South Edge that will be liable for

3    KTB&S's legal fees.  The Court should reject this argument, as it is nothing but form over

4    substance and is otherwise improper.  DeVore Decl., Ex. E (Action), p. 3.  This Court is a court

5    of equity and indisputably "possesses the power to delve behind the form of transactions and

6    relationships to determine the substance." *In re United Energy Corp.*, 944 F.2d 589, 596 (9th Cir.

7    1991) (citations omitted).  Here, KTB&S is purportedly being hired to represent South Edge, not

8    the Builders, and all payments of KTB&S's fees made by the Builders purportedly will be

9    counted as capital contributions by the Builders to South Edge.  DeVore Decl., Ex. E (Action).  In

10   short, there is absolutely no legitimate reason that South Edge should not be liable for KTB&S's

11   fees and the only conceivable explanation for this strange structure is to disenfranchise Focus and

12   permit the Builders to manipulate South Edge's defense for their own ends.  Unfortunately, the

13   Builders have done this before.  Throughout 2008 and 2009, they purported to extend their

14   takedown dates to the detriment of Focus, although the Panel found that such actions were clearly

15   not permitted by the Operating Agreement and other South Edge documents.  This Court should

16   similarly reject the Builders' ploy.

17         In any event, the mere fact that the Builders will be exclusively responsible for satisfying

18   KTB&S fee's severely compromises KTB&S's ability to represent South Edge and demonstrates

19   that the Builders do not seek counsel to represent the interests of South Edge; rather, they seek

20   counsel to represent their own interests.  As noted by the court in *In re Hathaway Ranch*

21   *Partnership*, 116 B.R. 208, 219 (Bankr. C.D. Cal. 1990):

22         Third parties do not transfer property or funds to an attorney to represent a debtor
           in possession unless that representation is in the best interest of the third party. . .
23         Thus by accepting payment from a third party, the proposed counsel for the debtor
           in possession necessarily has a conflict of interest in that counsel is serving two
24         masters -- the one who paid counsel and the one counsel is paid to represent.

25   While South Edge is not a debtor-in-possession, the concept remains the same.  KTB&S cannot

26   serve two masters, especially in a case such as this where South Edge has been alleged to be

27   insolvent and may have substantial and significant claims against the Builders.  Indeed, the

28   Builders can simply refuse to pay for KTB&S's services if KTB&S does not toe the Builders'

1    line, no matter what is best for South Edge.  *See e.g.*, *In re Bergdog Prods. of Hawaii, Inc.*, 7 B.R.

2    890, 891 (Bankr. D. Haw. 1980) (conflict of interest exists where debtor's attorney receives

3    payment from debtor's stockholders); *In re Hathaway Ranch P'ship*, 116 B.R. at 219.

4          Not surprisingly, these conflicts have already presented themselves.  Among other things,

5    the Action does not instruct KTB&S to investigate South Edge's legal rights and duties with

6    respect to the Petition and trustee motions; rather, it instructs KTB&S to oppose the Petition and

7    trustee motions no matter what may ultimately be best for South Edge.  Further, South Edge

8    appears to have valuable claims against the Builders that likely can only be pursued in a

9    bankruptcy proceeding; however, KTB&S has not noticed a single deposition of the Builders or

10    taken any actions to investigate those claims or determine how they affect South Edge's position

11    in these proceedings.[6]

12          Moreover, the Panel expressly found that a defaulting Member cannot vote with respect to

13    matters related to its own defaults.  Here, these proceedings are unquestionably related to the

14    Builders' own defaults.  As the Panel noted, the "[Builders] breached the agreement when they

15    voted to stop build out of the project, failed to fund interest reserves and land financing interest

16    payments, failed to perform on the Takedowns and unilaterally extended takedowns."  DeVore

17    Decl., Ex. D (Award), p. 56.  It should be undisputed that South Edge cannot satisfy its

18    obligations to the Petitioners as a result of these very same defaults.  In short, the Builders cannot

19    default under the Operating Agreement, and then vote to deprive South Edge of any effective

20    remedy by hiring friendly and conflicted counsel and directing it to defend their interests, rather

21    than the interests of South Edge.

22          Finally, the Operating Agreement provides that South Edge may only pursue legal

23    proceedings resulting from a Member's failure to make capital contributions upon a

24    supermajority vote of <u>contributing Members</u>.  DeVore Decl., Exs. A (Operating Agreement), §

25    2.4.3.2, and D (Award), pp. 46-47.  The Builders are not contributing Members and cannot dictate

26    the actions of South Edge.

27

28

---

[6] Conversely, KTB&S served Focus and Holdings Mangers with numerous duplicative and burdensome subpoenas without any effort to meet and confer.

LOSANGELES 890260 (2K)          MOTION TO PREVENT KTB&S AND TO APPOINT RESPONSIBLE OFFICER

For the reasons set forth above, the Court should find that the Builders have improperly and impermissibly retained counsel.

**B.      The Court Should Exercise Its Authority to Appoint a Responsible Officer to Hire Counsel and Determine Whether the Petition Should Be Controverted**

The Bankruptcy Code authorizes this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Further, the Bankruptcy Code provides that, after an involuntary petition is filed:

> Notwithstanding section 363 of this title, except to the extent that the court orders otherwise, and until an order for relief in the case, any business of the debtor may continue to operate, and the debtor may continue to use, acquire or dispose of property as if an involuntary case concerning the debtor had not been commenced.

*Id.* at § 303(f) (emphasis added).  And, "the case law demonstrates that the [bankruptcy] court has considerable authority to interfere with the management of a debtor corporation in order to protect the creditors' interests."  *Matter of Gaslight Club, Inc.*, 782 F.2d 767, 770 (7th Cir. 1986) (affirming court's replacement of debtor in possession's president and majority shareholder per creditors' committee's request).  *See also In re Property Co. of Am. Joint Venture*, 110 B.R. 244, 246 (Bankr. N.D. Tex. 1990) (discussing court appointment of "disinterested business consultant whose purpose was to focus the [joint venture debtor's] energies on . . . business exigencies . . . . and [to] exercise business judgment to resolve any business decisions where the venturers could not agree.").

These provisions, read together, permit a bankruptcy court to use its discretion to appoint a responsible officer where needed to assure the integrity of the bankruptcy process.  For example, the United States Bankruptcy Court for the Northern District of Texas (Hon. D. Michael Lynn) recently appointed a chief restructuring officer after an involuntary petition was filed against the parent of Texas Rangers Baseball Partners ("TRBP"), the owner of the Texas Rangers baseball team.  There, TRBP filed a voluntary petition to confirm a plan of reorganization that would sell the Texas Rangers baseball team to a third party without an

auction.  The parent was required to consent to the plan of reorganization in order for the plan to be confirmed.  The lenders of TRBP (which also held limited guaranties from the parent) objected to the sale and filed an involuntary petition against the parent.  Prior to the entry of any order for relief, the court determined that the existing management of the parent had a conflict of interest in connection with the proposed sale and appointed a chief restructuring officer as a neutral third party for the limited purpose of exercising the parent's right to consent to the plan. *In re Texas Rangers Baseball Partners*, 435 B.R. 706, 709 n. 3 (Bankr. N.D. Tex. 2010).  The court reasoned that the appointment of a neutral third party would ensure the integrity of the sale and bankruptcy process.  Importantly, the court made it clear that the chief restructuring officer had no authority over baseball operations.  Its sole purpose was to assure that the sale process was fair.  Judge Lynn has also recently noted in an article that "[p]arties have devised, with the acquiescence of the courts . . . neutrals to give stakeholders in a case confidence in the integrity of the bankruptcy process."  Judge D. Michael Lynn, *The Toolbox: Trustees & Examiners*, 4 Bloomberg Law Reports: Bankruptcy Law No. 40, Oct. 4, 2010, at 1.

This is exactly the type of case where a neutral third party is warranted for the limited purpose of choosing counsel for South Edge in connection with these proceedings and determining whether or not to controvert the Petition.  The members of South Edge have been unable to agree on who should be counsel or what strategy such counsel should pursue.  Further, the Builders claim to be able to speak for South Edge, but are conflicted.  A neutral third party will assure that South Edge is properly represented, and will resolve any potential governance issues.  Importantly, Focus does not propose that the responsible officer interfere with the day-to-day operations of South Edge, just that it hire counsel and make an independent decision of what is best for South Edge in connection with these proceedings.[7]

**1.       The Builders Are Hopelessly Conflicted And Cannot Meaningfully Represent South Edge's Interests**

---

[7] Focus is aware that the Petitioners have requested an interim trustee, and is not taking a position on that request at this time.  The point of this Motion is merely that South Edge must retain counsel and decide whether or not to contravene the Petition, and that a neutral third party is best to accomplish that role.

1      The Builders have serious conflicts of interest and simply cannot act for South Edge in

2  connection with the Petition.  As the Award made clear, the Builders improperly stopped

3  development of the Project, failed to provide South Edge with their pro rata share of the capital

4  required for South Edge to fund the payments it owed to the Lenders, and failed to make their

5  takedowns when due.  DeVore Decl., Ex. D (Award), p. 58.  As a result, the Builders owe South

6  Edge hundreds of millions of dollars.  The Panel, however, found that Focus lacked standing to

7  hold the Builders accountable on behalf of South Edge.  *Id.* at 48.  A chapter 11 proceeding could

8  provide South Edge with the tools needed to enforce its rights under the Operating Agreement.

9  This creates a serious and untenable conflict for the Builders.  The Builders simply have no

10  interest in enabling South Edge to pursue claims against them, let alone to fund such a result.  A

11  responsible officer would have none of these conflicts, and could make a reasoned decision

12  regarding how South Edge should proceed in this matter.

13      In addition, under the terms of the Repayment Guaranties, if this proceeding is not

14  dismissed within 60 days, the Builders will owe direct and substantial obligations to the Lenders.

15  This threat also makes it impossible for the Builders to put the interests of South Edge first.

16      Finally, South Edge has been alleged to be insolvent.  If this is, in fact, the case, the

17  Builders, as purportedly controlling Members of South Edge, may have fiduciary duties that they

18  simply cannot satisfy in light of their conflicts and self-interests.  Indeed, in July 2009, the

19  District Court noted in the UCC Actions that "the [District] Court concludes the Nevada Supreme

20  Court would extend the insolvency exception [to the general rule that the lender-borrower

21  relationship is not fiduciary] to limited liability companies."  *JPMorgan Chase Bank, N.A. v. KB*

22  *Home* et al., 632 F. Supp. 2d 1013, 1026-27 (D. Nev. 2009) (Pro, J.).  In light of these potential

23  duties, a neutral party is critical to assuring that the rights of all parties in interest are protected

24  and that South Edge makes appropriate decisions in connection with this proceeding.

25      **2.      A Responsible Officer is Necessary to Break Deadlock Among South Edge's**

26          **Members**

27      The arbitration directly resulted from acrimony between Focus and the Builders after two

28  years of unproductive Management Committee meetings in which Focus remained at loggerheads

- 19 -

1   with the Builders over the very events that directly led to this proceeding.  Further, a

2   supermajority is needed for South Edge to retain counsel in connection with these proceedings,

3   and the parties are unable to agree on whom that counsel should be or what positions it should

4   take.  Under these circumstances, a responsible officer is appropriate.  Indeed, where a debtor's

5   management suffers from such deadlock, bankruptcy courts regularly appoint chapter 11 trustees,

6   a more significant appointment than a responsible officer.

7          For example, in *In re New Towne Development, LLC*, 404 B.R. 140 (Bankr. M.D. La.

8   2009), the debtor, New Towne Development Group, ("New Towne") was a limited liability

9   company formed in 2006.  *Id.* at 143.  As with South Edge, New Towne's members signed an

10  operating agreement "contemplating the acquisition and development of real property."  *Id.*  In

11  April 2008, some of New Towne's members voted to terminate the tenure of one member's

12  representative as chair of the board of managers and project developer.  The representative

13  retained voting rights for his member company, though, and thereafter was the only member to

14  vote against a capital call for a required interest payment due to a lending bank.  *Id.* at 144.  When

15  New Towne failed to make the payment, the bank served a demand.  Two members subsequently

16  formed a new limited liability company, "Old Towne," bought the bank's note, and sued to

17  foreclose on its mortgage.  *Id.* at 145.  The day before the sheriff's sale, certain of New Towne's

18  members, on an individual basis, filed an involuntary petition to place New Towne into

19  bankruptcy.  *Id.*  Thereafter, both Old Towne and the petitioning creditors moved for the

20  appointment of a chapter 11 trustee.  The Bankruptcy Court held:

21                 The evidence supports a finding and conclusion that cause exists to

22                 appoint a chapter 11 trustee. The [] membership dispute effectively
    has paralyzed New Towne's management, and necessitates
    installing a neutral third party to operate the debtor unhampered by

23                 its members' disagreements.

24  *Id.* at 149.  Here, the South Edge Management Committee suffers from a more pressing

25  paralysis.  It cannot secure counsel and determine the proper course of action in connection with

26  this proceeding without a responsible officer.

27         Analogously, other courts have held that "grounds for the appointment of a trustee may

28  exist if a corporate deadlock of the debtor's governing body prevents debtor from receiving the

- 20 -

1   necessary corporate approval to present a plan of reorganization to the court." *In re New Orleans*

2   *Paddlewheels, Inc.*, 350 B.R. 667, 681 (Bankr. E.D. La. 2006) (citing *In re Petralex Stainless,*

3   *Ltd.*, 78 B.R. 738 (Bankr. E.D. Pa. 1987); *In re Advanced Electronics, Inc.*, 99 B.R. 249 (Bankr.

4   M.D. Pa. 1989); *In the Matter of Tahkenitch Tree Farm P'ship,* 156 B.R. 525 (Bankr. E. D. La.

5   1993). Moreover, while there is no "per se rule," bankruptcy courts may appoint a neutral trustee

6   where such acrimony exists between debtor and creditor that the situation becomes a "large and

7   messy bankruptcy that promises to get worse without a disinterested administrator at the helm."

8   *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (citing *In re Cajun*

9   *Elec. Power Coop., Inc.*, 73 F.3d 599, 600 (5th Cir. 1996) (adopting on rehearing the opinion of

10  dissent in 69 F.3d at 751), *cert denied*, 116 S.Ct. 51, 136 L.E.2d 15 (1996)); *see also In re*

11  *Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 176 (Bankr. D. Colo. 1990) (appointing trustee

12  where the court could not "envision a way for the current management and board to resolve the

13  inherent conflict between what is best for [the Debtor], its creditors, and the co-op members.").

14       The Members of South Edge have been so far unable to resolve their acrimony, which has

15  in turn led to managerial deadlock. A responsible officer can break this deadlock and allow South

16  Edge to proceed meaningfully, under neutral stewardship, through the chapter 11 restructuring

17  process.

18                                    **V.**

19                               **CONCLUSION**

20       For all the foregoing reasons, Focus and Holdings Manager respectfully requests that this

21  Court order the relief set forth above on an emergency basis and any other relief that may be just

22  and proper under the circumstances.

23

24

25

26

27

28

LOSANGELES 890260 (2K)                MOTION TO PREVENT KTB&S AND TO APPOINT RESPONSIBLE OFFICER

Dated: December 22, 2010

Respectfully submitted,

By: _/s/ I. Scott Bogatz_
I. Scott Bogatz (NSBN 3367)
Charles M. Vlasic III (NSBN 11308)
BOGATZ & ASSOCIATES, P.C.
3455 Cliff Shadows Parkway, Suite 110
Las Vegas, Nevada 89129
Telephone: (702) 776-7000
Facsimile: (702) 776-7900

Roberto J. Kampfner (*pro hac vice* pending)
Joshua M. Keesan (*pro hac vice* pending)
WHITE & CASE LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone:  213-620-7700
Facsimile:   213-452-2329

ATTORNEYS FOR FOCUS SOUTH GROUP, LLC and
HOLDINGS MANAGER, LLC