LEWIS AND ROCA LLP
Robert M. Charles, Jr.
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169-5996
Telephone:  702.949.8320
Facsimile:   702.949.8321
E-mail:      rcharles@LRLaw.com

&

MORRISON & FOERSTER LLP
G. Larry Engel (*admitted pro hac vice*)
425 Market Street
San Francisco, California  94105-2482
Telephone:  415.268.7000
Facsimile:   415.268.7522
E-mail:      lengel@mofo.com

&

MORRISON & FOERSTER LLP
James E. Hough (*admitted pro hac vice*)
Norman S. Rosenbaum (*admitted pro hac vice*)
Damion K.L. Stodola (*admitted pro hac vice*)
Jordan A. Wishnew (*admitted pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104
Telephone:  212.468.8000
Facsimile:   212.468.7900
E-mail:      jhough@mofo.com
E-mail:      nrosenbaum@mofo.com
E-mail:      dstodola@mofo.com
E-mail:      jwishnew@mofo.com

*Attorneys for JPMorgan Chase Bank, N.A.*
*as a petitioning creditor*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>SOUTH EDGE, LLC,<br><br>     Involuntary Debtor. | Case No.: 10-32968-BAM<br><br>Chapter 11<br><br>**Declaration of John P. McDonagh In Support of JPMorgan Chase Bank N.A.'s Petition for Relief (DE 1) and In Opposition to South Edge LLC's Motion to Dismiss (DE 188)**<br><br>**Hearing Information**<br>Date:  January 24, 26, &<br>     February 2, 3 and 4, 2010<br>Time:  9:30 a.m.<br>Courtroom: Courtroom #3 |

DECLARATION OF JOHN P. McDONAGH

ny-957929

I, John P. McDonagh, declare pursuant to 28 U.S.C. § 1746, as follows:

1.     I am a Managing Director at JPMorgan Chase Bank, N.A. (hereinafter, "JPMorgan").  I have held this position at JPMorgan for over 15 years and have been employed by JPMorgan and its predecessor for 37 years.  The facts in this declaration are based on my personal knowledge, the documents maintained in JPMorgan's files relating to this matter, and my discussions with various JPMorgan employees.[1]  I submitted a declaration dated December 9, 2010 in this proceeding (DE 8), and South Edge moved to strike that declaration (DE 205).  Rather than burden the Court with unnecessary motion practice, JPMorgan has decided to replace my earlier declaration with this declaration.

2.     In my role as Managing Director, I am one of the individuals at JPMorgan responsible for dealing with defaulted loans.  I have management responsibility for the South Edge loans described in this declaration.


## BACKGROUND

3.     I believe the information in this section of my declaration is not controversial, but South Edge moved to strike portions of my earlier declaration that contained this information.  I have therefore annotated the paragraphs in this section of my declaration by reference to Court Orders, the Arbitration Award, or documents that have been prepared by South Edge or its members.

4.     Around late 2003, a consortium of developers and homebuilders began preliminary talks for the creation of a large-scale development in Henderson, Nevada, to be known as "Inspirada," which was to include roughly 8,500 residences as well as shopping areas, parks, trails, cultural centers, and other amenities, spread over nearly 2,000 acres of land in seven "Villages."  In addition to the Villages, a centrally-located, 300-acre "Town Center" was to be an urban destination for retail, residential, commercial, gaming, office, civic and municipal uses, and was to include an additional approximately 3,000 residences.  Inspirada was intended to be a

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion to Appoint an Interim and Permanent Chapter 11 Trustee for South Edge, LLC During (i) the "Gap" Period and (ii) On A Permanent Basis (**DE 7**).

DECLARATION OF JOHN P. McDONAGH
ny-957929

large-scale "new urbanism" development project (the "Project")—the largest such project ever undertaken in Las Vegas.  The initial anticipated cost of Inspirada was over $1.0 billion.  The Villages and Town Center were intended to include two middle schools, three elementary schools, a fire station, a police station, three community parks, six neighborhood parks and miles of trail systems.   The Project was organized in units, the smallest of which (20-60 acres each) were called "Pods."  The Pods were grouped into seven residential "Villages" of 200-250 acres each, and a "Town Center."[2]

5.      In May 2004, in order to finance the acquisition of the underlying land as well as development of portions of the Project, the developers created a single purpose entity called South Edge LLC ("South Edge"), the involuntary debtor herein (the "Debtor").  The sole purpose of South Edge was to purchase the land for the Project from the Federal Bureau of Land Management ("BLM") and then to develop it by completing onsite and offsite work to enable its members to build house for sale.[3]

6.      South Edge is a Nevada limited liability company that is governed by the Amended and Restated Operating Agreement of South Edge, LLC, dated as of May 3, 2004 (the "Operating Agreement").[4]  The Operating Agreement addresses both the governance of South Edge as well as certain specified purchase, sale and development obligations of the members.  As set forth in the Operating Agreement, South Edge consists of eight members (each a "Member," and collectively, the "Members"), all of which are subsidiaries of major developers or homebuilders (each a "Parent," and collectively, the "Parents").  Each Member's ownership share of South Edge is based on the amount of land it is to develop in the Project.  One Member, KB Home Nevada, Inc. ("KBHN"), possesses an ownership share in South Edge that is significantly larger than that of the other Members.  KBHN's ownership share is 48.45 percent.  The remaining

---

[2] *See* Demand For Arbitration ("Arbitration Demand"), dated May 28, 2009, attached as Exhibit A (DE 69-2) to the Third-Party Defendant and Petitioners' Motion for An Order Compelling Arbitration, filed June 22, 2009, *JPMorgan Chase Bank, N.A. v. KB Home*, No. 2:08-cv-01711-RCJ-GWF (D. Nev), at 3-4.
[3] *See* Defendants KB Home and KB Home Nevada Inc.'s Motion to Dismiss, filed January 30, 2009, *JPMorgan Chase Bank, N.A. v. KB Home*, No. 2:08-cv-01711-RCJ-GWF (D. Nev) (DE 27), at 3:5-7; Arbitration Demand, at 3.
[4] A true and correct copy of the Operating Agreement is attached hereto as **Exhibit A**.

3
DECLARATION OF JOHN P. McDONAGH
ny-957929

51.55 percent is divided among the other seven Members, with the second largest ownership share at 15.59 percent, as set forth in the table below.[5]

| Member | Guarantor Parent | Acreage | Units | Percentage Interest |
|---|---|---|---|---|
| Focus South Group, LLC | John A. Ritter | 304.52 | 15.59 | 15.59 |
| Meritage Homes of NV | Meritage Corporation | 68.96 | 3.53 | 3.53 |
| Alameda Investments, LLC* | Woodside Group, LLC | 159.0 | 8.14 | 8.14 |
| Coleman-Toll Limited Partnership | Toll Brothers, Inc. | 205.49 | 10.52 | 10.52 |
| Beazer Homes Holding Corp. | Beazer Homes USA, Inc. | 50.4 | 2.58 | 2.58 |
| KB Home Nevada, Inc. | KB Home | 946.38 | 48.45 | 48.45 |
| Kimball Hill Homes Nevada, Inc.* | Kimball Hill, Inc. | 122.86 | 6.29 | 6.29 |
| Pardee Homes of Nevada, Inc. | Weyerhauser Real Estate Company | 95.71 | 4.9 | 4.9 |
| **TOTAL** | | 1,953.32 | 100.0 | 100.0 |

***Note:** Both Kimball Hill and Alameda filed for bankruptcy protection, and each rejected the Operating Agreement in their respective bankruptcy proceedings. Each is now represented by a Liquidating Trustee under a confirmed plan of reorganization. They are not "Builder-Defendants" herein.

7.     Pursuant to Section 5 of the Operating Agreement, South Edge is managed by a committee (the "Management Committee"), which includes one representative per Member (each, a "Manager"). The Management Committee is charged with a number of tasks, including determining the appropriate amount of capital contributions each Member must make in order to cover South Edge's expenses (see Operating Agreement at Section 2.3). Such expenses include on-going development costs, interest payments, principal payments for the land financing, maintaining interest reserves, funding management fees, as well as ongoing payments for post-auction planning, engineering, legal and other incidental expenses.[6]

8.     Under the Operating Agreement, all actions taken by South Edge require authorization by a quorum of Managers, as well as by sixty percent of the membership interests.[7]

---

[5] Final Arbitration Award ("Arbitration Award"), dated July 6, 2010, attached as Exhibit D (DE 10-4) to the Declaration of James E. Hough, at 11-13.
[6] *See id.* at 15.
[7] *See* Operating Agreement at section 5.2.4.

4

As a result of this structure, KBHN, the Member with the largest ownership percentage in South Edge, possesses considerable power over the management of South Edge.[8]

## THE LOAN DOCUMENTS

9.      The information in this section of my declaration is based on my review of documents maintained by JPMorgan in the ordinary course of its business, including the Loan Documents executed by South Edge, and the Confidential Information Memorandum prepared by South Edge for use in syndicating the Loan.[9]

10.      Following the formation of South Edge, JPMorgan, along with a group of other lenders (together with JPMorgan, the "Lenders"), agreed to finance a significant part of the costs of the Inspirada project.  To that end, South Edge and the Lenders entered into a credit agreement, dated November 1, 2004, which was replaced by an Amended and Restated Credit Agreement, dated March 9, 2007 (collectively, the "Credit Agreement").[10]  JPMorgan, as Administrative Agent under the Credit Agreement, acts as the agent for the Lenders with respect to the loans ("Agent").  In addition to the Credit Agreement, as explained below, South Edge also entered into several other loan documents (collectively, the "Loan Documents") with JPMorgan that assigned certain collateral to JPMorgan, as Agent (collectively, the "Collateral Documents").[11]

11.      Under Section 2.10 (e) of the Credit Agreement, each Lender that made its own several – not joint - loan (each, a "Loan") to South Edge was entitled to receive a note (each a "Note") made payable to the order of that Lender (a "Noteholder") for the sum of South Edge's obligation to such Noteholder.

---

[8] *See* Arbitration Award, at 11, 15.

[9] A true and correct copy of the Confidential Information Memorandum is attached hereto as **Exhibit B.**

[10] A true and correct copy of the Credit Agreement is attached hereto as **Exhibit C**.  The Credit Agreement has four "facilities."  Facility A is a construction loan that is drawn down by South Edge as needed, Facilities B and C are term loans that were fully funded at the closing of the Credit Agreement, and Facility D provides for letters of credit available to South Edge.  The original 2004 Credit Agreement is substantially the same as the Credit Agreement, and has been omitted for brevity.

[11] True and correct copies of certain of the Collateral Documents are attached as exhibits hereto, including (i) the Assignment of Contracts, Permits and Plans and Specifications dated as of November 1, 2004 (attached as **Exhibit D**), and (ii) the Assignment of and Agreement with Respect to Acquisition Agreements dated November 1, 2004 (attached as **Exhibit E**); *see* Arbitration Award, at 14.

DECLARATION OF JOHN P. McDONAGH

ny-957929

12.     As security for the loan facilities under the Credit Agreement, the Lenders obtained liens on both the land and related collateral, including on South Edge's rights to payment vis-à-vis the Members and their Parents. *See, e.g.*, Deed of Trust at 3-5 (listing the extensive collateral granted to Lenders, including the land Inspirada was to be built on as well as "all contract rights" and "actions and rights in action").[12]

13.     In addition to funding the purchase of the BLM land, the Credit Agreement also provided funding for the construction of the major infrastructure on the Project. In order to facilitate the construction of the Project, the Members each entered into an "Acquisition Agreement" with South Edge whereby the Member agreed to purchase, on a set schedule at the specified price, specific parcels of the Project from South Edge. South Edge, as the purchaser of the land, held title to the land, subject to the Lenders' lien. The schedule for the land purchases from South Edge (known as "Takedowns") was specifically set up to align periodic needs with the maturity of the loans provided by the Lenders.

14.     The Acquisition Agreements have all been assigned to JPMorgan as collateral. Such assignments make all of the Members' "rights, options, remedies, interests, privileges and other benefits arising out of, under or relating to the Acquisition Agreements . . . subject and subordinate to all rights, interests, security interests, and liens in favor of" JPMorgan under the other Loan Documents.[13] From the perspective of JPMorgan, the Acquisition Agreements, and the Takedown schedules provided therein, were essential to the Credit Agreement because they provided the means by which the loan would be repaid to the Lenders. The payments from the Members to South Edge in connection with land purchases were intended to provide South Edge with funds that it would use to repay its obligations under the Credit Agreement. In essence, South Edge served as the conduit by which JPMorgan was to be repaid by the Members for the loans, and by which the Members took title to the land they intended to develop. For example, Section 2.3.4 of the Operating Agreement provides that "[u]pon conveyance to each Member of its respective Pod[14] or Pods within the Subject Property to be conveyed to such Member in

---

[12] A true and correct copy of Deed of Trust dated October 29, 2004 is attached hereto as **Exhibit F**.
[13] *See* **Exhibit E** at paragraph 4.
[14] Section 5.1.2(c) of the Operating Agreement defines a "Pod" as a developable builder parcel.

DECLARATION OF JOHN P. McDONAGH
ny-957929

accordance with the terms of this Agreement and the applicable Acquisition Agreement, such Member shall pay to the Company the amount of its Member BLM Price less the sum of the Interim Payment and the Bid Payment previously paid to the Company by such Member ("Conveyance Payment")."

15.     As they would with any loan, and especially a loan of this size to a single-asset real estate entity with virtually no assets aside from the Project land and related assets, the Lenders sought assurance of payment under the loans, as well as protections in the event that payments are not made.  Here, the protection sought—and received—by the Lenders was based in significant part on the underlying agreements between and among the Members and Debtor.  In addition to the Credit Agreement, South Edge also entered into several other Loan Documents with JPMorgan that assigned certain collateral to JPMorgan, as Agent.  These documents are known as the "Collateral Documents" and are as follows:

    i.     The Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents and Leases dated as of October 29, 2004, and recorded as Instrument No. 20041101-0006330 with the Clark County Recorder on November 1, 2004, as amended by the First Amendment to Deed of Trust, Security Agreement and Fixture Filing and Assignment of Rents and Leases dated as of March 9, 2007, and recorded with the Clark County Recorder on March 9, 2007, (the "Deed of Trust") (**Exhibit F**);

    ii.     The Assignment of Contracts, Permits and Plans and Specifications dated as of November 1, 2004 (the "Assignment of Contracts") (**Exhibit D**); and

    iii.     The Assignment of and Agreement with Respect to Acquisition Agreements dated as of November 1, 2004 (the "Assignment of Acquisition Agreements") (**Exhibit E**).

16.     The Collateral Documents provide JPMorgan, as Administrative Agent, with security interests in, without limitation:  (1) the Acquisition Agreements as amended; (2) the Operating Agreement; (3) the MI Deposits and Letters of Credit; (4) the LID proceeds and related rights; (5) to the extent that they constitute personal property subject to the UCC, all other contract rights, accounts, general intangibles, actions and rights in actions relating to the "Real Property" or "Personal Property" referenced in the Deed of Trust or the Project, as well as all

DECLARATION OF JOHN P. McDONAGH

contracts relating to the development, design or construction of the Improvements, together with all proceeds thereof or proceeds of the Acquisition Agreement or of the sale of all or any part of that Real Property or other Trust Property (described in the Deed of Trust as "Sale Proceeds") and including the sale of interests in the Project; and (6) all other revenues, profits, proceeds, principal, interest, fees, or other sums or amounts constituting personal property under the UCC and derived or generated from the ownership, operation, occupancy, leasing, licensing, development, sale or other disposition of the Project or other Collateral by South Edge or due or payable to South Edge under the Acquisition Agreement, as well as all other similar contracts of any other nature concerning the design, construction, or development of any portion of or all of the Project, and all personal property proceeds thereof subject to the UCC.

17.     Under the Assignment of Acquisition Agreement, the Deed of Trust and other Collateral Documents, and the Credit Agreement, South Edge assigned all of its rights under all of its agreements with each Member and each Member's parent to the Lenders as collateral for the Loan (see **Exhibit E** at paragraphs 2 and 3, and **Exhibit F** at page 4).

18.     South Edge also executed in favor of JPMorgan the Assignment of Contracts assigning all "Permits" and "Governmental Approvals," all "Construction Agreements," "Contracts" and all "Assigned Plans" as each is so defined in the Assignment of Contracts.  This overlaps with the Deed of Trust and Assignment of Acquisition Agreements, but provides further rights and benefits for Lenders as to those unique assets.

19.     Each of the Members and Parents also expressly consented to each of the Loan Documents in the consent and agreement (the "Consent and Agreement"), dated March 9, 2007 entered into by each of the Members and their Parents and by and in favor of JPMorgan as Agent for the Lenders.[15]

20.     Additionally, as a condition precedent to the execution of the Credit Agreement in 2004, each South Edge Member and its respective Parent signed certain guaranties.  Specifically, the parties entered into (i) completion guaranties ("Completion Guaranties"), which guaranty the completion of certain improvements on the Project and the payment of certain development costs;

---

[15]  A true and correct copy of the Consent and Agreement is attached hereto as **Exhibit G**.

DECLARATION OF JOHN P. McDONAGH

ny-957929

(ii) limited guaranties ("Limited Guaranties"); and (iii) repayment guaranties ("Repayment Guaranties", together with Completion Guaranties and Limited Guaranties, the "Guaranties") in favor of JPMorgan, as Agent under the Credit Agreement.  Under the Limited Guaranties, (also known as a "bad boy" guaranties) the Members and Parents (the "Parent Guarantors") guaranty payment for damages related to certain fraudulent and/or unlawful acts.  Under the Repayment Guaranties, the Members and Parents are responsible for repayment of South Edge's obligations in the event of an involuntary or voluntary bankruptcy of South Edge.  Under each Guaranty, the Member and Parent are jointly and severally liable for their share of the guarantied obligations.

21.    Execution of the Guaranties was a condition precedent to JPMorgan's funding under the Credit Agreement.  From the perspective of the Lenders, in order to ensure repayment of the funds loaned pursuant to the Credit Agreement, it was necessary to rely not only on the land, but also on the protection of the Guaranties, including the assurance provided by the Completion Guaranties to improve the Project, as well as on the assignment of the Takedown payments owing to South Edge from its creditworthy Members.

### THE 2007 AMENDMENT

22.    The information in this section of my declaration is based on my review of documents maintained by JPMorgan in the ordinary course of its business, including the Loan Documents executed by South Edge.

23.    After the Credit Agreement, Loan Documents, and Collateral Documents were executed, the Project commenced.  In mid-2006, less than two years after the signing of the Credit Agreement, South Edge, through its Members (including KBHN), reached out to JPMorgan to seek an extension in the Takedown schedule.  Pursuant to the Loan Documents, South Edge could not modify the Takedown schedules without JPMorgan's consent.[16]

---

[16] *See* **Exhibit C**, Credit Agreement § 7.03(a) ("The Borrower shall not amend, modify or terminate any Acquisition Agreement without the prior written approval of the Administrative Agent . . . ); **Exhibit E**, Assignment of and Agreement with Respect to Acquisition Agreement § 8 ("Each Member [] agrees not to amend, modify, supplement or, except in accordance with the terms of its Acquisition Agreement, terminate its Acquisition Agreement without the Administrative Agent's prior written approval . . . ."); the Purchase and Sale Agreement and Joint Escrow Instructions § 1(b) ("Acquisition Agreement") ("[T]he order of the Takedowns set forth on the Takedown Schedule . . . . shall also be subject to any required approvals under any financing arrangements obtained by Developer . . . .").

24.     JPMorgan agreed to extend the Takedown schedules.  However, the Takedown schedule extensions did not change the maturity date of the Loan.[17]

25.     At the time JPMorgan consented to the extension of the Takedown schedule, South Edge and JPMorgan also began to discuss amending the Credit Agreement to increase the aggregate loan amount to South Edge.

26.     On March 9, 2007, JPMorgan, as Agent and Lender, South Edge and the other Lenders entered into the Amended and Restated Credit Agreement, which included a $50 million increase in Facility A (the construction loan facility) and incorporated the modified Takedown schedule.  Just prior to the closing of the amended Credit Agreement in March of 2007, South Edge paid off Facility B.

27.     On March 9, 2007, each South Edge Member also signed a Second Amendment to Purchase and Sale Agreement and Joint Escrow Instructions (a "Second Amended Acquisition Agreement")[18] that extended the Takedown schedules with the Lenders' consent.  The amended takedown schedule provided for the following:  (i) 295.59 acres to be taken down on April 15, 2007; (ii) 483.35 acres to be taken down on October 15, 2007; (iii) 324.07 acres to be taken down on April 15, 2008; (iv) 50.4 acres to be taken down on July 15, 2008; (v) 232.51 acres to be taken down on October 15, 2008; (vi) 445.52 acres to be taken down on April 15, 2009; and (vii) 121.88 acres to be taken down on October 15, 2009.

## SOUTH EDGE DEFAULTS

28.     I became involved in the South Edge credit in late 2007, and therefore I have personal knowledge of the information contained in this section of my declaration.

29.     Less than one year after entering into the amended Credit Agreement in 2007, certain Members of South Edge began to have financial problems.  One of the Members, Kimball

A true and correct copy of KB Home Nevada Inc.'s Acquisition Agreement is attached hereto as **Exhibit W** as an example of the Acquisition Agreement executed by all the Builder-Defendants.

[17]  A true and correct copy of the letter approving takedown extensions, dated November 28, 2006, is attached hereto as **Exhibit I**.

[18]  A true and correct copy of KB Home Nevada Inc.'s Second Acquisition Agreement is attached hereto as **Exhibit H** as an example of the second amendment executed by all the Builder-Defendants.

DECLARATION OF JOHN P. McDONAGH

ny-957929

Hill Homes Nevada (together with its Parent, Kimball Hill Inc., "Kimball Hill") defaulted on certain covenants in their corporate credit revolvers. Those defaults caused a cross-default under the Credit Agreement.[19]

30.    Throughout the beginning of 2008, JPMorgan and South Edge worked together in an effort to cure the defaults and allow funding of the Project to go forward. However, Kimball Hill filed for bankruptcy protection on April 23, 2008, causing another default under the Credit Agreement. Alameda Investments (together with its Parent, Woodside Group, Inc. ("Woodside")) also experienced financial troubles in early 2008, and it was not clear if it would be able to meet its obligations to South Edge and JPMorgan. An involuntary petition was commenced against Woodside by its creditors in August 2008 (that was later consensually converted to a voluntary chapter 11 proceeding), and its wholly-owned subsidiary (and Member of South Edge) Alameda Investments LLC sought bankruptcy protection on January 20, 2009. Both Members (and their respective Parents) confirmed liquidating plans of reorganization, and Liquidating Trustees now represent those Members.

31.    Even before the cross-defaults triggered by the bankruptcy filings, the Members caused significant defaults under the Credit Agreement and other Loan Documents by (A) failing to (1) make interest payments, (2) cure defaults of certain Members, and (3) make their scheduled Takedowns, and (B) voting to unilaterally extend the agreed-upon Takedown schedule. First, Kimball Hill and Woodside advised South Edge of their inability to make their respective Takedowns. This caused the entire credit facility to be in default. As a result, JPMorgan advised South Edge that it would not agree to fund an upcoming loan draw.

32.    There was a significant Takedown scheduled for April 15, 2008. At about this time, JPMorgan, South Edge, the Members, and their Parent Guarantors, began discussions regarding curing the existing and pending defaults under the Credit Agreement and restructuring the loans.

33.    However, unbeknownst to JPMorgan, the Members orchestrated secret votes of the Management Committee to extend the Takedown schedules, including those scheduled for April

---

[19] A true and correct copy of the January, 22 2008 Notice of Default letter is attached hereto as **Exhibit J**.

DECLARATION OF JOHN P. McDONAGH

ny-957929

15, 2008, so that their obligations to South Edge would not come due at the time agreed upon by JPMorgan in the Loan Documents. Specifically, on April 10, 2008, the Members (except for Meritage and Focus) voted to extend their Takedown schedules without JPMorgan's knowledge or consent even though they were aware that such consent was required. Ordinarily, for such modifications, both South Edge and its Members in their own capacity (in addition and separate from their capacity as Members) had to extend their Takedown schedules in writing.[20]

34.     On May 27, 2008, JPMorgan, South Edge, and the Members and the Parent Guarantors, entered into a forbearance agreement (the "Forbearance Agreement")[21] in order to afford South Edge the opportunity to negotiate a potential restructuring of the loans under the Credit Agreement. Neither South Edge, nor any of the Members or Parent Guarantors, informed JPMorgan of the secretly extended Takedown schedules at the time the Forbearance Agreement was signed. In fact, South Edge specifically warranted that only limited and enumerated defaults had occurred, and the Members, including KBHN, ratified such misstatements and omissions.

35.     After the signing of the Forbearance Agreement, JPMorgan, South Edge, the Members, and the Parents sought to restructure the loan, but those efforts were unsuccessful, and the Forbearance Agreement terminated, by its own terms, on June 30, 2008. JPMorgan formally notified South Edge and the Members and their Parent Guarantors of the Forbearance Agreement's termination and apprised them of some of the continuing defaults by letter dated July 1, 2008. On July 2, 2008, JPMorgan sent a notice of default to South Edge and KBHN (similar letters were sent to the other Members), regarding the defaults associated with KBHN's failure to make its Takedowns as required under its Acquisition Agreement.

36.     Following notices of default and demands for adequate assurance from JPMorgan, and after South Edge, its Members, and the Parent Guarantors refused to cure the numerous defaults, make the balancing payments required under the Credit Agreement, or assure any performance under the Credit Agreement, Loan Documents, or Collateral Documents, JPMorgan

---

[20] See Exhibit A of the Declaration of James E. Hough, Esq. dated December 9, 2010 (DE 10-1).
[21] A true and correct copy of the Forbearance Agreement is attached hereto as **Exhibit K.**

DECLARATION OF JOHN P. McDONAGH
ny-957929

commenced litigation proceedings against certain of the Members and Parent Guarantors, as set forth more fully in the accompanying Declaration of James E. Hough, Esq. (DE 10).

37.    To the best of my knowledge, there is no bona fide factual or legal dispute as to the validity of the debt owing to the Lenders and Noteholders under the Credit Agreement and the Notes.  South Edge has a definite payment obligation to both the Lenders and the Noteholders to satisfy the obligations provided for under the Credit Agreement and the Notes.  However, South Edge has not complied with these obligations despite numerous notices of default and demands for adequate assurance from JPMorgan.

38.    Under the Credit Agreement, South Edge issued to JPMorgan, in its capacity as Lender, two promissory notes:  (i) the Facility A Note, dated November 1, 2004 in the original principal amount of $20,000,000, and (ii) Facility D Note, dated March 9, 2007 in the original principal amount of $15,000,000 (collectively, the "JPMorgan Facility Notes").  As of the petition date of December 9, 2010 the ("Petition Date"), the aggregate outstanding principal and interest under the JPMorgan Facility Notes is $12,846,809.[22]  True and correct copies of the JPMorgan Facility Notes are attached hereto as **Exhibits L and M.**

39.    Under the Credit Agreement, South Edge issued to Wells Fargo Bank, N.A., in its capacity as Lender, three promissory notes:  (i) Facility A Note in the original principal amount of $20,000,000, (ii) Facility C Note in the original principal amount of $5,000,000, both dated November 1, 2004, and (iii) Facility D Note in the original principal amount of $5,000,000, dated March 9, 2007 (collectively, the "Wells Fargo Facility Notes"), all of which are between South Edge and Wachovia Bank National Association (as predecessor to Wells Fargo Bank, N.A.) (collectively, the "Wells Fargo Facility Notes").  As of the Petition Date, the aggregate outstanding principal and interest under the Wells Fargo Facility Notes is $20,062,203.[23]  True and correct copies of the Wells Fargo Facility Notes are attached hereto as **Exhibits N, O, and P**.

---

[22] This amount is $576,707 less than the $13,423,516 amount included in the Involuntary Petition due to an error in calculation.
[23] This amount is $477,827 less than the $20,540,030 amount included in the Involuntary Petition due to an error in calculation.

DECLARATION OF JOHN P. McDONAGH

ny-957929

40.     Under the Credit Agreement, South Edge issued to Credit Agricole and Investment Bank, in its capacity as Lender, two promissory notes:  (i) Amended and Restated Facility A Note, dated March 9, 2007 in the original principal amount of $20,000,000, and (ii) Facility C Note dated November 1, 2004 in the original principal amount of $5,000,000 (collectively, the "Credit Agricole Facility Notes").  As of the Petition Date, the aggregate outstanding principal and interest under the Credit Agricole Facility Notes is $19,801,972.[24]  True and correct copies of the Credit Agricole Facility Notes are annexed hereto as **Exhibits Q and R**.

41.     As recently as November 23, 2010, Lenders have sent South Edge an updated notice of defaults as well as a related demand for information and documents, as provided for under the Credit Agreement.[25]   However, South Edge, its Members, and the Parent Guarantors continue to refuse to cure the numerous defaults, make the Balancing Payments, or assure any performance under the Credit Agreement, Loan Documents, or Collateral Documents.

42.     In addition, on November 23, 2010, pursuant to the terms of the Assignment of Acquisition Agreement by and between South Edge, LLC and JPMorgan Chase Bank, N.A., in its capacity as Administrative Agent for the Lenders party to the Credit Agreement, dated as of April 27, 2006 (the "Assignment of Acquisition Agreement"),[26] the Agent sent a letter to the City of Henderson requesting that the Trustee pay to the Administrative Agent from the Acquisition Fund the Purchase Price from time to time payable under the Acquisition Agreement.[27]

## JPMORGAN AND THE OTHER LENDERS ARE UNDER SECURED

43.     The information in this section of my declaration is based on my personal knowledge, and on calculations performed by JPMorgan employees at my direction.

44.     Notwithstanding that South Edge pledged certain collateral to JPMorgan and the Lenders to secure repayment of its obligations under the Credit Agreement, the petitioning creditors' claims are under-secured because the amount outstanding under the principal and

---

[24] This amount is $467,854 less than the $20,269,826 amount included in the Involuntary Petition due to an error in calculation.
[25] True and correct copies of such notices are attached hereto as **Exhibits S** and **T.**
[26] A true and correct copy of the Assignment of Acquisition Agreement is attached hereto as **Exhibit U.**
[27] A true and correct copy of the Agent's letter is attached hereto as **Exhibit V.**

DECLARATION OF JOHN P. McDONAGH
ny-957929

interest owing to these parties under the Credit Agreement exceeds the estimated value of the collateral securing their claims by an amount not less than $14,425.20.[28]  I reach this conclusion through the following analysis.

45.    The principal amount outstanding under the Loan is $327,855,500.00.  South Edge and its Members agreed that this principal amount was due and owing in Schedule 1 of the Forbearance Agreement attached as **Exhibit K**.[29]

46.    South Edge owes interest on the principal amount outstanding at the post-default rate specified in Section 2.13 of the Credit Agreement.  South Edge and the Members agreed that the post-default rate would apply as of and after the Effective Date of the Forbearance Agreement, i.e. the date on which certain conditions specified in the Forbearance Agreement were satisfied.  According to JPMorgan's records, the Effective Date was May 30, 2008.

47.    JPMorgan has calculated the amount of interest due on the loan as of December 9, 2010 as $39,303,482, which means South Edge's total indebtedness for principal and interest under the Loan as of the Petition Date was $367,158,982.  This amount does not include other amounts owed by South Edge under the Loan Documents, including JPMorgan's fees as Administrative Agent and other out-of-pocket fees and expenses in connection with the enforcement of JPMorgan's rights as Administrative Agent under Section 11.03 of the Credit Agreement.

48.    I have been informed that South Edge confirmed in discovery that South Edge has no assets other than land, and that its land is worth less than $300 million.[30]  Since the admitted land value is less than the principal amount owed, on this basis alone the Loan is under secured.

49.    The Lenders' collateral also includes cash deposited by Focus South Group when it completed its takedowns in October 2007.[31]  The amount in this cash collateral account as of December 9, 2010 was $26,029,532.  Focus disputes JPMorgan's right to apply this account to

---

[28]  In addition, Petitioning Creditor C&S filed a Joinder to the Involuntary Petition on in which it asserts an unsecured claim of $2,746,036.
[29]  *See also* Testimony of Mathew A. Wyman, dated January 10, 2011, at 59:19-60:4.
[30]  Testimony of Robert V. McGibney, dated January 7, 2011, at 16:5-9.
[31]  The Builder Members that completed take downs before the Loan went into default provided Letters of Credit in lieu of cash MI deposits.  JPMorgan drew down those Letters of Credit, and has applied the proceeds as permitted by the Loan Documents.  None of the Letter of Credit proceeds remain available as additional collateral for the Loan.

the principal amount outstanding, because Focus has completed its take downs. JPMorgan, however, contends that this amount is available for application to all amounts due and owing under the Loan. If this amount were applied to the interest owed by South Edge as of the Petition Date, the interest amount would be reduced to $13,273,950, and the total principal and interest would be reduced to $341,129,450.

50.      The Lenders' collateral also includes pending claims in the bankruptcy proceedings of Woodside and Kimball Hill. Based on the most current Disclosure Statements filed in those proceedings, I have been informed that the Lenders will receive no more than $1,693,107 as a result of the claims in the Woodside bankruptcy, and no more than $6,570,720 from the Kimball Hill proceeding. Thus, the total amount the Lenders will receive from their claims in these proceedings is no more than $8,263,827. When this amount is deducted from the total principal and interest owed, as adjusted in the preceding paragraph with respect to the Focus MI deposit, the total principal and interest would be reduced to $332,865,623 (i.e. $341,129,450 minus $8,263,827). This amount is far above the value of the land (which according to South Edge's testimony is not greater than $300 million) owned by South Edge and specifically, the claims for outstanding principal and interest under the Credit Agreement would be under-secured by $32,865,623. The aggregate principal and interest owed to Petitioning Creditors represents approximately 14.4% of the amounts outstanding under the Credit Agreement (JPMorgan represents approximately 3.5%, Credit Agricole Corporate and Investment Bank represents approximately 5.4%, and Wells Fargo Bank, N.A. represents approximately 5.5%). Accordingly, it follows that the taken together, the value of the petitioning Noteholders' aggregate interests in the applicable liens on property of South Edge securing the claims asserted by the Noteholders in the Involuntary Petition is in an amount at least approximately $4,732,649 less than the principal and interest due the those Noteholders as of the Petition Date.

51.      Similarly, because the three petitioning Noteholders represent approximately 14.4% of the debt owed by South Edge to the Lenders, if the aggregate claims under the Credit Agreement are collectively under-secured by $101,000 or more, then the petitioning Noteholders are under secured by at least $14,425 (14.4% of $101,000 is $14,544).

16

52.    In addition, I have been advised that JPMorgan's counsel has obtained an appraisal of the land owned by South Edge with an effective date of September 10, 2010. I am further advised that the appraisal incorporates the value of LID proceeds to be recovered in the future. I am advised that in the opinion of the appraisers, the value of the land and future LID proceeds in the aggregate is $67,000,000.

53.    I understand that South Edge has argued that my deposition testimony supports the conclusion that the Lenders are adequately secured.[32] This argument is not correct. In my deposition on December 21, 2010, I explained that I expect the Lenders might eventually be repaid, in part due to the pending litigation, but only because the Lenders have recourse to the Guarantors through the Completion Guaranty and the Limited Guaranty. (E.g. "Q: Because the lenders might be paid in full the completion guaranties and everything else?" A: Correct." 142: 16-19.)[33]

## PURPOSES OF CHAPTER 11

54.    I understand that South Edge has argued that there is no business, financial or operational restructuring of South Edge that can be accomplished under Chapter 11. I disagree for many reasons:

- First, the Credit Facility encompasses approximately 39 Lenders. Outside of Chapter 11, unanimous consent would be required to restructure the obligations under the facility. I understand that under Chapter 11 plan a class of claims can be approved with less than 100% consent from the claimants in that class.

- Second, Chapter 11 would provide a forum and process for meaningful dialogue among the Lenders, South Edge (either in its capacity as a debtor in possession or through an appointed Chapter 11 Trustee), and the Members, all of which could provide a foundation for a plan of reorganization. If the Lenders were to agree to a discounted repayment, it is

---

[32] *See* Response to Interrogatory No. 10 to South Edge, LLC's Responses to Credit Agricole Corporate and Investment Bank's First Set of Interrogatories dated December 31, 2010, at 2:13-4:8.
[33] Exhibit 2 to the Declaration of David M. Stern, dated January 3, 2011 (DE 173-2).

reasonable to assume that the Members could reinvest some or all of the discount received back into the Project under the Plan.

- Third, I understand that the Members and South Edge contend that the future viability of the Inspirada project will require a constructive dialogue with COH regarding the various development agreements, plans and permits which are the foundation of the Project. I also understand that neither the Members nor South Edge have made any such effort to date. Chapter 11 would provide a forum for those discussions, ideally through a Chapter 11 trustee.

- Fourth, I understand that in Chapter 11 the debtor in possession or Court appointed Trustee, owes a fiduciary duty to South Edge and its creditors to maximize the value of its assets. One such avenue would be to enforce the Members' obligations to South Edge, including the obligation to take down land and fund infrastructure construction.

## MISCELLANEOUS MATTERS

55.     The information in this section of my declaration is based on my personal knowledge.

56.     I understand that South Edge has argued that JPMorgan did not conduct a sufficient investigation prior to filing the involuntary petition. This argument is not correct. JPMorgan investigated the status of the Project through its advisors, including Karl Billisits of the Monticello Group, and also attempted to obtain relevant information directly from South Edge.[34] In addition, through my discussions with the Members beginning in 2008, I have been aware that the Inspirada Project has been deliberately shut down since the spring of 2008.

57.     Neither South Edge, nor its Members, have made any recent efforts to discuss with JPMorgan re-starting the project. In fact, I understand that there has been testimony that the Members have no intention of taking any action on Inspirada until such time (if ever) they and South Edge resolve their defaults with the Credit Agreement.[35]

---

[34] November 23, 2010 Information Request Letters, attached hereto as **Exhibits S and T**.
[35] Testimony of Klif Andrews dated Jan. 5, 2011, at 83:22 - 84:8. *Cf.* Testimony of Larry Seay dated Jan. 5, 2011, at 96:2-12; Testimony of Frederick Cooper dated Jan. 6, 2011, at 20:22 - 21:12.

18
DECLARATION OF JOHN P. McDONAGH
ny-957929

58.     I understand that at one witness in a recent deposition indicated the South Edge did not consider completing LID projects in order to obtain LID reimbursements due to a concern that JPMorgan would seize the LID reimbursements and refuse to allow them to be used for completing additional LID projects.  (Testimony of Robert V. McGibney, dated January 7, 2011, at 37:3-38:23; 39:16-40:2.)  This contention is pure speculation.  No one from South Edge or the Builders ever approached JPMorgan to discuss whether JPMorgan would permit LID reimbursements to be used to fund additional LID reimbursable projects.  In fact, JPMorgan was in favor of doing so, and tried to encourage Focus to engage in such a process; however Focus refused to do so, claiming the South Edge management committee would not approve this effort.

59.     I understand that South Edge has argued that a receiver and/or foreclosure is preferable to a bankruptcy proceeding.  I do not agree.  I understand that under Nevada law a receiver is available only if a foreclosure proceeding is commenced.  While JPMorgan may at some point determine that a foreclosure is advisable, at this point I believe the interests of both the Lenders and South Edge's other creditors would be better served if the defaulting Builders completed their takedowns and met their other obligations to South Edge.  This would not be possible after a foreclosure.

I declare under penalty of perjury under the laws of the State of New York and the United States of America that the above is true and correct.  Executed this _13_ day of January, 2011 at New York, New York.

_____

John P. McDonagh

DECLARATION OF JOHN P. McDONAGH

ny-957929