1

2
Robert J. Moore (CA State Bar No. 77495)               Lenard E. Schwartzer (NV State Bar No. 399)
David B. Zolkin (CA State Bar No. 155410)              Jeanette E. McPherson (NV State Bar No. 5423)

3
MILBANK, TWEED, HADLEY & McCLOY LLP                    SCHWARTZER & MCPHERSON LAW FIRM
601 South Figueroa Street, 30th Floor                  2850 South Jones Boulevard, Suite 1
Los Angeles, California 90017                           Las Vegas, Nevada 89146-5308

4
Telephone:       (213) 892-4000                         Telephone:       (702) 228-7590
Facsimile:       (213) 629-5063                         Facsimile:       (702) 892-0122

5

6
*Counsel for*                                          *Local Counsel for*
*Chapter 11 Trustee*                                   *Chapter 11 Trustee*

7

8

9
# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

10

11
In re:

12
SOUTH EDGE, LLC,

13
                Debtor.

14

15

16

17

18

19

20

21

22

**Chapter 11**

**Case No. BK-10-32968 (BAM)**

**MOTION FOR INTERIM AND FINAL ORDERS (1) AUTHORIZING CHAPTER 11 TRUSTEE TO OBTAIN SENIOR PRIMING SECURED POSTPETITION FINANCING; (2) AUTHORIZING THE USE OF CASH COLLATERAL; AND (3) SCHEDULING A FINAL HEARING**

**Interim Hearing
Date:**                    **July 20, 2011**
**Hearing Time:**           **9:30 a.m.**
**Courtroom:**              **Courtroom #3
                            Foley Federal Building
                            300 Las Vegas Boulevard
                            Las Vegas, Nevada 89101**

23

24

25

26

27

28

#4845-7068-4681

**TABLE OF CONTENTS**

I. Jurisdiction and Venue ...........................................................................................8

II. Background ...........................................................................................................8

    A.    Commencement of Chapter 11 Case and Appointment of Trustee ...............8

    B.    The Debtor, It's Primary Assets and Economic Stakeholders.................9

        1.    The Builder Members ....................................................................9

        2.    The Agent and Prepetition Lenders ..........................................10

    C.    Status of Project ...............................................................................11

    D.    Recovery of LID Proceeds..................................................................11

    E.    Prior Short Term Advance and Use of Cash Collateral .......................12

    F.    The Settlement .................................................................................12

    G.    The TIP Facility ...............................................................................14

III. Argument .........................................................................................................17

    A.    The Trustee Has Satisfied the Legal Requirements for Approval of the TIP Facility. ..........................................................................................17

        1.    The Trustee Is Unable to Obtain Similar Financing From Other Sources.......................................................................................18

        2.    The Agent and Prepetition Lenders are Adequately Protected..................20

    B.    The Trustee's Use of the LID Proceeds Should Be Authorized. ............................22

IV. Final Hearing Date..............................................................................................23

V. Notice ..................................................................................................................23

VI. Conclusion .........................................................................................................25

#4845-7068-4681

**TABLE OF AUTHORITIES**

Page(s)

CASES

Anchor Sav. Bank FSB v. Sky Valley, Inc.,
    99 B.R. 117 (N.D. Ga. 1989) .........................................................................21

Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.),
    789 F.2d 1085 (4th Cir. 1986) ...................................................................19

In re 495 Central Park Avenue Corp.,
    136 B.R. 626 (Bankr. S.D.N.Y. 1992) .......................................................21

In re Ames Dept. Stores,
    115 B.R. 34 (Bankr. S.D.N.Y. 1990) .........................................................19

In re Martin,
    761 F.2d 472 (8th Cir. 1985) .....................................................................23

In re Photo Promotion Assoc., Inc.,
    87 B.R. 835 (Bankr. S.D.N.Y. 1988), aff'd, 881 F.2d 6 (2d Cir. 1989) ..................19

In re Pilgrim's Pride Corp.,
    401 B.R. 229 (Bankr. N.D. Tex. 2009).......................................................23

In re Reading Tube Indus.,
    72 B.R. 329 (Bankr. E.D. Pa. 1987) ...........................................................20

In re Sky Valley, Inc.,
    100 B.R. 107 (Bankr. N.D. Ga. 1988) ........................................................20

In re T.M. Sweeney & Sons LTL Servs., Inc.,
    131 B.R. 984 (Bankr. N.D. Ill. 1991) ........................................................19

MBank Dallas, N.A. v. O'Connor (In re O'Connor),
    808 F.2d 1393 (10th Cir. 1987) .................................................................23

Naert v. Daff (In re Washington Trust Deed Service Corp.),
    224 B.R. 109 (B.A.P. 9th Cir. 1998).........................................................24

Resolution Trustee Corp. v. Swedeland Development Group (In re Swedeland
    Development Group),
    16 F.3d 552 (3rd Cir. 1994) .................................................................21, 23

Simantob v. Claims Prosecutor, LLC (In re Lahijani),
    325 B.R. 282 (B.A.P 9th Cir. 2005)...........................................................23

U.S. Savings Assoc. of Tex. v. Timbers of Inwood Forest Assoc. Ltd.,
    484 U.S. 365 (1988).............................................................................21, 23

Walter v. Sunwest Bank (In re Walter),
 83 B.R. 14 (B.A.P. 9th Cir. 1987)..................................................................23

**STATUTES**

11 U.S.C. §§ 101-1532 ............................................................................................1

11 U.S.C. § 361(1)-(3) ...........................................................................................23

11 U.S.C. § 364(d)(2) .............................................................................................21

28 U.S.C. §§ 157 and 1334 ......................................................................................9

28 U.S.C. § 157(b)(2) ...............................................................................................9

28 U.S.C. §§ 1408 and 1409 ....................................................................................9

chapter 11 of the Bankruptcy Code ................................................................. passim

Bankruptcy Code section 361 ................................................................................23

Bankruptcy Code sections 361 and 363(c)(2)(A) ..................................................24

section 363(c)(2) of the Bankruptcy Code.............................................................23

Bankruptcy Code section 364 ..........................................................................18, 19

Bankruptcy Code section 364(a) ...........................................................................18

Bankruptcy Code section 364(b) ...........................................................................19

§ 364(d) of the Bankruptcy Code ...........................................................................16

Bankruptcy Code section 364(d)(1) .........................................................................3

Bankruptcy Code section 364(d)(1)(B) ..................................................................21

section 364(e) of the Bankruptcy Code ....................................................................3

Bankruptcy Code sections 503(b)............................................................................3

Bankruptcy Code section 503(b)(1) .......................................................................19

section 507(b) of the Bankruptcy Code ...................................................................5

Bankruptcy Code section 726(b) ..............................................................................3

**OTHER AUTHORITIES**

95th Cong., 1st Sess. (1977) ..................................................................................23

Bankruptcy Rule 2002 ............................................................................................25

1

Bankruptcy Rule 4001(b) ..................................................................................................5

Bankruptcy Rule 4001(c) ..................................................................................................2

Bankruptcy Rules 4001(b) and (c) ..................................................................................24

Debtor's "General Manager." ..........................................................................................11

Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure ...................1

H.R. Rep. No. 95-595 .....................................................................................................23

**STATEMENT PURSUANT TO LR 4001** ........................................................................2

*Third Stipulation Extending Trustee's Authorization To Use Cash Collateral* (the "Third Extension Stipulation") ..............................................................................................11

Wall Street Journal ..........................................................................................................2

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#4845-7068-4681

TO THE HONORABLE BRUCE A. MARKELL, UNITED STATES BANKRUPTCY JUDGE:

Cynthia Nelson, the chapter 11 trustee (the "Trustee") in the chapter 11 bankruptcy case (the "Chapter 11 Case") of South Edge, LLC ("South Edge" or the "Debtor"), hereby submits this motion ("Motion") for entry of an interim order (the "Interim Order") and a final order (the "Final Order") pursuant to, *inter alia*, sections 105(a), 361, 362, 363, 364(c)(1) and (d)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (1) authorizing and approving the Trustee to obtain postpetition financing on a priming lien basis in an aggregate principal amount of up to $21.4 million and with an initial, interim borrowing limit of $4.0 million (the "TIP Facility") pursuant to a Trustee Financing Agreement (the "TIP Loan Agreement," or "TLA", and together with any related documents required to be delivered by or in connection with the TIP Loan Agreement, the "TIP Loan Documents"), by and among the Trustee, solely in her capacity as the Trustee of South Edge, on behalf of its bankruptcy estate (the "Estate"), as Borrower, and certain affiliates of the Settling Builders (as defined below), as Lenders (the "Builder Lenders"), (2) authorizing the use of the TIP Facility loan proceeds and of the LID Proceeds (as defined below), the latter of which are the cash collateral of the Prepetition Lenders (as defined below), to pay for the administrative expenses of the Trustee and the Estate and to repay borrowings under the TIP Facility, and (3) finding that the creditors with an interest in the LID Proceeds and the Debtor's cash have been furnished with adequate protection. The TIP Loan Agreement will be substantially in the form attached as Exhibit 1 to the Declaration of Cynthia Nelson ("Nelson Decl.") filed in support hereof.

Unless otherwise stated herein, capitalized terms that are not otherwise defined herein or in the Legal Memorandum attached hereto shall have the meanings ascribed to them in the Interim Order and the TIP Loan Agreement, as applicable.

#4845-7068-4681

# STATEMENT PURSUANT TO LR 4001[1]

In accordance with Bankruptcy Rule 4001(c), the following is a "concise statement" of the specific relief the Trustee is seeking with respect to the TIP Facility, and the location within the Interim Order and the TIP Loan Agreement of all material provisions therein:

1. **Maturity Date/Termination**: The TIP Facility will mature on the earliest of: (a) the termination of the Plan Support Agreement; (b) the Trustee's Consent Termination; (c) the effective date of the Plan of Reorganization; (d) termination and acceleration of the Loans pursuant to Section 10.1 following a Default; or (e) November 30, 2011 (provided, however, that in the case of "e" only, the Maturity Date shall be extended by such additional time, if any, as is permitted for a plan effective date under Section 3(d) of the Plan Support Agreement, provided that a Budget that is acceptable to the Trustee, the Agent, and the Builder Lenders is agreed to in connection with such extension). TLA, § 1.1.

2. **Interest Rate**: 0%, unless a Default occurs, at which time interest will accrue and be payable at the Default Rate equal to the prime rate (as quoted in the Wall Street Journal), plus five percent. TLA, § 2.2(a) and (b).

3. **Loan Amount**: The initial loan to be made following the Interim Closing Date shall not exceed $4.0 million. Upon and after the Final Closing Date, the total borrowings under the loan shall not exceed $21.4 million at any point in time during the term of the TIP Loan Agreement. Furthermore, loans outstanding may not exceed an amount equal to the aggregate of (x) the next applicable weekly "Ending Balance – TIP Loan" on the Budget, plus (y) any revenue or receipt projected through such applicable weekly "Ending Balance – TIP Loan" on the Budget that has not been received by the Trustee, less (z) any expense projected through such applicable weekly ending balance. TLA, § 2.1(b); Interim Order, ¶ 2(b)

4. **Events of Default**: Subject to any applicable cure rights, any (i) payment default, (ii) failure to perform or comply with material terms, conditions, covenants, or other agreement in the TIP Loan Documents, (iii) representation or warranty of the Trustee that proves untrue; (iv) conversion of the Chapter 11 Case to a bankruptcy case under chapter 7, (v) action by the Trustee that is inconsistent with the Trustee's Consent, (vi) dismissal of the Chapter 11 Case, and (vii) revocation, reversal, modification, stay or vacation of the Financing Orders to which the Builder Lenders have not consented in writing. TLA, § 9.

5. **Liens**: All Obligations under the TIP Facility are to be secured by first priority priming liens in favor of the Builder Lenders on the Collateral, which will consist of any and all rights and interests of the Estate in and to payments or reimbursements from LID Proceeds (as defined below) that have been paid to the Estate or that will become payable to the Estate in connection with the construction and/or completion of improvements relating to Local Improvement

---

[1] Unless otherwise stated, capitalized terms used in this summary shall have the meanings ascribed to them in the TIP Loan Agreement.

District T-18 ("LID T-18") segments relating to the Project, and proceeds, products, offspring, and profits thereof (including cash). The Builder Lenders' liens will be senior to all other liens, encumbrances and other interests in the Collateral pursuant to Bankruptcy Code section 364(d)(1), including, but not limited to, those of the Agent, except for Permitted Liens that are valid, perfected, unavoidable and not subject to subordination. TLA, §§ 4.1, 4.2; Interim Order, ¶ 2(c) and (e).

6.    **Superpriority Claims**: All Obligations under the TIP Facility shall constitute an administrative expense claim against the Estate having priority over any and all other administrative expenses of the kind specified in Bankruptcy Code sections 503(b) or 507(b) (including any post-conversion expenses with a priority under Bankruptcy Code section 726(b) ). ("Superpriority Claim"). TLA, § 3; Interim Order, ¶ 2(h).

7.    **Conditions to Loans**: The following are conditions precedent to the Builder Lenders' obligations to make any Loan: (i) for the initial interim borrowing, the entry of the Interim Financing Order that is acceptable to the Builder Lenders and the Agent, is in full force and effect, and contains findings and protections under section 364(e) of the Bankruptcy Code; (ii) delivery the Builder Lenders of executed documents evidencing the TIP Loan Agreement to ; (iii) timely delivery to Builder Lenders of Notice of Borrowing; (iv) no Defaults; (v) the Maturity Date has not occurred; and (vi) the Final Order, which has been approved by the Builder Lenders and Agent, has been entered by no later than August 12, 2011, is in full force and effect, shall not have been stayed, revoked, reversed, modified, or amended in any respect, and contains findings and protections under section 364(e) of the Bankruptcy Code. TLA, § 5.1; Interim Order, ¶ 2(g).

8.    **Automatic Stay/Modification**: Upon a Default, the Builder Lenders may set an expedited hearing for relief from the automatic stay on not less than three Business Days' notice. At such hearing the only issues will be (i) whether an uncured Default exists, and (ii) whether the Court may impose any condition on the exercise of the Builder Lenders' remedies, so long as such condition does not impair the Builder Lenders' exercise of remedies for more than 30 days and does not otherwise impair their interests in the Collateral. The Builder Lenders shall be granted relief from stay if an uncured Default is found to exist to the extent necessary to permit the Builder Lenders to exercise their rights and to effectuate the provisions of the TIP Loan Agreement and the Financing Orders, without further notice, application to or order of the Court. TLA, §§ 10.2. and 10.3; Interim Order, ¶ 5(c) and (d)

9.    **Modification of Nonbankruptcy Law Relating to Lien Perfection**. The Builder Lenders' and the Agent's liens on the Collateral shall be deemed perfected with no need for the Trustee to execute any additional documents or of recordation. TLA, § 4.3; Interim Order, ¶ 3

10.    **Cooperation**: Subject to the execution of reasonable confidentiality agreements and/or common interest agreements, the Trustee has agreed to consult with the Builder Lenders and the Agent regarding her administration of the Estate. The Trustee will make non-privileged documentation and information regarding the Project available to the Builder Lenders and the Agent on reasonable notice. TLA, § 7.4.

11.    **Negative Covenants**: Among other covenants, the Trustee has agreed that, except upon the occurrence of the Maturity Date (other than as a result of the

effective date of the Plan of Reorganization), the Trustee, without consent of the Builder Lenders, will not (i) approve, file, support or consent to (a) a plan other than the Plan of Reorganization, (b) a sale or compromise of material assets, (c) the allowance of any claim in excess of $25,000, other than such claims as appear in the Schedules of Assets and Liabilities of South Edge previously filed by the Trustee that were not scheduled as disputed, contingent or unliquidated, and for which no proof of claim was filed, (d) enter into a contract with a total cost to the Estate in excess of $25,000 (provided, however, that if the contract relates to an expenditure set forth in the Budget, and if each of the Builder Lenders is given an equal opportunity to bid on the contract, and either (x) all Builder Lenders choose not to bid, or (y) none of the bids by any Builder Lender is the lowest bid, then written consent from the Builder Lenders shall not be required if such contract is commercially reasonable), (e) material amendments to plans or permits, provided, however, that with respect to sub-parts (c) and (e) above, the Agent's consent shall also be required; (ii) pursue litigation or other claims against the Builder Lenders or their affiliates, and (iii) unless the Trustee's Consent has terminated in accordance with its provisions, take actions inconsistent with the Trustee's Consent. However, in no event shall funds advanced by the Builder Lenders be used to fund the pursuit or investigation of any claims against the Builder Lenders, the Settling Builders, or their insiders or affiliates, or to oppose the Plan of Reorganization. TLA, §§ 8, 8.5, 8.6, 8.7.

12. **Fee Advances**: Pursuant to Section 15 of the Trustee's Consent and Section 2.7 of the TIP Loan Agreement, notwithstanding the occurrence of the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), the Builder Lenders remain obligated to fund the payment of all accrued and unpaid administrative expenses of the Trustee and the Estate as of the date of such termination, as set forth in the Budget; provided, however, that the allowed fees and expenses of the Trustee and the Trustee's professionals shall not exceed the unpaid fees and expenses for the full Budget period. TLA, § 2.7.

13. **Fiduciary Duties**: Nothing in the Trustee's Consent or the Plan Support Agreement prohibits the Trustee's exercise of her fiduciary or statutory duties in the Chapter 11 Case. However, if, in the exercise of those duties, a Trustee's Consent Termination occurs under the TIP Loan Agreement, then the Maturity Date under the TIP Facility will immediately occur and, upon notice by the Builder Lenders to the Trustee, the Obligations under the TIP Facility will become immediately due and owing. *See* Trustee's Consent § 13 and final sentence; TLA, §§ 1.1 (definitions of "Maturity Date" and "Trustee's Consent Termination") and 10.1.

14. **Deadlines re Disclosure Statement and Plan**: While the Plan Support Agreement to which the Trustee's Consent applies, as modified and conditioned by that Consent, the TIP Facility is not expressly tied to any disclosure statement or plan deadlines. Indeed, pursuant to the Trustee's Consent, the Trustee will not propose a plan. However, the November 30, 2011 Maturity Date of the TIP Facility is tied to the outside date of the anticipated effective date of the Plan of Reorganization to be proposed jointly by the Settling Builders and the Agent (unless extended by consent for up to an additional 30 days).

15. **Indemnifications**: The TIP Loan Agreement does not provide for the Estate's indemnification of any party.

16. **Releases**: The TIP Loan Agreement does not provide for the release or waiver of any claim of the Estate.

The identity of each provision above to remain in effect if the Interim Financing is granted but the Final Financing is denied, is as follows: All of the above.

In accordance with Bankruptcy Rule 4001(b), the following is a "concise statement" of the specific relief the Trustee is seeking to the extent of the Agent's interest in the Collateral, and the location within the Interim Order and the TIP Loan Agreement of all material provisions therein:

1. **Entities With an Interest in the Collateral**: The Agent (for the benefit of the Prepetition Lenders).

2. **Purpose of Loan/Use of Collateral**: Subject to the terms of the TIP Facility, the Loan will be used, consistent with the Budget, to fund, among other items, (i) operating disbursements on account of, among other items, the further construction of infrastructure segments of the Project, Project maintenance, Project security, surety bond obligations, and the administration of LID T-18 reimbursements, (ii) LID T-18 bond assessments and property taxes, and (iii) bankruptcy-related disbursements, including United States Trustee's fees and the fees and expenses of the Trustee, her professionals, and the Agent's professionals. *See* TLA, Recitals.

3. **Material Terms of Collateral Use**: Use of Collateral will only be subject to the terms of TIP Loan Agreement (as summarized above) for the term of the TIP Loan Agreement.

4. **Adequate Protection**: The Agent will be granted as adequate protection for any diminution in the value of the Agent's interest in the Collateral resulting from the use of the Collateral and the imposition of the automatic stay (the "Adequate Protection Obligations")

   a. a second-priority liens in the Collateral subject only to the Builders Lenders' first-priority liens on the Collateral; TLA, § 4.2; Interim Order, ¶ 2(d)

   b. a first priority lien in all other assets of the Estate; TIP Loan Agreement, subject only to Permitted Liens (as defined in the Cash Collateral Stipulation) and excluding avoidance actions or the proceeds thereof, § 4.2; Interim Order, ¶ 2(d)

   c. an allowed superpriority administrative expense claim as provided for under section 507(b) of the Bankruptcy Code on account of the Adequate Protection Obligations, which shall be junior only to the Superpriority Claim of the Builder Lenders; Interim Order, ¶ 2(d)

The identity of each provision above to remain in effect if the Interim Financing is granted but the Final Financing is denied, is as follows: All of the above.

# PRELIMINARY STATEMENT

The TIP Facility has been made possible by a settlement (the "Settlement")
reached only recently among KB Home Nevada, Inc., Coleman-Toll Limited Partnership, Pardee
Homes of Nevada, and Beazer Homes Holdings Corp., and their respective parent guarantors
(collectively, the "Settling Builders"), on the one hand, and JPMorgan Chase Bank, N.A.
("JPMorgan" or "Agent"), as Agent under the Debtor's prepetition credit agreement (the "Credit
Agreement"), and a supermajority of the lenders under the Credit Agreement (the "Consenting
Lenders" and, collectively with the Agent and the Settling Builders, the "Settling Parties").

The Settlement is to be implemented through a chapter 11 plan of reorganization
that is to be jointly proposed by the Settling Parties. A redacted, but otherwise true and correct,
copy of the letter agreement, incorporating a term sheet attached thereto (the "Plan Term Sheet")
that embodies the Settlement and sets forth the basic terms of a plan of reorganization based
thereon (the "Plan of Reorganization"), is attached as Exhibit 2 to the Nelson Decl. (the "Plan
Support Agreement").

The Trustee is not a party to the Plan Support Agreement and will not be a
proponent of the Plan of Reorganization.[2]  However, the effectiveness of the Plan Support
Agreement was conditioned upon the Trustee's consent to the provisions of the Plan Support
Agreement.  The Trustee was, and remains, supportive of the process by which the Agent and the
Settling Builders will be seeking confirmation of the Plan of Reorganization, but was not in a
position to execute the form of consent initially proposed by the Settling Parties. While the
Agent determined to waive the requirement for the Trustee's consent, the Trustee successfully
negotiated with the Settling Builders a qualified and conditioned form of consent by which the
Settling Builders agreed to certain matters not addressed in the Plan Support Agreement and
pursuant to which the Trustee will be supporting confirmation of the Plan of Reorganization.
That consent agreement is set forth in a letter delivered by the Trustee to the Settling Parties and

---

[2] As such, the Trustee need not and is not by this Motion seeking approval of the Plan Support
Agreement.

#4845-7068-4681                                    -6-

1    accepted by the Settling Builders on June 8, 2011, a true and correct copy of which is attached as

2    Exhibit 3 to the Nelson Decl. (the "Trustee's Consent").

3                    The TIP Facility is an essential element to the Settlement and is critical to the

4    Trustee's ability to administer the Estate.  Although the Estate owns assets of substantial value,

5    those assets are not particularly liquid and, in certain instances, are the subject of active disputes

6    or potential disputes that will require resolution through consent or litigation.  The TIP Facility

7    provides the Trustee and the Estate with access to funds necessary to pay through the end of

8    November 2011 (i) operating disbursements on account of, among other items, further

9    construction of and completion of requirements with respect to certain infrastructure segments of

10   the Project, Project maintenance, Project security, the Estate's surety bond and insurance

11   obligations, and the administration of LID Proceeds, (ii) LID T-18 bond assessments and

12   property taxes, and (iii) bankruptcy-related disbursements, including United States Trustee's fees

13   and the fees and expenses of the Trustee, her professionals, and the Agent's and Prepetition

14   Lenders' professionals.

15                   Significantly, the Plan Support Agreement (and, hence, the TIP Facility), has the

16   support of the Consenting Lenders, who collectively hold more than 92% in dollar amount of the

17   Prepetition Loans and represent more than 94% in number of the Prepetition Lenders.

18                   The TIP Facility is critical to the implementation of the Settlement, and is

19   intended to bridge the Estate to a near-term exit from this Chapter 11 Case through a confirmed

20   plan of reorganization that will have the consent of the Estate's largest creditor group and a

21   super-majority of the equity constituents in the Chapter 11 Case, provide necessary consideration

22   for the fair and appropriate treatment of all other constituencies, resolve protracted and expensive

23   litigation, and get the Project back on track after languishing to the detriment of the City of

24   Henderson and other parties in interest over the past few years.  The Trustee believes the TIP

25   Facility is in the best interests of the Estate and should be approved by the Court.

26

27

28

#4845-7068-4681                                    -7-

# LEGAL MEMORANDUM[3]

## I.

### Jurisdiction and Venue

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## II.

### Background

#### A.    Commencement of Chapter 11 Case and Appointment of Trustee

On December 9, 2010, certain of the Prepetition Lenders commenced an involuntary chapter 11 bankruptcy petition (the "Involuntary Petition") against the Debtor. In connection with the Involuntary Petition, the Agent filed the *Motion for Appointment of an Interim and Permanent Chapter 11 Trustee for South Edge, LLC (I) During the "Gap" Period and (II) on a Permanent Basis* [Docket No. 7] (the "Trustee Motion").[4]

On February 3, 2011, following a contested trial on the Involuntary Petition, the Court entered an order for relief under chapter 11 of the Bankruptcy Code against the Debtor [Docket No. 400] and issued an order directing the appointment of a chapter 11 trustee [Docket No. 401]. On February 20, 2011, the Office of the United States Trustee (the "UST") designated the Trustee to serve as trustee for the estate of South Edge, LLC. [Docket No. 441] and on February 23, 2011, the Court entered an order approving the appointment of the Trustee as chapter 11 trustee for the Debtor (the "Appointment Order") [Docket No. 449].

---

[3] Unless otherwise stated, capitalized terms used in this Legal Memorandum shall have the meanings ascribed to them in the Motion.

[4] As the Court is well aware, the Involuntary Petition and the Trustee Motion were filed after two years of disputes and litigation among the Builder Members (defined below) and between the Members and the Agent. The Trustee will not repeat the facts that lead to the commencement of the Chapter 11 Case.

**B.      The Debtor, It's Primary Assets and Economic Stakeholders**

The Debtor is a special-purpose, limited liability company that owns the real estate development project known as Inspirada (the "Project"), which, at the start of its development encompassed nearly 2,000 acres.  The Project was designed as a joint venture of builders who are South Edge's members (the "Builder Members") for the purpose of pooling their resources to acquire raw land and build common infrastructure on a cost-effective basis with (1) $585 million in loans pursuant to the Credit Agreement, (2) $102 million in LID T-18 bonds ("LID Proceeds"), and (3) capital contributions from the Builder Members.

In addition to the real estate and personal property assets that comprise the Project, the Debtor's primary assets include, among others, (i) approximately $900,000 in cash, of which, approximately $400,000 is encumbered by the Agent's liens, and approximately $500,000 is unencumbered, but subject to alleged interests asserted by certain of the Builder Members, (ii) an alleged ownership interest in more than $26 million in cash (the "Disputed MI Deposit") that is currently maintained in the name of  Focus South Group, LLC ("Focus") in an account at JPMorgan, and related claims against Focus and Holdings Manager, LLC ("Focus Manager"), an affiliate of Focus which is the former General Manager of South Edge (collectively, the "Focus Claims"); (iii) the right to realize the LID Proceeds; and (iv) claims against equity members of the Debtor other than Focus under a range of legal theories.

**1.      The Builder Members**

The Builder Members originally were comprised of each of KB Home Nevada, Inc., Coleman-Toll Limited Partnership, Pardee Homes of Nevada, Beazer Homes Holdings Corp., Meritage Homes of Nevada ("Meritage"), Focus, Alameda Investments, LLC ("Alameda"), and Kimball Hill Homes Nevada, Inc. ("Kimball Hill").  In April 2008, Kimball Hill filed for bankruptcy protection.  In January 2009, Alameda did the same.  The Trustee understands that each of Kimball Hill and Alameda purported to reject the operating agreement of the Debtor (as amended, modified and supplemented from time to time, the "Operating Agreement"), in its respective bankruptcy case.

As the sole owners of the Debtor, the Builder Members managed the Debtor's affairs largely through a management committee (the "Management Committee") comprised of committee members appointed by each of the Builder Members. Among other powers, the Management Committee established the business plan for the Debtor, approved all of the Debtor's material contracts, approved actions relating to enforcement of remedies against Members for failure to fund capital contributions, approved master plan documents, and determined the amount of capital contributions required of each Builder Member from time to time.[5]

## 2.      The Agent and Prepetition Lenders

As briefly referenced above, to partially finance the purchase and development of the Project, pursuant to the Credit Agreement the Debtor took out loans ("Prepetition Loans") which, in the aggregate, totaled $585,000,000 in principal amount. JPMorgan is the Agent under the Credit Agreement and is also a lender thereunder (hereafter, lenders under the Credit Agreement shall be referred to collectively as the "Prepetition Lenders").

As security for the Prepetition Loans, the Agent and the Prepetition Lenders obtained liens on all of the Debtor's land and related collateral, including its right to receive LID Proceeds held by the City of Henderson.[6] The Agent asserts that the Debtor's outstanding indebtedness to the Agent and the Prepetition Lenders presently amounts to approximately $382 million, an amount the Trustee has acknowledged in the Trustee's Consent to be owing solely for purposes of the Plan Support Agreement, the Plan Term Sheet and the Plan of Reorganization, with a full reservation of the Trustee's rights. Without question, however, the claims of the Agent and the Prepetition Lenders represent the lion's share of the debt in this Chapter 11 Case.

---

[5] Holdings Manager LLC, an affiliate of Builder Member Focus, was the Debtor's "General Manager." Holdings Manager was responsible for conducting, in the name of and on behalf of the Debtor, the day-to-day operations of the Debtor. Another affiliate of Focus, Landtek, LLC, was engaged as construction manager for the Project.

[6] See *Third Stipulation Extending Trustee's Authorization To Use Cash Collateral* (the "Third Extension Stipulation"), which is attached to the *Notice of Stipulation Extending Trustee's Authorization To Use Cash Collateral* [Docket No. 766] filed with the Court on June 30, 2011.

C.    **Status of Project**

Until the Trustee's appointment, no substantive work had taken place on the Project since the spring of 2008. The cessation in work was due, among other reasons, to disputes among (i) certain of the Builder Members and Focus and (ii) the Builder Members and the Agent. Those disputes precipitated a decision-making gridlock and funding shortfalls that, ultimately, led to complex multi-party litigation and the commencement of this Chapter 11 Case.

D.    **Recovery of LID Proceeds**

As suggested above, the Project, by design, is to be partially financed by LID Proceeds. In April 2006, the City of Henderson (the "City") raised approximately $102 million by issuing T-18 Local Improvement District (Inspirada) Limited bonds ("LID Bonds") to purchase from South Edge, as developer, certain roads and other public infrastructure (including, among such other infrastructure, parks, utilities, drainage systems, and sewer and water and storm drain pipelines) after they were built by the Debtor.

LID Proceeds are disbursed by the City in increments that relate to the ongoing completion of the infrastructure build-out of the Project. Most LID Proceeds have not been paid to South Edge or its Estate because the related infrastructure construction in LID T-18 has not been completed. As of the date hereof, approximately $89.7 million in LID Proceeds remain undisbursed. Certain of those projects, however, *are* substantially complete, requiring only incremental additional work to reach completion. If the Trustee is able to complete such improvements and otherwise fulfill the conditions precedent to recovering the LID Proceeds, the Estate will be able to recover approximately $34.1 million in LID Proceeds,[7] at an actual cost to complete of approximately $6.2 million.

---

[7] Although approximately $34.1 million in LID Proceeds is available for recovery, the actual amount of LID Proceeds that the Trustee anticipates she will be able to recover during the term of the TIP Loan Agreement is approximately $20.8 million. The Trustee projects that the remaining balance of the recoverable LID Proceeds will be recoverable after the Maturity Date. Any reference herein to the "Estate" in the context of the recovery of approximately $34.1 million in LID Proceeds should be read to mean the "Estate and/or any successor to the Estate."

The Trustee intends to use the TIP Facility to fund the completion of those already substantially completed LID segments that will entitle the Estate to recover LID Proceeds in amounts significantly in excess of the actual cost of completion.

**E.    Prior Short Term Advance and Use of Cash Collateral**

On April 8, 2011, the Court entered an order [Docket No. 568] approving on an interim basis that certain *Stipulation Providing For Post-Petition Financing and Use of Cash Collateral* (as subsequently amended to, among other things, address concerns of the Builder Members, the "Cash Collateral Stipulation"). Pursuant to that order, the Court authorized the Trustee's (i) receipt of a short term advance of approximately $500,000 sourced from the Disputed MI Deposit, and (ii) subject to the entry of a final order, use of cash collateral through April 29, 2011. The proceeds of the short-term advance were used to pay outstanding LID assessments due in the month of April. Following payment of those assessments, the Estate became eligible to recover, and did in fact recover, LID Proceeds from the City of approximately $1 million from which the Trustee repaid the funds advanced from the Disputed MI Deposit. The Cash Collateral Stipulation was approved by the Court on a final basis by order entered on April 21, 2011 [Docket No. 624]. Thereafter, the Trustee and Agent have entered into three stipulations extending the period during which the Trustee may use cash collateral. The Trustee currently is authorized to use the cash collateral remaining from the LID Proceeds recovered from the City through July 1, 2011, and has obtained the Agent's consent to continue to utilize that cash collateral through July 29, 2011. *See* Third Extension Stipulation.

**F.    The Settlement**

The early stages of this Chapter 11 Case were fraught with disputes and litigation among the Agent and the Builder Members regarding a myriad of issues, including, but not limited to, the involuntary commencement of this Chapter 11 Case, the appointment of the Trustee, and disparate views as to the direction the Trustee should take in reinvigorating and moving the Project forward and developing an exit from the Chapter 11 Case. As a consequence of these disputes and of the Estate's need to recover assets that were not within the Trustee's

1  immediate possession, the Trustee and her professionals immediately commenced investigations

2  of the Estate's rights and remedies against various parties, including the Estate's potential

3  litigation claims against the Builder Members and the Trustee's claims against Focus for

4  turnover of documents and the Disputed MI Deposit, and engaged in numerous discussions with

5  the various constituencies to determine how best to recover value for the Estate and, ultimately,

6  resolve this Chapter 11 Case.  To that end, as recently as May 20, 2011, the Trustee commenced

7  an adversary proceeding to recover on the Focus Claims.

8         In recent weeks, the Settling Builders[8] and the Agent, on behalf of itself and the

9  Prepetition Lenders, the key economic constituents of the Estate, negotiated the Plan Term Sheet

10  and Plan Support Agreement so as to resolve their disputes and allow the Debtor the opportunity

11  to make a timely exit from this Chapter 11 Case.  Implementation of the Plan Support Agreement

12  will depend upon the confirmation of what will be the jointly proposed chapter 11 Plan of

13  Reorganization, the terms of which are generally described in the Plan Term Sheet.  As the

14  Consenting Lenders that are parties to the Plan Support Agreement hold more than 92% in dollar

15  amount of the Prepetition Loans and represent more than 94% in number of the Prepetition

16  Lenders, it reasonably may be concluded that the Plan Support Agreement has the overwhelming

17  support of the largest creditor constituency in this Chapter 11 Case.

18         Although the Trustee is not a party to the Plan Support Agreement and will not be

19  a proponent of the Plan, the effectiveness of the Plan Support Agreement was conditioned upon

20  the Trustee's consenting to the provisions of the Plan Support Agreement.  Plan Support

21  Agreement, ¶ 2.  On June 8, 2011, after considering the Plan Support Agreement and the

22  pathway it creates for a timely exit from this Chapter 11 Case, the Trustee provided consent

23  subject to the terms and provisions of the Trustee's Consent that was heavily negotiated between

24  the Trustee and the Settling Builders.  The Trustee's Consent makes clear that:

25

26  _____

27  [8] The only Builder Members that are not party to the Settlement Agreement (other than Alameda and

28  Kimball Hill, each of which filed for bankruptcy and rejected the Operating Agreement) are Focus and
Meritage.

#4845-7068-4681                           -13-

The Trustee's role in the Case shall not be circumscribed in any manner other that as agreed to by the Trustee in this Consent, nor shall any restriction on the services to be performed by the Trustee or her professionals, as reflected in the Budget, restrict her from performing her statutory duties, fulfilling her fiduciary duties, or complying with any order of the Bankruptcy Court or any other court having jurisdiction over the Case....

Trustee's Consent, ¶ 13.

### G.   The TIP Facility

A key component of the Plan Support Agreement is that the Settling Builders provide to the Trustee financing through an anticipated late-November effective date of the Plan that will provide a funding source for payment in full of already accrued and unpaid and anticipated allowed administrative expenses, fund the build-out of the Project's infrastructure (which will result in Estate recovery of a substantial portion of the LID Proceeds), and otherwise preserve the value of the Estate's assets.  The TIP Facility and the Trustee's proposed use of the proceeds of the TIP Facility and of the LID Proceeds are intended to address the Settling Builders' financing obligations under the Plan Support Agreement.

The Builder Lenders are comprised of affiliates of each of the Settling Builders. As described at the outset of the Motion, pursuant and subject to the provisions of the TIP Facility:

1.      the Builder Lenders will advance to the Trustee up to $4.0 million following the entry of the Interim Financing Order and, following the entry of the Final Financing Order, up to a total of $21.4 million through the Maturity Date of the TIP Facility;

2.      the Trustee may use the advances to pay various expenses of administration and operation, consistent with the heavily negotiated Budget that the Trustee believes will be adequate to address the Estate's anticipated financial needs and which has been approved by both the Builder Lenders and the Agent,[9] a copy of which is attached to the TIP Loan Agreement;

---

[9] The Agent's consent to the terms of the TIP Loan Agreement is conditional, and at this time there remain certain unresolved issues between the Settling Builders and the Agent in the Budget.  Therefore, the Agent has reserved its right to withdraw its consent to the TIP Loan Agreement at any time before the start of the hearing on the Interim Order on July 20, 2011.

1           3.     to the great benefit of the Estate and vastly favorable to prevailing market

2  conditions for debtor-in-possession financing, unless a Default occurs under the TIP Loan

3  Agreement the advances made under the TIP Facility will be interest free;

4           4.     pursuant to § 364(d) of the Bankruptcy Code, the Builder Lenders will

5  receive as security for the Obligations first priority priming liens on any and all existing or future

6  LID Proceeds (their sole collateral), which liens, subject to certain Permitted Liens, will be

7  senior to all other liens, encumbrances and security interests in the Collateral, including, but not

8  limited to, those of the Agent;

9           5.     the Builder Lenders will be granted a Superpriority Claim on account of

10  all Obligations under the TIP Facility;

11           6.     the Builder Lenders have agreed that the Trustee may use the advances

12  received pursuant to the TIP Facility to fund the payment of the allowed fees and expenses of the

13  Trustee and the Trustee's professionals;[10] and

14           7.     the Trustee has agreed that, until the Maturity Date (other than as a result

15  of the effective date of a Plan of Reorganization), she will not take actions inconsistent with the

16  Trustee's Consent, will not pursue litigation or claims against the Builder Lenders or Settling

17  Builders, and, subject to the terms of the TIP Loan Agreement, absent the consent of the Builder

18  Lenders, will not file, support or consent to a plan of reorganization other than the Plan of

19  Reorganization, sell or compromise material Estate assets, allow or settle any claim in excess of

20  $25,000, enter into any contract with a cost to the Estate in excess of $25,000 (other than a

21  contract relating to an expenditure in the Budget if the Builder Lenders have been given an

[10] The Budget does not constitute a cap on such fees and expenses upon confirmation of the Plan of Reorganization. It is a guide and limits in real time the amounts that will be available to pay the Trustee and the Trustee's professionals pursuant to the TIP Facility. If the allowed fees and expenses of the Trustee and the Trustee's professionals exceed the amounts identified in the Budget, such allowed fees and expenses will need to be paid in full pursuant to the Plan and the requirements of the Bankruptcy Code. If the Settlement Agreement is terminated, the Trustee's rights to be paid in full for any fees and expenses allowed through the date of termination in excess of the amounts in the Budget from the Agent's collateral are fully reserved. The inclusion of fees and expenses of the Trustee and her professionals in the Budget is without prejudice to the rights of all parties in the Chapter 11 Case with respect to timely objection to the allowance of such fees and expenses.

#4845-7068-4681       -15-

1  opportunity to bid on the contract), amend plans, permits or specifications for any improvements

2  to South Edge's property or amend South Edge's Development Plan, its Acquisition Agreement

3  with the City, or any other material agreements relating to the City of Henderson, the LID, or

4  other governmental entities.  In no event shall funds advanced by the Builder Lenders be used to

5  fund the pursuit or investigation of any claims against the Builder Lenders, the Settling Builders,

6  or their insiders or affiliates, or to oppose the Plan of Reorganization.

7      The TIP Facility does not require the Trustee to determine the validity,

8  enforceability, priority or amount of any prepetition claim of the Builder Lenders, and the

9  Trustee has reserved all her rights in that regard pursuant to the Stipulation Extending Deadline

10  For Settling Builders To File Proofs Of Claim Or Interest [Docket Number 759].  Although the

11  TIP Facility prohibits the pursuit of litigation or claims against the Builder Lenders through the

12  Maturity Date, it does not release the Builder Lenders from any claims held by the Estate or,

13  after the Maturity Date,  prejudice in any way the Trustee's rights to assert such claims.

14      The TIP Facility will allow the Trustee to complete certain LID infrastructure

15  projects which, in turn, will permit the Estate to realize reimbursements of approximately $34.1

16  million in LID Proceeds that would not otherwise be available to the Estate.  Although the liens

17  against the LID Proceeds to be granted to the Builder Lenders under the TIP Facility will prime

18  the Agent's liens against the LID Proceeds, the Agent does not object to such priming and to the

19  use of the LID Proceeds, subject to the Budget and the other terms and conditions of the TIP

20  Loan Agreement.  The Trustee contends that the Agent and the Prepetition Lenders are

21  adequately protected by the TIP Facility and the Trustee's use of the LID Proceeds Collateral

22  because, among other reasons, (i) to the extent of any diminution in the value of their collateral

23  caused by the TIP Facility or the use of their Collateral and subject to the terms of the TIP Loan

24  Agreement and Interim Order, they will be receiving (a) second in priority secured priming liens

25  in the Collateral, and (b) first in priority secured priority priming liens against substantially all

26  other assets of the Estate (but excluding avoidance actions and the proceeds thereof); (ii) the TIP

27  Facility implements a settlement that, if successful, will result in the near-term satisfaction of the

28  Estate's outstanding obligations on the Prepetition Loan through a consensual plan of

#4845-7068-4681                    -16-

reorganization; (iii) the Trustee, as the sole authorized representative of the Estate, is the only party capable of recovering the LID Proceeds; and (iv) the LID Proceeds that will be reimbursed as a result of the Trustee's use of the advances under the TIP Facility are expected to exceed the amounts that will be advanced (meaning that, after repayment of the Obligations to the Builder Lenders, the Estate would hold several million dollars of cash that it does not now hold and that, but for the TIP Facility, would not be recoverable). Consequently, the TIP Facility places the Agent and Prepetition Lenders at little risk while offering them significant upside.

The Trustee has no present source of significant financing or liquidity other than the TIP Facility. Absent such a source, the Estate very likely would be rendered administratively insolvent, the partially and yet-to-be completed major Project infrastructure would remain partially or completely unfinished, unpaid property taxes and LID assessments would accrue as senior liens against the Project, the value of Estate's property would be significantly impaired, the Trustee would have to rely on the Bankruptcy Court Section 506(c) surcharge rights granted and preserved under the Cash Collateral Stipulation to address accrued and unpaid Trustee and professional fees, the Trustee may be required to convert the Chapter 11 Case to a liquidation case under chapter 7, and a largely consensual exit from bankruptcy premised on resolution of significant litigation and continuation of the development of the Inspirada Project would be frustrated and lost.

Based on the foregoing, the Trustee submits that the immediate approval and implementation of the TIP Facility and the proposed use of the LID Proceeds, subject to the Budget, is in the best interests of the Estate and, therefore, should be approved.

### III.

### Argument

A.    **The Trustee Has Satisfied the Legal Requirements for Approval of the TIP Facility.**

Bankruptcy Code section 364 states that a trustee that is authorized to operate the business of a debtor may obtain financing either in the ordinary course of business or outside the ordinary course of business. First, Bankruptcy Code section 364(a) allows the trustee to obtain

1   unsecured credit and to incur unsecured debt in the ordinary course of business.  11 U.S.C.

2   § 364(a).  Second, after notice and a hearing, the Court may authorize a trustee to obtain

3   financing outside the ordinary course of business.  Id. at § 364(b).

4           Bankruptcy Code section 364 is structured with an escalating series of

5   inducements that a trustee may offer to attract postpetition credit outside of the ordinary course

6   of business.  In re Photo Promotion Assoc., Inc., 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), aff'd,

7   881 F.2d 6 (2d Cir. 1989).  Specifically, when a trustee cannot obtain "basic" unsecured

8   postpetition credit, more specialized forms of credit may be obtained under certain prescribed

9   conditions.  See In re T.M. Sweeney & Sons LTL Servs., Inc., 131 B.R. 984, 989 (Bankr. N.D.

10  Ill. 1991).  Initially, Bankruptcy Code section 364(b) states that the postpetition financing may

11  be allowable as an administrative expense under Bankruptcy Code section 503(b)(1).  11 U.S.C.

12  § 364(b).  If lenders are unwilling to extend credit to a trustee on a general administrative

13  expense priority basis, then, upon notice and a hearing, further inducements can be offered,

14  including (i) superpriority administrative expense status for the postpetition credit, (ii) liens on

15  any unencumbered property of the estate, and (iii) liens junior to existing liens on property of the

16  estate.  Id. at § 364(c)(1)-(3).

17          Should the Trustee be unable to obtain credit under either Bankruptcy Code

18  section 364(b) or (c), then the Court, after notice and a hearing, may authorize the Trustee to

19  obtain credit secured by a lien on Estate property that primes or is equal in priority to existing

20  liens on such property, provided that the Trustee can provide any existing lienholder with

21  adequate protection of its interests.  Id. at § 364(d)(1)(A) and (B).

22          **1.      The Trustee Is Unable to Obtain Similar Financing From Other**
            **Sources.**
23

24          To demonstrate that the requisite credit is not obtainable on an unsecured,

25  superpriority or junior lien basis, the trustee need only demonstrate "by good faith effort that

26  credit was not available" without the protections afforded to potential lenders by section 364(b)

27  or (c) of the Bankruptcy Code.  Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe

28  Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit

#4845-7068-4681                                    -18-

1   from every possible lender before concluding that such credit is unavailable." Id. at 1088; see

2   also In re Ames Dept. Stores, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (holding that debtor made

3   a reasonable effort to secure financing when it selected the least onerous financing option from

4   the two remaining lenders); In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987)

5   ("Given the 'time is of the essence' nature of this type of financing, we would not require this or

6   any debtor to contact a seemingly infinite number of possible lenders."). Where few lenders are

7   likely to be able and willing to extend the necessary credit to a trustee, "it would be unrealistic

8   and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In

9   re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).

10              This threshold test is certainly satisfied here.  First, the Agent and the Prepetition

11  Lenders are only providing the Estate with financing in the form of the existing consent to use of

12  cash collateral or securing advances from the Disputed MI Deposit account, with or without the

13  consent of Focus during the pendency of the adversary proceeding commenced by the Trustee to

14  effect a turnover to the estate of the funds in that account.  Second, the interest and fee-free

15  financing offered under the TIP Facility is unique and is the result of the Builder Lenders' desire

16  to resolve exposure to the Agent under repayment guaranties and maintain ownership of the

17  Project properties. The Builder Lenders will not profit from the TIP Facility other than through

18  their ability to implement the Plan Support Agreement and thereby (i) enable the Debtor to exit

19  from bankruptcy and (ii) acquire control of the Project within the next several months.  The

20  Trustee asks that the Court take judicial notice of the fact that the commercial lender marketplace

21  does not typically offer loans on which the lenders will not profit through the imposition of

22  interest and fees.

23              Finally, although the TIP Facility will grant the Builder Lenders a priming lien on

24  the LID Proceeds, the Agent and the Consenting Lenders do not object to the TIP Facility and its

25  priming feature, as an element of the Plan Support Agreement.  In fact, by virtue of the Plan

26  Support Agreement, the Agent and the Consenting Lenders cannot support another party's

27  provision of a postpetition loan facility.

28

#4845-7068-4681                                    -19-

1        Based on the foregoing, the Trustee does not believe that she could obtain

2   postpetition financing on any basis (priming or otherwise) from a source other than the Builder

3   Lenders.

4            **2.       The Agent and Prepetition Lenders are Adequately Protected.**

5        With respect to the adequate protection requirement under Bankruptcy Code

6   section 364(d)(1)(B), the burden of proving such adequate protection rests with the Trustee.  11

7   U.S.C. § 364(d)(2).  The Bankruptcy Code states that adequate protection may be provided by a

8   cash payment or periodic cash payments to the secured creditor, the grant of an additional or

9   replacement lien, or such other relief "as will result in the realization by such entity of the

10  indubitable equivalent of such entity's interest." Id. at § 361.  Courts have noted that this

11  definition of adequate protection "confers upon the parties and the courts flexibility." In re 495

12  Central Park Avenue Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); see also Resolution

13  Trustee Corp. v. Swedeland Development Group (In re Swedeland Development Group), 16 F.3d

14  552, 564 (3rd Cir. 1994) ("Whether protection is adequate 'depends directly on how effectively it

15  compensates the secured creditor for loss of value' caused by the superpriority given the post-

16  petition loan.").  Furthermore, where the secured creditor's interest in the value of the collateral

17  is not diminishing by its use, sale or lease, it follows that the secured creditor's interest is

18  adequately protected.  See U.S. Savings Assoc. of Tex. v. Timbers of Inwood Forest Assoc. Ltd.,

19  484 U.S. 365, 369-73 (1988).

20        In light of the terms of the Plan Support Agreement and the adequate protection

21  offered to the Agent (on behalf of the Prepetition Lenders), the Agent has consented to the

22  priming lien on the Collateral. See e.g.,  Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117,

23  122 (N.D. Ga. 1989) ("The fact that . . . undersecured lienholders either did not object or

24  withdrew their objections to the superpriority financing must mean that they expect to derive

25  some benefit from the transaction . . . . [B]y tacitly consenting to the superpriority lien, those

26  creditors relieved the debtor of having to demonstrate that they were adequately protected").

27

28

#4845-7068-4681                          -20-

Even if the Agent and the Prepetition Lenders objected to the terms of the TIP Facility, the Trustee submits that their primed security interests in the LID Proceeds nonetheless would be adequately protected by the TIP Facility. The TIP Facility will enable the Trustee to complete LID infrastructure build-outs that are a prerequisite for the receipt by the Estate of $34.1 million in LID Proceeds reimbursements, an amount in excess of the funds that will be lent to the Trustee on a priming basis and repaid from the LID Proceeds generated thereby. As of the date hereof, approximately $89.7 million in LID Proceeds contained in the Acquisition Fund remain undisbursed. Certain of those projects, however, *are* substantially complete, requiring only incremental additional work to reach completion. If such improvements can be completed and the other conditions precedent to the recovery of the LID Proceeds can be fulfilled, the Estate will be able to recover approximately $34.1 million in LID Proceeds, at an actual cost to complete of approximately $6.2 million. The Trustee intends to use the TIP Facility to fund the completion of those already substantially completed LID segments that will entitle the Estate to recover LID Proceeds in amounts significantly in excess of the actual cost of completion. Those LID Proceeds would not be available to the Estate absent the TIP Facility.

Moreover, the TIP Facility implements a settlement that, if successful, will result in the near-term satisfaction of the Estate's outstanding obligations on the Prepetition Loan through a consensual plan of reorganization. The TIP Facility, together with the Settlement, also will allow the Estate and the Settling Parties to avoid what inevitably would be time-consuming and expensive litigation. The TIP Facility also ensures the ongoing administrative solvency of the Estate and preserves the value of the Agent's and the Prepetition Lenders' collateral. Finally, the Trustee believes that the resulting cost savings will only enhance the overall value to be recovered by the Estate's economic stakeholders. The TIP Facility is critical to the implementation of the Settlement, and is intended to bridge the Estate to a near-term exit from this Chapter 11 Case through a confirmed plan of reorganization that will have the consent of the largest creditor and a super-majority of the equity constituents in the Chapter 11 Case, provide necessary consideration for the fair and appropriate treatment of all other constituencies, and get the Project back on track after languishing to the detriment of the City of Henderson, current

residents of the Project and other parties in interest over the past few years.  The Trustee believes

the TIP Facility is in the best interests of the Estate and should be approved by the Court.

## B.    The Trustee's Use of the LID Proceeds Should Be Authorized.

Pursuant to section 363(c)(2) of the Bankruptcy Code, the Trustee may not use

cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the

provisions of this section."  11 U.S.C. § 363(c)(2).  Even with secured creditor consent,

Bankruptcy Code section 361 provides that secured creditors are entitled to adequate protection

where the use of collateral decreases the value of such lenders' interest in the collateral.  11

U.S.C. § 361(1)-(3); see also Timbers, 484 U.S. at 369-73 (the "interest in property" entitled to

protection is "the value of the collateral" that secures the claim).  The legislative history of

section 361 makes clear that bankruptcy courts are given broad flexibility in deciding what

constitutes adequate protection on a case-by-case basis, stating:

> This section specifies the means by which adequate protection may be
> provided.  It does not require the court to provide it.  To do so would place
> the court in an administrative role.  Instead, the trustee or debtor in
> possession will provide or propose a protection method.  If the party that is
> affected by the proposed action objects, the court will determine whether
> the protection provided is adequate.  The purpose of this section is to
> illustrate means by which it may be provided and to define the contours of
> the concept.

H.R. Rep. No. 95-595, at 338, 95th Cong., 1st Sess. (1977); see also Swedeland, 16 F.3d at 564

("[A] determination of whether there is adequate protection is made on a case by case basis.");

MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-97 (10th Cir. 1987)

(same); In re Martin, 761 F.2d 472, 474 (8th Cir. 1985) (same).

Courts also generally give broad deference to the business decisions of a trustee

or a debtor in possession.  See Simantob v. Claims Prosecutor, LLC (In re Lahijani), 325 B.R.

282, 289 (B.A.P 9th Cir. 2005) ("Ordinarily, the position of the trustee is afforded deference,

particularly where business judgment is entailed in the analysis or where there is no objection.");

Walter v. Sunwest Bank (In re Walter), 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1987); In re Pilgrim's

1  Pride Corp., 401 B.R. 229, 237 (Bankr. N.D. Tex. 2009) ("In applying the simple business

2  judgment test, courts are adjured to defer to the debtor in possession or trustee; if a valid business

3  reason is shown for a transaction, the transaction is to be presumed appropriate."); see also Naert

4  v. Daff (In re Washington Trust Deed Service Corp.), 224 B.R. 109 (B.A.P. 9th Cir. 1998).

5          Here, for all of the reasons set forth above, the Trustee believes that the use of the

6  LID Proceeds as contemplated in the Budget is in the Estate's best interests.  The Trustee's use

7  of the LID Proceeds, subject to and in accordance with the Budget, therefore represents a sound

8  exercise of the Trustee's business judgment.  Furthermore, the Agent's consent satisfies the

9  requirements of Bankruptcy Code sections 361 and 363(c)(2)(A) (use of cash collateral with

10  consent of secured party or other interested party, and grant of adequate protection).  Finally, for

11  all of the reasons set forth above, the Trustee submits that the Agent and the Prepetition Lenders'

12  interests in the LID Proceeds are adequately protected.

13                                        **IV.**

14                              **Final Hearing Date**

15          Pursuant to Bankruptcy Rules 4001(b) and (c), the Trustee requests that the Court

16  schedule a hearing to consider approval of the Motion on a final basis such that, if the Court

17  decides to approve the Motion on a final basis, a Final Order can be entered by no later than

18  August 12, 2011.

19                                        **V.**

20                                    **Notice**

21          Notice of this Motion will be given by hand delivery and/or electronic means to:

22  (i) the Office of the United States Trustee for the District of Nevada; (ii) counsel for the Builder

23  Lenders, Stutman, Treister & Glatt P.C., 1901 Avenue of the Stars, 12th Floor, Los Angeles, CA

24  90067, Attention: Robert A. Greenfield and K. John Shaffer; (iii) counsel for the Agent,

25  Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104, Attention:

26  James Hough and Norman Rosenbaum; Morrison & Foerster LLP, 425 Market Street, San

27  Francisco, CA 94105, Attention: G. Larry Engel; and Lewis and Roca LLP, 3993 Howard

28  Hughes Parkway, Suite 600, Las Vegas, NV 89169-5996, Attention: Robert M. Charles, Jr.; (iv)

counsel to Focus, White & Case LLP, 633 West Fifth Street, Suite 1900, Los Angeles, CA 90071-2007, Attention: Roberto Kampfner; (v) counsel to Meritage, Fennemore Craig, 300 S. Fourth Street, Suite 1400 Las Vegas, Nevada 89101, Attention Laurel E. Davis; (vi) counsel to the Debtor, Klee, Tuchin, Bogdanoff & Stern LLP, 1999 Avenue of the Stars, Thirty-Ninth Floor, Los Angeles, CA 90067-6049, Attention: David M. Stern; (vii) the top twenty unsecured creditors of the Estate (exclusive of the Prepetition Lenders) identified by the Trustee in Schedule F of the Debtors' Schedules of Assets and Liabilities; (viii) the City of Henderson; (ix) the Indenture Trustee for the bonds issued by the City of Henderson in connection with Local Improvement District T-18; and (x) all other parties requesting notices pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The Trustee submits that no other or further notice need be provided.

Any objections to the proposed Final Order shall be in writing and shall be filed with the Court and served by overnight mail service on: (i) counsel for the Trustee (as identified above); (ii) the Office of the United States Trustee; (iii) counsel for the Builder Lenders (as identified above); and (iv) counsel for the Agent (as identified above), so that it is received by no later than July 19, 2011.

# VI.

## Conclusion

Based upon all the foregoing, the Trustee respectfully requests that the Court enter the Interim Order, in substantially the form attached hereto as Exhibit 1, and the Final Order, the form of which will be submitted to the Court prior to the Final Hearing, and grant such other relief as the Court deems just and proper.

Dated:  July 8, 2011

Respectfully submitted,

By: ___/s/  Robert J. Moore_____
MILBANK, TWEED, HADLEY & McCLOY LLP
Robert J. Moore (CA State Bar No. 77495)
David B. Zolkin (CA State Bar No. 155410)
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017

*Counsel for*
*Chapter 11 Trustee*

SCHWARTZER & McPHERSON LAW FIRM
Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146-5308

*Local Counsel 11 for*
*Chapter 11 Trustee*

# EXHIBIT 1

#4845-7068-4681

1

2

3

4

5

6

7  Robert J. Moore (CA State Bar No. 77495)              Lenard E. Schwartzer (NV State Bar No. 399)
   David B. Zolkin (CA State Bar No. 155410)             Jeanette E. McPherson (NV State Bar No. 5423)
8  MILBANK, TWEED, HADLEY & McCLOY LLP                   SCHWARTZER & MCPHERSON LAW FIRM
   601 South Figueroa Street, 30th Floor                 2850 South Jones Boulevard, Suite 1
9  Los Angeles, California 90017                         Las Vegas, Nevada 89146-5308
   Telephone:    (213) 892-4000                          Telephone:    (702) 228-7590
10 Facsimile:    (213) 629-5063                          Facsimile:    (702) 892-0122

11 *Counsel For Chapter 11 Trustee*                       *Local Counsel For Chapter 11 Trustee*

12                       **UNITED STATES BANKRUPTCY COURT**

13                             **DISTRICT OF NEVADA**

14 In re:                                    | **Chapter 11**

15 SOUTH EDGE, LLC,                          | **Case No. BK-10-32968 (BAM)**

16                    Debtor.                | **INTERIM ORDER (I) AUTHORIZING
17                                           | CHAPTER 11 TRUSTEE TO OBTAIN
                                             | SENIOR PRIMING SECURED
18                                           | POSTPETITION FINANCING; (2)
                                             | AUTHORIZING CHAPTER 11
19                                           | TRUSTEE'S USE OF CASH
                                             | COLLATERAL; (3) DEEMING AGENT,
20                                           | PREPETITION LENDERS AND
                                             | BUILDERS LENDERS TO BE
21                                           | ADEQUATELY PROTECTED; AND (4)
                                             | SCHEDULING A FINAL HEARING**
22

23                                           | Hearing Date:  July 20, 2011
                                             | Hearing Time:  9:30 a.m.
24

25        THIS MATTER having come before the Court upon the motion (the "Motion") of

26 Cynthia Nelson, the chapter 11 trustee (the "Trustee") in the chapter 11 bankruptcy case (the

27

28 #4847-0483-8153

"Chapter 11 Case") of South Edge, LLC ("South Edge" or the "Debtor"), seeking, among other things, entry of an interim order (this "Interim Order"):[1]

       (i)    authorizing and approving the Trustee to obtain postpetition financing in an aggregate principal amount not to exceed $21.4 million, with an initial, interim borrowing limit of up to $4.0 million (the "TIP Facility"), pursuant to that certain Trustee Financing Agreement(the "TIP Loan Agreement"; and together with any related documents required to be delivered by or in connection with the TIP Loan Agreement, the "TIP Loan Documents"), by and among the Trustee, as borrower, and certain affiliates of the Settling Builders, as lenders (the "Builder Lenders"), with such TIP Facility secured by first priority priming liens (the "TIP Financing Liens") on all of the Debtor's interests in the Collateral (defined below), pursuant to section 364(d) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code;

       (ii)    authorizing the use of LID Proceeds, as cash collateral of the Agent, the Prepetition Lenders and the Builder Lenders, to pay for the chapter 11 estate's (the "Estate") administrative expenses and repay the loans made pursuant to the TIP Facility, in accordance with the Terms of the TIP Loan Documents;

       (iii)    granting the Agent, on behalf of the Prepetition Lenders, adequate protection for the use of its cash collateral and any diminution in the value thereof; and

       (iv)    scheduling a final hearing on the Motion (the "Final Hearing") for August [__], 2011 to consider entry of an order ("Final Order") granting the relief requested in the Motion on a final basis.

       Having considered the Motion, the TIP Loan Agreement, the Plan Support Agreement (in its redacted form), and the Trustee's Consent, and the record established and the evidence

---

[1] Any capitalized term used but not defined herein shall have the meaning ascribed to it in the Motion or the TIP Loan Agreement (defined below), as applicable.

submitted at the interim hearing on the Motion (the "Interim Hearing") and the statements of counsel at the Interim Hearing; finding that due and proper notice of the Motion and the Interim Hearing having been given, and the Interim Hearing having been held and concluded on July 20, 2011 in accordance with Bankruptcy Rules 2002, 4001 and 9014; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Estate pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Estate and its creditors and equity holders, and is essential for the continued operation of the Debtor's business and the preservation of the Estate's value; and it further appearing that the Trustee is unable to secure postpetition financing on terms and conditions that are better than those set forth in this Interim Order and the TIP Loan Agreement, that there is adequate protection of the Agent's and the Prepetition Lenders' interests in the LID Proceeds (i) against which the priming TIP Financing Liens are to be granted in favor of the Builder Lenders and (ii) that are to be used by the Trustee as cash collateral, that the Agent has consented[2] to the TIP Facility, including its priming lien feature, that the Agent has consented to the use of the LID Proceeds as cash collateral as set forth in this Interim Order and the TIP Loan Agreement, that the Agent, the Consenting Lenders and the Settling Builders (collectively, the "Settling Parties") are parties to the Plan Support Agreement, and that all objections, if any, to the entry of this Interim Order have been withdrawn, resolved or overruled by the Court, or continued to the Final Hearing; and having taken into consideration all pleadings filed with this Court, all proceedings held before the Court, and the evidence adduced in connection therewith in this Chapter 11 Case; and after due deliberation and consideration, and good and sufficient cause appearing therefor,

---

[2] The Agent's consent to the terms of the TIP Loan Agreement is conditional, and at this time there remain certain unresolved issues between the Settling Builders and the Agent in the Budget. Therefore, the Agent has reserved its right to withdraw its consent to the TIP Loan Agreement at any time before the start of the hearing on the Interim Order on July 20, 2011.

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.      <u>Involuntary Petition Date; Motion for Trustee</u>.  On December 9, 2010, certain of the Prepetition Lenders filed an involuntary chapter 11 petition against the Debtor (the "<u>Involuntary Petition</u>").  In connection with the Involuntary Petition, the Agent filed a motion seeking appointment of a chapter 11 trustee for the Debtor [Docket No. 7] (the "<u>Trustee Motion</u>").

B.      <u>Appointment of Trustee</u>.  On February 3, 2011, the Court entered an order for relief under chapter 11 of the Bankruptcy Code against the Debtor [Docket No. 400] and issued an order directing the appointment of a chapter 11 trustee [Docket No. 401].  On February 20, 2011, the Office of the United States Trustee (the "<u>UST</u>") designated the Trustee to serve as trustee for the Estate [Docket No. 441], and on February 23, 2011, the Court entered an order approving the appointment of the Trustee as chapter 11 trustee for the Debtor (the "<u>Appointment Order</u>").   [Docket No. 449].   No official committee of creditors has been appointed in this Chapter 11 Case.

C.      <u>Jurisdiction and Venue</u>.  This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      <u>Notice</u>. Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Trustee, either by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee for the District of Nevada; (ii) counsel to the Builder Lenders; (iii) counsel to the Agent; (iv) counsel to Focus South Group, LLC and its affiliates ("Focus"); (v) counsel to Meritage Homes of Nevada, Inc. and its affiliates ("Meritage"); (vi) counsel to the Debtor; (vii) the top twenty unsecured creditors

#4847-0483-8153                                                    -4-

of the Estate (exclusive of the Prepetition Lenders) identified by the Trustee in Schedule F of the Debtor's Schedules of Assets and Liabilities; (viii) the City of Henderson; (ix) the Indenture Trustee for the bonds issued by the City of Henderson in connection with Local Improvement District T-18; and (x) all other parties requesting notices pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). Under the circumstances, such notice of the Interim Hearing and the relief requested in the Motion constitutes due and sufficient notice and complies with sections 102(1), 364(c) and 364(d) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(b), 4001(c), and 9014.

   E.  Findings Regarding the Post-Petition Financing and Use of the LID Proceeds.

     (i)  On April 21, 2011, the Court entered a final order [Docket No. 624] that approved that certain Stipulation Providing For Postpetition Financing and Use of Cash Collateral (the "Cash Collateral Stipulation"), between and among JPMorgan, as Agent, the Trustee and certain the members of the Debtor and that was subsequently amended by periodic extensions [*see* Docket Nos. 676, 736 and [   ]] (collectively, the "Cash Collateral Orders"). The Cash Collateral Orders have provided the Trustee with continued use of the Agent's cash collateral through the date of this Interim Order.

     (ii)  As recently confirmed by the Trustee, *see* Docket No. 766, the Agent, for the benefit of the Prepetition Lenders holds a valid, perfected, priority and unavoidable lien in substantially all of the Debtor's real and personal property, including, but not limited to, the Collateral. The Collateral and the proceeds thereof constitutes the Agent's cash collateral under section 363(a) of the Bankruptcy Code.

     (iii)  Except as set forth in the TIP Loan Agreement with respect to the Collateral, the Agent's liens in and to the Debtor's and the Estate's assets granted to the Agent, for itself and the benefit of the Lenders, in accordance with the terms of the Cash Collateral Orders and the first priority nature thereof, shall be unaffected by the terms of the TIP Loan Agreement, the Interim Financing Order and the Final Financing Order and shall remain in full

1

2  force and effect.

3          (iv)    Need for Post-Petition Financing and Use of the LID Proceeds.  The

4  Estate has limited cash availability.  An immediate need exists for the TIP Facility so as to

5  enable the Trustee to fund among other things, (a) operating disbursements on account of, among

6  other items, the further construction of infrastructure segments of the Debtor's residential real

7  estate Project, commonly known as "Inspirada" (the "Project"), Project maintenance, security,

8  surety bond obligations, and the administration of reimbursements of LID Proceeds, (b) LID

9  Bond assessments and property taxes and (c) bankruptcy related disbursements, including UST

10  fees, the reasonable fees of the Agent's and Prepetition Lenders' professionals and the allowed

11  fees and expenses of the Trustee and her professionals.  The TIP Facility is essential to the

12  implementation of the Plan Support Agreement to which the Trustee has granted her consent,

13  subject to the terms and conditions of the Trustee's Consent.  The use of the TIP Facility

14  proceeds as contemplated in the Budget that is attached to the TIP Loan Agreement as Exhibit A

15  will enable the Trustee to preserve the value of the Estate by, among other things, completing

16  certain infrastructure construction at the Project, which, in turn, will lead to approximately

17  $$34.1 million in LID reimbursements that would otherwise be unavailable to the Estate (and/or

18  any successor to the Estate).  Without the TIP Facility and the use of the LID Proceeds, the

19  Estate and its economic stakeholders would suffer immediate and irreparable harm.

20          (v)    No Credit Available on More Favorable Terms.  The Trustee is unable to

21  obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative

22  expense.  The Trustee also is unable to obtain secured credit on more favorable terms and

23  conditions than those provided in the TIP Loan Agreement and this Interim Order. The Trustee

24  is unable to obtain credit for borrowed money without granting to the Builder Lenders (a) the

25  priming TIP Financing Liens on the Collateral pursuant to Bankruptcy Code sections 364(d); and

26  (b) superpriority administrative expense claim status pursuant to Bankruptcy Code section

27  364(c)(1), senior to all other administrative expenses under Bankruptcy Code sections 503(b)

28  #4847-0483-8153        -6-

and 507(b) (but pari passu with Agent's superpriority administrative expense claim granted to Agent, for the benefit of the Lenders, under the Cash Collateral Orders).

F.    <u>Extension of Financing</u>.  The Builder Lenders have indicated a willingness to provide financing to the Trustee in accordance with the TIP Loan Agreement and subject to, among other things, (i) the entry of this Interim Order and the subsequent entry of a Final Order, and (ii) findings by the Court that the Builder Lenders are good faith financiers, and that the Builder Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the TIP Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

G.    <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>.  The terms and conditions of the TIP Facility, the TIP Loan Agreement and the use of the LID Proceeds as contemplated therein are fair, reasonable, and the best available under the circumstances, reflect the Trustee's exercise of prudent business judgment consistent with her fiduciary duties, and are supported by reasonably equivalent value and consideration.  The TIP Facility and the use of the LID Proceeds were negotiated extensively, in good faith and at arms' length between the Trustee and the Builder Lenders, with the substantial input by and the consent of the Agent.  The credit to be extended under the TIP Facility is and will be so extended in good faith, and for valid business purposes and uses, the consequence of which is that the Builder Lenders are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

H.    <u>Adequate Protection of the Agent and Prepetition Lenders</u>.  In consideration for the Agent's Adequate Protection Liens under the TIP Loan Agreement and the superpriority administrative expense claim granted to the Agent herein, the Agent has consented to the priming of its security interest against the LID Proceeds by the liens granted to the Builder Lenders pursuant to the TIP Facility.

#4847-0483-8153                                              -7-

I.    <u>Benefits of TIP Facility</u>.  The TIP Facility will enable the Trustee to complete LID infrastructure build-outs that are a prerequisite for the Estate's (and/or any successor entity's) reimbursement of $34.1 million in LID Proceeds.  Moreover, the TIP Facility facilitates a settlement that, if successful, will result in the near-term resolution of the Estate's outstanding obligations on the Prepetition Loan through a plan of reorganization to be proposed to the Court by creditors that, in the aggregate, hold a substantial majority (in dollar amount) of the claims against the Estate and equity holders that, in the aggregate, hold a substantial majority of the equity in the Debtor.  The TIP Facility, together with the Settlement, will allow the Settling Parties (e.g., the Agent, the Consenting Lenders and the Settling Builders) and the Estate to avoid what inevitably would be time-consuming and expensive litigation.  The TIP Facility also ensures that the Estate will remain administratively solvent.  The cost savings associated with the successful implementation of the Settlement will enhance the overall value to be recovered by the Settling Parties, who are the Estate's primary economic stakeholders.

J.    <u>Entry of Interim Order</u>.  For the reasons stated above, the Trustee has requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

NOW, THEREFORE, on the Motion of the Trustee and the record before the Court with respect to the Motion, and with the consent of the Builder Lenders and the Agent to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED THAT:**

1.    <u>Motion Granted</u>.  The Motion is granted in its entirety subject to the terms and conditions set forth in this Interim Order.

2.    <u>TIP Loan Agreement Authorization</u>.

(a)    <u>Approval of TIP Facility</u>.  The Trustee is expressly and immediately authorized, empowered and directed to execute, deliver and enter into the TIP Loan Agreement and to incur and to perform the Obligations in accordance with, and subject to, the terms of this Interim Order and the TIP Loan Agreement, and to deliver all instruments and documents that may be required

#4847-0483-8153                          -8-

or necessary for the performance by the Trustee under the TIP Facility and the creation and perfection of the TIP Financing Liens described in and provided for by this Interim Order and the TIP Loan Agreement. Upon execution and delivery, the Obligations created under the TIP Loan Agreement shall represent valid and binding obligations of the Estate, enforceable against the Estate in accordance with the terms of the TIP Loan Agreement.

(b)    Authorization to Borrow.    Subject to the terms and conditions of this Interim Order, the TIP Loan Agreement, and any other TIP Loan Documents, and in accordance with the Budget, the Trustee is hereby authorized under the TIP Facility to borrow up to the amount of $4.5 million during the period between the entry of this Interim Order and the entry of a Final Order.

(c)    TIP Financing Liens.    Effective upon the entry of this Interim Order and subject to the TIP Loan Agreement, the Builder Lenders are granted the TIP Financing Liens pursuant to sections 361, 362 and 364(d) of the Bankruptcy Code, meaning a first priority, priming, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interest in and lien on the Collateral presently owned and hereafter acquired by the Estate, which shall consist of any and all rights of the Trustee and the Estate to receive payments or reimbursements of LID Proceeds, whether such rights constitute general intangibles, accounts, accounts receivable, contract rights, commercial tort claims, or deposit accounts relating thereto, and all proceeds, products, offspring, or profits thereof (including cash), and including all payments owing or made under the Acquisition Agreement, but the Collateral shall not include the Acquisition Agreement itself.

(d)    Agent's Adequate Protection.    Effective upon the entry of this Interim Order and subject to the TIP Loan Agreement, the Agent (on its behalf and on behalf of the Prepetition Lenders) is hereby granted the Adequate Protection Liens pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, meaning, as adequate protection for any diminution in the value of the Agent's interest in the Collateral securing the Debtor's obligations under the

#4847-0483-8153                                                          -9-

Prepetition Credit Agreement resulting from, the use of the Collateral and imposition of the automatic stay (the "Adequate Protection Obligations"): (x) a second priority (subject only to the TIP Financing Liens), priming, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interest in and lien on the Collateral presently owned and hereafter acquired by the Estate, which shall consist of any and all rights of the Trustee and the Estate to receive payments or reimbursements of LID Proceeds, whether such rights constitute general intangibles, accounts, accounts receivable, contract rights, commercial tort claims, or deposit accounts relating thereto, and all proceeds, products, offspring, or profits thereof (including cash), and including all payments owing or made under the Acquisition Agreement, but the Collateral shall not include the Acquisition Agreement itself, and (y) a first priority priming, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interest in and lien on all assets (other than the Collateral and any claims and causes of action under section 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code, or the proceeds such claims and causes of action) presently owned and hereafter acquired by the Estate and all products and proceeds thereof, but subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code.    Agent, for the benefit of the Prepetition Lenders, is granted an allowed superpriority administrative expense claim as provided for under section 507(b) of the Bankruptcy Code on account of the Adequate Protection Obligations (the "Adequate Protection Superpriority Claim "), which shall be junior to the TIP Loan Superpriority Claim (defined herein).

(e)    TIP Financing Lien Priority.    The TIP Financing Liens granted to the Builder Lenders (i) are created pursuant to section 364(d) of the Bankruptcy Code, (ii) are first priority, priming, valid, prior, perfected, unavoidable, and superior to any security interest, mortgage, or collateral interest or lien or claim in, on or to the Collateral, and are subject only to the Permitted Liens, if any, but only to the extent that such Permitted Liens are valid and perfected under

#4847-0483-8153

-10-

applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code; and (iii) shall secure all Obligations under the TIP Facility.

(f)    Enforceable Obligations.  The TIP Loan Agreement shall constitute and evidence the valid and binding obligations of the Estate, which Obligations shall be enforceable against the Estate, and any successors thereto.

(g)    Conditions Precedent to Making Advances.  The Builder Lenders shall have no obligation to make any advances pursuant to the TIP Facility unless all of the conditions precedent to the making of such advances under the TIP Facility are satisfied or waived by the Builders Lenders in accordance with the TIP Loan Agreement.

(h)    Superpriority Administrative Claim Status.    All Obligations under the TIP Facility shall be allowed superpriority administrative expense claims (the "TIP Loan Superpriority Claim" and, together with the TIP Loan Liens, the "TIP Loan Protections") with priority in the Chapter 11 Case under section 364(c)(l) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtor and the Estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 503(b) and 507(b); provided, however, such TIP Loan Superpriority Claim shall be *pari passu* with the superpriority administrative expense claim granted to the Agent (for the benefit of the Prepetition Lenders) under the Cash Collateral Orders.

3.    Post-Petition Lien Perfection.    This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the TIP Loan Liens and the Agent's Adequate Protection Liens without the necessity of filing or recording any financing statement or other instrument or document that may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the TIP Loan Liens or the Agent's Adequate Protection Liens or to entitle the Builder Lenders or the Agent to the priorities granted herein.  Notwithstanding the foregoing, the Trustee shall, at the request of the Builder

#4847-0483-8153

-11-

Lenders or the Agent, at any time and from time to time, execute and deliver to the Builder Lenders or the Agent such security agreements, mortgages, financing statements, documents, and other agreements and instruments (and, subject to sufficient availability of funding and any restrictions in the Budget, pay the cost of filing or recording the same in all public offices deemed reasonably necessary or desirable by the Builder Lenders) and do such other acts and things as the Builder Lenders or the Agent may reasonably deem necessary or desirable in order to establish and maintain the validity, attachment, and perfection of the liens of the Builder Lenders and the Agent granted in this Interim Order (free and clear of all other liens, claims, and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Permitted Liens). The Builder Lenders and the Agent (and all Persons designated by the Builder Lenders or the Agent for the purpose specified in this sentence) hereby are made, constitute, and are appointed as the Trustee's true and lawful attorney and agent-in-fact to execute such security agreements, mortgages, financing statements, documents, and other agreements and instruments and do such other acts and things as may be necessary or appropriate to preserve and perfect the liens of the Builder Lenders and the Agent on the Collateral. A carbon, photographic, photostatic, or other reproduction of the TIP Loan Agreement, this Interim Order, or of a financing statement shall be sufficient as a financing statement.

4.    Use of TIP Facility Proceeds and LID Proceeds. Pursuant to and in accordance with the terms and conditions of this Interim Order, the TIP Loan Documents, and in a manner consistent with the Budget (as the same may be modified, supplemented or updated from time to time consistent with the terms and conditions of the TIP Loan Agreement), (a) the Trustee is authorized to use the advances made under the TIP Loan Agreement, and (b) the Trustee is authorized to use the LID Proceeds.

5.    Events of Default; Remedies.

#4847-0483-8153

-12-

(a) <u>Events of Default</u>.   The Defaults identified in Section 9 of the TIP Financing Agreement shall constitute Defaults under this Interim Order and the TIP Loan Documents.

(b) <u>Rights and Remedies Upon Event of Default</u>.  Upon the occurrence of a Default, the Builder Lenders may immediately, upon giving any such notice to the Trustee as may be required under the TIP Loan Agreement, (i) cease to make any Loans under the TIP Loan Agreement or any other Loan Document, (ii) declare all or any portion of the Loans and all other outstanding Obligations to be due and payable immediately, without further order of, or application to, the Court, and without presentment, demand, or protest, all of which are deemed to be waived by the Trustee and (iii) subject to paragraphs 5(c) and 5(d) below, exercise any and all of their other rights and remedies under applicable law (including, but not limited to, the Bankruptcy Code), the TIP Loan Agreement and the other TIP Loan Documents.

(c)    <u>Relief from Automatic Stay</u>.

If a Default occurs (including the failure to pay all Obligations that are due upon maturity), then (i) the Builder Lenders may set an expedited hearing for relief from the automatic stay on not less than three Business Days' notice and at such hearing the only issues will be (x) whether an uncured Default exists, and (y) whether the Bankruptcy Court may impose any condition on the exercise of the Builder Lenders' remedies (which condition the Builder Lenders may oppose), so long as such condition does not delay the Builder Lenders' exercise of remedies for more than 30 days and otherwise does not impair the interests of the Builder Lenders in their Collateral; and (ii) consistent with the Court's determination as to "i" immediately above, the Builder Lenders shall be granted relief from stay if an uncured Default is found to exist and the automatic stay provisions of Bankruptcy Code section 362 shall be vacated and modified to the extent necessary to permit the Builder Lenders to

#4847-0483-8153                                -13-

exercise all rights and to effectuate the provisions of the TIP Loan Agreement and this Interim Order, without the need for filing further pleadings or application to or order of the Court.

(d)    Modification of Automatic Stay. Subject to paragraph 5(c) above,

(1)    the automatic stay provisions of Bankruptcy Code section 362 are hereby vacated and modified to the extent necessary to permit the Builder Lenders to exercise all rights and to effectuate the provisions of the TIP Loan Agreement and this Interim Order, without the need for filing further pleadings or application to or order of the Court; and

(2)    no party in interest shall have the right (i) to contest the enforcement of the remedies set forth in the TIP Loan Agreement on any basis other than the fact that a Default has not occurred or (ii) to seek injunctive relief against such enforcement under Bankruptcy Code section 105 or otherwise, or to seek injunctive relief in conflict with the provisions of the TIP Loan Agreement or the Interim Order.

6.    Other Rights and Obligations.

(a)    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order. Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the Builder Lenders and the TIP Facility contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, reversed or vacated by a subsequent order of this or any other Court, the Builder Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code and no such modification, amendment, reversal or vacation shall affect the validity and enforceability of any advances made hereunder or lien or priority authorized or created hereby. Notwithstanding any such modification, amendment, reversal or vacation, any claim granted to the Builder Lenders hereunder arising

#4847-0483-8153                                        -14-

prior to the effective date of such modification, amendment, reversal or vacation of any TIP Loan Protections granted to the Builder Lenders shall be governed in all respects by the original provisions of this Interim Order, and the Builder Lenders shall be entitled to all of the rights, remedies, privileges and benefits, including the TIP Loan Protections granted herein, with respect to any such claim. Since the advances to be made pursuant to the TIP Loan Agreement will be made in reliance on this Interim Order, the obligations owed the Builder Lenders prior to the effective date of any stay, modification, amendment, reversal or vacation of this Interim Order cannot, as a result of any subsequent order in this Chapter 11 Case, or, following the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or following the commencement of any other proceeding superseding the Chapter 11 Case or such chapter 7 case (any such chapter 7 case or superseding proceeding, "Successor Case"), be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the Builder Lenders under this Interim Order and/or the TIP Loan Agreement.

(b)    Binding Effect. The provisions of this Interim Order shall be binding upon all parties in interest in the Chapter 11 Case, including, without limitation, the Trustee, the Estate, the Debtor, the Builder Lenders, the Agent, the Prepetition Lenders, the City of Henderson, the Indenture Trustee for the bonds issued by the City of Henderson in connection with Local Improvement District T-18, Focus and Meritage and their respective successors and assigns (including any trustee, estate representative or other fiduciary hereinafter appointed as a legal representative of the Estate or with respect to the property of the Estate) whether in the Chapter 11 Case, in any Successor Case, or upon dismissal of the Chapter 11 Case or any Successor Case, and shall inure to the benefit of the Estate and the Builder Lenders.

(c)    No Third Party Rights. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

#4847-0483-8153                                    -15-

(d)    Amendment.  Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by the Trustee, the Builder Lenders, and the Agent and approved by the Court.

(e)    Survival of Interim Order.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order that may be entered (1) confirming any plan of reorganization in the Chapter 11 Case, (2) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (3) dismissing the Chapter 11 Case, and the terms and provisions of this Interim Order as well as the TIP Loan Protections, the Agent's Adequate Protection Liens and the Adequate Protection Superpriority Claim granted pursuant to this Interim Order and the TIP Loan Agreement shall continue in full force and effect notwithstanding the entry of such order, and (x) such TIP Financing Protections shall maintain their priority as provided by this Interim Order until all the Obligations under the TIP Facility are indefeasibly paid in full and discharged and (y) the Agent's Adequate Protection Liens and the Adequate Protection Superpriority Claim shall maintain their priority as provided by this Interim Order until the Adequate Protection Obligations are indefeasibly paid in full and discharged.

(f)    Inconsistency.  In the event of any inconsistency between the terms and conditions of the TIP Loan Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

(g)    Waiver of Bankruptcy Rules 4001(a)(3) and 6004(h) Stay.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry, notwithstanding the provisions of Bankruptcy Rule 4001(a)(3) and 6004(h), which, to the extent applicable, are waived and shall not apply to this Interim Order.

(h)    Final Hearing.  The Final Hearing to consider entry of a Final Order and final approval of the TIP Facility is scheduled for [August ___], 2011 at [_____] at the United States Bankruptcy Court for the District of Nevada, Las Vegas Division.  On or before [July ____],

#4847-0483-8153

-16-

1

2   2011, the Trustee shall serve, by United States mail, first-class postage prepaid, notice of the

3   entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with

4   copies of this Interim Order, the proposed Final Order and the Motion, on the Notice Parties

5   identified in the Motion.  The Final Hearing Notice shall state that any party in interest objecting

6   to the entry of the proposed Final Order shall file written objections with the Clerk of the

7   Bankruptcy Court by no later than [_____ ___], 2011, which objections shall be served so that

8   the same are received on or before such date by:  (i) counsel for the Trustee; (ii) the Office of the

9   United States Trustee; (iii) counsel for the Builder Lenders; (iv) counsel for the Debtor out-of-

10  possession, and (v) counsel for the Agent.

11          (i)     The terms and conditions of the Cash Collateral Orders remain in full force and

12  effect, except as expressly modified by this Interim Order.

13          (j)     Retention of Jurisdiction.   The Court has and will retain jurisdiction to enforce

14  this Interim Order according to its terms.

15  SCHWARTZER & McPHERSON LAW FIRM

16

17

18  By: _____
    Lenard E. Schwartzer, Nevada Bar No. 0399

19  Jeanette E. McPherson, Nevada Bar No. 5423
    2850 South Jones Boulevard, Suite 1

20  Las Vegas, Nevada 89146-5308

21  &

22  MILBANK, TWEED, HADLEY & MCCLOY LLP
    Robert J. Moore (admitted *pro hac vice*)

23  David Zolkin (admitted *pro hac vice*)
    601 South Figueroa Street, 30th Floor

24  Los Angeles, California 90017

25  Counsel For Cynthia Nelson, Chapter 11 Trustee

26

27

28  #4847-0483-8153                              -17-