1    Robert J. Moore (CA State Bar No. 77495)      Lenard E. Schwartzer (NV State Bar No. 399)
     David B. Zolkin (CA State Bar No. 155410)      Jeanette E. McPherson (NV State Bar No. 5423)
2    MILBANK, TWEED, HADLEY & McCLOY LLP      SCHWARTZER & MCPHERSON LAW FIRM
     601 South Figueroa Street, 30th Floor      2850 South Jones Boulevard, Suite 1
3    Los Angeles, California 90017      Las Vegas, Nevada 89146-5308
     Telephone:     (213) 892-4000      Telephone:     (702) 228-7590
4    Facsimile:     (213) 629-5063      Facsimile:     (702) 892-0122

5    Counsel for Chapter 11 Trustee      Local Counsel for Chapter 11 Trustee

6 **UNITED STATES BANKRUPTCY COURT**

7 **DISTRICT OF NEVADA**

8    In re:      Chapter 11

9    SOUTH EDGE, LLC,      Case No. BK-10-32968

10            Debtor.      **DECLARATION OF CYNTHIA NELSON
IN SUPPORT OF MOTION FOR INTERIM**
11         **AND FINAL ORDERS (1) AUTHORIZING
CHAPTER 11 TRUSTEE TO OBTAIN**
12         **SENIOR PRIMING SECURED
POSTPETITION FINANCING;**
13         **(2) AUTHORIZING THE USE OF CASH**
14         **COLLATERAL; AND (3) SCHEDULING
A FINAL HEARING**
15

16         **Interim Hearing Date:  July 20, 2011**
**Hearing Time:          9:30 a.m.**
17

18    I, Cynthia Nelson, declare as follows:

19        1.      I am the duly appointed chapter 11 trustee ("Trustee") of the chapter 11

20 bankruptcy estate (the "Estate") of South Edge, LLC (the "Debtor" or "South Edge"). I am over

21 the age of eighteen (18) years and, as set forth below, either have personal knowledge of the

22 facts set forth below or have obtained knowledge of such facts based upon inquiry from those

23 working at my direction or in the ordinary course of exercising my duties as Trustee. I make this

24 Declaration in support of the *Motion for Interim and Final Orders (1) Authorizing Chapter 11*

25 *Trustee to Obtain Senior Priming Secured Postpetition Financing; (2) Authorizing the Use of*

26 *Cash Collateral; and (3) Scheduling a Final Hearing* (the "Motion"). Capitalized terms that are

27 not otherwise defined herein shall have the meanings ascribed to them in the Motion.

28        2.      I am a Senior Managing Director in the Los Angeles Corporate Finance practice

#4834-2892-5962

1    of FTI Consulting, Inc. ("FTI") which maintains offices throughout the U.S. and internationally

2    and is the financial advisor to the Trustee.  The Corporate Finance practice is the largest

3    professional consulting practice in the United States that deals predominantly with workouts,

4    turnarounds, and bankruptcy reorganizations.

5        3.    I have over 25 years of experience in the real estate industry including positions

6    with master planned community developers, a real estate investment advisor and in real estate

7    consulting and restructuring.  In my position with FTI and prior professional career, including as

8    a Partner in the Business Recovery Services practice of PricewaterhouseCoopers, I have had and

9    continue to have extensive and diversified experience in real estate matters involving residential,

10    commercial, hospitality, industrial and other property types in various stages of development

11    ranging from raw land to operating properties.  These engagements routinely involve matters

12    related to valuation, market and cost analyses, financial feasibility, operational assessments,

13    development consulting and providing expert testimony in connection with such matters.

14        4.    On February 20, 2011, the Office of the United States Trustee (the "UST")

15    designated me to serve as trustee for the Estate [Docket No. 441].  On February 21, 2011, the

16    UST requested that the Court enter an order approving my appointment as Trustee, and, on

17    February 23, 2011, the Court entered an order approving my appointment as Trustee [Docket No.

18    449].

19        5.    Except as otherwise indicated, all statements in this Declaration are based upon

20    my personal knowledge, and, in the ordinary course of the exercise of my responsibilities as

21    Trustee, my (a) review of the pleadings filed, orders entered and hearing transcripts on record in

22    this chapter 11 case (the "Chapter 11 Case"), the books and records (the "Books and Records")

23    provided to me by Holdings Manager, LLC ("Holdings Manager"), the General Manager of the

24    Debtor, as well as other relevant documents maintained by my office in the ordinary course of its

25    business, including, without limitation, the Debtor's business plans and property ownership

26    maps, (b) discussions with members of the Debtor, and (c) communications with certain of the

27    Debtor's creditors, including, without limitation, JPMorgan Chase Bank, N.A., as Administrative

28    Agent and Collateral Agent ("JPMorgan" or the "Agent") to the Debtor's prepetition, senior

#4834-2892-5962                                -2-

secured lenders (the "Prepetition Lenders"), and representatives of the City of Henderson (the "City"). This Declaration is further based upon my opinion, which is based upon my experience, expertise, and knowledge in the areas of corporate finance and in the real estate industry (as described above). In making this Declaration, I have relied, in part, on information and materials that my advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing this Declaration. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

6.       The facts set forth in the Motion are true and correct to the best of my knowledge, information, and belief, and based upon the information supplied or verified for me by the sources identified above.

7.       By the Motion, I am seeking an order that (A) authorizes and approves my obtaining, solely in my capacity as Trustee on behalf of the Estate, my entry into that certain Trustee Financing Agreement (the "TIP Loan Agreement," and together with any related documents required to be delivered by or in connection with the TIP Loan Agreement, the "TIP Loan Documents"), pursuant to which the Estate will obtain postpetition financing from four lenders (the "Builder Lenders") that are affiliates of certain of the Debtor's equity members in an aggregate principal amount of up to $21,400,000, with an initial, interim borrowing limit of $4,000,000 (the "TIP Facility"), (B) authorizes my use of the TIP Facility proceeds and of the LID Proceeds (as defined below), the latter of which are the cash collateral of the Prepetition Lenders, to pay for the administrative expenses of the Estate and to repay borrowings under the TIP Facility, and (C) finds that the Prepetition Lenders, which have an interest in the LID Proceeds and the Debtor's cash are adequately protected. The TIP Loan Agreement into which I will enter following Court approval, will be in substantially the form attached hereto as Exhibit 1.

**Commencement of Chapter 11 Case**

8.       On December 9, 2010, certain of the Prepetition Lenders commenced an involuntary chapter 11 bankruptcy petition (the "Involuntary Petition") against the Debtor. In

1    connection with the Involuntary Petition, the Agent filed the *Motion for Appointment of an*

2    *Interim and Permanent Chapter 11 Trustee for South Edge, LLC (I) During the "Gap" Period*

3    *and (II) on a Permanent Basis* [Docket No. 7] (the "Trustee Motion").[1]

4           9.     On February 3, 2011, following a contested trial on the Involuntary Petition, the

5    Court entered an order for relief under chapter 11 of the Bankruptcy Code against the Debtor

6    [Docket No. 400] and issued an order directing the appointment of a chapter 11 trustee [Docket

7    No. 401]. As detailed in paragraph 4 above, I thereafter became the Trustee.

8    **The Debtor, It's Primary Assets and Economic Stakeholders**

9          10.    The Debtor is a special-purpose, limited liability company that owns the real

10    estate development project known as Inspirada (the "Project"), which, at the start of its

11    development encompassed nearly 2,000 acres. The Project was designed as a joint venture of

12    builders who are South Edge's members (the "Builder Members") for the purpose of pooling

13    their resources to acquire raw land and build common infrastructure on a cost-effective basis

14    with (1) $585 million in loans pursuant to the Credit Agreement, (2) $102 million in LID T-18

15    bonds ("LID Proceeds"), and (3) capital contributions from the Builder Members.

16          11.    In addition to the real estate and personal property assets that comprise the

17    Project, the Debtor's primary assets include, among others, (i) approximately $900,000 in cash,

18    of which, approximately $400,000 is encumbered by the Agent's liens, and approximately

19    $500,000 is unencumbered, but subject to alleged interests asserted by certain of the Builder

20    Members, (ii) an alleged ownership interest in more than $26 million in cash (the "Disputed MI

21    Deposit") that is currently maintained in the name of Builder Member Focus South Group, LLC

22    ("Focus") in an account at JPMorgan, and related claims against Focus and Holdings Manager,

23    LLC ("Focus Manager"), an affiliate of Focus which is the former General Manager of South

24    Edge (collectively, the "Focus Claims"), (iii) the right to realize the LID Proceeds, and (iv)

25    claims against equity members of the Debtor other than Focus under a range of legal theories.

26    ///

27

28    [1] As the Court is well aware, the Involuntary Petition and the Trustee Motion were filed after two years of disputes and litigation among the Builder Members (defined below) and between the Builder Members and the Agent.

**The Builder Members**

12.     The Builder Members originally were comprised of each of KB Home Nevada, Inc. ("KB"), Coleman-Toll Limited Partnership ("Coleman-Toll"), Pardee Homes of Nevada ("Pardee"), Beazer Homes Holdings Corp. ("Beazer"), Meritage Homes of Nevada ("Meritage"), Focus, Alameda Investments, LLC ("Alameda"), and Kimball Hill Homes Nevada, Inc. ("Kimball Hill"). In April 2008, Kimball Hill filed for bankruptcy protection. In January 2009, Alameda did the same. I understand that each of Kimball Hill and Alameda purported to reject the operating agreement of the Debtor (as amended, modified and supplemented from time to time, the "Operating Agreement"), in its respective bankruptcy case.

13.     As the sole owners of the Debtor, the Builder Members managed the Debtor's affairs largely through a management committee (the "Management Committee") comprised of committee members appointed by each of the Builder Members. Among other powers, the Management Committee established the business plan for the Debtor, approved all of the Debtor's material contracts, approved actions relating to enforcement of remedies against Members for failure to fund capital contributions, approved master plan documents, and determined the amount of capital contributions required of each Builder Member from time to time.[2]

**The Agent and Prepetition Lenders**

14.     As briefly referenced above, to partially finance the purchase and development of the Project, pursuant to the Debtor's prepetition secured credit agreement (the "Credit Agreement"), the Debtor took out loans ("Prepetition Loans") with the Agent and the Prepetition Lenders, which, in the aggregate, totaled $585,000,000 in principal amount. JPMorgan is the Agent under the Credit Agreement and is also a lender thereunder.

15.     As security for the Prepetition Loans, the Agent and the Prepetition Lenders obtained liens on all of the Debtor's land and related collateral, including its right to receive LID

---

[2] Holdings Manager LLC, an affiliate of Builder Member Focus, was the Debtor's "General Manager." Holdings Manager was responsible for conducting, in the name of and on behalf of the Debtor, the day-to-day operations of the Debtor. Another affiliate of Focus, Landtek, LLC, was engaged as construction manager for the Project.

Proceeds held by the City.[3]  The Agent asserts that the Debtor's outstanding indebtedness to the Agent and the Prepetition Lenders presently amounts to approximately $382 million.  Without question, the claims of the Agent and the Prepetition Lenders represent the lion's share of the debt in this Chapter 11 Case.

**Status of Project**

16.     Until my appointment, no substantive work had taken place on the Project since the spring of 2008.  The cessation in work was due, among other reasons, to disputes among (i) certain of the Builder Members and Focus and (ii) the Builder Members and the Agent.  Those disputes precipitated a decision-making gridlock and funding shortfalls that, ultimately, led to complex multi-party litigation and the commencement of this Chapter 11 Case.

**Recovery of LID Proceeds**

17.     As indicated above, the Project, by design, is to be partially financed by LID Proceeds.  In April 2006, the City raised approximately $102 million by issuing T-18 Local Improvement District (Inspirada) Limited bonds ("<u>LID Bonds</u>") to purchase from South Edge, as developer, certain roads and other public infrastructure (including, among such other infrastructure, parks, utilities, drainage systems, and sewer and water and storm drain pipelines) after they were built by the Debtor.

18.     LID Proceeds are disbursed by the City in increments that relate to the ongoing completion of the infrastructure build-out of the Project.  Most LID Proceeds have not been paid to South Edge or its Estate because the related infrastructure construction in LID T-18 has not been completed.  As of the date hereof, I am informed and believe that approximately $89.7 million in LID Proceeds remain undisbursed.  Certain of those projects, however, *are* substantially complete, requiring only incremental additional work to reach completion.  If I am able to complete such improvements and otherwise fulfill the other conditions precedent to recovering the LID Proceeds, I believe that the Estate will be able to recover in the near-term

---

[3] *See Third Stipulation Extending Trustee's Authorization To Use Cash Collateral* (the "<u>Third Extension Stipulation</u>"), which is attached to the *Notice of Stipulation Extending Trustee's Authorization To Use Cash Collateral* [Docket No. 766] filed with the Court on June 30, 2011.

1   approximately $34.1 million in LID Proceeds,[4] at an actual cost to complete of approximately

2   $6.2 million.

3         19.    I intend to use the TIP Facility to fund the completion of those already

4   substantially completed LID segments that will entitle the Estate to recover LID Proceeds in

5   amounts significantly in excess of the actual cost of completion.

6   **Prior Short Term Advance and Use of Cash Collateral**

7         20.    On April 8, 2011, the Court entered an order [Docket No. 568] approving on an

8   interim basis that certain *Stipulation Providing For Post-Petition Financing and Use of Cash*

9   *Collateral* (as subsequently amended to, among other things, address concerns of the Builder

10  Members, the "Cash Collateral Stipulation").  Pursuant to that order, the Court authorized the

11  Estate's (i) receipt of a short term advance of approximately $500,000 sourced from the Disputed

12  MI Deposit, and (ii) subject to the entry of a final order, use of cash collateral through April 29,

13  2011.  The proceeds of the short-term advance were used to pay outstanding LID assessments

14  due in the month of April.  Following payment of those assessments, the Estate became eligible

15  to recover, and did in fact recover, LID Proceeds from the City of approximately $1 million from

16  which I repaid the funds advanced from the Disputed MI Deposit.  The Cash Collateral

17  Stipulation was approved by the Court on a final basis by order entered on April 21, 2011

18  [Docket No. 624].  Thereafter, the Agent and I have entered into three stipulations extending the

19  period during which I may use cash collateral on behalf of the Estate.  I am currently authorized

20  to use the cash collateral remaining from the LID Proceeds recovered from the City through July

21  1, 2011, and have obtained the Agent's consent to continue to utilize that cash collateral through

22  July 29, 2011.  *See* Third Extension Stipulation.

23

24  [4] Although approximately $34.1 million in LID Proceeds will available for recovery in the near-term, the actual amount of LID Proceeds that I anticipate the Estate will be able to recover through November 30, 2011 is approximately $20.8 million.  I believe the remaining $13.3 million in LID Proceeds will be recoverable thereafter.

25  If the Motion is approved and, if the settlement among the Agent, the majority of the Prepetition Lenders and certain of the Builder Members (and that is discussed below) is successfully implemented, a plan of reorganization might be

26  confirmed and become effective on or before November 30, 2011, meaning that any portion of the approximately $34.1 million in LID Proceeds that the Estate has not recovered by that date would subsequently be distributed not

27  to the Estate, but rather, to whatever entity succeeds the Estate following the plan effective date.  Therefore, any reference in this Declaration to the "Estate" in the context of the recovery of the LID Proceeds should be read to

28  mean the "Estate and/or any successor to the Estate."

**The Settlement**

21.     The early stages of this Chapter 11 Case were fraught with disputes and litigation among the Agent and the Builder Members regarding a myriad of issues, including, but not limited to, the involuntary commencement of this Chapter 11 Case, my appointment as Trustee, and disparate views as to the direction that I, as Trustee, should take in order to reinvigorate and move the Project forward and to develop an exit approach from the Chapter 11 Case.  As a consequence of these disputes and of the Estate's need to recover Estate assets that were not within my immediate possession, I and my professionals immediately commenced investigating the Estate's rights and remedies against various parties, including the Estate's potential litigation claims against the Builder Members and against Focus for the turnover of documents and the Disputed MI Deposit.  I and my professionals engaged in numerous discussions with various constituencies to determine how best to recover value for the Estate and, ultimately, resolve this Chapter 11 Case.  To that end, as recently as May 20, 2011, I commenced an adversary proceeding to recover on the Focus Claims.

22.     But recently, representatives of Builder Members KB, Coleman-Toll, Pardee and Beazer (collectively, and together with their parent entities, the "Settling Builders"), on the one hand, and of the Agent and a supermajority of the Prepetition Lenders (the "Consenting Lenders" and, collectively with the Agent and the Settling Builders, the "Settling Parties") entered into a settlement (the "Settlement") designed to resolve their disputes and pave the way for an exit from this Chapter 11 Case.

23.     The Settlement is to be implemented through a chapter 11 plan of reorganization that is to be jointly proposed by the Settling Builders and the Agent.  A redacted, but otherwise true and correct copy of the letter agreement, incorporating a term sheet attached thereto (the "Plan Term Sheet") that embodies the Settlement and sets forth the basic terms of a plan of reorganization based thereon (the "Plan of Reorganization"), is attached hereto as Exhibit 2 (the "Plan Support Agreement").

24.     Neither I nor the Estate is a party to the Plan Support Agreement.  Nor will I be a proponent of the Plan of Reorganization.  However, the effectiveness of the Plan Support

Agreement was conditioned upon my consent, as Trustee, to the provisions of the Plan Support Agreement. Although I support the process by which the Agent and the Settling Builders will be seeking confirmation of the Plan of Reorganization, I was not in a position to execute the form of consent as initially proposed by the Settling Parties. And, although the Agent determined to waive the requirement for my consent, I and my professionals successfully negotiated with the Settling Builders a qualified and conditioned form of consent by which the Settling Builders agreed to certain matters not addressed in the Plan Support Agreement and pursuant to which I will be supporting confirmation of the Plan of Reorganization. My consent is set forth in a letter delivered by my counsel to the Settling Parties and accepted by the Settling Builders on June 8, 2011. A true and correct copy of that letter is attached hereto as Exhibit 3 (the "<u>Trustee's Consent</u>").

25.    My role as Trustee shall not be circumscribed in any manner other that as expressly set forth in the Trustee's Consent; nor shall any restriction on the services to be performed by me or my professionals, as reflected in the budget that is attached to the TIP Loan Agreement (the "<u>Budget</u>"), restrict me from performing my statutory duties, fulfilling my fiduciary duties, or complying with any order of the Bankruptcy Court or any other court having jurisdiction over the Chapter 11 Case. *See* Trustee's Consent, ¶ 13.

26.    I understand and believe that the Plan Support Agreement (and, hence, the TIP Facility), has the support of the Consenting Lenders, who collectively hold more than 92% in dollar amount of the Prepetition Loans and represent more than 94% in number of the Prepetition Lenders.

**The TIP Facility**

27.    A key component of the Plan Support Agreement is that the Settling Builders are to provide to the Estate financing through an anticipated late-November effective date of the Plan of Reorganization that will provide me with a source to (a) fund the payment in full of already accrued and unpaid and anticipated allowed administrative expenses, (b) fund the build-out of the Project's infrastructure (which will result in Estate recovery of a substantial portion of the LID Proceeds), and (c) otherwise preserve the value of the Estate's assets. The TIP Facility and

my proposed use of the proceeds of the TIP Facility and of the LID Proceeds are intended to address the Settling Builders' financing obligations under the Plan Support Agreement.

28.     I understand and believe that the TIP Facility is an essential element to the Settlement and is critical to my ability to administer the Estate pending confirmation of the Plan of Reorganization contemplated under the Settlement.  Although the Estate owns assets of substantial value, those assets are not particularly liquid and, in certain instances, are the subject of active disputes or potential disputes that will require resolution through consent or litigation. The TIP Facility provides me and the Estate with access to funds necessary to pay through the end of November 2011 (i) operating disbursements on account of, among other items, further construction of and completion of requirements with respect to certain infrastructure segments of the Project, Project maintenance, Project security, the Estate's surety bond and insurance obligations, and the administration of LID Proceeds, (ii) LID T-18 bond assessments and property taxes, and (iii) bankruptcy-related disbursements, including UST's fees and the fees and expenses of me, my professionals, and the Agent's and Prepetition Lenders' professionals.

29.     Absent a source of liquidity, (a) the Estate very likely would be rendered administratively insolvent, (b) the partially and yet-to-be completed major Project infrastructure would remain partially or completely unfinished, (c) unpaid property taxes and LID assessments would accrue as senior liens against the Project, (d) the value of the Estate's property would be significantly impaired, (e) the Estate would have to rely on Bankruptcy Court Section 506(c) surcharge rights granted and preserved under the Cash Collateral Stipulation to address accrued and unpaid Trustee and professional fees, (f) I might be required to convert the Chapter 11 Case to a liquidation case under chapter 7, and (g) a largely consensual exit from bankruptcy premised on resolution of significant litigation and continuation of the development of the Inspirada Project would be frustrated and lost.

30.     I believe that the TIP Facility is critical to the implementation of the Settlement, as it will bridge the Estate to a near-term exit from this Chapter 11 Case through a confirmed plan of reorganization that will have the consent of the Estate's largest creditor group and a super-majority of the equity constituents in the Chapter 11 Case, provide necessary consideration

for the fair and appropriate treatment of all other constituencies, resolve protracted and expensive litigation, and get the Project back on track after languishing to the detriment of the City of Henderson and other parties in interest over the past few years. The TIP Facility will allow me to complete certain LID infrastructure projects which, in turn, will permit the Estate to realize reimbursements of approximately $34.1 million in LID Proceeds that would not otherwise be available.

31. Although the liens against the LID Proceeds to be granted to the Builder Lenders under the TIP Facility will prime the Agent's liens against the LID Proceeds, the Agent does not object to such priming and to the use of the LID Proceeds, subject to the Budget and the other terms and conditions of the TIP Loan Agreement. The Trustee contends that the Agent and the Prepetition Lenders are adequately protected by the TIP Facility and my use of the LID Proceeds Collateral because, among other reasons, (a) to the extent of any diminution in the value of their collateral caused by the TIP Facility or the use of their Collateral, and subject to the terms of the TIP Loan Agreement and Interim Order, they will be receiving (i) second in priority secured priming liens in the Collateral, and (ii) first in priority secured priming liens against substantially all other assets of the Estate (but excluding avoidance actions and the proceeds thereof); (b) the TIP Facility implements a settlement that, if successful, will result in the near-term satisfaction of the Estate's outstanding obligations on the Prepetition Loan through a consensual plan of reorganization; (c) as Trustee, I am the sole authorized representative of the Estate capable of recovering the LID Proceeds; and (d) the LID Proceeds that will be reimbursed as a result of my use of the advances under the TIP Facility are expected to exceed the amounts that will be advanced (meaning that, after repayment of the obligations to the Builder Lenders, the Estate would hold several million dollars of cash that it does not now hold and that, but for the TIP Facility, would not be recoverable). Consequently, the TIP Facility places the Agent and Prepetition Lenders at little risk while offering them significant upside.

32. Based on the foregoing, I firmly believe that my entry into the TIP Facility and the proposed use of the LID Proceeds will preserve and materially benefit the Estate and its assets, is in the best interests of the Estate and should be approved by the Court.

#4834-2892-5962

-11-

1        I declare under penalty of perjury that the foregoing is true and correct to the best of my

2   knowledge, information, and belief.

3        Executed this 8th day of July 2011, at Los Angeles, California.

4

5                 /s/ Cynthia Nelson
              Cynthia Nelson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#4834-2892-5962                                    -12-

# Exhibit 1

# TIP LOAN AGREEMENT

# SOUTH EDGE, LLC.

## TRUSTEE FINANCING AGREEMENT

**KB Home NV Acquisition LLC, Toll Henderson II LLC, a Nevada LLC. Pardee Homes, a California corporation, and Trinity Homes, LLC, as Builder Lenders**

**and**

**Cynthia Nelson, solely in her capacity as Chapter 11 Trustee of South Edge, LLC, on behalf of South Edge, LLC and its Bankruptcy Estate, as Borrower**

RECITALS ............................................................................................................. 1

AGREEMENT ....................................................................................................... 2

1.    DEFINITIONS AND CONSTRUCTION. .................................................... 2

    1.1    Definitions. ............................................................................................ 2

    1.2    Financial Reporting. .............................................................................. 7

    1.3    Terms Generally. ................................................................................... 7

2.    LOAN AND TERMS OF PAYMENT. .......................................................... 8

    2.1    Credit Extensions. ................................................................................. 8

        (a)    Promise to Pay. ........................................................................ 8

        (b)    Loans. ........................................................................................ 8

    2.2    Interest Rates and Calculations. ........................................................... 9

        (a)    Interest. ..................................................................................... 9

        (b)    Default Rate and Fees. ............................................................. 9

        (c)    Computation. ............................................................................ 9

    2.3    Payments. ............................................................................................. 10

        (a)    Time of Payments. .................................................................. 10

        (b)    Location of Payments. ............................................................ 10

    2.4    Term. .................................................................................................... 10

    2.5    Revolving Loan. ................................................................................... 11

    2.6    Use of Proceeds. .................................................................................. 11

        (a)    Generally. ............................................................................... 11

        (b)    Deviation. ............................................................................... 11

        (c)    LID Segment Construction. ................................................... 11

        (d)    Professionals. .......................................................................... 12

    2.7    Section 15 Advances. ........................................................................... 12

    2.8    Source of Loans. .................................................................................. 12

3.    ALLOWANCE AND PRIORITY OF CLAIMS ........................................... 12

4.    SECURITY INTEREST IN FAVOR OF LENDERS ................................... 12

    4.1    Security Interest in Collateral. ............................................................. 12

    4.2    Priority of Builder Lenders' and Agent's Security Interests. ............... 13

    4.3    Preservation of Collateral; Perfection of Builder Lenders' Security Interest
            and Agent's Security Interest. .............................................................. 13

i

| 5. | | CONDITIONS OF LOANS | 14 |
| | 5.1 | Conditions Precedent to all Loans. | 14 |
| | | (a) | Interim Financing Order. | 14 |
| | | (b) | Delivery of Documents. | 14 |
| | | (c) | Notice of Borrowing. | 14 |
| | | (d) | No Default. | 14 |
| | | (e) | No Maturity. | 15 |
| | | (f) | Final Financing Order. | 15 |
| 6. | | REPRESENTATIONS AND WARRANTIES | 15 |
| | 6.1 | Authority. | 15 |
| | 6.2 | Execution and Binding Effect. | 16 |
| | 6.3 | No Default. | 16 |
| 7. | | AFFIRMATIVE COVENANTS. | 16 |
| | 7.1 | Financial Reporting. | 16 |
| | 7.2 | Books and Records. | 17 |
| | 7.3 | Use of Proceeds. | 17 |
| | 7.4 | Cooperation and Consultation. | 17 |
| 8. | | NEGATIVE COVENANTS. | 17 |
| | 8.1 | Superpriority Claims/Senior Liens. | 18 |
| | 8.2 | Financing Orders. | 18 |
| | 8.3 | Deviation from Budget. | 18 |
| | 8.4 | Protection of Collateral. | 18 |
| | 8.5 | Significant Transactions. | 18 |
| | 8.6 | Litigation Against Builder Lenders. | 19 |
| | 8.7 | Trustee Consent. | 19 |
| 9. | | DEFAULTS. | 19 |
| 10. | | LENDERS' RIGHTS AND REMEDIES. | 20 |
| | 10.1 | Remedies Generally. | 20 |
| | 10.2 | Relief from the Automatic Stay. | 21 |
| | 10.3 | Modification of the Automatic Stay. | 21 |
| 11. | | NOTICES. | 22 |
| 12. | | CHOICE OF LAW AND VENUE: JURY TRIAL WAIVER. | 23 |
| 13. | | GENERAL PROVISIONS. | 23 |

13.1    Binding Effect. ................................................................................. 23

13.2    Time of Essence. .............................................................................. 24

13.3    Severability of Provisions. ............................................................... 24

13.4    Amendments in Writing, Integration. ............................................... 24

13.5    Counterparts. ................................................................................... 24

13.6    Survival. ........................................................................................... 24

This TRUSTEE FINANCING AGREEMENT ("**Agreement**") is entered into as of July __, 2011, by and among KB Home NV Acquisition LLC, Toll Henderson II LLC, a Nevada LLC, Pardee Homes, a California corporation, and Trinity Homes, LLC ("**Builder Lenders**"), on the one hand, and Cynthia Nelson, not in her individual capacity, but solely in her capacity as trustee of chapter 11 debtor South Edge, LLC ("**Trustee**"), on behalf of South Edge, LLC ("**South Edge**") and its Estate (as defined below).

## RECITALS

WHEREAS, on December 9, 2010 ("**Petition Date**") JPMorgan Chase Bank, N.A. ("**JPMorgan**"), Credit Agricole Corporate and Investment Bank, and Wells Fargo Bank, N.A. filed an involuntary chapter 11 petition under section 303 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* ("**Bankruptcy Code**"), against South Edge in the United States Bankruptcy Court for the District of Nevada ("**Bankruptcy Court**"), commencing case number 10-32968 ("**Chapter 11 Case**");

WHEREAS, on the Petition Date, JPMorgan, in its capacities as Agent (as defined below) under the Prepetition Credit Agreement (as defined below) and as a lender thereunder, filed a motion to appoint a chapter 11 trustee for South Edge in the Chapter 11 Case ("**Trustee Motion**");

WHEREAS, on February 3, 2011, the Bankruptcy Court entered an order for relief on the involuntary petition and its order granting the Trustee Motion;

WHEREAS, on February 23, 2011, the Bankruptcy Court entered its order approving the Office of the United States Trustee's February 20, 2011, appointment of Cynthia Nelson as the Trustee;

WHEREAS, on April 21, 2011, the Court entered a final order [D.E. 624] that approved a stipulation, between and among JPMorgan, as Agent, the Trustee, and certain equity members of the Debtor that was subsequently amended by periodic extensions [*see* D.E. 676, 736] (collectively, the "**Cash Collateral Orders**"), which has provided the Trustee with continued use of the Agent's cash collateral;

WHEREAS, JPMorgan, as Agent, the members of a steering committee of lenders under the Prepetition Credit Agreement, and more than 92% in dollar amount and 94% in number of total lenders under the Prepetition Credit Agreement have entered into a letter agreement dated as of May 19, 2011 (together with the "Term Sheet for South Edge, LLC Chapter 11 Plan" attached to the letter agreement, the "**Plan Support Agreement**") with certain affiliates of the Builder Lenders ("**Settling Builders**" as defined in the Plan Support Agreement), which Plan Support Agreement requires the parties thereto to support a chapter 11 plan to be filed in the Chapter 11 Case, consistent with the Plan Support Agreement;

WHEREAS, the Trustee has consented to the Plan Support Agreement pursuant to the letter dated as of June 8, 2011, addressed by counsel for the Trustee to counsel for the Agent and counsel for the Settling Builders ("**Trustee's Consent**"), which Trustee's

Consent has been accepted by the Settling Builders and, as permitted by the Plan Support Agreement, been waived by the Agent, on behalf of the Lenders;

WHEREAS, nothing in this Agreement shall alter or modify the terms of the Plan Support Agreement or relieve the Settling Builders or the Agent and the Consenting Lenders of their respective obligations under the Plan Support Agreement;

WHEREAS, the Trustee has requested that the Builder Lenders extend post-petition financing to the Trustee pursuant to Bankruptcy Code section 364;

WHEREAS, the Trustee, on behalf of the Estate, requires funds in order to satisfy accrued and accruing administrative expenses of the Estate pursuant to a Budget (as defined below) and this Agreement, including, but not limited to (i) disbursements on account of, among other things, the construction of certain infrastructure segment improvements required to obtain Local Improvement District T-18 ("**LID**") reimbursements, project maintenance, security, and surety bond obligations, and the costs of administration with respect to LID reimbursements, (ii) LID-related assessments and property taxes, and (iii) bankruptcy-related disbursements, including United States Trustee's fees and the reasonable fees and expenses of the Trustee, her professionals, and the Agent's and Lenders' professionals;

WHEREAS, the Builder Lenders have agreed to provide such post-petition financing to the Trustee and the Estate subject to the terms and conditions set forth in this Agreement and the other Loan Documents (as defined below).

## AGREEMENT

Now, therefore, in consideration of the premises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    DEFINITIONS AND CONSTRUCTION.

　　1.1    Definitions.

As used in this Agreement, the following terms shall have the following definitions:

"**Acquisition Agreement**" means the Acquisition Agreement between the City of Henderson and South Edge dated April 1, 2006.

"**Agent**" means JPMorgan, in its capacity as administrative agent under the Prepetition Credit Agreement, and any subsequent or replacement administrative agent under the Prepetition Credit Agreement.

"**Agent's Adequate Protection Liens**" means the liens and security interests granted to Agent (on its behalf and on behalf of the Lenders) hereunder in the Collateral and the Estate's other assets, excluding any claims or causes of action under

sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, as adequate protection for, and to the extent of any diminution in the value of the Agent's interest in the Collateral securing the Debtor's obligations under the Prepetition Credit Agreement resulting from, the use of the Collateral and imposition of the automatic stay.

"**Agreement**" has the meaning specified in the preamble hereto.

"**Bankruptcy Code**" has the meaning specified in the recitals hereto.

"**Bankruptcy Court**" has the meaning specified in the recitals hereto.

"**Builder Lenders**" has the meaning specified in the preamble hereto.

"**Builder Lenders' Account**" means an account at a bank designated by the Builder Lenders from time to time as the account into which the Trustee shall make all payments to the Builder Lenders under this Agreement and the other Loan Documents, but only to the extent such payments are not required to be made to the Term Sheet Escrow.

"**Builder Lenders' LID Remedy**" has the meaning specified in Section 10.1 hereof.

"**Business Day**" means any day that is not a Saturday, Sunday, or other day on which banks in the State of Nevada are authorized or required to close.

"**Budget**" means the budget attached hereto as Exhibit "A", and any successor or modified budget that is acceptable to the Trustee and approved by the Builder Lenders and the Agent, in their sole and absolute discretion. The Budget shall provide for cash flows and accruals of professionals' fees projected in good faith by the Trustee on a weekly basis for the period from July 23, 2011, through November 30, 2011, as such cash flow projections may be amended or modified from time to time by the Trustee and approved by the Builder Lenders and the Agent, in their sole and absolute discretion.

"**Chapter 11 Case**" has the meaning specified in the recitals hereto.

"**Closing Date**" means either the Final Closing Date or the Interim Closing Date.

"**Collateral**" means any and all rights of the Trustee, South Edge, or the Estate to receive payments or reimbursements for funds that have been or will be expended for the construction and/or completion of improvements relating to the LID, whether they constitute general intangibles, accounts, accounts receivable, commercial tort claims, or deposit accounts relating thereto, and all proceeds, products, offspring, or profits thereof (including cash), including payments owing or made under the Acquisition Agreement, but Collateral shall not include the Acquisition Agreement itself.

"**Default**" means any event or condition specified in Section 9 hereof, after the passage of any applicable cure period.

"**Default Rate**" has the meaning specified in Section 2 hereof.

"**Estate**" means the bankruptcy estate of South Edge created pursuant to Bankruptcy Code section 541.

"**Final Closing Date**" means the first date on which (a) the Bankruptcy Court shall have entered the Final Financing Order, and (b) all of the conditions set forth in Section 5 hereof shall have been satisfied by the Trustee in a manner satisfactory to the Builder Lenders and the Agent.

"**Final Financing Order**" means the final order of the Bankruptcy Court approving the Loan Documents, granting the Superpriority Claim status, granting the Builder Lenders' first priority priming liens on the Collateral, granting the Agent, as Agent's Adequate Protection Liens, second-priority liens in the Collateral subject only to the Builders Lenders' first-priority liens on the Collateral, and a first priority lien in all other assets of the Estate other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, and subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code, which order shall have been entered upon motion of the Trustee and which order shall be satisfactory in form and substance to the Builder Lenders and the Agent.

"**Financing Orders**" means the Interim Financing Order and the Final Financing Order.

"**Gomez**" means Gomez Consulting Group, or any other entity performing a similar function with respect to LID-related projects.

"**Interim Closing Date**" means the first date on which (a) the Bankruptcy Court shall have entered the Interim Financing Order, and (b) all of the conditions set forth in Section 5 hereof (except for the entry of the Final Financing Order) shall have been satisfied by the Trustee in a manner satisfactory to the Builder Lenders and the Agent.

"**Interim Financing Order**" means the interim order of the Bankruptcy Court approving the Loan Documents, granting the Superpriority Claim status, and granting the Builder Lenders' first priority priming liens on the Collateral, granting the Agent, as Agent's Adequate Protection Liens, second-priority liens in the Collateral subject only to the Builders Lenders' first-priority liens on the Collateral, and a first priority lien in all other assets of the Estate other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, and subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code, which order shall have been entered upon motion of the Trustee satisfactory in form and substance to the Builder Lenders and the Agent.

"**JPMorgan**" has the meaning specified in the recitals hereto.

"**LID**" has the meaning specified in the recitals hereto.

"**Loan**" means a loan made by the Builder Lenders to the Trustee pursuant to Section 2 hereof.

"**Loan Documents**" means, collectively, this Agreement, any note or notes executed by the Trustee at the Builder Lenders' request, and all other agreements, instruments, and other documents executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Loan or the Obligations, all as may be amended, modified, or extended from time to time.

"**Maturity Date**" means the earliest of: (a) the termination of the Plan Support Agreement, (b) the Trustee's Consent Termination, (c) the effective date of the Plan of Reorganization, (d) termination of the Loans pursuant to Section 10.1 following a Default, or (e) November 30, 2011 (provided, however, that in the case of "e" only, the Maturity Date shall be extended by such additional time, if any, as is permitted for a plan effective date under Section 3(d) of the Plan Support Agreement, provided that a Budget that is acceptable to the Trustee, the Agent, and the Builder Lenders is agreed to in connection with such extension).

"**Notice of Borrowing**" has the meaning specified in Section 2 hereof.

"**Obligations**" means all present and future indebtedness, obligations, and liabilities of the Trustee, on behalf of South Edge and its Estate, to the Builder Lenders under the Loan Documents, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, or unsecured, and whether or not such claim is stayed. Without limiting the generality of the foregoing, the Obligations of the Trustee, South Edge, and its Estate under the Loan Documents include (a) the obligation to pay principal, Default Rate interest following a Default, reasonable attorneys' fees and expenses of the Builder Lenders following a Default that relate to the enforcement of remedies under the Loan Documents, and other amounts payable under the Loan Documents, (b) the obligation to reimburse any amount in respect of any of the foregoing that the Builder Lenders (in their sole discretion) may elect to pay or advance, consistent with the Budget, on behalf of the Trustee and the Estate, (c) advances to protect the Builder Lenders' Collateral following Default, including the completion of LID segment construction, and related documentation, within or outside of South Edge's development pursuant to Section 10.1, and (d) the Section 15 Advances; provided, however, "b" and "c" above shall also require the approval of the Agent in its reasonable discretion. The Obligations shall not be subject to setoff or counterclaim of any kind, including any assertion by the Trustee or the Estate for capital contributions or other alleged obligations of the Settling Builders to South Edge or the Estate.

"**Permitted Liens**" means: (i) liens for taxes or LID assessments for which funding has not been provided to the Trustee under the Budget such that a timely

payment may be made by the Trustee; (ii) liens for taxes or LID assessments not yet payable or that are payable but are being contested in good faith and by appropriate proceedings diligently pursued, provided that a reserve or other appropriate provision, if any, as shall be required by generally accepted accounting principles shall have been made therefore; and (iii) liens in favor of the Builder Lenders and Agent hereunder and under the Financing Orders.

**"Person"** means individual, company, or other entity.

**"Petition Date"** has the meaning specified in the recitals hereto.

**"Plan of Reorganization"** means the chapter 11 plan of reorganization to be confirmed in the Chapter 11 Case in accordance with the Plan Support Agreement.

**"Plan Support Agreement"** has the meaning specified in the recitals hereto.

**"Prepetition Credit Agreement"** means the Credit Agreement, dated November 1, 2004, as amended and restated by the Amended and Restated Credit Agreement, dated March 9, 2007, among South Edge as the borrower, the lenders party thereto, JPMorgan as the Administrative Agent, and The Royal Bank of Scotland PLC as Syndication Agent.

**"Revolving Note"** has the meaning set forth in Subsection 5.1(b) hereof.

**"Section 15 Advances"** means advances made on account of the Settling Builders' obligations pursuant to Section 15 of the Trustee's Consent for all allowed and unpaid administrative expenses of the Estate that are accrued through the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), not to exceed such unpaid amounts as are set forth in the Budget through the Maturity Date (other than as a result of the effective date of the Plan of Reorganization); provided, however, that the allowed fees and expenses of the Trustee, and all professional persons employed by the Trustee, shall not exceed the amount of unpaid fees and expenses for the full Budget period; and provided further that the Trustee reserves all her rights with respect to the allowance and payment in full of (i) any such excess amounts through the Maturity Date, and (ii) additionally any fees and expenses that remain accrued and unpaid through the conclusion of the Chapter 11 Case, from the Agent's cash collateral, from the MI Funds if they are determined to be property of the Estate, or from the Bankruptcy Code Section 506(c) surcharge of the Agent's and Lenders' non-cash collateral under the standard set forth in the Cash Collateral Orders, without prejudice to the rights of all parties in interest in the Chapter 11 Case, including the Agent (on its own behalf and on behalf of the Lenders) to contest such allowance and payment.  Section 15 Advances shall be made only after the satisfaction of such obligations from the following sources, and in the following order: (a) any unencumbered cash held by the Trustee as of the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), (b) LID proceeds in the possession of the Trustee that constitute the Builder Lenders' cash collateral, (c) funds remaining in the Term Sheet Escrow after payment of all amounts

owing from the Term Sheet Escrow to the Agent and the Prepetition Credit Agreement lenders, pursuant to the terms of the Term Sheet Escrow, (d) funds in the Builder Lenders' Account pursuant to Section 2.3(b) hereof, or (e) such other arrangements as are mutually acceptable to the Settling Builders and the Trustee.

"**Settling Builders**" has the meaning specified in the recitals hereto.

"**South Edge**" has the meaning specified in the preamble hereto.

"**Superpriority Claim**" means a claim against South Edge and its Estate in the Chapter 11 Case, which is an administrative expense claim having priority over any and all other administrative expenses of the kind specified in Bankruptcy Code sections 503(b) or 507(b) (including any post-conversion expenses with priority under Bankruptcy Code section 726(b)), except for the superpriority claim granted to the Agent under the Cash Collateral Orders, which shall be pari passu with this claim.

"**Term Sheet Escrow**" means the escrow account established at U.S. Bank National Association created pursuant to the Plan Support Agreement established for, among other purposes, to finance Chapter 11 administrative expenses, including LID assessments and taxes in accordance with the Budget and as contemplated by the Plan Support Agreement.

"**Trustee**" has the meaning specified in the preamble hereto.

"**Trustee's Consent**" has the meaning specified in the recitals hereto.

"**Trustee's Consent Termination**" means the Trustee's taking of actions that are inconsistent with the Plan Support Agreement, as consented to as modified, limited, or clarified by the Trustee pursuant to the Trustee's Consent (including, among other things, the Trustee's opposing the Plan of Reorganization or asserting claims against the Settling Builders or their insiders or affiliates), unless the Trustee's actions are preceded by the Settling Builders and the Agent modifying the Plan Support Agreement or the Plan of Reorganization contemplated thereunder in a manner that has a material adverse effect on the interests of the Estate.

"**Trustee Motion**" has the meaning specified in the recitals hereto.

1.2    Financial Reporting.

Except for professional fee accruals, all financial reporting to the Builder Lenders and the Agent pursuant to Section 6.1 hereof shall be made on a cash flow basis, unless otherwise specifically noted by the Trustee. The Trustee shall comply with the U.S. Trustee Guidelines in connection with financial reports filed in the Chapter 11 Case.

1.3    Terms Generally.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall

include the corresponding masculine, feminine, and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument, or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements, or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits, and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect, and such words shall refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal, or mixed, and whether tangible or intangible, and (f) the term "financial statements" shall include the accompanying notes and schedules.

2.    LOAN AND TERMS OF PAYMENT.

    2.1    <u>Credit Extensions</u>.

        (a)    Promise to Pay.

Subject to the terms and conditions of this Agreement and the other Loan Documents (including the absence of any Default or event that, with the passage of time, would become a Default), the Builder Lenders agree to make Loans to the Trustee, on behalf of the Estate, as set forth below prior to the Maturity Date. The Trustee on behalf of the Estate promises to pay to the Builder Lenders on the Maturity Date, or such earlier date as specified herein, in cash, the aggregate unpaid principal amount of all Loans made by the Builder Lenders to the Trustee, together with any accrued and unpaid Default Rate Interest and other unpaid Obligations in accordance with the terms of this Agreement and the other Loan Documents and the Final Financing Order.

        (b)    Loans.

           (i)    <u>Interim Closing Amount</u>.

Subject to the terms and conditions of this Agreement and the other Loan Documents (including the absence of any Default or event that, with the passage of time, would become a Default), and upon the Interim Closing Date, the Trustee may request Loans in an initial aggregate amount not to exceed $4 million for the purpose of funding those expenses in the Budget that are expressly identified as being payable pursuant to the Interim Financing Order.

           (ii)    <u>Final Closing Amount</u>.

Subject to the terms and conditions of this Agreement and the other Loan Documents (including the absence of any Default or event that, with the passage of time, would become a Default), and upon the Final Closing Date, the Trustee may request Loans from time to time in an amount such that the total Loans outstanding at any time shall not exceed the aggregate of (x) the next applicable weekly "Ending Balance – TIP Loan" on the Budget, plus (y) any revenue or receipt projected through such applicable weekly "Ending Balance – TIP Loan" on the Budget that has not been received by the Trustee or the Estate at such time, less (z) any expense projected through such applicable weekly "Ending Balance – TIP Loan" that has not been paid at such time. Subject to the terms of this Agreement and the other Loan Documents (including the Budget), the Loans shall be revolving Loans from which the Trustee may make draws from time to time in accordance with the Budget and without further approval of the Builder Lenders or the Agent.

(iii)    Form of Loan Request.

When the Trustee desires to obtain a Loan, the Trustee shall notify the Builder Lenders and the Agent (which notice shall be irrevocable) by electronic mail to be received no later than 3:00 p.m. Pacific Time three Business Days before the day on which the Loan is to be made, which Loan shall be made by wire transfer from the Term Sheet Escrow (or, following the Maturity Date with respect to Section 15 Advances only, the Builder Lenders' Account) to the Trustee as the Trustee directs. Such notice (a "**Notice of Borrowing**") shall be in the form reasonably acceptable to the Trustee, the Builder Lenders, and the Agent. The Notice of Borrowing shall be signed by the Trustee.

2.2    Interest Rates and Calculations.

(a)    Interest.

The Loans shall be without interest, unless and until a Default or the Maturity Date, at which time interest will accrue and be payable at the Default Rate.

(b)    Default Rate and Fees.

Upon the occurrence and during the continuance of a Default, (i) the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities, or any other Obligations of the Trustee under this Agreement or the other Loan Documents, shall bear interest from the date such Default occurs until all Obligations are paid in full at the prime rate (as quoted in the Wall Street Journal) plus five percent, per annum, and (ii) the Builder Lenders shall be reimbursed for all of their reasonable attorneys' fees and expenses relating to enforcement of the Builder Lenders' rights with respect to the Loans and other Obligations.

(c)    Computation.

All interest and fees chargeable under this Agreement and the other Loan Documents shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed, and compounded monthly.

2.3    Payments.

(a)    Time of Payments.

The Trustee shall make any payment under this Agreement not later than 1:00 p.m. Pacific Time on the day when due, in cash or other immediately available funds. All payments received after 4:00 p.m. Pacific Time on any Business Day will be credited on the next succeeding Business Day. All payments shall be made by the Trustee without setoff, counterclaim, deduction, or other defense of any kind, including any assertion by the Trustee or the Estate for capital contributions or other alleged obligations of the Settling Builders to the Estate. Whenever any payment made under this Agreement and the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

(b)    Location of Payments.

Prior to the Maturity Date, all payments shall be made to the Term Sheet Escrow. After the Maturity Date, and provided that all distributions from the Term Sheet Escrow to the Agent as required by the Plan Support Agreement have been made, all payments shall be made to the Builder Lenders' Account; provided, however, that if all or any of such distributions to the Agent have not been made, the Trustee shall continue to make payments to the Term Sheet Escrow until such required distributions to the Agent have been fully funded. Following the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), the Builder Lenders shall maintain a balance in the Builder Lenders' Account equal to the lesser of (i) $2 million or (ii) such amounts as the Builder Lenders reasonably conclude may have to be advanced in order to make the Section 15 Advances; provided, however, that prior to making any such reduction, the Builder Lenders shall give the Trustee five Business Days advance notice, and the Builder Lenders shall consent to an expedited hearing in the Bankruptcy Court for the resolution of any dispute concerning any such proposed reduction. Any amounts in the Builder Lenders' Account shall not be subject to attachment, setoff, or counterclaim of any kind, including any assertion by the Trustee or the Estate for capital contributions or other alleged obligations of the Settling Builders to South Edge or the Estate.

2.4    Term.

This Agreement shall become effective on the Interim Closing Date and shall continue in full force and effect for so long as any Obligations remain outstanding or the Builder Lenders have any obligation to make Loans under this Agreement. Notwithstanding the foregoing (and except as provided for Section 15 Advances), the Builder Lenders' obligation to make Loans shall terminate upon the Maturity Date, and prior to the Maturity Date, the Builder Lenders shall have the right to terminate their obligation to make Loans under this Agreement immediately and without further notice upon the occurrence of a Default.

2.5     Revolving Loan.

The Trustee shall repay with receipts received by the Trustee, without penalty or premium, the outstanding principal of Loan, in whole or in part, in such amount that, at the end of each week leaves the Trustee holding no more than $1,000,000 plus amounts projected to be paid, less any revenues or receipts projected to be received, through the next applicable three-week period in the Budget.  Upon such repayment, such amounts shall be available thereafter for further draw by the Trustee pursuant to the Budget and Section 2.1(b)(ii) hereof.

2.6     Use of Proceeds.

(a)     Generally.

The Trustee shall use the Loan proceeds to finance chapter 11 administrative expenses including LID assessments and segment project costs, taxes, the fees and expenses of the Trustee and her professionals in such amounts as are required to be paid on an interim and final basis, and other allowed administrative expenses, in accordance with the Budget and for such purposes and in such amounts as are set forth in the Budget, subject to Section 2.6(b) below; provided, however, that with respect to interim fees, the allowed fees and expenses shall not exceed the amount of unpaid fees and expenses for the full Budget period.

(b)     Deviation.

The Trustee, the Builder Lenders, and the Agent shall work diligently and in good faith with respect to any modifications to the Budget requested by the Trustee and to resolve any disputes that may exist with respect to deviations from the Budget, and the Trustee, the Builder Lenders, and the Agent shall consent to an expedited hearing in the Bankruptcy Court for the resolution of any such disputes.

Upon at least five Business Days advance notice to the Builder Lenders and the Agent (except with respect to the payment of the fees of the Trustee and the Trustee's professionals, which shall be only in such amounts as are set forth in the Budget), the Trustee may use the Loan proceeds for such other purposes and in such other amounts as are (x) reasonably consistent with the Budget, (y) commercially reasonable, or (z) essential to protect the Estate's assets.  Notwithstanding the foregoing notice requirement, the Trustee shall only be required to provide such notice as is reasonably practicable in the event of exigent circumstances that pose an immediate and irreparable threat to the Estate.

(c)     LID Segment Construction.

The Trustee shall confer in advance with the Builder Lenders and the Agent regarding anticipated draws with respect to all LID segment construction provided for in the Budget, including drainage-related construction expenses.

(d)    Professionals.

The inclusion of fees and expenses of the Trustee and her professionals in the Budget are without prejudice to the rights of all parties in the Chapter 11 Case with respect to timely objection to the allowance of such fees and expenses.

2.7    Section 15 Advances.

Notwithstanding the occurrence of the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), unless the Trustee has failed to act diligently and in good faith to comply with this Agreement, the Builder Lenders shall advance to the Trustee the Section 15 Advances.  Without the need for any further Bankruptcy Court order, such Section 15 Advances shall be Superpriority Claims secured by a first priority priming lien on the Collateral pursuant to Bankruptcy Code section 364(d) in the same manner as all other Obligations hereunder, shall accrue interest at the Default Rate, and shall be repaid by the Trustee or the Estate from and upon the earlier of (i) the receipt of any additional LID proceeds by the Trustee or the Estate, (ii) subject to the Agent's prior perfected lien and on terms acceptable to the Agent, such of the funds in the disputed MI Deposit Account as are determined to be property of the Estate (in such amounts and at such times as received by the Trustee or the Estate, until the Section 15 Advances are paid in full), (iii) the obtaining of any alternative section 364 financing, (iv) subject to the Agent's prior perfected lien and on terms acceptable to the Agent, the proceeds of the sale of substantially all of the assets of the Estate, (v) distributions pursuant to a plan of reorganization upon its effective date, or (vi) funds otherwise available for such application upon the conversion or dismissal of the Chapter 11 Case, under the terms hereof.

2.8    Source of Loans.

All Loans under this Agreement shall be funded from the Term Sheet Escrow, except to the extent that loans from the Builder Lenders' Account are required to fund the Section 15 Advances upon the Maturity Date.  The rights and obligations of each of the Builder Lenders under this Agreement are several, in the percentages set forth in Exhibit "1" to the plan term sheet that is a part of the Plan Support Agreement.

3.    ALLOWANCE AND PRIORITY OF CLAIMS

Upon entry of the Interim Financing Order or the Final Financing Order, as the case may be, the Obligations of the Trustee and of South Edge and its Estate hereunder shall at all times constitute allowed Superpriority Claims under the terms hereof.

4.    SECURITY INTEREST IN FAVOR OF LENDERS

4.1    Security Interest in Collateral.

As security for the Loans and all other Obligations, the Trustee on behalf of South Edge and its Estate hereby pledges, assigns, and grants to the Builder Lenders first priority priming liens on all of the Collateral.  Except as set forth herein with respect to

the Collateral, the Agent's liens in and to the Debtor's and the Estate's assets granted to the Agent for itself and the benefit of the Lenders in accordance with the terms of the Cash Collateral Order and the first priority status thereof, shall be unaffected by the terms of this Agreement, the Interim Financing Order, and the Final Financing Order and shall remain in full force and effect.

4.2    Priority of Builder Lenders' and Agent's Security Interests.

The Builder Lenders' liens on the Collateral shall be senior to all other liens, encumbrances, and other interests in such Collateral pursuant to Bankruptcy Code section 364(d)(1), including any lien or other encumbrances of the Agent under the Prepetition Credit Agreement or under prior orders of the Bankruptcy Court, except that (i) the Agent shall be granted a second priority lien on all Collateral and a first priority lien in all other assets of the Estate, other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, in accordance with Agent's Adequate Protection Lien for any diminution of the value of the Agent's interest in the Collateral resulting from the use of the Collateral and the imposition of the automatic stay, and (ii) the Permitted Liens, if any, may be senior to the Builder Lenders' liens, but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code. The Builder Lenders' liens on the Collateral shall not be subject to surcharge under Bankruptcy Code section 506(c) or otherwise.

4.3    Preservation of Collateral; Perfection of Builder Lenders' Security Interest and Agent's Security Interest.

The Builder Lenders' and Agent's liens on the Collateral shall be deemed perfected with no need for the Trustee to execute any additional documents or of recordation. Notwithstanding the foregoing, the Trustee shall, at the Builder Lenders' request, or Agent's request, at any time and from time to time, execute and deliver to the Builder Lenders or Agent such security agreements, mortgages, financing statements, documents, and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed reasonably necessary or desirable by the Builder Lenders or Agent) and do such other acts and things as the Builder Lenders or Agent may deem necessary or desirable in order to establish and maintain the validity, attachment, and perfection of the Builder Lenders' liens or Agent's liens (free and clear of all other liens, claims, and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Permitted Liens). The Trustee irrevocably hereby makes, constitutes, and appoints the Builder Lenders and Agent (and all Persons designated by the Builder Lenders or Agent for that purpose) as the Trustee's true and lawful attorney and agent-in-fact to execute such security agreements, mortgages, financing statements, documents, and other agreements and instruments and do such other acts and things as may be necessary or appropriate to preserve and perfect the Builder Lenders' liens or Agent's liens on the Collateral. The Trustee further agrees that a carbon, photographic, photostatic, or other reproduction of this Agreement, the Financing Orders, or of a financing statement shall be sufficient as a financing statement.

13

5.    CONDITIONS OF LOANS

    5.1    <u>Conditions Precedent to all Loans</u>.

    The obligation of the Builder Lenders, if any, to make any Loan is subject to the satisfaction of the following conditions precedent (or the express prior waiver thereof by the Builder Lenders, which shall be in writing and subject to the Builder Lenders' sole and absolute discretion):

        (a)    Interim Financing Order.

    The Bankruptcy Court shall have entered, and the Builder Lenders and the Agent shall have received a true copy of, an order in substantially the form of Exhibit "B" attached hereto, with only such changes as the Builder Lenders and Agent have approved in their sole and absolute discretion, approving on an interim basis pursuant to Bankruptcy Rule 4001(c)(2) this Agreement and the other Loan Documents, the granting the Superpriority Claim status, the Builder Lenders' first priority liens on the Collateral, and the Agent's second priority Adequate Protection Liens on the Collateral and first priority Adequate Protection Lien on the Estate's other assets other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, and subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code, which Interim Financing Order (i) shall have been entered upon motion of the Trustee in form and substance acceptable to the Builder Lenders and the Agent, (ii) shall be in full force and effect, (iii) shall not have been stayed, revoked, reversed, modified, or amended in any respect, and (iv) shall include full Bankruptcy Code section 364(e) findings and protections for the Builder Lenders and the Agent;

        (b)    Delivery of Documents.

    The Builder Lenders shall have received from the Trustee the following documents in each case duly executed by the Trustee:  (i) this Agreement; (ii) a promissory note (the "**Revolving Note**") in form and substance satisfactory to the Builder Lenders in their sole and absolute discretion; and (iii) such other Loan Documents (including UCC financing statements) as shall reasonably be requested by the Builder Lenders; and the Agent shall have received copies of each of the foregoing;

        (c)    Notice of Borrowing.

    The Builder Lenders shall have timely received from the Trustee a duly executed Notice of Borrowing;

        (d)    No Default.

    No Default or event that, with the passage of any applicable cure period, would become a Default, shall have occurred and be continuing;

(e)    No Maturity.

The Maturity Date shall not have occurred; provided, however, that notwithstanding the passage of the Maturity Date, the Builder Lenders' shall, subject to the terms of Section 2.7 hereof, make the Section 15 Advances if and to the extent required hereunder; and

(f)    Final Financing Order.

Except for those operating expenses which are expressly indicated on the Budget as being payable following entry of the Interim Financing Order (in an amount not to exceed $4 million), on or before August 12, 2011, the Bankruptcy Court shall have entered, and the Builder Lenders and the Agent shall have received a true copy of, an order in substantially the form of Exhibit "B" attached hereto (modified to be a final order), with only such changes as the Builder Lenders and the Agent have approved in their sole and absolute discretion, approving on a final basis this Agreement and the other Loan Documents, the granting of the Superpriority Claim status, and the Builder Lenders' first priority liens on the Collateral, the Agent's second priority Adequate Protection Liens on the Collateral, and first priority Adequate Protection Lien on the Estate's other assets other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, and subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code, which Final Financing Order (i) shall have been entered upon motion of the Trustee in form and substance acceptable to the Builder Lenders and the Agent, (ii) shall be in full force and effect, (iii) shall not have been stayed, revoked, reversed, modified, or amended in any respect, and (iv) shall include full Bankruptcy Code section 364(e) findings and protections for the Builder Lenders.

6.    REPRESENTATIONS AND WARRANTIES.

The Trustee hereby represents and warrants to the Builder Lenders the following statements to be true and correct as of each Closing Date and of each date that a Notice of Borrowing is submitted:

6.1    Authority.

The Trustee (i) is the duly appointed chapter 11 trustee of South Edge, (ii) has all requisite power and authority to conduct the business of South Edge as now conducted and as presently contemplated and, (iii) subject to the entry and the terms of the Interim Financing Order or the Final Financing Order, as the case may be, has the authority to make the borrowings hereunder, and to execute and deliver each Loan Document to which she is a party, and to consummate the transactions contemplated thereby.

6.2    <u>Execution and Binding Effect</u>.

Subject to the entry and the terms of the Interim Financing Order or the Final Financing Order, as the case may be, this Agreement and each of the other Loan Documents when delivered hereunder is or will be duly and validly executed and delivered by the Trustee and constitutes legal, valid, and binding obligations of the Trustee and of South Edge and its Estate, enforceable in accordance with the terms hereof or thereof, and binding upon any successor to the Trustee (including any chapter 7 trustee for South Edge).

6.3    <u>No Default</u>.

No Default or event that, with the passage of the applicable cure period would become a Default, exists.

7.    AFFIRMATIVE COVENANTS.

Until payment in full of all outstanding Obligations, and for so long as the Builder Lenders may have any commitment to make any Loans hereunder (including the Section 15 Advances), the Trustee shall do all of the following:

7.1    <u>Financial Reporting</u>.

The Trustee, or any of her retained advisors, shall provide to the Builder Lenders and the Agent the following:

       (i)       copies of the monthly operating reports filed in the Chapter 11 Case, and all other financial reports required to be prepared by the United States Trustee Guidelines or otherwise prepared by the Trustee and filed in the Chapter 11 Case;

       (ii)      copies by electronic mail or paper service of all pleadings, motions, applications, reports, or other documents filed by or on behalf of the Trustee with the Bankruptcy Court or the Office of the United States Trustee;

       (iii)     every two weeks, (x) a reconciliation report comparing actual cash flows and accrued professionals fees and expenses (including summary, mid-month reports by the Trustee's principal professionals) versus the Budget, with explanations of any material variances, and (y) a summary statement of cash balances and accrued accounts payable, each to be provided to the Builder Lenders within 14 days after the end of each two-week period; and

       (iv)     copies of all documents relating to the LID segments that the Trustee submits to either Gomez or the City of

16

Henderson in order to have the completed LID projects approved and submitted for reimbursement, and a weekly update, either written or oral, summarizing the progress on current LID segment projects, which update shall include the following information: (1) summary of meetings with representatives from the City of Henderson or other governmental entities, (2) expenditures, (3) status of pending approvals from both Gomez and the City of Henderson for completed projects, (4) any updates on imminent overruns or delays, and (5) the status of the reimbursement on prior LID projects.

7.2     Books and Records.

The Trustee shall maintain books of account and other records for South Edge and for disbursement and use of the proceeds of the Loan, and the same shall be available for inspection and copying by the Builder Lenders and the Agent upon reasonable prior notice.  The Trustee shall use her best efforts to obtain all remaining South Edge books and records that are in the possession of the former manager of South Edge and its affiliates.

7.3     Use of Proceeds.

The Trustee shall use the loan proceeds to finance allowed administrative expenses of the Chapter 11 Case solely in accordance with the Budget and Sections 2.6 and 2.7 hereof.

7.4     Cooperation and Consultation.

Subject to the execution of reasonable confidentiality and/or common interest agreements, and further subject to the terms of the Trustee's Consent, the Trustee shall consult in advance with the Builder Lenders and the Agent regarding the administration of the Estate, including (i) the prosecution of claims on behalf of the Estate and the incurrence of material fees and expenses in connection therewith, (ii) claims objections, (iii) restructuring, planning, or development proposals to the City of Henderson, other governmental entities, and holders of bonds issued in connection with LID, and (iv) other matters affecting the administration of the Estate.  The Trustee shall make available to the Builder Lenders and Agent, upon reasonable notice, access to all plans, reports, records, and other non-privileged documentation (including records relating to prevailing wage compliance) relating to LID segment work and other projects within South Edge's development.

8.     NEGATIVE COVENANTS.

Until payment in full of all outstanding Obligations, and for so long as Builder Lenders may have any commitment to make any Loans hereunder, the Trustee shall not do any of the following without Builder Lenders' prior written consent; provided, however, that Sections 8.5, 8.6, and 8.7 shall not apply upon the occurrence of a Maturity

Date (other than as a result of the effective date of a Plan of Reorganization), but in no event shall funds advanced by the Builder Lenders be used (x) to fund the pursuit or investigation of any claims against the Builder Lenders, the Settling Builders, or their insiders or affiliates, or (y) to oppose the Plan of Reorganization:

### 8.1    Superpriority Claims/Senior Liens.

Apply to the Bankruptcy Court for the authority to incur, create, assume, suffer to exist, or permit, or incur, create, assume, suffer to exist, or permit, any other Superpriority Claim, lien, or encumbrance that is either (i) pari passu with or senior to the liens or claims of the Builder Lenders with respect to the Collateral, except for the Permitted Liens, or (ii) pari passu with or senior to the Superpriority Claim with respect to any unencumbered assets of the Estate; provided, however, that this Section shall not apply if one of the purposes of such application is to provide for the immediate satisfaction, in full and in cash, of all outstanding Obligations.

### 8.2    Financing Orders.

At any time, seek or consent to any revocation, reversal, modification, vacation, or staying of the Financing Orders, except as may be agreed by the Builder Lenders and the Agent in their sole and absolute discretion.

### 8.3    Deviation from Budget.

Accrue, incur, or pay any expense that is not provided for in the Budget, or permit any of the forgoing to occur, except as may be agreed by the Builder Lenders and the Agent, in their sole and absolute discretion, or as permitted pursuant to Section 2.6 hereof.

### 8.4    Protection of Collateral.

Compromise, settle, release, or otherwise cause or permit the modification of any rights of the Trustee, South Edge, the Estate, or the Builder Lenders in and to the Collateral.

### 8.5    Significant Transactions.

Approve, file, support, or consent to any of the following that is not approved by the Builder Lenders, in their sole and absolute discretion: (i) a plan of reorganization in the Chapter 11 Case; (ii) a sale or compromise of material assets of South Edge or its Estate (the term "material" includes the sale or other transfer of any real property, and the settlement of any claims by or against members and former members of South Edge and their insiders or affiliates); (iii) the allowance of any claims against South Edge or its Estate in excess of $25,000 other than such claims as appear in the Schedules of Assets and Liabilities of South Edge previously filed by the Trustee in the Chapter 11 Case that were not scheduled as disputed, contingent or unliquidated, and for which no proof of claim was filed by such claimant; (iv) the entry into any contract with a total cost to South Edge or the Estate in excess of $25,000; provided, however, that if the contract

relates to an expenditure which has been set forth in the Budget, and if each of the Builder Lenders is given an equal opportunity to bid on the contract, and either (x) all Builder Lenders choose not to bid, or (y) none of the bids by any of the Builder Lenders is the lowest bid, then written consent from the Builder Lenders shall not be required for such contract if such contract is commercially reasonable; (v) material amendments to plans, permits, or specifications for any improvements to South Edge's property; or (vi) amendments to South Edge's Development Plan, Acquisition Agreement, or other material agreements with or relating to the City of Henderson or the LID, or other governmental entities; provided, however, "iii", "v", and "vi" above shall also require the approval of the Agent in its sole and absolute discretion.  In connection with "iv" above, the Trustee and her representatives will only be required to deal with a single representative to be appointed by the Builder Lenders.  The Builder Lenders' representative will coordinate any bids from the Builder Lenders, and/or their subcontractors.

### 8.6    Litigation Against Builder Lenders.

File or pursue any litigation or other claims against the Builder Lenders, the Settling Builders, or their insiders or affiliates, except with respect to actions to interpret or enforce the Trustee's rights under this Agreement.

### 8.7    Trustee Consent.

Unless the Trustee's Consent has been terminated in accordance with the limitations and qualifications set forth therein, take any action that is inconsistent with the Trustee Consent, including objecting to or otherwise opposing confirmation of the Plan of Reorganization.

### 9.    DEFAULTS.

Any one or more of the following events shall constitute a Default under this Agreement and the other Loan Documents:

(a)    the Trustee's failure to pay when due any monetary sum payable under this Agreement or any of the other Loan Documents, and such failure to pay continues for two Business Days after written notice by Builder Lenders to the Trustee that such sum is due and payable;

(b)    other than a monetary default of the type specified in Section 9.1(a), the Trustee's failure to perform, observe, or otherwise comply with any material term, condition, affirmative or negative covenant, or other agreement contained in this Agreement or in any of the other Loan Documents, and as to any such default that can be cured, the Trustee has failed to cure such default within five Business Days after the Trustee receives notice thereof from the Builder Lenders;

(c)    any representation or warranty made by the Trustee hereunder shall be untrue and, as to any such default that can be cured by the Trustee, the Trustee

has failed to cure such default within five Business Days after the Trustee receives notice thereof from the Builder Lenders;

        (d)    an order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

        (e)    the Trustee shall take any actions that are inconsistent with the Trustee's Consent, which actions are not revoked or annulled within five Business Days after the Trustee receives notice thereof from the Builder Lenders;

        (f)    an order shall be entered dismissing the Chapter 11 Case and such order does not provide for termination of the commitment hereunder and under the other Loan Documents, and for the immediate payment in full in cash of all Obligations hereunder and under the other Loan Documents; or

        (g)    an order shall be entered, without the express prior written consent of the Builder Lenders, to revoke, reverse, modify, stay, or vacate the Financing Orders.

10.     LENDERS' RIGHTS AND REMEDIES.

        10.1   Remedies Generally.

        Upon the occurrence of a Default, the Builder Lenders may immediately, upon giving notice to the Trustee, (a) in addition to the Builder Lenders' rights under Section 5.1(d) hereof, cease to make any Loans under this Agreement or any other Loan Document (other than the Section 15 Advances if and to the extent required hereunder), (b) declare all or any portion of the Loans and all other outstanding Obligations to be due and payable immediately, without further order of, or application to, the Bankruptcy Court, and without presentment, demand, or protest, all of which are hereby expressly waived by the Trustee, (c) subject to the following Sections 10.2 and 10.3 below, exercise any and all of its other rights and remedies under applicable law (including, but not limited to, the Bankruptcy Code), this Agreement, and the other Loan Documents, for the purpose of seeking and expediting repayment of all outstanding Obligations from the Collateral consistent with the provisions of section 9-607 of the UCC, and (d) the right (but not the obligation) to pay outstanding invoices, satisfy LID-related assessments and property taxes, and make other protective advances to the Trustee to enable her to complete LID segment construction and submit related documentation to collect LID Proceeds and apply them in reduction of any outstanding Loans and other Obligations, and additionally, upon 30 days after delivery of such notice if the Trustee has insufficient funds or financing available to enable her to do so, actually complete LID segment construction within or outside of South Edge's development (provided the Builder Lenders will consult on an ongoing basis with the Agent with respect to all contemplated and ongoing projects), and submit related documentation to collect LID Proceeds and apply them in reduction of any outstanding Loans and other Obligations (the "Builder Lenders' LID Remedy"); provided, however, that the Builder Lenders shall not be entitled to foreclose upon the Collateral or any of the other assets of the Estate.

In furtherance of the Builder Lenders' right to be repaid the Obligations in full immediately upon the occurrence of a Default (and without in any way limiting the rights of the Builder Lenders set forth in the remainder of this Section 10.1 or otherwise in this Agreement), and subject to the Trustee's retention of $150,000 in cash to be used to satisfy essential post-Default chapter 11 administrative expenses consistent with the Budget (excluding LID work or the Trustee's fees or the fees of her professionals) through a date that is the earlier of (i) thirty days after notice to the Trustee of the Default or (ii) the approval by the Bankruptcy Court of Bankruptcy Code section 364 borrowings from any source other than the Builder Lenders, the following funds must be used to repay the Builder Lenders following a Default, without any offset or delay of any kind whatsoever: (x) any unencumbered cash held by the Trustee as of the Maturity Date (to the extent such cash is not applied to Section 15 Advances), (y) LID proceeds in the possession of the Trustee that constitute the Builder Lenders' cash collateral, and (z) any proceeds of subsequent Bankruptcy Code section 364 borrowings from any source.

10.2     Relief from the Automatic Stay.

With respect to relief from the automatic stay of Bankruptcy Code section 362, the Financing Orders shall provide that if a Default occurs, then (i) the Builder Lenders may set an expedited hearing for relief from the automatic stay on not less than three Business Days' notice and at such hearing the only issues will be (x) whether an uncured Default exists, and (y) whether the Bankruptcy Court may impose any condition on the exercise of the Builder Lenders' remedies (which condition the Builder Lenders may oppose), so long as such condition does not delay the Builder Lenders' exercise of remedies for more than 30 days and otherwise does not impair the interests of the Builder Lenders in their Collateral hereunder; and (ii) consistent with the Bankruptcy Court's determination as to "i" above, the Builder Lenders shall be granted relief from stay if an uncured Default is found to exist.

10.3     Modification of the Automatic Stay.

Subject to Sections 10.1 and 10.2 of this Agreement, upon entry of the Interim Financing Order or the Final Financing Order, as the case may be:

(a)     the automatic stay provisions of Bankruptcy Code section 362 shall be vacated and modified to the extent necessary to permit the Builder Lenders to exercise all rights afforded to them hereunder and to effectuate the provisions of this Agreement and the Financing Orders, without the need for filing further pleadings or application to or order of the Bankruptcy Court; and

(b)     no party in interest shall have the right to contest the enforcement of the remedies set forth in this Agreement on any basis other than the fact that a Default has not occurred. No party in interest shall have the right to seek injunctive relief against such enforcement under Bankruptcy Code section 105 or otherwise, or to seek injunctive relief in conflict with the provisions of this Agreement or the Financing Orders.

11.     NOTICES.

Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement and the other Loan Documents and/or any other agreement entered into in connection herewith shall be in writing and (except for informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by a recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, or by facsimile or electronic mail to the Trustee, the Builder Lenders, or the Agent, as the case may be, at its addresses set forth below:

If to Trustee:                SOUTH EDGE, LLC.
                                [INSERT]

                                Attn:  Cynthia Nelson
                                FAX:  (213) 452-6099
                                Email: Cynthia.nelson@fticonsulting.com

with a copy to:          MILBANK, TWEED, HADLEY, & MCCLOY LLP
                                601 South Figueroa Street, 30th Floor
                                Los Angeles, CA  90017
                                Attn:  Robert J. Moore, Esq.
                                Attn:  David B. Zolkin, Esq.
                                FAX:  (213) 629-5063
                                Email: rmoore@milbank.com
                                Email: dzolkin@milbank.com

If to Builder Lenders:     [INSERT]

                                Attn:
                                Attn:
                                FAX:
                                Email:

with a copy to:          STUTMAN, TREISTER & GLATT P.C.
                                1901 Avenue of the Stars, 12th Floor
                                Los Angeles, CA  90067
                                Attn:  K. John Shaffer, Esq.
                                Attn: Robert A. Greenfield, Esq.
                                FAX:  (310) 228-5788
                                Email: jshaffer@stutman.com
                                Email: rgreenfield@stutman.com

If to Agent:                JPMorgan Chase Bank, N.A.
                            383 Madison Avenue, 23rd Floor
                            New York, NY  10179
                            Attn:  William A. Austin
                            FAX:  (212) 622-4556
                            Email: William.A.Austin@jpmchase.com

with a copy to:             Morrison & Foerster LLP
                            425 Market Street
                            San Francisco, CA  94105
                            Attn:  G. Larry Engel, Esq.
                            FAX:  (415) 268-7522
                            Email: lengel@mofo.com

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

12.     CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

        THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF NEVADA, EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE AND EXCEPT AS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE TRUSTEE HEREBY IRREVOCABLY ACCEPTS, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT.  THE UNDERSIGNED ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES.  TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY LOAN DOCUMENT.

13.     GENERAL PROVISIONS.

        13.1    Binding Effect.

        This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of the Trustee and the Builder Lenders, and their successors and assigns.

13.2    Time of Essence.

Time is of the essence for the performance of all obligations set forth in this Agreement.

13.3    Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

13.4    Amendments in Writing, Integration.

All future amendments to or terminations of this Agreement or the other Loan Documents must be in writing. All prior agreements, understandings, representations, warranties, and negotiations between the parties hereto with respect to the subject matter of this Agreement and the other Loan Documents, if any, are merged into this Agreement and the Loan Documents. This Agreement and its Exhibits are the entire agreement between the Trustee and the Builder Lenders with regard to the obligations and terms of any loans now or hereafter outstanding hereunder.

13.5    Counterparts.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.

13.6    Survival.

All covenants, representations, and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding.

24

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**TRUSTEE:**

**CYNTHIA NELSON, NOT IN HER INDIVIDUAL CAPACITY, BUT SOLELY IN HER CAPACITY AS THE CHAPTER 11 TRUSTEE OF SOUTH EDGE, LLC, ON BEHALF OF SOUTH EDGE AND ITS BANKRUPTCY ESTATE**


By:_____
        Cynthia Nelson:
        Title:   Chapter 11 Trustee for South Edge, LLC

**BUILDER LENDERS:**

        **[INSERT]**


By:_____
        Name:
        Title:

25

**EXHIBIT A**

South Edge, LLC
13-Week Cash Flow Forecast
Beginning July 21 - November 25, 2011

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | WE | Forecast 7/22/2011 | Forecast 7/29/2011 | Forecast 8/5/2011 | Forecast 8/12/2011 | Forecast 8/19/2011 | Forecast 8/26/2011 | Forecast 9/2/2011 | Forecast 9/9/2011 | Forecast 9/16/2011 | Forecast 9/23/2011 | Forecast 9/30/2011 | Forecast 10/7/2011 | Forecast 10/14/2011 |
| **Cash Receipts and Disbursements** | (7/21 - 7/22) | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | |
| Net LID T1-18 Acquisition Payments (1) | | 3,581,576 | | | | | | | | | | | | 1,093,755 |
| Trustee in Possession Loan Draw (2) | | | | | | | | | | | 5,357,392 | 801,144 | 3,859,989 | |
| Miscellaneous Deposits | | | | | | | | | | | | | | |
| **TOTAL CASH RECEIPTS** | | 3,581,576 | | | 9,315,149 | | 3,242,888 | | | | | | 3,859,989 | 1,093,755 |
| | | | | | | | | | | | | | | |
| **Disbursements** | | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| US Trustee Fees | | | | | | | | | | | | | | |
| Security and Maintenance (3) | | 5,500 | 5,500 | | 2,500 | 10,000 | 5,300 | 2,500 | 2,500 | | 2,500 | 2,800 | 2,500 | |
| Survey Bond Payments | | | | | | | | | 1,302 | | | | | |
| HOA Subsidies (8) | | | | | | | | | 86,000 | | 11,000 | | 22,000 | 1,866,460 |
| Other Construction Costs (9) | | | | 60,000 | 24,733 | | | | | | | | | |
| LID Improvement Costs (9) | | | | | | | | | | | | | | |
| LID Reimbursement Administration (9) | | | | | | | | | | | | | | 104,800 |
| **Total Construction and Maintenance** | | | 5,500 | 60,000 | 27,233 | 104,800 | 5,300 | 91,802 | 131,000 | 782,221 | 13,500 | 1,357,320 | 24,500 | 1,971,280 |
| Accounting, Taxes, and Outside Legal (7) | | 1,283 | 61,285 | 17,075 | | | | | | | | | | |
| Insurance (6) | | | | | | | | | | | | | | |
| Marketing and Advertising (10) | | | | | | | | | | | | | | |
| General, Administrative and Operations (11) | | 100 | 1,283 | 2,100 | | | 1,200 | 2,100 | 19,856 | | | 11,200 | 2,100 | 104,800 |
| Escrow for Estate Windown (14) | | | | | | | | | | | | | | |
| Escrow for Unpaid Estate Professional Fees, Holdback (14) | | | | | | | | | | | | | | |
| **Total Selling, General & Administrative** | | | 62,567 | 19,175 | 100 | 10,100 | 11,200 | 2,100 | 29,956 | 100 | 13,500 | 11,200 | 2,100 | 100 |
| LID T1-18 Bond Assessments (12) | | 2,317,522 | | | | | | | | | | | | |
| Property Taxes (13) | | 600,000 | | | 266,238 | | | | | | | 266,238 | | |
| **Total LID and Property Taxes** | | 2,917,522 | | | 266,238 | | | | | | | 266,238 | | |
| **TOTAL OPERATING DISBURSEMENTS** | | 2,917,622 | 68,067 | 79,175 | 293,571 | 114,900 | 16,500 | 2,100 | 121,758 | 131,100 | 13,600 | 26,600 | 1,971,380 | |
| | | | | | | | | | | | | | | |
| **Bankruptcy Related Disbursements** | | | | | | | | | | | | | | |
| Repayment of Trustee in Possession Loan (2) | | | | | | | | | | | | | | |
| Estate Professional Fees (14) | | | | | 3,667,100 | | 789,500 | 3,593,652 | | | | | | |
| Estate Noticing/Agent Fees (14) | | | 10,000 | | | 10,000 | 10,000 | | 10,000 | | | 10,000 | | 20,000 |
| Lender Professional Fees (15) | | | | | 3,280,000 | | 730,000 | | | | | | | |
| Chapter 11 Trustee Fee (estimated) | | | | | | | | | | | | | | |
| Chapter 11 Trustee Hourly-Based Fee (estimated) | | 100 | | 2,100 | | | | | | | | | | |
| **TOTAL BANKRUPTCY RELATED DISBURSEMENTS** | | 100 | 10,000 | | 6,947,100 | | 1,499,500 | | | 131,000 | | 1,113,755 | | |
| Accrued Estate Professional Fees and Expenses (14) | | 4,287,000 | 5,172,500 | 5,505,400 | 1,505,400 | 1,505,400 | 1,596,400 | 1,596,400 | 1,596,400 | 1,596,400 | 1,596,400 | 1,717,150 | 1,717,150 | |
| Accrued Lender Professional Fees and Expenses (15) | | 3,280,000 | 4,010,000 | 4,010,000 | 730,000 | 730,000 | 390,000 | 390,000 | 390,000 | 390,000 | 390,000 | | | |
| Contingency Provision (5% of Disbursements) | | | | | | | | | | | | | | |
| **TOTAL DISBURSEMENTS** | | 3,063,503 | 145,881 | 81,971 | 83,134 | 381,034 | 7,602,704 | 120,645 | 1,591,600 | 75,800 | 6,745 | 127,846 | 159,987 | 27,930 |
| | | | | | | | | | | | | | | |
| **Net Cash Generated (Used)** | | 518,073 | (81,971) | (83,134) | 1,712,445 | (120,645) | (1,591,600) | 3,240,683 | (127,846) | (178,769) | (14,280) | (2,921,791) | 3,832,059 | (2,145,637) |
| **Cumulative Net Cash Generated (Used)** | | 518,073 | 436,103 | 352,969 | 2,065,414 | 1,944,769 | 352,969 | 3,593,652 | 3,465,806 | 3,289,040 | 3,274,760 | 352,969 | 4,185,028 | 2,239,392 |
| | | | | | | | | | | | | | | |
| **Cash Rollforward** | | | | | | | | | | | | | | |
| Beginning Balance - Total Cash | | 647,031 | 1,155,104 | 1,083,134 | 1,000,000 | 2,712,445 | 2,591,800 | 1,000,000 | 4,240,683 | 4,112,837 | 3,936,071 | 3,921,791 | 1,000,000 | 4,832,059 |
| Cash Used/(Generated) - Total Cash | | 518,073 | (81,971) | (83,134) | 1,712,445 | (120,645) | (1,591,800) | 3,240,683 | (127,846) | (176,769) | (14,280) | (2,921,791) | 3,832,059 | (2,145,637) |
| **Ending Balance - Total Cash** | | 1,155,104 | 1,083,134 | 1,000,000 | 2,712,445 | 2,591,800 | 1,000,000 | 4,240,683 | 4,112,837 | 3,936,071 | 3,921,791 | 1,000,000 | 4,832,059 | 2,686,423 |
| | | | | | | | | | | | | | | |
| Beginning Balance - Encumbered Cash | | 153,598 | 1,165,104 | 1,083,134 | 1,000,000 | 2,712,445 | 2,591,800 | 1,000,000 | 4,240,683 | 4,112,837 | 3,936,071 | 3,921,791 | 1,000,000 | 4,832,059 |
| Receipts - Encumbered Cash | | 3,581,578 | | | 9,315,149 | | | 3,242,888 | | | | 801,144 | 3,859,989 | 1,093,755 |
| (Disbursements) - Encumbered Cash | | (2,570,040) | (81,971) | (83,134) | (7,602,704) | (120,645) | (1,591,800) | (2,205) | (127,846) | (958,987) | (14,280) | (3,722,935) | (27,930) | (3,239,392) |
| **Ending Balance - Encumbered Cash** | | 1,165,104 | 1,083,134 | 1,000,000 | 2,712,445 | 2,591,800 | 1,000,000 | 4,240,683 | 4,112,837 | 3,936,071 | 3,921,791 | 1,000,000 | 4,832,059 | 2,686,423 |
| | | | | | | | | | | | | | | |
| **Loan Rollforward** | | | | | | | | | | | | | | |
| Beginning Balance - TIP Loan | | | | | | | | | | | 5,357,392 | 6,357,392 | 15,357,392 | 18,416,238 |
| Draws | | | | | | | | | | 5,357,392 | | 1,000,000 | 3,859,989 | |
| Repayments | | | | | | | | | | | | (801,144) | | (1,083,755) |
| **Ending Balance - TIP Loan** | | | | | | | | | | 5,357,392 | 15,357,392 | 14,556,248 | 18,416,238 | 17,332,483 |

South Edge Preliminary Budget (circulated July 7)

1

EXHIBIT A

**South Edge, LLC**
**19-Week Cash Flow Forecast**
**Beginning July 21 - November 25, 2011**
**Cash Receipts and Disbursements**

| | Forecast 14 WE 10/21/2011 | Forecast 15 10/28/2011 | Forecast 16 11/4/2011 | Forecast 17 11/11/2011 | Forecast 18 11/18/2011 | Forecast 19 11/25/2011 | Cumulative 19 Weeks |
|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | |
| Net LID T-18 Acquisition Payments (1) | - | - | - | - | - | 2,820,773 | 20,782,967 |
| Trustee in Possession Loan Draw (2) | - | 6,133,823 | 5,450,837 | 9,151,253 | - | - | 25,450,439 |
| LID Improvement Reserve Draw (2) | - | - | - | - | - | - | - |
| Miscellaneous Deposits | - | - | - | - | - | - | - |
| **TOTAL CASH RECEIPTS** | - | 6,133,823 | 5,450,837 | 9,151,253 | - | 2,820,773 | 46,233,407 |
| **Disbursements** | | | | | | | |
| **Operating Disbursements** | | | | | | | |
| Security and Maintenance (3) | 2,500 | 3,000 | 2,500 | 13,777 | 2,500 | 1,600 | 35,700 |
| Survey Bond Payments | - | - | - | - | - | - | 39,811 |
| Estate Professional Fees (14) | - | 557,480 | - | - | - | - | 3,877,480 |
| Other Construction Costs (5) | - | - | - | - | - | - | 60,000 |
| LID Reimbursement Administration (6) | - | - | - | - | - | - | 578,400 |
| Total Construction and Maintenance | 2,500 | 560,480 | 2,500 | 13,777 | 2,500 | 1,600 | 4,591,391 |
| Accounting, Taxes, and Outside Legal (7) | - | 10,000 | - | - | - | - | 37,075 |
| HOA Subsidies (8) | - | - | - | - | 104,800 | - | 111,285 |
| Insurance (9) | - | - | - | - | - | - | 19,856 |
| Marketing and Advertising (10) | - | - | - | - | - | - | 18,583 |
| General, Administrative and Operations (11) | 100 | 1,200 | 2,100 | 100 | 100 | - | 186,798? |
| Total Selling, General & Administrative | 100 | 11,200 | 2,100 | 100 | 104,900 | - | 186,799 |
| LID T-18 Bond Assessments (12) | - | - | - | - | - | 24,300 | 2,317,522 |
| Property Taxes (13) | - | - | - | - | - | 131,000 | 1,132,476 |
| Total LID and Property Taxes | - | - | - | - | - | 155,300 | 3,449,998 |
| **TOTAL OPERATING DISBURSEMENTS** | 2,600 | 571,680 | 4,600 | 13,877 | 107,400 | 156,900 | 8,228,188 |
| **Bankruptcy Related Disbursements** | | | | | | | |
| US Trustee Fees | - | - | - | - | - | 30,000 | 50,000 |
| Repayment of Trustee in Possession Loan (2) | - | 6,873,573 | - | 9,151,253 | - | 2,820,773 | 20,782,967 |
| Estate Professional Fees (14) | - | - | - | - | - | - | 6,577,600 |
| Estate Noticing Agent Fees (14) | - | - | - | - | - | 10,000 | 50,000 |
| Escrow for Unpaid Estate Professional Fees, Holdback (14) | - | - | - | - | - | - | 1,906,900 |
| Escrow for Estate Windown (14) | - | - | - | - | - | 200,000 | 200,000 |
| Lender Professional Fees (15) | - | - | - | - | - | 1,500,000 | 4,400,000 |
| Chapter 11 Trustee Hourly-Based Fee (estimated) | - | - | - | - | - | - | 1,500,000 |
| Chapter 11 Trustee Fee Adult Compensation (to be discussed) | - | - | - | - | - | - | - |
| **TOTAL BANKRUPTCY RELATED DISBURSEMENTS** | - | 6,873,573 | - | 9,151,253 | - | 7,159,173 | 35,467,467 |
| **TOTAL DISBURSEMENTS** | 2,730 | 7,817,515 | 4,830 | 9,623,385 | 112,770 | 7,681,877 | 45,880,438 |
| Contingency Provision (5% of Disbursements) | 130 | 372,263 | 230 | 458,256 | 5,370 | 365,804 | 2,184,783 |
| *Accrued Estate Professional Fees and Expenses (14)* | - | - | - | - | - | - | - |
| *Accrued Lender Professional Fees and Expenses (15)* | - | - | - | - | - | - | - |
| **Net Cash Generated (Used)** | (2,730) | (1,683,693) | 5,446,007 | (472,133) | (112,770) | (4,861,104) | 352,969 |
| Cumulative Net Cash Generated (Used) | (2,730) | (1,686,423) | 3,759,584 | 3,287,451 | 3,174,681 | (1,686,423) | 352,969 |
| **Cash Rollforward** | | | | | | | |
| Beginning Balance - Total Cash | 2,696,423 | 2,693,693 | 1,000,000 | 6,446,007 | 5,973,874 | 5,861,104 | 2,696,423 |
| Receipts - Total Cash | - | 6,133,823 | 5,450,837 | 9,151,253 | - | 2,820,773 | 46,233,407 |
| Cash Used/(Generated) - Total Cash | (2,730) | (1,683,693) | 5,446,007 | (472,133) | (112,770) | (4,861,104) | - |
| Ending Balance - Total Cash | 2,693,693 | 1,000,000 | 6,446,007 | 5,973,874 | 5,861,104 | 1,000,000 | 1,000,000 |
| Beginning Balance - Encumbered Cash | 2,693,693 | 2,683,693 | 1,000,000 | 6,446,007 | 5,973,874 | 5,861,104 | - |
| Receipts - Encumbered Cash | - | 6,153,823 | 5,450,837 | 5,973,874 | - | 2,820,773 | 46,386,975 |
| (Disbursements) - Encumbered Cash | (2,730) | (7,817,515) | (4,830) | (9,623,385) | (112,770) | (7,681,876) | (46,386,975) |
| Ending Balance - Encumbered Cash | 2,683,693 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| Beginning Balance - Unencumbered Cash | 100 | 100 | 100 | 100 | 100 | 4,300 | - |
| Receipts - Unencumbered Cash | - | - | - | - | - | - | - |
| (Disbursements) - Unencumbered Cash | - | - | - | - | - | - | (493,463) |
| Ending Balance - Unencumbered Cash | - | - | - | - | - | - | (493,463) |
| **Loan Rollforward** | | | | | | | |
| Beginning Balance - TIP Loan | 17,322,483 | 17,322,483 | 11,188,660 | 16,639,497 | 7,488,244 | 7,488,244 | 25,450,439 |
| Draws | - | - | - | - | - | - | - |
| Repayments | - | (6,153,823) | - | (9,151,253) | - | (2,820,773) | (20,782,967) |
| Ending Balance - TIP Loan | 17,322,483 | 11,188,660 | 16,639,497 | 7,488,244 | 7,488,244 | 4,667,472 | 4,667,472 |

South Edge Preliminary Budget (circulated July 7)

# Notes to Preliminary Budget for period beginning with week ending 7/21 through 11/30 2011

(1) - LID T-18 Acquisition Payments are net of assessment engineer audit fee of 2.5%. The engineer audit fees cover administrative fees paid to Gomez Consulting Group. Funding is assumed to occur one week after City Council approval. Preliminary estimates for City Council hearing dates for each segment are listed below. *These estimated dates are based on recommendations of Advantage Civil Design Group regarding likely timing for completing outstanding construction work and necessary documentation and are subject to change.*

| LID Segments funded prior to Nov 30, 2011 | | LID Segments funded after Nov 30, 2011 | |
| Segment | Hearing Date | Segment | Hearing Date |
|---|---|---|---|
| SM-1B | 9/6/2011 | D-E4A | 12/6/11 |
| WM-2 | 9/20/2011 | D-E5 | 12/20/2011 |
| WM-5b/TCB | 10/4/2011 | D-E3 | 1/3/2012 |
| D-E1C, 2B | 10/18/11 | D-E6 | 5/22/2012 |
| D-E1A,E1B,1D, 1E | 11/1/11 | SM-2A, 2B, SD-2 | 8/21/2012 |
| D-E3A, 4 | 11/15/2011 | Village 2 Streets | 8/21/2012 |
| | | Village 3 Streets | 8/21/2012 |

LID segments funded after November, 2011 represent an additional $12.8M in net receipts with a total cost to complete of $2.7MM, none of which is reflected in this preliminary budget.

A reconciliation of total LID reimbursements follows:

| | |
|---|---|
| $  21,315,864.00 | 2011 gross fundings per cash forecast |
| 8,321,300.00 | 2012 gross fundings – Drainage |
| 3,500,567.00 | 2012 gross fundings – Village 2 Streets |
| 354,800.00 | 2012 gross fundings – Village 3 Streets |
| 635,100.00 | 2012 gross fundings – Village 2 Storm Drains |
| 1,679,638.00 | Village 1 previously funded |
| $  35,807,269.00 | Total LID reimbursements available |

(2) - TIP Loan – Funding for the Estate is via an interest-free "Trustee in Possession" Loan projected to close the July 21. Monthly advances will be used to prime the Encumbered Cash Account for amounts used to fund the Total Disbursement needs of the Estate post-loan closing with all net proceeds from LID T-18 Acquisition Payments applied as payments to pay down the loan.

(3) - Security and Maintenance includes services for storm water compliance, dust control, Storm Water Pollution Prevention Plan ("SWPPP") maintenance, security and other construction and maintenance related expenses.

(4) - LID Improvement Costs relate to LID recovery efforts (including but not limited to inspection fees, permitting fees, plan fees, contractor and materials costs) for segments eligible for LID reimbursement. *Amount and timing of costs is preliminary and is based on discussions with Lender's construction consultant. The ultimate amount and scope of work is unknown until inspections are completed by the City of Henderson and contracts bid and awarded.* Payment assumes customary and reasonable commercial terms.

(5) - Other Construction Costs over and above those related to LID segments include provision for repairs to Bicentennial Road ($20K) and Volunteer Road ($40K) requested by City of Henderson. This forecast does not include any contingency provision for additional miscellaneous work that might be required by the City of Henderson and other agencies in the future including potential work associated with outfall control improvements which might be required in connection with acquisition of drainage facilities under Volunteer Road.

(6) - LID Reimbursement Administration to be paid to Advantage Civil Design Group for services rendered related to the processing and construction management in connection with future LID T-18 Acquisition payments. Amounts are estimates and subject to change and will increase if schedule for completing submissions to the City of Henderson is accelerated. Amounts accrued for service through November 15th that would be paid in December are shown as paid on the last week of the period

(7) - Accounting, Taxes, and Outside Legal  include payment for services rendered by Goodwin Proctor in connection with the LID T-18 required disclosure filed in April and to be updated in October as well as estimated costs for tax return preparation work to performed by Piercy Bowler Taylor & Kern in July and budgeted for payment in August.

(8) - HOA Subsidy includes outstanding post-petition invoices and is currently under review.  Amounts accrued for November service that would be paid in December are shown as paid on the last week of the period.

(9) - Insurance includes current commercial liability coverage with one year term expiring 9/21/11.  Does not include premium in amount of $3,498 for policies expiring December 1, 2011 as those policies are outside the forecast period.

(10) - Marketing and Advertising Expenses are expected to be rejected by the Trustee or assumed by other parties by July 2011.

(11) - General, Administrative and Operations include payments to Jones Vargas for office space, administrative support, and miscellaneous office costs.  Other items include bank charges, license fees, utilities, and other general and administrative expenses.  December rent related to wind down operations is paid on the last week of the period.

(12) - The LID T-18 Bond Assessment payment upon closing of the TIP loan reflects the repayment of the MI Deposit advance used previously to

make the June 1 payment (with interest). Does not include the December 1 assessment amount of $2,940,028 as those assessments become due and owing outside the forecast period.

(13) - Accrued real property taxes (together with accrued penalties/interest) for the third and fourth installments of the 2010 - 2011 tax year are projected to be brought current and future installments paid as they come due.

(14) - Estate Professional Fees and Expenses are projected to be brought current at 85% of billed/incurred fees and 100% of billed/incurred expenses (except for the noticing agent which will be paid at 100%) upon the entry of final financing order for the TIP loan. Future Estate Professional Fees and Expenses will be paid at 85% of fees and 100% of expenses assuming a 30-day lag time for preparation of interim fee applications and notice period. Payment of 15% holdback, accrued professional fees for November and wind down costs after the post-effective date (including required post-plan filings, Trustee's final report and accounting, monthly operating report, and final fee applications for all professionals; such costs estimated at $200K) is assumed to be made at period end into an escrow account pending final fee hearings and Bankruptcy Court approval. Timing of payment and holdback percentages for interim amounts generally are consistent with the fee procedures anticipated to be filed with the Court. *Accrued fees and expenses presented are preliminary based on information provided by each professional, have not been reviewed by the Trustee or other parties and are included for information purposes only. Projected fees and expenses are based on expected average monthly "run" rates estimated by each professional. Actual amounts incurred in any single month might be higher or lower than the estimate depending on the nature of the work, particularly in connection with litigation. All fees and expenses are subject to Bankruptcy Court approval.*

(15) - Agent Professional Fees and Expenses are projected to be brought current at 100% of billed/incurred upon the entry of a final order for the TIP Loan. Agent Professional Fees and Expenses subject to a cumulative cap at $4.4 million based on provisions set forth in the Term Sheet. Last payment For Agent Fees anticipated in September 2011. *Accrued fees and expenses presented are preliminary based on information provided by each professional, have not been reviewed by the Trustee or other parties and are included for information purposes only. Projected fees and expenses are based on expected average monthly "run" rates estimated by each professional.*

(16) – The Cash Flow Forecast does not include payments for any unpaid administrative, priority, unsecured or other claims associated with any plan of reorganization other than payment of professional fees.

# Exhibit 2

# PLAN SUPPORT AGREEMENT
# (Partially Redacted)

#4834-2892-5962

**MORRISON** | **FOERSTER**

1290 AVENUE OF THE AMERICAS,
NEW YORK, NY 10104-0050

TELEPHONE: 212.468.8000
FACSIMILE: 212.468.7900

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SACRAMENTO, SAN DIEGO,
DENVER, NORTHERN VIRGINIA,
WASHINGTON, D.C.

TOKYO, LONDON, BRUSSELS,
BEIJING, SHANGHAI, HONG KONG

May 19, 2011

**For Settlement Purposes Only: FRE 408**

**Re:** *SOUTH EDGE,     LLC*
        **Support for Proposed Settlement Term Sheet**

TO THE PARTIES IDENTIFIED ON THE SIGNATURE PAGES HERETO:

On December 9, 2010 (the "**Petition Date**"), JPMorgan, Chase Bank, N.A. ("**JPMorgan**"), Credit Agricole Corporate and Investment Bank ("**Credit Agricole**") and Wells Fargo Bank, N.A., each in their capacities as Lenders to South Edge, filed an involuntary Chapter 11 petition (the "**Involuntary Petition**") against South Edge, LLC ("**South Edge**" or "**Debtor**") under section 303 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the U.S. Bankruptcy Court, District of Nevada (the "**Bankruptcy Court**") initiating a Chapter 11 case (the "**Case**"). JPMorgan, in its capacity as Agent for the lenders under the Credit Agreement[1] (the "**Lenders**") and also in its capacity as a Lender, filed the *Motion To Appoint An Interim And Permanent Chapter 11 Trustee For South Edge, LLC During (i) the "Gap" Period and (ii) On A Permanent Basis* (the "**Trustee Motion**"). South Edge filed its (i) Answer to the Involuntary Petition on January 4, 2011, (ii) *Motion for Dismissal for Cause of, or, in the Alternative, Abstention from, this Involuntary Case* on January 6, 2011 (the "**Dismissal/Abstention Motion**"), and (iii) Opposition *of South Edge, LLC to JPMorgan's Motion to Appoint an Interim and Permanent Chapter 11 Trustee* on January 7, 2011.

On February 3, 2011, the Court granted the Involuntary Petition (the "**Order for Relief**"), approved the Trustee Motion and denied the Dismissal/Abstention Motion, and it also ordered the appointment of a Chapter 11 trustee on February 3, 2011 (the "**Trustee Order**"). On February 20, 2011, the Office of the U.S. Trustee appointed Cynthia Nelson as Trustee for the Debtor's estate (the "**Estate**"). On February 23, 2011, the Court entered an order approving the appointment of Cynthia Nelson as Trustee (the "**Trustee**").

---

[1] "Credit Agreement" refers to the Credit Agreement, dated November 1, 2004, as amended and restated by the Amended and Restated Credit Agreement, dated March 9, 2007 among South Edge as borrower, the Lenders party thereto, JPMorgan as the Agent and The Royal Bank of Scotland PLC as Syndication Agent.

ny-974858

**MORRISON** | **FOERSTER**

THE PARTIES IDENTIFIED ON THE SIGNATURE PAGES HERETO
May 19, 2011
Page Two

On February 8, 2011, South Edge filed an appeal of both the Order for Relief and the Trustee Order (the "**South Edge Appeal**") to the U.S. District Court for the District of Nevada (the "**District Court**"). On February 22, 2011, KB Home Nevada Inc., Coleman-Toll Limited Partnership, Pardee Homes of Nevada, and Beazer Homes Holding Corp. (the "**Builders**"), and Meritage Homes of Nevada, Inc (f/k/a MTH-Homes Nevada, Inc., "**Meritage**") also filed an appeal of both the Order for Relief and the Trustee Order (the "**Builders' Appeal**," together with the South Edge Appeal, the "**Appeals**"). On March 4, 2011, the Trustee filed a motion in the District Court to dismiss the Appeals (the "**Dismissal Motion**"), and JPMorgan and Credit Agricole joined in the Dismissal Motion. On April 28, 2011, U.S. District Court Judge Pro issued an Order granting the Dismissal Motion (the "**Dismissal Order**"). On May 5, 2011, South Edge appealed the Dismissal Order (the "**South Edge Ninth Circuit Appeal**") to the U.S. Court of Appeals for the Ninth Circuit (the "**Ninth Circuit**"). On May 9, 2011, the Builders and Meritage also appealed the Dismissal Order to the Ninth Circuit (with the South Edge Ninth Circuit Appeal, the "**Ninth Circuit Appeals**").

The Builders and their respective parent guarantors, KB Home, a Delaware corporation, Toll Brothers, Inc., a Delaware corporation, Weyerhaeuser Real Estate Company, a Washington corporation, and Beazer Homes USA, Inc., a Delaware corporation (collectively, the "**Settling Builders**")[2] recently engaged with JPMorgan, as Agent, to work towards a global resolution of the outstanding disputes and issues amongst the parties related to obligations of South Edge and its members under the Credit Agreement and the related Loan Documents.[3] The Agent and the Settling Builders negotiated a Term Sheet (the "**Plan Term Sheet**," a copy of which is attached hereto as Exhibit A) that outlines the basic terms of a consensual settlement to be effectuated through a consensual plan of reorganization (the "**Plan**") and accompanying disclosure statement (the "**Disclosure Statement**") in form and substance satisfactory to the Agent and the Settling Builders, which will be filed in the Bankruptcy Court.

By this letter agreement (the "**Agreement**"), the Agent and the Settling Builders seek your support for the Plan Term Sheet subject to the following provisions:

1.    Pursuit of Settlement.  The signatories hereto shall use their commercially reasonable efforts to effectuate the settlement (the "**Settlement**"), including using their commercially reasonable efforts to support the Plan, obtain approval of the Disclosure Statement, obtain confirmation of the Plan, obtain the requisite support of Lenders to the Plan, and consummate the Plan promptly after confirmation, all consistent with the Plan Milestones identified in Section 3 herein.

---

[2] If Meritage and its parent guarantor, Meritage Homes Corporation, a Maryland corporation (the "**Meritage Parties**"), join this settlement, then the term "Settling Builders" shall also include the Meritage Parties.
[3] Capitalized terms not otherwise defined herein shall have the meaning set forth in the Credit Agreement.

ny-974858

**MORRISON | FOERSTER**

THE PARTIES IDENTIFIED ON THE SIGNATURE PAGES HERETO
May 19, 2011
Page Three

2.    <u>Conditions to Effectiveness of the Term Sheet</u>.  This Agreement (including the attached Plan Term Sheet) shall not become effective until such time as each of the following conditions have been satisfied, but no later than June 10, 2011:

    (a)     The execution and delivery of this Agreement by at least two-thirds (2/3) in dollar amount and a majority in number of the Lenders (the **"Consenting Lenders"**)[4];

    (b)     The execution and delivery of this Agreement by each of the Settling Builders; and

    (c)     The execution and delivery of the consent at the end of this Agreement by the Trustee; provided, that the Agent and the Settling Builders can elect to waive this condition precedent.

3.    <u>Plan Milestones</u>.

    (a)     The Agent and the Settling Builders shall file the Plan and Disclosure Statement, in form and substance reasonably acceptable to the Agent (for the benefit of the Consenting Lenders) and the Settling Builders, on or before August 1, 2011;

    (b)     The Bankruptcy Court shall approve the Disclosure Statement on or before September 16, 2011;

    (c)     The order (i) confirming the Plan (the **"Confirmation Order"**) and (ii) approving all exhibits, appendices, Plan supplement documents and related documents (collectively, the **"Plan Supplements"**), which are reasonably acceptable in form and substance to the Agent (for the benefit of the Consenting Lenders) and the Settling Builders, shall have been entered by the Bankruptcy Court on or before October 31, 2011; provided, however, the Agent (for the benefit of the Consenting Lenders) and the Settling Builders may mutually agree (each in their sole discretion) to extend this period for an additional period up to thirty (30) days; and

    (d)     The Effective Date of the Plan shall occur on or before November 30, 2011; provided, however, if the Confirmation Order deadline is extended in accordance with Section 3(c) of this Agreement, the Effective Date deadline shall automatically be extended for a similar period of time.

---

[4] Except as otherwise provided herein, the term **"Parties"** shall include the Agent, the Consenting Lenders and the Settling Builders.

ny-974858

**MORRISON** | **FOERSTER**

THE PARTIES IDENTIFIED ON THE SIGNATURE PAGES HERETO
May 19, 2011
Page Four

4.    Obligations of Consenting Lenders and Settling Builders.

(a)    As long as this Agreement has not been terminated, to the maximum extent
permitted by law, each Consenting Lender severally agrees with each other Consenting
Lender and with the Settling Builders that, if the Agent and the Settling Builders propose the
Plan, such Consenting Lender and Settling Builder shall:

(i)    subject to receipt of the Plan and the Disclosure Statement approved
by the Bankruptcy Court in accordance with Bankruptcy Code section 1125, as soon as
practicable (but in no case later than any voting deadline stated therein), vote all of its
impaired claims (as such term is defined under section 101 of the Bankruptcy Code,
"**Claim**"), against South Edge, whether now owned or hereafter acquired, to accept the Plan
and otherwise support and take all reasonable actions to facilitate the proposal, solicitation,
confirmation, and consummation of the Plan;

(ii)    not object to confirmation of, or vote to reject, the Plan or otherwise
commence or participate in any proceeding directly or indirectly for the purpose of opposing
or altering the Plan, the Disclosure Statement, the solicitation of acceptances of the Plan or
any other reorganization documents containing terms and conditions consistent in all
material respects with the Plan Term Sheet;

(iii)v    ote against any alternate settlement proposals to this Settlement,
workout, or plan of reorganization relating to South Edge other than the Plan;

(iv)    not directly or indirectly seek, solicit, support, encourage, vote for,
consent to, or participate in the negotiation or formulation of (x) any plan of reorganization,
proposal, offer, dissolution, winding up, liquidation, reorganization, merger, or settlement for
South Edge other than the Plan, (y) any disposition outside of the Plan of all or any
substantial portion of the assets of South Edge or (z) any other action that is inconsistent
with, or that would delay or obstruct the proposed solicitation, confirmation, or
consummation of the Plan;

(v)    support the releases, through the Plan, of the Agent, the Consenting
Lenders, and the Settling Builders, and their respective counsel and advisors;

(vi)    not pursue or prosecute any of the pending Agent suits in front of
Judge Pro, as well as any suits against the Agent or Lenders in the District Court. No new
actions between the Agent, Settling Builders, and the Consenting Lenders will be
commenced during this period in any court of competent jurisdiction;

(vii)    not pursue or prosecute the Appeals, and to affirmatively seek and
consent to a stay of the Ninth Circuit Appeals; South Edge, LLC (as the debtor out-of-

MORRISON | FOERSTER

THE PARTIES IDENTIFIED ON THE SIGNATURE PAGES HERETO
May 19, 2011
Page Five

possession) and their counsel shall be instructed by the Settling Builders to take the
necessary steps to stay any further prosecution of the Ninth Circuit Appeals; and

           (viii)   use their best efforts to avoid pursuing any adversarial course of action
that would create unnecessary costs for the Parties and potentially prejudice their rights.

     (b)    Notwithstanding the foregoing, each Consenting Lender and Settling Builder
may raise and be heard on any issue arising in the Case so long as such Consenting Lender or
Settling Builder is not attempting to oppose or alter the Plan or the Disclosure Statement
approved by it, or otherwise breach any of the provisions of this Agreement.

     (c)    The Agent, each Consenting Lender and the Settling Builders agree that until
this Agreement has been terminated, no party shall take any action or otherwise pursue any
right or remedy under applicable law, any agreement, contract, loan document or indenture,
as applicable, against any other party to this Agreement; provided, however, that nothing
herein shall preclude (i) the Agent (for the benefit of the Lenders) or the Settling Builders
from taking any and all actions that are consistent with the Term Sheet and, in their
respective sole discretion, they believe is appropriate to preserve the value of the Collateral
and/or the assets that the Settling Builders are acquiring under the Plan, and (ii) the Agent,
the Lenders, and the Settling Builders from defending any objections to their Claims against
the Estate in this Case.

     (d)    The obligations of the Agent and the Consenting Lenders hereunder are their
respective several obligations, and no Consenting Lender or the Agent shall be responsible
for the failure of any other Consenting Lender to perform any of its obligations hereunder or
for any action by any non-Consenting Lender, including any actions in contravention or
opposition to this Agreement, the Plan Term Sheet, the Plan or the Disclosure Statement.
Similarly, the obligations of the Settling Builders hereunder are their respective several
obligations, and no Settling Builder shall be responsible for the failure of any other Settling
Builder to perform any of its obligations hereunder or for any action by any non-Consenting
Lender, including any actions in contravention or opposition to this Agreement, the Plan
Term Sheet, the Plan or the Disclosure Statement.

    5.    Holdings and Transfers.  As long as this Agreement has not been terminated
pursuant to Section 11 hereof:

     (a)    Each Consenting Lender severally represents and warrants to the
Agent that it holds or is the legal or beneficial holder of, or the investment adviser or
manager with discretionary authority with respect to, the aggregate principal amount of
Claims set forth on Exhibit 1 to each such Consenting Lender's signature page (the
"Holdings") and has the power to vote and dispose of the Holdings in accordance with this
Agreement on behalf of such beneficial owners, whose Holdings shall be bound by the terms

ny-974858

**MORRISON | FOERSTER**

THE PARTIES IDENTIFIED ON THE SIGNATURE PAGES HERETO
May 19, 2011
Page Six

hereof, and that the amount of the Holdings constitutes the principal amount of all of such Consenting Lender's Claims against South Edge at the time this Agreement becomes effective. Following its receipt of the signatures from all of the Consenting Lenders, the Agent shall certify to the Settling Builders the aggregate dollar amount of Holdings and the number of the Lenders who have executed this Agreement;

(b)  Each Consenting Lender severally agrees that it will not sell, pledge, assign, hypothecate, or otherwise transfer any Holdings, and any such attempted sale, pledge, assignment, hypothecation, or other transfer shall be void and without effect, unless the transferee executes and there is delivered to the Agent, within three (3) business days after such transfer, a written undertaking (in the form of the Transferee Undertaking attached hereto as Schedule 1) agreeing to become a party to, and bound by all the terms of, this Agreement with respect to the Holdings being transferred, and such transferee (hereinafter a "**Transferee**") shall thereupon be deemed to be a Consenting Lender with respect to the amount of such transferred Holdings for purposes of this Agreement, and the transferor shall no longer be a Consenting Lender with respect to such transferred Holdings. The Agent and the Settling Builders hereby agree that any Transferee executing such an undertaking shall be entitled to the benefits of this Agreement; and

(c)  This Agreement shall in no way be construed to preclude a Consenting Lender from acquiring additional Claims, provided that such Consenting Lender (other than a Transferee) shall vote, and take such other actions in respect of, such Claims as is provided for herein.

6.  Good Faith Cooperation; Further Assurances; Acknowledgment; Definitive Documents.

(a)  The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) in respect of (i) all matters concerning the implementation of the Settlement, and (ii) the pursuit and support of the Settlement; provided, however, that the Settling Builders acknowledge that they bear the risks associated with any change in circumstances that affect the development and administration of the Project and nothing in the Plan Term Sheet or this Agreement shall be construed as an assumption of such liabilities by the Agent or any of the Lenders.

(b)  This Agreement is not and shall not be deemed a solicitation for consents of the Plan. This Agreement is a negotiated settlement, agreed to at arms' length by sophisticated parties who have had full opportunity to consult with their own legal counsel regarding the terms of this Agreement and their rights under the Bankruptcy Code.

(c)  Each Party hereby covenants and agrees (i) to negotiate in good faith the Plan and the Disclosure Statement, including all exhibits, supplements and annexes thereto, (ii) to

MORRISON | FOERSTER

THE PARTIES IDENTIFIED ON THE SIGNATURE PAGES HERETO
May 19, 2011
Page Seven

negotiate in good faith the definitive documents implementing, achieving, and relating to the Settlement, including the order of the Bankruptcy Court confirming the Plan, each of which is to be specifically described in the Plan (collectively, the "**Definitive Documents**"), which shall contain terms and conditions consistent in all material respects with the Plan, and shall otherwise be reasonably satisfactory in form and substance to the Agent (for the benefit of the Consenting Lenders) and the Settling Builders, and (iii) to execute (to the extent they are a party thereto) and otherwise support the Definitive Documents.

7.    Representations and Warranties.  Each Consenting Lender, severally and not jointly, and each of the Settling Builders, severally and not jointly, hereby represents and warrants to the others that:

(a)    It has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(b)    The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(c)    The execution, delivery, and performance by it of this Agreement does not and shall not (i) violate any provision of law, rule, or regulation applicable to it or any of its affiliates, or its certificate of incorporation or bylaws or other organizational documents or those of any of its affiliates, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its affiliates is a party;

(d)    The execution, delivery, and performance by it of this Agreement does not and shall not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body;

(e)    This Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability; and

(f)    Except as expressly set forth in this Agreement, none of the Parties hereto makes any representation or warranty, written or oral, express or implied.

ny-974858

**MORRISON | FOERSTER**

THE PARTIES IDENTIFIED ON THE SIGNATURE PAGES HERETO
May 19, 2011
Page Eight

8.    Termination Events Applicable to the Agent and the Settling Builders. This Agreement may be terminated by the Agent or the Settling Builders upon the occurrence of any of the following events (each, a "**Termination Event**"):

(a)    By either party, if the other party shall have breached any of its material obligations under this Agreement;

(b)    If any court (including the Bankruptcy Court) shall declare in an order that this Agreement is unenforceable in any material respect;

(c)    Upon issuance of an oral or written decision by the Bankruptcy Court denying approval of the Disclosure Statement for reasons other than (i) the adequacy of the information set forth in the Disclosure Statement or (ii) a defect that can be corrected consistent with the Term Sheet and the Plan Milestone dates in Section 3 above;

(d)    Upon entry of an order by the Bankruptcy Court denying confirmation of the Plan, which denial cannot be reconsidered or otherwise cured consistent with the Term Sheet and the Plan Milestone dates in Section 3 above; or

(e)    Failure to meet a Plan Milestone identified in Section 3 above.

9.    Termination Events Applicable to the Agent. This Agreement may be terminated by the Agent (on behalf of all Consenting Lenders) upon the occurrence of any of the following events (each, an "**Agent Termination Event**"):

(a)    If the Plan has been (i) amended, modified or supplemented such that the Plan is not consistent in all material respects with the Plan Term Sheet, or (ii) withdrawn by the Settling Builders without the prior written consent of the Agent (for the benefit of the Consenting Lenders);

(b)    If the Case shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or if a Settling Builder or South Edge files a motion seeking such relief;

(c)    If a Settling Builder publicly announces its intention not to pursue the Settlement in accordance with the Plan Term Sheet and this Agreement;

(d)    If any Settling Builder files any motion or pleading with the Bankruptcy Court, the District Court or the Ninth Circuit that is inconsistent in any material respect with this Agreement or the Plan Term Sheet, or any definitive agreements executed in connection therewith;

**MORRISON | FOERSTER**

THE PARTIES IDENTIFIED ON THE SIGNATURE PAGES HERETO
May 19, 2011
Page Nine

(e)     If a Settling Builder commences a case, proceeding or action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution or other similar relief;

(f)     If a Settling Builder or South Edge files, propounds, or otherwise supports any plan of reorganization (other than the Plan) that is inconsistent with the terms of this Agreement and that does not propose to pay the Secured Obligations due under the Credit Agreement, in full in cash, on the effective date of any such plan; or

(g)     Any term of any Settlement document that has been executed, been filed with the Bankruptcy Court, become effective, or been otherwise finalized, has not been approved by the Agent (for the benefit of the Consenting Lenders) or any such document that has been approved is modified without the consent of the Agent (for the benefit of the Consenting Lenders).

10.     <u>Termination Events Applicable to the Settling Builders</u>.  This Agreement may be terminated by the Settling Builders upon the occurrence of any of the following events (each, a "**Settling Builder Termination Event**"):

(a)     If the Plan has been (i) amended, modified or supplemented such that the Plan is not consistent in all material respects with the Plan Term Sheet, or (ii) withdrawn by the Agent without the prior written consent of the Settling Builders;

(b)     If the Case shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or if the Agent or a Consenting Lender files a motion seeking such relief;

(c)     If the Agent or a Consenting Lender publicly announces its intention not to pursue the Settlement in accordance with the Plan Term Sheet and this Agreement;

(d)     If the Agent or any Consenting Lender files any motion or pleading with the Bankruptcy Court, the District Court or the Ninth Circuit that is inconsistent in any material respect with this Agreement or the Plan Term Sheet, or any definitive agreements executed in connection therewith;

(e)     If the Agent or a Consenting Lender files, propounds, or otherwise supports any plan of reorganization (other than the Plan) that is inconsistent with the terms of this Agreement; or

**MORRISON** | **FOERSTER**

THE PARTIES IDENTIFIED ON THE SIGNATURE PAGES HERETO
May 19, 2011
Page Ten

(f)     Any term of any Settlement document that has been executed, been filed with the Bankruptcy Court, become effective, or been otherwise finalized, has not been approved by the Settling Builders or any such document that has been approved is modified without the consent of the Settling Builders.

11.    Termination of this Agreement.

(a)     Upon the occurrence of any of the Termination Events described in section 8(b), (c), (d) or (e) herein, this Agreement shall terminate automatically after five (5) business days and without further notice or action by or to any Party; provided, however, that if both the Agent and the Settling Builders mutually agree (each in their sole discretion) to seek to cure the Termination Event, including through a modification of any Plan Milestone (subject to the limitations set forth in Section 3(c) and (d) of this Agreement), this Agreement shall remain effective.

(b)     Upon the occurrence of the Termination Event set forth in Section 8(a), this Agreement shall terminate only upon written notice to the breaching Party from any non-breaching Party and a failure by the breaching Party to remedy such breach within five (5) business days.

(c)     Upon the occurrence of any Agent Termination Event set forth in Section 9, only the Agent may terminate this Agreement upon written notice to the other Parties.

(d)     Upon the occurrence of any Settling Builder Termination Event set forth in Section 10, only the Settling Builders may terminate this Agreement upon written notice to the other Parties.

12.    Effect of Termination.  Upon termination of this Agreement, all obligations hereunder shall terminate and shall be null and void ab initio, and all claims, causes of action, remedies, defenses, setoffs, rights or other benefits of such non-breaching Parties shall be fully preserved without any estoppel, evidentiary or other effect of any kind or nature whatsoever.  In addition, upon termination of this Agreement, the Parties shall be immediately entitled to pursue and prosecute their own plan of reorganization or liquidation before the Bankruptcy Court.  Finally, as set forth in the Plan Term Sheet, upon the termination of this Agreement (other than as a result of a breach by the Agent or the Consenting Lenders, or due to the failure of at least two-thirds (2/3) in dollar amount and a majority in number of the Lenders to become Consenting Lenders), $10 million of the Escrow (as that term is defined in the Plan Term Sheet) shall not be refunded to the Settling Builders and instead paid to the Agent.  The Agent shall apply the $10 million against the interest presently accruing under the Credit Agreement pursuant to the terms of the Repayment Guarantees.

**MORRISON** | **FOERSTER**

THE PARTIES IDENTIFIED ON THE SIGNATURE PAGES HERETO
May 19, 2011
Page Eleven

13.    Successors and Assigns.  Except as otherwise provided in this Agreement, this Agreement is intended to and shall bind and inure to the benefit of each of the Parties and each of their respective successors, assigns, heirs, executors, administrators, and representatives.

14.    No Third-Party Beneficiaries.  Nothing contained in this Agreement is intended to confer any rights or remedies under or by reason of, this Agreement on any person or entity (including the Trustee), other than the Parties hereto, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third party to any Party to this Agreement.

15.    Time Is Of The Essence.  Time is of the essence with respect to all obligations under this Agreement and the Plan Term Sheet.

16.    Headings.  The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

17.    Counterparts; Fax Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.  The parties agree that this Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Electronic transmission (e.g. via fax or email/pdf) of any signed original document (whether in paper or electronic format), and retransmission of any signed document via electronic form shall be the same as personal delivery of the original.  At the request of any Party, any other Party will confirm electronically transmitted signatures by signing an original paper document and delivering an original paper document.  It is agreed that the Parties may store executed originals of this Agreement in electronic format and that the same when reproduced shall be as if an original had been produced.

18.    Term Sheet Addendum.

       (a)    Notwithstanding anything in the Plan Term Sheet to the contrary, if the Meritage Parties do not become Settling Builders, then the Plan shall provide that (a) Meritage's Repayment, Limited, and Completion Guaranties shall not be released, but rather shall remain fully enforceable against the Meritage Parties, and (b) in lieu of a portion of the Settling Builders' Consideration (as such term is defined in the Plan Term Sheet), the Settling Builders shall pay into an escrow account (the "**Meritage Escrow**") an amount equal to the portion of the Settling Builders' Consideration under the Plan that is equal to the amount of the Meritage Repayment Guaranty liability (estimated to be between $12.4 million and $12.8 million).  Any Lender under the Credit Agreement (either a Consenting Lender or non-Consenting Lender) may elect to sell to the Settling Builders a participation in the

MORRISON | FOERSTER

THE PARTIES IDENTIFIED ON THE SIGNATURE PAGES HERETO
May 19, 2011
Page Twelve

selling Lender's pro rata interest in the Meritage Repayment Guarantee claim under the
Credit Agreement, and in exchange for the sale of such participation, the selling Lender's pro
rata interest in the Meritage Escrow shall be delivered to such Lender. By selling such
participation, the selling Lender agrees to direct (consistent with the instructions of the
Settling Builders) a sub-Agent (who is appointed by the Successor Agent) to pursue and
settle the litigation concerning the Meritage Repayment Guarantee claim, which litigation
shall be funded solely by the Settling Builders. Nothing herein affects the rights of the non-
Consenting Lenders to pursue the Completion or Limited Guarantee claims.

[ Redacted ]

# EXHIBIT A

## [Plan Term Sheet]

ny-974858

Subject to FRE 408

**This Term Sheet is a settlement proposal and is not intended to be, and shall not be construed as, a solicitation of any vote in favor of or against any plan of reorganization or liquidation**

<u>TERM SHEET FOR SOUTH EDGE, LLC CHAPTER 11 PLAN</u>
(to be attached to a Plan Support Agreement (the "PSA") among the Settling Builders, the Agent, the Consenting Lenders (defined below) and the Trustee)

I.    <u>Core Plan Economics For Lenders</u>

**<u>SCENARIO 1</u>**

*(assumes the <u>successful</u> resolution of the Focus MI claims by November 30, 2011 (the "Effective Date")*

      A.    "<u>Lenders' Settlement Recovery</u>":  Consenting Lenders and Agent are assured of the following net recovery of <u>$340 million</u> under a confirmed Chapter 11 Plan "settlement" (pursuant to FRBP 9019) that is feasible and satisfactory in form and substance to JPMorgan Chase Bank, N.A. (the "**Agent**") and Settling Builders (as defined below) and approved by at least two-thirds in dollar amount and one half plus one in number of the Lenders (the "**Consenting Lenders**")[1]:

      1.    The KB, Toll, Beazer, and Pardee Builders and their respective parent Guarantors, and the Meritage Builder and its parent Guarantor if they join in this settlement (collectively, the "Settling Builders") indefeasibly pay Lenders at the Effective Date <u>$314 million</u> (the "**Settling Builders' Consideration**"), $31.4 million of which is deposited into escrow that is not subject to offset or attachment (the "**Escrow**"), provided the Escrow shall be applied in accordance with section I.A.3. below, but shall be fully funded on the Effective Date.  The Escrow shall be funded in the following manner: (A) $10 million within two (2) business days of the receipt of the signatures of the Settling Builders, each of the members of the Steering Committee for the group of Lenders under the Credit Agreement[2], and the Trustee (though only as a consenting person, not a party); and (B) $21.4 million within two (2) business days of the Agent's receipt of the signatures from the balance of the Consenting Lenders, binding them and their assigns to the terms of this Term Sheet (the "**2/3 Consent Date**").

      a.    The Settling Builders' Consideration is calculated as follows:

      (i)    Lenders' total claim against South Edge of $382 million, less the MI Funds ($26 million) that is applied to the outstanding Loan debt, leaving a balance of $356 million;

---

[1] All references herein to "Consenting Lenders" include JPMorgan in its capacity not as Agent, but as a Lender who consents to the Plan.

[2] "Credit Agreement" means the Credit Agreement, dated November 1, 2004, as amended and restated by the Amended and Restated Credit Agreement, dated March 9, 2007 among South Edge as borrower, the Lenders party thereto, JPMorgan as the Agent and The Royal Bank of Scotland PLC as Syndication Agent.

**This Term Sheet is a settlement proposal and is not intended to be, and shall not be construed as, a solicitation of any vote in favor of or against any plan of reorganization or liquidation**

(ii)       By voting to approve the Plan, the Consenting Lenders agree, pursuant to section 506(a) of the Bankruptcy Code, that the amount of their secured claim is capped at $313.5 million, thereby creating an under-secured deficiency claim of $42.5 million (the "**Deficiency Claim**"). Under the Plan, the Lenders will receive a $500,000 plan distribution on account of the Deficiency Claim. Per section I.B hereof, the Consenting Lenders will be deemed to assign their rights to any additional distributions from non-debtor parties on account of the Deficiency Claim to Settling Builders' designees; provided, however, that the non-Consenting Lenders maintain all of their rights, if any, under the Completion Guaranty and the Limited Guaranty against the non-debtor, third-party guarantors and otherwise against non-debtor parties (although the non-Consenting Lenders' rights under the Repayment Guarantees of Settling Builders [ Redacted ] shall be fully satisfied on the Effective Date by the Settling Builders' payments).

b.       The Settling Builders' Consideration is comprised of:

(i)       $308 million for the full payment by the Settling Builders of their respective Repayment Guarantees (the "**Repayment Guaranty Amount**") (thereby subrogating these Settling Builders to the Agent's lien on their respective Takedown land and accommodating (without recourse or warranty or preventing the Effective Date), to the extent permitted by law or an order of a court of competent jurisdiction, the goal of the Settling Builders[3] to acquire the Meritage Takedown Land free and clear of liens and to have a claim against Meritage for the amount paid by Settling Builders to Lenders or Agent on behalf of Meritage[4], and

(ii)       $6 million (including the $500,000 plan distribution on the Deficiency Claim).

2.       "**MI Funds**": $26 million remains for the Lenders in the Focus MI account, either (a) because the Builders have paid expenses of the Chapter 11 estate of

---

[3] Should the Settling Builders settle with the Meritage Builder, then the Agent and the Lenders shall receive the same releases from the Meritage Builder that the Settling Builders receive from Meritage in order to ensure the consistency of the releases to JPM and the Lenders that are being provided to them under this Term Sheet and the PSA.
[4]

[ Redacted ]

Subject to FRE 408

**This Term Sheet is a settlement proposal and is not intended to be, and shall not be construed as, a solicitation of any vote in favor of or against any plan of reorganization or liquidation**

South Edge, LLC (the "**Estate**") from other sources or have restored that cash, or (b) because LID recoveries have replaced MI cash used for Estate expenses.

        a.        As a matter of timing, $26 million is applied from the MI account to the outstanding Loan debt as Cash Collateral before the Repayment Guaranty Amount payment. The Settling Builders indemnify and defend the Agent and Lenders from any loss or expense on account of that use of MI funds, including their respective reasonable attorneys' fees and costs. Such indemnity shall in form and substance be satisfactory to Agent, in its sole discretion, and shall not be subject to the limitations of section I.A.5 hereof.

        3.       <u>Application of Escrow</u>: Pending the Effective Date, proceeds of the Escrow shall be applied to finance Chapter 11 administrative expenses including LID Assessments and taxes in accordance with a budget to be agreed-upon prior to Settling Builders' funding of the Escrow (the "**Budget**"), provided that LID Assessments and taxes, as well as LID segment projects agreed upon by the Agent and the Settling Builders, will be financed prior to the 2/3 Consent Date (other expenses to be paid solely out of the Debtor's cash on hand, which includes the funds that the Trustee otherwise asserts are unencumbered by the Agent's liens and do not constitute Cash Collateral and in which the Settling Builders assert an interest (the latter, the "**Unencumbered Cash**"). Settling Builders obtain priming lien on future LID Proceeds and LID Proceeds only to replenish the Escrow to the extent it is used to finance LID Assessments, taxes and Chapter 11 administrative expenses, as contemplated by this paragraph. If the Plan is not confirmed by the Bankruptcy Court on or before October 31, 2011 for any reason (other than due to the failure of the 2/3 Consent Date to occur or the failure of the Agent and the requisite Consenting Lenders to support the Plan in accordance with this Term Sheet or the PSA), or in the event of Settling Builders' default under the terms of this Term Sheet or the PSA, then $10 million of the Escrow shall not be refunded to the Settling Builders and instead, paid to the Agent, and Settling Builders' lien is extinguished upon repayment of the financed amounts. The Agent shall apply the $10 million against the interest presently accruing under the Credit Agreement pursuant to the terms of the Repayment Guarantees.

Subject to FRE 408

**This Term Sheet is a settlement proposal and is not intended to be, and shall not be construed as, a solicitation of any vote in favor of or against any plan of reorganization or liquidation**

## SCENARIO 2

**(assumes the Estate's/Agent's/Lenders' claim to the Focus MI Deposit is <u>unsuccessful</u> or <u>unresolved</u> by the Effective Date)**

A.    "<u>Lenders' Settlement Recovery</u>": Consenting Lenders and Agent are assured of the following net recovery of **$330 million** under a confirmed Chapter 11 Plan that is feasible and satisfactory in form and substance to the Agent and Settling Builders, and approved by Consenting Lenders:

1.    The Settling Builders indefeasibly pay Lenders at the Effective Date $330 million (the **"Settling Builders' Consideration"**) and deposit the Escrow, which is not subject to offset or attachment, provided the Escrow shall be applied in accordance with section I.A.3 herein. The Escrow shall be funded in the same manner as provided for in Section I.A.1 of this Term Sheet.

a.    The Settling Builders' Consideration is calculated as follows:

(i)    Lenders' total claim against South Edge of $382 million, less the $16 million in "**MI Makeup**" funds applied to the outstanding Loan debt, leaving a balance of $366 million;

(ii)    By voting to approve the Plan, the Consenting Lenders agree pursuant to section 506(a) of the Bankruptcy Code that the amount of their secured claim is capped at $313.5 million, thereby creating an under-secured deficiency claim of $52.5 million (the "**Alternative Deficiency Claim**", and with the Deficiency Claim, the "**Applicable Deficiency Claim**") (based on the fact that the Agent/Lender will only recover the $16 million MI Makeup, in lieu of the $26 million MI Funds under Scenario 1). Under the Plan, the Lenders will receive a $500,000 plan distribution on account of the Alternative Deficiency Claim; per section I.B hereof, the Consenting Lenders will be deemed to assign their rights to any additional distributions from non-debtor parties on account of the Alternative Deficiency Claim to Settling Builders' designees; <u>provided</u>, <u>however</u>, that the non-Consenting Lenders maintain all of their rights, if any, under the Completion Guaranty and the Limited Guaranty against the non-debtor, third-party guarantors and otherwise against non-debtor parties (although the non-Consenting Lenders' rights under the Repayment Guarantees of Settling Builders 【 Redacted 】 shall be fully satisfied on the Effective Date by the Settling Builders' payments).

b.    The Settling Builders' Consideration of $330 million is comprised of the Repayment Guaranty Amount of $316.6 million (thereby subrogating these Settling Builders to the Agent's lien on their respective Takedown land and accommodating (without recourse or warranty or preventing the Effective Date), to the

Subject to FRE 408

**This Term Sheet is a settlement proposal and is not intended to be, and shall not be construed as, a solicitation of any vote in favor of or against any plan of reorganization or liquidation**

extent permitted by law or an order of the court of competent jurisdiction, the goal of the Settling Builders[5] to acquire the Meritage Takedown Land free and clear of liens and to have a claim against Meritage for the amount paid by Settling Builders to Lenders or Agent on behalf of Meritage[6], and $13.4 million (including the $500,000 plan distribution on the Alternative Deficiency Claim).

          c.    Notwithstanding the foregoing, the Agent and Lenders, in their sole discretion, shall have the right to continue any litigation concerning the MI Funds post-Effective Date. Recoveries, net of Agent and Lender reasonable legal fees and expenses, up to the amount of $16 million, will be paid to the Settling Builders as reimbursement for the MI Makeup. By way of example, if Agent recovers $20 million in the MI Fund litigation (net of expenses), and Settling Builders have made a $16 million MI Makeup Payment, $16 million will be paid to the Settling Builders as reimbursement of the MI Makeup and Agent will retain $4 million.

       2.    "MI Funds":  In the event the Agent or Lenders do not elect to continue the prosecution of any MI Fund litigation post-Effective Date, the Settling Builders' payment of the MI Makeup pursuant to this Scenario 2 shall be in full satisfaction of the Agent's and Lenders' rights to the MI Funds, and following the Effective Date an entity to be formed by Settling Builders ("NewCo") shall have the right to pursue any claims to such funds that the Estate, the Agent, or the Lenders had prior to the Effective Date.

       3.    Application of Escrow:  Pending the Effective Date, proceeds of the Escrow shall be applied to finance Chapter 11 administrative expenses including LID Assessments and taxes in accordance with the Budget, provided that LID Assessments and taxes, as well as LID segment projects agreed upon by the Agent and the Settling Builders, will be financed prior to the 2/3 Consent Date (other expenses to be paid solely out of the Debtor's cash on hand, which includes the Unencumbered Cash in which the Settling Builders assert an interest. Settling Builders obtain priming lien on future LID

---

[5] Should the Settling Builders settle with the Meritage Builder, then the Agent and the Lenders shall receive the same releases from the Meritage Builder that the Settling Builders receive from Meritage in order to ensure the consistency of the releases to JPM and the Lenders that are being provided to them under this Term Sheet and the PSA.

[Redacted]

Subject to FRE 408

**This Term Sheet is a settlement proposal and is not intended to be, and shall not be construed as, a solicitation of any vote in favor of or against any plan of reorganization or liquidation**

Proceeds and LID Proceeds only to replenish the Escrow to the extent it is used to finance LID Assessments, taxes and Chapter 11 administrative expenses, as contemplated by this paragraph. If the Plan is not confirmed by the Bankruptcy Court on or before October 31, 2011 for any reason (other than due to the failure of the 2/3 Consent Date to occur or the failure of the Agent and the requisite Consenting Lenders to support the Plan in accordance with this Term Sheet or the PSA), or in the event of Settling Builders' default under the terms of this Term Sheet or the PSA, then $10 million of the Escrow shall not be refunded to the Settling Builders and instead, paid to the Agent, and Settling Builders' lien is extinguished upon repayment of the financed amounts. The Agent shall apply the $10 million against the interest presently accruing under the Credit Agreement pursuant to the terms of the Repayment Guarantees.

## SCENARIO 3

**(assumes the Estate's/Agent's/Lenders' claim to the Focus MI Deposit is <u>resolved but only partially successful</u> by the Effective Date)**

If the Estate, Agent, or Lenders establish that they have a right to some, but not all, of the MI Funds, then Scenario 2 shall be modified such that, regardless of the outcome, (i) Agent and Lenders shall receive no less than $16 million from a combination of the MI Funds and MI Makeup, and (ii) Settling Builders shall pay no more than $16 million in MI Makeup, less any amounts that Agent or Lenders receive from the MI Funds.[7]

---

      4.    <u>Means for Implementing the Plan</u>: Immediately upon the Plan going effective,

      a.    Trustee transfers the Takedown land to NewCo (by the 2/3 Plan vote, the Consenting Lenders agreed to the real property transfer to NewCo, **subject to the Agent's $313.5 million Lien**).

      b.    Settling Builders tender the Repayment Guaranty Amount to the Agent (for the benefit of the Lenders) in full satisfaction of their respective obligations under the Repayment Guarantees (including Meritage's Repayment Guaranty regardless of whether it is a Settling Builder), which thereby subrogates the Settling Builders to the liens against the Takedown land.

      c.    Pursuant to the instructions of the Settling Builders (who became subrogated to the Agent's Lien against the Takedown land), the Agent (or

---

[7]    By way of example, (x) if the Bankruptcy Court determines that only $10 million of the MI Funds may be applied to the Lenders' obligations, then Settling Builders shall pay an additional $6 million in MI Makeup, or (y) if the Bankruptcy Court determines that $20 million of the MI Funds may be applied to the Lenders' obligations, then Settling Builders shall pay no addition MI Makeup.

Subject to FRE 408

**This Term Sheet is a settlement proposal and is not intended to be, and shall not be construed as, a solicitation of any vote in favor of or against any plan of reorganization or liquidation**

its successor) shall release the Lien as to the Takedown land, so that NewCo owns the property "free and clear."

d.      Trustee also transfers the Estate's other encumbered assets to NewCo, Agent (or its successor) assigns its remaining lien against South Edge to the Settling Builders, and Settling Builders are given credit for the payments to the Estate/Agent/Lenders in excess of the Repayment Guaranty amounts, plus the economic contributions to the estate that allowed the Plan to go effective (i.e., payment of admin / priority / unsecured claims – *see* Section 1.A.6 herein).

e.      The Agent/Lenders' claim against the Estate for the full amount of the Secured Claim is deemed satisfied, and the Successor Agent (whose appointment is discussed herein (or JPM, if a successor hasn't been appointed at that time)) makes the necessary distributions to claimants.

f.      Settling Builders contribute the additional $6 million (under Scenario 1) or $13.4 million (under Scenario 2) of the Settling Builders' consideration to the Estate in settlement of the Takedown litigation and Trustee's other actual and potential causes of action against the Settling Builders. This money is distributed to Lenders on account of the Lenders' secured claim and the Deficiency Claim.

g.      Final result after all transactions are complete is that (i) Agent/Lenders have received between $340 million (Scenario 1) or $330 million (Scenario 2) total cash, plus fees as provided under this Term Sheet, (ii) NewCo has received free and clear title to all of South Edge's assets (including Takedown land, all other land, LID rights, Estate's claims against non-settling Builders and other non-settling members, and cash not used to pay the Agent/Lenders' claims or other obligations of Settling Builders hereunder), (iii) Settling Builders receive release from Trustee, and (iv) Settling Builders' remaining liability is to non-Consenting Lenders to the extent that they are able to assert claims under the Limited Guaranty, Completion Guaranty or any other causes of action.

5.      <u>Reimbursement to Agent:</u>

a.      Settling Builders indefeasibly pay all accrued and unpaid fees and expenses owing now at the start of the Plan process without dispute by Builders (which are approximately $2.4 million). Agent and Lenders shall provide Settling Builders with redacted copies of invoices for all such fees and expenses;

b.      Settling Builders indefeasibly pay, as provided for in section 11.03(a) of the Credit Agreement, up to $2 million to reimburse future reasonable fees, expenses and charges of Agent (and the Lenders) incurred in effectuating the Plan

Subject to FRE 408

**This Term Sheet is a settlement proposal and is not intended to be, and shall not be construed as, a solicitation of any vote in favor of or against any plan of reorganization or liquidation**

process from and after the date that the Consenting Lenders agree to this Term Sheet. This allowance is a future cap, not a past cap; and

        c.      Agent shall provide to the Settling Builders an accounting of all MI funds applied to date.

      6.     <u>Plan Treatment of Non-Agent Claims</u>. Settling Builders indefeasibly pay the following items in connection with a confirmed plan of reorganization:

        a.      <u>Trustee Fees & Professional Fees & Expenses</u>: $2 million (which remains subject to an agreed-upon Budget) – paid in full.

        b.      <u>Administrative Expenses (not including Trustee Fees & Professional Fees & Expenses)</u>: paid in full in order to satisfy confirmation prerequisites (which remain subject to an agreed-upon Budget). Settling Builders remain obligated to fund all allowed Administrative Expenses notwithstanding divergence from the Budget; provided, however, that the Settling Builders reserve the right to object to any request for the allowance of an Administrative Expense that is not identified in, or that exceeds, the agreed-upon Budget.

        c.      <u>Priority Claims</u>: paid in full, or some other scheme, in order to satisfy Bankruptcy Code confirmation prerequisites.

        d.      <u>General Unsecured Claims</u>: General unsecured claims, which shall not include allowed claims filed by or scheduled in favor of the Settling Builders or non-Settling Builders including Focus entities, paid in order to achieve confirmation (whether by consent or cram down). Total cash contributed by Settling Builders to pay general unsecured claims shall not exceed $1 million, plus the $500,000 to be paid by Settling Builders on account of the Applicable Deficiency Claim. In the event the $1 million allocated for distribution to general unsecured creditors is insufficient to secure general unsecured creditor approval of or confirm the Plan, it shall be the obligation of the Settling Builders to fund such additional amounts in order to obtain such consent or approval; provided, however, the Settling Builders shall not increase the payment on the Applicable Deficiency Claim.

      7.     <u>Agent's Expectations</u>:

        a.      Subject to the limitations set forth in section I.A.5(b) above, the Lenders' Settlement Recovery is intended as a "net" recovery, including their attorneys' fees and costs, and the Plan and related deals referenced herein allocate all costs, risks and burdens to Settling Builders, unless otherwise expressly stated in this Term Sheet.

Subject to FRE 408

**This Term Sheet is a settlement proposal and is not intended to be, and shall not be construed as, a solicitation of any vote in favor of or against any plan of reorganization or liquidation**

    b.  Agent and Lenders expect this deal to be a primary obligation of the parent companies with minimum credit risk, and, to the extent any payment comes from any affiliate besides the Parent, the Parent continues to guaranty, defend and assure the indefeasible result of such affiliate's payment. Each Settling Builder (member and affiliated parent guarantor, together) shall be liable only for its respective pro rata share of any obligation of "Settling Builders" under this Term Sheet, per the shares on the attached <u>Exhibit 1</u>, which pro rata shares of all Settling Builders collectively shall equal 100% of the obligations hereunder.

    c.  Trustee and Agent shall actively pursue the MI Fund litigation, with the goal of seeking a resolution by the Effective Date. The Trustee, Settling Builders and Agent/Lenders may also settle with Focus, with the prior consent of both the Settling Builders and Lenders/Agent as to anything affecting the MI Funds or Lenders'/Agent's Collateral, but that shall not cause delay.

   B. <u>"Lender Refund of Excess Proceeds"</u>:  Consenting Lenders agree by their vote for the Plan to refund to the Settling Builders any proceeds payable to the Consenting Lenders from the Estate, Settling Builders, non-Settling Builders and guarantors, non-Consenting Lenders, or Collateral in excess of their pro rata share of the Lenders' Settlement Recovery.

   C. <u>Consenting Lenders' Covenant Not To Sue And To Cooperate.</u>

    1.  Consenting Lenders agree by their vote for the Plan (and any Plan Supplement incorporated therein):

    a.  to cooperate with the Settling Builders in certain respects to be specified (without risk of liability or expense to Lenders or Agent), and

    b.  not to seek to enforce remedies against the Collateral, the Settling Builders, or the Guarantors, leaving the Successor Agent as the party exclusively in charge as far as the Consenting Lenders are concerned.

    2.  The Successor Agent releases any claim against the Consenting Lenders or Agent under the Credit Agreement or otherwise, including for indemnity or expense reimbursement, looking only to non-Consenting Lenders as to what is available to or from subrogated Settling Builders or other parties for any recovery by such Successor Agent.

   D. <u>Successor Agent/Consenting Lenders Excused.</u>

    1.  The Agent shall resign pursuant to section 10.06(c) of the Credit Agreement immediately after the Effective Date.

Subject to FRE 408

**This Term Sheet is a settlement proposal and is not intended to be, and shall not be construed as, a solicitation of any vote in favor of or against any plan of reorganization or liquidation**

2.    As part of the amended Credit Agreement (which will be included as a Plan Supplement), in the event the "Required Lenders" (as such term is defined in the Credit Agreement) do not select a successor Agent, JPM shall appoint a Successor Agent in accordance with the terms of the Credit Agreement.

3.    The refund mechanism is accomplished through an amendment to the Credit Agreement that provides for the Consenting Lenders to assign to the Settling Builders their recovery rights under the three guaranty agreements, as well as, but not limited to, payments from the Agent's allowed claims against the Kimball Hill and Alameda estates. When and if future recoveries occur, that Successor Agent will handle the distribution to non-Consenting Lenders and the Settling Builders in accordance with the Credit Agreement (as amended).

E.    Miscellaneous.

1.    The Loan Documents (as such term is defined in the Credit Agreement) continue in effect, but the Consenting Lenders have no more executory obligations, exposures or recoveries (except for those obligations expressly stated in this Term Sheet, including the obligation to turn over excess proceeds to the Settling Builders under section I.B).

2.    The Successor Agent and the subrogated Settling Builders deal with all issues in the future with respect to Collateral, Guarantees, the Estate and the non-Consenting Lenders, subject to the Plan.

3.    The Settling Builders will not be "Lenders" under the Credit Agreement (as amended) and will not have voting rights thereon. Nothing herein shall modify the pro rata sharing of payments required by section 2.18(c) of the Credit Agreement, and on or after the Effective Date, any such pro rata distributions to which the Consenting Lenders are entitled to receive from the non-Consenting Lenders shall be assigned to the Settling Builders pursuant to the refund mechanism contemplated by Section I.B of this Term Sheet.

4.    The rights of the non-Consenting Lenders are preserved as they exist under the Loan Documents, including the Repayment, Completion and Limited Guarantees; provided, however, that the effect of the payment by the Settling Builders on account of the Repayment Guarantees will, by the terms of such guarantees, satisfy in full the Settling Builders' obligations thereunder. [ Redacted ]

5.    The Consenting Lenders are effected, in economic substance (but not in legal effect), by treating the Settling Builders as if they were subordinated subrogees before payment of the "Secured Obligations" (as such terms is defined in the Credit Agreement) in full as to the Consenting Lenders (i.e., Settling Builders get no

Subject to FRE 408

**This Term Sheet is a settlement proposal and is not intended to be, and shall not be construed as, a solicitation of any vote in favor of or against any plan of reorganization or liquidation**

portion of such payments on the Secured Obligations), but the Settling Builders retain the economic benefits of Consenting Lenders' economic interest.

      6.    If the Meritage Builder and its parent Guarantor do not become Settling Builders, then

[ Redacted ]

Settling Builders and/or NewCo shall obtain the benefits of such tender, including title to the Meritage Takedown land, and (iii) Settling Builders and/or NewCo (or their designee) shall obtain the right to pursue against Meritage the Estate's claims, claims under the Repayment Guaranty, and (if and to the extent such claims may be asserted by Lenders in their individual capacity), claims of the Consenting Lenders under the Completion and Limited Guarantees.

II.    <u>Interim Bankruptcy Matters</u>

    A.    The burden and risk shall be on the Settling Builders, at their sole cost, to manage the Estate's priority expenses and administrative claims to an amount that they are willing to pay in full at the Effective Date in order to assure Plan consummation. Agent, Settling Builders, and Trustee shall agree, in advance, to a Budget for all administrative expense claims, which Budget shall not be exceeded by the Trustee without the consent of both the Settling Builders and Agent. In the event of unanticipated expenditures that are essential to protect the Estate's assets, Settling Builders and Agent will negotiate a variance to the Budget in good faith. To the extent that funds are not available from LID proceeds and other Estate funds, the Settling Builders shall advance funds to the Estate from the Escrow in accordance with Section I.A.3.above, interest free through the Effective Date and with section 364 protection, for budgeted expenses as they come due. Notwithstanding the foregoing, Settling Builders will remain responsible for the satisfaction of all allowed Administrative expense claims.

    B.    Trustee shall continue work on the existing LID segments now in use or substantially complete, which shall continue pursuant to a Budget and shall be funded by one or more of the following: (i) Cash Collateral, (ii) at Agent's option, the MI funds, (iii) the Unencumbered Cash, or (iv) the Escrow in accordance with Section I.A.3 above, in order to recover the $34M expected LID reimbursement at the earliest practical time. Any LID proceeds or other cash indefeasibly received by the Lenders as of the Effective Date shall be credited against Settling Builders' cash obligations to Lenders hereunder (i.e., if Lenders receive $2 million in LID proceeds as of the Effective Date, Settling Builders' obligation to pay Lenders on the Effective Date shall be reduced by $2 million), provided, however, that the Settling Builders' obligations (including the Repayment Guaranty Amount) shall not be reduced if, and to the extent, the Lenders incur fees in excess of the $2 million amount that the Settling Builders are obligated to pay under

**This Term Sheet is a settlement proposal and is not intended to be, and shall not be construed as, a solicitation of any vote in favor of or against any plan of reorganization or liquidation**

section I.A.5.b of this Term Sheet. Any LID proceeds received after the Effective Date shall belong to NewCo.

      C.    Settling Builders, Agent, Consenting Lenders, and Trustee shall cooperate on future cash collateral agreement(s), including with respect to provisions concerning the adequate protection being provided to the Agent and the Lenders and the Settling Builders' financing from the Escrow, consistent with this Term Sheet, in exchange for the use of the Lenders' cash collateral and the Escrow.

      D.    Agent shall be entitled to consent to the use of Cash Collateral to finish LID reimbursement work, replacing any MI funds used with LID recoveries (after payment of allowed professional and other fees of the Trustee as permitted by the Budget). Agent shall be entitled to protect, defend and preserve its Collateral and rights pending the Effective Date, as well as to respond to litigation from third parties, including Focus, using Collateral proceeds.

      E.    The parties shall cooperate so as to preserve the status quo, apart from such LID work and defensive actions.

III.    City-LID Issues

      A.    The Settling Builders, under the Trustee's supervision, shall maintain the existing permits, entitlements and contracts with the City, and shall advance funds to the Estate pursuant to the above-referenced Budget (which advances may be made from the Escrow), interest free through the Effective Date and with section 364 protection, for all LID assessments and property taxes, HOA costs, insurance and other operating costs as they come due. Lenders and Agent shall have no liability or burden for those or other City-related issues.

      B.    The Plan shall defer the decision to assume, amend or reject the Development Agreement and other City contracts, permits and entitlements until after the Effective Date. No amendments or changes can occur before the Effective Date without the consent of the Agent. To the extent the Settling Builders discuss amendments or changes with the City, LID bondholders or their respective professionals or agents, before the Effective Date, Agent shall be entitled to participate, and those discussions shall not prejudice any of the Lenders' or Agent's rights or interests in the event the Plan is not consummated.

IV.    Plan Releases, Exculpation, Etc.

      A.    Consenting Lenders release any claims arising from or related to South Edge apart from claims relating to the Loan Documents and Plan against the Settling Builders and their related parties and professionals. As to the Guarantees and other Loan Documents, Consenting Lenders agree pursuant to the "Lender Refund of Excess Proceeds" and the covenant not to sue described above. The release to be provided by

**This Term Sheet is a settlement proposal and is not intended to be, and shall not be construed as, a solicitation of any vote in favor of or against any plan of reorganization or liquidation**

Highland Capital and its affiliates will contain an appropriate carve out for claims relating to all properties purchased in relation to the Inspirada development by Essex Real Estate Partners, LLC and/or Las Vegas Developments Associates, Inc.

B.    Settling Builders release any and all claims, offsets, or defenses (apart from the Plan contract) against the Consenting Lenders and Agent and their related parties and professionals. The release to be provided by KB Home will contain an appropriate carve out for claims relating to all properties purchased in relation to the Inspirada development by Essex Real Estate Partners, LLC and/or Las Vegas Developments Associates, Inc.

C.    The Estate releases all claims, offsets and defenses against all Lenders and Agent and their related parties and professionals (including any such claims, offsets and defenses that may be asserted derivatively).

D.    The Estate releases all claims, offsets and defenses against the Settling Builders and their related parties and professionals (including any such claims, offsets and defenses that may be asserted derivatively).

E.    The Estate releases any offsets or defenses against the Settling Builders' subrogation rights and claims against the Estate (*i.e.*, the lien on the Takedown land earned by satisfying the Repayment Guaranties).

F.    Plan provides for exculpation in favor of the Chapter 11 Trustee, the Agent, the Lenders, the Settling Builders, and their respective professionals.

G.    The pending Agent suits in the Nevada District Court would be dismissed without prejudice on the Effective Date. The Successor Agent can deal with future issues, subject to Section V below.

H.    The Settling Builder and Debtor out-of-possession appeals are also dismissed with prejudice on the Effective Date.

V.    Amended Credit Agreement (to be filed as a Plan Supplement)

A.    Section 11.03(c) and other sections to be identified (i.e., expense and reimbursement provisions) of the Credit Agreement survive confirmation so that Lenders' obligation to indemnify Agent (where Borrower fails to do so) inures to benefit of JPM (as former agent).

B.    Instruction by the Consenting Lenders to dismiss all litigation actions without prejudice.

C.    Adjust Pro Rata provisions in the Credit Agreement to reflect arrangements contained in this Term Sheet.

Subject to FRE 408

**This Term Sheet is a settlement proposal and is not intended to be, and shall not be construed as, a solicitation of any vote in favor of or against any plan of reorganization or liquidation**

VI.    Other Matters of Interest to Builders

      A.    The pending Agent suits in front of Judge Pro will be stayed pending the Effective Date, as well as any suits against the Agent or Lenders in that court. No new actions between the Agent, Settling Builders, and Lenders who join the Plan Support Agreement will be commenced during this period.

      B.    Any suit by the Chapter 11 Trustee for the Estate against the Settling Builders, including the demand for the Settling Builders to comply with their Takedown obligations, shall be stayed pending the Effective Date.

      C.    Trustee's role shall be limited to (i) recovering LID proceeds and (ii) resolving ownership of the Focus MI Deposit.

      D.    Any pending appeals by the Settling Builders of the § 303 involuntary ruling and Trustee appointment (the "**Appeals**") shall be stayed pending the Effective Date, including any appeal of the District Court decision to dismiss the Appeals; and similarly, the Settling Builders shall instruct South Edge, LLC (as the debtor out-of-possession) and its counsel to seek a stay of any further prosecution of any appeal of the District Court decision to dismiss the Appeals.

      E.    The parties shall resolve interim milestones with an Effective Date target of November 30, 2011.

VII.    Miscellaneous Plan Matters

      A.    The Settling Builders and Agent shall jointly prepare the Plan and Disclosure Statement to effectuate this Term Sheet, and as a settlement, without any admissions or prejudice to the parties. Time is of the essence, and the Effective Date must occur on or before November 30, 2011. Any amendment to the Plan must be agreed to by the Agent and Settling Builders.

      B.    If the Plan is not confirmed on or before October 31, 2011 for any reason (subject to the option of the Agent and the Settling Builders to extend this deadline for a period of no more than 30 days), then in the sole discretion of either the Agent or the Settling Builders (i) this Term Sheet agreement shall be terminated, (ii) the Plan and Disclosure Statement shall be withdrawn and have no continuing force or effect, and (iii) the funds remaining in the Escrow (net of $10 million if to be paid to the Agent in accordance with section I.A.3. above) shall be returned to the Settling Builders. Upon termination pursuant to this section, all parties' rights, defenses and claims are reserved, and all litigation stays created by this Term Sheet or the Plan Support Agreement will terminate, except for the protections herein for the Escrow and other funds advanced by the Settling Builders to fund LID payments, taxes, and other administrative expenses.

Subject to FRE 408

**This Term Sheet is a settlement proposal and is not intended to be, and shall not be construed as, a solicitation of any vote in favor of or against any plan of reorganization or liquidation**

## EXHIBIT 1

[ Redacted ]

# **Exhibit 3**

# **TRUSTEE'S CONSENT TO SUPPORT AGREEMENT**

# MILBANK, TWEED, HADLEY & McCLOY LLP

**601 South Figueroa Street**

**Thirtieth Floor**

**Los Angeles, CA 90017-5735**

TEL: 213-892-4000
FAX: 213-629-5063

Robert Jay Moore
Partner
DIRECT DIAL NUMBER
(213) 892-4501
Direct Fax: (213) 892-4701
rmoore@milbank.com

June 8, 2011

**NEW YORK**
212-530-5000
FAX: 212-530-5219

**WASHINGTON, D.C.**
202-835-7500
FAX: 202-835-7586

**LONDON**
44-20-7615-3000
FAX: 44-20-7615-3100

**FRANKFURT**
49-(0)69-71914-3400
FAX: 49-(0)69-71914-3500

**MUNICH**
49-89-25559-3600
FAX: 49-89-25559-3700

**BEIJING**
8610-5969-2700
FAX: 8610-5969-2707

**HONG KONG**
852-2971-4888
FAX: 852-2840-0792

**TOKYO**
813-5410-2801
FAX: 813-5410-2891

**SINGAPORE**
65-6428-2400
FAX: 65-6428-2500

**SÃO PAULO**
55-11-3927-7700
FAX: 55-11-3927-7777

Robert A. Greenfield, Esq.
K. John Shaffer, Esq.
Stutman, Treister & Glatt, a Professional Corporation
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067-6013

G. Larry Engel, Esq.
Morrison & Foerster LLP
425 Market Street
San Francisco, California 94105-2482

Re:     Trustee's Consent to Letter Agreement Among JPMorgan Chase
        Bank, the Consenting Lenders, and the Settling Builders (the
        "Parties") Dated May 19, 2011 (the "Support Agreement"),
        Regarding the Term Sheet for South Edge, LLC Chapter 11 Plan
        (the "Plan") Attached Thereto (the "Term Sheet")

Gentlemen:

        I write to you in my capacity as counsel to Cynthia Nelson, the Chapter 11 Trustee (the
"Trustee") of the Chapter 11 Estate (the "Estate") of South Edge, LLC ("South Edge"), and in
your respective capacities as counsel to the Settling Builders  and as counsel to JPMorgan Bank,
N.A, as the Administrative Agent and Collateral Agent under the Credit Agreement (the
"Agent"), with reference to the Support Agreement and the Term Sheet.[1]

---

[1] Capitalized terms used herein shall be accorded the definitions given to such terms in the Support Agreement or
the Term Sheet, as the case may be, unless otherwise defined herein.  References herein to Sections shall be to
Sections of the Term Sheet, and references herein to Paragraphs shall be to Paragraphs of the Support Agreement.

MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP

Robert A. Greenfield, Esq.
K. John Shaffer, Esq.
G. Larry Engel, Esq.
June 8, 2011
Page 2

      The Trustee hereby consents to the Support Agreement, which incorporates the Term Sheet, and this letter of consent (the "Consent") shall be affixed to the Support Agreement and is binding upon the Trustee and the Settling Builders, subject only to the following clarifications of the Trustee's understandings of, and limitations to or qualifications of the Trustee's consent to, the Support Agreement and the Term Sheet.

Term Sheet:

1.    The Effective Date of the Term Sheet under Scenarios 1, 2 and 3, shall be the effective date of the confirmed Plan.

2.    I. Scenario 1 - A.1. and 3, Scenario 2 - A.1. and 3, and Scenario 3.    The Settling Builders shall make advances to the Trustee pursuant to the Trustee Financing Agreement between the Trustee and the Builder Lenders, as defined therein (in such form as may be agreed upon and as it may be amended or modified from time to time with the consent of the Trustee and the Builder Lenders, the "Financing Agreement"), to enable the Trustee to pay administrative expenses of the Estate pursuant to the Budget attached to such Financing Agreement, in such form as may be agreed upon and as it may be amended or modified from time to time with the consent of the Trustee, the Settling Builders, and the Agent (the "Budget," and together with the Financing Agreement, the "Settling Builders' Loans"); provided, however, that the Settling Builders do not intend, and shall not be obligated under the Term Sheet, to advance to the Trustee any funds pursuant to the Settling Builders' Loans until (i) the Bankruptcy Court has entered a final order, that has not been stayed, granting them a first priority priming lien in any and all funds received or to be received by the Trustee, on behalf of the Estate, from the City of Henderson from the proceeds of the prepetition bonds issued in connection with Local Improvement District T-18 ("LID Proceeds"), to secure all advances made by the Settling Builders to the Trustee pursuant to the Settling Builders' Loans, and (ii) the Bankruptcy Court has entered a final order, that has not been stayed, allowing the Trustee to use the cash collateral of the Settling Builders and the Agent pursuant to the Budget. Consistent with provisions contained in the *Stipulation Providing For Post-Petition Financing and Use of Cash Collateral* dated March 31, 2011, and the Bankruptcy Court Order entered thereon (as amended, the "Cash Collateral Order"), the Budget shall provide that, during the period through the earlier of (a) the Effective Date and (b) the termination of the Support Agreement and Term Sheet, the Trustee may make expenditures and incur obligations that may be satisfied from the cash collateral of the Settling Builders and the Agent and from the Unencumbered Cash, without further order of the Bankruptcy Court or further consent of the Settling Builders or the Agent, in such amounts and for such purposes as are set forth in the Budget; provided, however, that, except with respect to the payment of fees of the Trustee and the Trustee's professionals, which shall be only in such amounts as are set forth in the Budget, the Trustee may make expenditures and incur obligations

Robert A. Greenfield, Esq.
K. John Shaffer, Esq.
G. Larry Engel, Esq.
June 8, 2011
Page 3

       subject to the provisions of the Financing Agreement but other than as provided for in the Budget, irrespective of whether such expenditures or obligations fall within a specific line item authorization in the Budget, so long as (i) advance notice of such expenditures or obligations are given to the Settling Builders and the Agent, and (ii) such expenditures and obligations are reasonably consistent with the Budget, are commercially reasonable, or are essential to protect the Estate's assets. The Parties acknowledge that the portion of the Unencumbered Cash funded by the Settling Builders represents only approximately $398,000 of the approximately $493,000 in the possession of the Trustee as of the date hereof, and the Trustee will not use the remaining approximately $95,000 portion of the Unencumbered Cash without first providing notice of such intended use and an opportunity for a hearing to such party or parties as the Trustee believes may be entitled to such notice. To the extent that, immediately prior to the Effective Date, the Escrow contains less than $31.4 million, the Settling Builders shall replenish the Escrow to the amount of $31.4 million as of the Effective Date.

3.      I. Scenario 1 - A.1.a. and I. Scenario 2 - A.1.a.(ii).    The Trustee acknowledges that the MI Funds total approximately $26 million as of March 31, 2011, and that solely for purposes of the Support Agreement, the Term Sheet and the Plan, the Lenders' claim would total approximately $382 million as of November 30, 2011, assuming interest continues to accrue on amounts outstanding at the default rate through that date, the Lenders' secured claim is capped at $313.5 million, under Scenario 1 the Lenders' Deficiency Claim is $42.5 and the Repayment Guaranty Amount is $308 million, and under Scenario 2 the Alternative Deficiency Claim is $52.5 and the Repayment Guaranty Amount is $316.6 million. Except as so acknowledged, the Trustee reserves all her rights with respect to (i) fulfilling her responsibilities regarding her determination of the validity, priority and extent of the security interests and liens of the Agent and the Lenders pursuant to the Investigation Period under the Cash Collateral Order, and (ii) if the Support Agreement and the Term Sheet are terminated or the Plan does not become effective, to investigate and possibly take a different position with respect to the allowable amounts in the Case of the Lenders' total claim and the allowed amounts of its secured claim and any deficiency claim, and the amount owing to the Agent under the Repayment Guaranties between the Agent and the original equity members and their corporate parents dated as of November 1, 2004.

4.      I. Scenario 1 - A.1.a. and b., I. Scenario 2 - A.1.a. and b., I.A.6.d.    Each of (i) the Applicable Deficiency Claim, (ii) any claim asserted by Focus South Group, LLC or any of its affiliates (a "Focus Claim"), (iii) any claim asserted by an original equity member of South Edge or an affiliate or successor of any of them, including, but not limited to, the Settling Builders and their parent guarantors (a "Member Claim"), and (iv) any unsecured claim asserted against the Debtor or the Estate other than an Applicable Deficiency Claim, a Focus Claim, or a Member Claim ("Other Unsecured Claims"), shall

MILBANK, TWEED, HADLEY & McCLOY LLP

Robert A. Greenfield, Esq.
K. John Shaffer, Esq.
G. Larry Engel, Esq.
June 8, 2011
Page 4

be separately classified in the Plan.  The Plan will propose a distribution on account of the Applicable Deficiency Claim of $500,000, no distribution on account of a Focus Claim or a Member Claim, and a distribution of up to $1 million on account of allowed Other Unsecured Claims.  Through the "Stipulation Regarding Relief From Stay" among the Trustee, C&S Company, Inc., and Merchants Bonding Company dated April 8, 2011 [Docket No. 586] and the Order thereon entered April 19, 2011 [Docket No. 618], C & S Company, Inc. and Merchants Bonding Company have released any and all claims such entities may have asserted or may assert against the Debtor or the Estate.  In connection with the Plan, the Settling Builders agree to enter into an agreement with Bond Safeguard Insurance Company such that the Debtor and the Estate shall be released from any and all claims Bond Safeguard Insurance Company may have asserted or may assert against the Debtor or the Estate.  Excluding the claims, if any, of C&S Company, Inc., Merchants Bonding Company, and Bond Safeguard Insurance Company (collectively, the "Bond Indemnity Claims"), the Settling Builders believe the distribution of up to $1 million on account of the remaining allowed Other Unsecured Claims will result in payment in full of all such allowed Other Unsecured Claims.

5.    I.A.5.a. and b.    The Trustee shall request the Agent to serve on the Trustee at the same time that the Agent delivers to the Settling Builders all invoices regarding services rendered and expenses incurred by the Agent, whether prior or subsequent to the date of this Consent, that are submitted for reimbursement to the Settling Builders pursuant to Section I.A.5.a. and b. of the Term Sheet.  The Trustee reserves all her rights with respect to the allowance of such invoiced amounts and the manner in which such reimbursements are applied by the Agent in the event the Plan is not confirmed or does not become effective.  The provisions of Section I.A.5.a. and b. of the Term Sheet supersede the provisions of the Cash Collateral Order with respect to any obligation of the Trustee thereunder to pay or reimburse the fees for services rendered and reimbursement of expenses incurred by the Agent.

6.    I.A.5.c.    Consistent with the provisions of the Cash Collateral Order, the Trustee expects the Agent to provide to the Trustee an accounting of all MI funds applied to date.  The Trustee reserves all her rights with respect to the propriety and treatment of the Agent's application of such MI funds in the event the Plan is not confirmed or does not become effective.

7.    I.A.6.a.    The Trustee's fees awarded under Bankruptcy Code Section 326 and 330(a) and the Trustee's professionals' fees allowed under Section 328 and 330(a) shall be paid on an interim basis in accordance with the Budget and pursuant to the terms of any order entered by the Bankruptcy Court authorizing interim compensation.

MILBANK, TWEED, HADLEY & McCLOY LLP

Robert A. Greenfield, Esq.
K. John Shaffer, Esq.
G. Larry Engel, Esq.
June 8, 2011
Page 5

8.    I.E.6.    The Settling Builders agree to indemnify and hold harmless the Trustee and
her professionals with respect to any liability of the Trustee and her professionals,
including, but not limited to, attorneys' fees and expenses, that may arise from or in
connection with satisfaction of the Bond Indemnity Claims and any third party dispute
regarding (i) the Trustee's execution of this Consent, and (ii) upon the Effective Date, (a)
the classification and treatment accorded to Meritage Builder and its parent Guarantor
under the Plan if they do not become Settling Builders, and (b) the Trustee's failure to
provide notice of the bar date by which non-governmental claimants must file a proof of
claim to any person or entity, the failure to bar and/or achieve a discharge of the claim of
any such person or entity, the failure of any such person or entity to receive the treatment
that otherwise would have been accorded to such claimant under the Plan or in the Case,
or the failure to provide such person or entity with adequate notice and an opportunity to
be heard with respect to the approval of a disclosure statement with respect to the Plan,
the confirmation hearing on the Plan, or any other material aspect of the administration of
the Case. Any liability of the Settling Builders hereunder shall be severable and shall be
divided proportionally among the Settling Builders in accordance with the percentages
set forth in Exhibit 1 to the Plan Term Sheet.

9.    III.A.    The Trustee, not the Settling Builders, shall maintain the Estate's existing
permits, entitlements, and contracts with the City through the Effective Date; provided,
however, that the Trustee shall have no such obligation and no liability if the Trustee has
insufficient Unencumbered Cash or cash collateral which she is authorized to use to
satisfy any monetary obligation that is necessary to maintain such permits, entitlements,
and contracts with the City of Henderson.

10.    III.B.    The Plan proponents shall determine, in their sole discretion, that as of the
Effective Date, the Development Agreement between South Edge and the City of
Henderson, recorded June 1, 2005, will be (a) rejected, (b) assumed and assigned to
Newco in its present form or pursuant to some binding memorandum of understanding or
such amended form as may be agreed to by the Settling Builders and the City of
Henderson, or (c) if the Bankruptcy Court shall allow, neither rejected nor assumed and
assigned with the power of rejection or assumption and assignment preserved for exercise
after the Effective Date; provided, however, that notwithstanding the foregoing, the
Development Agreement shall not be rejected or assumed and assigned in its present
form or pursuant to such a memorandum of understanding or amended form prior to such
Effective Date without the express written consent of the Trustee, which shall be granted
or denied in her sole discretion. To the extent the Settling Builders discuss any
memorandum of understanding regarding or amendment to the Development Agreement
with the City of Henderson, the Indenture Trustee for the LID Bonds, the LID
bondholders, or any of their respective professionals or agents prior to the Effective Date,
the Settling Builders shall coordinate with the Trustee and her professionals, who shall be

MILBANK, TWEED, HADLEY & McCLOY LLP

Robert A. Greenfield, Esq.
K. John Shaffer, Esq.
G. Larry Engel, Esq.
June 8, 2011
Page 6

entitled to participate in such discussions, and those discussions shall not prejudice any of the Trustee's rights or interests in the event the Plan is not consummated or the Support Agreement and Term Sheet are terminated.

11.    IV.    Upon the Effective Date, the Settling Builders shall release any and all claims that may exist against the Trustee and her professionals, other than claims arising by reason of her or their willful misconduct, fraud, or breach of fiduciary duty. Upon the consent of the Agent and the Consenting Lenders, the Agent and the Consenting Lenders also shall execute similar releases.

12.    VI.A.    The Trustee shall cooperate in participating in a Ninth Circuit Court of Appeals court-ordered mediation and otherwise support obtaining a stay of the Appeals pending the earlier to occur of (a) the Effective Date and (b) the termination of the Support Agreement and Term Sheet, so long as such actions do not prejudice the Trustee's ability to defend against the Appeals or take such actions in connection with the Appeals as such court or mediator may order.

13.    VI.C.    The Trustee's role in the Case shall not be circumscribed in any manner other that as agreed to by the Trustee in this Consent, nor shall any restriction on the services to be performed by the Trustee or her professionals, as reflected in the Budget, restrict her from performing her statutory duties, fulfilling her fiduciary duties, or complying with any order of the Bankruptcy Court or any other court having jurisdiction over the Case or the Appeals.

14.    VII.A.    The Trustee, on behalf of the Estate, shall be the moving party in any motion purporting to seek an order compromising or settling any claim owned by the Estate. This Consent shall not be binding on the Trustee or effective if the Plan as filed is materially inconsistent with the Term Sheet and adverse to the interests of the Estate (other than any inconsistency that relates to and affects Parties only, and not the Trustee or the Estate), or if a Plan that is consistent with the Term Sheet is amended or modified in any such manner without the express written consent of the Trustee.

15.    VII.B.    If the Support Agreement and Term Sheet are terminated, then all accrued and unpaid administrative expenses as of the date of such termination in such amounts as may be allowed, including, but not limited to, all accrued and unpaid administrative fees of the Trustee and her professionals, shall be paid in full or reserved for payment in full in cash as to the amounts set forth in the Budget through the date of such termination that remain accrued and unpaid, from Unencumbered Cash, from LID Proceeds in the possession of the Trustee that constitute the Settling Builders' cash collateral, from advances under the Settling Builders' Loans, or from funds remaining in the Escrow after payment of $10 million to the Agent, but before any remaining funds are returned to the Settling Builders

MILBANK, TWEED, HADLEY & McCLOY LLP

Robert A. Greenfield, Esq.
K. John Shaffer, Esq.
G. Larry Engel, Esq.
June 8, 2011
Page 7

in accordance with Section VII.B. of the Term Sheet, or directly from the Settling Builders, in each of the latter three instances (i) such funding to be treated as an advance to the Trustee secured by the priming lien granted to the Settling Builders on the LID Proceeds, and (ii) any obligation of the Settling Builders to advance hereunder shall be severable and shall be divided proportionally among the Settling Builders in accordance with the percentages set forth in Exhibit 1 to the Plan Term Sheet. As to amounts allowed in excess of amounts set forth in the Budget through the date of such termination, and additionally through the conclusion of the Case, that remain accrued and unpaid, the Trustee reserves all her rights to be paid in full or to be reserved for payment in full in cash from the Agent's cash collateral, from the MI Funds if they are determined to be property of the Estate, or from the Bankruptcy Code Section 506(c) surcharge of the Agent's and Lenders' non-cash collateral under the standard set forth in the Cash Collateral Order.

The Trustee intends to disclose the Trustee's execution of this Consent in the context of the Trustee's Motion seeking Bankruptcy Court authority to enter into the Settling Builders' Loans and any hearing thereon. The Trustee will consult with the Settling Builders and the Agent in connection with the form and manner of such disclosure and the redaction or the filing under seal of any portion of this Consent, the Term Sheet, or the Support Agreement that, in the view of the Settling Builders and the Agent, should remain confidential as among the Parties and the Trustee or that need not be subject to public filing in the Bankruptcy Court Record to achieve appropriate disclosure of the Trustee's execution of this Consent.

The Trustee shall not be bound by any provision of the Term Sheet or the Support Agreement that is or becomes inconsistent with the fiduciary or statutory duties of the Trustee under applicable law.

Very truly yours,

Robert Jay Moore

cc:    Cynthia Nelson, Chapter 11 Trustee
       M. Freddie Reiss
       Linda Dakin-Grimm
       David Zolkin