<table>
<tr><td>1</td><td>Robert J. Moore (CA State Bar No. 77495)<br>David B. Zolkin (CA State Bar No. 155410)</td><td>Lenard E. Schwartzer (NV State Bar No. 399)<br>Jeanette E. McPherson (NV State Bar No. 5423)</td></tr>
</table>

1  Robert J. Moore (CA State Bar No. 77495)
   David B. Zolkin (CA State Bar No. 155410)
2  MILBANK, TWEED, HADLEY & McCLOY LLP
   601 South Figueroa Street, 30th Floor
3  Los Angeles, California 90017
   Telephone:    (213) 892-4000
4  Facsimile:    (213) 629-5063

   Lenard E. Schwartzer (NV State Bar No. 399)
   Jeanette E. McPherson (NV State Bar No. 5423)
   SCHWARTZER & MCPHERSON LAW FIRM
   2850 South Jones Boulevard, Suite 1
   Las Vegas, Nevada 89146-5308
   Telephone:  (702) 228-7590
   Facsimile:  (702) 892-0122

5  *Counsel for Chapter 11 Trustee*          *Local Counsel for Chapter 11 Trustee*

6

7  **UNITED STATES BANKRUPTCY COURT**

8  **DISTRICT OF NEVADA**

9  In re:                                    Chapter 11

10  SOUTH EDGE, LLC,                         Case No. BK-10-32968 (BAM)

11                          Debtor.          **NOTICE OF SUBMISSION OF REDLINE
                                             TRUSTEE FINANCING AGREEMENT**
12

13                                           Hearing Date:  July 20, 2011
                                             Hearing Time:  9:30 a.m.
14

15        NOTICE IS HEREBY GIVEN that Cynthia Nelson, the chapter 11 trustee (the

16  "Trustee") of the chapter 11 bankruptcy estate (the "Estate") of South Edge, LLC (the "Debtor")

17  hereby submits the attached redline of the *Trustee Financing Agreement* (the "TIP Loan

18  Agreement"),[1] attached as Exhibit "1" to the *Order (1) Authorizing Chapter 11 Trustee To

19  Obtain Senior Priming Secured Postpetition Financing; (2) Authorizing Chapter 11 Trustee's

20  Use Of Cash Collateral; (3) Deeming Agent, Prepetition Lenders And Builders Lenders To Be

21  Adequately Protected; And (4) Scheduling A Final Hearing* which was lodged for entry onto the

22  Court's docket on July 22, 2011. The redline compares the TIP Loan Agreement to the original

23  form of the agreement (the "Original TIP Loan Agreement") that was attached as Exhibit "1" to

24  the *Declaration Of Cynthia Nelson In Support Motion For Interim And Final Orders (1)

25  Authorizing Chapter 11 Trustee To Obtain Senior Priming Secured Postpetition Financing; (2)

26  Authorizing The Use Of Cash Collateral; And (3) Scheduling A Final Hearing,* filed on July 8,

27

[1]        Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the
           Stipulation.

28

#4836-4898-9960

1   2011 (the "Declaration") [Docket No. 785], highlighting the changes that have been made to the

2   Original TIP Loan Agreement.

3        Dated this 22nd day of July, 2011.

4

5                                 SCHWARTZER & McPHERSON LAW FIRM
                                Lenard E. Schwartzer, Nevada Bar No. 0399

6                                 Jeanette E. McPherson, Nevada Bar No. 5423
                                2850 South Jones Boulevard, Suite 1

7                                 Las Vegas, Nevada  89146-5308

                                &

8                                 By:  /s/  David B. Zolkin

9                                 MILBANK, TWEED, HADLEY & McCLOY LLP
                                Robert J. Moore (CA State Bar No. 77495)

10                                 David B. Zolkin (CA State Bar No. 155410)
                                601 South Figueroa Street, 30th Floor

11                                 Los Angeles, California 90017

12                                 *Counsel for Chapter 11 Trustee*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SOUTH EDGE, LLC.**

**TRUSTEE FINANCING AGREEMENT**

**KB Home NV Acquisition LLC, Toll Henderson II LLC, a Nevada LLC. Pardee Homes, a California corporation, and Trinity Homes, LLC, as Builder Lenders**

**and**

**Cynthia Nelson, solely in her capacity as Chapter 11 Trustee of South Edge, LLC, on behalf of South Edge, LLC and its Bankruptcy Estate, as Borrower**

RECITALS ................................................................................................................. 1

AGREEMENT ........................................................................................................... 2

1.    DEFINITIONS AND CONSTRUCTION. ...................................................... 2

    1.1    Definitions. ............................................................................................ 2

    1.2    Financial Reporting. .............................................................................. 7

    1.3    Terms Generally. ................................................................................... 7

2.    LOAN AND TERMS OF PAYMENT. ........................................................... 8

    2.1    Credit Extensions. ................................................................................. 8

        (a)    Promise to Pay. ......................................................................... 8

        (b)    Loans. ........................................................................................ 8

    2.2    Interest Rates and Calculations. ........................................................... 9

        (a)    Interest. ..................................................................................... 9

        (b)    Default Rate and Fees. .............................................................. 9

        (c)    Computation. ............................................................................. 9

    2.3    Payments. ............................................................................................ 10

        (a)    Time of Payments. .................................................................. 10

        (b)    Location of Payments. ............................................................ 10

    2.4    Term. ................................................................................................... 10

    2.5    Revolving Loan. .................................................................................. 11

    2.6    Use of Proceeds. ................................................................................. 11

        (a)    Generally. ................................................................................ 11

        (b)    Deviation. ................................................................................ 11

        (c)    LID Segment Construction. .................................................... 11

        (d)    Professionals. .......................................................................... 12

    2.7    Section 15 Advances. .......................................................................... 12

    2.8    Source of Loans. ................................................................................. 12

3.    ALLOWANCE AND PRIORITY OF CLAIMS ........................................... 12

4.    SECURITY INTEREST IN FAVOR OF LENDERS .................................... 12

    4.1    Security Interest in Collateral. ............................................................ 12

    4.2    Priority of Builder Lenders' and Agent's Security Interests. ............. 13

    4.3    Preservation of Collateral; Perfection of Builder Lenders' Security Interest and Agent's Security Interest. .............................................. 13

5.      CONDITIONS OF LOANS.................................................................................. 14

    5.1      Conditions Precedent to all Loans. ....................................................... 14

        (a)      Interim Financing Order. ........................................................ 14

        (b)      Delivery of Documents. .......................................................... 14

        (c)      Notice of Borrowing. .............................................................. 14

        (d)      No Default. .............................................................................. 14

        (e)      No Maturity.............................................................................. 15

        (f)      Final Financing Order. ............................................................ 15

6.      REPRESENTATIONS AND WARRANTIES..................................................... 15

    6.1      Authority................................................................................................. 15

    6.2      Execution and Binding Effect................................................................. 16

    6.3      No Default............................................................................................... 16

7.      AFFIRMATIVE COVENANTS. ........................................................................ 16

    7.1      Financial Reporting................................................................................. 16

    7.2      Books and Records. ................................................................................ 17

    7.3      Use of Proceeds...................................................................................... 17

    7.4      Cooperation and Consultation. ............................................................... 17

8.      NEGATIVE COVENANTS. ............................................................................... 17

    8.1      Superpriority Claims/Senior Liens. ........................................................ 18

    8.2      Financing Orders..................................................................................... 18

    8.3      Deviation from Budget. .......................................................................... 18

    8.4      Protection of Collateral........................................................................... 18

    8.5      Significant Transactions.......................................................................... 18

    8.6      Litigation Against Builder Lenders. ....................................................... 19

    8.7      Trustee Consent. ..................................................................................... 19

9.      DEFAULTS. ....................................................................................................... 19

10.     LENDERS' RIGHTS AND REMEDIES. ........................................................... 20

    10.1     Remedies Generally................................................................................ 20

    10.2     Relief from the Automatic Stay. ............................................................. 21

    10.3     Modification of the Automatic Stay. ...................................................... 21

11.     NOTICES............................................................................................................. 22

12.     CHOICE OF LAW AND VENUE: JURY TRIAL WAIVER. .......................... 23

13.     GENERAL PROVISIONS. ................................................................................. 23

13.1    Binding Effect. ................................................................................... 23

13.2    Time of Essence. ................................................................................. 24

13.3    Severability of Provisions. ................................................................. 24

13.4    Amendments in Writing, Integration. ................................................. 24

13.5    Counterparts. ...................................................................................... 24

13.6    Survival. .............................................................................................. 24

This TRUSTEE FINANCING AGREEMENT ("**Agreement**") is entered into as of July —,20, 2011, by and among KB Home NV Acquisition LLC, Toll Henderson II LLC, a Nevada LLC, Pardee Homes, a California corporation, and Trinity Homes, LLC ("**Builder Lenders**"), on the one hand, and Cynthia Nelson, not in her individual capacity, but solely in her capacity as trustee of chapter 11 debtor South Edge, LLC ("**Trustee**"), on behalf of South Edge, LLC ("**South Edge**") and its Estate (as defined below).

## RECITALS

WHEREAS, on December 9, 2010 ("**Petition Date**") JPMorgan Chase Bank, N.A. ("**JPMorgan**"), Credit Agricole Corporate and Investment Bank, and Wells Fargo Bank, N.A. filed an involuntary chapter 11 petition under section 303 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* ("**Bankruptcy Code**"), against South Edge in the United States Bankruptcy Court for the District of Nevada ("**Bankruptcy Court**"), commencing case number 10-32968 ("**Chapter 11 Case**");

WHEREAS, on the Petition Date, JPMorgan, in its capacities as Agent (as defined below) under the Prepetition Credit Agreement (as defined below) and as a lender thereunder, filed a motion to appoint a chapter 11 trustee for South Edge in the Chapter 11 Case ("**Trustee Motion**");

WHEREAS, on February 3, 2011, the Bankruptcy Court entered an order for relief on the involuntary petition and its order granting the Trustee Motion;

WHEREAS, on February 23, 2011, the Bankruptcy Court entered its order approving the Office of the United States Trustee's February 20, 2011, appointment of Cynthia Nelson as the Trustee;

WHEREAS, on April 21, 2011, the Court entered a final order [D.E. 624] that approved a stipulation, between and among JPMorgan, as Agent, the Trustee, and certain equity members of the Debtor that was subsequently amended by periodic extensions [*see* D.E. 676, 736] (collectively, the "**Cash Collateral Orders**"), which has provided the Trustee with continued use of the Agent's cash collateral;

WHEREAS, JPMorgan, as Agent, the members of a steering committee of lenders under the Prepetition Credit Agreement, and more than 92% in dollar amount and 94% in number of total lenders under the Prepetition Credit Agreement have entered into a letter agreement dated as of May 19, 2011 (together with the "Term Sheet for South Edge, LLC Chapter 11 Plan" attached to the letter agreement, the "**Plan Support Agreement**") with certain affiliates of the Builder Lenders ("**Settling Builders**" as defined in the Plan Support Agreement), which Plan Support Agreement requires the parties thereto to support a chapter 11 plan to be filed in the Chapter 11 Case, consistent with the Plan Support Agreement;

WHEREAS, the Trustee has consented to the Plan Support Agreement pursuant to the letter dated as of June 8, 2011, addressed by counsel for the Trustee to counsel for the Agent and counsel for the Settling Builders ("**Trustee's Consent**"), which Trustee's

Consent has been accepted by the Settling Builders and, as permitted by the Plan Support Agreement, been waived by the Agent, on behalf of the Lenders;

WHEREAS, nothing in this Agreement shall alter or modify the terms of the Plan Support Agreement or relieve the Settling Builders or the Agent and the Consenting Lenders of their respective obligations under the Plan Support Agreement;

WHEREAS, the Trustee has requested that the Builder Lenders extend post-petition financing to the Trustee pursuant to Bankruptcy Code section 364;

WHEREAS, the Trustee, on behalf of the Estate, requires funds in order to satisfy accrued and accruing administrative expenses of the Estate pursuant to a Budget (as defined below) and this Agreement, including, but not limited to (i) disbursements on account of, among other things, the construction of certain infrastructure segment improvements required to obtain Local Improvement District T-18 ("**LID**") reimbursements, project maintenance, security, and surety bond obligations, and the costs of administration with respect to LID reimbursements, (ii) LID-related assessments and property taxes, and (iii) bankruptcy-related disbursements, including United States Trustee's fees and the reasonable fees and expenses of the Trustee, her professionals, and the Agent's and Lenders' professionals;

WHEREAS, the Builder Lenders have agreed to provide such post-petition financing to the Trustee and the Estate subject to the terms and conditions set forth in this Agreement and the other Loan Documents (as defined below).

## AGREEMENT

Now, therefore, in consideration of the premises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    DEFINITIONS AND CONSTRUCTION.

    1.1    <u>Definitions</u>.

As used in this Agreement, the following terms shall have the following definitions:

"**Acquisition Agreement"** means the Acquisition Agreement between the City of Henderson and South Edge dated April 1, 2006.

"**Agent**" means JPMorgan, in its capacity as administrative agent under the Prepetition Credit Agreement, and any subsequent or replacement administrative agent under the Prepetition Credit Agreement.

"**Agent's Adequate Protection Liens**" means the liens and security interests granted to Agent (on its behalf and on behalf of the Lenders) hereunder in the Collateral and the Estate's other assets, excluding any claims or causes of action under

sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, as adequate protection for, and to the extent of any diminution in the value of the Agent's interest in the Collateral securing the Debtor's obligations under the Prepetition Credit Agreement resulting from, the use of the Collateral and imposition of the automatic stay.

"**Agreement**" has the meaning specified in the preamble hereto.

"**Bankruptcy Code**" has the meaning specified in the recitals hereto.

"**Bankruptcy Court**" has the meaning specified in the recitals hereto.

"**Builder Lenders**" has the meaning specified in the preamble hereto.

"**Builder Lenders' Account**" means an account at a bank designated by the Builder Lenders from time to time as the account into which the Trustee shall make all payments to the Builder Lenders under this Agreement and the other Loan Documents, but only to the extent such payments are not required to be made to the Term Sheet Escrow.

"**Builder Lenders' LID Remedy**" has the meaning specified in Section 10.1 hereof.

"**Business Day**" means any day that is not a Saturday, Sunday, or other day on which banks in the State of Nevada are authorized or required to close.

"**Budget**" means the budget attached hereto as Exhibit "A", and any successor or modified budget that is acceptable to the Trustee and approved by the Builder Lenders and the Agent, in their sole and absolute discretion. The Budget shall provide for cash flows and accruals of professionals' fees projected in good faith by the Trustee on a weekly basis for the period from July 23, 2011, through November 30, 2011, as such cash flow projections may be amended or modified from time to time by the Trustee and approved by the Builder Lenders and the Agent, in their sole and absolute discretion.

"**Chapter 11 Case**" has the meaning specified in the recitals hereto.

"**Closing Date**" means either the Final Closing Date or the Interim Closing Date.

"**Collateral**" means any and all rights of the Trustee, South Edge, or the Estate to receive payments or reimbursements for funds that have been or will be expended for the construction and/or completion of improvements relating to the LID, whether they constitute general intangibles, accounts, accounts receivable, commercial tort claims, or deposit accounts relating thereto, and all proceeds, products, offspring, or profits thereof (including cash), including payments owing or made under the Acquisition Agreement, but Collateral shall not include the Acquisition Agreement itself.

"**Default**" means any event or condition specified in Section 9 hereof, after the passage of any applicable cure period.

"**Default Rate**" has the meaning specified in Section 2 hereof.

"**Estate**" means the bankruptcy estate of South Edge created pursuant to Bankruptcy Code section 541.

"**Final Closing Date**" means the first date on which (a) the Bankruptcy Court shall have entered the Final Financing Order, and (b) all of the conditions set forth in Section 5 hereof shall have been satisfied by the Trustee in a manner satisfactory to the Builder Lenders and the Agent.

"**Final Financing Order**" means the final order of the Bankruptcy Court approving the Loan Documents, granting the Superpriority Claim status, granting the Builder Lenders' first priority priming liens on the Collateral, granting the Agent, as Agent's Adequate Protection Liens, second-priority liens in the Collateral subject only to the Builders Lenders' first-priority liens on the Collateral, and a first priority lien in all other assets of the Estate other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, and subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code, which order shall have been entered upon motion of the Trustee and which order shall be satisfactory in form and substance to the Builder Lenders and the Agent.

"**Financing Orders**" means the Interim Financing Order and the Final Financing Order.

"**Gomez**" means Gomez Consulting Group, or any other entity performing a similar function with respect to LID-related projects.

"**Interim Closing Date**" means the first date on which (a) the Bankruptcy Court shall have entered the Interim Financing Order, and (b) all of the conditions set forth in Section 5 hereof (except for the entry of the Final Financing Order) shall have been satisfied by the Trustee in a manner satisfactory to the Builder Lenders and the Agent.

"**Interim Financing Order**" means the interim order of the Bankruptcy Court approving the Loan Documents, granting the Superpriority Claim status, and granting the Builder Lenders' first priority priming liens on the Collateral, granting the Agent, as Agent's Adequate Protection Liens, second-priority liens in the Collateral subject only to the Builders Lenders' first-priority liens on the Collateral, and a first priority lien in all other assets of the Estate  other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, and subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code, which order shall have been entered upon motion of the Trustee satisfactory in form and substance to the Builder Lenders and the Agent.

"**JPMorgan**" has the meaning specified in the recitals hereto.

"**LID**" has the meaning specified in the recitals hereto.

"**Loan**" means a loan made by the Builder Lenders to the Trustee pursuant to Section 2 hereof.

"**Loan Documents**" means, collectively, this Agreement, any note or notes executed by the Trustee at the Builder Lenders' request, and all other agreements, instruments, and other documents executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Loan or the Obligations, all as may be amended, modified, or extended from time to time.

"**Maturity Date**" means the earliest of: (a) the termination of the Plan Support Agreement, (b) the Trustee's Consent Termination, (c) the effective date of the Plan of Reorganization, (d) termination of the Loans pursuant to Section 10.1 following a Default, ~~or (e~~(e) the failure of the Final Financing Order to be entered by the Bankruptcy Court on or before August 12, 2011, or (f) November 30, 2011 (provided, however, that in the case of "~~e~~f" only, the Maturity Date shall be extended by such additional time, if any, as is permitted for a plan effective date under Section 3(d) of the Plan Support Agreement, provided that a Budget that is acceptable to the Trustee, the Agent, and the Builder Lenders is agreed to in connection with such extension).

"**Notice of Borrowing**" has the meaning specified in Section 2 hereof.

"**Obligations**" means all present and future indebtedness, obligations, and liabilities of the Trustee, on behalf of South Edge and its Estate, to the Builder Lenders under the Loan Documents, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, or unsecured, and whether or not such claim is stayed. Without limiting the generality of the foregoing, the Obligations of the Trustee, South Edge, and its Estate under the Loan Documents include (a) the obligation to pay principal, Default Rate interest following a Default, reasonable attorneys' fees and expenses of the Builder Lenders following a Default that relate to the enforcement of remedies under the Loan Documents, and other amounts payable under the Loan Documents, (b) the obligation to reimburse any amount in respect of any of the foregoing that the Builder Lenders (in their sole discretion) may elect to pay or advance, consistent with the Budget, on behalf of the Trustee and the Estate, (c) advances to protect the Builder Lenders' Collateral following Default, including the completion of LID segment construction, and related documentation, within or outside of South Edge's development pursuant to Section 10.1, and (d) the Section 15 Advances; provided, however, "b" and "c" above shall also require the approval of the Agent in its reasonable discretion. The Obligations shall not be subject to setoff or counterclaim of any kind, including any assertion by the Trustee or the Estate for capital contributions or other alleged obligations of the Settling Builders to South Edge or the Estate.

"**Permitted Liens**" means: (i) liens for taxes or LID assessments for which funding has not been provided to the Trustee under the Budget such that a timely payment may be made by the Trustee; (ii) liens for taxes or LID assessments not yet payable or that

are payable but are being contested in good faith and by appropriate proceedings diligently pursued, provided that a reserve or other appropriate provision, if any, as shall be required by generally accepted accounting principles shall have been made therefore; and (iii) liens in favor of the Builder Lenders and Agent hereunder and under the Financing Orders.

"**Person**" means individual, company, or other entity.

"**Petition Date**" has the meaning specified in the recitals hereto.

"**Plan of Reorganization**" means the chapter 11 plan of reorganization to be confirmed in the Chapter 11 Case in accordance with the Plan Support Agreement.

"**Plan Support Agreement**" has the meaning specified in the recitals hereto.

"**Prepetition Credit Agreement**" means the Credit Agreement, dated November 1, 2004, as amended and restated by the Amended and Restated Credit Agreement, dated March 9, 2007, among South Edge as the borrower, the lenders party thereto, JPMorgan as the Administrative Agent, and The Royal Bank of Scotland PLC as Syndication Agent.

"**Revolving Note**" has the meaning set forth in Subsection 5.1(b) hereof.

"**Section 15 Advances**" means advances made on account of the Settling Builders' obligations pursuant to Section 15 of the Trustee's Consent for all allowed and unpaid administrative expenses of the Estate that are accrued through the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), not to exceed such unpaid amounts as are set forth in the Budget through the Maturity Date (other than as a result of the effective date of the Plan of Reorganization); provided, however, that the allowed fees and expenses of the Trustee, and all professional persons employed by the Trustee, shall not exceed the amount of unpaid fees and expenses for the full Budget period; and provided further that the Trustee reserves all her rights with respect to the allowance and payment in full of (i) any such excess amounts through the Maturity Date, and (ii) additionally any fees and expenses that remain accrued and unpaid through the conclusion of the Chapter 11 Case, from the Agent's cash collateral, from the MI Funds if they are determined to be property of the Estate, or from the Bankruptcy Code Section 506(c) surcharge of the Agent's and Lenders' non-cash collateral under the standard set forth in the Cash Collateral Orders, without prejudice to the rights of all parties in interest in the Chapter 11 Case, including the Agent (on its own behalf and on behalf of the Lenders) to contest such allowance and payment. Section 15 Advances shall be made only after the satisfaction of such obligations from the following sources, and in the following order: (a) any unencumbered cash held by the Trustee as of the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), (b) LID proceeds in the possession of the Trustee that constitute the Builder Lenders' cash collateral, (c) funds remaining in the Term Sheet Escrow after payment of all amounts owing from the Term Sheet Escrow to the Agent and the Prepetition Credit Agreement lenders, pursuant to the terms of the Term Sheet Escrow, (d) funds in the Builder Lenders' Account pursuant to

Section 2.3(b) hereof, or (e) such other arrangements as are mutually acceptable to the Settling Builders and the Trustee.

"**Settling Builders**" has the meaning specified in the recitals hereto.

"**South Edge**" has the meaning specified in the preamble hereto.

"**Superpriority Claim**" means a claim against South Edge and its Estate in the Chapter 11 Case, which is an administrative expense claim having priority over any and all other administrative expenses of the kind specified in Bankruptcy Code sections 503(b) or 507(b) (including any post-conversion expenses with priority under Bankruptcy Code section 726(b)), except for the superpriority claim granted to the Agent under the Cash Collateral Orders, which shall be pari passu with this claim.

"**Term Sheet Escrow**" means the escrow account established at U.S. Bank National Association created pursuant to the Plan Support Agreement established for, among other purposes, to finance Chapter 11 administrative expenses, including LID assessments and taxes in accordance with the Budget and as contemplated by the Plan Support Agreement.

"**Trustee**" has the meaning specified in the preamble hereto.

"**Trustee's Consent**" has the meaning specified in the recitals hereto.

"**Trustee's Consent Termination**" means the Trustee's taking of actions that are inconsistent with the Plan Support Agreement, as consented to as modified, limited, or clarified by the Trustee pursuant to the Trustee's Consent (including, among other things, the Trustee's opposing the Plan of Reorganization or asserting claims against the Settling Builders or their insiders or affiliates), unless the Trustee's actions are preceded by the Settling Builders and the Agent modifying the Plan Support Agreement or the Plan of Reorganization contemplated thereunder in a manner that has a material adverse effect on the interests of the Estate.

"**Trustee Motion**" has the meaning specified in the recitals hereto.

1.2    Financial Reporting.

Except for professional fee accruals, all financial reporting to the Builder Lenders and the Agent pursuant to Section 6.1 hereof shall be made on a cash flow basis, unless otherwise specifically noted by the Trustee. The Trustee shall comply with the U.S. Trustee Guidelines in connection with financial reports filed in the Chapter 11 Case.

1.3    Terms Generally.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The

word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument, or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements, or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits, and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect, and such words shall refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal, or mixed, and whether tangible or intangible, and (f) the term "financial statements" shall include the accompanying notes and schedules.

2.      LOAN AND TERMS OF PAYMENT.

        2.1    Credit Extensions.

                (a)    Promise to Pay.

        Subject to the terms and conditions of this Agreement and the other Loan Documents (including the absence of any Default or event that, with the passage of time, would become a Default), the Builder Lenders agree to make Loans to the Trustee, on behalf of the Estate, as set forth below prior to the Maturity Date.  The Trustee on behalf of the Estate promises to pay to the Builder Lenders on the Maturity Date, or such earlier date as specified herein, in cash, the aggregate unpaid principal amount of all Loans made by the Builder Lenders to the Trustee, together with any accrued and unpaid Default Rate Interest and other unpaid Obligations in accordance with the terms of this Agreement and the other Loan Documents and the Final Financing Order.

                (b)    Loans.

                        (i)    Interim Closing Amount.

        Subject to the terms and conditions of this Agreement and the other Loan Documents (including the absence of any Default or event that, with the passage of time, would become a Default), and upon the Interim Closing Date, the Trustee may request Loans in an initial aggregate amount not to exceed $4 million for the purpose of funding those expenses in the Budget that are expressly identified as being payable pursuant to the Interim Financing Order.

                        (ii)    Final Closing Amount.

        Subject to the terms and conditions of this Agreement and the other Loan Documents (including the absence of any Default or event that, with the passage of time, would become a Default), and upon the Final Closing Date, the Trustee may request Loans

from time to time in an amount such that the total Loans outstanding at any time shall not exceed the aggregate of (x) the next applicable weekly "Ending Balance – TIP Loan" on the Budget, plus (y) any revenue or receipt projected through such applicable weekly "Ending Balance – TIP Loan" on the Budget that has not been received by the Trustee or the Estate at such time, less (z) any expense projected through such applicable weekly "Ending Balance – TIP Loan" that has not been paid at such time. Subject to the terms of this Agreement and the other Loan Documents (including the Budget), the Loans shall be revolving Loans from which the Trustee may make draws from time to time in accordance with the Budget and without further approval of the Builder Lenders or the Agent.

(iii)    <u>Form of Loan Request</u>.

When the Trustee desires to obtain a Loan, the Trustee shall notify the Builder Lenders and the Agent (which notice shall be irrevocable) by electronic mail to be received no later than 3:00 p.m. Pacific Time three Business Days before the day on which the Loan is to be made, which Loan shall be made by wire transfer from the Term Sheet Escrow (or, following the Maturity Date with respect to Section 15 Advances only, the Builder Lenders' Account) to the Trustee as the Trustee directs. Such notice (a "**Notice of Borrowing**") shall be in the form reasonably acceptable to the Trustee, the Builder Lenders, and the Agent. The Notice of Borrowing shall be signed by the Trustee.

2.2    <u>Interest Rates and Calculations</u>.

(a)    Interest.

The Loans shall be without interest, unless and until a Default or the Maturity Date, at which time interest will accrue and be payable at the Default Rate.

(b)    Default Rate and Fees.

Upon the occurrence and during the continuance of a Default, (i) the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities, or any other Obligations of the Trustee under this Agreement or the other Loan Documents, shall bear interest from the date such Default occurs until all Obligations are paid in full at the prime rate (as quoted in the Wall Street Journal) plus five percent, per annum**,** and (ii) the Builder Lenders shall be reimbursed for all of their reasonable attorneys' fees and expenses relating to enforcement of the Builder Lenders' rights with respect to the Loans and other Obligations.

(c)    Computation.

All interest and fees chargeable under this Agreement and the other Loan Documents shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed, and compounded monthly.

2.3    <u>Payments</u>.

(a)    Time of Payments.

The Trustee shall make any payment under this Agreement not later than 1:00 p.m. Pacific Time on the day when due, in cash or other immediately available funds. All payments received after 4:00 p.m. Pacific Time on any Business Day will be credited on the next succeeding Business Day.  All payments shall be made by the Trustee without setoff, counterclaim, deduction, or other defense of any kind, including any assertion by the Trustee or the Estate for capital contributions or other alleged obligations of the Settling Builders to the Estate.  Whenever any payment made under this Agreement and the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

(b)    Location of Payments.

Prior to the Maturity Date, all payments shall be made to the Term Sheet Escrow.  After the Maturity Date, and provided that all distributions from the Term Sheet Escrow to the Agent as required by the Plan Support Agreement have been made, all payments shall be made to the Builder Lenders' Account; provided, however, that if all or any of such distributions to the Agent have not been made, the Trustee shall continue to make payments to the Term Sheet Escrow until such required distributions to the Agent have been fully funded.  Following the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), the Builder Lenders shall maintain a balance in the Builder Lenders' Account equal to the lesser of (i) $2 million or (ii) such amounts as the Builder Lenders reasonably conclude may have to be advanced in order to make the Section 15 Advances; provided, however, that prior to making any such reduction, the Builder Lenders shall give the Trustee five Business Days advance notice, and the Builder Lenders shall consent to an expedited hearing in the Bankruptcy Court for the resolution of any dispute concerning any such proposed reduction.   Any amounts in the Builder Lenders' Account shall not be subject to attachment, setoff, or counterclaim of any kind, including any assertion by the Trustee or the Estate for capital contributions or other alleged obligations of the Settling Builders to South Edge or the Estate.

2.4    Term.

This Agreement shall become effective on the Interim Closing Date and shall continue in full force and effect for so long as any Obligations remain outstanding or the Builder Lenders have any obligation to make Loans under this Agreement. Notwithstanding the foregoing (and except as provided for Section 15 Advances), the Builder Lenders' obligation to make Loans shall terminate upon the Maturity Date, and prior to the Maturity Date, the Builder Lenders shall have the right to terminate their obligation to make Loans under this Agreement immediately and without further notice upon the occurrence of a Default.

2.5    Revolving Loan.

The Trustee shall repay with receipts received by the Trustee, without penalty or premium, the outstanding principal of Loan, in whole or in part, in such amount that, at the end of each week leaves the Trustee holding no more than $1,000,000 plus amounts

projected to be paid, less any revenues or receipts projected to be received, through the next applicable three-week period in the Budget.  Upon such repayment, such amounts shall be available thereafter for further draw by the Trustee pursuant to the Budget and Section 2.1(b)(ii) hereof.

2.6    Use of Proceeds.

(a)    Generally.

The Trustee shall use the Loan proceeds to finance chapter 11 administrative expenses including LID assessments and segment project costs, taxes, the fees and expenses of the Trustee and her professionals in such amounts as are required to be paid on an interim and final basis, and other allowed administrative expenses, in accordance with the Budget and for such purposes and in such amounts as are set forth in the Budget, subject to Section 2.6(b) below; provided, however, that with respect to interim fees, the allowed fees and expenses shall not exceed the amount of unpaid fees and expenses for the full Budget period.

(b)    Deviation.

The Trustee, the Builder Lenders, and the Agent shall work diligently and in good faith with respect to any modifications to the Budget requested by the Trustee and to resolve any disputes that may exist with respect to deviations from the Budget, and the Trustee, the Builder Lenders, and the Agent shall consent to an expedited hearing in the Bankruptcy Court for the resolution of any such disputes.

Upon at least five Business Days advance notice to the Builder Lenders and the Agent (except with respect to the payment of the fees of the Trustee and the Trustee's professionals, which shall be only in such amounts as are set forth in the Budget), the Trustee may use the Loan proceeds for such other purposes and in such other amounts as are (x) reasonably consistent with the Budget, (y) commercially reasonable, or (z) essential to protect the Estate's assets.  Notwithstanding the foregoing notice requirement, the Trustee shall only be required to provide such notice as is reasonably practicable in the event of exigent circumstances that pose an immediate and irreparable threat to the Estate.

(c)    LID Segment Construction.

The Trustee shall confer in advance with the Builder Lenders and the Agent regarding anticipated draws with respect to all LID segment construction provided for in the Budget, including drainage-related construction expenses.

(d)    Professionals.

The inclusion of fees and expenses of the Trustee and her professionals in the Budget are without prejudice to the rights of all parties in the Chapter 11 Case with respect to timely objection to the allowance of such fees and expenses.

2.7    Section 15 Advances.

Notwithstanding the occurrence of the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), unless the Trustee has failed to act diligently and in good faith to comply with this Agreement, the Builder Lenders shall advance to the Trustee the Section 15 Advances. Without the need for any further Bankruptcy Court order, such Section 15 Advances shall be Superpriority Claims secured by a first priority priming lien on the Collateral pursuant to Bankruptcy Code section 364(d) in the same manner as all other Obligations hereunder, shall accrue interest at the Default Rate, and shall be repaid by the Trustee or the Estate from and upon the earlier of (i) the receipt of any additional LID proceeds by the Trustee or the Estate, (ii) subject to the Agent's prior perfected lien and on terms acceptable to the Agent, such of the funds in the disputed MI Deposit Account as are determined to be property of the Estate (in such amounts and at such times as received by the Trustee or the Estate, until the Section 15 Advances are paid in full), (iii) the obtaining of any alternative section 364 financing, (iv) subject to the Agent's prior perfected lien and on terms acceptable to the Agent, the proceeds of the sale of substantially all of the assets of the Estate, (v) distributions pursuant to a plan of reorganization upon its effective date, or (vi) funds otherwise available for such application upon the conversion or dismissal of the Chapter 11 Case, under the terms hereof.

2.8    Source of Loans.

All Loans under this Agreement shall be funded from the Term Sheet Escrow, except to the extent that loans from the Builder Lenders' Account are required to fund the Section 15 Advances upon the Maturity Date. The rights and obligations of each of the Builder Lenders under this Agreement are several, in the percentages set forth in Exhibit "1" to the plan term sheet that is a part of the Plan Support Agreement.

3.    ALLOWANCE AND PRIORITY OF CLAIMS

Upon entry of the Interim Financing Order or the Final Financing Order, as the case may be, the Obligations of the Trustee and of South Edge and its Estate hereunder shall at all times constitute allowed Superpriority Claims under the terms hereof.

4.    SECURITY INTEREST IN FAVOR OF LENDERS

4.1    Security Interest in Collateral.

As security for the Loans and all other Obligations, the Trustee on behalf of South Edge and its Estate hereby pledges, assigns, and grants to the Builder Lenders first priority priming liens on all of the Collateral. Except as set forth herein with respect to the Collateral, the Agent's liens in and to the Debtor's and the Estate's assets granted to the Agent for itself and the benefit of the Lenders in accordance with the terms of the Cash Collateral Order and the first priority status thereof, shall be unaffected by the terms of this Agreement, the Interim Financing Order, and the Final Financing Order and shall remain in full force and effect.

4.2    Priority of Builder Lenders' and Agent's Security Interests.

The Builder Lenders' liens on the Collateral shall be senior to all other liens, encumbrances, and other interests in such Collateral pursuant to Bankruptcy Code section 364(d)(1), including any lien or other encumbrances of the Agent under the Prepetition Credit Agreement or under prior orders of the Bankruptcy Court, except that (i) the Agent shall be granted a second priority lien on all Collateral and a first priority lien in all other assets of the Estate, other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, in accordance with Agent's Adequate Protection Lien for any diminution of the value of the Agent's interest in the Collateral resulting from the use of the Collateral and the imposition of the automatic stay, and (ii) the Permitted Liens, if any, may be senior to the Builder Lenders' liens, but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code. The Builder Lenders' liens on the Collateral shall not be subject to surcharge under Bankruptcy Code section 506(c) or otherwise.

4.3     Preservation of Collateral; Perfection of Builder Lenders' Security Interest and Agent's Security Interest.

The Builder Lenders' and Agent's liens on the Collateral shall be deemed perfected with no need for the Trustee to execute any additional documents or of recordation. Notwithstanding the foregoing, the Trustee shall, at the Builder Lenders' request, or Agent's request, at any time and from time to time, execute and deliver to the Builder Lenders or Agent such security agreements, mortgages, financing statements, documents, and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed reasonably necessary or desirable by the Builder Lenders or Agent) and do such other acts and things as the Builder Lenders or Agent may deem necessary or desirable in order to establish and maintain the validity, attachment, and perfection of the Builder Lenders' liens or Agent's liens (free and clear of all other liens, claims, and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Permitted Liens). The Trustee irrevocably hereby makes, constitutes, and appoints the Builder Lenders and Agent (and all Persons designated by the Builder Lenders or Agent for that purpose) as the Trustee's true and lawful attorney and agent-in-fact to execute such security agreements, mortgages, financing statements, documents, and other agreements and instruments and do such other acts and things as may be necessary or appropriate to preserve and perfect the Builder Lenders' liens or Agent's liens on the Collateral. The Trustee further agrees that a carbon, photographic, photostatic, or other reproduction of this Agreement, the Financing Orders, or of a financing statement shall be sufficient as a financing statement.

5.      CONDITIONS OF LOANS

5.1     Conditions Precedent to all Loans.

The obligation of the Builder Lenders, if any, to make any Loan is subject to the satisfaction of the following conditions precedent (or the express prior waiver thereof by the Builder Lenders, which shall be in writing and subject to the Builder Lenders' sole and absolute discretion):

(a)    Interim Financing Order.

The Bankruptcy Court shall have entered, and the Builder Lenders and the Agent shall have received a true copy of, an order in substantially the form of Exhibit "B" attached hereto, with only such changes as the Builder Lenders and Agent have approved in their sole and absolute discretion, approving on an interim basis pursuant to Bankruptcy Rule 4001(c)(2) this Agreement and the other Loan Documents, the granting the Superpriority Claim status, the Builder Lenders' first priority liens on the Collateral, and the Agent's second priority Adequate Protection Liens on the Collateral and first priority Adequate Protection Lien on the Estate's other assets other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, and subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code, which Interim Financing Order (i) shall have been entered upon motion of the Trustee in form and substance acceptable to the Builder Lenders and the Agent, (ii) shall be in full force and effect, (iii) shall not have been stayed, revoked, reversed, modified, or amended in any respect, and (iv) shall include full Bankruptcy Code section 364(e) findings and protections for the Builder Lenders and the Agent;

(b)    Delivery of Documents.

The Builder Lenders shall have received from the Trustee the following documents in each case duly executed by the Trustee:  (i) this Agreement; (ii) a promissory note (the "**Revolving Note**") in form and substance satisfactory to the Builder Lenders in their sole and absolute discretion; and (iii) such other Loan Documents (including UCC financing statements) as shall reasonably be requested by the Builder Lenders; and the Agent shall have received copies of each of the foregoing;

(c)    Notice of Borrowing.

The Builder Lenders shall have timely received from the Trustee a duly executed Notice of Borrowing;

(d)    No Default.

No Default or event that, with the passage of any applicable cure period, would become a Default, shall have occurred and be continuing;

(e)    No Maturity.

The Maturity Date shall not have occurred; provided, however, that notwithstanding the passage of the Maturity Date, the Builder Lenders' shall, subject to the terms of Section 2.7 hereof, make the Section 15 Advances if and to the extent required hereunder; and

(f)    Final Financing Order.

Except for those operating expenses which are expressly indicated on the Budget as being payable following entry of the Interim Financing Order (in an amount not to exceed $4 million), on or before August 12, 2011, the Bankruptcy Court shall have entered, and the Builder Lenders and the Agent shall have received a true copy of, an order in substantially the form of Exhibit "B" attached hereto (modified to be a final order), with only such changes as the Builder Lenders and the Agent have approved in their sole and absolute discretion, approving on a final basis this Agreement and the other Loan Documents, the granting of the Superpriority Claim status, and the Builder Lenders' first priority liens on the Collateral, the Agent's second priority Adequate Protection Liens on the Collateral, and first priority Adequate Protection Lien on the Estate's other assets other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, and subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code, which Final Financing Order (i) shall have been entered upon motion of the Trustee in form and substance acceptable to the Builder Lenders and the Agent, (ii) shall be in full force and effect, (iii) shall not have been stayed, revoked, reversed, modified, or amended in any respect, and (iv) shall include full Bankruptcy Code section 364(e) findings and protections for the Builder Lenders.

6.    REPRESENTATIONS AND WARRANTIES.

The Trustee hereby represents and warrants to the Builder Lenders the following statements to be true and correct as of each Closing Date and of each date that a Notice of Borrowing is submitted:

6.1    <u>Authority</u>.

The Trustee (i) is the duly appointed chapter 11 trustee of South Edge, (ii) has all requisite power and authority to conduct the business of South Edge as now conducted and as presently contemplated and, (iii) subject to the entry and the terms of the Interim Financing Order or the Final Financing Order, as the case may be, has the authority to make the borrowings hereunder, and to execute and deliver each Loan Document to which she is a party, and to consummate the transactions contemplated thereby.

6.2    <u>Execution and Binding Effect</u>.

Subject to the entry and the terms of the Interim Financing Order or the Final Financing Order, as the case may be, this Agreement and each of the other Loan Documents when delivered hereunder is or will be duly and validly executed and delivered by the Trustee and constitutes legal, valid, and binding obligations of the Trustee and of South Edge and its Estate, enforceable in accordance with the terms hereof or thereof, and binding upon any successor to the Trustee (including any chapter 7 trustee for South Edge).

6.3    <u>No Default</u>.

No Default or event that, with the passage of the applicable cure period would become a Default, exists.

7.    AFFIRMATIVE COVENANTS.

Until payment in full of all outstanding Obligations, and for so long as the Builder Lenders may have any commitment to make any Loans hereunder (including the Section 15 Advances), the Trustee shall do all of the following:

7.1    <u>Financial Reporting</u>.

The Trustee, or any of her retained advisors, shall provide to the Builder Lenders and the Agent the following:

(i)    copies of the monthly operating reports filed in the Chapter 11 Case, and all other financial reports required to be prepared by the United States Trustee Guidelines or otherwise prepared by the Trustee and filed in the Chapter 11 Case;

(ii)    copies by electronic mail or paper service of all pleadings, motions, applications, reports, or other documents filed by or on behalf of the Trustee with the Bankruptcy Court or the Office of the United States Trustee;

(iii)    every two weeks, (x) a reconciliation report comparing actual cash flows and accrued professionals fees and expenses (including summary, mid-month reports by the Trustee's principal professionals) versus the Budget, with explanations of any material variances, and (y) a summary statement of cash balances and accrued accounts payable, each to be provided to the Builder Lenders within 14 days after the end of each two-week period; and

(iv)    copies of all documents relating to the LID segments that the Trustee submits to either Gomez or the City of Henderson in order to have the completed LID projects approved and submitted for reimbursement, and a weekly update, either written or oral, summarizing the progress on current LID segment projects, which update shall include the following information: (1) summary of meetings with representatives from the City of Henderson or other governmental entities, (2) expenditures, (3) status of pending approvals from both Gomez and the City of Henderson for completed projects, (4) any updates on imminent overruns or delays, and (5) the status of the reimbursement on prior LID projects.

7.2    <u>Books and Records</u>.

The Trustee shall maintain books of account and other records for South Edge and for disbursement and use of the proceeds of the Loan, and the same shall be available for inspection and copying by the Builder Lenders and the Agent upon reasonable prior notice. The Trustee shall use her best efforts to obtain all remaining South Edge books and records that are in the possession of the former manager of South Edge and its affiliates.

7.3    <u>Use of Proceeds</u>.

The Trustee shall use the loan proceeds to finance allowed administrative expenses of the Chapter 11 Case solely in accordance with the Budget and Sections 2.6 and 2.7 hereof.

7.4    <u>Cooperation and Consultation</u>.

Subject to the execution of reasonable confidentiality and/or common interest agreements, and further subject to the terms of the Trustee's Consent, the Trustee shall consult in advance with the Builder Lenders and the Agent regarding the administration of the Estate, including (i) the prosecution of claims on behalf of the Estate and the incurrence of material fees and expenses in connection therewith, (ii) claims objections, (iii) restructuring, planning, or development proposals to the City of Henderson, other governmental entities, and holders of bonds issued in connection with LID, and (iv) other matters affecting the administration of the Estate.  The Trustee shall make available to the Builder Lenders and Agent, upon reasonable notice, access to all plans, reports, records, and other non-privileged documentation (including records relating to prevailing wage compliance) relating to LID segment work and other projects within South Edge's development.

8.    NEGATIVE COVENANTS.

Until payment in full of all outstanding Obligations, and for so long as Builder Lenders may have any commitment to make any Loans hereunder, the Trustee shall not do any of the following without Builder Lenders' prior written consent; provided, however, that Sections <u>8.3,</u> 8.5, 8.6, and 8.7 shall not apply upon the occurrence of a Maturity Date (other than as a result of the effective date of a Plan of Reorganization), but in no event shall funds advanced by the Builder Lenders be used (x) to fund the pursuit or investigation of any claims against the Builder Lenders, the Settling Builders, or their insiders or affiliates, or (y) to oppose the Plan of Reorganization:

8.1    <u>Superpriority Claims/Senior Liens</u>.

Apply to the Bankruptcy Court for the authority to incur, create, assume, suffer to exist, or permit, or incur, create, assume, suffer to exist, or permit, any other Superpriority Claim, lien, or encumbrance that is either (i) pari passu with or senior to the liens or claims of the Builder Lenders with respect to the Collateral, except for the Permitted Liens, or (ii) pari passu with or senior to the Superpriority Claim with respect to any unencumbered assets of the Estate; provided, however, that this Section shall not apply if one of the

purposes of such application is to provide for the immediate satisfaction, in full and in cash, of all outstanding Obligations.

8.2    Financing Orders.

At any time, seek or consent to any revocation, reversal, modification, vacation, or staying of the Financing Orders, except as may be agreed by the Builder Lenders and the Agent in their sole and absolute discretion.

8.3    Deviation from Budget.

Accrue, incur, or pay any expense that is not provided for in the Budget, or permit any of the forgoing to occur, except as may be agreed by the Builder Lenders and the Agent, in their sole and absolute discretion, or as permitted pursuant to Section 2.6 hereof.

8.4    Protection of Collateral.

Compromise, settle, release, or otherwise cause or permit the modification of any rights of the Trustee, South Edge, the Estate, or the Builder Lenders in and to the Collateral.

8.5    Significant Transactions.

Approve, file, support, or consent to any of the following that is not approved by the Builder Lenders, in their sole and absolute discretion: (i) a plan of reorganization in the Chapter 11 Case; (ii) a sale or compromise of material assets of South Edge or its Estate (the term "material" includes the sale or other transfer of any real property, and the settlement of any claims by or against members and former members of South Edge and their insiders or affiliates); (iii) the allowance of any claims against South Edge or its Estate in excess of $25,000 other than such claims as appear in the Schedules of Assets and Liabilities of South Edge previously filed by the Trustee in the Chapter 11 Case that were not scheduled as disputed, contingent or unliquidated, and for which no proof of claim was filed by such claimant; (iv) the entry into any contract with a total cost to South Edge or the Estate in excess of $25,000; provided, however, that if the contract relates to an expenditure which has been set forth in the Budget, and if each of the Builder Lenders is given an equal opportunity to bid on the contract, and either (x) all Builder Lenders choose not to bid, or (y) none of the bids by any of the Builder Lenders is the lowest bid, then written consent from the Builder Lenders shall not be required for such contract if such contract is commercially reasonable; (v) material amendments to plans, permits, or specifications for any improvements to South Edge's property; or (vi) amendments to South Edge's Development Plan, Acquisition Agreement, or other material agreements with or relating to the City of Henderson or the LID, or other governmental entities; provided, however, "iii", "v", and "vi" above shall also require the approval of the Agent in its sole and absolute discretion.   In connection with "iv" above, the Trustee and her representatives will only be required to deal with a single representative to be appointed by the Builder Lenders.  The Builder Lenders' representative will coordinate any bids from the Builder Lenders, and/or their subcontractors.

8.6   <u>Litigation Against Builder Lenders</u>.

File or pursue any litigation or other claims against the Builder Lenders, the Settling Builders, or their insiders or affiliates, except with respect to actions to interpret or enforce the Trustee's rights under this Agreement.

8.7   <u>Trustee Consent</u>.

Unless the Trustee's Consent has been terminated in accordance with the limitations and qualifications set forth therein, take any action that is inconsistent with the Trustee Consent, including objecting to or otherwise opposing confirmation of the Plan of Reorganization.

9.   DEFAULTS.

Any one or more of the following events shall constitute a Default under this Agreement and the other Loan Documents:

(a)   the Trustee's failure to pay when due any monetary sum payable under this Agreement or any of the other Loan Documents, and such failure to pay continues for two Business Days after written notice by Builder Lenders to the Trustee that such sum is due and payable;

(b)   other than a monetary default of the type specified in Section 9.1(a), the Trustee's failure to perform, observe, or otherwise comply with any material term, condition, affirmative or negative covenant, or other agreement contained in this Agreement or in any of the other Loan Documents, and as to any such default that can be cured, the Trustee has failed to cure such default within five Business Days after the Trustee receives notice thereof from the Builder Lenders;

(c)   any representation or warranty made by the Trustee hereunder shall be untrue and, as to any such default that can be cured by the Trustee, the Trustee has failed to cure such default within five Business Days after the Trustee receives notice thereof from the Builder Lenders;

(d)   an order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

(e)   the Trustee shall take any actions that are inconsistent with the Trustee's Consent, which actions are not revoked or annulled within five Business Days after the Trustee receives notice thereof from the Builder Lenders;

(f)   an order shall be entered dismissing the Chapter 11 Case and such order does not provide for termination of the commitment hereunder and under the other Loan Documents, and for the immediate payment in full in cash of all Obligations hereunder and under the other Loan Documents; or

(g)    an order shall be entered, without the express prior written consent of the Builder Lenders, to revoke, reverse, modify, stay, or vacate the Financing Orders.

10.    LENDERS' RIGHTS AND REMEDIES.

10.1    <u>Remedies Generally</u>.

Upon the occurrence of a Default, the Builder Lenders may immediately, upon giving notice to the Trustee, (a) in addition to the Builder Lenders' rights under Section 5.1(d) hereof, cease to make any Loans under this Agreement or any other Loan Document (other than the Section 15 Advances if and to the extent required hereunder), (b) declare all or any portion of the Loans and all other outstanding Obligations to be due and payable immediately, without further order of, or application to, the Bankruptcy Court, and without presentment, demand, or protest, all of which are hereby expressly waived by the Trustee, (c) subject to the following Sections 10.2 and 10.3 below, exercise any and all of its other rights and remedies under applicable law (including, but not limited to, the Bankruptcy Code), this Agreement, and the other Loan Documents, for the purpose of seeking and expediting repayment of all outstanding Obligations from the Collateral consistent with the provisions of section 9-607 of the UCC, and (d) the right (but not the obligation) to pay outstanding invoices, satisfy LID-related assessments and property taxes, and make other protective advances to the Trustee to enable her to complete LID segment construction and submit related documentation to collect LID Proceeds and apply them in reduction of any outstanding Loans and other Obligations, and additionally, upon 30 days after delivery of such notice if the Trustee has insufficient funds or financing available to enable her to do so, actually complete LID segment construction within or outside of South Edge's development (provided the Builder Lenders will consult on an ongoing basis with the Agent with respect to all contemplated and ongoing projects), and submit related documentation to collect LID Proceeds and apply them in reduction of any outstanding Loans and other Obligations (the "<u>Builder Lenders' LID Remedy</u>"); provided, however, that the Builder Lenders shall not be entitled to foreclose upon the Collateral or any of the other assets of the Estate.

In furtherance of the Builder Lenders' right to be repaid the Obligations in full immediately upon the occurrence of a Default (and without in any way limiting the rights of the Builder Lenders set forth in the remainder of this Section 10.1 or otherwise in this Agreement), and subject to the Trustee's retention of $150,000 in cash to be used to satisfy essential post-Default chapter 11 administrative expenses consistent with the Budget (excluding LID work or the Trustee's fees or the fees of her professionals) through a date that is the earlier of (i) thirty days after notice to the Trustee of the Default or (ii) the approval by the Bankruptcy Court of Bankruptcy Code section 364 borrowings from any source other than the Builder Lenders, the following funds must be used to repay the Builder Lenders following a Default, without any offset or delay of any kind whatsoever: (x) any unencumbered cash held by the Trustee as of the Maturity Date (to the extent such cash is not applied to Section 15 Advances), (y) LID proceeds in the possession of the Trustee that constitute the Builder Lenders' cash collateral, and (z) any proceeds of subsequent Bankruptcy Code section 364 borrowings from any source.

10.2    <u>Relief from the Automatic Stay</u>.

With respect to relief from the automatic stay of Bankruptcy Code section 362, the Financing Orders shall provide that if a Default occurs, then (i) the Builder Lenders may set an expedited hearing for relief from the automatic stay on not less than three Business Days' notice and at such hearing the only issues will be (x) whether an uncured Default exists, and (y) whether the Bankruptcy Court may impose any condition on the exercise of the Builder Lenders' remedies (which condition the Builder Lenders may oppose), so long as such condition does not delay the Builder Lenders' exercise of remedies for more than 30 days and otherwise does not impair the interests of the Builder Lenders in their Collateral hereunder; and (ii) consistent with the Bankruptcy Court's determination as to "i" above, the Builder Lenders shall be granted relief from stay if an uncured Default is found to exist.

     10.3    <u>Modification of the Automatic Stay</u>.

Subject to Sections 10.1 and 10.2 of this Agreement, upon entry of the Interim Financing Order or the Final Financing Order, as the case may be:

     (a)    the automatic stay provisions of Bankruptcy Code section 362 shall be vacated and modified to the extent necessary to permit the Builder Lenders to exercise all rights afforded to them hereunder and to effectuate the provisions of this Agreement and the Financing Orders, without the need for filing further pleadings or application to or order of the Bankruptcy Court; and

     (b)    no party in interest shall have the right to contest the enforcement of the remedies set forth in this Agreement on any basis other than the fact that a Default has not occurred.  No party in interest shall have the right to seek injunctive relief against such enforcement under Bankruptcy Code section 105 or otherwise, or to seek injunctive relief in conflict with the provisions of this Agreement or the Financing Orders.

11.    NOTICES.

Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement and the other Loan Documents and/or any other agreement entered into in connection herewith shall be in writing and (except for informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by a recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, or by facsimile or electronic mail to the Trustee, the Builder Lenders, or the Agent, as the case may be, at its addresses set forth below:

If to Trustee:      SOUTH EDGE, LLC.
      ~~[INSERT]~~

      <u>c/o FTI Consulting, Inc.,</u>
      <u>633 West 5th Street</u>
      <u>Suite 1600</u>
      <u>Los Angeles, CA 90071</u>
      Attn:  Cynthia Nelson

FAX:  (213) 452-6099
Email:  Cynthia.nelson@fticonsulting.com

with a copy to:            MILBANK, TWEED, HADLEY, & MCCLOY LLP
                          601 South Figueroa Street, 30th Floor
                          Los Angeles, CA  90017
                          Attn:  Robert J. Moore, Esq.
                          Attn:  David B. Zolkin, Esq.
                          FAX:  (213) 629-5063
                          Email: rmoore@milbank.com
                          Email: dzolkin@milbank.com

If to Builder Lenders:         [INSERT]KB HOME NV ACQUISITION LLC


                          c/o KB Home
                                    Attn:  Albert Praw and Ross Kay
_____    Attn:
                          10990 Wilshire Boulevard, Floor 7
                          Los Angeles, CA  90024
                                    FAX:  (310) 231-4280
                                    Email: apraw-x@kbhome.com
                          Email: RKay@kbhome.com

                          TOLL HENDERSON II LLC
                          c/o Toll Brothers, Inc.
                          Attn:  Mark J. Warshauer
                          Vice President and Counsel
                          Toll Brothers, Inc.
                          250 Gibraltar Road
                          Horsham, PA 19044
                          FAX: 215-938-8260
                          Email: mwarshauer@tollbrothersinc.com

                          Kristine Maciolek Small, Esquire
                          Assistant Vice President
                          Toll Brothers, Inc.
                          250 Gibraltar Road
                          Horsham, PA 19044
                          FAX: (215) 938-8255
                          Email: kmacioleksmall@tollbrothersinc.com

                          TRINITY HOMES, LLC
                          c/o Beazer Homes Holdings Corp.
                          1000 Abernathy Road #1200
                          Atlanta, GA  30328
                          FAX: (770) 350-4337

Email: kkhoury@beazer.com

PARDEE HOMES
Attn:  Christopher J. Hallman, Esq.
Senior Vice President, General Counsel
10880 Wilshire Blvd, Suite 1900
Los Angeles, CA 90024
FAX: (253) 446-1292
Email: chris.hallman@pardeehomes.com

with a copy to:          STUTMAN, TREISTER & GLATT P.C.
                         1901 Avenue of the Stars, 12th Floor
                         Los Angeles, CA  90067
                         Attn:  K. John Shaffer, Esq.
                         Attn: Robert A. Greenfield, Esq.
                         Attn: Anthony Arnold, Esq.
                         FAX:  (310) 228-5788
                         Email: jshaffer@stutman.com
                         Email: rgreenfield@stutman.com
                         Email: aarnold@stutman.com

If to Agent:               JPMorgan Chase Bank, N.A.
383 Madison Avenue, 23rd Floor
New York, NY  10179
Attn:  William A. Austn
FAX:  (212) 622-4556
Email: William.A.Austin@jpmchase.com

with a copy to:           Morrison & Foerster LLP
425 Market Street
San Francisco, CA  94105
Attn:  G. Larry Engel, Esq.
FAX:  (415) 268-7522
Email: lengel@mofo.com

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

12.      CHOICE OF LAW AND VENUE: JURY TRIAL WAIVER.

THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF NEVADA, EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE AND EXCEPT AS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE TRUSTEE HEREBY IRREVOCABLY ACCEPTS, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT.  THE UNDERSIGNED ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES.  TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY LOAN DOCUMENT.

13.      GENERAL PROVISIONS.

13.1    <u>Binding Effect</u>.

This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of the Trustee and the Builder Lenders, and their successors and assigns.

13.2    <u>Time of Essence</u>.

Time is of the essence for the performance of all obligations set forth in this Agreement.

13.3    <u>Severability of Provisions</u>.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

13.4    <u>Amendments in Writing, Integration</u>.

All future amendments to or terminations of this Agreement or the other Loan Documents must be in writing.  All prior agreements, understandings, representations, warranties, and negotiations between the parties hereto with respect to the subject matter of this Agreement and the other Loan Documents, if any, are merged into this Agreement and the Loan Documents.  This Agreement and its Exhibits are the entire agreement between the Trustee and the Builder Lenders with regard to the obligations and terms of any loans now or hereafter outstanding hereunder.

13.5    <u>Counterparts</u>.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.

13.6    <u>Survival</u>.

~~All~~Except as otherwise provided herein, all covenants, representations, and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding.

*[Remainder of this page left intentionally blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**TRUSTEE**:

**CYNTHIA NELSON, NOT IN HER INDIVIDUAL CAPACITY, BUT SOLELY IN HER CAPACITY AS THE CHAPTER 11 TRUSTEE OF SOUTH EDGE, LLC, ON BEHALF OF SOUTH EDGE AND ITS BANKRUPTCY ESTATE**

By:_____
       Cynthia Nelson:
       Title:  Chapter 11 Trustee for South Edge, LLC

**BUILDER LENDERS**:

~~[INSERT]~~
**KB HOME NV ACQUISITION LLC**


By:_____
       Name:
       Title:


**TOLL HENDERSON II LLC**


By:_____
       Name:
       Title:


**TRINITY HOMES, LLC**


By:_____
       Name:
       Title:

**PARDEE HOMES**


By:_____
       Name:
       Title:

Document comparison by Workshare Professional on Friday, July 22, 2011 2:14:36 PM

| Input: | |
|---|---|
| Document 1 ID | d:\ndecho\South Edge - Trustee Financing Agreement(4).doc |
| Description | d:\ndecho\South Edge - Trustee Financing Agreement(4).doc |
| Document 2 ID | d:\ndecho\South Edge - Trustee Financing Agreement(5).doc |
| Description | d:\ndecho\South Edge - Trustee Financing Agreement(5).doc |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 60 |
| Deletions | 9 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 69 |