Robert J. Moore (CA State Bar No. 77495)
David B. Zolkin (CA State Bar No. 155410)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:    (213) 892-4000
Facsimile:    (213) 629-5063

*Counsel For Chapter 11 Trustee*

Lenard E. Schwartzer (NV State Bar No. 399)
Jeanette E. McPherson (NV State Bar No. 5423)
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone:    (702) 228-7590
Facsimile:    (702) 892-0122

*Local Counsel For Chapter 11 Trustee*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>SOUTH EDGE, LLC,<br><br>          Debtor. | **Chapter 11**<br><br>**Case No. BK-10-32968 (BAM)**<br><br>**NOTICE OF ENTRY OF INTERIM ORDER (1) AUTHORIZING CHAPTER 11 TRUSTEE TO OBTAIN SENIOR PRIMING SECURED POSTPETITION FINANCING; (2) AUTHORIZING CHAPTER 11 TRUSTEE'S USE OF CASH COLLATERAL; (3) DEEMING AGENT, PREPETITION LENDERS AND BUILDERS LENDERS TO BE ADEQUATELY PROTECTED; AND (4) SCHEDULING A FINAL HEARING; NOTICE OF FINAL HEARING**<br><br>Interim Hearing:<br>Hearing Date:  July 20, 2011<br>Hearing Time:  9:30 a.m.<br><br>Final Hearing:<br>Hearing Date:  August 12, 2011<br>Hearing Time:  9:30 a.m. |

     NOTICE IS HEREBY GIVEN that an Interim Order (1) Authorizing Chapter 11 Trustee

To Obtain Senior Priming Secured Postpetition Financing; (2) Authorizing Chapter 11 Trustee's

Use Of Cash Collateral; (3) Deeming Agent, Prepetition Lenders And Builders Lenders To Be

Adequately Protected; And (4) Scheduling A Final Hearing was entered on July 25, 2011 (the

"Interim Financing Order"), a copy of which is attached hereto as Exhibit 1.

#4847-0483-8153

NOTICE IS FURTHER GIVEN that a final hearing on the Motion for Order (1) Authorizing Chapter 11 Trustee To Obtain Senior Priming Secured Postpetition Financing; (2) Authorizing Chapter 11 Trustee's Use Of Cash Collateral; (3) Deeming Agent, Prepetition Lenders And Builders Lenders To Be Adequately Protected; And (4) Scheduling A Final Hearing (the "Motion") will be held before a United States Bankruptcy Judge, in the Foley Federal Building, 300 Las Vegas Boulevard South, Las Vegas, Nevada on **August 12, 2011 at 9:30 a.m.** (the "Final Hearing")

Attached hereto as Exhibit 2 is a proposed form of Final Order (1) Authorizing Chapter 11 Trustee To Obtain Senior Priming Secured Postpetition Financing; (2) Authorizing Chapter 11 Trustee's Use Of Cash Collateral; and (3) Deeming Agent, Prepetition Lenders And Builders Lenders To Be Adequately Protected (the "Final Financing Order") that the Trustee presently intends to ask the Court to enter at the conclusion of the Final Hearing.[1]

Upon entry of the Final Financing Order, the Trustee will be accessing and using Unencumbered Cash (as such term is defined in the Trustee's Consent) to satisfy Estate obligations in the ordinary course of business. If any party objects to such use, such party must file any objection thereto in accordance with the provisions of this Notice and appear at the Final Hearing.

Capitalized terms used herein but that are not otherwise defined herein shall have the meanings ascribed to them in the Interim Financing Order.

Any party in interest objecting to the Motion shall file written objections with the Clerk of the Bankruptcy Court by no later than August 1, 2011, which objections shall be served so that the same are received on or before such date by:  (i) counsel for the Trustee; (ii) the Office of the United States Trustee; (iii) counsel for the Builder Lenders; (iv) counsel for the Debtor

---

[1] The Trustee reserves the right to modify the Final Financing Order as may be appropriate or as may be required by the Builder Lenders (as defined in the Interim Financing Order) prior to the conclusion of the Final Hearing.

#4847-0483-8153                                    -2-

out-of-possession, and (v) counsel for the Agent; provided, however, that the Trustee shall

consider any objection to the Motion that was filed prior to the Interim Hearing to be a timely

filed objection. Pursuant to Local Rule 9014(d)(1), any objection

> must set forth all relevant facts and any relevant legal authority.
> An opposition must be supported by affidavits or declarations that
> conform to the provisions of subsection (c) of this rule.

---

If you object to the relief requested, you *must* file a WRITTEN response to this pleading with

the court.  You *must* also serve your written response on the parties identified above.

If you do not file a written response with the court, or if you do not serve your written

response on the person who sent you this notice, then:

- The court may *refuse to allow you to speak* at the scheduled hearing; and
- The court may *rule against you* without formally calling the matter at the hearing.

---

Replies to any objections, including those objections filed prior to the Interim hearing, shall

be filed by no later than August 10, 2011.

A copy of the Motion may be obtained by accessing PACER through the website of the

United States Bankruptcy Court for the District of Nevada (http://www.nvb.uscourts.gov), by

accessing the website maintained by BMC Group (http://www.bmcgroup.com/southedge), or by

contacting the undersigned counsel by telephone at (702) 228-7590 or by facsimile at (702) 892-

0122.

/ / /

/ / /

/ / /

/ / /

/ / /

#4847-0483-8153                                    -3-

NOTICE IS FURTHER GIVEN that the hearing on the Motion may be continued without further notice.

Dated: July 25, 2011

SCHWARTZER & MCPHERSON LAW FIRM


By:  /s/  Jeanette E. McPherson
Lenard E. Schwartzer
Jeanette E. McPherson
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146-5308
Telephone:  (702) 228-7590
Facsimile:  (702) 892-0122
E-Mail:  bkfilings@s-mlaw.com

&

MILBANK, TWEED, HADLEY & MCCLOY LLP
Robert J. Moore [(admitted *pro hac vice*)]
David Zolkin [(admitted *pro hac vice*)]
601 South Figueroa Street, 30th Floor
Los Angeles, California  90017
Telephone:      213.392.4000
Facsimile:      213.629.5063
E-mail:rmoore@milbank.com
E-mail:dzolkin@milbank.com

*Counsel For Cynthia Nelson, the Chapter 11 Trustee*

#4847-0483-8153

-4-

# EXHIBIT "1"

**Entered on Docket**
**July 25, 2011**

_Bruce A. Markell_

**Hon. Bruce A. Markell**
**United States Bankruptcy Judge**

Robert J. Moore (CA State Bar No. 77495)
David B. Zolkin (CA State Bar No. 155410)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:      (213) 892-4000
Facsimile:      (213) 629-5063

*Counsel For Chapter 11 Trustee*

Lenard E. Schwartzer (NV State Bar No. 399)
Jeanette E. McPherson (NV State Bar No. 5423)
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone:  (702) 228-7590
Facsimile:  (702) 892-0122

*Local Counsel For Chapter 11 Trustee*

## UNITED STATES BANKRUPTCY COURT

### DISTRICT OF NEVADA

In re:

SOUTH EDGE, LLC,

               Debtor.

**Chapter 11**

**Case No. BK-10-32968 (BAM)**

**INTERIM ORDER (I) AUTHORIZING CHAPTER 11 TRUSTEE TO OBTAIN SENIOR PRIMING SECURED POSTPETITION FINANCING; (2) AUTHORIZING CHAPTER 11 TRUSTEE'S USE OF CASH COLLATERAL; (3) DEEMING AGENT, PREPETITION LENDERS AND BUILDERS LENDERS TO BE ADEQUATELY PROTECTED; AND (4) SCHEDULING A FINAL HEARING**

**Date:**         **July 20, 2011**
**Hearing Time:**  **9:30 a.m.**
**Courtroom:**    **Courtroom #3**
                   **Foley Federal Building**
                   **300 Las Vegas Boulevard**
                   **Las Vegas, Nevada 89101**

#4847-0483-8153

THIS MATTER having come before the Court upon the motion (the "Motion") of Cynthia Nelson, the chapter 11 trustee (the "Trustee") in the chapter 11 bankruptcy case (the "Chapter 11 Case") of South Edge, LLC ("South Edge" or the "Debtor"), seeking, among other things, entry of an interim order (this "Interim Order):[1]

(i)    authorizing and approving the Trustee to obtain postpetition financing in an aggregate principal amount not to exceed $21.4 million, with an initial, interim borrowing limit of up to $4.0 million (the "TIP Facility"), pursuant to that certain Trustee Financing Agreement (the "TIP Loan Agreement";[2] and together with any related documents required to be delivered by or in connection with the TIP Loan Agreement, the "TIP Loan Documents"), by and among the Trustee, as borrower, and certain affiliates of the Settling Builders, as lenders (the "Builder Lenders"), with such TIP Facility secured by first priority priming liens (the "TIP Financing Liens") on all of the Debtor's interests in the Collateral (defined below), pursuant to section 364(d) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code;

(ii)    authorizing the use of LID Proceeds, as cash collateral of the Agent, the Prepetition Lenders and the Builder Lenders, to pay for the chapter 11 estate's (the "Estate") administrative expenses and repay the loans made pursuant to the TIP Facility, in accordance with the Terms of the TIP Loan Documents;

(iii)    granting the Agent, on behalf of the Prepetition Lenders, adequate protection for the use of its cash collateral and any diminution in the value thereof; and

---

[1] Any capitalized term used but not defined herein shall have the meaning ascribed to it in the Motion or the TIP Loan Agreement (defined below), as applicable.

[2] A true and correct copy of the TIP Loan Agreement, dated as of July 20, 2011, in the form to be executed by the parties thereto is attached hereto as Exhibit 1.

#4847-0483-8153

-2-

(iv)    scheduling a final hearing on the Motion (the "Final Hearing") for August 12, 2011 to consider entry of an order ("Final Order") granting the relief requested in the Motion on a final basis.

Having considered the Motion, the TIP Loan Agreement, the Plan Support Agreement (in its redacted form), and the Trustee's Consent, and the record established and the evidence submitted at the interim hearing on the Motion (the "Interim Hearing") and the statements of counsel at the Interim Hearing; finding that due and proper notice of the Motion and the Interim Hearing having been given, and the Interim Hearing having been held and concluded on July 20, 2011 in accordance with Bankruptcy Rules 2002, 4001 and 9014; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Estate pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Estate and its creditors and equity holders, and is essential for the continued operation of the Debtor's business and the preservation of the Estate's value; and it further appearing that the Trustee is unable to secure postpetition financing on terms and conditions that are better than those set forth in this Interim Order and the TIP Loan Agreement, that there is adequate protection of the Agent's and the Prepetition Lenders' interests in the LID Proceeds (i) against which the priming TIP Financing Liens are to be granted in favor of the Builder Lenders and (ii) that are to be used by the Trustee as cash collateral, that the Agent has consented to the TIP Facility, including its priming lien feature, that the Agent has consented to the use of the LID Proceeds as cash collateral as set forth in this Interim Order and the TIP Loan Agreement, that the Agent, the Consenting Lenders and the Settling Builders (collectively, the "Settling Parties") are parties to the Plan Support Agreement, and that all objections, if any, to the entry of this Interim Order have been withdrawn, resolved or overruled by the Court, or continued to the Final Hearing; and having taken into consideration all pleadings filed with this Court, all proceedings held before the Court, and the evidence adduced in connection therewith in this

#4847-0483-8153

-3-

Chapter 11 Case; and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    <u>Involuntary Petition Date; Motion for Trustee</u>.    On December 9, 2010, certain of the Prepetition Lenders filed an involuntary chapter 11 petition against the Debtor (the "<u>Involuntary Petition</u>").    In connection with the Involuntary Petition, the Agent filed a motion seeking appointment of a chapter 11 trustee for the Debtor [Docket No. 7] (the "<u>Trustee Motion</u>").

B.    <u>Appointment of Trustee</u>.    On February 3, 2011, the Court entered an order for relief under chapter 11 of the Bankruptcy Code against the Debtor [Docket No. 400] and issued an order directing the appointment of a chapter 11 trustee [Docket No. 401].    On February 20, 2011, the Office of the United States Trustee (the "<u>UST</u>") designated the Trustee to serve as trustee for the Estate [Docket No. 441], and on February 23, 2011, the Court entered an order approving the appointment of the Trustee as chapter 11 trustee for the Debtor (the "<u>Appointment Order</u>").    [Docket No. 449].    No official committee of creditors has been appointed in this Chapter 11 Case.

C.    <u>Jurisdiction and Venue</u>.    This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).    Venue for the Chapter 11 Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    <u>Notice</u>.    Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Trustee, either by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee for the District of Nevada; (ii) counsel to the Builder Lenders; (iii) counsel to the Agent; (iv) counsel to Focus

South Group, LLC and its affiliates ("Focus"); (v) counsel to Meritage Homes of Nevada, Inc. and its affiliates ("Meritage"); (vi) counsel to the Debtor; (vii) the top twenty unsecured creditors of the Estate (exclusive of the Prepetition Lenders) identified by the Trustee in Schedule F of the Debtor's Schedules of Assets and Liabilities; (viii) the City of Henderson; (ix) the Indenture Trustee for the bonds issued by the City of Henderson in connection with Local Improvement District T-18; and (x) all other parties requesting notices pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  Under the circumstances, such notice of the Interim Hearing and the relief requested in the Motion constitutes due and sufficient notice and complies with sections 102(1), 364(c) and 364(d) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(b), 4001(c), and 9014.

E.     Findings Regarding the Post-Petition Financing and Use of the LID Proceeds.

(i)     On April 21, 2011, the Court entered a final order [Docket No. 624] that approved that certain Stipulation Providing For Postpetition Financing and Use of Cash Collateral (the "Cash Collateral Stipulation"), between and among JPMorgan, as Agent, the Trustee and certain the members of the Debtor and that was subsequently amended by periodic extensions [see Docket Nos. 676, 736 and 803] (collectively, the "Cash Collateral Orders").  The Cash Collateral Orders have provided the Trustee with continued use of the Agent's cash collateral through the date of this Interim Order.

(ii)     As recently confirmed by the Trustee, see Docket No. 766, the Agent, for the benefit of the Prepetition Lenders holds a valid, perfected, priority and unavoidable lien in substantially all of the Debtor's real and personal property, including, but not limited to, the Collateral.  The Collateral and the proceeds thereof constitutes the Agent's cash collateral under section 363(a) of the Bankruptcy Code.

(iii)     Except as set forth in the TIP Loan Agreement with respect to the Collateral, the Agent's liens in and to the Debtor's and the Estate's assets granted to the Agent, for itself and the benefit of the Lenders, in accordance with the terms of the Cash Collateral

#4847-0483-8153

-5-

Orders and the first priority nature thereof, shall be unaffected by the terms of the TIP Loan Agreement, the Interim Financing Order and the Final Financing Order and shall remain in full force and effect.

(iv) <u>Need for Post-Petition Financing and Use of the LID Proceeds</u>. The Estate has limited cash availability.  An immediate need exists for the TIP Facility so as to enable the Trustee to fund among other things, (a) operating disbursements on account of, among other items, the further construction of infrastructure segments of the Debtor's residential real estate Project, commonly known as "Inspirada" (the "<u>Project</u>"), Project maintenance, security, surety bond obligations, and the administration of reimbursements of LID Proceeds, (b) LID Bond assessments and property taxes and (c) bankruptcy related disbursements, including UST fees, the reasonable fees of the Agent's and Prepetition Lenders' professionals and the allowed fees and expenses of the Trustee and her professionals.  The TIP Facility is essential to the implementation of the Plan Support Agreement to which the Trustee has granted her consent, subject to the terms and conditions of the Trustee's Consent.  The use of the TIP Facility proceeds as contemplated in the Budget that is attached to the TIP Loan Agreement as Exhibit A will enable the Trustee to preserve the value of the Estate by, among other things, completing certain infrastructure construction at the Project, which, in turn, will lead to approximately $34.1 million in LID reimbursements that would otherwise be unavailable to the Estate (and/or any successor to the Estate).  Without the TIP Facility and the use of the LID Proceeds, the Estate and its economic stakeholders would suffer immediate and irreparable harm.

(v) <u>No Credit Available on More Favorable Terms</u>. The Trustee is unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Trustee also is unable to obtain secured credit on more favorable terms and conditions than those provided in the TIP Loan Agreement and this Interim Order.  The Trustee is unable to obtain credit for borrowed money without granting to the Builder Lenders (a) the priming TIP Financing Liens on the Collateral pursuant to Bankruptcy Code sections 364(d); and

#4847-0483-8153

-6-

(b) superpriority administrative expense claim status pursuant to Bankruptcy Code section 364(c)(1), senior to all other administrative expenses under Bankruptcy Code sections 503(b) and 507(b) (but pari passu with Agent's superpriority administrative expense claim granted to Agent, for the benefit of the Lenders, under the Cash Collateral Orders).

F.  Extension of Financing.  The Builder Lenders have indicated a willingness to provide financing to the Trustee in accordance with the TIP Loan Agreement and subject to, among other things, (i) the entry of this Interim Order and the subsequent entry of a Final Order, and (ii) findings by the Court that the Builder Lenders are good faith financiers, and that the Builder Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the TIP Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

G.  Business Judgment and Good Faith Pursuant to Section 364(e).  The terms and conditions of the TIP Facility, the TIP Loan Agreement and the use of the LID Proceeds as contemplated therein are fair, reasonable, and the best available under the circumstances, reflect the Trustee's exercise of prudent business judgment consistent with her fiduciary duties, and are supported by reasonably equivalent value and consideration.  The TIP Facility and the use of the LID Proceeds were negotiated extensively, in good faith and at arms' length between the Trustee and the Builder Lenders, with the substantial input by and the consent of the Agent.  The credit to be extended under the TIP Facility is and will be so extended in good faith, and for valid business purposes and uses, the consequence of which is that the Builder Lenders are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

H.  Adequate Protection of the Agent and Prepetition Lenders.  In consideration for the Agent's Adequate Protection Liens under the TIP Loan Agreement and the superpriority administrative expense claim granted to the Agent herein, the Agent has consented to the

#4847-0483-8153

-7-

priming of its security interest against the LID Proceeds by the liens granted to the Builder

Lenders pursuant to the TIP Facility.

I.    <u>Benefits of TIP Facility</u>.  The TIP Facility will enable the Trustee to complete

LID infrastructure build-outs that are a prerequisite for the Estate's (and/or any successor

entity's) reimbursement of $$34.1 million in LID Proceeds.    Moreover, the TIP Facility

facilitates a settlement that, if successful, will result in the near-term resolution of the Estate's

outstanding obligations on the Prepetition Loan through a plan of reorganization to be proposed

to the Court by creditors that, in the aggregate, hold a substantial majority (in dollar amount) of

the claims against the Estate and equity holders that, in the aggregate, hold a substantial majority

of the equity in the Debtor.  The TIP Facility, together with the Settlement, will allow the

Settling Parties (e.g., the Agent, the Consenting Lenders and the Settling Builders) and the Estate

to avoid what inevitably would be time-consuming and expensive litigation.  The TIP Facility

also ensures that the Estate will remain administratively solvent.  The cost savings associated

with the successful implementation of the Settlement will enhance the overall value to be

recovered by the Settling Parties, who are the Estate's primary economic stakeholders.

J.    <u>Entry of Interim Order</u>.  For the reasons stated above, the Trustee has requested

immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

NOW, THEREFORE, on the Motion of the Trustee and the record before the Court with

respect to the Motion, and with the consent of the Builder Lenders and the Agent to the form and

entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED THAT:**

1.    <u>Motion Granted</u>.  The Motion is granted in its entirety subject to the terms and

conditions set forth in this Interim Order.

2.    <u>TIP Loan Agreement Authorization</u>.

(a)    <u>Approval of TIP Facility</u>.  The Trustee is expressly and immediately authorized,

empowered and directed to execute, deliver and enter into the TIP Loan Agreement and to incur

#4847-0483-8153

-8-

and to perform the Obligations in accordance with, and subject to, the terms of this Interim Order and the TIP Loan Agreement, and to deliver all instruments and documents that may be required or necessary for the performance by the Trustee under the TIP Facility and the creation and perfection of the TIP Financing Liens described in and provided for by this Interim Order and the TIP Loan Agreement. Upon execution and delivery, the Obligations created under the TIP Loan Agreement shall represent valid and binding obligations of the Estate, enforceable against the Estate in accordance with the terms of the TIP Loan Agreement.

(b)     <u>Authorization to Borrow</u>.  Subject to the terms and conditions of this Interim Order, the TIP Loan Agreement, and any other TIP Loan Documents, and in accordance with the Budget, the Trustee is hereby authorized under the TIP Facility to borrow up to the amount of $4.5 million during the period between the entry of this Interim Order and the entry of a Final Order.

(c)     <u>TIP Financing Liens</u>.  Effective upon the entry of this Interim Order and subject to the TIP Loan Agreement, the Builder Lenders are granted the TIP Financing Liens pursuant to sections 361, 362 and 364(d) of the Bankruptcy Code, meaning a first priority, priming, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interest in and lien on the Collateral presently owned and hereafter acquired by the Estate, which shall consist of any and all rights of the Trustee and the Estate to receive payments or reimbursements of LID Proceeds, whether such rights constitute general intangibles, accounts, accounts receivable, contract rights, commercial tort claims, or deposit accounts relating thereto, and all proceeds, products, offspring, or profits thereof (including cash), and including all payments owing or made under the Acquisition Agreement, but the Collateral shall not include the Acquisition Agreement itself.

(d)     <u>Agent's Adequate Protection</u>. Effective upon the entry of this Interim Order and subject to the TIP Loan Agreement, the Agent (on its behalf and on behalf of the Prepetition Lenders) is hereby granted the Adequate Protection Liens pursuant to sections 361, 363(e) and

#4847-0483-8153

-9-

364(d)(1) of the Bankruptcy Code, meaning, as adequate protection for any diminution in the value of the Agent's interest in the Collateral securing the Debtor's obligations under the Prepetition Credit Agreement resulting from, the use of the Collateral and imposition of the automatic stay (the "Adequate Protection Obligations"): (x) a second priority (subject only to the TIP Financing Liens), priming, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interest in and lien on the Collateral presently owned and hereafter acquired by the Estate, which shall consist of any and all rights of the Trustee and the Estate to receive payments or reimbursements of LID Proceeds, whether such rights constitute general intangibles, accounts, accounts receivable, contract rights, commercial tort claims, or deposit accounts relating thereto, and all proceeds, products, offspring, or profits thereof (including cash), and including all payments owing or made under the Acquisition Agreement, but the Collateral shall not include the Acquisition Agreement itself, and (y) a first priority priming, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interest in and lien on all assets (other than the Collateral and any claims and causes of action under section 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code, or the proceeds such claims and causes of action) presently owned and hereafter acquired by the Estate and all products and proceeds thereof, but subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code.  Agent, for the benefit of the Prepetition Lenders, is granted an allowed superpriority administrative expense claim as provided for under section 507(b) of the Bankruptcy Code on account of the Adequate Protection Obligations (the "Adequate Protection Superpriority Claim "), which shall be junior to the TIP Loan Superpriority Claim (defined herein).

(e)    TIP Financing Lien Priority.  The TIP Financing Liens granted to the Builder Lenders (i) are created pursuant to section 364(d) of the Bankruptcy Code, (ii) are first priority, priming, valid, prior, perfected, unavoidable, and superior to any security interest, mortgage, or

collateral interest or lien or claim in, on or to the Collateral, and are subject only to the Permitted Liens, if any, but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code; and (iii) shall secure all Obligations under the TIP Facility.

(f)    Enforceable Obligations.    The TIP Loan Agreement shall constitute and evidence the valid and binding obligations of the Estate, which Obligations shall be enforceable against the Estate, and any successors thereto.

(g)    Conditions Precedent to Making Advances.    The Builder Lenders shall have no obligation to make any advances pursuant to the TIP Facility unless all of the conditions precedent to the making of such advances under the TIP Facility are satisfied or waived by the Builders Lenders in accordance with the TIP Loan Agreement.

(h)    Superpriority Administrative Claim Status.    All Obligations under the TIP Facility shall be allowed superpriority administrative expense claims (the "TIP Loan Superpriority Claim" and, together with the TIP Loan Liens, the "TIP Loan Protections") with priority in the Chapter 11 Case under section 364(c)(l) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtor and the Estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 503(b) and 507(b); provided, however, such TIP Loan Superpriority Claim shall be *pari passu* with the superpriority administrative expense claim granted to the Agent (for the benefit of the Prepetition Lenders) under the Cash Collateral Orders.

3.    Post-Petition Lien Perfection.    This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the TIP Loan Liens and the Agent's Adequate Protection Liens without the necessity of filing or recording any financing statement or other instrument or document that may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the TIP Loan Liens or the

Agent's Adequate Protection Liens or to entitle the Builder Lenders or the Agent to the priorities granted herein. Notwithstanding the foregoing, the Trustee shall, at the request of the Builder Lenders or the Agent, at any time and from time to time, execute and deliver to the Builder Lenders or the Agent such security agreements, mortgages, financing statements, documents, and other agreements and instruments (and, subject to sufficient availability of funding and any restrictions in the Budget, pay the cost of filing or recording the same in all public offices deemed reasonably necessary or desirable by the Builder Lenders) and do such other acts and things as the Builder Lenders or the Agent may reasonably deem necessary or desirable in order to establish and maintain the validity, attachment, and perfection of the liens of the Builder Lenders and the Agent granted in this Interim Order (free and clear of all other liens, claims, and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Permitted Liens). The Builder Lenders and the Agent (and all Persons designated by the Builder Lenders or the Agent for the purpose specified in this sentence) hereby are made, constitute, and are appointed as the Trustee's true and lawful attorney and agent-in-fact to execute such security agreements, mortgages, financing statements, documents, and other agreements and instruments and do such other acts and things as may be necessary or appropriate to preserve and perfect the liens of the Builder Lenders and the Agent on the Collateral. A carbon, photographic, photostatic, or other reproduction of the TIP Loan Agreement, this Interim Order, or of a financing statement shall be sufficient as a financing statement.

4. <u>Use of TIP Facility Proceeds and LID Proceeds</u>. Pursuant to and in accordance with the terms and conditions of this Interim Order, the TIP Loan Documents, and in a manner consistent with the Budget (as the same may be modified, supplemented or updated from time to time consistent with the terms and conditions of the TIP Loan Agreement), (a) the Trustee is authorized to use the advances made under the TIP Loan Agreement, and (b) the Trustee is authorized to use the LID Proceeds.

5. <u>Events of Default; Remedies</u>.

#4847-0483-8153

-12-

(a) <u>Events of Default</u>.  The Defaults identified in Section 9 of the TIP Financing Agreement shall constitute Defaults under this Interim Order and the TIP Loan Documents.

(b) <u>Rights and Remedies Upon Event of Default</u>.  Upon the occurrence of a Default, the Builder Lenders may immediately, upon giving any such notice to the Trustee as may be required under the TIP Loan Agreement, (i) cease to make any Loans under the TIP Loan Agreement or any other Loan Document, (ii) declare all or any portion of the Loans and all other outstanding Obligations to be due and payable immediately, without further order of, or application to, the Court, and without presentment, demand, or protest, all of which are deemed to be waived by the Trustee and (iii) subject to paragraphs 5(c) and 5(d) below, exercise any and all of their other rights and remedies under applicable law (including, but not limited to, the Bankruptcy Code), the TIP Loan Agreement and the other TIP Loan Documents.

(c)    <u>Relief from Automatic Stay</u>.

If a Default occurs (including the failure to pay all Obligations that are due upon maturity), then (i) the Builder Lenders may set an expedited hearing for relief from the automatic stay on not less than three Business Days' notice and at such hearing the only issues will be (x) whether an uncured Default exists, and (y) whether the Bankruptcy Court may impose any condition on the exercise of the Builder Lenders' remedies (which condition the Builder Lenders may oppose), so long as such condition does not delay the Builder Lenders' exercise of remedies for more than 30 days and otherwise does not impair the interests of the Builder Lenders in their Collateral; and (ii) consistent with the Court's determination as to "i" immediately above, the Builder Lenders shall be granted relief from stay if an uncured Default is found to exist and the automatic stay provisions of Bankruptcy Code section 362 shall be vacated and modified to the extent necessary to permit the Builder Lenders to

#4847-0483-8153

-13-

exercise all rights and to effectuate the provisions of the TIP Loan Agreement and this Interim Order, without the need for filing further pleadings or application to or order of the Court.

(d)    Modification of Automatic Stay.  Subject to paragraph 5(c) above,

(1)    the automatic stay provisions of Bankruptcy Code section 362 are hereby vacated and modified to the extent necessary to permit the Builder Lenders to exercise all rights and to effectuate the provisions of the TIP Loan Agreement and this Interim Order, without the need for filing further pleadings or application to or order of the Court; and

(2)    no party in interest shall have the right (i) to contest the enforcement of the remedies set forth in the TIP Loan Agreement on any basis other than the fact that a Default has not occurred or (ii) to seek injunctive relief against such enforcement under Bankruptcy Code section 105 or otherwise, or to seek injunctive relief in conflict with the provisions of the TIP Loan Agreement or the Interim Order.

6.    Other Rights and Obligations.

(a)    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the Builder Lenders and the TIP Facility contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, reversed or vacated by a subsequent order of this or any other Court, the Builder Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code and no such modification, amendment, reversal or vacation shall affect the validity and enforceability of any advances made hereunder or lien or priority authorized or created hereby.  Notwithstanding any such modification, amendment, reversal or vacation, any claim granted to the Builder Lenders hereunder arising

#4847-0483-8153

-14-

prior to the effective date of such modification, amendment, reversal or vacation of any TIP Loan Protections granted to the Builder Lenders shall be governed in all respects by the original provisions of this Interim Order, and the Builder Lenders shall be entitled to all of the rights, remedies, privileges and benefits, including the TIP Loan Protections granted herein, with respect to any such claim.  Since the advances to be made pursuant to the TIP Loan Agreement will be made in reliance on this Interim Order, the obligations owed the Builder Lenders prior to the effective date of any stay, modification, amendment, reversal or vacation of this Interim Order cannot, as a result of any subsequent order in this Chapter 11 Case, or, following the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or following the commencement of any other proceeding superseding the Chapter 11 Case or such chapter 7 case (any such chapter 7 case or superseding proceeding, "Successor Case"), be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the Builder Lenders under this Interim Order and/or the TIP Loan Agreement.

(b)     Binding Effect.  The provisions of this Interim Order shall be binding upon all parties in interest in the Chapter 11 Case, including, without limitation, the Trustee, the Estate, the Debtor, the Builder Lenders, the Agent, the Prepetition Lenders, the City of Henderson, the Indenture Trustee for the bonds issued by the City of Henderson in connection with Local Improvement District T-18, Focus and Meritage and their respective successors and assigns (including any trustee, estate representative or other fiduciary hereinafter appointed as a legal representative of the Estate or with respect to the property of the Estate) whether in the Chapter 11 Case, in any Successor Case, or upon dismissal of the Chapter 11 Case or any Successor Case, and shall inure to the benefit of the Estate and the Builder Lenders.

(c)     No Third Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

#4847-0483-8153

-15-

(d)     Amendment.  Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by the Trustee, the Builder Lenders, and the Agent and approved by the Court.

(e)     Survival of Interim Order.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order that may be entered (1) confirming any plan of reorganization in the Chapter 11 Case, (2) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (3) dismissing the Chapter 11 Case, and the terms and provisions of this Interim Order as well as the TIP Loan Protections, the Agent's Adequate Protection Liens and the Adequate Protection Superpriority Claim granted pursuant to this Interim Order and the TIP Loan Agreement shall continue in full force and effect notwithstanding the entry of such order, and (x) such TIP Financing Protections shall maintain their priority as provided by this Interim Order until all the Obligations under the TIP Facility are indefeasibly paid in full and discharged and (y) the Agent's Adequate Protection Liens and the Adequate Protection Superpriority Claim shall maintain their priority as provided by this Interim Order until the Adequate Protection Obligations are indefeasibly paid in full and discharged.

(f)     Inconsistency.  In the event of any inconsistency between the terms and conditions of the TIP Loan Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

(g)     Waiver of Bankruptcy Rules 4001(a)(3) and 6004(h) Stay.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry, notwithstanding the provisions of Bankruptcy Rule 4001(a)(3) and 6004(h), which, to the extent applicable, are waived and shall not apply to this Interim Order.

(h)     Final Hearing.  The Final Hearing to consider entry of a Final Order and final approval of the TIP Facility is scheduled for August 12, 2011 at 9:30 a.m. at the United States Bankruptcy Court for the District of Nevada, Las Vegas Division.  On or before July  25 , 2011,

#4847-0483-8153

-16-

1   the Trustee shall serve, by United States mail, first-class postage prepaid, notice of the entry of

2   this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of

3   this Interim Order, the proposed Final Order and the Motion, on the Notice Parties identified in

4   the Motion.  The Final Hearing Notice state that any party in interest objecting to the entry of the

5   proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court by no

6   later than _____August 01, 2011_____, which objections shall be served so that the same are

7   received on or before such date by:  (i) counsel for the Trustee; (ii) the Office of the United

8   States Trustee; (iii) counsel for the Builder Lenders; (iv) counsel for the Debtor out-of-

9   possession, and (v) counsel for the Agent; provided, however, that the Trustee shall consider any

10  objection to the Motion that was filed prior to the Interim Hearing to be a timely filed objection.

11  Replies to any objections, including to those objections filed prior to the Interim Hearing, shall

12  be filed by no later than _____August 10, 2011_____.

13          (i)     Weekly Disbursement Reports.  Commencing on Friday July 29, 2011 and

14  through the date of the Final Hearing, the Trustee shall file with the Court and serve upon

15  counsel to the Builder Lenders, the Agent, Focus and Meritage a weekly report of the Trustee's

16  disbursements in accordance with the Budget.

17          (j)     The terms and conditions of the Cash Collateral Orders remain in full force and

18  effect, except as expressly modified by this Interim Order.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  #4847-0483-8153

-17-

28

(k)     <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated:  July 22, 2011

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146-5308
Telephone:     (702) 228-7590
Facsimile:     (702) 892-0122
E-Mail:        bkfilings@s-mlaw.com

&

By:   __/Robert J. Moore/_____
MILBANK, TWEED, HADLEY & MCCLOY LLP
Robert J. Moore (admitted *pro hac vice*)
David Zolkin (admitted *pro hac vice*)
601 South Figueroa Street, 30th Floor
Los Angeles, California  90017
Telephone:     213.892-4000
Facsimile:     213.629.5063
E-Mail:        rmoore@milbank.com
               dzolkin@milbank.com

Counsel For Cynthia Nelson, Chapter 11 Trustee

#4847-0483-8153                         -18-

In accordance with LR 9021, counsel submitting this document certifies as follows (check one):

   X   The court has waived the requirement of approval under LR 9021.

____ This is a chapter 7 or 13 case, and either with the motion, or at the hearing, I have delivered a copy of this proposed order to all counsel who appeared at the hearing, any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below [list each party and whether the party has approved, disapproved, or failed to respond to the document]:

____ This is a chapter 9, 11, or 15 case, and I have delivered a copy of this proposed order to all counsel who appeared at the hearing, any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below [list each party and whether the party has approved, disapproved, or failed to respond to the document]:

____ I certify that I have served a copy of this order with the motion, and no parties appeared or filed written objections.


By:   /Robert J. Moore/
MILBANK, TWEED, HADLEY & MCCLOY LLP
Robert J. Moore (admitted *pro hac vice*)
David Zolkin (admitted *pro hac vice*)
601 South Figueroa Street, 30th Floor
Los Angeles, California  90017


# # #

# EXHIBIT "1"



# SOUTH EDGE, LLC.

## TRUSTEE FINANCING AGREEMENT

**KB Home NV Acquisition LLC, Toll Henderson II LLC, a Nevada LLC. Pardee Homes, a California corporation, and Trinity Homes, LLC, as Builder Lenders**

**and**

**Cynthia Nelson, solely in her capacity as Chapter 11 Trustee of South Edge, LLC, on behalf of South Edge, LLC and its Bankruptcy Estate, as Borrower**

RECITALS ............................................................................................................... 1

AGREEMENT .......................................................................................................... 2

1.    DEFINITIONS AND CONSTRUCTION. ...................................................... 2

    1.1    Definitions. ........................................................................................ 2

    1.2    Financial Reporting. ......................................................................... 7

    1.3    Terms Generally. ............................................................................... 7

2.    LOAN AND TERMS OF PAYMENT. ........................................................... 8

    2.1    Credit Extensions. ............................................................................. 8

        (a)    Promise to Pay. ....................................................................... 8

        (b)    Loans. ...................................................................................... 8

    2.2    Interest Rates and Calculations. ....................................................... 9

        (a)    Interest. .................................................................................... 9

        (b)    Default Rate and Fees. ............................................................ 9

        (c)    Computation. ........................................................................... 9

    2.3    Payments. .......................................................................................... 10

        (a)    Time of Payments. ................................................................... 10

        (b)    Location of Payments. ............................................................ 10

    2.4    Term. ................................................................................................. 10

    2.5    Revolving Loan. ................................................................................ 11

    2.6    Use of Proceeds. ............................................................................... 11

        (a)    Generally. ................................................................................ 11

        (b)    Deviation. ................................................................................ 11

        (c)    LID Segment Construction. ..................................................... 11

        (d)    Professionals. .......................................................................... 12

    2.7    Section 15 Advances. ........................................................................ 12

    2.8    Source of Loans. ............................................................................... 12

3.    ALLOWANCE AND PRIORITY OF CLAIMS ............................................ 12

4.    SECURITY INTEREST IN FAVOR OF LENDERS ..................................... 13

    4.1    Security Interest in Collateral. ......................................................... 13

    4.2    Priority of Builder Lenders' and Agent's Security Interests. ............ 13

    4.3    Preservation of Collateral; Perfection of Builder Lenders' Security Interest and Agent's Security Interest. ........................................................... 13

| | | | |
|---|---|---|---|
| 5. | | CONDITIONS OF LOANS......................................................................... | 14 |
| | 5.1 | Conditions Precedent to all Loans. ...................................................... | 14 |
| | | (a) | Interim Financing Order. ......................................................... | 14 |
| | | (b) | Delivery of Documents. ........................................................... | 14 |
| | | (c) | Notice of Borrowing. ............................................................... | 14 |
| | | (d) | No Default. .............................................................................. | 15 |
| | | (e) | No Maturity. ............................................................................ | 15 |
| | | (f) | Final Financing Order. ............................................................ | 15 |
| 6. | | REPRESENTATIONS AND WARRANTIES............................................ | 15 |
| | 6.1 | Authority. ............................................................................................. | 15 |
| | 6.2 | Execution and Binding Effect. ............................................................ | 16 |
| | 6.3 | No Default. ........................................................................................... | 16 |
| 7. | | AFFIRMATIVE COVENANTS. ................................................................ | 16 |
| | 7.1 | Financial Reporting............................................................................. | 16 |
| | 7.2 | Books and Records. ............................................................................. | 17 |
| | 7.3 | Use of Proceeds................................................................................... | 17 |
| | 7.4 | Cooperation and Consultation. ............................................................ | 17 |
| 8. | | NEGATIVE COVENANTS. ...................................................................... | 18 |
| | 8.1 | Superpriority Claims/Senior Liens. ..................................................... | 18 |
| | 8.2 | Financing Orders................................................................................. | 18 |
| | 8.3 | Deviation from Budget. ....................................................................... | 18 |
| | 8.4 | Protection of Collateral. ...................................................................... | 18 |
| | 8.5 | Significant Transactions...................................................................... | 18 |
| | 8.6 | Litigation Against Builder Lenders. .................................................... | 19 |
| | 8.7 | Trustee Consent. ................................................................................. | 19 |
| 9. | | DEFAULTS. ............................................................................................. | 19 |
| 10. | | LENDERS' RIGHTS AND REMEDIES. .................................................. | 20 |
| | 10.1 | Remedies Generally............................................................................. | 20 |
| | 10.2 | Relief from the Automatic Stay. .......................................................... | 21 |
| | 10.3 | Modification of the Automatic Stay. ................................................... | 21 |
| 11. | | NOTICES................................................................................................. | 22 |
| 12. | | CHOICE OF LAW AND VENUE: JURY TRIAL WAIVER. ..................... | 24 |
| 13. | | GENERAL PROVISIONS. ....................................................................... | 24 |

13.1    Binding Effect. ........................................................................... 24

13.2    Time of Essence. ........................................................................ 24

13.3    Severability of Provisions. ....................................................... 25

13.4    Amendments in Writing, Integration. ...................................... 25

13.5    Counterparts. ............................................................................. 25

13.6    Survival. ..................................................................................... 25

This TRUSTEE FINANCING AGREEMENT ("**Agreement**") is entered into as of July 20, 2011, by and among KB Home NV Acquisition LLC, Toll Henderson II LLC, a Nevada LLC, Pardee Homes, a California corporation, and Trinity Homes, LLC ("**Builder Lenders**"), on the one hand, and Cynthia Nelson, not in her individual capacity, but solely in her capacity as trustee of chapter 11 debtor South Edge, LLC ("**Trustee**"), on behalf of South Edge, LLC ("**South Edge**") and its Estate (as defined below).

## RECITALS

WHEREAS, on December 9, 2010 ("**Petition Date**") JPMorgan Chase Bank, N.A. ("**JPMorgan**"), Credit Agricole Corporate and Investment Bank, and Wells Fargo Bank, N.A. filed an involuntary chapter 11 petition under section 303 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq*. ("**Bankruptcy Code**"), against South Edge in the United States Bankruptcy Court for the District of Nevada ("**Bankruptcy Court**"), commencing case number 10-32968 ("**Chapter 11 Case**");

WHEREAS, on the Petition Date, JPMorgan, in its capacities as Agent (as defined below) under the Prepetition Credit Agreement (as defined below) and as a lender thereunder, filed a motion to appoint a chapter 11 trustee for South Edge in the Chapter 11 Case ("**Trustee Motion**");

WHEREAS, on February 3, 2011, the Bankruptcy Court entered an order for relief on the involuntary petition and its order granting the Trustee Motion;

WHEREAS, on February 23, 2011, the Bankruptcy Court entered its order approving the Office of the United States Trustee's February 20, 2011, appointment of Cynthia Nelson as the Trustee;

WHEREAS, on April 21, 2011, the Court entered a final order [D.E. 624] that approved a stipulation, between and among JPMorgan, as Agent, the Trustee, and certain equity members of the Debtor that was subsequently amended by periodic extensions [*see* D.E. 676, 736] (collectively, the "**Cash Collateral Orders**"), which has provided the Trustee with continued use of the Agent's cash collateral;

WHEREAS, JPMorgan, as Agent, the members of a steering committee of lenders under the Prepetition Credit Agreement, and more than 92% in dollar amount and 94% in number of total lenders under the Prepetition Credit Agreement have entered into a letter agreement dated as of May 19, 2011 (together with the "Term Sheet for South Edge, LLC Chapter 11 Plan" attached to the letter agreement, the "**Plan Support Agreement**") with certain affiliates of the Builder Lenders ("**Settling Builders**" as defined in the Plan Support Agreement), which Plan Support Agreement requires the parties thereto to support a chapter 11 plan to be filed in the Chapter 11 Case, consistent with the Plan Support Agreement;

WHEREAS, the Trustee has consented to the Plan Support Agreement pursuant to the letter dated as of June 8, 2011, addressed by counsel for the Trustee to counsel for the Agent and counsel for the Settling Builders ("**Trustee's Consent**"), which Trustee's

Consent has been accepted by the Settling Builders and, as permitted by the Plan Support Agreement, been waived by the Agent, on behalf of the Lenders;

WHEREAS, nothing in this Agreement shall alter or modify the terms of the Plan Support Agreement or relieve the Settling Builders or the Agent and the Consenting Lenders of their respective obligations under the Plan Support Agreement;

WHEREAS, the Trustee has requested that the Builder Lenders extend post-petition financing to the Trustee pursuant to Bankruptcy Code section 364;

WHEREAS, the Trustee, on behalf of the Estate, requires funds in order to satisfy accrued and accruing administrative expenses of the Estate pursuant to a Budget (as defined below) and this Agreement, including, but not limited to (i) disbursements on account of, among other things, the construction of certain infrastructure segment improvements required to obtain Local Improvement District T-18 ("**LID**") reimbursements, project maintenance, security, and surety bond obligations, and the costs of administration with respect to LID reimbursements, (ii) LID-related assessments and property taxes, and (iii) bankruptcy-related disbursements, including United States Trustee's fees and the reasonable fees and expenses of the Trustee, her professionals, and the Agent's and Lenders' professionals;

WHEREAS, the Builder Lenders have agreed to provide such post-petition financing to the Trustee and the Estate subject to the terms and conditions set forth in this Agreement and the other Loan Documents (as defined below).

## AGREEMENT

Now, therefore, in consideration of the premises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    DEFINITIONS AND CONSTRUCTION.

1.1    Definitions.

As used in this Agreement, the following terms shall have the following definitions:

"**Acquisition Agreement**" means the Acquisition Agreement between the City of Henderson and South Edge dated April 1, 2006.

"**Agent**" means JPMorgan, in its capacity as administrative agent under the Prepetition Credit Agreement, and any subsequent or replacement administrative agent under the Prepetition Credit Agreement.

"**Agent's Adequate Protection Liens**" means the liens and security interests granted to Agent (on its behalf and on behalf of the Lenders) hereunder in the Collateral and the Estate's other assets, excluding any claims or causes of action under

sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, as adequate protection for, and to the extent of any diminution in the value of the Agent's interest in the Collateral securing the Debtor's obligations under the Prepetition Credit Agreement resulting from, the use of the Collateral and imposition of the automatic stay.

"**Agreement**" has the meaning specified in the preamble hereto.

"**Bankruptcy Code**" has the meaning specified in the recitals hereto.

"**Bankruptcy Court**" has the meaning specified in the recitals hereto.

"**Builder Lenders**" has the meaning specified in the preamble hereto.

"**Builder Lenders' Account**" means an account at a bank designated by the Builder Lenders from time to time as the account into which the Trustee shall make all payments to the Builder Lenders under this Agreement and the other Loan Documents, but only to the extent such payments are not required to be made to the Term Sheet Escrow.

"**Builder Lenders' LID Remedy**" has the meaning specified in Section 10.1 hereof.

"**Business Day**" means any day that is not a Saturday, Sunday, or other day on which banks in the State of Nevada are authorized or required to close.

"**Budget**" means the budget attached hereto as Exhibit "A", and any successor or modified budget that is acceptable to the Trustee and approved by the Builder Lenders and the Agent, in their sole and absolute discretion. The Budget shall provide for cash flows and accruals of professionals' fees projected in good faith by the Trustee on a weekly basis for the period from July 23, 2011, through November 30, 2011, as such cash flow projections may be amended or modified from time to time by the Trustee and approved by the Builder Lenders and the Agent, in their sole and absolute discretion.

"**Chapter 11 Case**" has the meaning specified in the recitals hereto.

"**Closing Date**" means either the Final Closing Date or the Interim Closing Date.

"**Collateral**" means any and all rights of the Trustee, South Edge, or the Estate to receive payments or reimbursements for funds that have been or will be expended for the construction and/or completion of improvements relating to the LID, whether they constitute general intangibles, accounts, accounts receivable, commercial tort claims, or deposit accounts relating thereto, and all proceeds, products, offspring, or profits thereof (including cash), including payments owing or made under the Acquisition Agreement, but Collateral shall not include the Acquisition Agreement itself.

"**Default**" means any event or condition specified in Section 9 hereof, after the passage of any applicable cure period.

"**Default Rate**" has the meaning specified in Section 2 hereof.

"**Estate**" means the bankruptcy estate of South Edge created pursuant to Bankruptcy Code section 541.

"**Final Closing Date**" means the first date on which (a) the Bankruptcy Court shall have entered the Final Financing Order, and (b) all of the conditions set forth in Section 5 hereof shall have been satisfied by the Trustee in a manner satisfactory to the Builder Lenders and the Agent.

"**Final Financing Order**" means the final order of the Bankruptcy Court approving the Loan Documents, granting the Superpriority Claim status, granting the Builder Lenders' first priority priming liens on the Collateral, granting the Agent, as Agent's Adequate Protection Liens, second-priority liens in the Collateral subject only to the Builders Lenders' first-priority liens on the Collateral, and a first priority lien in all other assets of the Estate other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, and subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code, which order shall have been entered upon motion of the Trustee and which order shall be satisfactory in form and substance to the Builder Lenders and the Agent.

"**Financing Orders**" means the Interim Financing Order and the Final Financing Order.

"**Gomez**" means Gomez Consulting Group, or any other entity performing a similar function with respect to LID-related projects.

"**Interim Closing Date**" means the first date on which (a) the Bankruptcy Court shall have entered the Interim Financing Order, and (b) all of the conditions set forth in Section 5 hereof (except for the entry of the Final Financing Order) shall have been satisfied by the Trustee in a manner satisfactory to the Builder Lenders and the Agent.

"**Interim Financing Order**" means the interim order of the Bankruptcy Court approving the Loan Documents, granting the Superpriority Claim status, and granting the Builder Lenders' first priority priming liens on the Collateral, granting the Agent, as Agent's Adequate Protection Liens, second-priority liens in the Collateral subject only to the Builders Lenders' first-priority liens on the Collateral, and a first priority lien in all other assets of the Estate  other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, and subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code, which order shall have been entered upon motion of the Trustee satisfactory in form and substance to the Builder Lenders and the Agent.

"**JPMorgan**" has the meaning specified in the recitals hereto.

"**LID**" has the meaning specified in the recitals hereto.

"**Loan**" means a loan made by the Builder Lenders to the Trustee pursuant to Section 2 hereof.

"**Loan Documents**" means, collectively, this Agreement, any note or notes executed by the Trustee at the Builder Lenders' request, and all other agreements, instruments, and other documents executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Loan or the Obligations, all as may be amended, modified, or extended from time to time.

"**Maturity Date**" means the earliest of: (a) the termination of the Plan Support Agreement, (b) the Trustee's Consent Termination, (c) the effective date of the Plan of Reorganization, (d) termination of the Loans pursuant to Section 10.1 following a Default, (e) the failure of the Final Financing Order to be entered by the Bankruptcy Court on or before August 12, 2011, or (f) November 30, 2011 (provided, however, that in the case of "f" only, the Maturity Date shall be extended by such additional time, if any, as is permitted for a plan effective date under Section 3(d) of the Plan Support Agreement, provided that a Budget that is acceptable to the Trustee, the Agent, and the Builder Lenders is agreed to in connection with such extension).

"**Notice of Borrowing**" has the meaning specified in Section 2 hereof.

"**Obligations**" means all present and future indebtedness, obligations, and liabilities of the Trustee, on behalf of South Edge and its Estate, to the Builder Lenders under the Loan Documents, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, or unsecured, and whether or not such claim is stayed. Without limiting the generality of the foregoing, the Obligations of the Trustee, South Edge, and its Estate under the Loan Documents include (a) the obligation to pay principal, Default Rate interest following a Default, reasonable attorneys' fees and expenses of the Builder Lenders following a Default that relate to the enforcement of remedies under the Loan Documents, and other amounts payable under the Loan Documents, (b) the obligation to reimburse any amount in respect of any of the foregoing that the Builder Lenders (in their sole discretion) may elect to pay or advance, consistent with the Budget, on behalf of the Trustee and the Estate, (c) advances to protect the Builder Lenders' Collateral following Default, including the completion of LID segment construction, and related documentation, within or outside of South Edge's development pursuant to Section 10.1, and (d) the Section 15 Advances; provided, however, "b" and "c" above shall also require the approval of the Agent in its reasonable discretion. The Obligations shall not be subject to setoff or counterclaim of any kind, including any assertion by the Trustee or the Estate for capital contributions or other alleged obligations of the Settling Builders to South Edge or the Estate.

"**Permitted Liens**" means: (i) liens for taxes or LID assessments for which funding has not been provided to the Trustee under the Budget such that a timely payment may be made by the Trustee; (ii) liens for taxes or LID assessments not yet payable or that are payable but are being contested in good faith and by appropriate proceedings diligently pursued, provided that a reserve or other appropriate provision, if any, as shall be required by generally accepted accounting principles shall have been made therefore; and (iii) liens in favor of the Builder Lenders and Agent hereunder and under the Financing Orders.

"**Person**" means individual, company, or other entity.

"**Petition Date**" has the meaning specified in the recitals hereto.

"**Plan of Reorganization**" means the chapter 11 plan of reorganization to be confirmed in the Chapter 11 Case in accordance with the Plan Support Agreement.

"**Plan Support Agreement**" has the meaning specified in the recitals hereto.

"**Prepetition Credit Agreement**" means the Credit Agreement, dated November 1, 2004, as amended and restated by the Amended and Restated Credit Agreement, dated March 9, 2007, among South Edge as the borrower, the lenders party thereto, JPMorgan as the Administrative Agent, and The Royal Bank of Scotland PLC as Syndication Agent.

"**Revolving Note**" has the meaning set forth in Subsection 5.1(b) hereof.

"**Section 15 Advances**" means advances made on account of the Settling Builders' obligations pursuant to Section 15 of the Trustee's Consent for all allowed and unpaid administrative expenses of the Estate that are accrued through the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), not to exceed such unpaid amounts as are set forth in the Budget through the Maturity Date (other than as a result of the effective date of the Plan of Reorganization); provided, however, that the allowed fees and expenses of the Trustee, and all professional persons employed by the Trustee, shall not exceed the amount of unpaid fees and expenses for the full Budget period; and provided further that the Trustee reserves all her rights with respect to the allowance and payment in full of (i) any such excess amounts through the Maturity Date, and (ii) additionally any fees and expenses that remain accrued and unpaid through the conclusion of the Chapter 11 Case, from the Agent's cash collateral, from the MI Funds if they are determined to be property of the Estate, or from the Bankruptcy Code Section 506(c) surcharge of the Agent's and Lenders' non-cash collateral under the standard set forth in the Cash Collateral Orders, without prejudice to the rights of all parties in interest in the Chapter 11 Case, including the Agent (on its own behalf and on behalf of the Lenders) to contest such allowance and payment.  Section 15 Advances shall be made only after the satisfaction of such obligations from the following sources, and in the following order: (a) any unencumbered cash held by the Trustee as of the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), (b) LID

proceeds in the possession of the Trustee that constitute the Builder Lenders' cash collateral, (c) funds remaining in the Term Sheet Escrow after payment of all amounts owing from the Term Sheet Escrow to the Agent and the Prepetition Credit Agreement lenders, pursuant to the terms of the Term Sheet Escrow, (d) funds in the Builder Lenders' Account pursuant to Section 2.3(b) hereof, or (e) such other arrangements as are mutually acceptable to the Settling Builders and the Trustee.

"**Settling Builders**" has the meaning specified in the recitals hereto.

"**South Edge**" has the meaning specified in the preamble hereto.

"**Superpriority Claim**" means a claim against South Edge and its Estate in the Chapter 11 Case, which is an administrative expense claim having priority over any and all other administrative expenses of the kind specified in Bankruptcy Code sections 503(b) or 507(b) (including any post-conversion expenses with priority under Bankruptcy Code section 726(b)), except for the superpriority claim granted to the Agent under the Cash Collateral Orders, which shall be pari passu with this claim.

"**Term Sheet Escrow**" means the escrow account established at U.S. Bank National Association created pursuant to the Plan Support Agreement established for, among other purposes, to finance Chapter 11 administrative expenses, including LID assessments and taxes in accordance with the Budget and as contemplated by the Plan Support Agreement.

"**Trustee**" has the meaning specified in the preamble hereto.

"**Trustee's Consent**" has the meaning specified in the recitals hereto.

"**Trustee's Consent Termination**" means the Trustee's taking of actions that are inconsistent with the Plan Support Agreement, as consented to as modified, limited, or clarified by the Trustee pursuant to the Trustee's Consent (including, among other things, the Trustee's opposing the Plan of Reorganization or asserting claims against the Settling Builders or their insiders or affiliates), unless the Trustee's actions are preceded by the Settling Builders and the Agent modifying the Plan Support Agreement or the Plan of Reorganization contemplated thereunder in a manner that has a material adverse effect on the interests of the Estate.

"**Trustee Motion**" has the meaning specified in the recitals hereto.

1.2     Financial Reporting.

Except for professional fee accruals, all financial reporting to the Builder Lenders and the Agent pursuant to Section 6.1 hereof shall be made on a cash flow basis, unless otherwise specifically noted by the Trustee.  The Trustee shall comply with the U.S. Trustee Guidelines in connection with financial reports filed in the Chapter 11 Case.

1.3     Terms Generally.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument, or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements, or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits, and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect, and such words shall refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal, or mixed, and whether tangible or intangible, and (f) the term "financial statements" shall include the accompanying notes and schedules.

2. LOAN AND TERMS OF PAYMENT.

    2.1   <u>Credit Extensions</u>.

        (a)   Promise to Pay.

Subject to the terms and conditions of this Agreement and the other Loan Documents (including the absence of any Default or event that, with the passage of time, would become a Default), the Builder Lenders agree to make Loans to the Trustee, on behalf of the Estate, as set forth below prior to the Maturity Date. The Trustee on behalf of the Estate promises to pay to the Builder Lenders on the Maturity Date, or such earlier date as specified herein, in cash, the aggregate unpaid principal amount of all Loans made by the Builder Lenders to the Trustee, together with any accrued and unpaid Default Rate Interest and other unpaid Obligations in accordance with the terms of this Agreement and the other Loan Documents and the Final Financing Order.

        (b)   Loans.

           (i)   <u>Interim Closing Amount</u>.

Subject to the terms and conditions of this Agreement and the other Loan Documents (including the absence of any Default or event that, with the passage of time, would become a Default), and upon the Interim Closing Date, the Trustee may request Loans in an initial aggregate amount not to exceed $4 million for the purpose of funding those expenses in the Budget that are expressly identified as being payable pursuant to the Interim Financing Order.

(ii)    <u>Final Closing Amount</u>.

Subject to the terms and conditions of this Agreement and the other Loan Documents (including the absence of any Default or event that, with the passage of time, would become a Default), and upon the Final Closing Date, the Trustee may request Loans from time to time in an amount such that the total Loans outstanding at any time shall not exceed the aggregate of (x) the next applicable weekly "Ending Balance – TIP Loan" on the Budget, plus (y) any revenue or receipt projected through such applicable weekly "Ending Balance – TIP Loan" on the Budget that has not been received by the Trustee or the Estate at such time, less (z) any expense projected through such applicable weekly "Ending Balance – TIP Loan" that has not been paid at such time.  Subject to the terms of this Agreement and the other Loan Documents (including the Budget), the Loans shall be revolving Loans from which the Trustee may make draws from time to time in accordance with the Budget and without further approval of the Builder Lenders or the Agent.

(iii)    <u>Form of Loan Request</u>.

When the Trustee desires to obtain a Loan, the Trustee shall notify the Builder Lenders and the Agent (which notice shall be irrevocable) by electronic mail to be received no later than 3:00 p.m. Pacific Time three Business Days before the day on which the Loan is to be made, which Loan shall be made by wire transfer from the Term Sheet Escrow (or, following the Maturity Date with respect to Section 15 Advances only, the Builder Lenders' Account) to the Trustee as the Trustee directs.  Such notice (a "**Notice of Borrowing**") shall be in the form reasonably acceptable to the Trustee, the Builder Lenders, and the Agent.  The Notice of Borrowing shall be signed by the Trustee.

2.2    <u>Interest Rates and Calculations</u>.

(a)    Interest.

The Loans shall be without interest, unless and until a Default or the Maturity Date, at which time interest will accrue and be payable at the Default Rate.

(b)    Default Rate and Fees.

Upon the occurrence and during the continuance of a Default, (i) the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities, or any other Obligations of the Trustee under this Agreement or the other Loan Documents, shall bear interest from the date such Default occurs until all Obligations are paid in full at the prime rate (as quoted in the Wall Street Journal) plus five percent, per annum**,** and (ii) the Builder Lenders shall be reimbursed for all of their reasonable attorneys' fees and expenses relating to enforcement of the Builder Lenders' rights with respect to the Loans and other Obligations.

(c)    Computation.

All interest and fees chargeable under this Agreement and the other Loan Documents shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed, and compounded monthly.

2.3    Payments.

(a)    Time of Payments.

The Trustee shall make any payment under this Agreement not later than 1:00 p.m. Pacific Time on the day when due, in cash or other immediately available funds. All payments received after 4:00 p.m. Pacific Time on any Business Day will be credited on the next succeeding Business Day. All payments shall be made by the Trustee without setoff, counterclaim, deduction, or other defense of any kind, including any assertion by the Trustee or the Estate for capital contributions or other alleged obligations of the Settling Builders to the Estate. Whenever any payment made under this Agreement and the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

(b)    Location of Payments.

Prior to the Maturity Date, all payments shall be made to the Term Sheet Escrow. After the Maturity Date, and provided that all distributions from the Term Sheet Escrow to the Agent as required by the Plan Support Agreement have been made, all payments shall be made to the Builder Lenders' Account; provided, however, that if all or any of such distributions to the Agent have not been made, the Trustee shall continue to make payments to the Term Sheet Escrow until such required distributions to the Agent have been fully funded. Following the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), the Builder Lenders shall maintain a balance in the Builder Lenders' Account equal to the lesser of (i) $2 million or (ii) such amounts as the Builder Lenders reasonably conclude may have to be advanced in order to make the Section 15 Advances; provided, however, that prior to making any such reduction, the Builder Lenders shall give the Trustee five Business Days advance notice, and the Builder Lenders shall consent to an expedited hearing in the Bankruptcy Court for the resolution of any dispute concerning any such proposed reduction. Any amounts in the Builder Lenders' Account shall not be subject to attachment, setoff, or counterclaim of any kind, including any assertion by the Trustee or the Estate for capital contributions or other alleged obligations of the Settling Builders to South Edge or the Estate.

2.4    Term.

This Agreement shall become effective on the Interim Closing Date and shall continue in full force and effect for so long as any Obligations remain outstanding or the Builder Lenders have any obligation to make Loans under this Agreement. Notwithstanding the foregoing (and except as provided for Section 15 Advances), the Builder Lenders' obligation to make Loans shall terminate upon the Maturity Date, and prior to the Maturity Date, the Builder Lenders shall have the right to terminate their

obligation to make Loans under this Agreement immediately and without further notice upon the occurrence of a Default.

2.5    Revolving Loan.

The Trustee shall repay with receipts received by the Trustee, without penalty or premium, the outstanding principal of Loan, in whole or in part, in such amount that, at the end of each week leaves the Trustee holding no more than $1,000,000 plus amounts projected to be paid, less any revenues or receipts projected to be received, through the next applicable three-week period in the Budget.  Upon such repayment, such amounts shall be available thereafter for further draw by the Trustee pursuant to the Budget and Section 2.1(b)(ii) hereof.

2.6    Use of Proceeds.

(a)    Generally.

The Trustee shall use the Loan proceeds to finance chapter 11 administrative expenses including LID assessments and segment project costs, taxes, the fees and expenses of the Trustee and her professionals in such amounts as are required to be paid on an interim and final basis, and other allowed administrative expenses, in accordance with the Budget and for such purposes and in such amounts as are set forth in the Budget, subject to Section 2.6(b) below; provided, however, that with respect to interim fees, the allowed fees and expenses shall not exceed the amount of unpaid fees and expenses for the full Budget period.

(b)    Deviation.

The Trustee, the Builder Lenders, and the Agent shall work diligently and in good faith with respect to any modifications to the Budget requested by the Trustee and to resolve any disputes that may exist with respect to deviations from the Budget, and the Trustee, the Builder Lenders, and the Agent shall consent to an expedited hearing in the Bankruptcy Court for the resolution of any such disputes.

Upon at least five Business Days advance notice to the Builder Lenders and the Agent (except with respect to the payment of the fees of the Trustee and the Trustee's professionals, which shall be only in such amounts as are set forth in the Budget), the Trustee may use the Loan proceeds for such other purposes and in such other amounts as are  (x) reasonably consistent with the Budget, (y) commercially reasonable, or (z) essential to protect the Estate's assets.   Notwithstanding the foregoing notice requirement, the Trustee shall only be required to provide such notice as is reasonably practicable in the event of exigent circumstances that pose an immediate and irreparable threat to the Estate.

(c)    LID Segment Construction.

The Trustee shall confer in advance with the Builder Lenders and the Agent regarding anticipated draws with respect to all LID segment construction provided for in the Budget, including drainage-related construction expenses.

(d)     Professionals.

The inclusion of fees and expenses of the Trustee and her professionals in the Budget are without prejudice to the rights of all parties in the Chapter 11 Case with respect to timely objection to the allowance of such fees and expenses.

2.7     Section 15 Advances.

Notwithstanding the occurrence of the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), unless the Trustee has failed to act diligently and in good faith to comply with this Agreement, the Builder Lenders shall advance to the Trustee the Section 15 Advances.  Without the need for any further Bankruptcy Court order, such Section 15 Advances shall be Superpriority Claims secured by a first priority priming lien on the Collateral pursuant to Bankruptcy Code section 364(d) in the same manner as all other Obligations hereunder, shall accrue interest at the Default Rate, and shall be repaid by the Trustee or the Estate from and upon the earlier of (i) the receipt of any additional LID proceeds by the Trustee or the Estate, (ii) subject to the Agent's prior perfected lien and on terms acceptable to the Agent, such of the funds in the disputed MI Deposit Account as are determined to be property of the Estate (in such amounts and at such times as received by the Trustee or the Estate, until the Section 15 Advances are paid in full), (iii) the obtaining of any alternative section 364 financing, (iv) subject to the Agent's prior perfected lien and on terms acceptable to the Agent, the proceeds of the sale of substantially all of the assets of the Estate, (v) distributions pursuant to a plan of reorganization upon its effective date, or (vi) funds otherwise available for such application upon the conversion or dismissal of the Chapter 11 Case, under the terms hereof.

2.8     Source of Loans.

All Loans under this Agreement shall be funded from the Term Sheet Escrow, except to the extent that loans from the Builder Lenders' Account are required to fund the Section 15 Advances upon the Maturity Date.  The rights and obligations of each of the Builder Lenders under this Agreement are several, in the percentages set forth in Exhibit "1" to the plan term sheet that is a part of the Plan Support Agreement.

3.     ALLOWANCE AND PRIORITY OF CLAIMS

Upon entry of the Interim Financing Order or the Final Financing Order, as the case may be, the Obligations of the Trustee and of South Edge and its Estate hereunder shall at all times constitute allowed Superpriority Claims under the terms hereof.

4.    SECURITY INTEREST IN FAVOR OF LENDERS

4.1    Security Interest in Collateral.

As security for the Loans and all other Obligations, the Trustee on behalf of South Edge and its Estate hereby pledges, assigns, and grants to the Builder Lenders first priority priming liens on all of the Collateral.  Except as set forth herein with respect to the Collateral, the Agent's liens in and to the Debtor's and the Estate's assets granted to the Agent for itself and the benefit of the Lenders in accordance with the terms of the Cash Collateral Order and the first priority status thereof, shall be unaffected by the terms of this Agreement, the Interim Financing Order, and the Final Financing Order and shall remain in full force and effect.

4.2    Priority of Builder Lenders' and Agent's Security Interests.

The Builder Lenders' liens on the Collateral shall be senior to all other liens, encumbrances, and other interests in such Collateral pursuant to Bankruptcy Code section 364(d)(1), including any lien or other encumbrances of the Agent under the Prepetition Credit Agreement or under prior orders of the Bankruptcy Court, except that (i) the Agent shall be granted a second priority lien on all Collateral and a first priority lien in all other assets of the Estate, other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, in accordance with Agent's Adequate Protection Lien for any diminution of the value of the Agent's interest in the Collateral resulting from the use of the Collateral and the imposition of the automatic stay, and (ii) the Permitted Liens, if any, may be senior to the Builder Lenders' liens, but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code.  The Builder Lenders' liens on the Collateral shall not be subject to surcharge under Bankruptcy Code section 506(c) or otherwise.

4.3    Preservation of Collateral; Perfection of Builder Lenders' Security Interest and Agent's Security Interest.

The Builder Lenders' and Agent's liens on the Collateral shall be deemed perfected with no need for the Trustee to execute any additional documents or of recordation.  Notwithstanding the foregoing, the Trustee shall, at the Builder Lenders' request, or Agent's request, at any time and from time to time, execute and deliver to the Builder Lenders or Agent such security agreements, mortgages, financing statements, documents, and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed reasonably necessary or desirable by the Builder Lenders or Agent) and do such other acts and things as the Builder Lenders or Agent may deem necessary or desirable in order to establish and maintain the validity, attachment, and perfection of the Builder Lenders' liens or Agent's liens (free and clear of all other liens, claims, and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Permitted Liens).  The Trustee irrevocably hereby makes, constitutes, and appoints the Builder Lenders and Agent (and all Persons designated by the Builder Lenders or Agent for that purpose) as the Trustee's true and lawful attorney and agent-in-

fact to execute such security agreements, mortgages, financing statements, documents, and other agreements and instruments and do such other acts and things as may be necessary or appropriate to preserve and perfect the Builder Lenders' liens or Agent's liens on the Collateral. The Trustee further agrees that a carbon, photographic, photostatic, or other reproduction of this Agreement, the Financing Orders, or of a financing statement shall be sufficient as a financing statement.

5.    CONDITIONS OF LOANS

    5.1    Conditions Precedent to all Loans.

    The obligation of the Builder Lenders, if any, to make any Loan is subject to the satisfaction of the following conditions precedent (or the express prior waiver thereof by the Builder Lenders, which shall be in writing and subject to the Builder Lenders' sole and absolute discretion):

        (a)    Interim Financing Order.

    The Bankruptcy Court shall have entered, and the Builder Lenders and the Agent shall have received a true copy of, an order in substantially the form of Exhibit "B" attached hereto, with only such changes as the Builder Lenders and Agent have approved in their sole and absolute discretion, approving on an interim basis pursuant to Bankruptcy Rule 4001(c)(2) this Agreement and the other Loan Documents, the granting the Superpriority Claim status, the Builder Lenders' first priority liens on the Collateral, and the Agent's second priority Adequate Protection Liens on the Collateral and first priority Adequate Protection Lien on the Estate's other assets other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, and subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code, which Interim Financing Order (i) shall have been entered upon motion of the Trustee in form and substance acceptable to the Builder Lenders and the Agent, (ii) shall be in full force and effect, (iii) shall not have been stayed, revoked, reversed, modified, or amended in any respect, and (iv) shall include full Bankruptcy Code section 364(e) findings and protections for the Builder Lenders and the Agent;

        (b)    Delivery of Documents.

    The Builder Lenders shall have received from the Trustee the following documents in each case duly executed by the Trustee: (i) this Agreement; (ii) a promissory note (the "**Revolving Note**") in form and substance satisfactory to the Builder Lenders in their sole and absolute discretion; and (iii) such other Loan Documents (including UCC financing statements) as shall reasonably be requested by the Builder Lenders; and the Agent shall have received copies of each of the foregoing;

        (c)    Notice of Borrowing.

The Builder Lenders shall have timely received from the Trustee a duly executed Notice of Borrowing;

(d)    No Default.

No Default or event that, with the passage of any applicable cure period, would become a Default, shall have occurred and be continuing;

(e)    No Maturity.

The Maturity Date shall not have occurred; provided, however, that notwithstanding the passage of the Maturity Date, the Builder Lenders' shall, subject to the terms of Section 2.7 hereof, make the Section 15 Advances if and to the extent required hereunder; and

(f)    Final Financing Order.

Except for those operating expenses which are expressly indicated on the Budget as being payable following entry of the Interim Financing Order (in an amount not to exceed $4 million), on or before August 12, 2011, the Bankruptcy Court shall have entered, and the Builder Lenders and the Agent shall have received a true copy of, an order in substantially the form of Exhibit "B" attached hereto (modified to be a final order), with only such changes as the Builder Lenders and the Agent have approved in their sole and absolute discretion, approving on a final basis this Agreement and the other Loan Documents, the granting of the Superpriority Claim status, and the Builder Lenders' first priority liens on the Collateral, the Agent's second priority Adequate Protection Liens on the Collateral, and first priority Adequate Protection Lien on the Estate's other assets other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, and subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code, which Final Financing Order (i) shall have been entered upon motion of the Trustee in form and substance acceptable to the Builder Lenders and the Agent, (ii) shall be in full force and effect, (iii) shall not have been stayed, revoked, reversed, modified, or amended in any respect, and (iv) shall include full Bankruptcy Code section 364(e) findings and protections for the Builder Lenders.

6.    REPRESENTATIONS AND WARRANTIES.

The Trustee hereby represents and warrants to the Builder Lenders the following statements to be true and correct as of each Closing Date and of each date that a Notice of Borrowing is submitted:

6.1    Authority.

The Trustee (i) is the duly appointed chapter 11 trustee of South Edge, (ii) has all requisite power and authority to conduct the business of South Edge as now conducted and as presently contemplated and, (iii) subject to the entry and the terms of the Interim Financing Order or the Final Financing Order, as the case may be, has the authority to make the borrowings hereunder, and to execute and deliver each Loan Document to which she is a party, and to consummate the transactions contemplated thereby.

      6.2    <u>Execution and Binding Effect</u>.

Subject to the entry and the terms of the Interim Financing Order or the Final Financing Order, as the case may be, this Agreement and each of the other Loan Documents when delivered hereunder is or will be duly and validly executed and delivered by the Trustee and constitutes legal, valid, and binding obligations of the Trustee and of South Edge and its Estate, enforceable in accordance with the terms hereof or thereof, and binding upon any successor to the Trustee (including any chapter 7 trustee for South Edge).

      6.3    <u>No Default</u>.

No Default or event that, with the passage of the applicable cure period would become a Default, exists.

7.    AFFIRMATIVE COVENANTS.

Until payment in full of all outstanding Obligations, and for so long as the Builder Lenders may have any commitment to make any Loans hereunder (including the Section 15 Advances), the Trustee shall do all of the following:

      7.1    <u>Financial Reporting</u>.

The Trustee, or any of her retained advisors, shall provide to the Builder Lenders and the Agent the following:

      (i)    copies of the monthly operating reports filed in the Chapter 11 Case, and all other financial reports required to be prepared by the United States Trustee Guidelines or otherwise prepared by the Trustee and filed in the Chapter 11 Case;

      (ii)    copies by electronic mail or paper service of all pleadings, motions, applications, reports, or other documents filed by or on behalf of the Trustee with the Bankruptcy Court or the Office of the United States Trustee;

(iii)   every two weeks, (x) a reconciliation report comparing actual cash flows and accrued professionals fees and expenses (including summary, mid-month reports by the Trustee's principal professionals) versus the Budget, with explanations of any material variances, and (y) a summary statement of cash balances and accrued accounts payable, each to be provided to the Builder Lenders within 14 days after the end of each two-week period; and

(iv)   copies of all documents relating to the LID segments that the Trustee submits to either Gomez or the City of Henderson in order to have the completed LID projects approved and submitted for reimbursement, and a weekly update, either written or oral, summarizing the progress on current LID segment projects, which update shall include the following information: (1) summary of meetings with representatives from the City of Henderson or other governmental entities, (2) expenditures, (3) status of pending approvals from both Gomez and the City of Henderson for completed projects, (4) any updates on imminent overruns or delays, and (5) the status of the reimbursement on prior LID projects.

7.2   Books and Records.

The Trustee shall maintain books of account and other records for South Edge and for disbursement and use of the proceeds of the Loan, and the same shall be available for inspection and copying by the Builder Lenders and the Agent upon reasonable prior notice.  The Trustee shall use her best efforts to obtain all remaining South Edge books and records that are in the possession of the former manager of South Edge and its affiliates.

7.3   Use of Proceeds.

The Trustee shall use the loan proceeds to finance allowed administrative expenses of the Chapter 11 Case solely in accordance with the Budget and Sections 2.6 and 2.7 hereof.

7.4   Cooperation and Consultation.

Subject to the execution of reasonable confidentiality and/or common interest agreements, and further subject to the terms of the Trustee's Consent, the Trustee shall consult in advance with the Builder Lenders and the Agent regarding the administration of the Estate, including (i) the prosecution of claims on behalf of the Estate and the incurrence of material fees and expenses in connection therewith, (ii) claims objections, (iii) restructuring, planning, or development proposals to the City of Henderson, other governmental entities, and holders of bonds issued in connection with LID, and (iv) other

matters affecting the administration of the Estate. The Trustee shall make available to the Builder Lenders and Agent, upon reasonable notice, access to all plans, reports, records, and other non-privileged documentation (including records relating to prevailing wage compliance) relating to LID segment work and other projects within South Edge's development.

8.    NEGATIVE COVENANTS.

Until payment in full of all outstanding Obligations, and for so long as Builder Lenders may have any commitment to make any Loans hereunder, the Trustee shall not do any of the following without Builder Lenders' prior written consent; provided, however, that Sections 8.3, 8.5, 8.6, and 8.7 shall not apply upon the occurrence of a Maturity Date (other than as a result of the effective date of a Plan of Reorganization), but in no event shall funds advanced by the Builder Lenders be used (x) to fund the pursuit or investigation of any claims against the Builder Lenders, the Settling Builders, or their insiders or affiliates, or (y) to oppose the Plan of Reorganization:

8.1    Superpriority Claims/Senior Liens.

Apply to the Bankruptcy Court for the authority to incur, create, assume, suffer to exist, or permit, or incur, create, assume, suffer to exist, or permit, any other Superpriority Claim, lien, or encumbrance that is either (i) pari passu with or senior to the liens or claims of the Builder Lenders with respect to the Collateral, except for the Permitted Liens, or (ii) pari passu with or senior to the Superpriority Claim with respect to any unencumbered assets of the Estate; provided, however, that this Section shall not apply if one of the purposes of such application is to provide for the immediate satisfaction, in full and in cash, of all outstanding Obligations.

8.2    Financing Orders.

At any time, seek or consent to any revocation, reversal, modification, vacation, or staying of the Financing Orders, except as may be agreed by the Builder Lenders and the Agent in their sole and absolute discretion.

8.3    Deviation from Budget.

Accrue, incur, or pay any expense that is not provided for in the Budget, or permit any of the forgoing to occur, except as may be agreed by the Builder Lenders and the Agent, in their sole and absolute discretion, or as permitted pursuant to Section 2.6 hereof.

8.4    Protection of Collateral.

Compromise, settle, release, or otherwise cause or permit the modification of any rights of the Trustee, South Edge, the Estate, or the Builder Lenders in and to the Collateral.

8.5    Significant Transactions.

Approve, file, support, or consent to any of the following that is not approved by the Builder Lenders, in their sole and absolute discretion: (i) a plan of reorganization in the Chapter 11 Case; (ii) a sale or compromise of material assets of South Edge or its Estate (the term "material" includes the sale or other transfer of any real property, and the settlement of any claims by or against members and former members of South Edge and their insiders or affiliates); (iii) the allowance of any claims against South Edge or its Estate in excess of $25,000 other than such claims as appear in the Schedules of Assets and Liabilities of South Edge previously filed by the Trustee in the Chapter 11 Case that were not scheduled as disputed, contingent or unliquidated, and for which no proof of claim was filed by such claimant; (iv) the entry into any contract with a total cost to South Edge or the Estate in excess of $25,000; provided, however, that if the contract relates to an expenditure which has been set forth in the Budget, and if each of the Builder Lenders is given an equal opportunity to bid on the contract, and either (x) all Builder Lenders choose not to bid, or (y) none of the bids by any of the Builder Lenders is the lowest bid, then written consent from the Builder Lenders shall not be required for such contract if such contract is commercially reasonable; (v) material amendments to plans, permits, or specifications for any improvements to South Edge's property; or (vi) amendments to South Edge's Development Plan, Acquisition Agreement, or other material agreements with or relating to the City of Henderson or the LID, or other governmental entities; provided, however, "iii", "v", and "vi" above shall also require the approval of the Agent in its sole and absolute discretion. In connection with "iv" above, the Trustee and her representatives will only be required to deal with a single representative to be appointed by the Builder Lenders. The Builder Lenders' representative will coordinate any bids from the Builder Lenders, and/or their subcontractors.

8.6     Litigation Against Builder Lenders.

File or pursue any litigation or other claims against the Builder Lenders, the Settling Builders, or their insiders or affiliates, except with respect to actions to interpret or enforce the Trustee's rights under this Agreement.

8.7     Trustee Consent.

Unless the Trustee's Consent has been terminated in accordance with the limitations and qualifications set forth therein, take any action that is inconsistent with the Trustee Consent, including objecting to or otherwise opposing confirmation of the Plan of Reorganization.

9.     DEFAULTS.

Any one or more of the following events shall constitute a Default under this Agreement and the other Loan Documents:

(a)     the Trustee's failure to pay when due any monetary sum payable under this Agreement or any of the other Loan Documents, and such failure to pay

continues for two Business Days after written notice by Builder Lenders to the Trustee that such sum is due and payable;

(b)    other than a monetary default of the type specified in Section 9.1(a), the Trustee's failure to perform, observe, or otherwise comply with any material term, condition, affirmative or negative covenant, or other agreement contained in this Agreement or in any of the other Loan Documents, and as to any such default that can be cured, the Trustee has failed to cure such default within five Business Days after the Trustee receives notice thereof from the Builder Lenders;

(c)    any representation or warranty made by the Trustee hereunder shall be untrue and, as to any such default that can be cured by the Trustee, the Trustee has failed to cure such default within five Business Days after the Trustee receives notice thereof from the Builder Lenders;

(d)    an order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

(e)    the Trustee shall take any actions that are inconsistent with the Trustee's Consent, which actions are not revoked or annulled within five Business Days after the Trustee receives notice thereof from the Builder Lenders;

(f)    an order shall be entered dismissing the Chapter 11 Case and such order does not provide for termination of the commitment hereunder and under the other Loan Documents, and for the immediate payment in full in cash of all Obligations hereunder and under the other Loan Documents; or

(g)    an order shall be entered, without the express prior written consent of the Builder Lenders, to revoke, reverse, modify, stay, or vacate the Financing Orders.

10.    LENDERS' RIGHTS AND REMEDIES.

10.1    Remedies Generally.

Upon the occurrence of a Default, the Builder Lenders may immediately, upon giving notice to the Trustee, (a) in addition to the Builder Lenders' rights under Section 5.1(d) hereof, cease to make any Loans under this Agreement or any other Loan Document (other than the Section 15 Advances if and to the extent required hereunder), (b) declare all or any portion of the Loans and all other outstanding Obligations to be due and payable immediately, without further order of, or application to, the Bankruptcy Court, and without presentment, demand, or protest, all of which are hereby expressly waived by the Trustee, (c) subject to the following Sections 10.2 and 10.3 below, exercise any and all of its other rights and remedies under applicable law (including, but not limited to, the Bankruptcy Code), this Agreement, and the other Loan Documents, for the purpose of seeking and expediting repayment of all outstanding Obligations from the Collateral consistent with the provisions of section 9-607 of the UCC, and (d) the right (but not the obligation) to pay outstanding invoices, satisfy LID-related assessments and

property taxes, and make other protective advances to the Trustee to enable her to complete LID segment construction and submit related documentation to collect LID Proceeds and apply them in reduction of any outstanding Loans and other Obligations, and additionally, upon 30 days after delivery of such notice if the Trustee has insufficient funds or financing available to enable her to do so, actually complete LID segment construction within or outside of South Edge's development (provided the Builder Lenders will consult on an ongoing basis with the Agent with respect to all contemplated and ongoing projects), and submit related documentation to collect LID Proceeds and apply them in reduction of any outstanding Loans and other Obligations (the "Builder Lenders' LID Remedy"); provided, however, that the Builder Lenders shall not be entitled to foreclose upon the Collateral or any of the other assets of the Estate.

In furtherance of the Builder Lenders' right to be repaid the Obligations in full immediately upon the occurrence of a Default (and without in any way limiting the rights of the Builder Lenders set forth in the remainder of this Section 10.1 or otherwise in this Agreement), and subject to the Trustee's retention of $150,000 in cash to be used to satisfy essential post-Default chapter 11 administrative expenses consistent with the Budget (excluding LID work or the Trustee's fees or the fees of her professionals) through a date that is the earlier of (i) thirty days after notice to the Trustee of the Default or (ii) the approval by the Bankruptcy Court of Bankruptcy Code section 364 borrowings from any source other than the Builder Lenders, the following funds must be used to repay the Builder Lenders following a Default, without any offset or delay of any kind whatsoever: (x) any unencumbered cash held by the Trustee as of the Maturity Date (to the extent such cash is not applied to Section 15 Advances), (y) LID proceeds in the possession of the Trustee that constitute the Builder Lenders' cash collateral, and (z) any proceeds of subsequent Bankruptcy Code section 364 borrowings from any source.

10.2    Relief from the Automatic Stay.

With respect to relief from the automatic stay of Bankruptcy Code section 362, the Financing Orders shall provide that if a Default occurs, then (i) the Builder Lenders may set an expedited hearing for relief from the automatic stay on not less than three Business Days' notice and at such hearing the only issues will be (x) whether an uncured Default exists, and (y) whether the Bankruptcy Court may impose any condition on the exercise of the Builder Lenders' remedies (which condition the Builder Lenders may oppose), so long as such condition does not delay the Builder Lenders' exercise of remedies for more than 30 days and otherwise does not impair the interests of the Builder Lenders in their Collateral hereunder; and (ii) consistent with the Bankruptcy Court's determination as to "i" above, the Builder Lenders shall be granted relief from stay if an uncured Default is found to exist.

10.3    Modification of the Automatic Stay.

Subject to Sections 10.1 and 10.2 of this Agreement, upon entry of the Interim Financing Order or the Final Financing Order, as the case may be:

(a)     the automatic stay provisions of Bankruptcy Code section 362 shall be vacated and modified to the extent necessary to permit the Builder Lenders to exercise all rights afforded to them hereunder and to effectuate the provisions of this Agreement and the Financing Orders, without the need for filing further pleadings or application to or order of the Bankruptcy Court; and

(b)     no party in interest shall have the right to contest the enforcement of the remedies set forth in this Agreement on any basis other than the fact that a Default has not occurred.  No party in interest shall have the right to seek injunctive relief against such enforcement under Bankruptcy Code section 105 or otherwise, or to seek injunctive relief in conflict with the provisions of this Agreement or the Financing Orders.

11.    NOTICES.

Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement and the other Loan Documents and/or any other agreement entered into in connection herewith shall be in writing and (except for informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by a recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, or by facsimile or electronic mail to the Trustee, the Builder Lenders, or the Agent, as the case may be, at its addresses set forth below:

| | |
|---|---|
| If to Trustee: | SOUTH EDGE, LLC.<br>c/o FTI Consulting, Inc.,<br>633 West 5th Street<br>Suite 1600<br>Los Angeles, CA 90071<br>Attn:  Cynthia Nelson<br>FAX:  (213) 452-6099<br>Email:  Cynthia.nelson@fticonsulting.com |
| with a copy to: | MILBANK, TWEED, HADLEY, & MCCLOY LLP<br>601 South Figueroa Street, 30th Floor<br>Los Angeles, CA  90017<br>Attn:  Robert J. Moore, Esq.<br>Attn:  David B. Zolkin, Esq.<br>FAX:  (213) 629-5063<br>Email: rmoore@milbank.com<br>Email: dzolkin@milbank.com |
| If to Builder Lenders: | KB HOME NV ACQUISITION LLC<br>c/o KB Home<br>Attn:  Albert Praw and Ross Kay<br>10990 Wilshire Boulevard, Floor 7<br>Los Angeles, CA  90024<br>FAX: (310) 231-4280<br>Email: apraw-x@kbhome.com |

#4849-9634-1513                                22

Email: RKay@kbhome.com

TOLL HENDERSON II LLC
c/o Toll Brothers, Inc.
Attn:  Mark J. Warshauer
Vice President and Counsel
Toll Brothers, Inc.
250 Gibraltar Road
Horsham, PA 19044
FAX: 215-938-8260
Email: mwarshauer@tollbrothersinc.com

Kristine Maciolek Small, Esquire
Assistant Vice President
Toll Brothers, Inc.
250 Gibraltar Road
Horsham, PA 19044
FAX: (215) 938-8255
Email: kmacioleksmall@tollbrothersinc.com

TRINITY HOMES, LLC
c/o Beazer Homes Holdings Corp.
1000 Abernathy Road #1200
Atlanta, GA  30328
FAX: (770) 350-4337
Email: kkhoury@beazer.com

PARDEE HOMES
Attn:  Christopher J. Hallman, Esq.
Senior Vice President, General Counsel
10880 Wilshire Blvd, Suite 1900
Los Angeles, CA 90024
FAX: (253) 446-1292
Email: chris.hallman@pardeehomes.com

with a copy to:          STUTMAN, TREISTER & GLATT P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA  90067
Attn:  K. John Shaffer, Esq.
Attn: Robert A. Greenfield, Esq.
Attn: Anthony Arnold, Esq.
FAX:  (310) 228-5788
Email: jshaffer@stutman.com
Email: rgreenfield@stutman.com
Email: aarnold@stutman.com

If to Agent:                JPMorgan Chase Bank, N.A.
                            383 Madison Avenue, 23rd Floor
                            New York, NY 10179
                            Attn: William A. Austin
                            FAX: (212) 622-4556
                            Email: William.A.Austin@jpmchase.com

with a copy to:             Morrison & Foerster LLP
                            425 Market Street
                            San Francisco, CA 94105
                            Attn: G. Larry Engel, Esq.
                            FAX: (415) 268-7522
                            Email: lengel@mofo.com

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

12.     CHOICE OF LAW AND VENUE: JURY TRIAL WAIVER.

        THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF NEVADA, EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE AND EXCEPT AS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE TRUSTEE HEREBY IRREVOCABLY ACCEPTS, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT. THE UNDERSIGNED ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES. TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY LOAN DOCUMENT.

13.     GENERAL PROVISIONS.

        13.1    Binding Effect.

        This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of the Trustee and the Builder Lenders, and their successors and assigns.

        13.2    Time of Essence.

Time is of the essence for the performance of all obligations set forth in this Agreement.

13.3    Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

13.4    Amendments in Writing, Integration.

All future amendments to or terminations of this Agreement or the other Loan Documents must be in writing. All prior agreements, understandings, representations, warranties, and negotiations between the parties hereto with respect to the subject matter of this Agreement and the other Loan Documents, if any, are merged into this Agreement and the Loan Documents. This Agreement and its Exhibits are the entire agreement between the Trustee and the Builder Lenders with regard to the obligations and terms of any loans now or hereafter outstanding hereunder.

13.5    Counterparts.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.

13.6    Survival.

Except as otherwise provided herein, all covenants, representations, and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding.

*[Remainder of this page left intentionally blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**TRUSTEE**:

**CYNTHIA NELSON, NOT IN HER INDIVIDUAL CAPACITY, BUT SOLELY IN HER CAPACITY AS THE CHAPTER 11 TRUSTEE OF SOUTH EDGE, LLC, ON BEHALF OF SOUTH EDGE AND ITS BANKRUPTCY ESTATE**

By:_____
      Cynthia Nelson:
      Title: Chapter 11 Trustee for South Edge, LLC

**BUILDER LENDERS**:

**KB HOME NV ACQUISITION LLC**

By:_____
　　　Name:
　　　Title:

**TOLL HENDERSON II LLC**

By:_____
　　　Name:
　　　Title:

**TRINITY HOMES, LLC**

By:_____
　　　Name:
　　　Title:

**PARDEE HOMES**

By:_____
　　　Name:
　　　Title:

**EXHIBIT A**

**South Edge, LLC**
**19-Week Cash Flow Forecast**
**Beginning July 21 - November 25, 2011**

*South Edge Preliminary Budget (circulated July 7)*

| Cash Receipts and Disbursements | WE (7/21 - 7/22) Forecast | Forecast 7/29/2011 | Forecast 8/5/2011 | Forecast 8/12/2011 | Forecast 8/19/2011 | Forecast 8/26/2011 | Forecast 9/2/2011 | Forecast 9/9/2011 | Forecast 9/16/2011 | Forecast 9/23/2011 | Forecast 9/30/2011 | Forecast 10/7/2011 | Forecast 10/14/2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | |
| Net LID T-18 Acquisition Payments (1) | | | | 9,315,149 | | 3,242,888 | | 782,221 | | 801,144 | | | 1,093,755 |
| Trustee in Possession Loan Draw (2) | 3,581,576 | | | | | | | | | | | | |
| Miscellaneous Deposits | | | | | | | | | | | | | |
| **TOTAL CASH RECEIPTS** | **3,581,576** | **–** | **–** | **9,315,149** | **–** | **3,242,888** | **–** | **782,221** | **–** | **801,144** | **–** | **3,859,989** | **1,093,755** |
| **Disbursements** | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Accounting, Taxes, and Outside Counsel (3) | 5,500 | 5,500 | | 2,500 | | 5,300 | | 2,500 | | 2,500 | | 2,800 | 2,500 |
| Survey Bond Payments (8) | | | | 24,733 | | | | 1,302 | | | | | |
| HOA Subsidies (8) | | | 17,075 | | | | | | | | | | |
| Insurance (9) | | | | | | | | 19,856 | | | | | |
| LID Improvement Costs (4) | | | 60,000 | | | | | | | | | | |
| Other Construction Costs (5) | | | 60,000 | | | | | | | | | 10,000 | |
| Escrow for Unpaid Estate Professional Fees, Holdback (14) | | | | | | | | | | | | | |
| LID Reimbursement Administration (6) | | | | | | | | | | | | | |
| **Total Construction and Maintenance** | **5,500** | | | **27,233** | **104,800** | **5,300** | | **91,602** | **131,000** | **13,500** | **1,337,320** | **24,500** | **1,971,280** |
| Marketing and Advertising (10) | 100 | | 2,100 | 100 | 10,000 | 10,000 | 2,100 | 10,000 | | | 10,000 | | |
| General, Administrative and Operations (11) | 1,283 | | 17,075 | | | | | | | 11,000 | | 22,000 | |
| **Total Selling, General & Administrative** | **1,283** | **62,567** | **19,175** | | **100** | | **2,100** | **29,956** | **100** | **100** | **1,334,520** | **100** | **104,800** |
| Property Taxes (13) | 100 | 100 | 100 | 100 | 10,100 | 11,200 | 2,100 | 100 | 100 | 100 | 11,200 | 2,100 | 100 |
| LID T-18 Bond Assessments (12) | 2,317,522 | | | 266,238 | | 730,000 | | | | | 266,238 | | |
| **Total LID and Property Taxes** | 600,000 | | | 266,238 | | 390,000 | 390,000 | | | | 266,238 | | |
| **TOTAL OPERATING DISBURSEMENTS** | **145,881** | **3,903** | **3,959** | **293,571** | **114,900** | **16,500** | **2,100** | **121,758** | **131,100** | **13,600** | **157,283** | **154,257** | **1,971,380** |
| **Bankruptcy Related Disbursements** | | | | | | | | | | | | | |
| US Trustee Fees | | | | | | | | | | | | | |
| Repayment of Trustee in Possession Loan (2) | | | | | | | | | 782,221 | | | | |
| Estate Professional Fees (14) | | | | 3,687,100 | | 759,500 | | | | | 801,144 | | 20,000 |
| Estate Noticing Agent Fees (14) | | 10,000 | | | 10,000 | 10,000 | | 10,000 | | 11,000 | 729,750 | | 1,093,755 |
| Escrow for Estate Professional Fees, Holdback (14) | | | | | | | | | | | 10,000 | | |
| Lender Professional Fees (15) | 10,000 | | | 3,280,000 | 730,000 | 730,000 | | | | | 390,000 | | |
| Chapter 11 Trustee Hourly-Based Fee (estimated) | | | | | | | | | | | | | |
| Chapter 11 Trustee Fee Adat Compensation (to be discussed) | | | | | | | | | | | | | |
| **TOTAL BANKRUPTCY RELATED DISBURSEMENTS** | | **10,000** | | **6,947,100** | **1,495,500** | | | **782,221** | **782,221** | | **1,930,894** | | **1,113,755** |
| Contingency Provision (5% of Disbursements) | | | | | 5,745 | 75,800 | | | | 680 | 17,283 | 1,330 | 26,600 |
| **TOTAL DISBURSEMENTS** | **3,065,503** | **81,971** | **83,134** | **762,054** | **120,645** | **1,591,800** | **2,205** | **127,846** | **958,987** | **45,660** | **3,722,935** | **27,930** | **3,239,392** |
| **Net Cash Generated (Used)** | **518,073** | **(81,971)** | **(83,134)** | **1,712,445** | **(120,645)** | **(1,591,800)** | **3,240,683** | **(127,846)** | **(176,766)** | **(14,280)** | **(2,921,791)** | **3,832,059** | **(2,145,637)** |
| **Cumulative Net Cash Generated (Used)** | **518,073** | **436,103** | **352,969** | **2,065,414** | **1,944,769** | **352,969** | **3,593,652** | **3,465,806** | **3,289,040** | **3,274,760** | **352,969** | **4,185,028** | **2,039,392** |
| **Cash Rollforward** | | | | | | | | | | | | | |
| Beginning Balance - Total Cash | | 5,772,500 | 5,772,500 | 4,060,054 | 5,772,700 | 5,772,500 | 1,596,400 | 1,596,400 | 1,596,400 | 1,596,400 | 1,596,400 | 801,144 | 1,717,150 |
| Cash Used/(Generated) - Total Cash | 4,287,000 | 4,010,000 | 4,010,000 | 730,000 | 730,000 | 390,000 | 390,000 | 390,000 | 390,000 | 390,000 | 390,000 | 729,750 | 1,717,150 |
| **Ending Balance - Total Cash** | **3,280,000** | | | | | | | | | | | | |
| Beginning Balance - Encumbered Cash | | | | | | | | | | | | | |
| Receipts - Encumbered Cash | | 1,165,104 | 1,083,134 | 1,712,445 | 2,712,445 | 2,591,800 | 1,000,000 | 4,240,683 | 4,112,837 | 3,936,071 | 3,921,791 | 4,832,059 | 4,832,059 |
| (Disbursements) - Encumbered Cash | 647,031 | (81,971) | (83,134) | | (1,591,800) | 10,000 | 3,240,683 | (127,846) | (176,766) | (14,280) | (2,921,791) | 801,144 | 4,832,059 |
| **Ending Balance - Encumbered Cash** | **1,165,104** | **1,083,134** | **1,000,000** | **1,712,445** | **2,591,800** | **1,000,000** | **4,240,683** | **3,936,071** | **3,921,791** | **1,000,000** | **3,832,059** | **3,832,059** | **2,686,423** |
| Beginning Balance - Unencumbered Cash | 153,568 | 1,165,104 | 1,083,134 | 1,000,000 | 2,712,445 | 2,591,800 | 1,000,000 | 4,240,683 | 4,112,837 | 3,936,071 | 3,921,791 | 4,832,059 | 4,832,059 |
| Receipts - Unencumbered Cash | 3,581,576 | (81,971) | (83,134) | 9,315,149 | (120,645) | (1,591,800) | (2,205) | (127,846) | 782,221 | (14,280) | 801,144 | 3,859,989 | 4,832,059 |
| (Disbursements) - Unencumbered Cash | (2,570,040) | | (7,602,704) | (120,645) | | | | | (958,987) | | (3,722,935) | (27,930) | (3,239,392) |
| **Ending Balance - Unencumbered Cash** | **1,165,104** | **1,083,134** | **1,000,000** | **2,712,445** | **2,591,800** | **1,000,000** | **4,240,683** | **4,112,837** | **3,936,071** | **3,921,791** | **1,000,000** | **2,686,423** | |
| **Loan Rollforward** | | | | | | | | | | | | | |
| Beginning Balance - TIP Loan | | 3,581,576 | 3,581,576 | 3,581,576 | 12,896,725 | 12,896,725 | 12,896,725 | 16,139,613 | 16,139,613 | 15,357,392 | 15,357,392 | 14,556,249 | 18,416,238 |
| Draws | 3,581,576 | | | 9,315,149 | | | 3,242,888 | | | | | | |
| Repayments | (493,463) | | | | | | | | (782,221) | | (782,221) | | |
| **Ending Balance - TIP Loan** | **3,581,576** | **3,581,576** | **3,581,576** | **12,896,725** | **12,896,725** | **12,896,725** | **16,139,613** | **16,139,613** | **15,357,392** | **15,357,392** | **14,556,249** | **18,416,238** | **17,322,483** |

1

EXHIBIT A

**South Edge, LLC**
**19-Week Cash Flow Forecast**
**Beginning July 21 – November 25, 2011**

| Cash Receipts and Disbursements | Forecast 10/21/2011 | Forecast 10/28/2011 | Forecast 11/4/2011 | Forecast 11/11/2011 | Forecast 11/18/2011 | Forecast 11/25/2011 | Cumulative 19 Weeks |
|---|---|---|---|---|---|---|---|
| WE | 16 | 17 | 18 | 19 | | | 19 Weeks |
| **Receipts** | | | | | | | |
| Net LID T-18 Acquisition Payments (1) | | | | | | | 20,782,967 |
| Trustee in Possession Loan Draw (2) | | | | | | | 25,450,439 |
| Miscellaneous Deposits | - | - | - | - | - | - | - |
| **TOTAL CASH RECEIPTS** | - | 6,133,823 | 5,450,837 | 9,151,253 | - | 2,820,773 | 46,233,407 |
| **Disbursements** | | | | | | | |
| *Operating Disbursements* | | | | | | | |
| Security and Maintenance (3) | 2,500 | 3,000 | 2,500 | 2,500 | 2,500 | 1,600 | 35,700 |
| Surety Bond Payments | | | | | | | 39,811 |
| HOA Subsidies (8) | | 557,480 | | | | 131,000 | 3,879,480 |
| LID Improvement Costs (4) | | | | | | | 60,000 |
| Other Construction Costs (5) | | | | | | | 576,400 |
| Total Construction and Maintenance | 2,500 | 560,480 | 2,500 | | | 132,600 | 4,591,391 |
| LID Reimbursement Administration (6) | | | | | | | 37,075 |
| Accounting, Taxes, and Outside Legal (7) | | 10,000 | | | | | 111,283 |
| Insurance (9) | | | | | | | 19,656 |
| Marketing and Advertising (10) | | | | | | | 18,583 |
| General, Administrative and Operations (11) | 100 | 1,200 | 2,100 | | 100 | 4,300 | 186,798 |
| Total Selling, General & Administrative | 100 | 11,200 | 2,100 | | | 24,300 | 373,395 |
| LID 5/T-18 Bond Assessments (12) | | | | | | | 2,317,522 |
| Property Taxes (13) | | | | | | | 1,132,476 |
| Total LID and Property Taxes | - | - | - | - | | - | 3,449,998 |
| **TOTAL OPERATING DISBURSEMENTS** | 2,600 | 571,680 | 4,600 | 13,877 | 107,400 | 156,900 | 8,228,188 |
| *Bankruptcy Related Disbursements* | | | | | | | |
| US Trustee Fees | | | | | | | 30,000 |
| Repayment of Trustee in Possession Loan (2) | | 6,133,823 | | 9,151,253 | | 2,820,773 | 20,782,967 |
| Estate Professional Fees (14) | | 729,750 | | | | | 2,820,773 |
| Estate Noticing Agent Fees (14) | | 10,000 | | | | | 10,000 |
| Escrow for Unpaid Estate Professional Fees, Holdback (14) | | | | | | | 691,500 |
| Escrow for Estate Windown (14) | | | | | | | 1,906,900 |
| Lender Professional Fees (15) | | | | | | 1,906,900 | 200,000 |
| Chapter 11 Trustee Hourly-Based Fee (estimated) | | | | | | 200,000 | 1,500,000 |
| Chapter 11 Trustee Fee Adult Compensation (to be discussed) | | | | | | 1,500,000 | - |
| **TOTAL BANKRUPTCY RELATED DISBURSEMENTS** | - | 6,873,573 | - | 9,151,253 | - | 7,159,173 | 35,467,467 |
| *Contingency Provision (5% of Disbursements)* | 130 | 372,263 | 230 | 458,256 | 5,370 | 365,804 | 2,184,783 |
| **TOTAL DISBURSEMENTS** | 2,730 | 7,817,515 | 4,830 | 9,623,385 | 112,770 | 7,681,876 | 45,880,438 |
| **Net Cash Generated (Used)** | (2,730) | (1,683,693) | 5,446,007 | (472,133) | (112,770) | (4,861,104) | 352,969 |
| *Cumulative Net Cash Generated (Used)* | 2,036,662 | 352,969 | 5,798,976 | 5,326,843 | 5,214,073 | 352,969 | 352,969 |
| **Cash Rollforward** | | | | | | | |
| Beginning Balance - Total Cash | 2,686,423 | 2,683,693 | 1,000,000 | 6,446,007 | 5,973,874 | 5,861,104 | 2,686,423 |
| Cash Used/(Generated) - Total Cash | 2,730 | 1,683,693 | (5,446,007) | 472,133 | 112,770 | 4,861,104 | 1,686,423 |
| Ending Balance - Total Cash | 2,683,693 | 1,000,000 | 6,446,007 | 5,973,874 | 5,861,104 | 1,000,000 | 1,000,000 |
| Beginning Balance - Encumbered Cash | 2,686,423 | 2,683,693 | 1,000,000 | 6,446,007 | 5,973,874 | 5,861,104 | 647,031 |
| Receipts - Encumbered Cash | | | | | | | 352,969 |
| (Disbursements) - Encumbered Cash | (2,730) | (1,683,693) | 5,446,007 | (472,133) | (112,770) | (4,861,104) | 153,568 |
| Ending Balance - Encumbered Cash | 2,683,693 | 1,000,000 | 6,446,007 | 5,973,874 | 5,861,104 | 1,000,000 | 1,000,000 |
| Beginning Balance - Unencumbered Cash | - | - | - | - | - | - | - |
| Receipts - Unencumbered Cash | - | - | - | - | - | - | 46,233,407 |
| (Disbursements) - Unencumbered Cash | - | - | - | - | - | - | (45,386,975) |
| Ending Balance - Unencumbered Cash | - | - | - | - | - | - | 1,000,000 |
| **Loan Rollforward** | | | | | | | |
| Beginning Balance - TIP Loan | 17,322,483 | 17,322,483 | 16,639,497 | 11,188,660 | 7,488,244 | 7,488,244 | 17,322,483 |
| Draws | - | 5,450,837 | - | - | - | - | 5,450,837 |
| Repayments | - | (6,133,823) | (5,450,837) | (9,151,253) | - | - | (20,782,967) |
| Ending Balance - TIP Loan | 17,322,483 | 16,639,497 | 11,188,660 | 7,488,244 | 7,488,244 | 7,488,244 | 7,488,244 |
| *Accrued Estate Professional Fees and Expenses (14)* | | | | | | (112,270) | (2,820,773) |
| *Accrued Lender Professional Fees and Expenses (15)* | | | | | | (493,463) | (20,782,967) |

2

South Edge Preliminary Budget (circulated July 7)

## Notes to Preliminary Budget for period beginning with week ending 7/21 through 11/30 2011

(1) - LID T-18 Acquisition Payments are net of assessment engineer audit fee of 2.5%. The engineer audit fees cover administrative fees paid to Gomez Consulting Group. Funding is assumed to occur one week after City Council approval. Preliminary estimates for City Council hearing dates for each segment are listed below. **These estimated dates are based on recommendations of Advantage Civil Design Group regarding likely timing for completing outstanding construction work and necessary documentation and are subject to change.**

| LID Segments funded prior to Nov 30, 2011 | | LID Segments funded after Nov 30, 2011 | |
| --- | --- | --- | --- |
| Segment | Hearing Date | Segment | Hearing Date |
| SM-1B | 9/6/2011 | D-E4A | 12/6/11 |
| WM-2 | 9/20/2011 | D-E5 | 12/20/2011 |
| WM-5b/TCB | 10/4/2011 | D-E3 | 1/3/2012 |
| D-E1C, 2B | 10/18/11 | D-E6 | 5/22/2012 |
| D-E1A,E1B,1D, 1E | 11/1/11 | SM-2A, 2B, SD-2 | 8/21/2012 |
| D-E3A, 4 | 11/15/2011 | Village 2 Streets | 8/21/2012 |
| | | Village 3 Streets | 8/21/2012 |

LID segments funded after November, 2011 represent an additional $12.8M in net receipts with a total cost to complete of $2.7MM, none of which is reflected in this preliminary budget.

A reconciliation of total LID reimbursements follows:

|  |  |  |
| --- | --- | --- |
| $ | 21,315,864.00 | 2011 gross fundings per cash forecast |
| $ | 8,321,300.00 | 2012 gross fundings – Drainage |
| | 3,500,567.00 | 2012 gross fundings – Village 2 Streets |
| | 354,800.00 | 2012 gross fundings – Village 3 Streets |
| | 635,100.00 | 2012 gross fundings – Village 3 Streets |
| | 1,679,638.00 | 2012 gross fundings – Village 2 Storm Drains |
| | | Village 1 previously funded |
| $ | 35,807,269.00 | Total LID reimbursements available |

(2) - TIP Loan – Funding for the Estate is via an interest-free "Trustee in Possession" Loan projected to close the July 21. Monthly advances will be used to prime the Encumbered Cash Account for amounts used to fund the Total Disbursement needs of the Estate post-loan closing with all net proceeds from LID T-18 Acquisition Payments applied as payments to pay down the loan.

(3) - Security and Maintenance includes services for storm water compliance, dust control, Storm Water Pollution Prevention Plan ("SWPPP") maintenance, security and other construction and maintenance related expenses.

(4) - LID Improvement Costs relate to LID recovery efforts (including but not limited to inspection fees, permitting fees, plan fees, contractor and materials costs) for segments eligible for LID reimbursement. *Amount and timing of costs is preliminary and is based on discussions with Lender's construction consultant. The ultimate amount and scope of work is unknown until inspections are completed by the City of Henderson and contracts bid and awarded.* Payment assumes customary and reasonable commercial terms.

(5) - Other Construction Costs over and above those related to LID segments include provision for repairs to Bicentennial Road ($20K) and Volunteer Road ($40K) requested by City of Henderson. This forecast does not include any contingency provision for additional miscellaneous work that might be required by the City of Henderson and other agencies in the future including potential work associated with outfall control improvements which might be required in connection with acquisition of drainage facilities under Volunteer Road.

(6) - LID Reimbursement Administration to be paid to Advantage Civil Design Group for services rendered related to the processing and construction management in connection with future LID T-18 Acquisition payments. Amounts are estimates and subject to change and will increase if schedule for completing submissions to the City of Henderson is accelerated. Amounts accrued for service through November 15th that would be paid in December are shown as paid on the last week of the period

(7) - Accounting, Taxes, and Outside Legal include payment for services rendered by Goodwin Proctor in connection with the LID T-18 required disclosure filed in April and to be updated in October as well as estimated costs for tax return preparation work to performed by Piercy Bowler Taylor & Kern in July and budgeted for payment in August.

(8) - HOA Subsidy includes outstanding post-petition invoices and is currently under review. Amounts accrued for November service that would be paid in December are shown as paid on the last week of the period.

(9) - Insurance includes current commercial liability coverage with one year term expiring 9/21/11. Does not include premium in amount of $3,498 for policies expiring December 1, 2011 as those policies are outside the forecast period.

(10) - Marketing and Advertising Expenses are expected to be rejected by the Trustee or assumed by other parties by July 2011.

(11) - General, Administrative and Operations include payments to Jones Vargas for office space, administrative support, and miscellaneous office costs. Other items include bank charges, license fees, utilities, and other general and administrative expenses. December rent related to wind down operations is paid on the last week of the period.

(12) - The LID T-18 Bond Assessment payment upon closing of the TIP loan reflects the repayment of the MI Deposit advance used previously to

make the June 1 payment (with interest). Does not include the December 1 assessment amount of $2,940,028 as those assessments become due and owing outside the forecast period.

(13) - Accrued real property taxes (together with accrued penalties/interest) for the third and fourth installments of the 2010 - 2011 tax year are projected to be brought current and future installments paid as they come due.

(14) - Estate Professional Fees and Expenses are projected to be brought current at 85% of billed/incurred fees and 100% of billed/incurred expenses (except for the noticing agent which will be paid at 100%) upon the entry of final financing order for the TIP loan. Future Estate Professional Fees and Expenses will be paid at 85% of fees and 100% of expenses assuming a 30-day lag time for preparation of interim fee applications and notice period. Payment of 15% holdback, accrued professional fees for November and wind down costs after the post-effective date (including required post-plan filings, Trustee's final report and accounting, monthly operating report, and final fee applications for all professionals; such costs estimated at $200K) is assumed to be made at period end into an escrow account pending final fee hearings and Bankruptcy Court approval. Timing of payment and holdback percentages for interim amounts generally are consistent with the fee procedures anticipated to be filed with the Court. **Accrued fees and expenses presented are preliminary based on information provided by each professional, have not been reviewed by the Trustee or other parties and are included for information purposes only. Projected fees and expenses are based on expected average monthly "run" rates estimated by each professional. Actual amounts incurred in any single month might be higher or lower than the estimate depending on the nature of the work, particularly in connection with litigation. All fees and expenses are subject to Bankruptcy Court approval.**

(15) - Agent Professional Fees and Expenses are projected to be brought current at 100% of billed/incurred upon the entry of a final order for the TIP Loan. Agent Professional Fees and Expenses subject to a cumulative cap at $4.4 million based on provisions set forth in the Term Sheet. Last payment for Agent Fees anticipated in September 2011. **Accrued fees and expenses presented are preliminary based on information provided by each professional, have not been reviewed by the Trustee or other parties and are included for information purposes only. Projected fees and expenses are based on expected average monthly "run" rates estimated by each professional.**

(16) – The Cash Flow Forecast does not include payments for any unpaid administrative, priority, unsecured or other claims associated with any plan of reorganization other than payment of professional fees.

# EXHIBIT "2"

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | **Chapter 11** |
| SOUTH EDGE, LLC, | **Case No. BK-10-32968 (BAM)** |
| Debtor. | **[PROPOSED] FINAL ORDER (1) AUTHORIZING CHAPTER 11 TRUSTEE TO OBTAIN SENIOR PRIMING SECURED POSTPETITION FINANCING; (2) AUTHORIZING CHAPTER 11 TRUSTEE'S USE OF CASH COLLATERAL; AND (3) DEEMING AGENT, PREPETITION LENDERS AND BUILDERS LENDERS TO BE ADEQUATELY PROTECTED** |

**Date:** **August 12, 2011**
**Hearing Time:** **9:30 a.m.**
**Courtroom:** **Courtroom #3**
**Foley Federal Building**
**300 Las Vegas Boulevard**
**Las Vegas, Nevada 89101**

#4835-1635-9434

THIS MATTER having come before the Court upon the motion (the "Motion")[1] of Cynthia Nelson, the chapter 11 trustee (the "Trustee") in the chapter 11 bankruptcy case (the "Chapter 11 Case") of South Edge, LLC ("South Edge" or the "Debtor"), seeking, among other things, entry of an interim order (the "Interim Order"):

(i)    authorizing and approving the Trustee to obtain postpetition financing in an aggregate principal amount not to exceed $21.4 million, with an initial, interim borrowing limit of up to $4.0 million (the "TIP Facility"), pursuant to that certain Trustee Financing Agreement (the "TIP Loan Agreement";[2] and together with any related documents required to be delivered by or in connection with the TIP Loan Agreement, the "TIP Loan Documents"), by and among the Trustee, as borrower, and certain affiliates of the Settling Builders, as lenders (the "Builder Lenders"), with such TIP Facility secured by first priority priming liens (the "TIP Financing Liens") on all of the Debtor's interests in the Collateral (defined below), pursuant to section 364(d) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code;

(ii)    authorizing the use of LID Proceeds, as cash collateral of the Agent, the Prepetition Lenders and the Builder Lenders, to pay for the chapter 11 estate's (the "Estate") administrative expenses and repay the loans made pursuant to the TIP Facility, in accordance with the Terms of the TIP Loan Documents;

---

[1] Any capitalized term used but not defined herein shall have the meaning ascribed to it in the Motion or the TIP Loan Agreement (defined below), as applicable.

[2] A true and correct copy of the TIP Loan Agreement, dated as of July 20, 2011, in the form to be executed by the parties thereto is attached hereto as Exhibit 1.

#4835-1635-9434                                                        -2-

(iii)    granting the Agent, on behalf of the Prepetition Lenders, adequate protection for the use of its cash collateral and any diminution in the value thereof; and

(iv)    scheduling a final hearing on the Motion (the "Final Hearing") for August 12, 2011 to consider entry of this order granting the relief requested in the Motion on a final basis (the "Final Order").

Having entered the Interim Order on July 25, 2011; having considered the Motion, the TIP Loan Agreement, the Plan Support Agreement (in its redacted form), and the Trustee's Consent, and the record established and the evidence submitted at the interim hearing on the Motion (the "Interim Hearing") and the final hearing on the Motion (the "Final Hearing"; collectively with the Interim Hearing, the "Hearings") and the statements of counsel at the Hearings; finding that due and proper notice of the Motion and the Hearings having been given, and the Final Hearing having been held and concluded on August 12, 2011 in accordance with Bankruptcy Rules 2002, 4001 and 9014; and it appearing that approval of the final relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Estate pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Estate and its creditors and equity holders, and is essential for the continued operation of the Debtor's business and the preservation of the Estate's value; and it further appearing that the Trustee is unable to secure postpetition financing on terms and conditions that are better than those set forth in this Final Order and the TIP Loan Agreement, that there is adequate protection of the Agent's and the Prepetition Lenders' interests in the LID Proceeds (i) against which the priming TIP Financing Liens are to be granted in favor of the Builder Lenders and (ii) that are to be used by the Trustee as cash collateral, that the Agent has consented to the TIP Facility, including its priming lien feature, that the Agent has consented to the use of the LID Proceeds as

#4835-1635-9434

-3-

cash collateral as set forth in this Final Order and the TIP Loan Agreement, that the Agent, the Consenting Lenders and the Settling Builders (collectively, the "Settling Parties") are parties to the Plan Support Agreement, and that all objections, if any, to the entry of this Final Order have been withdrawn, resolved or overruled by the Court, or continued to the Final Hearing; and having taken into consideration all pleadings filed with this Court, all proceedings held before the Court, and the evidence adduced in connection therewith in this Chapter 11 Case; and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.      Involuntary Petition Date; Motion for Trustee.  On December 9, 2010, certain of the Prepetition Lenders filed an involuntary chapter 11 petition against the Debtor (the "Involuntary Petition").  In connection with the Involuntary Petition, the Agent filed a motion seeking appointment of a chapter 11 trustee for the Debtor [Docket No. 7] (the "Trustee Motion").

B.      Appointment of Trustee.  On February 3, 2011, the Court entered an order for relief under chapter 11 of the Bankruptcy Code against the Debtor [Docket No. 400] and issued an order directing the appointment of a chapter 11 trustee [Docket No. 401].  On February 20, 2011, the Office of the United States Trustee (the "UST") designated the Trustee to serve as trustee for the Estate [Docket No. 441], and on February 23, 2011, the Court entered an order approving the appointment of the Trustee as chapter 11 trustee for the Debtor (the "Appointment Order").  [Docket No. 449].  No official committee of creditors has been appointed in this Chapter 11 Case.

#4835-1635-9434

-4-

C.    Jurisdiction and Venue.    This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Chapter 11 Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    Notice.    Notice of the Hearings and the relief requested in the Motion have been provided by the Trustee, either by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee for the District of Nevada; (ii) counsel to the Builder Lenders; (iii) counsel to the Agent; (iv) counsel to Focus South Group, LLC and its affiliates ("Focus"); (v) counsel to Meritage Homes of Nevada, Inc. and its affiliates ("Meritage"); (vi) counsel to the Debtor; (vii) the top twenty unsecured creditors of the Estate (exclusive of the Prepetition Lenders) identified by the Trustee in Schedule F of the Debtor's Schedules of Assets and Liabilities; (viii) the City of Henderson; (ix) the Indenture Trustee for the bonds issued by the City of Henderson in connection with Local Improvement District T-18; and (x) all other parties requesting notices pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). Under the circumstances, such notice of the Hearings and the relief requested in the Motion constitutes due and sufficient notice and complies with sections 102(1), 364(c) and 364(d) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(b), 4001(c), and 9014.

E.    Findings Regarding the Post-Petition Financing and Use of the LID Proceeds.

(i)    On April 21, 2011, the Court entered a final order [Docket No. 624] that approved that certain Stipulation Providing For Postpetition Financing and Use of Cash Collateral (the "Cash Collateral Stipulation"), between and among JPMorgan, as Agent, the Trustee and

#4835-1635-9434                                         -5-

certain the members of the Debtor and that was subsequently amended by periodic extensions [*see* Docket Nos. 676, 736 and 803] (collectively, the "Cash Collateral Orders"). The Cash Collateral Order provided the Trustee with continued use of the Agent's cash collateral through the date of the Interim Order. Subsequently, the Interim Order has governed the Trustee's use of the Agent's cash collateral through the date of this Final Order.

       (ii)    As recently confirmed by the Trustee, *see* Docket No. 766, the Agent, for the benefit of the Prepetition Lenders holds a valid, perfected, priority and unavoidable lien in substantially all of the Debtor's real and personal property, including, but not limited to, the Collateral. The Collateral and the proceeds thereof constitutes the Agent's cash collateral under section 363(a) of the Bankruptcy Code.

       (iii)    Except as set forth in the TIP Loan Agreement with respect to the Collateral, the Agent's liens in and to the Debtor's and the Estate's assets granted to the Agent, for itself and the benefit of the Lenders, in accordance with the terms of the Cash Collateral Orders and the first priority nature thereof, shall be unaffected by the terms of the TIP Loan Agreement, the Interim Financing Order and the Final Financing Order and shall remain in full force and effect.

       (iv)    Need for Post-Petition Financing and Use of the LID Proceeds. The Estate has limited cash availability. An immediate need exists for the TIP Facility so as to enable the Trustee to fund among other things, (a) operating disbursements on account of, among other items, the further construction of infrastructure segments of the Debtor's residential real estate Project, commonly known as "Inspirada" (the "Project"), Project maintenance, security, surety bond obligations, and the administration of reimbursements of LID Proceeds, (b) LID Bond assessments and property taxes and (c) bankruptcy related disbursements, including UST

#4835-1635-9434

-6-

fees, the reasonable fees of the Agent's and Prepetition Lenders' professionals and the allowed fees and expenses of the Trustee and her professionals.  The TIP Facility is essential to the implementation of the Plan Support Agreement to which the Trustee has granted her consent, subject to the terms and conditions of the Trustee's Consent.  The use of the TIP Facility proceeds as contemplated in the Budget that is attached to the TIP Loan Agreement as Exhibit A will enable the Trustee to preserve the value of the Estate by, among other things, completing certain infrastructure construction at the Project, which, in turn, will lead to approximately $34.1 million in LID reimbursements that would otherwise be unavailable to the Estate (and/or any successor to the Estate).  Without the TIP Facility and the use of the LID Proceeds, the Estate and its economic stakeholders would suffer immediate and irreparable harm.

(v)    No Credit Available on More Favorable Terms.  The Trustee is unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Trustee also is unable to obtain secured credit on more favorable terms and conditions than those provided in the TIP Loan Agreement and this Final Order.  The Trustee is unable to obtain credit for borrowed money without granting to the Builder Lenders (a) the priming TIP Financing Liens on the Collateral pursuant to Bankruptcy Code sections 364(d); and (b) superpriority administrative expense claim status pursuant to Bankruptcy Code section 364(c)(1), senior to all other administrative expenses under Bankruptcy Code sections 503(b) and 507(b) (but pari passu with Agent's superpriority administrative expense claim granted to Agent, for the benefit of the Lenders, under the Cash Collateral Orders).

F.    Extension of Financing.  The Builder Lenders have indicated a willingness to provide financing to the Trustee in accordance with the TIP Loan Agreement and subject to, among other things, (i) the entry of this Final Order, and (ii) findings by the Court that the

Builder Lenders are good faith financiers, and that the Builder Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Final Order and the TIP Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

G.    Business Judgment and Good Faith Pursuant to Section 364(e).  The terms and conditions of the TIP Facility, the TIP Loan Agreement and the use of the LID Proceeds as contemplated therein are fair, reasonable, and the best available under the circumstances, reflect the Trustee's exercise of prudent business judgment consistent with her fiduciary duties, and are supported by reasonably equivalent value and consideration.  The TIP Facility and the use of the LID Proceeds were negotiated extensively, in good faith and at arms' length between the Trustee and the Builder Lenders, with the substantial input by and the consent of the Agent.  The credit to be extended under the TIP Facility is and will be so extended in good faith, and for valid business purposes and uses, the consequence of which is that the Builder Lenders are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

H.    Adequate Protection of the Agent and Prepetition Lenders.  In consideration for the Agent's Adequate Protection Liens under the TIP Loan Agreement and the superpriority administrative expense claim granted to the Agent herein, the Agent has consented to the priming of its security interest against the LID Proceeds by the liens granted to the Builder Lenders pursuant to the TIP Facility.

I.    Benefits of TIP Facility.  The TIP Facility will enable the Trustee to complete LID infrastructure build-outs that are a prerequisite for the Estate's (and/or any successor entity's) reimbursement of $34.1 million in LID Proceeds.  Moreover, the TIP Facility facilitates

#4835-1635-9434                                         -8-

a settlement that, if successful, will result in the near-term resolution of the Estate's outstanding obligations on the Prepetition Loan through a plan of reorganization to be proposed to the Court by creditors that, in the aggregate, hold a substantial majority (in dollar amount) of the claims against the Estate and equity holders that, in the aggregate, hold a substantial majority of the equity in the Debtor. The TIP Facility, together with the Settlement, will allow the Settling Parties (e.g., the Agent, the Consenting Lenders and the Settling Builders) and the Estate to avoid what inevitably would be time-consuming and expensive litigation. The TIP Facility also ensures that the Estate will remain administratively solvent. The cost savings associated with the successful implementation of the Settlement will enhance the overall value to be recovered by the Settling Parties, who are the Estate's primary economic stakeholders.

J.      Entry of Final Order. For the reasons stated above, the Trustee has requested immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(c)(2).

NOW, THEREFORE, on the Motion of the Trustee and the record before the Court with respect to the Motion, and with the consent of the Builder Lenders and the Agent to the form and entry of this Final Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED THAT:**

1.      Motion Granted. The Motion is granted in its entirety subject to the terms and conditions set forth in this Final Order.

2.      TIP Loan Agreement Authorization.

(a)      Approval of TIP Facility. The Trustee is expressly and immediately authorized, empowered and directed to execute, deliver and enter into the TIP Loan Agreement and to incur and to perform the Obligations in accordance with, and subject to, the terms of this Final Order and the TIP Loan Agreement, and to deliver all instruments and documents that may be required

#4835-1635-9434                                    -9-

or necessary for the performance by the Trustee under the TIP Facility and the creation and perfection of the TIP Financing Liens described in and provided for by this Final Order and the TIP Loan Agreement.  Upon execution and delivery, the Obligations created under the TIP Loan Agreement shall represent valid and binding obligations of the Estate, enforceable against the Estate in accordance with the terms of the TIP Loan Agreement.

(b)    <u>Authorization to Borrow</u>.  Subject to the terms and conditions of this Final Order, the TIP Loan Agreement, and any other TIP Loan Documents, and in accordance with the Budget, the Trustee is hereby authorized under the TIP Facility to borrow up to the amount of $21.4 million.

(c)    <u>TIP Financing Liens</u>.  Effective upon the entry of this Final Order and subject to the TIP Loan Agreement, the Builder Lenders are granted the TIP Financing Liens pursuant to sections 361, 362 and 364(d) of the Bankruptcy Code, meaning a first priority, priming, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interest in and lien on the Collateral presently owned and hereafter acquired by the Estate, which shall consist of any and all rights of the Trustee and the Estate to receive payments or reimbursements of LID Proceeds, whether such rights constitute general intangibles, accounts, accounts receivable, contract rights, commercial tort claims, or deposit accounts relating thereto, and all proceeds, products, offspring, or profits thereof (including cash), and including all payments owing or made under the Acquisition Agreement, but the Collateral shall not include the Acquisition Agreement itself.

(d)    <u>Agent's Adequate Protection</u>. Effective upon the entry of this Final Order and subject to the TIP Loan Agreement, the Agent (on its behalf and on behalf of the Prepetition Lenders) is hereby granted the Adequate Protection Liens pursuant to sections 361, 363(e) and

#4835-1635-9434

-10-

364(d)(1) of the Bankruptcy Code, meaning, as adequate protection for any diminution in the value of the Agent's interest in the Collateral securing the Debtor's obligations under the Prepetition Credit Agreement resulting from, the use of the Collateral and imposition of the automatic stay (the "Adequate Protection Obligations"): (x) a second priority (subject only to the TIP Financing Liens), priming, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interest in and lien on the Collateral presently owned and hereafter acquired by the Estate, which shall consist of any and all rights of the Trustee and the Estate to receive payments or reimbursements of LID Proceeds, whether such rights constitute general intangibles, accounts, accounts receivable, contract rights, commercial tort claims, or deposit accounts relating thereto, and all proceeds, products, offspring, or profits thereof (including cash), and including all payments owing or made under the Acquisition Agreement, but the Collateral shall not include the Acquisition Agreement itself, and (y) a first priority priming, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interest in and lien on all assets (other than the Collateral and any claims and causes of action under section 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code, or the proceeds such claims and causes of action) presently owned and hereafter acquired by the Estate and all products and proceeds thereof, but subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code.   Agent, for the benefit of the Prepetition Lenders, is granted an allowed superpriority administrative expense claim as provided for under section 507(b) of the Bankruptcy Code on account of the Adequate Protection Obligations (the "Adequate Protection Superpriority Claim "), which shall be junior to the TIP Loan Superpriority Claim (defined herein).

#4835-1635-9434

-11-

(e)     <u>TIP Financing Lien Priority</u>.   The TIP Financing Liens granted to the Builder Lenders (i) are created pursuant to section 364(d) of the Bankruptcy Code, (ii) are first priority, priming, valid, prior, perfected, unavoidable, and superior to any security interest, mortgage, or collateral interest or lien or claim in, on or to the Collateral, and are subject only to the Permitted Liens, if any, but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code; and (iii) shall secure all Obligations under the TIP Facility.

(f)     <u>Enforceable Obligations</u>.   The TIP Loan Agreement shall constitute and evidence the valid and binding obligations of the Estate, which Obligations shall be enforceable against the Estate, and any successors thereto.

(g)     <u>Conditions Precedent to Making Advances</u>.   The Builder Lenders shall have no obligation to make any advances pursuant to the TIP Facility unless all of the conditions precedent to the making of such advances under the TIP Facility are satisfied or waived by the Builders Lenders in accordance with the TIP Loan Agreement.

(h)     <u>Superpriority Administrative Claim Status</u>.     All Obligations under the TIP Facility shall be allowed superpriority administrative expense claims (the "<u>TIP Loan Superpriority Claim</u>" and, together with the TIP Loan Liens, the "<u>TIP Loan Protections</u>") with priority in the Chapter 11 Case under section 364(c)(l) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtor and the Estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 503(b) and 507(b); provided, however, such TIP Loan Superpriority Claim shall be *pari*

#4835-1635-9434

-12-

*passu* with the superpriority administrative expense claim granted to the Agent (for the benefit of the Prepetition Lenders) under the Cash Collateral Orders.

3. <u>Post-Petition Lien Perfection</u>.  This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the TIP Loan Liens and the Agent's Adequate Protection Liens without the necessity of filing or recording any financing statement or other instrument or document that may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the TIP Loan Liens or the Agent's Adequate Protection Liens or to entitle the Builder Lenders or the Agent to the priorities granted herein. Notwithstanding the foregoing, the Trustee shall, at the request of the Builder Lenders or the Agent, at any time and from time to time, execute and deliver to the Builder Lenders or the Agent such security agreements, mortgages, financing statements, documents, and other agreements and instruments (and, subject to sufficient availability of funding and any restrictions in the Budget, pay the cost of filing or recording the same in all public offices deemed reasonably necessary or desirable by the Builder Lenders) and do such other acts and things as the Builder Lenders or the Agent may reasonably deem necessary or desirable in order to establish and maintain the validity, attachment, and perfection of the liens of the Builder Lenders and the Agent granted in this Final Order (free and clear of all other liens, claims, and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Permitted Liens). The Builder Lenders and the Agent (and all Persons designated by the Builder Lenders or the Agent for the purpose specified in this sentence) hereby are made, constitute, and are appointed as the Trustee's true and lawful attorney and agent-in-fact to execute such security agreements, mortgages, financing statements, documents, and other agreements and instruments and do such other acts and things as may be necessary or appropriate to preserve and perfect the liens of the

#4835-1635-9434

-13-

Builder Lenders and the Agent on the Collateral.  A carbon, photographic, photostatic, or other reproduction of the TIP Loan Agreement, this Final Order, or of a financing statement shall be sufficient as a financing statement.

4.  <u>Use of TIP Facility Proceeds and LID Proceeds</u>.  Pursuant to and in accordance with the terms and conditions of this Final Order, the TIP Loan Documents, and in a manner consistent with the Budget (as the same may be modified, supplemented or updated from time to time consistent with the terms and conditions of the TIP Loan Agreement), (a) the Trustee is authorized to use the advances made under the TIP Loan Agreement, and (b) the Trustee is authorized to use the LID Proceeds.

5.  <u>Events of Default; Remedies</u>.

(a) <u>Events of Default</u>.  The Defaults identified in Section 9 of the TIP Financing Agreement shall constitute Defaults under this Final Order and the TIP Loan Documents.

(b) <u>Rights and Remedies Upon Event of Default</u>.  Upon the occurrence of a Default, the Builder Lenders may immediately, upon giving any such notice to the Trustee as may be required under the TIP Loan Agreement, (i) cease to make any Loans under the TIP Loan Agreement or any other Loan Document, (ii) declare all or any portion of the Loans and all other outstanding Obligations to be due and payable immediately, without further order of, or application to, the Court, and without presentment, demand, or protest, all of which are deemed to be waived by the Trustee and (iii) subject to paragraphs 5(c) and 5(d) below, exercise any and all of their other rights and remedies under applicable law (including, but not limited to, the Bankruptcy Code), the TIP Loan Agreement and the other TIP Loan Documents.

(c)      <u>Relief from Automatic Stay</u>.

If a Default occurs (including the failure to pay all Obligations that are due upon maturity), then (i) the Builder Lenders may set an expedited hearing for relief from the automatic stay on not less than three Business Days' notice and at such hearing the only issues will be (x) whether an uncured Default exists, and (y) whether the Bankruptcy Court may impose any condition on the exercise of the Builder Lenders' remedies (which condition the Builder Lenders may oppose), so long as such condition does not delay the Builder Lenders' exercise of remedies for more than 30 days and otherwise does not impair the interests of the Builder Lenders in their Collateral; and (ii) consistent with the Court's determination as to "i" immediately above, the Builder Lenders shall be granted relief from stay if an uncured Default is found to exist and the automatic stay provisions of Bankruptcy Code section 362 shall be vacated and modified to the extent necessary to permit the Builder Lenders to exercise all rights and to effectuate the provisions of the TIP Loan Agreement and this Final Order, without the need for filing further pleadings or application to or order of the Court.

(d)      <u>Modification of Automatic Stay</u>.  Subject to paragraph 5(c) above,

(1)    the automatic stay provisions of Bankruptcy Code section 362 are hereby vacated and modified to the extent necessary to permit the Builder Lenders to exercise all rights and to effectuate the provisions of the TIP Loan Agreement and this Final Order, without the need for filing further pleadings or application to or order of the Court; and

#4835-1635-9434

-15-

(2)    no party in interest shall have the right (i) to contest the enforcement of the remedies set forth in the TIP Loan Agreement on any basis other than the fact that a Default has not occurred or (ii) to seek injunctive relief against such enforcement under Bankruptcy Code section 105 or otherwise, or to seek injunctive relief in conflict with the provisions of the TIP Loan Agreement or the Final Order.

6.    Other Rights and Obligations.

(a)    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order.  Based on the findings set forth in this Final Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the Builder Lenders and the TIP Facility contemplated by this Final Order, in the event any or all of the provisions of this Final Order are hereafter modified, amended, reversed or vacated by a subsequent order of this or any other Court, the Builder Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code and no such modification, amendment, reversal or vacation shall affect the validity and enforceability of any advances made hereunder or lien or priority authorized or created hereby.  Notwithstanding any such modification, amendment, reversal or vacation, any claim granted to the Builder Lenders hereunder arising prior to the effective date of such modification, amendment, reversal or vacation of any TIP Loan Protections granted to the Builder Lenders shall be governed in all respects by the original provisions of this Final Order, and the Builder Lenders shall be entitled to all of the rights, remedies, privileges and benefits, including the TIP Loan Protections granted herein, with respect to any such claim.  Since the advances to be made pursuant to the TIP Loan Agreement will be made in reliance on this Final Order, the obligations owed the Builder Lenders prior to the effective date of any stay,

#4835-1635-9434                                                  -16-

modification, amendment, reversal or vacation of this Final Order cannot, as a result of any subsequent order in this Chapter 11 Case, or, following the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or following the commencement of any other proceeding superseding the Chapter 11 Case or such chapter 7 case (any such chapter 7 case or superseding proceeding, "Successor Case"), be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the Builder Lenders under this Final Order and/or the TIP Loan Agreement.

(b)    Binding Effect.    The provisions of this Final Order shall be binding upon all parties in interest in the Chapter 11 Case, including, without limitation, the Trustee, the Estate, the Debtor, the Builder Lenders, the Agent, the Prepetition Lenders, the City of Henderson, the Indenture Trustee for the bonds issued by the City of Henderson in connection with Local Improvement District T-18, Focus and Meritage and their respective successors and assigns (including any trustee, estate representative or other fiduciary hereinafter appointed as a legal representative of the Estate or with respect to the property of the Estate) whether in the Chapter 11 Case, in any Successor Case, or upon dismissal of the Chapter 11 Case or any Successor Case, and shall inure to the benefit of the Estate and the Builder Lenders.

(c)    No Third Party Rights.    Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

(d)    Amendment.    Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by the Trustee, the Builder Lenders, and the Agent and approved by the Court.

#4835-1635-9434

-17-

(e)     <u>Survival of Final Order</u>.  The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order that may be entered (1) confirming any plan of reorganization in the Chapter 11 Case, (2) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (3) dismissing the Chapter 11 Case, and the terms and provisions of this Final Order as well as the TIP Loan Protections, the Agent's Adequate Protection Liens and the Adequate Protection Superpriority Claim granted pursuant to this Final Order and the TIP Loan Agreement shall continue in full force and effect notwithstanding the entry of such order, and (x) such TIP Financing Protections shall maintain their priority as provided by this Final Order until all the Obligations under the TIP Facility are indefeasibly paid in full and discharged and (y) the Agent's Adequate Protection Liens and the Adequate Protection Superpriority Claim shall maintain their priority as provided by this Final Order until the Adequate Protection Obligations are indefeasibly paid in full and discharged.

(f)     <u>Inconsistency</u>.   In the event of any inconsistency between the terms and conditions of the TIP Loan Documents and of this Final Order, the provisions of this Final Order shall govern and control.

(g)     <u>Waiver of Bankruptcy Rules 4001(a)(3) and 6004(h) Stay</u>.  This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry, notwithstanding the provisions of Bankruptcy Rule 4001(a)(3) and 6004(h), which, to the extent applicable, are waived and shall not apply to this Final Order.

(h)     The terms and conditions of the Cash Collateral Orders remain in full force and effect, except as expressly modified by this Final Order.

#4835-1635-9434

-18-

1         (i)    <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce

2    this Final Order according to its terms.

3    Dated:  August ____, 2011

4

5    Las Vegas, Nevada

6

7

8

9    SCHWARTZER & McPHERSON LAW FIRM

10

11   By: _____

12   Lenard E. Schwartzer, Nevada Bar No. 0399

13   Jeanette E. McPherson, Nevada Bar No. 5423

     2850 South Jones Boulevard, Suite 1

14   Las Vegas, Nevada  89146-5308

     Telephone:     (702) 228-7590

15   Facsimile:     (702) 892-0122

     E-Mail:        bkfilings@s-mlaw.com

16

17   &

18   MILBANK, TWEED, HADLEY & MCCLOY LLP

     Robert J. Moore (admitted *pro hac vice*)

19   David Zolkin (admitted *pro hac vice*)

     601 South Figueroa Street, 30th Floor

20   Los Angeles, California  90017

     Telephone:     213.892-4000

21   Facsimile:     213.629.5063

     E-Mail:        rmoore@milbank.com

22                  dzolkin@milbank.com

23   Counsel For Cynthia Nelson, Chapter 11 Trustee

24

25

26

27   #4835-1635-9434                           -19-

28

# EXHIBIT "1"

**SOUTH EDGE, LLC.**

**TRUSTEE FINANCING AGREEMENT**

**KB Home NV Acquisition LLC, Toll Henderson II LLC, a Nevada LLC. Pardee Homes, a California corporation, and Trinity Homes, LLC, as Builder Lenders**

**and**

**Cynthia Nelson, solely in her capacity as Chapter 11 Trustee of South Edge, LLC, on behalf of South Edge, LLC and its Bankruptcy Estate, as Borrower**

#4849-9634-1513

RECITALS ................................................................................................................ 1

AGREEMENT ............................................................................................................ 2

1.     DEFINITIONS AND CONSTRUCTION. ................................................... 2

    1.1   Definitions ........................................................................................ 2

    1.2   Financial Reporting ......................................................................... 7

    1.3   Terms Generally .............................................................................. 7

2.     LOAN AND TERMS OF PAYMENT. ...................................................... 8

    2.1   Credit Extensions. ........................................................................... 8

         (a)   Promise to Pay. .................................................................. 8

         (b)   Loans. ................................................................................ 8

    2.2   Interest Rates and Calculations. ...................................................... 9

         (a)   Interest. .............................................................................. 9

         (b)   Default Rate and Fees. ....................................................... 9

         (c)   Computation. ...................................................................... 9

    2.3   Payments. ....................................................................................... 10

         (a)   Time of Payments. ............................................................. 10

         (b)   Location of Payments. ....................................................... 10

    2.4   Term. .............................................................................................. 10

    2.5   Revolving Loan. .............................................................................. 11

    2.6   Use of Proceeds. ............................................................................. 11

         (a)   Generally. .......................................................................... 11

         (b)   Deviation. .......................................................................... 11

         (c)   LID Segment Construction. ............................................... 11

         (d)   Professionals. .................................................................... 12

    2.7   Section 15 Advances. ...................................................................... 12

    2.8   Source of Loans. ............................................................................. 12

3.     ALLOWANCE AND PRIORITY OF CLAIMS ........................................ 12

4.     SECURITY INTEREST IN FAVOR OF LENDERS ................................ 13

    4.1   Security Interest in Collateral. ......................................................... 13

    4.2   Priority of Builder Lenders' and Agent's Security Interests. ............. 13

    4.3   Preservation of Collateral; Perfection of Builder Lenders' Security Interest and Agent's Security Interest. ............................................. 13

5.      CONDITIONS OF LOANS.................................................................................... 14

        5.1     Conditions Precedent to all Loans. ....................................................... 14

                (a)     Interim Financing Order. ............................................................. 14

                (b)     Delivery of Documents. ............................................................... 14

                (c)     Notice of Borrowing. ................................................................... 14

                (d)     No Default. .................................................................................... 15

                (e)     No Maturity. .................................................................................. 15

                (f)     Final Financing Order. ................................................................. 15

6.      REPRESENTATIONS AND WARRANTIES................................................... 15

        6.1     Authority. .............................................................................................. 15

        6.2     Execution and Binding Effect. ............................................................. 16

        6.3     No Default. ............................................................................................ 16

7.      AFFIRMATIVE COVENANTS. ....................................................................... 16

        7.1     Financial Reporting. ............................................................................. 16

        7.2     Books and Records. .............................................................................. 17

        7.3     Use of Proceeds..................................................................................... 17

        7.4     Cooperation and Consultation .............................................................. 17

8.      NEGATIVE COVENANTS. .............................................................................. 18

        8.1     Superpriority Claims/Senior Liens. ..................................................... 18

        8.2     Financing Orders................................................................................... 18

        8.3     Deviation from Budget. ........................................................................ 18

        8.4     Protection of Collateral. ....................................................................... 18

        8.5     Significant Transactions....................................................................... 18

        8.6     Litigation Against Builder Lenders. ..................................................... 19

        8.7     Trustee Consent. ................................................................................... 19

9.      DEFAULTS. ....................................................................................................... 19

10.     LENDERS' RIGHTS AND REMEDIES. ......................................................... 20

        10.1    Remedies Generally. ............................................................................. 20

        10.2    Relief from the Automatic Stay. ........................................................... 21

        10.3    Modification of the Automatic Stay. .................................................... 21

11.     NOTICES............................................................................................................ 22

12.     CHOICE OF LAW AND VENUE: JURY TRIAL WAIVER. ........................ 24

13.     GENERAL PROVISIONS. ................................................................................ 24

13.1    Binding Effect. .................................................................................... 24

13.2    Time of Essence. ................................................................................. 24

13.3    Severability of Provisions. ..................................................................... 25

13.4    Amendments in Writing, Integration. ..................................................... 25

13.5    Counterparts. ...................................................................................... 25

13.6    Survival. ............................................................................................. 25

This TRUSTEE FINANCING AGREEMENT ("**Agreement**") is entered into as of July 20, 2011, by and among KB Home NV Acquisition LLC, Toll Henderson II LLC, a Nevada LLC, Pardee Homes, a California corporation, and Trinity Homes, LLC ("**Builder Lenders**"), on the one hand, and Cynthia Nelson, not in her individual capacity, but solely in her capacity as trustee of chapter 11 debtor South Edge, LLC ("**Trustee**"), on behalf of South Edge, LLC ("**South Edge**") and its Estate (as defined below).

## RECITALS

WHEREAS, on December 9, 2010 ("**Petition Date**") JPMorgan Chase Bank, N.A. ("**JPMorgan**"), Credit Agricole Corporate and Investment Bank, and Wells Fargo Bank, N.A. filed an involuntary chapter 11 petition under section 303 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq*. ("**Bankruptcy Code**"), against South Edge in the United States Bankruptcy Court for the District of Nevada ("**Bankruptcy Court**"), commencing case number 10-32968 ("**Chapter 11 Case**");

WHEREAS, on the Petition Date, JPMorgan, in its capacities as Agent (as defined below) under the Prepetition Credit Agreement (as defined below) and as a lender thereunder, filed a motion to appoint a chapter 11 trustee for South Edge in the Chapter 11 Case ("**Trustee Motion**");

WHEREAS, on February 3, 2011, the Bankruptcy Court entered an order for relief on the involuntary petition and its order granting the Trustee Motion;

WHEREAS, on February 23, 2011, the Bankruptcy Court entered its order approving the Office of the United States Trustee's February 20, 2011, appointment of Cynthia Nelson as the Trustee;

WHEREAS, on April 21, 2011, the Court entered a final order [D.E. 624] that approved a stipulation, between and among JPMorgan, as Agent, the Trustee, and certain equity members of the Debtor that was subsequently amended by periodic extensions [*see* D.E. 676, 736] (collectively, the "**Cash Collateral Orders**"), which has provided the Trustee with continued use of the Agent's cash collateral;

WHEREAS, JPMorgan, as Agent, the members of a steering committee of lenders under the Prepetition Credit Agreement, and more than 92% in dollar amount and 94% in number of total lenders under the Prepetition Credit Agreement have entered into a letter agreement dated as of May 19, 2011 (together with the "Term Sheet for South Edge, LLC Chapter 11 Plan" attached to the letter agreement, the "**Plan Support Agreement**") with certain affiliates of the Builder Lenders ("**Settling Builders**" as defined in the Plan Support Agreement), which Plan Support Agreement requires the parties thereto to support a chapter 11 plan to be filed in the Chapter 11 Case, consistent with the Plan Support Agreement;

WHEREAS, the Trustee has consented to the Plan Support Agreement pursuant to the letter dated as of June 8, 2011, addressed by counsel for the Trustee to counsel for the Agent and counsel for the Settling Builders ("**Trustee's Consent**"), which Trustee's

Consent has been accepted by the Settling Builders and, as permitted by the Plan Support Agreement, been waived by the Agent, on behalf of the Lenders;

WHEREAS, nothing in this Agreement shall alter or modify the terms of the Plan Support Agreement or relieve the Settling Builders or the Agent and the Consenting Lenders of their respective obligations under the Plan Support Agreement;

WHEREAS, the Trustee has requested that the Builder Lenders extend post-petition financing to the Trustee pursuant to Bankruptcy Code section 364;

WHEREAS, the Trustee, on behalf of the Estate, requires funds in order to satisfy accrued and accruing administrative expenses of the Estate pursuant to a Budget (as defined below) and this Agreement, including, but not limited to (i) disbursements on account of, among other things, the construction of certain infrastructure segment improvements required to obtain Local Improvement District T-18 ("**LID**") reimbursements, project maintenance, security, and surety bond obligations, and the costs of administration with respect to LID reimbursements, (ii) LID-related assessments and property taxes, and (iii) bankruptcy-related disbursements, including United States Trustee's fees and the reasonable fees and expenses of the Trustee, her professionals, and the Agent's and Lenders' professionals;

WHEREAS, the Builder Lenders have agreed to provide such post-petition financing to the Trustee and the Estate subject to the terms and conditions set forth in this Agreement and the other Loan Documents (as defined below).

## AGREEMENT

Now, therefore, in consideration of the premises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    DEFINITIONS AND CONSTRUCTION.

1.1    <u>Definitions</u>.

As used in this Agreement, the following terms shall have the following definitions:

"**Acquisition Agreement**" means the Acquisition Agreement between the City of Henderson and South Edge dated April 1, 2006.

"**Agent**" means JPMorgan, in its capacity as administrative agent under the Prepetition Credit Agreement, and any subsequent or replacement administrative agent under the Prepetition Credit Agreement.

"**Agent's Adequate Protection Liens**" means the liens and security interests granted to Agent (on its behalf and on behalf of the Lenders) hereunder in the Collateral and the Estate's other assets, excluding any claims or causes of action under

sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, as adequate protection for, and to the extent of any diminution in the value of the Agent's interest in the Collateral securing the Debtor's obligations under the Prepetition Credit Agreement resulting from, the use of the Collateral and imposition of the automatic stay.

"**Agreement**" has the meaning specified in the preamble hereto.

"**Bankruptcy Code**" has the meaning specified in the recitals hereto.

"**Bankruptcy Court**" has the meaning specified in the recitals hereto.

"**Builder Lenders**" has the meaning specified in the preamble hereto.

"**Builder Lenders' Account**" means an account at a bank designated by the Builder Lenders from time to time as the account into which the Trustee shall make all payments to the Builder Lenders under this Agreement and the other Loan Documents, but only to the extent such payments are not required to be made to the Term Sheet Escrow.

"**Builder Lenders' LID Remedy**" has the meaning specified in Section 10.1 hereof.

"**Business Day**" means any day that is not a Saturday, Sunday, or other day on which banks in the State of Nevada are authorized or required to close.

"**Budget**" means the budget attached hereto as Exhibit "A", and any successor or modified budget that is acceptable to the Trustee and approved by the Builder Lenders and the Agent, in their sole and absolute discretion. The Budget shall provide for cash flows and accruals of professionals' fees projected in good faith by the Trustee on a weekly basis for the period from July 23, 2011, through November 30, 2011, as such cash flow projections may be amended or modified from time to time by the Trustee and approved by the Builder Lenders and the Agent, in their sole and absolute discretion.

"**Chapter 11 Case**" has the meaning specified in the recitals hereto.

"**Closing Date**" means either the Final Closing Date or the Interim Closing Date.

"**Collateral**" means any and all rights of the Trustee, South Edge, or the Estate to receive payments or reimbursements for funds that have been or will be expended for the construction and/or completion of improvements relating to the LID, whether they constitute general intangibles, accounts, accounts receivable, commercial tort claims, or deposit accounts relating thereto, and all proceeds, products, offspring, or profits thereof (including cash), including payments owing or made under the Acquisition Agreement, but Collateral shall not include the Acquisition Agreement itself.

"**Default**" means any event or condition specified in Section 9 hereof, after the passage of any applicable cure period.

"**Default Rate**" has the meaning specified in Section 2 hereof.

"**Estate**" means the bankruptcy estate of South Edge created pursuant to Bankruptcy Code section 541.

"**Final Closing Date**" means the first date on which (a) the Bankruptcy Court shall have entered the Final Financing Order, and (b) all of the conditions set forth in Section 5 hereof shall have been satisfied by the Trustee in a manner satisfactory to the Builder Lenders and the Agent.

"**Final Financing Order**" means the final order of the Bankruptcy Court approving the Loan Documents, granting the Superpriority Claim status, granting the Builder Lenders' first priority priming liens on the Collateral, granting the Agent, as Agent's Adequate Protection Liens, second-priority liens in the Collateral subject only to the Builders Lenders' first-priority liens on the Collateral, and a first priority lien in all other assets of the Estate other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, and subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code, which order shall have been entered upon motion of the Trustee and which order shall be satisfactory in form and substance to the Builder Lenders and the Agent.

"**Financing Orders**" means the Interim Financing Order and the Final Financing Order.

"**Gomez**" means Gomez Consulting Group, or any other entity performing a similar function with respect to LID-related projects.

"**Interim Closing Date**" means the first date on which (a) the Bankruptcy Court shall have entered the Interim Financing Order, and (b) all of the conditions set forth in Section 5 hereof (except for the entry of the Final Financing Order) shall have been satisfied by the Trustee in a manner satisfactory to the Builder Lenders and the Agent.

"**Interim Financing Order**" means the interim order of the Bankruptcy Court approving the Loan Documents, granting the Superpriority Claim status, and granting the Builder Lenders' first priority priming liens on the Collateral, granting the Agent, as Agent's Adequate Protection Liens, second-priority liens in the Collateral subject only to the Builders Lenders' first-priority liens on the Collateral, and a first priority lien in all other assets of the Estate  other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, and subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code, which order shall have been entered upon motion of the Trustee satisfactory in form and substance to the Builder Lenders and the Agent.

"**JPMorgan**" has the meaning specified in the recitals hereto.

"**LID**" has the meaning specified in the recitals hereto.

"**Loan**" means a loan made by the Builder Lenders to the Trustee pursuant to Section 2 hereof.

"**Loan Documents**" means, collectively, this Agreement, any note or notes executed by the Trustee at the Builder Lenders' request, and all other agreements, instruments, and other documents executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Loan or the Obligations, all as may be amended, modified, or extended from time to time.

"**Maturity Date**" means the earliest of: (a) the termination of the Plan Support Agreement, (b) the Trustee's Consent Termination, (c) the effective date of the Plan of Reorganization, (d) termination of the Loans pursuant to Section 10.1 following a Default, (e) the failure of the Final Financing Order to be entered by the Bankruptcy Court on or before August 12, 2011, or (f) November 30, 2011 (provided, however, that in the case of "f" only, the Maturity Date shall be extended by such additional time, if any, as is permitted for a plan effective date under Section 3(d) of the Plan Support Agreement, provided that a Budget that is acceptable to the Trustee, the Agent, and the Builder Lenders is agreed to in connection with such extension).

"**Notice of Borrowing**" has the meaning specified in Section 2 hereof.

"**Obligations**" means all present and future indebtedness, obligations, and liabilities of the Trustee, on behalf of South Edge and its Estate, to the Builder Lenders under the Loan Documents, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, or unsecured, and whether or not such claim is stayed. Without limiting the generality of the foregoing, the Obligations of the Trustee, South Edge, and its Estate under the Loan Documents include (a) the obligation to pay principal, Default Rate interest following a Default, reasonable attorneys' fees and expenses of the Builder Lenders following a Default that relate to the enforcement of remedies under the Loan Documents, and other amounts payable under the Loan Documents, (b) the obligation to reimburse any amount in respect of any of the foregoing that the Builder Lenders (in their sole discretion) may elect to pay or advance, consistent with the Budget, on behalf of the Trustee and the Estate, (c) advances to protect the Builder Lenders' Collateral following Default, including the completion of LID segment construction, and related documentation, within or outside of South Edge's development pursuant to Section 10.1, and (d) the Section 15 Advances; provided, however, "b" and "c" above shall also require the approval of the Agent in its reasonable discretion. The Obligations shall not be subject to setoff or counterclaim of any kind, including any assertion by the Trustee or the Estate for capital contributions or other alleged obligations of the Settling Builders to South Edge or the Estate.

"**Permitted Liens**" means: (i) liens for taxes or LID assessments for which funding has not been provided to the Trustee under the Budget such that a timely payment may be made by the Trustee; (ii) liens for taxes or LID assessments not yet payable or that are payable but are being contested in good faith and by appropriate proceedings diligently pursued, provided that a reserve or other appropriate provision, if any, as shall be required by generally accepted accounting principles shall have been made therefore; and (iii) liens in favor of the Builder Lenders and Agent hereunder and under the Financing Orders.

"**Person**" means individual, company, or other entity.

"**Petition Date**" has the meaning specified in the recitals hereto.

"**Plan of Reorganization**" means the chapter 11 plan of reorganization to be confirmed in the Chapter 11 Case in accordance with the Plan Support Agreement.

"**Plan Support Agreement**" has the meaning specified in the recitals hereto.

"**Prepetition Credit Agreement**" means the Credit Agreement, dated November 1, 2004, as amended and restated by the Amended and Restated Credit Agreement, dated March 9, 2007, among South Edge as the borrower, the lenders party thereto, JPMorgan as the Administrative Agent, and The Royal Bank of Scotland PLC as Syndication Agent.

"**Revolving Note**" has the meaning set forth in Subsection 5.1(b) hereof.

"**Section 15 Advances**" means advances made on account of the Settling Builders' obligations pursuant to Section 15 of the Trustee's Consent for all allowed and unpaid administrative expenses of the Estate that are accrued through the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), not to exceed such unpaid amounts as are set forth in the Budget through the Maturity Date (other than as a result of the effective date of the Plan of Reorganization); provided, however, that the allowed fees and expenses of the Trustee, and all professional persons employed by the Trustee, shall not exceed the amount of unpaid fees and expenses for the full Budget period; and provided further that the Trustee reserves all her rights with respect to the allowance and payment in full of (i) any such excess amounts through the Maturity Date, and (ii) additionally any fees and expenses that remain accrued and unpaid through the conclusion of the Chapter 11 Case, from the Agent's cash collateral, from the MI Funds if they are determined to be property of the Estate, or from the Bankruptcy Code Section 506(c) surcharge of the Agent's and Lenders' non-cash collateral under the standard set forth in the Cash Collateral Orders, without prejudice to the rights of all parties in interest in the Chapter 11 Case, including the Agent (on its own behalf and on behalf of the Lenders) to contest such allowance and payment. Section 15 Advances shall be made only after the satisfaction of such obligations from the following sources, and in the following order: (a) any unencumbered cash held by the Trustee as of the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), (b) LID

proceeds in the possession of the Trustee that constitute the Builder Lenders' cash collateral, (c) funds remaining in the Term Sheet Escrow after payment of all amounts owing from the Term Sheet Escrow to the Agent and the Prepetition Credit Agreement lenders, pursuant to the terms of the Term Sheet Escrow, (d) funds in the Builder Lenders' Account pursuant to Section 2.3(b) hereof, or (e) such other arrangements as are mutually acceptable to the Settling Builders and the Trustee.

"**Settling Builders**" has the meaning specified in the recitals hereto.

"**South Edge**" has the meaning specified in the preamble hereto.

"**Superpriority Claim**" means a claim against South Edge and its Estate in the Chapter 11 Case, which is an administrative expense claim having priority over any and all other administrative expenses of the kind specified in Bankruptcy Code sections 503(b) or 507(b) (including any post-conversion expenses with priority under Bankruptcy Code section 726(b)), except for the superpriority claim granted to the Agent under the Cash Collateral Orders, which shall be pari passu with this claim.

"**Term Sheet Escrow**" means the escrow account established at U.S. Bank National Association created pursuant to the Plan Support Agreement established for, among other purposes, to finance Chapter 11 administrative expenses, including LID assessments and taxes in accordance with the Budget and as contemplated by the Plan Support Agreement.

"**Trustee**" has the meaning specified in the preamble hereto.

"**Trustee's Consent**" has the meaning specified in the recitals hereto.

"**Trustee's Consent Termination**" means the Trustee's taking of actions that are inconsistent with the Plan Support Agreement, as consented to as modified, limited, or clarified by the Trustee pursuant to the Trustee's Consent (including, among other things, the Trustee's opposing the Plan of Reorganization or asserting claims against the Settling Builders or their insiders or affiliates), unless the Trustee's actions are preceded by the Settling Builders and the Agent modifying the Plan Support Agreement or the Plan of Reorganization contemplated thereunder in a manner that has a material adverse effect on the interests of the Estate.

"**Trustee Motion**" has the meaning specified in the recitals hereto.

1.2    <u>Financial Reporting</u>.

Except for professional fee accruals, all financial reporting to the Builder Lenders and the Agent pursuant to Section 6.1 hereof shall be made on a cash flow basis, unless otherwise specifically noted by the Trustee.  The Trustee shall comply with the U.S. Trustee Guidelines in connection with financial reports filed in the Chapter 11 Case.

1.3    <u>Terms Generally</u>.

7

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms.  The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument, or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements, or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits, and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect, and such words shall refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal, or mixed, and whether tangible or intangible, and (f) the term "financial statements" shall include the accompanying notes and schedules.

2.      LOAN AND TERMS OF PAYMENT.

    2.1      <u>Credit Extensions</u>.

        (a)      Promise to Pay.

Subject to the terms and conditions of this Agreement and the other Loan Documents (including the absence of any Default or event that, with the passage of time, would become a Default), the Builder Lenders agree to make Loans to the Trustee, on behalf of the Estate, as set forth below prior to the Maturity Date.  The Trustee on behalf of the Estate promises to pay to the Builder Lenders on the Maturity Date, or such earlier date as specified herein, in cash, the aggregate unpaid principal amount of all Loans made by the Builder Lenders to the Trustee, together with any accrued and unpaid Default Rate Interest and other unpaid Obligations in accordance with the terms of this Agreement and the other Loan Documents and the Final Financing Order.

        (b)      Loans.

           (i)      <u>Interim Closing Amount</u>.

Subject to the terms and conditions of this Agreement and the other Loan Documents (including the absence of any Default or event that, with the passage of time, would become a Default), and upon the Interim Closing Date, the Trustee may request Loans in an initial aggregate amount not to exceed $4 million for the purpose of funding those expenses in the Budget that are expressly identified as being payable pursuant to the Interim Financing Order.

(ii)    <u>Final Closing Amount</u>.

Subject to the terms and conditions of this Agreement and the other Loan Documents (including the absence of any Default or event that, with the passage of time, would become a Default), and upon the Final Closing Date, the Trustee may request Loans from time to time in an amount such that the total Loans outstanding at any time shall not exceed the aggregate of (x) the next applicable weekly "Ending Balance – TIP Loan" on the Budget, plus (y) any revenue or receipt projected through such applicable weekly "Ending Balance – TIP Loan" on the Budget that has not been received by the Trustee or the Estate at such time, less (z) any expense projected through such applicable weekly "Ending Balance – TIP Loan" that has not been paid at such time.  Subject to the terms of this Agreement and the other Loan Documents (including the Budget), the Loans shall be revolving Loans from which the Trustee may make draws from time to time in accordance with the Budget and without further approval of the Builder Lenders or the Agent.

(iii)    <u>Form of Loan Request</u>.

When the Trustee desires to obtain a Loan, the Trustee shall notify the Builder Lenders and the Agent (which notice shall be irrevocable) by electronic mail to be received no later than 3:00 p.m. Pacific Time three Business Days before the day on which the Loan is to be made, which Loan shall be made by wire transfer from the Term Sheet Escrow (or, following the Maturity Date with respect to Section 15 Advances only, the Builder Lenders' Account) to the Trustee as the Trustee directs.  Such notice (a "**Notice of Borrowing**") shall be in the form reasonably acceptable to the Trustee, the Builder Lenders, and the Agent.  The Notice of Borrowing shall be signed by the Trustee.

2.2    <u>Interest Rates and Calculations</u>.

(a)    Interest.

The Loans shall be without interest, unless and until a Default or the Maturity Date, at which time interest will accrue and be payable at the Default Rate.

(b)    Default Rate and Fees.

Upon the occurrence and during the continuance of a Default, (i) the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities, or any other Obligations of the Trustee under this Agreement or the other Loan Documents, shall bear interest from the date such Default occurs until all Obligations are paid in full at the prime rate (as quoted in the Wall Street Journal) plus five percent, per annum**,** and (ii) the Builder Lenders shall be reimbursed for all of their reasonable attorneys' fees and expenses relating to enforcement of the Builder Lenders' rights with respect to the Loans and other Obligations.

(c)    Computation.

All interest and fees chargeable under this Agreement and the other Loan Documents shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed, and compounded monthly.

2.3     Payments.

(a)     Time of Payments.

The Trustee shall make any payment under this Agreement not later than 1:00 p.m. Pacific Time on the day when due, in cash or other immediately available funds. All payments received after 4:00 p.m. Pacific Time on any Business Day will be credited on the next succeeding Business Day. All payments shall be made by the Trustee without setoff, counterclaim, deduction, or other defense of any kind, including any assertion by the Trustee or the Estate for capital contributions or other alleged obligations of the Settling Builders to the Estate. Whenever any payment made under this Agreement and the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

(b)     Location of Payments.

Prior to the Maturity Date, all payments shall be made to the Term Sheet Escrow. After the Maturity Date, and provided that all distributions from the Term Sheet Escrow to the Agent as required by the Plan Support Agreement have been made, all payments shall be made to the Builder Lenders' Account; provided, however, that if all or any of such distributions to the Agent have not been made, the Trustee shall continue to make payments to the Term Sheet Escrow until such required distributions to the Agent have been fully funded. Following the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), the Builder Lenders shall maintain a balance in the Builder Lenders' Account equal to the lesser of (i) $2 million or (ii) such amounts as the Builder Lenders reasonably conclude may have to be advanced in order to make the Section 15 Advances; provided, however, that prior to making any such reduction, the Builder Lenders shall give the Trustee five Business Days advance notice, and the Builder Lenders shall consent to an expedited hearing in the Bankruptcy Court for the resolution of any dispute concerning any such proposed reduction. Any amounts in the Builder Lenders' Account shall not be subject to attachment, setoff, or counterclaim of any kind, including any assertion by the Trustee or the Estate for capital contributions or other alleged obligations of the Settling Builders to South Edge or the Estate.

2.4     Term.

This Agreement shall become effective on the Interim Closing Date and shall continue in full force and effect for so long as any Obligations remain outstanding or the Builder Lenders have any obligation to make Loans under this Agreement. Notwithstanding the foregoing (and except as provided for Section 15 Advances), the Builder Lenders' obligation to make Loans shall terminate upon the Maturity Date, and prior to the Maturity Date, the Builder Lenders shall have the right to terminate their

obligation to make Loans under this Agreement immediately and without further notice upon the occurrence of a Default.

    2.5    <u>Revolving Loan</u>.

The Trustee shall repay with receipts received by the Trustee, without penalty or premium, the outstanding principal of Loan, in whole or in part, in such amount that, at the end of each week leaves the Trustee holding no more than $1,000,000 plus amounts projected to be paid, less any revenues or receipts projected to be received, through the next applicable three-week period in the Budget. Upon such repayment, such amounts shall be available thereafter for further draw by the Trustee pursuant to the Budget and Section 2.1(b)(ii) hereof.

    2.6    <u>Use of Proceeds</u>.

    (a)    Generally.

The Trustee shall use the Loan proceeds to finance chapter 11 administrative expenses including LID assessments and segment project costs, taxes, the fees and expenses of the Trustee and her professionals in such amounts as are required to be paid on an interim and final basis, and other allowed administrative expenses, in accordance with the Budget and for such purposes and in such amounts as are set forth in the Budget, subject to Section 2.6(b) below; provided, however, that with respect to interim fees, the allowed fees and expenses shall not exceed the amount of unpaid fees and expenses for the full Budget period.

    (b)    Deviation.

The Trustee, the Builder Lenders, and the Agent shall work diligently and in good faith with respect to any modifications to the Budget requested by the Trustee and to resolve any disputes that may exist with respect to deviations from the Budget, and the Trustee, the Builder Lenders, and the Agent shall consent to an expedited hearing in the Bankruptcy Court for the resolution of any such disputes.

Upon at least five Business Days advance notice to the Builder Lenders and the Agent (except with respect to the payment of the fees of the Trustee and the Trustee's professionals, which shall be only in such amounts as are set forth in the Budget), the Trustee may use the Loan proceeds for such other purposes and in such other amounts as are (x) reasonably consistent with the Budget, (y) commercially reasonable, or (z) essential to protect the Estate's assets. Notwithstanding the foregoing notice requirement, the Trustee shall only be required to provide such notice as is reasonably practicable in the event of exigent circumstances that pose an immediate and irreparable threat to the Estate.

    (c)    LID Segment Construction.

The Trustee shall confer in advance with the Builder Lenders and the Agent regarding anticipated draws with respect to all LID segment construction provided for in the Budget, including drainage-related construction expenses.

        (d)     Professionals.

The inclusion of fees and expenses of the Trustee and her professionals in the Budget are without prejudice to the rights of all parties in the Chapter 11 Case with respect to timely objection to the allowance of such fees and expenses.

    2.7    Section 15 Advances.

Notwithstanding the occurrence of the Maturity Date (other than as a result of the effective date of the Plan of Reorganization), unless the Trustee has failed to act diligently and in good faith to comply with this Agreement, the Builder Lenders shall advance to the Trustee the Section 15 Advances.  Without the need for any further Bankruptcy Court order, such Section 15 Advances shall be Superpriority Claims secured by a first priority priming lien on the Collateral pursuant to Bankruptcy Code section 364(d) in the same manner as all other Obligations hereunder, shall accrue interest at the Default Rate, and shall be repaid by the Trustee or the Estate from and upon the earlier of (i) the receipt of any additional LID proceeds by the Trustee or the Estate, (ii) subject to the Agent's prior perfected lien and on terms acceptable to the Agent, such of the funds in the disputed MI Deposit Account as are determined to be property of the Estate (in such amounts and at such times as received by the Trustee or the Estate, until the Section 15 Advances are paid in full), (iii) the obtaining of any alternative section 364 financing, (iv) subject to the Agent's prior perfected lien and on terms acceptable to the Agent, the proceeds of the sale of substantially all of the assets of the Estate, (v) distributions pursuant to a plan of reorganization upon its effective date, or (vi) funds otherwise available for such application upon the conversion or dismissal of the Chapter 11 Case, under the terms hereof.

    2.8    Source of Loans.

All Loans under this Agreement shall be funded from the Term Sheet Escrow, except to the extent that loans from the Builder Lenders' Account are required to fund the Section 15 Advances upon the Maturity Date.  The rights and obligations of each of the Builder Lenders under this Agreement are several, in the percentages set forth in Exhibit "1" to the plan term sheet that is a part of the Plan Support Agreement.

3.    ALLOWANCE AND PRIORITY OF CLAIMS

Upon entry of the Interim Financing Order or the Final Financing Order, as the case may be, the Obligations of the Trustee and of South Edge and its Estate hereunder shall at all times constitute allowed Superpriority Claims under the terms hereof.

4.      SECURITY INTEREST IN FAVOR OF LENDERS

4.1      Security Interest in Collateral.

As security for the Loans and all other Obligations, the Trustee on behalf of South Edge and its Estate hereby pledges, assigns, and grants to the Builder Lenders first priority priming liens on all of the Collateral.  Except as set forth herein with respect to the Collateral, the Agent's liens in and to the Debtor's and the Estate's assets granted to the Agent for itself and the benefit of the Lenders in accordance with the terms of the Cash Collateral Order and the first priority status thereof, shall be unaffected by the terms of this Agreement, the Interim Financing Order, and the Final Financing Order and shall remain in full force and effect.

4.2      Priority of Builder Lenders' and Agent's Security Interests.

The Builder Lenders' liens on the Collateral shall be senior to all other liens, encumbrances, and other interests in such Collateral pursuant to Bankruptcy Code section 364(d)(1), including any lien or other encumbrances of the Agent under the Prepetition Credit Agreement or under prior orders of the Bankruptcy Court, except that (i) the Agent shall be granted a second priority lien on all Collateral and a first priority lien in all other assets of the Estate, other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, in accordance with Agent's Adequate Protection Lien for any diminution of the value of the Agent's interest in the Collateral resulting from the use of the Collateral and the imposition of the automatic stay, and (ii) the Permitted Liens, if any, may be senior to the Builder Lenders' liens, but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code.  The Builder Lenders' liens on the Collateral shall not be subject to surcharge under Bankruptcy Code section 506(c) or otherwise.

4.3      Preservation of Collateral; Perfection of Builder Lenders' Security Interest and Agent's Security Interest.

The Builder Lenders' and Agent's liens on the Collateral shall be deemed perfected with no need for the Trustee to execute any additional documents or of recordation.  Notwithstanding the foregoing, the Trustee shall, at the Builder Lenders' request, or Agent's request, at any time and from time to time, execute and deliver to the Builder Lenders or Agent such security agreements, mortgages, financing statements, documents, and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed reasonably necessary or desirable by the Builder Lenders or Agent) and do such other acts and things as the Builder Lenders or Agent may deem necessary or desirable in order to establish and maintain the validity, attachment, and perfection of the Builder Lenders' liens or Agent's liens (free and clear of all other liens, claims, and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Permitted Liens).  The Trustee irrevocably hereby makes, constitutes, and appoints the Builder Lenders and Agent (and all Persons designated by the Builder Lenders or Agent for that purpose) as the Trustee's true and lawful attorney and agent-in-

fact to execute such security agreements, mortgages, financing statements, documents, and other agreements and instruments and do such other acts and things as may be necessary or appropriate to preserve and perfect the Builder Lenders' liens or Agent's liens on the Collateral.  The Trustee further agrees that a carbon, photographic, photostatic, or other reproduction of this Agreement, the Financing Orders, or of a financing statement shall be sufficient as a financing statement.

5.    CONDITIONS OF LOANS

    5.1    <u>Conditions Precedent to all Loans</u>.

    The obligation of the Builder Lenders, if any, to make any Loan is subject to the satisfaction of the following conditions precedent (or the express prior waiver thereof by the Builder Lenders, which shall be in writing and subject to the Builder Lenders' sole and absolute discretion):

        (a)    Interim Financing Order.

    The Bankruptcy Court shall have entered, and the Builder Lenders and the Agent shall have received a true copy of, an order in substantially the form of Exhibit "B" attached hereto, with only such changes as the Builder Lenders and Agent have approved in their sole and absolute discretion, approving on an interim basis pursuant to Bankruptcy Rule 4001(c)(2) this Agreement and the other Loan Documents, the granting the Superpriority Claim status, the Builder Lenders' first priority liens on the Collateral, and the Agent's second priority Adequate Protection Liens on the Collateral and first priority Adequate Protection Lien on the Estate's other assets other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, and subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code, which Interim Financing Order (i) shall have been entered upon motion of the Trustee in form and substance acceptable to the Builder Lenders and the Agent, (ii) shall be in full force and effect, (iii) shall not have been stayed, revoked, reversed, modified, or amended in any respect, and (iv) shall include full Bankruptcy Code section 364(e) findings and protections for the Builder Lenders and the Agent;

        (b)    Delivery of Documents.

    The Builder Lenders shall have received from the Trustee the following documents in each case duly executed by the Trustee:  (i) this Agreement; (ii) a promissory note (the "**Revolving Note**") in form and substance satisfactory to the Builder Lenders in their sole and absolute discretion; and (iii) such other Loan Documents (including UCC financing statements) as shall reasonably be requested by the Builder Lenders; and the Agent shall have received copies of each of the foregoing;

        (c)    Notice of Borrowing.

The Builder Lenders shall have timely received from the Trustee a duly executed Notice of Borrowing;

(d)     No Default.

No Default or event that, with the passage of any applicable cure period, would become a Default, shall have occurred and be continuing;

(e)     No Maturity.

The Maturity Date shall not have occurred; provided, however, that notwithstanding the passage of the Maturity Date, the Builder Lenders' shall, subject to the terms of Section 2.7 hereof, make the Section 15 Advances if and to the extent required hereunder; and

(f)     Final Financing Order.

Except for those operating expenses which are expressly indicated on the Budget as being payable following entry of the Interim Financing Order (in an amount not to exceed $4 million), on or before August 12, 2011, the Bankruptcy Court shall have entered, and the Builder Lenders and the Agent shall have received a true copy of, an order in substantially the form of Exhibit "B" attached hereto (modified to be a final order), with only such changes as the Builder Lenders and the Agent have approved in their sole and absolute discretion, approving on a final basis this Agreement and the other Loan Documents, the granting of the Superpriority Claim status, and the Builder Lenders' first priority liens on the Collateral, the Agent's second priority Adequate Protection Liens on the Collateral, and first priority Adequate Protection Lien on the Estate's other assets other than any claims and causes of action under sections 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or the proceeds thereof, and subject to the Permitted Liens (as such term is defined in the Cash Collateral Stipulation), but only to the extent that such Permitted Liens are valid and perfected under applicable non-bankruptcy law and are not avoided or subordinated under the Bankruptcy Code, which Final Financing Order (i) shall have been entered upon motion of the Trustee in form and substance acceptable to the Builder Lenders and the Agent, (ii) shall be in full force and effect, (iii) shall not have been stayed, revoked, reversed, modified, or amended in any respect, and (iv) shall include full Bankruptcy Code section 364(e) findings and protections for the Builder Lenders.

6.     REPRESENTATIONS AND WARRANTIES.

The Trustee hereby represents and warrants to the Builder Lenders the following statements to be true and correct as of each Closing Date and of each date that a Notice of Borrowing is submitted:

6.1     Authority.

The Trustee (i) is the duly appointed chapter 11 trustee of South Edge, (ii) has all requisite power and authority to conduct the business of South Edge as now conducted and as presently contemplated and, (iii) subject to the entry and the terms of the Interim Financing Order or the Final Financing Order, as the case may be, has the authority to make the borrowings hereunder, and to execute and deliver each Loan Document to which she is a party, and to consummate the transactions contemplated thereby.

6.2     Execution and Binding Effect.

Subject to the entry and the terms of the Interim Financing Order or the Final Financing Order, as the case may be, this Agreement and each of the other Loan Documents when delivered hereunder is or will be duly and validly executed and delivered by the Trustee and constitutes legal, valid, and binding obligations of the Trustee and of South Edge and its Estate, enforceable in accordance with the terms hereof or thereof, and binding upon any successor to the Trustee (including any chapter 7 trustee for South Edge).

6.3     No Default.

No Default or event that, with the passage of the applicable cure period would become a Default, exists.

7.     AFFIRMATIVE COVENANTS.

Until payment in full of all outstanding Obligations, and for so long as the Builder Lenders may have any commitment to make any Loans hereunder (including the Section 15 Advances), the Trustee shall do all of the following:

7.1     Financial Reporting.

The Trustee, or any of her retained advisors, shall provide to the Builder Lenders and the Agent the following:

(i)     copies of the monthly operating reports filed in the Chapter 11 Case, and all other financial reports required to be prepared by the United States Trustee Guidelines or otherwise prepared by the Trustee and filed in the Chapter 11 Case;

(ii)     copies by electronic mail or paper service of all pleadings, motions, applications, reports, or other documents filed by or on behalf of the Trustee with the Bankruptcy Court or the Office of the United States Trustee;

(iii)    every two weeks, (x) a reconciliation report comparing actual cash flows and accrued professionals fees and expenses (including summary, mid-month reports by the Trustee's principal professionals) versus the Budget, with explanations of any material variances, and (y) a summary statement of cash balances and accrued accounts payable, each to be provided to the Builder Lenders within 14 days after the end of each two-week period; and

(iv)    copies of all documents relating to the LID segments that the Trustee submits to either Gomez or the City of Henderson in order to have the completed LID projects approved and submitted for reimbursement, and a weekly update, either written or oral, summarizing the progress on current LID segment projects, which update shall include the following information: (1) summary of meetings with representatives from the City of Henderson or other governmental entities, (2) expenditures, (3) status of pending approvals from both Gomez and the City of Henderson for completed projects, (4) any updates on imminent overruns or delays, and (5) the status of the reimbursement on prior LID projects.

7.2    <u>Books and Records</u>.

The Trustee shall maintain books of account and other records for South Edge and for disbursement and use of the proceeds of the Loan, and the same shall be available for inspection and copying by the Builder Lenders and the Agent upon reasonable prior notice.  The Trustee shall use her best efforts to obtain all remaining South Edge books and records that are in the possession of the former manager of South Edge and its affiliates.

7.3    <u>Use of Proceeds</u>.

The Trustee shall use the loan proceeds to finance allowed administrative expenses of the Chapter 11 Case solely in accordance with the Budget and Sections 2.6 and 2.7 hereof.

7.4    <u>Cooperation and Consultation</u>.

Subject to the execution of reasonable confidentiality and/or common interest agreements, and further subject to the terms of the Trustee's Consent, the Trustee shall consult in advance with the Builder Lenders and the Agent regarding the administration of the Estate, including (i) the prosecution of claims on behalf of the Estate and the incurrence of material fees and expenses in connection therewith, (ii) claims objections, (iii) restructuring, planning, or development proposals to the City of Henderson, other governmental entities, and holders of bonds issued in connection with LID, and (iv) other

matters affecting the administration of the Estate. The Trustee shall make available to the Builder Lenders and Agent, upon reasonable notice, access to all plans, reports, records, and other non-privileged documentation (including records relating to prevailing wage compliance) relating to LID segment work and other projects within South Edge's development.

8.    NEGATIVE COVENANTS.

Until payment in full of all outstanding Obligations, and for so long as Builder Lenders may have any commitment to make any Loans hereunder, the Trustee shall not do any of the following without Builder Lenders' prior written consent; provided, however, that Sections 8.3, 8.5, 8.6, and 8.7 shall not apply upon the occurrence of a Maturity Date (other than as a result of the effective date of a Plan of Reorganization), but in no event shall funds advanced by the Builder Lenders be used (x) to fund the pursuit or investigation of any claims against the Builder Lenders, the Settling Builders, or their insiders or affiliates, or (y) to oppose the Plan of Reorganization:

8.1    Superpriority Claims/Senior Liens.

Apply to the Bankruptcy Court for the authority to incur, create, assume, suffer to exist, or permit, or incur, create, assume, suffer to exist, or permit, any other Superpriority Claim, lien, or encumbrance that is either (i) pari passu with or senior to the liens or claims of the Builder Lenders with respect to the Collateral, except for the Permitted Liens, or (ii) pari passu with or senior to the Superpriority Claim with respect to any unencumbered assets of the Estate; provided, however, that this Section shall not apply if one of the purposes of such application is to provide for the immediate satisfaction, in full and in cash, of all outstanding Obligations.

8.2    Financing Orders.

At any time, seek or consent to any revocation, reversal, modification, vacation, or staying of the Financing Orders, except as may be agreed by the Builder Lenders and the Agent in their sole and absolute discretion.

8.3    Deviation from Budget.

Accrue, incur, or pay any expense that is not provided for in the Budget, or permit any of the forgoing to occur, except as may be agreed by the Builder Lenders and the Agent, in their sole and absolute discretion, or as permitted pursuant to Section 2.6 hereof.

8.4    Protection of Collateral.

Compromise, settle, release, or otherwise cause or permit the modification of any rights of the Trustee, South Edge, the Estate, or the Builder Lenders in and to the Collateral.

8.5    Significant Transactions.

Approve, file, support, or consent to any of the following that is not approved by the Builder Lenders, in their sole and absolute discretion: (i) a plan of reorganization in the Chapter 11 Case; (ii) a sale or compromise of material assets of South Edge or its Estate (the term "material" includes the sale or other transfer of any real property, and the settlement of any claims by or against members and former members of South Edge and their insiders or affiliates); (iii) the allowance of any claims against South Edge or its Estate in excess of $25,000 other than such claims as appear in the Schedules of Assets and Liabilities of South Edge previously filed by the Trustee in the Chapter 11 Case that were not scheduled as disputed, contingent or unliquidated, and for which no proof of claim was filed by such claimant; (iv) the entry into any contract with a total cost to South Edge or the Estate in excess of $25,000; provided, however, that if the contract relates to an expenditure which has been set forth in the Budget, and if each of the Builder Lenders is given an equal opportunity to bid on the contract, and either (x) all Builder Lenders choose not to bid, or (y) none of the bids by any of the Builder Lenders is the lowest bid, then written consent from the Builder Lenders shall not be required for such contract if such contract is commercially reasonable; (v) material amendments to plans, permits, or specifications for any improvements to South Edge's property; or (vi) amendments to South Edge's Development Plan, Acquisition Agreement, or other material agreements with or relating to the City of Henderson or the LID, or other governmental entities; provided, however, "iii", "v", and "vi" above shall also require the approval of the Agent in its sole and absolute discretion.  In connection with "iv" above, the Trustee and her representatives will only be required to deal with a single representative to be appointed by the Builder Lenders.  The Builder Lenders' representative will coordinate any bids from the Builder Lenders, and/or their subcontractors.

### 8.6    Litigation Against Builder Lenders.

File or pursue any litigation or other claims against the Builder Lenders, the Settling Builders, or their insiders or affiliates, except with respect to actions to interpret or enforce the Trustee's rights under this Agreement.

### 8.7    Trustee Consent.

Unless the Trustee's Consent has been terminated in accordance with the limitations and qualifications set forth therein, take any action that is inconsistent with the Trustee Consent, including objecting to or otherwise opposing confirmation of the Plan of Reorganization.

## 9.    DEFAULTS.

Any one or more of the following events shall constitute a Default under this Agreement and the other Loan Documents:

(a)    the Trustee's failure to pay when due any monetary sum payable under this Agreement or any of the other Loan Documents, and such failure to pay

continues for two Business Days after written notice by Builder Lenders to the Trustee that such sum is due and payable;

(b)     other than a monetary default of the type specified in Section 9.1(a), the Trustee's failure to perform, observe, or otherwise comply with any material term, condition, affirmative or negative covenant, or other agreement contained in this Agreement or in any of the other Loan Documents, and as to any such default that can be cured, the Trustee has failed to cure such default within five Business Days after the Trustee receives notice thereof from the Builder Lenders;

(c)     any representation or warranty made by the Trustee hereunder shall be untrue and, as to any such default that can be cured by the Trustee, the Trustee has failed to cure such default within five Business Days after the Trustee receives notice thereof from the Builder Lenders;

(d)     an order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

(e)     the Trustee shall take any actions that are inconsistent with the Trustee's Consent, which actions are not revoked or annulled within five Business Days after the Trustee receives notice thereof from the Builder Lenders;

(f)     an order shall be entered dismissing the Chapter 11 Case and such order does not provide for termination of the commitment hereunder and under the other Loan Documents, and for the immediate payment in full in cash of all Obligations hereunder and under the other Loan Documents; or

(g)     an order shall be entered, without the express prior written consent of the Builder Lenders, to revoke, reverse, modify, stay, or vacate the Financing Orders.

10.     LENDERS' RIGHTS AND REMEDIES.

    10.1    <u>Remedies Generally</u>.

    Upon the occurrence of a Default, the Builder Lenders may immediately, upon giving notice to the Trustee, (a) in addition to the Builder Lenders' rights under Section 5.1(d) hereof, cease to make any Loans under this Agreement or any other Loan Document (other than the Section 15 Advances if and to the extent required hereunder), (b) declare all or any portion of the Loans and all other outstanding Obligations to be due and payable immediately, without further order of, or application to, the Bankruptcy Court, and without presentment, demand, or protest, all of which are hereby expressly waived by the Trustee, (c) subject to the following Sections 10.2 and 10.3 below, exercise any and all of its other rights and remedies under applicable law (including, but not limited to, the Bankruptcy Code), this Agreement, and the other Loan Documents, for the purpose of seeking and expediting repayment of all outstanding Obligations from the Collateral consistent with the provisions of section 9-607 of the UCC, and (d) the right (but not the obligation) to pay outstanding invoices, satisfy LID-related assessments and

property taxes, and make other protective advances to the Trustee to enable her to complete LID segment construction and submit related documentation to collect LID Proceeds and apply them in reduction of any outstanding Loans and other Obligations, and additionally, upon 30 days after delivery of such notice if the Trustee has insufficient funds or financing available to enable her to do so, actually complete LID segment construction within or outside of South Edge's development (provided the Builder Lenders will consult on an ongoing basis with the Agent with respect to all contemplated and ongoing projects), and submit related documentation to collect LID Proceeds and apply them in reduction of any outstanding Loans and other Obligations (the "Builder Lenders' LID Remedy"); provided, however, that the Builder Lenders shall not be entitled to foreclose upon the Collateral or any of the other assets of the Estate.

In furtherance of the Builder Lenders' right to be repaid the Obligations in full immediately upon the occurrence of a Default (and without in any way limiting the rights of the Builder Lenders set forth in the remainder of this Section 10.1 or otherwise in this Agreement), and subject to the Trustee's retention of $150,000 in cash to be used to satisfy essential post-Default chapter 11 administrative expenses consistent with the Budget (excluding LID and or the Trustee's fees or the fees of her professionals) through a date that is the earlier of (i) thirty days after notice to the Trustee of the Default or (ii) the approval by the Bankruptcy Court of Bankruptcy Code section 364 borrowings from any source other than the Builder Lenders, the following funds must be used to repay the Builder Lenders following a Default, without any offset or delay of any kind whatsoever: (x) any unencumbered cash held by the Trustee as of the Maturity Date (to the extent such cash is not applied to Section 15 Advances), (y) LID proceeds in the possession of the Trustee that constitute the Builder Lenders' cash collateral, and (z) any proceeds of subsequent Bankruptcy Code section 364 borrowings from any source.

10.2    Relief from the Automatic Stay.

With respect to relief from the automatic stay of Bankruptcy Code section 362, the Financing Orders shall provide that if a Default occurs, then (i) the Builder Lenders may set an expedited hearing for relief from the automatic stay on not less than three Business Days' notice and at such hearing the only issues will be (x) whether an uncured Default exists, and (y) whether the Bankruptcy Court may impose any condition on the exercise of the Builder Lenders' remedies (which condition the Builder Lenders may oppose), so long as such condition does not delay the Builder Lenders' exercise of remedies for more than 30 days and otherwise does not impair the interests of the Builder Lenders in their Collateral hereunder; and (ii) consistent with the Bankruptcy Court's determination as to "i" above, the Builder Lenders shall be granted relief from stay if an uncured Default is found to exist.

10.3    Modification of the Automatic Stay.

Subject to Sections 10.1 and 10.2 of this Agreement, upon entry of the Interim Financing Order or the Final Financing Order, as the case may be:

(a)    the automatic stay provisions of Bankruptcy Code section 362 shall be vacated and modified to the extent necessary to permit the Builder Lenders to exercise all rights afforded to them hereunder and to effectuate the provisions of this Agreement and the Financing Orders, without the need for filing further pleadings or application to or order of the Bankruptcy Court; and

(b)    no party in interest shall have the right to contest the enforcement of the remedies set forth in this Agreement on any basis other than the fact that a Default has not occurred.  No party in interest shall have the right to seek injunctive relief against such enforcement under Bankruptcy Code section 105 or otherwise, or to seek injunctive relief in conflict with the provisions of this Agreement or the Financing Orders.

11.    NOTICES.

Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement and the other Loan Documents and/or any other agreement entered into in connection herewith shall be in writing and (except for informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by a recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, or by facsimile or electronic mail to the Trustee, the Builder Lenders, or the Agent, as the case may be, at its addresses set forth below:

If to Trustee:              SOUTH EDGE, LLC.
                            c/o FTI Consulting, Inc.,
                            633 West 5th Street
                            Suite 1600
                            Los Angeles, CA 90071
                            Attn:  Cynthia Nelson
                            FAX:  (213) 452-6099
                            Email:  Cynthia.nelson@fticonsulting.com

with a copy to:             MILBANK, TWEED, HADLEY, & MCCLOY LLP
                            601 South Figueroa Street, 30th Floor
                            Los Angeles, CA  90017
                            Attn:  Robert J. Moore, Esq.
                            Attn:  David B. Zolkin, Esq.
                            FAX:  (213) 629-5063
                            Email: rmoore@milbank.com
                            Email: dzolkin@milbank.com

If to Builder Lenders:      KB HOME NV ACQUISITION LLC
                            c/o KB Home
                            Attn:  Albert Praw and Ross Kay
                            10990 Wilshire Boulevard, Floor 7
                            Los Angeles, CA  90024
                            FAX: (310) 231-4280
                            Email: apraw-x@kbhome.com

Email: RKay@kbhome.com

TOLL HENDERSON II LLC
c/o Toll Brothers, Inc.
Attn:  Mark J. Warshauer
Vice President and Counsel
Toll Brothers, Inc.
250 Gibraltar Road
Horsham, PA 19044
FAX: 215-938-8260
Email: mwarshauer@tollbrothersinc.com

Kristine Maciolek Small, Esquire
Assistant Vice President
Toll Brothers, Inc.
250 Gibraltar Road
Horsham, PA 19044
FAX: (215) 938-8255
Email: kmacioleksmall@tollbrothersinc.com

TRINITY HOMES, LLC
c/o Beazer Homes Holdings Corp.
1000 Abernathy Road #1200
Atlanta, GA  30328
FAX: (770) 350-4337
Email: kkhoury@beazer.com

PARDEE HOMES
Attn:  Christopher J. Hallman, Esq.
Senior Vice President, General Counsel
10880 Wilshire Blvd, Suite 1900
Los Angeles, CA 90024
FAX: (253) 446-1292
Email: chris.hallman@pardeehomes.com

with a copy to:          STUTMAN, TREISTER & GLATT P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA  90067
Attn:  K. John Shaffer, Esq.
Attn: Robert A. Greenfield, Esq.
Attn: Anthony Arnold, Esq.
FAX:  (310) 228-5788
Email: jshaffer@stutman.com
Email: rgreenfield@stutman.com
Email: aarnold@stutman.com

| | |
|---|---|
| If to Agent: | JPMorgan Chase Bank, N.A. |
| | 383 Madison Avenue, 23rd Floor |
| | New York, NY  10179 |
| | Attn:  William A. Austin |
| | FAX:  (212) 622-4556 |
| | Email: William.A.Austin@jpmchase.com |
| | |
| with a copy to: | Morrison & Foerster LLP |
| | 425 Market Street |
| | San Francisco, CA  94105 |
| | Attn:  G. Larry Engel, Esq. |
| | FAX:  (415) 268-7522 |
| | Email: lengel@mofo.com |

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

12.    CHOICE OF LAW AND VENUE: JURY TRIAL WAIVER.

THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF NEVADA, EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE AND EXCEPT AS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE TRUSTEE HEREBY IRREVOCABLY ACCEPTS, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT.  THE UNDERSIGNED ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES.  TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY LOAN DOCUMENT.

13.    GENERAL PROVISIONS.

13.1    Binding Effect.

This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of the Trustee and the Builder Lenders, and their successors and assigns.

13.2    Time of Essence.

Time is of the essence for the performance of all obligations set forth in this Agreement.

13.3    <u>Severability of Provisions</u>.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

13.4    <u>Amendments in Writing, Integration</u>.

All future amendments to or terminations of this Agreement or the other Loan Documents must be in writing.  All prior agreements, understandings, representations, warranties, and negotiations between the parties hereto with respect to the subject matter of this Agreement and the other Loan Documents, if any, are merged into this Agreement and the Loan Documents.  This Agreement and its Exhibits are the entire agreement between the Trustee and the Builder Lenders with regard to the obligations and terms of any loans now or hereafter outstanding hereunder.

13.5    <u>Counterparts</u>.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.

13.6    <u>Survival</u>.

Except as otherwise provided herein, all covenants, representations, and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding.

*[Remainder of this page left intentionally blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**TRUSTEE**:

**CYNTHIA NELSON, NOT IN HER INDIVIDUAL CAPACITY, BUT SOLELY IN HER CAPACITY AS THE CHAPTER 11 TRUSTEE OF SOUTH EDGE, LLC, ON BEHALF OF SOUTH EDGE AND ITS BANKRUPTCY ESTATE**

By:_____
      Cynthia Nelson:
      Title:  Chapter 11 Trustee for South Edge, LLC

**BUILDER LENDERS**:

**KB HOME NV ACQUISITION LLC**

By:_____

    Name:
    Title:

**TOLL HENDERSON II LLC**

By:_____

    Name:
    Title:

**TRINITY HOMES, LLC**

By:_____

    Name:
    Title:

**PARDEE HOMES**

By:_____

    Name:
    Title:

**EXHIBIT A**

**South Edge, LLC**
**19-Week Cash Flow Forecast**
**Beginning July 21 - November 25, 2011**

South Edge Preliminary Budget (circulated July 7)

| Cash Receipts and Disbursements | Forecast WE 7/22/2011 | Forecast 7/29/2011 | Forecast 8/5/2011 | Forecast 8/12/2011 | Forecast 8/19/2011 | Forecast 8/26/2011 | Forecast 9/2/2011 | Forecast 9/9/2011 | Forecast 9/16/2011 | Forecast 9/23/2011 | Forecast 9/30/2011 | Forecast 10/7/2011 | Forecast 10/14/2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | |
| Net LID T-18 Acquisition Payments (1) | - | - | - | - | - | - | - | - | 782,221 | - | 801,144 | - | 1,093,755 |
| Trustee in Possession Loan Draw (2) | 3,581,576 | - | - | 9,315,149 | - | - | 3,242,888 | - | - | - | - | 3,859,989 | - |
| Miscellaneous Deposits | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL CASH RECEIPTS** | 3,581,576 | - | - | 9,315,149 | - | - | 3,242,888 | - | 782,221 | - | 801,144 | 3,859,989 | 1,093,755 |
| **Disbursements** | | | | | | | | | | | | | |
| *Operating Disbursements* | | | | | | | | | | | | | |
| Total Selling, General & Administrative | | 5,500 | 60,000 | 27,233 | 104,800 | 5,300 | | 91,602 | 131,000 | 13,500 | 1,337,320 | 24,500 | 1,971,280 |
| LID T-18 Bond Assessments (12) | | | | 266,238 | | | | | | | 266,238 | | 266,238 |
| Property Taxes (13) | | | | 266,238 | | | | | | | | | |
| Total LID and Property Taxes | | | | 266,238 | | | | | | | 266,238 | | 266,238 |
| **TOTAL OPERATING DISBURSEMENTS** | 145,881 | 68,067 | 79,175 | 293,571 | 114,900 | 16,500 | 2,100 | 121,758 | 131,100 | 13,600 | 1,614,758 | 26,600 | 1,971,380 |
| *Bankruptcy Related Disbursements* | | | | | | | | | | | | | |
| US Trustee Fees | | | | | | | | | | | | | |
| Repayment of Trustee in Possession Loan (2) | 2,317,522 | | | 3,280,000 | | 759,500 | | | 782,221 | | | | |
| Estate Professional Fees (14) | | | | | | | | | | | | | |
| Estate Noticing Agent Fees (14) | | | | | | | | | | | | | |
| Escrow for Estate Professional Fees, Holdback (14) | 600,000 | 10,000 | | 3,667,100 | | 730,000 | | | | | | | |
| Lender Professional Fees (15) | | | | | | 10,000 | | | | | 390,000 | | |
| Chapter 11 Trustee Hourly-Based Fee (estimated) | | | | | | | | | | | | | |
| Chapter 11 Trustee Fee Add'l Compensation (to be discussed) | | | | | | | | | | | | | |
| **TOTAL BANKRUPTCY RELATED DISBURSEMENTS** | 2,917,522 | 10,000 | - | 6,947,100 | - | 1,499,500 | - | - | 782,221 | - | 1,930,894 | - | 1,113,755 |
| **TOTAL DISBURSEMENTS** | 3,063,503 | 81,971 | 83,134 | 7,602,704 | 120,645 | 1,591,800 | 2,205 | 127,846 | 958,987 | 14,280 | 3,722,935 | 27,930 | 3,239,392 |
| **Net Cash Generated (Used)** | 518,073 | (81,971) | (83,134) | 1,712,445 | (120,645) | (1,591,800) | 3,240,683 | (127,846) | (176,766) | (14,280) | (2,921,791) | 3,832,059 | (2,145,637) |
| *Cumulative Net Cash Generated (Used)* | 518,073 | 436,103 | 352,969 | 2,065,414 | 1,944,769 | 352,969 | 3,593,652 | 3,465,806 | 3,289,040 | 3,274,760 | 352,969 | 4,185,028 | 2,039,392 |
| Contingency Provision (5% of Disbursements) | 100 | 3,903 | 3,959 | 362,034 | 5,745 | 75,800 | 105 | 6,088 | 45,666 | 680 | 177,283 | 1,330 | 154,257 |
| Accrued Lender Professional Fees and Expenses (14) | 4,287,000 | 5,722,500 | 5,772,500 | | | | | | | | | | |
| Accrued Lender Professional Fees and Expenses (14) | 3,280,000 | 4,010,000 | 4,010,000 | 730,000 | 730,000 | 390,000 | 380,000 | 390,000 | 390,000 | 390,000 | | | |
| **Cash Rollforward** | | | | | | | | | | | | | |
| Beginning Balance - Total Cash | 647,031 | 1,165,104 | 1,083,134 | 1,000,000 | 2,712,445 | 2,591,800 | 1,000,000 | 4,240,683 | 4,112,837 | 3,936,071 | 3,921,791 | 1,000,000 | 4,832,059 |
| Cash Used (Generated) - Total Cash | 518,073 | (81,971) | (83,134) | 1,712,445 | (120,645) | (1,591,800) | 3,240,683 | (127,846) | (176,766) | (14,280) | (2,921,791) | 3,832,059 | (2,145,637) |
| Ending Balance - Total Cash | 1,165,104 | 1,083,134 | 1,000,000 | 2,712,445 | 2,591,800 | 1,000,000 | 4,240,683 | 4,112,837 | 3,936,071 | 3,921,791 | 1,000,000 | 4,832,059 | 2,686,423 |
| Beginning Balance - Encumbered Cash | 153,568 | 1,165,104 | 1,083,134 | 1,000,000 | 2,712,445 | 2,591,800 | 1,000,000 | 4,240,683 | 4,112,837 | 3,936,071 | 3,921,791 | 1,000,000 | 4,832,059 |
| Receipts - Encumbered Cash | 3,581,576 | - | - | 9,315,149 | - | - | 3,242,888 | - | 782,221 | - | 801,144 | 3,859,989 | 1,093,755 |
| (Disbursements) - Encumbered Cash | (2,570,040) | (81,971) | (83,134) | (7,602,704) | (120,645) | (1,591,800) | (2,205) | (127,846) | (958,987) | (14,280) | (3,722,935) | (27,930) | (3,239,392) |
| Ending Balance - Encumbered Cash | 1,165,104 | 1,083,134 | 1,000,000 | 2,712,445 | 2,591,800 | 1,000,000 | 4,240,683 | 4,112,837 | 3,936,071 | 3,921,791 | 1,000,000 | 4,832,059 | 2,686,423 |
| Beginning Balance - Unencumbered Cash | 493,463 | - | - | - | - | - | - | - | - | - | - | - | - |
| Receipts - Unencumbered Cash | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (Disbursements) - Unencumbered Cash | (493,463) | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Balance - Unencumbered Cash | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Loan Rollforward** | | | | | | | | | | | | | |
| Beginning Balance - TIP Loan | - | 3,581,576 | 3,581,576 | 3,581,576 | 12,896,725 | 12,896,725 | 12,896,725 | 16,139,613 | 16,139,613 | 15,357,392 | 15,357,392 | 14,556,249 | 18,416,238 |
| Draws | 3,581,576 | - | - | 9,315,149 | - | - | 3,242,888 | - | - | - | - | 3,859,989 | - |
| Repayments | - | - | - | - | - | - | - | - | (782,250) | - | (801,144) | - | (1,093,755) |
| Ending Balance - TIP Loan | 3,581,576 | 3,581,576 | 3,581,576 | 12,896,725 | 12,896,725 | 12,896,725 | 16,139,613 | 16,139,613 | 15,357,392 | 15,357,392 | 14,556,249 | 18,416,238 | 17,322,483 |

1

**EXHIBIT A**

**South Edge, LLC**
**19-Week Cash Flow Forecast**
**Beginning July 21 - November 25, 2011**
**Cash Receipts and Disbursements**

| | Forecast 10/21/2011 | Forecast 10/28/2011 | Forecast 11/4/2011 | Forecast 11/11/2011 | Forecast 11/18/2011 | Forecast 11/25/2011 | Cumulative 19 Weeks |
|---|---|---|---|---|---|---|---|
| **WE** | 16 | 15 | 16 | 17 | 18 | 19 | |
| **Receipts** | | | | | | | |
| Net LID T-18 Acquisition Payments (1) | - | - | - | - | - | - | 20,782,967 |
| Trustee in Possession Loan Draw (2) | - | - | 5,450,837 | - | - | - | 25,450,439 |
| Miscellaneous Deposits | - | - | - | - | - | - | - |
| **TOTAL CASH RECEIPTS** | - | - | 5,450,837 | - | - | - | 46,233,407 |
| **Disbursements** | | | | | | | |
| *Operating Disbursements* | | | | | | | |
| Security and Maintenance (3) | | | | | | | 35,700 |
| Surety Bond Payments | | | | | | | 39,811 |
| HOA Subsidies (8) | | | | | | | 3,879,480 |
| LID Improvement Costs (4) | | | | | | | 60,000 |
| Other Construction Costs (5) | | | | | | | 576,400 |
| Total Construction and Maintenance | 2,500 | 3,000 | 94,500 | 13,777 | 104,800 | 132,600 | 4,591,391 |
| LID Reimbursement Administration (6) | | | | | | | 37,075 |
| Marketing and Advertising (10) | | | | | | | 111,285 |
| Insurance (9) | | | | | | | 19,656 |
| General, Administrative and Operations (11) | | | | | | | 18,583 |
| Total Selling, General & Administrative | 100 | 1,600 | 2,100 | 100 | 100 | 24,300 | 186,798 |
| LID T-16 Bond Assessments (12) | | | | | | | 2,317,522 |
| Property Taxes (13) | - | - | - | - | 2,500 | - | 1,132,476 |
| Total LID and Property Taxes | - | - | - | - | 2,500 | - | 3,449,998 |
| **TOTAL OPERATING DISBURSEMENTS** | 2,600 | 4,600 | 96,600 | 13,877 | 107,400 | 156,900 | 8,228,188 |
| *Bankruptcy Related Disbursements* | | | | | | | |
| US Trustee Fees | | | | | | | 50,000 |
| Repayment of Trustee in Possession Loan (2) | - | 6,133,823 | - | 9,151,253 | - | 2,820,773 | 20,782,967 |
| Estate Professional Fees (14) | | | | | | | 6,577,600 |
| Estate Noticing Agent Fees (14) | | | | | | | 30,000 |
| Escrow for Estate Windown (14) | | | | | | | 691,500 |
| Lender Professional Fees (15) | | | | | | | 1,906,906 |
| Chapter 11 Trustee Administration (14) | | | | | | | 10,000 |
| Chapter 11 Trustee Hourly-Based Fee (estimated) | | | | | | | 200,000 |
| Chapter 11 Trustee Fee Addt'l Compensation (to be discussed) | | | | | | | 1,500,000 |
| **TOTAL BANKRUPCY RELATED DISBURSEMENTS** | - | - | - | 9,151,253 | - | 7,159,173 | 35,467,467 |
| **TOTAL DISBURSEMENTS** | 2,730 | 4,830 | 101,430 | 9,623,385 | 112,770 | 7,681,876 | 45,880,438 |
| *Accrued Estate Professional Fees and Expenses (14)* | 1,717,150 | 1,792,900 | 1,792,900 | 1,792,900 | 1,792,900 | 1,792,900 | |
| *Accrued Lender Professional Fees and Expenses (14)* | | | | | | | |
| **Contingency Provision (5% of Disbursements)** | 130 | 230 | 4,830 | 458,256 | 5,370 | 365,804 | 2,184,783 |
| **Net Cash Generated (Used)** | (2,730) | (1,683,693) | 5,446,007 | (472,133) | (112,770) | (4,861,104) | 352,969 |
| Cumulative Net Cash Generated (Used) | 2,036,662 | 352,969 | 5,798,976 | 5,326,843 | 5,214,073 | 352,969 | 352,969 |
| **Cash Rollforward** | | | | | | | |
| Beginning Balance - Total Cash | 2,686,423 | 2,683,693 | 1,000,000 | 6,446,007 | 5,973,874 | 5,861,104 | 647,031 |
| Cash Used (Generated) - Total Cash | (2,730) | (1,683,693) | 5,446,007 | (472,133) | (112,770) | (4,861,104) | 352,969 |
| Ending Balance - Total Cash | 2,683,693 | 1,000,000 | 6,446,007 | 5,973,874 | 5,861,104 | 1,000,000 | 1,000,000 |
| Beginning Balance - Encumbered Cash | | | | | | | 1,000,000 |
| Receipts - Encumbered Cash | | | | | | | 45,233,407 |
| (Disbursements) - Encumbered Cash | | | | | | | (45,233,407) |
| Ending Balance - Encumbered Cash | | | | | | | 1,000,000 |
| Beginning Balance - Unencumbered Cash | | | | | | | |
| Receipts - Unencumbered Cash | | | | | | | |
| (Disbursements) - Unencumbered Cash | | | | | | | (493,463) |
| Ending Balance - Unencumbered Cash | | | | | | | |
| **Loan Rollforward** | | | | | | | |
| Beginning Balance - TIP Loan | 17,322,483 | 17,322,483 | 11,188,660 | 16,639,497 | 7,488,244 | 7,488,244 | 17,322,483 |
| Draws | - | - | 5,450,837 | - | - | - | 25,450,439 |
| Repayments | - | (6,133,823) | - | (9,151,253) | - | (2,820,773) | (20,782,967) |
| Ending Balance - TIP Loan | 17,322,483 | 11,188,660 | 16,639,497 | 7,488,244 | 7,488,244 | 4,667,472 | 4,667,472 |

South Edge Preliminary Budget (circulated July 7)

**Notes to Preliminary Budget for period beginning with week ending 7/21 through 11/30 2011**

(1) - LID T-18 Acquisition Payments are net of assessment engineer audit fee of 2.5%. The engineer audit fees cover administrative fees paid to Gomez Consulting Group. Funding is assumed to occur one week after City Council approval. Preliminary estimates for City Council hearing dates for each segment are listed below. *These estimated dates are based on recommendations of Advantage Civil Design Group regarding likely timing for completing outstanding construction work and necessary documentation and are subject to change.*

**LID Segments funded prior to Nov 30, 2011**

| Segment | Hearing Date |
|---|---|
| SM-1B | |
| WM-2 | 9/6/2011 |
| WM-5b/TCB | 9/20/2011 |
| D-E1C, 2B | 10/4/2011 |
| D-E1A,E1B,1D, 1E | 10/18/11 |
| D-E3A, 4 | 11/1/11 |
| | 11/15/2011 |

**LID Segments funded after Nov 30, 2011**

| Segment | Hearing Date |
|---|---|
| D-E4A | 12/6/11 |
| D-E5 | 12/20/2011 |
| D-E3 | 1/3/2012 |
| D-E6 | 5/22/2012 |
| SM-2A, 2B, SD-2 | 8/21/2012 |
| Village 2 Streets | 8/21/2012 |
| Village 3 Streets | 8/21/2012 |

LID segments funded after November, 2011 represent an additional $12.8M in net receipts with a total cost to complete of $2.7MM, none of which is reflected in this preliminary budget.

A reconciliation of total LID reimbursements follows:

| | | |
|---|---|---|
| $ | 21,315,864.00 | 2011 gross fundings per cash forecast |
| | 8,321,300.00 | 2012 gross fundings – Drainage |
| | 3,500,567.00 | 2012 gross fundings – Village 2 Streets |
| | 354,800.00 | 2012 gross fundings – Village 3 Streets |
| | 635,100.00 | 2012 gross fundings – Village 3 Streets |
| | 1,679,638.00 | 2012 gross fundings – Village 2 Storm Drains |
| | | Village 1 previously funded |
| $ | 35,807,269.00 | Total LID reimbursements available |

(2) - TIP Loan – Funding for the Estate is via an interest-free "Trustee in Possession" Loan projected to close the July 21. Monthly advances will be used to prime the Encumbered Cash Account for amounts used to fund the Total Disbursement needs of the Estate post-loan closing with all net proceeds from LID T-18 Acquisition Payments applied as payments to pay down the loan.

(3) - Security and Maintenance includes services for storm water compliance, dust control, Storm Water Pollution Prevention Plan ("SWPPP") maintenance, security and other construction and maintenance related expenses.

(4) - LID Improvement Costs relate to LID recovery efforts (including but not limited to inspection fees, permitting fees, plan fees, contractor and materials costs) for segments eligible for LID reimbursement. **Amount and timing of costs is preliminary and is based on discussions with Lender's construction consultant.  The ultimate amount and scope of work is unknown until inspections are completed by the City of Henderson and contracts bid and awarded.** Payment assumes customary and reasonable commercial terms.

(5) - Other Construction Costs over and above those related to LID segments include provision for repairs to Bicentennial Road ($20K) and Volunteer Road ($40K) requested by City of Henderson.  This forecast does not include any contingency provision for additional miscellaneous work that might be required by the City of Henderson and other agencies in the future including potential work associated with outfall control improvements which might be required in connection with acquisition of drainage facilities under Volunteer Road.

(6) - LID Reimbursement Administration to be paid to Advantage Civil  Design Group for services rendered related to the processing and construction management in connection with future LID T-18 Acquisition payments.  Amounts are estimates and subject to change and will increase if schedule for completing submissions to the City of Henderson is accelerated.  Amounts accrued for service through November 15th that would be paid in December are shown as paid on the last week of the period

(7) - Accounting, Taxes, and Outside Legal  include payment for services rendered by Goodwin Proctor in connection with the LID T-18 required disclosure filed in April and to be updated in October as well as estimated costs for tax return preparation work to performed by Piercy Bowler Taylor & Kern in July and budgeted for payment in August.

(8) - HOA Subsidy includes outstanding post-petition invoices and is currently under review.  Amounts accrued for November service that would be paid in December are shown as paid on the last week of the period.

(9) - Insurance includes current commercial liability coverage with one year term expiring 9/21/11.  Does not include premium in amount of $3,498 for policies expiring December 1, 2011 as those policies are outside the forecast period.

(10) - Marketing and Advertising Expenses are expected to be rejected by the Trustee or assumed by other parties by July 2011.

(11) - General, Administrative and Operations include payments to Jones Vargas for office space, administrative support, and miscellaneous office costs.  Other items include bank charges, license fees, utilities, and other general and administrative expenses.  December rent related to wind down operations is paid on the last week of the period.

(12) - The LID T-18 Bond Assessment payment upon closing of the TIP loan reflects the repayment of the MI Deposit advance used previously to

(13) - Accrued real property taxes (together with accrued penalties/interest) for the third and fourth installments of the 2010 - 2011 tax year are projected to be brought current and future installments paid as they come due.

make the June 1 payment (with interest). Does not include the December 1 assessment amount of $2,940,028 as those assessments become due and owing outside the forecast period.

(14) - Estate Professional Fees and Expenses are projected to be brought current at 85% of billed/incurred fees and 100% of billed/incurred expenses (except for the noticing agent which will be paid at 100%) upon the entry of final financing order for the TIP loan. Future Estate Professional Fees and Expenses will be paid at 85% of fees and 100% of expenses assuming a 30-day lag time for preparation of interim fee applications and notice period. Payment of 15% holdback, accrued professional fees for November and wind down costs after the post-effective date (including required post-plan filings, Trustee's final report and accounting, monthly operating report, and final fee applications for all professionals; such costs estimated at $200K) is assumed to be made at period end into an escrow account pending final fee hearings and Bankruptcy Court approval. Timing of payment and holdback percentages for interim amounts generally are consistent with the fee procedures anticipated to be filed with the Court. **Accrued fees and expenses presented are preliminary based on information provided by each professional, have not been reviewed by the Trustee or other parties and are included for information purposes only. Projected fees and expenses are based on expected average monthly "run" rates estimated by each professional. Actual amounts incurred in any single month might be higher or lower than the estimate depending on the nature of the work, particularly in connection with litigation. All fees and expenses are subject to Bankruptcy Court approval.**

(15) - Agent Professional Fees and Expenses are projected to be brought current at 100% of billed/incurred upon the entry of a final order for the TIP Loan. Agent Professional Fees and Expenses subject to a cumulative cap at $4.4 million based on provisions set forth in the Term Sheet. Last payment For Agent Fees anticipated in September 2011. **Accrued fees and expenses presented are preliminary based on information provided by each professional, have not been reviewed by the Trustee or other parties and are included for information purposes only. Projected fees and expenses are based on expected average monthly "run" rates estimated by each professional.**

(16) – The Cash Flow Forecast does not include payments for any unpaid administrative, priority, unsecured or other claims associated with any plan of reorganization other than payment of professional fees.