**THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

|  |  |
| --- | --- |
| In re: | ) Case No.: 10-32968 (BAM) |
|  | ) |
| SOUTH EDGE, LLC, | ) Chapter 11 |
|  | ) |
| Debtor. | ) |

## DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION PROPOSED BY JPMORGAN CHASE BANK, N.A., AS ADMINISTRATIVE AGENT UNDER THE PREPETITION CREDIT AGREEMENT, AND THE SETTLING BUILDERS (DATED AUGUST 1, 2011)

LEWIS AND ROCA LLP
Robert M. Charles, Jr.
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169-5996
Telephone:   (702) 949-8320
Facsimile:   (702) 949-8321
E-mail:      rcharles@LRLaw.com

MORRISON & FOERSTER LLP
G. Larry Engel (admitted *pro hac vice*)
425 Market Street
San Francisco, California 94105-2482
Telephone:   (415) 268-7000
Facsimile:   (415) 268-7522
E-mail:      lengel@mofo.com

Norman S. Rosenbaum (admitted *pro hac vice*)
Jordan A. Wishnew (admitted *pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104
Telephone:   (212) 468-8000
Facsimile:   (212) 468-7900
E-mail:      nrosenbaum@mofo.com
E-mail:      jwishnew@mofo.com

Attorneys for JPMorgan Chase Bank, N.A., as Administrative Agent

LAW OFFICES OF RICHARD McKNIGHT
Richard McKnight (Nevada Bar No. 001313)
330 S. Third Street #900
Las Vegas, Nevada 89101
Telephone:   (702) 388-7185
Facsimile:   (702) 388-0108
E-mail:      rmcknight@lawlasvegas.com

STUTMAN, TREISTER & GLATT PC
Robert A. Greenfield (admitted *pro hac vice*)
K. John Shaffer (admitted *pro hac vice*)
Anthony Arnold (admitted *pro hac vice*)
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone:   (310) 228-5600
Facsimile:   (310) 228-5788
E-mail:      rgreenfield@stutman.com
E-mail:      jshaffer@stutman.com
E-mail:      aarnold@stutman.com

Attorneys for the Settling Builders

# TABLE OF CONTENTS

**Page**

ARTICLE I SUMMARY .................................................................................4

A.      Rules of Interpretation; Computation of Time; Governing Law; Etc. ....................8

B.      The Debtor's Indebtedness and the Estate's Principal Assets. ...............................9

      1.      Assets ................................................................................................9

      2.      Indebtedness ....................................................................................10

C.      Compromise and Settlement of Claims and Controversies. ..................................10

D.      Good-Faith Settlement Protections Against Co-Defendant Indemnity or Contribution Claims..............................................................................................11

E.      Claims Estimates....................................................................................................11

F.      Treatment of Claims and Interests. .......................................................................12

      1.      Summary and Treatment of Allowed Unclassified Claims. .....................12

      2.      Summary of Classification and Treatment of Classified Allowed Claims and Interests....................................................................................13

G.      Releases, Exculpations, and Reservation of Indemnification Claims for Agent......................................................................................................................14

H.      Certain Factors to Be Considered Prior to Voting. ...............................................14

I.      Voting and Confirmation. ......................................................................................14

J.      Consummation of the Plan.....................................................................................15

ARTICLE II          BACKGROUND ...................................................................15

A.      Description of the Debtor's Business. ...................................................................15

      1.      Corporate Structure. .........................................................................15

      2.      Corporate History.............................................................................16

B.      The Debtor's Prepetition Capital Structure...........................................................18

      1.      The Prepetition Credit Agreement and Prepetition Credit Documents......................................................................................18

      2.      Member Capital Contributions ...........................................................20

      3.      LID Bonds.......................................................................................21

C.      Management of the Debtor. ....................................................................................22

ARTICLE III          THE CHAPTER 11 CASE ..................................................22

A.      Events Leading Up to the Involuntary Filing. ......................................................22

      1.      Debtor's Defaults.............................................................................22

      2.      Debtor's Management Committee Suspends Further Development of Inspirada and Other Alleged Events of Default Caused By Builder-Defendants....................................................................................23

      3.      Commencement of Litigation and Arbitration...........................................25

2430175

**TABLE OF CONTENTS**
**(continued)**

Page

B.    The Involuntary Filing of the Chapter 11 Case and the Appointment of the Chapter 11 Trustee. ................................................................28

C.    Proceedings Following Commencement of the Chapter 11 Case .........................28

     1.    Dismissal of the District Court Appeals and the Initiation of the Ninth Circuit Appeals. ...............................................................28

     2.    Use of Prepetition Lenders' Cash Collateral. .............................................30

     3.    Financing Provided by TIP Loan Lenders ................................................30

     4.    Certain Administrative Matters in the Chapter 11 Case. .........................31

     5.    Schedules of Assets and Liabilities and Bar Dates. ..................................32

     6.    Other Motions. ...........................................................................34

D.    Disputed MI Funds Litigation ...............................................................35

E.    The Negotiation of, and Entry into, the Plan Support Agreement. ........................37

ARTICLE IV      SUMMARY OF THE PLAN ................................................40

A.    Overview of Chapter 11 ...........................................................................41

B.    Unclassified Claims. ................................................................................42

     1.    Administrative Expense Claims and Gap Claims. ....................................42

     2.    Priority Tax Claims. ..................................................................43

     3.    TIP Loan Claims. .....................................................................43

     4.    Agent Adequate Protection Claims. ........................................................43

     5.    Professional Compensation Claims. ........................................................43

C.    Classification and Treatment of Claims and Interests. ..........................................43

     1.    Class P1 – Priority Non-Tax Claims. ......................................................44

     2.    Class S1 – Other Secured Claims. ...........................................................44

     3.    Class S2 – LID Claims. ............................................................45

     4.    Class S3 – Prepetition Lender Secured Claims. ......................................46

     5.    Class U1 – Prepetition Lender Deficiency Claims. .................................50

     6.    Class U2 – General Unsecured Claims. ..................................................50

     7.    Class U3 – Member Claims. ....................................................................51

     8.    Class E1 – Equity Interests. ....................................................................52

D.    Acceptance or Rejection of the Plan. ......................................................52

E.    Cramdown. ................................................................................................53

F.    Means for Implementation of the Plan. ...........................................................53

     1.    Formation Of Acquirer. ..........................................................................53

     2.    Acquisition Of Assets By Acquirer. .......................................................53

**TABLE OF CONTENTS**
**(continued)**

|  |  | | Page |
|---|---|---|---|
| | 3. | Continued Estate and Debtor Corporate Existence | 53 |
| | 4. | Effect of Plan on Prepetition Credit Agreement and Prepetition Credit Agreement Amendment | 53 |
| | 5. | The Agent And Successor Agent. | 54 |
| | 6. | Settling Builders' Funding Of The Plan. | 55 |
| | 7. | Corporate Action. | 55 |
| | 8. | Dismissal Of The Trustee. | 55 |
| | 9. | Exemption from Certain Transfer Taxes and Recording Fees | 55 |
| | 10. | Causes of Action. | 56 |
| G. | | Treatment of Executory Contracts and Unexpired Leases. | 57 |
| | 1. | Executory Contracts and Unexpired Leases to Be Assumed or Rejected. | 57 |
| | 2. | Objections To Assumption And Proposed Cure Amounts. | 58 |
| | 3. | Bar Date for Rejection Damages. | 59 |
| | 4. | Development Agreement. | 59 |
| | 5. | Reservation of Rights. | 59 |
| H. | | Claims Administration. | 60 |
| | 1. | Claims and Interests Administration Responsibilities. | 60 |
| | 2. | Objections to Claims. | 60 |
| | 3. | Estimation of Allowed Claims. | 60 |
| I. | | Provisions Governing Distributions | 61 |
| | 1. | Distributions on Account of Claims Allowed as of the Effective Date. | 61 |
| | 2. | Method of Distributions to Holders of Claims. | 61 |
| | 3. | Procedures For Treating And Resolving Disputed And Contingent Claims. | 61 |
| | 4. | Delivery of Distributions. | 62 |
| | 5. | Setoffs and Recoupment. | 63 |
| | 6. | Compliance with Tax Requirements | 63 |
| J. | | Effect of the Plan on Claims and Interests. | 63 |
| | 1. | Vesting of Assets. | 63 |
| | 2. | Compromise And Settlement of Claims, Interests and Controversies. | 64 |
| | 3. | Releases Of Certain Parties By The Debtor, The Estate, And The Trustee. | 64 |
| | 4. | Other Plan Releases And Covenants Not To Sue. | 65 |

2430175

# TABLE OF CONTENTS
## (continued)

**Page**

|   |   |   |   |
|---|---|---|---|
| | 5. | Exculpation. | 68 |
| | 6. | Post-Confirmation Injunction And Discharge. | 69 |
| | 7. | Release of Liens. | 69 |
| | 8. | Reservation of Claims and Rights | 69 |
| K. | | Allowance and Payment of Certain Administrative Claims. | 69 |
| | 1. | Professional Claims. | 69 |
| L. | | Conditions Precedent to Confirmation and the Effective Date of the Plan. | 70 |
| | 1. | Conditions to Confirmation. | 70 |
| | 2. | Conditions to Occurrence of the Effective Date. | 70 |
| | 3. | Waiver of Conditions Precedent. | 70 |
| | 4. | Confirmation Deadline. | 71 |
| | 5. | Satisfaction of Conditions Precedent to Confirmation. | 71 |
| | 6. | Effect Of Non-Occurrence Of Conditions To Confirmation. | 71 |
| M. | | Modification, Revocation, or Withdrawal of the Plan. | 72 |
| | 1. | Modification and Amendments. | 72 |
| | 2. | Effect of Confirmation on Modifications. | 72 |
| | 3. | Revocation or Withdrawal of Plan. | 72 |
| N. | | Retention of Jurisdiction. | 72 |
| ARTICLE V | | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN | 72 |
| A. | | The Confirmation Hearing. | 72 |
| B. | | Confirmation Standards. | 73 |
| C. | | Best Interests of Creditors Test. | 74 |
| D. | | Financial Feasibility. | 75 |
| | 1. | Plan Distribution Analysis. | 75 |
| | 2. | Conclusion. | 76 |
| E. | | Acceptance by Impaired Classes. | 76 |
| F. | | Confirmation Without Acceptance by All Impaired Classes. | 77 |
| ARTICLE VI | | CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING | 79 |
| A. | | Certain Bankruptcy Considerations. | 79 |
| | 1. | The Plan Proponents May Not Be Able to Obtain Confirmation of the Plan. | 79 |
| | 2. | Parties in Interest May Object to the Plan Proponents' Classification of Claims. | 80 |

**TABLE OF CONTENTS**
**(continued)**

<u>Page</u>

3.   Parties in Interest May Object to the Plan Proponents' Ability to Confirm the Plan Under Section 1129 of the Bankruptcy Code ............... 80

4.   Failure to Satisfy Vote Requirement ...................................................... 80

5.   The Estate Representative May Object to the Amount or Classification of a Claim ............................................................................ 80

6.   The Estimate of Allowed General Unsecured Claims Might Increase. ........................................................................................................ 81

7.   The Prepetition Lenders' Deficiency Claim Might Be Reclassified As A General Unsecured Claim ................................................................ 81

8.   City May Not Agree to Defer Assumption or Rejection of the Development Agreement. ......................................................................... 81

9.   The Bankruptcy Court May Not Agree to Defer Assumption or Rejection of the Development Agreement. .................................................. 81

10.   Nonconsensual Confirmation. .................................................................. 82

11.   Risk of Non-Occurrence of the Confirmation Date, Effective Date, and Conditions Precedent to the Plan Support Agreement. ...................... 82

12.   The Plan Support Agreement May Terminate, Thereby Preventing the Plan Proponents From Consummating the Plan. ................................ 82

B.   Disclosure Statement Disclaimer. .......................................................................... 82

1.   Information Contained Herein Is for Soliciting Votes. ............................. 82

2.   This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission. .................................................... 83

3.   No Legal or Tax Advice Is Provided to You by this Disclosure Statement. ................................................................................................. 83

4.   No Admissions Made. ............................................................................... 83

5.   Failure to Identify Litigation Claims or Projected Objections. ................. 83

6.   No Waiver of Right to Object or Right to Recover Transfers and Assets. ...................................................................................................... 83

7.   Potential Exists for Inaccuracies, and the Plan Proponents Have No Duty to Update. ......................................................................................... 83

8.   No Representations Outside this Disclosure Statement Are Authorized .................................................................................................. 84

ARTICLE VII      CERTAIN FEDERAL INCOME TAX CONSEQUENCES ............. 85

A.   General. ............................................................................................................... 85

B.   Consequences of Payment of Allowed Claims Pursuant to the Plan. .................... 86

1.   Recognition of Gain or Loss. ................................................................... 86

2.   Post-Effective Date Cash Distributions. .................................................. 86

3.   Bad Debt and Worthless Securities Deduction. ........................................ 87

**TABLE OF CONTENTS**
**(continued)**

**Page**

|     |     |     |     |     |
| --- | --- | --- | --- | --- |
|     | 4.  | Reserve for Disputed Claims. | 87 |
|     | 5.  | Receipt of Pre-Effective Date Interest. | 87 |
|     | 6.  | Gain Attributable to Market Discount | 88 |
|     | 7.  | Information Reporting and Withholding. | 88 |
| C.  | Tax Consequences of the Plan to the Debtor. | | 88 |
|     | 1.  | Transfer of the Assets | 88 |
|     | 2.  | Cancellation Of Debt Income | 89 |
| D.  | Importance of Obtaining Professional Tax Assistance. | | 89 |
| ARTICLE VIII | SOLICITATION PROCESS | | 90 |
| A.  | Voting and Solicitation Agent and Securities Voting Agent. | | 90 |
| B.  | Solicitation Package. | | 90 |
| C.  | Distribution of the Solicitation Package. | | 91 |
| D.  | Form of Notice to Unclassified Claims and Unimpaired Classes | | 91 |
| E.  | Counterparties to Executory Contracts and Unexpired Leases | | 91 |
| F.  | Distribution of Materials to the Master Service List and the 2002 List | | 91 |
| G.  | Publication of the Confirmation Hearing Notice. | | 91 |
| ARTICLE IX | VOTING INSTRUCTIONS | | 92 |
| A.  | The Record Date. | | 92 |
| B.  | Solicitation Deadline. | | 92 |
| C.  | Ballot Deadline. | | 92 |
| D.  | Holders of Claims Entitled To Vote. | | 93 |
| E.  | Conclusively Presumed Acceptance of the Plan. | | 93 |
| F.  | Conclusively Presumed Rejection of the Plan. | | 93 |
| G.  | Voting Procedures. | | 93 |
| H.  | Tabulation Procedures. | | 94 |
| I.  | Votes Required for Acceptance by a Class. | | 97 |
| ARTICLE X | RECOMMENDATION | | 98 |
| EXHIBITS | A – Plan | | |
|     | B – Plan Support Agreement | | |
|     | C – Liquidation Analysis | | |

2430175

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE JOINT PLAN OF REORGANIZATION PROPOSED BY JPMORGAN CHASE BANK, N.A., AS ADMINISTRATIVE AGENT UNDER THE PREPETITION CREDIT AGREEMENT, AND THE SETTLING BUILDERS (THE "PLAN" OR THE "CHAPTER 11 PLAN"), CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THIS CHAPTER 11 CASE, AND CERTAIN FINANCIAL INFORMATION.  ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  THE INFORMATION INCLUDED HEREIN IS FOR PURPOSES OF SOLICITING ACCEPTANCE OF THE PLAN AFTER APPROVAL OF THIS DISCLOSURE STATEMENT AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN AFTER APPROVAL OF THIS DISCLOSURE STATEMENT.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE ATTACHED HERETO OR INCORPORATED BY REFERENCE HEREIN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THE DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED HEREIN BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT HAS BEEN PROVIDED BY ONE OR MORE OF THE PLAN PROPONENTS EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE PLAN PROPONENTS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.  IN PARTICULAR, BECAUSE THE PLAN IS A SETTLEMENT BETWEEN AND AMONG THE PLAN PROPONENTS, NOT EVERY PLAN PROPONENT AGREES WITH EVERY STATEMENT IN THIS DISCLOSURE STATEMENT.  HOWEVER, EACH PLAN PROPONENT BELIEVES THAT, FOR PURPOSES OF VOTING TO ACCEPT THE PLAN, EACH PARTY IN INTEREST MAY ACCEPT EACH STATEMENT AS A FAIR STATEMENT OF THE CONTENTION OF ONE OR MORE PLAN PROPONENTS THAT THE OTHER PLAN PROPONENTS ACCEPT AS SUCH.  THE PLAN PROPONENTS DO NOT ATTEMPT TO IDENTIFY THE SOURCE OF EACH STATEMENT.  GENERALLY, THE STATEMENTS REGARDING THE LOAN DOCUMENTS, DEFAULTS AND ALLEGED DEFAULTS THEREUNDER, THE PREPETITION LENDERS, THE AGENT, AND THE COLLATERAL ARE ATTRIBUTABLE TO THE PREPETITION LENDERS OR THE AGENT.  THE STATEMENTS REGARDING THE SETTLING BUILDERS AND THEIR CONTRACTS AND PROJECT WORK ARE GENERALLY ATTRIBUTABLE TO THE SETTLING BUILDERS.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THE DISCLOSURE STATEMENT MAY INFER THAT THERE HAVE NOT BEEN ANY MATERIAL CHANGES IN THE FACTS SET FORTH HEREIN BETWEEN THE DATE HEREOF AND THE TIME OF SUCH

1

REVIEW. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THE DISCLOSURE STATEMENT, AND EXHIBITS TO THE PLAN IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY PERSONS DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THE DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTOR, THE TRUSTEE, OR THE PLAN PROPONENTS OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR ACTIONS, THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS AND PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE. ALL PARTIES' RIGHTS AND DEFENSES ARE PRESERVED IN THE EVENT THAT THE PLAN IS NOT CONFIRMED OR DOES NOT GO EFFECTIVE, AND THE STATEMENTS MADE HEREIN ARE NOT ADMISSIONS BY ANY PARTY.

THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

ALTHOUGH THE PLAN PROPONENTS HAVE USED THEIR BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THE DISCLOSURE STATEMENT, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THE DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

SEE ARTICLE VI OF THE DISCLOSURE STATEMENT, ENTITLED "CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT OR REJECT THE PLAN.

PURSUANT TO AN ORDER DATED SEPTEMBER [  ], 2011, THE DISCLOSURE STATEMENT HAS BEEN DETERMINED BY THE BANKRUPTCY COURT TO CONTAIN ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101-1532 (THE "BANKRUPTCY CODE"), WHICH DETERMINATION DOES NOT CONSTITUTE A RECOMMENDATION OR APPROVAL

2

OF THE PLAN.

UNLESS OTHERWISE STATED, ANY CAPITALIZED TERM USED HEREIN SHALL HAVE THE MEANING ASSIGNED TO SUCH TERM HEREIN OR, IF NO MEANING IS SO ASSIGNED, THE MEANING ASSIGNED TO SUCH TERM IN THE PLAN OR, IF APPLICABLE, IN A REFERENCED PLAN DOCUMENT.

**THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON OCTOBER [17], 2011 AT [10:00] A.M. PREVAILING PACIFIC TIME BEFORE THE HONORABLE BRUCE A. MARKELL, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA, IN COURTROOM #3 IN THE UNITED STATES COURTHOUSE LOCATED AT 300 LAS VEGAS BLVD. S., LAS VEGAS, NEVADA 89101.  THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE OTHER THAN AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT THEREOF.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE OCTOBER [7], 2011 AT [4:00] P.M. PREVAILING PACIFIC TIME, IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER THAT THE PLAN PROPONENTS FILED AND SERVED ON HOLDERS OF CLAIMS, HOLDERS OF INTERESTS, AND OTHER PARTIES IN INTEREST.  IF OBJECTIONS TO CONFIRMATION ARE NOT TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

2430175

# ARTICLE I
## SUMMARY

The following summary is qualified in its entirety by the more detailed information contained in the Plan and elsewhere in the Disclosure Statement.

This Disclosure Statement has been prepared to provide creditors and interest holders of South Edge, LLC ("South Edge" or the "Debtor") with information about a Plan that has been proposed by the agent for the Debtor's Prepetition Lenders,[1] JPMorgan Chase Bank, N.A. (the "Agent"), and four of the Debtor's Members and their parent affiliates, homebuilders KB Home, Toll Brothers, Inc., Weyerhaeuser Real Estate Company, and Beazer Homes Holdings Corp. (together with the four settling Members, the "Settling Builders").

**The Plan Proponents believe that the Plan provides the Debtor and its creditors with the best possible outcome, because it (1) enables non-insider creditors to receive substantial distributions within the next few months, (2) ends years of contentious and expensive litigation between the Agent and the Settling Builders, and (3) creates a platform for future development of the Debtor's master planned community known as "Inspirada." The Plan is supported by the chapter 11 trustee for the Debtor, Cynthia Nelson (the "Trustee"), subject to and in accordance with the terms and conditions of the Trustee's Consent, a copy of which is attached hereto as Exhibit "B". The Plan provides for prompt and significant distributions to the secured Prepetition Lenders. The Plan also provides for the prompt payment in full of all priority and administrative claims, as well as a $1 million fund for general unsecured creditors, notwithstanding the facts that (1) the Agent holds liens on all of the Estate's assets, and (2) the Prepetition Lenders will not be paid in full (and, in fact, will have a deficiency claim of at least $42.5 million).**

**The Plan Proponents believe it is highly unlikely that unsecured creditors would receive anything in a liquidation or an alternative plan that is not based upon the settlement they have proposed. The costs, delays, and risks of litigation would be significant. Moreover, the Prepetition Lenders' claims would continue to accrue interest and fees until they were paid in full. The Agent's Liens encumber all of the Estate's assets. Thus, although the Prepetition Lenders' postpetition interest and fees may not be allowable under Bankruptcy Code section 506(b) (if the Prepetition Lenders are undersecured, and the Plan Proponents submit that they are), such interest and fees nonetheless must be paid in full before unsecured creditors would be entitled to receive any distribution, but for the settlement included in the Plan.**

**The Trustee who was appointed to represent and protect the interests of the Estate and its creditors supports the Plan, subject to and in accordance with the terms and conditions of the Trustee's Consent. According to the Trustee, the settlement in the Plan has substantial benefits for the Estate, including the payout to secured creditors, the recovery to unsecured creditors, and the resolution of significant litigation in a timely and**

---

[1] Capitalized terms used in this summary, but not otherwise defined in this summary are defined below or have the meanings ascribed to them in the Plan.

2430175

largely consensual manner.

Accordingly, the Plan Proponents urge interested parties to support the Plan and those creditors who are eligible to vote to vote in favor of the Plan.

In the five years leading up to the filing of the involuntary chapter 11 bankruptcy petition against South Edge, the Debtor attempted to develop "Inspirada" (the "Project"), encompassing approximately 2,000 acres in the City of Henderson (the "City") with its eight Members. At the inception of the Project, seven of the Members were among the nation's most successful homebuilders, and the eighth (Focus) was an experienced Las Vegas area developer.

Of the eight Members, four members join in support of the Plan. Two of the Members— Alameda and Kimball Hill—together with their parents and certain other affiliates, filed for chapter 11 bankruptcy protection and are currently being liquidated by liquidating trustees pursuant to confirmed chapter 11 plans. The other two Members, Meritage and Focus, continue to dispute certain of the rights and claims of the Plan Proponents and the Trustee. Meritage and Focus are neither funding nor participating in the settlement incorporated into the Plan.

Following the cessation of the further development of the Project more than three years ago, the Agent, on behalf of the Prepetition Lenders, commenced certain litigation against the non-bankrupt Members and their affiliated parents on a variety of asserted claims that were ultimately consolidated in the United States District Court, District of Nevada in Las Vegas. The Agent also filed proofs of claim in the bankrupt Members' and their parents' chapter 11 cases. Those claims included, among other claims, causes of action under the Completion Guaranties and Limited Guaranties of those defendant Members and parents as well as claims for alleged breach of fiduciary duty and interference with contract, and for recovery of the Takedown-related Collateral causes of action on behalf of the Debtor pursuant to U.C.C. § 9-607.

In May 2009, Focus and certain affiliates initiated an arbitration proceeding against the other non-bankrupt Members under the Debtor's Operating Agreement. Focus and its affiliates won an award of $36,815,354, but were denied standing to assert the alleged claims on behalf of the Debtor and to control the Debtor as the allegedly only non-defaulting Member of the Debtor limited liability company. The Nevada District Court confirmed the arbitration award, and all of the Members against which judgment was entered have appealed (which appeal is currently pending in the United States Court of Appeals for the Ninth Circuit). The Agent supported Focus' effort in the arbitration proceeding pursuant to a Cooperation Agreement, as amended.

After numerous unsuccessful settlement efforts on the part of Agent and certain of the Members to resolve issues concerning the defaults asserted by the Agent against the Debtor, its Members, and their corporate parents under the Credit Agreement and related documentation, and to restructure their respective obligations, on December 9, 2010, JPMorgan Chase Bank, N.A. ("JPMorgan"), Credit Agricole Corporate and Investment Bank ("Credit Agricole"), and Wells Fargo Bank, N.A. ("Wells Fargo," together with JPMorgan and Credit Agricole, the "Petitioning Lenders"), each in their capacities as Prepetition Lenders filed an involuntary chapter 11 petition (the "Involuntary Petition") against the Debtor for relief under section 303 of the Bankruptcy Code in the Bankruptcy Court. At the same time, JPMorgan, in its capacity as Agent and Prepetition Lender, also filed a motion requesting the appointment of a chapter 11 trustee to administer the Estate.

Following a four-day trial, the Bankruptcy Court granted the Involuntary Petition and ordered the appointment of a chapter 11 trustee on February 3, 2011.  Certain of the Members, excluding Focus, Alameda, and Kimball Hill (the "Appellant Members"), as well as the Debtor-out-of-possession, appealed those rulings to the Nevada District Court.  The Office of the United States Trustee selected Cynthia Nelson as the Trustee, which selection was confirmed by the Bankruptcy Court.  The Trustee filed a motion to dismiss the appeals, in which the Agent and Petitioning Lenders joined, which was granted by the Nevada District Court.  The Debtor-out-of-possession and the Appellant Members have appealed the District Court's dismissal of the appeals to the Court of Appeals for the Ninth Circuit.  Because the settlements embodied in the Plan are intended to resolve most, if not all, of the issues implicated by the pending Ninth Circuit Appeals, the Plan Proponents and the Trustee have filed motions in the pending appeals seeking the referral of appeals to mediation and the abatement of the current briefing schedule.  Meritage opposed these motions, and based upon that opposition the motions requesting mediation were denied.  The motions to abate the current briefing schedule are still pending.

The Agent and Prepetition Lenders assert that the Repayment Guaranties of the Members and their affiliated parents have been triggered as a result of the bankruptcy, although those guarantors assert defenses thereto.  The settlement reflected in the Plan will obviate the need for the commencement or continuation of that litigation against the Settling Builders.

Likewise, the Trustee has asserted claims against the Members and their Member Affiliates on Takedown and other claims.  Those claims against the Settling Builders will also be resolved by the Plan settlement.

In the months that followed the Bankruptcy Court rulings, the Agent and certain of the Members engaged in renewed settlement discussions.  The Settling Builders, the Agent, and more than 90% in amount and number of the Prepetition Lenders entered into the Plan Support Agreement.  The product of those settlement efforts is the Plan presently before the Bankruptcy Court, which provides for, among other things, a global settlement of various issues and disputes among the Agent, on behalf of the Prepetition Lenders, the Consenting Prepetition Lenders, and the Settling Builders.  The Trustee supports the settlement, subject to the terms and conditions of the Trustee Consent.  Specifically, the Plan provides that, as part of a comprehensive settlement (and with full reservation of rights and defenses in the event the settlement is not consummated):

• The Settling Builders will satisfy their respective outstanding Repayment Guaranty obligations that have been asserted against them and acquire the Takedown properties from the Estate pursuant to their subrogated lien against that real property.

• The Settling Builders will fund an Escrow in the amount of Meritage's Repayment Guaranty liability, and the Agent's Repayment Guaranty claims against Meritage will be pursued at the direction and sole expense of those Settling Builders through a sub-agent under the Prepetition Credit Agreement satisfactory to them.  Prior to the Effective Date, the Agent reserves the right and may pursue such claims against Meritage.

• The non-Consenting Prepetition Lenders will share pro rata in the distributions made to the Prepetition Lenders generally under the Plan.  However, the non-Consenting Prepetition Lenders will not receive releases from the Settling Builders, and will be obligated to fund any future enforcement expenses.  The non-Consenting Prepetition Lenders will retain

6

whatever claims they may have against the Settling Builders (other than the Settling Builders' Repayment Guaranties, which are being satisfied under the Plan). The Consenting Prepetition Lenders will be obligated to refund any recoveries to the Settling Builders, to which they would otherwise be entitled under the terms of the Prepetition Credit Agreement, in excess of the amounts provided to them under the Plan, and will not have an obligation to fund any further enforcement efforts.

- The Agent's Secured Claim against the Debtor will be satisfied, and the Agent (for itself and for the benefit of the Lenders) will receive an additional $500,000 distribution on the Agent's unsecured deficiency claim. All together, the Agent, for the benefit of the Prepetition Lenders, shall receive between $330 million and $340 million in consideration, plus fees as provided in the Plan.

- Claims and property of the Estate will be transferred to a newly formed entity to be owned directly or indirectly by the Settling Builders, in exchange for certain consideration that will include (i) repayment in full by the Settling Builders of the financing their affiliates provided to the Trustee during the bankruptcy case (the "TIP Loan Claims"), (ii) payment in full of confirmation costs (including satisfaction of allowed administrative (such as Estate professionals, Trustee, and United States Trustee fees) and unsecured priority claims), and (iii) the funding of a $1 million "pot" distribution to holders of non-insider/affiliate Allowed General Unsecured Claims against the Debtor.

- The LID Indenture shall remain in effect together with the Debtor's Acquisition Agreement with the City of Henderson (the "COH Acquisition Agreement"), thus allowing the Estate Representative or the Acquirer to continue financing necessary improvements at the Project until such time that the Settling Builders and the City of Henderson determine, subsequent to the Plan Effective Date, how best to address and resolve the Development Agreement and related issues.

- The Development Agreement, the COH Acquisition Agreement, and related City contracts for Inspirada, which set forth the entitlements for the Project, will be neither assumed nor rejected at the time of the Effective Date, but rather, to the extent that they are executory contracts, the deadline for assumption or rejection of these agreements will be extended after the Effective Date to accommodate the longer process expected for the amendment or other resolution of those City contracts.

- Pending litigation between the Agent and the Settling Builders will be dismissed (as would any litigation between the Debtor and the Settling Builders, if such litigation were to be commenced). The Estate will settle and release all claims against the Agent, the Prepetition Lenders, and the Settling Builders, in consideration for their concessions and benefits they provided under the Plan. In addition, the Agent and the Consenting Prepetition Lenders, on the one hand, and the Settling Builders, on the other hand, will exchange certain mutual releases. *See* Article IV.J of this Disclosure Statement.

As discussed in greater detail herein and as will be demonstrated to the Bankruptcy Court during the Confirmation Hearing, the Plan Proponents believe that the settlement embodied by the Plan maximizes recoveries for Holders of Allowed Claims and strongly recommend that you vote to accept the Plan (if you are entitled to vote). The Trustee, as the representative of the

2430175

interests of the Estate and its creditors, supports confirmation of the Plan subject to and in accordance with the Trustee's Consent.  Any alternative to Confirmation of the Plan, such as conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code (*see* Liquidation Analysis attached as Exh. C to this Disclosure Statement) or attempts by another party in interest to file a plan, would result in significant delays, litigation, and additional costs and, ultimately, would lower the recoveries for Holders of Allowed Claims.  Consistent with the Plan Support Agreement, the Agent and the Consenting Prepetition Lenders are required to support the Plan and, in the Agent's opinion, it is not legally possible for any other plan to be confirmed over their objections.  Moreover, if the Plan Support Agreement terminates or the Plan is defeated, (1) the Agent (and, in all likelihood, the majority of the Prepetition Lenders) would vigorously resist any conversion of this case to chapter 7, and (2) the Agent would likely propose and seek to confirm its own alternative plan.  The compromise between and among the Plan Proponents embodied in the Plan offers the best result for all creditors because (1) it enables substantial, and prompt, distributions to non-insider general unsecured creditors, (2) ends years of expensive litigation, (3) creates a stable platform for future development of Inspirada, and, (4) through the Settling Builders' Repayment Guaranty and other Plan benefits, provides the Agent and Prepetition Lenders with slightly less from the Debtor than the Agent believes they are entitled to collect under the Loan Documents, and that residual value is being provided to the general unsecured creditors to fund a distribution that they likely would not otherwise receive (and certainly not within the time period provided by the Plan).

The Disclosure Statement is being furnished by the Plan Proponents pursuant to section 1125 of the Bankruptcy Code in connection with: (a) the solicitation of votes for the acceptance or rejection of the Plan and (b) the Confirmation Hearing, which is scheduled for October [17], 2011 at [10:00] a.m. Prevailing Pacific Time (the "Confirmation Hearing Date").  A copy of the Plan is annexed hereto as Exhibit A and incorporated by reference herein.

The Disclosure Statement describes certain aspects of the Plan, including the treatment of Claims and Interests, and describes certain aspects of the Debtor's operations, financial condition, and other related matters.  The Plan is implemented by certain "Plan Documents" that will be separately filed with the Court in due course as described herein and in the Plan.

     A.     <u>Rules of Interpretation; Computation of Time; Governing Law; Etc</u>.

The following rules for interpretation and construction shall apply to the Disclosure Statement:

     (i)     whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural;

     (ii)     unless otherwise specified, any reference in the Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

     (iii)     unless otherwise specified, any reference in the Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented;

2430175

(iv)    any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors, assigns, and affiliates;

(v)    unless otherwise specified, all references in this Disclosure Statement to Sections, Articles, schedules, and exhibits are references to Sections, Articles, schedules, and exhibits of or to this Disclosure Statement;

(vi)    the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety, rather than to a particular portion of the Disclosure Statement;

(vii)    captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement;

(viii)    unless otherwise set forth in the Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and

(ix)    all references to docket numbers of documents filed in the Chapter 11 Case are references to the docket numbers under the Bankruptcy Court's Case Management/Electronic Case Filing ("CM/ECF") system, and, as to the Nevada District Court Litigation, to that court's CM/ECF system.

B.    <u>The Debtor's Indebtedness and the Estate's Principal Assets</u>.

1.    Assets

The Estate's principal assets consist of the portions of the Inspirada Project still owned or controlled by the Estate, which includes real property (both raw and partially developed) and personal property, including accounts receivable, contracts, claims, deposit accounts, general intangibles, and bond proceeds.  The Agent asserts, and the Trustee has confirmed, that the Agent on its own behalf and on behalf of the Prepetition Lenders, holds a valid first-priority and unavoidable security interest in substantially all of the Debtor's assets as security for the Debtor's obligations under the Prepetition Loan Documents subject only to Permitted Liens (as such term is defined in the Cash Collateral Orders).  The Agent, on its own behalf and on behalf of the Prepetition Lenders, also holds a valid first-priority security interest in the Estate's assets as adequate protection replacement liens, subject only to the TIP Loan Lenders' security interest in certain proceeds of the COH Acquisition Agreement and certain "Permitted Liens."

In addition to the "Pod" parcels designated for "Takedowns" by the Settling Builders and Meritage, the remaining Project real estate includes the parcels originally designated for Takedowns by Alameda and Kimball Hill, as well as parcels reserved for the Debtor itself to use, mostly for LID and public improvements such as parks, a school site, a police station, and various infrastructure.

As of the Petition Date, the Estate's receivables included approximately $35.8 million in LID reimbursements for substantially complete infrastructure presently in place at the Project, whose direct cost for recovery was estimated to be approximately $6.2 million.  The Trustee is in the process of collecting these receivables.  At the time of the anticipated Effective Date (and as reflected in the budget for the Trustee's Bankruptcy Code section 364 financing from the TIP

2430175

Loan Lenders), the Estate's receivables will include approximately $12.8 million in LID reimbursements for substantially complete infrastructure presently in place at the Project, whose direct cost for recovery is currently estimated to be approximately $2.7 million. Between now and the Effective Date, the Trustee will continue seeking reimbursements for completed LID segments. The right to recover the balance of the LID Acquisition Fund not paid before the Effective Date will be an asset that will be conveyed to the Acquirer, which will take the Estate's real property subject to the associated LID assessments.

In addition, the Trustee has asserted claims against the Settling Builders (which will be settled pursuant to the Plan), and against, among others, Focus, Meritage, and their affiliates, and may have preference or fraudulent-transfer claims against third parties. Also, the Debtor's bankruptcy claims against Kimball Hill and Alameda are included as receivables, although those compete with the Agent's Guaranty claims that are filed against those bankrupt Members and their respective Member Affiliates.

One key variable under the Plan is the resolution of the ownership of the MI Funds and their application. The MI Funds consist of approximately $26 million in an account at the Agent, in the name of Focus South Group.[2] The Agent and the Prepetition Lenders assert that they are entitled to apply the full amount of the MI Funds to their Secured Obligations, a contention that Focus South Group disputes. Under the Plan, the Settling Builders guarantee that at least $16 million will be recovered by the Agent. The MI Funds are currently the subject of the MI Litigation among the Trustee, the Agent, and Focus South Group. The Trustee's pending adversary proceeding to establish the Debtor's ownership of that fund and certain other rights are discussed below (see Article III.D).

2. Indebtedness

The Debtor's prepetition accrued indebtedness includes approximately $367.5 million in secured debt under the Prepetition Credit Agreement's term and revolving credit facility (as further defined below, the "Loans"), and, according to the bankruptcy Schedules and Statement of Affairs filed by the Trustee, general unsecured liabilities and a relatively small amount of priority claims (including "Gap Claims" that arose after the Petition Date but prior to the granting of the involuntary petition).

C. Compromise and Settlement of Claims and Controversies.

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all specified Claims, Interests, Causes of Action, and controversies relating to the contractual, legal, and subordination rights that a specified Holder of a Claim may have with respect to any specified Allowed Claim or Interest, or any distribution to be made on account of such an Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor,

---

[2] Approximately $3 million of those funds was used to pay the LID assessments on June 1, 2011, but the Trustee restored those funds to the Agent's cash collateral account.

2430175

its Estate, Holders of Claims and Interests, and other parties in interest and that the same is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Estate Representative may compromise and settle Claims against the Debtor and Causes of Action of the Debtor or its Estate against other Entities.

D.    Good-Faith Settlement Protections Against Co-Defendant Indemnity or Contribution Claims.

Because the Plan is a good-faith settlement as to the Released Parties, no co-defendant or joint tortfeasors have any indemnity or contribution claims against any other co-defendant or joint tortfeasor, which shall be disallowed by the application of section 502(e) and by California Code of Civil Procedure section 877.6 (which shall apply to the maximum extent permitted by applicable law) and Nevada Revised Statute 17.245, and any similar law of any other jurisdiction.

E.    Claims Estimates.

The bar date for filing Proofs of Claim for prepetition Claims was June 29, 2011 for all Entities (except governmental units), and was August 2, 2011 for all governmental units.

The Plan Proponents estimate that, at the conclusion of the Claims objection, reconciliation, and resolution process, the aggregate amount of Allowed Claims is estimated to be as follows[3]:

(1)    Allowed Administrative Claims in the approximate total amount of $[10,034,500], a portion of which will have been paid on an interim basis pursuant to the interim fee procedures for the Trustee's professionals;[4]

(2)    Allowed Priority Claims and Gap Claims in the approximate total amount of $[25,000];[5]

(3)    No Allowed Other Secured Claims (Class S1);

---

[3] *See* Article III.C.5 for a more detailed discussion of the Plan Proponents' analysis of the estimated amount of the Estate's Allowed Claims.

[4] This amount represents an estimate based on the budget (the "Budget") attached as Exhibit "A" to the Trustee Financing Agreement. (Docket Entry 785). The Budget provides, among other things, that Estate professional fees and expenses will be paid on an interim basis at 85% of billed/incurred fees and 100% of billed/incurred expenses (except for BMC, the noticing agent, which will be paid at 100% in the ordinary course throughout the Chapter 11 Case), and that any fee payable to the Trustee under Bankruptcy Code section 326 will be paid when allowed. Note that the Budget provides that accrued fees and expenses are preliminary based on information provided by each professional. They have not been reviewed by the Trustee, Plan Proponents, or other parties, and are included for information purposes only. All fees and expenses remain subject to Bankruptcy Court approval and all parties (including the Plan Proponents, the Trustee, and the professionals) reserve all rights with respect thereto.

[5] Pursuant to the Notice Of Bar Date For Filing Proofs Of Claim Or Interest (Including Governmental Units) filed by the Trustee on May 9, 2011 (Docket Entry 673), the deadline for all Governmental Units to file a proof of claim or interest against the Debtor is August 2, 2011. No such proofs of claim have been filed by Governmental Units in any amount as of the date hereof, other than as were already filed by the June 29, 2011 bar date.

2430175

(4)     Allowed LID Claims of approximately $[74.4 million] (Class S2), which will be unimpaired and continue to be assessed upon the real property;

(5)     Allowed Prepetition Lenders' Secured Claim (Class S3) in the approximate total amount of between $329.5 million and $339.5 million;[6]

(6)     Allowed Prepetition Lenders' Deficiency Claim (Class U1) in the approximate total amount of between $42.5 million and $52.5 million;[7] and

(7)     Allowed General Unsecured Claims (Class U2) in the approximate total amount of $[850,000], which amount excludes insider and affiliate Claims, which are classified in Class U3.

F.      Treatment of Claims and Interests.

Except for the Administrative Claims, Gap Claims, and Priority Claims, the Plan divides all Claims against the Estate into various Classes. The table set forth below summarizes the Classes of Claims and Interests under the Plan, the treatment of Claims and Interests, and projected recovery for Holders of Allowed Claims and Interests in such Classes, and the entitlement of Holders of Claims and Interests in such Classes to vote to accept or reject the Plan.

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class. Pursuant to section 510 of the Bankruptcy Code, the Plan Proponents reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

1.      Summary and Treatment of Allowed Unclassified Claims.

| Claim | Plan Treatment of Allowed Claims | Projected Recovery Under the Plan |
|---|---|---|
| TIP Loan Claims | Payment in full in Cash. | 100% |
| Agent Adequate Protection Claims | Satisfied pursuant to treatment for Classes S3 and U1. | 100% |
| Administrative Expense Claims | Payment in full in Cash. | 100% |
| Priority Tax Claims | Payment in full in Cash. | 100% |
| Gap Claims | Payment in full in Cash | 100% |
| Professional Compensation Claims | Payment in full in Cash. | 100% |

---

[6] The precise amount of the Allowed Prepetition Lenders' Secured Claim is based on the status of litigation over the Disputed MI Account.

[7] Although the Prepetition Lenders are undersecured, and thus would not be entitled to postpetition interest under Bankruptcy Code section 506(b), they hold liens on all of the Estate's assets. Thus, absent the settlement in the Plan, in order for unsecured creditors to receive any distribution, the Prepetition Lenders' Deficiency Claim would have to be paid in full. For this reason, the Plan Proponents have included postpetition interest in the claim calculation. The Prepetition Lenders' total claim as of the Petition Date was filed in the amount of $367,538,209.77.

2430175

2.    Summary of Classification and Treatment of Classified Allowed Claims and Interests.

| Class | Claim | Plan Treatment of Class | Projected Recovery Range | Status | Voting Rights |
|---|---|---|---|---|---|
| P1 | Priority Non-Tax Claims | (i) cash in the amount of such Allowed Priority Non-Tax Claim in accordance with Bankruptcy Code section 1129(a)(9) or (ii) such other treatment required to render such Claim unimpaired pursuant to Bankruptcy Code section 1124 | 100% | Unimpaired | N/A |
| S1 | Other Secured Claims | (i) the Holder of such Claim shall receive cash in the amount of such Claim, (ii) leave unaltered the legal, equitable, and contractual rights to which such Claim entitles the Holder thereof, in which case the Acquirer shall assume all of the Debtor's obligations to such Holder, or (iii) the Estate shall surrender all Collateral securing such Allowed Other Secured Claim to the Holder thereof as soon as practicable after the Effective Date | 100% | Unimpaired | N/A |
| S2 | LID Claims | Pursuant to Bankruptcy Code section 1124(1), the Plan leaves unaltered the legal, equitable, and contractual rights to which the holders of the LID Claims are entitled. | 100% | Unimpaired | NO |
| S3 | Prepetition Lender Secured Claims | Net recovery of between $329.5 million and $339.5 million, funded by (i) cash contributions by the Settling Builders, (ii) the Resolved MI Amount, the Settling Builders' MI Makeup, or a combination thereof, and (iii) LID reimbursements and other recoveries that may be received by the Agent or the Prepetition Lenders during the Chapter 11 Case (e.g., the Prepetition Lender Postpetition Recoveries). | 89.9 – 92.6% | Impaired | YES |
| U1 | Prepetition Lender Deficiency Claims | Pro Rata Share of $500,000 | 1.3-1.8% | Impaired | YES |
| U2 | General Unsecured Claims | Proportionate Share of the General Unsecured Claim Recovery Fund ($1 million) | [100][8]% | Impaired | YES |

---

[8] Because Holders of Allowed Claims in Class U2 will receive a Proportionate Share of $1 Million, the actual amount received by each Holder of an Allowed General Unsecured Claim will depend upon the total amount of Claims that are allowed in Class U2. Although the Settling Builders believe that the $1 Million allocated for Class U2 will be sufficient to pay all Allowed Claims in that class in full, there can be no assurance of this result. Certain Members And Member Affiliates (who are classified in Class U3) may assert that they are entitled to share in this fund and, if so, Distributions to Holders of Allowed Claims in Class U2 could be diminished significantly.

2430175

| Class | Claim | Plan Treatment of Class | Projected Recovery Range | Status | Voting Rights |
|-------|-------|------------------------|--------------------------|--------|---------------|
| U3 | Member Claims (including Claims of Member Affiliates) | No distribution | 0% | Impaired | NO |
| E1 | Equity Interests | No distribution | 0% | Impaired | NO |

G.    Releases, Exculpations, and Reservation of Indemnification Claims for Agent.

**THE PLAN CONTAINS VARIOUS RELEASES AND EXCULPATIONS BY AND IN FAVOR OF THE DEBTOR, THE ESTATE, THE TRUSTEE, THE AGENT, THE CONSENTING PREPETITION LENDERS (AND, IN CERTAIN CASES, ALL PREPETITION LENDERS), THE SETTLING BUILDERS, AND OTHERS.  THESE PROVISIONS ARE DESCRIBED FURTHER HEREIN, AND ARE INCLUDED IN, *INTER ALIA*, SECTIONS 8.5 THROUGH 8.10 OF THE PLAN.**  The Plan creates certain express indemnification rights in favor of the Agent.

H.    Certain Factors to Be Considered Prior to Voting.

Holders of Claims entitled to vote on the Plan should carefully consider the risks set forth in Article VI herein prior to accepting or rejecting the Plan.

I.    Voting and Confirmation.

The Classes entitled to vote will have accepted the Plan if (1) the Holders of at least two thirds (⅔) in dollar amount of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan, and (2) the Holders of more than one half (½) in number of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan.  Assuming the requisite acceptances are obtained, the Plan Proponents intend to seek Confirmation of the Plan at the Confirmation Hearing scheduled to commence on October [17], 2011 at [10:00] a.m. Prevailing Pacific Time, before the Bankruptcy Court.  Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Class of Claims that is Impaired under the Plan.

THE PLAN PROPONENTS WILL SEEK CONFIRMATION OF THE PLAN UNDER SECTION 1129(B) OF THE BANKRUPTCY CODE WITH RESPECT TO ANY IMPAIRED CLASSES PRESUMED TO REJECT THE PLAN, AND THE PLAN PROPONENTS RESERVE THE RIGHT TO DO SO WITH RESPECT TO ANY OTHER REJECTING CLASS OR TO MODIFY THE PLAN.

The Bankruptcy Court has established September [7], 2011 (the "Record Date"), as the date for determining those Holders of Claims that are eligible to vote on the Plan.  Ballots, along with this Disclosure Statement, the Plan, and the Solicitation Procedures Order, will be mailed to all registered Holders of Claims as of the Record Date that are entitled to vote.  A return envelope will be included with Ballots, as appropriate.

The Voting and Solicitation Agent will answer questions regarding the procedures and

2430175

requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials, and oversee the voting tabulation. The Voting and Solicitation Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan. The address for the Voting and Solicitation Agent is:

| **If Delivered by Mail:** | **If Delivered by Overnight or Hand Delivery:** |
|---|---|
| BMC Group, Inc. Attention: South Edge, LLC Ballot Processing PO Box 3020 Chanhassen, MN 55317-3020 | BMC Group, Inc. Attention: South Edge, LLC Ballot Processing 18750 Lake Drive East Chanhassen, MN 55317 |

If you have any questions on voting procedures, please call the Voting and Solicitation Agent at the following toll free number: 1-888-909-0100.

TO BE COUNTED, BALLOTS INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE VOTING AND SOLICITATION AGENT NO LATER THAN [5:00] P.M. PREVAILING PACIFIC TIME ON OCTOBER [7], 2011 (THE "BALLOT DEADLINE"). ANY BALLOT RECEIVED AFTER THE BALLOT DEADLINE SHALL NOT BE COUNTED.

THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL OF THE DEBTOR'S CREDITORS AND OTHER PARTIES IN INTEREST. THE PLAN PROPONENTS RECOMMEND THAT ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN. THE TRUSTEE, AS REPRESENTATIVE OF THE ESTATE AND ITS CREDITORS, ALSO SUPPORTS CONFIRMATION OF THE PLAN BASED ON THE TERMS OF THE TRUSTEE'S CONSENT.

  J.  Consummation of the Plan.

It will be a condition to Confirmation of the Plan that all provisions, terms, and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Section 9.3 of the Plan. Following Confirmation, the Plan will be consummated on the Effective Date, which will be a Business Day selected by the Plan Proponents after the Confirmation Date on which all conditions to consummation of the Plan have been satisfied or waived.

**ARTICLE II**
**BACKGROUND**

  A.  Description of the Debtor's Business.

    1.  Corporate Structure.

15

2430175

The Debtor is a special-purpose, limited liability company joint venture, which is held indirectly through eight Members.  The following chart sets forth each Member's ownership share of the Debtor, as of December 9, 2010.

| Member | Parent Guarantor (Member Affiliate) | Acreage | Units | Percentage Interest |
|---|---|---|---|---|
| Focus South Group, LLC ("Focus") | John A. Ritter | 304.52 | 15.59 | 15.59 |
| Meritage Homes of NV ("Meritage") | Meritage Corporation | 68.96 | 3.53 | 3.53 |
| Alameda Investments, LLC ("Alameda") | Woodside Group, LLC | 159.0 | 8.14 | 8.14 |
| Coleman-Toll Limited Partnership ("Coleman-Toll")* | Toll Brothers, Inc.* | 205.49 | 10.52 | 10.52 |
| Beazer Homes Holding Corp. ("Beazer")* | Beazer Homes USA, Inc.* | 50.4 | 2.58 | 2.58 |
| KB Home Nevada, Inc. ("KBHN")* | KB Home* | 946.38 | 48.45 | 48.45 |
| Kimball Hill Homes Nevada, Inc. ("Kimball Hill") | Kimball Hill, Inc. | 122.86 | 6.29 | 6.29 |
| Pardee Homes of Nevada, Inc. ("Pardee")* | Weyerhaeuser Real Estate Company* | 95.71 | 4.9 | 4.9 |
| TOTAL | | 1,953.32 | 100.0 | 100.0 |

**\* Denotes a Settling Builder.**

**Note:** Both Kimball Hill and Alameda filed for bankruptcy protection, and each rejected the Operating Agreement in their respective bankruptcy proceedings.  Each is now represented by a Liquidating Trustee under a confirmed plan of reorganization.

As noted in the foregoing chart, each Member's ownership share of the Debtor is based on the amount of land it was obligated to acquire and develop in the Project as a so called "takedown" under the Debtor's Operating Agreement and the Prepetition Loan Documents.  In addition, each Member has a parent guarantor.

The Debtor's operations are governed by the Amended and Restated Operating Agreement of South Edge, LLC, dated as of May 3, 2004 (as amended).  Together with certain Purchase and Sale Agreements and Joint Escrow Instructions (the "Member Acquisition Agreements"), the Operating Agreement addresses the governance of the Debtor, as well as the purchase, sale, and development obligations of its Members, consistent with the Prepetition Credit Agreement and related Prepetition Loan Documents (each as defined below).  However, the Focus arbitration award against the other non-bankrupt Members, as confirmed by order of District Judge Pro and now on appeal, clarifies various matters and resolved various disputes under the Operating Agreement (subject to the Settling Builders' appeal and their reservation of rights in connection therewith).

2.      Corporate History.

In 2003, preliminary discussions began among seven of the nation's most successful

homebuilders and Focus South Group, a Las Vegas area developer, for the creation of "Inspirada" — a large-scale "new urbanism" development[9] project in the City of Henderson, Nevada (the "Project"). The Project initially was to include 8,500 residences spread over nearly 2,000 acres of land in seven "Villages," and was initially budgeted to cost $941,180,871. In addition, a centrally-located, 300-acre Town Center was slated to become an urban destination for retail, residential, commercial, gaming, office, civic and municipal uses, and was to include an additional approximately 3,000 residences. As originally planned, the Villages and Town Center were to include two middle schools, three elementary schools, a fire station, a police station, three community parks, six neighborhood parks, and miles of trail systems.

The Project was organized in units, the smallest of which (20-60 acres each) were called "Pods." Pursuant to contractual agreements between the Debtor and its Members, the Pods were designated for acquisition by individual Members, in what are called "Takedown" purchases to be further developed by the Members (as discussed in more detail below). The Pods are grouped into seven residential Villages of 200-250 acres each, and the Town Center. Of the original 1,953 acres in the Project, Members have acquired 773.82 acres, resulting in 1,179 acres currently remaining with the Debtor. Approximately 830 acres of this land currently is developable, with the remainder currently slated for public improvements, open space, and other uses.

In May 2004, the homebuilders and developers, through their subsidiary members, formed the Debtor, to purchase the land for the Project (the "Property") from the Federal Bureau of Land Management ("BLM") at a cost of approximately $557 million,[10] and then to develop it with basic infrastructure, such as major roads, water lines, sewers, and utilities. The Debtor owns the Property, and the Members agreed to pool their resources to allow South Edge to build common infrastructure on a cost-effective basis with (1) $585 million in Loans under the Prepetition Credit Agreement, (2) Member capital contributions in the form of "Major Infrastructure" or "MI Deposits", and (3) $102 million in public local improvement district bonds previously issued and sold by the City (the "LID Bonds") of which as of the Petition Date approximately $90 million remained available for the City to use to purchase LID "segments" at prescribed prices when completed as required by the "Acquisition Agreement" between the City and the Debtor (approximately $20 million of this amount is expected to be received by the Trustee prior to the Effective Date).

In order to facilitate the construction of the Project, the Members each entered into a "Member Acquisition Agreement" with the Debtor whereby, subject to the terms thereof, the Member agreed to takedown specific Pods from the Debtor on a set schedule at a specified price (the "Takedown Schedule"). The Pods were allocated to the Members based on each Member's percentage interest in the Debtor. The Member was then obligated to takedown the Pod on a date certain and for a set price. The proceeds of the Takedowns were intended to provide the Debtor with funds that it would use to repay its obligations under the Loans. Among the Prepetition Credit Documents with the Agent was the Assignment of Member Acquisition Agreements (defined below) that assigned all those rights to the Agent, for the benefit of the

---

[9] The urbanism concept for Inspirada was, at the time, the largest ever undertaken in Las Vegas for this style of development.

[10] Property values were experiencing a boom at that time, and the land purchase price for Inspirada was a record purchase price for land in the Las Vegas Valley.

2430175

Prepetition Lenders, as collateral, as well as creating subordination and other obligations for the Members and their Member Affiliates.

However, as discussed herein, the Debtor ceased work on infrastructure-related projects and suspended development of the Project in March 2008. Those projects, which once completed generate LID reimbursements from the City, were resumed by the Estate on a limited basis subsequent to the Trustee's appointment and, as noted, the Trustee is projected to receive approximately $20 million in LID reimbursements prior to the Effective Date.

Apart from the completion of the LID segment work on in-use infrastructure at the Project that is scheduled to be completed before the Effective Date, the remaining LID work shall be part of the negotiations with the City regarding the future plans, specifications, and schedule for the revised Project, including as to the amendment to the Development Agreement.

The Development Agreement between South Edge and the City defines the size and scope of the Project and forms the entitlements for the underlying real estate that run with the Property. The City's role is to provide utility, safety, recreational, and administrative services to the development and its future residents. South Edge's role includes constructing the initial installation of the infrastructure necessary for the City to deliver the above-listed municipal services. Much, but not all, of that infrastructure was to be funded by bonds issued pursuant to the LID. The holders of the LID Bonds invested in the municipal bonds issued to finance the infrastructure, consisting of improvements that are going to be made to the property that is the underlying security for the bonds. The Agent contends that the Development Agreement provides for ongoing and mutual obligations between the Debtor and the City.

     B.     The Debtor's Prepetition Capital Structure.

     1.     The Prepetition Credit Agreement and Prepetition Credit Documents

On November 1, 2004, the Debtor entered into a $535 million secured credit facility (as further amended, the "Prepetition Credit Agreement" or, as applicable, the "Loans"). JPMorgan Chase Bank, N.A., serves as Agent under the Prepetition Credit Agreement. The bulk of the funds loaned under the Prepetition Credit Agreement were used by the Debtor to acquire the Property from the BLM. The Loans also provided funding for the construction of the major infrastructure on the Project.

As security for the Loans, the Debtor also entered into several related agreements (together with the Prepetition Credit Agreement, the "Collateral Documents") with JPMorgan that assigned certain collateral (the "Collateral") to the Agent, including the following:

     (i)     The Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents and Leases dated as of October 29, 2004, and recorded as Instrument No. 20041101-0006330 with the Clark County Recorder on November 1, 2004, as amended by the First Amendment to Deed of Trust, Security Agreement and Fixture Filing and Assignment of Rents and Leases dated as of March 9, 2007, and recorded with the Clark County Recorder on March 9, 2007, (the "Deed of Trust");

     (ii)     The Assignment of Contracts, Permits and Plans and Specifications dated as of November 1, 2004 (the "Assignment of Contracts");

(iii)    The Assignment of and Agreement with Respect to Acquisition Agreements dated as of November 1, 2004 (the "Assignment of Member Acquisition Agreements"); and

(iv)    The Assignment of Acquisition Agreement dated as of April 27, 2006 (the "Assignment of COH Acquisition Agreement") regarding South Edge's LID recoveries from the City.

The Collateral Documents provide the Agent with security interests in all or substantially all of the Assets, including, without limitation:  (1) the Member Acquisition Agreements, as amended; (2) the COH Acquisition Agreement, (3) Operating Agreement; (4) the MI Deposits and related letters of credit; (5) the proceeds of the LID Bonds and related rights when the LID segments are sold to the City pursuant to the Debtor's COH Acquisition Agreement assigned to the Agent pursuant to the Assignment of COH Acquisition Agreement; (6) to the extent that they constitute personal property subject to the Uniform Commercial Code (the "UCC"), the Debtor's inventory, equipment and other tangible property, including books and records, all other contract rights, accounts, general intangibles, actions and rights in actions relating to the "Real Property" or "Personal Property" referenced in the Deed of Trust or the Project, as well as all contracts relating to the development, design or construction of the improvements, together with all proceeds thereof or proceeds of the Member Acquisition Agreements or COH Acquisition Agreement or of the sale of all or any part of that Real Property or other Trust Property (described in the Deed of Trust as "Sale Proceeds") and including the sale of interests in the Project; and (7) all other revenues, profits, principal, interest, fees, or other sums or amounts constituting personal property under the UCC and derived or generated from the ownership, operation, occupancy, leasing, licensing, development, sale, or other disposition of the Project or other Collateral by the Debtor or due or payable to the Debtor under any Member Acquisition Agreement, as well as all other similar contracts of any other nature concerning the design, construction, or development of any portion of or all of the Project, and all personal property proceeds thereof subject to the UCC.

Under the Collateral Documents, the Debtor assigned all of its rights under all of its agreements with each Member and each Member's corporate parent to the Agent, for the benefit of the Prepetition Lenders, as collateral for the Loan. The Debtor also executed in favor of JPMorgan the Assignment of Contracts assigning all "Permits" and "Governmental Approvals," all "Construction Agreements," "Contracts" and all "Assigned Plans" as each is so defined in the Assignment of Contracts, as well as the COH Acquisition Agreement assigned pursuant to the Assignment of COH Acquisition Agreement with respect to the LID proceeds.  This overlaps with the Deed of Trust and Assignment of Member Acquisition Agreements, but provides further rights and benefits for Lenders as to those unique assets.  Each of the Members and Parents expressly consented to each of the Loan Documents in the consent and agreement (the "Consent and Agreement"), dated March 9, 2007, entered into by each of the Members and their Parents and by and in favor of JPMorgan as Agent for the Lenders, as well as in their Assignment of Member Acquisition Agreements.

When the Debtor entered into the Prepetition Credit Agreement with the Agent and the Prepetition Lenders, each Member and its respective parent also executed the following Guaranties in favor of JPMorgan, as Agent under the Credit Agreement:  (1) a Completion Guaranty, which guaranties certain "balancing payments" and the completion of certain

2430175

improvements on the Project and the payment of certain development costs, (2) a Limited Guaranty (also known as a "bad boy guaranty") under which the Member and Parent guarantee payment for damages related to certain fraudulent and/or unlawful acts, and (3) a Repayment Guaranty, which the Agent asserts is triggered in the event of an involuntary or voluntary bankruptcy of the Debtor. Under each Guaranty, the Member and its Parent are jointly and severally liable for their share of the guaranteed obligations.

In mid-2006, less than two years after the execution of the Prepetition Credit Agreement, the Debtor, through its Members, reached out to the Agent to seek a consensual extension to the Takedown Schedule. On March 9, 2007, JPMorgan and the Debtor entered into the Amended and Restated Credit Agreement, which included a $50 million increase in the construction loan portion of the facility and incorporated a modified Takedown Schedule. At that time, each Member also signed a second amended Member Acquisition Agreement that provided the Agent with additional collateral and extended the Takedown Schedule with the Prepetition Lenders' consent. Following defaults under the Credit Agreement, including the Debtor's nonpayment of interest, the Debtor, the Agent, the Members, and Member Affiliates entered into a Forbearance Agreement in May 2008 in which, among other things, the Loans and Loan Documents were reaffirmed, any claims or defenses were released, and the existing Events of Default were acknowledged. The Agent's forbearance obligations terminated June 30, 2008 pursuant to the terms of the Forbearance Agreement.

As described below (see "The Chapter 11 Case—Events Leading Up to the Involuntary Filing"), on July 2, 2008, the Agent, as provided for under the Prepetition Credit Agreement, sent a Notice of Default under the Prepetition Credit Agreement. Several notices of additional and continuing defaults were subsequently issued to the Debtor (and all the Members and parent guarantors) by the Agent, including updated default notices shortly before the Petitioning Lenders filed the Involuntary Petition.

As of the Petition Date, the Prepetition Credit Agreement remained in default (that is, the Loans matured without payment), and the aggregate outstanding amount of principal due and owing was $327,855,500, plus interest, fees, and charges accrued and accruing thereon and chargeable with respect thereto. On June 28, 2011, the Agent (for itself and on behalf of each of the Prepetition Lenders) filed a secured claim against the Debtor in the amount of $367,538,209.77.

In accordance with Cash Collateral Orders, on June 20, 2011 the Trustee completed her investigation of the Agent's liens on the Collateral under the Collateral Documents and determined that the Agent's prepetition liens constituted properly perfected, priority liens (subject to certain permitted exceptions) under applicable state laws and that they are not subject to avoidance; however, the Trustee has not conducted her investigation as to the validity of the total amount of the Agent's claim filed against the Estate, and her rights to conduct and conclude such an investigation are hereby preserved.

2.       Member Capital Contributions

Subject to the terms of the Operating Agreement and the Member Acquisition Agreements, the Members agreed to contribute capital to the Debtor for the purpose of building infrastructure and funding certain Project "soft" costs. Specifically, pursuant to the terms of the

Operating Agreement and the Member Acquisition Agreements, the Members were each required to post a "Major Infrastructure" or "MI Deposit" concurrently with the Takedown of their respective Pods. The MI Deposit prefunded a portion of each Member's share of the cost of certain of the Major Infrastructure the Debtor was required to build.

As of the Petition Date, $26,029,532.23 in MI Deposits was held in a cash collateral account in the name of Focus South Group, LLC that is maintained by the Agent, and the Agent asserts that such account serves as Collateral for repayment of the Loans. The proceeds from the MI Deposits from other Members were used or applied by the Agent prior to the commencement of the involuntary bankruptcy proceeding in a manner the Agent contends was consistent with the Prepetition Credit Documents.

3.    LID Bonds

On April 4, 2006, by Ordinance No. 2456, the City formed the "T-18 Local Improvement District" or "LID" to help finance the construction of roads, water lines, sewers and utilities (the "Major Infrastructure") in and for the benefit of the Villages. The Debtor, with funds from the MI Deposits and other sources, was to build the Major Infrastructure for the benefit of the Property within the LID.

The net proceeds from the sale of the LID Bonds were previously put into an acquisition account (the "LID Account") held by the City to be used to purchase infrastructure as when completed by the Debtor. When the Debtor completes the construction of specified infrastructure improvements (such as roads or utilities), the Debtor may deed those improvements to the City pursuant to the COH Acquisition Agreement. This agreement was assigned to the Agent, for the benefit of the Prepetition Lenders, pursuant to the Assignment of COH Acquisition Agreement. If the City accepts the improved "segment" as being within the pre-established specifications, and if the work is free of all liens, then the City acquires the "segment" improvements and the Debtor receives the lesser of (i) a pre-established acquisition price or (ii) the actual costs expensed, under the COH Acquisition Agreement from the proceeds of $102 million in LID Bonds previously issued and sold by the City. The LID Bonds are payable from the proceeds of and secured by assessments (the "Assessments") levied on the owners of property within the LID, including the Debtor. Once the City acquires the improvements, it assumes responsibility for the ongoing maintenance of the improvements.

At the time of the commencement of the involuntary bankruptcy filing on December 9, 2010, the Debtor had substantially completed sufficient segments of streets, water and sewer utilities and storm draining systems that were in use and serving more than 600 occupied homes in Village 1 and other land. At a cost of an additional approximately $6 million, approximately $35 million was available for recovery from the LID Account under the COH Acquisition Agreement. Completion and turnover to the City of the improvements would enable the City properly to maintain those improvements for the benefit of its residents. At this time, the Trustee is moving forward with the construction of certain LID segment infrastructure at Inspirada in an effort to bring LID reimbursement proceeds into the Estate, fund the administration of the Estate, and shift the responsibility for maintaining that infrastructure to the City. It is anticipated that approximately $20 million in LID proceeds will be received by the Effective Date.

When LID proceeds have proven inadequate, the Trustee has sought, and obtained,

authority from the Bankruptcy Court to utilize certain of the Debtor's cash, which is subject to the Agent's liens and constitutes the Prepetition Lenders' cash collateral (the "Cash Collateral") under section 363 of the Bankruptcy Code, except for the "unencumbered" cash (identified in the Cash Collateral Orders). Most recently, the TIP Loan Lenders (affiliates of the Settling Builders) provided priming, post-petition, secured financing to the Trustee pursuant to Bankruptcy Code section 364 to pay for such work and other budgeted administrative expenses in accordance with the Plan Support Agreement and the Settling Builders' related Consent Letter with the Trustee.

      C.     <u>Management of the Debtor.</u>

Pursuant to the Operating Agreement, prior to the Petition Date, the Debtor was managed by a representative of each Member (the "Management Committee"). As a result of the Bankruptcy Court granting the Agent's request for the appointment of a chapter 11 trustee to oversee the Estate, the Trustee currently controls the Estate and makes all decisions on its behalf. Pursuant to the Plan, the Estate Representative will also take certain actions to implement the Plan as described herein.

**ARTICLE III**
**THE CHAPTER 11 CASE**

The following is a general summary of the Chapter 11 Case, including certain of the events leading up to the filing of the Involuntary Petition, the initiation of the Chapter 11 Case, certain administrative matters addressed during the Chapter 11 Case, the Trustee's activities since her appointment, and the negotiation of the global settlement among the Plan Proponents that culminated in the preparation, filing, and prosecution of the Plan.

      A.     <u>Events Leading Up to the Involuntary Filing.</u>

      1.     Debtor's Defaults

By early 2008, the real estate market had begun a dramatic decline that ultimately resulted in what has come to be known as the "Great Recession." The Las Vegas area in particular was hit hard by the real estate decline. Less than one year after entering into the amended Prepetition Credit Agreement, certain Members began experiencing financial problems. Two of the Members, Alameda and Kimball Hill, defaulted on certain covenants in their corporate credit revolvers, and those defaults caused a cross-default under the Prepetition Credit Agreement.

Member Kimball Hill filed for bankruptcy protection on April 23, 2008,[11] causing another default under the Prepetition Credit Agreement. Woodside Group, LLC ("Woodside"), the parent of Member Alameda, continued to have financial issues as well, and it was not clear if Woodside would be able to meet its obligations to the Debtor and the Agent. An involuntary petition was filed against Woodside by its lender creditors in August 2008 (that was later consensually converted to a voluntary chapter 11 case).[12] Alameda also sought bankruptcy

---

[11] *See* Case No. 08-10095 (SPS) (Jointly Administered) pending in the U.S. Bankruptcy Court, Northern District of Illinois.

[12] *See* Case No. 08-20682 (PC) (Jointly Administered) pending in the U.S. Bankruptcy Court, Central District of California.

22

protection on January 20, 2009.  Both Members (and their respective Parents) confirmed liquidating plans of reorganization, and Liquidating Trustees now represent the Members.  Both the Debtor (as to the Operating Agreement and Member Acquisition Agreements) and the Agent (as to those contracts and its Guaranties) filed proofs of claim in those cases.  Not all of the Liquidating Trustees have yet resolved their positions as to those proofs of claim.

2.     Debtor's Management Committee Suspends Further Development of Inspirada and Other Alleged Events of Default Caused By Builder-Defendants

Significant litigation has occurred among the Settling Builders, the Agent, Focus South Group, and others regarding the events leading up to the Debtor's involuntary bankruptcy.  An arbitration panel found that certain of the Members caused defaults by the Debtor under the Prepetition Credit Agreement and other Prepetition Credit Documents by (1) failing to (a) cause the Debtor to make interest payments, (b) cure defaults of certain Members, and (c) make their scheduled Takedowns, and (2) voting to extend the agreed-upon Takedown Schedule without obtaining the Agent's consent (the Agent contends that it had no knowledge of this vote).  The Agent agrees with these findings, while the Settling Builders dispute these findings and how they have been characterized by some parties, and they have taken an appeal.

The Settling Builders contend that on February 26, 2008, Woodside informed the Debtor that it would not be able to fund its portion of a capital call that had been made upon the Members.  Among the obligations of the Debtor to be paid with that capital call was interest due on February 28, 2008 under the Prepetition Credit Agreement.  The Settling Builders believed that the obligations of the Members under the Prepetition Credit Documents were several, and that Members were not required to contribute capital owing by another Member.  With Woodside stating that it would not fund its share, in early March 2008, the Management Committee determined that it would not remit the February 2008 interest payment due under the Prepetition Credit Agreement and that, in light of the impending failure of one or more Members, a default under the Prepetition Credit Agreement was inevitable.  Soon thereafter, a controlling majority of the Management Committee (i) did not issue capital calls to either fund interest payments or maintain credit reserves, (ii) did not pay financing interest, (iii) voted to cease work on Inspirada, and (iv) commenced discussions with the Agent to restructure the Prepetition Credit Agreement.

Prior to the Petitioning Lenders' filing of the Involuntary Petition, the Debtor had not made any payments to either fund credit reserves or interest payments in nearly three years, and further development of the Project (beyond the initial Takedown parcels acquired by certain Members) had ceased.  A number of LID segments were substantially complete and in use, but were not transferred by the Debtor to the City.  Thus, the Debtor remained responsible for significant in-use infrastructure that it was obligated to turn over to the City.  The Settling Builders assert that from March 2008 until the filing of the involuntary petition, the Settling Builders and Meritage contributed in excess of $30 million in capital to the Debtor for the purpose of paying trade creditors, taxes, and other liabilities, but the Agent contests such assertions.  In fact, vigorous disputes existed between the Members and the Agent over that situation, which was a major factor in the involuntary bankruptcy trial and in the Bankruptcy Court's rulings.

23

a.    Members' Extension of Takedown Schedule

On March 9, 2007, with the Prepetition Lenders' express consent, each Member signed an amended Member Acquisition Agreement, which extended the Takedown Schedule as follows:  (i) 295.59 acres to be taken down on April 15, 2007; (ii) 483.35 acres to be taken down on October 15, 2007; (iii) 324.07 acres to be taken down on April 15, 2008; (iv) 50.4 acres to be taken down on July 15, 2008; (v) 232.51 acres to be taken down on October 15, 2008; (vi) 445.52 acres to be taken down on April 15, 2009; and (vii) 121.88 acres to be taken down on October 15, 2009.

The Members completed their respective Takedowns scheduled for April 15, 2007 and October 15, 2007; however, there was a significant Takedown scheduled for April 15, 2008, and in advance of that date, the Settling Builders contend that one or more of the Members stated that they would be unable to perform their respective Takedowns.

With these Takedowns scheduled and uncertainty surrounding whether they could be completed, the Agent, the Debtor, the Members, and their Parent Guarantors began discussions to cure the existing and pending defaults under the Prepetition Credit Agreement and further restructure the terms of the Credit Agreement, including in connection with the 2008 Forbearance Agreement.

However, the Management Committee voted (except for Focus, and with respect to certain votes, Meritage and/or Beazer) to extend the Takedown Schedule, including those scheduled for April 15, 2008.  The Agent asserts that this vote was held without its knowledge or consent, and was done so that the Member's obligations to the Debtor purportedly would not come due at the time agreed upon by JPMorgan in the Prepetition Credit Documents.  The Agent asserts that this should have been disclosed in the list of the Events of Default set forth in the Forbearance Agreement (discussed below).  The Settling Builders dispute these assertions.

b.    Forbearance Agreement

On May 27, 2008, the Agent, the Debtor, and the Members and their respective Member Affiliates, entered into a Forbearance Agreement in order to "provide [South Edge] with sufficient time to propose, negotiate and close a potential restructuring of Loans advanced under the Credit Agreement."  The Forbearance Agreement reaffirmed all obligations owing to the Prepetition Lenders and all rights and liens of the Prepetition Lenders.  The Agent contends that neither the Debtor, nor any of the Members or their parent entities, informed the Agent of the extended Takedown Schedule at the time the Forbearance Agreement was signed.

Following the signing of the Forbearance Agreement, the Agent, the Debtor, the Members, and the Member Affiliates sought to restructure the Loans under the Prepetition Credit Agreement, but those efforts were unsuccessful, and the Forbearance Agreement terminated, by its own terms, on June 30, 2008.

c.    Alleged Continuing Defaults

On July 1, 2008, the Agent formally notified the Debtor and the Members and the parent guarantors of the Forbearance Agreement's termination and apprised them of some of the alleged continuing defaults.  Specifically, on July 2, 2008, the Agent sent a Notice of Default to the

Debtor and the Member Affiliates, regarding the defaults associated with the failure to make Takedowns as required under the Member Acquisition Agreements and Operating Agreement.

On November 13, 2008, the Agent sent the Debtor a "Balancing Notice." Pursuant to the terms of the Prepetition Credit Agreement, a "Balancing Payment" is due when the projected costs to complete the Project exceed the approved project budget. At such time, an "Out of Balance Condition" exists and, upon demand, the Debtor must make a Balancing Payment to the Agent in the amount of the "Out of Balance Condition." Under the Completion Guaranty executed by each Member and its parent, if the Debtor fails to make a Balancing Payment, the Agent asserts that the Members and their Member Affiliate must jointly and severally pay their pro rata shares of the Balancing Payment to the Agent, but the Settling Builders dispute this assertion. On December 1, 2008, the Agent sent the Debtor (and all the non-bankrupt Members and Member Affiliates) two Notices of Default alleging multiple defaults under the Prepetition Credit Agreement and Collateral Documents. Also on December 1, 2008, the Agent sent the Debtor, all of the non-bankrupt Members and the Member Affiliates, a Demand for Adequate Assurance of Due and Future Performance.

On November 23, 2010, the Agent, on behalf of the Prepetition Lenders, sent the Debtor an updated Notice of Defaults as well as a related demand for information and documents, as provided for under the Prepetition Credit Agreement. The Debtor, its Members, and the Member Affiliates did not cure the asserted defaults, make the Balancing Payments, or provide any assurance of performance under the Loan Documents.

> 3.    Commencement of Litigation and Arbitration

> a.    Litigation Commenced by Prepetition Lenders

In view of the numerous actual and alleged defaults on the part of the Debtor, the Members, and the Member Affiliates, the Agent commenced two sets of actions (collectively, the "Nevada Actions") against certain of the Members (Meritage, Coleman-Toll, Beazer, KBHN, and Pardee, collectively the "Guaranty Defendant Members") and their respective Member Affiliates.

The first set of actions, filed in the Southern District of New York on December 5, 2008, against the Guaranty Defendant Members and their respective Member Affiliates, were based on the Completion Guaranties executed by each of the defendants (the "Completion Guaranty Actions"). On that same day, the Agent also filed a second set of actions (the "UCC Actions") against the non-bankrupt Members and their respective Member Affiliates (the "UCC Defendant Members") in the District of Nevada (the "Nevada District Court"). The UCC Actions sought pursuant to UCC § 9607 to collect against the Collateral pledged to the Agent pursuant to the Credit Agreement and other Prepetition Credit Documents, including the Takedowns then alleged to be owing in excess of $304 million, and also sought damages for certain torts allegedly committed by the UCC Defendant Members and to establish a resulting trust for the benefit of the Prepetition Lenders.[13] Specifically, under the UCC Actions, the Agent sought

---

[13] On May 26, 2009, an order was entered, pursuant to the motion of KBHN, KB Home, and the other Builder-Defendant Members and Parent Guarantors, transferring the Completion Guaranty Actions to the District of Nevada where the UCC Actions were pending. The Completion Guaranty Actions were eventually consolidated with the UCC Actions in front of the Honorable Philip M. Pro in case number 2:08-cv-01711.

2430175

damages based upon allegations of (1) the Members' breach of contract, including breach of the Operating Agreement, Member Acquisition Agreements, and Assignment of Member Acquisition Agreements; (2) the corporate parents' breach of the same contracts; (3) the Members' and Parents' breach of their fiduciary duties to the Debtor (the Agent asserts the Debtor assigned its rights to the Agent) and to the Agent (as a creditor of an insolvent LLC); and (4) the corporate parents' intentional interference with contractual relations between each Member and the Debtor.

On January 30, 2009, the UCC Defendant Members and their respect Member Affiliates moved to dismiss the UCC Actions. The Agent opposed the motion, and on July 15, 2009, the Nevada District Court granted in part, and denied in part the motion to dismiss, leaving intact (1) certain of the Agent's claims against certain Members for breach of the Operating Agreement and Member Acquisition Agreements, (2) the Agent's claims against certain Member Affiliates under the Member Acquisition Agreements and Assignment of Member Acquisition Agreements, (3) JPMorgan's claim for breach of fiduciary duty as a creditor to an insolvent LLC against both the Members and the Parent Guarantors, and (4) the Agent's claims against the Parent Guarantors for intentional interference with contract. Later these would be amended to include alleged misrepresentations to the Agent in the Forbearance Agreement discussed above regarding the purported Member extensions of the Takedown dates.

        b.      Focus' Arbitration Proceeding

In May of 2009, Focus, as a Member of South Edge, filed a demand for arbitration against the other non-bankrupt Members, on behalf of itself and the Debtor, and it sought relief in the arbitration both for itself and for the Debtor. Focus alleged that it was the only Member that (i) did not default on its Takedown obligations under the Operating Agreement and Member Acquisition Agreement and (ii) performed all of its Takedowns under its Member Acquisition Agreement and Operating Agreement.

Focus sought, among other things, to require the other non-bankrupt Members to honor and specifically perform their alleged contractual obligations to the Debtor, including satisfying the Takedowns past due and owing to the Debtor. By operation of the Prepetition Credit Agreement and other Prepetition Credit Documents, the Agent believes that any such recovery by the Debtor would have resulted in substantial payments to the Agent, to pay down the Loans.

In the arbitration award, the arbitration panel determined that certain Members breached their agreements by (i) failing to fund interest payments, (ii) voting to cease construction on the Project, (iii) refusing to make their Takedowns, and (iv) purporting to extend the Takedown Schedule. Various Members have appealed the award, which appeal is still pending. The arbitration panel awarded Focus damages in the sum of $36,815,354. The panel determined that this amount was equivalent to the diminution in value of Focus' investment in the Project resulting from the breaches the panel found by the other non-bankrupt Members. The Trustee and Agent contend in the Chapter 11 Case that the arbitration award collaterally estops the Members from relitigating those issues, but the Members who are defendants in the arbitration dispute that contention and, as noted, have appealed the decision, which is currently pending in the U.S. Court of Appeals for the Ninth Circuit.

The Agent contends that the arbitration panel's decision fostered what the Bankruptcy

2430175

Court determined in the trial on the Involuntary Petition to be managerial deadlock. As a result, under the panel's interpretation of the Operating Agreement, no Member was able to compel the allegedly defaulting Members to perform their past-due Takedowns to the Debtor—*i.e.*, pay down a significant portion of the money owed to the Prepetition Lenders under the Prepetition Credit Agreement. The panel concluded that Focus could only commence an arbitration on its own behalf and could not assert claims on behalf of the Debtor, because Focus was not permitted to singularly form a quorum under the Operating Agreement as the only non-defaulting Member. Rather, the panel found that a quorum of the Management Committee, duly constituted, is the only entity with the authority to bring an arbitration on behalf of the Debtor. In this regard, the panel concluded that the Members retain their right to vote until they are formally voted out under the Operating Agreement, but cannot vote on matters relating to their own defaults. This interpretation of the Operating Agreement by the Arbitration Award created various disputes.

        c.       Recent Litigation Decisions

On September 27, 2010, the Nevada District Court denied the motion of all non-bankrupt Members (except for Focus) and their respective Member Affiliates for leave to file a counterclaim and third-party complaint arising from a Cooperation Agreement entered into by the Agent and Focus. The court held that any counterclaims arising under the Guaranties were waived by the movants, including the proposed counterclaim for breach of good faith and fair dealing under the court's interpretation of the New York UCC, and counterclaims relating to Nevada's one action rule, unclean hands, and *in pari delicto*.

On that same date, the Nevada District Court also denied Member KB Homes Nevada and its corporate parent's motion for a preliminary injunction (joined by the other Members and their respective Member Affiliates) to enjoin the Agent from drawing down on the MI Deposits.

Finally, the Nevada District Court granted the Agent's motion to amend its UCC Actions. The amended complaints added claims in which the Agent alleged that the non-bankrupt Members were liable for damages arising from (1) fraudulently inducing the Agent into a Forbearance Agreement, (2) tortiously interfering with the Prepetition Credit Agreement between the Debtor and the Lenders (the court ordered that this claim only proceed against the Members), (3) breaching the Limited Guaranty executed by each of the Members and Parent Guarantors, and (4) seeking a declaration that certain purported extensions of the Takedown Schedule were null and void. These claims were largely based on allegations (disputed by the Settling Builders) of certain Members' and Parent Guarantors' efforts to extend the dates on which each Member was required to perform its Takedowns without the Agent's consent and the subsequent efforts to allegedly conceal these actions from the Agent, including misrepresentations allegedly made in the Forbearance Agreement.

        d.       Current Status of Pending Litigation

On December 6, 2010, the Nevada District Court unsealed the Arbitration Award, which had been filed under seal by the Members. On December 10, 2010, the Agent notified the Nevada District Court of the involuntary bankruptcy filing, and moved to stay all proceedings before the court until the Bankruptcy Court issued a decision on the involuntary bankruptcy. Certain of the Members stipulated to the motion for a stay on December 21, 2010, and the Nevada District Court entered the stay on December 22, 2010.

27

On February 7, 2011, certain of the Members notified the Nevada District Court that South Edge had been made a debtor under chapter 11 of the Bankruptcy Code, and on February 8, 2011, the Nevada District Court entered an order staying all proceedings pending the resolution of the Debtor's bankruptcy proceeding or further order of the court.  The Nevada Actions pending before the Nevada District Court remain stayed at this time.

   e.  Agent's Repayment Guaranty Demand Against Meritage

By letter dated June 6, 2011, the Agent sent a demand to Member Meritage and Meritage Homes Corp. (together, "Meritage") regarding their liability under the Repayment Guaranty jointly executed by them.  The Agent demanded immediate payment of $13,242,841.10, the amount owed jointly and severally by Meritage and Meritage Homes Corp.  By letter dated June 20, 2011, counsel for Meritage responded to the Agent's demand letter, rejecting the demand and refusing to pay.

   B.  The Involuntary Filing of the Chapter 11 Case and the Appointment of the Chapter 11 Trustee.

On December 9, 2010, the Petitioning Lenders filed the Involuntary Petition against the Debtor under section 303 of the Bankruptcy Code in the Bankruptcy Court, and JPMorgan, in its capacity as a Prepetition Lender and Agent, filed a motion seeking appointment of a chapter 11 trustee (the "Trustee Motion").

The Debtor filed (i) an answer to the Involuntary Petition on January 4, 2011, (ii) a motion for dismissal for cause of, or, in the alternative, abstention from, the involuntary case on January 6, 2011 (the "Dismissal/Abstention Motion"), and (iii) its opposition to the Trustee Motion on January 7, 2011.

On February 3, 2011, following a four-day trial, the Bankruptcy Court entered an order granting the Involuntary Petition (the "Order for Relief"), entered an order approving the Trustee Motion (the "Trustee Order"), and denied the Dismissal/Abstention Motion.  The Court ordered the appointment of a chapter 11 trustee on February 3, 2011.

On February 8, 2011, the Debtor-out-of-possession filed an appeal of both the Order for Relief and the Trustee Order (the "South Edge Appeal") to the Nevada District Court.  On February 22, 2011, KBHN, Coleman-Toll, Pardee, Beazer, and Meritage (the "Appealing Builders") also filed an appeal of both the Order for Relief and the Trustee Order (the "Builders' Appeal," together with the South Edge Appeal, the "District Court Appeals").  The Appealing Builders also filed a motion to intervene in the South Edge Appeal.

On February 20, 2011, the Office of the U.S. Trustee appointed Cynthia Nelson as chapter 11 trustee for the Estate.  On February 23, 2011, the Bankruptcy Court entered an order approving the appointment of Cynthia Nelson as Trustee.

   C.  Proceedings Following Commencement of the Chapter 11 Case

     1.  Dismissal of the District Court Appeals and the Initiation of the Ninth Circuit Appeals.

28

2430175

On March 4, 2011, the Trustee filed a motion to dismiss the District Court Appeals (the "Dismissal Motion"). JPMorgan and Credit Agricole joined in the Dismissal Motion.

On April 28, 2011, U.S. District Court Judge Pro issued an Order granting the Dismissal Motion (the "Dismissal Order"). The Dismissal Order also denied the Appealing Builders' separate motion to intervene.

On May 5, 2011, the Debtor appealed the Dismissal Order (the "South Edge Appeal") to the U.S. Court of Appeals for the Ninth Circuit (the "Ninth Circuit"), which has been docketed as Ninth Circuit Case No. 11-16146. On May 9, 2011, the Appealing Builders filed two appeals which have been docketed as Ninth Circuit Case No. 11-16174 (the "Appealing Builders' First Appeal") and Ninth Circuit Case No. 11-16177 (the "Appealing Builders' Second Appeal"), appealing the Dismissal Order and the District Court's refusal to allow them to intervene in the appeal to the Ninth Circuit (the South Edge Appeal, the Appealing Builders' First Appeal, and the Appealing Builders' Second Appeal, the "Ninth Circuit Appeals").

The Trustee contends that she did not receive proper notice of the Appealing Builders' Second Appeal, and thus the following discussion is qualified by (1) the Trustee's position (which the Settling Builders' dispute) that the Appealing Builders' Second Appeal is not valid, and (2) the fact that the Trustee did not join in seeking any of the following relief in connection with the Appealing Builders' Second Appeal.

Disputes as to those appeals continue to exist among the parties. However, the consummation of the Plan would render most, if not all, of the Ninth Circuit Appeals moot. Therefore, the Plan Proponents, the out-of-possession Debtor, and the Trustee elected to seek mediation in accordance with the Ninth Circuit rules to avoid unnecessary litigation expenses. Recently, the parties communicated with the appointed Ninth Circuit mediator and advised him of the substantial progress made by the parties to effectuate a global settlement. Without the unanimous consent of all parties to the Ninth Circuit Appeals (Meritage withheld its consent), the Circuit Mediator informed the parties that he was unable to enter an order that would procedurally accommodate the settlement discussions because the Ninth Circuit Appeals have not yet been formally referred to the Circuit Mediation Program.

The Plan Proponents desired sufficient time to conclude their settlement efforts, file and proceed with confirmation of the Plan, and to allow for the occurrence of the Plan's Effective Date (assuming it is confirmed) without devoting time and resources to the pursuit of the Ninth Circuit Appeals that could ultimately be dismissed (or substantially narrowed) pursuant to the settlement. Accordingly, on July 14, 2011, all parties to the Ninth Circuit Appeals (other than Meritage) filed joint motions requesting that (i) the Ninth Circuit Appeals be referred to the Circuit Mediation Program for purposes of case management and for purposes of narrowing of issues, and (ii) the briefing schedule in the Ninth Circuit Appeals be abated pending the mediation process and consideration by the Bankruptcy Court of the settlement embodied in the Plan that would resolve most, if not all, of the disputes underlying the Ninth Circuit Appeals (the "Stay Motion"). On July 22, 2011, Meritage filed its opposition to the Stay Motion, and on July 29 2011, an order was entered referring the Stay Motion to the clerk for the Ninth Circuit and, based upon Meritage's opposition to mediation, denying the referral of the Ninth Circuit Appeals to the Circuit Mediation Program.

2430175

2.      Use of Prepetition Lenders' Cash Collateral.

On March 31, 2011, the Trustee filed a motion requesting entry of an order approving a stipulation (as amended, the "Cash Collateral Stipulation") among the Trustee, the Agent, and Focus, pursuant to which the Agent would advance to the Trustee proceeds of the MI Funds in an aggregate amount of up to $510,000 and the Trustee would be permitted to use the Agent's Cash Collateral to fund the Trustee's expenses of administering the Chapter 11 Case and the Estate through April 29, 2011 in accordance with an agreed upon budget.  The advance was to be used to pay off outstanding LID Bond Assessments, thereby enabling the release of approximately $1.04 million in proceeds from the LID Bonds (the "LID Proceeds") for recovery by the Estate. The Agent holds a perfected security interest in the LID Proceeds, which constitute the Agent's Cash Collateral.  The LID Proceeds were to be paid back by the Trustee to the Agent, who was to deposit them into the account that held the MI Funds.  On April 8, 2011, the Bankruptcy Court approved the Cash Collateral Stipulation on an interim basis.

On April 14, 2011, only days after the payment of the outstanding LID assessments, the City of Henderson released to the Trustee over $1 million in proceeds from the LID Bonds.  On April 15, 2011, the Trustee used a portion of those proceeds to repay the funds advanced from the MI Funds.  The Cash Collateral Stipulation was approved by the Bankruptcy Court on a final basis by order entered on April 21, 2011 (the "Final Cash Collateral Order").

The Trustee's authority to use Cash Collateral under the Final Cash Collateral Order expired on April 29, 2011.  In order to allow the Trustee to fund certain of the Estate's administrative expenses, the Agent and the Trustee negotiated a further stipulation for the continued use of Cash Collateral through May 27, 2011 (the "Extension Stipulation").  The Extension Stipulation was approved by the Bankruptcy Court on May 10, 2011.  *See* Docket Entry 676.  Thereafter, the Agent and the Trustee negotiated a further extension of Cash Collateral use through July 1, 2011, on the same terms as set forth in the Extension Stipulation. *See* Docket Entry 736.  Most recently, in order to allow the Trustee to utilize cash collateral until she obtained authority to utilize the senior priming financing provided by the TIP Loan Lenders, the Agent and the Trustee negotiated a further extension of Cash Collateral use through July 27, 2011, on the same terms as set forth in the Extension Stipulation.  *See* Docket Entry 803.

On May 26, 2011, the Trustee filed a motion seeking approval of a stipulation between the Agent and the Trustee for modification of the automatic stay (the "LID Assessment Stipulation") to permit the Agent to use a portion of the MI Funds to pay certain LID assessments due June 1, 2011.  *See* Docket Entry 712.  Focus opposed the LID Assessment Stipulation.  *See* Docket Entry 727.  The Bankruptcy Court orally approved the stay relief motion on June 1, 2011 and a form of order was subsequently entered by the Bankruptcy Court on June 17, 2011 granting stay relief *nunc pro tunc* to June 1, 2011.  *See* Docket Entry 738.  The MI Funds that were utilized on June 1, 2011 were fully restored to the Agent's cash collateral account on July 29, 2011.

3.      Financing Provided by TIP Loan Lenders

Pursuant to the terms of the Plan Support Agreement, on June 10 and 14, 2011, the Settling Builders deposited, in the aggregate, $31.4 million into an escrow account (the "Escrow") that was established by the Settling Builders and the Agent in connection with the

2430175

execution of the Plan Support Agreement. A portion of the Escrow is being applied to finance chapter 11 administrative expenses, including the payment of LID Assessments and taxes in accordance with a budget (the "Budget") agreed upon by the Agent, the Settling Builders, and the Trustee. Specifically, the Trustee obtained interim authority from the Bankruptcy Court to obtain postpetition financing on a priming lien basis in an aggregate principal amount of up to $21.4 million and with an initial, interim borrowing limit of $4.0 million pursuant to a Trustee Financing Agreement. Pursuant to an interim order of the Bankruptcy Court, dated July 25, 2011, s*ee* Docket Entry 823, the TIP Loan Lenders were granted priming liens on LID Proceeds (including future LID Proceeds) (the "TIP Loan Collateral") as security for providing the Estate with the aforementioned interim liquidity through Confirmation of the Plan. These funds are to be used by the Trustee to finance LID Assessments, taxes, and chapter 11 administrative expenses, as set forth in greater detail in a Budget agreed to by the TIP Loan Lenders and the Agent. As part of the Trustee's interim borrowing of funds, approximately $2.9 million was used to restore the MI Funds to the balance immediately prior to June 1, 2011. In addition, under the terms of the Trustee Financing Agreement and as set forth in the Interim Order, the Agent was granted adequate protection on account of any diminution in the value of the Agent's interest in the Collateral resulting from the use of the Collateral and the imposition of the automatic stay.

On August 12, 2011, the Bankruptcy Court is scheduled to hold a final hearing to consider whether to allow the Trustee to utilize $21.4 million of secured financing from the Builder Lenders.

        4.      Certain Administrative Matters in the Chapter 11 Case.

        a.      Trustee's Employment and Retention of Advisors and Claims Agent.

During the pendency of the Chapter 11 Case, the Trustee has retained certain Professionals to assist her in carrying out her duties as on behalf of the Debtor and Estate. These Professionals include: FTI Consulting, Inc., as financial advisors (Docket Entry 660), Milbank, Tweed, Hadley & McCoy LLP, as bankruptcy counsel (Docket Entry 659), Schwartzer & McPherson Law Firm, as Nevada counsel (Docket Entry 707), Jones Vargas, as section 327(e) special real estate land use counsel (Docket Entry 664), and BMC Group, Inc., as claims and noticing agent (Docket Entry 708). The Plan Proponents are also proposing to use BMC Group in connection with the noticing and solicitation of the Plan.

Most recently, the Trustee filed an application to retain the firm of Piercy Bowler Taylor & Kern to assist the Trustee with preparations of tax returns for the Estate.

In addition, the Trustee retained Advantage Civil Design Group, LLP ("Advantage") pursuant to an order of the Bankruptcy Court (although Advantage is not a "professional" for purposes of Bankruptcy Code section 327). *See* Docket No. 757. As construction manager, Advantage is providing engineering and construction management services for the Trustee, including, but not limited to, assisting the Trustee with the preparation of reports required by the City under the COH Acquisition Agreement.

        b.      Interim Compensation Procedures

On July 25, 2011, the Bankruptcy Court entered an order approving certain procedures

for the interim compensation and reimbursement of retained Professionals in the Chapter 11 Case, which will allow Professionals to recover, subject to objections by certain parties-in-interest, and to the extent of available funds, eighty-five percent of their billed fees and one hundred percent of their expenses on a monthly basis. *See* Docket Entry 822.

> 5.      Schedules of Assets and Liabilities and Bar Dates.

On April 29, 2011, the Trustee filed schedules of the Estate's assets and liabilities and its statement of financial affairs, and global notes related thereto (collectively, the "Schedules"). *See* Docket Entries 647, 648.  Interested parties may review the Schedules at the office of the Clerk of the United States Bankruptcy Court for the District of Nevada or via the claim agent's website at www.bmcgroup.com.

> a.      Bar Dates.

On February 24, 2011, the Clerk for the Bankruptcy Court entered a notice pursuant to Bankruptcy Rule 3003(c)(3) setting: (a) June 29, 2011, as the date by which all Entities (except Governmental Units) are required to file Proofs of Claim for prepetition Claims; and (b) August 2, 2011, as the date by which all Governmental Units are required to file Proofs of Claim for prepetition Claims.  Pursuant to a bar date order entered on May 9, 2011, written notice of the various Bar Dates was mailed to, among others, all Holders of Claims listed on the Schedules.

> b.      Claims.

As of July [31], 2011, BMC Group, Inc., the Debtor's claims and noticing agent, had received forty-one (41) filed Claims, and the approximate numbers and total amounts of Claims filed <u>and</u> scheduled against the Debtor are as follows:

> (1)      one (1) Administrative Claim in the total amount of $9,208.42;
>
> (2)      one (1) Priority Tax Claim in an unknown amount;
>
> (3)      the Agent's Secured Claim in the total amount of $367,538,209.77, plus nine (9) other Secured Claims in the total amount of $191,194,670.13 (plus unliquidated amounts);[14]
>
> (4)      thirty-two (32) Priority Non-Tax Claims and Gap Claims in the total amount of $25,717.70 (plus unliquidated amounts);[15] and

---

[14] The vast majority of these Secured Claims by amount represent two essentially duplicate proofs of claim on account of the LID Claims, which are classified separately in Class S2.  The claims register reflects that the City of Henderson has filed a proof of claim (Claim No. 9) in an amount of $74,439,476.50 and the Bank of New York Mellon Trust Company, NA as Indenture Trustee under the LID Indenture, has filed a proof of claim (Claim No. 17) in an amount of $97,645,000.00 (which amount appears to include all LID assessments on property within Inspirada, including that not owned by the Estate).  These proofs of claim are duplicative to the extent they are based on LID Claims on the Estate's property, which are classified separately in Class S2.  In addition, Holdings Manager filed a proof of claim (Claim No. 13) in an amount of at least $10,000,000.00.  This claim represents a Member Claim that is separately classified in Class U3.

[15] The vast majority of these Priority Non-Tax Claims by number represent claims that have been scheduled as

2430175

(5)    forty-four (44) General Unsecured Claims in the total amount of $73,901,885.07 (plus unliquidated amounts).[16]

Pursuant to Section 7.4 of the Trustee Financing Agreement, subject to the Trustee's Consent, the Trustee shall consult with the Settling Builders and the Agent regarding the administration of the Estate including Claims objections.   As set forth above, the Plan Proponents estimate that, at the conclusion of the Claims objection, reconciliation, and resolution process, the aggregate amount of Allowed Claims will be as follows:

(1)    Allowed Administrative Claims in the approximate total amount of $[10,034,500], a substantial portion of which will be paid on an interim basis prior to the Effective Date;[17]

(2)    Allowed Priority Claims and Gap Claims in the approximate total amount of $[25,000];

(3)    No Allowed Other Secured Claims (Class S1);

(4)    Allowed LID Claims of approximately $[74.4 million] (Class S2), which will be unimpaired and continue to be assessed upon the real property;

(5)    Allowed Lenders' Secured Claim in the approximate total amount of between $329.5 million and $339.5 million;[18]

(6)    Allowed Lenders' Deficiency Claim in the approximate total amount of between $[42.5 million and $52.5 million];[19] and

---

contingent, disputed, or unliquidated and with respect to which no proof of claim has yet been filed by the responsible governmental unit.

[16] The vast majority of these General Unsecured Claims by amount represent Member Claims that are separately classified in Class U3.   The schedules and claims register reflect that Claims scheduled or filed as General Unsecured Claims in a total amount of $56,905,730.85 represent Member Claims, including a substantial amount scheduled in favor of the Settling Builders.  In addition, a substantial number of the proofs of claim filed as General Unsecured Claims represent duplicative claims, claims that are contingent, disputed, or unliquidated, or claims that are otherwise invalid.

[17] This amount represents an estimate based on the budget (the "Budget") attached as Exhibit "A" to the Trustee Financing Agreement. (Docket Entry 785).  The Budget provides, among other things, that Estate professional fees and expenses will be paid on an interim basis at 85% of billed/incurred fees and 100% of billed/incurred expenses (except for BMC, the noticing agent, which will be paid at 100% in the ordinary course throughout the Chapter 11 Case), and that any fee payable to the Trustee under Bankruptcy Code section 326 will be paid when allowed.  Note that the Budget provides that accrued fees and expenses presented are preliminary based on information provided by each professional.  They have not been reviewed by the Trustee, Plan Proponents, or other parties, and are included for information purposes only.  All fees and expenses remain subject to Bankruptcy Court approval, and all parties (including the Plan Proponents, the Trustee, and the professionals) reserve all rights with respect thereto.

[18] The precise amount of the Allowed Lenders' Secured Claim is based on the status of litigation over the Disputed MI Account.

[19] Although the Prepetition Lenders are undersecured, and thus would not be entitled to postpetition interest under Bankruptcy Code section 506(b), they hold liens on all of the Estate's assets.  Thus, absent the settlement in the Plan, in order for unsecured creditors to receive any distribution, the Prepetition Lenders' Deficiency Claim would have to be paid in full.  For this reason, the Plan Proponents have included postpetition interest in the claim calculation.  The Prepetition Lenders' total claim as of the Petition Date was filed in the amount of $367,538,209.77.

33

(7)    Allowed General Unsecured Claims in the approximate total amount of $[850,000].

The estimate of Allowed Administrative Claims includes, among others, Claims arising from the cure of assumed executory contracts and unexpired leases and certain Administrative Claim requests reflected on the Claims Register and docket.  The estimate of Allowed Administrative Claims does not include ordinary course obligations incurred postpetition such as trade payables, which amounts are to be funded by the TIP Loan Lenders in accordance with the Plan Support Agreement and the court-approved loan documentation.

A precise valuation of the collateral securing the Prepetition Lenders' Secured Claims would require substantial time and expense to determine.  However, all evidence (including that introduced at the trial on the involuntary petition) shows that the Prepetition Lenders' real property and other collateral is worth less than what they are owed.  Accordingly, the Plan Proponents have agreed to fix the amount of the aggregate Allowed Prepetition Lenders' Secured Claim at between $329.5 million and $339.5 million based on the status of litigation over the Disputed MI Account, which amount the Plan Proponents believe to be fair and reasonable under the circumstances.  That results in an unsecured deficiency claim owing on the Loans as of the Petition Date of at least $27.5 million (or at least $42.5 million if postpetition interest is included).

These estimates are approximate and based upon numerous assumptions and represent significant reductions in the aggregate face amount of Claims filed.  There is no guaranty that the ultimate amount of each category of Claims will conform to the estimates stated herein, and the majority of Claims underlying such estimates are subject to challenge.  Seventeen (17) Claims have been filed in unliquidated amounts.  The Plan Proponents believe that certain Claims are without merit and expect that such Claims will be disallowed, however, there can be no assurance that the Trustee or Estate Representative will be able to achieve the significant reductions in Claims set forth above.  Moreover, additional Claims may be filed or identified during the Claims objection, reconciliation, and resolution process that may materially affect the foregoing estimates.

**UNLESS YOUR CLAIM IS ALLOWED BY THE EXPRESS TERMS OF THE PLAN, (1) YOUR CLAIM REMAINS SUBJECT TO OBJECTION BY THE ESTATE REPRESENTATIVE AFTER CONFIRMATION OF THE PLAN, (2) CONFIRMATION OF THE PLAN IS NOT A GUARANTY THAT YOUR CLAIM WILL BE ALLOWED, AND (3) ALL RIGHTS TO PURSUE OBJECTIONS ARE RESERVED.  IF YOUR CLAIM IS ALLOWED BY THE EXPRESS TERMS OF THE PLAN, SUCH ALLOWANCE WILL BE OF NO FORCE OR EFFECT UNLESS AND UNTIL THE OCCURRENCE OF THE EFFECTIVE DATE.**

If the Effective Date does not occur, unless allowed by a Final Order, the allowance of any Claim or portion thereof by the terms of the Plan shall be of no force or effect and all rights of parties in interest with respect thereto shall be preserved.

6.    Other Motions.

a.    Stay Relief.

On December 13, 2010, C&S Company, Inc. ("C&S") filed a motion (the "C&S Stay Motion") requesting that the Bankruptcy Court grant it relief from the automatic stay to pursue liquidation of its claims against the Debtor totaling approximately in the amount of $2.7 million, plus fees and costs, and to collect against the mechanics lien bond that was posted in a separate arbitration proceeding regarding claims arising from excavation work performed by C&S for the Debtor. *See* Docket Entry 41. On December 28, 2010, C&S's bonding company, Merchants Bonding Company ("Merchants"), joined in the C&S Stay Motion. *See* Docket Entry 168. On April 12, 2011, the Trustee filed a stipulation with C&S and Merchants, pursuant to which the Trustee consented to the lifting of the automatic stay to allow C&S to proceed with the liquidation of its underlying claims against the Debtor in the arbitration, to allow C&S and Merchants to obtain a final judgment, if necessary, in order to confirm any final award issued in the arbitration; and to allow C&S and Merchants to seek payment of the proceeds from the bond. Moreover, as part of the stipulation, C&S and Merchants agreed to not exercise any right, remedy, or claim against the Debtor or any property of the Estate. *See* Docket Entry 586. The Bankruptcy Court approved the stipulation on April 19, 2011. *See* Docket Entry 618.

On March 1, 2011, Laura Rochetto, individually, and as Special Administrator of the Estate of Kelly Rochetto and Tom Rochetto (collectively, the "Rochetto Movants") filed a motion (the "Rochetto Stay Motion") requesting that the Bankruptcy Court grant them relief from the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code to allow them to proceed with a pending personal injury action against the Debtor. *See* Docket Entry 465. On April 27, 2011, the Trustee filed a stipulation with the Rochetto Movants, pursuant to which the Trustee consented to the lifting of the automatic stay for the sole purpose of allowing the Rochetto Movants to proceed with the personal injury action and recover any judgment solely from the Debtor's liability insurance carrier and the Debtor's applicable insurance policy. *See* Docket Entry 643. Under the stipulation, the Rochetto Movants agreed that they would not receive any payments or distributions from the Estate in connection with the action. The Bankruptcy Court approved the stipulation on April 29, 2011. *See* Docket Entry 646.

D.    Disputed MI Funds Litigation

On May 20, 2011, the Trustee initiated an adversary proceeding against the Agent, Focus, and Focus's manager, Holdings Manager, LLC ("Holdings Manager"), seeking, among other things, the turnover of MI Funds held in a JPMorgan cash collateral account (the "Disputed MI Account"), which constitute the remaining balance of a mandatory capital contribution by Focus to the Debtor in 2007 of over $30.9 million in connection with its Takedowns under the Operating Agreement. The Trustee also seeks a declaration by the Bankruptcy Court, against those parties and the Agent, that the proceeds of the Disputed MI Account are an asset of the Estate and that the Trustee is vested with ownership and the right to use such funds for the benefit of the Estate subject to the Agent's lien. Focus and Holdings Manager dispute that the funds are an asset of the Estate of South Edge. The Agent disputes that the Trustee is entitled to use the Disputed MI Account without the Agent's consent on the grounds that the Agent holds a perfected security interest in the Disputed MI Account, which constitutes the Agent's Cash Collateral.

2430175

On June 23, 2011 (as subsequently amended), the Agent filed an answer to the Trustee's Complaint and cross-claim against Focus seeking declaratory relief. The cross-claim asserts, among other things, that the Agent has the right as a secured party to apply the current balance in the Disputed MI Account (of approximately $26 million) to the Secured Obligations of the Lenders, regardless of who owns the deposit legally or beneficially. On June 27, 2011, Focus and Holdings Manager filed their answer to the Trustee's Complaint generally denying the Trustee's allegations, and Focus filed a counterclaim against South Edge and a crossclaim against the Agent. Focus' counterclaims were for (1) declaratory relief regarding the ownership of the Disputed MI Account, (2) breach of contract related to the Acquisition Agreement, and (3) conversion. Focus's crossclaim against the Agent sought declaratory relief regarding the use of the Disputed MI Account for Secured Obligations under the Prepetition Credit Agreement.

On June 28, 2011, JPMorgan filed an amended answer (which amended JPMorgan's answer of June 22, 2011) to the Trustee's complaint and a crossclaim against Focus regarding the use of the Disputed MI Deposit. JPMorgan's answer denied that the Trustee was entitled to relief against JPMorgan, and did not take a position on the ownership of the Disputed MI Account or the relief sought against Focus. JPMorgan's crossclaim against Focus sought a declaration that Agent was entitled to use the Disputed MI Account in satisfaction of the Secured Obligations under the Prepetition Credit Agreement. Focus, the Agent, and the Trustee have not yet filed responses to the various counterclaims and crossclaims filed against them.

On July 13, 2011, the Trustee filed an Amended Adversary Complaint against Focus South Group, LLC, Holdings Manager, LLC, and the Agent regarding the disposition and ownership of the Disputed MI Account (it amended the Trustee's original adversary complaint of May 20, 2011). The Complaint included causes of action against Focus for (1) turnover of property of the estate, (2) fraudulent transfer, (3) violation of the automatic stay, (4) payment of debt owed to the estate, (5) violation of NRS 86.391, (6) breach of the Acquisition Agreement, (7) breach of the Operating Agreement, (8) conversion, and (9) declaratory relief. The Amended Complaint alleges causes of action against Holdings Manager for (1) turnover of property of the estate, (2) breach of the Operating Agreement, and (3) gross negligence, and alleges a cause of action against the Agent for declaratory relief related to ownership of the Disputed MI Account funds. Together, the Trustee's Amended Complaint seeks to assert ownership of the Disputed MI Account funds for the Estate and to recover certain money expended from the Disputed MI Account to date. In addition, the Trustee's Amended Complaint identifies Focus' award in the arbitration it filed against the other Members as additional grounds whereby Focus is not entitled to the Disputed MI Account.

On July 18, 2011, the Trustee filed an answer to Focus' counterclaim, denying that Focus is entitled to relief against the Estate. On July 21, 2011, JPMorgan filed an answer to Focus' crossclaims, denying that Focus is entitled to relief against JPMorgan. Also on July 21, 2011, Focus filed an answer to JPMorgan's crossclaim, denying that JPMorgan is entitled to relief against Focus.

On July 25, 2011, Focus filed a motion for an initial determination under 28 U.S.C. § 157(b)(3) that the crossclaims filed by Focus and JPMorgan are "non-core." Focus asserts that the crossclaims are non-core because Focus and JPMorgan are both non-debtors and their crossclaims do not depend on the bankruptcy laws for their existence. It requests that the bankruptcy court enter an order determining that each of the crossclaims is non-core and

36

therefore subject to the procedures of 28 U.S.C. § 157(c)(1), which allows the Bankruptcy Court to hear claims and submit proposed findings of fact and conclusions of law to the district court for *de novo* review.

      E.      <u>The Negotiation of, and Entry into, the Plan Support Agreement</u>.

While the Ninth Circuit Appeals were pending, the Settling Builders and the Agent engaged in extensive negotiations to work towards a global resolution of the outstanding disputes and issues amongst the parties related to obligations of the Debtor and its Members and the Member Affiliates under the Prepetition Credit Agreement and the Prepetition Credit Documents. In May 2011, the Agent and the Settling Builders negotiated the Plan Support Agreement, attached as **Exhibit B** to this Disclosure Statement, which outlines the basic terms of a settlement to be effectuated through a consensual plan of reorganization and process, thus bringing to an end the contentious 3-plus year battle that has hindered development at South Edge to the detriment of all parties-in-interest.

On June 10, 2011, the Plan Support Agreement was executed by more than 92% in dollar amount and 94% in number of Prepetition Lenders and by each of the Settling Builders. The Trustee also consented to the Plan Support Agreement, although she is not a party to it, in a consent form negotiated solely with the Settling Builders. The Agent, in accordance with the terms of the Plan Support Agreement, waived the requirement of the Trustee's consent.

The Loan debt to the Lenders at the Effective Date is expected to be approximately $382 million, disregarding the effect of section 506(a) of the Bankruptcy Code on post-petition interest as to the Debtor, because such limitation does not affect the Member Affiliates' liability. The Agent and the Consenting Prepetition Lenders will compromise their claims against the Debtor and the Guarantors for a sum between $330-340 million, plus fees as provided in the Plan. The Plan Support Agreement which is the foundation for the Plan, generally provides that,

      •      Subject to receipt of the Plan and the Disclosure Statement approved by the Bankruptcy Court in accordance with Bankruptcy Code section 1125, the Consenting Prepetition Lenders will vote their respective impaired Claims, whether now owned or hereafter acquired, to accept the Plan and otherwise support and take all reasonable actions to facilitate the proposal, solicitation, confirmation, and consummation of the Plan.

      •      The Settling Builders will satisfy their alleged respective Repayment Guaranty liabilities to the Agent and the Prepetition Lenders (approximately $295 million to $304 million), and thereafter, acquire the Takedown Properties from the Estate pursuant to their subrogated lien against their respective portion of the real property at the Project.

      •      In addition, the Settling Builders will fund an Escrow (the Meritage Repayment Guaranty Escrow) in the amount of the alleged Repayment Guaranty liability of Meritage (estimated at the Effective Date to be between $12.4 and $12.8 million, assuming the prior application of $16 million to $26 million in MI Funds (the Plan Proponents reserve their rights as to whether the application of MI Funds as provided in the Plan would reduce Meritage's liability). The funds in the Meritage Repayment Guaranty Escrow will be used by the Settling Builders to purchase participations in the Prepetition Lenders' Repayment Guaranty Claims against Meritage, and all of the Prepetition Lenders shall have the option to participate their

interests in such claims.  The repayment guarantee litigation against Meritage will be pursued at the direction and sole expense of those Settling Builders through a sub-agent under the Prepetition Credit Agreement satisfactory to them.  The Plan also contains a comprehensive indemnity for the Agent, the Consenting Prepetition Lenders, and the Trustee against claims by Meritage.

• Claims and property of the Estate will be transferred to the Acquirer in exchange for the remaining consideration payable to the Agent (for the benefit of the Prepetition Lenders) under the Plan (so that the Agent and the Prepetition Lenders shall receive net distributions of between $330 million and $340 million), as well as certain consideration being provided by the Settling Builders to the Estate, including: (i) payment in full by the Settling Builders of the TIP Loan Claims, estimated to be approximately $[4.7 million]; (ii) funding of the costs to ensure confirmation of the Plan, including (A) satisfaction of allowed Administrative Expense Claims (such as United States Trustee fees and Professional Compensation Claim), which are estimated to be approximately $[10,034,500] (subject to the Bankruptcy Court allowance process) and (B) unsecured Priority Claims and Gap Claims, which are approximately $[25,000]; and (iii) the funding of a "pot" distribution to non-Member and non-Member Affiliate creditors with Allowed General Unsecured Claims against the Debtor in the amount of $1,000,000 (notwithstanding that the Agent possesses a first-priority security interest over substantially all of the assets and the value of the Estate's assets is not sufficient to fully satisfy the Agent's filed Claim).

• The Prepetition Lenders' Secured Claim against the Debtor will be satisfied, and the Agent (for the benefit of the Lenders) will receive a $500,000 distribution on the Prepetition Lenders' unsecured deficiency claim, which ranges from $27.5 – $37.5 million.[20]

• Depending on the outcome of the MI Litigation, the Agent will receive up to an additional $16 million of consideration from the Settling Builders.  The Agent and Prepetition Lenders will have the option to continue the MI Litigation subsequent to the Plan Effective Date.  If they decline to do so, the Settling Builders have the right to pursue this litigation.

• The non-Consenting Prepetition Lenders will receive their pro rata share of distributions to the Prepetition Lenders under the Plan, and will retain their claims (if any) against the Settling Builders (except for the Repayment Guaranty claims, which are satisfied under the Plan).  However, the non-Consenting Prepetition Lenders will not receive releases from the Settling Builders.  Moreover, the vote of the Consenting Prepetition Lenders also approves certain amendments to the Credit Agreement and the election of the replacement Agent, such that the non-Consenting Prepetition Lenders will ultimately have to absorb any future enforcement expenses.

• The Consenting Prepetition Lenders agree to refund to the Settling Builders any proceeds payable to each Consenting Prepetition Lender from the Debtor, Reorganized Debtor,

---

[20] The Agent has liens on all of the Estate's assets.  Thus, in a chapter 7 liquidation or under an alternative plan, the Prepetition Lenders would have to receive payment in full of all their accrued interest and fees, before unsecured creditors would be entitled to receive any distribution.  As a result, under such a scenario, and assuming an Effective Date of on or about November 30, 2011, as compared to the Plan, the Prepetition Lenders would be entitled to approximately an additional $42.5 – $52.5 million before a distribution to any class of junior claims could be made.

2430175

Estate, Settling Builders, Members, Member Affiliates, other Consenting Prepetition Lenders, non-Consenting Prepetition Lenders, Agent, Successor Agent, Prepetition Lenders' Collateral, or otherwise in connection with or on account of the Prepetition Lender Claims, to the extent that such payment is in excess of such Consenting Prepetition Lender's Proportionate Share of its Distributions under Classes S3 and U1 of the Plan. This refund mechanism will be accomplished through the Prepetition Credit Agreement Amendment, which shall provide for the Consenting Prepetition Lenders to assign to the Settling Builders their recovery rights under the Prepetition Credit Agreement and the Guaranties, as well as, but not limited to, any payments from the Successor Agent's Claims and/or Causes of Action against the Members and Member Affiliates.

• The Development Agreement, the COH Acquisition Agreement, and related City contracts for Inspirada (to the extent such contracts are considered executory) will be neither assumed nor rejected, but rather the deadline for assumption or rejection will be extended after the Effective Date to accommodate the longer process expected for the amendment of those City contracts. The Settling Builders have already begun engaging with the City to discuss how the Development Agreements need to be modified in order to allow the project to move forward, and the Settling Builders intend to continue those discussions after the Effective Date in order to try and resolve the future of the Project, including the scope of LID segment work to be completed, as well as the timing and sequence of such work.

• Pending litigation between the Debtor and the Settling Builders, as well as between the Agent and the Settling Builders, will be dismissed. The Estate will settle and release all claims against the Agent, the Consenting Prepetition Lenders, and the Settling Builders, in consideration for their concessions and benefits provided under the Plan.

• Other customary releases and exculpations shall be provided to the Plan Proponents, the Trustee, the Estate Representative, and their respective professionals, as provided in the Plan.

• The Trustee has provided a form of "Consent" to the Settling Builders under the Plan Support Agreement, in which the Trustee has agreed to support the Plan, subject to her fiduciary obligations. The Agent, in accordance with the terms of the Plan Support Agreement, waived the Trustee's consent. The Trustee is not a "proponent" of the Plan, but she supports its confirmation in accordance with and subject to the terms of the Consent, a copy of which is attached hereto as part of **Exhibit B**.

Among other things, the obligations of the parties to support the Plan under the Plan Support Agreement are conditioned, in part, on meeting specific milestones:

2430175

a.      The Agent and the Settling Builders must file the Plan and Disclosure Statement on or before August 1, 2011;

b.      The Bankruptcy Court must approve the Disclosure Statement on or before September 16, 2011;

c.      The Confirmation Order must be entered by the Bankruptcy Court on or before October 31, 2011; provided that the Agent and the Settling Builders may mutually agree (each in their sole discretion) to extend the period for an additional period up to thirty (30) days; and

d.      The Effective Date of the Plan must occur on or before November 30, 2011; provided, however, if the Confirmation Order deadline is extended, the Effective Date deadline will automatically be extended for a similar period of time.

The Plan Proponents do not intend to conduct an auction of the Estate's residual Assets, which, if the Plan is approved, will be conveyed to the Acquirer.  The Bankruptcy Court determined at the outset of this Chapter 11 Case that the Prepetition Lenders are undersecured, and thus in either a reorganization or a liquidation, no prepetition creditors other than the Prepetition Lenders and the LID parties would be entitled to any value absent the settlement set forth in the Plan.  Indeed, as shown in the Liquidation Analysis accompanying this Disclosure Statement, the Prepetition Lenders' deficiency claim will be at least $42.5 million under the Plan, and far more in a liquidation.  This amount would have to be satisfied in full before the payment of any unsecured claims.  The only remaining Estate assets after the real property and LID reimbursement rights would be litigation claims, which would be expensive and time consuming to pursue, and which would lead to significant delays and uncertainties.  Moreover, the Plan Proponents believe that, because the Settling Builders will be paying in full their alleged Repayment Guaranty obligations under the Plan, the disputed "Takedown" litigation claims that might be asserted against them would have little to no value to the Estate, because the damages sought through such claims would largely be duplicative of the payments under the Repayment Guarantees.

The package of consideration being offered by the Settling Builders to the Prepetition Lenders in exchange for a release of their liens against substantially all of the Debtor's assets is fair and reasonable.  It avoids substantial litigation risks, costs, and delays.  To date, no third party has offered a higher and better offer to the Agent or the Trustee, or filed a plan that provides the Estate's creditors with a recovery greater than what is set forth in the Plan. However, until the Plan is confirmed by the Court, the Plan Proponents, in consultation with the Trustee, will consider offers from third parties that (i) provide the Debtor's creditors with a recovery greater than that contemplated by the Plan and (ii) allow for such plan to be consummated within the timeline set forth in the Plan Support Agreement.

**ARTICLE IV**
**SUMMARY OF THE PLAN**

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND

2430175

TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN.

THE PLAN ITSELF AND THE DOCUMENTS IN THE PLAN CONTROL THE ACTUAL TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AND INTERESTS, THE ESTATE, THE TRUSTEE, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

The Plan provides for the transfer of the ownership of the remaining Inspirada Project to an entity to be owned directly or indirectly by the Settling Builders. This transfer will maximize the value of the Estate, and the proceeds from this omnibus asset purchase will then be distributed to the Debtor's creditors in a manner consistent with the Bankruptcy Code. The Plan Proponents believe that the Plan is in the best interests of Holders of Claims and parties in interest. If the Plan is not confirmed, the Plan Proponents believe that they will be forced either to file an alternate plan of reorganization or that the Debtor will have to liquidate under chapter 7 of the Bankruptcy Code. Under these alternative scenarios, the Plan Proponents believe that the Holders of Claims would realize a less favorable distribution of value, or, in certain cases, none at all.

A.    Overview of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor can reorganize or wind-down its business for the benefit of itself and holders of claims against and interests in the debtor.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code generally provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." However, in this case, the Bankruptcy Court ordered the appointment of the Trustee to administer the Debtor's Estate.

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying claims against, and interests in, a debtor.

2430175

Confirmation of a chapter 11 plan by a bankruptcy court makes the plan binding upon the debtor, any person or entity acquiring property under the plan, and any holder of claims against or interests in the debtor, whether or not such holder of claims or interests (1) is impaired under or has accepted the plan or (2) receives or retains any property under the plan.

A chapter 11 plan may specify that the legal, contractual, and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by provisions of the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, the Plan Proponents need not solicit votes from the Holders of Claims or Interests in such classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a chapter 11 plan shall classify claims against and interests in the debtor. The Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class. Section 1122 of the Bankruptcy Code requires the Plan Proponents to classify Claims and Interests into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Classes. The Plan Proponents believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Plan Proponents intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such reasonable modifications of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

B.    Unclassified Claims.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims (including Professional Compensation Claims), Gap Claims, Priority Tax Claims, Agent Adequate Protection Claims, and TIP Loan Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

1.    Administrative Expense Claims and Gap Claims.

Subject to certain additional requirements for Professional Compensation Claims set forth in Section 4.5 of the Plan, each Holder of an Allowed Administrative Expense Claim or Allowed Gap Claim shall receive, on account of and in full and complete settlement, release, and discharge of such Claim, cash equal to the full unpaid amount of such Allowed Administrative Expense Claim or Allowed Gap Claim, as the case may be, on the latest of (i) the Initial Distribution Date, (ii) the date such Claim becomes an Allowed Administrative Expense Claim or Allowed Gap Claim, or (iii) such other date as may be agreed upon by the Settling Builders

2430175

and the Holder of such Claim.  All Allowed Administrative Expense Claims against the Estate that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Acquirer in accordance with the terms thereof or accorded such other treatment as may be permitted under Bankruptcy Code section 1129(a)(9).

       2.      Priority Tax Claims.

Unless otherwise agreed by the Settling Builders and the Holder of an Allowed Priority Tax Claim (in which event such other agreement shall govern), each Holder of an Allowed Priority Tax Claim against the Debtor or its Estate that is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release, and discharge of such Claim, cash equal to the amount of such Allowed Priority Tax Claim on the later of the Initial Distribution Date and the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as practicable.  All Allowed Priority Tax Claims against the Estate that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Acquirer in accordance with the terms thereof or accorded such other treatment as may be permitted under Bankruptcy Code section 1129(a)(9).

       3.      TIP Loan Claims.

All TIP Loan Claims shall be allowed and paid in full in cash on the Effective Date from the proceeds of the Settling Builders' Total Plan Contribution.

       4.      Agent Adequate Protection Claims.

All Agent Adequate Protection Claims shall be allowed and deemed to be satisfied in full from the treatment for Classes S3 and U1.

       5.      Professional Compensation Claims.

All Entities seeking an award by the Bankruptcy Court of a Professional Compensation Claim incurred through and including the Effective Date are required (unless otherwise ordered by the Bankruptcy Court) to file final applications for the allowance of compensation for services rendered and reimbursement of expenses incurred within sixty days after the Effective Date. Holders of Professional Compensation Claims that file final applications in accordance with the Plan shall be paid in full in cash in the amounts approved by the Bankruptcy Court: (a) on or as soon as reasonably practicable following the date on which the order relating to the allowance of any such Allowed Professional Compensation Claim is entered; or (b) on such other terms mutually agreed upon by the Settling Builders and the Holder of an Allowed Professional Compensation Claim.  Allowed Professional Compensation Claims will be paid by the Acquirer, and shall include reasonable and necessary expenses in connection with final fee applications as permitted by applicable law.

    C.    <u>Classification and Treatment of Claims and Interests</u>.

Except for unclassified Administrative Expense Claims, Gap Claims, Priority Tax Claims, Agent Adequate Protection Claims, and TIP Loan Claims, the Plan divides all Claims against and Interests in the Debtor into various Classes.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of

43

2430175

that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The treatment in the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights (including any liens) that each Entity holding an Allowed Claim or an Interest may have in or against the Debtor, the Estate, or their respective property. This treatment supersedes and replaces any agreements or rights those Entities may have in or against the Debtor, the Estate, or their respective property.

All payments and other distributions under the Plan will be made on or after the Effective Date by the Estate Representative.

       1.      Class P1 – Priority Non-Tax Claims.

       a.      Classification.

Class P1 consists of all Priority Non-Tax Claims.

       b.      Allowance.

Claims in Class P1 shall be allowed or disallowed in accordance with Section 7.4 of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

       c.      Treatment.

The legal, equitable, and contractual rights of the Holders of Allowed Priority Non-Tax Claims shall remain unaltered by the Plan. On the Effective Date, except to the extent a Holder of an Allowed Priority Non-Tax Claim and the Settling Builders agree to a different treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Priority Non-Tax Claim shall receive on account of and in full and complete settlement, release, and discharge of such Claim, at the Settling Builders' election, (i) cash in the amount of such Allowed Priority Non-Tax Claim in accordance with Bankruptcy Code section 1129(a)(9) or (ii) such other treatment required to render such Claim unimpaired pursuant to Bankruptcy Code section 1124. All Allowed Priority Non-Tax Claims that are not due and payable on or before the Effective Date shall be paid by the Acquirer when such Claims become due and payable in accordance with the terms thereof.

       d.      Impairment and Voting.

Class P1 is unimpaired, and the Holders of Claims in Class P1 are conclusively deemed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Therefore, Holders of Claims in Class P1 are not entitled to vote to accept or reject the Plan.

       2.      Class S1 – Other Secured Claims.

2430175

a.    Classification.

Class S1 consists of all Other Secured Claims.  To the extent that the Holder of an Other Secured Claim is only partially secured, such Holder's deficiency shall be treated as a General Unsecured Claim in Class U2 or as a Member Claim in Class U3, as applicable.

b.    Allowance.

Claims in Class S1 shall be allowed or disallowed in accordance with Section 7.4 of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

c.    Treatment.

Each Allowed Other Secured Claim shall, at the sole option of the Settling Builders, be treated as follows:  (i) the Holder of such Claim shall receive cash in the amount of such Claim, (ii) the Plan will leave unaltered the legal, equitable, and contractual rights to which such Claim entitles the Holder thereof, in which case the Acquirer shall assume all of the Debtor's obligations to such Holder, or (iii) the Estate shall surrender all Collateral securing such Allowed Other Secured Claim to the Holder thereof as soon as practicable after the Effective Date, without representation or warranty by or recourse against the Debtor, the Estate, the Trustee, the Agent, the Prepetition Lenders, the Acquirer, or the Settling Builders, and in full and complete settlement, release, and discharge of such Other Secured Claim.

d.    Impairment and Voting.

Class S1 is unimpaired, and the Holders of Claims in Class S1 are conclusively deemed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).  Therefore, Holders of Claims in Class S1 are not entitled to vote to accept or reject the Plan.

3.    Class S2 – LID Claims.

a.    Classification.

Class S2 consists of all LID Claims.

b.    Allowance.

Claims in Class S2 shall be Allowed Secured Claims in the amount owing on account of such Claims as of the Effective Date, as determined at the Confirmation Hearing.

c.    Treatment.

Pursuant to Bankruptcy Code section 1124(1), the Plan leaves unaltered the legal, equitable, and contractual rights to which the holders of the LID Claims are entitled.

d.    Impairment and Voting.

Class S2 is unimpaired, and each Holder of an Allowed LID Claim in Class S2 is conclusively deemed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Therefore, Holders of Claims in Class S2 are not entitled to vote to accept or reject the Plan.

2430175

4.      Class S3 – Prepetition Lender Secured Claims.

a.      Classification.

Class S3 consists of all Prepetition Lender Secured Claims.

b.      Summary of Treatment.

The Plan provides for a net recovery to the Agent and the Prepetition Lenders of between $330 million and $340 million, funded by (i) the Settling Builders' Consideration, (ii) the Resolved MI Amount, the Settling Builders' MI Makeup, or a combination thereof, and (iii) LID reimbursements and other recoveries that may be received by the Agent or the Prepetition Lenders during the Chapter 11 Case (i.e., the Prepetition Lender Postpetition Recoveries); provided, however, if the Agent and Prepetition Lenders (in connection with the Prepetition Lenders' effectuating the Plan) incur fees and expenses in excess of $2.0 million from and after the Cutoff Dates through the Effective Date, then the Prepetition Lender Postpetition Recoveries shall first be credited towards such excess fees until paid in full, and then credited against the Settling Builders' Consideration. In addition, the Agent and the Prepetition Lenders shall receive during the Chapter 11 Case reimbursement of accrued fees and expenses as set forth in Section 3.4(H) of the Plan. The treatment for Class S3 shall be in full and complete settlement, release, and discharge of the Prepetition Lender Secured Claims and liens vis-à-vis the Estate and its Assets.

c.      Allowance and Treatment.

The amount of the Allowed Prepetition Lender Secured Claims in Class S3, and the treatment thereof, shall depend upon the resolution of the MI Litigation as follows:

(i)      Scenario 1.

If, on or before the Effective Date, the Resolved MI Amount is determined to be at least $26 million (either through a judgment of the Bankruptcy Court or a settlement of the MI Litigation), then on the Effective Date:

(1)      The Prepetition Lender Secured Claims shall be deemed allowed on the Effective Date pursuant to the Plan in the amount of $339.5 million; and

(2)      The Allowed Prepetition Lender Secured Claims shall be paid in cash and in full on the Effective Date out of (i) the Resolved MI Amount equal to $26 million, (ii) the Prepetition Lender Postpetition Recoveries, and (iii) the Settling Builders' Consideration. The Settling Builders' Consideration shall consist of $313.5 million, less the Meritage Repayment Guaranty Escrow and the Prepetition Lender Postpetition Recoveries, if any.

(ii)      Scenario 2.

In the event that the Resolved MI Amount is determined on or before the Effective Date to be less than $26 million (either by a judgment of the Bankruptcy Court or settlement), or if the Bankruptcy Court has not yet resolved the MI Litigation on or before the Effective Date, then on

the Effective Date:

(1)     The Prepetition Lender Secured Claims shall be deemed allowed on the Effective Date pursuant to the Plan in the amount of $329.5 million plus any Resolved MI Amount that is between $16 million and $26 million;

(2)     The Allowed Prepetition Lender Secured Claims shall be paid in cash and in full on the Effective Date out of (i) the Resolved MI Amount, (ii) the Postpetition Lender Prepetition Recoveries, if any and (iii) the Settling Builders' Consideration.   The Settling Builders' Consideration shall consist of:

(a)     $313.5 million, less the Meritage Repayment Guaranty Escrow and the Prepetition Lender Postpetition Recoveries; and

(b)     an amount of cash equal to the amount that the Resolved MI Amount is less than $16 million (the "**Settling Builders' MI Makeup**").   By way of example,  (x) if the Bankruptcy Court determines that only $10 million of the MI Funds may be applied to the Allowed Prepetition Lender Secured Claims, then the Settling Builders shall pay an additional $6 million in Settling Builders' MI Makeup, or (y) if the Bankruptcy Court determines that $20 million of the MI Funds may be applied to the Prepetition Lender Secured Claims, then the Settling Builders shall pay no additional Settling Builders' MI Makeup.   In the event that the Agent and the Prepetition Lenders elect to continue the MI Litigation in accordance with Section 3.4(C)(ii)(c) of the Plan, the Settling Builders' MI Makeup shall be $16 million.

(3)     Notwithstanding the foregoing, the Agent (or its designee) and the Prepetition Lenders, in their sole discretion, shall have the right, with such decision to be made on or prior to the Effective Date, to continue the MI Litigation post-Effective Date, if such litigation is not resolved by such time.   The first recoveries up to the amount of $16 million (net of the Successor Agent's and Prepetition Lender's reasonable legal fees and expenses) will be paid to the Settling Builders as reimbursement for the Settling Builders' MI Makeup.

By way of example, if the Resolved MI Amount is $20 million (net of expenses), and the Settling Builders have made a $16 million Settling Builders' MI Makeup payment, the first $16 million shall be paid to the Settling Builders as reimbursement of the Settling Builders' MI Makeup, and the Agent shall retain $4 million.   In the event the Agent and the Prepetition Lenders do not elect to continue the prosecution of any MI Fund litigation post-Effective Date, the Settling Builders' payment of the Settling Builders' MI Makeup pursuant to this Scenario 2 shall be in full satisfaction of the Agent's and Prepetition Lenders' rights to the MI Funds, and following the Effective Date, the Acquirer shall have the right

47

2430175

to pursue any claims to such funds that the Estate, the Agent, or the Prepetition Lenders had prior to the Effective Date.

      d.      Manner of Payments.

Of the amounts paid to the Prepetition Lenders pursuant to either Scenario 1 or 2:

      (i)      an amount equal to the liability of the Settling Builders under their respective Repayment Guaranties as of the Effective Date shall be treated as being paid directly by the Settling Builders to the Agent,[21] which payment shall (x) satisfy the Settling Builders' obligations under their Repayment Guaranties in full, and (y) pursuant to section 6 of each Repayment Guaranty, entitle the Settling Builders to be subrogated to the Agent's liens against the portion of the Debtor's project to be purchased by the Settling Builders under their respective Acquisition Agreements; and

      (ii)      the remainder shall be treated as a portion of the Settling Builders' consideration to the Estate for the acquisition of the Assets (which consideration also shall include, among other things, (i) the Settling Builders' release of the subrogation liens obtained through the immediately preceding subparagraph, (ii) the Settling Builders' satisfaction of the TIP Loan Claims, and (iii) the Settling Builders' satisfaction of all other Allowed Claims against the Estate that they (or the Acquirer) are required to pay under the Plan).

      e.      Impairment and Voting.

Class S3 is impaired, and each Holder of an Allowed Prepetition Lender Secured Claim in Class S3 shall be entitled to vote to accept or reject the Plan, pursuant to Bankruptcy Code section 1126 and any additional voting procedures approved by the Bankruptcy Court; provided, however, pursuant to the Plan Support Agreement, the Consenting Prepetition Lenders have agreed to vote in a manner consistent with the terms of the Plan Support Agreement.

      f.      Meritage Repayment Guaranty Election.

The Settling Builders shall pay into an escrow account (the "**Meritage Repayment Guaranty Escrow**") an amount equal to the portion of the Settling Builders' Consideration under the Plan that is equal to the amount of the Meritage Repayment Guaranty liability as of the Effective Date (estimated to be between $12.4 million and $12.8 million). Any Prepetition Lender (either a Consenting Prepetition Lender or a non-Consenting Prepetition Lender) may elect to (with such election to be reflected on its Ballot) to assign to the Settling Builders a participation in the assigning Prepetition Lender's pro rata interest in the Meritage Repayment Guaranty claim under the Prepetition Credit Agreement, and in exchange for the assignment of such participation, the assigning Prepetition Lender's pro rata interest in the Meritage Repayment Guaranty Escrow shall be delivered to such Prepetition Lender on the Effective Date. To the extent that any portion of the Meritage Repayment Guaranty Escrow is not paid to

---

[21] Notwithstanding the manner in which the Plan Proponents have structured the flow of funds under this Plan from the Settling Builders to the Agent, the Trustee has requested that such flow of funds not prejudice the Trustee's calculation of any percentage limitation on her compensation under Bankruptcy Code section 326 (which compensation also must be "reasonable compensation for actual, necessary services" under Bankruptcy Code section 330(a)(1)(A)). At this time, the Plan Proponents are reserving their rights with respect to this issue.

2430175

electing Prepetition Lenders, then such amount (which shall be in an amount mutually agreed to by the Plan Proponents) shall be disbursed to the Acquirer.

By electing to assign a participation in the Meritage Repayment Guaranty claim, the electing Prepetition Lender agrees to direct (consistent with the instructions of the Settling Builders) a sub-Agent (to be appointed by the Successor Agent) to pursue and, if instructed by the Settling Builders, settle the litigation concerning the Meritage Repayment Guaranty claim, which litigation shall be funded and directed solely by the Settling Builders and the electing Prepetition Lenders shall be relieved of any obligation, financial or otherwise, including indemnity or expense reimbursement, with respect to any such litigation.

Nothing in Section 3.4(F) of the Plan affects the rights of the (x) non-Consenting Prepetition Lenders to pursue the Completion Guaranty or Limited Guaranty claims against the Settling Builders or Meritage Parties (if and to the extent such claims may be asserted by any Prepetition Lenders in their individual capacity, as opposed to by the Agent on their behalf) or to instruct the Successor Agent to commence such actions under the Prepetition Credit Agreement Amendment (provided, however, that any recovery from such actions shall be subject to the turn over of any share of such recoveries otherwise payable to the Consenting Prepetition Lenders under Sections 6.5 and 8.6 of the Plan, and further provided that, with the exception of their obligations under Sections 6.5 and 8.6 of the Plan, the Consenting Lenders shall have no further obligations under the Prepetition Credit Agreement or Prepetition Credit Agreement Amendment, including, without limitation, with respect to voting, indemnity or expense reimbursement), or (y) any Prepetition Lender to receive their allocable portion of any recovery on the Meritage Repayment Guaranty (to the extent they do not elect to opt out of the Meritage Repayment Guaranty Election as provided for under Section 3.4(F) of the Plan).

The Acquirer (either on its own behalf or as Estate Representative) shall retain all of the Debtor's, the Trustee's, and the Estate's Claims and Causes of Action against the Meritage Parties, as part of the Retained Actions.

g.    Consenting Prepetition Lender Assignment.

The Consenting Prepetition Lenders will be deemed to assign to the Settling Builders (or their designees) their rights to any additional distributions (e.g. distributions other than from the Debtor, its Estate, or the Settling Builders' Consideration under Section 3.4(C) of the Plan) from Members, Member Affiliates, or other Credit Parties (as such term is defined in the Prepetition Credit Agreement (whether directly or through the Agent or Successor Agent)) on account of the Prepetition Lender Claims, including, but not limited to: (a) any Claims or Causes of Action arising under the Guaranties or other Prepetition Credit Documents, (b) any related tort, breach of duty, breach of contract, or other such Claims or Causes of Action, and (c) any Claims asserted, and cash or non-cash distributions received thereon, in the bankruptcy cases of any Members or Member Affiliates.  To the extent that any cash or other property is held by the Agent, Successor Agent, or Consenting Prepetition Lenders that would be subject to Section 3.4(G) of the Plan, such cash or other property shall be held in trust for the benefit of the Settling Builders and promptly remitted to them.

2430175

h.      Agent and Prepetition Lender Fees.

To the extent not already paid prior to the Effective Date, the Settling Builders shall indefeasibly pay:

(i)      all accrued and unpaid fees and expenses of the Agent and the Prepetition Lenders that were incurred through the dates (the "Cutoff Dates") reflected on the itemized invoices and statements previously delivered by the Agent to the Settling Builders, in the amount of approximately $3.5 million; provided, however, that any such amount in excess of $2.4 million shall not be paid until the Effective Date, and will not be paid out of the TIP Loan, but rather out of the Settling Builders' Consideration on the Effective Date; and

(ii)     as provided in section 11.03(a) of the Prepetition Credit Agreement, up to $2.0 million to reimburse the reasonable fees, expenses, and charges of the Agent and the Prepetition Lenders incurred in effectuating the Plan after the Cutoff Dates. In addition, to the extent that reasonable fees, expenses, and charges of the Agent and the Prepetition Lenders incurred in effectuating the Plan after the Cutoff Dates exceed $2.0 million, then all Prepetition Lender Postpetition Recoveries shall be applied to such excess fees, expenses, and charges, as provided in Section 3.4(B) of the Plan.

5.      Class U1 – Prepetition Lender Deficiency Claims.

a.      Classification.

Class U1 consists of all Prepetition Lender Deficiency Claims.

b.      Allowance.

Claims in Class U1 shall deemed allowed on the Effective Date in an aggregate amount equal to the difference between the Prepetition Lender Claims and the Prepetition Lender Secured Claims.

c.      Treatment.

Each Holder of an Allowed Prepetition Lender Deficiency Claim shall receive in full and complete settlement, release, and discharge of such Claim a ratable share of $500,000, to be funded from the Settling Builders' Total Plan Contribution.

d.      Impairment and Voting.

Class U1 is impaired, and each Holder of an Allowed Prepetition Lender Deficiency Claim shall be entitled to vote to accept or reject the Plan, pursuant to Bankruptcy Code section 1126 and any additional voting procedures approved by the Bankruptcy Court.

6.      Class U2 – General Unsecured Claims.

a.      Classification.

Class U2 consists of all General Unsecured Claims.

50

2430175

b.    Allowance.

Claims in Class U2 shall be allowed or disallowed in accordance with Sections 7.4 and 7.7 of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

c.    Treatment.

Each Holder of an Allowed General Unsecured Claim shall receive, on account of and in full and complete settlement, release, and discharge of such Claim, on the later of (i) the Initial Distribution Date or (ii) the first Distribution Date after the date on which such General Unsecured Claim becomes an Allowed Claim, such Holder's Pro Rata Share of the General Unsecured Claim Recovery Fund; provided, however, that under no circumstances shall any Holder's Pro Rata Share of the General Unsecured Claim Recovery Fund exceed 100% of such Holder's Allowed General Unsecured Claim.  Any portion of the General Unsecured Claim Recovery Fund that is not distributed to the Holders of Allowed General Unsecured Claims shall be retained by the Acquirer.

**BECAUSE HOLDERS OF ALLOWED CLAIMS IN CLASS U2 WILL RECEIVE A PROPORTIONATE SHARE OF $1 MILLION, THE ACTUAL AMOUNT RECEIVED BY EACH HOLDER OF AN ALLOWED CLAIM WILL DEPEND UPON THE TOTAL AMOUNT OF CLAIMS THAT ARE ALLOWED IN CLASS U2.  ALTHOUGH THE SETTLING BUILDERS BELIEVE THAT THE $1 MILLION ALLOCATED FOR CLASS U2 WILL BE SUFFICIENT TO PAY ALL ALLOWED CLAIMS IN THAT CLASS IN FULL, THERE CAN BE NO ASSURANCE OF THIS RESULT.**

**CERTAIN MEMBERS AND MEMBER AFFILIATES (WHO ARE CLASSIFIED IN CLASS U3) MAY ASSERT THAT THEY ARE ENTITLED TO SHARE IN THIS FUND AND, IF SO, DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS IN CLASS U2 COULD BE DIMINISHED SIGNIFICANTLY.  FOR THE REASONS SET FORTH IN SECTION V.F BELOW, THE PLAN PROPONENTS BELIEVE THAT THE SEPARATE CLASSIFICATION OF INSIDER AND AFFLIATE CLAIMS IN CLASS U3 IS APPROPRIATE.  IF, HOWEVER, THE BANKRUPTCY COURT DETERMINES THAT SUCH SEPARATE CLASSIFICATION IS NOT APPROPRIATE, THE PLAN PROPONENTS RESERVE THE RIGHT TO EITHER (1) PROVIDE FOR THE ASSUMPTION OF ALL ALLOWED, NON-INSIDER/AFFILIATE CLAIMS BY THE ACQUIRER, IN LIEU OF (BUT RESULTING IN THE SAME NET VALUE FOR GENERAL UNSECURED CREDITORS AS) THE TREATMENT PROPOSED FOR CLASS U2, OR (2) PROVIDE FOR THE CLASSIFICATION OF ALL UNSECURED CLAIMS TOGETHER (INCLUDING THE PREPETITION LENDERS' DEFICIENCY CLAIM IN CLASS U1) TO THE EXTENT IT IS CONSISTENT WITH THE TERMS OF THE PLAN SUPPORT AGREEMENT.**

d.    Impairment and Voting.

Class U2 is impaired, and each Holder of an Allowed General Unsecured Claim in Class U2 shall be entitled to vote to accept or reject the Plan, pursuant to Bankruptcy Code section 1126 and any additional voting procedures approved by the Bankruptcy Court.

7.    Class U3 – Member Claims.

2430175

a.    Classification.

Class U3 consists of all Member Claims.

b.    Allowance.

Claims in Class U3 shall be allowed or disallowed in accordance with Sections 7.4 and 7.7 of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

c.    Treatment.

Each Holder of an Allowed Member Claim shall receive no distribution under the Plan.

d.    Impairment and Voting.

Class U3 is impaired, but because the Allowed Member Claims are receiving no Distributions under the Plan, Holders of Allowed Member Claims are conclusively deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g) and are thus not entitled to vote to accept or reject the Plan.

8.    Class E1 – Equity Interests.

a.    Classification.

Class E1 consists of all Equity Interests in the Debtor.

b.    Allowance.

Equity Interests in the Debtor shall be deemed allowed on the Effective Date pursuant to the Plan.

c.    Treatment.

Equity Interests in the Debtor shall be cancelled and duly extinguished upon the final administration of the Estate by the Estate Representative, and the Holders of Equity Interests in the Debtor shall not be entitled to receive or retain any property on account of such Equity Interests.

d.    Impairment and Voting.

Class E1 is impaired, but because the Holders of Equity Interests in the Debtor are receiving no Distributions under the Plan, Holders of Equity Interests are conclusively deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g) and are thus not entitled to vote to accept or reject the Plan.

D.    <u>Acceptance or Rejection of the Plan</u>.

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the

2430175

Allowed Claims in such Class actually voting have voted to accept the Plan.

The Voting and Solicitation Agent will tabulate all votes on the Plan for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and (10) of the Bankruptcy Code.

E.     Cramdown.

The Plan Proponents request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that either is deemed to reject or does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.

F.     Means for Implementation of the Plan.

1.     Formation Of Acquirer.

The Acquirer shall be formed by the Settling Builders prior to the Effective Date.

2.     Acquisition Of Assets By Acquirer.

In exchange for the consideration provided by the Settling Builders in Section 6.1 of the Plan, the Acquirer shall obtain, free and clear of all liens, claims, and encumbrances, all of the Assets of the Debtor and the Estate, including, among other things, (a) all real and personal property owned by the Debtor and the Estate, and (b) the Retained Actions; provided, however, that the Assets shall be subject to unimpaired Class S2 LID Claims and such other governmental rights and entitlements that run with the land.  Notwithstanding the foregoing, the Settling Builders may, in their sole and absolute discretion, elect to leave certain Assets in the Estate, as may be identified in a filing with the Bankruptcy Court prior to the Effective Date.

3.     Continued Estate and Debtor Corporate Existence

The Assets of the Estate shall not revest in the Reorganized Debtor.  Rather, to the extent such Assets are not transferred to the Acquirer, such Assets shall be administered by the Estate Representative (free and clear of all liens, claims, and encumbrances) until such time as the Estate Representative determines that the Assets have been fully liquidated or abandoned by the Estate Representative to the Acquirer (such abandonment may occur without the necessity of any further order of the Bankruptcy Court).  The Reorganized Debtor shall continue to exist only for as long as is necessary to complete the administration of the Estate, under the administration and control of the Estate Representative.  The Estate Representative shall have the sole authority to act in the name of the Reorganized Debtor, as representative of the Estate and its attorney-in-fact, to pursue and/or liquidate any remaining Assets of, and Claims or Causes of Action of, the Debtor and the Estate, without the interference of any Member or Member Affiliate.  The Reorganized Debtor shall be dissolved upon the final administration of the Estate.

4.     Effect of Plan on Prepetition Credit Agreement and Prepetition Credit Agreement Amendment

The Prepetition Credit Agreement will be amended and will be included as part of the Plan Supplement.  By voting in favor of the Plan, a Prepetition Lender in Class S3 will also be approving the proposed amendments to the Prepetition Credit Agreement set forth in the Plan

2430175

Supplement.  Through the proposed amendments, the Loan Documents, including the amended Prepetition Credit Agreement, will continue in effect, but the Consenting Prepetition Lenders will have no further executory obligations, exposures or recoveries except for those obligations expressly stated in the Plan.  Notwithstanding absolving the Consenting Prepetition Lenders from specific executory obligations under the Prepetition Credit Agreement, specific sections of the Prepetition Credit Agreement, including, but not limited to Section 11.03(c) and other specified sections (*i.e.*, expense and reimbursement provisions), will survive confirmation so that the Prepetition Lenders' obligation to indemnify Agent (where Borrower fails to do so) inures to benefit of JPMorgan as former Agent.

The proposed amendments to the Prepetition Credit Agreement shall preserve the rights of the Prepetition Lenders under the Prepetition Credit Documents, except that:

(a)     the total Distributions to be received by the Agent and the Prepetition Lenders from the Debtor and its Estate shall be in the amount provided for in (and limited by) the treatment of Class S3 and Class U1 under the Plan;

(b)     the Repayment Guaranties executed by the Settling Builders shall be fully satisfied and released pursuant to the treatment of Class S3 under the Plan;

(c)     the Consenting Prepetition Lenders shall have no more executory obligations, exposures, or recoveries, including without limitation, voting, expense reimbursement or indemnification (except for those obligations expressly stated in this Plan, including the provisions of Section 6.5 of the Plan , and the obligation to turn over excess proceeds to the Settling Builders pursuant to Section 8.6 of the Plan);

(d)     The Settling Builders shall succeed to the rights of the Consenting Prepetition Lenders for purposes of the pro rata sharing of payments required by section 2.18(c) of the Prepetition Credit Agreement.  On or after the Effective Date, any such pro rata distributions to which the Consenting Prepetition Lenders would be entitled to receive from the non-Consenting Prepetition Lenders shall be assigned to the Settling Builders, pursuant to the turnover mechanism contemplated by Section 8.6 of the Plan.  Notwithstanding the foregoing, the Settling Builders will not be treated as "Lenders" under the Prepetition Credit Agreement, and will not have voting rights thereunder; provided, however, that through the voluntary election by Prepetition Lenders under Section 3.4(F) of the Plan, the Settling Builders shall be entitled, on such electing Prepetition Lenders' behalf, to direct and instruct the sub-Agent with respect to the Meritage Repayment Guaranty in accordance with the terms of the Consenting Prepetition Lenders' Participation Agreement; and

(e)     Subject to the terms of the Plan (and conditioned upon the Consenting Prepetition Lenders receiving all payments to which they are entitled on the Plan's Effective Date pursuant to Article III of the Plan), the Successor Agent shall pay to the Settling Builders all further payments allocated to the Consenting Prepetition Lenders.

5.     The Agent And Successor Agent.

JPMorgan Chase Bank, N.A., shall resign as the Agent pursuant to section 10.06(c) of the

Prepetition Credit Agreement effective as of or immediately after the Effective Date, with such timing to be in JPMorgan Chase Bank, N.A.'s sole discretion.  In the event that the "Required Lenders" (as such term is defined in the Prepetition Credit Agreement) do not select a Successor Agent, then JPMorgan Chase Bank, N.A. shall appoint a Successor Agent in accordance with the terms of the Prepetition Credit Agreement.

Section 11.03(c) of the Prepetition Credit Agreement and other sections thereof to be identified (i.e., expense and reimbursement provisions) shall survive confirmation vis-à-vis the Prepetition Lenders, such that the Prepetition Lenders' obligation to indemnify the Agent shall continue to inure for benefit of both the Successor Agent and JPMorgan Chase Bank, N.A.

6.    Settling Builders' Funding Of The Plan.

The Settling Builders shall, consistent with their obligations under the Plan Support Agreement, through the Settling Builders' Total Plan Contribution, contribute sufficient cash (severally pursuant to their Builder Shares) to the account of the Estate Representative to fund payments required under the Plan to (a) Holders of Allowed Claims (to the extent such payments are not provided to be paid from other funds, such as the MI Funds or the proceeds of completed LID segments), and (b) Holders of Allowed Administrative Expenses, Gap Claims, Priority Tax Claims, and TIP Loan Claims.

7.    Corporate Action.

Each of the matters provided for under the Plan involving the corporate structure and eventual dissolution of the Reorganized Debtor or corporate action to be taken by or required by the Reorganized Debtor shall be deemed to have occurred and be effective as provided for in the Plan, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by the Trustee, Members, Member Affiliates, creditors, owners, or managers of the Reorganized Debtor.

8.    Dismissal Of The Trustee.

Except as expressly provided in the Plan, as of the Effective Date, the Trustee shall be discharged, the Trustee's bond shall be exonerated, and she shall be released and discharged of and from all powers, duties, responsibilities, and obligations related to and arising from and in connection with the Debtor, the Estate, and the Chapter 11 Case; provided, however, that the Trustee and her professionals shall have standing to file and be heard on their Professional Compensation Claims.

9.    Exemption from Certain Transfer Taxes and Recording Fees.

Pursuant to Bankruptcy Code section 1146, (a) the issuance, transfer, or exchange of any securities, instruments, or documents, (b) the creation of any Lien, mortgage, deed of trust, or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the transfer or sale of any real or personal property of the Estate or the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification, or securing of

55

indebtedness by such means, and the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment. Consistent with the foregoing, and in accordance with the Plan, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

        10.     Causes of Action.

        a.     Preservation of Avoidance Actions and other Retained Actions.

The Reorganized Debtor or the Acquirer (on its own behalf or as Estate Representative) shall retain and may (but shall not be required to) investigate and prosecute all of the Retained Actions, and the Reorganized Debtor or the Acquirer (on its own behalf or as Estate Representative) may assert any such Retained Action for purposes of setoff, recoupment, disallowance under Bankruptcy Code section 502(d), or as other defenses to Claims. The Acquirer (on its own behalf or as Estate Representative), in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce the Retained Actions (or decline to do any of the foregoing) without further approval of the Bankruptcy Court.

Except as otherwise set forth in the Plan, pursuant to Bankruptcy Code section 1123(b)(3)(B), on the Effective Date, all Retained Actions of any kind or nature whatsoever against third parties arising before the Effective Date shall become property of the Acquirer. From and after the Effective Date, the Acquirer may commence any suit or other proceeding for the enforcement of Retained Actions (other than with respect to the Released Parties), and furthermore, the Acquirer shall be authorized to assert such Retained Actions (other than with respect to the Released Parties) for purposes of objecting to the allowance of any Claim pursuant to Bankruptcy Code section 502(d). **Except as specifically provided herein and in Sections 8.5 through 8.10 of the Plan, nothing contained in the Plan shall constitute a release, satisfaction, or settlement of the Retained Actions, nor shall it constitute a waiver of the rights, if any, of any party to a jury trial with respect to any Retained Action, and nothing in the Plan or the Confirmation Order shall constitute a waiver or release of any Retained Action under the doctrine of *res judicata* nor shall any Retained Action be barred or limited by any doctrine of estoppel, whether judicial, equitable, or otherwise. The Acquirer and Estate Representative have the full right to pursue all Retained Actions, subject to the option of the Agent and the Prepetition Lenders to pursue the MI Litigation pursuant to Section 3.4(C)(ii)(c) of the Plan, including but not limited to pursuing Claims and Causes of Action against Members and Member Affiliates that are not Settling Builders.**

Except as otherwise set forth in the Plan, pursuant to Bankruptcy Code section 1123(b)(3)(B), on the Effective Date all Avoidance Actions of any kind or nature whatsoever against third parties (other than Released Parties) arising before the Effective Date shall become property of the Acquirer. **The Acquirer and Estate Representative have the full right to**

2430175

**pursue all Avoidance Actions, including but not limited to pursuing Claims and Causes of Action against Members and Member Affiliates that are not Settling Builders**

        b.      Dismissal of Litigation and Appeals Relating to Involuntary Petition.

As soon as reasonably possible following the Effective Date, the Plan Proponents, the Consenting Prepetition Lenders, the Reorganized Debtor, the Estate Representative, and the Trustee shall take all actions necessary: (a) to cause the dismissal without prejudice of all litigation by the Agent and the Consenting Prepetition Lenders against the Settling Builders (provided that any subsequent actions by the Agent, Successor Agent, or Prepetition Lenders shall be subject to Sections 8.6 and 8.7 of the Plan); and (b) to cause the dismissal with prejudice of all appeals relating to the involuntary commencement of the Chapter 11 Case and the appointment of the Trustee.

        G.      <u>Treatment of Executory Contracts and Unexpired Leases</u>.

        1.      Executory Contracts and Unexpired Leases to Be Assumed or Rejected.

        a.      Rejected Contracts and Leases.

On the Effective Date, all executory contracts and unexpired leases to which the Debtor is a party, except for those contracts covered by Section 5.5 of the Plan, shall be deemed rejected in accordance with the provisions and requirements of Bankruptcy Code sections 365 and 1123, <u>except</u> those executory contracts, unexpired leases, and other obligations that (i) have previously been assumed by the Trustee pursuant to an order of the Bankruptcy Court, (ii) are the subject of a motion to assume filed by the Trustee at any time prior to the Effective Date, or (iii) are Assumed Obligations listed in the Contract Assumption Schedule. Except for those executory contracts addressed in Section 5.5 of the Plan, the Acquirer may identify additional executory contracts, unexpired leases, and other obligations to be assumed or assigned in accordance with the Plan with such contracts, leases and other obligations to be added to the Contract Assumption Schedule, and assumed or assigned as of the Effective Date. The Trustee shall not seek the assumption or rejection of any executory contract or unexpired lease without the approval of the Plan Proponents.

        b.      Assumptions and Assignments of Executory Contracts and Unexpired Leases.

Each Executory Contract and Lease listed on the Contract Assumption Schedule includes any modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such contract or lease, irrespective of whether such agreement, instrument, or other document is listed on the Contract Assumption Schedule, unless any such modification, amendment, supplement, restatement, or other agreement is rejected pursuant to Article V of the Plan or is disputed by the Estate Representative.

        c.      Assumed Obligations.

Entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the

2430175

Debtor's or Acquirer's assumption or assignment of the Assumed Obligations listed in the Contract Assumption Schedule, as of the Effective Date pursuant to Bankruptcy Code section 365(a).

        d.      Payments of Cure Amounts.

The Contract Assumption Schedule shall list the proposed Cure Amount, if any, with respect to each Assumed Obligation included therein.  Cure Amounts with respect to the Assumed Obligations will be satisfied, pursuant to Bankruptcy Code section 365(b)(1): (i) by payment of the Cure Amount in cash on the Initial Distribution Date or, (ii) in the event a timely objection to assumption or assignment of the Assumed Obligation or to the proposed Cure Amount is raised in accordance with Section 5.3 of the Plan, as soon as practicable after the Cure Amount is determined by the Bankruptcy Court in a Final Order, or agreed to by the Reorganized Debtor or the Acquirer, as applicable, and the non-Debtor party to the Assumed Obligation.

        e.      Right to Reject Assumed Obligations

Notwithstanding anything in Section 5.1 of the Plan to the contrary, if either (i) there is either a dispute as to the Cure Amount, or (ii) the non-Debtor party otherwise objects to assumption or assignment to the Acquirer, then in either case the Reorganized Debtor or Acquirer, as applicable, shall have the right to abandon the assumption of any such contract, lease, or other agreement listed on the Contract Assumption Schedule, and to treat such contract, lease, or other agreement as rejected under the Plan at any time during the pendency of such dispute.

        2.      Objections To Assumption And Proposed Cure Amounts.

        a.      Requirement of Timely Objection.

If any non-Debtor party to an Assumed Obligation opposes the Reorganized Debtor's or Acquirer's assumption or assignment of such Assumed Obligation for any reason (including, but not limited to, (i) the assertion of the existence of a monetary or non-monetary default under such Assumed Obligation, (ii) any dispute as to the Cure Amount set forth in the Contract Assumption Schedule, or (iii) any dispute as to the ability of the Reorganized Debtor or the Acquirer to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365)), then such non-Debtor party to the Assumed Obligation must file an objection with the Bankruptcy Court no later than the deadline for filing objections to Confirmation of the Plan.  Such objection shall be served on the Plan Proponents, and shall state (w) the Cure Amount to which such non-Debtor party claims it is entitled; (x) the amount of the Rejection Claim which such non-Debtor would be able to assert if the Assumed Obligation were rejected by the Trustee; (y) the nature of any defaults with respect to such Assumed Obligation; and (z) any other basis upon which the non-Debtor party opposes the assumption or assignment of the Assumed Obligation.

        b.      Consequences of Failure to Object.

Failure to timely file and serve an objection in accordance with Section 5.3 of the Plan shall constitute the non-Debtor party's consent to the Debtor's or the Acquirer's assumption or

2430175

assignment of the Assumed Obligation, and a determination by the Bankruptcy Court that, upon payment of the Cure Amount (if any), no defaults shall exist under such Assumed Obligation. Any non-Debtor party that fails to object timely to the proposed Cure Amount or to the assumption or assignment of any contract, unexpired lease, or other obligation to which it is a party shall be forever barred and estopped from asserting any Claims against the Reorganized Debtor, the Estate, the Acquirer, any Plan Proponent, or any Entity acting on behalf of the foregoing that arose prior to the Effective Date with respect to such contract or unexpired lease or with respect to any additional agreements, either oral or written, that may be related thereto.

3.    Bar Date for Rejection Damages.

All proofs of claim with respect to Rejection Claims arising from the rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise must be filed with the Bankruptcy Court within thirty days after the entry of an order by the Bankruptcy Court, which may be the Confirmation Order, authorizing the rejection of such executory contract or unexpired lease. All Rejection Claims that become Allowed Claims shall be treated as General Unsecured Claims or Member Claims, as the case may be. Any Rejection Claims that are not timely filed in accordance with the foregoing provision shall be forever barred and shall not be enforceable against the Reorganized Debtor, the Estate, the Acquirer, any Plan Proponent or any property of the Reorganized Debtor, the Estate, any Plan Proponent, or the Acquirer.

4.    Development Agreement.

Notwithstanding anything to the contrary in this Article V, the Plan shall defer the decision to assume, amend, or reject the Development Agreement and other related contracts, permits, and entitlements (to the extent any such contracts, permits, or entitlements constitutes an executory contract under Bankruptcy Code section 365) between the Debtor and the City until after the Effective Date. The City has acknowledged that it will consider modifications to the LID T-18 and Master Plans (the Development Agreements), which modifications, if acceptable, will be made only in accordance with, and subject to the satisfaction of all requirements of all applicable laws, rules, regulations, ordinances, and statutes, as applicable, of both the City and State of Nevada, including but not limited to NRS 271, as amended, NRS 278, as amended, and all provisions of the LID T-18 documents and all other documents and agreements currently in place between the City and the Debtor related to the project or the LID bonds. If the Development Agreement and other related contracts, permits, and entitlements are determined to be executory at the time of such decision, then such contracts shall be subject to Article V of the Plan.

5.    Reservation of Rights.

Neither the exclusion nor inclusion of any contract or lease by the Plan Proponents on a Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtor, the Plan Proponents, or the Trustee that any such contract or lease is or is not in fact an executory contract or lease or that the Debtor, the Trustee, the Estate, or the Plan Proponents have any liability thereunder.

Nothing in the Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtor, the Estate, the Plan Proponents,

2430175

or the Trustee under any executory contract or non-executory contract or any unexpired lease or any lease.

Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Estate, Plan Proponents, or the Trustee under any executory contract or non-executory contract or any unexpired lease or any lease.

At any time through and including the Confirmation Date, the Plan Proponents reserve the right to alter, amend, modify, or supplement the Contract Assumption Schedule.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, then the Plan Proponents will have 30 days following entry of a Final Order resolving such dispute to amend their decision to assume or reject such contract or lease.

The assumption, assumption and assignment, or rejection of any executory contract or unexpired lease under the terms of and in accordance with the Plan, will be of no force or effect until the occurrence of the Effective Date.  If the Effective Date does not occur, the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease under the terms of and in accordance with the Plan, shall be of no force or effect and the rights of all parties interest shall be preserved.

        H.    <u>Claims Administration</u>.

        1.    Claims and Interests Administration Responsibilities.

On and after the Effective Date, the Estate Representative shall have sole responsibility and authority for administering, disputing, objecting to, compromising, and settling, or otherwise resolving and making Distributions with respect to all Claims, including all Administrative Expense Claims; <u>provided</u>, <u>however</u>, that the Agent or Successor Agent shall have the sole responsibility for administering Distributions to holders of Allowed Prepetition Lender Claims.

        2.    Objections to Claims.

Unless otherwise extended by the Bankruptcy Court, any objections to Claims shall be served and filed on or before the Claims Objection Deadline.

        3.    Estimation of Allowed Claims.

Except as otherwise agreed to by the Estate Representative in writing or as set forth in the Plan, the Allowed amount of any Claim as to which a proof of claim was timely filed in the Chapter 11 Case, and which Claim is subject to an objection filed before the Claims Objection Deadline, shall be determined and liquidated pursuant to a Final Order.  Upon such determination, the Claim shall become an Allowed Claim and will be satisfied in accordance with the Plan.  Furthermore, the Bankruptcy Court shall have the authority to estimate the amount of Claims for the purpose of enabling Distributions.  Notwithstanding the foregoing, any Claim Allowed or estimated with consent of the Estate Representative and other than by a Final Order, shall be subject to the occurrence of the Effective Date and shall be of no force and effect nor binding on any party in interest unless the Effective Date occurs.

2430175

**ANY CLAIM OR INTEREST THAT HAS BEEN OR IS HEREAFTER LISTED IN THE SCHEDULES AS CONTINGENT, UNLIQUIDATED, OR DISPUTED, AND FOR WHICH NO PROOF OF CLAIM OR INTEREST HAS BEEN TIMELY FILED IS DISALLOWED WITHOUT FURTHER ACTION AND WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

I.     <u>Provisions Governing Distributions</u>.

1.     Distributions on Account of Claims Allowed as of the Effective Date.

Except as otherwise provided in the Plan, the Plan Supplement, or a Final Order, or as otherwise agreed to by the relevant parties, initial distributions under the Plan on account of Claims Allowed on or before the Effective Date shall be made on the Distribution Date; provided, that Allowed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case or assumed by the Trustee prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

2.     Method of Distributions to Holders of Claims.

On or after the Effective Date, the Estate Representative will make all distributions required under the Plan.  The Estate Representative will serve without bond, and may employ or contract with other Persons to assist in or make the distributions required by the Plan or the Plan Supplement.

Notwithstanding any other provision of the Plan, all distributions to or for the account of Prepetition Lenders shall be made to the Agent, and the Agent, in turn, shall distribute such recoveries in accordance with the Prepetition Credit Agreement.

3.     Procedures For Treating And Resolving Disputed And Contingent Claims.

a.     No Distributions Pending Allowance.

No Distributions shall be made with respect to any portion of a Disputed Claim unless and until such Disputed Claim has become an Allowed Claim.  All objections to Claims shall be filed on or before the Claims Objection Deadline, and all Claims with respect to which objections have been filed on or before the Claims Objection Deadline shall be treated as Disputed Claims for purposes of the Plan.

b.     Disputed Claim Reserve Account.

The Estate Representative shall establish the Disputed Claim Reserve Account as soon as practicable after the Effective Date.  The Disputed Claim Reserve Account shall hold cash in such amount as the Estate Representative reasonably determines is necessary to enable it to make the Pro Rata Share Distributions required to be made to the Holders of Allowed General Unsecured Claims once the allowance or disallowance of each Disputed Claim, including any filed or anticipated Rejection Claims, is ultimately determined.

2430175

      c.      Distributions After Allowance.

From and after the Effective Date, promptly after a Disputed Claim becomes an Allowed Claim, the Estate Representative shall distribute to the Holder of such Allowed Claim any cash or other property that would have been distributed to the Holder of such Allowed Claim on the dates Distributions were previously made to Holders of other Allowed Claims in the same Class, had such Claim been an Allowed Claim on such dates.

      d.      Limitation On Distributions.

Notwithstanding anything to the contrary in the Plan, under no circumstances shall any Holder of an Allowed Claim be entitled to receive Distributions that exceed, on a cumulative basis, the lesser of (i) the Allowed amount of such Claim, or (ii) the amount that such Claim was estimated by the Bankruptcy Court for purposes of establishing reserves.

      e.      No Recourse.

No Holder of a Disputed Claim shall have any recourse against the Debtor, the Reorganized Debtor, the Estate, the Estate Representative, the Agent, the Prepetition Lenders, the Trustee, the Settling Builders, the Acquirer, or any of their respective directors, officers, employees, agents, partners, members, attorneys, investment bankers, restructuring consultants, and financial advisors, in the event that the Disputed Claim Reserve Account established by the Estate Representative pursuant to the Plan is insufficient to pay the portion of such Disputed Claim that becomes an Allowed Claim.

      4.      Delivery of Distributions.

      a.      Delivery of Distributions in General.

Except as provided in Section 7.4(A) of the Plan, Distributions to Holders of Allowed Claims shall be made by the Estate Representative, (a) at the addresses set forth on the proofs of claim filed by such Holders (or at the last known addresses of such holders if no proof of claim is filed), (b) at the addresses set forth in any written notice of change of address delivered to the Estate Representative, or (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Estate Representative has not received a written notice of a change of address.

      b.      Manner of Payment Pursuant to the Plan.

Checks issued by the Estate Representative on account of Allowed Claims shall be null and void if not negotiated within ninety days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Estate Representative by the Holder of the Allowed Claim with respect to which the check was originally issued. Any Claim in respect of a voided check shall be made on or before the six month anniversary of the date of issuance of such check. After such date, all Claims and respective voided checks on account thereof shall be discharged and forever barred, and the Acquirer shall retain all moneys related thereto notwithstanding any federal or state escheat laws to the contrary.

c.      Accrual of Interest.

Except as specifically otherwise provided in the Plan, in no event shall interest accrue after the Effective Date on account of any Allowed Claim.

d.      De Minimis and Undeliverable Distributions.

(i)      De Minimis Distributions.

On or after the Effective Date, the Estate Representative shall have no obligation to make a Distribution on account of an Allowed Claim from the Disputed Claim Reserve Account or otherwise if the amount to be distributed on account of such Allowed Claim is less than $20.00. In the event a Holder of an Allowed Claim is entitled to a Distribution that is not a whole dollar amount, the actual payment made may reflect a rounding of such fractional portion of such Distribution down or up to the nearest whole dollar.

(ii)      Undeliverable Distributions.

If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Estate Representative is notified of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest.  Amounts in respect of undeliverable Distributions made in cash shall be retained by the Acquirer until such Distributions are claimed.  All cash Distributions returned to the Acquirer and not claimed within six months of return shall be irrevocably retained by the Acquirer.

5.      Setoffs and Recoupment.

On or after the Effective Date, the Estate Representative may, but shall not be required to, setoff or recoup against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Claim, Causes of Action of any nature that the Debtor, the Reorganized Debtor, or the Acquirer (on account of having acquired the Assets) may have against the Holder of such Allowed Claim, except to the extent such Causes of Action are released by the Plan.

6.      Compliance with Tax Requirements.

In connection with the Plan, to the extent applicable, the Estate Representative shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan that may be necessary or appropriate to comply with such withholding and reporting requirements.  Notwithstanding any other provision of the Plan, each Entity that has received any Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.

J.      Effect of the Plan on Claims and Interests.

1.      Vesting of Assets.

2430175

On the Effective Date, all property of the Estate and any and all other rights and Assets of the Debtor of every kind and nature (including the Retained Actions and Avoidance Actions) shall vest in the Acquirer free and clear of all Liens, Claims, and Equity Interests, except as specifically provided for in the Plan or the Confirmation Order. As of the Effective Date, the Acquirer shall be authorized to operate its business and to use, acquire, and dispose of property and settle and compromise Claims, Equity Interests, or Causes of Action (either in its own right or as Estate Representative) without supervision of the Bankruptcy Court and without notice to any party, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, except those restrictions explicitly imposed by the Plan and the Confirmation Order.

2.        Compromise And Settlement of Claims, Interests and Controversies.

Pursuant to Bankruptcy Code sections 363 and 1123 and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all specified Claims, Interests, Causes of Action, and controversies relating to the contractual and legal rights that a specified Holder of a Claim or Interest may have with respect to any specified Allowed Claim or Interest, or any distribution to be made on account of such an Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, Holders of Claims and Interests, and other parties in interest, and that the same is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Code sections 363 and 1123 and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Estate Representative may compromise and settle Claims against the Debtor and Causes of Action of the Debtor or its Estate against other Entities. Moreover, because the Plan is a good-faith settlement as to the Released Parties, no co-defendant or joint tortfeasors shall have any indemnity or contribution claims, which shall be disallowed by the application of Bankruptcy Code section 502(e), by California Code of Civil Procedure section 877.6 (which shall apply to the maximum extent permitted by applicable law), Nevada Revised Statute 17.245, and any similar law of any other jurisdiction.

3.        Releases Of Certain Parties By The Debtor, The Estate, And The Trustee.

Except for the obligations created by or arising under the Plan, pursuant to Section 8.5 of the Plan, on the Effective Date, the Debtor, the Estate, and the Trustee release unconditionally, and are hereby deemed to release unconditionally, (a) the Settling Builders; (b) the TIP Loan Lenders; (c) the Agent, (d) the Prepetition Lenders; and (e) with respect to each of the foregoing Entities, each of their respective directors, officers, employees, agents, representatives, shareholders, partners, members, affiliates, attorneys, investment bankers, restructuring consultants, and financial advisors in their capacities as such (collectively, the "**Released Parties**") from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities whatsoever (including, without limitation, those arising under the Bankruptcy Code or nonbankruptcy law, and those assertable by the Debtor, its Estate, or the Trustee), whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event, or other occurrence, taking place at any time through and including the Effective Date in

64

2430175

connection with, relating to, or arising out of (i) the Chapter 11 Case, (ii) the Debtor, (iii) the Prepetition Loan Documents, (iv) the management, operation, or financing of the Debtor, or (v) the formulation, negotiation, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, or any other contract, instrument, release, or other agreement or document entered into during the Chapter 11 Case, or otherwise created in connection with the Plan or the Debtor.

The foregoing release of the Released Parties includes, but is not limited to, any Claims, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities that might be asserted derivatively on behalf of the Debtor or its Estate.

    4.    Other Plan Releases And Covenants Not To Sue.

    a.    Release of the Settling Builders And The TIP Loan Lenders By the Agent and Prepetition Lenders.

**Pursuant to Section 8.7 of the Plan, on the Effective Date, in consideration for the Settling Builders' payment of the Settling Builders' Repayment Guaranty Amount, the settlements contained in the Plan, and the releases to be granted by the Settling Builders and the TIP Loan Lenders:**

**(a)    all obligations of the Settling Builders to the Agent and the Prepetition Lenders on account of the Repayment Guaranties shall be released and discharged, on account of the treatment of Classes S3 and U1 herein, which provide for the Settling Builders' full payment of the Repayment Guaranties; and**

**(b)    The Agent and the Consenting Prepetition Lenders release unconditionally, and are hereby deemed to release unconditionally, the Settling Builders, the TIP Loan Lenders, and each of their respective directors, officers, employees, agents, representatives, shareholders, partners, members, affiliates, attorneys, investment bankers, restructuring consultants, and financial advisors in their capacities as such, from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities whatsoever (including, without limitation, those arising under the Bankruptcy Code or nonbankruptcy law), whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event, or other occurrence, taking place on or prior to the Petition Date through and including the Effective Date in connection with, relating to, or arising out of (i) the Chapter 11 Case, (ii) the Debtor (including, but not limited to, any claims on account of the Guaranties), (iii) the management, operation, or financing of the Debtor, or (iv) the formulation, negotiation, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, or any other contract, instrument, release, or other agreement or document entered into during the Chapter 11 Case, or otherwise created in connection with the Plan or the Debtor.**

65

2430175

Notwithstanding the foregoing subparagraph (b):

(x)    the Agent and the Consenting Prepetition Lenders shall not be deemed to release Claims against or obligations of the Settling Builders arising under the Plan, the Confirmation Order, or the Prepetition Credit Documents (other than the Settling Builders' Repayment Guaranties, which shall be satisfied in full pursuant to Section 3.4 of the Plan). Rather, any such Claims against the Settling Builders shall be subject to the covenant not to sue and turnover provisions contained in Section 8.6 of the Plan, such that in any action by the Successor Agent against the Settling Builders, a percentage of any recovery equal to the Prepetition Consenting Lenders' percentage of the total Prepetition Lender Claims shall be subject to turnover to the Settling Builders pursuant to Section 8.6 of the Plan; and

(y)    the release contained in Section 8.7 of the Plan shall not be interpreted to be a release by the Agent and the Prepetition Lenders of (i) obligations created by the Plan, (ii) any claims against a Settling Builder that do not arise under or relate to the Prepetition Credit Documents or the Debtor, and (iii) with respect to Highland Capital and its affiliates, any claims relating to properties purchased in relation to the Inspirada development by Essex Real Estate Partners, LLC and/or Las Vegas Developments Associates, Inc.

      b.    Release of the Agent and the Consenting Prepetition Lenders By the Settling Builders and the TIP Loan Lenders.

**Pursuant to Section 8.8 of the Plan, on the Effective Date, in consideration for the settlement contained in the Plan and the releases to be granted by the Agent and the Consenting Prepetition Lenders, the Settling Builders and the TIP Loan Lenders release unconditionally, and are hereby deemed to release unconditionally, the Agent and the Consenting Prepetition Lenders, and each of their respective directors, officers, employees, agents, representatives, shareholders, partners, members, affiliates, attorneys, investment bankers, restructuring consultants, and financial advisors in their capacities as such, from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities whatsoever (including, without limitation, those arising under the Bankruptcy Code or nonbankruptcy law), whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event, or other occurrence, taking place on or prior to the Petition Date through and including the Effective Date in connection with, relating to, or arising out of (i) the Chapter 11 Case, (ii) the Debtor (including, but not limited to, any claims on account of the Guaranties), (iii) the Prepetition Loan Documents, (iv) the management, operation, or financing of the Debtor, or (v) the formulation, negotiation, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, or any other contract, instrument, release, or other agreement or document entered into during the Chapter 11 Case, or otherwise created in connection with the Plan or the Debtor.**

Notwithstanding provisions of Section 8.8 of the Plan:

(x)    To the extent that actions are brought or continued by or for the benefit of

the non-Consenting Prepetition Lenders against the Settling Builders, the Settling Builders shall not be deemed to have released any counterclaims or defenses arising under or relating to the Prepetition Credit Documents; and

(y)    the release contained in Section 8.8 of the Plan shall not be interpreted to be a release by the Settling Builders or the TIP Loan Lenders of (i) obligations created by the Plan, (ii) any claims that do not arise under or relate to the Prepetition Credit Documents or the Debtor, and (iii) with respect to KB Home and its affiliates, claims relating to properties purchases in relation to the Inspirada development by Essex Real Estate Partners, LLC and/or Las Vegas Developments Associates, Inc.

c.    Covenants Regarding Turnover Of Recoveries, Cooperation, And Not To Sue By The Agent And Consenting Prepetition Lenders.

**Pursuant to Section 8.6 of the Plan, from and after the Effective Date:**

(a)    **each Consenting Prepetition Lender shall pay to the Settling Builders any proceeds payable to such Consenting Prepetition Lender from the Debtor, Reorganized Debtor, Estate, Settling Builders, Members, Member Affiliates, other Consenting Prepetition Lenders, non-Consenting Prepetition Lenders, Agent, Successor Agent, Prepetition Lenders' Collateral, or otherwise in connection with or on account of the Prepetition Lender Claims or otherwise relating to the Debtor, to the extent that such payment is in excess of such Consenting Prepetition Lender's ratable share of its Distributions under Classes S3 and U1 of the Plan (including, but not limited to, any payment that the Consenting Prepetition Lender would otherwise be entitled to under section 2.18(c) of the Prepetition Credit Agreement), but shall not pay to the Settling Builders any recovery from (y) the MI Litigation pursued by the Agent after the Effective Date (subject to Section 3.4(C) of the Plan and the Settling Builders receiving all reimbursements of the Settling Builders' MI Makeup required thereunder), and (z) to the extent any Prepetition Lender does not assign its interest in the Meritage Repayment Guaranty to the Settling Builders, then any such recovery from the Meritage Repayment Guaranty.**

(b)    **the Consenting Prepetition Lenders irrevocably instruct the Agent and Successor Agent to remit promptly any payments that would be subject to this Section directly to the Settling Builders, and the Agent and Successor Agent are bound thereby.   Moreover, any payments received by the Consenting Prepetition Lenders that are subject to this Section shall be held in trust for the benefit of the Settling Builders and promptly paid to them.**

(c)    **the Consenting Prepetition Lenders shall not independently of the Successor Agent seek to enforce any remedies against the Prepetition Lenders' Collateral, the Members, or the Member Affiliates in connection with the Debtor, leaving the Successor Agent as the party exclusively in charge as far**

67

2430175

as the Consenting Prepetition Lenders are concerned.

(d)     the non-Consenting Prepetition Lenders shall not be bound by subparagraphs "a", "b", and "c" of Section 8.6 of the Plan, and nothing in those subparagraphs shall require the non-Consenting Prepetition Lenders to turn over their recoveries to the Settling Builders (provided, however, that the non-Consenting Prepetition Lenders shall remain subject to the pro rata sharing provisions in the Prepetition Credit Agreement, and the turnover of any distributions required by such provisions and Section 6.5 of this Plan).

(e)     in the event that any non-Consenting Prepetition Lender commences an action relating to the Prepetition Credit Documents against any Member, Member Affiliate, or other Credit Party (as that term is used in the Prepetition Credit Agreement) independent of the Successor Agent or sub-Agent, and the standing of such non-Consenting Prepetition Lender to pursue such an action is sustained, then the Settling Builders and the Acquirer shall have the right to seek to intervene in such action so as to effectuate their rights to recover from such Member, Member Affiliate, or other Credit Party the amounts they otherwise would be entitled to vis-à-vis the rights of the Consenting Prepetition Lenders under Section 8.6 of the Plan.

The refund mechanism set forth in subparagraphs "a" and "b" above shall be accomplished through the Prepetition Credit Agreement Amendment, which shall provide for the Consenting Prepetition Lenders to assign to the Settling Builders their recovery rights under the Prepetition Credit Agreement and the Guaranties, as well as, but not limited to, any payments from the Successor Agent's Claims and/or Causes of Action against the Members and Member Affiliates. When and if future recoveries occur, the Successor Agent will handle the distribution to non-Consenting Prepetition Lenders and the Settling Builders in accordance with Section 8.6 of the Plan and the Prepetition Credit Agreement Amendment.

              5.    Exculpation.

        Pursuant to Section 8.10 of the Plan, none of (a) the Debtor, the Reorganized Debtor, or the Estate Representative, (b) the Agent, (c) the Consenting Prepetition Lenders, (d) the Settling Builders, (e) the TIP Loan Lenders, (f) the Trustee, and (g) with respect to each of the foregoing Entities, each of their respective directors, officers, employees, agents, representatives, shareholders, partners, members, affiliates, attorneys, investment bankers, restructuring consultants, and financial advisors in their capacities as such (collectively, the "Exculpated Parties"), shall have or incur any liability to any Entity for any act or omission in connection with, relating to, or arising out of the Chapter 11 Case, the formulation, negotiation, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document entered into during the Chapter 11 Case or otherwise created in connection with the Plan; provided, however, that nothing in Section 8.10 of the Plan shall be construed to release or exculpate any Exculpated Party from (i) its obligations set forth in the Plan, or

2430175

**(ii) willful misconduct or gross negligence as determined by a Final Order.**

      6.      Post-Confirmation Injunction And Discharge.

Because the Estate Representative will be liquidating the Assets, the Debtor will not receive a discharge under the Plan. However, until all remaining Assets of the Reorganized Debtor and the Estate are administered, and except as otherwise provided in the Plan or the Confirmation Order, all Entities shall be barred from asserting against the Debtor or the Reorganized Debtor, or their respective successors or property, any other or further Claims, demands, debts, rights, Causes of Action, liabilities, or Equity Interests based upon any act, omission, cause, transaction, state of facts, or other activity of any kind or nature that occurred prior to the Effective Date.

      7.      Release of Liens.

Except as otherwise provided in the Plan, Plan Documents, or in any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, (1) all Interests, mortgages, deeds of trust, liens, or other security interests against the property of the Estate will be fully released and compromised, and (2) the Estate and all property dealt with in the Plan or Plan Documents shall be free and clear of all such Claims and Interests, including, but not limited to, liens, security interests, and any and all other encumbrances.

      8.      Reservation of Claims and Rights.

Nothing contained in the Plan shall be construed as a waiver of any rights, suits, damages, Causes of Action, remedies, offsets, recoupments, adverse interests, or liabilities, including any derivative claims or Causes of Action, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, against any party not expressly released or otherwise satisfied under the Plan. All such claims and Causes of Action are expressly reserved and preserved under the Plan, including those rights and adverse interests described in the Disclosure Statement.

      K.      <u>Allowance and Payment of Certain Administrative Claims</u>.

      1.      Professional Claims.

      a.      Final Fee Applications.

All applications for final allowance of Professional Compensation Claims of professional persons employed by the Trustee pursuant to orders entered by the Bankruptcy Court and on account of services rendered prior to the Effective Date, and all other requests for payment of Administrative Expense Claims shall be filed with the Bankruptcy Court no later than sixty days after the Effective Date and served on the Acquirer at the addresses set forth in Section 11.11 of the Plan. Any such Claim that is not served and filed within this time period shall be discharged and forever barred. Unless such deadline is extended by the Bankruptcy Court, objections to any application for allowance of an Administrative Expense Claim must be filed before the later of (a) thirty days after the filing thereof, or (b) ninety days after the Effective Date. The Acquirer and Estate Representative shall have sole responsibility for filing

objections to requests for allowance of Administrative Expense Claims; provided, however, that the Office of the United States Trustee and any party in interest may be heard with respect to Professional Compensation Claims.

      L.      Conditions Precedent to Confirmation and the Effective Date of the Plan.

              1.      Conditions to Confirmation.

The following are conditions precedent to Confirmation that must be satisfied or waived in accordance with Article 9.3 of the Plan:

      a.      The Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Plan Proponents, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

      b.      The proposed Confirmation Order shall be in form and substance reasonably acceptable to the Plan Proponents.

      c.      The Plan and the Plan Supplement, and all of the schedules, documents, and exhibits contained therein shall be filed with the Bankruptcy Court in form and substance reasonably acceptable to the Plan Proponents.

              2.      Conditions to Occurrence of the Effective Date.

The following are conditions precedent to the occurrence of the Effective Date that must be satisfied or waived in accordance with Article 9.3 of the Plan:

      a.      The Confirmation Date shall have occurred on or before October 31, 2011; and shall not be subject to any stay and shall otherwise be in full force and effect; provided, that the Plan Proponents may mutually agree (each in their sole discretion) to extent this period up to an additional thirty (30) days.

      b.      No request for revocation of the Confirmation Order under Section 1144 has been made, or, if made, remains pending.

      c.      Each exhibit, document, or agreement to be executed in connection with the Plan (including each document or agreement included in the Plan Supplement) shall be reasonably acceptable to the Plan Proponents.

      d.      The Settling Builders shall provide the Agent with account statements evidencing that the Settling Builders have severally funded the account of the Estate Representative with their monetary obligations under the Plan, including, without limitation, the full amounts of (x) the Settling Builders' Consideration, (y) the Settling Builders' Total Plan Contribution, and (z) if necessary, the Settling Builders' MI Makeup.

              3.      Waiver of Conditions Precedent.

70

2430175

The Plan Proponents may jointly, but not unilaterally, waive any of the conditions to Confirmation or consummation set forth in Article 9.1 or 9.2 of the Plan at any time, without any notice to other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

4.      Confirmation Deadline.

If either:

(a)      the Plan is not confirmed on or before October 31, 2011, for any reason (subject to the option of the Plan Proponents to extend this deadline for a period of no more than thirty days pursuant to the Plan Support Agreement); or

(b)      the Effective Date does not occur on or before November 30, 2011 (or December 30, 2011, if the confirmation deadline is extended pursuant to the preceding clause);

then in the sole discretion of either the Agent or the Settling Builders (i) the Plan and Disclosure Statement shall be withdrawn and have no continuing force or effect, and (ii) the funds remaining in the Term Sheet Escrow (net of $10 million to be paid to the Agent in accordance with the Plan Support Agreement) shall be returned to the Settling Builders.  Upon termination, all parties' rights, defenses, and claims are reserved, and all litigation stays created by the Plan Support Agreement shall terminate; provided, however, that nothing in Section 9.4 of the Plan shall prejudice in any way the rights of the TIP Loan Lenders or the Estate in connection with the TIP Loans.

5.      Satisfaction of Conditions Precedent to Confirmation.

Upon entry of a Confirmation Order in form and substance acceptable to the Plan Proponents, each of the conditions precedent to Confirmation, as set forth in Article 9.1 of the Plan, shall be deemed to have been satisfied or waived in accordance with the Plan.

6.      Effect Of Non-Occurrence Of Conditions To Confirmation.

If the Confirmation Order is vacated for any reason, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the compromise and allowance of Claims and termination of Interests pursuant to the Plan and Bankruptcy Code section 1141 and the assumptions, assignments, or rejections of Executory Contracts or Leases pursuant to Article V of the Plan, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claim, Interests, or Causes of Action; (b) prejudice in any manner the rights of the Plan Proponents, the Prepetition Lenders, the Debtor, the Trustee or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Plan Proponents, the Prepetition Lenders, the Debtor the Trustee or any other Entity.

2430175

M.    Modification, Revocation, or Withdrawal of the Plan.

     1.    Modification and Amendments.

Any modification, alteration or amendment to the Plan shall be agreed to by all of the Plan Proponents.  The Plan Proponents jointly reserve the right to modify the Plan at any time to the extent permitted by, and in accordance with, the Plan Support Agreement, Bankruptcy Code section 1127, and Bankruptcy Rule 3019.

     2.    Effect of Confirmation on Modifications.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

     3.    Revocation or Withdrawal of Plan.

Subject to the terms of the Plan Support Agreement, the Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date or the Effective Date and to file subsequent plans of reorganization.  If the Plan is revoked or withdrawn by either the Agent or all of the Settling Builders, or if Confirmation or consummation of the Plan does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption and assignment or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.  Nothing set forth in the Plan shall impair the rights and obligations existing under the Plan Support Agreement.

N.    Retention of Jurisdiction.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, as set forth in Article X of the Plan.

# ARTICLE V
# STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Plan Confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own attorneys.

A.    The Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation (the "Confirmation Hearing").    Section 1128(b) of the

2430175

Bankruptcy Code provides that any party in interest may object to Confirmation.

**THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON OCTOBER [17], 2011 AT [10:00] A.M. PREVAILING PACIFIC TIME BEFORE THE HONORABLE BRUCE A. MARKELL, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA, LOCATED AT 300 LAS VEGAS BLVD. S., LAS VEGAS, NEVADA 89101. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT THEREOF.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE OCTOBER [7], 2011 AT 4:00 P.M. PREVAILING PACIFIC TIME, IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER FILED AND SERVED ON HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

      B.    <u>Confirmation Standards</u>.

To confirm the Plan, the Bankruptcy Court must find, among other things, that the applicable requirements of section 1129 of the Bankruptcy Code have been satisfied. The requirements of section 1129 of the Bankruptcy Code are listed below:

      1.    the Plan complies with the applicable provisions of the Bankruptcy Code;

      2.    the Plan Proponents will have complied with the applicable provisions of the Bankruptcy Code;

      3.    the Plan has been proposed in good faith and not by any means forbidden by law;

      4.    any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the cases, has been disclosed to the Bankruptcy Court, and any such payment made before the Confirmation is reasonable, or if such payment is to be fixed after the Confirmation, such payment is subject to the approval of the Bankruptcy Court as reasonable;

      5.    with respect to each Class of Impaired Claims or Interests, either each Holder of a Claim or Interest of such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code;

      6.    each Class of Claims or Interests that is entitled to vote on the Plan either has accepted the Plan or is not impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code;

2430175

7.      except to the extent that the Holder of a particular Claim will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative and Allowed Priority Claims will be paid in full on the Effective Date, or as soon as reasonably practicable thereafter;

8.      at least one Class of Impaired Claims or Interests will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Interest of such Class;

9.      Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan;

10.      all fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date;

11.      the Plan addresses payment of retiree benefits, if any, in accordance with section 1114 of the Bankruptcy Code; and

12.      all transfers of property of the Plan will be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

The Plan Proponents believe that the Plan satisfies the requirements of section 1129 of the Bankruptcy Code, including that (a) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code, (b) the Plan Proponents have complied or will have complied with all of the requirements of Chapter 11, and (c) the Plan has been proposed in good faith.

C.      Best Interests of Creditors Test.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation, that each Holder of a Claim or Interest in each Impaired Class: (1) has accepted the Plan or (2) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the Cash proceeds (the "Liquidation Proceeds") that a Chapter 7 trustee would generate if the Chapter 11 Case were converted to a Chapter 7 case and the assets of the Estate were liquidated; (b) determine the distribution ("Liquidation Distribution") that each non-accepting Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in Chapter 7; and (c) compare each Holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such Holder would receive if the Plan were Confirmed and consummated.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7), the Plan Proponents, together with their Professionals, prepared the analysis of estimated distributions to creditors under the Plan set forth below (the "Plan Distribution Analysis") and the Liquidation Analysis attached hereto as **Exhibit C** (to assist in elements (a) and (b) in the prior paragraph).

74

2430175

D.    Financial Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation, that Confirmation is not likely to be followed by the liquidation of the Debtor, unless such liquidation is proposed in the Plan, or the need for further financial reorganization. The Plan contemplates that all Assets ultimately will be sold to Acquirer, and all proceeds received by the Trustee for the Assets will be distributed to creditors pursuant to the terms of the Plan. Since no further reorganization of the Debtor will be possible, the Plan Proponents believe that the Plan meets the feasibility requirement. Moreover, the Plan Proponents believe that sufficient funds exist to make all distributions contemplated by the Plan. Accordingly, the Plan Proponents believe that sufficient funds will exist to make all payments required by the Plan.

1.    Plan Distribution Analysis.

The Plan Distribution Analysis presents estimates of the proceeds that would be available for distribution to creditors if the Plan were confirmed and effectuated according to its terms. In accordance with the Plan Support Agreement and the Plan, the Settling Builders have agreed to fully fund Allowed unclassified claims including Allowed TIP Loan Claims, Allowed Administrative Expense Claims, Allowed Gap Claims, Allowed Agent Adequate Protection Claims, Allowed Priority Tax Claims, and Allowed Professional Compensation Claims. In addition, the Plan provides for unimpaired treatment of Allowed Class S1—Other Secured Claims and Allowed Class S2—LID Claims and the funding of Distributions to Holders of Allowed Class S3—Prepetion Lender Secured Claims, Allowed Class U1—Prepetition Lender Deficiency Claims, and Allowed Class U2—General Unsecured Claims in fixed sums established pursuant to the Plan. The Allowed amount of the Class S3—Prepetition Lender Secured Claims and Class U1—Prepetition Lender Deficiency Claims is determined under Sections 3.4 and 3.5 of the Plan. Accordingly, with respect to estimated recoveries to Holders of Allowed Claims under the Plan, the only variance will be with respect to Holders of Allowed Class U2—General Unsecured Claims, which will depend on the aggregate amount of Allowed Claims included within that class. As set forth in Article III.C.5, the Plan Proponents estimate that the Allowed Claims in Class U2 will range between [$800,000] and [$900,000]. Based on such estimates, the Plan Distribution Analysis includes a high and low range for estimated recoveries for Holders of Claims in Class U2. However, because Holders of Allowed Claims in Class U2 will receive a Proportionate Share of $1 Million, the actual amount received by each Holder of an Allowed Claim will depend upon the total amount of Claims that are allowed in Class U2. Although the Settling Builders believe that the $1 Million allocated for Class U2 will be sufficient to pay all Allowed Claims in that class in full, there can be no assurance of this result. Certain Members And Member Affiliates (who are classified in Class U3) may assert that they are entitled to share in this fund and, if so, Distributions to Holders of Allowed Claims in Class U2 could be diminished significantly.

If the Plan is confirmed, on the Effective Date, the Trustee will transfer the Assets to Acquirer. Consistent with the goals of the Plan discussed in Article IV of this Disclosure Statement, the Plan Distribution Analysis assumes, among other things: (a) the transfer of substantially all of the Assets to Acquirer, (b) a resolution of claims by the Estate Representative; and (c) mitigation of Administrative Claims and other wind-down costs to the extent possible.

2430175

**Plan Distribution Analysis**

| Class | Claim | Projected Recovery Under the Plan | Projected Recovery In A Chapter 7 Liquidation |
|---|---|---|---|
| Unclassified | TIP Loan Claims | 100% | 100% |
| Unclassified | Agent Adequate Protection Claims | 100% | 100% |
| Unclassified | Administrative Expense Claims | 100% | [ ] |
| Unclassified | Priority Tax Claims | 100% | [ ] |
| Unclassified | Gap Claims | 100% | 0% |
| Unclassified | Professional Compensation Claims | 100% | [ ] |
| P1 | Priority Non-Tax Claims | 100% | [ ] |
| S1 | Other Secured Claims | 100% | [ ] |
| S2 | LID Claims | 100% | [ ] |
| S3 | Prepetition Lender Secured Claims | 89.9 – 92.6% | [ ] |
| U1 | Prepetition Lender Deficiency Claims | 1.3-1.8% | 0% |
| U2 | General Unsecured Claims | 100% (subject to dilution if claims in Class U2 exceed $1 million) | 0% |
| U3 | Member Claims (including Claims of Member Affiliates) | 0% | 0% |
| E1 | Equity Interests | 0% | 0% |

THE PLAN PROPONENTS BELIEVE THAT ANY ANALYSIS OF HYPOTHETICAL PLAN DISTRIBUTIONS IS NECESSARILY SPECULATIVE.  THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THESE ESTIMATES THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT LEGAL, ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE PLAN PROPONENTS.  NEITHER THE ESTIMATED PLAN DISTRIBUTIONS, NOR THE FINANCIAL INFORMATION ON WHICH THEY ARE BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS OR PREPARED IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WILL NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE PLAN DISTRIBUTION ANALYSIS.

       2.     Conclusion.

Holders of Allowed Claims in every Class are projected to recover as much or more under the Plan than they would in a chapter 7 liquidation, thus satisfying the "best interests" test.

       E.     <u>Acceptance by Impaired Classes.</u>

The Bankruptcy Code also requires, as a condition to confirmation, that each class of claims or interests that is impaired under a plan accept the plan, with the exception described in

the following section.  A class is "impaired" unless the plan (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or interest entitles the holder of such claim or interest or (2) cures any default and reinstates the original terms of the obligation.  A class that is not "impaired" under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.  Under section 1126(d) of the Bankruptcy Code, a class of interests has accepted the plan if holders of such interests holding at least two-thirds in amount actually voting have voted to accept the plan.

F.    Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan; provided that such plan has been accepted by at least one impaired class.

Section 1129(b) of the Bankruptcy Code states that, notwithstanding the failure of an impaired class to accept a plan of reorganization, the plan will be confirmed, on request of the proponent of the plan, in a procedure commonly known as "cram-down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

In determining whether a plan discriminates unfairly, courts will take into account a number of factors.  Accordingly, two classes of unsecured claims could be treated differently without unfairly discriminating against either class.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the secured claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the debtor's plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the Effective Date, equal to the allowed amount of such claim; or (2) the holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of interests includes the requirements that either: (1) the plan provide that each holder of an interest

77

2430175

in such class receive or retain under the plan, on account of such interest, property of a value, as of the Effective Date, equal to the greater of (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled, or (c) the value of such interest; or (2) if the class does not receive such an amount as required under (1), no class of interests junior to the non-accepting class may receive a distribution under the plan.

The Plan Proponents will seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class, as applicable, presumed to reject the Plan, and the Plan Proponents reserve the right to do so with respect to any other rejecting Class of Claims or Interests, as applicable, or to modify the Plan.   Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Class that is Impaired under the Plan.

The Plan Proponents submit that if they "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan will be structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.

With respect to the unfair discrimination requirement, all unsecured Claims are being treated in a single Class (Class U2), except for (1) the Prepetition Lenders' deficiency (Class U1), which is receiving relatively less favorable treatment ($500,000 divided pro rata among at least $27 million in deficiency Claims) based upon the settlement, and (2) Member, Member Affiliate, and insider Claims (Class U3), which are receiving no distributions.   The Plan Proponents note that (1) the Agent and the Prepetition Lenders have been determined by the Chapter 11 Trustee to have liens on all of the assets of the Estate, (2) the Prepetition Lenders will not be paid in full under the Plan, but rather will be left with a deficiency of at least $42 million, and (3) accordingly, no value is available to pay General Unsecured Claims of the Debtor. Nonetheless, in order to provide for third-party trade creditors who have been affected by the Debtor's bankruptcy, and to minimize the impact of the bankruptcy on the Henderson community and the ability to obtain future credit from third-party vendors in connection with the Inspirada development, the Settling Builders have agreed to contribute $1 million to the payment of non-insider, third-party General Unsecured Claims, and the Agent and the Consenting Prepetition Lenders have agreed that this amount may be paid to such creditors notwithstanding the non-payment in full of the Prepetition Lender Claims.   Because the Plan could be confirmed without the payment of any General Unsecured Claims, and because the payment of General Unsecured Claims is not being done for any improper purpose (such as obtaining the consent of at least one class of creditors), the Plan does not unfairly discriminate by not paying the unsecured claims of insider creditors.   Moreover, the Trustee has scheduled substantial claims of the Settling Builders, and they could assert additional claims.   Those claims are receiving the exact same treatment as all other claims in Class U3.

If the Plan Proponents seek to "cram-down" the Plan on Holders of Secured Claims, all such Holders shall receive a distribution that satisfies the fair and equitable requirement.   The Plan also satisfies the fair and equitable requirement with respect to Holders of Unsecured Claims because even though such Holders will not receive payment in full on account of the Allowed amount of their Claims, no junior Claim or Interest receives any distribution under the Plan.   Holders of Interests will receive no distribution under the Plan, but there is no junior Claim or Interest that will receive any distribution under the Plan either.   Therefore, the

2430175

requirements of section 1129(b) of the Bankruptcy Code would be satisfied in the event that the Plan Proponents are required to "cram down."

## ARTICLE VI
## CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING

HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE DISCLOSURE STATEMENT AND RELATED DOCUMENTS, REFERRED TO OR INCORPORATED BY REFERENCE IN THE DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS ARTICLE PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN AND THE FINANCIAL INFORMATION PROVIDED IN CONNECTION WITH THIS DISCLOSURE STATEMENT. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.    Certain Bankruptcy Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.    The Plan Proponents May Not Be Able to Obtain Confirmation of the Plan.

The Plan Proponents cannot ensure that they will receive the requisite acceptances to confirm the Plan. Even if the Plan Proponents receive the requisite acceptances, the Plan Proponents cannot ensure that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of Claims and Interests might challenge the adequacy of the Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes.

As discussed in greater detail in Article V of this Disclosure Statement, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things: (a) a finding by the Bankruptcy Court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of the plan is not likely to be followed by a liquidation or a need for further financial reorganization; and (c) the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under Chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Plan Proponents believe that the Plan complies with section 1129 of the Bankruptcy Code.

2430175

Confirmation and consummation also are subject to certain conditions described in Article IV.L herein.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive and it is possible that an alternative plan would result in substantially less favorable treatment for Holders of Claims than such Holders would receive under the Plan.

2.      Parties in Interest May Object to the Plan Proponents' Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a Chapter 11 plan may classify a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Plan Proponents believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there is no assurance that the Bankruptcy Court will hold that the Plan's classification of Claims and Interests complies with the Bankruptcy Code.  If the classification of Claims were to change, it is possible that the estimated distributions on Allowed Class U2 General Unsecured Claims would change and possibly be less than what is currently projected.

3.      Parties in Interest May Object to the Plan Proponents' Ability to Confirm the Plan Under Section 1129 of the Bankruptcy Code.

Section 1129 of the Bankruptcy Code provides that a Chapter 11 plan must address certain requirements.  The Plan Proponents believe that the Plan meets all of the statutory requirements, but there is no assurance that the Bankruptcy Court will hold that the Plan complies with section 1129 of the Bankruptcy Code.  If the Bankruptcy Court were to find that the Plan does not meet these statutory prerequisites, then there is a chance that the Plan would not be confirmed by the deadline set forth in the Plan Support Agreement and Plan.  As a result, the Plan Support Agreement would be subject to potential termination, and ultimately lead to the Plan Proponents or the Trustee pursuing their own plans that could be substantially different in structure and claim treatment than what is currently in the Plan.

4.      Failure to Satisfy Vote Requirement.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Plan Proponents intend to seek Confirmation, as promptly as practicable thereafter.  In the event that sufficient votes are not received, the Plan Proponents may propose an alternative Chapter 11 plan, or the Agent, Settling Builders, or Trustee may proffer separate Chapter 11 plans.  There can be no assurance that the terms of any such alternative Chapter 11 plan would be similar to or as favorable to the Holders of Allowed General Unsecured Claims as those proposed in the Plan.  If an alternative reorganization could not be agreed to in a timely manner, it is possible that the Debtor would have to liquidate its assets, in which case it is likely that Holders of Allowed Claims would receive less than they would receive pursuant to the Plan.

5.      The Estate Representative May Object to the Amount or Classification of a Claim.

The Estate Representative reserves the right to object to the amount or the secured or priority status of any Claim or Interest.  The estimates set forth in the Disclosure Statement cannot be relied on by any Holder of a Claims or Interest whose Claim or Interest is subject to an

2430175

objection.  Any such Holder of a Claim or Interest may not receive its specified share of the estimated distributions described in the Disclosure Statement.

6.      The Estimate of Allowed General Unsecured Claims Might Increase.

The Plan contemplates that Holders of Allowed General Unsecured Claims in Class U2 will receive their Pro Rata Share of the General Unsecured Claim Recovery Fund, and based on current estimates, this will provide such creditors with a recovery estimated to be 100% on their Allowed Claims.  However, in the event that the final amount of Allowed General Unsecured Claims is greater than the current projections, the proposed distribution to Class U2 may be revised downwards.

7.      The Prepetition Lenders' Deficiency Claim Might Be Reclassified As A General Unsecured Claim

The Plan classifies the under-secured portion of the Prepetition Lenders' Claim in Class U1 separate from General Unsecured Claims.  If the Prepetition Lenders' Class U1 Claim were to be classified with the General Unsecured Claim in Class U2, then the Prepetition Lenders would no longer be bound by the proposed plan treatment for Class U1, and instead would recover their Proportionate Share of the General Unsecured Claim Recovery Amount, thereby greatly diminishing the estimated recovery for Holders of Allowed General Unsecured Claims.

8.      City May Not Agree to Defer Assumption or Rejection of the Development Agreement.

The Plan Proponents assert that there is legal precedent to defer the Estate's rejection or assumption of the Development Agreement.  The Development Agreement contemplates a community very different from what is currently viable in today's economic environment, and therefore, it must be negotiated and modified in a manner amenable to both the City and the Settling Builders.  However, those negotiations are not easily completed in a matter of weeks. The costs associated with the administration of a Chapter 11 case are too great to allow this Chapter 11 Case to remain open and unresolved for an undetermined period of time.  Therefore, the Plan Proponents seek to confirm the Plan now and allow the negotiations between the City and the Settling Builders without being burdened by the intricacies of a Chapter 11 proceeding. However, should the City not consent to, or object to, the deferral of the decision to assume or reject the Development Agreement, and the Bankruptcy Court does otherwise permit such deferral, then the Plan Proponents may elect not to seek confirmation of the Plan, the Agent, the Settling Builders, or the Trustee will likely pursue their own reorganization or liquidation plans, and creditors' recoveries on their Allowed Claims will likely be very different from those provided for in the Plan.

9.      The Bankruptcy Court May Not Agree to Defer Assumption or Rejection of the Development Agreement.

As noted above, the Plan Proponents assert that there is legal precedent to defer the Estate's rejection or assumption of the Development Agreement.  However, the Plan Proponents can not definitively state that the Bankruptcy Court will agree with their reasoning.  Should the Bankruptcy Court hold that the Development Agreement is an executory contract and the Plan Proponents cannot defer the decision to assume or reject the Development Agreement, then the

2430175

Plan Proponents may elect not to seek confirmation of the Plan, the Agent, the Settling Builders, or the Trustee will likely pursue their own reorganization or liquidation plans, and creditors' recoveries on their Allowed Claims will likely be very different from those provided for in the Plan.

        10.    Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a Chapter 11 plan, a bankruptcy court may nevertheless confirm such plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Plan Proponents believe that the Plan satisfies these requirements and the Plan Proponents may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

        11.    Risk of Non-Occurrence of the Confirmation Date, Effective Date, and Conditions Precedent to the Plan Support Agreement.

Although the Plan Proponents believe that the Confirmation of the Plan will occur on or before October 31, 2011 (or, subject to the mutual agreement of the Plan Proponents, by November 30, 2011), and that the Effective Date will occur within approximately thirty (30) days after the Confirmation Date, there can be no assurance as to such timing. The effectiveness of the Plan is conditioned upon numerous conditions described in Article [9.2] of the Plan. In the event the Effective Date does not occur, the Plan Support Agreement will no longer be binding on the parties thereto. No assurance can be given that these conditions will be satisfied or, if not satisfied, that the Agent, the Settling Builders, and other parties whose consent is required could or would waive such conditions. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will become effective. See Article IV.L, "Summary of the Plan—Conditions Precedent to Confirmation and the Effective Date of the Plan." If the Effective Date does not occur, the Plan Proponents or Trustee may propose and solicit votes on the Plan (as modified) or an alternative plan of reorganization that may not be as favorable to parties in interest as the Plan.

        12.    The Plan Support Agreement May Terminate, Thereby Preventing the Plan Proponents From Consummating the Plan.

To the extent that the terms or conditions of the Plan Support Agreement are not satisfied, or to the extent events giving rise to termination of the Plan Support Agreement occur, the Plan Support Agreement may terminate prior to the Confirmation or the Effective Date of the Plan, which could result in the loss of support for the Plan by important creditor constituents. Any such loss of support could adversely affect the Plan Proponents' ability to confirm and consummate the Plan.

        B.    <u>Disclosure Statement Disclaimer</u>.

        1.    Information Contained Herein Is for Soliciting Votes.

2430175

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

2.     **This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission.**

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws.  Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein.

3.     **No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

This Disclosure Statement is not legal advice to you.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

4.     **No Admissions Made.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

5.     **Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Estate Representative may seek to investigate, file, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

6.     **No Waiver of Right to Object or Right to Recover Transfers and Assets.**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Trustee or the Estate Representative (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets (other than those Causes of Action released under the Plan), regardless of whether any claims or causes of action of the Debtor or its Estate are specifically or generally identified herein.

7.     **Potential Exists for Inaccuracies, and the Plan Proponents Have No Duty to Update.**

2430175

The statements contained in this Disclosure Statement are made by the Plan Proponents as of the date of this Disclosure Statement, unless otherwise specified herein, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth herein since that date. While the Plan Proponents have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Plan Proponents nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Plan Proponents may subsequently update the information in this Disclosure Statement, the Plan Proponents have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

8.      No Representations Outside this Disclosure Statement Are Authorized.

No representations concerning or relating to the Debtor, this Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Plan Proponents, the United States Trustee for the District of Nevada, and the Chapter 11 Trustee.

THESE CONSIDERATIONS CONTAIN CERTAIN STATEMENTS THAT MAY BE "FORWARD–LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. WORDS SUCH AS "EXPECT," "PLANS," "ANTICIPATES," "INDICATES," "BELIEVES," "FORECAST," "GUIDANCE," "OUTLOOK," AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. ADDITIONALLY, FORWARD-LOOKING STATEMENTS INCLUDE STATEMENTS WHICH DO NOT RELATE SOLELY TO HISTORICAL FACTS, SUCH AS STATEMENTS WHICH IDENTIFY UNCERTAINTIES OR TRENDS, DISCUSS THE POSSIBLE FUTURE EFFECTS OF CURRENT KNOWN TRENDS OR UNCERTAINTIES OR WHICH INDICATE THAT THE FUTURE EFFECTS OF KNOWN TRENDS OR UNCERTAINTIES CANNOT BE PREDICTED, GUARANTEED, OR ASSURED. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE PLAN PROPONENTS, INCLUDING, WITHOUT LIMITATION, THOSE DESCRIBED ELSEWHERE IN THIS DISCLOSURE STATEMENT, THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, TERRORIST ACTIONS OR ACTS OF WAR, ACTIONS OF GOVERNMENTAL BODIES, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE PLAN PROPONENTS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS. ADDITIONAL RISKS AND UNCERTAINTIES NOT PRESENTLY KNOWN TO THE PLAN PROPONENTS OR THAT

2430175

THE PLAN PROPONENTS CURRENTLY BELIEVE TO BE IMMATERIAL MAY ALSO IMPAIR THE DEBTOR'S BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS, AND THE VALUE OF THE DEBTOR'S ESTATE.  IF ANY OF THE RISKS OCCUR, THE DEBTOR'S BUSINESS, FINANCIAL CONDITION, OPERATING RESULTS, AND THE VALUE OF THE DEBTOR'S ESTATE, AS WELL AS THE PLAN PROPONENTS' ABILITY TO CONSUMMATE THE PLAN, COULD BE MATERIALLY ADVERSELY AFFECTED.

## ARTICLE VII
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

A.    <u>General</u>.

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtor and certain Holders of Claims.  The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Plan Proponents have not requested and will not request a ruling from the Internal Revenue Service or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the Internal Revenue Service will adopt.  In addition, this summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as Persons who are related to the Debtor within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, investors in pass-through entities, and Holders of Claims who are themselves in bankruptcy).  Holders of Claims should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

This discussion assumes that, except as recharacterized by a Final Order of the Bankruptcy Court, the various debt and other arrangements to which the Debtor is a party will be respected for federal income tax purposes in accordance with their form.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATES INTERNAL

2430175

REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE.   TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE PROMOTION, MARKETING, OR RECOMMENDATION TO ANOTHER PARTY OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

      B.      <u>Consequences of Payment of Allowed Claims Pursuant to the Plan</u>.

The federal income tax consequences to the Holders of Allowed Claims of implementing the Plan will depend on, among other things, the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder receives distributions under the Plan in more than one taxable year, whether the Holder's Claim is Allowed or Disputed on the Effective Date, and whether the Holder has taken a bad debt deduction or worthless security deduction with respect to its Claim.

      1.      Recognition of Gain or Loss.

In general, a Holder of a Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the Holder's basis in the Claim.  The "amount realized" is equal to the sum of the Cash and the fair market value of any other consideration received under the Plan in respect of a Holder's Claim (to the extent that such Cash or other property is not allocable to any portion of the Allowed Claim representing accrued but unpaid interest (see discussion below)).

Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Claim and the Holder, the length of time the Holder held the Claim, and whether the Claim was acquired at a market discount.  If the Holder realizes a capital loss, its deduction of the loss may be subject to limitation.  The Holder's aggregate tax basis for any property received under the Plan generally will equal the amount realized.  The Holder's amount realized generally will equal the sum of the Cash and the fair market value of any other property received (or deemed received) by the Holder under the Plan on the Effective Date or subsequent distribution date, less the amount (if any) allocable to Claims for interest, as discussed below.  The exchanging Holder should consult his or her own tax advisor regarding the possible application of the installment method of accounting under Section 453 of the Tax Code to any gain that the Holder realizes on the deemed exchange.

      2.      Post-Effective Date Cash Distributions.

Because Holders of Allowed Claims, including Disputed Claims that ultimately become Allowed Claims, may receive Cash distributions subsequent to the Effective Date of the Plan, the imputed interest provisions of the Tax Code may apply to treat a portion of the subsequent distributions as imputed interest.  Additionally, because Holders may receive distributions with

respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the Holder may be deferred.  All Holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

3.        Bad Debt and Worthless Securities Deduction.

A Holder who, under the Plan, receives in respect of a Claim an amount less than the Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the Tax Code or a worthless securities deduction under section 165(g) of the Tax Code.  The rules governing the character, timing, and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed.  Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

4.        Reserve for Disputed Claims.

Distributions from the reserves, funds, and escrows established in connection with the Plan will be made to holders of Disputed Claims after such Claims are subsequently Allowed and to holders of Allowed Claims (whether such Claims were Allowed on or after the Effective Date) after Disputed Claims are subsequently disallowed.  Such distributions (other than amounts attributable to earnings) should be taxable to the recipients in accordance with the principles discussed above.

After the Effective Date, the Estate Representative (1) will treat the Disputed Claim Reserve as a disputed ownership fund for federal income tax purposes taxable in accordance with Treasury Regulations Section 1.468B-9, and (2) to the extent permitted by applicable law, to report consistently for state and local income tax purposes.  If such treatment is not available with respect to the Disputed Claim Reserve, then for federal income tax purposes the Estate Representative intends to treat such entity as a trust subject to a separate entity tax.  The Estate Representative will report as subject to a separate entity level tax any amounts earned by such reserves, funds, holdbacks, and escrows.  There can be no assurance that the IRS will agree with the classification of the Disputed Claim Reserve as a disputed ownership funds subject to a separate entity tax for federal income tax purposes, and a different classification could result in a different income tax treatment of the Disputed Claim Reserve, of the Debtor, and of the holders entitled to distributions therefrom.

In light of the foregoing, each Holder entitled to distributions from the Disputed Claim Reserve is urged to contact its tax advisors regarding the potential tax treatment of the Disputed Claim Reserve.

5.        Receipt of Pre-Effective Date Interest.

In general, a Claim of a Holder that was not previously required to include in its taxable income any accrued but unpaid interest arising on the Claim prior to the Effective Date may be required to take such an amount into income as taxable interest.  A Claim of a Holder that was previously required to include in its taxable income any accrued but unpaid interest on the Claim

may be entitled to recognize a deductible loss to the extent that the interest is not satisfied under the Plan. The Plan provides that all distributions to a Holder of an Allowed Claim will be deemed to apply first to the principal amount of the Claim until the principal amount is paid in full, and then the remaining portion of the distributions, if any, will be deemed to apply to any prepetition accrued interest included in the Claim. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to Holders of Allowed Claims is properly allocable to prepetition interest. Each Holder is urged to consult its tax advisor regarding the tax treatment of its distributions under the Plan and the deductibility of any accrued but unpaid interest for federal income tax purposes.

6.      Gain Attributable to Market Discount

Under the "market discount" provisions of Section 1276 and 1278 of the Tax Code, the gain realized by a Holder of a Claim that exchanges a Claim for Cash on or after the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the Claim (or the debt instrument constituting the Claim) that accrued on the Holder's Claim during its holding period (unless the Holder elected to include market discount in income as it accrued). In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" (interest required to be paid at least annually in cash or other property other than debt of the issuer), or (ii) in the case of the debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

7.      Information Reporting and Withholding.

Under the Tax Code's backup withholding rules, the Holder of an Allowed Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the Holder comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Holders of Allowed Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

C.      Tax Consequences of the Plan to the Debtor.

1.      Transfer of the Assets

The Settling Builders believe that the transfer of the Assets to the Acquirer pursuant to Section 6.2 of the Plan should be characterized as a distribution with a carryover basis for tax purposes, in light of the fact that the owners of the Acquirer will be the Settling Builders or their affiliates, who are also members of the Debtor. If, however, notwithstanding the foregoing, the transfer to the Acquirer is treated as a "sale" for tax purposes vis-à-vis a member, it may as to

2430175

that member be treated a taxable sale of the purchased assets.

The Debtor is treated as a partnership for federal income tax purposes and its members are treated as partners. As a partnership, the Debtor is not itself subject to federal income tax. Instead, each person treated as a partner in the Debtor for tax purposes is required to report separately on its own income tax return its allocable share of the Debtor's gains, losses, income, deductions, and credits, including any such amounts attributable to the asset purchase, for the Debtor's taxable year ending with or within the partner's taxable year regardless of whether such partner has received any distributions from the Debtor.

As noted, the Settling Builders do not believe that the transfer of the Assets to the Acquirer would be a taxable event. If it were to be treated as such, however, the Debtor's gain or loss on the asset transfer will be equal to the difference between: (i) the amount paid by the Acquirer in connection with the acquisition of the Assets and the amount of certain liabilities assumed by the Acquirer, and (ii) the Debtor's adjusted basis in the purchased Assets.

2.       Cancellation Of Debt Income

Cancellation of Debt Income ("CODI") is the amount by which discharged indebtedness (reduced by any unamortized discount) exceeds any consideration given in exchange therefor (less any consideration attributable to accrued interest), subject to certain statutory or judicial exceptions that can apply to limit the amount of CODI (such as where the payment of the cancelled debt would have given rise to a tax deduction). As a result of the implementation of the Plan, and in particular the discharge of, and satisfaction of, Claims for Cash, the Debtor is expected to have CODI that will be allocated to persons treated as the Debtor's partners for federal income tax purposes.

There are exceptions to the taxation of CODI for taxpayers that are in bankruptcy or are insolvent (but only to the extent of their insolvency) at the time the CODI is generated. In the case of CODI of an entity taxed as a partnership, a partner's share of partnership CODI is only eligible for the bankruptcy or insolvency exception to the recognition of CODI if the partner is in bankruptcy or is insolvent. As a result, these exceptions may not be available to persons treated as partners in the Debtor for federal income tax purposes. If a Debtor partner is subject to tax on its share of the Debtor CODI, such partner may be able to reduce any such CODI by its share of ordinary losses, if any, generated in connection with the Sale.

D.       Importance of Obtaining Professional Tax Assistance.

**The foregoing discussion is intended only as a summary of certain U.S. Federal income tax consequences of the Plan, and is not a substitute for careful tax planning with a tax professional. The tax consequences are in many cases uncertain and may vary depending on a Holder's individual circumstances. Accordingly, Holders are urged to consult with their tax advisors about federal, state, local and non-U.S. tax consequences of the Plan.**

2430175

## ARTICLE VIII
## SOLICITATION PROCESS

A.    <u>Voting and Solicitation Agent and Securities Voting Agent</u>.

On September [__], 2011, the Bankruptcy Court entered an order (the "Solicitation Procedures Order") approving the adequacy of the Disclosure Statement and approving procedures for the solicitation of votes to accept or reject the Plan (the "Solicitation Procedures").  In addition to approving the Solicitation Procedures, the Solicitation Procedures Order established certain dates and deadlines, including the Record Date (September [7], 2011), the Ballot Deadline (October [7], 2011), the Plan Objection Deadline (October [7], 2011), and the Confirmation Hearing Date (October [17], 2011).  The Solicitation Procedures Order also approved the forms of Ballots and certain Confirmation-related notices.  The Solicitation Procedures Order and the Solicitation Procedures should be read in conjunction with this Article VIII of the Disclosure Statement.  Capitalized terms used in this Article VIII of the Disclosure Statement that are not otherwise defined in the Disclosure Statement or Plan shall have the meanings ascribed to them in the Solicitation Procedures Order.

The Plan Proponents have engaged BMC Group, Inc. to, among other things, act as their voting and solicitation agent in connection with the solicitation of votes to accept or reject the Plan (in such capacity, the "Voting and Solicitation Agent").  The Voting and Solicitation Agent is authorized to assist the Plan Proponents in the following: (1) distributing the Solicitation Packages and soliciting votes on the Plan; (2) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims; (3) responding to inquiries from Holders of Claims and Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Procedures, the Solicitation Package, and all other matters related thereto, including, without limitation, the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, (4) if necessary, contacting creditors and Holders of Claims and Interests regarding the Plan; and (5) filing a Ballot Summary prior to the Confirmation Hearing.

B.    <u>Solicitation Package</u>.

The following documents and materials will constitute the solicitation package (the "Solicitation Package"):

- the Disclosure Statement, as approved by the Bankruptcy Court (with all appendices thereto, including the Plan), the exhibits to the Plan, and any other supplements or amendments to these documents that may be filed with the Bankruptcy Court (which may be provided on a CD-ROM containing electronic copies);

- the Solicitation Procedures Order;

- the Confirmation Hearing Notice; and

- if the intended recipient is in an impaired Class that is entitled to vote on the Plan, the appropriate Ballot(s) and ballot instructions with respect thereto,

2430175

together with a pre-addressed, postage pre-paid return envelope; and

- any supplemental Solicitation Documents the Plan Proponents may file with the Bankruptcy Court or that the Bankruptcy Court orders to be made available.

C.     Distribution of the Solicitation Package.

The Solicitation Package will be distributed in accordance with the Solicitation Procedures to Holders of Claims in voting Classes as of the Record Date. The Solicitation Package (except the Ballots) may also be obtained by accessing the website of the Voting and Solicitation Agent at www.bmcgroup.com/southedge, or by sending a written request to counsel for either of the Plan Proponents: Morrison & Foerster LLP, Attn: Jordan A Wishnew, 1290 Avenue of the Americas, New York, New York 10104, Telephone: (212) 336-4328, E-mail: jwishnew@mofo.com; or Stutman Treister & Glatt, Attn: K. John Shaffer, 1901 Avenue of the Stars, 12th Floor, Los Angeles, California 90067, Telephone: (310) 228-5785, E-mail: jshaffer@stutman.com.

D.     Form of Notice to Unclassified Claims and Unimpaired Classes.

Certain Holders of Claims that are either not entitled to vote because they are unimpaired or are otherwise deemed to accept the Plan under section 1126(f) of the Bankruptcy Code, or not entitled to vote because they will not receive a distribution under the Plan or are otherwise deemed to reject the Plan under section 1126(g) of the Bankruptcy Code, will receive only (i) the Plan and Disclosure Statement, (ii) the Confirmation Hearing Notice and either (a) the Non-Voting Status Notice–Deemed to Accept or (b) the Non-Voting Status Notice–Deemed to Reject, as applicable.

E.     Counterparties to Executory Contracts and Unexpired Leases.

The counterparties to the Executory Contracts and Unexpired Leases listed on Schedule G to the Debtor's Schedules will receive a Solicitation Package pursuant to the procedures outlined in Article VIII.C herein.

F.     Distribution of Materials to the Master Service List and the 2002 List.

Through the Voting and Solicitation Agent, the Plan Proponents also intend to serve on all parties requesting notice pursuant to Bankruptcy Rule 2002 as of the Record Date, either paper copies of, or a CD-ROM containing, the Solicitation Procedures Order, the Disclosure Statement, and all exhibits to the Disclosure Statement, including the Plan, and the Confirmation Hearing Notice. Any party who receives a CD-ROM but desires a paper copy of these documents and any party that desires a CD-ROM or a paper copy of the Solicitation Package (excluding Ballots) may request the copies pursuant to the procedures outlined in Article VIII.C herein.

G.     Publication of the Confirmation Hearing Notice.

Following entry of the Solicitation Procedures Order, the Plan Proponents will publish the abbreviated Confirmation Hearing Notice, which will contain, among other things, the Plan

2430175

Objection Deadline, the Ballot Deadline, and the date that the Confirmation Hearing is first scheduled, in the Las Vegas Review-Journal to provide notification to those Entities that may not receive notice by mail.

# ARTICLE IX
# VOTING INSTRUCTIONS

The following is a brief summary regarding voting on the Plan.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own attorneys.  Additional information regarding voting procedures is set forth in the Solicitation Procedures Order accompanying the Disclosure Statement.  Capitalized terms used in this Article IX that are not otherwise defined herein shall have the meanings ascribed to them in the *Motion for Entry of Order Approving (A) the Disclosure Statement, (b) the Form, Scope, and Nature of Solicitation, Balloting, Tabulation, and Notices with Respect to the Joint Plan of Reorganization Filed by JPMorgan Chase Bank, N.A., as Administrative Agent under the Prepetition Credit Agreement, and the Settling Builders, and (C) Related Confirmation Procedures, Deadlines, and Notices* (the "Solicitation Procedures Motion") and documents filed therewith.

THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL CREDITORS AND INTEREST HOLDERS.  THE PLAN PROPONENTS RECOMMEND THAT ALL CREDITORS ENTITLED TO VOTE SUBMIT BALLOTS VOTING TO ACCEPT THE PLAN.

A.    The Record Date.

The Bankruptcy Court has approved September [7], 2011, as the record date for purposes of determining which creditors and interest holders are entitled to vote on the Plan (the "Record Date").

B.    Solicitation Deadline.

The Plan Proponents will distribute the Solicitation Package to Holders of Claims entitled to vote on the Plan no later than September [13], 2011 (the "Solicitation Deadline").

C.    Ballot Deadline.

The Bankruptcy Court has approved October [7], 2011, at 4:00 p.m., Prevailing Pacific Time, as the Ballot Deadline (the "Ballot Deadline") for submitting Ballots with respect to the Plan.  The Plan Proponents may extend the Ballot Deadline without further order of the Bankruptcy Court, but will document any such extension in the Ballot Summary (each as defined below).  To be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and delivered by: (1) first class mail; (2) overnight courier; or (3) personal delivery, so that they are actually received no later than the Ballot Deadline by the Voting and Solicitation Agent, BMC Group, Inc.

The Ballots will clearly indicate the appropriate return address.  Ballots should be sent to:

2430175

| If Delivered by Mail: | If Delivered by Overnight or Hand Delivery: |
|---|---|
| BMC Group, Inc.<br>Attention: South Edge, LLC Ballot Processing<br>PO Box 3020<br>Chanhassen, MN 55317-3020 | BMC Group, Inc.<br>Attention: South Edge, LLC Ballot Processing<br>18750 Lake Drive East<br>Chanhassen, MN 55317 |

      D.      <u>Holders of Claims Entitled To Vote</u>.

Classes S3, U1, and U2 are Impaired Classes under the Plan and Holders of Claims in such Classes are entitled to receive a distribution under the Plan; therefore, only Holders of a Claim in Classes S3, U1, and U2 as of the Record Date, may vote to accept or reject the Plan.

      E.      <u>Conclusively Presumed Acceptance of the Plan</u>.

Classes P1, S1, and S2 are Unimpaired and conclusively presumed to accept the Plan. Therefore, such Classes are not entitled to vote to accept or reject the Plan and the vote of the Holders of such Claims and Interests will not be solicited.

      F.      <u>Conclusively Presumed Rejection of the Plan</u>.

Classes U3 and E1 will not receive a distribution under the Plan and are conclusively presumed to reject the Plan. Therefore, such Classes are not entitled to vote to accept or reject the Plan and the vote of such Holders of Claims and Interests shall not be solicited.

      G.      <u>Voting Procedures</u>.

All known Holders of Claims entitled to vote on the Plan will be sent a Ballot together with a pre-addressed, postage pre-paid return envelope in accordance with the Solicitation Procedures. Such Holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies the Disclosure Statement. If a Holder holds a Claim in more than one Class, such Holder may receive more than one Ballot.

The Plan Proponents have engaged the Voting and Solicitation Agent to assist Holders of Claims and Interests in the voting process. The Voting and Solicitation Agent will (1) oversee the voting tabulation, (2) answer questions regarding the procedures and requirements for voting on the Plan and for objecting to the Plan, and (3) provide additional copies of all material. The Voting and Solicitation Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

If you have any questions on voting procedures, you may contact the Voting and Solicitation Agent at (**888**) **909-0100**.

Except as specifically agreed to in writing by the Plan Proponents, to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and delivered by: (a) first class mail; (b) overnight courier; or (c) personal delivery, so that they are actually

2430175

received before the Ballot Deadline, by the Voting and Solicitation Agent. The Ballots will clearly indicate the appropriate return address.

        H.    <u>Tabulation Procedures</u>.

        With respect to a Claim in Class U2, the amount of a claim for the purposes of Ballot tabulation will be:

        1.    For a Claim identified in the Schedules as neither contingent, unliquidated, nor disputed, and that is not the subject of an objection filed before the Ballot Deadline (defined below), or that has not been disallowed, waived, or withdrawn by order of the Bankruptcy Court, stipulation, or otherwise prior to the Ballot Deadline, and for which no proof of claim has been timely filed, the claim amount as identified in the Schedules (the "<u>Scheduled Amount</u>");

        2.    For a timely proof of claim that is filed in a specified liquidated amount and that is not the subject of an objection filed before the Ballot Deadline or that has not been disallowed, waived, or withdrawn by order of the Bankruptcy Court, stipulation, or otherwise prior to the Ballot Deadline, the specified liquidated amount in such proof of claim;

        3.    For a timely proof of claim that is filed in a contingent, unliquidated or unknown amount and that is not the subject of an objection filed before the Ballot Deadline or that has not been disallowed, waived, or withdrawn by order of the Bankruptcy Court, stipulation, or otherwise prior to the Ballot Deadline, such claim will count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as a Ballot for Claims in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code; and

        4.    For a Claim that is the subject of an objection before the Ballot Deadline, only the undisputed amount, if any, of such Claim, unless such claim is temporarily allowed under Bankruptcy Rule 3018(a) at or prior to the Confirmation Hearing. Any creditor whose claim is the subject of an objection may nonetheless tender a ballot, which shall only be counted as it relates to the disputed amount of such Claim upon the temporary allowance of such Claim for voting purposes.

        With respect to a Claim in Class S3 or Class U1, the amount of such claim for the purpose of Ballot tabulation will be the obligations due under the Prepetition Credit Agreement as of the Petition Date to each Prepetition Lender as reflected in the books and records of the Agent as of the Record Date (**September [7], 2011**), without regard to whether a proof of claim has been filed and without regard to the identities of the Prepetition Lenders listed on the Debtor's Schedules.

        Except with respect to Class S3 and Class U1, if an entity submits a ballot for a claim (i) for which there is no timely proof of claim filed and for which there is no corresponding

2430175

Scheduled Amount, or (ii) which is the subject of an unresolved objection filed prior to the Confirmation Hearing, such ballot will not be counted unless otherwise ordered by the Bankruptcy Court.

The amount of the Claim established under these procedures shall control for voting purposes only and shall not constitute the Allowed amount of any Claim. Moreover, any amounts filled in on Ballots by the Plan Proponents through the Voting and Solicitation Agent are not binding for any purposes, including for purposes of voting and distribution.

The following voting procedures and standard assumptions will be used in tabulating Ballots:

5.     BMC, in its capacity as the Voting and Solicitation Agent, will tabulate the Class U2 Ballots and the Prepetition Lenders' Ballots. Pursuant to Local Rule 3018(a), the Voting and Solicitation Agent will prepare and file a ballot summary (the "Ballot Summary") no later than one business day prior to the Confirmation Hearing.

a.     The Plan Proponents will file the Ballot Summary one business day prior to the Confirmation Hearing and provide notice of the Ballot Summary to the Debtor, the Chapter 11 Trustee, the U.S. Trustee, all parties who have requested notice pursuant to Bankruptcy Rule 2002, and all parties who have timely filed an objection to the Plan by the Plan Objection Deadline. The Plan Proponents will also deliver a copy of the Ballot Summary to the chambers of the Honorable Bruce A. Markell at 300 Las Vegas Blvd. S., Las Vegas, NV 89101.

b.     The Ballot Summary will, among other things, (i) describe each Class and whether or not it is Impaired; (ii) provide the number of votes received, the number of votes voting to accept the Plan and their aggregate dollar amount, and the number of votes voting to reject the Plan and their aggregate dollar amount; (iii) indicate whether the Plan has received sufficient votes to be confirmed; (iv) delineate every irregular Ballot including, without limitation, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lack signatures or lack necessary information, received via facsimile or electronic mail, or damaged. The Ballot Summary will indicate the Plan Proponents' intentions with regard to irregular Ballots.

6.     Except as otherwise provided in the Solicitation Procedures, unless the Ballot being furnished is timely submitted on or prior to the Ballot Deadline, the Plan Proponents will reject such Ballot as invalid and, therefore, decline to count it in connection with Confirmation of the Plan.

7.     The Voting and Solicitation Agent will date all Ballots when received. The Voting and Solicitation Agent will retain the original Ballots and an electronic copy of the same for a period of one year after the Ballot Deadline, unless otherwise ordered by the Bankruptcy Court.

2430175

8.      An original executed Ballot is required to be submitted by the party submitting such Ballot.  Delivery of a Ballot to the Voting and Solicitation Agent by facsimile, e-mail, or any other electronic means will not be valid.

9.      The method of delivery of Ballots to the Voting and Solicitation Agent is at the election and risk of each Holder of a Claim.  Except as otherwise provided in the Solicitation Procedures Order, delivery will be deemed made only when the Voting and Solicitation Agent actually receives the originally executed Ballot.

10.     No Ballot should be sent to the Bankruptcy Court, Clerk of the Bankruptcy Court, the Debtor, the Trustee, the Plan Proponents or their agents (other than the Voting and Solicitation Agent) or financial or legal advisors, and if so sent will not be counted.

11.     If multiple Ballots are received from the same Holder of a Claim with respect to the same Claim prior to the Ballot Deadline, the latest dated, validly executed Ballot timely received will supersede and revoke any prior Ballot.

12.     Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split their votes.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.  Further, if a Holder has multiple Claims within the same Class, the Plan Proponents may, in their discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes.

13.     Any creditor that requires additional copies of a Ballot may obtain an additional Ballot pursuant to the instructions set forth in the Confirmation Hearing Notice and the proposed Ballots.

14.     A person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity must indicate such capacity when signing and, if required or requested by the Voting and Solicitation Agent, the Plan Proponents, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.

15.     Subject to any contrary order of the Bankruptcy Court, the Plan Proponents reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Plan Proponents, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; provided, that any such rejections shall be documented in the Ballot Summary.

16.     The following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains

96

insufficient information to permit the identification of the Holder of the Claim; (b) any Ballot cast by a party that does not hold a Claim in a Class that is entitled to vote on the Plan; (c) any Ballot cast for a Claim scheduled as contingent, disputed, or unliquidated or for which the applicable Bar Date has passed and no Proof of Claim was timely filed; (d) any unsigned Ballot; (e) any Ballot marked both to accept and reject the Plan; (f) any Ballot sent by facsimile or other electronic means; and (g) any Ballot submitted by any party not entitled to vote pursuant to the Solicitation Procedures; and (h) any Ballot that is incomplete; provided, however, that any Ballot that is signed but that does not indicate an acceptance or rejection of the Plan shall be deemed to be a Ballot accepting the Plan.

17.    The Plan Proponents, subject to contrary order of the Bankruptcy Court, may waive any defects or irregularities as to any particular Ballot at any time, either before or after the close of voting; provided, that any such waivers will be documented in the Ballot Summary.

18.    Neither the Plan Proponents, nor any other party, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Ballot Summary, nor will any party incur any liability for failure to provide such notification.

19.    Unless waived by the Plan Proponents, subject to a contrary order of the Bankruptcy Court, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Ballot Deadline or such Ballots will not be counted.

20.    In the event a designation for lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected by such Claim.

I.    Votes Required for Acceptance by a Class.

The Classes entitled to vote will have accepted the Plan if (1) Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan and (2) Holders of more than one-half in number of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan.

THE PLAN PROPONENTS WILL SEEK CONFIRMATION OF THE PLAN UNDER SECTION 1129(B) OF THE BANKRUPTCY CODE WITH RESPECT TO ANY IMPAIRED CLASSES PRESUMED TO REJECT THE PLAN, AND THE PLAN PROPONENTS RESERVE THE RIGHT TO DO SO WITH RESPECT TO ANY OTHER REJECTING CLASS OR TO MODIFY THE PLAN.

2430175

## ARTICLE X
## RECOMMENDATION

In the opinion of the Plan Proponents, the Plan is preferable to the alternatives described herein because it provides for a larger distribution to the Holders of Claims than would otherwise result in a liquidation under Chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased Administrative Claims resulting in smaller distributions to the Holders of Claims.  **Accordingly, the Plan Proponents recommend that Holders of Claims entitled to vote on the Plan support Confirmation and vote to accept the Plan.  The Trustee also supports Confirmation of the Plan subject to and in accordance with the Trustee's Consent.**

2430175

Respectfully Submitted,

__/s/ Robert M. Charles, Jr.___  (#6593)_____

LEWIS AND ROCA LLP
Robert M. Charles, Jr.
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169-5996
Telephone:  (702) 949-8320
Facsimile:  (702) 949-8321
E-mail:    rcharles@LRLaw.com

MORRISON & FOERSTER LLP
G. Larry Engel (admitted *pro hac vice*)
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522
E-mail:    lengel@mofo.com

Norman S. Rosenbaum (admitted *pro hac vice*)
Jordan A. Wishnew (admitted *pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
E-mail:    nrosenbaum@mofo.com
E-mail:    jwishnew@mofo.com

Attorneys for JPMorgan Chase Bank, N.A., as Administrative Agent

__/s/ Richard McKnight_____
LAW OFFICES OF RICHARD McKNIGHT
Richard McKnight (Nevada Bar No. 001313)
330 S. Third Street #900
Las Vegas, Nevada 89101
Telephone:    (702) 388-7185
Facsimile:    (702) 388-0108
E-mail:        rmcknight@lawlasvegas.com

STUTMAN,  TREISTER  &  GLATT  PC
Robert A. Greenfield (admitted *pro hac vice*)
K. John Shaffer (admitted *pro hac vice*)
Anthony Arnold (admitted *pro hac vice*)
1901 Avenue of the Stars, 12th Floor
Los Angeles, California  90067
Telephone:    (310) 228-5600
Facsimile:    (310) 228-5788
E-mail:        rgreenfield@stutman.com
E-mail:        jshaffer@stutman.com
E-mail:        aarnold@stutman.com

Attorneys for the Settling Builders

2430175